## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MONTGOMERY ROAD I** | ) | |
| **LIMITED PARTNERSHIP,** | ) | |
| | ) | |
| **Plaintiff/** | ) | |
| **Counter-Defendant,** | ) | |
| | ) | **Case No. 1:06CV00344 (HHK)** |
| **and** | ) | |
| | ) | |
| **MONTGOMERY ROAD TDR, LLC,** | ) | |
| | ) | |
| **Third-Party Defendant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VIAD CORP,** | ) | |
| | ) | |
| **Defendant/** | ) | |
| **Counter-Plaintiff/** | ) | |
| **Third-Party Plaintiff.** | ) | |
| | ) | |

### MOTION OF MONTGOMERY ROAD I LIMITED PARTNERSHIP
### AND MONTGOMERY ROAD TDR, LLC FOR SUMMARY JUDGMENT

Plaintiff/Counterdefendant Montgomery Road I Limited Partnership ("Montgomery Road") and

Third-Party Defendant Montgomery Road TDR, LLC, by and through their undersigned counsel, hereby

move for summary judgment on Montgomery Road's Complaint and on the Counterclaim of Viad Corp.

In support hereof, they submit the accompanying Memorandum of Points and Authorities and the Statement

of Undisputed Material Facts.

Respectfully submitted,


COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
Phone:(202)537-0700
Fax:     (202)364-3664
efiling@cootermangold.com

*Attorneys  for   Plaintiff/Counterdefendant
Montgomery Road I  Limited  Partnership and Third-
Party  Defendant Montgomery Road TDR, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 29th day of March, 2007, a copy of the MOTION OF MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC FOR SUMMARY JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES, STATEMENT OF MATERIAL FACTS NOT IN DISPUTE and EXHIBITS in support thereof, and proposed ORDER was served upon the following counsel, by electronic transmission through the ECF system:

Rodney F. Page, Esq.
Alicia Hogges-Thomas, Esq.
Bryan Cave LLP
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C. 20005


_____/s/_____
Donna S. Mangold

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MONTGOMERY ROAD I** ) | |
| **LIMITED PARTNERSHIP,** ) | |
| ) | |
| **Plaintiff/** ) | |
| **Counter-Defendant,** ) | |
| ) | **Case No. 1:06CV00344 (HHK)** |
| **and** ) | |
| ) | |
| **MONTGOMERY ROAD TDR, LLC,** ) | |
| ) | |
| **Third-Party Defendant,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **VIAD CORP,** ) | |
| ) | |
| **Defendant/** ) | |
| **Counter-Plaintiff/** ) | |
| **Third-Party Plaintiff.** ) | |
| ) | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS FILED IN SUPPORT OF
MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD
TDR'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1 of the Local Rules of Civil Procedure and in support of their Motion

for Summary Judgment, Plaintiff/Counterdefendant Montgomery Road I Limited Partnership ("Montgomery

Road ") and Third-Party Defendant Montgomery Road TDR, LLC ("Montgomery Road TDR"), by and

1

through their undersigned counsel, hereby submit this Statement of Undisputed Material Facts[1] and state

as follows:

_____

[1] The following Exhibits, filed simultaneously herewith, are submitted in support of the Motion for Summary Judgment, the Memorandum in Support thereof, and this Statement of Undisputed Material Facts:

| | | |
|---|---|---|
| 1 | 3/29/07 | Declaration of Steven Braesch |
| 2 | 3/28/07 | Declaration of Ronald Glassman |
| 3 | 3/29/07 | Declaration of Donna S. Mangold |
| 4 | 3/26/07 | Declaration of Samuel G. Rose |
| 5 | 11/28/06 | Excerpts of Deposition Tr. of Steven Braesch |
| 6 | 11/7/06 | Excerpts of Deposition Tr. of Eve Fiorucci |
| 7 | 2/15/07 | Excerpts of Deposition Tr. of Cynthia Giordano |
| 8 | 11/28/06 | Excerpts of Deposition Tr. of Ronald Glassman |
| 9 | 2/20/07 | Excerpts of Deposition Tr. of Steve Halbert |
| 10 | 11/28/06 | Excerpts of Deposition Tr. of Reid Liffmann |
| 11 | 11/14/06 | Excerpts of Deposition Tr. of Samuel G. Rose |
| 12 | 11/30/06 | Excerpts of Deposition Tr. of Brent Solomon |
| 13 | 11/30/87 | Cash Participation Agreement |
| 14 | 3/2/89 | First Amendment to Cash Participation Agreement |
| 15 | 7/02/99 | Letter from Kenneth Goldman to Reid Liffman |
| 16 | 10/1/99 | Agreement re: Transferable Development Rights |
| 17 | 10/1/99 | Certificate of Transfer of Development Rights |
| 18 | 6/27/00 | Letter of transmittal and Special Purpose Financial Statements as of December 31, 1999 |
| 19 | 8/23/00 | Letter from Kenneth Goldman to Samuel Rose |
| 20 | 9/12/00 | Letter from Reid Liffmann to Kenneth Goldman |
| 21 | 10/2/00 | Letter from Kenneth Goldman to Reid Liffman |
| 22 | 11/30/00 | Assignment from TLC to Viad |
| 23 | 6/10/02 | Notes of telephone conversation between Eve Fiorucci and Samuel Rose |
| 24 | 3/02/05 | Letter from Eve Fiorucci to Brent Solomon |
| 25 | 3/30/05 | Letter from Gerald Katz to Brent Solomon |
| 26 | 4/10/05 | Letter from Brent Solomon to Samuel Rose (Reznick Opinion) |
| 27 | 6/24/06 | Appraisal of 90 K Street |
| 28 | 11/21/06 | Letter of transmittal and 2005 Revised Special Purpose Financial Statements |

2

1. Greenebaum & Rose Associates ("G&R") is a real estate development firm with offices in Washington, D.C. and Baltimore Maryland. Declaration of Samuel Rose at ¶1.

2. Samuel G. Rose ("Rose") and Stewart J. Greenebaum ("Greenebaum") are the principals of G&R. Declaration of Samuel Rose at ¶2.

3. G&R typically sets up separate entities to own the properties in which it invests. The Plaintiff in this case, Montgomery Road I Limited Partnership ("Montgomery Road") is one of those entities. Declaration of Samuel Rose at ¶3. Montgomery Road is a Maryland limited partnership formed for the purpose of owning real property. Declaration of Samuel Rose at ¶3. The limited partners of Montgomery Road are Reid Liffmann ("Liffmann"), Steven Braesch ("Braesch"), SJG Holdings, LLC (owned by Greenebaum and/or his family members) and the Samuel G. Rose Revocable Trust. Declaration of Samuel Rose at ¶3. Rose, Greenebaum, Liffmann, and Braesch and all employees of G&R. Declaration of Samuel Rose at ¶3. Montgomery Road TDR, LLC ("Montgomery Road TDR"), a Maryland limited liability company is a non-land owning entity created by Montgomery Road in 2006 to acquire and hold the Future TDRs. Declaration of Steven Braesch at ¶19. Steven Braesch, Reid Liffmann, SJ Holdings, Inc., and the Samuel G. Rose Revocable Trust are the members of Montgomery Road TDR. Declaration of Steven Braesch at ¶19.

## THE PURCHASE AND FINANCING OF 90 K STREET

4. In late 1987, Montgomery Road purchased the property located at First and K Streets, N.E. ("90 K Street" or "the Property") for approximately $11 million from Transportation Leasing Company ("Transportation Leasing"), which is the predecessor in interest to Viad Corp. ("Viad"), the Defendant in this case. Transcript of Deposition of Ronald Glassman ("Glassman Tr.") at 11; Declaration of Samuel

Rose at ¶4.   Montgomery Road owned and maintained 90 K Street for twenty years, until January 2007.

Declaration of Samuel Rose at ¶4.  At the time it was acquired, 90 K Street was, and remains, a vacant

lot. Rose Tr. at 56; Exhibit 9 (Transcript of Deposition of Steve Halbert ("Halbert Tr.") at 21); Viad's

Answer to ¶12 of the First Amended Complaint

     5.   At the time of the purchase of the Property, Transportation Leasing and Montgomery Road

entered into a Cash Participation Agreement.  Exhibit 13.  The Cash Participation Agreement was drafted

by outside counsel for Transportation Leasing.  Transcript of Deposition of Eve Fiourucci ("Fiorucci Tr.")

at 65 ; Declaration of Samuel Rose at ¶5.  Pursuant to the Cash Participation Agreement, under certain

circumstances, Transportation Leasing would receive 15% of any cash flow generated by the operation

of the property ("Operations Cash Flow") and 15% of the net proceeds generated by the sale, disposition,

or refinancing of the property ("Appreciation Cash Flow").  See Cash Participation Agreement at §§ 1.27,

1.28, 2.1, and 3.1.

     6.   At the time Montgomery Road acquired 90 K Street in 1987, a $10.3 million mortgage was

placed on 90 K Street with Yorkridge-Calvert Savings and Loan ("Yorkridge-Calvert").  Declaration of

Samuel Rose at ¶6.   On March 1, 1989, a second mortgage in the amount of $1.5 million was placed on

90 K Street with Yorkridge-Calvert to fund operating deficits, including interest paid on the mortgage.

Declaration of Samuel Rose at ¶6.

     7.   Montgomery Road paid interest on both loans on an ongoing basis, and Stewart Greenebaum

and Samuel Rose personally guaranteed the loans.  Declaration of Samuel Rose at ¶7.

     8.   Montgomery Road and Transportation Leasing amended the Cash Participation Agreement in

1989, effective retroactively as of December 9, 1987, to revise the definition of "Senior Mortgage" in

Section 1.39 to clarify that mortgages and deeds of trust executed after the initial loan closing for specified purposes would be superior to Transportation Leasing's interest. Specifically, the amendment was executed to make clear that debts incurred to fund carrying costs (such as the $1.5 million second mortgage) would be senior to Transportation Leasing's interest. Exhibit 14; Declaration of Samuel Rose at ¶8.

9. In 1990, Yorkridge-Calvert encountered financial difficulties and came under the control of the Resolution Trust Company (the "RTC"). Declaration of Samuel Rose at ¶9; Transcript of Deposition of Samuel Rose ("Rose Tr.") at 186. Thereafter, Montgomery Road was required to and did pay off the $1.5 million second trust in 1992, as a condition of obtaining a two-year extension on the loan. Declaration of Samuel Rose at ¶9.

10. The RTC sold the first mortgage to Sun Chase Bank of Phoenix. Montgomery Road continued to pay interest on that loan to Sun Chase until 1996. Declaration of Samuel Rose at ¶10.

11. S&S Finance Limited Partnership ("S&S Finance") is an "in house" bank for all G&R projects; the limited partners of S&S Finance are the Stewart J. Greenebaum Revocable Trust and the Samuel G. Rose Revocable Trust. Declaration of Samuel Rose at ¶11.

12. In 1996, S&S Finance purchased the Sun Chase note for approximately $9.3 million. At the time of S&S Finance's purchase of the note, the real estate business suffered from a massive liquidity crisis. Declaration of Samuel Rose at ¶12. This enabled S&S Finance to purchase the loan at a discount (in the amount of $1,027,139). Declaration of Samuel Rose at ¶12.

13. S&S Finance held the first mortgage on 90 K Street until the sale of the property in January 2007, and a Deed of Trust securing its position was recorded in the land records of the District of

Columbia.  Declaration of Samuel Rose at ¶13.  From 1996 to date, S&S Finance charged the Property

1.5% over prime on the first mortgage, which was at or below the market rate.  See, e.g., Declaration of

Ronald Glassman at ¶¶11, 12; Declaration of Samuel Rose at ¶13; Exhibit 18 (Special Purpose Financial

Statements as of December 31, 1999 at 9 (note 3));  This was consistent with Section 2.3 (b) of the Cash

Participation Agreement ("Permitted Debt") which provides that debt can be held by a related company

so long as it charges interest at or below the rates charged by other financial institutions on similar real

estate loans.  Declaration of Samuel Rose at ¶13.

### THE RECLASSIFICATION OF DEBT TO EQUITY AND THE SPECIAL PURPOSE FINANCIAL STATEMENTS

14.  In 1997, Montgomery Road's accountants reclassified approximately $7.3 million of the first

mortgage debt to equity.  Declaration of Samuel Rose at ¶14; Declaration of Ronald Glassman at ¶9.  The

reason for this reclassification was for internal tax reasons, relating to the fact that the interest income in

S&S Finance could not be offset by the interest expense in Montgomery Road for Maryland state tax

purposes.  Declaration of Samuel Rose at ¶14; Declaration of Ronald Glassman at ¶9.

15.  Pursuant to the Cash Participation Agreement, Montgomery Road prepared Special Purpose

Financial Statements ("Special Purpose Statements") which were provided to Transportation Leasing

annually.  Declaration of Samuel Rose at ¶15; Declaration of Ronald Glassman at ¶10.  Although the

reclassification referred to in the foregoing paragraph was for internal tax reasons, and had nothing to do

with the Cash Participation Agreement, Ronald Glassman, G&R's in-house accountant, carried the

reclassification through to the Special Purpose Statements prepared for the years 1997 through 1999.

Declaration of Samuel Rose at ¶15; Declaration of Ronald Glassman at ¶10.  Mr. Glassman reduced the

6

first mortgage debt by $7.3 million, which had the effect of increasing the amounts under the label "Developer's Invested Equity" (a term used in the Cash Participation Agreement).  See Exhibit 18 (Special Purpose Financial Statements as of December 31, 1999 at 8,  9 (note 3)), and 10-11 (note 6); See also Declaration of Samuel Rose at ¶15; Declaration of Ronald Glassman at ¶10.   He then included the annual interest expense on that increase in Developer's Invested Equity under the label "Developer's Equity Return" (another term used in the Cash Participation Agreement).    Declaration of Samuel Rose at ¶15; Declaration of Ronald Glassman at ¶10.  Without regard to the label however, the economic reality of the situation is that the funds provided by S&S Finance (the $7.3 million as well as other funds) were provided by S&S Finance with the absolute intention of earning a return on those funds.  Declaration of Samuel Rose at ¶15; Declaration of Ronald Glassman at ¶14.  Therefore, the amounts categorized as "Developer's Equity Return" on the Special Purpose Statements (prior to the 2005 Revision described below) are in fact interest expense.  Declaration of Samuel Rose at ¶15; Declaration of Ronald Glassman at ¶14.

16. Beginning in 2000, Mr. Glassman eliminated the re-classification, and treated the entire $9.3 million first mortgage as debt, and it continued to carry a rate of interest of 1.5% over prime.  Declaration of Ronald Glassman at ¶11.

17. In November 2006, Mr. Glassman prepared Montgomery Road's revised Special Purpose Financial Statement for the period from 1987 through December 31, 2005 (see Exhibit 28 ("2005 Revised Special Purpose Statement")), which reflect the amounts as interest expense, not as "Developer's Equity Return." Declaration of Ronald Glassman at ¶15.  This revision is discussed more fully below.

18. Although Stewart Greenebaum and Samuel Rose have limited partnership interests in both Montgomery Road and S&S Finance (through trusts and a family partnership), they always intended that

the funds invested into Montgomery Road, including the $7.3 million portion of the first mortgage which S&S Finance held, were to have earned interest. Declaration of Samuel Rose at ¶17. S&S Finance is not a partner in Montgomery Road, and it never has been; it is a separate legal entity and its ownership is different than the ownership of Montgomery Road, in which Reid Liffmann and Steven Braesch are also limited partners. Declaration of Samuel Rose at ¶17.

19.     S&S Finance funds projects under the G&R umbrella. Declaration of Samuel Rose at ¶18. Certain real estate, like 90 K Street, is not income producing. With such non-income producing properties, there are no monies available to pay for the costs of maintaining the property. These costs (which for 90 K Street were in the millions of dollars) include expenses such as real estate taxes, assessments, bid pursuit costs, and insurance. Montgomery Road has paid all of the real estate taxes, interest and other payments on the property, and has managed and marketed the 90 K Street property at a substantial loss (prior to the sale in January 2007). Declaration of Samuel Rose at ¶18. Montgomery Road has funded these costs and operating deficits (via cash infusions from S&S Finance) with no contribution from Defendant Viad or its predecessor Transportation Leasing. Declaration of Samuel Rose at ¶18.

## THE DISPUTE DEVELOPS

20.     On or about June 26, 2000, Montgomery Road notified Transportation Leasing of a pending sale of the Property pursuant to Section 4.1 of the Cash Participation Agreement. Viad's Answer to ¶13 of the First Amended Complaint. As stated in the notice, the sale price of the Property was $24,975,000 with expected net proceeds of approximately $23 million. Viad's Answer to ¶13 of the First Amended Complaint. Montgomery Road calculated its cost basis on the property, including the interest and other charges which had been reflected on the Special Purpose Financial Statements as Developer's Invested

Equity, Developer's Operating Equity, Developer's Equity Return, and the balance of the first mortgage. Viad's Answer to ¶13 of the First Amended Complaint. Those costs were estimated to be in excess of $29,000,000. Declaration of Samuel Rose at ¶19. As a result, there would be no positive cash flow (and thus, no Cash Appreciation Payment) from the sale transaction. As part of this pending transaction, however, Montgomery Road sought to resolve any outstanding title issues created by the Cash Participation Agreement including obtaining from Transportation Leasing a waiver of its right of first refusal and the release of any lien on the Property. Viad's Answer to ¶13 of the First Amended Complaint; Declaration of Samuel Rose at ¶19.

21. In response, in August 2000, Transportation Leasing contended that the interest expense, categorized on the Special Purpose Financial Statements as "Developers Equity Return," could not be subtracted in calculating the Appreciation Cash Flow. Exhibit 19. It was Transportation Leasing's position that if the pending sale took place, Transportation Leasing would be entitled to a substantial six-figure Cash Appreciation Payment. See Exhibit 19 (8/23/00 letter from Kenneth Goldman to Samuel Rose). Specifically, Transportation Leasing claimed that under the definition of "Appreciation Cash Flow" in Section 3.1 of the Cash Participation Agreement, the category "Developer's Equity Return" was not a permitted subtraction. Id.; Declaration of Samuel Rose at ¶20. Thus, it was Transportation Leasing's position (and it is now Viad's position) that the interest on the funds provided by S&S Finance are not a proper deduction when calculating the Appreciation Cash Flow, simply because the interest expense was labeled as "Developer's Equity Return" in Montgomery Road's Special Purpose Statements. Declaration of Samuel Rose at ¶20.

22.  Transportation Leasing also questioned whether the acquisition of the first mortgage by Montgomery Road's affiliate, S&S Finance, was a "Refinancing" under Section 3.2(b) of the Cash Participation Agreement, which would have triggered a disclosure by Montgomery Road and an analysis of whether a Cash Appreciation Payment was due to Transportation Leasing.   Declaration of Samuel Rose at ¶21; Viad's Answer to ¶15 of the First Amended Complaint.

23.  For reasons unrelated to this lawsuit, the proposed 2000 sale of the 90 K Street property did not take place.   Declaration of Samuel Rose at ¶22; Viad's Answer to ¶17 of the First Amended Complaint.

24.  In November 2000, Transportation Leasing assigned its interest in the Cash Participation Agreement to Viad.   Exhibit 22.

### THE REZNICK OPINION

25.  The dispute between the parties remained concerning the meaning and application of certain terms of the Cash Participation Agreement, and the Special Purpose Statements.   Viad's Answer to ¶17 of the First Amended Complaint. In 2005, Montgomery Road and Viad agreed to seek a resolution of the dispute by submitting the matter to the Reznick Group, an independent accounting firm.   Consistent with §2.7 of the Cash Participation Agreement, the Reznick Group was selected by Viad.   Montgomery Road, however, paid the cost of the review.   Declaration of Samuel Rose at ¶24; See also Rose Tr. at 75,77, 78, 86; Fiorucci Tr. at 45; Viad's Answer to ¶18 of the Amended Complaint.   Specifically, the parties sought the interpretation, analysis, and application of certain terms of the Cash Participation Agreement. See Exhibit 24 (3/2/05 letter from Eve Fiorucci to Brent Solomon); Exhibit 25 (3/30/05 letter from Gerald Katz to Brent Solomon).   In addition, the parties asked the independent accountants to analyze the

10

classification of certain costs and charges, and prepare a pro-forma calculation under the Cash Participation Agreement for the hypothetical sale of the Property. Id. Both parties were permitted to, and did, submit position papers and any relevant materials. Exhibits 24, 25. On March 2, 2005, Defendant Viad submitted its position paper plus nine related exhibits. Exhibit 24. In the cover letter transmitting its position papers and other documents, Viad stated to the Reznick Group that neither Viad nor TLC would be bound by the opinion rendered. See Exhibit 24 (3/2/05 letter from Eve Fiorucci to Brent Solomon). Montgomery Road submitted its position paper on March 30, 2005. Exhibit 25. In addition to the parties' position papers, the Reznick Group reviewed and analyzed the Cash Participation Agreement, the 1989 First Amendment thereto, and the Special Purpose Financial Statements for the years 2002 and 2003. See Exhibit 26 (4/10/05 Brent Solomon letter to Samuel Rose (the "Reznick Opinion")).

26. On April 10, 2005 the Reznick Group rendered its opinion, which found in favor of Montgomery Road on five of the six issues submitted to them. Exhibit 26 (Reznick Opinion at 2-4). The Reznick Group also determined that as of December 31, 2003, 90 K Street would have to command a selling price in excess of $37.8 million for Viad to be entitled to any Cash Appreciation Payment under the terms of the Cash Participation Agreement. Exhibit 26 (Reznick Opinion at Exhibit A). Exhibit 26 is a true and correct copy of the Reznick Opinion. Declaration of Samuel Rose at ¶25.

27. Pursuant to §2.7 of the Cash Participation Agreement, "the determination [of the accountant] shall be final." Cash Participation Agreement at §2.7. Viad however, refused to be bound by the Reznick Group's conclusions. Declaration of Samuel Rose at ¶26; Viad Answer to ¶21 of the First Amended Complaint.

11

28. Thereafter, this litigation was instituted by Montgomery Road in January 2006, to seek a declaration of the parties' rights under the Cash Participation Agreement. Declaration of Samuel Rose at ¶27. Viad has taken the position in this litigation (as it did in August 2000, and during the Reznick review in 2005) that it was entitled to an Appreciation Cash Payment (provided for under §3.1 of the Cash Participation Agreement) which is calculated without any offset for interest owed to S&S Finance for either the first mortgage it held or the funds it advanced to maintain the property. Declaration of Samuel Rose at ¶27.

## MONTGOMERY ROAD'S SALE OF 90 K STREET

29. While this litigation has been pending, in August 2006, Montgomery Road received an offer to purchase 90 K Street from an unrelated third party, TC MidAtlantic Development, Inc. ("TC MidAtlantic"). Declaration of Samuel Rose at ¶28; Viad's Answer to ¶22 of the Amended Complaint. In addition, TC MidAtlantic also offered to purchase the adjacent property located at 45 L Street, N.E., from an affiliate of Montgomery Road, 45 L Street Venture, LLC. ("45 L Venture"). Declaration of Samuel Rose at ¶28.[2]

30. The various agreements with TC MidAtlantic also included the purchase of certain transferable development rights ("TDRs") that had been, or will be acquired in the future. Viad's Answer to ¶23 of the Amended Complaint.

31. On August 15, 2006, Montgomery Road notified Viad of the offer to purchase, pursuant to the right of first refusal provisions set forth in Section 4.1(a) of the Cash Participation Agreement. Viad

---

[2] 45 L Street is not an issue in this litigation.

12

did not exercise its right of first refusal. Declaration of Samuel Rose at ¶30; Viad's Answer to ¶24 of the Amended Complaint.

32. On November 2, 2006, Montgomery Road notified Viad that the agreements with TC MidAtlantic had been modified (to adjust the purchase price and address a future potential contingent liability), and on that same date, Montgomery Road provided Viad with the modified contracts, so as to comply with the right of first refusal provisions set forth in Section 4.1(c) of the Cash Participation Agreement. Viad's Answer to ¶25 of the Amended Complaint. Viad did not exercise its right of first refusal. Declaration of Samuel Rose at ¶31; Viad's Answer to ¶25 of the Amended Complaint.

33. The land sale portion of the TC MidAtlantic transaction closed in January 2007; and the first portion of the TDR sale also closed. The land itself was sold to TC Midatlantic for approximately $46 million. Declaration of Steven Braesch at ¶20. Montgomery Road sold the currently existing 90 K Street TDRs to TC Midatlantic for approximately $8 million by way of purchase agreement that was separate from the purchase agreement for the land at 90 K Street. Declaration of Steven Braesch at ¶20. Under the purchase agreement, Montgomery Road is obligated to acquire and transfer to TC Midatlantic additional TDRs. Declaration of Steven Braesch at ¶20. When these additional TDRs are delivered to TC Midatlantic (sometime between January 11, 2009 and June 11, 2009), Montgomery Road will be paid an additional $13 million. Declaration of Steven Braesch at ¶20. Prior to closing, and to secure the release of Viad's lien on the property (securing Montgomery Road's obligations under the Cash Participation Agreement) Montgomery Road and Viad entered into an agreement whereby $4.5 million of the sale proceeds was put into a jointly-controlled account pending the resolution of this dispute. Declaration of Samuel Rose at ¶34.

13

## THE TDR'S

34.    In its Counterclaim, Viad has taken the position that, as a component of any Appreciation Cash Payment, Viad is also entitled to 15% of the value of the TDRs included in the purchase by TC MidAtlantic.  Viad's Answer to ¶27 of the Amended Complaint.

35.    Pursuant to the First Amendment of Purchase and Sale of Transferable Development Rights between Montgomery Road and TC MidAtlantic, dated October 31, 2006, the purchase price of the TDRs to be purchased from Montgomery Road is $21,387,929.00.   Declaration of Samuel Rose at ¶33.

36.    Real Property, Property and Improvements are all defined terms under the Cash Participation Agreement.  1.21 defines "improvements" as "all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the real property."  1.32 defines "Property" as "the Improvements and the Real Property."  1.35 defines "Real Property" as "that certain land, more fully described in Exhibit 'A' made a part of this Agreement by reference hereto."

37. Viad's expert, Cynthia Girodano, testified that "commodity" is an apt description for TDRs. Exhibit 7 (Transcript of Deposition of Cynthia Girodano ("Girodano Tr.")) at 24; see also Exhibit 5 (Transcript of Deposition of Steven Braesch ("Braesch Tr.")) at 18, 63, 68 (describing TDRs as commodities that are fungible and able to be moved to different properties); Exhibit 1 (Declaration of Steven Braesch ("Braesch Decl.")) at ¶6; Exhibit 10 (Transcript of Deposition of Reid Liffmann ("Liffmann Tr.")) at 31 (describing TDRs as a "commodity that is freely traded back and forth between developers and users").

38.    In 1987, when MRLP purchased 90 K Street from Transportation Leasing and the parties entered into the Cash Participation Agreement, TDRs did not exist - not in general and not the specific ones

14

at issue in this case. Exhibit 1 (Braesch Decl.) at ¶4. D.C. had not yet passed the regulations creating the TDRs. Braesch Decl. at ¶4. It was not until 1991 that the D.C. Council passed regulations creating TDRs. Braesch Decl. at ¶4. The regulations were passed under the authority of the D.C. Zoning Act. Braesch Decl. at ¶4.

39.    The regulations (set out in Title 11 of the D.C. Municipal Regulations) "authorize the transfer of development rights from a project with the DD Overlay District to a receiving lot or lots located elsewhere in the DD Overlay District or in the Downtown East, New Downtown, or other receiving zones or sites pursuant to this section." 11 DCMR 1709.1. See Braesch Decl. at ¶¶7, 8. In general, under the regulatory scheme approving TDRs, a developer who engages in a qualifying development activity (*e.g.*, historic preservation or residential rehabilitation)) can generate additional development rights and, once certified by the District of Columbia, can apply to move development rights from that area and project - the "sending site" - and transfer them to a different area and project – the "receiving site." Braesch Decl. at ¶7. Once TDRs are transferred to a qualified site in a receiving zone, or to a "receiving entity" that does not own land (TDRs may be purchased by an entity or individual that intends to hold the TDRs for resale at a future date), the receiving site benefits in that the development rights of the receiving site will be increased to an amount greater than would otherwise be available in the receiving site without TDRs. Braesch Decl. at ¶7.

40. In the District of Columbia, the creation and transfer of TDRs is accomplished in a three-step process. Braesch Decl. at ¶9. First, the District of Columbia and the owner of the sending site enter into a "Transfer of Development Rights Covenant" (the "TDR Covenant"). Braesch Decl. at ¶9; 11 DCMR 1709.3. Pursuant to the TDR Covenant, the owner of the sending site agrees that development of the

15

sending site will be undertaken in a way that furthers the purposes of the of the Downtown Development

District. Braesch Decl. at ¶9. In exchange, the District of Columbia agrees to grant the owner of the

sending site TDRs pursuant to which the sending site can transfer its bonus gross floor area to a receiving

site or to an entity. Braesch Decl. at ¶9. The TDR Covenant is recorded in the District of Columbia land

records. Braesch Decl. at ¶9; 11 DCMR 1709.3; 11 DCMR 1709.11. The content and form of TDR

Covenant is approved by the District of Columbia. Braesch Decl. at ¶9.

41. The second step in the process occurs when the owner of the sending site enters into an

agreement with the owner of a receiving site to transfer the TDRs from the sending site to the receiving site

or to an entity. Braesch Decl. at ¶10. This agreement of transfer is entered into between the owners of

the sending and receiving sites and sets forth the consideration being paid and the number of square feet

of development rights being transferred. Braesch Decl. at ¶10. This purchase agreement is typically

negotiated between the purchaser (owner of receiving lot or non-land owning entity) and the seller (owner

of sending lot) and need not be approved as to form or content by the District of Columbia. Braesch Decl.

at ¶10.

42. The third step in the process occurs when the owner of the sending lot and the owner of the

receiving lot or purchasing entity and the District of Columbia enter into a Certificate of Transfer of

Development Rights ("TDR Certificate"). Braesch Decl. at ¶11. The TDR Certificate is an instrument of

transfer of the TDRs from the sending lot to the receiving lot or non-land owning entity. Braesch Decl. at

¶11; Braesch Tr. at 22-23. Like the TDR Covenant, the form and content of the TDR Certificate is subject

to approval by the District of Columbia and is recorded in the District of Columbia land records. Braesch

Decl. at ¶11. Once TDRs have been transferred to a receiving site or non-land owning entity, they may

16

later be re-transferred to a receiving site or if already on a receiving site, may be re-transferred to another receiving site. Braesch Decl. at ¶12. See also 11 DCMR 1709.8; 11 DCMR 1709.9.

43.    There are three sets of TDRs which are at issue in this litigation. Braesch Decl. at ¶13. The first set of TDRs were purchased by MRLP from Manufacturers Life Insurance Company ("ManLife TDRs"). Braesch Decl. at ¶13; Braesch Tr. at 21. The second set of TDRs (the "E Street TDRs") was transferred by a Carr America entity as part of a transaction whereby a G&R entity (other than Montgomery Road) sold property bordered by 6th, 7th, E and F Streets, Northwest in Washington, D.C.(the "E Street Property") to Carr America in 2002 but retained the right to any TDRs that might subsequently be generated on the E Street Property (which was a qualified "sending site"). Braesch Decl. at ¶13; Braesch Tr. at 61-62. Carr America did subsequently generate TDRs and transferred them in late 2003 to Montgomery Road at G&R's direction. Braesch Decl. at ¶13. The third set of TDRs has not yet been acquired by Montgomery Road ("Future TDRs"). Braesch Decl. at ¶13.

44. The ManLife TDRs consisted of 7,500 square feet of gross floor area (as that term is defined in the zoning regulations) and were sold by Manufacturers Life Insurance Company ("Manufacturers Life") as the owner of the sending lot to Montgomery Road as the owner of the receiving lot (90 K Street). Braesch Decl. at ¶14; Braesch Tr. at 22. The sale was made pursuant to an Agreement Concerning Transferable Development Rights made as of October 1, 1999 (*twelve  years **after** the Cash Participation Agreement was entered into by MRLP and TLC*). Braesch Decl. at ¶14. See Exhibit 16 (A true and correct copy of pertinent portions of the Agreement).  As part of the same transaction, an additional 2,500 square feet of TDRs (which are not at issue in this litigation) were sold by Manufacturers Life to Swanee Limited Partnership (1,250 square feet) as the owner of a receiving lot and to Sliver

17

Building Limited Partnership (1,250 square feet) as the owner of another receiving lot. Braesch Decl. at ¶14; Braesch Tr. at 19, 22. Manufacturers Life sold the 10,000 square feet of TDRs for $300,000. Braesch Decl. at ¶14; Braesch Tr. at 23-24. Manufacturers Life originally acquired the 10,000 square feet of TDRs in 1994 pursuant to the Transfer of Development Rights Covenant entered into between Manufacturers Life and the District of Columbia. Braesch Decl. at ¶14. In addition to the ManLife TDRs purchase agreement, the parties (Manufacturers Life and Montgomery Road) and the District of Columbia executed a "Certificate of Transfer of Development Rights" ("Certificate of Transfer") (Exhibit 17). Braesch Decl. at ¶15. The Certificate of Transfer provides (at ¶8 on page 3) that the TDRs which are the subject of the Certificate of Transfer may be "further transferred from the Receiving Lot and vested in one or more 'receiving lots' or "receiving zone lots." Braesch Decl. at ¶15.

45. 90 K Street became the receiving site of the E Street TDRs in October 2003. Braesch Decl. at ¶16. Prior to October of 2003, a G&R entity had owned and subsequently sold the E Street Property. Braesch Decl. at ¶16. However, G&R retained the right to all TDR's generated by the E Street Property whether before or after the sale. Braesch Decl. at ¶16. The E Street Property became a sending site for TDRs based on completion of a qualified residential development. Braesch Decl. at ¶16. G&R decided to transfer 112,606 square fee of TDRs from the E Street Property sending lot to MLRP (90 K Street) as the receiving lot in October 2003. Braesch Decl. at ¶16. MRLP paid no additional consideration at the time these TDRs were transferred other than the legal and transactions costs. Braesch Decl. at ¶16.

46. 90 K Street is the receiving lot for both the ManLife TDRs and the E Street TDRs. Braesch Decl. at ¶17. The TDRs do not inure as a natural benefit to or reflect value of 90 K Street. Braesch Decl. at ¶17. Just as Manufacturers Life in 1999 divided its 10,000 square feet of TDRs among three receiving

18

sites, MRLP could have transferred one or both sets of TDRs from 90 K Street to another receiving site, just as TCMD could do now. Braesch Decl. at ¶17. MRLP never used either the ManLife TDRs or the E Street TDRs for development at 90 K Street. Braesch Decl. at ¶18. These TDRs always remained available for further transfer to other receiving lots. Braesch Decl. at ¶18.

47. Concurrently with its sale to TC MidAtlantic of the land at 90 K Street, MRLP also sold both the ManLife TDRs and the E Street TDRs to TC MidAtlantic. Braesch Decl. at ¶19. Under its sales agreement, Montgomery Road is obligated to cause Montgomery Road TDR, LLC to acquire 124,000 square feet of additional TDRs (the Future TDRs) which will then be transferred to TC MidAtlantic as part of TC MidAtlantic 's purchase of 90 K Street. Braesch Decl. at ¶19. Montgomery Road TDR, LLC is a non-land owning entity created by Montgomery Road in 2006 to acquire and hold the Future TDRs. Braesch Decl. at ¶19. Pursuant to the agreement with TC MidAtlantic, Montgomery Road TDR has until June 2009 within which to acquire and transfer the Future TDRs to TCMD. Braesch Decl. at ¶19.

48. Montgomery Road sold the 90 K Street TDRs (comprised of the ManLife TDRs and the E Street TDRs) to TC MidAtlantic by way of purchase agreement that was separate from the purchase agreement for the land at 90 K Street. Braesch Decl. at ¶20. The sale of TDRs may or may not be done concurrently with a land sale. Braesch Decl. at ¶20. TDRs are freely saleable commodities without regard to the sale of the land itself. Braesch Decl. at ¶20. Here, Montgomery Road did not buy land from Manufacturers Life, for instance, but it did buy TDRs from Manufacturers Life. Braesch Decl. at ¶20. Similarly, G&R sold the E Street land to Carr America, but it did not sell the rights to the E Street TDRs to Carr America as part of that transaction. Braesch Decl. at ¶20.

19

49. One of the documents produced by Ms. Giordano (expert for Viad) at her deposition was an Appraisal of Real Property as of June 24, 2006 regarding 90 K Street ("6/24/06 Appraisal"). The 6/24/06 Appraisal was prepared by Viad's valuation expert, Steve Halbert. Halbert Tr. at 19. This appraisal identifies the "site improvements" as the "sidewalks, curbs and drainage." Exhibit 27 (pertinent portions of 6/24/06 Appraisal) at 24 (Bates Numbered VD-001470). Noticeably absent are TDRs. When asked at her deposition what an improvement on real estate is, Ms. Giordano testified that "in a general – you know, sense, an improvement is usually a building or a structure." Giordano Tr. at 31. When Mr. Halbert was asked whether the 90 K Street site was improved, Mr. Halbert answered: "If you mean by improved is there a proposed office building on it yet, no. There are parking spaces. So it's improved with sidewalks and asphalt parking." Halbert Tr. at 21. When asked whether there were any other improvements, Mr. Halbert responded that he did not recall any others. Halbert Tr. at 22.[3] Mr. Halbert then described "improvements" in the context of something that would be "demolished" in the event of redevelopment. Halbert Tr. at 22-23. Pursuant to the testimony of Viad's experts, TDRs are neither improvements nor land.

## THE 2005 REVISED SPECIAL PURPOSE FINANCIAL STATEMENTS

50. In November 2006, Ronald Glassman prepared the 2005 Revised Special Purpose Statements for the period from 1987 through December 31, 2005 (Exhibit 28); Declaration of Ronald Glassman at ¶15. The 2005 Revised Special Purpose Statements identify the amounts owing to S&S Finance as debt and the interest thereon as an expense, and contain other corrections to accurately reflect

---

[3]  After Mr. Halbert's recollection was later refreshed, he recalled that the site was also improved with drainage. Halbert Tr. at 27.

the economic reality of what had occurred since Montgomery Road's purchase of the 90 K Street in 1987. Declaration of Samuel Rose at ¶35; Declaration of Ronald Glassman at ¶16. The main reason the financial statements were revised is because S&S Finance funds projects under the G&R umbrella and expects a return on the funds it advances, and because the categorization of those funds as equity, when in fact it was debt, was incorrect. Liffman Tr. at 20. None of the corrections were made to deprive Viad of rights under the Cash Participation Agreement; rather they were made to accurately reflect the economic reality of the advances made by S&S Finance throughout the period of Montgomery Road's twenty year ownership of the Property. Declaration of Samuel Rose at ¶35.

51. The 2005 Revised Special Purpose Statement reflect the amounts advanced by S&S Finance as debt and the interest thereon as interest expense, not as "Developer's Equity Return." Declaration of Ronald Glassman at ¶15; Liffman Tr. at 33-35; 40-41 (because S&S finance is not a partner of Montgomery Road, it could not put equity in; only debt).

52. The 2005 Revised Special Purpose Statements also contain corrections in three other areas to accurately reflect the economic reality of what had occurred since Montgomery Road's purchase of 90 K Street in 1987. Liffman Tr. at 18; Declaration of Ronald Glassman at ¶15. Those corrections addressed the treatment of the loan discount which S&S Finance obtained when it purchased the Sun Chase note in 1996, the accounting for the cost of the TDR's, and the rate of interest on advances from S&S Finance. Declaration of Ronald Glassman at ¶15. The revision maintains the interest rate on the first mortgage (principal amount of approximately $10.3 million) at 1.5% over prime. Id. As to the advances by S&S Finance for other expenses, Mr. Glassman calculated the interest rate for those amounts at 2% over prime.

21

Id.  The rate of interest of 2% over prime does not exceed the market rate.  Declaration of Samuel Rose at ¶35; see also Declaration of Ronald Glassman at ¶15.

53.  As set forth in the 2005 Revised Special Purpose Statement at page 2,  the liabilities for 90 K Street (as of December 31, 2005), are as follows:

| | |
|---|---|
| First Mortgage Note Payable | $10,297,139 |
| Loan Payable S&S Finance | 18,874,695[4] |
| Metro Station Assessment Payable | 26,407 |
| Accrued Interest S&S Finance | 16,768,203[5] |
| Accrued Real Estate Taxes | 93,962 |
| Total Liabilities | $46,061,871 |

See Liffman Tr. at 45-46 ($18,874,695 loan payable to S&S Finance and $16,768,203 interest to S&S Finance are corrections as a result change of classification of S&S transactions from equity to debt).

54.  With regard to the loan discount, S&S Finance purchased the Sun Chase note at a discount (in the amount of $1,027,139) in 1996.  Declaration of Ronald Glassman at ¶15. That discount should not result in a reduction of the principal balance on the mortgage owed by Montgomery Road:  Montgomery Road should owe the same principal amount to S&S Finance as it owed to Sun Chase.  Id.  To the extent that the earlier Special Purpose Statements reflected such a discount benefitting Montgomery Road, it was erroneous.  Id. The 2005 Revision corrected this error to eliminate the discount.  Id.; Liffman Tr. at 32-33, 44-45 (reversal of the loan discount).

---

[4]  See Exhibit 28 (2005 Revised Special Purpose Statement) at 8, "Schedule of S&S Loan Activity" for the ending loan balance.

[5]  See Id. for the detail of the interest calculation at 2% over prime.

55.   With regard to the adjustment on the TDRs, the cost ($938,341) of the ManLife TDRs and the E Street TDRs was originally reflected as an expense on the Special Purpose Financial Statements provided to Viad. Braesch Decl. at ¶21.  However, this was an error because the costs of these TDRs were not part of the 90 K Street property.  Braesch Decl. at ¶21. Rather, TDRs are a commodity that is freely traded back and forth between developers and users.  Braesch Decl. at ¶21; Liffman Tr. at 31. Montgomery Road determined that charging the expense of the purchased TDRs to Montgomery Road was not proper absent a development of the Property.  Braesch Decl. at ¶21. The Property was not developed.  Braesch Decl. at ¶21.  Rather it has been sold, and the Property and the TDRs have been sold pursuant to separate contracts.  Braesch Decl. at ¶21.  Because Viad is not entitled the value of the TDRs, it was not a correct cost deduction on the Special Purpose Financial Statements.  Braesch Decl. at ¶21; Liffman Tr. at 30.  In addition, neither Viad nor Transportation Leasing provided any contribution for the purchase of the TDR's.  Braesch Decl. at ¶21; Rose Declaration at ¶29. Therefore, one of the revisions which is reflected in the 2005 Revised Special Purpose Financial Statements provided to Viad in November 2006 is the removal of these costs.  Braesch Decl. at ¶21.

Respectfully submitted,


COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


            /s/
_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
Phone:(202)537-0700
Fax:     (202)364-3664
efiling@cootermangold.com

*Attorneys  for   Plaintiff/Counterdefendant
Montgomery Road I Limited   Partnership and Third-
Party  Defendant Montgomery Road TDR, LLC*

24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MONTGOMERY ROAD I**<br>**LIMITED PARTNERSHIP,**<br><br>    **Plaintiff/**<br>    **Counter-Defendant,**<br><br>    **and**<br><br>**MONTGOMERY ROAD TDR, LLC,**<br><br>    **Third-Party Defendant,**<br><br>    **v.**<br><br>**VIAD CORP,**<br><br>    **Defendant/**<br>    **Counter-Plaintiff/**<br>    **Third-Party Plaintiff.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Case No. 1:06CV00344 (HHK)**

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC FOR SUMMARY JUDGMENT

Respectfully submitted,

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.
5301 Wisconsin Avenue, N.W., Suite 500
Washington, D.C.  20015
Phone:(202)537-0700
Fax:    (202)364-3664
efiling@cootermangold.com

*Attorneys   for   Plaintiff/Counterdefendant*
*Montgomery  Road I Limited   Partnership  and Third-*
*Party  Defendant Montgomery Road TDR, LLC*

# TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

FACTS AND CHRONOLOGY OF KEY EVENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.      THE SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     THE DISPUTE BETWEEN THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

III.    THE REZNICK OPINION IS BINDING ON THE PARTIES . . . . . . . . . . . . . . . 9

IV.     THE REZNICK OPINION'S RESOLUTION OF ISSUES 1 - 5 IS
        SUPPORTED BY THE TERMS OF THE CASH PARTICIPATION
        AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

        A.      Developer's Equity Return is Properly Deductible in the
                Appreciation Cash Flow Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.      S&S Finance's Acquisition of the Mortgage was not a Refinancing . . . . . . . 16

        C.      Amounts Advanced to Pay Interest or other Expenses Should
                Be Included in Developer's Operating Equity . . . . . . . . . . . . . . . . . . . . . . . 17

        D.      Computations of Operations Cash Flow and
                Developer's Operating Equity are Not Impacted by the
                Form the Interest Obligation Takes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        E.      The First Mortgage Was Debt, Not Equity . . . . . . . . . . . . . . . . . . . . . . . . 20

        F.      Deduction for Interest Charged should be Reduced to
                Reflect Loan Discount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

V.      TREATING THE S&S ADVANCES AS PERMITTED DEBT
        PROVIDES AN ALTERNATIVE APPROACH UNDER THE
        CASH PARTICIPATION AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

VI.    THE TDRs SHOULD NOT BE INCLUDED IN THE CASH
APPRECIATION CALCULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    A. TDRs In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

    B. The History of TDRs in the District of Columbia . . . . . . . . . . . . . . . . . . . . . 32

    C. The TDRs In This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

VII.    MONTGOMERY ROAD IS ENTITLED TO SUMMARY
JUDGMENT ON VIAD'S CLAIM OF BREACH OF IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING . . . . . . . . . . . . . . . . . . 39

    A.    Montgomery Road Did Not Owe A Duty Of Good
Faith And Fair Dealing To Viad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    B.    Even if Montgomery Road Owed A Duty of Good
Faith and Fair Dealing, It Did Not Breach The Duty . . . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Plaintiff/Counterdefendant Montgomery Road I Limited Partnership ("Montgomery Road") and

Third-Party Defendant Montgomery Road TDR, LLC ("Montgomery Road TDR"), by and through their

undersigned counsel, hereby submit this Memorandum of Points and Authorities in support of their Motion

for Summary Judgment on Montgomery Road's Complaint and on the Counterclaim of Viad Corp ("Viad")

against Montgomery Road and Montgomery Road TDR and state as follows:

## INTRODUCTION[6]

Montgomery Road is a Maryland limited partnership formed for the purpose of owning real

property. Stewart J. Greenebaum and Samuel G. Rose (via trusts) , as well as Steven Braesch and Reid

Liffmann are limited partners of Montgomery Road. At the time this lawsuit was filed and continuing

through early January 2007, Montgomery Road owned the property located at First and K Streets, N.E.

("90 K Street" or "the Property") in Washington, D.C., which is a vacant lot. Defendant Viad is a

Delaware corporation and the parent company and successor in interest to Transportation Leasing

Company ("Transportation Leasing"), a California corporation whose assets are now liquidated.

Montgomery Road purchased 90 K Street from Transportation Leasing on or about December 9, 1987,

for approximately $11 million dollars. In connection with that sale, Montgomery Road and Transportation

Leasing executed a "Cash Participation Agreement" (Exhibit 13),[7] which contemplated that under certain

---

[6] Record citations to the factual statements in this Introduction are set forth in the accompanying Statement of Material Facts Not in Dispute.

[7] The following Exhibits, filed simultaneously herewith, are submitted in support of the Motion for Summary Judgment, this Memorandum in Support thereof, and the Statement of Material Facts Not in Dispute:

| | | |
|---|---|---|
| 1 | 3/29/07 | Declaration of Steven Braesch |
| 2 | 3/28/07 | Declaration of Ronald Glassman |
| 3 | 3/29/07 | Declaration of Donna S. Mangold |
| 4 | 3/26/07 | Declaration of Samuel G. Rose |

circumstances Transportation Leasing would receive 15% of any cash flow generated by the operation of the property ("Operations Cash Flow") and 15% of the net proceeds generated by the sale, disposition, or refinancing of the property ("Appreciation Cash Payment").  Under the terms of the Cash Participation Agreement, which was drafted by attorneys for Transportation Leasing, Montgomery Road was to be provided with a complete return of, and return on, its investment – including a return on its equity, and a payoff of all debt, including interest – before Transportation Leasing was permitted any participation in Appreciation Cash Flow.  The Cash Participation Agreement also gave Transportation Leasing the right

| 5  | 11/28/06 | Excerpts of Deposition Tr. of Steven Braesch |
| 6  | 11/7/06  | Excerpts of Deposition Tr. of Eve Fiorucci |
| 7  | 2/15/07  | Excerpts of Deposition Tr. of Cynthia Giordano |
| 8  | 11/28/06 | Excerpts of Deposition Tr. of Ronald Glassman |
| 9  | 2/20/07  | Excerpts of Deposition Tr. of Steve Halbert |
| 10 | 11/28/06 | Excerpts of Deposition Tr. of Reid Liffmann |
| 11 | 11/14/06 | Excerpts of Deposition Tr. of Samuel G. Rose |
| 12 | 11/30/06 | Excerpts of Deposition Tr. of Brent Solomon |
| 13 | 11/30/87 | Cash Participation Agreement |
| 14 | 3/2/89   | First Amendment to Cash Participation Agreement |
| 15 | 7/02/99  | Letter from Kenneth Goldman to Reid Liffman |
| 16 | 10/1/99  | Agreement re: Transferable Development Rights |
| 17 | 10/1/99  | Certificate of Transfer of Development Rights |
| 18 | 6/27/00  | Letter of transmittal and Special Purpose Financial Statements as of December 31, 1999 |
| 19 | 8/23/00  | Letter from Kenneth Goldman to Samuel Rose |
| 20 | 9/12/00  | Letter from Reid Liffmann to Kenneth Goldman |
| 21 | 10/2/00  | Letter from Kenneth Goldman to Reid Liffmann |
| 22 | 11/30/00 | Assignment from TLC to Viad |
| 23 | 6/10/02  | Notes of telephone conversation between Eve Fiorucci and Samuel Rose |
| 24 | 3/02/05  | Letter from Eve Fiorucci to Brent Solomon |
| 25 | 3/30/05  | Letter from Gerald Katz to Brent Solomon |
| 26 | 4/10/05  | Letter from Brent Solomon to Samuel Rose (Reznick Opinion) |
| 27 | 6/24/06  | Appraisal of 90 K Street |
| 28 | 11/21/06 | Letter of transmittal and 2005 Revised Special Purpose Financial Statements |

of first refusal to purchase the Property. Transportation Leasing's interest in the property was secured by a Deed of Trust recorded on December 10, 1987 in the land records of the District of Columbia.

This litigation resulted from a dispute between Montgomery Road and Viad regarding Viad's rights to the Appreciation Cash Payment under the Cash Participation Agreement. Viad has interpreted the Cash Participation Agreement and 90 K Street accounting information to conclude that it has valuable cash appreciation rights. Montgomery Road interprets the Cash Participation Agreement and 90 K Street accounting information to conclude that Viad's cash appreciation rights should be valued at zero. Notwithstanding the fact that Montgomery Road's interpretation has been confirmed by a neutral accounting firm consulted by the parties, and that the accountant's conclusions are binding pursuant to Section 2.7 of the Cash Participation Agreement, Viad refuses to abide by the accounting firm's conclusions. Montgomery Road filed this litigation in January 2006[8] to obtain a declaration of its rights under the Cash Participation Agreement. On December 8, 2006, Montgomery Road filed its First Amended Complaint. On January 3, 2007, Viad filed a Counterclaim seeking a declaration of its rights under the Cash Participation Agreement and also joining Montgomery Road TDR as a third-party Defendant. As explained below, Montgomery Road TDR is an entity created by Montgomery Road to hold Transferable Development Rights ("TDRs"). In its Counterclaim, Viad asserts that the TDRs should be included in the cash participation and/or cash appreciation calculations with a resulting cash value to Viad.[9]

_____

[8] Montgomery Road filed its Complaint in the District of Columbia Superior Court and Viad removed it to this Court.

[9] In January 2007, after this litigation was filed, Montgomery Road sold 90 K Street for approximately $46 million to TC MidAtlantic Development, Inc. ("TC Midatlantic"). By way of

While literally tens of thousand of pages of documents have been produced by the parties, the resolution to this dispute can be found in the express terms of the Cash Participation Agreement.[10] The facts that are material to the declarations of rights sought by Montgomery Road and by Viad, and to Viad's claim for damages (by way of attorneys fees) based on the implied covenant of good faith and fair dealing, are not in dispute and this case is appropriate for resolution by summary judgment.[11] Montgomery Road and Montgomery Road TDR respectfully request the Court to enter summary judgment in their favor and against Viad on all claims herein.

## FACTS AND CHRONOLOGY OF KEY EVENTS

Pursuant to Local Rule 56.1, Montgomery Road and Montgomery Road TDR are filing concurrently herewith their separate Statement of Material Facts as to which there is no genuine issue.  The Statement of Material Facts contains detailed facts as well as their evidentiary support.  The following is a chronology of the key events described by the Statement of Material Facts:

• November 1987 - Montgomery Road purchased the property located at First and K Streets, N.E. ("90 K Street" or "the Property") for approximately $11 million from Transportation Leasing Company ("Transportation Leasing"), which is the predecessor in interest to Viad Corp. ("Viad"), the

---

separate purchase agreement, Montgomery Road sold its then existing TDRs to TC MidAtlantic for $8 million.  Montgomery Road is obligated under its purchase agreement to provide TC Midatlantic with additional TDRs between January 11, 2009 and June 11, 2009.  At the time those additional TDRs are delivered, TC Midatlantic will pay an additional $13 million.

[10] The Cash Participation Agreement, as drafted by counsel for Transportation Leasing, is admittedly cumbersome to decipher, but that alone does not preclude summary adjudication of the claims in this litigation.

[11] Indeed, a vast majority of the facts in this case have been admitted by Viad in its Answer to the First Amended Complaint.

Defendant in this case.  At the same time, Transportation Leasing and Montgomery Road entered into a Cash Participation Agreement.  Pursuant to the Cash Participation Agreement, under certain circumstances, Transportation Leasing would receive 15% of any cash flow generated by the operation of the property ("Operations Cash Flow") and 15% of the net proceeds generated by the sale, disposition, or refinancing of the property ("Appreciation Cash Flow").  At the time Montgomery Road acquired 90 K Street in 1987, a $10.3 million mortgage was placed on 90 K Street.

• 1996 - S&S Finance Limited Partnership ("S&S Finance") (an "in house" bank for all G&R projects) purchased the mortgage note for approximately $9.3 million (at a discount of approximately $1 million).  S&S Finance held the first mortgage on 90 K Street until the sale of the property in January 2007.

• 1997 - Montgomery Road's accountants reclassified approximately $7.3 million of the first mortgage debt to equity.  Although the reclassification was for internal tax reasons, and had nothing to do with the Cash Participation Agreement, Ronald Glassman, G&R's in-house accountant, carried the reclassification through to the 1997-1999 Special Purpose Financial Statements (which were provided to Transportation Leasing annually).

• 2000-2005 -  Montgomery Road and Transportation Leasing disagree regarding the calculation of the Appreciation Cash Payment in the event of a sale of 90 K Street.  The focus of the dispute is the effect of the classification as equity of the amounts advanced by S&S Finance.

• 2005 - Montgomery Road and Viad agreed to seek a resolution of the dispute by submitting the matter to the Reznick Group, an independent accounting firm.  On April 10, 2005 the Reznick Group rendered its opinion, which found in favor of Montgomery Road  on five of the six issues submitted to them. Viad refused to be bound by the Reznick Group's conclusions.

5

• January 2006 - Montgomery Road institutes this litigation to seek a declaration of the parties' rights under the Cash Participation Agreement.

• November 2006 - Revised Special Purpose Financial Statements for the period from 1987 through December 31, 2005 (Exhibit 28) are prepared by Montgomery Road to identify the amounts owing to S&S Finance as debt and the interest thereon as an expense, and contain other corrections to accurately reflect the economic reality of what had occurred since Montgomery Road's purchase of the 90 K Street in 1987.

• January 2007 - 90 K Street is sold to a third party.

## ARGUMENT

## I.    THE SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Although the Court will give the non-movant the benefit of justifiable inferences in that party's favor, the non-movant must "'provide evidence that would permit a reasonable [fact-finder] to find' in the non-moving party's favor." Feemster v. GSL Limited Partnership, __ F.Supp.2d __, 2007 WL 106522, at *3 (D.D.C. 2007)(bracketed language in original) (quoting Laningham v.U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987)).  See Galdamez v. Xerox Corp., 171 Fed. Appx. 353, 354 (D.C. Cir. 2006) (affirming grant of summary judgment where plaintiff failed to make a showing on an essential element of his claim and on which he would bear burden of proof at trial). Summary judgment is appropriate where the language of a written contract is not ambiguous because a

written contract speaks for itself and binds the parties without the need for extrinsic evidence.  Paul v. Howard University, 754 A.2d 297, 302 n.5 (D.C. 2000).  That the two parties disagree over the proper interpretation of the terms of a contract does not render the contract ambiguous.  Holland v. Hannan, 456 A.2d 807, 815 (D.C. 1983).

Here, summary judgment is appropriate because there are no disputed facts which are material to the relief sought either on the First Amended Complaint or the Counterclaim.  As discussed below, Montgomery Road and Montgomery Road TDR are entitled to summary judgment in their favor.

## II.    THE DISPUTE BETWEEN THE PARTIES

As explained in the Declaration of Samuel G. Rose ("Rose Decl.") (Exhibit 4), in the summer of 2000, Montgomery Road provided to Viad a copy of a contract Montgomery Road had received for the purchase of 90 K Street as it was obligated to do by the first right of refusal provisions in Section 4.1 of the Cash Participation Agreement.    Rose Decl. at ¶19.  As stated in the notice, the sale price of the Property was $24,975,000 with expected net proceeds of approximately $23 million.  Viad's Answer to ¶13 of the First Amended Complaint.  Although Viad did not exercise its right of first refusal and although the sale did not go through, the transaction raised questions for Transportation Leasing/Viad regarding Montgomery Road's calculation of Transportation Leasing's/Viad's Appreciation Cash Payment. Rose Decl. at ¶¶21-22.  Montgomery Road calculated its cost basis on the property, including the interest and other charges which had been reflected on the Special Purpose Financial Statements as Developer's Invested Equity, Developer's Operating Equity, Developer's Equity Return, and the balance of the first mortgage.  Viad's Answer to ¶13 of the First Amended Complaint. Those costs were estimated to be in

excess of $29,000,000.  Declaration of Samuel Rose at ¶19.  As a result, there would be no positive cash flow (and thus, no Cash Appreciation Payment) from the sale transaction.

In response, in August 2000, Transportation Leasing contended that the interest expense, categorized on the Special Purpose Financial Statements as "Developers Equity Return," could not be subtracted in calculating the Appreciation Cash Flow.  Exhibit 19.  It was Transportation Leasing's position that if the pending sale took place, Transportation Leasing would be entitled to a substantial six-figure Cash Appreciation Payment.  See Exhibit 19 (8/23/00 letter from Kenneth Goldman to Samuel Rose).  Specifically, Transportation Leasing claimed that under the definition of "Appreciation Cash Flow" in Section 3.1 of the Cash Participation Agreement, the category "Developer's Equity Return" was not a permitted subtraction.  Id.; Declaration of Samuel Rose at ¶20.  Thus, it was Transportation Leasing's position (and it is now Viad's position) that the interest on the funds provided by S&S Finance are not a proper deduction when calculating the Appreciation Cash Flow, simply because the interest expense was labeled as "Developer's Equity Return" in Montgomery Road's Special Purpose Statements.  Declaration of Samuel Rose at ¶20.

Transportation Leasing also questioned whether the acquisition of the first mortgage by Montgomery Road's affiliate, S&S Finance, was a "Refinancing" under Section 3.2(b) of the Cash Participation Agreement, which would have triggered a disclosure by Montgomery Road and an analysis of whether a Cash Appreciation Payment was due to Transportation Leasing.[12]  Declaration of Samuel

---

[12] The loan discount, received by S&S in 1996, had been reflected on the financial statements provided each year to Transportation Leasing and then to Viad.  Yet, Transportation Leasing never raised the issue as to whether the transaction might be a refinancing under the terms of the Cash Participation Agreement.  Viad (Transportation Leasing's successor) also sat by quietly, not raising the issue until its correspondence in 2000.

Rose at ¶21; Viad's Answer to ¶15 of the First Amended Complaint.  As part of this pending transaction, Montgomery Road sought to resolve any outstanding title issues created by the Cash Participation Agreement including obtaining from Transportation Leasing a waiver of its right of first refusal and the release of any lien on the Property.  Viad's Answer to ¶13 of the First Amended Complaint;  Declaration of Samuel Rose at ¶19.

A series of correspondence was exchanged between the parties regarding their differences concerning the Cash Participation Agreement calculations, including a September 12, 2000 letter from Reid Liffmann (on behalf of Montgomery Road) to Kenneth Goldman (on behalf of Transportation Leasing/Viad). Exhibit 20 .  Mr. Liffmann's letter enclosed Special Purpose Financial Statements for 1998 and 1999, revised as of September 11, 2000.  Section 2.6 of the Cash Participation Agreement required the year end Special Purpose Financial Statements which Montgomery Road provided each year to Transportation Leasing/Viad.  Mr. Goldman responded with a letter to Mr. Liffmann dated October 2, 2000 (Exhibit 21).  In his letter, Mr. Goldman describes the special purpose financial statements included with Mr. Liffmann's letter as having "creat[ed] a host of issues."  Thus, the parties had a dispute regarding both  computations and items contained in the financial statements which were being provided by Montgomery Road to Transportation Leasing/Viad pursuant to Section 2.6 of the Cash Participation Agreement.

III.    **THE REZNICK OPINION IS BINDING ON THE PARTIES**

The dispute between the parties regarding the computation and items in the special purpose financial statements persisted. As Mr. Rose testified, he and Eve Fiorucci (Viad's Assistant Director of Real Estate)[13] had discussions over a period of about three years regarding accounting issues. Rose Tr. at 74-75. Mr. Rose told Ms. Fiorucci that he thought they should resolve their accounting disagreements because the disagreements came up each time Montgomery Road tried to sell the property and the disagreements were hurting Montgomery Road's ability to sell. Rose Tr. at 75, 77. Ms. Fiorucci agreed. Rose Tr. at 75.

Because the Cash Participation Agreement contained a provision whereby the parties could settle accounting disagreements by picking an independent accountant, Ms. Fiorucci and Mr. Rose agreed that that is what they would do. Rose Tr. at 75, 78. Specifically, § 2.7 of the Cash Participation Agreement provides that if Transportation Leasing/Viad "disputes any computation or item contained in any portion" of a year end special purpose financial statement, such disputed items were to be submitted for resolution by an independent certified public accountant selected by Transportation Leasing "***whose determination shall be final*** ." Cash Participation Agreement (cited herein as "CPA") at §2.7.[14]

In 2005, Montgomery Road and Viad agreed to seek a resolution of the dispute by submitting the matter to the Reznick Group, an independent accounting firm (selected by Viad). Rose Decl. at ¶24. This course of action was in accordance with the dispute resolution provisions of Section 2.7 of the Cash Participation Agreement. Section 2.7 of the Cash Participation Agreement provides that the determination

---

[13] Transcript of Deposition of Eve Fiorucci ("Fiorucci Tr.") at 6 ( Exhibit 6).

[14] For reasons unrelated to this lawsuit, the proposed 2000 sale of the 90 K Street property did not take place. Declaration of Samuel Rose at ¶22; Viad's Answer to ¶17 of the First Amended Complaint.

of the independent certified public accountant "selected by Transportation Leasing and reasonably satisfactory to Developer" "*shall be final*." The conversations which Mr. Rose and Ms. Fiorucci had regarding the process of having an independent accountant look at their dispute were all had in the context of the Cash Participation Agreement and the dispute resolution provisions of the Cash Participation Agreement. Rose Tr. at 78. It was Viad (by Ms. Fiorucci) that selected the Reznick Group to resolve the dispute. Rose Tr. at 86; Fiorucci Tr. at 45. The cost of that dispute resolution was paid for by Montgomery Road. Rose Decl. at ¶24. Both parties submitted position statements to the Reznick Group and Viad also submitted documents. See Exhibits 24, 25. The conclusions in the Reznick Opinion were favorable to Montgomery Road on five of the six issues presented and were favorable to Viad on one of the six issues. Reznick Opinion (Exhibit 26) at 2-4. Both Montgomery Road and Viad seek a declaration from this Court regarding the Reznick Opinion. Montgomery Road seeks a declaration that the Reznick Opinion is binding as provided in Section 2.7 of the Cash Participation Agreement; Viad seeks a declaration that it is not binding.[15] Viad and Montgomery Road both submitted materials to the Reznick Group for its consideration. Viad, however, accompanied its materials with a cover letter addressed to the Reznick Group stating: "Finally, while we will appreciate your review of the documents and your opinion as to our interpretation of same, we wish to make it clear that your opinion is not binding on TLC/Viad Corp." See Exhibit 24 (3/2/05 letter from Eve Fiorucci to Brent Solomon). Viad apparently relies on this unilateral statement as the basis for its argument that the Reznick Opinion is not binding. Moreover, Ms. Firoucci knew that Montgomery Road was seeking a *resolution* of the accounting issue

---

[15] Although Viad seeks this declaration, by way of prayer for relief, it makes absolutely no allegations in its Counterclaim regarding the Reznick Opinion.

11

at that time.  See Exhibit 23 (Record of 6/10/02 Telephone Conversation between Eve Fiorucci and Mr.

Rose); see also Exhibit 24 (Viad's position paper submitted to Reznick Group) (describing process as a

"dispute resolution process" at page 4).  That the Reznick Opinion would not be binding simply is not

reasonable. As Mr. Rose explained:

> Q.     How – When and how did you agree that it was binding?
>
> A.     That we spent three years picking them, getting to this point.  What's the
>        point of doing it if it's not binding?  It was almost assumed.  Why would
>        you take years to talk to  your accountant, to talk to all the bosses, to pick
>        an accountant, and then say it's not binding?  I mean:  Why bother?

Rose Tr. at 87.  At best, the insertion by Ms. Fiorucci of the "non-binding" language could be viewed as

a counter-offer to amend the Cash Participation Agreement's provisions,[16] but as is clear from Mr. Rose's

testimony, it was never accepted by Montgomery Road.  The District of Columbia follows the Restatement

(Second) of Contracts with regard to whether an offeree's silence can constitute acceptance.  William F.

Klingensmith, Inc. v. District of Columbia, 370 A.2d 1341, 1343 (D.C. 1977)(discussing a tentative draft

of Restatement (Second) of Contracts §72 which later became the final draft of §69).  Generally, silence

does not constitute acceptance.   Id.; In Re Haar, 667 A.2d 1350, 1353-54 (D.C. App. 1995)

(respondent was not entitled to take client's silence as an agreement to respondent's statement in his letter

that he would withdraw money from the client trust account).   Although there are limited exceptions to this

---

[16] It is doubtful that this would even be a valid characterization, however, because Ms.
Fiorucci addressed her letter to the Reznick Group,  not to Montgomery Road.

general rule, none apply here.[17] Courts consistently refuse to treat unilateral statements in cover and transmittal letters as effective modifications to agreements.

In <u>Sea Crest Construction Corp. v. United States</u>, 59 Fed. Cl. 615 (2004) a home builder submitted "best and final offer" ("BAFO") to the government for construction of housing units at West Point. The accompanying transmittal letter ("BAFO Transmittal Letter") stated "'some revisions to the site plan will be necessary'" but such revisions were to be made "'in conjunction with the approval of the Army Corps of Engineers.'" 59 Fed. Cl. at 616. The government accepted the BAFO. The plaintiff's first site plan, however, differed significantly from the original plans. <u>Id</u>. The plaintiff submitted the site plan with a copy of its BAFO Transmittal Letter. <u>Id</u>. The government rejected the first site plan because of its significant differences from te BAFO. At the conclusion of the project (which endured many delays and revisions), the plaintiff submitted claims relating to the government's rejection of the first site plan. <u>Id</u>. at 617. With regard to the rejected site plan, the builder argued in defense to the government's summary judgment motion that "the Corps wrongfully rejected Drawing No. 1 because the drawing met 'most' of the criteria for the site plan contained in the RFP. The letter that plaintiff submitted with its BAFO reserved [to plaintiff] the right to revise its BAFO site plan . . .." <u>Id</u>. The Court rejected this argument, granting summary judgment in the government's favor, because the builder "did not have a unilateral right to alter

---

[17]     The three exceptions are where: (a) an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation; (b) the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer; and (c) because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept. Restatement (Second) of Contracts, §69(1)(a), (b) and (c) (1981).

its BAFO site plan." Id. Similarly, in Underwater Exotics, Ltd. V. Secretary of the Interior, 1994 WL 80878 (D.D.C. 1994), the Court rejected the plaintiff's argument that the Government had stipulated it would not imply any admission by plaintiff from plaintiff's agreement to settle regarding certain aquatic importing/exporting violations. 1994 WL 80878, at *9. Plaintiff's argument was based on language plaintiff used in a cover letter to the government accompanying plaintiff's payment fo the settlement amount. As the Court noted, "not only is this condition unilateral, but the plaintiff also attempted to impose it after the settlement agreement had been concluded." Id.

Here, the parties agreed to submit their dispute to the Reznick Group for resolution and such a process is provided for in Section 2.7 of the Cash Participation Agreement. After they came to that agreement, Viad attempted to unilaterally decide that any conclusions reached by the Reznick Group would not be binding. Viad's unilateral statement in its cover letter is ineffective to convert the Reznick Opinion to a non-binding determination Accordingly, Montgomery Road and Montgomery Road TDR respectfully request the Court to grant them summary judgment on their request for a declaration that the Reznick Opinion is binding.

## IV.   THE REZNICK OPINION'S RESOLUTION OF ISSUES 1 - 5 IS SUPPORTED BY THE TERMS OF THE CASH PARTICIPATION AGREEMENT

Even if the Court were to conclude that the Reznick Opinion is not binding and that the substance of the Opinion should be subjected to review and examination by the Court, Montgomery Road submits that because the conclusions for issues one through five reached by the Reznick Opinion are supported by

14

the terms of the Cash Participation Agreement and have not been effectively disputed by Viad, Montgomery Road is entitled to the declaration it seeks.[18]

### A.     Developer's Equity Return is Properly Deductible in the Appreciation Cash Flow Calculation

As to the first issue submitted to it, the Reznick Group concluded that it *is* proper to deduct Developer's Equity Return in computing Appreciation Cash Flow by including the annual Developer's Equity Return as an allowable incurred Expense under Section 2.3 in computing Operations Cash Flow that is effectively paid from and increases Developer's Operating Equity. Developer's Operating Equity is then treated as a deduction in computing Appreciation Cash Flow under Section 3.1. As Brent Solomon (the partner in the Reznick Group responsible for the Reznick Opinion) explained in his deposition, under Section 2.3, "Developers Equity Return" is an "Expense"[19] and therefore should be an permitted deduction under Section 3 as well because if Developer's Equity Return becomes part of Developer's Operating Equity, then Developer's Operating Equity is a permitted deduction under Section 3. Exhibit 12 (Transcript of Deposition of Brent Solomon ("Solomon Tr.")) at 90. As an allowable incurred expense, the interest amounts build up, and become part of Developer's Operating Equity which is one of the permitted deductions under the Cash Participation Agreement calculations. Solomon Tr. at 91. When the interest is added in a given year, it becomes a part of the carried forward operation equity of the developer.

---

[18] As to Issue No. 6, Montgomery Road will accept the conclusion if the Court finds that the entire Reznick Opinion is binding. However, if the Court determines that it is not binding, and in the event that after a substantive review of the Reznick Opinion the Court were to further conclude that Montgomery Road is not entitled to the Declaration it seeks, then Viad should not be entitled to benefit from the resolution of Issue No. 6 in its favor.

[19] Section 2.3(a)(15) defines "Expenses" as including "amounts paid to Equity Holders in payment of (i) Developer's Operating Equity and (ii) Developer's Equity Return."

15

Solomon Tr. at 91.   Then, at the time the property is sold, the Developer's Operating Equity is an appropriate deduction.   Solomon Tr. at 91.   Although Developer's Equity Return is not listed as an Allowable Deduction under Section 3.1 of the Cash Participation Agreement, because the Developer's Equity Return accumulates annually, it becomes part of the Developer's Operating Equity and therefore becomes an allowable deduction.   Solomon Tr. at 91-92.   As Mr. Solomon explained, where there is an early stage development and no cash flow, such that a lender is not being paid, interest accrues.   Solomon Tr. at 94.   The deduction for that accruing interest would be permitted for a party that was not the developer or an equity owner of the property.   Solomon Tr. at 94.

### B.    S& S Finance's Acquisition of the Mortgage was not a Refinancing

The second issue addressed by the Reznick Opinion is whether the 1996 acquisition of the first mortgage debt by S&S Finance was a "refinancing" that should have triggered a Cash Appreciation Payment under Section 3.3(c).   The Reznick Group correctly concluded that it was not.   As noted by Mr. Solomon, "refinancing" is not defined in the Cash Participation Agreement.   Reznick Opinion at 2 (discussing Issue 2).[20]   A "refinancing" "typically contemplates obtaining a new loan and a partial or total repayment of an existing loan."   Reznick Opinion at 2, Issue 2.

The refinancing issue arises only because S&S Finance purchased the Sun Chase loan at a discount (equal to approximately one million dollars).   Viad's position is that this discount should inure to

---

[20] Although the Cash Participation Agreement includes "refinancing" as a defined term in Section 1.37 of the Definitions Article (Article 1), the Cash Participation Agreement defines the term by using the term.   Section 1.37 states that "'Refinancing' shall have the meaning as set forth in Section 3.2(b) hereof."   Section 3.2(b), however, defines "Refinancing" as "the *refinancing*  of all or any part of the principal sum of any indebtedness secured by the Property or the placing of any Senior Mortgage on the Property."   §3.2(b) (emphasis added).   Thus, the definition is not really a definition.

Montgomery Road's benefit and that the purchase by S&S Finance should therefore be considered a refinancing. In explaining that such a transaction should not be considered a refinancing, Mr. Solomon testified:

> I think my opinion was with respect to a cash participation agreement such as this, that a refinancing is an event, it's a debt event that provides new capital.
> And with respect to the entity, there was no capital. There was no refinancing event.
>
> What had occurred was the holder of the note [Sun Chase], which sits outside the entity, sold their note and it happened to be to a related party [S&S Finance].
> So, in general, there would really be no accounting or any event inside the entity.
>
> * * * *
>
> I'm giving you my business and accounting perspective on whether this as a refinancing would have met the criteria to trigger an appreciation cash flow.
> And the reduction of the stated amount of debt, without any cash being received by the entity, certainly couldn't logically from a business perspective trigger an appreciation cash flow. No proceeds were received.
>
> The only other question then becomes, if this loan was acquired at a discount, would there be any effect on the accounting in the cash participation agreement. Okay?
>
> If it were acquired by a third party, there wouldn't have been any effect on the cash participation agreement, because the third party would never pass that savings along to a borrower.
>
> That happens in the mortgage market every day. Borrowers are unaffected by loans being transferred.
>
> You would never know from a borrowers' perspective whether a loan was sold at a premium or a discount and, in all transactions, they are sold at premiums and discounts. They may not be as significant as the discount in this case.
> In this case, we had a related party transaction at a discount, and we think it would be appropriate for that discount to be passed along for purposes of this cash participation agreement in computing an appreciation cash flow.
>
> But that event, in and of itself, doesn't have any business purpose to trigger a payment under the appreciation cash flow, because no proceeds were received.

17

Solomon Tr. at 119, 125-127.  Here, there is no reason why the discount which S&S Finance was able to obtain should be treated any differently vis-a-vis its borrower than would any other loan purchase discount would be treated for a borrower.  Because the discount from the 1996 loan purchase was not a refinancing, it was not an event which would trigger an Appreciation Cash Payment.

### C.     Amounts Advanced to Pay Interest or other Expenses Should Be Included in Developer's Operating Equity

The third issue addressed by the Reznick Opinion was whether amounts advanced by S&S Finance or its partners to pay interest or any other reasonable expense should be treated as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b).   The Reznick Group concluded that they should be.  Reznick Opinion at 2-3, Issue 3.  The Reznick Opinion reasons that:

> It should make no difference from a business or accounting perspective under the Agreement whether an advance is actually made by S&S or a partner of S&S.  The partners of S&S are Equity Holders because they are the partners of the Developer.[21] Payments are often made by an affiliate company on behalf of its owners for convenience, and as long as the substance is a payment by a partner of that affiliate, than it is typical to give accounting recognition to this nominee treatment (i.e., the payment was really a payment from an affiliate entity to an owner of the affiliate, and a contribution by the owner to the entity.)  Accordingly, payments by S&S would be accounted for as payments by an Equity Holder.

Reznick Opinion at 3, Issue No.3 (footnote added).  As Mr. Solomon explained in his deposition, the Reznick Group did not analyze whether the partners of S&S Finance could be treated as equity holders. Solomon Tr. at 97-98.  Rather, the Reznick Group analyzed how funds provided by S&S Finance should

---

[21] The Reznick Opinion's discussion regarding Issue 3 contains one factual error.  The Opinion states: "S&S is an affiliate of the Developer and has the same partners."  In fact, there is not a complete identity of partners.  S&S Finance is a separate legal entity and its ownership is different than the ownership of Montgomery Road, in which Reid Liffman and Steven Braesch are also limited partners.  See Rose Decl. at ¶17.  This error is not material to the Reznick Opinion's analysis of Issue 3 (or to Issue 4, where the same error is made).

be treated. Solomon Tr. at 98. The Reznick Group concluded that it would have been reasonable "to deal with the funds as if they were loaned to the partners and then the partners put that money in as equity." Solomon Tr. at 98.

### D. Computations of Operations Cash Flow and Developer's Operating Equity are Not Impacted by the Form the Interest <u>Obligation Takes</u>

The fourth issue analyzed by the Reznick Group ask whether it matters if the Developer makes an actual cash payment of interest, or if instead S&S Finance makes a non-cash charge for interest. The Reznick Opinion concludes that there is no substance or effect on the computations for Operations Cash Flow, or Developer's Operating Equity, between a cash payment for interest on the first mortgage and a non-cash charge for interest that satisfies Montgomery Road's obligation for interest due. Reznick Opinion at 3, Issue No. 4. The Reznick Opinion explains:

> A cash payment for interest would require the Equity Holders to advance the amount due (increasing Developer's Operating Equity) and then cause the Partnership to make a payment to S&S. Accordingly, there would be no difference on Operations Cash Flow or Developer's Operating Equity. Furthermore the partners of the Developer are the same as the partners of S&S,[22] so in substance, contributions by S&S or partners of S&S would be treated as if it were made by an Equity Holder."

Reznick Opinion at 3, Issue No. 4 (footnote 17 added). "Operations Cash Flow" is defined in Section 1.26 of the Cash Participation Agreement as "all Gross Revenues of the Property for a Fiscal Year minus all Expenses of the Property for that Fiscal Year." CPA §1.26. Both "Gross Revenues" (CPA §2.2 (a)) and "Expenses" (CPA §2.3(a)) are defined as being calculated "on the basis of sound cash basis accounting practices." "Cash basis accounting" is not a defined term in the Cash Participation Agreement. At his deposition, Mr. Solomon gave the following opinion as to the definition of "cash basis accounting":

---

[22] <u>See</u> <u>supra</u> n. 16.

19

> Cash basis accounting is applied from a revenue and expense perspective. When cash comes in, cash goes out, for expenses.
>
> With respect to capital items, if you will, like fixed assets, loans, equity, it is not on a pure cash basis.
>
> So if there were interests, for example, accrued on a loan, on a cash basis financial statement, that would still show up as a liability, regardless of when it was paid.
>
> If there was depreciation on a fixed asset which is a noncash transaction, that still shows up on a financial statement, on a cash basis financial statement.
>
> The cash basis is intended to focus on items of operating revenue and expenses.

Solomon Tr. at 129. Mr. Solomon testified that interest on principal payments on Permitted Debt referred to in Section 2.3(a)(9) of the Cash Participation Agreement would be an expense category that does not require an actual cash payment for the expense to be included as a liability on a cash basis accounting financial statement. Solomon Tr. at 134. Another example would include amounts paid to Equity Holders in payment of Developer's Operating Equity and Developer's Equity Return. Solomon Tr. at 134 (citing CPA §2.3(a)(15)). Mr. Solomon's deposition testimony fully supports the analysis of Issue No. 4 in the Reznick Opinion.

### E.     The First Mortgage Was Debt, Not Equity

In the fifth issue, the Reznick Issue analyzed the reclassification of the first mortgage from debt to equity. This issue resulted from a reclassification by Montgomery Road's accountants of the first mortgage (held by S&S Finance) as equity. To reflect the economic realities, however, the first mortgage should be classified as debt, and this debt would qualify as Permitted Debt under the Cash Participation Agreement. Reznick Opinion at 3-4, Issue No. 5. In analyzing this issue, the Reznick Group considered the fact that the Cash Participation Agreement treats both outstanding principal and interest on a mortgage, and equity

20

contributed and return on equity.  Reznick Opinion at 4, Issue No. 5.    Both are "considered in computations of Operations Cash Flow (as allowable expenses under Section 2.3) and Apreciation Cash Flow (as part of Developer's Operating Equity)... The 'carve out' in Section 3.6(a) and Section 3.6(b) appears to be intended to ensure that amounts are treated as debt or equity but not double counted." Reznick Opinion at 4, Issue No. 5.  Thus, the Cash Participation Agreement provides a mechanism for reaching the same end number, whether the calculation uses interest on a mortgage or return on equity contributed.[23]

**F.      Deduction for Interest Charged should be Reduced to Reflect <u>Loan Discount</u>**

The sixth and last issue which the Reznick Opinion considered was the impact, if any, that the loan purchase discount received by S&S Finance should have on the amount of interest deducted in the Appreciation Cash Flow calculation. The Reznick Opinion concludes that because the 1996 acquisition of the first mortgage by S&S Finance occurred at a $1,024,571 discount to the outstanding loan balance, interest on the first mortgage should only be charged on the amount actually paid by S&S Finance to acquire the first mortgage.  Reznick Opinion at 4, Issue No. 6.  The Reznick Group concluded that the discount on the mortgage would be considered an unreasonable related party fee if not passed on to the Partnership (Section 2.3(b) and Section 3.7).  Reznick Opinion at 4, Issue No. 6.  Montgomery Road disagrees with this conclusion.  As Mr. Solomon testified with respect to the loan discount itself, the benefit of such discounts are not usually passed on to the debtor.  Solomon Tr. at 125-27.  If the principal of the loan is unchanged by the discount from the debtor's perspective, than the interest amounts would be

---

[23] This issue is addressed from the debt/interest expense perspective in Section V, below.

unchanged. There is nothing in the express terms of either Section 2.3(b) or 3.7 which would preclude this particular interest component from falling within the defined term "Expenses." Therefore, if the Court finds that the Reznick Opinion is not binding and undertakes an analysis of the substance of the Reznick Opinion, Montgomery Road requests the Court to find that the Reznick Opinion's conclusions regarding Issue 6 are incorrect. If the Court finds the Reznick Opinion is a binding determination, then Montgomery Road will accept all aspects of the Reznick Opinion even though it disagrees with the conclusions with respect to Issue No. 6.

## V.    TREATING THE S&S ADVANCES AS PERMITTED DEBT    PROVIDES AN ALTERNATIVE APPROACH UNDER THE CASH PARTICIPATION AGREEMENT

As just discussed, the Reznick Opinion is firmly grounded in the language of the Cash Participation Agreement. There is, however, an alternative analysis - also supported by the Cash Participation Agreement's express language – which would also calculate Viad's Appreciation Cash Payment at zero. This alternative analysis would be to simply treat the contributions by S&S Finance as Permitted Debt. See CPA §2.3(b); Solomon Tr. at 96, 104 . Then the amounts would simply be interest. Solomon Tr. at 96. As long as the rates were the same, the end number would also be the same. Solomon Tr. at 96, 104, 106. "[T]he effect on any appreciation cash flow payment would be no other affect on the appreciation cash flow payment. Debt would be deducted, and it's principal, just like equity would be, equity contributed would be." Solomon Tr. at 104. The Cash Participation Agreement is not an agreement among equity partners; it is an agreement regarding a distribution of a residuary type interest. Solomon Tr. at 107. It does not matter under the Cash Participation Agreement if the return is a return on equity computed based on an equity return or a return on debt which would be interest. Solomon Tr. at 108.

22

As set forth in the Declarations of Samuel Rose and Ronald Glassman (G&R in-house accountant), Montgomery Road's accountants reclassified approximately $7.3 million of the first mortgage debt to equity in 1997. Declaration of Samuel Rose at ¶14; Declaration of Ronald Glassman at ¶9. The reason for this reclassification was for internal tax reasons, relating to the fact that the interest income in S&S Finance could not be offset by the interest expense in Montgomery Road for Maryland state tax purposes. Declaration of Samuel Rose at ¶14; Declaration of Ronald Glassman at ¶9. The event of the 1997 reclassification of mortgage debt to equity does not control over the particular terms of the Cash Participation Agreement, however, especially given the context in which the 1997 reclassification occurred. Pursuant to the Cash Participation Agreement, Montgomery Road prepared Special Purpose Financial Statements ("Special Purpose Statements") which were provided to Transportation Leasing annually. Rose Decl. at ¶15; Glassman Decl. at ¶10. Although the 1997 reclassification was for internal tax reasons, and had nothing to do with the Cash Participation Agreement, Ronald Glassman, G&R's in-house accountant, carried the reclassification through to the Special Purpose Statements prepared for the years 1997 through 1999. Rose Decl. at ¶15; Glassman Decl. at ¶10. Mr. Glassman reduced the first mortgage debt by $7.3 million, which had the effect of increasing the amounts under the label "Developer's Invested Equity" (a term used in the Cash Participation Agreement). See Exhibit 18 (Special Purpose Financial Statements as of December 31, 1999 at 8, 9 (note 3)), and 10-11 (note 6); See also Rose Decl. at ¶15; Glassman Decl. at ¶10. He then included the annual interest expense on that increase in Developer's Invested Equity under the label "Developer's Equity Return" (another term used in the Cash Participation Agreement). Rose Decl. at ¶15; Glassman Decl. at ¶10.

23

It is Montgomery Road's position that without regard to the label however, the economic reality of the situation is that the funds provided by S&S Finance (the $7.3 million as well as other funds) are "Permitted Debt" and were provided by S&S Finance with the absolute intention of earning a return on those funds. Rose Decl. at ¶15; Glassman Decl. at ¶14. Therefore, the amounts categorized as "Developer's Equity Return" on the Special Purpose Statements (prior to the 2005 Revision described below) are in fact interest expense. Rose Decl. at ¶15; Glassman Decl. at ¶14. Beginning in 2000, Mr. Glassman eliminated the re-classification, and treated the entire $9.3 million first mortgage as debt, and it continued to carry a rate of interest of 1.5% over prime. Glassman Decl. at ¶11. In November 2006, Mr. Glassman prepared Montgomery Road's revised Special Purpose Financial Statement for the period from 1987 through December 31, 2005 (see Exhibit 28 ("2005 Revised Special Purpose Statement")), which reflect the amounts as interest expense, not as "Developer's Equity Return." Glassman Decl. at ¶15.

The determination that the S&S Finance advances are Permitted Debt is consistent with the applicable provisions in the Cash Participation Agreement. The agreement has several defined terms and those definitions apply throughout the agreement, not just to limited sections. See CPA §1.1 ("*As used in this Agreement*, certain terms shall have the meanings described in this Article 1") (emphasis added). Not all of the definitions are actually set forth in Section 1; some of the definitions are made by cross-reference to other sections of the Agreement in which the substance of the definition can be found. Just because the definition is set out in a particular section, however, does not limit the applicability of that definition to that particular section. The definition applies throughout the agreement. For example, Section 1.18 defines the term "Expenses" as having "the meaning as set forth in Section 2.3 hereof." Section 2.3, in turn, falls within Article 2 which is entitled "Operations Cash Flow." The definition of "Expenses" in

24

Section 2.3, however, is not limited to "Operations Cash Flow" or to Article 2.[24]  Rather, the definition of "expenses" as set forth in Section 2.3 applies throughout the Agreement.  Working through the various definitions throughout the Cash Participation Agreement demonstrates that as long as the interest on the amounts infused by S&S were calculated according to a bank's rate of interest, the amounts constitute "Permitted Debt" (a defined term), which is an "Expense" (a defined term) and is therefore an "Approved Deduction for Appreciation Cash Flow") (also defined terms).  As set forth in the Declarations of Samuel Rose (Exhibit 4) and Ronald Glassman (Exhibit 2), the interest rate does not exceed the market rate of interest.  Rose Decl. at ¶35; Glassman Decl. at ¶¶12, 15.

Section 2.3 of the Cash Participation Agreement defines "Expenses" "*[f]or the purposes of th[e] agreement*" as including "all reasonable expenses actually incurred by Developer[25] with respect to ownership, operation, leasing and occupancy of the Property ... ."  §2.3(a)(footnote and italics added).  These expenses include, but are not limited to, "(1)general real estate taxes;(2) government assessments or similar charges; (3)personal property taxes; (4)sales taxes; (5)costs of utilities, air conditioning and heating for the Property; (6)maintenance and repair costs of a non-capital nature; (7)operating and reasonable and customary management expenses and fees; (8)premiums payable for insurance carried on or with respect to the property; (9)interest and principle payable on *Permitted Debt* , as well as any fees and charges related thereto; (10)costs, including leasing commissions . . . .; (11) accounting and audit fees and costs, attorneys' fees, . . . .; (12)development fees paid to Developer or its Affilliates  . . . . ;

---

[24] Section 7.11 of the Agreement provides: "The titles of Articles and Sections contained in this Agreement are inserted for convenience of reference only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation thereof."

[25] "Developer" is Montgomery Road.

(13)amounts required to be paid by the Developer pursuant to Section 6 of Purchase Agreement; (14)any portion of Gross Revenues approved by TLC which is deposited . . . in a reserve account for future maintenance and repair . . . ; and (15)amounts paid to **Equity Holders** in payment of **(i)Developer's Operating Equity** and **(ii)Developer's Equity Return**." CPA §2.3(a) (emphasis added; initial capitals on defined terms in original). Subsections (9) (interest on Permitted Debt) and (15) (amounts paid to Equity Holders for Developer's Operating Equity and Developer's Equity Return) are the key provisions.

Permitted Debt is defined in Section 2.3(b) of the Cash Participation Agreement as "(i) any debt secured by a Senior Mortgage and (ii)that portion of any debt incurred by Equity Holders, whether secured or unsecured, the proceeds of which are incurred solely to fund all or part of: (1)the purchase price of the Real Property, (2) predevelopment, development, construction costs (but excluding any costs representing **Approved Deductions** or Ineligible Deductions) with respect to the Property or (3)deficits incurred in the operation of the Property. If **Permitted Debt** is held by any Affiliate of Developer, interest paid thereon shall be included as an **expense** only to the extent that it does not exceed the amount of interest that would have been payable on an equivalent loan from an unrelated bank ... if such loan had been made on terms generally available in the District of Columbia area at the time such debt was incurred." CPA §2.3(b)(emphasis added; initial capitals on defined terms in original). "Developer's Operating Equity" and "Developer's Equity Return" are defined in Sections 3.6(b) and (c), respectively.

Based on the foregoing definitions, the interest which S&S Finance charged is an allowable "Expense" on Permitted Debt and therefore an Approved Deduction. See Rose Decl. at ¶13; Glassman Decl. at ¶12. Here, it is the calculation of the Appreciation Cash Payment and the Appreciation Cash

Flow which is at issue.  These calculations are contained in Article 3, but, as noted *supra*, the definitions of the defined terms apply throughout the agreement.  Accordingly, the components of the Appreciation Cash Payment and the Appreciation Cash Flow build on terms defined in other sections of the Agreement, including those in Article 2.  The applicable analysis is as follows:

"***Appreciation Cash Flow***" is defined as (i)the ***Agreed Value*** of the Property or applicable portion thereof, (ii)reduced by the sum of the **Approved Deductions** [3.4] related to the Property or applicable portion thereof and the Closing costs and (iii)reduced by the amount, if any, of the then remaining [3.6d] ***Developer's Invested Equity*** [3.6a] and ***Developers Operating Equity*** [3.6b]; each determined as of the date(s) on which the Appreciation Cash Payment shall be payable, provided that in no event shall the Appreciated Cash Payment be less than zero."  CPA §3.1 (emphasis added; initial capitals on defined terms in original).   The following chart sets out the operative terms and definitions:

## CALCULATION OF APPRECIATION CASH FLOW

In the following Table, Column 1 defines terms used in Column 2; Column 2 defines terms used

in Column 3; Column 3 sets out the calculation for Appreciation Cash Flow.

| COLUMN 1 | COLUMN 2 | COLUMN 3 |
|---|---|---|
| | **AGREED VALUE OF PROPERTY** = Greater of gross proceeds of sale or fair market value of property  (3.3(a)) | **AGREED VALUE OF PROPERTY** |
| **Permitted Debt** = (i) debt secured by senior mortgage and (ii) portion of any debt incurred by **Equity Holders**, the proceeds of which are used to fund all or part of purchase price of **Real Property**, (2) predevelopment, development, construction costs (but excluding costs representing **Approved Deductions**) with respect to the property or (3) operations deficits. *If Permitted Debt is held by Affiliate, interest is included as an expense to the extent it does not exceed amount of interest that would have been payable on loan from unrelated bank*  (2.3(b)). | **APPROVED DEDUCTIONS  =**   Aggregate outstanding principal balances of all **Permitted Debt** & **Junior Financing** (3.4(a)(i))   *Plus:*  **Appreciation Cash Flows** from previous occurring **Sales of** **Interest**   (3.4(a)(ii)) | *Minus:*  **APPROVED DEDUCTIONS & CLOSING COSTS** (3.1(ii)) |
| | | *Minus:*       Amount of then remaining **DEVELOPER'S INVESTED EQUITY** (3.1(iii)) |
| **Permitted Debt** =   (See above) | **DEVELOPER'S OPERATING EQUITY  =**   Amounts actually advanced to the **Developer** by the **Equity Holders** (other than amounts treated as **Permitted Debt**) which **Developer** uses for operation of **Property** including interest and principal on Mortgages on the Poperty, but excluding any **Ineligible Deductions** with respect thereto and any costs included as **Approved Deductions** in any calculation of **Appreciation Cash Flow** (3.6(b)). | *Minus:*       Amount of then remaining **DEVELOPER'S OPERATING EQUITY** (3.1(iii)) |
| | | *EQUALS:*  **APPRECIATION CASH FLOW** |

As the foregoing demonstrates, the Cash Participation Agreement is laden with defined terms.  A

calculation or item is assigned a defined term only if the definition of that term is applicable.  It is no answer

28

for Viad to say that because Montgomery Road used a particular label ("Developer's Equity Return") that Montgomery Road is bound by the consequences of using such a label (*i.e.,* that referring to the interest as "Developers' Equity Return" mandates that it may not be included in the offsets when calculating the Appreciation Cash Flow). Use of a term does not make it so. Where an event or a calculation does not meet the criteria of a particular definition of a defined term, then the Cash Participation Agreement must be searched for the correct term. Here, the Cash Participation Agreement defined term which most accurately defines and captures the economic realities of the interest charged by S&S Finance is "Permitted Debt." As such, the total interest amount is properly deducted in calculating Appreciation Cash Flow. See Rose Decl. at ¶13; Glassman Decl. at ¶12.

## VI. THE TDRs SHOULD NOT BE INCLUDED IN THE CASH APPRECIATION CALCULATIONS

The Cash Participation Agreement sets forth terms and conditions under which Transportation Leasing will participate in cash flow generated from "the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing thereof." CPA Recital at B. When TC Midatlantic purchased the land located at 90 K Street in January 2007 for approximately $46 million, it also purchased from Montgomery Road (for $8 million) by way of separate contract (Braesch Decl. at ¶20) the transferable development rights ("TDRs") which had been transferred to 90 K Street.[26] Viad has taken the position, first in Kenneth Goldman's deposition and then again in its Counterclaim, that, as a component of any Cash Appreciation Payment, Viad is also entitled to 15% of the value of the TDRs sold by Montgomery Road to TC Midatlantic. In its Counterclaim, Viad alleges (in paragraph 10) that "[t]he

---

[26] TDRs which Montgomery Road is obligated to acquire in the future and transfer to TC Midatlantic will be sold to TC Midatlantic for $13 million. Braesch Decl. at ¶20.

definition of 'property' in the Cash Participation Agreement ("CPA") encompasses TDRs because TDRs are improvements on the property and are an interest in the property."  Real Property, Property and Improvements are all defined terms under the Cash Participation Agreement.  1.21 defines "improvements" as "all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the real property."  1.32 defines "Property" as "the Improvements and the Real Property."  1.35 defines "Real Property" as "that certain land, more fully described in Exhibit 'A' made a part of this Agreement by reference hereto."  TDRs do not meet any of these definitions and Viad will not be able to prove its allegation in Paragraph 10 of its Counterclaim.  TDRs are not land and they are not improvements; they are tradeable commodities that are a creation of the District of Columbia City Council to encourage development in various parts of the city.  TDRs were not even in existence at the time the parties entered into the Cash Participation Agreement.

### A. TDRs In General

TDRs are development rights that are transferred from one property (the sending zone) to another property (the receiving zone).  They have been described as "commodities":

> Borrowing from the metaphor of property as a bundle of sticks, such programs classify the right to develop as a stick capable of being severed from geographically specific sites and sold like a fungible commodity.

Market-Based Regulatory Approaches: A Comparative Discussion of Environmental and Land Use Techniques in the United States, 19 B.C. Envtl. Aff. L. Rev. 565, 574-75 (Kayden, J.) (Spring 1992).  See also Trading Spaces: Measure 37, MacPherson v. Department of Administrative Services,  and Transferable Development Rights as a Path Out of Deadlock, 20 J. Envtl. L. & Litig. 273, 303, 315 (Aioki, K., Briscoe, K., Hovland, B.) (2005) ("sending-site owners who did not intend to develop their property

anyway reap the monetary benefits of receiving a tradable and potentially valuable commodity;" discussing fair pricing of TDRs to endure steady demand "for the commodity"); Banking on TDRs: The Government's Role as Banker of Transferable Development Rights, 73 N.Y.U.L. Rev. 1329, 1343 (Stevenson, S.) (October 1998) (describing TDRs as a "unique commodity"); Casenotes and Comments on Local Growth Control Management Concepts, C750 ALI-ABA 629, 637 (Abrams, S.) (August 19, 1992)("TDRs are one of the rights incident to fee simple ownership. TDR programs envision the severing of development potential from land to treat it as a marketable commodity"). Viad's expert, Cynthia Giordano, agrees that "commodity" is an apt description for TDRs. Exhibit 7 (Transcript of Deposition of Cynthia Giordano ("Giordano Tr.")) at 24. See also Exhibit 5 (Transcript of Deposition of Steven Braesch ("Braesch Tr.")) at 18, 63, 68 (describing TDRs as commodities that are fungible and able to be moved to different properties); Exhibit 1 (Declaration of Steven Braesch ("Braesch Decl.")) at ¶6; Exhibit 10 (Transcript of Deposition of Reid Liffmann ("Liffmann Tr.")) at 31 (describing TDRs as a "commodity that is freely traded back and forth between developers and users").

The purpose of TDRs is to foster "good" land use planning goals, such as historic preservation and control of urban growth:

> TDR programs have been used to foster historic preservation, farmland preservation, open space and environmental protection of sensitive areas, and as a tool for urban growth management control. The marketability of TDRs is a key element to the program, particularly to prevent regulatory restrictions from rising to the level of an impermissible taking of private property. The TDR concept involves identifying pre-designated properties or areas as having development rights which can be marketed and transferred to other properties for many of the purposes explained above.

Casenotes, C750 ALI-ABA at 637-38. In a TDR program, a landowner agrees to restrict development on the sending site and in exchange the landowner obtains from the local government "extra development

rights" that permit the landowner to exceed development restrictions on another site.    Kayden, 19 B.C. Envtl. Aff. L. Rev. at 575-76.  The landowner can use the extra development rights on a parcel owned by the landowner, or the landowner can sell the extra development rights to another party for that party's use on a parcel owned by that party or for that party to hold and possibly sell to yet another party.  Id.

## B.  The History of TDRs in the District of Columbia

In 1987, when Montgomery Road purchased 90 K Street from Viad's predecessor and the parties entered into the Cash Participation Agreement, TDRs did not exist - not in general and not the specific ones at issue in this case.  Exhibit 1 (Braesch Decl.) at ¶4.  D.C. had not yet passed the regulations creating the TDRs. Braesch Decl. at ¶4.  It was not until 1991 that the D.C. Council passed regulations creating TDRs. Braesch Decl.  at ¶4.  The regulations were passed under the authority of the D.C. Zoning Act. Braesch Decl. at ¶4.

The regulations (set out in Title 11 of the D.C. Municipal Regulations) "authorize the transfer of development rights from a project with the DD Overlay District to a receiving lot or lots located elsewhere in the DD Overlay District or in the Downtown East, New Downtown, or other receiving zones or sites pursuant to this section."  11 DCMR 1709.1.  See Braesch Decl. at ¶¶7, 8.  In general, under the regulatory scheme approving TDRs, a developer who engages in a qualifying development activity (e.g., historic preservation or residential rehabilitation)) can generate additional development rights and, once certified by the District of Columbia, can apply to move development rights from that area and project - the "sending site" - and transfer them to a different area and project – the "receiving site."  Braesch Decl. at ¶7.  Once TDRs are transferred to a qualified site in a receiving zone, or to a "receiving entity" that does not own land (TDRs may be purchased by an entity or individual that intends to hold the TDRs for resale

at a future date), the receiving site benefits in that the development rights of the receiving site will be increased to an amount greater than would otherwise be available in the receiving site without TDRs. Braesch Decl. at ¶7.

In the District of Columbia, the creation and transfer of TDRs is accomplished in a three-step process. Braesch Decl. at ¶9. First, the District of Columbia and the owner of the sending site enter into a "Transfer of Development Rights Covenant" (the "TDR Covenant"). Braesch Decl. at ¶9; 11 DCMR 1709.3. Pursuant to the TDR Covenant, the owner of the sending site agrees that development of the sending site will be undertaken in a way that furthers the purposes of the of the Downtown Development District. Braesch Decl. at ¶9. In exchange, the District of Columbia agrees to grant the owner of the sending site TDRs pursuant to which the sending site can transfer its bonus gross floor area to a receiving site or to an entity. Braesch Decl. at ¶9. The TDR Covenant is recorded in the District of Columbia land records. Braesch Decl. at ¶9; 11 DCMR 1709.3; 11 DCMR 1709.11. The content and form of TDR Covenant is approved by the District of Columbia. Braesch Decl. at ¶9.

The second step in the process occurs when the owner of the sending site enters into an agreement with the owner of a receiving site to transfer the TDRs from the sending site to the receiving site or to an entity. Braesch Decl. at ¶10. This agreement of transfer is entered into between the owners of the sending and receiving sites and sets forth the consideration being paid and the number of square feet of development rights being transferred. Braesch Decl. at ¶10. This purchase agreement is typically negotiated between the purchaser (owner of receiving lot or non-land owning entity) and the seller (owner of sending lot) and need not be approved as to form or content by the District of Columbia. Braesch Decl. at ¶10.

The third step in the process occurs when the owner of the sending lot and the owner of the receiving lot or purchasing entity and the District of Columbia enter into a Certificate of Transfer of Development Rights ("TDR Certificate"). Braesch Decl. at ¶11. The TDR Certificate is an instrument of transfer of the TDRs from the sending lot to the receiving lot or non-land owning entity. Braesch Decl. at ¶11; Braesch Tr. at 22-23. Like the TDR Covenant, the form and content of the TDR Certificate is subject to approval by the District of Columbia and is recorded in the District of Columbia land records. Braesch Decl. at ¶11. Once TDRs have been transferred to a receiving site or non-land owning entity, they may later be re-transferred to a receiving site or if already on a receiving site, may be re-transferred to another receiving site. Braesch Decl. at ¶12; Giordano Tr. at 20 ("TDRs can go to any site; they can be re-transferred").. See also 11 DCMR 1709.8; 11 DCMR 1709.9.

### C. The TDRs In This Case

There are three sets of TDRs which are at issue in this litigation. Braesch Decl. at ¶13. The first set of TDRs were purchased by Montgomery Road from Manufacturers Life Insurance Company ("ManLife TDRs"). Braesch Decl. at ¶13; Braesch Tr. at 21. The second set of TDRs (the "E Street TDRs") was transferred by a Carr America entity as part of a transaction whereby a G&R entity (other than Montgomery Road) sold property bordered by 6th, 7th, E and F Streets, Northwest in Washington, D.C.(the "E Street Property") to Carr America in 2002 but retained the right to any TDRs that might subsequently be generated on the E Street Property (which was a qualified "sending site"). Braesch Decl. at ¶13; Braesch Tr. at 61-62. Carr America did subsequently generate TDRs and transferred them in late 2003 to Montgomery Road at G&R's direction. Braesch Decl. at ¶13. The third set of TDRs has not yet been acquired by Montgomery Road ("Future TDRs"). Braesch Decl. at ¶13.

The ManLife TDRs consisted of 7,500 square feet of gross floor area (as that term is defined in the zoning regulations) and were sold by Manufacturers Life Insurance Company ("Manufacturers Life") as the owner of the sending lot to Montgomery Road as the owner of the receiving lot (90 K Street). Braesch Decl. at ¶14; Braesch Tr. at 22. The sale was made pursuant to an Agreement Concerning Transferable Development Rights made as of October 1, 1999 (*twelve years **after** the Cash Participation Agreement was entered into by Montgomery Road and Transportation Leasing*). Braesch Decl. at ¶14; Exhibit 16 (portions of the 10/1/99 Agreement). As part of the same transaction, an additional 2,500 square feet of TDRs (which are not at issue in this litigation) were sold by Manufacturers Life to Swanee Limited Partnership (1,250 square feet) as the owner of a receiving lot and to Sliver Building Limited Partnership (1,250 square feet) as the owner of another receiving lot. Braesch Decl. at ¶14; Braesch Tr. at 19, 22. Manufacturers Life sold the 10,000 square feet of TDRs for $300,000. Braesch Decl. at ¶14; Braesch Tr. at 23-24. Manufacturers Life originally acquired the 10,000 square feet of TDRs in 1994 pursuant to the Transfer of Development Rights Covenant entered into between Manufacturers Life and the District of Columbia. Braesch Decl. at ¶14. In addition to the ManLife TDRs purchase agreement, the parties (Manufacturers Life and Montgomery Road) and the District of Columbia executed a "Certificate of Transfer of Development Rights" ("Certificate of Transfer") (Exhibit 17). Braesch Decl. at ¶15. The Certificate of Transfer provides (at ¶8 on page 3) that the TDRs which are the subject of the Certificate of Transfer may be "further transferred from the Receiving Lot and vested in one or more 'receiving lots' or "receiving zone lots." Braesch Decl. at ¶15.

90 K Street became the receiving site of the E Street TDRs in October 2003. Braesch Decl. at ¶16. Prior to October of 2003, a G&R entity had owned and subsequently sold the E Street Property.

Braesch Decl. at ¶16.  However, G&R retained the right to all TDR's generated by the E Street Property wheter before or after the sale.  Braesch Decl. at ¶16.  The E Street Property became a sending site for TDRs based on completion of a qualified residential development.  Braesch Decl. at ¶16.  G&R decided to transfer 112,606 square fee of TDRs from the E Street Property sending lot to MLRP (90 K Street) as the receiving lot in October 2003.  Braesch Decl. at ¶16.  Montgomery Road paid no additional consideration at the time these TDRs were transferred other than the legal and transactions costs.  Braesch Decl. at ¶16.

90 K Street is the receiving lot for both the ManLife TDRs and the E Street TDRs.  Braesch Decl. at ¶17.  The TDRs do not inure as a natural benefit to or reflect value of 90 K Street.  Braesch Decl. at ¶17.  Just as Manufacturers Life in 1999 divided its 10,000 square feet of TDRs among three receiving sites, Montgomery Road could have transferred one or both sets of TDRs from 90 K Street to another receiving site, just as TC Midatlantic could do now.  Braesch Decl. at ¶17.  Montgomery Road never used either the ManLife TDRs or the E Street TDRs for development at 90 K Street.  Braesch Decl. at ¶18.  These TDRs always remained available for further transfer to other receiving lots.  Braesch Decl. at ¶18.


Concurrently with its sale to TC MidAtlantic ("TC Midatlantic") of the land at 90 K Street, Montgomery Road also sold both the ManLife TDRs and the E Street TDRs to TC Midatlantic.  Braesch Decl. at ¶19. Under its sales agreement, Montgomery Road is obligated to cause Montgomery Road TDR to acquire 124,000 square feet of additional TDRs (the Future TDRs) which will then be transferred to TC Midatlantic as part of TC Midatlantic's purchase of 90 K Street.  Braesch Decl. at ¶19. Montgomery Road TDR is a non-land owning entity created by Montgomery Road in 2006 to acquire and hold the Future

36

TDRs. Braesch Decl. at ¶19. Pursuant to the agreement with TC Midatlantic, Montgomery Road TDR has until June 2009 within which to acquire and transfer the Future TDRs to TC Midatlantic. Braesch Decl. at ¶19.

Montgomery Road sold the 90 K Street TDRs (comprised of the ManLife TDRs and the E Street TDRs) to TC Midatlantic by way of purchase agreement that was separate from the purchase agreement for the land at 90 K Street. Braesch Decl. at ¶20. The sale of TDRs may or may not be done concurrently with a land sale. Braesch Decl. at ¶20. TDRs are freely saleable commodities without regard to the sale of the land itself. Braesch Decl. at ¶20. Here, Montgomery Road did not buy land from Manufacturers Life, for instance, but it did buy TDRs from Manufacturers Life. Braesch Decl. at ¶20. Similarly, G&R sold the E Street land to Carr America, but it did not sell the rights to the E Street TDRs to Carr America as part of that transaction. Braesch Decl. at ¶20.

As the foregoing discussion demonstrates, TDRs are neither land nor improvements. This conclusion is bolstered by the exhibits and deposition testimony of Viad's own experts. One of the documents produced by Ms. Giordano at her deposition was an Appraisal of Real Property as of June 24, 2006 regarding 90 K Street ("6/24/06 Appraisal"). The 6/24/06 Appraisal was prepared by Viad's valuation expert, Steve Halbert. Halbert Tr. at 19. This appraisal identifies the "site improvements" as the "sidewalks, curbs and drainage." Exhibit 27 (pertinent portions of 6/24/06 Appraisal) at 24 (Bates Numbered VD-001470). Noticeably absent are TDRs. When asked at her deposition what an improvement on real estate is, Ms. Giordano testified that "in a general – you know, sense, an improvement is usually a building or a structure." Giordano Tr. at 31. When Mr. Halbert was asked whether the 90 K Street site was improved, Mr. Halbert answered: "If you mean by improved is

there a proposed office building on it yet, no. There are parking spaces. So it's improved with sidewalks and asphalt parking." Halbert Tr. at 21. When asked whether there were any other improvements, Mr. Halbert responded that he did not recall any others. Halbert Tr. at 22.[27] Mr. Halbert then described "improvements" in the context of something that would be "demolished" in the event of redevelopment. Halbert Tr. at 22-23. Clearly, TDRs are neither improvements nor land.

Neither Viad nor Transportation Leasing contributed any monies or other consideration toward the purchase of the ManLife TDRs, the E Street TDRs or the Future TDRs. Braesch Decl. at ¶21. The cost ($938,341) of the ManLife TDRs and the E Street TDRs was originally reflected as an expense on the Special Purpose Financial Statements provided to Viad. Braesch Decl. at ¶21. However, this was an error because the costs of these TDRs were not part of the 90 K Street property. Braesch Decl. at ¶21. Rather, TDRs are a commodity that is freely traded back and forth between developers and users. Braesch Decl. at ¶21. Montgomery Road determined that charging the expense of the purchased TDRs to Montgomery Road was not proper absent a development of the Property. Braesch Decl. at ¶21. The Property was not developed. Braesch Decl. at ¶21. Rather it has been sold, and the Property and the TDRs have been sold pursuant to separate contracts. Braesch Decl. at ¶21. Because Viad is not entitled the value of the TDRs, it was not a correct cost deduction on the Special Purpose Financial Statements. Braesch Decl. at ¶21. Therefore, one of the revisions which is reflected in the 2005 Revised Special Purpose Financial Statements provided to Viad in November 2006 is the removal of these costs. Braesch Decl. at ¶21.

---

[27] After Mr. Halbert's recollection was later refreshed, he recalled that the site was also improved with drainage. Halbert Tr. at 27.

38

Montgomery Road and Montgomery Road TDR respectfully request the Court to grant their Motion for summary judgment on the TDR issue and to find and declare that the sale of the TDRs to TC Midatlantic should not be included in the calculation of Appreciation Cash Flow.

## VII.    MONTGOMERY ROAD IS ENTITLED TO SUMMARY JUDGMENT ON VIAD'S CLAIM OF BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Viad asserts in Count II of its Counterclaim that Montgomery Road violated the covenant of good faith and fair dealing which is implied in contracts.  Viad alleges that over the years, Montgomery Road has misrepresented the value of 90 K Street, thereby seeking to convince Viad to relinquish its participation rights; that through the years, Montgomery Road has changed its position on accounting matters intending to decrease the appreciation cash flow and the appreciation cash payment to Viad; and that in its most recent financial statement (November 2006), Montgomery Road attempted to decrease Viad's appreciation cash payment and took positions and classified items in ways that conflict with the Reznick opinion. Counterclaim at ¶¶26-30. Viad claims that by the foregoing conduct, "Montgomery Road has acted in bad faith by intentionally evading the letter and spirit of the Cash Participation Agreement" and has "sought to destroy Viad's right to receive the fruits of its contract." Id. at ¶¶31-32.

Viad has no evidence to support  these allegations of bad faith. Viad's allegation that Montgomery Road has ever misrepresented the value of 90 K Street is completely unsupported by the record.   None of the accounting revisions were intended to deprive Viad of any rights it had under the Cash Participation Agreement.   Rose Decl. at ¶35.  The reasons for the accounting revisions are fully explained in the Declarations and deposition testimony of both Samuel Rose and Ronald Glassman, as discussed *supra*. In addition to the fact that Viad will be unable to support its factual allegations in Count II, Montgomery

Road submits that it is entitled to summary judgment in its favor on Count II because: (1) in these particular circumstances, it did not owe Viad a duty of good faith and fair dealing; and (2) even if such a duty was owed, the conduct alleged does not rise to a breach of that duty.

### A. Montgomery Road Did Not Owe A Duty Of Good Faith And Fair Dealing To Viad

There is implied in many contracts a duty of good faith and fair dealing. <u>Allworth v. Howard University</u>, 890 A.2d 194 (D.C. 2006). Here, however, there is no question that the relationship between Viad and Montgomery Road is that of creditor-debtor. The Cash Participation Agreement expressly provides that the relationship between Viad and Montgomery Road is "solely that of creditor and debtor" and that "[n]othing in [the Cash Participation Agreement] or in any other document or instrument made in connection with the [Cash Participation Agreement] ... shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between [Viad] and [Montgomery Road]." CPA at §6.1. Many jurisdictions have recognized that the nature of the debtor-creditor relationship ought not trigger an implied duty of good faith and fair dealing. <u>See</u> e.g., <u>Allied Capital Corp. v. GC-Sun Holdings, L.P.</u>, 910 A.2d 1020, 1034 (Del. Ch. 2006) ("the restrictive covenants between debtors and creditors define, by omission, the freedom of action that the debtor retains"); <u>Home Hearth Plano Parkway, L.P. v. LaSalle Bank, N.A.</u>, 320 B.R. 596, 610 n.9 (N.D. Texas 2004) (Texas law does not recognized an implied covenant of good faith and fair dealing in the lender-borrower relationship); <u>Hais v. Smith</u>, 547 A.2d 986, 988 (D.C. 1988) (implied covenant of good faith and fair dealing does not require creditor to ensure fair dealings between co-debtors).

Further, Section 6.1 of the Cash Participation Agreement provides:

40

[Montgomery Road], at all times consistent with the terms and provisions of this Agreement and the other documents and instruments evidencing, securing or otherwise relating to this Agreement, *shall be free to determine and follow its own policies and practices in the management and conduct of its business on the Property*.

CPA at §6.1 (emphasis added). The foregoing provision, coupled with the fact that the Transportation Leasing/Montgomery Road relationship was nothing more than a creditor/debtor relationship, insulates Montgomery Road from the kind of duty of good faith and fair dealing Viad now seeks to impose on it.

### B.    Even If Montgomery Road Owed A Duty Of Good Faith And Fair Dealing, It Did Not Breach The Duty

No provision of the Cash Participation Agreement obligates Montgomery Road to structure any sales transaction so as to maximize *Viad's* cash participation. Because Montgomery Road is not a fiduciary to Viad, no such provision can be implied. As explained by the Southern District of New York in Suthers v. Amgen Inc.:

> Plaintiffs have no support for the broad proposition that an entity violates the implied covenant of good faith and fair dealing by acting in its own self-interest consistent with its rights under a contract. Indeed, courts have refused attempts to impose liability on a party that engaged in conduct permitted by a contract, even when such conduct is allegedly unreasonable.

Suthers v. Amgen Inc., 441 F.Supp.2d 478, 485 (S.D.N.Y. 2006). Had Viad's predecessor, Transportation Leasing, wanted protection obligating Montgomery Road to structure any sale or refinancing in such a way to *maximize* Viad's interests to the detriment of Montgomery Road, it could have so drafted the Cash Participation Agreement and attempted to gain Montgomery Road's agreement to such a provision. As stated by the Allied Capital Court:

> Had SunSub [the original creditor on the note] wanted protection against insider equity investments, it easily could have (and should have) suggested that language to that effect be added to the $10 Million Note to see whether and on what terms [the debtor] would

41

accede to that additional restriction on its freedom to further capitalize the cash-strapped Brafasco business. SunSub failed to extract anything other than a discrete limitation that does not apply to equity investments. Allied cannot use the implied covenant of good faith and fair dealing to avoid the consequences of the plain language of the contract. The implied covenant is not a fall-back position to be argued when you now wish your predecessor-in-interest had done a better job of negotiating the contract in the first place.

910 A.2d at 1035.

Even in cases in which the implied covenant applies, it implies good faith and fair dealing in abiding by the contract's terms. It is not to be used as a tool to modify or override the express terms of the contract. Washington Metropolitan Area Transit Authority v. Quik Serve Foods, Inc., 2006 WL 1147933, *4, *5 (D.D.C. 2006). Under District of Columbia law, a claim for a breach of the covenant of good faith and fair dealing requires a showing that the defendant has "'evade[d] the spirit of the contract, willfully render[ed] imperfect performance, or interfere[d] with performance by the other party.'" Allworth v. Howard University, 890 A.2d 194, 201 (D.C. 2006) (quoting Paul v. Howard University, 754 A.2d 297, 310 (D.C. 2000)); Quik Serve Foods, 2006 WL 1147933 at *6.

The implied covenant of good faith and fair dealing is not to be used to prevent a party from acting in its own self-interest. In Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400 (2d Cir. 2006), the plaintiff's breach of contract claim was based on his attempt to recover personal and business information on his former computer. The plaintiff claimed that, because his Agent's Agreement provided that he could compete with Nationwide after one year from the date of his termination, Nationwide had an obligation not to deprive him of the information on his computer. Id. at 403. He argued that the implied covenant of good faith and fair dealing buttressed his claim. Id. The District Court disagreed and granted summary judgment for Nationwide. Id. at 402. The U.S. Court of Appeals for the Second Circuit affirmed as to the breach

of contract claim finding that the implied covenant "'does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.'" Id. at 408 (quoting M/A-COM Security Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990)). Despite plaintiff's evidence that Nationwide "may have acted in bad faith in the manner in which it removed the policyholder information from [plaintiff's] possession, no rational trier of fact could conclude that in so doing Nationwide violated any provisions of the contract. ... No permissible reading of this section [of the Agent's Agreement], however, commands that Nationwide provide Thyroff with the means to compete. Such a reading requires inferences beyond what could have reasonably been intended by the contract." Id.

In In re IT Group, 448 F.3d 661, 666 (3d Cir. 2006), the Third Circuit considered an appeal from the District Court's affirmance of the Bankruptcy Court's granting of a motion to dismiss the plaintiff's claims. Before the Bankruptcy Court was the bankruptcy filing of IT Corporation and its subsidiaries. Id. The plaintiffs were a group of participants in a deferred compensation plan offered by IT Corporation that explicitly stated that "the Plan is 'merely that of an unfunded and unsecured promise to pay money in the future.'" Id. (quoting IT Corporation's Deferred Compensation Plan (the "Plan")). The Plan also stated that IT Corporation would "transfer over assets to [a] Trust such assets, if any, as the [administrative] Committee determines, from time to time and in its sole discretion, are appropriate." Id. (quoting the Plan). The plaintiffs claimed their Plan benefits should be paid before general, unsecured creditors of IT Corporation. Id. at 670-671. They argued that an implied duty of good faith bound IT Corporation to its promise to fund the Plan. Id. The Third Circuit affirmed the granting of the motion to dismiss, finding:

43

> The implied duty of good faith is merely an "interpretive tool to determine the parties' justifiable expectations," Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000); it may not be used to add new terms to an agreement, Lorenz v. CSX Corp., 1 F.3d 1406, 1415 (3d Cir. 1993), or to override express contractual terms, Northview, 227 F.3d at 91.

Id. at 671. Similarly, in this case, Viad seeks to impose duties not present in the Cash Participation Agreement. Transportation Leasing expressly excised any fiduciary duties from the Cash Participation Agreement. Viad cannot now require further duties of Montgomery Road, nor impose additional terms, by claiming a breach of a duty of good faith.

Finally, in Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc., 431 F.3d 1241 (10th Cir. 2006), a series of contracts set forth the relationship between Pepsico and an independent bottler and distributor ("Pittsburg"). Pittsburg gained exclusive rights to distribution in a territory of several counties in the state of Kansas. Id. at 1248. Pittsburg claimed that Pepsi failed to protect it from invasions into its territory by other bottlers/distributors, and additionally, failed to continue to renew Pittsburg's contracts with the new lines of drinks Pepsi was selling. The District Court granted summary judgment on Pittsburg's claims that Pepsi breached its implied duty of good faith and fair dealing. Id. at 1254. Affirming the District Court's decision, the Tenth Circuit stated:

> The implied duty of good faith and fair dealing is not without limitation. It "does not provide a court carte blanche to rewrite the parties' agreement," and "the mere exercise of one's contractual rights, without more, cannot constitute ... a breach" of the implied covenant of good faith and fair dealing. Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 991 (S.D.N.Y. 1989)(internal quotation omitted). Rather, "it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained for benefits." Don King Prod. [v. Douglas], 742 F. Supp. [741] at 767 [S.D.N.Y. 1990](internal quotation omitted).
>
> Additionally, courts are not "at liberty to impose obligations under the guise of the implied covenant which are inconsistent with the terms of the contract from which the covenant is to be implied." In re Minipeco, USA, Inc., 237 B.R. 12, 26 (Bkrtcy. S.D.N.Y. 1997). Thus, **"[a] party which**

44

**acts in accordance with rights expressly provided in a contract cannot be held liable for breaching an implied covenant of good faith."** Id. at 26.

Id. at 1261.  In the present case, the Cash Participation Agreement drafted by counsel for Transportation Leasing expressly eschewed fiduciary duties between the parties.  Now Viad seeks, in absence of any ability to claim Montgomery Road breached its fiduciary duties, to magnify the provisions of the Cash Participation Agreement using the general principles of good faith and fair dealing.  Moreover, Viad could have no justifiable or reasonable expectation that MRLP would attempt to ***maximize*** Viad's profit at MRLP's ***expense***.  Accordingly, Montgomery Road is entitled to Summary Judgment on Count II of Viad's Counterclaim.  Because Count III of Viad's Counterclaim (seeking attorneys fees) is based on Count II, summary judgment is also appropriate in Montgomery Road's favor on Count III.

## CONCLUSION

For all the foregoing reasons, Montgomery Road and Montgomery Road TDR respectfully request the Court to grant their Motion for Summary Judgment.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.

_____/s/_____

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W., Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com

*Attorneys   for   Plaintiff/Counterdefendant*
*Montgomery Road I Limited   Partnership and Third-*
*Party  Defendant Montgomery Road TDR, LLC*

45