**EXHIBIT 5**

Page 1

1         IN THE UNITED STATES DISTRICT COURT FOR THE

2                    DISTRICT OF COLUMBIA

3     ----------------------------------:

4     MONTGOMERY ROAD I, LIMITED        :

5     PARTNERSHIP                       :

6                  Plaintiff            : Civil Action

7            v.                         : No. 06-00344

8     VIAD CORPORATION                  : (HHK)

9                  Defendant            :

10    ----------------------------------:

11                Washington, D.C.

12             Tuesday, November 28, 2006

13    Deposition of:

14                STEVEN BRAESCH,

15    called for oral examination by counsel for

16    Defendant, pursuant to notice, at the law office

17    of Bryan Cave, LLP, 700 13th Street, N.W.,

18    Washington, D.C. 20005, before Sheri C. Stewart,

19    Registered Professional Reporter and Notary

20    Public in and for the District of Columbia,

21    beginning at 10:06 a.m., when were present on

22    behalf of the respective parties:

Capital Reporting Company

Page 2

1          A P P E A R A N C E S:

2

3   ON BEHALF OF PLAINTIFF:

4        DALE A. COOTER, ESQUIRE

5        COOTER, MANGOLD, TOMPERT & KARAS, LLP

6        5301 Wisconsin Avenue, N.W.

7        Suite 500

8        Washington, D.C.  20015

9        (202)537-0700

10

11

12  ON BEHALF OF DEFENDANT:

13       RODNEY F. PAGE, ESQUIRE

14       ALICIA HOGGES-THOMAS, ESQUIRE

15       BRYAN CAVE, LLP

16       700 13th Street, N.W.

17       Washington, D.C.  20005

18       (202)508-6000

19

20  ALSO PRESENT:   DANIEL HOLMESTOCK, VIDEOGRAPHER

21                  RONALD GLASSMAN

22                  *  *  *  *  *

**Capital Reporting Company**

Page 18

1   residential or providing arch uses or
2   entertainment uses can result in a property
3   getting that additional TDR.
4           When they generate that by doing
5   something under the zoning code that complies,
6   they then have -- they then have a commodity that
7   they can transfer to another receiving zone in the
8   City, and that density then becomes movable in the
9   City, and that's documented under the District
10  zoning laws.
11      Q    Do you know when it was that these
12  transferable development rights were first created
13  in the District of Columbia?
14      A    In the '90s.  I don't know the exact
15  date, but in the late 1990s.
16      Q    What was your first involvement with
17  any issue or transaction involving TDRs?
18      A    I believe in 1999 was the first
19  involvement we had directly with TDRs.
20      Q    And what was that involvement?
21      A    Acquiring a very limited amount of
22  those on -- that we could put on three properties

Page 19

1    in the District.
2              I think we acquired 10,000 square feet
3    of TDRs at that point, which is a nominal amount,
4    and put those on three different properties to
5    provide some development flexibility.
6        Q    What three properties were they, if you
7    recall?
8        A    Suwanee Limited Partnership, Sliver
9    Limited Partnership and Montgomery Road Limited
10   Partnership.
11       Q    Just for the record, Montgomery Road
12   owns a property at 90 K Street Northeast, correct?
13       A    Correct.
14       Q    So at some points if you and I mention
15   "the property," we will understand we're talking
16   about the property owned by Montgomery Road,
17   right?
18            MR. COOTER:  Well, now your question's
19       unclear.  I think Montgomery Road actually
20       owned more than one property.  I think you
21       mean to say that you want to talk about 90 K.
22            MR. PAGE:  Yeah, I do.

1          The second was to try to find out who
2     had generated them under the City guidelines.
3          And the third was to get those under
4     contract and complete the transaction to acquire
5     some.
6     Q     How do you go about finding who had
7     TDRs to sell?
8     A     Two ways; I mean, zoning counsel is
9     always a good sounding board, and second is just
10    the development community.
11    Q     Do you recall in 1999 from whom TDRs
12    were purchased?
13    A     Manufacturers Life.
14    Q     Anybody else?
15    A     No.
16    Q     Okay.  And who was zoning counsel, if
17    there was one at that time?
18    A     Our zoning counsel was Chip Glassman,
19    actually.
20    Q     Glassco?
21    A     Glassco, yes.
22    Q     And was he involved in the purchase of

Page 22

1  those TDRs?

2  A    Yes.

3  Q    Now, you said that they were for a
4  possible use at three properties, if I recall your
5  testimony correctly; is that correct?

6  A    Correct.

7  Q    How was it, if you remember, that those
8  TDRs were assigned to any particular property?

9  A    We allocated them 1250 square feet to
10 Sliver, 1250 square feet to Suwanee, and the
11 balance to 90 K Street.

12 Q    So if I recall your testimony
13 correctly, that means about 7500 --

14 A    Correct.

15 Q    -- to 90 K Street?

16 A    Correct.

17 Q    Now, in the process of acquiring the
18 TDRs, were those TDRs actually assigned to that
19 property in some formal fashion?

20 A    In that case they were.

21 Q    How was that done?

22 A    The City process is that you have to

Page 23

1  have -- the sending lot has to have a covenant,
2  the receiving lot has to have a certificate of
3  transfer, and we follow that process.
4      Q    Does that mean that the City issues a
5  certificate by designating the property to which
6  the TDRs will be certified or provided; is that a
7  correct statement?
8      A    They can.
9      Q    And did they in that case?
10     A    In this case they did.
11     Q    Okay. Were there any other -- well,
12 before I go on.
13          The TDRs were purchased you said for
14 Manufacturers Life; is that correct?
15     A    Correct.
16     Q    And that's a company that had developed
17 a property; and as a result, had TDRs available to
18 sell. Am I correct?
19     A    Correct.
20     Q    Now, do you recall what price was paid
21 for those TDRs?
22     A    $30.

Page 24

```
1      Q      $30 per --
2      A      Per TDR.
3      Q      Per square foot?
4      A      Per square foot.
5      Q      And who paid for the TDRs in that
6    transaction?
7      A      I don't know.
8      Q      Do you know -- can you tell me, on
9    behalf of Montgomery Road Limited Partnership,
10   where the Montgomery Road Limited Partnership paid
11   for any of those TDRs?
12     A      I don't know the answer to that.
13     Q      Did you ever have reason or occasion
14   after 1999 to be involved in the purchase of TDRs
15   for 90 K Street at any time?
16     A      Yes.
17     Q      And when was that?
18     A      We currently have -- the answer is no.
19     Q      Have you ever had reason to be involved
20   in the negotiation for the purchase of TDRs since
21   1999?
22     A      Yes.
```

Page 61

1   generated TDRs in the Downtown Development
2   District and transferred those to a property that
3   we owned and could use them.
4       Q    Who is "we" in your answer?
5       A    We owned the property downtown.  When
6   we contracted to sell a piece of that property, we
7   retained the right that if TDRs were ever
8   produced, covenanted, certified for transfer, that
9   we receive those since the purchaser didn't have
10  the use for those and we did.
11      Q    I'm sorry.  I wasn't clear, but you
12  said "we," and I'm trying to figure out what
13  entity is "we"?  Who owned the other property?
14      A    I don't recall the entity name.
15  Greenebaum & Rose entity owned the other property
16  briefly and when we sold it to an entity related
17  to Car America, we retained the rights to acquire
18  the TDRs and transfer them to a property that
19  could use them if they were ever perfected.
20      Q    Where was that property located?
21      A    Square 456.
22      Q    Do you know the street addresses for

Page 62

```
 1   that?
 2        A      Between 6th and 7th and E and F,
 3   Northwest.
 4        Q      When was the property sold to a Car
 5   America entity?
 6        A      My recollection is sometime in 2002.
 7        Q      When were the TDRs made available?
 8        A      Somewhat after that, after they met
 9   City requirements, got them covenanted and got
10   them certified, I would guess mid to late 2003.
11        Q      And to whom they were certified?
12        A      I don't recall.
13        Q      Was it Montgomery Road I Limited
14   Partnership?
15        A      I don't recall.
16        Q      Was it to some TDR, the special purpose
17   entity like the one we talked about earlier?
18        A      I don't recall the entity that bought
19   those.
20        Q      Have they been transferred since they
21   were first provided to a Greenebaum & Rose entity?
22        A      No, they have not.
```

Page 63

```
 1      Q     Are they under a contract of sale
 2   within -- internally within Greenebaum & Rose?
 3      A     Ask that again.
 4      Q     Well, let me rephrase it.
 5            Look at the spreadsheet.  I'm assuming
 6   from there, and you tell me if I'm wrong, that
 7   Montgomery Road Limited Partnership intends to
 8   transfer 120,000 FAR?
 9      A     Yes.
10      Q     How is it that Montgomery Road Limited
11   Partnership acquired or is going to acquire those
12   120,000 FARs?
13      A     You have to look at the paper trail.  I
14   don't have the certification.  They may be
15   certified at 90 K.  They may be certified in
16   another entity, I don't know the answer to that.
17            These are -- these are fungible
18   commodities, we can move those from place to
19   place.  That's why I'm not being specific.
20            All we have to do is look at the
21   certificate and if it's Montgomery Road, it's
22   Montgomery Road.
```

Page 68

1   city own them in both forms.

2           And so they're able to be moved,
3   they're a commodity, they're fungible and, you
4   know, they were not originally part of the
5   property.

6       Q   And therefore -- I mean, do you have a
7   conclusion from that?

8       A   I'm not an attorney.  I mean, my issue
9   is clearly development, and that is the date.

10      Q   All right.

11          MR. PAGE:  I have no further questions
12      of this witness.

13       EXAMINATION BY COUNSEL FOR PLAINTIFF
14  BY MR. COOTER:

15      Q   Do you understand that I now have the
16  opportunity to cross-examine you, did I tell you
17  about that?

18      A   No, I didn't know that.

19      Q   Are you ready?  I have no questions.

20      A   Okay.

21          MR. COOTER:  You got lucky.

22          THE VIDEOGRAPHER:  The time is