**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONTGOMERY ROAD I LIMITED PARTNERSHIP, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>VIAD CORP., )<br>)<br>Defendant. )<br>) | CIVIL ACTION NO. 06-00344<br>(HHK) |

30(b)(6) DEPOSITION OF EVE FIORUCCI
VOLUME I
PAGES 1 THROUGH 99

Phoenix, Arizona
November 7, 2006
9:30 a.m.

PREPARED FOR:
MR. DALE A. COOTER

REPORTED BY:
DAVID R. MINDER, RPR
ARIZONA CR NO. 50636

(COPY)

*Ottmar Holiday & Associates*
2800 N. Central, Ste. 150
Phoenix, Arizona 85004
(602) 485-1488
1-866-485-1444

EVE FIORUCCI 11/7/2006

1        30(b)(6) DEPOSITION OF EVE FIORUCCI, taken on
2   November 7, 2006, commencing at 10:05 a.m., at the law
3   offices of BRYAN CAVE, LLP, One Renaissance Square,
4   Two North Central Avenue, Suite 2200, Phoenix, Arizona,
5   before DAVID R. MINDER, a Certified Reporter in the
6   State of Arizona.
7
8
9
10  COUNSEL APPEARING:
11          COOTER, MANGOLD, TOMPERT & WAYSON, L.L.P.
            BY:  Mr. Dale A. Cooter
12               Ms. Donna S. Mangold
            5301 Wisconsin Avenue, N.W.
13          Suite 500
            Washington, D.C.  20015
14          Attorneys for Plaintiff
            (202) 537-0700
15          dcooter@cootermangold.com
16
            BRYAN CAVE, L.L.P.
17          BY:  Mr. Rodney F. Page
            700 Thirteenth Street NW
18          Washington, D.C.  20005
            Attorneys for Defendant
19          (202) 508-6002
            rfpage@bryancave.com
20
21
22
23
24
25

```
 1                        EVE FIORUCCI,
 2   a witness herein, having been first duly sworn by the
 3   Certified Reporter to speak the truth and nothing but
 4   the truth, was examined and testified as follows:
 5
 6                         EXAMINATION
 7
 8   BY MR. COOTER:
 9          Q.   Good morning.
10          A.   Good morning.
11          Q.   State your name and address for the record, if
12   you would.
13          A.   Eve Fiorucci, 6745 East Windstone Trail, Cave
14   Creek, Arizona, 85331.
15          Q.   Are you employed?
16          A.   I am.
17          Q.   How are you employed?
18          A.   I am employed by Viad Corp.
19          Q.   What do you do there?  What's your job?
20          A.   My title is Assistant Director of Real Estate.
21          Q.   What does that mean functionally?  Nice title,
22   but I want to know what you do.
23          A.   My job responsibilities include handling the
24   real estate needs of the company.
25          Q.   Do you have real estate undermanagement
```

1    A.    I do not.

2    Q.    This disagreement about how to treat this
3    interest on Developer's Equity, was that given to
4    Reznick to analyze?

5    A.    Yes, it was.

6    Q.    Confirm for me, did you select Reznick or did
7    the Montgomery Road people?

8    A.    We proposed the use of Reznick and Montgomery
9    Road agreed with them.

10              MR. COOTER:  I'm going to show you what
11   we'll mark as Exhibit No. 7.

12              (Exhibit No. 7 marked.)

13   BY MR. COOTER:

14   Q.    Exhibit No. 7 would appear to be notes of a
15   telephone conversation between Mr. Rose and you dated
16   December 16th of '04.  And again, it's a Viad document.
17   It's got a VD Bates number.  Can you confirm for me that
18   that's what it is?

19   A.    Can you repeat that?

20   Q.    These appear to be notes of a phone
21   conversation that happened 7/16 of '04.  Can you just
22   confirm that's what it is?

23   A.    Yes.

24   Q.    These are your notes?

25   A.    Yes.

64

EVE FIORUCCI 11/7/2006

1   Can you confirm that you drafted and sent this e-mail to
2   Mr. Goldman at or about that time?
3        A.   I can.
4        Q.   You did do that?
5        A.   I did do that.
6             MR. COOTER:   That's all I have on that.
7   I'm going to show you a document that we'll mark as
8   Exhibit 17.
9             (Exhibit No. 17 marked.)
10  BY MR. COOTER:
11       Q.   Exhibit No. 17 is a piece of paper that came
12  out of your files, has a VD Bates number on it.
13       A.   Correct.
14       Q.   Who prepared this document?  Have you ever
15  seen it before?
16       A.   I have.
17       Q.   Who prepared it?
18       A.   I think I did.
19       Q.   Now the document is dated January 9th of '03.
20  Can you tell me when it was you prepared this thing?
21       A.   On or about that time.
22       Q.   Why were you preparing this at that point?
23  Why were you doing this?
24       A.   I prepared this note to myself to help me
25  simplify the Cash Participation Agreement.  Why I did

1    that at that exact time I'm not sure.
2         Q.   Who directed the Cash Participation Agreement?
3         A.   I believe that was Jeff Buchanan and David
4    Lindner.
5         Q.   That was somebody at Transportation Leasing or
6    Greyhound?
7         A.   They were outside counsel, I believe.
8         Q.   Our understanding is, in reading the document,
9    that it was sort of an off-the-shelf agreement that had
10   been used somewhere else for something else; is that
11   right?
12        A.   I don't know.
13        Q.   They're outside counsel for Viad, the drafters
14   of it?
15        A.   Yes.
16        Q.   Now making reference to your notes of
17   January 9th, No. 17, just read those and tell me if
18   there's anything in your notes on Exhibit 17 with which
19   you disagree.
20        A.   Would you like me to read all these out loud?
21        Q.   No.  Read them to yourself.  If you change
22   your mind about something, let me know; will you?  If
23   you disagree with your notes, tell me.  If you agree
24   with them, tell me that.
25             (Witness examines document.)

1    A.   Well, I may.
2         (Witness examines document.)
3    Q.   First of all, if you disagree with something
4    in your notes, show me what part of your notes you
5    disagree with. What are we talking about?
6         (Witness examines document.)
7    A.   No, I think I misread that.
8    Q.   That's going to be terribly unclear on this
9    record. So far, you haven't disagreed with anything in
10   your notes?
11   A.   Correct.
12   Q.   Keep working.
13        (Witness examines document.)
14   A.   So far, I disagree with nothing in my notes.
15   Q.   All I'm trying to do is confirm. Exhibit
16   No. 17 are your notes, and you don't disagree with
17   anything on the page; is that right?
18   A.   Correct.
19   Q.   Did you have any experience in the use of a
20   similar Cash Participation Agreement in any real estate
21   in Sacramento?
22   A.   Did I personally?
23   Q.   Did the company you're here as a
24   representative of?
25   A.   I believe there may have been a Cash

67

EVE FIORUCCI 11/7/2006

1  Participation Agreement drafted and used for a property
2  in Sacramento.
3      Q.   Was the property sold?  Do you still have the
4  Cash Participation Agreement?
5      A.   I don't believe we still have it, although I
6  don't know.  My experience with that property is limited
7  to my review of the archive box.  And I may have seen a
8  Cash Participation Agreement for a property in
9  Sacramento, but I couldn't tell you which one, and I
10 couldn't tell you if we still retain that.
11     Q.   Well, this is not a trick question.  It looks
12 from our review of material that this Cash Participation
13 Agreement was essentially off-the-shelf and also used in
14 Sacramento and Chicago.  Is that consistent with your
15 understanding?
16     A.   I just don't know.
17     Q.   Can you identify for me the property in
18 Sacramento which may have been subject to a Cash
19 Participation Agreement with Viad or a predecessor to
20 Viad?
21     A.   I can't remember.
22     Q.   Would your files reflect that?
23     A.   Yes.
24          MR. PAGE:  Well, if you want to treat that
25 as an interrogatory, I'll give you a letter on behalf of

EVE FIORUCCI 11/7/2006

```
 1  the company that gives you the history.
 2           MR. COOTER:  That will be fine.
 3      Q.   Are you familiar with whether or not Viad had
 4  a Cash Participation Agreement in connection with
 5  property in Chicago?
 6      A.   I believe they did.
 7      Q.   Does Viad still have that Cash Participation
 8  Agreement?
 9      A.   I don't know.
10      Q.   Can you identify the property in Chicago that
11  was involved?
12      A.   I cannot.
13           MR. COOTER:  Okay.  Mr. Page, will you
14  give me the answer to that?
15           MR. PAGE:  Yes, I'll give you the same
16  outline for that.
17           MR. COOTER:  That will be fine.
18           MR. PAGE:  On that question, I don't think
19  it's covered by your designation in the 30(b)(6), but I
20  don't mind giving you --
21           MR. COOTER:  It probably is, but I'm not
22  going to argue with you about it.  I don't think it's
23  necessary for our today's purposes, anyway.
24           MR. PAGE:  Excuse me.  Can we go off the
25  record a minute?
```

EVE FIORUCCI 11/7/2006

1           MR. COOTER:  Yes.

2           (Discussion off the record.)

3           MR. COOTER:  I'm going the show you what

4   we'll mark as deposition Exhibit No. 18.  It's dated

5   June 13th of '05.

6           (Exhibit No. 18 marked.)

7   BY MR. COOTER:

8      Q.   Exhibit No. 18 would appear to be notes of a

9   telephone conversation between yourself and Pat Marr

10  having to do with 90 K Street in Washington.  Whose

11  notes are these?

12     A.   I believe these are my notes.

13     Q.   What were you talking to Pat Marr about in

14  June of '05 having to do with K Street?  What was the

15  assignment to Marr at this point?

16     A.   Occasionally I checked in with Pat Marr to

17  talk about the value of that property.

18     Q.   Your notes reflect a number of bullet points.

19  The fourth one down one is that Pat was to provide a

20  current estimated value of the land only.  Did he do

21  that in '05?

22     A.   I believe that what he stated is that land is

23  selling for $80 a square foot per buildable foot.

24     Q.   I see.  Did Viad ever have an appraisal done

25  of this property, a real appraisal?