**EXHIBIT 10**

## Capital Reporting Company

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE

 2                  DISTRICT OF COLUMBIA

 3   -----------------------------------:

 4   MONTGOMERY ROAD I, LIMITED        :

 5   PARTNERSHIP                       :

 6              Plaintiff    : Civil Action

 7         v.                : No. 06-00344

 8   VIAD CORPORATION         : (HHK)

 9              Defendant    :

10   -----------------------------------:

11              Washington, D.C.

12         Tuesday, November 28, 2006

13   Deposition of:

14              REID LIFFMANN,

15   called for oral examination by counsel for

16   Defendant, pursuant to notice, at the law office

17   of Bryan Cave, LLP, 700 13th Street, N.W.,

18   Washington, D.C. 20005, before Sheri C. Stewart,

19   Registered Professional Reporter and Notary

20   Public in and for the District of Columbia,

21   beginning at 1:34 p.m., when were present on

22   behalf of the respective parties:
```

**Capital Reporting Company**

Page 2

1              A P P E A R A N C E S:

2

3    ON BEHALF OF PLAINTIFF:

4         DALE A. COOTER, ESQUIRE

5         COOTER, MANGOLD, TOMPERT & KARAS, LLP

6         5301 Wisconsin Avenue, N.W.

7         Suite 500

8         Washington, D.C.  20015

9         (202)537-0700

10

11

12   ON BEHALF OF DEFENDANT:

13        RODNEY F. PAGE, ESQUIRE

14        ALICIA HOGGES-THOMAS, ESQUIRE

15        BRYAN CAVE, LLP

16        700 13th Street, N.W.

17        Washington, D.C.  20005

18        (202)508-6000

19

20   ALSO PRESENT:  DANIEL HOLMESTOCK, VIDEOGRAPHER

21

22              *   *   *   *   *

**Capital Reporting Company**

Page 18

1    lists like this.

2        Q    Okay.  Did you have any role then in

3    the preparation of this?

4        A    I was aware that it was being done.

5        Q    Did you review it for purposes of

6    making comment?

7        A    No.

8        Q    Did you provide it to Mr. Cooter?

9        A    No.  I believe that it was sent to

10   Cooter by Mr. Glassman.

11       Q    Do you know why it was prepared?

12       A    Yes.

13       Q    Why is that?

14       A    Because the special purpose financial

15   statements that had been previously prepared did

16   not accurately reflect the economic reality of

17   what occurred in the course of this transaction.

18       Q    Which prior statement are you referring

19   to?  Which prior statement or statements are you

20   referring to?

21       A    I believe the -- I know for certain the

22   most recent ones, and I don't know, for instance,

## Capital Reporting Company

Page 19

1    this one that you gave me as Exhibit 48.

2         Q    Okay.  Your answer was that -- I'm

3    sorry, I'm going to paraphrase it, but I'm not

4    trying to misstate what you said.

5              Your answer was that it had been

6    determined or you had determined that there were

7    some aspects of previous statements that had been

8    prepared incorrect -- incorrectly.

9              Is that a fair statement of what you

10   said?

11        A    No.  You asked me --

12        Q    All right.

13        A    -- what statements had been prepared

14   incorrectly, and I said I know for sure these

15   statements, this statement, Exhibit 48 --

16        Q    Right.

17        A    -- had been prepared incorrectly.  I

18   don't know that -- you know, I haven't reviewed

19   each and every other statement before that.

20        Q    All right.  In what way was the prior

21   statement or any other prior statements incorrect,

22   as you understand it?

**Capital Reporting Company**

Page 20

1       A       The biggest reason that they're

2   incorrect is that S & S Finance is an internal

3   bank that funds projects under the G & R umbrella

4   and expects a return on the capital that is

5   funded.

6               And that our accounting department had

7   classified capital that had been infused into

8   Montgomery Road I Limited Partnership as equity

9   when, in reality, it was debt.

10      Q       All right.  Any others, any other ways

11  in which it was incorrect?

12      A       There was an issue regarding a loan

13  discount that was incorrectly stated in the

14  statements.

15              There was a million dollar loan

16  discount that S & S obtained when they purchased

17  the first mortgage on the property, and that was

18  incorrectly reflected on the statements.

19              And there were some costs put into the

20  special purpose financial statements that were

21  not -- that shouldn't have been put in there.

22      Q       Any others that you can think of?

## Capital Reporting Company

Page 21

1       A       No, those three are it, I can think of

2    now.

3       Q       On the second page which you have open

4    in front of you, the very top right in the title

5    is the following, I guess sentence is what it is.

6               It states as follows, "Revised for no

7    loan discount, no TDR costs, and 100 percent S & S

8    Finance debt."

9               Do you see that?

10      A       Um-hum.

11      Q       That's a shorthand reference for each

12   of the three items that you just described, right?

13      A       Yes.

14      Q       When was it that Greenebaum & Rose

15   Associates, Montgomery Road, LP, or anyone else

16   came to the conclusion that these three items had

17   been recorded incorrectly in prior statements?

18      A       I don't recall specifically when it

19   was.

20      Q       I showed you Exhibit No. 48 earlier.

21   You still have that in front of you, right?

22      A       Um-hum.

**Capital Reporting Company**

Page 22

1       Q      What's the date of that letter that

2    Mr. Cooter's colleague sent?

3       A      September 21st, 2006.

4       Q      And the date of Exhibit 52 in front of

5    you is November 21 --

6       A      Um-hum.

7       Q      -- 2006?

8              Would it be fair to conclude that the

9    decision that this had been an error occurred

10   sometime between September 21 and November 21?

11      A      No.

12      Q      When was it, then, in your recollection

13   and under oath today that it was first determined

14   that there had been an error in these three

15   matters?

16      A      I don't know.

17      Q      Who would know within the entity

18   Montgomery Road Limited Partnership or Greenebaum

19   & Rose Associates?

20      A      I don't know.

21      Q      You know that you were designated today

22   to testify on the preparation of Exhibit 52?

**Capital Reporting Company**

Page 23

```
1       A       Yes.

2               MR. COOTER:  Wait just a minute.  One

3       thing at a time.

4               He was designated to testify as to the

5       methodology of the revised statement.  That's

6       what he was designated to testify to, which

7       is different from what you just said.

8   BY MR. PAGE:

9       Q       Who would know as to when those

10  decisions were made?

11      A       Decisions?

12      Q       Decisions to change the -- and correct

13  the three items that you just described?

14      A       I'm confused.  You just asked me when

15  they were prepared, you didn't say anything about

16  decisions.

17      Q       No.  I'm asking you when it was that

18  the decision was made, the determination was made

19  to change the accounting for those three items,

20  when was that decision made?

21      A       I don't know.

22      Q       And your testimony today is it did not
```

**Capital Reporting Company**

Page 24

1    occur after September 21?

2         A     No, that's not my testimony.

3         Q     What is your testimony?

4         A     You asked the question, I think you

5    said is it fair to assume that it was done between

6    September 21st, 2006 and November 21, 2006.  And I

7    said I don't know.  Because I don't know when this

8    statement was prepared.

9         Q     Mr. Liffmann, who was involved in the

10   determination to revise the financial statements

11   with respect to these three items?

12        A     Counsel, myself, Mr. Rose.

13        Q     Anyone else?

14        A     Who was involved in the decision?

15        Q     Yes.

16        A     Mr. Glassman.

17        Q     Okay.  Was there a specific meeting or

18   conversation at which the decision or

19   determination was made to change these three

20   items?

21             MR. COOTER:  You can answer that but

22        only yes or no, if you can remember.

**Capital Reporting Company**

Page 25

1       A     No, there was not a specific meeting.

2    BY MR. PAGE:

3       Q     Was there a specific meeting with

4    counsel where this was discussed?

5            MR. COOTER:  I instruct him not to

6       answer.

7            MR. PAGE:  As to whether there was a

8       meeting with counsel?

9            MR. COOTER:  Your question is in two

10      parts.  Was there a meeting with counsel is

11      the first part, that is not objectionable.

12           The second is where this was discussed.

13      The substance of what was discussed with

14      counsel, embodied by your question, I

15      instruct him not to answer.

16           MR. PAGE:  He's already answered it was

17      discussed with counsel, so I don't see why

18      that's an issue.  I'm trying to pin down the

19      date.

20   BY MR. PAGE:

21      Q     I want to know when it was, the

22   decision was made to restate these financial

**Capital Reporting Company**

Page 26

1    statements.

2         A    I understand that.  I don't have the

3    specific date.

4         Q    Okay.  Let me try to narrow the scope.

5              It was after the litigation was filed

6    by Montgomery Road Limited Partnership against

7    VIAD, correct?

8         A    Yes.

9         Q    It was after contracts were signed for

10   the sale of the property with Mid Atlantic,

11   correct?

12        A    When were the contracts signed by Mid

13   Atlantic?

14        Q    You don't remember?

15        A    I don't remember precisely.

16        Q    You know there are contracts that have

17   been signed by Mid Atlantic, correct?

18        A    I'm aware of that.

19        Q    All right.  Let's find them.

20             MR. COOTER:  We'll accept your proffer

21        as to a date, Mr. Page.

22   BY MR. PAGE:

## Capital Reporting Company

Page 27

1      Q      Mr. Liffmann, on November 2, Mr. Rose

2   wrote to VIAD enclosing a notice of a contract of

3   sale and indicating that -- excuse me, I

4   misstated.

5             He indicated that there had been a

6   change in the contract of sale that had been

7   agreed to earlier with TC Mid Atlantic

8   Development, Inc.

9             The umbrella agreement, which I have

10  here in front of me, and I'll be glad to show you,

11  is made and entered into as of August 10, 2006.

12     A      Okay.

13     Q      Does that refresh your recollection as

14  to when the agreement to sell the property --

15     A      August 10th was the date that the

16  contract was signed.

17     Q      Okay.

18     A      Or effective.

19     Q      Now I'm going to return to my question

20  which was, was the decision or determination to

21  change these three accounting treatments made

22  after August 10 of 2006?

**Capital Reporting Company**

Page 28

1    A    I believe so.

2    Q    What was the rationale for deciding to

3    change the TDR costs that are referred to in

4    the -- on the second page of the document that I

5    handed you?

6    A    Which document?  I have two documents.

7    Q    Okay.  Exhibit 52.

8    A    Okay.

9    Q    Second page at the top.  For shorthand,

10    I referred you to the statement there, "Revised

11    for no loan discount, no TDR costs, and 1,000" --

12    excuse me, "100 percent S & S Finance debt."

13         You see that?

14    A    Yes.

15    Q    I want to focus for the time being just

16    on the "no TDR costs."

17    A    Um-hum.

18    Q    What does TDR costs mean, as far as you

19    know?

20    A    In this instance, it means the cost of

21    approximately 7 to 10,000 TDRs that were purchased

22    for this property, for this entity, Montgomery

**Capital Reporting Company**

Page 29

1    Road.

2        Q    And when -- the shorthand said "no TDR

3    costs."

4            What does that mean?

5        A    It's been adjusted to back out those

6    TDR costs.

7        Q    These were costs which had earlier been

8    included in the financial statements; is that

9    correct?

10       A    That's my understanding.

11       Q    Well -- okay.  Why was the decision

12   made to change that, what's the rationale for it?

13       A    Because it was an administrative

14   mistake to include them.

15       Q    Why was it a mistake?

16       A    Because the TDRs -- these financial

17   statements are called special purpose

18   statements -- well, they're actually called

19   special purpose financial statements, they're for

20   a special purpose, that is to compute what

21   transportation leasing of VIAD might be entitled

22   to.

**Capital Reporting Company**

Page 30

1              And transportation leasing or VIAD is

2    not entitled to the TDRs, so putting the cost of

3    those 7500 to 10,000 TDRs into these statements

4    was incorrect.

5        Q    Do you know when it was that they had

6    been put into the financial statements?

7        A    No.

8        Q    Would it surprise you to know that they

9    were put in as early as year 2000?

10       A    No.

11       Q    Are you aware that they were included

12   in the right of first refusal, the TDRs, for the

13   level three contract when the right of first

14   refusal was put to VIAD?

15       A    No.

16       Q    Did you make any independent review

17   yourself of the cash participation agreement to

18   determine if VIAD was in fact entitled to

19   participate in any sale of the TDRs?

20       A    That's why we have lawyers.  They're

21   the only ones who can read this agreement.

22       Q    Any basis, any at all in fact for your

Page 31

1    statement that VIAD is not entitled to participate

2    based on -- in the sale of the TDR costs -- excuse

3    me, the sale of the TDRs except for what counsel

4    has told you?

5         A    Can you repeat that?

6         Q    Yes.

7         A    It was very long.

8         Q    I'm sorry.

9              Is there any basis you have, any fact

10   you can point me to, other than the advice from

11   counsel, for your contention that VIAD is not

12   entitled to participate with respect to the sale

13   of the TDRs on property at 90 K Street?

14        A    Yes.

15        Q    What?

16        A    They're not part of the property.

17   They're a commodity that is freely traded back and

18   forth between developers and users.

19             Other than the 7500 TDRs that was the

20   administrative mistake, VIAD hasn't paid or taken

21   any -- paid for any of them, and there's a large

22   part of them that we don't own and haven't

**Capital Reporting Company**

Page 32

1    perfected yet and are still working on.

2         Q      Anything else?

3         A      That's all I can think of for now.

4         Q      Let's talk about the loan discount.

5                What was the rationale for revising the

6    financial statements to change the treatment of

7    the loan discount?

8         A      The loan discount arose because there

9    was a massive liquidity crisis in the real estate

10   business, and S & S Finance was able to buy the

11   loan from a third party at a discount.

12               S & S Finance became the new lender, I

13   think you called it permitted lender, and that

14   discount of approximately a million dollars should

15   ignore S & S Finance, not to Montgomery Road I

16   Limited Partnership.  S & S Finance is the lender,

17   has always been the lender, they acquired a loan,

18   first mortgage loan secured by a deed of trust.

19        Q      So your point would be that S & S is

20   different from Montgomery Road, the rationale is

21   that because it's a different entity, the loan

22   discount would not apply to the Montgomery Road

**Capital Reporting Company**

Page 33

1    entity, is that it?

2         A     I understand, yes, S & S is definitely

3    different than Montgomery Road.

4         Q     Right.  And I'm sorry, I'm not trying

5    to put words in your mouth, but that's the reason

6    for the change in treatment?

7         A     Montgomery Road is not entitled to it.

8    S & S is the lender, it's a separate entity.

9         Q     Okay.  The 100 percent S & S Finance

10   debt, you see that reference?  Again I'm using --

11        A     Yes.

12        Q     Explain to me what that means.  What

13   was the change that was made here?

14        A     S & S Finance is an internal captive

15   finance company that funds G & R's projects.  Real

16   estate, it's capital intensive and especially real

17   estate like this that doesn't produce income or

18   not net income, is capital intensive, and money

19   that is infused in this over the years came from

20   S & S, originated from S & S, and was debt.

21             So these statements reflect the fact

22   that the monies came from S & S and was in fact --

**Capital Reporting Company**

Page 34

1    was in fact debt.

2        Q     Why was it necessary to change anything

3    to reflect that it was debt?

4             MR. COOTER:  I didn't hear the last

5        part of your question.  Why was it necessary

6        to do what?

7    BY MR. PAGE:

8        Q     Let me start over.

9             The change that was made in this

10   financial statement is to treat it as debt; is

11   that correct?

12       A     Yes.

13       Q     It had previously been classified as

14   equity; am I right about that?

15       A     Not all of it.

16       Q     Well, tell me what -- what I'm

17   incorrect about and what I'm correct about.

18       A     Well, S & S Finance is the holder of

19   the mortgage.  The permitted debt, the first

20   mortgage, that's been on property since the day we

21   bought it from VIAD.  I believe it has been shown

22   on previous statements as an -- under liabilities.

## Capital Reporting Company

Page 35

1      Q      Well, what was the change that was made

2    then?

3      A      Is this 48?  First mortgage note

4    payable, that's payable, this is the -- this is

5    48, first mortgage payable, payable to S & S.

6      Q      Well, what was the change that was made

7    in this new statement in November?

8      A      The change that was made was to reflect

9    that the additional monies that were infused over

10   the years to pay for real estate taxes,

11   assessments, bid pursuit costs, insurance, the

12   carry on that debt, the first mortgage debt, all

13   originated from S & S Finance and was improperly

14   classified as equity in Exhibit 48.

15     Q      Okay.  Let's get Exhibit 48 and compare

16   it with Exhibit 52, if you would.  There are a

17   couple of the specific schedules that I want to

18   look at first.

19            And if you have them side by side, let

20   me start with this.  In Exhibit 48 and in Exhibit

21   52, in each case we have a cover letter from

22   counsel, correct?

## Capital Reporting Company

Page 36

1    A    Yes.

2    Q    Then we turn the page, there's no cover

3    sheet on Exhibit 52, right?

4    A    Correct.

5    Q    Next page in Exhibit 48 is a table of

6    contents, we don't have that, right?

7    A    No.

8    Q    Then the next page on Exhibit 48 is the

9    text of a letter that appears to be prepared for

10   the signature of an accountant, right?

11   A    It's a letter; I don't know who it's

12   prepared for.

13   Q    Have you ever seen a letter like this

14   before in connection with these financial

15   statements?

16   A    Yes.

17   Q    Do you know whether an accounting firm

18   has been involved in the past in reviewing these

19   financial statements?

20   A    Yes.

21   Q    Do you know who it is?

22   A    Some group in Baltimore.

**Capital Reporting Company**

Page 37

1    Q    Okay.  Exhibit 52 has no such letter

2    attached to it, does it?

3    A    It does not.

4    Q    No outside accounting firm has looked

5    at Exhibit 52; is that correct?

6    A    Well, it has no such letter.  I don't

7    know if any of their accountants looked at it or

8    not.

9    Q    Do you know if an accounting firm has

10   looked at it?

11   A    I don't believe an accounting firm

12   looked at it.

13   Q    You don't contend that Exhibit 52

14   complies with the cash participation agreement in

15   its requirement of submitting an annual financial

16   statement, do you?

17   A    I'd ask my lawyer of that.

18   Q    Well, I'm going to ask you.  Why don't

19   you look at paragraph 2.6 of this document which

20   is the cash participation agreement.

21   A    What page?

22   Q    I think it's page 7, 6 or 7.

## Capital Reporting Company

Page 38

1  A  I'm on page 6.

2  Q  Okay.  You look at paragraph 2.6?

3  A  On page 6 there is no 2.6.

4  Q  I'm sorry, page 8, 2.6.

5  A  2.6?

6  Q  Yeah.  I want you to read that -- first

7 just read it to yourself.

8  A  Refers to paragraph 2.4 and 2.5.

9 (Witness reading to self).

10    I don't see the statements are required

11 for 2.4 and 2.5, but I have read 2.6.

12  Q  Okay.  You can ignore 2.4 and 2.5 for

13 now.

14  A  Okay.

15  Q  Okay?  You do not contend, do you,

16 Mr. Liffmann, that Exhibit 52 is a statement that

17 is submitted in compliance with paragraph 2.6, do

18 you?

19  A  Well, it's prepared with general

20 accepted accounting principles, applied on a basis

21 consistent with past practices bearing the

22 unqualified opinion of the firm and independent

**Capital Reporting Company**

Page 39

1    certified public accountant, satisfactory TSE.

2           There is no unqualified opinion of the

3    firm.  Certified public accountants attached to

4    it.

5       Q    Right.  And no accountants have

6    reviewed it as far as you know?

7       A    As far as I know, no.

8       Q    And your testimony is this was prepared

9    in accordance with GAAP?

10      A    That's what I've been told.

11      Q    Who told you that?

12      A    Ron Glassman.

13      Q    Do you believe the prior statements

14   submitted to VIAD and TLC were also prepared in

15   accordance with GAAP?

16      A    I haven't asked the question.

17      Q    Do you think they should have been?

18      A    Do I think they should have been?

19      Q    Yes.

20      A    It says they should be.

21      Q    All right.  Is it your view that both

22   the statements with the mistakes in them and this

**Capital Reporting Company**

Page 40

1    new statement, mistakes, you used the word

2    mistakes, the previous statements with mistakes

3    and the new one both comply with 2.6; is that your

4    view?

5         A    Say that again.

6         Q    Do you believe that the statements

7    submitted to TLC and VIAD have complied with

8    paragraph 2.6?

9         A    I believe that the methodology in the

10   previous statements is wrong because the cash

11   participation agreement was interpreted

12   incorrectly.

13        Q    And it has now been interpreted

14   correctly since the filing of this lawsuit,

15   correct?

16        A    Well, the reality is that S & S Finance

17   is not a partner in Montgomery Road, has never

18   been a partner, is a separate legal entity and

19   over the course of 18 years has infused many

20   millions of dollars.  So the reality of the

21   economics.

22             Transaction, how could that be equity?

**Capital Reporting Company**

Page 41

1    We must have read the cash participation or

2    tried -- I think we tried to interpret it

3    correctly, it's a very cumbersome document, but

4    S & S Finance could not put equity in, it would

5    have to be debt.  Or else S & S would be a partner

6    and they're not a partner, they're a lender.

7         Q     Now, are you aware that the tax returns

8    for S & S have treated the -- the amount of the

9    loan that is held as the first mortgage note as

10   equity?

11        A     I'm not aware of S & S's tax returns

12   and, frankly, don't see why it matters.

13        Q     You don't think there's any reason why

14   the tax returns would be relevant?

15        A     They could be relevant.  I don't think

16   in the end it changes what happened, S & S Finance

17   is a lender, not a partner, and they put capital

18   in as a lender.

19        Q     All right.  Let's go back to Exhibit

20   52, and I was going through the page-by-page

21   comparison.

22              Here's what I was trying to get to, Mr.

**Capital Reporting Company**

Page 42

1    Liffmann, and maybe you can help me short-circuit

2    it here.

3              I'm trying to find where the three

4    changes, no loan discount, no TDR costs and the

5    100 percent S & S Finance debt, how they show up

6    in these various schedules as changes.

7              Now, with the TDR costs, I think I can

8    nail that pretty quickly, there's a schedule

9    attached somewhere which is a schedule of costs

10   for the property.

11             And I take it -- and I'll refer you

12   specifically to page 7, it has the number seven at

13   the bottom.  You see that?

14   A     Seven, yes.

15   Q     Yes, and its title is "Schedule of

16   Project Costs."

17             Do you see that?

18   A     Yes.

19   Q     Now, there's a list of items here that

20   appear to be charges against the property, and

21   then the last item -- line item is "various costs

22   for TDRs."

**Capital Reporting Company**

Page 43

1              Do you see that?

2    A    Yes.

3    Q    Prior years, and then it's a reversal

4  or negative in parenthesis.

5              Do you see that?

6    A    Yes.

7    Q    Now, that appears to me to be the

8  change that was made for that item.  Am I correct

9  about that?

10   A    That's what it looks like, yes.

11   Q    All right.  Now, I don't know that that

12 shows up anywhere else, except that the cost

13 number is in -- carried on to the other schedules.

14   A    I think you take that, they subtract

15 it, it comes within the number of 938,341.

16   Q    Yes.

17   A    And then that's on the balance sheet

18 here as a project cost.

19   Q    Okay.  That's fine.

20              Now, can you walk me through how we

21 will find the reversal or change in numbers for

22 the no loan discount?  Where is that going to

## Capital Reporting Company

Page 44

1    appear?

2        A    I'm looking now at Exhibit 48.   The

3    statement of assets and liabilities, as first

4    mortgage payable, 9,000,270, and here it says

5    first mortgage no payable, 10,297,139.

6             So that's roughly $1,027,000.   That

7    must be the loan discount.

8        Q    Okay.  Any other place you find it in

9    here?

10        A    Here on page -- it said 5 in the upper

11    right-hand corner, but 4 on the bottom.

12             The loan discount is shown on the one,

13    two, three, fourth line, gain from willing

14    discount, 1,024,571.

15        Q    All right.  And that shows the reversal

16    of it, correct?  Let me rephrase that, I'm sorry.

17             You have two columns, middle column,

18    December '87 to December of '04, it's shown as a

19    deduction, but in the '05 statements it's added

20    back in in the separate column, right?

21        A    That's what's happening.  I mean,

22    that's the math of it, yes.  I don't know what

**Capital Reporting Company**

Page 45

1    exactly it shows.

2        Q    Okay.  I was just trying to walk

3    through the math of it.

4        A    Yeah.  He substracted 1,024,571 from

5    the number above, 19,445,478, came up with that

6    summation.

7        Q    Okay.  That's fine on the loan

8    discount.  Let's go through the S & S debt.

9        A    Okay.

10       Q    What changes are made on the financial

11   statements as a result of the decision to change

12   that?

13       A    Loan payable, S & S Finance,

14   18,874,695.  That isn't on this previous

15   statement.

16       Q    Okay.

17       A    And then accrued interest, S & S

18   Finance, 16, 9, 768,203.  I don't think any of

19   these other things deal with S & S Finance under

20   the liabilities section of the balance sheet of

21   Exhibit 52.

22       Q    Is it your view and belief that accrued

**Capital Reporting Company**

Page 46

1    expenses are permitted as deductions for expenses

2    under the cash participation agreement?

3        A    Say again?

4        Q    Is it your -- is it your view that the

5    cash participation agreement permits accrued

6    expenses to be deducted in the calculation of any

7    of the cash flows?

8        A    That's what legal counsel has advised

9    us.

10           MR. COOTER:  Strike that.  You can't

11           talk about what anybody has -- what your

12           lawyers have told you, okay?

13           He's asking you what your view is.  If

14           you have a view, you have a view; if you

15           don't, you don't.

16       A    Yes, it's my view that it can be

17    deducted from cash appreciation.

18    BY MR. PAGE:

19       Q    Do you know what cash basis accounting

20    is?

21       A    Yeah.

22       Q    Would a cash basis accounting permit