**EXHIBIT 24**



*VVI – Washington DC*
*90 K street*

**VIAD CORP**
1850 North Central Avenue
Phoenix, AZ 85077
602-207-4000

March 2, 2005

Mr. Brent Solomon MSF, CPA, CVA, CM&A                *via overnight mail*
Principal
Reznick Group, P.C.
7700 Old Georgetown Rd., Suite 400
Bethesda, MD. 20814

RE:   90 K Street, Washington, DC

Dear Brent:

Per our telephone conversation I am enclosing a summary document titled "Statement of TLC's Position" and the related Exhibits for your review.

Just to confirm:

- The purpose of our sending this information is to obtain an estimate of the cost involved for your firm to review the information and render an opinion as to the accuracy of our position.
- Sam Rose, of Greenebaum and Rose Associates, will be paying the costs associated with your review and he must receive and approve the estimated cost before you commence your review. I believe that you have already been in contact with Sam, but just in case you have not, his telephone number is (202) 686-3000.
- Finally, while we will appreciate your review of the documents and your opinion as to our interpretation of same, we wish to make it clear that your opinion is not binding on TLC/Viad Corp.

Before you commence any work on this project, please provide Sam and me with an estimated cost and an estimate of the time it will take to complete the review. I can be reached at (602) 207-6050. Also, we are providing a copy of this information to Sam Rose and we would like to receive a copy of any information that he may provide to you so that we can review and respond. Thank you.

Sincerely,

Eve Fiorucci
Assistant Director – Real Estate

Enclosures
cc w/encls:      Mr. Sam Rose/Greenebaum and Rose Associates
cc w/out encls:  Ms. Susan Mann /Viad Corp
                 Mr. Ken Goldman/Viad Corp

DEP. E. FIORUCCI
(11/7/06)
EXH. # 8

VD-000904

# STATEMENT OF TLC'S POSITION

**Synopsis of Transactions:**

On December 9, 1987, Montgomery Road I Limited Partnership ("Developer"), as purchaser, and Transportation Leasing Co. ("TLC"), the renamed former owner of the Greyhound Bus Lines company, as seller, entered into an Agreement for Developer to purchase TLC's property located at First and K Streets, N.E. (90 K Street), in Washington, D.C. (the "Property"). As part of the consideration for the sale of the property, Developer and TLC entered into a Cash Participation Agreement dated November 30, 1987 (**Exhibit 1**), under which TLC would receive 15% of any cash flow generated by the operation of the Property (the "Operations Cash Flow"), or by the sale, disposition or refinancing of the Property (the "Appreciation Cash Flow").

The parties amended the Cash Participation Agreement in 1989, effective as of December 9, 1987, to revise the definition of "Senior Mortgage" in Section 1.39 (**Exhibit 2**).

The Cash Participation Agreement remains in effect for so long as Developer or an Affiliate of Developer owns all or a portion of the Property (although TLC's right to receive a share of the Operations Cash Flow ends in 2087). TLC's interest was assigned to its parent corporation, Viad Corp, in 2000, but for consistency with the terminology used in the Cash Participation Agreement, that interest holder will be referred to herein as "TLC".

The definitions of terms used in the Cash Participation Agreement are detailed and extensive. An Appendix is attached listing the defined terms which are most important in understanding the disputes between Developer and TLC.

**Purpose of Cash Participation Agreement:**

As recited in the Cash Participation Agreement, its purpose was to describe how TLC would " . . . participate in the *cash flow* hereafter generated from the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing thereof." (Emphasis added.) It is important <u>not</u> to lose sight of what is to be measured under the Cash Participation Agreement – *cash flow*, as measured by "cash in" and "cash out". The use of accrued or imputed amounts or internal bookkeeping entries have no place in the analysis of this transaction, unless expressly permitted by the terms of the Cash Participation Agreement – an allowable Expense must reflect cash actually spent or distributed by the Developer; a computation of allowable Equity must reflect amounts actually advanced to the Developer by an Equity Holder; an allowable return to an Equity Holder must reflect an amount actually paid to an actual Equity Holder. Although the terms "paid", "actually incurred", and "actually advanced" are used throughout the Cash Participation Agreement to reflect this intent, it is easy to lose sight of the measurement of cash flow when applying normal accounting methodology and thought processes to the analysis of the transactions which have occurred or may occur.

**History of the Dispute between Developer and TLC:**

On June 26, 2000, Developer notified TLC of a pending sale of the Property pursuant to Section 4.1 of the Cash Participation Agreement (**Exhibit 3**). According to the notice, the sale price of the Property was $24,975,000, and the expected net proceeds would be $23,402,250. Developer provided a Schedule of Investment in Property as of December 31, 1999 which showed a total of Developer's Invested Equity, Developer's Operating Equity, and Developer's Equity Return in excess of $27,000,000 (**Exhibit 4**). Developer indicated that as a result of its calculations, there would be no positive cash flow from the sale transaction, but offered a payment of $10,000 to TLC in exchange for a prompt release of TLC's right of first refusal under the Cash Participation Agreement, and for TLC's immediate termination of the Cash Participation Agreement.

Other correspondence between the parties ensued, and on August 23, 2000, TLC notified Developer that TLC believed that Exhibit 4 had been calculated incorrectly, and overstated the amount of Developer's Equity which could be subtracted in calculating the Appreciation Cash Flow by $8,775,927, the amount of the Developer's Equity Return (**Exhibit 5**). TLC pointed out that under the definition of Appreciation Cash Flow in Section 3.1 of the Cash Participation Agreement, the Developer's Equity Return is not a permitted subtraction. When that error was corrected, TLC calculated that the proposed sale would produce a positive Appreciation Cash Flow of nearly $4.9 million, in which TLC was entitled to participate. TLC requested resolution of this dispute in accordance with Section 3.11 of the Cash Participation Agreement.

On September 12, 2000, Developer responded with the correspondence attached as **Exhibit 6**. Developer stated that in 1996, Developer's Affiliate S & S Finance had acquired the debt on the Property from Sun Chase for $9.3 million, and that in 1997 Developer had reclassified $7.3 million of that loan amount from debt to Developer's Invested Equity for internal bookkeeping purposes. Developer included a recalculation of Appreciation Cash Flow if the reclassified $7.3 million had been accounted for as debt rather than equity (**Exhibit 7**), and restated Special Purpose Statements revised September 11, 2000 (**Exhibit 8**). According to Developer, under the revised calculation method in Exhibit 7, TLC was still not entitled to an Appreciation Cash Flow Payment, although the Developer's net loss determined under this method was only $318,097 instead of the $6,243,570 loss calculated under the previous method.

On October 2, 2000, TLC responded with the correspondence attached as **Exhibit 9**. TLC questioned whether the acquisition of the first mortgage by Developer's Affiliate, disclosed in Exhibit 6, was a "Refinancing" under Section 3.2(b) of the Cash Participation Agreement, which should have triggered a disclosure by Developer and an analysis of whether an Appreciation Cash Payment was due TLC. TLC also raised concerns regarding Developer's classifications of debt and equity.

The proposed sale of the Property which triggered the original notice to TLC in 2000 was never consummated, for reasons unrelated to the disputes between Developer and TLC. However, the parties seek interpretation, analysis and application of the terms of the Cash Participation Agreement to resolve the issues which developed during the parties' correspondence in 2000.

VD-000906

**TLC's Positions and Goals:**

TLC's positions on the issues raised by the potential transaction in 2000 and the resulting correspondence between the parties and review of Developer's calculations and Special Purpose Statements are described below. TLC's positions have been developed based upon the provisions within the "four corners" of the Cash Participation Agreement, which, although complicated, were narrowly drafted and negotiated between the parties in order to carefully describe how actual *cash flow* was to be shared between the parties.

1. It is improper to subtract Developer's Equity Return when computing the Appreciation Cash Flow from a transaction pursuant to Section 3.1 of the Cash Participation Agreement; subtraction of the amount of Developer's Equity Return actually paid to Equity Holders is only appropriate in computing Expenses which can be deducted in determining Operations Cash Flow.

2. The 1996 acquisition of the first mortgage by Developer's Affiliate S & S Finance was a "Refinancing" under the Cash Participation Agreement, which should have been disclosed to TLC and should have triggered an Appreciation Cash Payment (or an analysis of whether such a payment was due) under Article 3.

3. The calculation of Developer's Invested Equity, Developer's Operating Equity, and Developer's Equity Return has been performed incorrectly, since any such amounts must be "actually incurred" and "paid" to Equity Holders to qualify as Expenses under Sections 1.26 and 2.3(a) of the Cash Participation Agreement, and must be "actually advanced" by Equity Holders to Developer under Sections 3.6(a) and 3.6(b). Developer has not established that all such amounts were actually paid by or advanced to Developer. Furthermore, any payments to or advances from Developer's Affiliate S & S Finance or its partners or shareholders do not satisfy the definitions of Developer's Invested Equity and Developer's Operating Equity because S & S Finance cannot be an Equity Holder unless it acquires title to the Property (see point 4).

4. The reclassification from debt to equity of the $7.3 million loan held by Developer's affiliated company was improper. Developer's Affiliate, S & S Finance, or its partners or shareholders, cannot be treated as Equity Holders under the Cash Participation Agreement, because according to Section 1.17, the partners or shareholders of an Affiliate can be Equity Holders only if title to the Property has been transferred to that Affiliate. Furthermore, Sections 3.6(a) and (b), which define the Developer's Invested Equity and Developer's Operating Equity, specifically carve out Permitted Debt, and Developer has claimed in Exhibit 6 that the acquisition of the debt by S & S Finance was Permitted Debt under the Cash Participation Agreement.

5. Because S & S Finance or its partners or shareholders cannot be treated as Equity Holders, no payments actually made to any of them can be treated as Expenses under Section 2.3(a)(15) covering payments to Equity Holders of Developer's Operating Equity and Developer's Equity Return, and no amounts actually advanced by them can be considered as

Developer's Invested Equity or Developer's Operating Equity, since according to Sections 3.6(a) and (b), such advances must be made by Equity Holders.

6.   The deduction of interest on such $7.3 million loan as an Expense is improper, unless Developer can demonstrate that interest was actually paid on such debt and not merely accrued, because under Section 2.3(b), interest must be actually paid on Permitted Debt in order to deduct it as an Expense.

7.   The recalculation of the Appreciation Cash Flow dated September 11, 2000 (Exhibit 7) was incorrect, because the amount of $2,155,454 subtracted in the line labeled "mortgage interest for 1997 to 1999 on 7.3M" was already subtracted as part of the amount of $11,239,268 deducted in the line labeled "less net equity invested on 1999 report" (see revised Schedule of Investment in Property, "interest expense through 12-31-99" line, page 4 of Exhibit 8). If the double subtraction of this amount is corrected, the revised amount should be a positive cash flow of approximately $1.7 million. If the transaction had closed, TLC would have been entitled to an Appreciation Cash Payment of $255,000.

Ultimately, TLC would like to accomplish the following goals during the dispute resolution process:

- Receive from Developer a set of accurate Special Purpose Statements and supporting Schedules for the period ended December 31, 2004, which correctly apply the provisions of the Cash Participation Agreement and correctly reflect the cash flow of the Property and Developer's Equity to date.

- Receive from Developer an analysis and calculation of whether TLC is entitled to an Appreciation Cash Payment as a result of the Refinancing which occurred when S & S Finance acquired the debt on the Property in 1996.

- Receive from Developer one or more pro forma calculations showing Appreciation Cash Flow for a hypothetical sale of the property closing January 1, 2005, which the parties could agree to use as a model for making an acceptable calculation in the event of a future sale.

We suggest that Developer submit drafts of such documents to TLC and to the arbitrator of these disputes for use as part of the dispute resolution process.

# APPENDIX

Definitions transcribed verbatim from the following sections of the Cash Participation Agreement (highlighting added by TLC to emphasize points discussed in the attached Statement of Position):

1.17 "Equity Holders" shall mean (i) if the Developer is a corporation, each and every shareholder of that corporation and (ii) if the Developer is a partnership, each and every partner of that partnership; provided, however, that an "Equity Holder" shall not include a partner or shareholder of Developer if the admission of that partner or shareholder caused a reduction in the Participating Percentage; further provided that "Equity Holder" shall include the partners or shareholders of an Affiliate of Developer if the Property has been transferred in whole or in part to the Affiliate pursuant to the provisions of Section 4.2 hereof.

1.26 "Operations Cash Flow" shall mean all Gross Revenues of the Property for a Fiscal Year minus all Expenses of the Property for that Fiscal Year.

2.3(a) For purposes of this Agreement, the term "Expenses" shall mean all reasonable expenses actually incurred by the Developer with respect to the ownership, operation, leasing and occupancy of the Property, determined on the basis of sound cash basis accounting practices applied on a consistent basis, including but not limited to any and all of the following (but without duplication of any item): (1) general real estate taxes; (2) special governmental assessments or similar charges; (3) personal property taxes; (4) sales taxes; (5) costs of utilities, air conditioning and heating for the Property; (6) maintenance and repair costs of a non-capital nature; (7) operating and reasonable and customary management expenses and fees; (8) premiums payable for insurance carried on or with respect to the Property; (9) interest and principle payable on Permitted Debt, as well as any fees and charges related thereto; (10) costs, including leasing commissions, advertising and promotion costs, to obtain new Leases or to extend or renew existing Leases, and the costs of work performed to ready tenant space in the property for new or renewal occupancy under Leases, provided that such costs are amortized over the primary term of the Lease; (11) accounting and audit fees and costs, attorneys' fees, and other administrative and general expenses and disbursements, in each case reasonably incurred by Developer in connection with the operation and management of the Property; (12) development fees paid to Developer or its Affiliates, provided that the total amount of such fees do not exceed five percent (5%) of the construction costs (which shall include hard costs only) of the Improvements; (13) amounts required to be paid by the Developer pursuant to Section 6 of the Purchase Agreement; (14) any portion of Gross Revenues approved by TLC which is deposited during the period in respect of which Expenses are being determined in a reserve account for future maintenance and repair costs of the Property (but excluding any reserves for replacements or improvements of a capital nature); and (15) amounts paid to Equity Holders in payment of the Developer's Operating Equity and the Developer's Equity Return.

2.3(b)  For purposes hereof, "**Permitted Debt**" shall mean (i) any debt secured by a Senior Mortgage and (ii) that portion of any debt incurred by Equity Holders, whether secured or unsecured, the proceeds of which are applied solely to fund all or part of (1) the purchase price of the Real Property, (2) predevelopment, development, construction costs (but excluding any cost representing Approved Deductions or Ineligible Deductions) with respect to the Property or (3) deficits incurred in the operation of the Property. If Permitted Debt is held by any Affiliate of Developer, interest paid thereon shall be included as an expense only to the extent that it does not exceed the amount of interest that would have been payable on an equivalent loan from an unrelated bank, savings and loan association, insurance company or other financial institution engaged in the business of making real estate construction loans, if such loan had been made on terms generally available in the District of Columbia area at the time such debt was incurred.

3.1  In addition to the Operations Cash Payment, Developer shall pay to TLC, in lawful money of the United States at the time or times and in the manner hereinafter described, the Appreciation Cash Payment. As used herein, the term **Appreciation Cash Flow** shall mean (i) the Agreed Value of the Property or applicable portion thereof, (ii) reduced by the sum of the Approved Deductions related to the Property or applicable portion thereof and the Closing Costs and (iii) reduced by the amount, if any, of the then remaining Developer's Invested Equity and Developer's Operating Equity; each determined as of the date(s) on which the Appreciation Cash Payment shall be payable, provided that in no event shall the Appreciated Cash Payment be less than zero.

3.2(b)  the refinancing of all or part of the principal sum of any indebtedness secured by the Property or the placing of any Senior Mortgage on the Property (hereinafter referred to as a "**Refinancing**".

3.6(a)  For purposes of this Agreement, the term "**Developer's Invested Equity**" shall mean at any time those amounts actually advanced to the Developer by the Equity Holders (other than amounts that are treated as Permitted Debt), which advances are used by Developer to pay (i) that portion of the Real Property's purchase price paid by Developer which is not represented by promissory notes or other evidences of indebtedness secured by a Mortgage on the Property, and (ii) predevelopment, development and construction expenses actually incurred by Developer that are not financed by borrowings secured by a Mortgage on the Property, but excluding (1) any Ineligible Deductions paid by Developer and (2) any costs included as Approved Deductions in any calculation of Appreciation Cash Flow.

3.6(b)  For purposes of this Agreement, the term "**Developer's Operating Equity**" shall mean at any time those amounts actually advanced to the Developer by the Equity Holders (other than amounts that are treated a Permitted Debt), which advances are used by the Developer for the operation of the Property, including, without limitation, interest and principal on Mortgages and operating expenses that are not financed by borrowings secured by a Mortgage on the Property, but excluding any Ineligible Deductions with respect thereto and any costs included as Approved Deductions in any calculation of Appreciation Cash Flow.

3.6(c) For purposes of this Agreement, the term "**Developer's Equity Return**" shall mean the unpaid sum total of each and every "Daily Equity Return." For purposes of this Section 3.06(c), a "Daily Equity Return" shall be computed for each day and shall be equal to the product of (i) the annual Prime Rate on such day divided by 365 and (ii) the sum of Developer's Invested Equity and Developer's Operating Equity on such day.