**EXHIBIT 25**

*Greenebaum & Rose Associates*
*5301 Wisconsin Avenue, N.W.*
*Suite 510*
*Washington, D.C. 20015*

March 30, 2005

**UPS/Next Day Air**
Brent Solomon, MSF, CPA, CVA, CNMA
Reznick Group, PC
7700 Old Georgetown Road
Suite 400
Bethesda, MD 20814-6224

Re: 90 K Street, Washington, DC

Dear Mr. Solomon:

    I have reviewed the statement of Transportation Leasing Co.'s position submitted to you by cover letter dated March 2, 2005. I am enclosing my response to that position statement. Since Sam Rose has been out of the country, I have not had the opportunity to review my response with him.

    We have previously furnished to you accounting statements reflecting the position and calculation of Greenebaum and Rose Associates with respect to the Cash Participation Agreement.

    Let us know if you require any further additional information from Greenebaum and Rose.

Sincerely,

Gerald M. Katz

GMK:jrg
Enclosure
G:\files\GMK.LTR\early2005\03-14solomon.doc
Cc: Mr. Samuel G. Rose (w/encl.)

## Statement of Greenebaum and Rose Associates, Inc.
## With Respect to Transportation Leasing Co. Position Statement

I. <u>The Accounting Question to be Determined.</u>

The question to be determined by Reznick Group is, in their opinion, what is the proper method of calculating Developer's Operating Equity, Developer's Invested Equity, and Appreciation Cash Flow in accordance with the Cash Participation Agreement dated November 30, 1987.

It is important initially to understand the genesis of the Cash Participation Agreement. An affiliate of Greenebaum and Rose Associates, Inc., Montgomery Road I Limited Partnership (the "Developer"), purchased property known as 90 K Street, Washington, D.C. from Transportation Leasing Co. ("TLC") simultaneously with the execution of the Cash Participation Agreement. TLC insisted at the time of the sale that it wanted to participate in Operations Cash Flow as well as any future Appreciation Cash Flow and insisted that the Cash Participation Agreement be executed by the Developer. There was very little negotiation with respect to the Cash Participation Agreement; rather, TLC insisted that its form be executed by the Developer. The Developer was willing to execute this agreement, since the intent of the agreement was to give the Developer a complete return of its investment and a return on its equity and a payoff of all debt, including interest, before any participation in Appreciation Cash Flow by TLC.

It is also important to understand the following:
a) The books of the Developer are maintained on the tax basis of accounting which is different from the cash basis of accounting. Nothing in the Cash Participation Agreement dictates the method of accounting to be used by Developer, but adjusting entries needed to be made for purposes of calculations under this Agreement were made.
b) Greenebaum and Rose funds its entities with either direct capital contributions from its owners, or advances from its financing affiliate, S&S Finance Limited Partnership ("S&S"), which are recorded as either capital contributions or loans. It would not be practical for Greenebaum and Rose, as well as other large companies, to obtain cash directly from its owners every time an invoice needs to be paid, as TLC's interpretation of the Cash Participation Agreement would require.
c) In 1997 the Developer reclassified $7,270,000 of the first mortgage debt to equity for tax reasons, but not for other purposes, and did not modify the recorded loan documentation. Again, nothing in the Cash Participation Agreement dictates Developer's tax treatment of any item, but appropriate accounting adjustments required under this Agreement were made.

In order to report the Developer's Operating Equity, Developer's Invested Equity, and Developer's Equity Return in accordance with the Cash Participation Agreement, the Developer prepared annually Special Purpose Financial Statements (the "Statements") compiled by an outside CPA firm, KAWG&F. These reports clearly showed the

1

accounting treatment to comply with the Cash Participation Agreement and were not questioned by TLC. In order to properly eliminate the effects of b above, the Statements reflected every receipt and every disbursement applicable to the 90 K Street property as an addition to or subtraction from Developer's Operating Equity or Developer's Invested Equity. A cumulative balance of combined Equity was maintained, and the Developer's Equity Return was calculated. In order to properly eliminate the effect of c above, the monthly interest that would have been paid on the $7,270,000 of debt reclassified was treated as an addition to Developer's Operating Equity on the last day of every month (along with interest on the remaining $2,000,000 of debt), and the debt balance was reflected at the full $9,270,000. The effect of item a above was properly eliminated by preparing the Statements on the accrual basis of accounting and then modifying the appropriate schedules in the Statements to convert to the cash basis of accounting.

II. Response to TLC's Positions.

The following responses are numbered to correspond to TLC's numbered paragraphs in its Position Statement.

1. Section 3.1 provides that the term "Appreciation Cash Flow" shall mean the Agreed Value of the Property reduced by certain items, including the amount of the remaining Developer's Invested Equity and Developer's Operating Equity. Section 3.3 defines Agreed Value as the gross sale price, and Section 3.4(a) says you reduce the sales price by Approved Deductions, which includes Permitted Debt.

Section 3.6(a) defines "Developer's Invested Equity" to mean those amounts actually advanced to the Developer by the Equity Holders, other than amounts that are treated as Permitted Debt, and predevelopment, development and construction expenses actually incurred by Developer that are not financed by borrowings secured by a mortgage, but excluding any costs included as Approved Deductions in calculating Appreciation Cash Flow, and certain other items.

Section 3.6(b) defines Developer's Operating Equity as meaning amounts actually advanced to the Developer by the Equity Holders, other than amounts that are treated as Permitted Debt, which advances are used by the Developer for the operation of the Property including interest and principal on mortgages and operating expenses not financed by borrowings secured by a mortgage on the property and excluding certain items.

Section 1.17 defines "Equity Holders" as meaning, if the Developer is a partnership, each and every partner of that partnership.

"Permitted Debt" is defined in Section 2.3(b) to include any debt secured by a Senior Mortgage and that portion of any debt incurred by Equity Holders whether secured or unsecured, the proceeds of which are applied solely to fund all or part of pre-development, development, construction costs or deficits incurred in the operations of the Property. This section further provides that if Permitted Debt is held by any affiliate of

2

SOL 0215

Developer, interest paid thereon shall be included as an expense only to the extent that it does not exceed the amount of interest that would have been payable on an equivalent loan from an unrelated lender.

Section 3.6(c) defines the term "Developer's Equity Return" as meaning the unpaid sum total of each and every "Daily Equity Return" which is computed based on the annual prime rate and the sum of Developer's Invested Equity and Developer's Operating Equity on each day.

It is submitted that the parties intent in determining Appreciation Cash Flow was to allow Developer to recover all of its equity and a return on that equity, whether in the form of interest on Permitted Debt or an interest calculation based on its actual equity. At the time of acquisition, and currently, the land is a vacant property with only a limited amount of Operations Cash Flow, if any, available from usage as a parking lot. It defies logic for TLC to suggest that in computing Operating Cash Flow, Developer can have an equity return from this raw land, but in computing Appreciation Cash Flow from the raw land, Developer would not be entitled to an equity return. If there was 100% financing for the acquisition and all expenses, TLC agrees that interest paid on that would be an expense. If the Developer uses part equity, however, TLC makes a distinction. Since the goal is to determine Appreciation Cash Flow to come up with a cash flow participation for TLC, the practical effect in determining that cash flow participation on Appreciation Cash Flow should be exactly the same whether funded by debt or equity. There should not be a windfall to either side based on the mechanics of funding.

It should be noted that the First Amendment to Cash Participation Agreement dated March 2, 1989 which was executed by TLC and Developer, amended the definition of Senior Mortgage in Section 1.39 to make it clear that mortgages or deeds of trust executed after the initial loan closing for the specified purposes would be senior to the TLC mortgage. In that case, the amendment was done to make it clear that the $1,500,000 second mortgage to the S&L that was used to fund carrying costs was also senior to the TLC mortgage. Thus, since TLC agreed, as it was required to do so under the Cash Participation Agreement, that debts incurred to fund carrying costs are senior to the TLC mortgage, it does not matter that this $1,500,000 debt (or any other debt, for that matter) was subsequently paid off by Developer since Developer is entitled to a return of that loan/equity including an interest factor in calculating the Appreciation Cash Flow, in order to properly reflect the intent of the parties.

TLC takes the position that Developer's Equity Return is not a deduction in computing Appreciation Cash Flow under Section 3.1. This may have simply been a scrivener's error by TLC in drafting the Cash Participation Agreement. Regardless, however, Developer's Equity Return is included in computing the deficit in Operations Cash Flow and that is sufficient. Also interest on Permitted Debt is a reduction before computing TLC's Appreciation Cash Payment. Further, in response to TLC's position that the amount must actually be paid, Developer is prepared, at or prior to the time of a sale, to make this payment of interest on this debt or its Developer's Equity Return or its Equity if this ministerial act is insisted upon by TLC.

3

The bottom line is that it is clear that Appreciation Cash Flow can only be determined by allowing Developer the benefit of interest on its debt and an interest calculation on its Equity.

2. The acquisition of the first mortgage debt by Developer's affiliate was and is under no reasonable accounting interpretation a "refinancing". A "refinancing" contemplates the payoff of one debt and the placement of an alternate debt. In this case, the same debt remained on the Property since its acquisition and continues to remain a debt on the Property as of this date. In the instant case, Section 3.2(b) defines a "refinancing" as the refinancing by the borrower of all or any part of the principal sum of any indebtedness secured by the Property or the placing of any Senior Mortgage on the Property; it does not encompass the acquisition of the debt from the lender. In this case, the principal sum of the indebtedness secured by the Property did not increase by the acquisition of the loan by Developer's affiliate.

Since this was not a refinancing, TLC was not required to be notified at the time of the transaction. Nevertheless, TLC was subsequently notified and advised in the financial statement and in any event, this point is irrelevant for purposes of the current issue. It should also be noted that Developer calculated its interest on this debt based on the $9,270,000 purchase price for the debt and not the full $10,300,000 loan balance so as to give TLC the benefit of the favorable acquisition price of the debt. Developer also credited the $1,024,571 purchase discount against its Developer's Invested Equity. Since this was not a cash receipt, if we were to use TLC's narrow interpretation of the Cash Participation Agreement, the $1,024,571 purchase discount should not reduce the Developer's Invested Equity.

3. As stated above, if TLC wants the interest on the debt or the Developer's Equity Return or Developer's Equity to be actually paid by Developer, then a check can be written at or prior to the time of the closing on any sale of the Property. As to TLC's position that payments to S&S do not satisfy the definition of Developer's Invested Equity and Developer's Operating Equity and S&S can not be an Equity Holder unless it acquires the property, this position misses the point and is not even a correct interpretation. Developer is not suggesting that S&S is an Equity Holder; rather, S&S is the holder of the Permitted Debt and is entitled to be paid interest and that interest is an appropriate deduction in computing Developer's Operating Equity and Operations Cash Flow. Further, the partners of Developer are the same as the partners of S&S and thus payments to S&S would also qualify for purposes of Developer's Invested Equity and Developer's Operating Equity. TLC was referring to Section 1.7 in the definition of "Equity Holder" which requires a transfer of the property to an affiliate, but Developer is not arguing that S&S is an Equity Holder.

4. As stated above in number 3, Developer is not arguing that S&S is an Equity Holder. Developer has previously advised TLC that its reclassification of $7,270,000 of the first mortgage loan to equity for purposes of the Cash Participation Agreement was

4

improper and the entire $9,270,000 should be treated as Permitted Debt. Thus, it is irrelevant that S&S may not be an Equity Holder.

In this case, the Property was acquired in December, 1987 from TLC for approximately $11,000,000, and Developer placed a first mortgage on the Property for $10,300,000 and in March, 1989 a second mortgage was placed on the property by the same lender in the amount of $1,500,000. In 1990, the S&L lender encountered financial difficulties and was taken over by RTC. In December, 1991, RTC required that the second mortgage be paid off and in 1992, RTC sold the first loan to an unrelated bank. Interest was paid on the first and second loans by Developer throughout their terms. In 1996, S&S acquired the first loan for $9,270,000 and interest continued to be accrued on that loan for purposes of this Agreement. S&S is owned by the partners of Developer. The first mortgage remains on the Property as of the current date. Interest is being accrued at no greater than market rates, i.e., one and a half over prime, in accordance with the Cash Participation Agreement. In January, 1997, $7,270,000 of the loan was classified for tax purposes as equity and was shown in the Special Purpose Financial Statements under the Cash Participation Agreement as Developer's Invested Equity. However, as has previously been stated to TLC by Developer, since TLC is making a distinction between Developer's Equity Return and Developer's Operating Equity, Developer agreed that for purposes of the Cash Participation Agreement, the annual interest on the full $9,270,000 debt should be included in calculating Developer's Operating Equity and would thus not be part of Developer's Equity Return, i.e., for purposes of Section 3.1 of the Cash Participation Agreement, the full interest should be allowed as a deduction in computing Appreciation Cash Flow.

TLC further argues that the $10,300,000 first mortgage loan is not Permitted Debt, presumably because it was acquired by an affiliate of Developer. Thus, TLC would have one believe that the $10,300,000 simply disappears for purposes of the Cash Participation Agreement, i.e., it is not debt and it is not equity. This argument is made by TLC notwithstanding the fact that essentially the entire purchase price paid to TLC for the property came from the first mortgage loan of $10,300,000. "Permitted Debt" is defined in Section 2.3(b)(i)(a) as any debt secured by a Senior Mortgage. Senior Mortgage is defined in Section 1.39 as meaning any and all mortgages, deeds of trust, etc. constituting liens on the Property and are senior in priority to the TLC mortgage and which constitutes security for loans made to the Developer solely for purposes of financing or refinancing a portion of the purchase price paid to TLC for the Property, as well as development and construction of the Property and deficits incurred in the operation of the Property and distributions to Equity Holders. Section 2.6(b) specifically states that Permitted Debt can be held by an affiliate of Developer so long as interest paid thereon does not exceed market rate.

TLC's reference to Section 3.6(a) and (b) which define Developer's Invested Equity and Developer's Operating Equity is also misplaced. Those sections exclude Permitted Debt only so that there is no duplication of deductions in computing the Appreciation Cash Flow.

5

SOL 0218

The weakness in TLC's position becomes further apparent when noting that TLC agrees to the interest paid on the Senior Mortgage as an Approved Expense, and the Senior Mortgage as Permitted Debt reducing the sale price, until the point that the Senior Mortgage was reacquired by an affiliate of Developer, at which point TLC stops counting it for purposes of <u>debt</u> <u>or</u> <u>as</u> <u>equity</u> and a return on equity.

5.  Again, TLC's position that S&S cannot be treated as an Equity Holder and therefore payments to S&S cannot be treated as expenses, is misplaced. Section 2.3(a)(15) cited by TLC allowing a deduction as an expense for amounts paid to Equity Holders in payment of Developer's Operating Equity and Developer's Equity Return is irrelevant since Developer is not suggesting that S&S is an Equity Holder. Rather, Developer is simply stating that the $10,300,000 mortgage debt is a Permitted Debt and further Developer is entitled to its return on equity (but, not so that this amount is duplicated).

6.  As stated above, Developer will make the payment of interest on the debt as required by the first mortgage if that is what TLC wants to see happen. However, it should be noted that TLC cites Section 2.3(b) for the proposition that interest must actually be paid on debt, not merely accrued, whereas Section 2.3(b) really is addressing that the interest to be paid must not exceed market rate. In fact, Section 2.3(a)(9) refers to interest and principal "payable" on Permitted Debt. This reference to an amount "payable" shows that an accrued and unpaid amount may be used for the interest calculation and loan principal owed.

7.  TLC is incorrect in its statement that the amount of $2,155,454 was already subtracted as part of the amount of $11,239,268 deducted in the line labeled "less net equity invested on 1999 report". The $2,155,154 referred to mortgage interest from 1997 to 1999 on the $7,270,000 of debt that had previously been reclassified. The $2,155,464 was initially added in as part of the interest from 1997 to 1999, but then it was deducted in the calculation of total equity of $11,239,268 as accrued interest as of 12-31-99. The calculation in TLC's Exhibit 7 included the $2,155,464 as a subtraction in order to show the net loss including the unpaid interest, which was accounted for as a payment on the 2000 Special Purpose Financial Statements. There is no double subtraction.

III.  <u>Conclusion.</u>

Developer has given TLC an accurate Special Purpose Financial Statement as of December 31, 2003 and is in the process of updating that statement to December 31, 2004 as requested by TLC. There was no refinancing when S&S Finance acquired the debt on the Property so there is no need to calculate any appreciation cash payment as a result of such debt purchase, although of course there would not be any Appreciation Cash Flow even if it were a refinancing as no cash was received. If desired by Reznick, Developer will produce the 12/31/04 Special Purpose Financial Statement and a proforma calculation of Appreciation Cash Flow as of January 1, 2005 with a hypothetical sale of the Property, however, this will involve the same calculation as has previously been given to TLC in 2000.

6

SOL 0219

It should also be noted this was at the time of acquisition and still remains vacant property with only a limited amount of Operations Cash Flow, if any, available from usage as a parking lot. It defies logic for TLC to suggest that in computing Operating Cash Flow, Developer can have an equity return from this raw land, but in computing Appreciation Cash Flow from the raw land, Developer would not be entitled to an equity return.

It is the Developer's position that TLC should receive only what was intended at the time of the execution of the Cash Participation Agreement and the purchase of the Property by Developer from TLC, i.e., 15% of the _real_ cash flow from appreciation after Developer receives a complete return of its equity and return on its equity and after deducting all of the debt and interest on such debt.

G:\files\GMK.GEN\05DOCS\3046G.doc

7

SOL 0220