**EXHIBIT 26**



**Reznick Group**

Reznick Group, P.C.
7700 Old Georgetown Road
Suite 400
Bethesda, MD 20814-6224

Tel: (301) 652-9100
Fax: (301) 652-1848
www.reznickgroup.com

April 10, 2005

Mr. Samuel G. Rose
Greenebaum & Rose Associates
5301 Wisconsin Avenue, NW
Washington, D.C. 20015

Dear Mr. Rose:

Pursuant to your request, we have performed independent business and accounting analysis related to Montgomery Road I Limited Partnership (the "Partnership), which owns real property located at First and K Streets, N.E. in Washington D.C. (the "Property"). We understand that our services are intended to assist in resolving a dispute between the Partnership and Viad Corp related to a Cash Participation Agreement dated November 30, 1987 (the "Agreement"). This report may only be used for the aforementioned purpose, and may not be distributed or used for other purposes without the express written consent of Reznick Group, P.C.

The objective of our analysis is to provide our business and accounting interpretation of certain terms provided in the Agreement, analyze the classification of certain costs and charges, and prepare a pro-forma calculation under the Agreement for a hypothetical sale of the Property. Our conclusions are based on our interpretation the Agreement by applying business and accounting judgments, and do not constitute a legal opinion, audit opinion, or any other form of assurance.

Our procedures included a review and analysis of the following:

- The Agreement and First Amendment dated March 2, 1989.

- The Special Purpose Financial Statements for the years ended December 31, 2002 and December 31, 2003.

- A letter from Viad Corp dated March 2, 2005, including nine exhibits, which provided a statement of Viad Corp's position.

- A letter and exhibit from Greenbaum & Rose Associates dated March 30, 2005, which provided a statement of Greenbaum & Rose Associates with respect to Viad Corp's position.

In performing our analysis, we relied upon the accuracy and reliability of all data that was provided to us. We did not audit, compile or review any financial data, and we express no opinion or any form of assurance on the data provided to us. Our engagement cannot be relied upon to disclose errors, fraud or other illegal acts that may exist.

Atlanta · Baltimore · Bethesda · Charlotte · Sacramento

Exh 10

SOL 0044

**Reznick Group**

Mr. Samuel G. Rose
April 10, 2005
Page 2

The following summarizes our analysis of the significant issues and our interpretation of the Agreement from a business and accounting perspective. All capitalized terms are based on definitions provided in the Agreement.

ISSUE 1: Is it proper to subtract Developer's Equity Return when computing the Appreciation Cash Flow?

> **Interpretation:** In our opinion, it is proper to deduct Developer's Equity Return in computing Appreciation Cash Flow by including the annual Developer's Equity Return as an allowable incurred Expense under Section 2.3 in computing Operations Cash Flow that is effectively paid from (and increases) Developer's Operating Equity. Developer's Operating Equity is then treated as a deduction in computing Appreciation Cash Flow under Section 3.1.
>
> **Analysis:** Developer's Equity Return is included in Section 2.3 as an allowable "incurred" Expense in computing Operations Cash Flow for each fiscal year. The Partnership has not generated positive cash flow internally, and has required equity contributions to pay its incurred Expenses. Accordingly, the annual expense for Developer's Equity Return could be accounted for by a contribution (increasing Developer's Operating Equity) and immediate distribution of cash (in payment of Developer's Equity Return), or a non-cash charge that increases Developer's Operating Equity. From an accounting and business perspective, there is no difference, and both result in an increase in Developer's Operating Equity equal to the incurred expense for Developer's Equity Return.

ISSUE 2: Was the 1996 acquisition of the first mortgage by S&S Finance Limited Partnership ("S&S"), which is owned by the same partners as the Developer, a refinancing that should have triggered an Appreciation Cash Payment?

> **Interpretation:** In our opinion, the 1996 acquisition of debt was not a refinancing that should have triggered an Appreciation Cash Payment.
>
> **Analysis:** The Agreement does not provide a specific definition for a refinancing. A refinancing typically contemplates obtaining a new loan and a partial or total repayment of an existing loan. In S&S's acquisition of the first mortgage, neither occurred, and the Partnership is assumed to be legally obligated under the terms of the original first mortgage. A sale of a mortgage by a holder outside of the reporting entity typically does not require any accounting at the entity that is obligated under the mortgage. Furthermore, an Appreciation Cash Payment would only be relevant if proceeds were realized (Section 3.3(c)) and no proceeds were realized from the acquisition of debt.

ISSUE 3: The question has been raised as to whether S&S or its partners can be treated as Equity Holders and whether payments to any of them can be treated as Expenses in computing Operations Cash Flow under Section 2.3(a), or if advances by them can be treated as Developer's Invested Equity or Developer's Operating Equity under Section 3.6(a) or Section 3.6(b).

**Reznick Group**

Mr. Samuel G. Rose
April 10, 2005
Page 3

**Interpretation:** In our opinion, any amount advanced by S&S or its partners to pay interest or any other reasonable expense should be treated as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b).

**Analysis:** S&S is an affiliate of the Developer and has the same partners. It should make no difference from a business or accounting perspective under the Agreement whether an advance is actually made by S&S or a partner of S&S. The partners of S&S are Equity Holders because they are the partners of the Developer. Payments are often made by an affiliate company on behalf of its owners for convenience, and as long as the substance is a payment by a partner of that affiliate, than it is typical to give accounting recognition to this nominee treatment (i.e., the payment was really a payment from an affiliate entity to an owner of the affiliate, and a contribution by the owner to the entity). Accordingly, payments by S&S would be accounted for as payments by an Equity Holder.

**ISSUE 4:** What is the effect of certain non-cash charges for interest incurred on the first mortgage on the computation of Operations Cash Flow under Section 2.3(a) or in computing Developer's Invested Equity and Developer's Operating Equity under Sections 3.6(a) and 3.6(b).

**Interpretation:** In our opinion, there is no substance or effect on these computations whether amounts actually payable are satisfied in cash or by a non-cash charge.

**Analysis:** In substance, there is no difference for purposes of computing Operations Cash Flow between a cash payment for interest and a non-cash charge for interest that satisfies the Partnership's obligation for interest due. A cash payment for interest would require the Equity Holders to advance the amount due (increasing Developer's Operating Equity) and then cause the Partnership to make a payment to S&S. Accordingly, there would be no difference on Operations Cash Flow or Developer's Operating Equity. Furthermore, the partners of the Developer are the same as the partners of S&S, so in substance, contributions by S&S or partners of S&S would be treated as if it were made by an Equity Holder.

**ISSUE 5:** For financial reporting purposes and computations under the Cash Participation Agreement, the first mortgage (held by S&S) was reclassified by the Developer as equity. This raised a question as to whether this classification was proper, and whether the first mortgage is considered Permitted Debt.

**Interpretation:** In our opinion, the first mortgage is best classified as debt on the Partnership and this debt would be Permitted Debt.

**Analysis:** The First Amendment provides that Permitted Debt includes any debt secured by a Senior Mortgage and that Permitted Debt may be held by an Affiliate of the Developer as long as interest charged does not exceed interest charged by a financial institution in similar real estate loans.


Reznick Group

Mr. Samuel G. Rose
April 10, 2005
Page 4

The effect of treating the mortgage as equity or debt would not have a material effect on computations under the Agreement. The substance of the Agreement is that a both outstanding principal and interest on a mortgage, and equity contributed and return on equity are considered in computations of Operations Cash Flow (as allowable expenses under Section 2.3) and Appreciation Cash Flow (as part of Developer's Operating Equity). Therefore, computations under the Agreement would only be effected if the interest rate charged on the mortgage differed from the rate used to compute the Daily Equity Return. The "carve out" in Section 3.6(a) and Section 3.6(b) appears to be intended to ensure that amounts are treated as debt or equity, but not double counted.

ISSUE 6: The 1996 acquisition of the first mortgage by S&S occurred at a $1,024,571 discount to the outstanding loan balance. This type of transaction is neither contemplated nor prohibited by the Agreement. The question is what type of accounting, if any, should this transaction, which occurred outside of the Partnership, receive for purposes of computations under the Agreement?

**Interpretation:** In our opinion, for purposes of computations in accordance with the Agreement, interest should only be charged on the amount paid by S&S to acquire the first mortgage.

**Analysis:** The discount on the mortgage would be considered an unreasonable related party fee if not passed on to the Partnership (Section 2.3(b) and Section 3.7). We have been informed that the interest charged to the Partnership has been reduced as if the outstanding balance was reduced to the amount paid to acquire the debt and the amount of Developer's Invested Equity has also been reduced in an amount equal to the discount.

Our overall interpretation is that the Agreement was intended to allow Viad Corp to participate in residual economic earnings (both annually and upon a capital event) in the event that the Partnership generated economic earnings in excess of amounts invested and a reasonable return on amounts invested. Amounts invested clearly contemplated both debt and equity and the Agreement provides for a return on debt (i.e., interest) and a return on equity. Accordingly, it is appropriate to make deductions for "return on" and "return of" invested amounts for purposes of computing both Operations Cash Flow and Appreciation Cash Flow. In determining equity invested, it is not relevant for accounting purposes whether amounts were invested in cash or in substance, or whether advances were made directly by Equity Holders or advanced on their behalf by an affiliate entity controlled by the Equity Holders. We believe this interpretation is also consistent with our experience with similar real estate transactions.

Based on our interpretation, and reliance on all financial information provided to us without independent verification, we have prepared a pro-forma calculation showing Appreciation Cash Flow (see Exhibit A). The pro-forma is calculation assumes a hypothetical sales price equal to the amount that would cause Appreciation Cash Flow to equal zero solely for purposes of this pro-forma. We were not asked to provide an independent opinion on the value of the Property, and we did not perform such an analysis.

SOL 0047



Reznick Group

Mr. Samuel G. Rose
April 10, 2005
Page 5

We reserve the right to modify this report should additional facts come to our attention. Our fees for this engagement are based on our standard hourly billing rates and are in no way contingent on the outcome of our engagement.

We sincerely appreciate this opportunity to be of service to you. If you have any questions regarding these matters, please call us.

Sincerely,

REZNICK GROUP, P.C.

Brent Solomon, MSF, CPA, CVA, CM&A

BSS/nw

cc:   Eve Fiorucci, Viad Corp

MONTGOMERY ROAD I LIMITED PARTNERSHIP  
(90 K STREET ONLY)  
PRO-FORMA COMPUTATION OF APPRECIATION CASH FLOW  
AS OF DECEMBER 31, 2003

EXHIBIT A

| | |
|---|---:|
| Agreed Upon Value of the Property (a) | $ 37,815,571 |
| **Less: Approved Deductions and Closing Costs** | |
| Outstanding Balance of Permitted Debt (b) | 9,270,000 |
| Sum of Appreciation Cash Flows calculated with respect to previously occurring Sales of an Interest (c) | - |
| Closing Costs (d) | 1,134,467 |
| Total Approved Deductions and Closing Costs | 10,404,467 |
| **Less: Remaining Developer's Equity** | |
| Developer's Invested Equity (e) | 2,430,961 |
| Developer's Operating Equity (e) | 14,003,264 |
| Developer's Operating Equity (f) | 10,976,879 |
| Total Developer's Equity Deductions | 27,411,104 |
| **APPRECIATION CASH FLOW** | $ 0 |

### NOTES
a  Computed sales price to make Appreciation Cash Flow equal to $0.00 (i.e., the breakeven point)  
b  Represents discounted amount of loan, actual outstanding balance is $10.3 million  
c  Assumes no previously occurring Sales of an Interest  
d  Assumed 3% closing costs  
e  Based on 12/31/03 compiled financial statements prepared by KAWG&F  
f  Based on the 12/31/03 compiled financial statements prepared by KAWG&F amount reported as Developer's Equity Return. This amount should be reflected as Developer's Operating Equity.