## SITE DESCRIPTION

| | |
|---|---|
| Location: | 90 K Street, NE<br>Washington, D.C. 20002 |
| | The subject site occupies the eastern 3/8 of the block bounded by North Capitol, K, 1st and L Streets, NE in the NoMA section of the Capitol Hill office submarket. |
| Shape: | Rectangular |
| Topography: | Level at street grade |
| Land Area: | 2.38 acres |
| | 103,878 square feet |
| Frontage: | The subject fronts along the north side of K Street, the west side of 1st Street and the south side of L Street, NE |
| Access: | The subject property has good access. |
| Visibility: | The subject property has good visibility. |
| Soil Conditions: | We did not receive nor review a soil report (for load-bearing issues). However, we assume that the soil's load-bearing capacity is sufficient to support existing and/or proposed structure(s). We did not observe any evidence to the contrary during our physical inspection of the property. Drainage appears to be adequate. |
| Utilities: | All available |
| Site Improvements: | The site improvements include sidewalks, curbs and drainage. |
| Land Use Restrictions: | We were not given a title report to review. We do not know of any easements, encroachments, or restrictions that would adversely affect the site's use. However, we recommend a title search to determine whether any adverse conditions exist. |
| Flood Zone: | The subject property is located in flood zone C. |
| Flood Zone Description: | FEMA Zone C: Areas outside of a 100-year flood hazard. |
| FEMA Map & Date | 110001 0020B, dated November 15, 1985 |
| Wetlands: | We were not given a Wetlands survey. If subsequent engineering data reveal the presence of regulated wetlands, it could materially affect property value. We recommend a wetlands survey by a competent engineering firm. |
| Hazardous Substances: | We observed no evidence of toxic or hazardous substances during our inspection of the site. However, we are not trained to perform technical environmental inspections and recommend the services of a professional engineer for this purpose. |
| Overall Site Utility: | The subject site is functional for its contemplated use as offices. |
| Location Rating: | After considering all of the locational aspects of the subject, including regional and local accessibility as well as overall visibility, we concluded that the location of this property is good. |

**SITE DESCRIPTION**

**TAX PARCEL MAP**





## REAL PROPERTY TAXES AND ASSESSMENTS

**Current Property Taxes**

The subject property is located within the taxing jurisdiction of the District Of Columbia. The assessors parcel identification numbers are Square 674 Lot 432. According to the local assessor's office, taxes are current. The assessment and taxes for the property are presented below:

| PROPERTY ASSESSMENT INFORMATION | |
|---|---|
| Assessor's Parcel Number: | Square 674 Lot 432 |
| Assessing Authority: | District of Columbia |
| Current Tax Year: | 2007 |
| Are taxes current? | Taxes are current |
| Is there a grievance underway? | Not to our knowledge |
| The subject's assessment and taxes are: | Below market levels |

| ASSESSMENT INFORMATION | |
|---|---|
| Assessed Value | Totals |
| Land: | $27,008,280 |
| Improvements: | 59,890 |
| Taxable Assessment: | $27,068,170 |

| TAX LIABILITY | |
|---|---|
| Total Tax Rate | 1.8500 |
| Total Property Taxes | $500,761 |

*Compiled by Cushman & Wakefield, Inc.*

After reviewing the assessment and our final value conclusion herein, we formed the opinion that the subject property is assessed below market levels.

**CUSHMAN & WAKEFIELD.**

## General Information

The property is zoned C-3-C by District of Columbia. Permitted uses within this district include office, retail, housing, and mixed uses. Prohibited uses within this district include industrial uses.

This locale is a receiving zone for transferable development rights (TDRs).

A summary of the subject's zoning is provided below:

| ZONING | |
|---|---|
| **Municipality Governing Zoning:** | District of Columbia |
| **Current Zoning:** | C-3-C |
| **Change In Zone Likely:** | No |
| **Change To:** | Not applicable |
| **Zoning Change Applied For:** | No |
| **Zoning Variance Applied For:** | Not applicable |
| **Permitted Uses:** | Permitted uses within this district include office, retail, housing, and mixed uses. |
| **Prohibited Uses:** | Prohibited uses within this district include industrial uses. |

| ZONING REQUIREMENTS | CODE | SUBJECT CONFORM |
|---|---|---|
| Maximum Building Height: | 90 ft | Conforming |
| Maximum Floor Area Ratio (FAR): | 9.6 times lot area | Conforming |
| Maximum Lot Coverage (% of lot area): | 100% | Conforming |
| Minimum Yard Setbacks | | |
| Front (feet): | 0 | Conforming |
| Rear (feet): | 0 | Conforming |
| Side (feet): | 0 | Conforming |
| Required On-Site Parking: | | |
| Spaces per 1,000 square feet: | 1 space per 1,000 SF gross floor area above 2,000 SF | Conforming |

*Compiled by Cushman & Wakefield, Inc.*

## Zoning Conformance

The subject lies in one of the downtown receiving zones for transferable development rights, the acquisition of which would allow the developers to increase the density of their development. The *potential* allowable FAR for the subject site is 10.0 with a height of 130 feet. The developer reportedly has plans for a 9.6 FAR multi-building development.

We analyzed the zoning requirements in relation to the subject property. We are not experts in the interpretation of complex zoning ordinances but based on our review of public information, the subject property appears to be a conforming use. Even so, the determination of compliance is beyond the scope of a real estate appraisal.

We know of no deed restrictions, private or public, that further limit the subject property's use. The research required to determine whether or not such restrictions exist, however, is beyond the scope of this appraisal assignment. Deed restrictions are a legal matter and only a title examination by an attorney or title company can usually uncover such restrictive covenants. Thus, we recommend a title search to determine if any such restrictions do exist.

CUSHMAN & WAKEFIELD.

## HIGHEST AND BEST USE

**Definition Of Highest And Best Use**

According to *The Dictionary of Real Estate Appraisal*, Fourth Edition (2002), a publication of the Appraisal Institute, the highest and best use is defined as:

> The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.

**Highest And Best Use Criteria**

The highest and best use analysis generally involves consideration of the subject site under two scenarios: as though vacant land and as presently improved. The highest and best use of the underlying land may differ from that of the property as improved if the improvements do not constitute an appropriate use. The existing use, however, should be continued until the value of the land, less the cost to demolish the existing improvements, exceeds the value of the property as currently improved.

We have evaluated the site's highest and best use both as currently improved and as if vacant. In both cases, the property's highest and best use must meet four criteria. That use must be (1), legally permissible (2) physically possible, (3) financially feasible, and (4) maximally productive.

<u>Legally Permissible</u>

The legal permissibility of a potential use on the subject site is governed by the zoning in effect at the time of the appraisal. As described in the Zoning section, the subject site is zoned C-3-C by the District of Columbia. According to our understanding of the zoning ordinance, permitted uses within this district include office, retail, housing, and mixed uses. This municipality also cites certain uses that are prohibited in this zone. Prohibited uses within this district include industrial uses.

Aside from the site's zoning regulations, we are not aware of any legal restrictions that limit the potential uses of the subject.

<u>Physically Possible</u>

The physical possibility of a use is determined by characteristics such as size, shape, topography, the availability of utilities, and any other physical aspects of the site. The subject site contains 103,878 square feet. The site is level at street grade, and is rectangular in shape. The site has good frontage, good access, and good visibility. The overall utility of the site is considered to be very good.

All public utilities are available to the site including public water and sewer, gas, electric and telephone. Overall, the site is considered adequate to accommodate most permitted development possibilities.

<u>Financial Feasibility and Maximal Productivity</u>

The third and fourth tests are what is financially feasible and what will produce the highest net return. After analyzing the physically possible and legally permissible uses of the property, the highest and best use must be considered in light of financial feasibility and maximum productivity. For a potential use to be seriously considered, it must have the potential to provide



## HIGHEST AND BEST USE

a sufficient return to attract investment capital over alternative forms of investment. A positive net income or acceptable rate of return would indicate that a use is financially feasible.

Financially feasible uses are those uses that can generate a profit over and above the cost of acquiring the site, and constructing the improvements. Determining the value of a property upon completion of new construction typically requires an in depth analysis of the economic factors that drive value including the condition of the local market, the location of the subject property, the proposed use of the property, its tenancy (owner-user, single tenant, multi-tenant), level of pre-leasing, an estimate for absorbing vacant space, leasing costs, operating expenses, market vacancy and rental rates.

Of the uses that are permitted, possible, and financially feasible, the one that is considered to be maximally productive is considered the highest and best use. Determining which use is maximally productive is often straightforward, but at times it can be quite complicated. Detailed analysis of values, costs, and returns will need to be conducted for the various uses being put to this final test.

### Conclusion

We considered the legal issues related to zoning and legal restrictions. We have analyzed the physical characteristics of the site to determine what legal uses would be possible use. We then considered the financial feasibility of these uses, in order to determine the use that we feel is the one that is maximally productive.

Considering the subject site's physical characteristics and location, as well as the state of the local office market, it is our opinion that the Highest and Best Use of the subject site as though vacant is office development as and when dictated by market conditions.



## VALUATION PROCESS

### Methodology

There are three generally accepted approaches available in developing an opinion of value: the Cost, Sales Comparison and Income Capitalization approaches. We have considered each in this appraisal to develop an opinion of the market value of the subject property. In appraisal practice, an approach to value is included or eliminated based on its applicability to the property type being valued and the quality of information available. The reliability of each approach is dependent upon the availability and comparability of the market data uncovered as well as the motivation and thinking of purchasers in the market for a property such as the subject. Each approach is discussed below, and applicability to the subject property is briefly addressed in the following summary.

### Land Value

Developing an opinion of land value is typically accomplished via the Sales Comparison Approach by analyzing recent sales transactions of sites of comparable zoning and utility adjusted for differences which exist between the comparables and the subject. Valuation is typically accomplished using a unit of comparison such as price per square foot of land, price per acre, price per unit, or price per square foot of potential building area (FAR). Adjustments are applied to the unit of comparison from an analysis of comparable sales, and the adjusted unit of comparison is then used to derive a value for the subject site.

### Cost Approach

The Cost Approach is based upon the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements which represent the highest and best use of the land; or when relatively unique or specialized improvements are located on the site, for which there exist few improved sales or leases of comparable properties.

In the Cost Approach, the appraiser forms an opinion of the cost of all improvements, depreciating them to reflect any value loss from physical, functional and external causes. Land value, entrepreneurial profit and depreciated improvement costs are then added resulting in a value estimate for the subject property.

### Sales Comparison Approach

The Sales Comparison Approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject property. Valuation is typically accomplished using a unit of comparison such as price per square foot of building area, effective gross income multiplier or net income multiplier. Adjustments are applied to the unit of comparison from an analysis of comparable sales, and the adjusted unit of comparison is then used to derive a value for the subject property.

### Income Capitalization Approach

This approach first determines the income-producing capacity of a property by utilizing contract rents on leases in place and by estimating market rent from rental activity at competing properties for the vacant space. Deductions then are made for vacancy and collection loss and operating expenses. The resulting net operating income is divided by an overall capitalization rate to derive an opinion of value for the subject property. The capitalization rate represents the

---

VALUATION SERVICES                      30                      

## VALUATION PROCESS

relationship between net operating income and value. This method is referred to as Direct Capitalization.

Related to the Direct Capitalization Method is the Discounted Cash Flow Method. In this method, periodic cash flows (which consist of net operating income less capital costs) and a reversionary value are developed and discounted to a present value using an internal rate of return that is determined by analyzing current investor yield requirements for similar investments.

### Summary

This appraisal employs only the Sales Comparison Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable for market participants.

The valuation process is concluded by analyzing each approach to value used in the appraisal. When more than one approach is used, each approach is judged based on its applicability, reliability, and the quantity and quality of its data. A final value opinion is chosen that either corresponds to one of the approaches to value, or is a correlation of all the approaches used in the appraisal.

CUSHMAN & WAKEFIELD.

## LAND VALUATION

We used the Sales Comparison Approach to develop an opinion of land value. In this method, we analyzed prices buyers have recently paid for similar sites in the market, as well as examined current offerings. In making comparisons, we adjusted the sale prices for differences between this site and the comparable sites. If the comparable was superior to the subject, a downward adjustment was made to the comparable sale. If inferior, an upward adjustment was made. We present on the following pages a summary of pertinent details of sites recently sold that we compared to the subject site.

In the valuation of the subject site's fee simple interest, the Sales Comparison Approach has been used to establish prices being paid for comparably zoned land. The most widely used and market oriented unit of comparison for properties with characteristics similar to those of the subject are price per square foot of potential building area (FAR). All transactions utilized in this analysis are based on the most appropriate method used in the local market.

The major elements of comparison utilized to value the subject site include the property rights conveyed, the financial terms incorporated into the transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its utility and the physical characteristics of the property.

The comparables and our analysis are presented on the following pages.

### OFFICE LAND SALE LOCATION MAP

CUSHMAN & WAKEFIELD.

LAND VALUATION

CUSHMAN &
WAKEFIELD.

33

VALUATION SERVICES

# LAND VALUATION

## SUMMARY OF OFFICE LAND SALES

| No. | Location | PROPERTY INFORMATION | | | | | TRANSACTION INFORMATION | | | | | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Size (sf) | Potential Building Area | Zoning | Site Utility | Public Utilities | Grantor | Grantee | Sale Date | Sale Price | $/SF Build. | |
| 1 | 100 M Street, NE, Washington, DC | 302,429 | 2,200,000 | C-2-C | Excellent | All Available | Louraco/Akridge | Stonebridge/Walton Street | 3/06 | $122,000,000 | $55.45 | Constitution Square will eventually contain 2.2 msf of office, residential, and retail space. The first phase, which is set to begin in early 2007 will be a 350,000 sf office building and a 550,000 sf residential tower with first floor retail. Prior sale Sep 03 at $7.634 million or a compound growth rate of 187%. |
| 2 | 77 K Street NE, Washington, DC | 33,566 | 285,311 | C-3-C | Good | All Available | Carfritz | ING Clarion | 3/06 | $24,000,000 | $84.12 | Previously under contract--however, buyer (ING) has filed suit to force seller to accept terms of previous contract. Seller is reportedly marketing the project at the above price. Artist's rendering of building under construction as of spring 2006. |
| 3 | 1111 North Capital Street NE, Washington, DC | 86,725 | 500,000 | C-3-C | Good | All Available | Stern & Moran | WB/BFP North Capitol Street, LLC-J St | 10/05 | $25,597,269 | $51.19 | The Smithsonian warehouse on the property has 3-6 years remaining on the lease depending on the owner or tenant terminating. The existing building will be retained and the new development will be added to achieve and expected 500,000 SF total-5.76 FAR. The NE lot is under contract for $12,000,000 or $63 to $67/FAR based on allowable/planned. Settlement set for May/June 2006. |
| 4 | 1200 1st St NE, Washington, DC | 108,885 | 908,523 | C3C, Washington | Good | All Available | Department of Housing and Community | First & M, LLC | 8/05 | $58,000,000 | $63.84 | 1st building is under construction at FAR pricing of $60/SF. 2nd & 3rd buildings planned at $55/SF FAR. |
| 5 | 60 L Street NE, Washington, DC | 127,050 | 628,000 | C-M-3, Washington | Good | All Available | 52 L Street Data Center LLC | JF NoMa LLC | 6/05 | $35,769,703 | $57.14 | This assemblage planned for 650,000 in net office buildings. The price above includes demolition costs paid by buyer. This property in escrow with April/May closing at $78 million including 358,000 SF of TDRs. Deducting an estimated $4/TDR from the price results in net contract price of $76.598 million or about $76/SF of mixed use planned development (650,000 SF office + 362,500 SF residential). This contract buyer has purchased the allowable density by TDRs. |
| 6 | 731-733 2nd Street NE, Washington, DC | 34,444 | 206,664 | PUD-072 | Good | All Available | H Street Overpass, LLC | SH Holdings No. 777 LLC | 1/05 | $14,500,000 | $70.16 | This parcel is the eastern-most in a large multi-parcel development by the buyer called "Station Place". The Station Place project is a series of office buildings being constructed adjacent to Union Station in Northeast Washington, DC. It is a large parcel of land that will eventually have up to 2.1 million square feet of office space. The entire project is zoned as a PUD where a maximum FAR of 6.0 is allowed. |
| | **STATISTICS** | | | | | | | | | | | |
| | Low | 33,566 | 206,664 | | | | | | 1/05 | $14,500,000 | $51.19 | |
| | High | 302,429 | 2,200,000 | | | | | | 3/06 | $122,000,000 | $84.12 | |
| | Average | 115,183 | 787,750 | | | | | | 9/05 | $46,644,495 | $63.95 | |

Compiled by Cushman & Wakefield, Inc.

VALUATION SERVICES

CUSHMAN & WAKEFIELD.

# LAND VALUATION

## OFFICE LAND SALE ADJUSTMENT GRID

| No. | Price Per Building Area/SF | Property Rights Conveyed | Conditions of Sale | Financing | Market(1) Conditions | Per SF of Building Subtotal | Location | Size | Public Utilities | Utility(2) | Other | Adj. Price Per SF of Building | Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Economic Adjustments (Cumulative) | | | | | Property Characteristic Adjustments (Additive) | | | | | | |
| 1 | $55.45 3/06 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 1.5% | $56.29 1.5% | Similar 0.0% | Larger 10.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $61.92 10.0% | Inferior |
| 2 | $84.12 3/06 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 1.5% | $85.38 1.5% | Similar 0.0% | Smaller -10.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $76.84 -10.0% | Superior |
| 3 | $51.19 10/05 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 3.6% | $53.04 3.6% | Superior -10.0% | Smaller -5.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $45.08 -15.0% | Superior |
| 4 | $63.84 8/05 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 4.5% | $66.71 4.5% | Similar 0.0% | Smaller -5.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $63.38 -5.0% | Superior |
| 5 | $57.14 8/05 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 4.5% | $59.71 4.5% | Similar 0.0% | Smaller -5.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $56.73 -5.0% | Superior |
| 6 | $70.16 8/05 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 4.5% | $73.32 4.5% | Superior -10.0% | Smaller -10.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $58.66 -20.0% | Superior |

| | | |
|---|---|---|
| $51.19 | - Low | Low - $45.08 |
| $84.12 | - High | High - $76.84 |
| $64.95 | - Average | Average - $60.43 |

*Compiled by Cushman & Wakefield, Inc.*

(1) **Market Conditions Adjustment Footnote**
Compound annual change in market conditions:  5.00%
Date of Value (for adjustment calculations):  6/24/06

(2) **Utility Footnote**
Utility includes shape, access, frontage and visibility.

CUSHMAN & WAKEFIELD®

VALUATION SERVICES

## LAND VALUATION

### Discussion of Adjustments

Property Rights Conveyed

The property rights conveyed in a transaction typically have a bearing on the price that is paid. Acquiring the fee simple interest implies that the buyer is acquiring the full bundle of rights. Acquiring a leased fee interest typically means that the property being acquired is encumbered by at least one lease, which is a binding agreement transferring rights of use and occupancy to the tenant. A leasehold interest involves the acquisition of a lease, which conveys the rights to use and occupy the property to the buyer for a finite period of time. At the end of the lease term, there is typically no reversionary value to the leasehold interest. An appropriate adjustment was made to each comparable in comparison to the subject to account for the property rights conveyed. No adjustments were needed.

Financial Terms

The financial terms of a transaction can have an impact on the sale price of a property. A buyer who purchases an asset with favorable financing might pay a higher price, as the reduced cost of debt creates a favorable debt coverage ratio. A transaction involving above-market debt will typically involve a lower purchase price tied to the lower equity returns after debt service. We analyzed all of the transactions to account for atypical financing terms. To the best of our knowledge, all of the sales utilized in this analysis were accomplished with cash or market-oriented financing. Therefore, no adjustments were required.

Conditions of Sale

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. However, all sales used in this analysis are considered to be "arms-length" market transactions between both knowledgeable buyers and sellers on the open market. Therefore, no adjustments were required.

Market Conditions

The sales that are included in this analysis date between January 2005 and March 2006. As the market has improved over this time period, we applied an annual adjustment of 5.00 percent.

Location

An adjustment for location is required when the locational characteristics of a comparable property are different from those of the subject property. The subject property is rated good in location. We made a downward adjustment to those comparables considered superior in location versus the subject. Conversely, an upward adjustment was made to those comparables considered inferior. We adjusted Sales 3 and 6 downward because of their superior locations. Sale 3 fronts on North Capitol Street, which we deemed superior to the subject's L Street or 1st Street, NE addresses. Sale 6 is part of the 2 msf Station Place development.

Size

The size adjustment generally reflects the inverse relationship between unit price and lot size. Smaller lots tend to sell for higher unit prices than larger lots, and vice versa. Hence, upward adjustments were made to larger land parcels, and downward adjustments were made to smaller land parcels. Considering paired sales analysis and other methods of evaluating size

---



## LAND VALUATION

adjustments, the data does not demonstrate a size adjustment. Nevertheless, we made an upward adjustment to Sale 1 due to its sheer size and downward adjustments to all the other sales.

Public Utilities

The availability of public utilities is an important aspect that has a bearing on the value of a property. Municipal utility providers often provide utilities such as gas, water, electric, sewer, and telephone. However, there are cases where certain utilities may not be available by the municipality. Hence, it is important to understand the availability of public utilities in reference to the comparable properties, as well as the subject property. All of the sales, like the subject, had full access to public utilities at the time of sale; therefore, no adjustments were required.

Utility

The subject parcel is adequately shaped to accommodate a typical building. It has good access, good frontage and good visibility. Overall, it has been determined that the site has very good utility. When a comparable was considered to have superior or inferior utility, the appropriate adjustment was made. The subject is offers a corner location as do the sales. Hence, no adjustment was needed.

Other

In some cases, other variables will impact the price of a land transaction. Some examples include soil or slope conditions, restrictive zoning, easements, wetlands or external influences. In our analysis of the comparables we found that no unusual conditions existed at the time of sale. As a result, no adjustments were required.

**Conclusion of Site Value**

After a thorough analysis, the comparable land sales reflect adjusted unit values ranging from a low of $45.08 per building square foot to $76.84 per building square foot, with an average of $60.43 per building square foot. We placed substantial reliance on all sales. Sales 4 and 5 needed the least adjustment and thus received greater consideration.

Therefore, we concluded that the indicated value by the Sales Comparison Approach was:

| AS IS VALUE CONCLUSION | Price Per Building SF |
|---|---|
| Indicated Value | $65.00 |
| Allowable Development | x 997,229 |
| Indicated Value | $64,819,872 |
| Rounded to nearest $100,000 | $64,800,000 |
| $/unit basis | $64.98 |
| | |
| **FINAL VALUE CONCLUSION** | **$64,800,000** |
| $/Unit Basis | $65 |

*Cushman & Wakefield, Inc.*



## RECONCILIATION AND FINAL VALUE OPINION

**Valuation Methodology Review and Reconciliation**

This appraisal employs only the Sales Comparison Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable for market participants.

The approaches indicated the following:



| FINAL VALUE RECONCILIATION | | |
| --- | --- | --- |
| | As Is Value | $/FAR |
| Date of Value | June 24, 2006 | |
| **VALUATION OF LAND ONLY** | | |
| Land Value | $64,800,000 | $65 |
| | | |
| Final Value Conclusion | $64,800,000 | $65 |

*Compiled by Cushman & Wakefield, Inc.*

**Market Value As Is**

Based on our appraisal as defined by the *USPAP*, we developed an opinion that the Market Value As Is of the Fee Simple estate of the referenced property, subject to the assumptions and limiting conditions, certifications, extraordinary and hypothetical conditions, if any, and definitions, on June 24, 2006 was:

**SIXTY-FOUR MILLION EIGHT HUNDRED THOUSAND DOLLARS**

**$64,800,000**

CUSHMAN & WAKEFIELD.

## ASSUMPTIONS AND LIMITING CONDITIONS

"Report" means the appraisal or consulting report and conclusions stated therein, to which these Assumptions and Limiting Conditions are annexed.

"Property" means the subject of the Report.

"C&W" means Cushman & Wakefield, Inc. or its subsidiary that issued the Report.

"Appraiser(s)" means the employee(s) of C&W who prepared and signed the Report.

The Report has been made subject to the following assumptions and limiting conditions:

1.  No opinion is intended to be expressed and no responsibility is assumed for the legal description or for any matters that are legal in nature or require legal expertise or specialized knowledge beyond that of a real estate appraiser. Title to the Property is assumed to be good and marketable and the Property is assumed to be free and clear of all liens unless otherwise stated. No survey of the Property was undertaken.

2.  The information contained in the Report or upon which the Report is based has been gathered from sources the Appraiser assumes to be reliable and accurate. The owner of the Property may have provided some of such information. Neither the Appraiser nor C&W shall be responsible for the accuracy or completeness of such information, including the correctness of estimates, opinions, dimensions, sketches, exhibits and factual matters. Any authorized user of the Report is obligated to bring to the attention of C&W any inaccuracies or errors that it believes are contained in the Report.

3.  The opinions are only as of the date stated in the Report. Changes since that date in external and market factors or in the Property itself can significantly affect the conclusions.

4.  The Report is to be used in whole and not in part. No part of the Report shall be used in conjunction with any other analyses. Publication of the Report or any portion thereof without the prior written consent of C&W is prohibited. Reference to the Appraisal Institute or to the MAI designation is prohibited. Except as may be otherwise stated in the letter of engagement, the Report may not be used by any person(s) other than the party(ies) to whom it is addressed or for purposes other than that for which it was prepared. No part of the Report shall be conveyed to the public through advertising, or used in any sales, promotion, offering or SEC material without C&W's prior written consent.

    Any authorized user(s) of this Report who provides a copy to, or permits reliance thereon by, any person or entity not authorized by C&W in writing to use or rely thereon, hereby agrees to indemnify and hold C&W, its affiliates and their respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorneys' fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the Report by any such unauthorized person(s) or entity(ies).

5.  Except as may be otherwise stated in the letter of engagement, the Appraiser shall not be required to give testimony in any court or administrative proceeding relating to the Property or the Appraisal.

6.  The Report assumes (a) responsible ownership and competent management of the Property; (b) there are no hidden or unapparent conditions of the Property, subsoil or structures that render the Property more or less valuable (no responsibility is assumed



## ASSUMPTIONS AND LIMITING CONDITIONS

for such conditions or for arranging for engineering studies that may be required to discover them); (c) full compliance with all applicable federal, state and local zoning and environmental regulations and laws, unless noncompliance is stated, defined and considered in the Report; and (d) all required licenses, certificates of occupancy and other governmental consents have been or can be obtained and renewed for any use on which the value opinion contained in the Report is based.

7.  The physical condition of the improvements considered by the Report is based on visual inspection by the Appraiser or other person identified in the Report. C&W assumes no responsibility for the soundness of structural members or for the condition of mechanical equipment, plumbing or electrical components.

8.  The forecasted potential gross income referred to in the Report may be based on lease summaries provided by the owner or third parties. The Report assumes no responsibility for the authenticity or completeness of lease information provided by others. C&W recommends that legal advice be obtained regarding the interpretation of lease provisions and the contractual rights of parties.

9.  The forecasts of income and expenses are not predictions of the future. Rather, they are the Appraiser's best opinions of current market thinking on future income and expenses. The Appraiser and C&W make no warranty or representation that these forecasts will materialize. The real estate market is constantly fluctuating and changing. It is not the Appraiser's task to predict or in any way warrant the conditions of a future real estate market; the Appraiser can only reflect what the investment community, as of the date of the Report, envisages for the future in terms of rental rates, expenses, and supply and demand.

10. Unless otherwise stated in the Report, the existence of potentially hazardous or toxic materials that may have been used in the construction or maintenance of the improvements or may be located at or about the Property was not considered in arriving at the opinion of value. These materials (such as formaldehyde foam insulation, asbestos insulation and other potentially hazardous materials) may adversely affect the value of the Property. The Appraisers are not qualified to detect such substances. C&W recommends that an environmental expert be employed to determine the impact of these matters on the opinion of value.

11. Unless otherwise stated in the Report, compliance with the requirements of the Americans with Disabilities Act of 1990 (ADA) has not been considered in arriving at the opinion of value. Failure to comply with the requirements of the ADA may adversely affect the value of the Property. C&W recommends that an expert in this field be employed.

12. If the Report is submitted to a lender or investor with the prior approval of C&W, such party should consider this Report as only one factor together with its independent investment considerations and underwriting criteria, in its overall investment decision. Such lender or investor is specifically cautioned to understand all Extraordinary Assumptions and Hypothetical Conditions and the Assumptions and Limiting Conditions incorporated in this Report.

13. In the event of a claim against C&W or its affiliates or their respective officers or employees or the Appraisers in connection with or in any way relating to this Report or



## ASSUMPTIONS AND LIMITING CONDITIONS

this engagement, the maximum damages recoverable shall be the amount of the monies actually collected by C&W or its affiliates for this Report and under no circumstances shall any claim for consequential damages be made.

14. If the Report is referred to or included in any offering material or prospectus, the Report shall be deemed referred to or included for informational purposes only and C&W, its employees and the Appraiser have no liability to such recipients. C&W disclaims any and all liability to any party other than the party that retained C&W to prepare the Report.

15. By use of this Report each party that uses this Report agrees to be bound by all of the Assumptions and Limiting Conditions, Hypothetical Conditions and Extraordinary Assumptions stated herein.

**Extraordinary Assumptions**

An extraordinary assumption is defined by the *USPAP* (2005 Edition, The Appraisal Foundation, page 3) as "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

This appraisal employs no extraordinary assumptions.

**Hypothetical Conditions**

A hypothetical condition is defined by the *USPAP* (2005 Edition, The Appraisal Foundation, page 3) as "that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

This appraisal employs no hypothetical conditions.



# CERTIFICATION OF APPRAISAL

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

4. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

8. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

9. Steven M. Halbert, J.D., MAI, MRICS, did make a personal inspection of the property that is the subject of this report.

10. No one provided significant real property appraisal assistance to the persons signing this report.

11. As of the date of this report, Steven M. Halbert, J.D., MAI, MRICS, has completed the continuing education program of the Appraisal Institute.



Steven M. Halbert, J.D., MAI, MRICS
Senior Director
District of Columbia Certified General Real Estate Appraiser
Certificate No. GA 10262
Dated July 11, 2006



## GLOSSARY OF TERMS & DEFINITIONS

**Definitions of Value, Interest Appraised and Other Terms**

The following definitions of pertinent terms are taken from *The Dictionary of Real Estate Appraisal*, Fourth Edition (2002), published by the Appraisal Institute, as well as other sources.

Market Value

Market value is one of the central concepts of the appraisal practice. Market value is differentiated from other types of value in that it is created by the collective patterns of the market. A current economic definition agreed upon by agencies that regulate federal financial institutions in the United States of America follows, taken from Advisory Opinion-22 of *USPAP* of The Appraisal Foundation:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  Buyer and seller are typically motivated;

2.  Both parties are well informed or well advised, and acting in what they consider their own best interests;

3.  A reasonable time is allowed for exposure in the open market;

4.  Payment is made in terms of cash in US dollars or in terms of financial arrangements comparable thereto; and

5.  The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

Leased Fee Interest

An ownership interest held by a landlord with the rights of use and occupancy conveyed by lease to others. The rights of the lessor (the leased fee owner) and the lessee are specified by contract terms contained within the lease.

Leasehold Interest

The interest held by the lessee (the tenant or renter) through a lease transferring the rights of use and occupancy for a stated term under certain conditions.

Market Rent

The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the specified lease agreement including term, rental adjustment and revaluation, permitted uses, use restrictions, and expense obligations; the lessee and lessor each acting prudently and knowledgeably, and assuming consummation of a lease contract as of a specified



## GLOSSARY OF TERMS & DEFINITIONS

date and the passing of the leasehold from lessor to lessee under conditions whereby:

1.  Lessee and lessor are typically motivated.

2.  Both parties are well informed or well advised, and acting in what they consider their best interests.

3.  A reasonable time is allowed for exposure in the open market.

4.  The rent payment is made in terms of cash in United States dollars, and is expressed as an amount per time period consistent with the payment schedule of the lease contract.

5.  The rental amount represents the normal consideration for the property lease unaffected by special fees or concessions granted by anyone associated with the transaction.

### Cash Equivalence

A price expressed in terms of cash, as distinguished from a price expressed totally or partly in terms of the face amounts of notes or other securities that cannot be sold at their face amounts. Calculating the cash-equivalent price requires an appraiser to compare transactions involving atypical financing to transactions involving comparable properties financed at typical market terms.

### Value As Is

The value of specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal; relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning.

### Prospective Value Opinion

A forecast of the value expected at a specified future date. A prospective value opinion is most frequently sought in connection with real estate projects that are proposed, under construction, or under conversion to a new use, or that have not achieved sellout or a stabilized level of long-term occupancy at the time the appraisal report is written.

### Prospective Value Upon Reaching Stabilized Occupancy

The value of a property as of a point in time when all improvements have been physically constructed and the property has been leased to its optimum level of long-term occupancy. At such point, all capital outlays for tenant improvements, leasing commissions, marketing costs, and other carrying charges are assumed to have been incurred.

### **Exposure Time and Marketing Time**

### Exposure Time

Under Paragraph 3 of the Definition of Market Value, the value opinion presumes that "A reasonable time is allowed for exposure in the open market". Exposure time is defined as the length of time the property interest being appraised would have



## GLOSSARY OF TERMS & DEFINITIONS

been offered on the market prior to the hypothetical consummation of a sale at the market value on the effective date of the appraisal. Exposure time is presumed to precede the effective date of the appraisal.

The reasonable exposure period is a function of price, time and use. It is not an isolated opinion of time alone. Exposure time is different for various types of property and under various market conditions. As noted above, exposure time is always presumed to precede the effective date of appraisal. It is the length of time the property would have been offered prior to a hypothetical market value sale on the effective date of appraisal. It is a retrospective opinion based on an analysis of past events, assuming a competitive and open market. It assumes not only adequate, sufficient and reasonable time but adequate, sufficient and a reasonable marketing effort. Exposure time and conclusion of value are therefore interrelated.

Based on our review of national investor surveys, discussions with market participants and information gathered during the sales verification process, a reasonable exposure time for the subject property at the value concluded within this report would have been approximately six (6) months. This assumes an active and professional marketing plan would have been employed by the current owner.

Marketing Time

Marketing time is an opinion of the time that might be required to sell a real property interest at the concluded market value level. Marketing time is presumed to start during the period immediately after the effective date of an appraisal. (Marketing time is subsequent to the effective date of the appraisal and exposure time is presumed to precede the effective date of the appraisal). The opinion of marketing time uses some of the same data analyzed in the process of developing a reasonable exposure time opinion as part of the appraisal process and it is not intended to be a prediction of a date of sale or a one-line statement.

We believe, based on the assumptions employed in our analysis, as well as our selection of investment parameters for the subject, that our value conclusion represents a price achievable within six (6) months.



**ADDENDA**

**Addenda Contents**

ADDENDUM A:      Engagement Letter

ADDENDUM B:      Office Land Sale Data Sheets

ADDENDUM C:      Qualifications of the Appraisers



**ADDENDUM A:  Engagement Letter**

Steven M. Halbert, J.D., MAI, MRICS
Senior Director



**CUSHMAN &
WAKEFIELD**®

Cushman & Wakefield of Washington, D.C., Inc.
1801 K Street NW, Suite 1100-L
Washington, D.C. 20006
202 739 0869 Tel
202 223 8963 Fax
steve.halbert@cushwake.com

June 7, 2006

Scott Sayre
Vice President & General Counsel
**VIAD CORP**
Viad Tower
1850 N. Central Avenue
Suite 800
Phoenix, AZ 85004-4545

Re:    **Development Land
       90 K Street, NE
       Washington, D.C. 20002**

Dear Mr. Sayre:

Thank you for requesting our proposal for appraisal services. This proposal letter will become, upon your acceptance, our letter of engagement to provide the services outlined herein.

### TERMS OF ENGAGEMENT

| | |
|---|---|
| **The Parties To This Agreement:** | Cushman & Wakefield of Washington, D.C., Inc. and VIAD CORP (herein at times referred to as "Client") |
| **Scope Of Work:** | Complete Appraisal in a Summary Report format, which will be prepared by Cushman & Wakefield of Washington, D.C., Inc. or its designated affiliate (herein at times "C&W") |
| **Rights Appraised:** | Market value of the "Fee Simple" Interest |
| **Date Of Value:** | Date of inspection |
| **Property Appraised:** | The property to be appraised consists of Lot 432 in Square 674 (owned by Montgomery Road I LP Greenebaum 7 Rose Associates). a 103,878 square foot parcel of land zoned C-3-C located at 90 K Street, NE, Washington, D.C. |
| **Intended Users:** | The appraisal will be prepared for VIAD CORP and is intended only for its specified use. It may not be relied upon by other persons or entities without written permission of Cushman & Wakefield of Washington, D.C., Inc. |
| **Intended Use:** | Internal decision making related to a retained cash participation |
| **Anticipated Primary Methodology:** | Sales Comparison Approach |
| **Fee:** | $5,000. Payment is due upon submission of the draft report. |
| **Additional Expenses:** | Fee quoted is inclusive of expenses related to the preparation of the report. |
| **Retainer:** | A retainer is not required for this assignment in order to commence work. |

Scott Sayre
**Viad Corp**
June 7, 2006
Page 2

| | |
|---|---|
| **Report Copies:** | The final report will be delivered electronically in PDF form, along with three (3) bound hard copies if requested. |
| **Start Date:** | The appraisal process will commence upon receipt of the signed Letter of Engagement. |
| **Acceptance Date:** | This proposal is subject to withdrawal if the engagement letter is not executed within four (4) business days. |
| **Report Delivery:** | Within thirty (30) days of receipt of your written authorization to proceed, assuming prompt receipt of necessary property information. |
| **Further Conditions of Engagement** | The Conditions of Engagement attached hereto are incorporated herein and are part of this letter of engagement. The report referred to herein is at times herein also referred to as the "appraisal". |

Thank you for calling on us to render these services and we look forward to working with you.

Sincerely,
**CUSHMAN & WAKEFIELD OF WASHINGTON, D.C., INC.**

Steven M. Halbert, J.D., MAI, MRICS
Senior Director

**AGREED:**
**CLIENT: VIAD CORP**

By: _____    Date: 7 June 2006
        Scott Sayre

Title:    Vice President & General Counsel

E-mail Address/Phone & Fax Nos.:    SSAYRE @ VIAD . COM
                                                        FAX 602-207-5602

**CUSHMAN & WAKEFIELD.**

## Information Needed to Complete the Assignment

Please supply us with the following data, if you have such:

1.  Survey or plat
2.  Relevant zoning communications, e.g., from architects, planners, attorneys, zoning officials, etc.
3.  Anything else you deem relevant

**CUSHMAN & WAKEFIELD.**

## CONDITIONS OF ENGAGEMENT

1) The Client should consider the appraisal as only one factor together with its independent investment considerations and underwriting criteria in its overall investment decision. Unless C&W consents in writing, the appraisal cannot be used by any party or for any purpose other than the Client for the purpose specified in this engagement letter.

2) Federal banking regulations require banks and savings and loan associations to employ appraisers where a FIRREA compliant appraisal must be used in connection with mortgage loans or other transactions involving federally regulated lending institutions, including mortgage bankers/brokers. Because of that requirement, this appraisal, if ordered independent of a financial institution or agent, may not be accepted by a federally regulated financial institution. This appraisal will be prepared in accordance with the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation, the Standards of Professional Practice and the Code of Ethics of the Appraisal Institute.

3) The appraisal report will be subject to our standard Assumptions and Limiting Conditions, which will be incorporated into the appraisal. All users of the appraisal report are specifically cautioned to understand any Extraordinary Assumptions and Hypothetical Conditions which may be employed by the appraiser and incorporated into the appraisal.

4) The appraisal report or our name may not be used in any offering memoranda or other investment material without the prior written consent of C&W, which may be given at the sole discretion of C&W. Any such consent, if given, shall be conditioned upon our receipt of an indemnification agreement from a party satisfactory to us and in a form satisfactory to us. Furthermore, Client agrees to pay the fees of C&W's legal counsel for the review of the material which is the subject of the requested consent. If the appraisal is referred to or included in any offering material or prospectus, the appraisal shall be deemed referred to or included for informational purposes only and C&W, its employees and the appraiser have no liability to such recipients. C&W disclaims any and all liability to any party other than the party which retained C&W to prepare the appraisal.

5) In the event the Client provides a copy of this appraisal to, or permits reliance thereon by, any person or entity not authorized by C&W in writing to use or rely thereon, Client hereby agrees to indemnify and hold C&W, its affiliates and the respective shareholders, directors, officers and employees, harmless from and against all damages, expenses, claims and costs, including attorney's fees, incurred in investigating and defending any claim arising from or in any way connected to the use of, or reliance upon, the appraisal by any such unauthorized person or entity.

6) The balance of the fee for the appraisal will be due upon delivery of the report. Payment of the fee is not contingent on the appraised value, outcome of the consultation report, a loan closing, or any other prearranged condition. Additional fees will be charged on an hourly basis for any work, which exceeds the scope of this proposal, including performing additional valuation scenarios, additional research and conference calls or meetings with any party, which exceed the time allotted by C&W for an assignment of this nature. If we are requested to stop working on this assignment, for any reason, prior to our completion of the appraisal, C&W will be entitled to bill the Client for the time expended to date at C&W's hourly rates for the personnel involved.

7) Client will have up to twenty-one (21) days from receipt of the draft report to communicate its review to C&W. C&W will respond to Client's review of C&W's draft report within five (5) business days of Client's communication to C&W. C&W reserves the right to bill Client for responding to Client's review beyond this time period.

8) If C&W or any of its affiliates or any of their respective employees receives a subpoena or other judicial command to produce documents or to provide testimony involving this assignment in connection with a lawsuit or proceeding, C&W will use reasonable efforts to notify the Client of our receipt of same. However, if C&W or any of its affiliates are not a party to these proceedings, Client agrees to compensate C&W or its affiliate for the professional time and reimburse C&W or its affiliate for the actual expense that it incurs in responding to any such subpoena or judicial command, including attorneys' fees, if any, as they are incurred. C&W or its affiliate will be compensated at the then prevailing hourly rates of the personnel responding to the subpoena or command for testimony.

9) By signing this agreement Client expressly agrees that its sole and exclusive remedy for any and all losses or damages relating to this agreement or the appraisal shall be limited to the amount of the appraisal fee paid by the Client. In the event that the Client, or any other party entitled to do so, makes a claim against C&W or any of its affiliates or any of their respective officers or employees in connection with or in any way relating to this engagement or the appraisal, the maximum damages recoverable from C&W or any of its affiliates or their respective officers or employees shall be the amount of the monies actually collected by C&W or any of its affiliates for this assignment and under no circumstances shall any claim for consequential damages be made.

10) It is acknowledged that any opinions and conclusions expressed by the professionals of C&W or its affiliates during this assignment are representations made as employees and not as individuals. C&W's or its affiliate's responsibility is limited to the Client, and use of our product by third parties shall be solely at the risk of the Client and/or third parties.

11) The fees and expenses shall be due C&W as agreed in this letter. If it becomes necessary to place collection of the fees and expenses due C&W in the hands of a collection agent and/or an attorney (whether or not a legal action is filed) Client agrees to pay all fees and expenses including attorney's fees incurred by C&W in connection with the collection or attempted collection thereof.

**CUSHMAN & WAKEFIELD**

**ADDENDUM B:  Office Land Sale Data Sheets**

**LAND SALE COMPARABLE - 1**



**Constitution Square Land**

100 M Street, NE

Washington, DC 20002

MSA:  Washington

District of Columbia County

| | |
|---|---|
| Property Type: | Land |
| Property Subtype: | Planned Development (PUD) |
| ID: | 82892 |
| APN: | Sq 711 Lot 160 |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 6.94 | Public Utilities: | All Available |
| Site Area (SqFt): | 302,429 | Electricity: | Yes |
| Zoning: | C-3-C | Water: | Yes |
| Utility: | Excellent | Sewer: | Yes |
| Access: | Good | Gas: | Yes |
| Frontage: | Good | Proposed Use: | Mixed Use |
| Visibility: | Good | Maximum FAR: | 63.00 |
| Shape: | Rectangular | Building Area: | 2,200,000 |
| Topography: | Level | Potential Units: | N/A |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Sale Status: | Recorded Sale | Price per SqFt: | $403.40 |
| Sale Date: | 3/2006 | Price per Acre: | $17,579,250. |
| Sale Price: | $122,000,000 | Price per Building Area: | $55.45 |
| Grantor: | Leucadia/Akridge | Price per Potential Units: | N/A |
| Grantee: | Stonebridge/Walton Street | | |
| Value Interest: | Fee Simple | | |

## VERIFICATION COMMENTS

Local developer.

## COMMENTS

Constitution Square will eventually contain 2.2 msf of office, residential, and retail space. The first phase, which is set to begin in early 2007 will be a 350,000 sf office building and a 550,000 sf residential tower with first floor retail. Prior sale Sep 03 at $7.634 million or a compound growth rate of 187%.



**LAND SALE COMPARABLE - 2**



**Capitol City Plaza**
77 K Street NE
Washington, DC 20002
MSA:  Washington
District of Columbia County

| | |
|---|---|
| Property Type: | Land |
| Property Subtype: | Office |
| ID: | 82859 |
| APN: | N/A |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 0.77 | Public Utilities: | All Available |
| Site Area (SqFt): | 33,566 | Electricity: | Yes |
| Zoning: | C-3-C | Water: | Yes |
| Utility: | Good | Sewer: | Yes |
| Access: | Excellent | Gas: | Yes |
| Frontage: | Good | Proposed Use: | Office |
| Visibility: | Good | Maximum FAR: | 8.50 |
| Shape: | Rectangular | Building Area: | 285,311 |
| Topography: | Level | Potential Units: | N/A |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Sale Status: | In-Contract | Price per SqFt: | $715.01 |
| Sale Date: | 3/2006 | Price per Acre: | $31,168,831. |
| Sale Price: | $24,000,000 | Price per Building Area: | $84.12 |
| Grantor: | Cafritz | Price per Potential Units: | N/A |
| Grantee: | ING Clarion | | |
| Value Interest: | Fee Simple | | |

## VERIFICATION COMMENTS

Local developer; broker

## COMMENTS

Previously under contract--however, buyer (ING) has filed suit to force seller to accept terms of previous contract. Seller is reportedly marketing the project at the above price. Artist's rendering of building under construction as of spring 2006.

VALUATION SERVICES



## LAND SALE COMPARABLE - 3

1111 North Capitol Street NE
Washington, DC 20002
MSA:  Washington
District of Columbia County

| | |
|---|---|
| Property Type: | Land |
| Property Subtype: | Office |
| ID: | 82894 |
| APN: | Square 0673 various lots |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 1.99 | Public Utilities: | All Available |
| Site Area (SqFt): | 86,725 | Electricity: | Yes |
| Zoning: | C-3-C | Water: | Yes |
| Utility: | Good | Sewer: | Yes |
| Access: | Good | Gas: | Yes |
| Frontage: | Good | Proposed Use: | Mixed Use |
| Visibility: | Good | Maximum FAR: | 5.76 |
| Shape: | Irregular | Building Area: | 500,000 |
| Topography: | Level | Potential Units: | N/A |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Sale Status: | Recorded Sale | Price per SqFt: | $295.15 |
| Sale Date: | 10/2005 | Price per Acre: | $12,862,949. |
| Sale Price: | $25,597,269 | Price per Building Area: | $51.19 |
| Grantor: | Stern & Moran | Price per Potential Units: | N/A |
| Grantee: | WB/BFP North Capitol Street, LLC-J St | | |
| Value Interest: | Leased Fee | | |

## VERIFICATION COMMENTS

Tax recoreds; CoStar; local developer.

## COMMENTS

The Smithsonian warehouse on this property has 3-6 years remaining on the lease depending on the owner or tenant terminating. The existing building will be retained and the new development will be added to achieve and expected 500,000 SF total-5.76 FAR. The NE lot is under contract for $12,000,000 or $63 to $67/FAR based on allowable/planned. Settlement set for May/June 2006.

VALUATION SERVICES



**LAND SALE COMPARABLE - 4**



**Capitol Plaza I**
1200 1st St NE
Washington, DC 20002-3361
MSA: Washington
District of Columbia County

| | |
|---|---|
| Property Type: | Land |
| Property Subtype: | Office |
| ID: | 83147 |
| APN: | 0673-0833; 0673-0834 |
| | 0673-0835 |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 2.45 | Public Utilities: | All Available |
| Site Area (SqFt): | 106,885 | Electricity: | Yes |
| Zoning: | C3C, Washington | Water: | Yes |
| Utility: | Good | Sewer: | Yes |
| Access: | Good | Gas: | Yes |
| Frontage: | Good | Proposed Use: | Office |
| Visibility: | Good | Maximum FAR: | 8.50 |
| Shape: | Rectangular | Building Area: | 908,523 |
| Topography: | Level | Potential Units: | N/A |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Sale Status: | Recorded Sale | Price per SqFt: | $542.64 |
| Sale Date: | 8/2005 | Price per Acre: | $23,673,469. |
| Sale Price: | $58,000,000 | Price per Building Area: | $63.84 |
| Grantor: | Department of Housing and Community | Price per Potential Units: | N/A |
| Grantee: | First & M, LLC | | |
| Value Interest: | Leased Fee | | |

## VERIFICATION COMMENTS

Local developer. Tax records. CoStar

## COMMENTS

1st building is under construction at FAR pricing of $60/SF. 2nd & 3rd buildings planned at $65/SF FAR.



**LAND SALE COMPARABLE - 5**



**First Place at NoMa**
60 L Street NE
Washington, DC 20002-4221
MSA:  Washington
District of Columbia County

| | |
|---|---|
| Property Type: | Land |
| Property Subtype: | Office |
| ID: | 72321 |
| APN: | 0673-0031 and -0032 |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 2.92 | Public Utilities: | All Available |
| Site Area (SqFt): | 127,050 | Electricity: | Yes |
| Zoning: | C-M-3, Washington | Water: | Yes |
| Utility: | Good | Sewer: | Yes |
| Access: | Good | Gas: | Yes |
| Frontage: | Good | Proposed Use: | Office |
| Visibility: | Good | Maximum FAR: | N/A |
| Shape: | Irregular | Building Area: | 626,000 |
| Topography: | Level | Potential Units: | N/A |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Sale Status: | Recorded Sale | Price per SqFt: | $281.54 |
| Sale Date: | 6/2005 | Price per Acre: | $12,249,898. |
| Sale Price: | $35,769,703 | Price per Building Area: | $57.14 |
| Grantor: | 52 L Street Data Center LLC | Price per Potential Units: | N/A |
| Grantee: | JF NoMa LLC | | |
| Value Interest: | Fee Simple | | |

## VERIFICATION COMMENTS

Seller. Partially confirmed by buyer. Local developer.

## COMMENTS

This assemblage planned for 650,000 in two office buildings. The price above included demolition costs paid by buyer. This property in escrow with April/May closing at $78 million including 358,000 SF of TDRs. Deducting an estimated $4/TDR from the price results in net contract price of $76.568 million or about $76/SF of mixed use planned development (650,000 SF office + 362,500 SF residential). This contract buyer has increased the allowable density by TDRs.

---

VALUATION SERVICES



**LAND SALE COMPARABLE - 6**



**Station Place III**

731-733 2nd Street NE

Washington, DC 20002-4307

MSA:  Washington

District of Columbia County

| | |
|---|---|
| Property Type: | Land |
| Property Subtype: | Office |
| ID: | 64867 |
| APN: | 0752-0045 |

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Site Area (Acres): | 0.79 | Public Utilities: | All Available |
| Site Area (SqFt): | 34,444 | Electricity: | Yes |
| Zoning: | PUD-072 | Water: | Yes |
| Utility: | Good | Sewer: | Yes |
| Access: | Good | Gas: | Yes |
| Frontage: | Excellent | Proposed Use: | Office |
| Visibility: | Good | Maximum FAR: | 6.00 |
| Shape: | L | Building Area: | 206,664 |
| Topography: | Level | Potential Units: | N/A |

## SALE INFORMATION

| | | | |
|---|---|---|---|
| Sale Status: | Recorded Sale | Price per SqFt: | $420.97 |
| Sale Date: | 1/2005 | Price per Acre: | $18,354,430. |
| Sale Price: | $14,500,000 | Price per Building Area: | $70.16 |
| Grantor: | H Street Overpass, LLC | Price per Potential Units: | N/A |
| Grantee: | SH Holdings No. 777 LLC | | |
| Value Interest: | Fee Simple | | |

## VERIFICATION COMMENTS

Lender; local developer.

## COMMENTS

This parcel is the eastern-most in a large multi-parcel development by the buyer called "Station Place". The Station Place project is a series of office buildings being constructed adjacent to Union Station in Northeast Washington, DC. It is a large parcel of land that will eventually have up to 2.1 million square feet of office space. The entire project is zoned as a PUD where a maximum FAR of 6.0 is allowed.



**ADDENDUM E:  Qualifications of the Appraisers**

# PROFESSIONAL QUALIFICATIONS

## Steven M. Halbert, J.D., MAI, MRICS
*Senior Director, Valuation Services, Capital Markets Group*

Mr. Steven Halbert entered the real estate business in 1978 as an investor & syndicator. Employed from 1981 to December 1982 as a faculty associate at Arizona State University in Tempe, AZ. Employed from 1981 to 1987 as corporate counsel at James Stewart Company in Phoenix, AZ. Employed from 1987 to 1990 as Vice President by Western Savings & Loan in Phoenix, AZ. Employed from 1990 as Asset Specialist with FDIC/RTC in Phoenix, AZ. Employed 1990 to 1991 at Cimarron Federal Savings & Loan in Muskogee, OK. Employed from April 1991 to August 1992 as Senior Appraiser with Ralph J. Brekan & Associates in Phoenix, AZ. Currently employed with Cushman & Wakefield Inc., as Senior Director in Valuation Services Department. Started as Senior Appraiser from August 1992 to June 1995, Associate Director from June 1995 to July 2001, Director from July 2001 to November 2003 and Senior Director from November 2003 to Present.

### Experience

Actively involved in the analysis and appraisal of commercial real estate since 1978. National experience analyzing a variety of property types including office buildings, shopping centers, apartment buildings, regional malls, motels and hotels, warehouses and mixed use projects. Appraisal and consulting assignments have been completed for mortgage loan purposes, condemnations, tax assessment hearings and as an aid in the decision making process in the acquisition, disposition and marketing of real estate.

Extensive experience in the analysis and appraisal of Metropolitan Washington office buildings including Class A and B buildings, as well as mixed-use properties and institutional office buildings. The primary market area of concentration is downtown Washington where over 400 office buildings have been appraised. Notable office building assignments include the following:

- The Warner
- Washington Harbour
- L'Enfant Plaza
- 1001 Penn
- 2099 Penn
- The Washington Building
- The Portals
- 1700 K Street
- The Homer Building
- Southeast Federal Center
- Independence Square
- 1701 Penn
- Fairfax Square, Tysons Corner

- National Press Building
- Franklin Square
- Lincoln Square
- Investment Building
- The Executive Tower
- U.S. Chamber of Commerce
- 700 13th Street
- 1601 K Street
- 1111 Penn
- USX Headquarters, Pittsburgh
- Southern Railway Building
- Potomac Tower, Arlington
- Towers Crescent, Tysons Corner



**Testimony in Courts of Law and Quasi-Judicial Hearings**

Qualified as an expert witness

- Maryland

**Education**

Bachelor of Arts cum laude (ital) (Economics, English & German), 1975
Brigham Young University, Provo, Utah

Juris Doctor cum laude (ital) (Law), 1978
Brigham Young University, Provo, Utah

**Appraisal Education**

Accredited Courses Beyond the Appraisal Institute courses for MAI designation.

The Appraiser's Complete Review
Appraisal of Environmentally Impacted Real Estate
Developing Small Income Properties
Investing in Self Storage Warehouses
Pro-Ject +plus Advanced Case Studies
Condemnation Appraising: Basic Principals & Applications
Condemnation Appraising: Advanced Topics & Applications
Appraising Troubled Properties
Valuing Income Properties
Highest & Best Use Applications
Valuing Income Properties
Fundamentals of Real Estate
Investment and Taxation
The Appraiser as an Expert Witness
DYNA Training Modules 1, 2, & 4

Certified in the Appraisal's Institute's voluntary program of continuing education for its designated members.

**Memberships, Licenses and Professional Affiliations**

Appraisal Institute (MAI Designation #10241)
Metropolitan Washington, D.C. Chapter

Member, Royal Institution of Chartered Surveyors (#1228422)

Certified General Real Estate Appraiser
#4001 001971 Virginia
#10252 Maryland
#GA 10262 District of Columbia

