## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONTGOMERY ROAD I LIMITED PARTNERSHIP,<br><br>  Plaintiff and<br>  Counter Defendant<br><br>  v.<br><br>VIAD CORP,<br><br>  Defendant and<br>  Counterclaimant<br>  and Plaintiff on<br>  the Counterclaim<br><br>  v.<br><br>MONTGOMERY ROAD TDR, LLC<br>A DISTRICT OF COLUMBIA LLC<br>5301 WISCONSIN AVENUE<br>WASHINGTON, D.C. 20015<br>  Additional<br>  Defendant on the<br>  Counterclaim | Case No.  1:06CV00344 (HHK) |

## MOTION FOR SUMMARY JUDGMENT BY DEFENDANT VIAD CORP

Defendant Viad Corp ("Viad") moves pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the First Amended Complaint and entering judgment on its counterclaims in the action.  The attention of the Court is respectfully directed to the Memorandum of Points and Authorities and to the Statement of  Undisputed Material Facts filed herewith.

Filed simultaneously with this Motion for Summary Judgment is Viad's Motion for Leave to File Amended and Supplemental Counterclaims.  An amended pleading is appropriate because, during this litigation, Plaintiff and Counterdefendant Montgomery Road I Limited Partnership ("MRLP") has contracted to sell, and has closed on the sale of, the real property which is the subject matter of the Cash Participation Agreement (the "CPA") and the dispute

between the parties. At the time the First Amended Complaint was filed by MRLP and a Counterclaim was filed by Viad, each party sought generally to declare its rights under the CPA in the event of a sale. Now that the sale has occurred, a supplemental pleading is necessary to make the allegations necessary for the appropriate relief.

In this motion, Viad seeks summary judgment dismissing both counts of the First Amended Complaint. The first count asks that the Court declare that an opinion obtained by the parties from an accounting firm as to the interpretation of some terms of the CPA is binding. As demonstrated hereafter, it is undisputed that the terms of engagement with the accounting firm were that its opinion would not be binding and was advisory only. The same count seeks, "in the alternative", a declaration from the Court that MRLP's proposed accounting for the sale of the property, by which all equity investment would be retroactively treated as debt and accrued, unpaid interest on that debt would be a permitted deduction from any amount owed to Viad, is proper under the CPA. Viad demonstrates in this Motion that the proposed treatment is contrary to the plain language of the CPA.

The second count of MRLP's First Amended Complaint seeks a declaration that Viad is not entitled to any payment arising from the portion of the sales price for the real estate which MRLP has assigned to an allegedly separate contract for the sale of Transferable Development Rights ("TDRs"). Viad demonstrates in this Motion that the contract is not separate, that TDRs are tied to the property under the CPA and otherwise, and that the relief sought by MRLP must be denied.

Viad also seeks summary judgment on its Counterclaims. Specifically, in Counts I and II of the Amended and Supplemental Counterclaim, Viad seeks a declaration that: it is owed a payment under the CPA based on the full value of the property, including the value assigned by

MRLP to the TDRs; that segmenting the price paid to MRLP for the property was a sham transaction; and that MRLP is in default for failure to pay Viad or even to report on the transaction as required by the CPA.  Further, under Count II, MRLP is in default for failure to comply with the accounting reporting requirements of the CPA.

Summary judgment is also sought on Count III of the Counterclaim asserting that the failures and defaults by MRLP are breach of an implied duty and covenant of good faith and fair dealing.   Finally, because the CPA provides for the payment of attorneys fees in the event of default and litigation, Viad seeks an award of fees for this litigation.

WHEREFORE, Viad moves for summary judgment on the First Amended Complaint and on the Amended and Supplemental Counterclaim.

Respectfully Submitted,

BRYAN CAVE LLP

By:  /s/ Rodney F. Page
Rodney F. Page (DC Bar No. 37994)
Alicia I. Hogges-Thomas (DC Bar No. 480548)
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005-3960
P:  (202) 508-6000
F:  (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff Viad Corp*

Dated: March 29, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONTGOMERY ROAD I LIMITED PARTNERSHIP,<br>    Plaintiff and<br>    Counterclaim-Defendant<br>    v.<br><br>VIAD CORP,<br>    Defendant and<br>    Counterclaim-Plaintiff<br>    v.<br><br>MONTGOMERY ROAD TDR, LLC<br>    Counterclaim-Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No.  1:06CV00344 (HHK) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT VIAD CORP'S MOTION FOR SUMMARY JUDGMENT

Rodney F. Page (DC Bar No. 37994)
Alicia I. Hogges-Thomas (DC Bar No. 480548)
Bryan Cave LLP
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005-3960
P:  (202) 508-6000
F:  (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff Viad Corp*

Dated:  March 29, 2006

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ............................... 2

III.  SUMMARY JUDGMENT STANDARD ..................................................... 2

IV.   ARGUMENT ............................................................................................ 3

    A.   SUMMARY JUDGMENT SHOULD BE ENTERED FOR VIAD ON
    COUNT IOF MRLP'S FIRST AMENDED COMPLAINT BECAUSE THE
    OPINION OF REZNICK GROUP IS NOT BINDING AND BECAUSE IT
    IS NOT PROPER TO DEDUCT INTEREST REFLECTED AS
    DEVELOPER'S EQUITY RETURN WHEN CALCULATING
    APPRECIATION CASH FLOW ................................................................ 3

        1.   The Opinion of Reznick is Not Binding ....................................... 3

        2.   It is Not Proper to Deduct Accrued Interest Reflected as Developer's
        Equity Return When Calculating Appreciation Cash Flow ....................... 6

    B.   THE TOTAL PURCHASE PRICE FOR 90 K STREET, INCLUDING THE
    VALUE ASSIGNED BY MRLP, MRTDR AND THE BUYER FOR THE
    PURCHASE OF TDRS, SHOULD BE INCLUDED WHEN
    CALCULATING THE CASH APPRECIATION PAYMENT ........................... 10

        1.   The TDRs Are Clearly an Interest in The Property Under The Plain
        Language of The CPA.  As a Result, They Should be Considered in
        Calculating The Appreciation Cash Payment ........................................... 11

        2.   Under The Plain Language of The CPA, TDRs Are Improvements to
        The Property ................................................................................. 12

        3.   The Undisputed Evidence Supports The Plain Language of The CPA .... 13

        4.   The Separation of TDRs in The Purchase Price is a Sham ...................... 16

    C.   MRLP Has Defaulted Under the CPA ............................................... 19

        1.   The Failure to Provide Financial Statements For 2005 And 2006 is a
        Default Under The CPA ................................................................. 19

        2.   MRLP Has Failed to Fulfill Its Post-Closing Obligations Under The
        CPA ............................................................................................. 21

3.  MRLP Has Failed to Identify an Appraiser to Contest Fair Market Value ................................................................................. 21

4.  This Court Should Find That The Agreed Value is The Total Contract Price For 90 K Street, Including The Price Paid For The TDRs. Alternatively, if This Court Finds That TDRs Should Not be Included in The Sales Price For Purposes of Calculating The Cash Appreciation Payment, Then The Agreed Value Should be The Appraised Value ........................................................................ 23

D.  MRLP Has Breached The Implied Covenant of Good Faith and Fair Dealing .... 24

E.  Due to MRLP's Default and Breach of the Implied Covenant of Good Faith and Fair Dealing, Viad is Entitled to Attorneys Fees ............................................ 26

V.  CONCLUSION ........................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*Adair v. Winter,*
451 F. Supp. 2d 210 (D.D.C. 2006) ................................................................3

*Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.),*
353 B.R. 324 (Bankr. D.D.C. 2006) ............................................................16

*Allworth v. Howard University,*
890 A.2d 194 (D.C. 2006) ...........................................................24, 25, 26

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)......................................................................................2

*Arizona Department of Revenue v. Arizona Outdoor Advertisers, Inc.,*
41 P.3d 631 (Ariz. Ct. App. 2002) ..............................................................16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)......................................................................................2

*Chagnon v. Bell,*
468 F. Supp. 927 (D.D.C. 1979), aff'd, 642 F.2d 1248 (D.C. Cir. 1980) .....................3

*Intercounty Construction Corp. v. District of Columbia,*
443 A.2d 29 (D.C. 1982) ...............................................................................7

*Mitsui Fudosan, Inc. v. County of Los Angeles,*
268 Cal. Rptr. 356 (Cal. Ct. App. 1990)...............................................14, 15

*Rose v. Fox Pool Corp.,*
335 Md. 351 (Md. 1994)..............................................................................16

*Simpson Bros. v. District of Columbia,*
179 F.3d 430 (D.C. Cir. 1949).......................................................................7

*United States Plywood Corp. v. Continental Casualty Co.,*
157 A.2d 286 (D.C. 1960) ...........................................................................10

*Washington Post Co. v. United States Department of Health & Human Services,*
865 F.2d 320 (D.C. Cir. 1989).......................................................................2

*West v. United States,*
866 A.2d 74 (D.C. 2005) .............................................................................15

## MISCELLANEOUS AUTHORITIES

D.C. Mun. Regs. tit. 11, § 1707.5 (d) ..............................................................................12

D.C. Code § 6-1003 (2001)............................................................................................15

Fed. R. Civ. P. 56(c) ......................................................................................................2

Fed. R. Civ. P. 56(e) ......................................................................................................2

Black's Law Dictionary 757 (6th ed. 1990) ..................................................................15

## I.     INTRODUCTION

In 1987, Plaintiff Montgomery Road I Limited Partnership ("MRLP") purchased a parcel of land at 90 K Street N.E. from an affiliate of the Greyhound Bus Company. (Defendant Viad Corp's Statement of Undisputed Material Facts, (hereinafter "SOF") ¶¶ 6-8). The purchase price was approximately $11,000,000. (SOF ¶¶ 6-8). As part of the transaction, MRLP contractually agreed that, if the property were thereafter sold, it would pay, as additional consideration to the seller, 15% of the appreciation in the property. (SOF ¶ 12). On January 11, 2007, MRLP sold 90 K Street N.E. for more than $67,000,000. (SOF ¶¶ 133-34). In anticipation of selling the property, MRLP filed this suit a year before the closing seeking a declaratory judgment that it owes nothing under the contract to the successor in interest to the seller, Defendant Viad Corp ("Viad"). (*See generally* First Amended Complaint).

MRLP recognizes that the contract is a valid obligation. But, as its principal Sam Rose has made very clear, it does not want to honor the agreement. (SOF ¶ 23). To avoid the contractual obligation, MRLP has devised a variety of tactics, including shifting and contingent accounting practices, to claim that its costs for the property exceed any appreciation. (SOF ¶¶ 125-27; 130-31). Moreover, in violation of its duty of good faith and fair dealing, MRLP has structured the sale of the property in a way that assigns approximately a third of the purchase price, $21,387,929, to a separate contract for density rights on the property – valuing them at $70.00 per square foot, which is more than eleven times the $6.00 per square foot it paid to acquire them, and approximately thirteen times the current market range for TDRs of $5.25 to $5.50 per square foot– so that it could claim that portion of the price is not covered by the contract commitment to Viad. (SOF ¶¶ 98, 102, 110).

The terms of the contract between the parties are clear, however, and MRLP has defaulted under the agreement in numerous instances. (SOF ¶¶ 123-24; 135-40, 148). Viad has counterclaimed against MRLP seeking appropriate relief under the contract. As shown herein, summary judgment based on undisputed facts is appropriate.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

The facts pertinent to this Motion are set forth in the accompanying Statement of Undisputed Material Facts, which is incorporated herein by reference.

## III.     SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To succeed in its motion for summary judgment, Viad must demonstrate initially the absence of any genuine issue of material fact and its entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once Viad meets its initial burden, MRLP and Montgomery Road TDR, LLC ("MRTDR") "may not rest upon the mere allegations or denials of [their] pleading[s], but the[ir] response[s] . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 322. In considering a summary judgment motion, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson*, 477 U.S. at 255; *see Washington Post Co. v. United States Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

## IV.    ARGUMENT

**A.    SUMMARY JUDGMENT SHOULD BE ENTERED FOR VIAD ON COUNT I OF MRLP'S FIRST AMENDED COMPLAINT BECAUSE THE OPINION OF REZNICK GROUP IS NOT BINDING AND BECAUSE IT IS NOT PROPER TO DEDUCT INTEREST REFLECTED AS DEVELOPER'S EQUITY RETURN WHEN CALCULATING APPRECIATION CASH FLOW**

### 1.    The Opinion of Reznick is Not Binding

In Count I of the First Amended Complaint, MRLP seeks a declaratory judgment "that the findings of the independent accountants are valid, binding, and enforceable as to Defendant VIAD [*sic*] and its predecessor, TLC." (First Amended Complaint, ¶ 35).  Under the Declaratory Judgment Act, a court "'may declare the rights and other legal relations of any interested party'" in "'a case of actual controversy within its jurisdiction.'"  *Adair v. Winter*, 451 F. Supp. 2d 210, 214 (D.D.C. 2006).  When deciding whether to enter a declaratory judgment, the court should consider "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy . . . of such sufficient immediacy and reality' to warrant the issuance of a declaratory judgment."  *Chagnon v. Bell*, 468 F. Supp. 927, 933 (D.D.C. 1979) (citation omitted), *aff'd*, 642 F.2d 1248 (D.C. Cir. 1980).

Viad does not dispute that there is a substantial controversy between the parties.  But, the undisputed facts demonstrate that the findings of the independent accountants are not binding on Viad.

Since the late 1980's, MRLP has sought to persuade Viad to relinquish its rights under the Cash Participation Agreement ("CPA") for a nominal sum.  (SOF ¶ 29).  In furtherance of this goal, MRLP employees have misrepresented the value of the 90 K Street Property to Viad employees.  (SOF ¶ 30).  On August 14, 2000, MRLP informed Viad of a proposed sale to Level 3 Communications, LLC ("Level 3").  (SOF ¶ 31).  At that time, MRLP also asserted that the

3

sale price would result in no Appreciation Cash Payment[1/] to Viad. (SOF ¶ 32). Viad disputed MRLP's calculation, asserting that a particular item, specifically, the Developer's Equity Return, was improperly deducted as a cost from the sales price. (SOF ¶ 33).

Although the Level 3 transaction did not close, the parties continued to debate the proper calculation of the Appreciation Cash Payment for 4 years, since MRLP was anxious to sell the Property as soon as possible. (SOF ¶¶ 34-36). In or around December 2004, Viad and MRLP decided to seek the advice of Reznick Group, P.C. ("Reznick"), an accounting firm, in an effort to informally resolve the disagreement. (SOF ¶ 37). In records of phone conversations leading up to this decision, there is no indication that Viad or MRLP intended Reznick's advice to be binding. (SOF ¶ 44). Furthermore, MRLP cannot point to a specific conversation where Viad stated that the Reznick analysis was intended to be or would be binding. (SOF ¶ 44).

When Viad submitted its statement of position to Reznick in March 2005, Eve Fiorucci, the Assistant Director of Real Estate, wrote in the third bulleted paragraph: "Finally, while we appreciate your review of the documents and your opinion as to our interpretation of same, we wish to make clear that your opinion is not binding on TLC/Viad Corp." (SOF ¶ 38). Sam Rose of MRLP was copied on this letter, and he testified that he did in fact receive it. (SOF ¶ 42). Mr. Rose also testified that at the time he received the letter, he made no efforts to contact Viad to discuss whether the Reznick analysis would be binding. (SOF ¶ 42). On April 10, 2005, Reznick provided its interpretation of certain terms in the CPA, an analysis of the classification of costs and charges, and a pro-forma calculation for a hypothetical sale of the property ("the Reznick Analysis"). (SOF ¶ 40). It was not until May 2, 2005, almost a month after the Reznick Analysis was completed, that MRLP suggested to Viad that Reznick's review was binding on the

---

[1/]     This term, like others hereafter which are capitalized, are defined terms in the CPA.

parties. (SOF ¶ 41). From the timing of this assertion, one could infer that MRLP only decided that the Reznick Analysis should be binding after receiving notice that the review was in its favor.

MRLP has argued that the Reznick Analysis is binding under Section 2.7 of the CPA. (SOF ¶ 45). However, the Reznick advice was not provided under Section 2.7, which applies to disputes over financial statements that were submitted in accordance with Sections 2.4, 2.5 or 2.6 of the CPA. (SOF ¶ 46). Section 2.7 states in relevant part that, if the parties are unable to resolve a dispute concerning the fiscal year statements within a certain period of time, "the items shall be submitted to arbitration which arbitration shall be performed by an independent certified public accountant." (SOF ¶ 46). This section does not apply to the Reznick Analysis. The purpose of seeking advice from Reznick was to begin to resolve informally the five year dispute between MRLP and Viad regarding the calculation of the Appreciation Cash Payment, since MRLP was eager to buy out Viad's interest thereby simplifying a sale of the property. (SOF ¶ 51). In Reznick's own words, the purpose of its analysis was to interpret certain terms of the CPA, analyze the classification of costs and charges, and create a pro-forma calculation for a hypothetical sale of the property. (SOF ¶ 40).

Although MRLP submitted Special Purpose Financial Statements in an effort to comply with Section 2.6 of the CPA, these statements are not related to the calculation of the Appreciation Cash Payment because Section 2.6 is part of Article 2 of the CPA, which addresses Operations Cash Flow only. (SOF ¶¶ 11, 47-49). Appreciation Cash Flow is addressed in Article 3 of the CPA. (SOF ¶ 12). For the same reason, the dispute resolution provision in Section 2.7 is not related to the Appreciation Cash Payment. (SOF ¶ 50).

There is in fact a provision in Article 3 that addresses the resolution of disputes concerning the calculation of the Appreciation Cash Payment. According to Section 3.11, disputes regarding the calculation of the Appreciation Cash Payment must be submitted to resolution by an MAI appraiser after receipt of the Appreciation Cash Payment and of the statement accompanying the payment. (SOF ¶ 52). However, the Reznick Analysis was not conducted under Section 3.11 because no Appreciation Cash Payment had been paid at the time of the analysis, the analysis was conducted by an accountant, not an appraiser, and as MRLP has admitted, the analysis by Reznick was not an arbitration. (SOF ¶ 53-54).

In sum, there is no evidence that the parties agreed to a binding analysis, Viad notified MRLP prior to Reznick's review that the analysis would not be binding, and the arbitration provisions in the CPA do not apply to the Reznick Analysis. For the foregoing reasons, the Court should declare that the Reznick Analysis is <u>not</u> binding and enter judgment against MRLP.

**2.     It is Not Proper to Deduct Accrued Interest Reflected as Developer's Equity Return When Calculating Appreciation Cash Flow**

Also in Count I, MRLP seeks in the alternative a declaratory judgment that under the terms of the CPA "[i]t is proper to deduct any interest pursuant to loans related to the Property, whether those loans were for the purpose of acquisition of the Property, or to fund operational needs, regardless of whether the interest is reflected as Developer's Equity Return on the Special Purpose Financial Statements." (First Amended Complaint, ¶ 37(a)). MRLP also asks the Court to declare that "[i]t is proper in computing Appreciation Cash Flow to deduct the annual Developer's Equity Return . . . as an Approved Deduction pursuant to Section 3.4 of the CPA." (First Amended Complaint, ¶ 37(b)).

The alternative theory relies on two gross distortions of the CPA. The first is to ignore the plain wording of Article 3 of the CPA and imply that Developer's Equity Return is an

6

Approved Deduction despite the absence of that element in the language of the CPA.  The second is to ignore the requirement of the CPA that accounting for expenses be on a cash basis, i.e. actual payments, not, as MRLP suggests on accruals.

According to the D.C. Court of Appeals, in the absence of ambiguity, the intent of the parties to a contract must be ascertained from the language thereof without resort to parol evidence or extrinsic circumstances.  *Simpson Bros. v. District of Columbia*, 179 F.3d 430 (D.C. Cir. 1949).  However, where the terms are in dispute, the court must determine "what a reasonable person in the position of the parties would have thought the disputed language meant."  *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C. 1982).  To make this determination the court must consider the circumstances surrounding the making of the contract, usages which the parties know or have reason to know, and the intent of the parties entering the agreement.  *Id.*

Because there is no ambiguity surrounding the definition of Appreciation Cash Flow, the Court may derive the intent of the parties from the contract language itself.  Under Section 3.1, Appreciation Cash Flow is calculated by finding the Agreed Value of the Property, deducting the Approved Deductions and the Closing Costs, and then deducting the Developer's Invested Equity and Developer's Operating Equity.  (SOF ¶ 60).  Developer's Equity Return is not included in this calculation.  (SOF ¶ 61).  MRLP's efforts to include Developer's Equity Return as a deduction from Appreciation Cash Flow is merely a fraudulent attempt to decrease Viad's cash participation.

From approximately 1987 to 2004, the Special Purpose Financial Statements were compiled by a firm of independent certified public accountants.  (SOF ¶ 70).  During that time period, MRLP classified amounts advanced by S&S Finance Limited Partnership ("S&S

Finance"), a wholly owned affiliate of Greenebaum and Rose, who also own and control MRLP, to fund operational needs as equity. (SOF ¶ 63, 66). Furthermore, after S&S Finance acquired the first mortgage on the 90 K Street Property in 1996, MRLP started to classify the accrued interest on the mortgage as Developer's Equity Return. (SOF ¶¶ 64-65). These classifications have consistently been reflected in the Financial Statements of MRLP, which were compiled by outside accountants until 2004, and were also reflected in the Draft Special Purpose Financial Statement for 2005, which was submitted to Viad by MRLP's litigation counsel Dale Cooter on September 21, 2006. (SOF ¶ 69-70). Then, under the direction of its litigation counsel, MRLP sought to reclassify the amounts forwarded by S&S Finance, the accrued interest on those amounts, and the accrued interest on the first mortgage as debt. (SOF ¶ 67). In a letter sent to Viad's counsel on November 21, 2006, attorney Cooter wrote: "[a]s you know, I established that all money contributed to Montgomery Road I Limited Partnership was actually in the form of loans originating with S&S Finance. There was never any intention to contribute non-interest bearing equity to the project." (SOF ¶ 67). Attached to Mr. Cooter's letter was a revised Special Purpose Financial Statement for 2005. (SOF ¶ 68). In this revised statement, the accrued interest on the first mortgage was reclassified as "Interest Expense – S&S Loan." (SOF ¶ 71). Furthermore, the amounts contributed by S&S Finance and the accrued interest on those amounts were reclassified as "S&S Finance Loan Payable." (SOF ¶ 71). These classifications, which do not appear in previous financial statements, were then included under the Liabilities section of the financial statement.[2/] (SOF ¶ 71). The result is another fraudulent attempt to decrease Viad's cash participation to zero.

---

[2/]    When the sale of 90 K Street took place on January 11, 2006, the distribution of the proceeds from the sale did not reflect the existence of such loans. Less than $5 million was paid to S&S Finance for outstanding loans. (SOF ¶ 129).

Neither the draft nor the revised statements (hereinafter the "Cooter Financials") were "prepared in accordance with generally accepted accounting principles," as required by Section 2.6. Furthermore, the Cooter Financials are not "consistent with past practices," and they do not bear "the unqualified opinion of a firm of independent certified public accountants," all of which is required by the CPA. (SOF ¶¶ 70, 125-26). The Cooter Financials are also inconsistent with the Reznick Analysis, which MRLP seeks to enforce as binding in this case. (SOF ¶ 72).

Moreover, the Cooter Financials conflict with the information provided in MRLP's 2005 tax return. (SOF ¶ 127). Finally, the settlement sheet from the closing on January 11, 2007, indicates that no loan from S&S Finance as hypothesized by Mr. Cooter was repaid. (SOF ¶ 127).

Given the foregoing, the motive for this reclassification is obvious – since Permitted Debt is an Approved Deduction under Section 3.4(a), MRLP is designating the S&S Finance contribution as debt to ensure its deduction. Such behavior amounts to fraud and violates the duty of good faith and fair dealing.

The second fatal defect for MRLP's proposed accounting is that the CPA requires that MRLP account for its expenses on a cash basis of accounting. (SOF ¶ 56). The proposed alternative in Count I and in the Cooter Financials is explicitly based on accruals of interest, not actual payments of interest, between MRLP and its affiliate S&S Finance. Thus, if MRLP's interpretation of the deductibility of Equity Return on sale were correct, which it is not, its calculations are based on hypothetical – not actual – payments of interest to itself.

The plain language of the CPA demonstrates that Developer's Equity Return is not considered when computing Appreciation Cash Flow. (SOF ¶¶ 60-61). Also, there is no reference to Developer's Equity Return in the definition of "Approved Deductions." (CPA ¶ 62).

Courts are not at liberty to ignore the plain language and intent of the contracting parties. *United States Plywood Corp. v. Continental Cas. Co.*, 157 A.2d 286, 289 (D.C. 1960). Furthermore, this court should not reward MRLP's flip-flops in accounting by upholding its reclassification of equity to debt. Given the foregoing, this court should declare that it is <u>not</u> proper to deduct Developer's Equity Return when computing Appreciation Cash Flow.

**B.    THE TOTAL PURCHASE PRICE FOR 90 K STREET, INCLUDING THE VALUE ASSIGNED BY MRLP, MRTDR AND THE BUYER FOR THE PURCHASE OF TDRS, SHOULD BE INCLUDED WHEN CALCULATING THE CASH APPRECIATION PAYMENT**

In or about August 2006, MRLP signed an agreement with T.C. MidAtlantic Development, Inc. ("TCMD") for the sale of the 90 K Street Property. (SOF ¶ 110). This sale closed on January 11, 2007. (SOF ¶ 133). As part of this sale, MRLP has sought to exclude Viad from participating in the appreciation of the property by creating a separate contract for the fraudulent sale of the Transferable Development Rights ("TDRs") – the Agreement of Purchase and Sale of Transferable Development Rights – and allocating approximately a third of the purchase price, $21,387,929, to this separate contract. (SOF ¶ 110). The contract provides for the sale of such rights to the buyer at eleven times the acquisition price paid by MRLP (*i.e.*, $6 per square foot) and approximately thirteen times the current market price of the TDRs (*i.e.*, $5.25 to $5.50 per square foot). (SOF ¶¶ 98, 102). MRLP created a new entity in the summer of 2006, Counterclaim Defendant Montgomery Road TDR, LLC ("MRTDR"), to be a party to the separate contract selling TDRs. (SOF ¶¶ 108-09). This entity has the identical ownership as MRLP and is its alter ego. (SOF ¶¶ 108-09).

In Count II of its Amended Complaint, MRLP seeks a declaratory judgment that "the value of the purchase price attributed to the TDRs cannot be considered in determining the Cash Appreciation Payment." (First Amended Complaint, ¶ 42). In Count I of its Amended and

Supplemental Counterclaim, Viad counters that the value assigned to the purchase of the TDRs is properly included in the calculation of the Cash Appreciation Payment, and requests a declaratory judgment to that effect. (Counterclaim, ¶ 7). As demonstrated below, the language of the CPA indicates that the price paid for the TDRs should be considered in calculating the Appreciation Cash Payment. As a result, the Court should grant summary judgment for Viad on Count II of MRLP's First Amended Complaint and on Count I of the Amended and Supplemental Counterclaim.

        1.      **The TDRs Are Clearly an Interest in The Property Under The Plain Language of The CPA. As a Result, They Should be Considered in Calculating The Appreciation Cash Payment**

Under the CPA, one of the events that triggers the payment of an Appreciation Cash Payment to Viad is "the sale, assignment, condemnation, conveyance or other disposition of all or any part of or interest in the Property." (SOF ¶ 12). TDRs are clearly an "interest in the Property." According to Viad's expert Cynthia Giordano, TDRs are zoning density which may be transferred from a site on which the density is not used to another site on which the density may be developed. (Expert Report of Cynthia Giordano (hereinafter "Giordano Report") at 2; SOF ¶ 78). The property at 90 K Street is in a "receiving zone" and may by right acquire TDRs to increase density from 6.5 FAR to as much as 10.0 FAR. (D.C. Mun. Regs. tit. 11, § 1707.5 (d); SOF ¶ 96). In Ms. Giordano's expert opinion, the establishment of a receiving zone is effectively an up-zoning of the properties located within the zone to a higher matter-of-right density. (Giordano Report at 5; SOF ¶ 95). Consistent with this principle, MAI appraiser Steven Halbert based his valuation of 90 K Street on its total development potential of 10.0 FAR. (Expert Report of Steven Halbert ("Halbert Report") at 27 & 37; SOF ¶ 146). This is the common approach to finding fair market value of a property. Because TDRs are readily

11

available for a reasonable – even nominal – price, it follows logically that the value of a property in a receiving zone will reflect the full potential for development.

Moreover, the evidence demonstrates that TCMD only paid the purchase price, more than $67 million for 90 K Street, because the up-zoning permitted the TDRs to be applied to the determination of the total FAR.  In fact, Daniel Hudson, President of TCMD, testified that they analyzed the sale in terms of the total FAR.  (SOF ¶ 118).  In TCMD's experience, the District of Columbia government would allow a maximum of 10.0 FAR on 90 K Street, and it calculated its expected yield on that basis.  (SOF ¶ 119).  Under the D.C. regulations, 10.0 FAR is only achievable when the TDRs are included.  (D.C. Mun. Regs. tit. 11, § 1707.5 (d); SOF ¶ 96).

In sum, because 90 K Street is in a receiving zone, because TDRs are inherently included in the value of the land, and because no purchaser of the land (including specifically TCMD) would value TDRs separately, the total compensation received by MRLP and its affiliate must be included in the calculation of the payment due to Viad.  This conclusion is supported by the opinions of Viad's experts Cynthia Giordano and Steven Halbert and the sequence of events leading to the sale to TCMD.  As an inherent part of the value of the land, the TDRs are clearly an "interest in the Property" under the plain language of the CPA.  As a result, the sale of the TDRs, regardless of how MRLP structured the sale documents, should have triggered the payment of an Appreciation Cash Payment.

**2.  Under The Plain Language of The CPA, TDRs Are Improvements to The Property**

It is also clear from the plain language of the CPA that TDRs are Improvements and, therefore, Property.  According to Section 1.32 of the CPA, "Property" includes "the Improvements and the Real Property."  (SOF ¶ 12).  "Improvements" are defined as "all buildings, structures and other improvements that are hereafter constructed, installed or placed

upon the Real Property." (SOF ¶ 12). Since TDRs add density to the property, they are essentially "placed upon the Real Property" and, therefore, an Improvement under the plain language of the CPA. As a result, the sale of the TDRs is properly included in the calculation of the Appreciation Cash Payment.

**3.    The Undisputed Evidence Supports The Plain Language of The CPA**

The extrinsic evidence amply demonstrates that the parties intended to treat TDRs as an "interest in the Property" or an "Improvement" to the property. Beginning in its Special Purpose Financial Statement for 2000, MRLP listed as expenses deductible against Viad's payment from yearly operations the cost of acquiring TDRs and the legal fees associated with the acquisition. SOF ¶ 107). MRLP continued to list TDR expenses as a deduction in its statements for 2000, 2001, 2002, 2003, 2004 and the draft statement for 2005. (SOF ¶ 107). MRLP only removed the TDR expenses in the revised statement for 2005, which was submitted by MRLP's counsel in November 2006 after depositions in this case. (SOF ¶ 113). According to MRLP's 30(b)(6) witness Reid Liffmann, based on the advice of litigation counsel, it was determined that the previous deductions taken for TDR expenses were "an administrative mistake." (SOF ¶ 113).

Furthermore, MRLP has recorded its prior purchases of TDRs in the Land Records for the District of Columbia for 90 K Street. (SOF ¶¶ 105-106). When it signed an agreement with Level 3 Communications in 2000 for the sale of 90 K Street, there were TDRs recorded on the Property at that time. (SOF ¶ 106). In that agreement, the definition of property included "development rights." (SOF ¶ 106). In sum, MRLP's conduct demonstrates that it has for many years treated TDRs as part of the 90 K Street Property. It was not until seven months after this litigation was filed that MRLP, for the first time, asserted that the purchase price paid by TCMD

for the TDRs is not properly included in the calculation of the Appreciation Cash Payment. (SOF ¶ 113).

Standard interpretation by other courts of "real property" and "improvements" has specifically found that TDRs "are appropriately viewed as one of the fractional interests in the complex bundle of rights arising from the ownership of land." *Mitsui Fudosan, Inc. v. County of Los Angeles*, 268 Cal. Rptr. 356, 358 (Cal. Ct. App. 1990). Although Courts in the District of Columbia have not yet considered the categorization of TDRs in relation to property interests, logic and analogous case law suggests that TDRs do, in fact, represent owned property and improvements to that property in certain situations, such as in the instant case.

In *Mitsui*, the Court considered whether TDRs which had been purchased by the respondent could be taxed upon transfer. To reach its decision, the court analyzed whether TDRs constituted real property interests. Although the court found that the word "land" was "not specifically defined by the revenue and taxation code or related property tax regulations", it did find that "the sort of property in land which is taxable . . . is not limited to the title in fee, but is sufficiently comprehensive to include any unsufrucary interest."[3/] *Id.*

By specifically extending the definition of "property" in land to include TDRs, the court concluded that the value of the TDRs should be assessed on a tax basis upon transfer. Further, the court found that transactions involving TDRs "bear all the hallmarks of a transfer in real property." *Id.* The court noted that valuable consideration had been rendered in return for a divesting of a portion of property interest. *Id.*

---

[3/]    Unsufruct is defined as the legal right to use and derive profit from property belonging to someone else provided that the property itself is not injured in any way.

Similarly, in the instant case, TDRs were transferred for valuable consideration. Furthermore, the CPA defines "Property" to include "Improvements" and "Real Property" and defines "Improvements" to include "other improvements . . . that are placed upon the Real Property." (SOF ¶ 12). If this court were to follow the common sense approach used by the *Mitsui* court, then the TDRs at issue would also be deemed "Property," "Improvements" to the Property, or "an interest in the Property."

As even further evidence that TDRs should properly be construed as "Property" or as "Improvements" to the property, the court can look to the D.C. Code. Although "land" is not explicitly defined, as in the *Mitsui* case, and TDRs are not discussed in the D.C. Code, the Code does include in its definition of "real property", interests that would be deemed "unsufrucuary" by the *Mitsui* court. For example, Section 6-1003 of the D.C. Code defines "real property" to include "air rights, water rights, and other interests therein." D.C. Code § 6-1003 (2001).

In determining what constitutes an improvement, several courts, including the Supreme Court of Maryland,[4/] have looked at the Black's Law Dictionary for guidance.[5/] In Black's, "improvement" is defined as:

> [a] valuable addition made to property (usually real estate) or an amelioration in its condition, amounting to more than mere repairs or replacement, costing labor or capital, and intended to enhance its *value*, beauty or utility or to adapt it for new or further purposes.

Black's Law Dictionary 757 (6th ed. 1990) (emphasis added). Courts have utilized this definition in an effort to effectuate a definition that aligns with the terms' "common-sense,

---

[4/]   As courts in this jurisdiction have stated, the District shares its common law with Maryland, making its case more persuasive than other jurisdictions. *See West v. United States*, 866 A.2d 74, 79 (D.C. 2005) (stating that the District of Columbia derives its common law from Maryland); *Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp.)*, 353 B.R. 324, 352 (Bankr. D.D.C. 2006) (noting that Maryland shares its common law with the District of Columbia).

ordinary meaning." *Rose v. Fox Pool Corp.*, 643 A.2d 906, 918 (Md. 1994). The *Rose* Court further stated that considerations that a court should consider in making its case by case determination include "the nature of the addition or betterment, its permanence and relationship to the land and its occupants, and its effect on the *value* and use of the property." (emphasis added).

Similarly, in Arizona, the court found that "an improvement . . . encompasses everything that permanently enhances the *value* of the premises for general use." *Arizona Dep't of Revenue v. Arizona Outdoor Advertisers, Inc.*, 41 P.3d 631, 634 (Ariz. Ct. App. 2002) (emphasis added).

By definition, TDRs have value, as required by other jurisdictions' definitions of "improvement." In addition to the value element espoused by other jurisdictions' definition of improvement, the utility of the addition to "adapt it for new or further purposes" is clearly met in the case of TDRs. TDRs are designed to assist landowners, where zoning restrictions have frustrated other uses or attempts, to adapt their land for more effective uses.

Given the nature of TDRs and the traditional definitions that other jurisdictions, including Maryland, have utilized, this Court should find that TDRs are in fact Improvements under the contract.

### 4.    The Separation of TDRs in The Purchase Price is a Sham

The undisputed evidence demonstrates that the structure of the MRLP-TCMD sale documents, which segregate consideration for the purchase of the property into land value and value for the attributes of the TDR zoning, is a sham. Currently, TDRs are selling at $5.25 to $5.50 per square foot. (Giordano Report at 5; SOF ¶ 98). Since 1998, they have ranged in price from $25.00 to $3.00 with an overall downward trend to the present. (SOF ¶ 94). MRLP's own expert, Stuart Smith, testified that on one recent occasion, he determined the value of the TDRs in the North Capitol receiving zone, where 90 K Street is located, to be $3.50 per FAR. (SOF ¶

103). And the evidence demonstrates that MRLP paid $6.00 per square foot for the TDRs that were subsequently sold to TCMD for $70 per square foot as part of the 90 K Street transaction, compared to the current market price of $5.25 to $5.50 per square foot. (SOF ¶¶ 98, 102).

The agreements with TCMD included a so-called Umbrella Agreement. Under that document, sale of the land at 90 K Street was conditioned on the purchase of 45 L Street, the adjoining lot, and on the purchase of TDRs at a price sufficient to provide compensation for MRLP at an FAR value of $70 per square foot. (SOF ¶ 114).

Thus, MRLP has acquired TDRs for $6 per square foot or less for use at 90 K Street and is claiming a sale price of $70 per square foot in re-selling them to TCMD. (SOF ¶¶ 102, 114). The artificial nature of this price is readily apparent. TCMD has admitted in deposition testimony that the price paid to MRLP for TDRs was well-above the market price and was agreed to only because purchasing the TDRs at an inflated value was a requirement imposed by MRLP as a condition for purchasing the land at 90 K Street, even though they could be purchased for $5.25 to $5.50. (SOF ¶¶ 98, 122).

The cost of acquisition of the TDRs by MRLP is clearly a deductible cost under the CPA in calculating the payment due to Viad. Thus, Viad would not be entitled to any share of the $6 per square foot price paid by MRLP to maximize the value it received in sale of the property. It is, however, clearly entitled to the share in the amount artificially assigned to the TDRs by MRLP to the extent they exceed the cost of acquisition. By fixing an arbitrary inflated price for selling the TDRs at 90 K Street (a price equal to price per FAR for the land), MRLP has unabashedly tried to deprive Viad of its share of that portion of the value of the property.

The history of the sale transaction proves MRLP's chicanery. In the summer of 2006, TCMD had learned through its broker that a large property in the NoMa area was available for

"roughly $100 million." (SOF ¶ 115). There was a subsequent face to face meeting between representatives of TCMD, Sam Rose and Reid Liffmann, and the price discussed, or at least the expectation of the parties regarding price was known to be, approximately $100 million. (SOF ¶ 116). In discussions between TCMD and the seller MRLP, there was never any differentiation made in the discussions of price between the two parcels (90 K Street and the adjoining 45 L Street) or between TDRs and land. The only discussion "was relating to the total FAR." (SOF ¶ 117). The buyer analyzed the sale in terms of the total FAR, which it priced at approximately $70 per square foot. (SOF ¶ 118). In fact, the "experience" of TCMD was that the District government would allow a FAR of up to 10 in this area, and it calculated its expected yield on that basis. (SOF ¶ 119).

In or about October 2006, TCMD determined that it did not need to purchase as many TDRs as the contracts provided for because they could not be used in the development plans under consideration. (SOF ¶ 120). Although the contracts were amended, the total dollar amount for the purchase of TDRs by TCMD from MRLP was not changed. (SOF ¶ 120). Instead, the price per TDR was increased by an amount necessary to insure that MRLP was paid the same amount (roughly $100 million) even if the total number of TDRs it sold was reduced. (SOF ¶ 120). The reason for making the change in this manner was explained by counsel for TCMD, who explained that the only reduction in the price if the TDRs were not to be included in the sale was the small cost of acquisition of the TDRs. Specifically, he said, the "profit piece" would be guaranteed to MRLP. (SOF ¶ 121). This merely confirmed the "bargain," according to Daniel Hudson, President of TCMD, which was that MRLP would be paid for the achievable FAR regardless of how the price was allocated between TDRs and land. (SOF ¶ 122). In sum,

the undisputed evidence demonstrates that the purchase price for the 90 K TDRs was only achieved by affixing the TDRs to the 90 K Street Property.

Furthermore, the draft agreements demonstrate that efforts were made to delete any reference to the TDRs as "property." For example, in one draft agreement, Section 3.5(a) states that upon closing, the Seller shall deliver a deed, which shall include the TDRs. (SOF ¶ 112). Inserted next to this section is the following comment: ("Why are the TDR's [*sic*] here – because they run with the land – would prefer not to have this clause here – thinking about Cooter/Viad?" (SOF ¶ 112).

The evidence demonstrates that the decision to separate the TDRs and the land into separate contracts was merely a fraudulent, bad faith attempt to deprive Viad of its Appreciation Cash Payment. And, as shown above, the CPA does not support such a distinction. As a result, this court should find that MRLP's interpretation is incorrect and that the purchase price paid by TCMD for the TDRs is properly included in the calculation of the Appreciation Cash Payment.

## C.    MRLP HAS DEFAULTED UNDER THE CPA

During the course of this litigation, MRLP has failed to comply with the requirements of the CPA with regard to its accounting practices and reports to Viad. As a result, summary judgment should be granted for Viad on Count II of the Amended and Supplemental Counterclaim.

### 1.    The Failure to Provide Financial Statements For 2005 And 2006 is a Default Under The CPA

The undisputed evidence demonstrates that MRLP has not provided financial statements for fiscal years 2005 and 2006. This failure to provide financial statements under Section 2.6 of the CPA is a default under the contract. (SOF ¶¶ 123-24).

As was discussed previously in Section IV.A.2, during the course of litigation, on November 21, 2006, MRLP tendered a compilation of financial data, under cover of a letter from attorney Dale Cooter, its litigation counsel, with his opinion that the financial data is a correct statement of expenses and other deductions under the CPA. (SOF ¶ 125). By contrast, the CPA requires the certification of an independent certified public accountant applying generally accepted accounting principles on a consistent basis to the books and records of MRLP. (SOF ¶ 125). The Cooter Financials do not remotely comply with the requirements of the CPA. (SOF ¶ 126). Furthermore, the Cooter Financials are inconsistent with tax returns filed by MRLP. (SOF ¶ 127). Specifically, whereas the Cooter Financials classify all out of pocket expenses by MRLP in maintaining the land as loans rather than as equity investments in the Property, the actual accounting and tax treatment of these items for all other purposes and in prior financial statements submitted by MRLP to Viad classified these expenses as equity. (SOF ¶ 127). The purpose and intent of the Cooter Financials is to change retroactively the accounting for MRLP's ownership of the Property for the purpose of increasing artificially those items that might be deducted as an expense from the Agreed Value of the Property upon sale and, thus, defeat the possibility of a payment to Viad. (SOF ¶¶ 128-31). Like the structure of the MRLP-TCMD sale documents, which purport to segregate consideration for the purchase of the Property by TCMD into land value and value for attributes of the zoning, thus lowering the Agreed Value under the CPA, the failure to provide financial statements for 2005 and 2006 and to substitute during this litigation the Cooter Financials is a sham which fraudulently seeks to increase the possible deductions or adjustments to the payment due to Viad. (SOF ¶¶ 128-31).

**2.    MRLP Has Failed to Fulfill Its Post-Closing Obligations Under The CPA**

On January 11, 2007, MRLP proceeded to close on the MRLP-TCMD transaction. (SOF ¶ 133). The total consideration paid to MRLP for the sale of 90 K Street N.E. on January 11, 2007, including deferred compensation, was $67,424,457. (SOF ¶ 134). Under Section 3.2 of the CPA, MRLP was required to make the Appreciation Cash Payment within three (3) days of that closing. (SOF ¶ 135). However, no payment was made by MRLP at any time nor was any payment received by Viad as a result of the sale of the property on January 11, 2007. (SOF ¶ 136).

Furthermore, under Section 3.9 of the CPA, MRLP was required to deliver to Viad "a statement reflecting the Agreed Value, the Approved Deductions, the Closing Costs and the Appreciation Cash Flow used in calculating the Appreciation Cash Payment and a detailed breakdown of all items necessary for the calculation of each such item." (SOF ¶ 137). However, no "statement" as required by Section 3.9 has been delivered by MRLP to Viad. (SOF ¶ 138).

On February 21, 2007, Viad gave written notice to MRLP under Section 7.3 that it was in default under the CPA for failure to provide either a payment or a statement of the calculation of the payment. (SOF ¶ 139). The CPA provides that MRLP had a ten (10) day period to cure monetary defaults and a thirty (30) day period to cure non-monetary defaults after notice from Viad. (SOF ¶ 139). However, MRLP has made no effort to cure these defaults, and it remains in default. (SOF ¶ 140).

**3.    MRLP Has Failed to Identify an Appraiser to Contest Fair Market Value**

The CPA provides in Section 3.1 that the Appreciation Cash Payment shall be based on the Agreed Value of the Property, less certain specified deductions as defined in the CPA. (SOF ¶ 141). The Agreed Value is defined in Section 3.3 of the CPA as  the <u>greater</u> of the gross

proceeds actually received in a sale of the property or the fair market value of the property. (SOF ¶ 142). The CPA provides in Section 3.11 that, if the parties disagree about the Agreed Value, Viad may notify MRLP within ninety days of the receipt of the payment of that disagreement. (SOF ¶ 144). Because MRLP had filed this suit to declare that the TDR portion of the sale was not covered by the CPA, and because it failed and refused to provide any payment or even a statement of how it calculated the lack of a payment and the deductions from the Agreed Value upon which it is relying, Viad gave notice on February 21, 2007, in writing, that a disagreement existed. (SOF ¶¶ 143-44).

In addition, on January 31, 2007, Viad provided to MRLP in accordance with the CPA a report prepared by an M.A.I. appraiser, as provided for in Sections 3.8 and 3.11 of the CPA, with an opinion as to the fair market value of the Property. (SOF ¶ 145). The appraiser, Steven Halbert, of Cushman and Wakefield, provided his written opinion that the fair market value of the Property on June 24, 2006, and within a 6 month period thereafter, which period included the date of the contract between MRLP-TCMD, was $64,800,000. (SOF ¶ 146). According to Section 3.8, MRLP must select its own appraiser and MRLP's appraiser and Viad's appraiser shall together select a third appraiser. (SOF ¶ 147). MRLP failed to designate an appraiser to determine fair market value. Under Section 3.8 of the CPA, this designation should have been made by February 15, 2007.[6] (SOF ¶ 148). Viad's notice of February 21, 2007 provided notice to MRLP that it was in default for failure to contest the fair market value component of the Agreed Value under the CPA. (SOF ¶ 150).

---

[6]    MRLP did designate as a rebuttal expert in this litigation Stuart I. Smith. He has testified that he has no opinion of the fair market value of the property. Rather, the thrust of his "rebuttal" is that Mr. Halbert should have described the availability of TDRs as an "extraordinary assumption." (SOF ¶ 149).

**4.    This Court Should Find That The Agreed Value is The Total Contract Price For 90 K Street, Including The Price Paid For The TDRs.  Alternatively, if This Court Finds That TDRs Should Not be Included in The Sales Price For Purposes of Calculating The Cash Appreciation Payment, Then The Agreed Value Should be The Appraised Value**

The Agreed Value for the Property under Section 3.3(a) of the CPA is the higher of the sales price or the fair market value of the Property, and, thus, based on inclusion of the TDR portion of the contract that MRLP has sought improperly to exclude, is $67,424,457.  (SOF ¶ 151).  In the alternative, in no event is the Agreed Value less than the fair market value for the Property, appraised in accordance with the CPA as $64,800,000.  (SOF ¶ 152).  This is due to the fact that the sales price for 90 K Street minus the TDR portion is $46,036,528, which is less than the fair market value provided by Viad's appraiser.

**5.    The Court Should Order an Audit of MRLP's Records to Determine The Calculation of The Cash Appreciation Payment**

Had MRLP made a good faith effort to disclose its costs and to provide reports in accordance with the CPA, a calculation of the 15% payment due to Viad could be readily accomplished upon resolution of the issues relating to the Agreed Value of the property.  But MRLP has not done that.  It has not provided financial statements on a cash basis, claiming deductions for interest payments to an affiliate which were never paid.  (SOF ¶¶ 57-59).  It has reversed course in calculating costs for acquiring TDRs removing them from its financial statements after filing this suit and after structuring the contract to separate the TDRs from the land.  (SOF ¶ 113).  It failed to provide the required statement of its costs and deductions after closing.  (SOF ¶¶ 133-38).

In these circumstances, the most reliable evidence of the proper calculation is the spreadsheet prepared by MRLP partner Reid Liffman on January 9, 2007, intended for internal distribution only.  (SOF ¶ 128).  In that spreadsheet, Liffmann deducted the actual costs to

23

determine the "Gain Allocated" to the partners. (SOF ¶ 128). The deductions listed are similar to those described in the CPA, including "project costs," broker's commissions, and closing costs. (SOF ¶ 128). Liffmann's calculations show a gain of $54,672,452.[7/] (SOF ¶ 128). A payment to Viad of 15% of this gain would equal $8,200,868. This calculation is surely a close approximation of the payment due to Viad.

Because of the defaults by MRLP in complying with the CPA, Viad requests that the Court order an audit of MRLP's records, at its expense, to determine whether or not other costs are to be recognized in the calculation. The audit should be conducted by an auditor appointed by the Court with instructions to report within 30 days on the final calculation of the Appreciation Cash Payment.

## D.    MRLP HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Since 1987 and extending through this litigation, MRLP has endeavored to prevent Viad from receiving the benefits of the CPA. According to the D.C. Court of Appeals, "'all contracts contain an implied duty of good faith and fair dealing, which means that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."'" *Allworth v. Howard University*, 890 A.2d 194, 201 (D.C. 2006) (quoting *Paul v. Howard Univ.,* 754 A.2d 297, 310 (D.C.2000)). "If the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of

---

[7/]    The spreadsheet, like all internal and external correspondence and documentation on the subject combines the economics of the two sales contracts relating to 90 K Street, making no distinction between MRLP and MRTDR.

good faith and fair dealing." *Id.* The undisputed evidence demonstrates that MRLP has not acted in good faith in its dealings with Viad.

In *Allworth v. Howard University*, the D.C. Court of Appeals looked to the Restatement for clarification of the meaning of "good faith":

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate standards of decency, fairness or reasonableness.

*Allworth v. Howard University*, 890 A.2d at 201-02 (quoting Restatement, § 205 cmt. a.) The court also noted that "[b]ad faith involves evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. Bad faith means more than mere negligence." *Id.* at 202 (internal quotations and citations omitted). Finally, the court also found that "'fair dealing' involves reasonable rather than arbitrary or capricious action." *Id.* (citing *Adler v. Abramson*, 728 A.2d 86 (D.C. 1999)).

For 20 years, MRLP misrepresented the value of the property during conversations with Viad employees in an effort to deceive Viad into giving up its participation interest for a small price. (SOF ¶¶ 29-30). Furthermore, as was discussed in Section IV.A.2, MRLP has taken multiple and contradictory positions on the manner in which items should be classified in its financial statements with the intent to decrease the Appreciation Cash Payment to Viad. (SOF ¶ 73). In the last six months, MRLP, through the Cooter Financials, has removed expenses associated with acquiring TDRs and has reclassified the amounts advanced by equity holders from equity to debt. (SOF ¶¶ 67, 113). The Cooter Financials conflict with the Reznick Analysis, which MRLP seeks to enforce as binding in this litigation. (SOF ¶ 72). The Cooter

Financials also conflict with MRLP's 2005 tax returns. (SOF ¶ 127). Finally, after the closing on January 11, 2007, MRLP failed to provide a calculation of the Appreciation Cash Payment to Viad, as required under the CPA. (SOF ¶ 133-38). This calculation should have been provided to Viad three (3) days after the closing. (SOF ¶ 133-38). Although Viad requested a statement of the calculation on February 21, 2007, no response has been received. (SOF ¶ 139-40). MRLP's failure to provide this calculation is yet another attempt to prevent Viad from receiving its benefits under the CPA.

The evidence demonstrates that MRLP has intentionally evaded the spirit of the CPA, willfully rendered imperfect performance, and failed to cooperate with Viad's performance under the CPA. *See Allworth,* 890 A.2d at 202. As a result, summary judgment should be entered for Viad on Count III of the Amended and Supplemental Counterclaim.

**E.    DUE TO MRLP'S DEFAULT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, VIAD IS ENTITLED TO ATTORNEYS FEES**

According to Section 7.4 of the CPA:

> If either party hereto shall bring suit against the other as a result of any alleged breach or failure of the other party to fulfill or perform any covenants or obligations under this Agreement, then in such event, the prevailing party in such action shall, in addition to any other relief granted or awarded by the court, be entitled to judgment for reasonable attorney's fees incurred by reason of such action and all costs of suit and those incurred in preparation thereof at both trial and appellate levels.

(SOF § 140). The evidence demonstrates that MRLP has defaulted under the CPA and breached the implied covenant of good faith and fair dealing. As a result, Viad requests that this Court award attorneys fees in addition to such other relief as this Court may deem proper.

26

## V.     CONCLUSION

For the foregoing reasons, Viad requests that this Court enter Summary Judgment for

Viad on Counts I and II of the First Amended Complaint and Counts I, II, III, and IV of the

Amended and Supplemental Counterclaim.

Respectfully Submitted,

BRYAN CAVE LLP


By:   /s/ Rodney F. Page
    Rodney F. Page (DC Bar No. 37994)
    Alicia I. Hogges-Thomas (DC Bar No. 480548)
    700 Thirteenth Street, N.W., Suite 700
    Washington, D.C. 20005-3960
    P:  (202) 508-6000
    F:  (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff*
*Viad Corp*

Dated:  March 29, 2007