IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MONTGOMERY ROAD I LIMITED PARTNERSHIP, <br><br>      Plaintiff and <br>      Counterclaim-Defendant <br><br> v. <br><br> VIAD CORP, <br><br>      Defendant and <br>      Counterclaim-Plaintiff <br><br> v. <br><br> MONTGOMERY ROAD TDR, LLC <br><br>      Counterclaim-Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Case No.  1:06CV00344 (HHK) |

## DEFENDANT VIAD CORP'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

      Pursuant to Local Civil Rule 7(h), Defendant/Counterclaim-Plaintiff Viad Corp ("Viad"),

hereby submits this Statement of Undisputed Material Facts in support of its Motion for

Summary Judgment.  Viad avers that there are no genuine issues with respect to these facts.  The

citations referenced are to those portions of the record filed herewith.

**Parties and Affiliated Entities**

      1.     Viad Corp ("Viad") is a Delaware corporation, with its principal place of business

in Phoenix, Arizona.  (Amended and Supplemental Counterclaim ¶ 1).

      2.     Montgomery Road I Limited Partnership ("MRLP") is a Maryland Limited

Partnership that was formed for the purpose of owning real property.  (First Amended

Complaint ¶ 3). The limited partners of MRLP include The Samuel G. Rose Revocable Trust, Reid Liffmann and Steven Braesch. (Eighth Amendment to MRLP Partnership Agreement, MR-16825, attached as Ex. 7).

3.      Montgomery Road TDR, LLC ("MRTDR") is a limited liability company under the same ownership as MRLP. (Limited Liability Company Operating Agreement of MRTDR, MR-07636, attached as Ex. 8). MRTDR was formed in July 2006 to "acquire, hold and ultimately sell transfer development rights in the District of Columbia." *(Id.).*

4.      Greenebaum and Rose Associates ("Greenebaum and Rose") is a partnership that was created by Samuel Rose and Stewart Greenebaum. (Deposition of Samuel Rose ("Rose Dep.") at 18:6-20:3, attached as Ex. 1). Greenebaum and Rose formed MRLP to purchase real property. *(Id.* at 33:5-12; 35:20-36:10).

5.      S&S Finance Limited Partnership ("S&S Finance") is an internal finance company that funds Greenebaum and Rose projects and is an affiliate of MRLP. (Deposition of Reid Liffmann ("Liffmann Dep.") at 33:14-20, attached as Ex. 2).

**The Cash Participation Agreement**

6.      A Cash Participation Agreement ("CPA") was executed on November 30, 1987, by Transportation Leasing Company ("TLC"), and on December 9, 1987 by Montgomery Road I Limited Partnership ("MRLP") as "Developer." (Cash Participation Agreement ("CPA"), VD-000484, attached as Ex. 9).

7.      Thereafter, on or about November 30, 2000, Viad succeeded to the interests of TLC. (Assignment and Assumption Agreement, VD-000954, attached as Ex. 10).

8.      The CPA was negotiated and signed as partial consideration for a sale by Viad's predecessor in interest of a parcel of land located at 90 K Street NE in the District of Columbia

to MRLP for $11,000,000, "further described as Lot 432 in Square 674" ("the Property"). (CPA at Recital A (Ex. 9).

9.    The CPA sets "forth the terms and conditions under which [Viad] will participate in the cash flow hereafter generated from the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing" of the Property. (*Id.* at Recital B).

10.    To secure the obligations of MRLP under the CPA, the agreement created a lien on the Property, referred to as a "mortgage," which was recorded in the land records and remained in effect during the life of any obligations of MRLP. (*Id.* § 5.1)

11.    The CPA sets forth three broad obligations on the part of the Developer, MRLP. First, in Article 2 of the CPA, the Developer is required to pay to Viad 15% of the cash flow from operations on the Property. The CPA defines the terms and conditions for calculating this payment, referred to as the "Operations Cash Payment." (*Id.* §§ 1.26-1.28, 2.1).

12.    Second, in Article 3 of the CPA, the Developer is required to pay to Viad 15% of the appreciation realized by the Developer in "the sale, assignment, condemnation, conveyance or other disposition of all or any part of or interest in the Property," or in the refinancing of the Property or of an interest in the Property. The CPA defines the terms and conditions for calculating this payment, referred to as the "Appreciation Cash Payment." (*Id.* §§ 1.6, 1.28, 3.1, 3.2). Furthermore, the CPA defines "Property" as "the Improvements and the Real Property." (*Id.* § 1.32). "Improvements" are defined as "all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the Real Property." (*Id.* § 1.21).

13.    Third, in Article 4 of the CPA, the Developer is required to afford Viad a right of first refusal in the event it makes or receives a bona fide written offer for sale of the Property. (*Id.* § 4.1).

14.     There is no dispute between the parties concerning the Article 4 rights of the parties. MRLP has notified Viad of offers to purchase the property, and Viad has declined to exercise its right of first refusal. (Letter dated 8/31/06 from E. Fiorucci to MRLP, attached as Ex. 11).

15.     By agreement of the parties while this litigation was pending, the "mortgage" created by the CPA in favor of Viad was released to facilitate a sale of the Property by MRLP. This action was taken in conjunction with the creation of a fund reserved from proceeds of the sale to provide alternate security for Viad. (Deposit Agreement, attached as Ex. 12).

16.     During the life of the CPA, the Property has been used as a parking lot, but there has been no commercial development thereon. (Statement of Greenebaum and Rose Associates at 7, attached as Ex. 13).

17.     During the life of the CPA, MRLP has made no payments under the CPA. (Letter dated 2/21/07 from E. Fiorucci to S. Rose; letter dated 8/14/00 from S. Rose to E. Fiorucci, VD-000364), attached as Exs. 22 & 53.

18.     Viad is not claiming in this litigation that any Operations Cash Payment, that is a payment based on operations on the Property under Article 2, is owed to it. (*See generally*, Amended and Supplemental Counterclaim).

**MRLP's Interpretation of the CPA**

19.     According to Samuel G. Rose, a principal owner of MRLP, testifying as a Rule 30 (b)(6) witness on its behalf, "we (MRLP) are sophisticated developers." (Rose Dep. at 108:13-109:1) (Ex. 1).

20.     At the same time, he is candid in stating that "there is some resentment on our part" about the CPA. (*Id.*). He has indicated various reasons or motives for this resentment. For

example, Rose has testified that "we were sloppy in not being careful about reading it. We would never sign such an agreement if we were careful, but we weren't but that's – We still take responsibility for signing it." (*Id.*).

21.    Rose, who obtained a law degree before becoming a real estate developer, finds the CPA a "mysterious, obnoxious" agreement. (*Id.* at 13:7-11, 15:1-14, & 45:4-6).

22.    Rose testifies that the CPA was "the first and only such agreement that we've ever been involved in in the history of our company." (*Id.* at 50:3-16).

23.    Rose states that, in retrospect, " I think we didn't pay enough attention to it because it's one of the most obnoxious agreements I've ever read in my life and I don't – you know, we must have been stupid to sign it without even any – fighting any of these clauses which are so one-sided but I do not recall – recollect really getting into this." (*Id.*).

24.    MRLP, in filing suit to have this Court declare that it owes no money under the CPA to Viad, has not made any claim that the contract is fraudulent, was induced by fraud, contains mistakes, should be rescinded, or needs reformation. Instead, it seeks to assert its own interpretation of the CPA. (*See generally* First Amended Complaint).

25.    Although the CPA requires that an annual financial statement be submitted by MRLP to Viad, no statement has been submitted for 2005. Instead, with a cover letter from its litigation counsel, a compilation of financial data for that year was submitted to Viad on September 21, 2006, with the word "Draft" written across the top of the first page. (Letter dated 9/21/06 from A. Pignatelli to R. Page, enclosing Draft 2005 Special Purpose Financial Statement ("Draft 2005 Statement"), attached as Ex. 14).

26.    Rose had an explanation for why MRLP has not submitted a financial statement for 2005. He testified as the Rule 30(b)(6) witness that MRLP "missed it" (referring to the

requirement of such submissions) because, "well, we got more important things to do, like our taxes." (Rose Dep. at 212:6-213:7) (Ex. 1).

27.    Rose and MRLP contend that the CPA should be interpreted to provide that the expenses of MRLP which are recognized in calculation of the annual Operations Cash Payment are the same expenses that should be recognized for calculation of the Appreciation Cash Payment on sale of the property. (*Id.* at 215:3-9). But, Rose admits that the CPA is not written so as to make the calculations the same. (*Id.* at 215:10-13).

28.    Rose acknowledges on behalf of MRLP that the CPA requires that all expenses shall be "determined on the basis of sound cash basis accounting practices applied on a consistent basis," but he finds those requirements "tricky and devious." (*Id.* at 219:2-15).

**The Analysis Performed by Reznick Group**

29.    Since the late 1980's, MRLP has sought to convince Viad to relinquish its cash participation interest for a nominal sum. (Letter dated 10/25/89 from A. Ervanian to S. Rose, VD-001027; Letter dated 4/6/95 from S. Rose to A. Ervanian, MR-05987; Letter dated 7/14/99 from R. Liffmann to K. Goldman, VD-001098; Letter dated 7/12/00 from E. Fiorucci to S. Rose, VD-000658; Memorandum dated 12/18/02, MR-00664, attached as Exs. 15-19).

30.    In its efforts to convince Viad to relinquish its participation interest, MRLP has frequently misrepresented the value of the property to Viad employees. For example, in April 1995, Sam Rose wrote to Viad that the 90 K Street Property was worth $5,000,000 and that MRLP's costs exceeded this amount. However, three years earlier, in June 1992, Sam Rose wrote to a potential buyer that the property was valued at $26,000,000 and that this amount exceeded MRLP's costs. (*Compare* Letter dated June 17, 1992 from S. Rose to C. Helwig, MR-

07004 (Ex. 20) with Letter dated 4/6/95 from S. Rose to A. Ervanian, MR-05987 (Ex. 16); *see also* Letter dated 5/21/02 from S. Rose to E. Fiorucci, VD-000537-38, attached as Ex. 21).

31.    On or about August 14, 2000, MRLP advised Viad of its intent to sell the 90 K Street property to Level 3 Communications, LLC ("Level 3").  (Letter dated 8/14/00 from S. Rose to E. Fiorucci, VD-000364, attached as Ex. 22).

32.    In a letter to Viad dated August 14, 2000, Greenebaum and Rose Associates, an affiliate of MRLP, stated that the proposed sale price would result in no cash participation payment to Viad.  *Id.*

33.    In a letter dated August 23, 2000, Viad responded that MRLP had overstated the costs that could be deducted from the purchase price when calculating Viad's participation payment.  Specifically, Viad asserted that the Developer's Equity Return was not a proper deduction when calculating the Appreciation Cash Payment, and that Viad would be entitled to their portion of the Appreciation Cash Flow of $4.9 million after the sale of 90 K Street to Level 3.  (Letter dated 8/23/00 from K. Goldman to S. Rose, VD-000533, attached as Ex. 23).

34.    The parties continued to correspond in September and October of 2000, debating the proper calculation of the Appreciation Cash Payment.  (Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-001015; Letter dated 10/2/00 from K. Goldman to R. Liffmann, VD-000944, attached as Exs. 24-25).

35.    For reasons unrelated to Viad, the transaction between MRLP and Level 3 did not close.  (Letter from R. Liffmann to E. Fiorucci dated 4/10/01, VD-000544-46, attached as Ex. 26).

36.    For the next four years, MRLP sought continuously to convince Viad to relinquish its participation interest for a nominal sum.  MRLP was anxious to sell 90 K Street as

soon as possible. (Letter dated 5/21/02 from S. Rose to E. Fiorucci, VD-000537; Record of

Telephone Conversation on 6/10/02, VD-00966; Record of Telephone Conversation on 6/15/04,

VD-000965; Record of Telephone Conversation on 7/25/04, VD-000964) (Exs. 21, 27-29).

37.     In or about December 2004 Viad and MRLP agreed to seek the advice of Reznick

Group, P.C. ("Reznick"), an accounting firm, with respect to the interpretation of terms in the

CPA and the proper classification of costs and charges for purposes of calculating the

Appreciation Cash Payment. (*See* Record of Telephone Conversation dated 12/16/04, VD-

000960, attached as Ex. 30).

38.     On March 2, 2005, Viad submitted the statement of its position and related

exhibits to Reznick.  In her March 2, 2005 letter to Reznick, Eve Fiorucci, Assistant Director of

Real Estate for Viad, stated in the third bulleted paragraph: "Finally, while we appreciate your

review of the documents and your opinion as to our interpretation of same, we wish to make it

clear that your opinion is not binding on TLC/Viad Corp." (*See* Letter dated March 2, 2005 from

E. Fiorucci to B. Solomon enclosing Statement of TLC's Position ("Statement of TLC's

Position"), VD-000904, attached as Ex. 31).

39.     In or about April 2005, Greenebaum and Rose submitted its statement of position

to Reznick. (*See* Fax dated 4/27/05 from Robin-Eve Jasper to E. Fiorucci enclosing Statement of

Greenebaum and Rose Associates, Inc. ("Statement of Greenebaum and Rose") VD-000458)

(Ex. 13).

40.     On April 10, 2005, Reznick provided its interpretation of certain terms in the

CPA, an analysis of the classification of costs and charges, and a pro-forma calculation for a

hypothetical sale of the property. (*See* Letter dated 4/10/05 from B. Solomon to S. Rose

(hereinafter "Reznick Analysis") ¶ 2, VD-000466, attached as Ex. 32).

41.     On May 2, 2005, <u>after</u> the Reznick Analysis was completed, Greenebaum and Rose suggested to Viad that Reznick's review should be binding on the parties. (*See* letter dated 5/2/05 from S. Rose to E. Fiorucci, VD-000453, attached as Ex. 33).

42.     However, Greenebaum and Rose knew that Viad, in its letter dated March 2, 2005, conditioned its submission of papers to Reznick on the understanding that Reznick's analysis would not be binding. Sam Rose was copied on this letter and he testified that he received the letter. However, prior to the issuance of the Reznick Analysis, no efforts were made to contact Viad regarding its statement that the Reznick opinion would not be binding . *(See* Letter dated 3/2/05 from E. Fiorucci to B. Solomon, VD-000904 (Ex. 31); Rose Dep. at 88:13-91:11; 95:1-96:1 (Ex. 1).

43.     In fact, in a letter to Reznick during the review process, Reid Liffmann, a limited partner of MRLP, indicated that the process was advisory only, stating: "[h]opefully, with guidance from you, the parties can get a process moving that will lead to a resolution, without wasting a lot of legal dollars and time." (Letter dated 3/24/05 from R. Liffmann to B. Solomon, MR-01685, attached as Ex. 34).

44.     Furthermore, MRLP cannot point to a specific conversation where Viad stated that the Reznick Analysis would be binding. (Rose Dep. at 86:13-87:8; 93:15-94:13) (Ex. 1). In the records of phone conversations leading up to the decision to seek advice from an accountant, there is no indication that Viad or MRLP intended Reznick's advice to be binding (Record of Telephone Conversation on 6/15/04, VD-000965; Record of Telephone Conversation on 7/25/04, VD-000964; Record of Telephone Conversation dated 12/16/04, VD-000960) (Exs. 29-30).

45.     MRLP claims that the Reznick Analysis is binding under Section 2.7 of the CPA. (Rose Dep. at 87:9-20) (Ex. 1).

46.     Under Section 2.7, if the parties are unable to resolve a dispute concerning the fiscal year statements in Sections 2.4, 2.5 and 2.6 within a certain period of time, "the items shall be submitted to arbitration which arbitration shall be performed by an independent certified public accountant selected by TLC [Viad's predecessor] and reasonably satisfactory to Developer, whose determination shall be final." (CPA § 2.7) (Ex. 9).

47.     From approximately 1987 to 2005, MRLP has submitted Special Purpose Financial Statements to Viad in an effort to comply with Section 2.6 of the CPA. (*See* Special Purpose Financial Statement for December 31, 2004 and 2003 (hereinafter "Representative Statement"), MR-00953 at 00955, attached as Ex. 35).

48.     Under Section 2.6, MRLP must furnish "financial statements and schedules, including a balance sheet and statement of operations for the Property for such Fiscal Year, prepared in accordance with generally accepted accounting principles applied on a basis consistent with past practices and bearing the unqualified opinion of a firm of independent certified public accountants. . . ." (CPA § 2.6) (Ex. 9).

49.     The Special Purpose Financial Statements, which were submitted in response to Section 2.6, are not related to the calculation of the Appreciation Cash Payment. Section 2.6 appears in Article 2, which deals with "Operations Cash Flow," not "Appreciation Cash Flow." (*See generally* CPA, Article 2) (Ex. 9).

50.     Furthermore, the dispute resolution provision in Section 2.7 also is not related to the Appreciation Cash Payment. Article 2.7 appears in Article 2, which deals with "Operations Cash Flow," not "Appreciation Cash Flow." (*See generally* CPA, Article 2) (Ex. 9).

51.     The purpose of seeking advice from an accounting firm was to begin to resolve informally the potential dispute between MRLP and Viad regarding the calculation of the

Appreciation Cash Payment, since MRLP was eager to buy out Viad's interest. (Record of Telephone Conversation on 6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664) (Exs. 19, 27).

52.     According to CPA Section 3.11, disputes regarding the calculation of the Appreciation Cash Payment shall be submitted <u>to arbitration by an MAI appraiser after receipt of the Appreciation Cash Payment and the statement accompanying the payment</u>. (CPA § 3.11) (Ex. 9).

53.     The Reznick Analysis was not conducted under Section 3.11 because no Appreciation Cash Payment had been paid at the time of the analysis, the analysis was conducted by an accountant, not an appraiser, and the analysis was not an arbitration. (CPA § 3.11; Rose Dep. at 86:8-12) (Ex. 1 & 9).

54.     Samuel Rose, MRLP's 30(b)(6) witness, has testified that he has no recollection of describing the Reznick Analysis as an "arbitration." (Rose Dep. at 86:8-12) (Ex. 1).

55.     At most the evidence demonstrates that MRLP and Viad agreed to seek the advice of an accounting firm regarding the proper classification of costs and charges for purposes of calculating the Appreciation Cash Payment in the event of a sale. (Deposition of Eve Fiorucci, hereinafter "Fiorucci Dep." at 46:1-20 attached as Ex. 6; *see* Letter dated 4/10/05 from B. Solomon to S. Rose ¶ 2, VD-000466 (Ex. 32); *see also* Record of Phone Conversation on 12/16/04, VD-000960; Record of Phone Conversation on 6/15/04, VD-000965; Letter from R. Liffmann to B. Solomon dated 3/24/05, MR-01685) (Exs. 28, 30, 34).

**Cash Basis Accounting**

56.     The CPA requires that accounting for both revenue and expenses related to the Property be "on the basis of sound cash basis accounting practices applied on a consistent basis." (CPA §§ 2.2, 2.3, 2.6) (Ex. 9).

57.     The various financial statements tendered from time to time by MRLP and by its counsel have, despite the requirement for cash basis accounting, reflected accrued interest payments on debt allegedly incurred by MRLP.  (Statement of Greenebaum and Rose Associates, at Section I, VD-000458) (Ex. 13).

58.     The debt claimed by MRLP, and on which it has accrued interest, is based on its own, or its principals' and affiliates' investment in the property.  *(Id.)*

59.     MRLP has never made interest payments, in fact, but it seeks to deduct such payments as if they had been made in any calculation of amounts due to Viad under the CPA. (Deposition of Reid Liffmann ("Liffmann Dep.") at 45:10-46:17) (Ex. 2).

**Developer's Equity Return**

60.     According to the CPA, the Appreciation Cash Flow is calculated by taking the Agreed Value of the Property, deducting the Approved Deductions and the Closing Costs, and then deducting the Developer's Invested Equity and Developer's Operating Equity.  The Appreciation Cash Payment is 15% of the Appreciation Cash Flow.  (CPA § 3.1)  (Ex. 9).

61.     In Section 3.1 of the CPA, "Developer's Equity Return" is not included in the definition of Appreciation Cash Flow.  *(Id.* § 3.1).

62.     Under Section 3.4(a) of the CPA, "Permitted Debt" and "Junior Financing" are Approved Deductions from Appreciation Cash Flow in the event of the sale of the Property. *(Id.* § 3.4(a).

63.    S&S Finance is a 100% owned affiliate of Greenebaum and Rose.  (First Amended Complaint ¶ 10).

64.    In 1996, S&S Finance acquired the first mortgage on the 90 K Street Property. (Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-001015) (Ex. 24).

65.    In its Special Purpose Financial Statements for 1997 through 2004, MRLP classified the accrued interest on the first mortgage as Developer's Equity Return.  (Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-001015, at 001016 (Ex. 24)).

66.    From approximately 1987 to November 2006, MRLP has treated amounts contributed by S&S Finance to 90 K Street as equity.  (*See* Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised Special Purpose Financial Statement for 2005 ("Revised 2005 Statement"), attached as Ex. 36).

67.    Now, under the direction of its litigation attorney Dale Cooter, MRLP seeks retroactively to convert the amounts contributed by S&S Finance, the accrued interest on those amounts, and the accrued interest on the first mortgage from equity to debt.  In a letter to Viad's counsel, Mr. Cooter stated: "As you know, I established that all money contributed to Montgomery Road I Limited Partnership was actually in the form of loans originating with S&S Finance.  There was never any intention to contribute non-interest bearing equity to the project." (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36). However, no loan documents have been provided to Viad to substantiate Mr. Cooter's claim that the money contributed to MRLP by S&S Finance was in the form of a loan. (*Id.*).

68.    Attorney Cooter also attached a revised Special Purpose Financial Statement for 2005 ("Revised 2005 Statement") to his November 21, 2006 letter.  (*Id.*).

69.     Prior to their receipt of the Revised 2005 Statement, counsel for Viad received a Draft 2005 Statement from Mr. Cooter's office on September 21, 2006 (Letter dated 9/21/06 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement) (Ex. 14).

70.     Unlike the other Special Purpose Financial Statements, which were prepared between 1987 and 2004, there is no signed statement indicating that the Revised or Draft 2005 Statements were compiled by a firm of independent certified public accountants, as required by Section 2.6 of the CPA.  (Liffmann Dep. at 14:9-16:22; 35:15-37:12 (Ex. 2); CPA Section 2.6 (Ex. 9); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing revised 2005 Statement (Ex. 36); Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement (Ex. 14); *see also* Special Purpose Financial Statement for December 31, 2004 and 2003 (hereinafter "Representative Statement") MR-00953 at 00955) (Ex. 35).

71.     In the Revised 2005 Statement, MRLP reclassified the amount that was previously classified as Developer's Equity Return as "Interest Expense – S&S Loan."  MRLP also reclassified other amounts as "S&S Finance Loan Payable."  These items were then added under "Liabilities" in the Revised 2005 Statement.  These new classifications do not appear in previous Special Purpose Financial Statements.  (*See* Letter dated 11/21/06 from D. Cooter to R. Page, Revised 2005 Statement at 2 & 5 (Ex. 36); *see also* Representative Statement, VD-00953 at 00956) (Ex. 35).

72.     The decision to treat amounts advanced by S&S Finance and the accrued interest on those amounts as debt instead of equity is inconsistent with the Reznick Analysis, which MRLP seeks to enforce as binding in this case.  According to the Reznick Analysis "any amount advanced by S&S or its partners to pay interest or any other reasonable expense should be treated

as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b)." (Reznick Analysis, VD-000466, at ISSUE 3, Interpretation) (Ex. 32).

73.     Through its attorney, MRLP has taken multiple and contradictory positions on the manner in which items should be classified on its financial statements, with the intent to decrease Viad's Appreciation Cash Payment. (*Compare* Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement, with Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement) (Exs. 14 & 36).

**Transferable Development Rights**

74.     The 90 K Street Property is zoned C-3-C which permits a maximum height of 90 feet and a maximum FAR of 6.5. (*See* Expert Report of Cynthia Giordano ("Giordano Report") at 1, attached as Ex. 37).

75.     It is also located in the North Capitol TDR Receiving Zone under the D.C. Zoning Regulations (D.C. Mun. Regs. tit. 11, § 1709.17) which permits increased density up to the maximum height permitted by the 1910 Building Height Act and an FAR of 10.0 with TDRs. (46 D.C. Reg. 1054, 1059 (Oct. 19, 1998)).

76.     FAR is a general measure of building density. FAR, or floor-to-area ratio, is the result of adding together the square footage of all of the floors in the building and dividing that total by the land area of the lot. Thus, a one-story building covering 100% of the lot equals a 1.0 FAR. At the other end of the range, a ten-story building covering 100% of the lot is a 10.0 FAR. (Giordano Report at 1 n.1) (Ex. 37).

77.     Permitted FAR under District of Columbia zoning ranges from the lowest density of 0.9 FAR to the highest density of 10.0 FAR. (*Id.* at 1, n.1; *see generally,* D.C. Mun. Regs. tit. 11, § 1709).

78.    Transferable Development Rights or TDRs are what the name implies:  zoning density which may be transferred from a site on which the density is not used to another site on which the density may be developed.  (Giordano Report at 2) (Ex. 37).

79.    TDRs were created in the District of Columbia in 1991 when the D.C. Zoning Commission enacted the "Downtown Development District" regulations ("DD regulations"). (*Id.* at 2; 49 D.C. Reg. 6444, 6448 (Jul. 5, 2002)).

80.    These regulations imposed significant requirements on new development projects in downtown Washington, ranging from minimum retail space requirements and historic preservation to design standards and mandated housing. (Giordano Report at 2; *see generally,* D.C. Mun. Regs. tit. 11, § 1709).

81.    To compensate owners subject to the new restrictions, the DD Regulations also created TDRs.  Under the new regulations, when an owner develops a project which meets or exceeds certain requirements of the DD Regulations, TDRs are generated.  These TDRs can then be sold at a profit for use on other development sites in designated "receiving" districts. (Giordano Report at 2; D.C. Mun. Regs. tit. 11, § 1709.1).

82.    TDRs can have a dramatic impact on the value of downtown properties. (Giordano Report at 2) (Ex. 37).

83.    For sending sites, generating and transferring TDRs can yield profits which mitigate the costs of historic preservation and providing preferred uses and provide an incentive for providing such uses. (*Id.* at 2).

84.    For receiving sites, TDRs can create additional density in a way that was formerly available only through expensive and lengthy discretionary zoning processes. (*Id.* at 2).

85.    The mechanics of a TDR transfer begins with a sending site and a receiving site. A sending site which is eligible to generate and transfer TDRs meets one of two profiles. It may be a designated historic property or a development project which provides certain preferred uses identified in the DD regulations. (*Id.* at 2; D.C. Mun. Regs. tit. 11, § 1709).

86.    TDRs generated under the DD Regulations may be transferred to any other lot located within the DD District or to lots located within receiving zones which have been designated by the City as appropriate for high density commercial development. (Giordano Report at 3; D.C. Mun. Regs. tit. 11, § 1709.1).

87.    The "North Capitol" receiving zone, in which the 90 K Street Property is located, is one such zone. It was established in October of 1998. (Giordano Report at 3; 46 D.C. Reg. 1054, 1058 (Oct. 19, 1998)).

88.    The TDR transfer process involves both a real estate transaction and a ministerial government process. (Giordano Report at 3) (Ex. 37).

89.    The transfer must be certified by the District government. (*Id.* at 4; D.C. Mun. Regs. tit. 11, § 1707 (i) (4)).

90.    The owner of the sending site will process with the District of Columbia zoning, planning and legal agencies a "TDR Covenant." The TDR Covenant restricts the sending site in perpetuity to provide the preferred use giving rise to TDRs, or to maintain the historic project undertaken. Once approved and executed by the District, the TDR Covenant is recorded in the land records and runs with the chain of title to the sending site. (Giordano Report at 4; D.C. Mun. Regs. tit. 11, § 1709.14).

91.    The parties also process with the same District agencies a "TDR Certificate." This document is akin to a deed, and legally transfers the specified TDRs from the sending site to

the receiving site. (D.C. Mun. Regs. tit. 11, § 1709.10-1709.11). Standard forms for the TDR

Covenant and the TDR Certificate have been developed by the City and the process for City

review and execution is ministerial in nature. (Giordano Report at 4) (Ex. 37).

92.    The TDR Certificate is recorded at closing on the transfer of TDRs, and

completes the transaction between sending lot and receiving lot. (*Id.* at 4; D.C. Mun. Regs. tit.

11, § 1709.14).

93.    The DD regulations permit the re-transfer from the original receiving lot to

another eligible receiving lot. (D.C. Mun. Regs. tit. 11, § 1709.8).

94.    TDRs have generally been readily available for purchase and the going rate for

TDRs has generally ranged since 1998 from a high of approximately $25.00 per square foot of

transferred density to a low of $3.00 per square foot with an overall downward trend in prices to

the present. (Giordano Report at 4) (Ex. 37).

95.    The establishment of a receiving zone is effectively an up-zoning of the properties

located within the zone to a higher matter-of-right density. *(Id.* at 5).

96.    In the North Capitol receiving zone, where the 90 K Street Property is located,

TDRs may be used to increase matter-of-right FAR from a maximum of 6.5 FAR to as much as

10.0 FAR with TDRs. (*Id.*; D.C. Mun. Regs. tit. 11, § 1707.5 (d)).

97.    Utilizing approximately 360,513 square feet of TDRs, the density of the 90 K

Street Property can potentially be increased from 6.5 to 10.0 FAR. This approximate quantity of

TDRs has been available in the market since the inclusion of 90 K Street in a receiving zone at

prices which have generally ranged from approximately $25.00 to $3.00 per square foot with an

overall downward trend in prices to the present. (Giordano Report. at 5) (Ex. 37).

98.    TDRs are currently selling at $5.50 to $5.25 per square foot. (*Id.* at 5).

**Transferable Development Rights are an "Interest in the Property" or an "Improvement"
to the Property for Purposes of Calculating the Appreciation Cash Payment**

99.    TDRs are an aspect of the zoning for the property. (Giordano Report at 2)
(Ex. 37).

100.    The effect of a parcel being placed in a 'receiving zone' for TDRs is an
"upzoning" of the property. *(Id.* at 5).

101.    There is a glut of TDRs available in the market place.  The fair market value of
TDRs has ranged from $3.00 to $25.00.  *(Id.* at 4-5).

102.    MRLP contracted to buy TDRs for use at the 90 K Street Property for $6 per
square foot.  (Deposition of Steven Braesch ("Braesch Dep.") at 24:19-29:17), attached as Ex. 3).

103.    The "rebuttal appraisal" expert retained in this litigation by MRLP, Stuart I.
Smith, has on one occasion determined the value of TDRs in the "North Capitol" receiving zone.
The value he concluded for that transaction was that TDRs had value of $3.50 per FAR.
(Deposition of Stuart I. Smith ("Smith Dep.") at 34:1-3, attached as Ex. 4).

104.    TDRs do not sell for a price that is equal to or similar to the price per square foot
of land to which they will be attached.  *(Id.* at 94:13-95:4).

105.    TDRs are recorded in the land records of the District of Columbia for both the
sending and receiving lots.  (D.C. Mun. Regs. tit. 11, §§ 1709.10-1709.11, 1709.14).

106.    In 2000, when MRLP complied with the requirement of the CPA and provided to
Viad the details of its proposal to sell the Property to Level 3, there were TDRs recorded on the
property at that time.  (Letter dated 7/21/00 from S. Rose to TLC, attaching agreement between
MRLP and Level 3 Communications, LLC ("MRLP–Level 3 Agreement"), VD-000593;
Certificate of TDR Transfer dated 8/16/00, MR-07470-07487, attached as Exs. 38 & 39).  The
contract of sale to Level 3 was for a single price that included the TDRs already assigned, since

"development rights" were included in the definition of "Property."  (Rose Dep. at 193:21-195:17 (Ex. 1); "MRLP-Level 3 Agreement" at 1.1.3 and Article 2, VD-000593) (Ex. 38). MRLP provided that contract to Viad so that it could consider whether to exercise its right of first refusal; Viad chose not to do so.  (MRLP-Level 3 Agreement at cover letter, VD-000593) (Ex. 38).

107.     Beginning in 2000, MRLP listed as expenses for the property deductible under the CPA against any payment owed to Viad for yearly operations the cost of acquiring TDRs and the legal fees associated with doing so.  The total cost over a period of time was approximately $350,000.  The annual financial statements of MRLP submitted to Viad under the CPA for the years 2000, 2001, 2002, 2003, 2004 and the 'Draft' statement for 2005 listed these TDR expenses as an appropriate deduction.  (Financial Statement for December 31, 2000 and 1999 at 7, VD 000180, attached as Ex. 40; Letter dated 11/21/06 from D. Cooter to R. Page ¶ 1) (Ex. 36).

108.     In July 2006, the partners of MRLP formed a separate entity, Montgomery Road TDR, LLC ("MRTDR"), which is identical in ownership to MRLP.  This new entity was created to be a party to which TDRs would be transferred and then sold as part of a transaction with TC MidAtlantic Development, Inc.  (Limited Liability Operating Agreement of Montgomery Road TDR, LLC, MR-07636; Eighth Amendment to Certificate of Agreement of Limited Partnership of MRLP, MR-16825, at 4)  (Exs. 7 & 8).

109.     MRTDR is an "Affiliate" of MRLP within the meaning of the CPA.  (CPA § 1.2) (Ex. 9).

110.     In or about August 2006, MRLP signed an agreement with TC MidAtlantic Development, Inc. ("TCMD") for the sale of the 90 K Street Property.  (Land Purchase and Sale Agreement dated August 10, 2006; Agreement of Purchase and Sale of Transferable

Development Rights dated August 10, 2006, MR-19926, attached as Exs. 41 & 42). As part of this sale, MRLP has sought to exclude Viad from participating in the appreciation of the property by creating a separate contract for the sale of the TDRs – the Agreement of Purchase and Sale of Transferable Development Rights -- and allocating approximately a third of the purchase price, $21,387,929, to this separate contract. (Agreement of Purchase and Sale of Transferable Development Rights dated August 10, 2006, MR-19926 (Ex. 42); First Amendment to Agreement of Purchase and Sale of Transferable Development Rights dated October 31, 2006; Settlement Statement for 90 K Street TDR Sale, MR-26163, attached as Exs. 43 & 55). In this separate TDR agreement, the TDRs are valued at more than eleven times the price that MRLP paid to acquire them and approximately thirteen times the market price for TDRs. (*Id; see also* Giordano Report at 5 (Ex. 37).

111.  TCMD is an affiliate of The Trammel Crow Company. (Hudson Dep. at 11:19-12:3) (Ex. 5).

112.  The draft agreements demonstrate that efforts were made to delete any reference to the TDRs as "property." For example, in one draft, Section 3.5(a) states that the deed shall include the TDRs. Inserted next to this section is the following comment: ("Why are the TDR's [*sic*] here – because they run with the land – would prefer not to have this clause here – thinking about Cooter/Viad?" (Draft Purchase and Sale Agreement at 6, MR-10942, attached as Ex. 44).

113.  In November 2006, 10 months after this litigation was filed, and after the contract of sale between MRLP and TCMD had been entered into, MRLP reversed its accounting treatment of the TDRs. The unaudited, unsigned financial statement submitted to Viad by counsel for MRLP eliminated these TDR expenses. (Letter dated 11/21/06 from D. Cooter to R. Page, at cover page and p.2) (Ex. 36). In the Rule 30(b)(6) deposition of MRLP on this matter,

Reid Liffmann testified that, based on advice of litigation counsel, it was determined that the previous deductions taken for TDR expenses were "an administrative mistake." (Liffmann Dep. at 28:2-29:14) (Ex. 2).

114.    The agreements with TCMD included a so-called Umbrella Agreement.  Under that document, sale of the land at 90 K Street was conditioned on the purchase of 45 L Street, the adjoining lot, and on the purchase of TDRs at a price sufficient to provide compensation for MRLP at an FAR value of $70 per square foot. (Umbrella Agreement dated August 11, 2006 between MRLP, 45 L Street Venture, LLC and TCMD, attached as Ex. 45).

115.    In the summer of 2006, TCMD had learned through its broker that a large property in the NoMa area was available for "roughly $100 million." (Hudson Dep. at 21:2-13) (Ex. 5).

116.    There was a subsequent face to face meeting between representatives of TCMD and Rose and Liffmann, and the price discussed, or at least the expectation of the parties regarding price was known to be, approximately $100 million. (*Id.* at 24:14-21).

117.    In discussions between TCMD and the seller MRLP, there was never any differentiation made in the discussions of price between the two parcels, one at 45 L Street and one at 90 K Street.  The only discussion "was relating to the total FAR." (*Id.* at 30:3-14).

118.    The buyer analyzed the sale in terms of the total FAR, which it priced at approximately $70 per square foot. (*Id.* at 33:5-10).

119.    The "experience" of TCMD was that the District of Columbia government would allow up an FAR of up to 10 in this area, and it calculated its expected yield on that basis. (*Id.* at 33:18-34:4).

120.    The TDR price in the contracts was changed after the agreement was made.  In or about October 2006, TCMD determined that it did not need to purchase as many TDRs as the contracts provided for because they could not be used in the plans under consideration. However, in the amendments to the contracts, the total contract price for the purchase of TDRs by TCMD from MRLP was not changed.  Instead, the price per TDR was increased by an amount necessary to insure that MRLP was paid the same amount even if the total number of TDRs it sold was reduced.  (Hudson Dep. at 42:9-45:6) (Ex. 5); Email dated 10/31/06, 6:27 p.m., from R. Saas to D. Hudson, MR-22461 at 22462; Email, dated 11/1/06, 8:02 a.m., from S. Braesch to R. Shapiro, R. Saas, D. Hudson, R. Liffmann, and R. Foster, MR-19563; Email dated 11/1/06, 11:40 a.m., from S. Braesch to R. Saas, R. Shapiro, R. Liffmann, D. Hudson and R. Foster, MR-20535, attached as Exs. 46-48) (First Amendment to Agreement of Sale of Transferable Development Rights dated October 31, 2006) (Ex. 55).

121.    The reason for making the change in this manner was explained by counsel for TCMD.  The only reduction in the price if the TDRs were not to be included in the sale was the small cost of acquisition of the TDRs, and the "profit piece" would be guaranteed to TCMD. (Email from 10/31/06, 6:27 p.m., from R. Saas to D. Hudson, MR-22461 at 22462) (Ex. 46).

122.    TCMD has admitted in deposition testimony that the price paid to MRLP for TDRs was well-above the market price and was agreed to only because purchasing the TDRs at the higher value was a requirement imposed by MRLP as a condition for purchasing the land at 90 K Street.  (Hudson Dep. 45:4-46:17) (Ex. 5).  The "bargain" according to Daniel Hudson, President of TCMD, was that MRLP would be paid for the achievable FAR regardless of how the price was allocated between TDRs and land.  (*Id.* at 46:8-17).

**MRLP's Default Under the CPA**

123.    MRLP has not provided financial statements pursuant to the CPA for fiscal years 2005 and 2006. (*See* Letter from R. Page to D. Cooter dated 9/13/06 requesting Special Purpose Financial Statement for 2005, attached as Ex. 48).

124.    The failure to provide financial statements under Section 2.6 of the CPA is a default under the contract. (CPA § 2.6) (Ex. 9).

125.    As was discussed previously, during the course of litigation, on November 21, 2006, MRLP has tendered a compilation of financial data, accompanied by a letter from its litigation counsel with his opinion that the financial data is a correct statement of expenses and other deductions under the CPA. (this compilation is hereinafter referred to as the "Cooter Financials"). By contrast, the CPA requires the certification of an independent certified public accountant applying generally accepted accounting principles on a consistent basis to the books and records of MRLP. (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement; CPA § 2.6) (Exs. 9 & 36).

126.    The Cooter Financials do not comply with the requirements of the CPA. *Id.*

127.    The Cooter Financials are inconsistent with tax returns filed by MRLP and, on information and belief, with the tax returns filed by the principals of MRLP. Specifically, whereas the Cooter Financials classify all out of pocket expenses by MRLP in maintaining the land as loans rather than as equity investments in the Property, the actual accounting and tax treatment of these items for all other purposes and in prior financial statements submitted by MRLP to Viad classified these expenses as equity. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406 (Ex. 50); Revised 2005 Statement at 2 & 5 (Ex. 36); Representative Financial Statement at 2 & 5, MR-00953 (Ex. 35).

128.    On January 9, 2007, MRLP partner Reid Liffmann prepared a spreadsheet with a summary of the MRLP-TCMD transaction, including a "Net Gain Calculation" and a "Gain on Sale" calculation.  In that spreadsheet, he identified the various closing costs and the reimbursement or recognition of previously incurred expenses in buying and holding the Property.  The deductions listed are similar to those described in the CPA, including "project costs," broker's commissions, and closing costs.  His calculation showed that a total of $50,172,452 would be available for distribution to the partners of MRLP, not including the $4,500,000 it set aside for possible payment to Viad.  Thus a net gain of $54,672,452 was anticipated.  (Email dated 1/9/07 from R. Liffmann to R. Glassman attaching spreadsheet, MR-19671, attached as Ex. 51).

129.    Consistent with the tax returns of MRLP prior to the closing, and consistent with the distribution of funds shown on the settlement statement after the sale, the Liffmann spreadsheet indicated total loans payable to S&S (including the mortgage) of less than $5 million.  (Email dated 1/9/07 from R. Liffmann to R. Glassman attaching spreadsheet, MR-19671 at 19676; MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50-52).

130.    The purpose and intent of the Cooter Financials was to retroactively change the accounting for MRLP's ownership of the Property for the purpose of increasing those items that might be deducted as an expense from the Agreed Value of the Property upon sale and, thus, defeat the possibility of a payment to Viad.  (Liffmann Dep. at 19:20-21:2; 24:9-16; 25:21-26:13; 27:9-28:1) (Ex. 2).

131.    Like the structure of the MRLP-TCMD sale documents, which purport to segregate consideration for the purchase of the Property by TCMD into land value and value for

attributes of the zoning, thus lowering the Agreed Value under the CPA, the failure to provide financial statements for 2005 and 2006 and to substitute during this litigation the Cooter Financials is a sham for which MRLP fraudulently seeks to increase the possible deductions or adjustments to the payment due to Viad. (*Id.*).

132.    During the course of this litigation, MRLP has engaged in actions to avoid and defeat its contractual obligations to Viad under the CPA. (Letter from E. Fiorucci to Sam Rose dated 2/21/07, attached as Ex. 53).

133.    On January 11, 2007, MRLP proceeded to close on the transaction to sell 90 K Street, N.E. to TCMD or one of its affiliates. (Settlement Statement for 90 K Street Land Sale, MR-26158, Settlement Statement for 90 K Street TDR Sale, MR-26163) (Ex. 43 & 52).

134.    The total consideration paid to MRLP for the sale of 90 K Street N.E. on January 11, 2007, including deferred compensation, was $67,424,457. (*Id.*).

135.    Under Section 3.2 of the CPA, MRLP was required to make the Appreciation Cash Payment within three (3) days of that closing. (CPA § 3.2) (Ex. 9).

136.    No payment was made by MRLP at any time nor was any payment received by Viad as a result of the sale of the property on January 11, 2007. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

137.    Under Section 3.9 of the CPA, MRLP was required to deliver to Viad "a statement reflecting the Agreed Value, the Approved Deductions, the Closing Costs and the Appreciation Cash Flow used in calculating the Appreciation Cash Payment and a detailed breakdown of all items necessary for the calculation of each such item." (CPA § 3.9) (Ex. 9).

138.    No "statement" as required by Section 3.9 has been delivered by MRLP to Viad. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

139.   On February 21, 2007, Viad gave written notice to MRLP under Section 7.3 that it was in default under the CPA for failure to provide either a payment or a statement of the calculation of the payment. (*Id.*). The CPA provides that MRLP had a ten (10) day period to cure monetary defaults and a thirty (30) day period to cure non-monetary defaults after notice from Viad. (CPA § 7.3) (Ex, 9).

140.   MRLP made no effort to cure these defaults, and it remains in default. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53). According to Section 7.4 of the CPA: "[i]f either party hereto shall bring suit against the other as a result of any alleged breach or failure of the other party to fulfill or perform any covenants or obligations under this Agreement, then in such event, the prevailing party in such action shall, in addition to any other relief granted or awarded by the court, be entitled to judgment for reasonable attorney's fees incurred by reason of such action and all costs of suit and those incurred in preparation thereof at both trial and appellate levels." (CPA § 7.4) (Ex. 9).

141.   The CPA provides in section 3.1 that the Appreciation Cash Payment shall be based on the Agreed Value of the Property, less certain specified deductions as defined in the CPA. (CPA § 3.1) (Ex. 9).

142.   The Agreed Value is defined in Section 3.3 of the CPA as the greater of the gross proceeds actually received in a sale of the property or the fair market value of the property. (*Id.* § 3.3).

143.   After the sale of the Property on January 11, 2007, MRLP failed to provide a statement of the Agreed Value based on the sale or otherwise to provide its calculation of the Cash Appreciation Payment. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

144.    The CPA provides in Section 3.11 that, if the parties disagree about the Agreed Value, Viad may notify MRLP within ninety days of the receipt of the payment of that disagreement. Because MRLP had filed this suit to declare that the TDR portion of the sale was not covered by the CPA, and because it failed and refused to provide any payment or even a statement of how it calculated the lack of a payment and its deductions from the Agreed Value upon which it is relying, Viad gave notice on February 21, 2007, in writing, that a disagreement existed. (CPA § 3.11; Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Exs. 9 & 53).

145.    Viad also, on January 31, 2007, provided to MRLP in accordance with the CPA a report prepared by an M.A.I. appraiser, as provided for in Sections 3.8 and 3.11 of the CPA, with an opinion as to the fair market value of the Property. (Expert Report of Steven Halbert ("Halbert Report"), attached as Ex. 54); CPA §§ 3.8, 3.11) (Ex. 9).

146.    The appraiser, Steven Halbert, of Cushman and Wakefield, provided his written opinion that the fair market value of the Property on June 24, 2006, and within a 6 month period thereafter, which period included the date of the contract between MRLP-TCMD, was $64,800,000. (Halbert Report, at Executive Summary). Mr. Halbert based his valuation on the total development potential of 90 K Street. (Halbert Report at 27 & 37) (Ex. 54).

147.    Section 3.8 of the CPA provides that MRLP must select its own appraiser and MRLP's appraiser and Viad's appraiser shall together select a third appraiser (CPA § 3.8).

148.    MRLP failed to name an appraiser to determine fair market value. Under Section 3.8 of the CPA, this designation should have been made by February 15, 2007 (CPA § 3.8.) (Exs. 9 & 53).

149.    MRLP did designate as a rebuttal expert in this litigation Stuart I. Smith. He has testified that he has no opinion of the fair market value of the property. (Deposition of Stuart I.

Smith, ("Smith Dep.") at 65:16-67:8). Rather, the thrust of his "rebuttal" is that Mr. Halbert

should have described the availability of TDRs as an "extraordinary assumption." (Smith Dep.

at 84:20-86:6) (Ex. 4).

     150.    Viad's notice of February 21, 2007, gave notice to MRLP that it was in default for

failure to contest the fair market value calculation and component of the Agreed Value under the

CPA (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

**The Agreed Value and Approved Deductions for Purposes of Calculating the Appreciation Cash Payment**

     151.    The Agreed Value for the Property under Section 3 of the CPA is the higher of the

sales price or the fair market value of the Property, and, thus, based on inclusion of the TDR

portion of the contract that MRLP has sought improperly to exclude, is $67,424,457. (CPA

§ 3.3; Settlement Statement for 90 K Street Land Sale; Settlement Statement for 90 K Street

TDR Sale) (Exs. 9, 43 & 52).

     152.    In the alternative, in no event is the Agreed Value less than the fair market value

for the Property, appraised in accordance with the CPA as $64,800,000. (Halbert Report, at

Executive Summary); CPA § 3.3) (Ex. 9 & 54).

     153.    Calculation of the Approved Deductions and other components of the

Appreciation Cash Payment is based on the legitimate expenses incurred by MRLP in the sale of

the property and upon the proper calculation of the Agreed Deductions. (CPA § 3.1, 3.4(a))

(Ex. 9).

     154.    Calculation of the Appreciation Cash Payment will require an audit of the records

of MRLP and must be conducted, as contemplated in the CPA, by a qualified accountant. (*Id.*

§ 3.9).