# EXHIBIT 1

Case 1:06-cv-00344-HHK    Document 25-5    Filed 03/29/2007    Page 1 of 16

Capital Reporting Company

Page 1

```
1           UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3  --------------------------------:
                                   :
4  MONTGOMERY ROAD I LIMITED       :
                                   :
5  PARTNERSHIP,                    :
                                   :
6           Plaintiff,             : Case No.
                                   :
7       v.                         : 1:06CV00344 (HHK)
                                   :
8  VIAD CORP.,                     :
                                   :
9           Defendant.             :
                                   :
10 --------------------------------: Pages 1 - 229
11                                   Washington, D.C.
                                     Tuesday, November 14, 2006
12 Videotape 30(b)(6) Deposition,
13      MONTGOMERY ROAD I LIMITED PARTNERSHIP
14 Individual deposition, SAMUEL G. ROSE,
15 called for oral examination by counsel for the
16 Defendant, pursuant to notice, at the law offices of
17 BRYAN CAVE, LLP, 700 Thirteenth Street, Northwest,
18 Twelfth Floor, Washington, D.C., before Marijane
19 Simon, RDR, CLR, of Capital Reporting Company, a
20 Notary Public in and for the District of Columbia,
21 beginning at 9:40 a.m. when were present on behalf
22 of the respective parties:
```

**Capital Reporting Company**

Page 10

1  MR. PAGE: Okay.
2  (The reporter marked Exhibit 32.)
3  BY MR. PAGE:
4  Q. I'm also going to hand you, Mr. Rose,
5  what's -- what's previously marked as Exhibit No. 32
6  and ask if you have seen Exhibit 32 prior today.
7  A. Yes.
8  MR. PAGE: And this is a letter from your
9  counsel to me or to my colleague here at Bryan Cave
10 indicating which witness on behalf of Montgomery
11 Road Limited Partnership will testify as to which
12 topic. And I'm putting it out here so that it can
13 be used, if necessary, for reference later in the
14 deposition.
15 And, Mr. Cooter, you indicated you were
16 going to amend it in some regards so I understand
17 that.
18 MR. COOTER: If I have a problem, I'll let
19 you know. I'm not shy.
20 MR. PAGE: I'm sure you will. I'm sure
21 you will.
22 ...

Page 11

1  BY MR. PAGE:
2  Q. Mr. Rose, you indicated, I think, as we
3  were off the record, that you may have to go feed a
4  parking meter at some point. If there is any reason
5  you'd need to take a break at a specific time, just
6  say so --
7  A. Okay.
8  Q. -- and I'll be glad to take a break.
9  A. Okay.
10 Q. So if I keep talking, it doesn't mean that
11 you can't take a break.
12 A. Right, thank you.
13 Q. I'll try to remember.
14 Mr. Rose, where do you live?
15 A. I live at 6636 Landon Lane in Bethesda,
16 Maryland.
17 Q. How old are you, sir?
18 A. Seventy and almost a half. I'll be a half
19 on November 27th.
20 Q. All right.
21 A. The reason I know that is because I have
22 to take money out of my 401(k) on that date.

Page 12

1  Q. What is your present occupation, sir?
2  A. Real estate developer, I think.
3  Q. How long have you been a real estate
4  developer?
5  A. Well, I've been around the real estate
6  business for 40 years but actually as a developer,
7  probably the last 20.
8  Q. Would you tell me what formal education
9  you have.
10 A. I have a college degree and I have a law
11 degree and that's about it.
12 Q. Where did you obtain your college degree?
13 A. Dickinson College.
14 Q. What year did you obtain your degree?
15 A. Fifty-eight.
16 Q. And was that a B.A. degree?
17 A. Mm-hmm.
18 MR. COOTER: You have to say yes, Sam.
19 THE WITNESS: Yes.
20 BY MR. PAGE:
21 Q. All right. And was there an area of study
22 or concentration that you had?

Page 13

1  A. Yes. Girls and table tennis were my
2  concentration.
3  Q. I didn't know Dickinson had that as a
4  degree but I wish I'd known it earlier at this
5  point.
6  A. Well, it's not too late.
7  Q. What -- From what institution did you
8  obtain a law degree?
9  A. University of Baltimore, night law school.
10 Q. What year did you obtain that degree?
11 A. Sixty-one.
12 Q. Did you ever practice law?
13 A. No.
14 Q. Have you ever been admitted to the bar of
15 any jurisdiction?
16 A. Yes. I've been admitted to the Maryland
17 Bar.
18 Q. When were you admitted to the Maryland
19 Bar?
20 A. A year or so -- Within a year of
21 graduating.
22 Q. And are you still an active member of the

Page 14

1  Maryland bar?
2  A.  No.
3  Q.  Do you -- Can you recall how many years
4  you were a member of the bar?
5  A.  I think I kept -- I think there was a
6  deposit requirement which -- and you had to renew it
7  and it seemed to me I did it for, maybe, five or ten
8  years after I got out of law school; but I -- I --
9  since I wasn't practicing law, I just let it drop.
10  Q.  You don't remember when that was?
11  A.  No, I don't.
12  Q.  After you graduated from law school, what
13  was your employment, immediately after?
14  A.  Immediately after law school, I was a
15  schoolteacher.
16  Q.  Where?
17  A.  For a year in Baltimore County, elementary
18  school system.
19  Q.  What did you do after that?
20  A.  Wait a minute.  Excuse me.
21  Q.  Yes.
22  A.  That's wrong.  That was during law school.

Page 15

1  When I graduated, I was -- I was working for the
2  Rouse Company.  I -- I changed jobs while I was
3  going to law school which as I say was at night so
4  that's -- that's -- that's correct.  I taught school
5  while I was going to night law school but I -- when
6  I graduated -- By the time I graduated, I was
7  working for the Rouse Company in Baltimore,
8  Maryland.
9  Q.  What job did you have for the Rouse
10  Company?
11  A.  I was a closing attorney which -- and then
12  I supervised closing residential loans but I wasn't
13  really a lawyer.  It was just called that.  I didn't
14  really do the closings.  All I did was supervise.
15  Q.  How long did you have that job?
16  A.  Well, I stayed at the Rouse Company for
17  ten years but I -- I had a lot of other jobs.
18  Q.  Tell me generally what other jobs -- what
19  you had, what your job progression was at the Rouse
20  Company.
21  A.  Well, I -- From that, I went into mortgage
22  banking, and from that, I went into development.

Page 16

1  And that all took place over ten years and then I --
2  I -- I left.
3  Q.  What did you do upon leaving the Rouse
4  Company?
5  A.  I ran a division of a big public company
6  called McKeon Corporation.
7  Q.  I'm sorry.  Say the name again.
8  A.  M-c-K-e-o-n, McKeon Construction.  They
9  were a California company.
10  Q.  What -- What was the business of that
11  company?
12  A.  Developing residential real estate.
13  Q.  How long were you with that company?
14  A.  Oh, a couple of years.
15  Q.  Then what did you do?
16  A.  I could have submitted a chronology of
17  what I did during my life (talking to himself) from
18  that.
19      I think I started a company speculating on
20  land -- was the next thing I did.  My own company.
21  Q.  About what year was that?
22  A.  Sixty, seventy -- I would say '73, 1973.

Page 17

1  Q.  What was the name of the company?
2  A.  Tiburon, Inc.
3  Q.  Were you the sole owner of the company?
4  A.  No, I had some partners.
5  Q.  All right.  How long did you maintain
6  Tiburon as your principal activity?
7  A.  Three years.  Three years.
8  Q.  And following that, then what -- what
9  happened next?
10  A.  Somewhere in there, I'm sure I'm
11  missing -- confusing some of these.  I went to work
12  for the Blaustein company of Baltimore develop --
13  developing real estate for them.
14  Q.  You said Blaustein?
15  A.  Yes, the Blaustein interests.
16  Q.  All right.
17  A.  It was called the Blaustein company.
18  Actually, they had another name but I don't
19  remember.
20  Q.  About how long were you there?
21  A.  Probably, three, four years.
22  Q.  And then?

Page 18

1   A. And then. Do you get a release from
2   answering these questions for Alzheimer's? I --
3   Q. Just do your best. I'm actually trying to
4   get your background just to under --
5   A. Well --
6   Q. I want to understand what your background
7   is.
8   A. Yeah, well, I had several things I did in
9   the real estate. I can't remember the order and all
10  the dates. After Blaustein, I think I started
11  Greenebaum and Rose but I think there's more in
12  there --
13  Q. Okay.
14  A. -- in that ten years. There were other --
15  other real estate things I did and tried.
16  Q. About -- Approximately what year did you
17  start Greenebaum and Rose?
18  A. About 1980.
19  Q. All right. And in the name of that, there
20  is your name but there's also the name of
21  Mr. Greenebaum; right?
22  A. Well, I try to discount that, but yes,

Page 19

1   he's my partner.
2   Q. And you let his name -- You let his name
3   go first, I noticed.
4   A. That's right. We -- We argued about that
5   when we started. It just sounded better.
6   Q. Tell me who he is and how you met him --
7   A. Who he is.
8   Q. -- how you came to form the business.
9   A. He's a fat, Jewish guy from Baltimore that
10  we bumped into each other socially around the city
11  and we were both doing similar things, buying and
12  developing real estate, and we decided to hook up.
13  Q. Okay. Greenebaum and Rose today is
14  located, I think, in Washington, D.C., or its
15  principal offices.
16  A. No. That's not correct.
17  Q. All right.
18  A. Stewart would not like that.
19  Q. All right. Tell me -- Tell me why that's
20  incorrect.
21  A. Well, we have a partnership. Everything
22  is split down the middle. And he operates in

Page 20

1   Baltimore. He has an office in Baltimore. He has a
2   staff in Baltimore comparable to mine. So it's two
3   offices.
4   Q. Okay.
5   A. And we really can't say either one --
6   Though the accounting takes place over there, I --
7   we try to consider them equal.
8   Q. Okay. Have you been deposed before,
9   Mr. Rose?
10  A. I'll have to say yes because somewhere --
11  We've been involved in very few lawsuits in the
12  history of the company but I have been deposed
13  somewhere along the way. I'm not sure exactly what
14  for.
15  Q. You think it was more than once?
16  A. No. It's one other -- I think it had to
17  do with the savings and loan crises in -- in
18  Maryland. When the savings and loans went under, I
19  think we got deposed.
20  Q. All right. Have you ever participated as
21  a litigant in a trial?
22  A. No.

Page 21

1   Q. How about an arbitration?
2   A. No.
3   Q. Have you ever appeared as a witness in a
4   trial or arbitration?
5   A. No.
6   Q. Okay.
7   A. Not to the best of my recollection.
8   Q. And is it fair to say, as a lawyer, you
9   never handled any things like that: depositions,
10  trials, arbitrations?
11  A. As I recollect, I said I never practiced
12  law --
13  Q. Okay.
14  A. -- though I may have slowed down a couple
15  traffic tickets for friends.
16  Q. Okay.
17  A. That was the height of my legal career.
18      MR. PAGE: All right. Mr. Cooter may want
19  to ask you not to volunteer information but that's
20  okay.
21      THE WITNESS: I don't --
22      MR. COOTER: Actually, I doubt I could

**Capital Reporting Company**

Page 30

1  Glasgow, as an attorney for zoning, but I don't -- I
2  guess Norman was the son's name, too, as a junior or
3  something. Yeah, Chip.
4      Q.  Right. It is Chip.
5      A.  Chip. Chip, yeah.
6      Q.  Right.
7          He's a zoning attorney?
8      A.  Mm-hmm.
9      Q.  Okay. An outside attorney? Right?
10     A.  Outside attorney.
11     Q.  Alfred Windesheim?
12     A.  Outside accountant.
13     Q.  With what entity?
14     A.  Windesheim, Windesheim, Windesheim,
15  something like that, in Baltimore.
16     Q.  Clem Mueller?
17     A.  Don't know the name.
18     Q.  Okay. Do you know Mary Andrews?
19     A.  Andrews?
20     Q.  Yes.
21     A.  No.
22     Q.  Richard Kovens, K-o-v-e-n-s?

Page 31

1      A.  No.
2      Q.  Robert Gottlieb?
3      A.  Robert Gottlieb is outside attorney in
4   Washington.
5      Q.  Paul Beeber?
6      A.  Don't know the name.
7      Q.  That's B-e-e-b-e-r.
8          By the way, and I -- I don't mean to --
9   I'm not hiding anything. I'm using, among other
10  things, a list provided by your counsel of documents
11  that were withheld on grounds of attorney/client
12  privilege --
13     A.  Mm-hmm.
14     Q.  -- so that's why I know some of these are
15  lawyers but I'm simply trying to identify who's
16  who --
17     A.  Mm-hmm.
18     Q.  -- since I don't know all -- all of these
19  people.
20     A.  No problem.
21     Q.  Kenneth Goldman?
22     A.  Kenneth Goldman. That sounds familiar but

Page 32

1   I -- I don't recognize it. Kenneth Goldman.
2      Q.  Abba Blum?
3      A.  That's an accountant firm that has -- an
4   outside accounting firm.
5      Q.  Which one? Do you know?
6      A.  I think it's called Abba, isn't it?
7          Oh, I don't know the name of it.
8          MR. COOTER: In the interest of
9   disclosure, it's Aronson & Company.
10         THE WITNESS: I just know the name.
11         MR. PAGE: Aronson?
12         MR. COOTER: Yeah.
13         MR. PAGE: Okay.
14         BY MR. PAGE:
15     Q.  And Jerry Katz?
16     A.  Outside lawyer, slash, tax specialist.
17     Q.  Okay. And Laurence Bensignor is an
18  outside attorney?
19     A.  Yes.
20     Q.  And Richard David, an outside attorney?
21     A.  Yes.
22     Q.  Okay.

Page 33

1      A.  We like to support the Washington Bar.
2      Q.  I can tell. I appreciate it. I'm sure
3   Mr. Cooter does.
4      A.  I'm sure he does.
5      Q.  Let me turn to Montgomery Road I Limited
6   Partnership.
7      A.  Mm-hmm.
8      Q.  You're familiar with that entity?
9      A.  It's the name, I know, that we put 90 K
10  in. You know, it's -- it's a name that has nothing
11  to do with Washington. It comes from another
12  property.
13     Q.  Well, that's one of the reasons I wanted
14  to ask about it, was to get a short history of how
15  the --
16     A.  Yeah.
17     Q.  -- how it got named and what it was.
18     A.  Well, I'll give you the short history. I
19  mean, you know, when you go back that many years,
20  everything I remember is short --
21     Q.  Okay.
22     A.  -- but as I recall, Montgomery Road owned

**Capital Reporting Company**

Page 34

1  some residential property in Howard County where my
2  partner does a lot of work and he sold it and we did
3  a 1031 exchange of -- some type of swap into 90 K so
4  that's why that name was used.
5    Q. Nine --
6    A. That's the best of -- That's the best
7  recollection I have.
8    Q. "90 K" refers to the property that is the
9  subject matter of this litigation; right?
10   A. Are you sure?
11   Q. No. I'm asking a question.
12   A. To the best of my knowledge, yes.
13   Q. The -- The reason I'm doing that is simply
14  so that, for the record, it'll all be clear --
15   A. Mm-hmm. Okay. I gotcha.
16   Q. -- in case some third person ever has to
17  read this.
18   A. Right, right, right.
19   Q. 90 K Street, Northeast, is what you're
20  referring to; correct?
21   A. Yes.
22   Q. And that is a -- a parcel in the District

Page 35

1  of Columbia at the corner of First Street,
2  Northeast, and K Street?
3    A. The northwest corner. Mm-hmm. Yes.
4    Q. Of First and K?
5    A. Of First and K.
6    Q. All right. And the land swap that you
7  just described occurred when?
8    A. Oh, well, it seems to me it's roughly 1987
9  and I only know that because I've been reading the
10  documents because of this case.
11   Q. Okay.
12   A. I would never re -- I couldn't recall that
13  if you paid me a million dollars.
14   Q. Okay. We're not going to do that so --
15   A. Oh, okay. Well, I looked it up for you
16  so -- I figured you weren't going to pay me.
17   Q. The partnership itself had been formed
18  prior to that land swap; correct?
19   A. I assume so.
20   Q. I'm -- I'm just trying to get a little bit
21  of history without getting into too much detail. It
22  was an existing partnership that engaged in a land

Page 36

1  swap for tax reasons; correct?
2    A. We formed a separate partnership as I said
3  for every --
4    Q. Right.
5    A. -- deal every time we brought property, so
6  we had formed this Montgomery Road to buy a piece of
7  residential land, yes.
8    Q. Do you recall approximately when the
9  partnership was formed?
10   A. No. I don't have any idea.
11   Q. Let's focus on 1987. At that time do you
12  recall who were the partners of Montgomery Road
13  Limited Partnership?
14   A. I have not the foggiest idea but I would
15  tell you that, at that -- normally, going back that
16  many years, it would be Stewart and me were the --
17  probably the two partners and I doubt if there were
18  any others.
19   Q. Okay. And I -- I'm not trying to trip you
20  up on this particular issue. I know your counsel
21  has produced a lot of documents so we probably have
22  those partnership agreements but for purposes of the

Page 37

1  dialog today, I was trying to --
2    A. Right.
3    Q. -- establish what you remember about it.
4    A. Mm-hmm.
5    Q. Do you remember, for example, whether
6  people like Reid Liffmann or Steve Baesch or any of
7  those others had become partners in that deal at the
8  time of the land swap?
9    A. Well, I know they didn't because that far
10  back, they were not considered junior partners.
11   Q. Okay.
12   A. And it just would have been logical, I
13  mean, and -- until later, and then they had been --
14  been coming along -- plus that's a residential deal;
15  so Reid and Steve would not have been part of that
16  in Baltimore anyway.
17   Q. Okay.
18      Now, the 90-K-Street property came into
19  the partnership in approximately 1987, you said;
20  correct?
21      Had you had any prior involvement or
22  activity related to the 90-K-Street property, prior

Capital Reporting Company

Page 42

1  us.
2      We said, Irfan, why don't you buy it in
3  your name so Greyhound will not pick on us.
4      Q.  And he presented himself in that way to
5  Mr. Ervanian; is that correct?
6      A.  I don't know how he -- I assume so.
7      Q.  All right. Now, as a result of that
8  conversation, was there the -- the land transaction
9  that you described earlier?
10     MR. COOTER:  You've lost me. That
11 question is --
12     MR. PAGE:  All right. Let me start over.
13     MR. COOTER:  -- meaningless.
14     BY MR. PAGE:
15     Q.  You described this land swap where you got
16 the land back; correct?
17     A.  Well, that was not a swap. In other
18 words, I bought it, sold it. I just bought it back.
19     Q.  I'm sorry.
20     A.  Swapped it.
21     Q.  I misunderstood.
22     A.  Oh. You mean the fact that I used an

Page 43

1  entity?
2      Q.  Yes.
3      A.  Well, that was a -- That had nothing to
4  do. Yes, that --
5      Q.  Oh, that was internal; is that correct?
6      A.  That was internal; that had nothing to do
7  with Greyhound.
8      Q.  I mis -- I misunderstood.
9      A.  No, that was our own internal for tax
10 reasons. It had nothing to do with --
11     Q.  So Greyhound was not a party to the land
12 swap which is where I got the idea of this
13 originally.
14     A.  No. No, they were just selling it. They
15 sold it for a fixed price and, of course, that Cash
16 Participation Agreement.
17     Q.  Right.
18     A.  Yeah.
19     Q.  All right. So a deal was made with the
20 bus company or the -- the -- the entity that
21 succeeded the bus company --
22     A.  Right.

Page 44

1      Q.  -- correct? And that company was called
2  Transportation Leasing Company; is that correct?
3      A.  Yes.
4      Q.  TL --
5      A.  That's -- That's --
6      Q.  TLC?
7      A.  That's my recollection. I'm --
8      Q.  I'm sorry.
9          Now, to go back to my question, it was:
10 The conversation or -- or the offer made by Irfan
11 Ali, is what resulted in your buying the land;
12 correct?
13     A.  Yes.
14     Q.  Did there come a time when Mr. Ervanian
15 found out that you were behind Mr. Ali?
16     A.  I think so. I think, you know, in the
17 end, it was kind of silly for us to think that maybe
18 that would be helpful because I think, you know, we
19 were using our attorneys and we were drawing the
20 contracts. We were involved. I don't remember ever
21 specifically talking to Armen about that, but I
22 think, somewhere along the way, they found out that

Page 45

1  Greenebaum and Rose was really buying it.
2      Q.  Did they try to jack up the price on you
3  as you feared?
4      A.  I think that's when this Cash
5  Participation Agreement appeared, this mysterious,
6  obnoxious Cash Participation Agreement.
7      Q.  Did -- And your -- your testimony and your
8  recollection is that Mr. Ervanian had no particular
9  reaction to finding out that you were involved; is
10 that correct?
11     A.  That's correct.
12     Q.  All right.
13     A.  I mean, we always had a good relation with
14 Armen; but as I said, he had a very bad experience
15 in a lawsuit with the Benders which, you know, we
16 had nothing to do. We never recommend him. He
17 never asked us to recommend a construction company
18 but I think that left a very bad taste in his mouth
19 about Washington, D.C., period.
20     Q.  Now, you mentioned earlier that as the
21 deal progressed, you and your lawyers were involved.
22 I think I heard you say that.

Page 50

1 involvement in the negotiation of this document?
2   A. I don't recall what our involvement is.
3      My only memory of this is that it -- it --
4 it was -- At the time, we were -- we had never seen
5 such an agreement before. This is the -- the -- the
6 first and only such agreement that we've ever been
7 involved in in the history of our company. It -- It
8 was brought into the deal sort of as after the fact,
9 after we had a deal to buy the land for a certain
10 price. And I -- I -- I think we didn't pay enough
11 attention to it because it's one of the most
12 obnoxious agreements I've ever read in my life and I
13 don't -- you know, we must have been stupid to sign
14 it without even any -- fighting any of these clauses
15 which are so one-sided but I do not recall --
16 recollect really getting into this.
17   Q. Okay. The question I had asked was: What
18 was Mr. Greenebaum's role, if any, in the
19 negotiations.
20   A. Well, I can't recall. I can hardly recall
21 my role.
22   Q. Okay.

Page 51

1   A. I'm sure he, at the time -- go back to
2 '87. I'm sure he -- he was involved. You know,
3 this was a big deal for us. I'm sure he was
4 involved. You'll have to ask him.
5   Q. He -- There's no question that he signed
6 it; is that right?
7   A. Well, I mean, it's -- it looks to me like
8 his signature. I mean, you're asking me: There's
9 no question? Do I remember seeing him sign it?
10   Q. Do you -- Do you think or do you
11 contend --
12   A. I think they spelled his name correctly so
13 that's a good indication.
14   Q. Is there any contention on the part of
15 Montgomery Road that you and Mr. Greenebaum did not
16 agree to this document?
17      MR. COOTER: No.
18      THE WITNESS: I don't know, you know.
19 We're not saying we didn't sign it.
20      MR. COOTER: Right.
21      BY MR. PAGE:
22   Q. Did you read it before you signed it,

Page 52

1 Mr. Rose?
2   A. I -- I have no rec -- recollection of
3 reading it.
4   Q. Do you know if your counsel, Mr. David,
5 read it?
6   A. I don't know.
7      MR. COOTER: Wait just a moment. I have
8 to instruct him not to answer.
9      Do not answer that.
10     THE WITNESS: Okay.
11     MR. PAGE: On -- On the grounds?
12     MR. COOTER: Privilege. I mean --
13     MR. PAGE: It's privileged.
14     MR. COOTER: My -- My problem is, once you
15 waive it, it gets pretty slippery, Rodney.
16     MR. PAGE: Okay.
17     THE WITNESS: Teacher, can I take a break?
18     MR. PAGE: Yeah. Sure. I'm sorry.
19     THE WITNESS: Would you mind?
20     MR. PAGE: Please. Let's go off the
21 record.
22     (Discussion off the record.)

Page 53

1      THE VIDEOGRAPHER: Going off the record.
2 The time is now 10:26.
3      (Recess.)
4      THE VIDEOGRAPHER: Back on the record.
5 The time is 10:39.
6      BY MR. PAGE:
7   Q. Mr. Rose, just before we broke, I was
8 asking you about people who may have been involved
9 in the discussions and negotiations leading up to
10 the Cash Participation Agreement --
11   A. Mm-hmm.
12   Q. -- in 1987.
13
14   A. Mm-hmm.
15   Q. Do you recall what role Mr. Glassman
16 played in the discussions?
17   A. No.
18     MR. PAGE: He has been designated in the
19 list of designees as someone with knowledge of the
20 negotiations in 1987.
21     MR. COOTER: Well, Mr. Page, I -- I told
22 you off the record that I believe that the Glassman

14 (Pages 50 to 53)

Page 86

1 the subject of your conversation with Miss Fiorucci?
2  A. Have not the foggiest idea. I -- I just
3 told you that we didn't have this agreement in front
4 of us talking about it. We were talking about a
5 general dispute about these statements. I didn't
6 pull this thing out. I can't understand this thing
7 even now so I don't think anybody else can either.
8  Q. Is it -- Is it your contention that there
9 was an arbitration conducted by Reznick?
10  A. I don't know that it was arbitration. It
11 seemed to me -- I don't recollect describing it that
12 way.
13  Q. All right. What -- What happened here is
14 that each of you, meaning you, Greenebaum and Rose,
15 and -- and, on the other hand, VIAD -- submitted
16 letters to Reznick. Is that correct?
17  A. Eve picked an accountant. We said we
18 would pay the fee just to get this done. And the
19 accountant -- And then she wrote a letter in which
20 she, you know, made a comment that she felt it was
21 not binding but it seemed to me we had already
22 agreed that it was.

Page 87

1  Q. How -- When and how did you agree that it
2 was binding?
3  A. That we spent three years picking them,
4 getting to this point. What's the point of doing it
5 if it's not binding? It was almost assumed. Why
6 would you take years to talk to your accountant, to
7 talk to all the bosses, to pick an accountant, and
8 then say it's not binding? I mean: Why bother?
9  Q. Can you point to any statement or writing
10 by VIAD in which it agreed that the Reznick opinion
11 would be binding?
12  A. Yes. The fact that this called for it to
13 be binding, that their own -- the agreement that
14 they drew called a Cash Participation Agreement
15 said, if we -- if they picked an accountant, it
16 would be binding.
17  Q. It's -- You're relying, then, on the
18 wording of Section 2.7; correct?
19  A. Well, I'm -- I'm relying on the fact --
20 Yes, I guess I'm relying on 2.7.
21  Q. Is there anything else you're relying on
22 when you say that it's binding?

Page 88

1  A. Well, the -- just the -- the -- the
2 goodwill of the person I was talking to on the phone
3 who's representing the person I'm disagreeing with.
4  Q. All right. Let me have marked --
5  A. Why -- why --
6  Q. I'm sorry.
7  A. Why bother him?
8   MR. PAGE: Okay. Let me have marked
9 Exhibit 8.
10   (The reporter marked Exhibit 8.)
11   THE WITNESS: Thank you.
12   BY MR. PAGE:
13  Q. I've handed you a copy of a document
14 marked as Exhibit 8 and ask you if you recognize
15 this document, Mr. Rose.
16  A. I think so. I'm looking for --
17  Q. It's dated March 2 of 2005; correct?
18  A. Yes.
19  Q. Okay.
20  A. Yes, I remember this one.
21  Q. All right. You're shown as a cc at the
22 bottom of the page on the first page. Do you see

Page 89

1 that?
2  A. Yeah.
3  Q. Do you recall receiving it on or about
4 March 2 of 2005?
5  A. I've -- I've seen it before. I don't
6 re -- remember when I've call -- when I received it.
7  Q. All right. What is this? How would you
8 describe this?
9  A. It's a letter.
10  Q. To Mr. Solomon; correct?
11  A. Mm-hmm.
12  Q. And it encloses the statement of TLC's
13 position. Do you see that?
14  A. Yes, but I -- I didn't agree to this.
15  Q. That wasn't my question.
16  A. Oh.
17  Q. I'm just asking you at the moment what the
18 document is.
19  A. It's a letter.
20  Q. And it is -- it is "the" letter submitted
21 to Reznick to state the --
22  A. "The" letter? I don't know. Well, what

Capital Reporting Company

Page 90

1 does that mean, "the" letter?
2   Q. I -- I'm sorry. I -- I'll withdraw that.
3   A. "A" letter.
4   Q. It's a letter --
5   A. A letter.
6   Q. That's correct.
7   A. I got it.
8   Q. It is a letter submitted to Reznick to
9 state the position of VIAD or TLC with respect to
10 the Cash Participation Agreement; correct?
11   A. So, in other words, you want me to say
12 that -- that -- that -- it's acceptable to say the
13 opinion's not binding on them, it's just binding on
14 me.
15   Q. No, I didn't ask you --
16   A. That makes a lot of sense. I'm paying for
17 something -- No, we didn't agree to this. She
18 didn't ask me to sign it except the fact she sent
19 this to them --
20   Q. I understand that but I --
21   A. -- but how about me?
22   Q. Mr. Rose, I'm not trying to trap you into

Page 91

1 anything. I'm -- You're --
2   A. I know.
3   Q. Let me take it a step at a time and it
4 might be clearer.
5   A. Yeah. Yeah, but I -- It seems to me that
6 she unilaterally, after years of negotiating, at the
7 last -- must have decided she didn't want it to be
8 binding but I didn't agree to that.
9   Q. Well, you did receive this letter in March
10 of Two Thousand --
11   A. I -- I did receive it.
12   Q. All right. And in the para -- In the
13 cover letter, Miss Fiorucci writes -- and I'm
14 referring to the bullet paragraphs. She says: The
15 purpose of our sending this information is to obtain
16 an estimate of the cost involved for your firm to
17 review the information and render an opinion as to
18 the accuracy of our position.
19      Do you see that?
20   A. Yes.
21   Q. That was correct at the time, was that not
22 right?

Page 92

1   A. That -- That seems to say what should be
2 said.
3   Q. And -- And was that consistent with your
4 prior conversations with Miss Fiorucci?
5      MR. COOTER: Was what consistent?
6      MR. PAGE: The paragraph I just read.
7      THE WITNESS: (Reading) The purpose of
8 our -- is to obtain estimated costs -- to allow for
9 your firm to review the information.
10      Yes. That's -- That was our position.
11      BY MR. PAGE:
12   Q. The next bulleted paragraph says, Sam Rose
13 will be paying the costs associated with your
14 review, et cetera.
15      Do you see that?
16   A. I see that.
17   Q. And she says in that paragraph --
18 instructing Mr. Solomon to contact you, Sam, and
19 gives your telephone number; correct?
20   A. Yes.
21   Q. Did that happen?
22   A. Yes, I think it did. I don't remember if

Page 93

1 it followed exactly this letter but we talked to him
2 about the price.
3   Q. You talked to Mr. Solomon about the price
4 estimate --
5   A. Mm-hmm.
6   Q. -- or the cost estimate; correct?
7   A. Yes.
8   Q. And you agreed to pay that cost; right?
9   A. Yes.
10   Q. All right. So that paragraph, the second
11 paragraph, is consistent with your discussions with
12 Miss Fiorucci --
13   A. Yes.
14   Q. -- preceding this letter; correct?
15      Now, the third bulleted point says,
16 "Finally" -- That's how it begins. And then it goes
17 on to say, we wish to make it clear that your
18 opinion is not binding on TLC VIAD Corporation.
19      Do you see that?
20   A. I see that.
21   Q. Is it your testimony today that for some
22 reason that paragraph is not consistent with your

Page 94

1 prior conversations --
2    A. Yes.
3    Q. -- with Miss Fiorucci?
4       Can you point to a specific, earlier
5 conversation where Miss Fiorucci said it would be
6 binding?
7    A. I can point to numerous conversations with
8 Miss Fiorucci where we were trying to settle a
9 disagreement and there's no way you can settle a
10 disagreement if it's not binding. Why would you
11 bother? Why would I pay for something that wouldn't
12 change anything if I was right? Am I stupid? If
13 I'm stupid, I would have.
14      Now, it seems to me that we, all the way
15 along, and all this time it took her to check -- And
16 you ought to check with -- with VIAD. How many
17 people had input before she got approval to do this?
18 Why would you do it on a nonbinding basis? It seems
19 silly. So it seemed to me it was an afterthought of
20 hers or somebody there: We don't want this to be
21 binding in case we're wrong. That doesn't make
22 sense.

Page 95

1    Q. Did you respond to this letter, Mr. Rose?
2    A. No.
3    Q. Did you pick up the phone and say to her,
4 You're wrong about the third bulleted paragraph?
5    A. No.
6    Q. Did you have any conversation or
7 communication of any kind with anyone at VIAD after
8 receiving this letter saying that you disagreed with
9 what was in this third --
10    A. She didn't ask me to contact her or talk
11 about it.
12    Q. That wasn't my question.
13    A. Well, we had already agreed to what it was
14 going to be so I don't think that if you have an
15 agreement where you need two people that you can
16 unilaterally just throw our conversations out the
17 window.
18    Q. And the agreement you're re -- referring
19 to was an understanding that you were trying to get
20 a resolution; correct?
21    A. It was our agreement that we -- we were
22 going to check the accounting and have somebody

Page 96

1 decide whether -- who was right and who was wrong.
2    Q. Right.
3       Did there come a time when -- Well, when
4 you received this document with the statement of
5 position attached, what happened with it internally
6 at -- at your company?
7    A. Internally?
8    Q. Yes.
9    A. I put it in a frame and put it on the
10 wall. I mean: What -- What do you think happens
11 with a letter? You put it in the file.
12    Q. Well, I'm sorry. I didn't mean to be cute
13 with you, Mr. Rose.
14      Did your company write a response to the
15 position paper that was submitted to Mr. Solomon?
16    A. This is a position paper? This letter?
17       MR. COOTER: Look at the second page.
18       BY MR. PAGE:
19    Q. Well, I'm just -- Let me use the exact
20 words at the top of the second page, "Statement of
21 TLC's Position." Do you see that, Mr. Rose?
22    A. On the second page? Yes.

Page 97

1    Q. Yes. You see that?
2    A. Yes.
3    Q. That's an accurate representation of what
4 the document says; correct?
5    A. Of what?
6    Q. Is it --
7    A. I'm sorry. Of what document?
8    Q. Am I reading it accurately when I say,
9 "Statement of TLC's Position"?
10    A. I don't know. What is "it"? This was
11 attached to the letter?
12    Q. Is it your testimony it wasn't?
13    A. Oh, I don't know. I never saw this.
14    Q. Well, let's go back to the first page.
15    A. Yeah, this was not attached to the letter.
16    Q. Mr. Rose, go back to the first page of the
17 letter.
18    A. This -- I never saw this before.
19       MR. COOTER: Go back to the first page,
20 Sam.
21       THE WITNESS: Yeah.
22 ...

Page 106

1   Agreement?
2       A. Oh, over the years, I'm sure it came up.
3   I -- I don't recall any exact things. I know that,
4   a couple of times, I think it -- it got discussed.
5       Q. And do you recall the first such time it
6   was discussed?
7       A. Not -- Not really.
8       Q. Did you in fact make an offer to purchase
9   the interest for $75,000?
10      A. According to this letter, I did. I mean,
11  if you could show me my letter -- I -- I -- I have
12  no reason to doubt it.
13      Q. Well, let me ask the question this way.
14  Do you have any independent recollection of having
15  done that?
16      A. No, I don't.
17      Q. Okay.
18      A. I know I made an offer. I don't remember
19  what amount.
20      Q. Do you recall any other offers you made?
21      A. No, I don't.
22      Q. Did there ever come a time when you think

Page 107

1   that you reached an agreement to purchase the
2   interests of VIAD or TLC?
3       A. No. I don't think so.
4       Q. Now, let's -- let's return to this letter
5   and the Reznick opinion. After you received this
6   letter, did you have any conversations with
7   Miss Fiorucci or anyone at VIAD about its position
8   on the Cash Participation Agreement?
9       A. I'm sorry? When?
10      Q. Did you have any discussions after
11  receiving this letter with VIAD? So I'm referring
12  to the period after --
13      A. Ah, ah.
14      Q. -- August 26.
15      A. Yeah, I understand your question. I -- I
16  don't recollect that we did but we might have.
17      Q. On the second page of this letter, I want
18  to draw your attention to the paragraph that begins
19  with the word "Finally." Do you see that?
20      A. Mm-hmm. Yes.
21      Q. Just take a second and read it to
22  yourself. Then I'm going to ask you something about

Page 108

1   it.
2       A. Okay. I read it.
3       Q. All right. Mr. Rose, is the statement
4   from Miss Fiorucci about the transaction being a
5   fully integrated, negotiated document and deal -- is
6   that an accurate representation in your view?
7       A. I'm not sure I understand that sentence,
8   "fully integrated." What does that mean? I'm at a
9   loss here.
10      Q. Do you --
11      A. I don't know what "fully integrated"
12  means.
13      Q. Okay. Anything else you disagree with?
14      A. (Reading) Document. There's no reason to
15  say that the deal wasn't legitimate. I understand
16  what "legitimate" is and, you know, we're
17  sophisticated developers. I -- I -- I would tell
18  you that there is some resentment on our part that
19  this Cash Participation Agreement -- I think we were
20  sloppy in not being careful about reading it. We
21  would never sign such an agreement if we were
22  careful but we weren't but that's -- We still take

Page 109

1   responsibility for signing it.
2       Q. Okay. I don't have, for some reason, the
3   letter of -- of May 2 that's referred to but I will
4   have it this afternoon so we'll come back to that
5   and we can set that aside for now.
6           Let me ask you to turn again to Exhibit
7   No. 9. This is the letter from the Reznick group
8   addressed to you. Have you found that?
9       A. Mm-hmm. I found it.
10      Q. Now, again, I -- I probably asked you
11  this, but just to make sure --
12      A. Mm-hmm.
13      Q. -- you reviewed this letter when it was
14  received; is that correct, Mr. Rose?
15      A. To the best of my recollection, I did.
16      Q. All right. Let -- Let me ask you to turn
17  to the -- the substance of the letter beginning on
18  the second page where there is a -- a heading that
19  says "Issue 1." Do you see that?
20      A. Yes.
21      Q. All right. And then below that, there's
22  "Issue 2" and then "Issue 3" and then I think it

**Capital Reporting Company**

Page 210

1  And you say that, Sam, boy, if you ever
2  bought any TDRs with our money, we want the TDRs,
3  but I'm supposed to put equity in there and get no
4  return on it. And that's a very strange position to
5  take if you want to talk about fairness.
6      Q. Well, in the calculation of appreciation
7  cash flow, the return on developer's equity is not
8  listed in the document as an expense to be deducted;
9  correct?
10     A. But it is listed if you develop it.
11     Q. It's listed for operations cash flow --
12     A. So why does that make sense? Why do you
13 get it in one case and not the other? Could you
14 explain that to me?
15     Q. Well, you know, I think there's --
16        MR. COOTER: Wait a minute.
17        MR. PAGE: -- I think there's a perfectly
18 logical explanation but I'm not going to answer the
19 question.
20        THE WITNESS: Okay.
21        MR. PAGE: My question to you is --
22        THE WITNESS: Well, you don't have to

Page 211

1  answer my questions.
2        BY MR. PAGE:
3      Q. Here's -- Here's the question to you,
4  Mr. Rose. You agree that the op -- that the Cash
5  Participation Agreement does not include a -- the
6  return on developer's equity as an authorized
7  deduction for purposes of appreciation cash flow; is
8  that not correct?
9      A. That's correct.
10        MR. PAGE: Okay. Let me have this marked
11 as Exhibit 48.
12        THE REPORTER: 48?
13        MR. PAGE: Yes.
14        (The reporter marked Exhibit 48)
15        BY MR. PAGE:
16     Q. I've handed you Exhibit 48 which is a
17 cover letter from Mr. Cooter's office but attached
18 to it are financial -- is a financial statement.
19 Have you seen this before?
20        MR. COOTER: Mr. Page, attached to it is a
21 draft financial statement.
22        MR. PAGE: Well, I'm sorry. I was going

Page 212

1  to say that --
2        MR. COOTER: Okay.
3        MR. PAGE: -- but that was my next
4  question.
5        BY MR. PAGE:
6      Q. Have you seen the document?
7      A. Yes.
8      Q. All right. It does have, as Mr. Cooter
9  has volunteered, the word "Draft" in big handwritten
10 letters on the front page of the financials.
11        Do you see that?
12     A. Yes.
13     Q. Why is it a draft?
14     A. Why is anything a draft? Because it's not
15 the final.
16     Q. Well, under the Cash Participation
17 Agreement, you were required to have a statement?
18     A. Well, we missed --
19     Q. And you missed it; right?
20     A. Yes.
21     Q. And here we are in November. So when is
22 there going to be a financial statement?

Page 213

1      A. Well, We got more important things --
2      Q. Just --
3      A. -- than this accounting statement to do,
4  like our taxes.
5      Q. More important than complying with the
6  contract? Just --
7      A. Yes.
8      Q. Now, when will it be the case that you
9  will have a financial statement --
10     A. As soon as possible.
11        MR. COOTER: Just a minute. I told you
12 off the record, the revisions are in process, and
13 you will have them shortly. And I've already told
14 you what we're doing here and you'll have them
15 shortly.
16        THE WITNESS: Yeah.
17        MR. PAGE: Okay.
18        THE WITNESS: We're going to -- We're
19 going to get you a new statement.
20        MR. COOTER: There's no question pending.
21        MR. PAGE: Yeah.
22 ...

54 (Pages 210 to 213)

**Capital Reporting Company**

Page 214

1  BY MR. PAGE:
2  Q. Well, do -- do you know what changes are
3  going to be made in the financial statement,
4  Mr. Rose?
5  A. I hope that they find a way to comply with
6  your agreement so -- and -- and in complying with
7  it, we're just going to change things, put them in
8  the right column so we can be -- get -- get a
9  reasonable return on our investment.
10  Q. Is there anything about the financial
11  statements here that will help calculate
12  appreciation cash flow in the event of a sale in
13  your view?
14       MR. COOTER: In --
15       THE WITNESS: In the statements?
16       MR. PAGE: Yeah.
17       THE WITNESS: That will help calculate?
18  Yes.
19       BY MR. PAGE:
20  Q. What -- What will -- What will help us
21  calculate the appreciation cash flow?
22  A. What our expenses are, what can be charged

Page 215

1  against the account. And all we want is what's
2  fair.
3  Q. Your view as I understand it is that
4  expenses as calculated for the operations cash flow
5  are necessarily the same expenses that are
6  calculated for purposes of the appreciation cash
7  flow; is that a fair statement of your position?
8  A. I -- I think in my opinion they should be
9  the same, yes.
10  Q. You agree that the Cash Participation
11  Agreement, however, is not written so as to make
12  it the same?
13  A. I -- I understand that.
14  Q. And your argument is that as a matter of
15  fairness or equity, they should be the same;
16  correct?
17  A. Well, fairness is one thing and equity,
18  but even if we want to be literal and follow a
19  contract, I think, if our accountant misstated
20  something because you could put in Category A and as
21  Category B, and all of a sudden, you're telling me
22  it's -- All right. If it's debt but it's not

Page 216

1  equity -- and I'm paying out all this money. I
2  would think your client would want to step up and
3  say, That's wrong, but we'll -- we'll make it comply
4  with your forms if that's what you want. If that's
5  what you want to do, you want to play those kind of
6  games, we'll play those games.
7  Q. Now, in fact, you're claiming expenses
8  for -- expenses -- Your claim -- Excuse me. Let me
9  start over.
10       You're claiming as expenses items for
11  which there's never been a cash payment; isn't that
12  correct?
13  A. There's never been a cash payment?
14  Q. Yeah.
15  A. For -- For what?
16  Q. Well, let's take developer's equity
17  return.
18  A. You want me to charge myself interest so I
19  can pay taxes on that? Does that make sense to you?
20  We just impute it and add it on. We have plenty of
21  mortgages where the interest isn't added on till the
22  end.

Page 217

1  Q. Is there any division --
2  A. You want to create some taxes for no good
3  reason?
4  Q. Is there any provision in the Cash
5  Participation Agreement that either permits or
6  requires accrual financing or accrual accounting
7  with respect to expenses?
8  A. Well, I don't see why it should. And I
9  don't know -- I can't read -- I've read that
10  agreement 30, 40 times. I -- Every time I read it,
11  I'm more confused. And maybe you're more astute
12  than I am but I can't understand that agreement.
13  Q. Well, it's pretty clear, is it not,
14  Mr. Rose, that the document requires cash-basis
15  accounting, not accrual accounting?
16  A. I don't know.
17  Q. Well, let's turn to the document. It's
18  No. 5.
19  A. I'm not an accountant. I -- I don't know.
20  Q. I'm not asking you to be an accountant.
21  I'm asking you to read the contract and to testify
22  as the witness designated --

55 (Pages 214 to 217)

Page 218

1   A. Yeah.
2   Q. -- to testify on behalf of Montgomery Road
3   Limited Partnership.
4        Exhibit 5, sir, is the Cash Participation
5   Agreement.
6        MR. COOTER: Mr. Page, I've already told
7   you, you're surely going to have revised financial
8   statements; and so this exercise, I suggest, is a
9   bit premature. We will solve your problems.
10       MR. PAGE: I doubt it. I really -- I
11  understand you're going to change it.
12       MR. COOTER: Well --
13       MR. PAGE: I just feel that you're not
14  going to solve the problem from our standpoint.
15       MR. COOTER: Oh, I think I will.
16       MR. PAGE: If you can get No. 5, I just
17  want to ask you -- I'm not going to be long on this
18  so --
19       THE WITNESS: Oh, good. What page?
20       MR. PAGE: Well, I thought I had it here.
21  Hold on. Here we go.
22  ...

Page 219

1        BY MR. PAGE:
2   Q. I want you to turn to page 6 of the Cash
3   Participation Agreement, Exhibit 5, and look at
4   Section 2.3, Definition of Expenses. Do you see
5   that at the bottom of the page?
6   A. Mm-hmm.
7   Q. And do you agree with me that the
8   provision, 2.3(a), clearly states that all the
9   expenses shall be determined -- quote, determined on
10  the basis of sound cash-basis accounting practices
11  applied on a consistent basis, unquote?
12  A. Well, I would tell you this. This
13  agreement is so tricky and devious that I'd have to
14  read the whole agreement before I would swear to
15  anything it said.
16  Q. Is there anything tricky or devious about
17  a statement that says: You shall calculate expenses
18  based on a cash basis of accounting?
19  A. If you knew what --
20  Q. What's tricky about that?
21  A. Well, that particular statement is not
22  devious but what about other statements? I find

Page 220

1   things constantly contradicting one another in this
2   agreement. And smarter people than I say the same
3   thing, and your accountants and our accountants and
4   other accountants are all saying something so
5   different from the agreement so you're the only one
6   that sees it as a clear document.
7   Q. Have you made any effort or are you going
8   to make any effort to reduce expenses for the
9   property in your new cash statements -- Excuse me --
10  your new financial statements -- by backing out or
11  eliminating past expenses for TDRs --
12  A. I --
13  Q. -- and for legal fees associated with
14  TDRs?
15  A. I have no idea.
16  Q. Why is it that you made a decision with
17  respect to the Mid-Atlantic contract to have one
18  contract for the land and one for TDRs?
19  A. Because TDRs are not part of the land.
20  They're not part of any sharing that Greyhound gets.
21  Why should I spend money? You won't even give me
22  credit for any equity. I should go out and buy?

Page 221

1   Why don't -- Maybe I should throw in all the other
2   land I bought --
3   Q. You agree, do you not --
4   A. -- under your agreement. TDRs have
5   nothing to do with you.
6   Q. TDRs are an interest in the land, are they
7   not?
8   A. No.
9   Q. And --
10  A. TDRs are a right to add to the thing
11  that -- add to the development by going out and
12  paying for them.
13  Q. There were --
14  A. There's nothing in here that says you get
15  TDRs.
16  Q. There is something in here, though, is
17  there not, that says that any interest in the
18  property that is sold -- any interest in the
19  property --
20  A. Any interest in the property that's sold?
21  Q. Yes.
22  A. Uh-huh. What was sold?