# EXHIBIT 2

Capital Reporting Company

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2                    DISTRICT OF COLUMBIA

 3    ----------------------------------:

 4    MONTGOMERY ROAD I, LIMITED         :

 5    PARTNERSHIP                        :

 6              Plaintiff                : Civil Action

 7         v.                            : No. 06-00344

 8    VIAD CORPORATION                   : (HHK)

 9              Defendant                :

10    ----------------------------------:

11                Washington, D.C.

12                Tuesday, November 28, 2006

13    Deposition of:

14             REID LIFFMANN,

15    called for oral examination by counsel for

16    Defendant, pursuant to notice, at the law office

17    of Bryan Cave, LLP, 700 13th Street, N.W.,

18    Washington, D.C. 20005, before Sheri C. Stewart,

19    Registered Professional Reporter and Notary

20    Public in and for the District of Columbia,

21    beginning at 1:34 p.m., when were present on

22    behalf of the respective parties:
```

**Capital Reporting Company**

Page 14

1 nature of the dispute?
2        MR. COOTER: As it existed then?
3        MR. PAGE: Yes, right.
4    A   What their participation would be.
5 BY MR. PAGE:
6    Q   Any more detail other than that?
7    A   No. There's lots of correspondence on
8 it, I'm sure.
9    Q   There is. In fact, I'm going to hand
10 you a copy of a document, has not been marked
11 previously, it will be Exhibit No. 48.
12       (Whereupon, Exhibit No. 48 was marked
13 for identification.)
14 BY MR. PAGE:
15   Q   What I've handed you is multiple pages,
16 the top page is a letter from counsel in
17 Mr. Cooter's firm to me, and there's an attachment
18 with the word "draft" written across the second
19 page.
20       You can take a minute if you want just
21 to flip through the document, familiarize yourself
22 with it.

Page 15

1        Have you seen this document which I
2 have marked as Exhibit 48 prior to today?
3    A   Yes.
4    Q   And did you play any role in the
5 preparation of Exhibit 48? And I don't mean the
6 cover letter, but the document that's attached.
7    A   No.
8    Q   Do you know who prepared this document?
9    A   It was prepared by our internal
10 accounting group.
11   Q   Anyone in particular?
12   A   Probably Ron Glassman.
13   Q   Okay. Do you know when you first saw
14 it?
15   A   No.
16   Q   Do you know when it was prepared?
17   A   No.
18   Q   Okay.
19       MR. PAGE: Let's mark the next document
20 as Exhibit No. 52.
21       (Whereupon, Exhibit No. 52 was marked
22 for identification.)

Page 16

1 BY MR. PAGE:
2    Q   I'm handing you Exhibit 52.
3    A   Um-hum.
4    Q   Like Exhibit 48, it has a cover letter
5 from the Cooter Mangold firm, this one's from
6 Mr. Cooter on the first page. And then -- isn't
7 it?
8        MR. COOTER: Yes, himself.
9        MR. PAGE: Himself.
10 BY MR. PAGE:
11   Q   It's a rare document, which is why I
12 wanted to call your attention to it.
13       This -- the attachment now is a series
14 of pages that -- the top of -- several of the
15 pages of the title is "Montgomery Road I Limited
16 Partnership (90 K Street only), Special Purpose
17 Statements of Assets and Liabilities, December 31,
18 2005." And '04.
19       And then a similar but not identical
20 wording on the subsequent pages.
21       Have you seen this before?
22   A   Yes.

Page 17

1    Q   All right. Now, I'm assuming but I
2 don't know, I'll ask you, did you play any role in
3 the -- I'm assuming you didn't, but you tell me --
4 that you played no role in the preparation of the
5 cover letter from Mr. Cooter?
6    A   No, Dale writes his own cover letters.
7    Q   Good. So let's just leave that aside
8 for a moment and look at the underlying document.
9        When was this document prepared, or
10 when were these sheets of paper prepared?
11   A   When was what prepared?
12   Q   I'm looking at the paper that's --
13 begin with -- it's page 2 is the first page behind
14 Mr. Cooter's letter, and then there are a series
15 of pages.
16   A   Okay.
17   Q   Let me stop, I'm sorry, let me back up
18 a minute.
19       What role did you have, if any, in the
20 preparation of these schedules, charts, lists,
21 whatever they are?
22   A   I don't prepare schedules, charts,

Capital Reporting Company

Page 18

1  lists like this.
2  Q   Okay. Did you have any role then in
3  the preparation of this?
4  A   I was aware that it was being done.
5  Q   Did you review it for purposes of
6  making comment?
7  A   No.
8  Q   Did you provide it to Mr. Cooter?
9  A   No. I believe that it was sent to
10 Cooter by Mr. Glassman.
11 Q   Do you know why it was prepared?
12 A   Yes.
13 Q   Why is that?
14 A   Because the special purpose financial
15 statements that had been previously prepared did
16 not accurately reflect the economic reality of
17 what occurred in the course of this transaction.
18 Q   Which prior statement are you referring
19 to? Which prior statement or statements are you
20 referring to?
21 A   I believe the -- I know for certain the
22 most recent ones, and I don't know, for instance,

Page 19

1  this one that you gave me as Exhibit 48.
2  Q   Okay. Your answer was that -- I'm
3  sorry, I'm going to paraphrase it, but I'm not
4  trying to misstate what you said.
5      Your answer was that it had been
6  determined or you had determined that there were
7  some aspects of previous statements that had been
8  prepared incorrect -- incorrectly.
9      Is that a fair statement of what you
10 said?
11 A   No. You asked me --
12 Q   All right.
13 A   -- what statements had been prepared
14 incorrectly, and I said I know for sure these
15 statements, this statement, Exhibit 48 --
16 Q   Right.
17 A   -- had been prepared incorrectly. I
18 don't know that -- you know, I haven't reviewed
19 each and every other statement before that.
20 Q   All right. In what way was the prior
21 statement or any other prior statements incorrect,
22 as you understand it?

Page 20

1  A   The biggest reason that they're
2  incorrect is that S & S Finance is an internal
3  bank that funds projects under the G & R umbrella
4  and expects a return on the capital that is
5  funded.
6      And that our accounting department had
7  classified capital that had been infused into
8  Montgomery Road I Limited Partnership as equity
9  when, in reality, it was debt.
10 Q   All right. Any others, any other ways
11 in which it was incorrect?
12 A   There was an issue regarding a loan
13 discount that was incorrectly stated in the
14 statements.
15     There was a million dollar loan
16 discount that S & S obtained when they purchased
17 the first mortgage on the property, and that was
18 incorrectly reflected on the statements.
19     And there were some costs put into the
20 special purpose financial statements that were
21 not -- that shouldn't have been put in there.
22 Q   Any others that you can think of?

Page 21

1  A   No, those three are it, I can think of
2  now.
3  Q   On the second page which you have open
4  in front of you, the very top right in the title
5  is the following, I guess sentence is what it is.
6      It states as follows, "Revised for no
7  loan discount, no TDR costs, and 100 percent S & S
8  Finance debt."
9      Do you see that?
10 A   Um-hum.
11 Q   That's a shorthand reference for each
12 of the three items that you just described, right?
13 A   Yes.
14 Q   When was it that Greenebaum & Rose
15 Associates, Montgomery Road, LP, or anyone else
16 came to the conclusion that these three items had
17 been recorded incorrectly in prior statements?
18 A   I don't recall specifically when it
19 was.
20 Q   I showed you Exhibit No. 48 earlier.
21 You still have that in front of you, right?
22 A   Um-hum.

(866) 448 - DEPO
www.CapitalReportingCompany.com

Page 22

1  Q   What's the date of that letter that
2  Mr. Cooter's colleague sent?
3  A   September 21st, 2006.
4  Q   And the date of Exhibit 52 in front of
5  you is November 21 --
6  A   Um-hum.
7  Q   -- 2006?
8      Would it be fair to conclude that the
9  decision that this had been an error occurred
10 sometime between September 21 and November 21?
11 A   No.
12 Q   When was it, then, in your recollection
13 and under oath today that it was first determined
14 that there had been an error in these three
15 matters?
16 A   I don't know.
17 Q   Who would know within the entity
18 Montgomery Road Limited Partnership or Greenebaum
19 & Rose Associates?
20 A   I don't know.
21 Q   You know that you were designated today
22 to testify on the preparation of Exhibit 52?

Page 23

1  A   Yes.
2      MR. COOTER: Wait just a minute. One
3      thing at a time.
4      He was designated to testify as to the
5      methodology of the revised statement. That's
6      what he was designated to testify to, which
7      is different from what you just said.
8  BY MR. PAGE:
9  Q   Who would know as to when those
10 decisions were made?
11 A   Decisions?
12 Q   Decisions to change the -- and correct
13 the three items that you just described?
14 A   I'm confused. You just asked me when
15 they were prepared, you didn't say anything about
16 decisions.
17 Q   No. I'm asking you when it was that
18 the decision was made, the determination was made
19 to change the accounting for those three items,
20 when was that decision made?
21 A   I don't know.
22 Q   And your testimony today is it did not

Page 24

1  occur after September 21?
2  A   No, that's not my testimony.
3  Q   What is your testimony?
4  A   You asked the question, I think you
5  said is it fair to assume that it was done between
6  September 21st, 2006 and November 21, 2006. And I
7  said I don't know. Because I don't know when this
8  statement was prepared.
9  Q   Mr. Liffmann, who was involved in the
10 determination to revise the financial statements
11 with respect to these three items?
12 A   Counsel, myself, Mr. Rose.
13 Q   Anyone else?
14 A   Who was involved in the decision?
15 Q   Yes.
16 A   Mr. Glassman.
17 Q   Okay. Was there a specific meeting or
18 conversation at which the decision or
19 determination was made to change these three
20 items?
21     MR. COOTER: You can answer that but
22     only yes or no, if you can remember.

Page 25

1  A   No, there was not a specific meeting.
2  BY MR. PAGE:
3  Q   Was there a specific meeting with
4  counsel where this was discussed?
5      MR. COOTER: I instruct him not to
6      answer.
7      MR. PAGE: As to whether there was a
8      meeting with counsel?
9      MR. COOTER: Your question is in two
10     parts. Was there a meeting with counsel is
11     the first part, that is not objectionable.
12     The second is where this was discussed.
13     The substance of what was discussed with
14     counsel, embodied by your question, I
15     instruct him not to answer.
16     MR. PAGE: He's already answered it was
17     discussed with counsel, so I don't see why
18     that's an issue. I'm trying to pin down the
19     date.
20 BY MR. PAGE:
21 Q   I want to know when it was, the
22 decision was made to restate these financial

Page 26

1  statements.
2   A   I understand that. I don't have the
3  specific date.
4   Q   Okay. Let me try to narrow the scope.
5      It was after the litigation was filed
6  by Montgomery Road Limited Partnership against
7  VIAD, correct?
8   A   Yes.
9   Q   It was after contracts were signed for
10 the sale of the property with Mid Atlantic,
11 correct?
12  A   When were the contracts signed by Mid
13 Atlantic?
14  Q   You don't remember?
15  A   I don't remember precisely.
16  Q   You know there are contracts that have
17 been signed by Mid Atlantic, correct?
18  A   I'm aware of that.
19  Q   All right. Let's find them.
20     MR. COOTER: We'll accept your proffer
21 as to a date, Mr. Page.
22 BY MR. PAGE:

Page 27

1   Q   Mr. Liffmann, on November 2, Mr. Rose
2  wrote to VIAD enclosing a notice of a contract of
3  sale and indicating that -- excuse me, I
4  misstated.
5      He indicated that there had been a
6  change in the contract of sale that had been
7  agreed to earlier with TC Mid Atlantic
8  Development, Inc.
9      The umbrella agreement, which I have
10 here in front of me, and I'll be glad to show you,
11 is made and entered into as of August 10, 2006.
12  A   Okay.
13  Q   Does that refresh your recollection as
14 to when the agreement to sell the property --
15  A   August 10th was the date that the
16 contract was signed.
17  Q   Okay.
18  A   Or effective.
19  Q   Now I'm going to return to my question
20 which was, was the decision or determination to
21 change these three accounting treatments made
22 after August 10 of 2006?

Page 28

1   A   I believe so.
2   Q   What was the rationale for deciding to
3  change the TDR costs that are referred to in
4  the -- on the second page of the document that I
5  handed you?
6   A   Which document? I have two documents.
7   Q   Okay. Exhibit 52.
8   A   Okay.
9   Q   Second page at the top. For shorthand,
10 I referred you to the statement there, "Revised
11 for no loan discount, no TDR costs, and 1,000" --
12 excuse me, "100 percent S & S Finance debt."
13     You see that?
14  A   Yes.
15  Q   I want to focus for the time being just
16 on the "no TDR costs."
17  A   Um-hum.
18  Q   What does TDR costs mean, as far as you
19 know?
20  A   In this instance, it means the cost of
21 approximately 7 to 10,000 TDRs that were purchased
22 for this property, for this entity, Montgomery

Page 29

1  Road.
2   Q   And when -- the shorthand said "no TDR
3  costs."
4      What does that mean?
5   A   It's been adjusted to back out those
6  TDR costs.
7   Q   These were costs which had earlier been
8  included in the financial statements; is that
9  correct?
10  A   That's my understanding.
11  Q   Well -- okay. Why was the decision
12 made to change that, what's the rationale for it?
13  A   Because it was an administrative
14 mistake to include them.
15  Q   Why was it a mistake?
16  A   Because the TDRs -- these financial
17 statements are called special purpose
18 statements -- well, they're actually called
19 special purpose financial statements, they're for
20 a special purpose, that is to compute what
21 transportation leasing of VIAD might be entitled
22 to.

Page 30

1   And transportation leasing or VIAD is
2 not entitled to the TDRs, so putting the cost of
3 those 7500 to 10,000 TDRs into these statements
4 was incorrect.
5   Q   Do you know when it was that they had
6 been put into the financial statements?
7   A   No.
8   Q   Would it surprise you to know that they
9 were put in as early as year 2000?
10   A   No.
11   Q   Are you aware that they were included
12 in the right of first refusal, the TDRs, for the
13 level three contract when the right of first
14 refusal was put to VIAD?
15   A   No.
16   Q   Did you make any independent review
17 yourself of the cash participation agreement to
18 determine if VIAD was in fact entitled to
19 participate in any sale of the TDRs?
20   A   That's why we have lawyers. They're
21 the only ones who can read this agreement.
22   Q   Any basis, any at all in fact for your

Page 31

1 statement that VIAD is not entitled to participate
2 based on -- in the sale of the TDR costs -- excuse
3 me, the sale of the TDRs except for what counsel
4 has told you?
5   A   Can you repeat that?
6   Q   Yes.
7   A   It was very long.
8   Q   I'm sorry.
9   Is there any basis you have, any fact
10 you can point me to, other than the advice from
11 counsel, for your contention that VIAD is not
12 entitled to participate with respect to the sale
13 of the TDRs on property at 90 K Street?
14   A   Yes.
15   Q   What?
16   A   They're not part of the property.
17 They're a commodity that is freely traded back and
18 forth between developers and users.
19   Other than the 7500 TDRs that was the
20 administrative mistake, VIAD hasn't paid or taken
21 any -- paid for any of them, and there's a large
22 part of them that we don't own and haven't

Page 32

1 perfected yet and are still working on.
2   Q   Anything else?
3   A   That's all I can think of for now.
4   Q   Let's talk about the loan discount.
5   What was the rationale for revising the
6 financial statements to change the treatment of
7 the loan discount?
8   A   The loan discount arose because there
9 was a massive liquidity crisis in the real estate
10 business, and S & S Finance was able to buy the
11 loan from a third party at a discount.
12   S & S Finance became the new lender, I
13 think you called it permitted lender, and that
14 discount of approximately a million dollars should
15 ignore S & S Finance, not to Montgomery Road I
16 Limited Partnership. S & S Finance is the lender,
17 has always been the lender, they acquired a loan,
18 first mortgage loan secured by a deed of trust.
19   Q   So your point would be that S & S is
20 different from Montgomery Road, the rationale is
21 that because it's a different entity, the loan
22 discount would not apply to the Montgomery Road

Page 33

1 entity, is that it?
2   A   I understand, yes, S & S is definitely
3 different than Montgomery Road.
4   Q   Right. And I'm sorry, I'm not trying
5 to put words in your mouth, but that's the reason
6 for the change in treatment?
7   A   Montgomery Road is not entitled to it.
8 S & S is the lender, it's a separate entity.
9   Q   Okay. The 100 percent S & S Finance
10 debt, you see that reference? Again I'm using --
11   A   Yes.
12   Q   Explain to me what that means. What
13 was the change that was made here?
14   A   S & S Finance is an internal captive
15 finance company that funds G & R's projects. Real
16 estate, it's capital intensive and especially real
17 estate like this that doesn't produce income or
18 not net income, is capital intensive, and money
19 that is infused in this over the years came from
20 S & S, originated from S & S, and was debt.
21   So these statements reflect the fact
22 that the monies came from S & S and was in fact --

Capital Reporting Company

Page 34

1  was in fact debt.
2  Q  Why was it necessary to change anything
3  to reflect that it was debt?
4      MR. COOTER:  I didn't hear the last
5  part of your question.  Why was it necessary
6  to do what?
7  BY MR. PAGE:
8  Q  Let me start over.
9      The change that was made in this
10 financial statement is to treat it as debt; is
11 that correct?
12 A  Yes.
13 Q  It had previously been classified as
14 equity; am I right about that?
15 A  Not all of it.
16 Q  Well, tell me what -- what I'm
17 incorrect about and what I'm correct about.
18 A  Well, S & S Finance is the holder of
19 the mortgage.  The permitted debt, the first
20 mortgage, that's been on property since the day we
21 bought it from VIAD.  I believe it has been shown
22 on previous statements as an -- under liabilities.

Page 35

1  Q  Well, what was the change that was made
2  then?
3  A  Is this 48?  First mortgage note
4  payable, that's payable, this is the -- this is
5  48, first mortgage payable, payable to S & S.
6  Q  Well, what was the change that was made
7  in this new statement in November?
8  A  The change that was made was to reflect
9  that the additional monies that were infused over
10 the years to pay for real estate taxes,
11 assessments, bid pursuit costs, insurance, the
12 carry on that debt, the first mortgage debt, all
13 originated from S & S Finance and was improperly
14 classified as equity in Exhibit 48.
15 Q  Okay.  Let's get Exhibit 48 and compare
16 it with Exhibit 52, if you would.  There are a
17 couple of the specific schedules that I want to
18 look at first.
19     And if you have them side by side, let
20 me start with this.  In Exhibit 48 and in Exhibit
21 52, in each case we have a cover letter from
22 counsel, correct?

Page 36

1  A  Yes.
2  Q  Then we turn the page, there's no cover
3  sheet on Exhibit 52, right?
4  A  Correct.
5  Q  Next page in Exhibit 48 is a table of
6  contents, we don't have that, right?
7  A  No.
8  Q  Then the next page on Exhibit 48 is the
9  text of a letter that appears to be prepared for
10 the signature of an accountant, right?
11 A  It's a letter; I don't know who it's
12 prepared for.
13 Q  Have you ever seen a letter like this
14 before in connection with these financial
15 statements?
16 A  Yes.
17 Q  Do you know whether an accounting firm
18 has been involved in the past in reviewing these
19 financial statements?
20 A  Yes.
21 Q  Do you know who it is?
22 A  Some group in Baltimore.

Page 37

1  Q  Okay.  Exhibit 52 has no such letter
2  attached to it, does it?
3  A  It does not.
4  Q  No outside accounting firm has looked
5  at Exhibit 52; is that correct?
6  A  Well, it has no such letter.  I don't
7  know if any of their accountants looked at it or
8  not.
9  Q  Do you know if an accounting firm has
10 looked at it?
11 A  I don't believe an accounting firm
12 looked at it.
13 Q  You don't contend that Exhibit 52
14 complies with the cash participation agreement in
15 its requirement of submitting an annual financial
16 statement, do you?
17 A  I'd ask my lawyer of that.
18 Q  Well, I'm going to ask you.  Why don't
19 you look at paragraph 2.6 of this document which
20 is the cash participation agreement.
21 A  What page?
22 Q  I think it's page 7, 6 or 7.

10 (Pages 34 to 37)

(866) 448 - DEPO
www.CapitalReportingCompany.com

**Capital Reporting Company**

Page 42

1  Liffmann, and maybe you can help me short-circuit
2  it here.
3      I'm trying to find where the three
4  changes, no loan discount, no TDR costs and the
5  100 percent S & S Finance debt, how they show up
6  in these various schedules as changes.
7      Now, with the TDR costs, I think I can
8  nail that pretty quickly, there's a schedule
9  attached somewhere which is a schedule of costs
10 for the property.
11     And I take it -- and I'll refer you
12 specifically to page 7, it has the number seven at
13 the bottom. You see that?
14   A   Seven, yes.
15   Q   Yes, and its title is "Schedule of
16 Project Costs."
17     Do you see that?
18   A   Yes.
19   Q   Now, there's a list of items here that
20 appear to be charges against the property, and
21 then the last item -- line item is "various costs
22 for TDRs."

Page 43

1      Do you see that?
2   A   Yes.
3   Q   Prior years, and then it's a reversal
4  or negative in parenthesis.
5      Do you see that?
6   A   Yes.
7   Q   Now, that appears to me to be the
8  change that was made for that item. Am I correct
9  about that?
10  A   That's what it looks like, yes.
11  Q   All right. Now, I don't know that that
12 shows up anywhere else, except that the cost
13 number is in -- carried on to the other schedules.
14  A   I think you take that, they subtract
15 it, it comes within the number of 938,341.
16  Q   Yes.
17  A   And then that's on the balance sheet
18 here as a project cost.
19  Q   Okay. That's fine.
20     Now, can you walk me through how we
21 will find the reversal or change in numbers for
22 the no loan discount? Where is that going to

Page 44

1  appear?
2   A   I'm looking now at Exhibit 48. The
3  statement of assets and liabilities, as first
4  mortgage payable, 9,000,270, and here it says
5  first mortgage no payable, 10,297,139.
6      So that's roughly $1,027,000. That
7  must be the loan discount.
8   Q   Okay. Any other place you find it in
9  here?
10  A   Here on page -- it said 5 in the upper
11 right-hand corner, but 4 on the bottom.
12     The loan discount is shown on the one,
13 two, three, fourth line, gain from willing
14 discount, 1,024,571.
15  Q   All right. And that shows the reversal
16 of it, correct? Let me rephrase that, I'm sorry.
17     You have two columns, middle column,
18 December '87 to December of '04, it's shown as a
19 deduction, but in the '05 statements it's added
20 back in in the separate column, right?
21  A   That's what's happening. I mean,
22 that's the math of it, yes. I don't know what

Page 45

1  exactly it shows.
2   Q   Okay. I was just trying to walk
3  through the math of it.
4   A   Yeah. He substracted 1,024,571 from
5  the number above, 19,445,478, came up with that
6  summation.
7   Q   Okay. That's fine on the loan
8  discount. Let's go through the S & S debt.
9   A   Okay.
10  Q   What changes are made on the financial
11 statements as a result of the decision to change
12 that?
13  A   Loan payable, S & S Finance,
14 18,874,695. That isn't on this previous
15 statement.
16  Q   Okay.
17  A   And then accrued interest, S & S
18 Finance, 16, 9, 768,203. I don't think any of
19 these other things deal with S & S Finance under
20 the liabilities section of the balance sheet of
21 Exhibit 52.
22  Q   Is it your view and belief that accrued

**Capital Reporting Company**

Page 46
1  expenses are permitted as deductions for expenses
2  under the cash participation agreement?
3      A    Say again?
4      Q    Is it your -- is it your view that the
5  cash participation agreement permits accrued
6  expenses to be deducted in the calculation of any
7  of the cash flows?
8      A    That's what legal counsel has advised
9  us.
10         MR. COOTER: Strike that. You can't
11     talk about what anybody has -- what your
12     lawyers have told you, okay?
13         He's asking you what your view is. If
14     you have a view, you have a view; if you
15     don't, you don't.
16     A    Yes, it's my view that it can be
17  deducted from cash appreciation.
18  BY MR. PAGE:
19     Q    Do you know what cash basis accounting
20  is?
21     A    Yeah.
22     Q    Would a cash basis accounting permit

Page 47
1  accrued expenses to be treated as expenses?
2      A    Well, the accrued expenses could be
3  paid in cash at any time, then it becomes cash,
4  it's accrued until the -- it's paid in cash.
5      Q    Well, we're looking at a financial
6  statement that has a specific date, December 31 of
7  2005, right?
8      A    Right.
9      Q    So as of that date, could accrued
10  expenses be treated as a cash payment?
11     A    That's a technical question. I don't
12  know.
13     Q    You think that's a technical question?
14     A    Yes.
15     Q    Okay.
16         MR. PAGE: I have no further questions
17     of this witness.
18         MR. COOTER: Okay. I don't either.
19         THE VIDEOGRAPHER: The time is
20     2:22 p.m. on November 28, 2006. Going off
21     the record, completing the videotaped
22     deposition.

Page 48
1         (Signature having been waived, the
2     deposition of Reid Liffmann was concluded at 2:22
3     p.m.)

Page 49
1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Sheri C. Stewart, the officer before
3  whom the foregoing proceedings were taken, do
4  hereby certify that the foregoing transcript is a
5  true and correct record of the proceedings; that
6  said proceedings were taken by me stenographically
7  and thereafter reduced to typewriting under my
8  supervision; and that I am neither counsel for,
9  related to, nor employed by any of the parties to
10  this case and have no interest, financial or
11  otherwise, in its outcome.
12         IN WITNESS WHEREOF, I have hereunto set
13  my hand and affixed my notarial seal this 12th day
14  of December, 2006 .
15  My commission expires:
16  October 14, 2009
17
18
19  _____
20  NOTARY PUBLIC IN AND FOR
21  THE DISTRICT OF COLUMBIA
22

13 (Pages 46 to 49)