# EXHIBIT 5

Case 1:06-cv-00344-HHK   Document 25-9   Filed 03/29/2007   Page 1 of 9

Case 1:06-cv-00344-HHK   Document 25-9   Filed 03/29/2007   Page 2 of 9

Daniel Hudson                    March 9, 2007    Montgomery Road V Viad Corp, et al.

Page 1

In the U.S. District Court

For the District of Columbia

---------------------------x

Montgomery Road I Limited          :
Partnership                        :
                                   : NO. 1:06CV00344

          v.                       :

                                   :

Viad Corp., et al                  :

---------------------------x

            March 9, 2007

DEPOSITION OF:

          Daniel Hudson,

a witness, called by counsel pursuant to notice,

commencing at 9:00 a.m., which was taken at Bryan,

Cave, 700 13th Street, NW, Washington, DC 20005

Case 1:06-cv-00344-HHK   Document 25-9   Filed 03/29/2007   Page 3 of 9

Daniel Hudson                March 9, 2007    Montgomery Road V Viad Corp, et al.

Page 10

1   A. I have not.
2   Q. Feel free to ask me to stop and repeat
3 something if you don't understand it and I'll try
4 not to go too quickly; but I understood from
5 everybody this morning that we were trying to finish
6 by midday if possible. So I want to keep moving, if
7 we can, at a fairly rapid pace to accommodate
8 everybody's schedule.
9   A. Okay.
10  Q. You need to answer orally without shaking
11 your head and give me clear answers and that will
12 make it go quicker. If you and I try hard we will
13 not step on each other's comments and the reporter
14 will be able to take it down better as we speak.
15     Is that all right?
16  A. That's fine.
17  Q. As I said, feel free to interrupt me if
18 you have any questions or comments.
19  A. Okay.
20  Q. Would you tell me what your employment is,
21 sir?

Page 11

1   A. I work for the Trammell Crow Company with
2 the title of senior managing director, and I'm
3 responsible for other development activities in the
4 Mid-Atlantic region.
5   Q. What is your educational training?
6   A. My undergraduate degree was in mechanical
7 engineering from the University of Delaware and my
8 graduate degree was in business administration from
9 the Wharton School in Philadelphia.
10  Q. What year was your degree from the Wharton
11 school?
12  A. 1986.
13  Q. How long have you been employed by
14 Trammell Crow or any of its affiliates?
15  A. Almost 21 years.
16  Q. Essentially since you were a graduate of
17 Wharton?
18  A. Correct.
19  Q. Can you tell me the relationship between
20 the Trammell Crow Company and TC MidAtlantic
21 Development, Inc.?

Page 12

1   A. TC MidAtlantic Development, Inc. is a
2 wholly owned operating entity for purposes of
3 transacting real estate business.
4   Q. How long has it been in existence?
5   A. I do not know that answer, but certainly
6 for many years.
7   Q. It was not formed specifically for the
8 purpose of acquiring title to the property subject
9 to this litigation on K and L Streets, Northeast?
10  A. Correct, and typically while we will
11 contract for many purposes under this entity. We
12 will generally never close a property under this
13 entity.
14  Q. In fact, in the situation we're talking
15 about involving the property purchased from
16 affiliates of Greenbaume & Rose who took title to
17 the property at closing?
18  A. I'm not sure that I can answer that
19 without checking, candidly. I do not know that
20 answer. Unfortunately we got 40 or 50 projects. I
21 can't keep all of the ownership entities straight.

Page 13

1   Q. Leaving aside the specific name and so
2 forth, what is the relationship between the entity
3 that took title and Trammell Crow?
4   A. The entity that took title is a joint
5 venture between Trammell Crow Company and an entity
6 called Crow Holdings, which is the investment arm of
7 the Crow family in Dallas, Texas.
8     It's not the family per se, but it is one
9 of on their investment funds. It is a separate
10 entity. No affiliation with the Trammell Crow
11 Company.
12    They are an investor in real estate. They
13 raise funds through other investments and they
14 become an equity investor. So simply it's a 90/10
15 joint venture where they provided 90 percent of the
16 entity equity and we provided 10 percent of the
17 equity and then we roughly financed 50 percent of
18 the project with debt.
19  Q. Now, turning back to TC MidAtlantic
20 Development, Inc. Do you have a title or office
21 with respect to that entity?

Case 1:06-cv-00344-HHK   Document 25-9   Filed 03/29/2007   Page 4 of 9

Daniel Hudson                March 9, 2007    Montgomery Road V Viad Corp, et al.

### Page 18

1  to indemnify Trammell Crow or its affiliates with
2  respect to legal fees in this matter?
3     A.  I don't know the answer to that question.
4     Q.  Is there any agreement, written or oral,
5  to indemnify Trammell Crow in the event it is sued
6  for conspire to defraud Viad?
7     A.  I don't believe, but I don't know that
8  question either.
9     Q.  Has there been any discussion about the
10 probability that that might occur?
11    A.  None.
12    Q.  When you used the word indemnification, do
13 you have anything in mind other than the escrow when
14 you use that word?
15    A.  No, I do not.
16       MR. COOTER: That's Reid Liffmann.
17 BY MR. PAGE:
18    Q.  If I could, Mr. Hudson, we'll return to
19 your duties for a moment as president of TCMD.  Are
20 you involved in the acquisition of properties and
21 projects?

### Page 19

1     A.  Yes, I am.
2     Q.  Are there others in the entity that are
3  also involved in that process?
4     A.  Certainly our group of -- our team of
5  people in this marketplace is 40 people of which
6  probably six on eight work on new project
7  origination.
8     Q.  How is it that Trammell Crow first became
9  involved in discussions to purchase the property
10 from Montgomery Road Limited Partnership?
11    A.  We were made aware by Scott Frankel, who
12 is a broker in our Washington office that the seller
13 might possibly consider an offer if we made one of
14 the sufficient strength.
15    Q.  When did that occur?
16    A.  I do not recall, but I'm going to guess it
17 was late summer early fall.
18    Q.  Of 2006?
19    A.  Yes.
20    Q.  Tell me a little bit about Mr. Frankel.
21 Is he an employee of TCMD?

### Page 20

1     A.  He is not.  He is an employee of Trammell
2  Crow, the company, and he is in our brokerage group.
3  He acts as a commercial broker in the Washington
4  marketplace.
5     Q.  Did he bring the matter to your attention
6  or to the attention of someone else?
7     A.  He brought the matter to the attention of
8  Chris Roth, whom I work for, and very quickly Chris
9  and I got up to speed with the opportunity.
10    Q.  Tell me a little more about Mr. Roth.
11 What is his title?
12    A.  His title is president of the Eastern
13 United States for the Trammell Crow Company.
14    Q.  Is he based here in Washington?
15    A.  He is.
16    Q.  So when you say he's your boss, that means
17 you report to him in some fashion; is that correct?
18    A.  Correct.
19    Q.  So when Mr. Frankel brought this to the
20 attention of Mr. Roth and yourself was that done in
21 writing or orally?

### Page 21

1     A.  Orally.
2     Q.  Tell me what you recall about what
3  Mr. Frankel said?
4     A.  Basically would we have interest in a
5  significant purchase over in the NOMA area.  He was
6  aware of a site that was large and that would carry
7  a significant price tag with it.
8        The number, the range was talked about,
9  was roughly $100 million and would that be something
10 that, A, we would be interested in, and, B,
11 something that we could close on, meaning would it
12 be too big for us, and we expressed interest and
13 Scott set up a meeting.
14    Q.  Before we talk about the meeting, let me
15 ask you whether you, Trammell Crow, had prior
16 experience developing properties in what you
17 described as NOMA?
18    A.  I do not.  Although I've been with the
19 company a long time, the vast my experience is
20 largely in Maryland.  I've been active in the
21 District for the last 20 months.

Case 1:06-cv-00344-HHK    Document 25-9    Filed 03/29/2007    Page 5 of 9

Daniel Hudson                              March 9, 2007     Montgomery Road V Viad Corp, et al.

Page 22

1    Chris Roth has been active in D.C.
2  development since the early eighties. So a
3  significant period of time. Our firm has developed
4  many properties near town.
5    Q. Among those properties are there
6  properties in the area called NOMA?
7    A. There are two properties in the Capitol
8  Hill area. One was a build to suit for the American
9  Psychological Association at 750 First Street and
10 the other at 10 G Street which was also an APA
11 related project. Technically neither are in NOMA,
12 although it's a similar submarket.
13   Q. Did Mr. Frankel pass on any information
14 about how he had learned of the owner's interest in
15 selling the property?
16   A. He did not. I think he knows the sellers
17 well and has for many years and the particulars of
18 on that conversation were not made known to me.
19   Q. And what was the result of this meeting,
20 what follow-up occurred?
21   A. Well, the meeting from the three of us we

Page 23

1  expressed interest in sitting down with the seller
2  and learning more about what their desires were to
3  sell the property.
4    Q. Did a discussion with the seller take
5  place?
6    A. It did. I cannot tell you when it
7  occurred, but it was with myself, Chris Roth, Reid
8  and Sam. I do not recall whether Steve was in that
9  first meeting or not.
10   Q. By Sam you mean Sam Rose?
11   A. Sam Rose was in the meeting. I do not
12 recall whether Steve was in the meeting or not.
13   Q. Again you think it was sometime in the
14 late summer perhaps?
15   A. Sure. I'm sure -- if it's material I'm
16 sure I could figure out exactly what day it was.
17   Q. Where did that meeting take place?
18   A. It took place in their offices.
19   Q. On Wisconsin Avenue?
20   A. Correct.
21   Q. How long did that meeting last?

Page 24

1    A. I do not recall, but I would speculate it
2  was 45 minutes to an hour.
3    Q. Tell me what you remember being discussed
4  in that meeting.
5    A. Like any very preliminary conversation
6  there was a lot of small talk made for the first
7  95 percent of the meeting and then the meeting
8  concluded with a discussion of how interested were
9  they in selling the property and I think how
10 interested might we be in purchasing the property
11 and what was the range of purchase price that would
12 excite them. And we left the meeting with a view
13 that we would think about it and make an offer.
14   Q. What was said specifically about the
15 interest of the seller in selling?
16   A. That they would review an offer. I think
17 it certainly wasn't clear that they were eager to
18 sell the property, but they would entertain an offer
19 if it was of substance. I think the numbers we
20 talked about were approximately that $100 million
21 figure.

Page 25

1    Q. Was that number used in the meeting?
2    A. I do not recall.
3    Q. What specifically do you recall telling
4  Mr. Rose and Mr. Liffmann about your interest in the
5  property?
6    A. Simply that we had the capability to make
7  an offer of substance in the range that we thought
8  would be attractive and that we were an active
9  developer we the wherewithal to close.
10   Q. And the range that you're referring to is
11 roughly somewhere around the number of 100 million;
12 is that correct?
13   A. Correct. I think the number -- that may
14 not have been at all been out of the seller's
15 mouths, but that was certainly the conversation with
16 Frankel about the range of expectation.
17   Q. So you don't remember that number actually
18 being mentioned in the meeting; is that right?
19   A. I don't know that it was, no.
20   Q. All right. Do you remember anything else
21 about the meeting?

Case 1:06-cv-00344-HHK    Document 25-9    Filed 03/29/2007    Page 6 of 9

Daniel Hudson                  March 9, 2007    Montgomery Road V Viad Corp, et al.

Page 30

1    the smaller lot was the 45 K Street lot, correct?
2        A.  Still is I think, yes.
3        Q.  This litigation is about interest that
4    Viad has in the 90 K Street lot. You understand
5    that, right?
6        A.  I do.
7        Q.  Now, in the offer that was made, or the
8    discussions preceding it, was there a
9    differentiation made as to price or terms with
10   respect to the two lots?
11       A.  Never. The only discussion we had in
12   those early stages was relating to total FAR, and at
13   that time I'm not sure I even understood there were
14   two lots.
15       Q.  Was the total FAR a subject of the
16   discussion in the meeting that you held with
17   Mr. Rose at his office?
18       A.  It probably was.
19       Q.  Do you recall any of the specifics of
20   that?
21       A.  Not at that time. I certainly I am

Page 31

1    familiar with the FAR issues since. Whether it
2    started then or started later, I can't answer; but I
3    certainly understood that our initial interest was
4    in purchasing what we believed was approximately a
5    10 FAR site which took us to like a million three
6    ninety and change I think.
7        Q.  Would you have been interested in
8    purchasing the site if the FAR had been less than
9    that.
10       A.  Yes, or more.
11       Q.  Or more?
12       A.  Yes.
13       Q.  In the offer letter that you described,
14   was there discussion or terms concerning the FAR of
15   the property?
16       A.  No recollection.
17       Q.  Did you have any discussion with you or
18   anyone on your behalf, with anyone at Montgomery
19   Road Limited Partnership about the offer letter at
20   or about the time it was sent?
21       A.  Again, I have no recollection. I'm fuzzy

Page 32

1    as to how we advanced from 100 million to 97 million
2    to a signed agreement, but certainly there was a lot
3    of discussion back and forth as things progressed.
4        Q.  I understand it was six to nine months
5    ago, but nonetheless I want your best recollection.
6        A.  Yes.
7        Q.  What happened, what response occurred
8    after the letter was sent that you just described?
9        A.  I think -- and again, this is speculation;
10   but my recollection was it was a very quick process,
11   you know.
12           My view was there was a hope to see a
13   purchase price in the range of 100 million. We made
14   an offer that was less than that, and we agreed
15   relatively quickly to the initial purchase price for
16   the totality of the property which again is a little
17   bit fuzzy but I think was in the range of that
18   $97 million level, largely based upon an FAR price
19   and an expected yield.
20       Q.  Could you explain to me what you mean by
21   the expected yield?

Page 33

1        A.  The totality whether one could receive a
2    10 FAR or something less than a 10 FAR on that site.
3        Q.  The yield then I'm sorry means --
4        A.  Gross square footage buildable.
5        Q.  What was the FAR price that you had in
6    mind at that time?
7        A.  It was roughly $70 a square foot. We were
8    talking about gross dollars divisible by a 10 FAR
9    yield which got us to a FAR value. So the
10   discussion focused on the gross dollar amount.
11       Q.  Now, up to this point, and the point I'm
12   talking about is when you've made this offer in
13   writing.
14           Up to this point had you been involved in
15   any internal analysis of the FAR that was yieldable
16   at that property?
17       A.  Not at that time, no.
18       Q.  How did you come to believe then that a 10
19   FAR was possible on that property when you made the
20   offer?
21       A.  Simply based upon our experience in the

Case 1:06-cv-00344-HHK   Document 25-9   Filed 03/29/2007   Page 7 of 9

Daniel Hudson                         March 9, 2007    Montgomery Road V Viad Corp, et al.

Page 34

1  District and what the District will allow, and we
2  basically took a 10 FAR times the size of the site
3  to get an expected yield. So it's a figurative
4  goal.
5      Q. Were you aware at that time that the
6  property was in a so-called receiving zone?
7      A. Sure, yes.
8      Q. And had you had prior experience with --
9      A. Absolutely.
10     Q. Tell me what your experience had been
11 with -- let me complete the sentence, as an example
12 of how the record is going to get screwed up if we
13 talk over each other. I'm trying to be clear. I'm
14 taking a little bit longer.
15     A. Yes.
16     Q. The receiving zone refers to a concept
17 under District of Columbia law for transferable
18 development rights.
19        Do you understand that?
20     A. I do.
21     Q. And there's also a concept called the

Page 35

1  sending zone.
2        Do you understand that?
3      A. Yes.
4      Q. So this property, these two lots are
5  actually in a receiving zone in NOMA.
6        Is that a correct statement as you
7  understand it?
8      A. Yes.
9      Q. Now, what is your prior experience dealing
10 with these receiving zones and TDRs in the District
11 of Columbia?
12     A. We have obviously worked on other
13 properties where TDRs are a common tool. There's no
14 mystery about them. It's a means to the take the
15 density on a site up to a large number.
16     Q. Have you been involved in purchasing TDRs?
17     A. This is my first purchase of TDRs,
18 although our firm has done -- purchased TDRs
19 numerous times. We're actually an owner of idol
20 TDRs presently that we'd love to sell if you're
21 interested.

Page 36

1      Q. What are you asking for it?
2      A. The market moves. We're not selling them
3  right now because I think the market is too low, but
4  it's a common tool. No mystery about TDRs.
5      Q. I wanted to return now, and I know you
6  said you don't remember all of the details, but do
7  you recall a specific response to your letter with a
8  $97 million offer?
9      A. No. Written response, no. I believe my
10 recollection is we moved very quickly towards a
11 draft of an agreement, purchase and sale agreement.
12     Q. Can you flush that out? What do you mean
13 by quickly?
14     A. That we had a verbal agreements as to the
15 total price and we instructed our lawyers to
16 commence work on a purchase and sale agreement.
17     Q. Who are your lawyers?
18     A. Rick Saas at Tenenbaum & Saas.
19     Q. Who in your company was responsible for
20 dealing with Mr. Saas?
21     A. I was. Myself and Kim Kepley.

Page 37

1      Q. And do you recall when it was that you
2  asked him to start work?
3      A. I do not.
4      Q. We can move through some other things
5  here. Do you recall when the contracts were
6  actually signed?
7      A. The exact day?
8      Q. Yes.
9      A. No, sir.
10     Q. Give me a timeframe.
11     A. Again, early fall.
12     Q. And I was --
13     A. We studied an anticipated close that took
14 us through the end of December, and that was
15 subsequently amended.
16     Q. And the closing took place in January of
17 '07?
18     A. 10th.
19     Q. January 10th of "07?
20     A. Yes.
21     Q. I thought I had with me the actual

Case 1:06-cv-00344-HHK   Document 25-9   Filed 03/29/2007   Page 8 of 9

Daniel Hudson                March 9, 2007   Montgomery Road V Viad Corp, et al.

Page 42

1   A.  I have no idea what that was about.
2   Q.  Was there a consideration of leasing
3   whatever you built on the land to GSA?
4   A.  Absolutely, and they're certainly were --
5   there was consideration by the seller previously to
6   lease what they intended to potentially build to the
7   GSA; but what he was speaking to right here I don't
8   have the background for that.
9   Q.  The same e-mail from Mr. Foster refers to
10  drafts of the second amendment to the land contracts
11  and drafts of first amendments to the TDR
12  agreements.
13      Do you see that?
14  A.  No.  Where are you referring to?
15  Q.  Mr. Foster's e-mail.
16  A.  Sure.  Okay.
17  Q.  I'm just trying to get a sense.  This is
18  in October of '06.
19      What was it that occasioned the need to
20  have amendments to the agreements at that time?
21  A.  If you flip forward on the page, and I

Page 43

1   could review this further and speak specifically
2   about it; but in broadbrush we had price adjustments
3   for two reasons.
4       One was the perceived environmental
5   contamination issues for which there was $1,500,000
6   offset, and the other was an adjustment based upon
7   the number of TDRs actually required to execute our
8   plan.  This was indoor study period.
9       We had done a number of layouts with our
10  architect and engineer to better track what the
11  achievable FAR on the site was, and while we had
12  originally agreed to purchase TDRs to fulfill the
13  maximum, the maximum was not attainable.
14      So the seller has profit in the land and
15  profit in the TDRs.  As the buyer I did not want to
16  purchase and have them purchase TDRs that were of no
17  use to me.
18      So there was an adjustment for -- and
19  again, recollection, 75 or $80,000 worth of TDRs
20  that we as the purchaser viewed we did not need.
21  Allowing the purchaser the profit on the TDRs was

Page 44

1   fine, but having them incur the cost of purchasing
2   them only for us to, in essence, reimburse them for
3   the cost to purchase them seemed like a waste of
4   money.  So that's where that second $400,000 ish
5   price adjustment came from.
6   Q.  When you said 75 to $80,000 worth of TDRs,
7   what do you mean by that?
8   A.  $75,000 square feet of TDRs.
9   Q.  I thought you said dollars.
10  A.  If I did I misspoke.
11      We believed that the theoretical density
12  of the site was 10 FAR which took us to that
13  1,390,000 square feet.  In our best hope we don't
14  think today we will realize and then we would
15  realize more than about a 1,300,000 square feet of
16  density.
17      So there was no point, for example -- and
18  I don't know what their cost of TDRs was; but if
19  their cost of TDRs was $20 an FAR, for example, or
20  $50 an FAR, I didn't want to reimburse them for a
21  cost that was just a sucker cost.

Page 45

1       I was happy to allow them the profit on
2   the TDRs they were purchasing that I didn't need
3   because that was part of our bargain.
4   Q.  You actually know that they didn't pay $50
5   a square foot for the TDRs, don't you?
6   A.  I think they did not.
7   Q.  In fact, in this e-mail on the second page
8   your lawyer, near the top there, is addressing a
9   question to you.  Do you see that where he says,
10  Dan-did I misunderstand that?
11      Do you see that?
12  A.  I do see that.
13  Q.  And the text of his message points out
14  that the profit piece, that's his word, quote,
15  profit piece, unquote, on the TDRs is 69 per foot
16  less the 5 per foot you would have paid to acquire
17  them.
18      Do you see that?
19  A.  I do see that.  That 5 per square foot is
20  not necessarily what they paid.  I believe, and I've
21  had the opportunity to buy them in the open market

12 (Pages 42 to 45)

Overnite Court Reporting   301-593-0671
Baltimore/Washington, D.C. Metro Area

Fax - 301-593-8353
www.DCcourtreporters.com

b700b22b-6149-4ac7-8662-4cb4bbaaebb3

Case 1:06-cv-00344-HHK   Document 25-9   Filed 03/29/2007   Page 9 of 9

Daniel Hudson                    March 9, 2007     Montgomery Road V Viad Corp, et al.

**Page 46**

1  in the past as cheaply as $5. I have no idea what
2  they paid for them. I don't think the current
3  market today is $5.
4     Q. You think it's less?
5     A. More.
6     Q. What?
7     A. I have no idea, 10, 12, 15 bucks.
8     Q. Why didn't you use TDRs that you had that
9  you owned, so-called idol TDRs that you referred to
10 earlier, rather than by any TDRs from Montgomery
11 Road.
12    A. I would like to have done that, but that
13 was not the bargain we made. The bargain we made
14 was we were buying achievable FAR from the seller
15 and however the seller got to that achievable FAR
16 procuring TDRs and selling them to us that was the
17 bargain.
18     The point in this e-mail is that he was
19 pointing out to me, you're paying $69 for something
20 that you, Dan, I could take my $5 TDRs and use them
21 for that. I haven't sold them at $5 a foot because

**Page 47**

1  I think they're going to be worth more than that in
2  the future, but that was the point.
3      I think it's implicit in his e-mail, Dan,
4  this is your bargain.
5     Q. What you had agreed to was to pay $69, or
6  whatever the number is?
7     A. Per FAR?
8     Q. Per FAR?
9     A. Correct.
10    Q. Regardless?
11    A. That's correct.
12    Q. Start over. A condition of your
13 purchasing the land was purchasing the TDRs at that
14 price; is that correct?
15    A. Everything was at the same FAR price,
16 correct; 90 K, 45 L, TDR, XYZ, yes, sir.
17    Q. The reduction in the price to reflect the
18 downward adjustment in the the TDRs that you could
19 use is the 400,000 referred to in this e-mail,
20 correct?
21    A. That's right.

**Page 48**

1      (Whereupon the proffered item was
2    marked as exhibit number 5.)
3  BY MR. PAGE:
4     Q. I'm going to show on you what we've marked
5  as Exhibit Number 5, Mr. Hudson?
6     A. (Witness reviewing document.)
7     Q. Do you recognize the e-mail thread on
8  Exhibit 5?
9     A. Give me a minute.
10    Q. Take a minute and review it?
11    A. It looks familiar. Yes.
12    Q. In the e-mails there is reference to an
13 assignment of the TDRs?
14     MR. COOTER: Which e-mail are you
15 talking about?
16     MR. PAGE: The second page again.
17 BY MR. PAGE:
18    Q. An e-mail that originally it appears that
19 you were not copied on but it came to you later.
20 There are two things in here I want to ask you
21 about.

**Page 49**

1      The first is the there's a reference to
2  the recital that MRLP has assigned its rights with
3  respect to the to be acquired TDRs immediately after
4  closing on the existing TDRs to Montgomery Road TDR,
5  LLC.
6      Do you see that?
7     A. I do not. Which line are you on?
8     Q. It's actually the first sentence of
9  Mr. Shapiro's e-mail after the number one.
10
11    A. Okay.
12    Q. Do you recall any discussion that you were
13 involved in concerning that assignment?
14    A. This was two days prior to closing?
15    Q. Yes.
16    A. And there were a number of moving pieces
17 at that time as it related to the obligations of the
18 purchaser and the ability for the seller to rely on
19 the purchaser to close under those future TDRs two
20 years hence.
21     I think this was one of many e-mails in a

13 (Pages 46 to 49)

Overnite Court Reporting   301-593-0671
Baltimore/Washington, D.C. Metro Area

Fax - 301-593-8353
www.DCcourtreporters.com

b700b22b-6149-4ac7-8662-4cb4bbaaebb3