# EXHIBIT 9

*Copy*

# CASH PARTICIPATION AGREEMENT

### by and between

### MONTGOMERY ROAD I LIMITED PARTNERSHIP

### and

## TRANSPORTATION LEASING CO., a
### California corporation

Executed ~~Dated~~ _____November 30_____, 1987, by TLC

EXECUTED December 9, 1987, by Developer

DEP. E. FIORUCCI
(11/7/06)

EXH. # 5

VD-000484

# TABLE OF CONTENTS

## ARTICLE 1

### DEFINITIONS

| | | Page |
|---|---|---|
| 1.1 | General | 1 |
| 1.2 | Affiliate | 1 |
| 1.3 | Agreed Value | 1 |
| 1.4 | Agreement | 1 |
| 1.5 | Appreciation Cash Flow | 2 |
| 1.6 | Appreciation Cash Payment | 2 |
| 1.7 | Approved Deductions | 2 |
| 1.8 | Closing Costs | 2 |
| 1.9 | Control | 2 |
| 1.10 | Default | 2 |
| 1.11 | Developer | 2 |
| 1.12 | Developer's Equity Return | 2 |
| 1.13 | Developer's Invested Equity | 2 |
| 1.14 | Developer's Operating Equity | 2 |
| 1.15 | Encumbered Sale of the Property | 2 |
| 1.16 | Estoppel Certificate | 2 |
| 1.17 | Equity Holders | 2 |
| 1.18 | Expenses | 3 |
| 1.19 | Fiscal Year | 3 |
| 1.20 | Gross Revenues | 3 |
| 1.21 | Improvements | 3 |
| 1.22 | Ineligible Deductions | 3 |
| 1.23 | Junior Financing | 3 |
| 1.24 | Leases | 3 |
| 1.25 | Mortgage | 3 |
| 1.26 | Operations Cash Flow | 3 |
| 1.27 | Operations Cash Payment | 3 |
| 1.28 | Participating Percentage | 3 |
| 1.29 | Permitted Debt | 4 |
| 1.30 | Person | 4 |
| 1.31 | Prime Rate | 4 |
| 1.32 | Property | 4 |
| 1.33 | Proposed Contract | 4 |
| 1.34 | Purchase Agreement | 4 |
| 1.35 | Real Property | 4 |
| 1.36 | Recovery | 4 |
| 1.37 | Refinancing | 4 |
| 1.38 | Sale of the Property | 4 |
| 1.39 | Senior Mortgage | 4 |
| 1.40 | Subordination Agreement | 4 |
| 1.41 | TLC | 5 |
| 1.42 | TLC Mortgage | 5 |
| 1.43 | Transfer | 5 |

VD-000485

Page

## ARTICLE 2

### OPERATIONS CASH FLOW

| | | |
|---|---|---|
| 2.1 | General | 5 |
| 2.2 | Definition of Gross Revenues | 5 |
| 2.3 | Definition of Expenses | 6 |
| 2.4 | Time for Operations Cash Payment | 8 |
| 2.5 | Status Reports | 8 |
| 2.6 | Fiscal Year Statements | 8 |
| 2.7 | Disputes Concerning Fiscal Year Statements | 9 |
| 2.8 | Developer's Books and Records | 9 |

## ARTICLE 3

### APPRECIATION CASH FLOW

| | | |
|---|---|---|
| 3.1 | General | 9 |
| 3.2 | Events Triggering Payment of Appreciation Cash Payment | 10 |
| 3.3 | Definition of Agreed Value | 11 |
| 3.4 | Definition of Approved Deductions | 12 |
| 3.5 | Definition of Closing Costs | 13 |
| 3.6 | Definitions of Developer's Equity | 14 |
| 3.7 | Definition of Ineligible Deductions | 15 |
| 3.8 | Determination of Fair Market Value | 15 |
| 3.9 | Statements, Books and Records | 16 |
| 3.10 | No Deduction for Negative Appreciation Cash Flow | 16 |
| 3.11 | Disputes Concerning Appreciation Cash Payment | 16 |
| 3.12 | No Duplication | 17 |

## ARTICLE 4

### RESTRICTION ON TRANSFERS

| | | |
|---|---|---|
| 4.1 | Right of First Refusal | 17 |
| 4.2 | Transfers to Affiliates of Developers | 18 |
| 4.3 | Other Transfers | 18 |

## ARTICLE 5

### SECURITY FOR AGREEMENT

| | | |
|---|---|---|
| 5.1 | TLC Mortgage | 18 |
| 5.2 | Subordination of TLC Mortgage | 19 |

VD-000486

Page

## ARTICLE 6

### RELATIONSHIP OF PARTIES

6.1   Creditor Relationship ...................................... 19
6.2   Indemnification .......................................... 19

## ARTICLE 7

### MISCELLANEOUS

7.1    Notices ................................................. 20
7.2    Security ................................................ 20
7.3    Default ................................................. 20
7.4    Attorney's Fees ......................................... 21
7.5    Payments ............................................... 21
7.6    No Waiver .............................................. 21
7.7    Severability ............................................ 21
7.8    Successors and Assigns .................................. 21
7.9    Amendments ............................................ 21
7.10   Controlling Law ......................................... 21
7.11   Titles Not To Affect Interpretation ....................... 21
7.12   Gender ................................................. 21
7.13   Merger ................................................. 21
7.14   Time of the Essence ..................................... 22

VD-000487

## CASH PARTICIPATION AGREEMENT

This CASH PARTICIPATION AGREEMENT (the "Agreement") is ~~made as~~ executed ~~of~~ the 30 day of November 1987 by and between MONTGOMERY ROAD I LIMITED PARTNERSHIP ("Developer") and TRANSPORTATION LEASING CO., a California ~~corporation ("TLC").~~ and made December 9, 1987, by Developer.

### RECITALS

A.    The Developer and TLC have entered into an Agreement dated October 9, 1987 (the "Purchase Agreement") in which Developer has agreed to purchase from TLC that certain real property located at First and K Streets, N.E. in the District of Columbia and further described as Lot 432 in Square 674, which the Developer intends to develop, own and operate as commercial rental property.

B.    As partial consideration for entering into the Purchase Agreement, and to induce TLC to execute and deliver the Purchase Agreement, Developer and TLC will enter into this Agreement setting forth the terms and conditions under which TLC will participate in the cash flow hereafter generated from the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing thereof.

### AGREEMENT

In consideration of the recitals mutual promises and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

### ARTICLE 1

### DEFINITIONS

1.1    **General.**  As used in this Agreement, certain terms shall have the meanings described in this Article 1.

1.2    **"Affiliate"** shall mean any Person directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under Control with the Person in question, which, in the case of a Person which is a partnership, shall include each of the constituent partners thereof.

1.3    **"Agreed Value"** shall be defined as set forth in Section 3.3 hereof.

1.4    **"Agreement"** shall mean this Cash Participation Agreement, as may be amended from time to time.

VD-000488

1.5    "**Appreciation Cash Flow**" shall have the meaning as set forth in Section 3.1 hereof.

1.6    "**Appreciation Cash Payment**" shall be an amount equal to Participating Percentage multiplied by the Appreciation Cash Flow.

1.7    "**Approved Deductions**" shall have the meanings as set forth in Section 3.4 hereof.

1.8    "**Closing Costs**" shall have the meanings as set forth in Section 3.5 hereof.

1.9    "**Control**" shall mean with respect to a Person that is a corporation, the right to exercise, directly or indirectly, more than ten percent (10%) of the voting rights attributable to the shares of the corporation and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person.

1.10    "**Default**" shall have the meaning as set forth in Section 3.2(d) hereof.

1.11    "**Developer**" shall mean <u>MONTGOMERY ROAD I LIMITED</u> PARTNERSHIP

1.12    "**Developer's Equity Return**" shall have the meaning as set forth in Section 3.6 hereof.

1.13    "**Developer's Invested Equity**" shall have the meaning as set forth in Section 3.6 hereof.

1.14    "**Developer's Operating Equity**" shall have the meaning as set forth in Section 3.6 hereof.

1.15    "**Encumbered Sale of the Property**" shall have the meaning as set forth in Section 3.2(f).

1.16    "**Estoppel Certificate**" shall mean a certificate signed by an officer or designated representative of TLC to the effect that (i) TLC holds all right, title and interest in and to the TLC Mortgage and the obligations secured thereby, (ii) the Agreement has not been modified or superseded or, if the Agreement has been modified or superseded, a description of the documents evidencing such changes, and (iii) to the actual knowledge of the officer or representative executing that certificate after due inquiry and investigation, the Developer is not in default of its obligations under the Agreement, or if that officer or representative has knowledge of a default, the nature of that default known to that officer or representative.    The Estoppel Certificate shall also contain such other matters as the holder of the Senior Mortgage reasonably requests.

1.17    "**Equity Holders**" shall mean (i) if the Developer is a corporation, each and every shareholder of that corporation and (ii) if the Developer is a partnership, each and every partner of that partnership; provided, however, that an "Equity

VD-000489

Holder" shall not include a partner or shareholder of Developer if the admission of that partner or shareholder caused a reduction in the Participating Percentage; further provided that "Equity Holder" shall include the partners or shareholders of an Affiliate of Developer if the Property has been transferred, in whole or in part, to that Affiliate pursuant to the provisions of Section 4.2 hereof.

1.18    "**Expenses**" shall have the meaning as set forth in Section 2.3 hereof.

1.19    "**Fiscal Year**" shall mean that period from January 1 to December 31 .

1.20    "**Gross Revenues**" shall have the meaning as set forth in Section 2.2 hereof.

1.21    "**Improvements**" shall mean all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the Real Property.

1.22    "**Ineligible Deductions**" shall have the meaning as set forth in Section 3.7 hereof.

1.23    "**Junior Financing**" shall have the meaning as set forth in Section 3.2(e) hereof.

1.24    "**Leases**" shall mean all leases, rental agreements and occupancy agreements, and all amendments thereto and extensions and renewals thereof covering all or any portion of the Real Property or Improvements.

1.25    "**Mortgage**"  shall mean a mortgage, deed of trust, security agreement or other similar instrument which constitutes a lien on all or any part of the Property as security for the payment or performance of indebtedness or other obligations.

1.26    "**Operations Cash Flow**" shall mean all Gross Revenues of the Property for a Fiscal Year minus all Expenses of the Property for that Fiscal Year.

1.27    "**Operations Cash Payment**" shall be an amount equal to the Participating Percentage multiplied by the Operations Cash Flow.

1.28    "**Participating Percentage**" shall mean fifteen percent (15%); provided, however, that if (a) Developer, pursuant to arm's length negotiations, transfers an equity interest in the Property to a holder of a Senior Mortgage or to a lessee under a Lease or admits as a partner or shareholder of Developer a holder of a Senior Mortgage or a lessee under a Lease or an Affiliate of such holder or lessee, (b) such transfer is made in partial consideration of the Senior Mortgage or Lease, as the case may be, and (c) such holder or lessee is not an Affiliate of Developer, then TLC agrees that the Participating Percentage shall be reduced by .015 for each percentage point of dilution incurred by the Developer or Equity Holders, as the case may be, with respect to its or their ownership in the Property; further provided, however, that in no event

VD-000490

shall the Participating Percentage be less than seven and one-half percent (7½%). As a condition to the reduction of the Participating Percentage, Developer shall demonstrate to TLC's reasonable, good faith satisfaction that no extraordinary benefit will be received disproportionally by Developer or an Affiliate of Developer that would result in a distortion of the proportionate economic dilution contemplated.

1.29    **"Permitted Debt"** shall have the meaning as set forth in Section 2.3(b) hereof.

1.30    **"Person"** shall mean an individual, partnership, corporation, trust, unincorporated association, or other entity or association.

1.31    **"Prime Rate"** shall mean the rate of interest quoted by American Security Bank, N.A., Washington, D.C. from time to time as its "prime rate," or, if no such rate is announced by that bank, or if that bank shall cease to do business or engage in business as a commercial bank, then the rate of interest quoted from time to time by any other bank acceptable to TLC as that bank's "prime rate."

1.32    **"Property"** shall mean the Improvements and the Real Property.

1.33    **"Proposed Contract"** shall have the meaning as set forth in Section 4.1(a) hereof.

1.34    **"Purchase Agreement"** shall mean that Agreement between Developer and TLC pursuant to which Developer agreed to purchase and TLC agreed to sell and convey the Real Property.

1.35    **"Real Property"** shall mean that certain land, more fully described in Exhibit "A" made a part of this Agreement by reference hereto.

1.36    **"Recovery"** shall have meaning as set forth in Section 3.2(c) hereof.

1.37    **"Refinancing"** shall have the meaning as set forth in Section 3.2(b) hereof.

1.38    **"Sale of the Property"** shall have the meaning as set forth in Section 3.2(a) hereof.

1.39    **"Senior Mortgage"** shall mean any and all mortgages, deeds of trust, security agreements or other similar agreements which constitute liens on the Property and are senior in priority to the TLC Mortgage, and which constitute security for loan(s) made to the Developer solely for the purpose of financing or refinancing (a) a portion of the purchase price payable to TLC for the Real Property and reasonable closing costs in connection with the purchase of the Real Property, (b) development and construction of the Property, (c) deficits incurred in operation of the Property and (d) distributions to Equity Holders.

1.40    **"Subordination Agreement"** shall mean an agreement by which TLC agrees that the lien of the TLC Mortgage is subordinated and junior in priority to another Mortgage.

VD-000491

1.41  "TLC" shall mean Transportation Leasing Co., a California corporation, its successors and assigns.

1.42  "TLC Mortgage" shall mean the mortgage, deed of trust, security agreement or other similar instrument executed and delivered by the Developer as security for the performance of the Developer's covenants and obligations under this Agreement.

1.43  "Transfer" shall mean to sell, assign, convey, transfer, give, donate, pledge, mortgage, grant a security interest in, deposit, alienate, bequeath, devise or otherwise dispose of or encumber to any Person.

## ARTICLE 2

## OPERATIONS CASH FLOW

2.1  General  As consideration for entering into the Purchase Agreement, and as a material inducement for TLC's execution and delivery thereof, Developer shall pay or cause to be paid to TLC, in lawful money of the United States of America at the times herein specified, the Operations Cash Payment. The Operations Cash Payment shall be payable for so long as Developer or an Affiliate of the Developer owns all or a portion of the Property; provided, however, that no Operations Cash Payment shall be payable for any Fiscal Year beginning after October 15, 2086.

2.2.  Definition of Gross Revenues.

(a)  General.  For purposes of this Agreement, the term "Gross Revenues" shall mean all gross income, rentals, revenues and consideration, of whatever form or nature, received by or paid to or for the account or benefit of Developer, or any Affiliate of Developer, from any and all sources, resulting from or attributable to the ownership, operation, leasing and occupancy of the Property, determined on the basis of sound cash basis accounting practices applied on a consistent basis, including but not limited to any and all of the following (but without duplication of any item): (1) gross, fixed, minimum and guaranteed rentals payable by or for the benefit of tenants of the Property under Leases; (2) overage, additional, participation, percentage and similar rentals payable by lessees under Leases; (3) amounts payable by or for the benefit of tenants pursuant to escalation provisions in Leases or on account of maintenance or service charges, taxes, assessments, utilities, air conditioning and heating, and other administrative, management, operating, leasing and maintenance expenses for the Property; (4) late charges and interest or other penalties or premiums payable on rentals; (5) amounts payable as a result of provisions in Leases permitting the lessor thereunder to receive or share in receipts from the subleasing of space or assignment of such Leases; (6) rents and receipts from licenses, concessions, vending machines and similar items; (7) parking fees and rentals; (8) other fees, charges and payments not denominated as rental but payable for or in connection with the rental of office, retail, storage, parking or other space in the Property; (9) payments made as consideration in whole or in part for the cancellation, modification, extension or renewal of Leases; (10) proceeds of any rental or business interruption or other similar insurance; and (11) any payments by or for the benefit of tenants or third parties

-5-

VD-000492

which are attributable to or paid in reimbursement of the costs of construction or installation of tenant improvements or fixtures in leased space within the Improvements, including payments received on account of the costs of any financing of such tenant improvements provided by Developer, or any Affiliate of Developer.

(b)    **Noncash Consideration.**  Any noncash consideration received for or on account of any of the items listed in Section 2.2(a) hereof for the purposes hereof, shall be treated as received and included in Gross Revenues when that noncash consideration is converted into cash or cash equivalents or is used to satisfy an obligation of Developer or an Affiliate of Developer.  Any interest earned on such noncash consideration shall also be included in Gross Revenues.

(c)    **Leases with Affiliates.**  With respect to any lease as to which Developer or an Affiliate of Developer is the lessee, including any lease as to which the leased premises thereunder have been sublet, or any lease as to which Developer or an Affiliate of Developer has been lessee but which has been assigned to a third-party lessee, then any rental or other consideration derived from such sublease or assignment in excess of the rental payable to Developer in connection with such space shall be included within Gross Revenues in addition to all rental payable under such Lease.

(d)    **Exclusions From Gross Revenues.**  Notwithstanding the provisions of Sections 2.2(a), (b) and (c) hereof, there shall be excluded from Gross Revenues: (1) any security or other deposits of lessees unless and until they are actually applied to rental owed; (2) the proceeds of any financing or refinancing with respect to all or any part of the Property; (3) the proceeds of any sale or other disposition of all or any portion of the Property; (4) proceeds of condemnation or private conveyance in lieu thereof; (5) proceeds of insurance arising out of a casualty except to the extent of proceeds which are distributable to Equity Holders unless those proceeds that are available for distribution to Equity Holders are included as a Recovery (as defined in Section 3.2(c)(5) of this Agreement); and (6) all income, rentals, revenues and consideration received by the Developer or an Affiliate with respect to the Real Property but prior to the occupancy by the first tenant in the Improvements; provided, however, that if any such income, rentals, revenues and considerations received prior to such occupancy exceeds Nine Hundred Thousand Dollars ($900,000) in any one Fiscal Year, then all income, rentals, revenues and consideration received in that Fiscal Year which would have been Gross Revenues (but for this Section 2.2(d)(6)) shall not be excluded under this Section 2.2(d).

(e)    **No Duplication of Any Item of Gross Revenues.**  Any funds received by the Developer, its agents or employees, or an Affiliate of Developer and included as items of Gross Revenue, which are then paid to either the Developer, its agents or employees, or an Affiliate of the Developer shall not be included in Gross Revenues such as to result in a duplication of those items.

2.3    **Definition of Expenses.**

(a)    **General.**  For purposes of this Agreement, the term "Expenses" shall mean all reasonable expenses actually incurred by Developer with respect to the ownership, operation, leasing and occupancy of the Property, deter-

-6-

mined on the basis of sound cash basis accounting practices applied on a consistent basis, including but not limited to any and all of the following (but without duplication of any item): (1) general real estate taxes; (2) special governmental assessments or similar charges; (3) personal property taxes; (4) sales taxes; (5) costs of utilities, air conditioning and heating for the Property; (6) maintenance and repair costs of a non-capital nature; (7) operating and reasonable and customary management expenses and fees; (8) premiums payable for insurance carried on or with respect to the Property; (9) interest and principle payable on Permitted Debt, as well as any fees and charges related thereto; (10) costs, including leasing commissions, advertising and promotion costs, to obtain new Leases or to extend or renew existing Leases, and the costs of work performed to ready tenant space in the Property for new or renewal occupancy under Leases, provided that such costs are amortized over the primary term of the Lease; (11) accounting and audit fees and costs, attorneys' fees, and other administrative and general expenses and disbursements, in each case reasonably incurred by Developer in connection with the operation and management of the Property; (12) development fees paid to Developer or its Affiliates, provided that the total amount of such fees do not exceed five percent (5%) of the construction costs (which shall include hard costs only) of the Improvements; (13) amounts required to be paid by the Developer pursuant to Section 6 of the Purchase Agreement; (14) any portion of Gross Revenues approved by TLC which is deposited during the period in respect of which Expenses are being determined in a reserve account for future maintenance and repair costs of the Property (but excluding any reserves for replacements or improvements of a capital nature); and (15) amounts paid to Equity Holders in payment of (i) Developer's Operating Equity and (ii) Developer's Equity Return.

(b)   **Permitted Debt.** For purposes hereof, "Permitted Debt" shall mean (i) any debt secured by a Senior Mortgage and (ii) that portion of any debt incurred by Equity Holders, whether secured or unsecured, the proceeds of which are applied solely to fund all or part of (1) the purchase price of the Real Property, (2) predevelopment, development, construction costs (but excluding any costs representing Approved Deductions or Ineligible Deductions) with respect to the Property or (3) deficits incurred in the operation of the Property. If Permitted Debt is held by any Affiliate of Developer, interest paid thereon shall be included as an expense only to the extent that it does not exceed the amount of interest that would have been payable on an equivalent loan from an unrelated bank, savings and loan association, insurance company or other financial institution engaged in the business of making real estate construction loans, if such loan had been made on terms generally available in the District of Columbia area at the time such debt was incurred.

(c)   **Exclusion From Expenses.** Notwithstanding the provisions of Sections 2.3(a) and (b) hereof, the following shall be excluded from Expenses: (1) foreign, U.S., state and local income taxes, franchise taxes or other taxes based on income; (2) depreciation, amortization and any other noncash deduction of Developer for income tax purposes; (3) payments made in respect of principal or interest on or charges related to any loan of Developer, except as to principal and interest on any Permitted Debt; (4) any expenses listed in Sections 2.3(a) and (b) hereof that are paid to Persons which exceed reasonable and necessary amounts of fees which would be payable to unrelated third parties in arms' length transactions for similar services in the District of Columbia area; (5) any expenses paid out of any reserve account to the

VD-000494

extent that the amounts in such reserve account have already been included within Expenses pursuant to Section 2.3(a)(12) hereof, and (6) any Operations Cash Flow or Appreciation Cash Flow which has been paid to TLC. Management fees of three percent (3%) of "gross rent" received and leasing fees of four and one-half percent (4½%) of "gross rent" payable under any Lease, whether paid or accrued, shall be reasonable and necessary amounts of fees which would be payable to unrelated third parties in arms length transactions for similar services in the District of Columbia area, provided that any such leasing fees are paid for actual work performed and are only paid for no more than the first ten (10) years of the lease to which they pertain. For purposes of this Section 2.3(c), "gross rent" includes fixed, minimum and guaranteed rentals payable by or for the benefit of tenants of the Property under Leases and overage or percentage rentals payable by lessees under Leases, excluding, however, any amounts representing payments for taxes; insurance premiums; operating expenses, utilities, and other landlord services; sales or transaction privilege or franchise taxes or other similar items; and any amounts representing "free-rent" or other rental concessions or reimbursement for tenant improvements, fixtures or other similar items.

2.4    **Time for Operations Cash Payment.** Operations Cash Flow shall be computed by Developer on an annual basis. Developer shall pay to TLC within ninety (90) days after the end of each Fiscal Year the full amount of the Operations Cash Payment, if any, for the preceding Fiscal Year. With each Operations Cash Payment, and in any case within ninety (90) days after the end of each such Fiscal Year, Developer shall furnish to TLC a statement which shall show, among other things, the name of each lessee, sublessee and tenant of the Property, the commencement date of the term of the Lease and the sublease (if any) and the space occupied by such lessee, sublessee or tenant and the Gross Revenues, Expenses, Operations Cash Flow, and Operation Cash Payment for such Fiscal Year.

2.5    **Status Reports.** As soon as available, but no later than thirty (30) days after the close of each quarter in the Fiscal Year, until not less than ninety percent (90%) of the total leaseable area of the Improvements are fully leased and thereafter no later than thirty (30) days after the close of each Fiscal Year of Developer, Developer shall furnish to TLC a report certifying as to the status of the leasing of space in the Improvements, including (i) information on the amount of space covered by letters of intent, (ii) Leases out for execution and fully executed Leases, (iii) the rental under each Lease (including base rent, percentage rents and other consideration payable by the lessee), (iv) the term of each Lease, and of any options to renew or extend, and (v) an abstract of any rights or obligations which vary from the standard form of lease.

2.6    **Fiscal Year Statements.** Within one hundred twenty (120) days after the end of each Fiscal Year, Developer shall furnish to TLC, in addition to the statements described in Section 2.4 and 2.5 hereof, financial statements and schedules, including a balance sheet and statement of operations for the Property for such Fiscal Year, prepared in accordance with generally accepted accounting principles applied on a basis consistent with past practices and bearing the unqualified opinion of a firm of independent certified public accountants satisfactory to TLC, covering the operations of the Property and including all items necessary to calculate the Operations Cash Flow for such Fiscal Year on the cash basis provided for herein.

VD-000495

2.7    **Disputes Concerning Fiscal Year Statements.** TLC may notify Developer within ninety (90) days after receipt of any of the statements referenced in Sections 2.4, 2.5 or 2.6 that TLC disputes any computation or item contained in any portion of such statement. In the event TLC so notifies Developer, the parties shall meet in good faith to resolve such disputed items for a period not greater than sixty (60) days. If the parties are unable to resolve such disputed items between themselves during such sixty-day period, the items shall be submitted to arbitration which arbitration shall be performed by an independent certified public accountant selected by TLC and reasonably satisfactory to Developer, whose determination shall be final. The fees of such accountant, as well as any arbitration fees incurred in connection with the dispute, shall be paid by TLC unless such review shall indicate that the computation resulted in an error, in favor of Developer, in the Operations Cash Payment of an amount more than three percent (3%) of the amount actually owing to TLC for such Fiscal Year, in which case Developer shall pay all such fees. If the variance is three percent (3%) or less of the payment actually owing to TLC, Developer shall pay the additional amount due to TLC within ten (10) days after the resolution of any dispute, together with interest thereon from the date such payment was due at a rate equal to the Prime Rate. If the variance is greater than three percent (3%) of the amount actually owing to TLC, Developer shall pay any additional amount due to TLC within ten (10) days after the resolution of any dispute, together with interest thereon from the date such payment was due at a rate equal to five percentage points in excess of the Prime Rate.

2.8    **Developer's Books and Records.** Developer shall keep and maintain at all times full and accurate books of account and records adequate to correctly reflect Gross Revenues and Expenses of the Property and all such books and records shall be kept by Developer at its office at 7717 Keisterstown Rd 20815, Baltimore, Maryland 20814 and shall be available for at least five (5) years after the end of the relevant Fiscal Year. TLC shall have the right to inspect, copy and audit such books of account and records at TLC' expense (except as otherwise provided in Section 2.7 hereof above) during reasonable business hours, whether such books and records are in the possession of Developer or any agent or custodian of Developer, for the purpose of verifying the accuracy of the payments made on account of Operations Cash Flow. All statements required under this Agreement shall be in addition to any other documents or financial or operating statements required by TLC from Developer pursuant to any other document or agreement entered into with respect to the Property.

## ARTICLE 3

## APPRECIATION CASH FLOW

3.1    **General.** In addition to the Operations Cash Payment, Developer shall pay to TLC, in lawful money of the United States at the time or times and in the manner hereinafter described, the Appreciation Cash Payment. As used herein, the term Appreciation Cash Flow shall mean (i) the Agreed Value of the Property or applicable portion thereof, (ii) reduced by the sum of the Approved Deductions related to the Property or applicable portion thereof and the Closing Costs and (iii) reduced by the amount, if any, of the then remaining Developer's Invested Equity and Developers Operating Equity; each determined as of the date(s) on which the Appreciation Cash

Payment shall be payable, provided that in no event shall the Appreciated Cash Payment be less than zero.

      **3.2    Events Triggering Payment of Appreciation Cash Payment.** An Appreciation Cash Payment shall be due and payable by Developer within three (3) business days after the occurrence of any one or more of the following events; provided, however, if a Sale of the Property or Sale of an Interest as to which the Agreed Value is determined under Section 3.3(a)(1) or 3.3(d)(1) below occurs, and if the gross proceeds used to determine that Agreed Value consist in whole or part of promissory notes or other instruments evidencing deferred payments of the purchase price, then the Appreciation Cash Payment shall be remitted to TLC in installments, each installment of which shall be equal to the Participating Percentage existing as of the date of the Sale of the Property or Sale of an Interest multiplied by the amount of the deferred payment (whether representing principal, interest or other sums) received by Developer or transferor Equity Holder(s), and each such installment of an Appreciation Cash Payment shall be due and payable to TLC within three (3) business days following the receipt by Developer or transferor Equity Holder(s) of the deferred payment as to which such installment to TLC is to be paid. Developer shall also deliver written notice to TLC of the expected occurrence of any of the following events, such notice to be given not less than thirty (30) days in advance of any occurrence referred to in subsections (a), (b), (e), (f) and (g) below:

      (a)    the sale, assignment, condemnation, conveyance or other disposition of all or any part of or interest in the Property by the Developer or an Affiliate of Developer, other than a sale, assignment, conveyance or other disposition to an Affiliate of Developer if TLC has approved that sale, assignment, conveyance or other disposition as provided in Article 4 hereof (hereinafter referred to as a "Sale of the Property");

      (b)    the refinancing of all or any part of the principal sum of any indebtedness secured by the Property or the placing of any Senior Mortgage on the Property (hereinafter referred to as a "Refinancing");

      (c)    the recovery of any damages or other compensation from any Person for or on account of any of the following with respect to the Property or any part thereof (such events are hereinafter collectively referred to as a "Recovery"):

      (1)    any loss, damage or injury;

      (2)    any failure of title or other defect or impairment of title;

      (3)    any loss of or restriction on use, operation or occupancy;

      (4)    any diminution in value; and

      (5)    (i) any recoveries under any property damage insurance policies other than rental or business interruption insurance, and (ii) any amounts received pursuant to any judgments or

-10-

awards made by any court, arbitrator or other authority, or pursuant to any Leases or other agreements relating to the Property, such as indemnities or other sums, other than judgments, awards, indemnities and sums relating to rent due from a tenant;

(d)   a default occurs under this Agreement (which default has been noticed and not been cured within the time period set forth in this Agreement), a Mortgage, the Purchase Agreement, or any other instrument or document relating to the Property, which is not fully cured within the time, if any, provided for cure herein or therein (hereinafter a "Default"), and TLC delivers written demand to Developer to pay the Appreciation Cash Payment.

(e)   any Mortgage is placed on the Property or any part thereof which is junior to the lien of the TLC Mortgage (hereinafter a "Junior Financing");

(f)   any sale, assignment, transfer, conveyance or other disposition of all or any part of an interest in the Property (excluding Leases for occupancy purposes only) which does not result in the payment of the principal of all indebtedness secured by the Property or a release or reconveyance of all Mortgages (such events are hereinafter collectively referred to as an "Encumbered Sale of the Property"); or

(g)   the Transfer, whether directly or indirectly, of twenty percent (20%) or more of the Equity Holders' interests in Developer within a twelve (12) month period, excluding (i) any pledge of such interest that is given by an Equity Holder to secure Permitted Debt, (ii) Transfers to an executor, administrator, conservator, guardian, or heir that occur as a result of the death or incapacity of an Equity Holder, (iii) Transfers that are made to members of the transferor Equity Holder's immediate family or are made to a trust in which the only beneficiaries are the transferor Equity Holder or members of the transferor Equity Holder's immediate family and (iv) Transfers that are made to other Equity Holders if the transferee Equity Holder (a) has been an Equity Holder for at least five (5) years, (b) was an Equity Holder on the date hereof or (c) acquired the interest in connection with the transferor's default under a capital call (hereinafter a "Sale of an Interest").

3.3   Definition of Agreed Value.

(a)   Sale of Property. In the event of a Sale of the Property or an Encumbered Sale of the Property, "Agreed Value" shall mean the greater of (1) the gross proceeds of whatever form or nature, including without limitation cash, the aggregate outstanding balance of indebtedness and other obligations secured by Mortgage(s) on the Property following such Sale or Encumbered Sale, and the cash equivalent of the fair market value of any "noncash consideration" received in lieu of cash, including the present value of any promissory note(s) received as part of the proceeds of such Sale or Encumbered Sale (such present value to be determined by an independent certified public accountant selected by Developer and reasonably satisfactory to TLC if Developer and TLC are unable to agree upon the present value within ten (10) days prior to the date of such Sale or Encumbered Sale), payable directly or indirectly to or for the benefit or account of the Developer, or any Affiliate of Developer, and including with respect to a condemnation or taking in eminent domain of any part of the Property or interest therein, or a conveyance in lieu thereof, the entire

VD-000498

condemnation award or compensation payable in connection with such taking or
conveyance (including without limitation any amounts attributable to the value of any
unexpired Lease which are otherwise payable to an Affiliate of Developer or a consti-
tuent partner of Developer), or (2) the fair market value of the Property or the portion
thereof or interest therein included in such Sale of the Property or Encumbered Sale
of the Property, determined pursuant to the procedures hereinafter described in
Section 3.8; provided, however, that if the amount as calculated pursuant to Section
3.3(a)(1) is greater than the amount calculated pursuant to Section 3.3(a)(2), then, for
purposes of this Agreement, the Agreed Value as calculated pursuant to Section
3.3(a)(1) shall be increased so that the full principal balance of any promissory notes
received as part of the proceeds of a Sale or Encumbered Sale of the Property, as well
as any interest or any other sums to be paid under those promissory notes, is included
in the calculation of Agreed Value.

      (b)    Default.  In the event of a Default, "Agreed Value" shall
mean the fair market value of the Property determined pursuant to the appraisal pro-
cedures hereinafter described.

      (c)    Recovery, Refinancing, Junior Financing. In the event of a
Recovery, Refinancing or Junior Financing, "Agreed Value" shall mean the gross pro-
ceeds of whatever form or nature received or realized by Developer or an Affiliate of
Developer, or the agent or employees of Developer or of an Affiliate of Developer,
from or in connection with such Recovery, Refinancing or Junior Financing.

      (d)    Sale of an Interest. In the event of a Sale of an Interest,
"Agreed Value" shall mean the greater of (1) the gross proceeds of whatever form or
nature received by all Equity Holders in consideration of any Transfers of their equity
interests in Developer occurring during the previous twelve (12) month period, includ-
ing, without limitation, cash, the cash equivalent of the fair market value of any and
all noncash consideration received in lieu of cash and the relief or assumption of any
indebtedness, or (2) the fair market value of all Equity Holders' interests that were
Transferred during the previous twelve (12) month period, with that fair market value
being determined pursuant to the procedures hereinafter described in Section 3.8;
provided, however, that if any proceeds received in consideration of a Transfer of an
Equity Holder's interest, or if the fair market value of an Equity Holder's interest, was
previously included in the calculation of Agreed Value within the last twelve months,
those proceeds or the fair market value of the interest shall not again be included in
the calculations of Agreed Value such as to result in a duplication.

      3.4    Definition of Approved Deductions.

      (a)    Sale of Property. In the event of a Sale of the Property, an
Encumbered Sale of the Property or a Default, "Approved Deductions" shall mean the
sum of (i) the aggregate outstanding principal balances of all Permitted Debt and
Junior Financing (excluding, however, the amount of any Ineligible Deductions with
respect to any financing) and (ii) the sum of the Appreciation Cash Flows calculated
with respect to previously occurring Sales of an Interest, if any.

      (b)    Recovery. In the event of a Recovery, "Approved Deduc-
tions" shall mean (i) the reasonable and actual costs of repairing or restoring the

VD-000499

damage to or destruction of the Property, excluding any Ineligible Deductions with respect thereto, and (ii) any amounts applied against the principal of a Mortgage as a result of the Recovery if that application is required by terms of that Mortgage.

(c) **Junior Financing, Refinancing.** In the event of a Junior Financing or a Refinancing, "Approved Deductions" shall mean the sum of (i) the actual costs of any capital improvements (excluding any Ineligible Deductions with respect thereto) made or to be made to the Property with the proceeds of the Refinancing or the Junior Financing, and all other proceeds of the Refinancing or the Junior Financing that are used to fund deficits incurred in the operation of the Property or are invested in the Property, or with respect to the Property, and are not distributed or distributable to the Equity Holders plus (ii) the then outstanding principal balance of any indebtedness secured by a Mortgage on the Property which is repaid with the proceeds of such Refinancing or Junior Financing (excluding any Ineligible Deductions with respect thereto).

(d) **Sale of an Interest.** In the event of a Sale of an Interest, "Approved Deductions" shall mean for each Equity Holder who has Transferred an equity interest in Developer and received proceeds included in Agreed Value pursuant to Section 3.3(d) the sum of (i) the share of the Developers' Invested Equity and Developers' Operating Equity attributable to that portion of the equity interest that was Transferred, (ii) the aggregate outstanding principal balance of any indebtedness that qualifies as Permitted Indebtedness under Section 2.3(b)(ii) hereof and which was assumed by the transferee Equity Holder, and (iii) the sum of the Appreciation Cash Flows calculated with respect to previous Transfers, if any, of that equity interest.

(e) **Allocation of Approved Deductions.** In the event a Sale of the Property or an Encumbered Sale of the Property is for a part of the Property, Approved Deductions shall be allocated to such portion of the Property. When Approved Deductions are not directly attributable to a particular portion of the Property, the Approved Deductions shall be determined and allocated on a fair and equitable basis to such portion of the Property.

3.5     **Definition of Closing Costs.**

(a)     **Sale of Property.** In the case of a Sale of the Property or Encumbered Sale of the Property, "Closing Costs" shall mean reasonable brokerage commissions payable as a result of the Sale or Encumbered Sale, which shall not in any event exceed three percent (3%) of the sales price unless the broker is a third party that is not an Affiliate of Developer, costs of title insurance reports and premiums, documentary stamp taxes, transfer taxes, surveys, appraisals, hazard waste reports and other studies, escrow fees and recording charges, settlement agent charges, reasonable attorneys' fees and costs, in each case actually paid or payable by Developer in connection with the Sale of the Property or Encumbered Sale of the Property, but excluding (i) any foreign, United States, state or local income taxes, franchise taxes or other taxes based on income, (ii) any penalty, premium or other charge payable to an Affiliate of Developer as a result of the prepayment of the principal balance of any indebtedness secured by a Mortgage on the Property prior to the maturity thereof.

VD-000500

-13-

(b)  **Default.** In the case of a Default, "Closing Costs" shall mean the fees and costs of the appraisers required to determine the fair market value of the Property as provided herein.

(c)  **Recovery.** In the event of a Recovery, "Closing Costs" shall mean all reasonable and actual costs incurred by Developer in obtaining such Recovery, including without limitation court costs and reasonable attorneys' fees and costs.

(d)  **Junior Financing, Refinancing.** In the event of a Junior Financing or Refinancing, "Closing Costs" shall mean the reasonable and necessary costs of consummating the Junior Financing or Refinancing, including without limitation reasonable attorneys fees and costs, title insurance premiums, documentary stamp taxes, transfer taxes, surveys, appraisals, hazard waste reports and other studies, escrow fees and recording charges, settlement agent charges, points, commitment fees and other fees payable to the lender to the extent that such fees are customarily charged by said lender in the usual and ordinary course of business.

(e)  **Sale of an Interest.** In the event of a Sale of an Interest, "Closing Costs" shall mean the reasonable and actual costs incurred by the transferor of the equity interest in Developer, including, without limitation, reasonable attorneys' fees and costs.

3.6  **Definitions of Developer's Equity.**

(a)  **Developer's Invested Equity.** For purposes of this Agreement, the term "Developer's Invested Equity" shall mean at any time those amounts actually advanced to the Developer by the Equity Holders (other than amounts that are treated as Permitted Debt), which advances are used by Developer to pay (i) that portion of the Real Property's purchase price paid by Developer which is not represented by promissory notes or other evidences of indebtedness secured by a Mortgage on the Property, and (ii) predevelopment, development and construction expenses actually incurred by Developer that are not financed by borrowings secured by a Mortgage on the Property, but excluding (1) any Ineligible Deductions paid by Developer and (2) any costs included as Approved Deductions in any calculation of Appreciation Cash Flow.

(b)  **Developer's Operating Equity.** For purposes of this Agreement, the term "Developer's Operating Equity" shall mean at any time those amounts actually advanced to the Developer by the Equity Holders (other than amounts that are treated as Permitted Debt), which advances are used by the Developer for the operation of the Property, including, without limitation, interest and principal on Mortgages and operating expenses that are not financed by borrowings secured by a Mortgage on the Property, but excluding any Ineligible Deductions with respect thereto and any costs included as Approved Deductions in any calculation of Appreciation Cash Flow.

(c)  **Developer's Equity Return.** For purposes of this Agreement, the term "Developer's Equity Return" shall mean the unpaid sum total of each and every "Daily Equity Return." For purposes of this Section 3.06(c), a "Daily Equity

-14-

VD-000501

"Return" shall be computed for each day and shall be equal to the product of (i) the annual Prime Rate on such day divided by 365 and (ii) the sum of Developer's Invested Equity and Developer's Operating Equity on such day.

(d)    **Application of Payments by Developer.**    Payments by the Developer to the Equity Holders that constitute return of capital, or dividends or income with respect to that capital, other than payments that constitute payments on Permitted Debt, shall first be applied to reduce the Developer's Equity Return, shall then be applied to reduce the Developer's Operating Equity, and shall finally be applied to reduce the Developer's Invested Equity.

3.7    **Definition of Ineligible Deductions.**    As used herein, the term "Ineligible Deductions" shall mean:

(a)    with respect to costs incurred on account of capital improvements to the Property or for repair, restoration or replacement following any damage, destruction or loss, the sum of (1) the amounts, if any, reimbursed by any lessee, sublessee or tenant of the Property or any other Person, plus (2) the portion of such costs, if any, which are paid or payable to or for the account or benefit of any Affiliate of Developer and which are in excess of the costs which would be payable for the same or equivalent work, materials or services in an arms' length transaction between unrelated parties in the District of Columbia area; and

(b)    with respect to any Refinancing or Junior Financing, the amount of any Ineligible Deductions determined under clause (a) above with respect to any capital improvements, repairs, restoration or replacement paid for with the proceeds of a Junior Financing or Refinancing.

3.8    **Determination of Fair Market Value.**    At any time when it shall be necessary to determine fair market value of all or any portion of the Property or of an Equity Holder's interest pursuant to this Agreement, Developer and TLC may by written agreement determine that fair market value; provided, however, that if TLC and Developer are unwilling or unable to make such a determination within thirty (30) days after TLC shall have received notice of the occurrence of any event requiring the determination of fair market value, then the fair market value shall be determined by appraisers in accordance with the procedures hereinafter described. TLC and Developer shall each select an appraiser within fifteen (15) days after the expiration of such thirty-day period or the date the parties shall agree that the fair market value shall be determined by appraisal, whichever first occurs. Those two selected appraisers shall together select a third appraiser. The three appraisers shall within thirty (30) days thereafter submit their written appraisals to TLC and Developer. Each appraiser shall be an M.A.I. appraiser with at least ten (10) years of experience appraising commercial properties in the District of Columbia area. The fair market value of the Property or of an Equity Holder's interest shall be determined by: first, averaging the three appraisals; then, disregarding the appraisal that deviates to the greatest extent from such average; then, averaging the two remaining appraisals. Such average shall constitute the fair market value of the Property or of the Equity Holder's interest and shall be final and binding on the parties hereto. In making such determination of fair market value, the amount of rents then payable with respect to the Property shall not be conclusive evidence of fair market value, and the appraisers shall consider and take

-15-

into account the value of any leasehold estate(s) held by Developer or by any Affiliate of Developer to the extent that such leasehold(s) are evidenced by leases with terms which are less favorable to the lessor than could reasonably have been obtained at the time such Leases were executed from an unrelated third party in an arms' length transaction for similar space and for the same lease term in the area.

3.9    **Statements, Books and Records.**    With each Appreciation Cash Payment, Developer shall deliver to TLC a statement reflecting the Agreed Value, the Approved Deductions, the Closing Costs and the Appreciation Cash Flow used in calculating the Appreciation Cash Payment and a detailed breakdown of all items necessary for the calculation of each such item.    Developer shall keep and maintain at all times full and accurate books and records adequate to correctly reflect each such item, at its office at 1717 Reisterstown Rd. #215 Baltimore, Maryland 20612 and shall be available for TLC's inspection, copying and review at TLC's expense (except as provided in Section 3.11 hereof) during reasonable business hours for the purpose of verifying the accuracy of the payments made on account of Appreciation Cash Flow.

3.10    **No Deduction for Negative Appreciation Cash Flow.**    Notwithstanding any of the foregoing provisions or any other provision of this Agreement, TLC shall in no event be liable to Developer for the reduction in the fair market value of the Property. If the Appreciation Cash Flow at any time shall be a negative amount, TLC shall in no way be liable for any portion of that negative amount, and no deduction or offset shall be made or taken into account as to such negative amount at any time when Appreciation Cash Flow shall be subsequently calculated.

3.11    **Disputes Concerning Appreciation Cash Payment.**    TLC may notify Developer within ninety (90) days after receipt of any Appreciation Cash Payment that TLC disputes any computation or item contained in the statement submitted with such Appreciation Cash Payment, except, however, that if the fair market value of the Property was determined in accordance with the appraisal procedure described in Section 3.8 hereof, then the determination of such fair market value shall be conclusive. In the event TLC so notifies Developer of an item which is questioned, the parties shall meet and attempt in good faith to resolve such disputed item. If the parties are unable to resolve such disputed item, the dispute shall be submitted to arbitration by an M.A.I. appraiser selected by TLC and reasonably satisfactory to Developer, whose determination shall be final. The fees of the appraiser and any costs incurred in connection with such determination shall be paid by TLC unless such appraiser shall determine that the computation resulted in an underpayment of the Appreciation Cash Payment of an amount exceeding three percent (3%) of the amount actually owing to TLC, in which case Developer shall pay all such fees and costs. If the variance is three percent (3%) or less of the amount actually owing to TLC, Developer shall pay any additional amount due to TLC within ten (10) days after the resolution of such dispute, together with interest thereon from the date such payment was originally due at a rate equal to the Prime Rate. In the event that the variance is greater than three percent (3%) of the amount actually owing to TLC, Developer shall pay any additional amount due to TLC within ten (10) days after the resolution of such dispute, together with interest thereon from the date such payment was originally due at a rate equal to the Prime Rate plus five percentage points.

VD-000503

-16-

3.12   No Duplication.   Any item that is included in the calculation of Gross Revenues shall not be included in the calculation of Appreciation Cash Flow, nor shall any item included in the calculation of Appreciation Cash Flow be included in the calculation of Gross Revenues so as to result in a duplication of such item. Also, any item that is included in the calculation of Expenses shall not be included in the calculation of Approved Deductions or Closing Costs, nor shall any item included in the calculation of Approved Deductions or Closing Costs be included in the calculation of Expenses so as to result in duplication of such item.

## ARTICLE 4

### RESTRICTION ON TRANSFERS

4.1   Right of First Refusal.

(a)   Notice of Developer of Proposed Sale.  If at any time during the term of this Agreement Developer or an Affiliate of Developer shall make or receive a bona fide written offer for a Sale of the Property other than (i) a Sale of the Property or portion thereof to an Affiliate of Developer, or (ii) a Lease of a portion of the Property for occupancy purposes only, Developer shall deliver to TLC written notice thereof, together with an executed copy of the contract or other instrument evidencing such offer made to or received from the proposed purchaser (the "Proposed Contract").

(b)   TLC's Right to Purchase.  TLC shall have the right to purchase the Property on the terms set forth in the Proposed Contract by notifying Developer in writing within twenty-one (21) days of the date of receipt of Developer's notice.  If TLC does not notify Developer within such time period, such failure to notify shall be deemed to constitute TLC's election not to purchase the Property.  If TLC notifies Developer of its election to so purchase, Developer shall be obligated to sell and TLC shall be obligated to purchase the Property in accordance with the terms of the Proposed Contract, except that the closing of the purchase shall take place on the later of (1) the date for closing set forth in such contract; or (2) ninety (90) days after TLC has delivered to Developer written notice of TLC's election to so purchase. The deposit schedule and the other terms of the closing and the payment of costs in connection therewith shall be in accordance with the terms of such contract, as applicable, except that TLC may, at its option, purchase the Property for all cash notwithstanding any provisions in such contract for financing of such purchase to be provided by Developer or for the structuring of the Sale of the Property as an exchange with other real property.

(c)   Subsequent Sales of the Property.  If TLC shall not elect to purchase the Property prior to the expiration of the twenty-one day period provided in subsection 4.1(b) above, then (i) Developer may sell the Property or portion thereof or interest therein covered by the contract, according to the terms thereof, but no such sale shall be made at a price less than the price offered to TLC or otherwise on terms less favorable to Developer than were offered to TLC without first delivering to TLC a new notice setting forth such new price and/or terms, in which event TLC shall have a further period of fourteen (14) days in which to elect to purchase on the new price and/or terms.  If the sale to the proposed purchaser is not consummated within the period described in the contract, any intended sale of the Property thereafter,

VD-000504

whether to the same or any other purchaser, shall be subject to the terms and conditions of this Section 4.1, in which case TLC shall have the right to purchase the Property as provided hereinabove.  No failure of TLC to exercise their rights to purchase in any one or more instances shall constitute a waiver of TLC' right to purchase at the time of any subsequent proposed sale, and TLC shall continue to enjoy such right of first refusal with respect to any and all subsequent proposed sales until each Appreciation Cash Payment due and payable hereunder to TLC has been paid in full.

      4.2    **Transfers to Affiliates of Developer.**  Developer may at any time and from time to time sell, assign or convey, all or any part of the Property to an Affiliate without payment to TLC of an Appreciation Cash Payment, provided however, that Developer prior to such sale, assignment or conveyance, shall have delivered to TLC (i) good and legible copies of the document or documents evidencing such transfer; (ii) the name and address of the transferee; and (iii) an instrument in form and substance reasonably satisfactory to TLC , duly executed by the transferee and acknowledged before a notary public, pursuant to which the transferee has unconditionally assumed and agreed to pay and perform all amounts and obligations to be paid or performed by Developer under this Agreement, including such amounts and obligations which were due and payable or which were to have been performed by Developer prior to the sale, assignment or conveyance to such Affiliate.  Any such sale, assignment or conveyance shall not release or extinguish any of Developer's obligations under this Agreement, and Developer following such sale, assignment or conveyance shall remain fully liable for the payment and satisfaction of all obligations hereunder.

      4.3    **Other Transfers.**  Upon any Transfer by Developer of all of any part of the Property, or upon any Transfer of an Equity Holder's interest, there shall be delivered to TLC (i) good and legible copies of the document or documents evidencing such transfer and (ii) the name and address of the transferee.

**ARTICLE 5**

**SECURITY FOR AGREEMENT**

      5.1    **TLC Mortgage.**  All sums to be paid to TLC hereunder and all covenants and obligations to be performed by Developer pursuant to this Agreement shall be secured by the TLC Mortgage, and by any other instruments signed by Developer in favor of TLC which recite that this Agreement is to be secured thereby, it being the intention of TLC and Developer that this Agreement shall remain in effect and continue to be secured until all covenants and obligations of Developer to TLC hereunder have been fully satisfied, which shall be no earlier than ninety (90) days after all Operations Cash Payments and Appreciation Cash Payments have been made, or, in the event of a dispute concerning the amount of those Operations Cash Payments or Appreciation Cash Payments payable, until such dispute has been resolved. Notwithstanding any other provision of this Agreement, this Agreement shall continue in full force and effect until all covenants and obligations of Developer under this Agreement and the TLC Mortgage have been paid and/or performed in full at which time TLC shall execute and cause to be recorded a release of the TLC Mortgage and all other security instruments securing TLC. If a default occurs under Section 3.2(d) hereof and triggers an Appreciation Cash Payment with respect to the entire

-18-

Property, and if such Appreciation Cash Payment is actually paid, TLC shall execute a release of the TLC Mortgage, and this Agreement shall terminate upon the payment to TLC of the Appreciation Cash Payment and all other accrued but unpaid sums due and owing TLC hereunder. The provisions of Section 7.3 of this Agreement shall survive such termination and remain in effect.

       5.2    **Subordination of TLC Mortgage.** TLC hereby agrees that the lien of the TLC Mortgage is hereby subordinated and junior in priority to the Senior Mortgages, if any, automatically and without further act. In addition, upon request of a holder of a Senior Mortgage, TLC agrees to execute and deliver a Subordination Agreement evidencing the subordination of the TLC Mortgage to the Senior Mortgage and containing terms reasonably agreeable to TLC and that holder. Within ten (10) days after requested, TLC agrees to execute and deliver an Estoppel Certificate with respect to the TLC Mortgage and the obligations secured thereby.

## ARTICLE 6

### RELATIONSHIP OF PARTIES

       6.1    **Creditor Relationship.** TLC and Developer intend that the relationship between them shall be solely that of creditor and debtor. Nothing contained in this Agreement or in any other document or instrument made in connection with the Purchase Agreement, including without limitation TLC's right to receive Operations Cash Payments and Appreciation Cash Payments, shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between TLC and Developer. TLC shall not be in any way responsible or liable for the debts, losses, obligations or duties of Developer with respect to the Property or otherwise. All obligations to pay real property or other taxes, assessments, insurance premiums, and all other fees and charges arising from the ownership, operation or occupancy of the Property and to perform all Leases and other agreements and contracts relating to the Property, shall be the sole and absolute responsibility of Developer. Developer, at all times consistent with the terms and provisions of this Agreement and the other documents and instruments evidencing, securing or otherwise relating to this Agreement, shall be free to determine and follow its own policies and practices in the management and conduct of its business on the Property.

       6.2    **Indemnification.** Developer hereby agrees to indemnify, defend and hold TLC harmless for, from and against any and all third-party claims, liabilities, losses, injuries, costs, expenses and damages (including without limitation reasonable attorneys' fees) arising either directly or indirectly out of any Lease, Mortgage or other agreement entered into by Developer with any third party, whether as a result of the failure of Developer to perform and discharge its obligations thereunder or otherwise, or out of any acts or omissions of Developer relating to its ownership, operation, management, leasing or rental of the Property or any part thereof. In the event TLC incurs any loss, damage, cost, obligation or liability from a third party under or by reason of any Lease, or under or by virtue of or any other agreement made by Developer relating to the Property, or in defense of any claims or demands related thereto, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured by the TLC Mortgage and any other instruments executed by

-19-

VD-000506

Developer as security for its obligations under this Agreement, and Developer agrees to reimburse TLC therefor upon demand together with interest thereon at a rate equal to the Prime Rate plus five percentage points.

## ARTICLE 7

### MISCELLANEOUS

7.1   **Notices.**  Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been delivered upon personal delivery or delivery by a nationally recognized courier service, with all charges prepaid, or forty-eight (48) hours after it is deposited with the United States Postal Service, registered or certified mail, postage prepaid, return receipt requested, and addressed as follows:

If to TLC:           Transportation Leasing Co.
                     c/o The Greyhound Corporation
                     Real Estate Department
                     Greyhound Tower
                     Phoenix, Arizona 85077

If to Developer:     MONTGOMERY ROAD I LIMITED PARTNERSHIP
                     c/o Samuel G. Rose
                     1777 Reisterstown Road, Suite 275
                     Baltimore, Maryland  20814

or such other addresses as either party may from time to time specify in writing to the other in accordance with this notice provision.

7.2   **Security.**  Developer agrees that TLC may, without notice to or consent or approval of Developer and without affecting the liability of Developer, accept additional or substitute security for this Agreement or release any security or any party liable for this Agreement, or extend or renew this Agreement.

7.3   **Default.**  In the event Developer shall breach or fail to perform any covenant or obligation to be performed by it pursuant to this Agreement, then TLC shall be entitled to all rights and remedies provided at law or in equity, including damages suffered as a result of such breach or failure, and if TLC shall demand and receive an Appreciation Cash Payment as provided in Section 3.2(d) above, such payment shall not be exclusive of any other rights or remedies to which TLC may be entitled by reason of such breach or failure; provided, however, in the event Developer shall breach or fail to perform any covenant or obligation to be performed by it pursuant to this Agreement, then TLC shall give Developer written notice thereof and an opportunity to cure such default (i) within ten (10) days if it is a monetary default and (ii) within thirty (30) days if it is a nonmonetary default, provided, however, that if a nonmonetary default cannot reasonably be cured within the required thirty (30) day period and if Developer shall immediately commence action to cure and diligently prosecute such cure, the thirty (30) day period shall be extended for such period as is reasonable to complete the cure, but in all events the cure of the nonmonetary default must occur within ninety (90) days of the written notice thereof.

VD-000507

7.4    **Attorney's Fees.** If either party hereto shall bring suit against the other as a result of any alleged breach or failure of the other party to fulfill or perform any covenants or obligations under this Agreement, then in such event, the prevailing party in such action shall, in addition to any other relief granted or awarded by the court, be entitled to judgment for reasonable attorney's fees incurred by reason of such action and all costs of suit and those incurred in preparation thereof at both trial and appellate levels.

7.5    **Payments.** All amounts payable under this Agreement are payable in lawful money of the United States of America.  Checks will constitute payment only when collected.

7.6    **No Waiver.**  No failure to exercise, and no delay in exercising any right, power or remedy hereunder or under any document delivered pursuant hereto or in connection with the Purchase Agreement, shall impair any right, power or remedy which TLC may have, nor shall any such delay be construed to be a waiver of any such rights, powers or remedies, or an acquiescence in any breach or default under this Agreement or any document delivered pursuant hereto or in connection with the Purchase Agreement, nor shall any waiver of any breach or default of Developer be deemed a waiver of any default or breach subsequently occurring.

7.7    **Severability.** In case any one or more of the provisions contained in this Agreement should be held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

7.8    **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of Developer, TLC and their respective successors and assigns.

7.9    **Amendments.**  No provision of this Agreement may be amended, modified, supplemented, changed, waived, discharged or terminated, except in writing signed by the party asserting any rights, benefits or defenses under such amendment, modification, supplement, change, waiver, discharge or termination.

7.10    **Controlling Law.**  This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia notwithstanding any other conflict-of-law provision to the contrary.

7.11    **Titles Not To Affect Interpretation.**  The titles of Articles and Sections contained in this Agreement are inserted for convenience of reference only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation thereof.

7.12    **Gender.**  Words used herein, regardless of the gender specifically used, shall be deemed and construed to include any other gender, singular or plural, masculine, feminine or neuter, as the context requires.

7.13    **Merger.**  This Agreement supersedes all prior agreements and understandings between the parties hereto relating to the subject matter hereof, provided that the foregoing provision shall not be deemed to modify or otherwise affect in any way the provisions of the Purchase Agreement or TLC Mortgage.

-21-

VD-000508

**7.14  Time of the Essence.** Time is of the essence of this Agreement and the performance of each of the covenants and agreements contained herein, subject to the notice requirements of Section 7.3 hereof.

Executed ~~Dated~~ this 30th day of _November_, 1987.

TRANSPORTATION LEASING CO., a
California corporation

By _____

    Name: _____Armen Ervanian_____

    Title: _____Vice President_____

_____

Made December 9, 1987 By _MONTGOMERY ROAD I LIMITED PARTNERSHIP_

    Name: _____
         Samuel G. Rose
    Title: General Partner

    NAME: _____
         Stewart J. Greenebaum
    TITLE: General Partner

VD-000509

35798TAG/112487

State of Arizona        )
~~District of Columbia~~  ss:
County of Maricopa)

    I HEREBY CERTIFY that on this 30 day of November , 1987, before me, the subscriber, a Notary Public in and for the jurisdiction aforesaid, personally appeared in said jurisdiction  Armen Ervanian , personally well known to me to be  Vice President  of Transportation Leasing Co., and on behalf of said corporation, and having authority so to do, did acknowledge the foregoing instrument to be the act and deed of said corporation and that the same was executed for the purposes therein contained, and delivered the same as such.

    WITNESS my hand and Notarial Seal.

                                         *Mary Ann Duckett*
                                Notary Public
                                Mary Ann Duckett

My Commission Expires:  My Commission Expires May 31, 1990

District of Columbia) ss:

    I HEREBY CERTIFY that on this    day of              , 1987, before me, the subscriber, a Notary Public in and for the jurisdiction aforesaid, personally appeared in said jurisdiction                      , personally well known to me to be                          of                              , and on behalf of said corporation, and having authority so to do, did acknowledge the foregoing instrument to be the act and deed of said                  and that the same was executed for the purposes therein contained, and delivered the same as such.

    WITNESS my hand and Notarial Seal.

                                Notary Public
                                D.E.P. Clark

My Commission Expires:

My Commission Expires August 14, 1991

                                               **VD-000510**

### FIRST AMENDMENT
### TO
### CASH PARTICIPATION AGREEMENT

This First Amendment to Cash Participation Agreement ("First Amendment") is made as of March 2, 1989 by and between Montgomery Road I Limited Partnership ("Developer") and Transportation Leasing Co. ("TLC"), amending the Cash Participation Agreement between Developer and TLC (the "Agreement") executed by TLC on November 30, 1987 and executed by Developer on December 9, 1987.

In consideration of the mutual promises set forth below, Developer and TLC agree as follows:

1.    The effective date of this First Amendment shall be December 9, 1987.

2.    Section 1.39 of the Agreement is hereby deleted in its entirety, and the following provision is inserted in lieu thereof:

> "1.39 'Senior Mortgage' shall mean any and all mortgages, deeds of trust, security agreements or other similar agreements which constitute liens on the Property, and which constitute security for loan(s) made to the Developer solely for the purpose of financing or refinancing (a) a portion of the purchase price payable to TLC for the Real Property and reasonable closing costs in connection with the purchase of the Real Property, (b) development and construction of the Property, (c) deficits incurred in operation of the Property, and (d) distributions to Equity Holders. All such mortgages, deeds of trust, security agreements or other similar agreements shall be deemed to have priority over the TLC Mortgage, regardless of whether they are recorded before or after the date of recording of the TLC Mortgage."

VD-000511

3.    Developer and TLC hereby ratify and confirm the Agreement, as amended by this First Amendment.


IN WITNESS WHEREOF, Developer and TLC have caused their general partners or duly authorized officers to execute this First Amendment as of the date first set forth above.

                              TRANSPORTATION LEASING CO.


                              BY: _____
                                  A. Ervanian
                                  Vice President


                              MONTGOMERY ROAD I
                              LIMITED PARTNERSHIP


                              BY: _____
                                  Samuel G. Rose
                                  General Partner

                              BY: _____
                                  Stewart J. Greenebaum
                                  General Partner


STATE OF ARIZONA      )
                      ) ss.
COUNTY OF MARICOPA    )

     I hereby certify that on _March 9, 1989_, before me, the subscriber, a notary public in and for the jurisdiction afore-said, personally appeared in said jurisdiction Armen Ervanian, personally well known to me to be Vice President of Trans-portation Leasing Co., and on behalf of said corporation, and

                              2

VD-000512

having authority so to do, did acknowledge the foregoing
instrument to be the act and deed of said corporation and that
the same was executed for the purposes therein contained, and
delivered the same as such.

_____
Notary Public

My commission expires: My Commission Expires May 31, 1990

DISTRICT OF COLUMBIA     ) ss.

     I hereby certify that on this _____, before me, the
subscriber, a notary public in and for the jurisdiction afore-
said, personally appeared in said jurisdiction Samuel G. Rose and
Stewart J. Greenebaum, personally well known to me to be the
General Partners of Montgomery Road I Limited Partnership, and on
behalf of said partnership, and having authority so to do, did
acknowledge the foregoing instrument to be the act and deed of
said partnership and that the same was executed for the purposes
therein contained, and delivered the same as such.

_____
Notary Public

My commission expires:

3

VD-000513