# EXHIBIT 22

(6)

GREENEBAUM AND ROSE ASSOCIATES
5301 WISCONSIN AVENUE, N.W.
SUITE 510
WASHINGTON, D.C. 20015

TEL (202) 686-3000
FAX (202) 686-3617

August 14, 2000

Via Federal Express

Ms. Eve Fiorucci
VIAD Corporation
1850 North Central Avenue
Phoenix, Arizona 85004

Re: Transportation Leasing Company – 90 K Street

Dear Ms. Fiorucci:

Transportation Leasing's right of first refusal expired on Wednesday, July 16th by our measurement and on August 14th by yours. We would appreciate a letter from you acknowledging the same.

There was also a potential cash participation for TLC if we could sell the property for a price which exceeded our original purchase plus carrying cost. We were unable to get such a price and have substantiated our cost by providing to TLC annual statements of cost for the past 13 years. These statements have never been questioned by TLC and they make it very clear that the proposed sales price generated no cash participation for TLC. Therefore, we would appreciate your execution of the attached Certificate of Satisfaction.

As protection for TLC in the event the sale does not close, we recommend that said executed release be sent to the Title Company. They will hold it in trust for TLC benefit and only release it if the sale is consummated, per the attached contract and specifically at a Purchase price of $24,975,000. If not, it will be returned. The Title Company closing the transaction is as follows:

Commonwealth Land Title Insurance Company
1413 K Street, N.W., 12th Floor
Washington, D.C. 20005
Attention: Stuart S. Levin, Vice President

Please call me if you have any questions.

Very Truly Yours,

Samuel G. Rose

Attachments: Purchase Contract
Certificate of Satisfaction

VD-000364

SGR:rbh

H:\Admin\Sam\8-14 Fiorucci letter.doc

# AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale ("Agreement") is made and entered into by and between Purchaser and Seller.

## RECITALS

A. Defined terms are indicated by initial capital letters. Defined terms shall have the meaning set forth herein, whether or not such terms are used before or after the definitions are set forth.

B. Purchaser desires to purchase the Property and Seller desires to sell the Property, all upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual terms, provisions, covenants and agreements set forth herein, as well as the sums to be paid by Purchaser to Seller, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Purchaser and Seller agree as follows:

## ARTICLE 1 - Basic Information

1.1 **Certain Basic Terms.** The following defined terms shall have the meanings set forth below:

1.1.1 Seller: Montgomery Road I Limited Partnership, a Maryland limited partnership

1.1.2 Purchaser: Level 3 Communications, LLC

1.1.3 Purchase Price: $24,975,000.00

1.1.4 Earnest Money: $2,497,500.00, plus interest thereon

1.1.5 Title Company: Commonwealth Land Title Insurance Company
1413 K Street N.W., 12th Floor
Washington, D.C. 20005
Attention: Stuart S. Levin, Vice President
Telephone: 202-737-4747
Facsimile: 202-737-4108

1.1.6 Escrow Agent: Commonwealth Land Title Insurance Company
1413 K Street N.W., 12th Floor
Washington, D.C. 20005
Attention: Stuart S. Levin, Vice President
Telephone: 202-737-4747
Facsimile: 202-737-4108

1.1.7 Broker: Cushman & Wakefield

1.1.8 Effective Date: The date on which this Agreement is executed by the latter to sign of Purchaser or Seller, as indicated on the signature page of this Agreement.

VD-000365

1.1.9 Property Information Delivery Date: The date which is ten (10) days after the Effective Date.

1.1.10 Title Commitment Delivery Date: The date which is twenty (20) days after the Effective Date.

1.1.11 Survey Delivery Date: The date which is twenty (20) days after the Effective Date.

1.1.12 Title and Survey Review Period: The period ending forty (40) days after Purchaser's receipt of the initial Title Commitment and the initial Survey, but in any event not later than the expiration of the Inspection Period.

1.1.13 Inspection Period: The period beginning on the Effective Date and ending sixty (60) days after the Effective Date.

1.1.14 Closing Date: The date which is thirty (30) days after the expiration of the Inspection Period.

1.2 **Closing Costs.** Closing costs shall be allocated and paid as follows:

| Cost | Responsible Party |
|---|---|
| Title Commitment required to be delivered pursuant to Section 5.1 | Purchaser |
| Premium for standard form Title Policy required to be delivered pursuant to Section 5.4 | Purchaser |
| Premium for any upgrade of Title Policy for extended or additional coverage and any endorsements desired by Purchaser, any inspection fee charged by the Title Company, tax certificates, municipal and utility lien certificates, and any other Title Company charges | Purchaser |
| Costs of Survey | Purchaser |
| Costs for UCC Searches | Purchaser |
| Recording Fees | Purchaser ½<br>Seller ½ |
| Any deed taxes, documentary stamps or transfer taxes | Purchaser ½<br>Seller ½ |
| Any escrow fee charged by Escrow Agent for holding the Earnest Money or conducting the Closing | Purchaser ½<br>Seller ½ |
| Real Estate Sales Commission to Broker | Seller |
| All other closing costs, expenses, charges and fees | Purchaser |

1.3 **Notice Addresses:**

Purchaser: Level 3 Communications, LLC
1025 Eldorado Boulevard
Broomfield, Colorado 80021
Attention: Vice President of Real Estate
Telephone: 720-888-1000
Facsimile: 720-888-5200

Copy to: Fraser Stryker Law Firm
409 South 17th Street, Suite 500
Omaha, Nebraska 68102
Attention: Thomas F. Flaherty
Telephone: 402-978-5219
Facsimile: 402-341-8290

Level 3 Communciations, LLC
1025 Eldorado Boulevard
Broomfield, Colorado 80021
Attention: General Counsel

VD-000366

Telephone: 720-888-1000
Facsimile: 720-888-5200

Seller: Montgomery Road I Limited Partnership
c/o Greenebaum & Rose Associates
5301 Wisconsin Avenue, N.W., Suite 510
Washington, D.C. 20015
Attention: Mr. Reid Liffmann
Telephone: 202-686-3000
Facsimile: 202-686-3617

Copy to: Venable, Baetjer, Howard & Civiletti, LLP
1615 L Street, N.W.
Suite 400
Washington, D.C. 20036
Telephone: 202-429-3223
Facsimile: 202-429-3231

**1.4 Index of Certain Additional Defined Terms:**

Closing ........ Section 7.1
Deed ........ Subsection 7.3.1
Due Diligence Termination Notice ........ Section 4.3
Intangible Personal Property ........ Subsection 2.1.2
Land ........ Subsection 2.1.1
Permitted Exceptions ........ Section 5.3
Property ........ Section 2.1
Property Information ........ Section 4.1
Real Property ........ Subsection 2.1.1
Reports ........ Section 4.4
Survey ........ Section 5.2
Taxes ........ Section 8.1
Title Commitment ........ Section 5.1
Title Policy ........ Section 5.4

## ARTICLE 2 - Property

**2.1** Subject to the terms and conditions of this Agreement, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the following property (collectively, the "Property"):

**2.1.1 Real Property.** The land commonly known as 90 K Street, N.E., Washington, D.C., consisting of 103,878 square feet, and legally described in Exhibit A attached hereto (the "Land"), together with (i) all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in anywise appertaining thereto, and (ii) without warranty, all right, title, and interest of Seller, if any, in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such Land (collectively, the "Real Property").

**2.1.2 Intangible Personal Property.** All of Seller's right, title and interest, if any, without warranty, in all intangible personal property related to the Real Property, including, without limitation: all trade names and trade marks associated with the Real Property, including Seller's rights and interests, if any, in the name of the Real Property; contract rights related to the construction, operation, ownership or management of the Real Property, including all development rights owned by Seller in respect of the Property; and governmental permits, approvals and licenses, if any (collectively the "Intangible Personal Property").

## ARTICLE 3 - Earnest Money

VD-000367

3.1 **Deposit and Investment of Earnest Money.** Within three (3) business days after the Effective Date, Purchaser shall deposit one-half of the Earnest Money with Escrow Agent. If no timely Due Diligence Termination Notice has been given by Purchaser to Seller pursuant to Section 4.3 hereof, the balance of the Earnest Money shall be deposited with Escrow Agent the next business day following expiration of the

Inspection Period. Escrow Agent shall invest the Earnest Money in government insured interest-bearing accounts satisfactory to Seller and Purchaser, shall not commingle the Earnest Money with any funds of Escrow Agent or others, and shall promptly provide Purchaser and Seller with confirmation of the investments made. Interest earned shall be added to the Earnest Money and become a part thereof. Such account shall have no penalty for early withdrawal, and Purchaser accepts all risks with regard to such account.

3.2 **Form; Failure to Deposit.** The Earnest Money shall be in the form of a certified or cashier's check or a wire transfer to Escrow Agent of immediately available U.S. federal funds. If Purchaser fails to timely deposit the Earnest Money within the time periods required, Seller may terminate this Agreement by written notice to Purchaser, in which event the parties hereto shall have no further rights or obligations hereunder, except for rights and obligations which, by their terms, survive the termination hereof, and any portion of the Earnest Money previously deposited shall be refunded to Purchaser.

3.2 **Disposition of Earnest Money.** The Earnest Money shall be applied as a credit to the Purchase Price at Closing. However, if Purchaser elects to terminate this Agreement prior to the expiration of the Inspection Period pursuant to Section 4.3, Escrow Agent shall pay that portion of the Earnest Money held by Escrow Agent to Purchaser one (1) business day following receipt of the Due Diligence Termination Notice from Purchaser (as long as the current investment can be liquidated and disbursed in one business day). No notice to Escrow Agent from Seller shall be required for the release of the Earnest Money to Purchaser by Escrow Agent if Purchaser terminates this Agreement pursuant to Section 4.3. In the event of a termination of this Agreement by either Seller or Purchaser for any reason other than pursuant to Section 4.3, Escrow Agent is authorized to deliver the Earnest Money to the party hereto entitled to same pursuant to the terms hereof on or before the tenth (10th) business day following receipt by Escrow Agent and the non-terminating party of written notice of such termination from the terminating party, unless the other party hereto notifies Escrow Agent that it disputes the right of the other party to receive the Earnest Money. In such event, Escrow Agent may interplead the Earnest Money into a court of competent jurisdiction. All attorneys' fees and costs and Escrow Agent's costs and expenses incurred in connection with such interpleader shall be assessed against the party that is not awarded the Earnest Money, or if the Earnest Money is distributed in part to both parties, then in the inverse proportion of such distribution.

## ARTICLE 4 - Due Diligence

4.1 **Due Diligence Materials To Be Delivered.** To the extent such items are in Seller's possession, Seller shall deliver to Purchaser the following (the "Property Information") on or before (except as otherwise provided herein) the Property Information Delivery Date:

4.1.1 **Environmental Reports.** Copies of all environmental reports and site assessments related to the Property;

4.1.2 **Tax Statements.** Copy of ad valorem tax statements relating to the Property for the current tax period;

4.1.3 **Title and Survey.** Copies of Seller's most current title insurance policy and commitment and survey of the Property;

4.1.4 **Soils Reports.** Copies of soils reports relating to the Property;

4.1.5 **Management/Parking Agreements.** A copy of any agreement pursuant to which a third party has the right to manage or operate the Real Property as a parking lot;

4.1.6 **Zoning.** Copies of all documents relating to the permissible uses of the Property, including evidence of current zoning of the Property, evidence of the floor area ratio applicable to the Property, and development rights purchased or otherwise benefiting the Property;

VD-000368

4.1.7 **Governmental Proceedings**. Copies of any notice relating to pending or threatened eminent domain proceedings or rezonings affecting the Property;

4.1.8 **Easements**. Copies of all documents or instruments granting easements, licenses, rights-of-way or the like, whether or not recorded, relating to the Property, including copies of all restrictive covenants or restrictions affecting the Property; and

4.1.9 **Zoning Opinion**. Within twenty (20) days after the Effective Date, the original written opinion of the law firm of Wilkes, Artis, Hedrick & Lane, prepared at Seller's expense but directed to and for the benefit of Purchaser and in form and substance satisfactory to Purchaser, with respect to permissible uses of the Property, including an opinion in respect of the current zoning of the Property, the floor area ratio and maximum height of improvements applicable to the Property, and the existence and assignability of development rights purchased in respect of or otherwise benefiting the Property.

4.2 **Physical Due Diligence**. Commencing on the Effective Date and continuing until the Closing, Purchaser shall have reasonable access to the Property at all reasonable times during normal business hours for the purpose of conducting tests, including soil test borings, surveys and architectural, engineering, geotechnical and environmental inspections and tests, and Purchaser or Purchaser's representatives may meet with any governmental authority for any reasonable purpose in connection with the transaction contemplated by this Agreement.

4.3 **Due Diligence/Termination Right**. Purchaser shall have through the last day of the Inspection Period in which to (i) examine, inspect, and investigate the Property Information and the Property and, in Purchaser's sole and absolute judgment and discretion, determine whether the Property is acceptable to Purchaser, (ii) obtain all necessary internal approvals, and (iii) satisfy all other contingencies of Purchaser. Notwithstanding anything to the contrary in this Agreement, Purchaser may terminate this Agreement for any reason or no reason by giving written notice of termination to Seller and Escrow Agent (the "Due Diligence Termination Notice") on or before the last day of the Inspection Period. If Purchaser does not deposit the balance of the Earnest Money the next business day following expiration of the Inspection Period, Purchaser shall be deemed to have given a Due Diligence Termination Notice. Upon any such termination, neither Seller nor Purchaser shall have any further liability to the other hereunder (except as provided in Section 4.5) and the Earnest Money shall be returned to Purchaser (as provided in Section 3.2). If Purchaser does not give a Due Diligence Termination Notice and Purchaser deposits with Escrow Agent the balance of the Earnest Money the next business day following expiration of the Inspection Period, this Agreement shall continue in full force and effect, and Purchaser shall be deemed to have waived its right to terminate this Agreement pursuant to this Section 4.3.

4.4 **Return of Documents and Reports**. If this Agreement terminates for any reason other than Seller's default hereunder, Purchaser shall promptly return and/or deliver to Seller all Property Information and copies thereof. Additionally, if this Agreement terminates for any reason other than Seller's default, then Purchaser must deliver to Seller copies of all third party reports, investigations and studies, other than economic analyses (collectively, the "Reports" and, individually, a "Report") prepared for Purchaser in connection with its due diligence review of the Property. The Reports shall be delivered to Seller without any representation or warranty as to the completeness or accuracy of the Reports or any other matter relating thereto, and Seller shall have no right to rely on any Report without the written consent of the party preparing same. Purchaser's obligation to deliver the Property Information and the Reports to Seller shall survive the termination of this Agreement.

4.5 **Purchaser's Agreement to Indemnify**. Purchaser indemnifies and holds Seller harmless from and against any and all liens, claims, causes of action, damages, liabilities and expenses (including reasonable attorneys' fees) arising out of Purchaser's inspections or tests permitted under this Agreement; provided, however, the indemnity shall not extend to protect Seller from any pre-existing liabilities for matters

merely discovered by Purchaser (i.e., latent environmental contamination) so long as Purchaser's actions do not aggravate any pre-existing liability of Seller. Purchaser's obligations under this Section 4.5 shall survive the termination of this Agreement and shall survive the Closing.

## ARTICLE 5 - Title and Survey

5.1 **Title Commitment**. Seller shall cause to be prepared and delivered to Purchaser on or before the Title Commitment Delivery Date: (i) a current commitment for title insurance (the "Title Commitment") issued by the Title Company, in the amount of the Purchase Price and showing Purchaser as the proposed insured, and (ii) copies of all documents of record referred to in the Title Commitment as exceptions to title to the Property.

5.2 **Survey**. Seller shall cause to be prepared and delivered to Purchaser on or before the Survey Delivery Date, an ALTA/ACSM Urban Land Title Survey ("Survey") in form reasonably acceptable to Purchaser.

5.3 **Title Review**. During the Title and Survey Review Period, Purchaser shall review title to the Property as disclosed by the Title Commitment and the Survey and determine whether title to the Property is marketable, good of record and in fact. If Purchaser does not provide written notice to Seller, within the Title and Survey Review Period, that title is not marketable, good of record and in fact, Purchaser may not rely on matters reflected in the Title Commitment or Survey (except mortgages, liens and financial encumbrances created by, through or under Seller) as a basis for refusing to effect a Closing hereunder. Seller agrees to remove any exceptions or encumbrances to title which are recorded or created after the Effective Date without Purchaser's consent; provided however, Seller shall not be required to expend more than $50,000.00 to remove any such exceptions or encumbrances to title which are recorded or created after the Effective Date without Purchaser's consent. The term "Permitted Exceptions" shall mean: the exceptions (not including so-called "standard exceptions") in the Title Commitment that the Title Company has not agreed to remove from the Title Commitment as of the end of the Title Review Period and Survey Review Period; matters created by, through or under Purchaser; items shown on the Survey which have not been removed as of the end of the Inspection Period; and real estate taxes not yet due and payable. In the event the Title Commitment is not delivered to Purchaser on or before the Title Commitment Delivery Date, or in the event the Survey is not delivered to Purchaser on or before the Survey Delivery Date, the Inspection Period shall be extended by the number of days of delay in delivery of the Title Commitment or the Survey, whichever is greater.

5.4 **Condition of Title at Closing**. It shall be a condition of Purchaser's obligation to close hereunder that at Closing, title to the Real Property shall be marketable, good of record and in fact, and free and clear of all mortgages, liens, encumbrances, easements, leases, conditions and other matters affecting title, recorded or unrecorded, other than the Permitted Exceptions.

## ARTICLE 6 - Condemnation

If proceedings in eminent domain are instituted with respect to the Property or any portion thereof, Purchaser may, at its option, by written notice to Seller given within twenty (20) days after Seller notifies Purchaser of such proceedings (and if necessary the Closing Date shall be automatically extended to give Purchaser the full twenty (20) day period to make such election), either: (i) terminate this Agreement, in which case the Earnest Money shall be immediately returned to Purchaser and the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement, or (ii) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Purchaser its entire right, title and interest in and to any condemnation award, and Purchaser shall have the sole right after the Closing to negotiate and otherwise deal with the condemning authority in respect of such condemnation.

VD-000370

## ARTICLE 7 - Closing

7.1 Closing. The consummation of the transaction contemplated herein ("Closing") shall occur on the Closing Date at the offices of Escrow Agent (or such other location as may be mutually agreed upon by Seller and Purchaser). Purchaser may, in its sole and absolute discretion, accelerate the Closing Date to a date five (5) business days after Purchaser provides written notice to Seller of its desire to effect an early Closing ("Early Closing Notice"). If Purchaser provides an Early Closing Notice to Seller, the Closing shall occur on the date five (5) business days after the date Seller receives the Early Closing Notice and, if the Inspection Period has not expired as of the date of the Early Closing Notice, Purchaser shall be deemed to have waived its right to terminate this Agreement pursuant to Section 4.3. Funds shall be deposited into and held by Escrow Agent in a closing escrow account with a bank satisfactory to Purchaser and Seller. Upon satisfaction or completion of all closing conditions and deliveries, the parties shall direct Escrow Agent to immediately record and deliver the closing documents to the appropriate parties and make disbursements according to the closing statements executed by Seller and Purchaser.

7.2 **Conditions to Parties' Obligation to Close.** In addition to all other conditions set forth herein, the obligation of Seller, on the one hand, and Purchaser, on the other hand, to consummate the transactions contemplated hereunder are conditioned upon the following:

7.2.1 **Representations and Warranties.** The other party's representations and warranties contained herein shall be true and correct in all material respects as of the date of this Agreement and the Closing Date;

7.2.2 **Performance**. The other party shall have observed and performed all of its covenants and agreements under this Agreement;

7.2.3 **Deliveries**. As of the Closing Date, the other party shall have tendered all deliveries to be made at Closing; and

7.2.4 **Actions, Suits, etc.** There shall exist no pending or threatened actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings or notices of violation of law, against the other party or the Property that would materially and adversely affect the operation or value of the Property or the other party's ability to perform its obligations under this Agreement.

So long as a party is not in default hereunder, if any condition to such party's obligation to proceed with the Closing hereunder has not been satisfied as of the Closing Date (or such earlier date as is provided herein), such party may, in its sole discretion, terminate this Agreement by delivering written notice to the other party on or before the Closing Date (or such earlier date as is provided herein), or elect to close (or to permit any such earlier termination deadline to pass) notwithstanding the non-satisfaction of such condition, in which event such party shall be deemed to have waived any such condition.

7.3 **Seller's Deliveries in Escrow**. As of or prior to the Closing Date, Seller shall deliver in escrow to Escrow Agent the following:

7.3.1 **Deed**. A special warranty deed in form acceptable to Purchaser and in form acceptable for recordation under the law of the District of Columbia, duly executed and acknowledged by Seller, conveying to Purchaser marketable, fee simple title to the Real Property, subject only to the Permitted Exceptions (the "Deed");

7.3.2 **Title Affidavits**. Such title affidavits and indemnities as the Title Company may require to delete the standard exceptions to the Title Commitment;

VD-000371

7.3.3 **Lien Releases.** Such mortgage releases, deeds of reconveyance and other documents and instruments required to effect the complete release and discharge of all financial liens and encumbrances against or affecting the Property or, in lieu thereof, unconditional written commitments to release or reconvey, in form acceptable to Purchaser and the Title Company, duly executed by the holders of all mortgages, deeds of trust, liens or encumbrances against or affecting the Property;

7.3.4 **Conveyancing or Transfer Tax Forms or Returns.** Such conveyancing or transfer tax forms or returns, if any, as are required to be delivered or signed by Seller by applicable local law in connection with the conveyance of the Real Property;

7.3.5 **FIRPTA.** A Foreign Investment in Real Property Tax Act affidavit executed by Seller;

7.3.6 **Authority.** Evidence of the existence, organization and authority of Seller and of the authority of the persons executing documents on behalf of Seller reasonably satisfactory to the underwriter for the Title Policy; and

7.3.7 **Additional Documents.** Any additional documents that Purchaser, Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement (provided, however, no such additional document shall expand any obligation, covenant, representation or warranty of Seller or result in any new or additional obligation, covenant, representation or warranty of Seller under this Agreement beyond those expressly set forth in this Agreement), including an assignment of Intangible Personal Property owned by Seller.

7.4 **Purchaser's Deliveries in Escrow.** As of or prior to the Closing Date, Purchaser shall deliver in escrow to Escrow Agent the following:

7.4.1 **Conveyancing or Transfer Tax Forms or Returns.** Such conveyancing or transfer tax forms or returns, if any, as are required to be delivered or signed by Purchaser by applicable local law in connection with the conveyance of Real Property; and

7.4.2 **Additional Documents.** Any additional documents that Seller, Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement (provided, however, no such additional document shall expand any obligation, covenant, representation or warranty of Purchaser or result in any new or additional obligation, covenant, representation or warranty of Purchaser under this Agreement beyond those expressly set forth in this Agreement).

7.5 **Closing Statements.** As of or prior to the Closing Date, Seller and Purchaser shall deposit with Escrow Agent executed closing statements consistent with this Agreement in the form required by Escrow Agent.

7.6 **Purchase Price.** At or before 1:00 p.m. local time on the Closing Date, Purchaser shall deliver to Escrow Agent the Purchase Price, less the Earnest Money that is applied to the Purchase Price, plus or minus applicable prorations, in immediate, same-day U.S. federal funds wired for credit into Escrow Agent's escrow account, which funds must be delivered in a manner to permit Escrow Agent to deliver good funds to Seller or its designee on the Closing Date.

7.7 **Possession.** Seller shall deliver possession of the Property to Purchaser at the Closing.

## ARTICLE 8 - Prorations, Deposits, Commissions

VD-000372

8.1 **Prorations.** At Closing, ad valorem taxes ("Taxes") and any assessments by private covenant for the then-current fiscal year of Closing shall be prorated as of the date of Closing. If Taxes for the year of

Closing are not known or cannot be reasonably estimated, Taxes shall be prorated based on Taxes for the year prior to Closing. If, after the Closing Date, any additional or supplemental Taxes are assessed against the Real Property by reason of back assessments, corrections of previous tax bills or other events occurring before the Closing Date, Seller and Purchaser shall re-prorate the real estate Taxes to provide the appropriate credit to Purchaser. Any refunds of Taxes made after the Closing shall be held by Purchaser (and, if received by Seller, shall be delivered immediately to Purchaser to be held in accordance with this section) and shall first be applied to the unreimbursed costs incurred in obtaining the refund, then paid to Seller (for the period prior to the Closing Date) and to Purchaser (for the period commencing on and after the Closing Date). If any proceeding to determine the assessed value of the Real Property or the Taxes payable with respect to the Real Property has been commenced before the date of this Agreement and shall be continuing as of the Closing Date, Purchaser shall be entitled to control the prosecution of such proceeding or proceedings to completion and to settle or compromise any claim therein. Seller agrees to cooperate with Purchaser and to execute any and all documents reasonably required by Purchaser in furtherance of the foregoing.

8.2 **Closing Costs**. Closing costs shall be allocated between Seller and Purchaser in accordance with Section 1.2.

8.3 **Final Adjustment After Closing**. If final bills are not available or cannot be issued prior to Closing for any item being prorated under Section 8.1, then Purchaser and Seller agree to allocate such items on a fair and equitable basis as soon as such bills are available; final adjustment to be made as soon as reasonably possible after the Closing. Payments in connection with the final adjustment shall be due within thirty (30) days of written notice. All such rights and obligations shall survive the Closing.

8.4 **Commissions**. Seller shall be responsible to Broker for payment of a real estate sales commission at Closing in accordance with a separate agreement between Seller and Broker. Other than as stated above in this Section 8.4, Seller and Purchaser each represent and warrant to the other that no real estate brokerage commission is payable to any person or entity in connection with the transaction contemplated hereby, and each agrees to and does hereby indemnify and hold the other harmless against the payment of any commission to any other person or entity claiming by, through or under Seller or Purchaser, as applicable. This indemnification shall extend to any and all claims, liabilities, costs and expenses (including reasonable attorney fees and litigation costs) arising as a result of such claims and shall survive the Closing.

## ARTICLE 9 - Representations and Warranties

9.1 **Seller's Representations and Warranties**. Seller represents and warrants to Purchaser that:

9.1.1 **Organization and Authority.** Seller has been duly organized, is validly existing, and is in good standing in the state in which it was formed. Seller has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Seller at the Closing will be, authorized and executed and constitute, or will constitute, as appropriate, the valid and binding obligation of Seller, enforceable in accordance with their terms.

9.1.2 **Conflicts and Pending Actions**. There is no agreement to which Seller is a party or which is otherwise binding on Seller which is in conflict with this Agreement. There is no action or proceeding pending or threatened against Seller or relating to the Property.

9.1.3 **Title**. Seller has good and marketable fee simple title to the Property, subject to all matters of record. If the Property is currently encumbered, the Purchase Price is sufficient to fully pay and discharge all financing encumbrances. As a result of a Closing, the Property shall be transferred and conveyed to Purchaser free and clear of all liens, claims and encumbrances.

VD-000373

9.1.4 **Occupancy Rights**. There are no leases or tenancies affecting the Property, and no party has any right to occupy the Property except Seller. At Closing any management agreement affecting the Property will be terminated, and the Property will be conveyed free thereof. Seller will pay any termination fee payable to the operator/lessee of the parking lot on the Property in connection with the termination of such operator/lessee's lease by Seller.

9.1.5 Access. The Property has access to and from a duly dedicated and accepted public street or highway, and the Property does not serve any adjoining real estate for ingress or egress.

9.1.6 **Zoning**. The Property is zoned, under applicable land use laws, C-3-C, and is located in a transfer of development rights receiving zone. Seller has purchased development rights in respect of and exclusively for the benefit of the Property, the effect of which is to increase the allowable height of improvements that may be constructed on the Property from ninety (90) feet to one hundred thirty feet (130) and to increase the allowable maximum floor area applicable to the Property from six hundred seventy-five thousand square feet to six hundred eighty-two thousand square feet. Except for the issuance of a building permit, no other or further governmental approvals of any type will be required for Seller to construct, use and occupy a 130 feet in height, 675,000 square feet in floor area telecommunications facility on the Property. There are no overlay district requirements (*i.e.*, retail, residential, arts, historic or the like) that apply to any part of the Property, and the Property is not located in an historic district or been designated as an historic site by any governmental authority.

9.1.7 **Absence of Adverse Conditions**. To the best knowledge of Seller (i) no underground storage tanks or hazardous, toxic or other regulated substances, within the meaning of any applicable federal or local statute or regulation, are presently stored at or otherwise located upon or within, or have been released from, the Property, and no part of the Property is contaminated by any such substance, (ii) the Property has never been used as a landfill, and (iii) the Property is not in violation of any other federal, state or local laws, rules, regulations or standards; and the Property is not impacted by a consent decree in connection with any of the foregoing.

9.1.8 **Absence of Adverse Proceedings**. No proceedings, actions, litigation, bankruptcy petitions, judgments or claims of any nature whatsoever, against Seller or the Property, are pending,or to the knowledge of Seller threatened, before any court, governmental regulatory authority or any administrative forum.

9.2 **Purchaser's Representations and Warranties**. Purchaser represents and warrants to Seller that:

9.2.1 **Organization and Authority**. Purchaser has been duly organized and is validly existing as a limited liability company in good standing in the State of Delaware. Purchaser has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Purchaser at the Closing will be, authorized and properly executed and constitute, or will constitute, as appropriate, the valid and binding obligation of Purchaser, enforceable in accordance with their terms.

9.2.2 **Conflicts and Pending Action**. There is no agreement to which Purchaser is a party or which is otherwise binding on Purchaser which is in conflict with this Agreement. There is no action or proceeding pending or, to Purchaser's knowledge, threatened against Purchaser which challenges or impairs Purchaser's ability to execute or perform its obligations under this Agreement.

9.3 **Survival of Representations and Warranties**. The representations and warranties set forth in this Article 9 are made as of the date of this Agreement and are remade as of the Closing Date and shall not be deemed to be merged into or waived by the instruments of Closing, but shall survive the Closing for a

period of twelve (12) months. Notwithstanding anything to the contrary contained in this Agreement, no claim for breach of representation or warranty of Seller or Purchaser shall be actionable or payable if the breach in question arises from or is based on a condition, state of facts or other matter as to which the other party had actual knowledge at or prior to Closing.

## ARTICLE 10 - Default and Remedies

**10.1 Seller's Remedies.** If Purchaser fails to perform its obligations pursuant to this Agreement at or prior to Closing for any reason except failure by Seller to perform hereunder, or if prior to Closing any one or more of Purchaser's representations or warranties are breached in any material respect, Seller shall be entitled, as its sole remedy (except as provided in Sections 4.5, 8.4, 10.3 and 10.4 hereof), to terminate this Agreement and recover the Earnest Money as liquidated damages and not as penalty, in full satisfaction of claims against Purchaser hereunder. Seller and Purchaser agree that Seller's damages resulting from Purchaser's default are difficult, if not impossible, to determine and the Earnest Money is a fair estimate of those damages which has been agreed to in an effort to cause the amount of such damages to be certain. If Closing is consummated, Seller shall have all remedies available at law or in equity in the event Purchaser fails to perform any obligation of Purchaser under this Agreement.

**10.2 Purchaser's Remedies.** If Seller fails to perform its obligations pursuant to this Agreement for any reason except failure by Purchaser to perform hereunder, or if prior to Closing any one or more of Seller's representations or warranties are breached in any material respect, Purchaser shall have the right to pursue specific performance and/or assert a claim for its out-of-pocket expenses; provided, however, if Seller does not cure or correct matters found objectionable by Purchaser in the Title Commitment or Survey, Purchaser's sole remedy shall be either to waive such objections and proceed to Closing, or terminate this Agreement pursuant to Section 4.3 hereof and receive the return of the Earnest Money.

**10.3 Attorney Fees.** In the event either party hereto employs an attorney in connection with claims by one party against the other arising from this Agreement, the non-prevailing party shall pay the prevailing party all reasonable fees and expenses, including attorney fees, incurred in connection therewith.

**10.4 Other Expenses.** If this Agreement is terminated due to the default of a party, then the defaulting party shall pay any fees or charges due to Escrow Agent for holding the Earnest Money as well as any escrow cancellation fees or charges and any fees or charges due to the Title Company for preparation and/or cancellation of the Title Commitment.

## ARTICLE 11 - Miscellaneous

**11.1 Parties Bound; Assignment.** This Agreement, and the terms, covenants, and conditions herein contained, shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and assigns of each of the parties hereto. Purchaser may assign its rights under this Agreement upon the following conditions: (i) the assignee of Purchaser shall assume all obligations of Purchaser hereunder, but Purchaser shall remain primarily liable for the performance of Purchaser's obligations, and (ii) a copy of the fully executed written assignment and assumption agreement shall be delivered to Seller prior to Closing.

**11.2 Like-Kind Exchange.** Purchaser hereby agrees to cooperate with Seller in the effectuation of a like-kind exchange under Section 1031 of the Internal Revenue Code of 1986, as amended ("Section 1031"), including without limitation, the execution and delivery of any and all documents reasonably required in accordance with the agreements of the parties set forth in this Agreement to effectuate such Section 1031 transaction; provided, however, that Purchaser shall not be obligated to incur any cost, expense, liability, obligation or other financial or legal exposure with respect thereto; and provided, further, that Seller shall indemnify, defend and hold Purchaser harmless of, from and against any and all loss, damage, cost or expense, including reasonable attorney fees and costs, incurred by Purchaser and in any way related to or arising from

any such exchange. In no event shall Purchaser be required to take title to any replacement or exchange property.

11.3 **Headings**. The article, section, subsection, paragraph and/or other headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

11.4 **Invalidity and Waiver**. If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and, to the greatest extent legally possible, effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

11.5 **Governing Law**. This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of theDistrict of Columbia.

11.6 **Survival**. The provisions of this Agreement shall survive the Closing, for a period of twelve (12) months, and shall not be deemed to be merged into or waived by the instruments of Closing.

11.7 **Entirety and Amendments**. This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property. This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

11.8 **Time**. Time is of the essence in the performance of this Agreement.

11.9 **Confidentiality**. Purchaser shall make no public announcement or disclosure of any information related to this Agreement to outside brokers or third parties, before or after the Closing, without the prior written specific consent of Seller; provided, however, that Purchaser may make disclosure of this Agreement as necessary to perform its obligations hereunder and as may be required under laws or regulations applicable to Purchaser.

11.10 **Notices**. All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Section 1.3. Any such notices shall, unless otherwise provided herein, be given or served (i) by depositing the same in the United States mail, postage paid, certified and addressed to the party to be notified, with return receipt requested, with a duplicate copy sent by facsimile to such party, (ii) by overnight delivery using a nationally recognized overnight courier, or (iii) by personal delivery. Notice deposited in the mail in the manner hereinabove described shall be effective on the third (3rd) business day after such deposit. Notice given in any other manner shall be effective only if and when received by the party to be notified between the hours of 8:00 a.m. and 5:00 p.m. of any business day with delivery made after such hours to be deemed received the following business day. A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice. Notices given by counsel to the Purchaser shall be deemed given by Purchaser and notices given by counsel to the Seller shall be deemed given by Seller.

11.11 **Construction**. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and agree that the normal rule of construction – to the effect that any ambiguities are to be resolved against the drafting party – shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

VD-000376

CERTIFICATE OF SATISFACTION

KNOW ALL BY THESE PRESENTS:

That ________________________________, ____________________,
(Name) (Title)
representing Transportation Leasing Company, Inc., does hereby certify and acknowledge, secured by that certain deed of trust made by Montgomery Road I Limited Partnership, to Charles E. Duke, Trustee, dated December 9, 1987 and recorded December 10, 1987 as Instrument No. 69751 among the Land Records of the District of Columbia, which encumbers the real property described in Exhibit "A" attached hereto, has been fully satisfied and that Transportation Leasing Company, Inc. was, at the time of satisfaction, the holder of the obligation that the lien of the said deed of trust is hereby released.

The property encumbered by said deed of trust is described as follows:

Lot numbered 432 in Square numbered 674 in a subdivision made by District of Columbia Redevelopment Land Agency as per plat recorded in Liber 146 at Folio 82 in the Office of Surveyor of the District of Columbia.

WITNESS the hand and seal of the party making this certification this _________ day of ______________________, 2000.

Transportation Leasing Company, Inc.

(SEAL) Authorized By ________________________________
(Officer)

ATTEST:

________________________________
Secretary

State of ____________________
County of __________________

This instrument was acknowledged before me on ______________________________, 2000 by __________________________ as ______________________President of Transportation Leasing Company, Inc.

(Notary Seal)

________________________________
Notary Public
My Commission Expires: _____________