# EXHIBIT 37

# ARNOLD & PORTER LLP

**Cynthia A. Giordano**
Cynthia_Giordano@aporter.com

202.942.5840
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

January 31, 2007

Viad Corp
c/o Rodney Page, Esq.
Bryan Cave LLP
700 13th Street, N.W.
Washington, D.C. 20005

Re: Expert Witness Report; Viad Corp Litigation

Dear Mr. Page:

You have asked me to testify as an expert addressing the following topics: the zoning and development potential of 90 K Street, N.E., Washington, D.C., Square 674, Lot 432, (the "Subject Property"), as well the process for purchasing, transferring and developing Transferable Development Rights ("TDRs") in the District of Columbia. My qualifications to provide the aforementioned opinions are set forth in my resume which is attached hereto as Exhibit "A." My compensation for providing this report is included in Exhibit "B" also attached hereto. In response to your request, I offer this letter as my opinion.

Subject Property Zoning and Development Potential

The Subject Property located at 90 K Street, N.E. is zoned C-3-C which permits a maximum height of 90 feet and a maximum FAR[1] of 6.5. It is also located in the North Capitol TDR Receiving Zone under the D.C. Zoning Regulations (§ 1709.17) which permits increased density up to the maximum height permitted by the 1910 Building Height Act and an FAR of 10.0 with TDRs.

---

[1] FAR is a general measure of building density. FAR, or floor-to-area ratio, is the result of adding together the square footage of all of the floors in a building and dividing that total by the land area of the lot. Thus, a one-story building covering 100% of the lot equals a 1.0 FAR. At the other end of the range, a ten-story building covering 100% of the lot is 10.0 FAR. Permitted FAR under District of Columbia zoning ranges from the lowest density 0.9 FAR to the highest density of 10.0 FAR.

# ARNOLD & PORTER LLP

Viad Corporation
c/o Rodney Page, Esq.
January 31, 2007
Page 2

TDRs Overview

Transferable Development Rights or TDRs are what the name implies: zoning density which may be transferred from a site on which the density is not used to another site on which the density may be developed.

TDRs were created in the District of Columbia in 1991 when the D.C. Zoning Commission enacted the "Downtown Development District" regulations ("DD regulations").[2] These regulations imposed significant requirements on new development projects in downtown Washington, ranging from minimum retail space requirements and historic preservation to design standards and mandated housing. But with these burdens came a benefit. To compensate owners subject to the new restrictions, the DD Regulations also created TDRs. Under the new regulations, when an owner develops a project which meets or exceeds certain requirements of the DD Regulations, TDRs are generated. These TDRs can then be sold at a profit for use on other development sites in designated "receiving" districts.

TDRs can have a dramatic impact on the value of downtown properties. For sending sites, generating and transferring TDRs can yield profits which mitigate the costs of historic preservation for providing preferred uses and provide an incentive for providing such uses. For receiving sites, TDRs can create additional density in a way that was formerly available only through expensive and lengthy discretionary zoning processes.

Since the enactment of the DD regulations in 1991, the TDRs have been successfully used to transfer density and increase density on sites in receiving zones.

TDRs Mechanics

The mechanics of a TDR transfer begins with a sending site and a receiving site. A sending site which is eligible to generate and transfer TDRs meets one of two profiles. It may be a designated historic property or a development project which provides certain preferred uses identified in the DD regulations.

---

[2] TDRs were adopted on a limited basis in 1989 with enactment of the Downtown Shopping District, Zoning Commission Order No. 609.

ARNOLD & PORTER LLP

Viad Corporation
c/o Rodney Page, Esq.
January 31, 2007
Page 3

With respect to designated historic properties, by restoring and/or preserving the historic property in accordance with City directives, the owner can generate TDRs in an amount up to 4.0 FAR, thereby typically offsetting a high percentage of the unbuilt but normally allowed density on the property (commensurate with the difference between the FAR of the approved project and the maximum permitted FAR for the property). For example, if the approved project has a density of 50,000 square feet, and zoning would otherwise permit the development of 75,000 square feet, 25,000 square feet of TDRs are generated and available for transfer. In summary, the approved project generates TDRs in an amount up to 4.0 FAR of the unused density or FAR on the site.

Projects which generate preferred uses which meet or exceed the minimum requirements of the DD Regulations, may also be eligible for TDRs. Preferred uses include retail, arts district, and housing. TDRs are triggered by devoting a portion of the sending site to these special uses. Generally, preferred use TDRs may be transferred only after the project on the sending site has been completed and the preferred use fully leased.

TDRs generated under the DD Regulations may be transferred to any other lot located within the DD District or to lots located within receiving zones which have been designated by the City as appropriate for high density commercial development. The "North Capitol" receiving zone, in which the subject property is located, is one such zone. It was established in October of 1998.

The TDR transfer process involves both a real estate transaction and a ministerial government process. For the owner of the sending site, the process begins with satisfying the conditions of the DD Regulations which give rise to TDRs: in the case of historic TDRs, developing and completing a renovation program for the improvements on the sending site; in the case of preferred use TDRs, usually constructing the space for the preferred use and then leasing it up.

Once the project on the sending site is completed or at least well under way, the owner of the sending site can sell their TDRs to an owner of a receiving site. The respective owners will enter into a purchase agreement to buy and sell all or a portion of the TDRs generated by the sending site. The agreement is similar to an agreement for the transfer of commercial real estate, including a deposit, representations and warranties, covenants of performance and similar matters.

# ARNOLD & PORTER LLP

Viad Corporation
c/o Rodney Page, Esq.
January 31, 2007
Page 4

      The transfer must then be certified by the District government. The owner of the sending site will process with the District of Columbia zoning, planning and legal agencies a "TDR Covenant." The TDR Covenant restricts the sending site in perpetuity to provide the preferred use giving rise to TDRs, or to maintain the historic project undertaken. Once approved and executed by the District, the TDR Covenant is recorded in the land records and runs with the chain of title to the sending site.

      The parties also process with the same District agencies a "TDR Certificate." This document is akin to a deed, and legally transfers the specified TDRs from the sending site to the receiving site. Standard forms for the TDR Covenant and the TDR Certificate have been developed by the City and the process for City review and execution is ministerial in nature. The TDR Certificate is recorded at closing on the transfer of TDRs, and completes the transaction between sending lot and receiving lot. A transfer is not cast in stone, however, the DD regulations permit the re-transfer from the original receiving lot to another eligible receiving lot.

      The DD regulations also permit "banking" (i.e., holding) of TDRs, either on a receiving site or independent of any receiving site. A purchaser can acquire TDRs from a sending site, and then hold them for retransfer to an eligible receiving site. This gives purchasers some maneuvering room in the event that TDRs are acquired for a development which does not proceed. It also gives investors the ability to "play the market" and stockpile TDRs in anticipation of an increased demand and higher TDR prices.

The TDRs Market in the District of Columbia

      Based upon my firm's involvement in negotiating a substantial number of TDR sales, and drafting TDR covenants and certificates and obtaining the necessary District government review and execution of the same, as well as my zoning experience which entails the prosecution and monitoring of zoning cases and processes in the District of Columbia, I offer the following observations about the TDR market in the District of Columbia since the adoption of the North Capitol receiving area in 1998. Numerous TDR transfers have occurred since that date and the program generally works as intended. TDRs have generally been readily available for purchase and the going rate for TDRs have generally ranged since 1998 from a high of approximately $25.00 per square foot of transferred density to a low of $3.00 per square foot with an overall downward trend in prices to the present.

# ARNOLD & PORTER LLP

Viad Corporation
c/o Rodney Page, Esq.
January 31, 2007
Page 5

Conclusion

The establishment of a receiving zone is effectively an up-zoning of the properties located within the zone to a higher matter-of-right density. In the North Capitol receiving zone, in which the Subject Property is located, TDRs may be used to increase matter-of-right FAR from a maximum of 6.5 FAR to as much as 10.0 FAR with TDRs.

Utilizing approximately 360,513 square feet of TDRs, the density of the Subject Property can potentially be increased from 6.5 to 10.0 FAR. As indicated above, this approximate quantity of TDRs has been available in the market since the inclusion of the Subject Property in a receiving zone at prices which have generally ranged from approximately $25.00 to $3.00 per square foot with an overall downward trend in prices to the present. TDRs are currently selling at $5.50 to $5.25 per square foot.

In closing, I have attached hereto as Exhibit "C" a list of documents which I have considered in formulating the opinions set forth in this report.

Thank you for the opportunity to present these opinions.

Respectfully submitted,

*Cynthia Giordano*

Cynthia A. Giordano

Attachments

# ARNOLD & PORTER LLP

## CYNTHIA A. GIORDANO

Cynthia A. Giordano is Counsel to the Real Estate Practice Group of the firm. She has over twenty-five years of legal experience in land use, zoning, and historic preservation in the District of Columbia. She specializes in the analysis, interpretation, and implementation of complex zoning and land use regulations including PUDs, TDRs, overlay zones, variances and special exceptions.

**Educational Background**

- Juris Doctor, with honors, George Washington National Law Center, 1979

- Bachelor of Arts, University of Wisconsin, 1976; Dean's List, Honors Program

**Significant Recent Projects**

- Charles E. Smith Company, zoning approvals and TDRs analysis for a new Downtown commercial project at 1925 K Street, N.W.

- A&R Development Corporation/Mid-City Urban, zoning for new residential and retail development located at the Rhode Island Avenue Metro Station

- DC Housing Authority/A&R Development Corporation, land use counsel for the redevelopment of the East Capitol Dwellings -- Planned Unit Development ("PUD") approval for a 500+ unit, 40-acre mixed-income residential community with a 10-acre retail shopping center

- DC Housing Authority/The Enterprise Foundation/A&R Development Corporation, Planned Unit Development ("PUD") approval for Wheeler Creek Estates, a new 314-unit mixed income residential community in Southeast, Washington

- JBG Companies, land use and historic preservation approvals for new apartment project at 1300 N Street, NW, in Logan Circle

- The Kaempfer Company/Forest City Enterprise, Inc. – PUD approvals for mixed-use redevelopment of Waterside Mall in Southwest, Washington

- DC Department of Mental Health, land use and historic preservation counsel in connection with development of a new

mental health facility on the historic St. Elizabeth's hospital campus in Southeast Washington

- Avalon Bay Communities, Inc., land use approvals The Avalon at Gallery Place, a new 200 unit apartment building under construction in Chinatown

- Howard University, Campus Plan approvals and zoning for numerous new University projects

- The George Washington University, zoning approvals for new School of Business and Media and Public Affairs Building

- Home Depot, land use counsel for new store in the District of Columbia

**Professional Affiliations**

- D.C. Bar Association

- Urban Land Institute, Workforce Housing Task Force

- Commercial Real Estate Women

2

**EXHIBIT "B"**



Rodney F. Page
Direct: (202) 508-6002
Fax: (202) 508-6200
rfpage@bryancave.com

## VIA E-MAIL AND FIRST CLASS MAIL

January 31, 2007

Cynthia A. Giordano, Esq.
Arnold & Porter LLP
555 12th Street, NW
Washington, D.C. 20004

Dear Ms. Giordano,

I am writing to confirm our discussion regarding certain pending litigation in the federal court in Washington, D.C. I represent Viad Corp, and I have requested that you provide certain expert testimony in the pending litigation. You have agreed to do so and to provide a written report stating your opinion. My client Viad Corp agrees to pay your hourly rate of $500 for time spent preparing your report, preparing for testimony, and testifying in the event you are required to do so.

Thank you for your cooperation in this matter.

Sincerely yours,

Rodney F. Page

RFP/wmb

Bryan Cave LLP
700 Thirteenth Street NW
Washington, DC 20005-3960
Tel (202) 508-6000
Fax (202) 508-6200
www.bryancave.com

Chicago
Hong Kong
Irvine
Jefferson City
Kansas City
Kuwait
Los Angeles
New York
Phoenix
Shanghai
St. Louis
Washington, DC

And Bryan Cave,
A Multinational Partnership.

London

# ARNOLD & PORTER LLP

**Cynthia A. Giordano**
Cynthia_Giordano@aporter.com

202.942.5840
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

January 31, 2007

Viad Corporation
c/o Rodney Page, Esq.
Bryan Cave LLP
700 13th Street, N.W.
Washington, D.C. 20005

Dear Mr. Page:

     Arnold & Porter (the "Firm") would be pleased to help Viad Corporation ("Viad") by providing expert advice and testimony in a zoning dispute. The purpose of this letter is to set forth a proposal for our fees and related expenses with respect to this matter.

     1.    **Fee Proposal.** Anticipated charges will include the legal fees of Cynthia Giordano. Cynthia Giordano's hourly rate for this matter will be $500.

     2.    **Statement for Fees and Expenses.** We will send Viad a monthly statement covering our fees and expenses, providing such reasonable detail as you may require. All fees and expenses set forth on such statements shall be due and payable within thirty (30) days following Viad's receipt of such statements.

     3.    **Reimbursement of Expenses.** While some firms have elected to recover overhead expenses as part of the basic charges for legal services, we believe that it is more appropriate to charge our clients for such services (*e.g.*, taxi fares, photocopying, express delivery, long-distance telephone calls) only to the extent that they are used for a particular matter. We will bill Viad at cost for charges to third parties, and charges for internal services will be billed at the firm's usual and customary rates for such services.

     4.    **Waiver.** In connection with Viad's retention of A&P for legal advice and representation for legal advice and representation, we want to remind you that A&P is a large firm, with offices in four United States cities and several foreign countries. Our practice is broadly based and covers many areas of both domestic and international law. The very size of the firm has created situations where limited work for one client in one area has barred other lawyers from pursuing major matters, unrelated to the first matter.

     Furthermore, if A&P represents a party in any matter adverse to Viad, A&P shall prohibit, and sufficiently screen Cynthia Giordano and Nate Gross, and any other A&P

Washington, DC    New York    London    Brussels    Los Angeles    Century City    Northern Virginia    Denver

# ARNOLD & PORTER LLP

Rodney Page, Esq.
January 31, 2007
Page 2

legal or professional staff persons who have been engaged in our representation of your firm hereunder, from participating in such matter.

So that we are not unnecessarily conflicted from representing Viad or our other clients, we routinely ask clients for advance waivers of conflicts of interest in matters distinct from the matters on which we represent them. Thus we request an advance agreement from your firm that Arnold & Porter will not be disqualified by reason of our representation of you from representing interests adverse to you in litigation, transactions or other matters that are not substantially related to the matters on which we have been retained by Viad. This waiver and consent would not permit us to represent interests directly adverse to you in matters that are substantially related to the work done for you. And, of course, we will hold your firm's confidences and secrets in confidence.

This will also confirm our understanding that, unless we reach an explicit understanding to the contrary, we are being engaged by, and will represent, Viad and not any parent, subsidiary or affiliated entities.

If you have any questions about the proposed terms of engagement, as described above, please contact us at your earliest convenience. If the terms of the engagement are satisfactory to the ~~D.C. Public Schools~~, we would appreciate it if you would sign and return to us a copy of this letter, evidencing your agreement to these terms.

Thank you for considering Arnold & Porter to represent you.

Sincerely,

Cynthia Giordano

Cynthia A. Giordano

ACCEPTED AND AGREED TO:

VIAD CORPORATION

By: _____

Dated: _____1/31/07_____

**Exhibit "C"**

**Montgomery Road I Limited Partnership v. Viad Corp, Case No. 1:06CV00344 (HHK)**

# Documents Considered by Cynthia Giordano

1.  D.C. Zoning Regulations, § 1709.17

2.  Downtown Shopping District, Zoning Commission Order No. 609

3.  Downtown Development District, D.C. Zoning Commission Regulations, §§ 1700-1799

4.  North Capitol Receiving Zone, Zoning Commission Order No. 860, October 19, 1998

5.  Umbrella Agreement dated August 10, 2006 between Montgomery Road I Limited Partnership, 45 L Street Venture, LLC, and TC MidAtlantic Development, Inc.

6.  Land Purchase and Sale Agreement between Montgomery Road I Limited Partnership and TC MidAtlantic, Development, Inc., dated August 11, 2006

7.  Agreement of Purchase and Sale of Transferable Development Rights between Montgomery Road I Limited Partnership and TC MidAtlantic, Development, Inc., dated August 10, 2006

8.  Land Purchase and Sale Agreement between 45 L Street Venture, LLC and TC MidAtlantic, Development, Inc., dated August 11, 2006

9.  Agreement of Purchase and Sale of Transferable Development Rights between 45 L Street Venture, LLC and TC MidAtlantic, Development, Inc., dated August 10, 2006

10. Second Amendment to Land Purchase and Sale Agreement between Montgomery Road I Limited Partnership and TC MidAtlantic, Development, Inc., dated October 31, 2006

11. First Amendment to Agreement of Purchase and Sale of Transferable Development Rights between Montgomery Road I Limited Partnership and TC MidAtlantic, Development, Inc., dated October 31, 2006

12. Second Amendment to Land Purchase and Sale Agreement between 45 L Street Venture, LLC and TC MidAtlantic, Development, Inc., dated October 31, 2006

13. First Amendment to Agreement of Purchase and Sale of Transferable Development Rights between 45 L Street Venture, LLC and TC MidAtlantic, Development, Inc., dated October 31, 2006

14. Cash Participation Agreement by and between Montgomery Road I Limited Partnership and Transportation Leasing Company, dated November 30, 1987

15. First Amended Complaint for Declaratory Judgment

16. Answer and Affirmative Defenses to First Amended Complaint, and Counterclaim of Defendant Viad Corp

17. Appraisal of Real Property, prepared by Cushman & Wakefield of Washington, DC., Inc. for Viad Corp, dated June 24, 2006