# EXHIBIT 54

APPRAISAL OF REAL PROPERTY

**Development Site**
90 K Street, NE
Washington, D.C. 20002

IN A SELF-CONTAINED APPRAISAL REPORT

As of June 24, 2006

Prepared For:

**Viad Corp**
Viad Tower, 1850 N. Central Avenue, Suite 850
Phoenix, Az 85004

Prepared By:

**Cushman & Wakefield of Washington, D.C., Inc.**
Valuation Services, Capital Markets Group
1801 K Street NW, Suite 1100-L
Washington, D.C. 20006

C&W File ID:   06-26001-9427

VALUATION SERVICES

CUSHMAN &
WAKEFIELD.



**Cushman & Wakefield of Washington, D.C., Inc.**
1801 K Street NW, Suite 1100-L
Washington, D.C. 20006
(202) 739-0869 Tel
(202) 223-8963 fax
steve.halbert@cushwake.com

July 11, 2006

Mr. Scott Sayre
Vice President & General Counsel
**Viad Corp**
Viad Tower, 1850 N. Central Avenue, Suite 850
Phoenix, Az 85004

Re:    Appraisal of Real Property
       In a Self-Contained Report

       **Development Site**
       90 K Street, NE
       Washington, D.C. 20002

       C&W File ID:  06-26001-9427

Dear Mr. Sayre:

In fulfillment of our agreement as outlined in the Letter of Engagement, we are pleased to transmit our appraisal presented in a self-contained report on the property referenced above. The date of the report is July 11, 2006. The effective date of the As Is value is June 24, 2006.

The value opinion reported herein is qualified by certain assumptions, limiting conditions, certifications, and definitions, which are set forth in the report. We particularly call your attention to the extraordinary assumptions and hypothetical conditions listed after our value estimate.

The intended use of the appraisal and report is for internal decision making related to a retained cash participation. This report may not be distributed to or relied upon by any other persons or entities without the written permission of Cushman & Wakefield of Washington, D.C., Inc.

This report was prepared for Viad Corp and is intended only for their specified use. It may not be distributed to or relied upon by any other persons or entities without the written permission of Cushman & Wakefield of Washington, D.C., Inc.

This appraisal report has been prepared in accordance with our interpretation of Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) and the Uniform Standards of Professional Appraisal Practice (USPAP), including the Competency Provision.

**Market Value As Is**

Based on our appraisal as defined by the *USPAP*, we have developed an opinion that the Market Value As Is of the Fee Simple estate of the referenced property, subject to the

Mr. Scott Sayre
Viad Corp
July 11, 2006
Page 2

assumptions and limiting conditions, certifications, extraordinary and hypothetical conditions, if any, and definitions, on June 24, 2006 was:

## SIXTY-FOUR MILLION EIGHT HUNDRED THOUSAND DOLLARS

### $64,800,000

### Extraordinary Assumptions

An extraordinary assumption is defined by the *USPAP* (2005 Edition, The Appraisal Foundation, page 3) as "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

This appraisal employs no extraordinary assumptions.

### Hypothetical Conditions:

A hypothetical condition is defined by the *USPAP* (2005 Edition, The Appraisal Foundation, page 3) as "that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

This appraisal employs no hypothetical conditions.

This letter is invalid as an opinion of value if detached from the report, which contains the text, exhibits, and Addenda.

Respectfully submitted,

**CUSHMAN & WAKEFIELD OF WASHINGTON, D.C., INC.**

Steven M. Halbert, J.D., MAI, MRICS
Senior Director
District of Columbia Certified General
Appraiser
License No. GA 10262
Steve.Halbert@cushwake.com
(202) 739-0869 Office Direct
(202) 223-8963 Fax

## Scope of Work

This appraisal is presented in a self-contained report, intended to comply with the reporting requirements set forth under the *USPAP* for a Self-Contained Appraisal Report. In addition, the report was also prepared to conform to the requirements of the Code of Professional Ethics of the Appraisal Institute.

In preparation of this appraisal, we investigated numerous land sales in the subject's market, and considered the input of buyers, sellers, brokers, property developers and public officials. Additionally, we investigated the general regional economy as well as the specifics of the local area of the subject.

The scope of this appraisal required collecting primary and secondary data relative to the subject property. The depth of the analysis is intended to be appropriate in relation to the significance of the appraisal issues as presented herein. The data have been analyzed and confirmed with sources believed to be reliable, in the normal course of business, leading to the value conclusions set forth in this report. In the context of completing this report, we made a physical inspection of the subject property. The valuation process involved utilizing generally accepted market-derived methods and procedures considered appropriate to the assignment.

This appraisal employs only the Sales Comparison Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable for market participants.

## Intended Use and Users of the Appraisal

<u>Intended Use</u>

This appraisal is intended to provide an opinion of the As Is Market Value of the Fee Simple interest for Internal decision making related to a retained cash participation. All other uses are unintended, unless specifically stated in the letter of transmittal.

<u>Intended User</u>

This report was prepared for Viad Corp and is intended only for their specified use. It may not be distributed to or relied upon by any other persons or entities without the written permission of Cushman & Wakefield of Washington, D.C., Inc.

This appraisal report has been prepared in accordance with our interpretation of Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) and the Uniform Standards of Professional Appraisal Practice (USPAP), including the Competency Provision.

# EXECUTIVE SUMMARY

The following is an executive summary of the information that we present in more detail within the report.

## BASIC INFORMATION

| | | | |
|---|---|---|---|
| Common Property Name: | Development Site | CW File Reference: | 06-26001-9427 |
| Address: | 90 K Street, NE | Appraisal Type: | Self-Contained |
| City: | Washington | | |
| State: | D.C. | Value Interest Appraised: | Fee Simple |
| Zip Code: | 20002 | Date of Value: | 6/24/06 |
| County: | Washington | Date of Inspection: | 6/24/06 |
| Property Ownership Entity: | Montgomery Road I LP | Date of Transmittal Letter: | 7/11/06 |
| | Greenebaum 7 Rose | | |
| | Associates | | |

## SITE INFORMATION

| | | | |
|---|---|---|---|
| Land Area Gross SF: | 103,878 | Site Utility: | Very good |
| Land Area Acres: | 2.38 | Site Topography: | Level at street grade |
| Is there additional Excess Land? | No | Site Shape: | Rectangular |
| Excess Land Area SF: | 0 | Frontage: | Good |
| Excess Land Area Acres: | 0.00 | Access: | Good |
| Total Land Area SF: | 103,878 | Visibility: | Good |
| Total Land Area Acres: | 2.38 | Location Rating: | good |
| Flood Zone: | C | Number of Parking Spaces: | N/A |
| Flood Map Number: | 110001 0020B | Parking Ratio (per 1,000 sf): | N/A |
| Flood Map Date: | 11/15/85 | Parking Type: | Surface |

## MUNICIPAL INFORMATION

| | | | |
|---|---|---|---|
| Assessor's Parcel Number: | Square 674 Lot 432 | Subject's assessment is: | Below market levels |
| Assessing Authority: | District of Columbia | Municipality Governing Zoning: | District of Columbia |
| Current Tax Year: | 2007 | Current Zoning: | C-3-C |
| Land Taxable Assessment As Is: | $27,068,170 | Is current use permitted: | Yes |
| Current Tax Liability: | $500,761 | Current Use Conformance: | Conforming Use |
| Taxes per square foot: | $0.42 | Zoning Change Applied For: | No |
| Are taxes current? | Taxes are current | Zoning Variance Applied For: | Not applicable |
| Is a grievance underway? | Not to our knowledge | | |

## HIGHEST & BEST USE

| | |
|---|---|
| As Vacant: | As Improved: |
| Office development as and when dictated by market conditions | N/A |

| | AS IS |
|---|---|
| **LAND VALUATION** | |
| Land Value | |
|   Indicated Value: | $64,800,000 |

| EXPOSURE AND MARKETING TIME | |
|---|---|
| Exposure Time: | 6 Months |
| Marketing Time: | 6 Months |

## Extraordinary Assumptions and Hypothetical Conditions

### Extraordinary Assumptions

An extraordinary assumption is defined by the *USPAP* (2005 Edition, The Appraisal Foundation, page 3) as "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."



## EXECUTIVE SUMMARY

This appraisal employs no extraordinary assumptions.

Hypothetical Conditions

A hypothetical condition is defined by the *USPAP* (2005 Edition, The Appraisal Foundation, page 3) as "that which is contrary to what exists but is supposed for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis."

This appraisal employs no hypothetical conditions.

CUSHMAN & WAKEFIELD®

**ZONING**

## General Information

The property is zoned C-3-C by District of Columbia. Permitted uses within this district include office, retail, housing, and mixed uses. Prohibited uses within this district include industrial uses.

This locale is a receiving zone for transferable development rights (TDRs).

A summary of the subject's zoning is provided below:

| ZONING | |
|---|---|
| Municipality Governing Zoning: | District of Columbia |
| Current Zoning: | C-3-C |
| Change In Zone Likely: | No |
| Change To: | Not applicable |
| Zoning Change Applied For: | No |
| Zoning Variance Applied For: | Not applicable |
| Permitted Uses: | Permitted uses within this district include office, retail, housing, and mixed uses. |
| Prohibited Uses: | Prohibited uses within this district include industrial uses. |

| ZONING REQUIREMENTS | CODE | ECT CONFORM |
|---|---|---|
| Maximum Building Height: | 90 ft | Conforming |
| Maximum Floor Area Ratio (FAR): | 9.6 times lot area | Conforming |
| Maximum Lot Coverage (% of lot area): | 100% | Conforming |
| Minimum Yard Setbacks | | |
| Front (feet): | 0 | Conforming |
| Rear (feet): | 0 | Conforming |
| Side (feet): | 0 | Conforming |
| Required On-Site Parking: | | |
| Spaces per 1,000 square feet: | 1 space per 1,000 SF gross floor area above 2,000 SF | Conforming |

*Compiled by Cushman & Wakefield, Inc.*

## Zoning Conformance

The subject lies in one of the downtown receiving zones for transferable development rights, the acquisition of which would allow the developers to increase the density of their development. The **potential** allowable FAR for the subject site is 10.0 with a height of 130 feet. The developer reportedly has plans for a 9.6 FAR multi-building development.

We analyzed the zoning requirements in relation to the subject property. We are not experts in the interpretation of complex zoning ordinances but based on our review of public information, the subject property appears to be a conforming use. Even so, the determination of compliance is beyond the scope of a real estate appraisal.

We know of no deed restrictions, private or public, that further limit the subject property's use. The research required to determine whether or not such restrictions exist, however, is beyond the scope of this appraisal assignment. Deed restrictions are a legal matter and only a title examination by an attorney or title company can usually uncover such restrictive covenants. Thus, we recommend a title search to determine if any such restrictions do exist.

 CUSHMAN & WAKEFIELD.

**HIGHEST AND BEST USE**

**Definition Of Highest And Best Use**

According to *The Dictionary of Real Estate Appraisal*, Fourth Edition (2002), a publication of the Appraisal Institute, the highest and best use is defined as:

> The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.

**Highest And Best Use Criteria**

The highest and best use analysis generally involves consideration of the subject site under two scenarios: as though vacant land and as presently improved. The highest and best use of the underlying land may differ from that of the property as improved if the improvements do not constitute an appropriate use. The existing use, however, should be continued until the value of the land, less the cost to demolish the existing improvements, exceeds the value of the property as currently improved.

We have evaluated the site's highest and best use both as currently improved and as if vacant. In both cases, the property's highest and best use must meet four criteria. That use must be (1), legally permissible (2) physically possible, (3) financially feasible, and (4) maximally productive.

Legally Permissible

The legal permissibility of a potential use on the subject site is governed by the zoning in effect at the time of the appraisal. As described in the Zoning section, the subject site is zoned C-3-C by the District of Columbia. According to our understanding of the zoning ordinance, permitted uses within this district include office, retail, housing, and mixed uses. This municipality also cites certain uses that are prohibited in this zone. Prohibited uses within this district include industrial uses.

Aside from the site's zoning regulations, we are not aware of any legal restrictions that limit the potential uses of the subject.

Physically Possible

The physical possibility of a use is determined by characteristics such as size, shape, topography, the availability of utilities, and any other physical aspects of the site. The subject site contains 103,878 square feet. The site is level at street grade, and is rectangular in shape. The site has good frontage, good access, and good visibility. The overall utility of the site is considered to be very good.

All public utilities are available to the site including public water and sewer, gas, electric and telephone. Overall, the site is considered adequate to accommodate most permitted development possibilities.

Financial Feasibility and Maximal Productivity

The third and fourth tests are what is financially feasible and what will produce the highest net return. After analyzing the physically possible and legally permissible uses of the property, the highest and best use must be considered in light of financial feasibility and maximum productivity. For a potential use to be seriously considered, it must have the potential to provide



## HIGHEST AND BEST USE

a sufficient return to attract investment capital over alternative forms of investment. A positive net income or acceptable rate of return would indicate that a use is financially feasible.

Financially feasible uses are those uses that can generate a profit over and above the cost of acquiring the site, and constructing the improvements. Determining the value of a property upon completion of new construction typically requires an in depth analysis of the economic factors that drive value including the condition of the local market, the location of the subject property, the proposed use of the property, its tenancy (owner-user, single tenant, multi-tenant), level of pre-leasing, an estimate for absorbing vacant space, leasing costs, operating expenses, market vacancy and rental rates.

Of the uses that are permitted, possible, and financially feasible, the one that is considered to be maximally productive is considered the highest and best use. Determining which use is maximally productive is often straightforward, but at times it can be quite complicated. Detailed analysis of values, costs, and returns will need to be conducted for the various uses being put to this final test.

### Conclusion

We considered the legal issues related to zoning and legal restrictions. We have analyzed the physical characteristics of the site to determine what legal uses would be possible use. We then considered the financial feasibility of these uses, in order to determine the use that we feel is the one that is maximally productive.

Considering the subject site's physical characteristics and location, as well as the state of the local office market, it is our opinion that the Highest and Best Use of the subject site as though vacant is office development as and when dictated by market conditions.



## VALUATION PROCESS

**Methodology**

There are three generally accepted approaches available in developing an opinion of value: the Cost, Sales Comparison and Income Capitalization approaches. We have considered each in this appraisal to develop an opinion of the market value of the subject property. In appraisal practice, an approach to value is included or eliminated based on its applicability to the property type being valued and the quality of information available. The reliability of each approach is dependent upon the availability and comparability of the market data uncovered as well as the motivation and thinking of purchasers in the market for a property such as the subject. Each approach is discussed below, and applicability to the subject property is briefly addressed in the following summary.

Land Value

Developing an opinion of land value is typically accomplished via the Sales Comparison Approach by analyzing recent sales transactions of sites of comparable zoning and utility adjusted for differences which exist between the comparables and the subject. Valuation is typically accomplished using a unit of comparison such as price per square foot of land, price per acre, price per unit, or price per square foot of potential building area (FAR). Adjustments are applied to the unit of comparison from an analysis of comparable sales, and the adjusted unit of comparison is then used to derive a value for the subject site.

Cost Approach

The Cost Approach is based upon the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements which represent the highest and best use of the land; or when relatively unique or specialized improvements are located on the site, for which there exist few improved sales or leases of comparable properties.

In the Cost Approach, the appraiser forms an opinion of the cost of all improvements, depreciating them to reflect any value loss from physical, functional and external causes. Land value, entrepreneurial profit and depreciated improvement costs are then added resulting in a value estimate for the subject property.

Sales Comparison Approach

The Sales Comparison Approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject property. Valuation is typically accomplished using a unit of comparison such as price per square foot of building area, effective gross income multiplier or net income multiplier. Adjustments are applied to the unit of comparison from an analysis of comparable sales, and the adjusted unit of comparison is then used to derive a value for the subject property.

Income Capitalization Approach

This approach first determines the income-producing capacity of a property by utilizing contract rents on leases in place and by estimating market rent from rental activity at competing properties for the vacant space. Deductions then are made for vacancy and collection loss and operating expenses. The resulting net operating income is divided by an overall capitalization rate to derive an opinion of value for the subject property. The capitalization rate represents the

 CUSHMAN & WAKEFIELD.

## VALUATION PROCESS

relationship between net operating income and value. This method is referred to as Direct Capitalization.

Related to the Direct Capitalization Method is the Discounted Cash Flow Method. In this method, periodic cash flows (which consist of net operating income less capital costs) and a reversionary value are developed and discounted to a present value using an internal rate of return that is determined by analyzing current investor yield requirements for similar investments.

### Summary

This appraisal employs only the Sales Comparison Approach. Based on our analysis and knowledge of the subject property type and relevant investor profiles, it is our opinion that this approach would be considered necessary and applicable for market participants.

The valuation process is concluded by analyzing each approach to value used in the appraisal. When more than one approach is used, each approach is judged based on its applicability, reliability, and the quantity and quality of its data. A final value opinion is chosen that either corresponds to one of the approaches to value, or is a correlation of all the approaches used in the appraisal.



## LAND VALUATION

We used the Sales Comparison Approach to develop an opinion of land value. In this method, we analyzed prices buyers have recently paid for similar sites in the market, as well as examined current offerings. In making comparisons, we adjusted the sale prices for differences between this site and the comparable sites. If the comparable was superior to the subject, a downward adjustment was made to the comparable sale. If inferior, an upward adjustment was made. We present on the following pages a summary of pertinent details of sites recently sold that we compared to the subject site.

In the valuation of the subject site's fee simple interest, the Sales Comparison Approach has been used to establish prices being paid for comparably zoned land. The most widely used and market oriented unit of comparison for properties with characteristics similar to those of the subject are price per square foot of potential building area (FAR). All transactions utilized in this analysis are based on the most appropriate method used in the local market.

The major elements of comparison utilized to value the subject site include the property rights conveyed, the financial terms incorporated into the transaction, the conditions or motivations surrounding the sale, changes in market conditions since the sale, the location of the real estate, its utility and the physical characteristics of the property.

The comparables and our analysis are presented on the following pages.

### OFFICE LAND SALE LOCATION MAP

CUSHMAN & WAKEFIELD.

LAND VALUATION

CUSHMAN &
WAKEFIELD.

33

VALUATION SERVICES

# LAND VALUATION

## SUMMARY OF OFFICE LAND SALES

| No. | Location | PROPERTY INFORMATION | | | | | TRANSACTION INFORMATION | | | | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Size (sf) | Potential Building Area | Zoning | Site Utility | Public Utilities | Grantor | Grantee | Sale Date | Sale Price | $/SF Build. | |
| 1 | 100 M Street, NE, Washington, DC | 302,429 | 2,200,000 | C-3-C | Excellent | All Available | Loucas/da/Akridge | Stoneridge/Walton Street | 3/06 | $122,000,000 | $55.45 | Constitution Square will eventually contain 2.2 msf of office, residential, and retail space. The first phase, which is set to begin in early 2007 will be a 350,000 sf office building and a 500,000 sf residential tower with first floor retail. Prior sale Sep 03 at $7,834 million or a compound growth rate of 187%. |
| 2 | 77 K Street NE, Washington, DC | 33,566 | 285,311 | C-3-C | Good | All Available | Cafritz | ING Clarion | 3/06 | $24,000,000 | $84.12 | Previously under contract–however, buyer (ING) has filed suit to force seller to accept terms of previous contract. Seller is reportedly marketing the project at the above price. Artist's rendering of building under construction as of spring 2006. |
| 3 | 1111 North Capitol Street NE, Washington, DC | 86,725 | 500,000 | C-3-C | Good | All Available | Stern & Moran | WB/BFP North Capitol Street, LLC-J St | 10/05 | $25,597,269 | $51.19 | The Smithsonian warehouse on this property has 3-6 years remaining on the lease depending on the owner or tenant terminating. The existing building will be retained and the new development will be added to achieve and expected 500,000 SF total-5.76 FAR. The NE lot is under contract for $12,000,000 or $63 to $67/FAR based on allowable/planned. Settlement set for May/June 2006. |
| 4 | 1200 1st St NE, Washington, DC | 106,885 | 908,523 | C3C, Washington | Good | All Available | Department of Housing and Community | First E. M. LLC | 8/05 | $58,000,000 | $63.84 | 1st building is under construction at FAR pricing of $60/0SF. 2nd & 3rd buildings planned at $65/6SF FAR. |
| 5 | 601 L Street NE, Washington, DC | 127,050 | 628,000 | C-M-3, Washington | Good | All Available | 52 L Street Data Center LLC | JF NoMa LLC | 6/05 | $35,769,703 | $57.14 | This assemblage planned for 650,000 in two office buildings. The price above included demolition costs paid by buyer. This property in escrow with April/May closing at $78 million including 358,000 SF of TDRs. Deducting an estimated $4/TDR from the price results in net contract price of $76.568 million or about $76/SF of mixed use planned development (650,000 SF office + 362,500 SF residential). This contract buyer has increased the allowable density by TDRs. |
| 6 | 731-733 2nd Street NE, Washington, DC | 34,444 | 206,664 | PUD-072 | Good | All Available | H Street Overpass, LLC | SH Holdings No 777 LLC | 1/05 | $14,500,000 | $70.16 | This parcel is the eastern-most in a large multi-parcel development by the buyer called "Station Place". The Station Place project is a series of office buildings being constructed adjacent to Union Station in Northeast Washington, DC. It is a large parcel of land that will eventually have up to 2.1 million square feet of office space. The entire project is zoned as a PUD where a maximum FAR of 6.0 is allowed. |

## STATISTICS

| | Size (sf) | Potential Building Area | | | | | | | Sale Date | Sale Price | $/SF Build. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Low | 33,566 | 206,664 | | | | | | | 1/05 | $14,500,000 | $51.19 | |
| High | 302,429 | 2,200,000 | | | | | | | 3/06 | $122,000,000 | $84.12 | |
| Average | 115,183 | 787,750 | | | | | | | 9/05 | $46,644,495 | $63.65 | |

Compiled by Cushman & Wakefield, Inc.

VALUATION SERVICES

34



CUSHMAN & WAKEFIELD.

# LAND VALUATION

## OFFICE LAND SALE ADJUSTMENT GRID

| No. | Price Per Building Area/SF | Economic Adjustments (Cumulative) | | | | Per SF of Building Subtotal | Property Characteristic Adjustments (Additive) | | | | | Adj. Price Per SF of Building | Overall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Property Rights Conveyed | Conditions of Sale | Financing | Market(1) Conditions | | Location | Size | Public Utilities | Utility(2) | Other | | |
| 1 | $55.45 3/06 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 1.5% | $56.29 1.5% | Similar 0.0% | Larger 10.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $61.92 10.0% | Inferior |
| 2 | $84.12 3/06 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 1.5% | $85.38 1.5% | Similar 0.0% | Smaller -10.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $76.84 -10.0% | Superior |
| 3 | $51.19 10/05 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 3.6% | $53.04 3.6% | Superior -10.0% | Smaller -5.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $45.08 -15.0% | Superior |
| 4 | $63.84 8/05 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 4.5% | $66.71 4.5% | Similar 0.0% | Smaller -5.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $63.38 -5.0% | Superior |
| 5 | $57.14 8/05 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 4.5% | $59.71 4.5% | Similar 0.0% | Smaller -5.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $56.73 -5.0% | Superior |
| 6 | $70.16 8/05 | Fee Simple 0.0% | Arms-Length 0.0% | None 0.0% | Inferior 4.5% | $73.32 4.5% | Superior -10.0% | Smaller -10.0% | Similar 0.0% | Similar 0.0% | Similar 0.0% | $58.66 -20.0% | Superior |

| | | |
|---|---|---|
| $51.19 | - Low | Low - $45.08 |
| $84.12 | - High | High - $76.84 |
| $64.95 | - Average | Average - $60.43 |

*Compiled by Cushman & Wakefield, Inc.*

(1) **Market Conditions Adjustment Footnote**
Compound annual change in market conditions: 5.00%
Date of Value (for adjustment calculations): 6/24/06

(2) **Utility Footnote**
Utility includes shape, access, frontage and visibility.

CUSHMAN & WAKEFIELD.

VALUATION SERVICES

35

## LAND VALUATION

### Discussion of Adjustments

Property Rights Conveyed

The property rights conveyed in a transaction typically have a bearing on the price that is paid. Acquiring the fee simple interest implies that the buyer is acquiring the full bundle of rights. Acquiring a leased fee interest typically means that the property being acquired is encumbered by at least one lease, which is a binding agreement transferring rights of use and occupancy to the tenant. A leasehold interest involves the acquisition of a lease, which conveys the rights to use and occupy the property to the buyer for a finite period of time. At the end of the lease term, there is typically no reversionary value to the leasehold interest. An appropriate adjustment was made to each comparable in comparison to the subject to account for the property rights conveyed. No adjustments were needed.

Financial Terms

The financial terms of a transaction can have an impact on the sale price of a property. A buyer who purchases an asset with favorable financing might pay a higher price, as the reduced cost of debt creates a favorable debt coverage ratio. A transaction involving above-market debt will typically involve a lower purchase price tied to the lower equity returns after debt service. We analyzed all of the transactions to account for atypical financing terms. To the best of our knowledge, all of the sales utilized in this analysis were accomplished with cash or market-oriented financing. Therefore, no adjustments were required.

Conditions of Sale

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. However, all sales used in this analysis are considered to be "arms-length" market transactions between both knowledgeable buyers and sellers on the open market. Therefore, no adjustments were required.

Market Conditions

The sales that are included in this analysis date between January 2005 and March 2006. As the market has improved over this time period, we applied an annual adjustment of 5.00 percent.

Location

An adjustment for location is required when the locational characteristics of a comparable property are different from those of the subject property. The subject property is rated good in location. We made a downward adjustment to those comparables considered superior in location versus the subject. Conversely, an upward adjustment was made to those comparables considered inferior. We adjusted Sales 3 and 6 downward because of their superior locations. Sale 3 fronts on North Capitol Street, which we deemed superior to the subject's L Street or 1st Street, NE addresses. Sale 6 is part of the 2 msf Station Place development.

Size

The size adjustment generally reflects the inverse relationship between unit price and lot size. Smaller lots tend to sell for higher unit prices than larger lots, and vice versa. Hence, upward adjustments were made to larger land parcels, and downward adjustments were made to smaller land parcels. Considering paired sales analysis and other methods of evaluating size



## LAND VALUATION

adjustments, the data does not demonstrate a size adjustment. Nevertheless, we made an upward adjustment to Sale 1 due to its sheer size and downward adjustments to all the other sales.

<u>Public Utilities</u>

The availability of public utilities is an important aspect that has a bearing on the value of a property. Municipal utility providers often provide utilities such as gas, water, electric, sewer, and telephone. However, there are cases where certain utilities may not be available by the municipality. Hence, it is important to understand the availability of public utilities in reference to the comparable properties, as well as the subject property. All of the sales, like the subject, had full access to public utilities at the time of sale; therefore, no adjustments were required.

<u>Utility</u>

The subject parcel is adequately shaped to accommodate a typical building. It has good access, good frontage and good visibility. Overall, it has been determined that the site has very good utility. When a comparable was considered to have superior or inferior utility, the appropriate adjustment was made. The subject is offers a corner location as do the sales. Hence, no adjustment was needed.

<u>Other</u>

In some cases, other variables will impact the price of a land transaction. Some examples include soil or slope conditions, restrictive zoning, easements, wetlands or external influences. In our analysis of the comparables we found that no unusual conditions existed at the time of sale. As a result, no adjustments were required.

**Conclusion of Site Value**

After a thorough analysis, the comparable land sales reflect adjusted unit values ranging from a low of $45.08 per building square foot to $76.84 per building square foot, with an average of $60.43 per building square foot. We placed substantial reliance on all sales. Sales 4 and 5 needed the least adjustment and thus received greater consideration.

Therefore, we concluded that the indicated value by the Sales Comparison Approach was:

| AS IS VALUE CONCLUSION | Price Per Building SF |
|---|---|
| Indicated Value | $65.00 |
| Allowable Development | x 997,229 |
| Indicated Value | $64,819,872 |
| Rounded to nearest $100,000 | $64,800,000 |
| $/unit basis | $64.98 |
| | |
| **FINAL VALUE CONCLUSION** | **$64,800,000** |
| $/Unit Basis | $65 |

*Cushman & Wakefield, Inc.*

