## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MONTGOMERY ROAD I LIMITED PARTNERSHIP,** ) | |
| ) | |
| **Plaintiff/** ) | |
| **Counter-Defendant,** ) | |
| ) | **Case No. 1:06CV00344 (HHK)** |
| ) | |
| **v.** ) | **Next event:  Status Conference** |
| ) | **May 11, 2007** |
| **VIAD CORP,** ) | |
| ) | |
| **Defendant/** ) | |
| **Counter-Plaintiff/** ) | |
| **Third-Party Plaintiff** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **MONTGOMERY ROAD TDR, LLC,** ) | |
| ) | |
| **Third-Party Defendant** ) | |

## OPPOSITION OF MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC TO DEFENDANT VIAD'S MOTION FOR SUMMARY JUDGMENT

Plaintiff/Counterdefendant Montgomery Road I Limited Partnership ("Montgomery Road") and Third-Party Defendant Montgomery Road TDR, LLC, ("Montgomery Road TDR") by and through their undersigned counsel, hereby oppose the Motion for Summary Judgment filed by Defendant Viad Corp. In support hereof, they submit the accompanying Memorandum of Points and Authorities.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.


_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
Phone:(202)537-0700
Fax:     (202)364-3664
efiling@cootermangold.com

*Attorneys   for   Plaintiff/Counterde fendant*
*Montgomery Road I Limited    Partnership and Third-*
*Party  Defendant Montgomery Road TDR, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 19th day of April, 2007, the OPPOSITION OF MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC TO DEFENDANT VIAD CORP.'S MOTION FOR SUMMARY JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES, STATEMENT OF GENUINE ISSUES AND RESPONSE TO DEFENDANT VIAD CORP'S STATEMENT OF UNDISPUTED MATERIAL FACTS, and EXHIBITS in support thereof, and proposed ORDER were served upon the following counsel, by electronic transmission through the ECF system:

Rodney F. Page, Esq.
Alicia Hogges-Thomas, Esq.
Bryan Cave LLP
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C. 20005


                                          /s/
                                          Donna S. Mangold

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| **MONTGOMERY ROAD I** | ) | |
| **LIMITED PARTNERSHIP,** | ) | |
|  | ) | |
| **Plaintiff/** | ) | |
| **Counter-Defendant,** | ) | |
|  | ) | **Case No. 1:06CV00344 (HHK)** |
|  | ) | |
| **v.** | ) | |
|  | ) | |
| **VIAD CORP,** | ) | |
|  | ) | |
| **Defendant/** | ) | |
| **Counter-Plaintiff/** | ) | |
| **Third-Party Plaintiff** | ) | |
|  | ) | |
| **v.** | ) | |
|  | ) | |
| **MONTGOMERY ROAD TDR, LLC,** | ) | |
|  | ) | |
| **Third-Party Defendant** | ) | |
| ———————————————— | ) | |

### MONTGOMERY ROAD AND MONTGOMERY ROAD TDR'S STATEMENT OF GENUINE ISSUES AND RESPONSE TO DEFENDANT VIAD CORP'S STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

1. Viad Corp ("Viad") is a Delaware corporation, with its principal place of business in Phoenix, Arizona. (Amended and Supplemental Counterclaim ¶ 1).

   **Response:** This is not disputed.

2. Montgomery Road I Limited Partnership ("MRLP") is a Maryland Limited Partnership that was formed for the purpose of owning real property. (First Amended Complaint ¶ 3). The limited partners of MRLP include The Samuel G. Rose Revocable Trust, Reid Liffmann and Steven Braesch. (Eighth Amendment to MRLP Partnership Agreement, MR-16825, attached as Ex. 7).

———————————————

[1] For the convenience of the Court, each of Viad's "Undisputed" Facts are set forth, and responded to immediately below.

**Response:** This is not disputed, except that the limited partners of MRLP also include SJG

Holdings, LLC, which is owned by Stewart Greenebaum and/or his family members.

3. Montgomery Road TDR, LLC ("MRTDR") is a limited liability company under the same ownership as MRLP. (Limited Liability Company Operating Agreement of MRTDR, MR-07636, attached as Ex. 8). MRTDR was formed in July 2006 to "acquire, hold and ultimately sell transferable development rights in the District of Columbia." (Id.)

**Response:** This is not disputed.

4. Greenebaum and Rose Associates ("Greenebaum and Rose") is a partnership that was created by Samuel Rose and Stewart Greenebaum. (Deposition of Samuel Rose ("Rose Dep.") at 18:6-20:3, attached as Ex. 1). Greenebaum and Rose formed MRLP to purchase real property. (Id. at 33:5-12; 35:20-36:10).

**Response:** This is not disputed.

5. S&S Finance Limited Partnership ("S&S Finance") is an internal finance company that funds Greenebaum and Rose projects and is an affiliate of MRLP. (Deposition of Reid Liffmann ("Liffmann Dep.") at 33:14-20, attached as Ex. 2).

**Response:** This is not disputed, although the ownership of MRLP and S&S Finance are

different. Decl. of Samuel Rose at ¶11.

6. A Cash Participation Agreement ("CPA") was executed on November 30, 1987, by Transportation Leasing Company ("TLC"), and on December 9, 1987 by Montgomery Road I Limited Partnership ("MRLP") as "Developer." (Cash Participation Agreement ("CPA"), VD000484, attached as Ex. 9).

**Response:** This is not disputed.

7. Thereafter, on or about November 30, 2000, Viad succeeded to the interests of TLC. (Assignment and Assumption Agreement, VD-000954, attached as Ex. 10).

**Response:** This is not disputed.

8. The CPA was negotiated and signed as partial consideration for a sale by Viad's predecessor in interest of a parcel of land located at 90 K Street NE in the District of Columbia to MRLP for

$11,000,000, "further described as Lot 432 in Square 674" ("the Property"). (CPA at Recital A (Ex. 9).

    **Response:**  This is not disputed.

9. The CPA sets "forth the terms and conditions under which [Viad] will participate in the cash flow hereafter generated from the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing" of the Property. (Id. at Recital B).

    **Response:**  This is not disputed.

10. To secure the obligations of MRLP under the CPA, the agreement created a lien on the Property, referred to as a "mortgage," which was recorded in the land records and remained in effect during the life of any obligations of MRLP. (Id. § 5.1)

    **Response:**  This is not disputed.

11. The CPA sets forth three broad obligations on the part of the Developer, MRLP. First, in Article 2 of the CPA, the Developer is required to pay to Viad 15% of the cash flow from operations on the Property. The CPA defines the terms and conditions for calculating this payment, referred to as the "Operations Cash Payment." (Id. §§ 1.26-1.28, 2.1).

    **Response:**  This is not disputed.

12. Second, in Article 3 of the CPA, the Developer is required to pay to Viad 15% of the appreciation realized by the Developer in "the sale, assignment, condemnation, conveyance or other disposition of all or any part of or interest in the Property," or in the refinancing of the Property or of an interest in the Property. The CPA defines the terms and conditions for calculating this payment, referred to as the "Appreciation Cash Payment." (Id. §§ 1.6, 1.28, 3.1,
3.2). Furthermore, the CPA defines "Property" as "the Improvements and the Real Property." (Id. § 1.32). "Improvements" are defined as "all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the Real Property." (Id. § 1.21).

    **Response:**  This is not disputed.

13. Third, in Article 4 of the CPA, the Developer is required to afford Viad a right of first refusal in the event it makes or receives a bona fide written offer for sale of the Property. (Id. § 4.1).

    **Response:**  This is not disputed.

3

14. There is no dispute between the parties concerning the Article 4 rights of the parties. MRLP has notified Viad of offers to purchase the property, and Viad has declined to exercise its right of first refusal. (Letter dated 8/31/06 from E. Fiorucci to MRLP, attached as Ex. 11).

    **Response:**  This is not disputed.

15. By agreement of the parties while this litigation was pending, the "mortgage" created by the CPA in favor of Viad was released to facilitate a sale of the Property by MRLP. This action was taken in conjunction with the creation of a fund reserved from proceeds of the sale to provide alternate security for Viad. (Deposit Agreement, attached as Ex. 12).

    **Response:** This is not disputed.

16. During the life of the CPA, the Property has been used as a parking lot, but there has been no commercial development thereon. (Statement of Greenebaum and Rose Associates at 7, attached as Ex. 13).

    **Response:** This is not disputed.

17. During the life of the CPA, MRLP has made no payments under the CPA. (Letter dated 2/21/07 from E. Fiorucci to S. Rose; letter dated 8/14/00 from S. Rose to E. Fiorucci, VD000364), attached as Exs. 22 & 53.

    **Response:** This is not disputed, to the extent that it refers to payments to TLC/Viad.

18. Viad is not claiming in this litigation that any Operations Cash Payment, that is a payment based on operations on the Property under Article 2, is owed to it. (See generally, Amended and Supplemental Counterclaim).

    **Response:** This is not disputed.

19. According to Samuel G. Rose, a principal owner of MRLP, testifying as a Rule 30 (b)(6) witness on its behalf, "we (MRLP) are sophisticated developers." (Rose Dep. at 108:13- 109:1)(Ex. 1).

    **Response:** This is not disputed.

20. At the same time, he is candid in stating that "there is some resentment on our part" about the CPA. (Id.). He has indicated various reasons or motives for this resentment. For example, Rose has testified

that "we were sloppy in not being careful about reading it. We would never sign such an agreement if we were careful, but we weren't but that's — We still take responsibility for signing it." (Id.).

     **Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

Rose's deposition, but SOF 20 is not a material fact.

21. Rose, who obtained a law degree before becoming a real estate developer, finds the CPA a "mysterious, obnoxious" agreement. (Id. at 13:7-11, 15:1-14, & 45:4-6).

     **Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

Rose's deposition, but SOF 21 is not a material fact.

22. Rose testifies that the CPA was "the first and only such agreement that we've ever been involved in the history of our company." (Id. at 50:3-16).

     **Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

Rose's deposition, but SOF 22 is not a material fact.

23. Rose states that, in retrospect, "I think we didn't pay enough attention to it because it's one of the most obnoxious agreements I've ever read in my life and I don't — you know, we must have been stupid to sign it without even any — fighting any of these clauses which are so one-sided but I do not recall — recollect really getting into this." (Id.).

     **Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

Rose's deposition, but SOF 23 is not a material fact..

     24. MRLP, in filing suit to have this Court declare that it owes no money under the CPA to Viad, has not made any claim that the contract is fraudulent, was induced by fraud, contains mistakes, should be rescinded, or needs reformation. Instead, it seeks to assert its own interpretation of the CPA. (See generally First Amended Complaint).

     **Response:** This is not disputed.

25. Although the CPA requires that an annual financial statement be submitted by MRLP to Viad, no statement has been submitted for 2005. Instead, with a cover letter from its litigation counsel, a compilation of financial data for that year was submitted to Viad on September 21, 2006, with the word "Draft" written across the top of the first page. (Letter dated

9/21/06 from A. Pignatelli to R. Page, enclosing Draft 2005 Special Purpose Financial Statement ("Draft 2005 Statement"), attached as Ex. 14).

**Response:** This is disputed. Revised 2005 Statements were tendered on November 21, 2006. Viad Exhibit 36.

26. Rose had an explanation for why MRLP has not submitted a financial statement for 2005. He testified as the Rule 30(b)(6) witness that MRLP "missed it" (referring to the requirement of such submissions) because, "well, we got more important things to do, like our taxes." (Rose Dep. at 212:6-213:7) (Ex. 1).

**Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr. Rose's deposition.

27. Rose and MRLP contend that the CPA should be interpreted to provide that the expenses of MRLP which are recognized in calculation of the annual Operations Cash Payment are the same expenses that should be recognized for calculation of the Appreciation Cash Payment on sale of the property. (Id. at 215:3-9). But, Rose admits that the CPA is not written so as to make the calculations the same. (Id. at 215:10-13).

**Response:** This is not disputed, except that Mr. Rose's analysis of the calculations required under the CPA do not control this Court's analysis of those required calculations.

28. Rose acknowledges on behalf of MRLP that the CPA requires that all expenses shall be "determined on the basis of sound cash basis accounting practices applied on a consistent basis," but he finds those requirements "tricky and devious." (Id. at 219:2-15).

**Response:** The terms of the CPA speak for themselves, and are for this Court to determine. MRLP and MRLP TDR do not dispute the recitation of the words "tricky and devious" from Mr. Rose's deposition.

29. Since the late 1980's, MRLP has sought to convince Viad to relinquish its cash participation interest for a nominal sum. (Letter dated 10/25/89 from A. Ervanian to S. Rose, VD-001027; Letter dated 4/6/95 from S. Rose to A. Ervanian, MR-05987; Letter dated 7/14/99 from R. Liffmann to K. Goldman, VD-00l098; Letter dated 7/12/00 from E. Fiorucci to S. Rose, VD-000658; Memorandum dated 12/18/02, MR-00664, attached as Exs. 15-19).

6

**Response:** This inference from this statement is disputed. Over the years, Mr. Rose has approached Transportation Leasing/Viad to offer to buy it out of its cash participation interest. Those offers were not intended to mislead or represent the value of the property, but rather, were based on Mr. Rose's assessment that the value of any Appreciation Cash Payment was zero, based on the amount of funds that had been expended by Montgomery Road to maintain the Property. His assessment was validated in the Reznick Opinion, which concluded that the sale price of the Property would have to exceed $37 million (as of April 2005) for there to be any Appreciation Cash Flow. Rose Decl. at ¶36;  Exhibit 39 (Reznick Opinion) at VD000326.

30. In its efforts to convince Viad to relinquish its participation interest, MRLP has frequently misrepresented the value of the property to Viad employees. For example, in April 1995, Sam Rose wrote to Viad that the 90 K Street Property was worth $5,000,000 and that MRLP's costs exceeded this amount. However, three years earlier, in June 1992, Sam Rose wrote to a potential buyer that the property was valued at $26,000,000 and that this amount exceeded MRLP's costs. (Compare Letter dated June 17, 1992 from S. Rose to C. Helwig, MR-07004 (Ex. 20) with Letter dated 4/6/95 from S. Rose to A. Ervanian, MR-05987 (Ex. 16); see also Letter dated 5/21/02 from S. Rose to E. Fiorucci, VD-000537-38, attached as Ex. 21).

**Response:**  See Response to SOF 29.  Moreover, Viad has no evidence that the value of the property at any given point in time was not what Mr. Rose stated it was, or that anyone from TLC/Viad was misled.   As Mr. Goldman testified, each time Mr. Rose proposed buying TLC/Viad out of the Cash Participation position, the company conducted due diligence (with the assistance of local District of Columbia real estate brokers) and decided not to sell.  Goldman Tr. at 99-102.  Pat Marr (of CB Richard Ellis) was a real estate broker consulted by TLC/Viad on several occasions.  See Exhibit 25 (Letter from Pat Marr to E. Fiourucci, 9-15-99) ("[i]f Greenebaum & Rose were to sell [the Property] today, [the value] would be approximately $30.00 per developable foot.  With the ability to construct

650,000 square feet, that would equate to a value of $19,500,000. With your participating interest not valid until it exceeds what the owner has in the property (approximately $25 million), your interest would be worth nothing"). See also Exhibit 26 (E. Fiorucci Memorandum to K. Goldman, 9-15-99); Exhibit 34 (E. Fiorucci e-mail to K. Goldman, 11-26-02)(reflecting conversation with Pat Marr: if property "sold as land, value is approximately $30/developable sq. ft. or $20,250,000"); see also Exhibit 41 (E. Fiorucci Record of Telephone Conversation with K. Goldman, 5-23-05: "it's hard to identify what the interest is worth, because you don't know what Sam will do – sell or develop); see also Exhibit 20 (Draft letter from K. Goldman to R. Liffman, 7-2-99)(rejecting Liffmann proposal to relinquish cash participation interest).

31. On or about August 14, 2000, MRLP advised Viad of its intent to sell the 90K Street property to Level 3 Communications, LLC ("Level 3"). (Letter dated 8/14/00 from S. Rose to E. Fiorucci, VD-000364, attached as Ex. 22).

    **Response:** This is not disputed.

32. In a letter to Viad dated August 14, 2000, Greenebaum and Rose Associates, an affiliate of MRLP, stated that the proposed sale price would result in no cash participation payment to Viad. Id.

    **Response:** This is not disputed.

33. In a letter dated August 23, 2000, Viad responded that MRLP had overstated the costs that could be deducted from the purchase price when calculating Viad's participation payment. Specifically, Viad asserted that the Developer's Equity Return was not a proper deduction when calculating the Appreciation Cash Payment, and that Viad would be entitled to their portion of the Appreciation Cash Flow of $4.9 million after the sale of 90 K Street to Level 3. (Letter dated 8/23/00 from K. Goldman to S. Rose, VD-000533, attached as Ex. 23).

    **Response:** MRLP and MRLP TDR do not dispute the summary of the words of (or message conveyed in) Mr. Goldman's letter.

8

34. The parties continued to correspond in September and October of 2000, debating the proper calculation of the Appreciation Cash Payment. (Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-00l015; Letter dated 10/2/00 from K. Goldman to R. Liffmann, VD-000944, attached as Exs. 24-25).

      **Response:** This is not disputed.

35. For reasons unrelated to Viad, the transaction between MRLP and Level 3 did not close. (Letter from R. Liffmann to E. Fiorucci dated 4/10/01, VD-000544-46, attached as Ex. 26).

      **Response:** This is not disputed.

36. For the next four years, MRLP sought continuously to convince Viad to relinquish its participation interest for a nominal sum. MRLP was anxious to sell 90 K Street as soon as possible. (Letter dated 5/21/02 from S. Rose to E. Fiorucci, VD-000537; Record of Telephone Conversation on 6/10/02, VD-00966; Record of Telephone Conversation on 6/15/04, VD-000965; Record of Telephone Conversation on 7/25/04, VD-000964) (Exs. 21, 27-29).

      **Response:** The use of the term "continuously" is disputed, because four communications in four years is not "continuously." In addition, MRLP and MRLP TDR dispute the reference to a "nominal sum." <u>See</u> Response to SOF 29.

37. In or about December 2004 Viad and MRLP agreed to seek the advice of Reznick Group, P.C. ("Reznick"), an accounting firm, with respect to the interpretation of terms in the CPA and the proper classification of costs and charges for purposes of calculating the Appreciation Cash Payment. (See Record of Telephone Conversation dated 12/16/04, VD-000960, attached as Ex. 30).

      **Response:** This is disputed. The dispute was submitted to Reznick consistent with the binding arbitration provision in §2.7 of the CPA, it was not merely to "seek advice." CPA §2.7; Rose Tr. at 87; Rose Decl. at ¶¶ 24-26.

38. On March 2, 2005, Viad submitted the statement of its position and related exhibits to Reznick. In her March 2, 2005 letter to Reznick, Eve Fiorucci, Assistant Director of Real Estate for Viad, stated in the third bulleted paragraph: "Finally, while we appreciate your review of the documents and your opinion as to our interpretation of same, we wish to make it clear that your opinion is not binding on

TLC/Viad Corp." (See Letter dated March 2, 2005 from E. Fiorucci to B. Solomon enclosing Statement of TLC's Position ("Statement of TLC's Position"), VD-000904, attached as Ex. 31).

**Response:** MRLP and MRLP TDR do not dispute that TLC/Viad submitted its Statement of

Position on March 2, 2005, nor to they dispute the recitation of the words from Ms. Fiorucci's letter.

They do however dispute that those words are effective to unilaterally turn a binding dispute resolution

process into a non-binding "request for advice" or merely a "review."

39. In or about April 2005, Greenebaum and Rose submitted its statement of position to Reznick. (See Fax dated 4/27/05 from Robin-Eve Jasper to E. Fiorucci enclosing Statement of Greenebaum and Rose Associates, Inc. ("Statement of Greenebaum and Rose") VD-000458) (Ex. 13).

**Response:** This is not disputed.

40. On April 10, 2005, Reznick provided its interpretation of certain terms in the CPA, an analysis of the classification of costs and charges, and a pro-forma calculation for a hypothetical sale of the property. (See Letter dated 4/10/05 from B. Solomon to S. Rose (hereinafter "Reznick Analysis") ¶ 2, VD-000466, attached as Ex. 32).

**Response:** This is not disputed, except to the extent that Viad attempts to infer that "Reznick

provided its interpretation" is something other than a final determination as provided for in CPA §2.7.

41. On May 2, 2005, <u>after</u> the Reznick Analysis was completed, Greenebaum and Rose suggested to Viad that Reznick's review should be binding on the parties. (See letter dated 5/2/05 from S. Rose to E. Fiorucci, VD-000453, attached as Ex. 33).

**Response:** This is disputed as a distortion of Mr. Rose's letter. Mr. Rose did not "suggest[]

to Viad that Reznick's review should be binding on the parties." Rather Mr. Rose stated:

> The Participation Agreement which was "drawn by TLA" states that if we mutually select an accountant, their opinion should be binding. Although you made a statement in your signed authorization letter to Reznick that you would not be blind [sic] to their opinion, you failed to get us to agree to that. Your Participation Agreement clearly requires two signatures to make changes to the agreement. So the Reznick opinion, whether we like it or not, is binding.

42. However, Greenebaum and Rose knew that Viad, in its letter dated March 2,

10

2005, conditioned its submission of papers to Reznick on the understanding that Reznick's analysis would not be binding. Sam Rose was copied on this letter and he testified that he received the letter. However, prior to the issuance of the Reznick Analysis, no efforts were made to contact Viad regarding its statement that the Reznick opinion would not be binding. (See Letter dated 3/2/05 from E. Fiorucci to B. Solomon, VD-000904 (Ex. 31); Rose Dep. at 88:13- 91:11; 95:1-96:1 (Ex. 1).

**Response:**   See Response to SOF 42.  For the reasons stated in Mr. Rose's letter, MRLP

had no obligation to "contact" Viad with regard to its unilateral attempt to change the terms of the CPA.

43. In fact, in a letter to Reznick during the review process, Reid Liffmann, a limited partner of MRLP, indicated that the process was advisory only, stating: "[h]opefully, with guidance from you, the parties can get a process moving that will lead to a resolution, without wasting a lot of legal dollars and time." (Letter dated 3/24/05 from R. Liffmann to B. Solomon, MR-01685, attached as Ex. 34).

**Response:**   MRLP and MRLP TDR dispute that Mr. Liffmann's letter indicates that the

process was "advisory only" or that his letter effectively modified the terms of the CPA.

44. Furthermore, MRLP cannot point to a specific conversation where Viad stated that the Reznick Analysis would be binding. (Rose Dep. at 86:13-87:8; 93:15-94:13) (Ex. 1). In the records of phone conversations leading up to the decision to seek advice from an accountant, there is no indication that Viad or MRLP intended Reznick's advice to be binding (Record of Telephone Conversation on 6/15/04, VD-000965; Record of Telephone Conversation on 7/25/04, VD-000964; Record of Telephone Conversation dated 12/16/04, VD-000960) (Exs. 29-30).

**Response:** This is disputed.  First, the CPA provides that the arbitration proceeding would be

final, it is not MRLP's burden to "point to a specific conversation" where Viad affirmatively acquiesced

in something to which it was already bound.  Mr. Rose testified however:

Q.    How – When and how did you agree that it was binding?

A.    That we spent three years picking them, getting to this point.  What's the point of doing it if it's not binding?  It was almost assumed.  Why would you take years to talk to  your accountant, to talk to all the bosses, to pick an accountant, and then say it's not binding?  I mean: Why bother?

11

Rose Tr. at 87. Indeed, Viad's own language in its "Statement of Position" submitted to Reznick belies

its unilateral attempt to make the process non-binding: "We suggest that [Montgomery Road] submit

drafts of such documents to TLC [Viad] and **to the arbitrator of these disputes for use as part of**

**the dispute resolution process**." Exhibit 37 at VD 908 (emphasis added). Moreover, Ms. Fiorucci

expressed concern about submitting the dispute to an accountant for resolution, evidencing Viad's

recognition that the process constituted binding arbitration: "Sam wants to buy Viad out .... Believes his

accounting methods were correct, would pay for Viad to have an outside firm look at accounting (**I**

**don't recommend this**)[.] ... Sam wants to resolve the accounting issue right now." Exhibit 33

(Record of Tele. Conversation, 6-10-02).

45. MRLP claims that the Reznick Analysis is binding under Section 2.7 of the CPA. (Rose Dep. at
87:9-20) (Ex. I).

> **Response:** This is not disputed, because the Reznick Opinion, resulting from the arbitration

process described in §2.7, is binding.

46. Under Section 2.7, if the parties are unable to resolve a dispute concerning the fiscal year
statements in Sections 2.4, 2.5 and 2.6 within a certain period of time, "the items shall be submitted to
arbitration which arbitration shall be performed by an independent certified public accountant selected
by TLC [Viad's predecessor] and reasonably satisfactory to Developer, whose determination shall be
final." (CPA § 2.7) (Ex. 9).

> **Response:** This is not disputed.

47. From approximately 1987 to 2005, MRLP has submitted Special Purpose
Financial Statements to Viad in an effort to comply with Section 2.6 of the CPA. (See Special
Purpose Financial Statement for December 31, 2004 and 2003 (hereinafter "Representative
Statement"), MR-00953 at 00955, attached as Ex. 35).

> **Response:** This is not disputed, except to the extent that Viad infers that the Statements did

not substantially comply with §2.6. Mr. Zatarkski, an internal accountant advised Mr. Goldman

"**Overall, these both provide us the information we require."**  See Exhibit 18 (J. Zatarkski

handwritten notes, 6-7-91) (emphasis added); see also K. Goldman Tr. at 46 (given that there was

very little going on with the property, Mr. Goldman agreed with Mr. Zatarkski's statement).  Similarly

in 1994, another internal accountant, Joyce Lum, reviewed Montgomery Road's Financials and

advised Mr. Goldman "everything looks ok."  Exhibit 19 (K. Goldman handwritten note and J. Lum

handwritten note in response, 5/31/94); see also K. Goldman Tr. at 46-53.

48. Under Section 2.6, MRLP must furnish "financial statements and schedules, including a balance
sheet and statement of operations for the Property for such Fiscal Year, prepared in accordance with
generally accepted accounting principles applied on a basis consistent with past practices and bearing
the unqualified opinion of a firm of independent certified public accountants...." (CPA § 2.6) (Ex. 9).

      **Response:** This recitation of language from CPA §2.6 is not disputed.

49. The Special Purpose Financial Statements, which were submitted in response to Section 2.6, are
not related to the calculation of the Appreciation Cash Payment. Section 2.6 appears in Article 2,
which deals with "Operations Cash Flow," not "Appreciation Cash Flow." (See generally CPA, Article
2) (Ex. 9).

      **Response:** This is disputed.  The Financial Statements necessary to compute the elements of

the Appreciation Cash Flow, including expenses related to the operation of the Property, are the same

Financial Statements required by § 2.6.  Moreover, The agreement has numerous defined terms and

those definitions apply throughout the agreement, not just to limited sections.  See CPA §1.1 ("***As***

***used in this Agreement***, certain terms shall have the meanings described in this Article 1") (emphasis

added).  Most of the definitions are not actually set forth in Article 1 – Article 1 merely contains a

cross-reference to other sections of the Agreement in which the substance of the definition can be

found.  See CPA at 1-5.  Just because the definition is set out in a particular section, however, does not

limit the applicability of that definition to that particular section. The definition applies throughout the

agreement.  For example, Section 1.18 defines the term "Expenses" as having "the meaning as set forth

in Section 2.3 hereof."  Although Article 2 is captioned "Operations Cash Flow", Section 2.3 states:

"*[f]or purposes of this Agreement*  , the term "Expenses" shall mean ... ."(Emphasis added).  Thus,

"expenses" which are an element of the Appreciation Cash Payment (<u>see</u> §3.6(b)), are identified on the

Special Purpose Financial Statement, as are items of Developers Equity, which are also part of the

Appreciation Cash Payment calculation.  CPA §3.6.  In addition, § 7.11 provides: "The titles of

Articles and Sections contained in this Agreement are inserted for convenience of reference only, and

they neither form a part of this Agreement nor are they to be used in the construction or interpretation

thereof."

50. Furthermore, the dispute resolution provision in Section 2.7 also is not related to the Appreciation
Cash Payment. Article 2.7 appears in Article 2, which deals with "Operations Cash Flow," not
"Appreciation Cash Flow." (See generally CPA, Article 2) (Ex. 9).

     **Response:** This is disputed.  <u>See</u> Response to SOF 49.

51. The purpose of seeking advice from an accounting firm was to begin to resolve informally the
potential dispute between MRLP and Viad regarding the calculation of the Appreciation Cash
Payment, since MRLP was eager to buy out Viad's interest. (Record of Telephone Conversation on
6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664). (Exs. 19, 27).

     **Response:** This is disputed.  <u>See</u> Response to SOF 36 through SOF 47.

52. According to CPA Section 3.11, disputes regarding the calculation of the Appreciation Cash
Payment shall be submitted <u>to arbitration by an MAI appraiser after receipt of the Appreciation Cash
Payment and the statement accompanying the payment.</u> (CPA § 3.11) (Ex. 9).

     **Response:** This summary of the terms of §3.11 is not disputed.

53. The Reznick Analysis was not conducted under Section 3.11 because no Appreciation Cash
Payment had been paid at the time of the analysis, the analysis was conducted by an accountant, not an
appraiser, and the analysis was not an arbitration. (CPA § 3.11; Rose Dep. at 86:8-12) (Ex. 1 & 9).

**Response:** MRLP and MRTDR do not dispute the fact that Solomon is an accountant, and not an appraiser, and that no Appreciation Cash Payment had been paid at the time. Nevertheless, the Reznick Opinion resulted from an arbitration under §2.7, and its determination is binding on the parties.

54. Samuel Rose, MRLP's 30(b)(6) witness, has testified that he has no recollection of describing the Reznick Analysis as an "arbitration." (Rose Dep. at 86:8-12) (Ex. 1).

**Response:** MRLP and MRTDR do not dispute the summary of Mr. Rose's testimony.

55. At most the evidence demonstrates that MRLP and Viad agreed to seek the advice of an accounting firm regarding the proper classification of costs and charges for purposes of calculating the Appreciation Cash Payment in the event of a sale. (Deposition of Eve Fiorucci, hereinafter "Fiorucci Dep." at 46:1-20 attached as Ex. 6; see Letter dated 4/10/05 from B. Solomon to S. Rose ¶ 2, VD-000466 (Ex. 32); see also Record of Phone Conversation on 12/16/04, VD-000960; Record of Phone Conversation on 6/15/04, VD-000965; Letter from R. Liffmann to B. Solomon dated 3/24/05, MR-01685) (Exs. 28, 30, 34).

**Response:** This is disputed. <u>See</u> Response to SOF 36 through SOF 47; SOF 49 through SOF 51.

56. The CPA requires that accounting for both revenue and expenses related to the Property be "on the basis of sound cash basis accounting practices applied on a consistent basis." (CPA §§ 2.2, 2.3, 2.6) (Ex. 9).

**Response:** It is not disputed that the provisions cited include the quoted language.

57. The various financial statements tendered from time to time by MRLP and by its counsel have, despite the requirement for cash basis accounting, reflected accrued interest payments on debt allegedly incurred by MRLP. (Statement of Greenebaum and Rose Associates, at Section I, VD-000458) (Ex. 13).

**Response:** MRLP and MRTDR dispute that the accrued interest payments are inconsistent with the CPA. <u>See</u> Fiorucci Tr. at 39-42 (if loan balance increases because of failure to pay interest, accrued interest "would be an allowable deduction in the event of a sale under [the CPA]"; Solomon

Tr. at 91 (as an allowable incurred expense, the interest amounts build up, and become part of

Developer's Operating Equity); . Solomon Tr. at 94 (where there is an early stage development and no

cash flow, such that a lender is not being paid, interest accrues and must be booked for cash basis

financial statements; otherwise, the liability would be misstated). The term "Cash basis accounting" is

not defined in the Agreement.   As further explained by Mr. Solomon in his deposition:

> Cash basis accounting is applied from a revenue and expense perspective.  When cash
> comes in, cash goes out, for expenses.
>
> With respect to capital items, if you will, like fixed assets, loans, equity, it is not on a
> pure cash basis.
>
> So if there were interest[], for example, accrued on a loan, on a cash basis financial
> statement, that would still show up as a liability, regardless of when it was paid.
>
> If there was depreciation on a fixed asset which is a noncash transaction, that still shows
> up on a financial statement, on a cash basis financial statement.
>
> The cash basis is intended to focus on items of operating revenue and expenses.

Solomon Tr. at 129; see also  Solomon Tr. at 134 (interest on principal payments on Permitted Debt

referred to in Section 2.3(a)(9) of the Cash Participation Agreement would be an expense category that

does not require an actual cash payment for the expense to be included as a liability on a cash basis

accounting financial statement).

58. The debt claimed by MRLP, and on which it has accrued interest, is based on its own, or its
principals' and affiliates' investment in the property. (Id.)

**Response:** This is not disputed, except to the extent that the Mortgage was originally held by

Yorkridge-Calvert Savings and Loan, and later by Sun Chase Bank of Phoenix. Thereafter the

mortgage note was acquired by S&S Finance.

16

59. MRLP has never made interest payments, in fact, but it seeks to deduct such payments as if they had been made in any calculation of amounts due to Viad under the CPA. (Deposition of Reid Liffmann ("Liffmann Dep.") at 45:10-46:17) (Ex. 2).

   **Response:** This is disputed.  MRLP paid interest on the Mortgage until it was acquired by

S&S Finance in 1996.  Rose Decl. at 6-10.

60. According to the CPA, the Appreciation Cash Flow is calculated by taking the Agreed Value of the Property, deducting the Approved Deductions and the Closing Costs, and then deducting the Developer's Invested Equity and Developer's Operating Equity. The Appreciation Cash Payment is 15% of the Appreciation Cash Flow. (CPA § 3.1) (Ex. 9).

   **Response:** MRLP and MRLPTDR do not dispute this "summary" of the terms of CPA § 3.1,

but dispute that the calculation is as simplistic as inferred by this SOF.

61. In Section 3.1 of the CPA, "Developer's Equity Return" is not included in the definition of Appreciation Cash Flow. (Id. § 3.1).

   **Response:** It is not disputed that the words "Developer's Equity Return" are not included in

§3.1.

62. Under Section 3.4(a) of the CPA, "Permitted Debt" and "Junior Financing" are Approved Deductions from Appreciation Cash Flow in the event of the sale of the Property. (Id. § 3.4(a).

   **Response:** This is not disputed.

63. S&S Finance is a 100% owned affiliate of Greenebaum and Rose. (First Amended Complaint ¶ 10).

   **Response:** More precisely, the limited partners of S&S Finance are the Stewart J.

Greenebaum Revocable Trust and the Samuel G Rose Revocable Trust.

64. In 1996, S&S Finance acquired the first mortgage on the 90K Street Property. (Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-001015) (Ex. 24).

   **Response:** This is not disputed.

17

65. In its Special Purpose Financial Statements for 1997 through 2004, MRLP classified the accrued interest on the first mortgage as Developer's Equity Return. (Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-001015, at 001016 (Ex. 24)).

**Response:** This is disputed. From 1997 to 1999 (not 2004), the accrued interest on only $7.3 million of the first mortgage was included in Developer's Equity Return. This was restated on the 1999 and 2000 statements to reclassify all of the first mortgage interest under the classification "Developer's Operating Equity." Only the interest on this "first mortgage interest" was included in Developer's Equity Return. Effective with the 2005 Revision (done in November 2006), all of the first mortgage interest is included in the loan payable to S&S Finance, and interest on these loan advances is included in interest payable to S&S Finance. On the 2005 Revision (and for all prior periods back to the acquisition of the first mortgage by S&S Finance), MRLP has used the following procedure: the monthly interest on the first mortgage is treated as an advance from S&S Finance on the last day of each month and is therefore added to the loan balance on that day. Glassman Decl. at ¶ 19.

66. From approximately 1987 to November 2006, MRLP has treated amounts contributed by S&S Finance to 90 K Street as equity. (See Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised Special Purpose Financial Statement for 2005 ("Revised 2005 Statement"), attached as Ex. 36).

**Response:** This is disputed. See Response to SOF 65. The amounts advanced from S&S Finance were always intended to earn interest. They were however, for internal tax purposes, reflected as equity during the period 1997-2000. As described above, a reclassification took place as to $7.3 million of the first mortgage in 2000. See Rose Decl. at ¶¶ 14-18 ; Glassman Decl. at ¶¶ 9-15, 19.

67. Now, under the direction of its litigation attorney Dale Cooter, MRLP seeks retroactively to convert the amounts contributed by S&S Finance, the accrued interest on those amounts, and the accrued interest on the first mortgage from equity to debt. In a letter to Viad's counsel, Mr. Cooter stated: "As you know, I established that all money contributed to Montgomery Road I Limited

Partnership was actually in the form of loans originating with S&S Finance. There was never any intention to contribute non-interest bearing equity to the project." (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36). However, no loan documents have been provided to Viad to substantiate Mr. Cooter's claim that the money contributed to MRLP by S&S Finance was in the form of a loan. (Id.).

**Response:** This is disputed; the Special Purpose Financial Statements were revised in 2006 to reflect the proper treatment of the advances from S&S Finance. As set forth in Mr. Rose's Declaration, the funds were advanced by S&S with the intention of earning a return on those funds. See Rose Decl. at ¶¶ 14-18 ; Glassman Decl. at ¶¶ 9-15.

68. Attorney Cooter also attached a revised Special Purpose Financial Statement for 2005 ("Revised 2005 Statement") to his November 21, 2006 letter. (Id.).

**Response:** This is not disputed.

69. Prior to their receipt of the Revised 2005 Statement, counsel for Viad received a Draft 2005 Statement from Mr. Cooter's office on September 21, 2006 (Letter dated 9/21/06 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement) (Ex. 14).

**Response:** This is not disputed.

70. Unlike the other Special Purpose Financial Statements, which were prepared between 1987 and 2004, there is no signed statement indicating that the Revised or Draft 2005 Statements were compiled by a firm of independent certified public accountants, as required by Section 2.6 of the CPA. (Liffmann Dep. at 14:9-16:22; 35:15-37:12 (Ex. 2); CPA Section 2.6 (Ex. 9); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing revised 2005 Statement (Ex. 36); Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement (Ex. 14); see also Special Purpose Financial Statement for December 31, 2004 and 2003 (hereinafter "Representative Statement") MR-00953 at 00955) (Ex. 35).

**Response:** This is not disputed.

71. In the Revised 2005 Statement, MRLP reclassified the amount that was previously classified as Developer's Equity Return as "Interest Expense — S&S Loan." MRLP also reclassified other amounts as "S&S Finance Loan Payable." These items were then added under "Liabilities" in the Revised 2005 Statement. These new classifications do not appear in previous Special Purpose Financial Statements.

(See Letter dated 11/21/06 from D. Cooter to R. Page, Revised 2005 Statement at 2 & 5 (Ex. 36); see also Representative Statement, VD-00953 at 00956) (Ex. 35).

     **Response:** This is not disputed.

72. The decision to treat amounts advanced by S&S Finance and the accrued interest on those amounts as debt instead of equity is inconsistent with the Reznick Analysis, which MRLP seeks to enforce as binding in this case. According to the Reznick Analysis "any amount advanced by S&S or its partners to pay interest or any other reasonable expense should be treated as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b)." (Reznick Analysis, VD-000466, at ISSUE 3, Interpretation) (Ex. 32).

     **Response:** This is disputed. These treatments are not inconsistent; they are alternative

treatments.

73. Through its attorney, MRLP has taken multiple and contradictory positions on the manner in which items should be classified on its financial statements, with the intent to decrease Viad's Appreciation Cash Payment. (Compare Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement, with Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement) (Exs. 14 & 36).

     **Response:** This is disputed. As set forth in the Declaration of Mr. Rose, the revisions were

made to accurately reflect the economic situation resulting from S&S Finance's substantial advances to

fund the Property over the past twenty years ($18 million in addition to the first mortgage).  Rose Decl.

at ¶ 35; see also Glassman Decl. at ¶¶ 13-16.

74. The 90K Street Property is zoned C-3-C which permits a maximum height of 90 feet and a maximum FAR of 6.5. (See Expert Report of Cynthia Giordano ("Giordano Report") at 1, attached as Ex. 37).

     **Response:** This is not disputed.

75. It is also located in the North Capitol TDR Receiving Zone under the D.C. Zoning Regulations (D.C. Mun. Regs. tit. 11, § 1709.17) which permits increased density up to the maximum height permitted by the 1910 Building Height Act and an FAR of 10.0 with TDRs. (46 D.C. Reg. 1054, 1059 (Oct. 19, 1998)).

**Response:** This is not disputed.

76. FAR is a general measure of building density. FAR, or floor-to-area ratio, is the result of adding together the square footage of all of the floors in the building and dividing that total by the land area of the lot. Thus, a one-story building covering 100% of the lot equals a 1.0 FAR. At the other end of the range, a ten-story building covering 100% of the lot is a 10.0 FAR. (Giordano Report at 1 n.1) (Ex. 37).

**Response:** This is not disputed.

77. Permitted FAR under District of Columbia zoning ranges from the lowest density of 0.9 FAR to the highest density of 10.0 FAR. (Id. at 1, n.l; see generally, D.C. Mun. Regs. tit. 1l, §1709).

**Response:** This is not disputed.

78. Transferable Development Rights or TDRS are what the name implies: zoning density which may be transferred from a site on which the density is not used to another site on which the density may be developed. (Giordano Report at 2) (Ex. 37).

**Response:** This is not disputed.

79. TDRs were created in the District of Columbia in 1991 when the D.C. Zoning Commission enacted the "Downtown Development District" regulations ("DD regulations"). (Id. at 2; 49 D.C. Reg. 6444,6448 (Jul. 5, 2002)).

**Response:** This is not disputed.

80. These regulations imposed significant requirements on new development projects in downtown Washington, ranging from minimum retail space requirements and historic preservation to design standards and mandated housing. (Giordano Report at 2; see generally, D.C. Mun. Regs. tit. 11, § 1709).

**Response:** This is not disputed.

81. To compensate owners subject to the new restrictions, the DD Regulations also created TDRs. Under the new regulations, when an owner develops a project which meets or exceeds certain requirements of the DD Regulations, TDRs are generated. These TDRs can then be sold at a profit for use on other development sites in designated "receiving" districts. (Giordano Report at 2; D.C. Mun. Regs. tit. 11, § 1709.1).

**Response:** This is not disputed.

21

82. TDRs can have a dramatic impact on the value of downtown properties. (Giordano Report at 2) (Ex. 37).

    **Response:** This is not disputed.

83. For sending sites, generating and transferring TDRs can yield profits which mitigate the costs of historic preservation and providing preferred uses and provide an incentive for providing such uses. (Id. at 2).

    **Response:** This is not disputed.

84. For receiving sites, TDRs can create additional density in a way that was formerly available only through expensive and lengthy discretionary zoning processes. (Id. at 2).

    **Response:** This is not disputed.

85. The mechanics of a TDR transfer begins with a sending site and a receiving site. A sending site which is eligible to generate and transfer TDRs meets one of two profiles. It may be a designated historic property or a development project which provides certain preferred uses identified in the DD regulations. (Id. at 2; D.C. Mun. Regs. tit. 11, § 1709).

    **Response:** This is not disputed.

86. TDRs generated under the DD Regulations may be transferred to any other lot located within the DD District or to lots located within receiving zones which have been designated by the City as appropriate for high density commercial development. (Giordano Report at 3; D.C. Mun. Regs. tit. 11 § 1709.1).

    **Response:** This is not dispute.  In addition, MRLP and MRLP TDR state that the TDRs can also be transferred to a non-landowning entity.  Braesch Decl. at ¶¶11.  Either the receiving lot or the non-landowning entity can then re-transfer the TDRs. ¶¶12, 17, 18.

87. The "North Capitol" receiving zone, in which the 90 K Street Property is located, is one such zone. It was established in October of 1998. (Giordano Report at 3; 46 D.C. Reg. 1054, 1058 (Oct. 19, 1998)).

    **Response:** This is not disputed.

88. The TDR transfer process involves both a real estate transaction and a ministerial government process. (Giordano Report at 3) (Ex. 37).

**Response:** This is not disputed.

89. The transfer must be certified by the District government. (Id. at 4; D.C. Mun. Regs. tit. 11, § 1707 (I) (4)).

    **Response:** This is not disputed.

90. The owner of the sending site will process with the District of Columbia zoning, planning and legal agencies a "TDR Covenant." The TDR Covenant restricts the sending site in perpetuity to provide the preferred use giving rise to TDRs, or to maintain the historic project undertaken. Once approved and executed by the District, the TDR Covenant is recorded in the land records and runs with the chain of title to the sending site. (Giordano Report at 4; D.C. Mun. Regs. tit. 11, § 1709.14).

    **Response:** This is not disputed.

91. The parties also process with the same District agencies a "TDR Certificate." This document is akin to a deed, and legally transfers the specified TDRs from the sending site to the receiving site. (D.C. Mun. Regs. tit. 11, § 1709.10-1709.11). Standard forms for the TDR Covenant and the TDR Certificate have been developed by the City and the process for City review and execution is ministerial in nature. (Giordano Report at 4) (Ex. 37).

    **Response:** This is not disputed.

92. The TDR Certificate is recorded at closing on the transfer of TDRs, and completes the transaction between sending lot and receiving lot. (Id. at 4; D.C. Mun. Regs. tit. 11, § 1709.14).

    **Response:** This is not disputed except to state that there is usually another document involved

and that is the purchase agreement between the owner of the sending lot and the owner of the receiving

lot or the non-landowning entity that is purchasing the TDRs. Braesch Decl. at ¶10.

93. The DD regulations permit the re-transfer from the original receiving lot to another eligible receiving lot. (D.C. Mun. Regs. tit. 11, § 1709.8).

    **Response:** This is not disputed.

94. TDRs have generally been readily available for purchase and the going rate for TDRs has generally ranged since 1998 from a high of approximately $25.00 per square foot of transferred density to a low

of $3.00 per square foot with an overall downward trend in prices to the present. (Giordano Report at 4) (Ex. 37).

     **Response:** This is not disputed.

95. The establishment of a receiving zone is effectively an up-zoning of the properties located within the zone to a higher matter-of-right density. (Id. at 5).

     **Response:** This is not disputed.

96. In the North Capitol receiving zone, where the 90 K Street Property is located, TDRs may be used to increase matter-of-right FAR from a maximum of 6.5 FAR to as much as 10.0 FAR with TDRs. (Id.; D.C. Mun. Regs. tit. 11, § 1707.5 (d)).

     **Response:** This is not disputed.

97. Utilizing approximately 360,513 square feet of TDRS, the density of the 90 K Street Property can potentially be increased from 6.5 to 10.0 FAR. This approximate quantity of TDRS has been available in the market since the inclusion of 90 K Street in a receiving zone at prices which have generally ranged from approximately $25.00 to $3.00 per square foot with an overall downward trend in prices to the present. (Giordano Report at 5) (Ex. 37).

     **Response:** MRLP and MRLP TDR dispute that $25.00 is the high end of the range of prices

for TDRs.   MRLP purchased the TDRs from Manufacturers Life Insurance Company ("ManLife

TDRs") for $30.00 per square foot.  Braesch Decl. at ¶14.  Currently, the availability of TDRs is

somewhat diminished from recent years and therefore the cost to purchase TDRs is now in a range of

$5.00 to $8.00 per square foot. Braesch Decl. at ¶10.

98. TDRs are currently selling at $5.50 to $5.25 per square foot. (Id. at 5).

     **Response:**  MRLP and MRLP TDR  dispute that the current selling price is as stated; the

current selling price ranges from $5.00 to $8.00 per square foot.  Braesch Decl. at ¶10.  This dispute is

not material, however,  because it is the value of the TDRs  that is material.

99. TDRs are an aspect of the zoning for the property. (Giordano Report at 2) (Ex. 37).

**Response:** MRLP and MRLP TDR are uncertain of the meaning of the term "aspect of" zoning and therefore they dispute this statement. The zoning at a receiving site remains unchanged. Braesch Decl. at ¶24. The zoning at 90 K remained unchanged at C-3-C. Braesch Decl. at ¶24. The District of Columbia designates certain areas (the receiving sites) as eligible to receive TDRs. Braesch Decl. at ¶24. There is no other or different zoning that applies. Braesch Decl. at ¶24. There is no act by the District of Columbia that changes what can be built on the property. Braesch Decl. at ¶24.

100. The effect of a parcel being placed in a 'receiving zone' for TDRs is an "upzoning" of the property. (Id. at 5).

**Response:** MRLP and MRLP TDR dispute this statement. The effect of a parcel being placed in a "receiving zone" for TDRs is not "upzoning." Braesch Decl. at ¶24. See also Response to SOF 99.

101. There is a glut of TDRs available in the market place. The fair market value of TDRs has ranged from $3.00 to $25.00. (Id. at 4-5).

**Response:** MRLP and MRLP TDR dispute that there is currently a "glut" of TDRs in the market place. Braesch Decl. at ¶10. They also dispute that the "fair market value" of TDRs has ranged from $3.00 to $25.00. The value of a TDR to a developer is different than the acquisition cost of the TDR. Braesch Decl. at ¶22.

102. MRLP contracted to buy TDRs for use at the 90 K Street Property for $6 per square foot. (Deposition of Steven Braesch ("Braesch Dep.") at 24:19-29:17), attached as Ex. 3).

**Response:** MRLP and MRLP TDR dispute that MRLP purchased the ManLife TDRs for $6 per square foot; it purchased them for $30.00 per square foot. Braesch Decl. at ¶14. MRLP and

MRLP TDR  do not dispute that the ManLife TDRs were sent to 90 K Street as the receiving site.

MRLP  was not required to use the TDRs at 90 K Street because it could have transferred the

ManLife TDRs from 90 K Street to another receiving site.  Braesch Decl. at ¶16.  MRLP did not

contract to buy the E Street TDRs, as explained by Steve Braesch in his Declaration at Paragraph 16.

103. The "rebuttal appraisal" expert retained in this litigation by MRLP, Stuart I.
Smith, has on one occasion determined the value of TDRs in the "North Capitol" receiving zone.
The value he concluded for that transaction was that TDRs had value of $3.50 per FAR.
(Deposition of Stuart I. Smith ("Smith Dep.") at 34:1-3, attached as Ex. 4).

**Response:** MRLP and MRLP TDR dispute that in the referenced testimony Stuart Smith

testified that the "value" of the TDRs was $3.50 per FAR.  Mr. Smith testified that there is a difference

between price and value.  Smith Tr. at 93.  "Price is simply a transaction amount and value has certain

definitions associated with it, willing buyer, willing seller."  Smith Tr. at 93.

104. TDRs do not sell for a price that is equal to or similar to the price per square foot
of land to which they will be attached. (Id. at 94:13-95:4).

**Response:** MRLP and MRLP TDR dispute this statement.  TDRs sell for whatever price is

reached between the seller and the buyer.  Braesch Decl. at ¶22.

105. TDRs are recorded in the land records of the District of Columbia for both the sending and
receiving lots. (D.C. Mun. Regs. tit. 11, § 1709.10-1709.11, 1709.14).

**Response:** This is not disputed.

106. In 2000, when MRLP complied with the requirement of the CPA and provided to Viad the details
of its proposal to sell the Property to Level 3, there were TDRs recorded on the property at that time.
(Letter dated 7/21/00 from S. Rose to TLC, attaching agreement between MRLP and Level 3
Communications, LLC ("MRLP—Level 3 Agreement"), VD-000593; Certificate of TDR Transfer
dated 8/16/00, MR-07470-07487, attached as Exs. 38 & 39). The contract of sale to Level 3 was for
a single price that included the TDRs already assigned, since "development rights" were included in the
definition of "Property." (Rose Dep. at 193:21- 195:17 (Ex. 1); "MRLP-Level 3 Agreement" at 1.1.3
and Article 2, VD-000593) (Ex. 38). MRLP provided that contract to Viad so that it could consider

whether to exercise its right of first refusal; Viad chose not to do so. (MRLP-Level 3 Agreement at cover letter, VD-000593) (Ex. 38).

**Response:** MRLP and MRLP TDR do not dispute that in 2000, pursuant to the first right of refusal provisions of the Cash Participation Agreement, MRLP provided to Viad the details of its proposed transaction with Level 3 and that Viad chose not to exercise those rights. While the Level 3 Agreement did include "development rights" within the definition of Property, they were included within the "Intangible Personal Property" subsection of that definition. Level 3 Agreement at Paragraph 2.1.2.

107. Beginning in 2000, MRLP listed as expenses for the property deductible under the CPA against any payment owed to Viad for yearly operations the cost of acquiring TDRs and the legal fees associated with doing so. The total cost over a period of time was approximately $350,000. The annual financial statements of MRLP submitted to Viad under the CPA for the years 2000, 2001, 2002, 2003, 2004 and the 'Draft' statement for 2005 listed these TDR expenses as an appropriate deduction. (Financial Statement for December 31, 2000 and 1999 at 7, VD 000180, attached as Ex. 40; Letter dated 11/21/06 from D. Cooter to R. Page ¶ 1) (Ex. 36).

**Response:** MRLP and MRLP TDR do not dispute that MRLP included the TDR expenses as recited in Paragraph 107. MRLP and MRLP TDR do dispute that they were appropriate deductions. Braesch Decl. at ¶21.

108. In July 2006, the partners of MRLP formed a separate entity, Montgomery Road TDR, LLC ("MRTDR"), which is identical in ownership to MRLP. This new entity was created to be a party to which TDRs would be transferred and then sold as part of a transaction with TC MidAtlantic Development, Inc. (Limited Liability Operating Agreement of Montgomery Road TDR, LLC, MR-07636; Eighth Amendment to Certificate of Agreement of Limited Partnership of MRLP, MR-16825, at 4) (Exs. 7 & 8).

**Response:** This is not disputed.

109. MRTDR is an "Affiliate" of MRLP within the meaning of the CPA. (CPA § 1.2) (Ex. 9).

**Response:** This is not disputed.

27

110. In or about August 2006, MRLP signed an agreement with TC MidAtlantic Development, Inc. ("TCMD") for the sale of the 90 K Street Property. (Land Purchase and Sale Agreement dated August 10, 2006; Agreement of Purchase and Sale of Transferable Development Rights dated August 10, 2006, MR-19926, attached as Exs. 41 & 42). As part of this sale, MRLP has sought to exclude Viad from participating in the appreciation of the property by creating a separate contract for the sale of the TDRs — the Agreement of Purchase and Sale of Transferable Development Rights -- and allocating approximately a third of the purchase price, $21,387,929, to this separate contract. (Agreement of Purchase and Sale of Transferable Development Rights dated August 10, 2006, MR-19926 (Ex. 42); First Amendment to Agreement of Purchase and Sale of Transferable Development Rights dated October 31, 2006; Settlement Statement for 90 K Street TDR Sale, MR-26163, attached as Exs. 43 & 55). In this separate TDR agreement, the TDRs are valued at more than eleven times the price that MRLP paid to acquire them and approximately thirteen times the market price for TDRs. (Id; see also Giordano Report at 5 (Ex. 37).

    **Response:** MRLP and MRLP TDR do not dispute the first sentence of Paragraph 110.

MRLP and MRLP TDR do, however, dispute that as part the sale MRLP sought to exclude Viad

from participating in the appreciation of the property by creating a separate contract for the sale of the

TDRs. TDRs are not part of the Cash Participation Agreement's definition of "Property" as explained

in Montgomery Road's Memorandum in opposition to Viad's summary judgment motion. Montgomery

Road has not sought to exclude Viad from participating in the appreciation of the Property as that term

is defined by the Cash Participation Agreement. Braesch Decl. at ¶23.

111. TCMD is an affiliate of The Trammel Crow Company. (Hudson Dep. at 11:19-12:3) (Ex. 5).

    **Response:** This is not disputed.

112. The draft agreements demonstrate that efforts were made to delete any reference to the TDRS as "property." For example, in one draft, Section 3.5(a) states that the deed shall include the TDRs. Inserted next to this section is the following comment ("Why are the TDR's [sic] here — because they run with the land — would prefer not to have this clause here — thinking about Cooter/Viad?" (Draft Purchase and Sale Agreement at 6, MR-l0942, attached as Ex. 44).

**Response:** The documents speak for themselves and the statement is not disputed. Because TDRs are intangibles, not real property or improvements, the deletions were appropriate. Braesch Decl. at ¶6.

113. In November 2006, 10 months after this litigation was filed, and after the contract of sale between MRLP and TCMD had been entered into, MRLP reversed its accounting treatment of the TDRs. The unaudited, unsigned financial statement submitted to Viad by counsel for MRLP eliminated these TDR expenses. (Letter dated 11/21/06 from D. Cooter to R. Page, at cover page and p.2) (Ex. 36). In the Rule 30(b)(6) deposition of MRLP on this matter, Reid Liffmann testified that, based on advice of litigation counsel, it was determined that the previous deductions taken for TDR expenses were "an administrative mistake." (Liffmann Dep. at 28:2-29:14) (Ex. 2).

**Response:** This is not in dispute.

114. The agreements with TCMD included a so-called Umbrella Agreement. Under that document, sale of the land at 90K Street was conditioned on the purchase of 45 L Street, the adjoining lot, and on the purchase of TDRs at a price sufficient to provide compensation for MRLP at an FAR value of $70 per square foot. (Umbrella Agreement dated August 11, 2006 between MRLP, 45 L Street Venture, LLC and TCMD), attached as Ex. 45).

**Response:** This is not disputed.

115. In the summer of 2006, TCMD had learned through its broker that a large property in the NoMa area was available for "roughly $100 million." (Hudson Dep. at 21:2-13) (Ex. 5).

**Response:** This is not disputed.

116. There was a subsequent face to face meeting between representatives of TCMD and Rose and Liffmann, and the price discussed, or at least the expectation of the parties regarding price was known to be, approximately $100 million. (Id. at 24:14-21).

**Response:** This is not in dispute.

117. In discussions between TCMD and the seller MRLP, there was never any differentiation made in the discussions of price between the two parcels, one at 45 L Street and one at 90K Street. The only discussion "was relating to the total FAR." (Id. at 30:3-14).

**Response:** This is not in dispute.

118. The buyer analyzed the sale in terms of the total FAR, which it priced at approximately $70 per square foot. (Id. at 33:5-10).

    **Response:**  This is not in dispute.

119. The "experience" of TCMD was that the District of Columbia government would allow up an FAR of up to 10 in this area, and it calculated its expected yield on that basis. (Id. at 33:18-34:4).

    **Response:**  This is not in dispute.

120. The TDR price in the contracts was changed after the agreement was made. In or about October 2006, TCMD determined that it did not need to purchase as many TDRS as the contracts provided for because they could not be used in the plans under consideration. However, in the amendments to the contracts, the total contract price for the purchase of TDRs by TCMD from MRLP was not changed. Instead, the price per TDR was increased by an amount necessary to insure that MRLP was paid the same amount even if the total number of TDRs it sold was reduced. (Hudson Dep. at 42:9-45:6) (Ex. 5); Email dated 10/31/06, 6:27 p.m., from R. Saas to D. Hudson, MR-22461 at 22462; Email, dated 11/1/06, 8:02 a.m., from S. Braesch to R. Shapiro, R. Saas, D. Hudson, R. Liffmann, and R. Foster, MR-19563; Email dated 11/1/06, 11:40a.m., from S. Braesch to R. Saas, R. Shapiro, R. Liffmann, D. Hudson and R. Foster, MR-20535, attached as Exs. 46-48) (First Amendment to Agreement of Sale of Transferable Development Rights dated October 31, 2006) (Ex. 55).

    **Response:**  This is not in dispute.  MRLP and MRLP TDR do, however, dispute the inference

which Viad seeks to glean from this - that the TC Midatlantic deal was a sham transaction.  It was not.

Braesch Decl. at ¶20.

121. The reason for making the change in this manner was explained by counsel for TCMD. The only reduction in the price if the TDRs were not to be included in the sale was the small cost of acquisition of the TDRs, and the "profit piece" would be guaranteed to TCMD. (Email from 10/31/06,6:27 p.m, from R. Saas to D. Hudson, MR-22461 at 22462) (Ex. 46).

    **Response:**  This is not in dispute.  MRLP and MRLP TDR do, however, dispute the inference

which Viad seeks to glean from this - that the TC Midatlantic deal was a sham transaction; it was not.

Braesch Decl. at ¶20.

122. TCMD has admitted in deposition testimony that the price paid to MRLP for TDRS was well-above the market price and was agreed to only because purchasing the TDRs at the higher value was a requirement imposed by MRLP as a condition for purchasing the land at 90K Street. (Hudson Dep. 45:4-46:17) (Ex. 5). The "bargain" according to Daniel Hudson, President of TCMD, was that MRLP would be paid for the achievable FAR regardless of how the price was allocated between TDRs and land. (Id. at 46:8-17).

    **Response:**  This is not in dispute.  MRLP and MRLP TDR do, however, dispute the inference

which Viad seeks to glean from this - that the TC Midatlantic deal was a sham transaction; it was not.

Braesch Decl. at ¶20.

123. MRLP has not provided financial statements pursuant to the CPA for fiscal years 2005 and 2006. (See Letter from R. Page to D. Cooter dated 9/13/06 requesting Special Purpose Financial Statement for 2005, attached as Ex. 48).

    **Response:**  Section 2.6 of the Cash Participation Agreement requires financial statements and

schedules to be submitted within 120 days of the end of each Fiscal Year (defined as December 31 in

§1.19).  Thus, the 2006 financial statements are not due until April 30, 2007.  They are being worked

on at the present time.  Glassman Decl. at ¶18.  Financial statements and schedules for Fiscal Year

2005 were provided on November 21, 2006.  Exhibit 46.  As set forth in the Declarations of Messrs.

Rose and Glassman, these financial statements contained a restatement of the financials for the period

December 1987- December 2005 (the "2005 Revised Statements").  Glassman Decl. at ¶¶12-16;

Rose Decl. at ¶¶ 16-18.

124. The failure to provide financial statements under Section 2.6 of the CPA is a default under the contract. (CPA § 2.6) (Ex. 9).

    **Response:** This is disputed. As set forth in the Response to SOF 123, 2005 Statements were

provided on November 21, 2006, and the 2006 financial statements are not yet due.  See Glassman

Decl. at ¶¶15, 18.

125. As was discussed previously, during the course of litigation, on November 21, 2006, MRLP has tendered a compilation of financial data, accompanied by a letter from its litigation counsel with his opinion that the financial data is a correct statement of expenses and other deductions under the CPA. (this compilation is hereinafter referred to as the "Cooter Financials"). By contrast, the CPA requires the certification of an independent certified public accountant applying generally accepted accounting principles on a consistent basis to the books and records of MRLP. (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement; CPA § 2.6) (Exs. 9 & 36).

**Response:** The summary of the language of CPA §2.6 is not accurate. Specifically, CPA §2.6 states: "Developer shall furnish to TLC ... financial statements and schedules, including a balance sheet and statement of operations for the Property for such Fiscal Year, prepared in accordance with generally accepted accounting principles applied on a basis consistent with past practices and bearing the unqualified opinion of a firm of independent certified public accountants ... ."

126. The Cooter Financials do not comply with the requirements of the CPA. Id.

**Response:** It is not disputed that the 2005 Revised Statements do not contain the unqualified opinion of an independent accountant. Until this litigation however, TLC/Viad has been satisfied with the information provided. See, e.g. Response to SOF 47. In addition, the position paper submitted by Viad to the Reznick Group (Exhibit 37) makes no complaint about the fact that the financials had historically not been accompanied by such an unqualified opinion. Moreover, Ms. Fiorucci testified that (since her involvement) TLC/Viad has never requested an audited statement in writing. Fiorucci Tr. at 94-95.

127. The Cooter Financials are inconsistent with tax returns filed by MRLP and, on information and belief, with the tax returns filed by the principals of MRLP. Specifically, whereas the Cooter Financials classify all out of pocket expenses by MRLP in maintaining the land as loans rather than as equity investments in the Property, the actual accounting and tax treatment of these items for all other purposes and in prior financial statements submitted by MRLP to Viad classified these expenses as equity. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406 (Ex. 50); Revised 2005 Statement at 2 & 5 (Ex. 36); Representative Financial Statement at 2 & 5, MR-00953 (Ex. 35).

32

**Response:** Viad makes the statement that the 2005 Revised Statements contain a different treatment of Montgomery Road's expenses than the tax returns filed by Montgomery Road for 2005, yet fails to identify – other than a cursory reference to the tax returns – the specific items about which it complains. There is nothing in the Cash Participation Agreement that requires the tax and Special Purpose Financial Statements to be the same as the tax returns for MRLP. Moreover, as described in detail above, the Special Purpose Financial Statements tendered prior to the 2005 Revised Statements erroneously treated legitimate expenses as equity, and the interest thereon was erroneously labeled as "Developers' Equity Return." Glassman Decl. at ¶¶10-16; Rose Decl. at ¶¶15-18. The purpose and intent of the 2005 Revised Statements was to reflect the economic reality of advances from S&S Finance to Montgomery Road to maintain the Property for over 20 years. Glassman Decl. at ¶¶10-16; Rose Decl. at ¶¶15-18.

128. On January 9, 2007, MRLP partner Reid Liffmann prepared a spreadsheet with a summary of the MRLP-TCMD transaction, including a "Net Gain Calculation" and a "Gain on Sale" calculation. In that spreadsheet, he identified the various closing costs and the reimbursement or recognition of previously incurred expenses in buying and holding the Property. The deductions listed are similar to those described in the CPA, including "project costs," broker's commissions, and closing costs. His calculation showed that a total of $50,172,452 would be available for distribution to the partners of MRLP, not including the $4,500,000 it set aside for possible payment to Viad. Thus a net gain of $54,672,452 was anticipated. (Email dated 1/9/07 from R. Liffmann to R. Glassman attaching spreadsheet, MR19671, attached as Ex. 51).

**Response:** This is disputed. In anticipation of the closing of the transaction with TC MidAtlantic in January 2007, Mr. Glassman prepared numerous draft spread sheets to show various allocations of the sale proceeds, including the one that is included in Exhibit 51 to Viad's Motion for Summary Judgment. Exhibit 51 shows an e-mail transmittal from Mr. Liffmann dated January 9, 2007, but Mr. Glassman prepared the first three schedules on the spreadsheet (at pages MR 19672-76)

referenced by Viad. Although the spreadsheet reflects that $4,870,000 would be "repaid" to S&S Finance from the proceeds of the closing on 90 K Street, an additional approximately $35 million was distributed directly to Mr. Rose and Mr. Greenebaum, or to related entities. At year-end 2006 (ten days prior to closing), in addition to the First Mortgage payable to S&S Finance of $10,297,139, the loan payable due to S&S Finance was approximately $19.9 million and the interest thereon was approximately $18.7 million.

129. Consistent with the tax returns of MRLP prior to the closing, and consistent with the distribution of funds shown on the settlement statement after the sale, the Liffmann spreadsheet indicated total loans payable to S&S (including the mortgage) of less than $5 million. (Email dated 1/9/07 from R. Liffmann to R. Glassman attaching spreadsheet, MR 19671 at 19676; MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50-52).

      **Response:** <u>See</u> Response to SOF 128.

130. The purpose and intent of the Cooter Financials was to retroactively change the accounting for MRLP's ownership of the Property for the purpose of increasing those items that might be deducted as an expense from the Agreed Value of the Property upon sale and, thus, defeat the possibility of a payment to Viad. (Liffmann Dep. at 19:20-21:2; 24:9-16; 25:21-26:13; 27:9-28:1) (Ex. 2).

      **Response:** This is disputed. The purpose and intent of the 2005 Revised Statements was to reflect the economic reality of advances from S&S Finance to Montgomery Road to maintain the Property for over 20 years. Glassman Decl. at ¶¶10-16; Rose Decl. at ¶¶15-18.

131. Like the structure of the MRLP-TCMD sale documents, which purport to segregate consideration for the purchase of the Property by TCMD) into land value and value for attributes of the zoning, thus lowering the Agreed Value under the CPA, the failure to provide financial statements for 2005 and 2006 and to substitute during this litigation the Cooter Financials is a sham for which MRLP fraudulently seeks to increase the possible deductions or adjustments to the payment due to Viad. (Id.).

      **Response:** This is disputed. <u>See</u> Response to SOF 130.

132. During the course of this litigation, MRLP has engaged in actions to avoid and defeat its contractual obligations to Viad under the CPA. (Letter from E. Fiorucci to Sam Rose dated 2/21/07, attached as Ex. 53).

      **Response:** This is disputed. <u>See</u> Response to SOF 130.

133. On January 11, 2007, MRLP proceeded to close on the transaction to sell 90 K Street, N.E. to TCMD or one of its affiliates. (Settlement Statement for 90 K Street Land Sale, MR-26158, Settlement Statement for 90 K Street TDR Sale, MR-26163) (Ex. 43 & 52).

      **Response:** This is not disputed.

134. The total consideration paid to MRLP for the sale of 90 K Street N.E. on January 11, 2007, including deferred compensation, was $67,424,457. (Id.).

      **Response:** More precisely, the consideration was as follows: the land purchase ($46,036,528), the TDR purchase ($8,387,929), and the purchase of Future TDRs ($13,000,000). Braesch Decl. at ¶20.

135. Under Section 3.2 of the CPA, MRLP was required to make the Appreciation Cash Payment within three (3) days of that closing. (CPA § 3.2) (Ex. 9).

      **Response:** It is not disputed that Section 3.2 of the CPA requires the Appreciation Cash Payment to be made within 3 days of a sale (or other triggering event). At the time of the closing however, this matter was already being litigated in this case. The binding nature of the Reznick Opinion, and how to calculate the amount, if any, of the Appreciation Cash Payment have been the subject of this litigation since the original Complaint was filed by Montgomery Road in January 2006. Whether the TDRs are appropriately considered in the calculation of the Appreciation Cash Payment is the subject of Montgomery Road's First Amended Complaint, filed on December 8, 2006, and Viad's Counterclaim filed on January 3, 2007. Thus, there was no basis upon which to "make" the Appreciation Cash Payment within 3 days of closing on the TC MidAtlantic transaction. Nevertheless,

Viad's rights are protected, because on the date of closing of the transaction with TC MidAtlantic, $4.5 million (an amount agreed to by Viad) was wired into an account jointly controlled by counsel for Montgomery Road and Viad, to secure any potential Appreciation Cash Payment, pending the resolution of this dispute.  See Rose Decl. at ¶34.

136. No payment was made by MRLP at any time nor was any payment received by Viad as a result of the sale of the property on January 11,2007. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

**Response:** See Response to SOF 135.

137. Under Section 3.9 of the CPA, MRLP was required to deliver to Viad "a statement reflecting the Agreed Value, the Approved Deductions, the Closing Costs and the Appreciation Cash Flow used in calculating the Appreciation Cash Payment and a detailed breakdown of all items necessary for the calculation of each such item." (CPA § 3.9) (Ex. 9).

**Response:**  with regard to the "statement" required by §3.9, literally tens of thousands of documents have been produced by Montgomery Road in this case, including the closing settlement sheets from the TC MidAtlantic transaction, and all documents from which to calculate all elements of the Appreciation Cash Flow, and all costs and deductions therefrom (which will result in the conclusion that no Appreciation Cash Payment is owed).  At the time of the closing of the TC MidAtlantic transaction, both Montgomery Road and Viad had petitioned this Court for a declaration of their rights under the CPA, and thus, the calculation of the "statement" contemplated by § 3.9 of the CPA would have been an exercise in futility, given the disparate views of the parties on the inclusion of interest due to S&S Finance, and the exclusion of the TDRs from the sale proceeds in calculating the Appreciation Cash Payment.

138. No "statement" as required by Section 3.9 has been delivered by MRLP to Viad. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

36

**Response:** See Response to SOF 138.

139. On February 21, 2007, Viad gave written notice to MRLP under Section 7.3 that it was in default under the CPA for failure to provide either a payment or a statement of the calculation of the payment. (Id.). The CPA provides that MRLP had a ten (10) day period to cure monetary defaults and a thirty (30) day period to cure non-monetary defaults after notice from Viad. (CPA § 7.3) (Ex, 9).

**Response:** It is not disputed that Viad sent such a letter, declaring a default, and that the CPA

§7.3 contains a cure provision.

140. MRLP made no effort to cure these defaults, and it remains in default. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53). According to Section 7.4 of the CPA: "[i]f either party hereto shall bring suit against the other as a result of any alleged breach or failure of the other party to fulfill or perform any covenants or obligations under this Agreement, then in such event, the prevailing party in such action shall, in addition to any other relief granted or awarded by the court, be entitled to judgment for reasonable attorney's fees incurred by reason of such action and all costs of suit and those incurred in preparation thereof at both trial and appellate levels." (CPA § 7.4) (Ex. 9).

**Response:** As set forth in ¶ 18 of Mr. Glassman's Declaration, he is presently preparing the

2006 Financials, which are not even due until April 30, 2007, yet Viad has declared a default as to

those financials. The other alleged "defaults" are subject to resolution in this litigation. Viad's

declaration of a "default" is nothing more than an artifice upon which to base its claim for attorneys fees.

141. The CPA provides in section 3.1 that the Appreciation Cash Payment shall be based on the Agreed Value of the Property, less certain specified deductions as defined in the CPA. (CPA § 3.1) (Ex. 9).

**Response:** It is admitted that the basic components of the Appreciation Cash Payment are set

forth in CPA § 3.1.

142. The Agreed Value is defined in Section 3.3 of the CPA as the greater of the gross proceeds actually received in a sale of the property or the fair market value of the property. (Id. § 3.3).

> **Response:** This "summary" of Agreed Value is not disputed.

143. After the sale of the Property on January 11, 2007, MRLP failed to provide a statement of the Agreed Value based on the sale or otherwise to provide its calculation of the Cash Appreciation Payment. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

> **Response:** This is not disputed, however, see Response to SOF 137.

144. The CPA provides in Section 3.11 that, if the parties disagree about the Agreed Value, Viad may notify MRLP within ninety days of the receipt of the payment of that disagreement. Because MRLP had filed this suit to declare that the TDR portion of the sale was not covered by the CPA, and because it failed and refused to provide any payment or even a statement of how it calculated the lack of a payment and its deductions from the Agreed Value upon which it is relying, Viad gave notice on February 21, 2007, in writing, that a disagreement existed. (CPA § 3.11; Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Exs. 9 & 53).

> **Response:** Viad sent a letter to Mr. Rose on February 21, 2007, alleging various "defaults,"
> and indicating that "agreement" as to fair market value was not likely.

145. Viad also, on January 31, 2007, provided to MRLP in accordance with the CPA a report prepared by an M.A.I. appraiser, as provided for in Sections 3.8 and 3.11 of the CPA, with an opinion as to the fair market value of the Property. (Expert Report of Steven Halbert ("Halbert Report"), attached as Ex. 54); CPA §§ 3.8, 3.11) (Ex. 9).

> **Response:** Viad contends that when it tendered its "expert report" of Stephen Halbert on
> January 31, 2007, it was invoking the "appraisal" process set forth in the Agreement for disputes as to
> the "fair market value" of the Property. Viad's contention is unfounded. First, Montgomery Road
> submits that if Viad intended to invoke the appraisal process, it would have to have done so within 45
> days of "receiving notice of an[] event requiring the determination of fair market value." CPA §3.8.
> That date was December 17, 2006, which was 45 days following Viad's receipt of the Amended
> Contracts for the sale of 90 K Street and the TDR's on November 2, 2006. See Rose Decl. at ¶31.
> Without regard to the timeliness of Viad's purported invocation of the "appraisal process," the
> appraisal upon which Viad relies was tendered in accordance with the January 31st deadline contained

38

in the Scheduling Order for expert reports. Indeed, the appraisal was an attachment to a pleading entitled "Designation of Expert Witnesses by Viad Corp." [Docket #19], and made absolutely no reference to invoking the appraisal process under the Agreement. By the time the expert report was tendered, Viad had already filed its Counterclaim [Docket # 16], which sought a declaration that the value of the TDRs being sold to TC MidAtlantic were to be considered in valuing the Property for purposes of the Appreciation Cash Payment. Counterclaim ¶7. Thus, Viad had, by actively participating in this litigation, waived the appraisal process.

146. The appraiser, Steven Halbert, of Cushman and Wakefield, provided his written opinion that the fair market value of the Property on June 24, 2006, and within a 6 month period thereafter, which period included the date of the contract between MRLP-TCMD, was $64,800,000. (Halbert Report, at Executive Summary). Mr. Halbert based his valuation on the total development potential of 90 K Street. (Halbert Report at 27 & 37) (Ex. 54).

**Response:** It is not disputed that Mr. Halbert valued the Property at $64,800,000. For purposes of this Summary Judgment Motion however, his report is hearsay.

147. Section 3.8 of the CPA provides that MRLP must select its own appraiser and MRLP's appraiser and Viad's appraiser shall together select a third appraiser (CPA § 3.8).

**Response:** It is not disputed that §3.8 provides for the designation of an appraiser by MRLP in the context of an appraisal process. As set forth above however, Viad has not invoked the appraisal process under the CPA, but rather, has simply tendered the report of an expert witness pursuant to the Scheduling Order in this case.

148. MRLP failed to name an appraiser to determine fair market value. Under Section 3.8 of the CPA, this designation should have been made by February 15, 2007 (CPA § 3.8.) (Exs. 9 & 53).

**Response:** It is disputed that MRLP was required to "name an appraiser" pursuant to §3.8 of the CPA. See Response to SOF 147 and SOF 148. Given that Halbert's expert report was tendered in the context of this litigation, on February 23, 2007, Montgomery Road designated Stuart Smith [Docket #21] as its rebuttal expert witness (pursuant to Fed. R. Civ. P. 26(2)(C)) on the issue of fair market value of the property. Mr. Smith provided a review report of the Halbert appraisal. Smith Tr. At 82-86.

149. MRLP did designate as a rebuttal expert in this litigation Stuart I. Smith. He has testified that he has no opinion of the fair market value of the property. (Deposition of Stuart I. Smith, ("Smith Dep.") at 65:16-67:8). Rather, the thrust of his "rebuttal" is that Mr. Halbert should have described the availability of TDRs as an "extraordinary assumption." (Smith Dep. at 84:20-86:6) (Ex. 4).

**Response:** It is not disputed that Mr. Smith did an "appraisal review" of Mr. Halbert's appraisal, rather than performing his own appraisal of the Property. Smith Tr. at 65-67. One of the criticisms of Mr. Halbert's appraisal was that he failed to identify the availability of TDRs as an extraordinary assumption. Smith Tr. at 82-86.

150. Viad's notice of February 21, 2007, gave notice to MRLP that it was in default for failure to contest the fair market value calculation and component of the Agreed Value under the CPA (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

**Response:** Viad's letter of February 21, 2007 purported to give notice to MRLP that it was in default for failing to "select an appraiser." MRLP denies that it was in default. The parties have actively participated in this litigation, for months prior to Viad's designation of its expert witnesses (pursuant to this Court's Scheduling Order), and then three-weeks later (by its February 21, 2007 letter) attempting to portray that expert witness designation as an invocation of the "appraisal" process.

40

151. The Agreed Value for the Property under Section 3 of the CPA is the higher of the sales price or the fair market value of the Property, and, thus, based on inclusion of the TDR portion of the contract that MRLP has sought improperly to exclude, is $67,424,457. (CPA § 3.3; Settlement Statement for 90 K Street Land Sale; Settlement Statement for 90 K Street TDR Sale) (Exs. 9, 43 & 52).

**Response:** This is disputed. The TDR Contract is not included in the fair market value of the Property. "Property" is defined under the CPA as the real property and the improvements thereon. CPA §§ 1.21 ("Improvements"), 1.32 ("Property"), 1.35 ("Real Property").

152. In the alternative, in no event is the Agreed Value less than the fair market value for the Property, appraised in accordance with the CPA as $64,800,000. (Halbert Report, at Executive Summary); CPA § 3.3) (Ex. 9 & 54).

**Response:** The appraisal prepared by Viad's expert, Mr. Halbert specifically depends on inclusion of the TDRs in reaching his fair market value of $64,800,000. Halbert Tr. at 39-43. Without the TDRs, the value is approximately $44 million (Halbert Tr. at 43), which approximates the land sale contract with TC MidAtlantic. See, e.g., Braesch Decl. at ¶20.

153. Calculation of the Approved Deductions and other components of the Appreciation Cash Payment is based on the legitimate expenses incurred by MRLP in the sale of the property and upon the proper calculation of the Agreed Deductions. (CPA § 3.1, 3.4(a)) (Ex. 9).

**Response:** This is not disputed.

154. Calculation of the Appreciation Cash Payment will require an audit of the records of MRLP and must be conducted, as contemplated in the CPA, by a qualified accountant. (Id. § 3.9).

**Response:** This is disputed. in 2005, the Reznick Group provided its binding conclusion that the interest expense attributable to the advances from S&S Finance were to be deducted in computing the Appreciation Cash Payment. Viad now wants a "do-over," and seeks an audit of Montgomery Road's books and records "for review by a qualified accountant." Whether the interest expense

41

attributable to advances funded by S&S Finance are proper deductions, and whether the purchase price of the TDRs is included in determining the value of the Property.  An audit of Montgomery Road's records will not provide any assistance to the determination of those issues.  As set forth above, Special Purpose Financial Statements have been provided for twenty years, and tens of thousands of pages of documentation have been provided in this litigation, and other than the classification of the interest expense, Viad has not challenged *any* expense items related to the maintenance of the Property, either in this litigation, or in the Reznick arbitration proceeding.  Ms. Fiorucci testified that she has no evidence that as of September 1999, MRLP did not have $25 million invested in the Property, which Mr. Rose told her was the investment at that time. Fiorucci Tr. at 58; see Exhibit 23 (E. Fiorucci e-mail to K. Goldman, 9-8-99).  Nor did she have any basis to dispute that Montgomery Road had been accumulating significant interest expense.  Fiorucci Tr. at 53-54.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.

    /s/
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com

*Attorneys for  Plaintiff/Counterdefendant
Montgomery Road I Limited  Partnership and
Third-Party  Defendant Montgomery Road TDR,
LLC*

42

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MONTGOMERY ROAD I** )<br>**LIMITED PARTNERSHIP,** )<br>)<br>    **Plaintiff/** )<br>    **Counter-Defendant,** )<br>)<br>**v.** )<br>)<br>**VIAD CORP,** )<br>)<br>    **Defendant/** )<br>    **Counter-Plaintiff/** )<br>    **Third-Party Plaintiff** )<br>)<br>**v.** )<br>)<br>**MONTGOMERY ROAD TDR, LLC,** )<br>)<br>    **Third-Party Defendant** )<br>) | **Case No. 1:06CV00344 (HHK)**<br><br>**Next event:   Status Conference**<br>                    **May 11, 2007** |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
### MONTGOMERY ROAD I LIMITED PARTNERSHIP
### AND MONTGOMERY ROAD TDR, LLC'S OPPOSITION TO
### <u>DEFENDANT VIAD'S MOTION FOR SUMMARY JUDGMENT</u>

Respectfully submitted,

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
Phone:(202)537-0700
Fax:     (202)364-3664
efiling@cootermangold.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

FACTS AND CHRONOLOGY OF KEY EVENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I        THE SUMMARY JUDGMENT STANDARD  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.      VIAD HAS NOT ESTABLISHED AS A MATTER OF LAW THAT THE
         REZNICK OPINION IS NOT BINDING ON THE PARTIES  . . . . . . . . . . . . . . . . . . . 4

         A.       The Dispute Between the Parties Arose
                  from the Special Purpose Financial Statements  . . . . . . . . . . . . . . . . . . . . . . . . . 4

         B.       Submission of the Dispute to the Reznick Group is Binding  . . . . . . . . . . . . . . . . 8

III.     THE DEDUCTION OF INTEREST PREVIOUSLY LABELED AS
         DEVELOPER'S EQUITY RETURN IS SUPPORTED BY THE
         TERMS OF THE CASH PARTICIPATION AGREEMENT  . . . . . . . . . . . . . . . . . . . . . . 12

IV.      THE TDRs SHOULD NOT BE INCLUDED IN THE CASH
         APPRECIATION CALCULATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

         A.       The TDRs are not Real Property  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

         B.       The TDRs are not Improvements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

         C.       Extrinsic Evidence is Not Necessary to Interpret the CPA . . . . . . . . . . . . . . . . . 29

         D.       The Separation of TDRs in the Purchase Price was not a Sham . . . . . . . . . . . . . . 33

V.       VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT
         ON  ITS CLAIM FOR BREACH OF CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

         A.       Viad is Not Entitled to Summary Judgment on its Breach of
                  Contract Claim for an Alleged Default Relating to
                  2005 and 2006 Financial Statements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

B.     Viad is Not Entitled to Summary Judgment on its Breach of Contract Claim for an Alleged Default Relating to Providing a Statement or Payment to Viad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

C.     Viad is Not Entitled to Summary Judgment on its Breach of Contract Claim for an Alleged Default Relating to the Appraisal Process . . . . . . . . . . . . . . . 39

D.     An Audit of MRLP's Records is Not Required . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VI.    VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM OF BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.     Montgomery Road Did Not Owe A Duty Of Good Faith And Fair Dealing To Viad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

B.     Even If Montgomery Road Owed A Duty Of Good Faith And Fair Dealing, It Did Not Breach The Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

VII.   VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR ATTORNEYS FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## <u>TABLE OF AUTHORITIES</u>

<u>FEDERAL CASES</u>

<u>America v. Preston</u>,  468 F.Supp.2d 118 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

<u>Washington Metropolitan Area Transit Authority v. Quik Serve Foods, Inc.</u>, 2006 WL 1147933, *4 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

<u>CEI Washington Bureau, Inc. v. Department of Justice</u>, 469 F.3d 126 (C.A.D.C. 2006) . . . . . . . . . . 3

<u>Home Hearth Plano Parkway, L.P. v. LaSalle Bank, N.A.</u>, 320 B.R. 596 (N.D. Texas 2004) . . . . . 44

<u>In re IT Group</u>, 448 F.3d 661 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

<u>Moses H. Cone Hospital v. Mercury Construction Corp.</u>, 460 U.S. 1 (1983)  . . . . . . . . . . . . . . . .5

<u>Nuzzo v. FBI</u>, 1996 WL 741587, *1 (D.D.C.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

<u>Pearce v. E.F. Hutton Group, Inc.</u>, 828 F. 2d 826 (C.A.D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . . 5

<u>Rains v. Cascade Indus., Inc.</u>, 402 F.2d 241 (3d Cir.1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

<u>Sea Crest Construction Corp. v. United States</u>, 59 Fed. Cl. 615 (2004) . . . . . . . . . . . . . . . . . . . . . 12

<u>Suthers v. Amgen Inc.</u>, 441 F.Supp.2d 478 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

<u>Thyroff v. Nationwide Mut. Ins. Co.</u>, 460 F.3d 400 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 44

<u>Underwater Exotics, Ltd. v. Secretary of the Interior</u>, 1994 WL 80878 (D.D.C. 1994) . . . . . . . . . . 12

<u>STATE CASES</u>

<u>Allied Capital Corp. v. GC-Sun Holdings, L.P.</u>, 910 A.2d 1020 (Del. Ch. 2006) . . . . . . . . . . . . . . 43

<u>Allworth v. Howard University</u>, 890 A.2d 194 (D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

<u>Camalier & Buckley, Inc. v. Sandoz & Lamberton, Inc.</u>,  667 A.2d 822 (D.C. 1995) . . . . . . . . . . 38

<u>Hais v. Smith</u>, 547 A.2d 986, 988 (D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

Holland v. Hannan, 456 A.2d 807 (D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

In Re Haar, 667 A.2d 1350, 1353-54 (D.C. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

Mitsui Fudosan, Inc. v. County of Los Angeles, 268 Cal. Rptr. 356 (Cal. Ct. App. 1990)  . . . . 31-32

Paul v. Howard University, 754 A.2d 297 (D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

Shore v. Groom Law Group,  877 A.2d 86 (D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

Wilkinson v. St. Jude Harbors, Inc., 570 So.2d 1332 (Fla. Dist. Ct. App. 1990)  . . . . . . . . . . . . . 32

William F. Klingensmith, Inc. v. District of Columbia, 370 A.2d 1341 (D.C. 1977) . . . . . . . . . . . . 11

<u>FEDERAL RULES</u>

Fed. R. Civ. P. 26(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Plaintiff/Counterdefendant Montgomery Road I Limited Partnership ("Montgomery Road") and Third-Party Defendant Montgomery Road TDR, LLC ("Montgomery Road TDR"), by and through their undersigned counsel, hereby submit this Memorandum of Points and Authorities in support of their Opposition to Defendant Viad's Motion for Summary Judgment. Defendant Viad Corp. ("Viad") seeks summary judgment in its favor on its First Amended and Supplemental Counterclaim[2] and on Montgomery Road's First Amended Complaint.

## FACTS AND CHRONOLOGY OF KEY EVENTS[3]

Pursuant to Local Rule 56.1, Montgomery Road and Montgomery Road TDR are filing concurrently herewith their separate Response to Viad's Statement of Undisputed Material Facts. Montgomery Road and Montgomery Road TDR's Response to Viad's Statement of Material Facts contains detailed facts as well as their evidentiary support. The following is a chronology of the key events described by the Response to Viad's Statement of Material Facts:

• November 1987 - Montgomery Road[4] purchased the property located at First and K Streets, N.E. ("90 K Street" or "the Property") for approximately $11 million from Transportation Leasing Company ("Transportation Leasing"), which is the predecessor in interest to Viad Corp. ("Viad"), the Defendant in this case. At the same time, Transportation Leasing and Montgomery Road entered into a Cash Participation Agreement. Pursuant to the Cash Participation Agreement, under certain circumstances,

---

[2] Viad filed its First Amended and Supplemental Counterclaim at the same time as its Motion for Summary Judgment.

[3] Record citations to the factual statements in this section are set forth in the accompanying Response to Viad's Statement of Material Facts Not in Dispute.

[4] Montgomery Road is an affiliate of Greenebaum & Rose ("G&R"), which is a real estate developer with offices in the District of Columbia and Baltimore, Maryland

Transportation Leasing would receive 15% of any cash flow generated by the operation of the property ("Operations Cash Payment") and 15% of the net proceeds generated by the sale, disposition, or refinancing of the property ("Appreciation Cash Payment"). At the time Montgomery Road acquired 90 K Street in 1987, a $10.3 million mortgage was placed on 90 K Street.

• 1996 - S&S Finance Limited Partnership ("S&S Finance") (an "in house" bank for all G&R projects) purchased the mortgage note for approximately $9.3 million (at a discount of approximately $1 million). S&S Finance held the first mortgage on 90 K Street until the sale of the property in January 2007.

• 1997 - Montgomery Road's accountants reclassified approximately $7.3 million of the first mortgage debt to equity. Although the reclassification was for internal tax reasons, and had nothing to do with the Cash Participation Agreement, Ronald Glassman, G&R's in-house accountant, carried the reclassification through to the 1997-1999 Special Purpose Financial Statements (which were provided to Transportation Leasing annually).

• 2000-2005 - Montgomery Road and Transportation Leasing disagree regarding the calculation of the Appreciation Cash Payment in the event of a sale of 90 K Street. The focus of the dispute is the effect of the classification as equity of the amounts advanced by S&S Finance.

• 2005 - Montgomery Road and Viad agreed to seek an arbitration of the dispute by submitting the matter to the Reznick Group, an independent accounting firm. On April 10, 2005 the Reznick Group rendered its opinion, which found in favor of Montgomery Road on five of the six issues submitted to them. Viad refused to be bound by the Reznick Group's conclusions, despite language in the Cash Participation Agreement that the determination "shall be final."

• January 2006 - Montgomery Road institutes this litigation to seek a declaration of the parties' rights under the Cash Participation Agreement.

• November 2006 - Revised Special Purpose Financial Statements for the period from 1987 through December 31, 2005 (Exhibit 46) are prepared by Montgomery Road to identify the amounts owing to S&S Finance as debt and the interest thereon as an expense, and contain other corrections to accurately reflect the economic reality of what had occurred since Montgomery Road's purchase of the 90 K Street in 1987.

• January 2007 - 90 K Street is sold to a third party.

## ARGUMENT

## I.    THE SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard. See Nuzzo v. FBI, 1996 WL 741587, *1 (D.D.C.1996) ("When both parties in a cause of action move for summary judgment, each party must carry its own burden"); CEI Washington Bureau, Inc. v. Department of Justice 469 F.3d 126, 129 (C.A.D.C.2006) ("cross-motion for summary judgment does not concede the factual assertions of the opposing motion"); Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.1968) ("cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected

the other is necessarily justified"). Viad is not entitled to summary judgment because it cannot establish that it is entitled to judgment as a matter of law on the claims set forth in Montgomery Road's First Amended Complaint or Viad's First Amended and Supplemental Counterclaim.

## II.    VIAD HAS NOT ESTABLISHED AS A MATTER OF LAW THAT THE REZNICK OPINION IS NOT BINDING ON THE PARTIES

Viad seeks summary judgment on the grounds that the "undisputed facts demonstrate that the findings of the independent accountants are not binding on VIAD." Mem. at 3. Montgomery Road of course contends that the undisputed facts demonstrate that the Reznick Opinion, resulting from an arbitration process provides for in the CPA, is binding. In any event however, Viad has failed to establish as a matter of law that it is entitled to summary judgment on this issue.

### A.    The Dispute Between the Parties Arose from the Special Purpose Financial Statements

Section 2.7 of the Cash Participation Agreement provides that if Transportation Leasing/Viad "disputes any computation or item contained in any portion" of a year end special purpose financial statement, such disputed items were to be "submitted to arbitration" for resolution by an independent certified public accountant selected by Transportation Leasing "*whose determination shall be final*." Cash Participation Agreement (cited herein as "CPA") at §2.7. As set forth below, Viad and Montgomery Road submitted their dispute regarding the Special Purpose Financial Statements for arbitration to an independent accountant in March 2005. In its Summary Judgment Motion, Viad argues that the findings of the independent accountant are not binding because the issue now confronting the parties is the Appreciation Cash Payment. Mem. at 5-6. Viad argues that disputes regarding the Appreciation Cash Payment are resolved by an appraisal process under Section 3.11 of the Cash Participation Agreement.

4

What Viad ignores however, is that the determination of the Appreciation Cash Payment depends on the calculation of deductions and expenses defined in other sections of the Cash Participation Agreement, and as set forth in the Special Purpose Financial Statements. The calculation of the Appreciation Cash Payment is not done in a vacuum: income and expenses (and accounting treatment of those items) which are offsets from the gross proceeds of a sale (in calculating the Appreciation Cash Flow) are identified in the Special Purpose Financial Statements, and those deductions have previously been submitted to arbitration by an independent accountant whose conclusions are binding under Section 2.7 of the Cash Participation Agreement. It is clear under both Federal and District of Columbia law that decisions rendered pursuant to an arbitration clause are binding on the parties. The Federal Arbitration Act makes written agreements to arbitrate "valid, irrevocable, and enforceable" on the same terms as other contracts. 9 U.S.C. § 2. "Whereas doubts about the meaning of a contract are generally to be resolved by reference to the intention of the parties, the federal policy favoring arbitration counsels that doubts about the intended scope of an agreement to arbitrate be resolved in favor of the arbitral process." Pearce v. E.F. Hutton Group, Inc. 828 F.2d 826, 829, 264 U.S.App.D.C. 246, 249 (C.A.D.C.1987) (citing Moses H. Cone Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)); Shore v. Groom Law Group, 877 A.2d 86, 91 (D.C.2005) ("a party may not submit a claim to arbitration and then challenge the authority of the [arbitration panel] to act after receiving an unfavorable result")(quoting Fortune, Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355, 1357 (9th Cir.1983)); see also District of Columbia Arbitration Act, D.C. Code Ann., § 16-4301 ("... a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable ... .").

5

The dispute over the propriety of the expenses and deductions (which are ultimately offsets to any Appreciation Cash Payment) began nearly seven years ago.  As explained in the Declaration of Samuel G. Rose ("Rose Decl.") (Exhibit 4), in the summer of 2000, Montgomery Road entered into a contract to sell 90 K Street.   Rose Decl. at ¶19.   The contract price of Property was $24,975,000 with expected net proceeds of approximately $23 million.  Viad's Answer to ¶13 of the First Amended Complaint.[5]  After Transportation Leasing/Viad received a copy of the contract pursuant to the right of first refusal provisions of the Cash Participation Agreement (CPA § 4.1), it began to challenge Montgomery Road's calculation of certain expenses that would ultimately be deducted from any future Appreciation Cash Payment.  Rose Decl. at ¶¶21-22.   Montgomery Road calculated its cost basis on the property, including the interest and other charges which had been reflected on the Special Purpose Financial Statements as Developer's Invested Equity, Developer's Operating Equity, Developer's Equity Return, and the balance of the first mortgage.  Viad's Answer to ¶13 of the First Amended Complaint. Those costs were estimated to be in excess of $29,000,000.  Rose Decl. at ¶19.  As a result, there would be no positive cash flow (and thus, no Cash Appreciation Payment) from the proposed sale transaction.

In response, in August 2000, Transportation Leasing contended that the interest expense, categorized on the Special Purpose Financial Statements as "Developers Equity Return,"[6] could not be subtracted in calculating the Appreciation Cash Flow.  It was Transportation Leasing's position that if the

---

[5] The proposed 2000 sale of the 90 K Street property did not take place for reasons unrelated to this lawsuit. Rose Decl. at ¶22; Viad's Answer to ¶17 of the First Amended Complaint.

[6] As discussed below, the labeling what was really "interest" as "Developers' Equity Return" resulted from a reclassification of the first mortgage to equity for internal tax reasons, and had nothing to due with the economic reality of the situation from the perspective of the Cash Participation Agreement.

pending sale took place, Transportation Leasing would be entitled to a substantial six-figure Cash Appreciation Payment. See Exhibit 28 (Letter from K. Goldman to S. Rose, 8-23-00). Specifically, Transportation Leasing claimed that under the definition of "Appreciation Cash Flow" in Section 3.1 of the Cash Participation Agreement, the category "Developer's Equity Return" was not a permitted subtraction. Id.; Rose Decl. at ¶20. Thus, it was Transportation Leasing's position (and it is now Viad's position) that the interest on the funds provided by S&S Finance (an internal bank for G&R development projects)[7] were not a proper deduction when calculating the Appreciation Cash Flow, simply because the interest expense was labeled as "Developer's Equity Return" in Montgomery Road's Special Purpose Statements. Rose Decl. at ¶20.

A series of correspondence was exchanged between the parties regarding their differences concerning the Special Purpose Financial Statements, including a September 12, 2000 letter from Reid Liffmann (on behalf of Montgomery Road) to Kenneth Goldman (on behalf of Transportation Leasing/Viad). Exhibit 29. Mr. Liffmann's letter enclosed Special Purpose Financial Statements for 1998 and 1999, revised as of September 11, 2000 (pursuant to § 2.6 of the Cash Participation Agreement ). On October 2, 2000 Mr. Goldman responded to Mr. Liffmann (Exhibit 30), describing the special purpose financial statements as having "creat[ed] a host of issues." Thus, the parties had a dispute regarding the computations and the items contained in the financial statements which were being provided by Montgomery Road to Transportation Leasing/Viad pursuant to § 2.6 of the Cash Participation Agreement. Accordingly, the dispute was properly subject to resolution pursuant to § 2.7 of the Cash Participation Agreement, which result is binding on the parties.

---

[7] See Rose Decl. at ¶11.

7

**B.    Submission of the Dispute to the Reznick Group is Binding**

In addition to arguing that Section 2.7 does not apply, Viad also argues that it can unilaterally convert the resolution of the dispute by Reznick into a non-binding exercise. See, e.g., Mem. at 4. This is not supported by the evidence however, and is inconsistent with the Federal and District of Columbia Arbitration Acts.[8]  As Mr. Rose testified in his deposition, he and Eve Fiorucci (Viad's Assistant Director of Real Estate)[9] had discussions over a period of about three years regarding the accounting issues. Rose Tr. at 74-77. In 2005, Montgomery Road and Viad finally submitted the dispute to the Reznick Group for resolution. Rose Decl. at ¶24; see also Fiorucci Tr. at 44-46; Transcript of Deposition of Kenneth Goldman ("Goldman Tr.") at 25 ( Exhibit 10).[10] Consistent with §2.7 of the Cash Participation Agreement, the Reznick Group was selected by Viad. Montgomery Road, however, paid the cost of the review. Rose Decl. at ¶24; See also Rose Tr. at 75,77, 78, 86; Fiorucci Tr. at 45; Viad's Answer to ¶18 of the Amended Complaint.

Specifically, the parties sought the interpretation, analysis, and application of certain terms of the Cash Participation Agreement. Both parties were permitted to, and did, submit position papers and any relevant materials. On March 2, 2005, Defendant Viad submitted its position paper plus nine related exhibits.   Exhibit 37  ( Letter from E. Fiorucci to Brent Solomon[11], 3-2-05).   Montgomery Road

---

[8]  As set forth above, § 2.7 of the CPA provides for an arbitration by an accountant of disputes relating to the financial statements, "whose determination shall be final."

[9]  Transcript of Deposition of Eve Fiorucci ("Fiorucci Tr.") at 6 ( Exhibit 7).

[10]  Kenneth Goldman is Viad's Director of Real Estate. He is Ms. Fiorucci's supervisor. Goldman Tr. at 5, 10-11.

[11]  Mr. Solomon was the Reznick partner who rendered the Opinion.

8

submitted its position paper on March 30, 2005. Exhibit 38 (Letter from Gerald Katz to B. Solomon, 3/30/05 ). In addition, the parties asked the independent accountants to analyze the classification of certain costs and charges in the Special Purpose Financial Statements, and prepare a pro-forma calculation under the Cash Participation Agreement for the hypothetical sale of the Property. Id.

On April 10, 2005 the Reznick Group rendered its determination, which found in favor of Montgomery Road on five of the six issues submitted for resolution. Exhibit 39 (B. Solomon letter to S. Rose, 4/10/05 (the "Reznick Opinion")) at 2-4). In addition to the parties' position papers, the Reznick Group reviewed and analyzed the Cash Participation Agreement, the 1989 First Amendment thereto, and the Special Purpose Financial Statements for the years 2002 and 2003. Id. The Reznick Group also determined that as of December 31, 2003, 90 K Street would have to command a selling price in excess of $37.8 million for Viad to be entitled to any Cash Appreciation Payment under the terms of the Cash Participation Agreement. Exhibit 39 (Reznick Opinion at Exhibit A).

The Reznick Opinion, rendered in the context of an arbitration proceeding pursuant to § 2.7 of the Cash Participation Agreement, is binding on the parties. § 2.7 provides that the determination of the independent certified public accountant "selected by Transportation Leasing and reasonably satisfactory to Developer ... ***shall be final***." (Emphasis added). The conversations which Mr. Rose and Ms. Fiorucci had regarding the process of having an independent accountant look at their dispute were all had in the context of the Cash Participation Agreement and the dispute resolution provisions contained in §2.7 of the

Cash Participation Agreement. Rose Tr. at 78. It was Viad (by Ms. Fiorucci) that selected the Reznick

Group to resolve the dispute. Rose Tr. at 86; Fiorucci Tr. at 45.[12]

When Viad submitted its materials to Mr. Solomon in the context of this dispute resolution process,

it accompanied its materials with a cover letter addressed to the Reznick Group stating[13]: "Finally, while

we will appreciate your review of the documents and your opinion as to our interpretation of same, we wish

to make it clear that your opinion is not binding on TLC/Viad Corp." See Exhibit 37 (3/2/05 letter from

E. Fiorucci to Solomon). Viad now relies on this unilateral statement as the basis for its argument that the

Reznick Opinion is not binding, despite Ms. Fiorucci's knowledge that Montgomery Road was seeking a

***resolution*** of the accounting issue at that time. See Exhibit 36 (Record of 12/16/04 Telephone

Conversation between Ms. Fiorucci and Mr. Rose: "Discussed hiring ... Reznick to help sort out our

dispute"); Exhibit 33 (Record of 6/10/02 Telephone Conversation between Ms. Fiorucci and Mr. Rose:

"Sam wants to resolve the accounting issue right now"). Indeed, Viad's own submission to Mr. Solomon

demonstrates that it was submitting the dispute for "resolution." See Exhibit 37 at VD 906 (referring to the

"History of the Dispute;" and submission "to resolve the issues"); at VD 908 (describing process as a

"dispute resolution process"). At best, the insertion by Ms. Firorucci of the unilateral "non-binding"

---

[12] Ms. Fiorucci expressed concern about submitting the dispute to an accountant for resolution, evidencing Viad's recognition that the process would be binding: "Sam wants to buy Viad out ... . Believes his accounting methods were correct, would pay for Viad to have an outside firm look at accounting **(I don't recommend this)**[.] ... Sam wants to resolve the accounting issue right now." Exhibit 33 (Record of Tele. Conversation, 6-10-02).

[13] This is the first indication that Viad gave that it did not agree that the process was binding. See e.g. Rose Tr. at 87. Mr. Goldman testified that the decision to contend that the Reznick Opinion would be non-binding was made by Ms. Fiorucci, or by Viad's counsel, Susan Mann. Mr. Goldman did not speak to anyone about it. Goldman Tr. at 27.

10

language could be viewed as a counter-offer to amend the Cash Participation Agreement's provisions,[14]

but as is clear from Mr. Rose's testimony, it was never accepted by Montgomery Road:

> Q.    How – When and how did you agree that it was binding?
>
> A.    That we spent three years picking them, getting to this point. What's the
>        point of doing it if it's not binding? It was almost assumed. Why would
>        you take years to talk to your accountant, to talk to all the bosses, to pick
>        an accountant, and then say it's not binding? I mean: Why bother?

Rose Tr. at 87. Indeed, Viad's own language in its "Statement of Position" submitted to Mr. Solomon

belies its unilateral attempt to make the process non-binding: "We suggest that [Montgomery Road] submit

drafts of such documents to TLC [Viad] and **to the arbitrator of these disputes for use as part of the**

**dispute resolution process**." Exhibit 37 at VD 908 (emphasis added).

   The District of Columbia follows the Restatement (Second) of Contracts with regard to whether

an offeree's silence can constitute acceptance. William F. Klingensmith, Inc. v. District of Columbia, 370

A.2d 1341, 1343 (D.C. 1977)(discussing a tentative draft of Restatement (Second) of Contracts §72

which later became the final draft of §69). Generally, silence does *not* constitute acceptance. Id.; In Re

Haar, 667 A.2d 1350, 1353-54 (D.C. App. 1995) (respondent was not entitled to take client's silence

as an agreement to respondent's statement in his letter that he would withdraw money from the client trust

account). Although there are limited exceptions to this general rule, none apply here.[15] Courts consistently

---

[14] It is doubtful that this would even be a valid characterization, however, because Ms.
Fiorucci addressed her letter to the Reznick Group, not to Montgomery Road.

[15]    The three exceptions are where: (a) an offeree takes the benefit of offered services with
reasonable opportunity to reject them and reason to know that they were offered with the expectation
of compensation; (b) the offeror has stated or given the offeree reason to understand that assent may be
manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the
offer; and (c) because of previous dealings or otherwise, it is reasonable that the offeree should notify

refuse to treat unilateral statements in cover and transmittal letters as effective modifications to agreements.

See, e.g Sea Crest Construction Corp. v. United States, 59 Fed. Cl. 615 (2004)(granting summary judgment in the government's favor, because the builder "did not have a unilateral right to alter its [best and final offer] site plan," despite its attempt to reserve such a right to itself in its letter transmitting its offer); Underwater Exotics, Ltd. V. Secretary of the Interior, 1994 WL 80878 (D.D.C. 1994)(rejecting the argument based on language plaintiff used in a cover letter to the government: "not only is this condition unilateral, but the plaintiff also attempted to impose it after the settlement agreement had been concluded").

Here, the parties agreed to submit their dispute to the Reznick Group for resolution and such a process is explicitly provided for in Section 2.7 of the Cash Participation Agreement, which refers to it as "arbitration". After they came to that agreement, Viad attempted to unilaterally decide that any conclusions reached by the Reznick Group would not be binding. Viad's unilateral statement in its cover letter is ineffective to convert the Reznick Opinion into a non-binding determination, and thus, is not entitled to summary judgment on this issue.

## III.    THE DEDUCTION OF INTEREST PREVIOUSLY LABELED AS DEVELOPER'S EQUITY RETURN IS SUPPORTED BY THE TERMS OF THE CASH PARTICIPATION AGREEMENT

Viad argues that it is entitled to Summary Judgment on Montgomery Road's claim for a declaration that in calculating the Cash Appreciation Payment, it is proper to deduct interest expense related to the Property, regardless of whether the interest is reflected as "Developer's Equity Return" or "interest" on the

---

the offeror if he does not intend to accept. Restatement (Second) of Contracts, §69(1)(a), (b) and (c) (1981).

Special Purpose Financial Statements. Quite simply, the Viad argument is that because the Special Purpose Financial Statements (beginning in 1997)[16] labeled the interest as "Developer's Equity Return," Montgomery Road is not allowed to deduct those amounts in calculating the appreciation cash payment. The Cash Participation Agreement is laden with defined terms, and resolution of this issue depends on tracing the components of the Appreciation Cash Payment through the various definitions set forth in the agreement. It is no answer for Viad to say that because Montgomery Road used a particular label ("Developer's Equity Return") that Montgomery Road is bound by the consequences of using such a label (*i.e.,* that referring to the interest as "Developers' Equity Return" mandates that it may not be included in the offsets when calculating the Appreciation Cash Flow). Use of a term does not make it so. Where an event or a calculation does not meet the criteria of a particular definition of a defined term, then the Cash Participation Agreement must be searched for the correct term. Here, the Cash Participation Agreement defined terms which most accurately defines and captures the economic realities of the interest charged by S&S Finance is either "Expense" or "Permitted Debt." As such, the total interest amount is properly deducted in calculating Appreciation Cash Flow. <u>See</u> Rose Decl. at ¶13; Glassman Decl. at ¶12.

The genesis of this issue is S&S Finance's purchase of the mortgage on the property (then held by Sun Chase) in 1996, for approximately $9.3 million. Rose Decl. at ¶12. S&S Finance held the first mortgage on 90 K Street until the sale of the property in January 2007, and a Deed of Trust securing its position was recorded in the land records of the District of Columbia. Rose Decl. at ¶13. From 1996 to date, S&S Finance charged the Property 1.5% over prime on the first mortgage, which was at or below

---

[16] In November 2006, the Special Purpose Financial Statements were revised to properly classify the amounts as "interest" and to remove the label of "Developers Equity Return." <u>See</u> Declaration of Ronald Glassman ("Glassman Decl.") at ¶15.

the market rate.  See, e.g., Glassman Decl. at ¶¶11, 12; Rose Decl. at ¶13; Exhibit 27 (see attachment, Special Purpose Financial Statements as of December 31, 1999 at 9 (note 3));  This was consistent with Section 2.3 (b) of the Cash Participation Agreement ("Permitted Debt") which provides that debt can be held by a related company so long as it charges interest at or below the rates charged by other financial institutions on similar real estate loans.  Rose Decl. at ¶13.

In 1997, Montgomery Road's accountants reclassified approximately $7.3 million of the first mortgage debt to equity.  Rose Decl. at ¶14; Glassman Decl. at ¶9.  The reason for this reclassification was for internal tax reasons, relating to the fact that the interest income in S&S Finance could not be offset by the interest expense in Montgomery Road for Maryland state tax purposes.  Rose Decl. at ¶14; Glassman Decl. at ¶9.  Although this reclassification was for internal tax reasons, and had nothing to do with the Cash Participation Agreement, Mr. Glassman carried the reclassification through to the Special Purpose Statements prepared for the years 1997 through 1999.  Rose Decl. at ¶15; Glassman Decl. at ¶10.  When he prepared those statements, Mr. Glassman reduced the first mortgage debt by $7.3 million, which had the offsetting effect of increasing the amounts under the label "Developer's Invested Equity" (a term used in the Cash Participation Agreement).  See Exhibit 27 (see attachment, Special Purpose Financial Statements as of December 31, 1999 at 8,  9 (note 3), and 10-11 (note 6)); See also Rose at ¶15; Glassman Decl. at ¶10.  Mr. Glassman then included the annual interest expense on that increase in Developer's Invested Equity under the label "Developer's Equity Return."  Rose Decl. at ¶15; Glassman Decl. at ¶10.

Beginning in 2000, Mr. Glassman eliminated the re-classification, and treated the entire $9.3 million first mortgage as debt, and it continued to carry a rate of interest of 1.5% over prime.  Glassman Decl. at

14

¶11.  Until November 2006 however, Mr. Glassman continued to label the interest on the other funds advanced by S&S Finance (advances as of December 2005 which were in excess of $18 million) as "Developers Equity Return."  See e.g., Exhibit 44 (9/21/06 Letter of transmittal and draft 2004/2005 Special Purpose Financial Statements).

In November 2006, Mr. Glassman prepared Montgomery Road's revised Special Purpose Financial Statements for the period from 1987 through December 31, 2005 (see Exhibit 46 ("2005 Revised Statements")).[17]  The Revised Special Purpose Statements reflect the amounts as interest expense, not as "Developer's Equity Return."  Glassman Decl. at ¶15.  Viad contends that the 2005 Revised Statements demonstrate a "flip flop" – a contrivance for purposes of this litigation.  In fact however, they reflect the economic reality of the transaction, not tainted by an erroneous label.  Although Stewart Greenebaum and Samuel Rose have limited partnership interests in both Montgomery Road and S&S Finance (through trusts and a family partnership), they always intended that the funds invested into Montgomery Road, including the $7.3 million portion of the first mortgage which S&S Finance held, were to have earned interest.  Rose Decl. at ¶17.  S&S Finance is not a partner in Montgomery Road, and it never has been; it is a separate legal entity and its ownership is different than the ownership of Montgomery Road, in which Reid Liffmann and Steven Braesch are also limited partners.  Rose Decl. at ¶17.

S&S Finance funds projects under the G&R umbrella.  Rose at ¶18.  Certain real estate, like 90 K Street, is not income producing.  With such non-income producing properties, there is no operating cash flow available to pay for the costs of maintaining the property.  These costs include expenses such as real

---

[17] Viad's repeated reference to the Revised Special Purpose Financial Statements as the "Cooter Financials" is a transparent attempt to paint the financials as a litigation artifice, rather than what they are: a legitimate portrayal of the economic reality of the situation.

15

estate taxes, assessments, bid pursuit costs, and insurance. Montgomery Road has paid all of these expenses on the property, and has managed and marketed the 90 K Street property at a substantial loss (prior to the sale in January 2007). Rose Decl. at ¶18. Montgomery Road has funded these costs and operating deficits (via cash infusions from S&S Finance) with no contribution from Defendant Viad or its predecessor Transportation Leasing. Rose Decl. at ¶18. By the end of 2005, S&S Finance had advanced in excess of $18 million to Montgomery Road to maintain the Property in addition to the first mortgage, See Exhibit 46 (2005 Revised Statements) at page 2; Glassman Decl. at ¶13. It is Montgomery Road's position that without regard to the label, the economic reality of the situation is that the funds provided by S&S Finance (the $7.3 million as well as other funds) are "Permitted Debt" and were provided by S&S Finance with the absolute intention of earning a return on those funds. Rose Decl. at ¶15; Glassman Decl. at ¶14. Therefore, the amounts categorized as "Developer's Equity Return" on the Special Purpose Statements (prior to the 2005 Revision described below) are in fact interest expense. Rose Decl. at ¶15; Glassman Decl. at ¶14.

The determination that the S&S Finance advances are Permitted Debt (and therefore a deduction in calculating the Appreciation Cash Payment) is consistent with the applicable provisions in the Cash Participation Agreement. The agreement has numerous defined terms and those definitions apply throughout the agreement, not just to limited sections. See CPA §1.1 ("*As used in this Agreement*, certain terms shall have the meanings described in this Article 1") (emphasis added). Most of the definitions are not actually set forth in Article 1 – Article 1 merely contains a cross-reference to other sections of the Agreement in which the substance of the definition can be found. See CPA at 1-5. Just because the definition is set out in a particular section, however, does not limit the applicability of that definition to that

16

particular section. The definition applies throughout the agreement.   For example, Section 1.18 defines the term "Expenses" as having "the meaning as set forth in Section 2.3 hereof."   Although Article 2 is captioned "Operations Cash Flow"[18], Section 2.3 states: "*[f]or purposes of  this Agreement*, the term "Expenses" shall mean ... ."(Emphasis added).   Working through the various definitions throughout the Cash Participation Agreement demonstrates that as long as the interest on the amounts infused by S&S Finance were calculated according to a bank's rate of interest, the amounts constitute "Permitted Debt" (a defined term), which is an "Expense" (a defined term) and is therefore an "Approved Deduction for Appreciation Cash Flow" (also defined terms).   As set forth in the Declarations of Samuel Rose and Ronald Glassman, the interest rate does not exceed the market rate of interest.   Rose Decl. at ¶35; Glassman Decl. at ¶¶12, 15.

Section 2.3 of the Cash Participation Agreement defines "Expenses" as "all reasonable expenses actually incurred by Developer [Montgomery Road] with respect to ownership, operation, leasing and

---

[18] Section 7.11 of the Agreement provides: "The titles of Articles and Sections contained in this Agreement are inserted for convenience of reference only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation thereof."

occupancy of the Property ... ."[19]  Pertinent to this dispute, "Expenses" specifically include the following

two items:

> (9) interest and principle payable on *Permitted Debt*, as well as any fees and charges related thereto;

> (15) amounts paid to *Equity Holders* in payment of *(i)Developer's Operating Equity* and *(ii)Developer's Equity Return*."[20]

---

[19]  The expenses enumerated in §2.3 include, but are not limited to, "(1)general real estate taxes;(2) government assessments or similar charges;(3)personal property taxes;(4)sales taxes; (5)costs of utilities, air conditioning and heating for the Property;(6)maintenance and repair costs of a non-capital nature;(7)operating and reasonable and customary management expenses and fees; (8)premiums payable for insurance carried on or with respect to the property;(9)interest and principle payable on *Permitted Debt*, as well as any fees and charges related thereto; (10)costs, including leasing commissions . . . .;(11) accounting and audit fees and costs, attorneys' fees, . . . .; (12)development fees paid to Developer or its Affilliates  . . . .;          (13)amounts required to be paid by the Developer pursuant to Section 6 of Purchase Agreement;(14)any portion of Gross Revenues approved by TLC which is deposited . . . in a reserve account for future maintenance and repair . . . ; and (15)amounts paid to *Equity Holders*  in payment of *(i)Developer's Operating Equity*  and *(ii)Developer's Equity Return* ."

[20]  Pursuant to the definition set forth in §1.17, "Equity Holders" are the partners of Montgomery Road.  "Developer's Operating Equity" and "Developer's Equity Return," are defined in Sections  3.6(b) and (c), respectively:

> 3.6 (b) Developer's Operating Equity shall mean ... amounts actually advanced to the Developer by the Equity Holders (other than amounts treated as Permitted Debt) which are used by the Developer for operation of the Property, including without limitation *interest and principal on Mortgages and operating   expenses*  that are not financed by borrowings secured by a Mortgage on the Property, but excluding any Ineligible Deductions with respect thereto, and any costs included as Approved Deductions in any calculation of Appreciation Cash Flow.

> (c) "'Developer's Equity Return" shall mean the unpaid sum total of each and every "Daily Equity Return." For purposes [of this section], a "Daily Equity Return" shall be computed for each day and shall be equal to the product of the (i) the annual Prime Rate on such day divided by 365 and (ii) the sum of Developers Invested Equity and Developer's Operating Equity on such day.

18

"Permitted Debt" is defined in Section 2.3(b) of the Cash Participation Agreement as:

> (i) any debt secured by a Senior Mortgage and
>
> (ii) that portion of any debt incurred by Equity Holders, whether secured or unsecured, the proceeds of which are incurred solely to fund all or part of:
>
>> (1) the purchase price of the Real Property,
>>
>> (2) predevelopment, development, construction costs (but excluding any costs representing *Approved Deductions* or Ineligible Deductions) with respect to the Property
>>
>> or
>>
>> (3) deficits incurred in the operation of the Property.
>
> If *Permitted Debt* is held by any Affiliate of Developer [Montgomery Road], interest paid thereon shall be included as an *expense* only to the extent that it does not exceed the amount of interest that would have been payable on an equivalent loan from an unrelated bank ... if such loan had been made on terms generally available in the District of Columbia area at the time such debt was incurred."

CPA §2.3(b)(emphasis added; initial capitals on defined terms in original).

Based on the foregoing definitions, the interest on the funds advanced by S&S Finance charged is an allowable "Expense" or Permitted Debt, and therefore an Approved Deduction for purposes of the Appreciation Cash Payment. See Rose Decl. at ¶13; Glassman Decl. at ¶12. Here, it is the calculation of the Appreciation Cash Payment and the Appreciation Cash Flow which is at issue. These calculations are contained in Article 3, but, as noted *supra*, the definitions of the defined terms apply throughout the agreement. Accordingly, the components of the Appreciation Cash Payment and the Appreciation Cash Flow build on terms defined in other sections of the Agreement, including those in Article 2. The applicable analysis is as follows:

> "*Appreciation Cash Flow* " is defined as

19

(i) the **Agreed Value** of the Property or applicable portion thereof,

(ii) reduced by the sum of the **Approved Deductions** [3.4] related to the Property or applicable portion thereof and the Closing costs and

(iii) reduced by the amount, if any, of the then remaining [3.6d] **Developer's Invested Equity** [3.6a] and **Developers Operating Equity** [3.6b]; each determined as of the date(s) on which the Appreciation Cash Payment shall be payable, provided that in no event shall the Appreciated Cash Payment be less than zero."

CPA §3.1 (emphasis added; initial capitals on defined terms in original).    The following chart sets out the operative terms and definitions:

20

# CALCULATION OF APPRECIATION CASH FLOW

In the following Table, Column 1 defines terms used in Column 2; Column 2 defines terms used in Column 3; Column 3 sets out the calculation for Appreciation Cash Flow.

| COLUMN 1 | COLUMN 2 | COLUMN 3 (§3.1) |
|---|---|---|
| | **AGREED VALUE OF PROPERTY**= Greater of gross proceeds of sale or fair market value of property  (3.3(a)) | **AGREED VALUE OF PROPERTY** (3.1 (i)) |
| **Permitted Debt =** (i) debt secured by senior mortgage and (ii) portion of any debt incurred by **Equity Holders**, the proceeds of which are used to fund all or part of purchase price of **Real Property**, (2) predevelopment, development, construction costs (but excluding costs representing **Approved Deductions**) with respect to the property or (3) operations deficits. *If Permitted Debt is held by Affiliate, interest is included as an expense to the extent it does not exceed amount of interest that would have been payable on loan from unrelated bank*  (2.3(b)). | **APPROVED DEDUCTIONS  =**          Aggregate outstanding principal          balances of all **Permitted Debt** &          **Junior Financing** (3.4(a)(i)) *Plus:*     **Appreciation Cash Flows** from          previous occurring **Sales of** **Interest**          (3.4(a)(ii)) [DOES NOT APPLY] | *Minus:*  **APPROVED DEDUCTIONS & CLOSING COSTS** (3.1(ii)) |
| | | *Minus:*     Amount of then remaining **DEVELOPER'S INVESTED EQUITY** (3.1(iii)) |
| **Permitted Debt =** (See above) **Expenses =** (9) interest and principle payable on Permitted Debt, as well as any fees and charges related thereto; (15) amounts paid to Equity Holders in payment of (i)Developer's Operating Equity and (ii)Developer's Equity Return." | **DEVELOPER'S OPERATING EQUITY =** Amounts actually advanced to the **Developer** by the **Equity Holders** (other than amounts treated as **Permitted Debt**) which **Developer** uses for operation of **Property** including interest and principal on Mortgages and **operating expenses** that are not financed by borrowings secured by a Mortgage on the Property, but excluding any **Ineligible Deductions** with respect thereto and any costs included as **Approved Deductions** in any calculation of **Appreciation Cash Flow** (3.6(b)). | *Minus:*     Amount of then remaining **DEVELOPER'S OPERATING EQUITY** (3.1(iii)) |
| | | *EQUALS:*  **APPRECIATION CASH FLOW** |

Thus, simply because "Developer's Equity Return" is not specifically referred to in §3.1 does not mean that the interest due on the funds advanced by S&S Finance are not appropriate deductions when computing Appreciation Cash Flow.  Indeed, Ms. Fiorucci (Viad's corporate representative, testified that if the "Developers Equity Return" had represented accrued interest, it would have been properly deducted in computing the Appreciation Cash Payment:

> Q: Now you and I can agree ... that if this 8,775,000 was not listed as equity, Developer's Equity Return, but it simply had been an accrued interest payment made to a third-party lender, that it would be deducted from sales price before 15% cash participation kicked in?  We can agree to that; can't we?

> A: Yes.

Fiorucci Tr. at 37.[21]

> Q: ... Would you agree that if that 8,775,000 ... was a permitted debt, that it would be a proper deduction before the 15 % kicks in? That's all I'm asking.

> A:  If it's a permitted debt, yes, I believe that it would be an allowable deduction.

> ***

> A: The approved deduction is the principal balance of the permitted debt.  It says nothing about interest.

> Q: Where did the money come from?  I'm trying to follow-up on something that you just said.  If the money had come from a lender, and the interest is accruing, just in normal parlance, would you agree with me that every month, the principal balance gets bigger and bigger if the interest isn't paid on a note?

> A:  In general terms?

> Q: Yes.

---

[21] $8,775,927 was the amount identified as "Developer's Equity Return" at the time of the proposed 2000 sale of the Property. See Exhibit 27 (Letter from R. Liffman to K. Goldman, 6/27/00)

A:  If you don't pay your interest and you accrue it, then your principal balance gets larger.

                                    ***

A: If they went to a third-party lender, and they took a loan on which they never had to make a payment in the life of the loan –
Q: And the balance gets bigger and bigger, just confirm for me that that would be an allowable deduction in the event of a sale under this Agreement.

A: I think it would be.

Fiorucci Tr. at 39-42.  Similarly, Mr. Solomon[22] testified that as an allowable incurred expense, the interest amounts build up, and become part of Developer's Operating Equity which is one of the permitted deductions under the Cash Participation Agreement calculations.  Solomon Tr. at 91.  When the interest is added in a given year, it becomes a part of the carried forward operating equity of the developer.  Solomon Tr. at 91.   Then, at the time the property is sold, the Developer's Operating Equity is an appropriate deduction.  Solomon Tr. at 91.  Although Developer's Equity Return is not listed as an Allowable Deduction under Section 3.1 of the Cash Participation Agreement, because the Developer's Equity Return accumulates annually, when it is not paid, it becomes part of the Developer's Operating Equity and therefore becomes an allowable deduction.  Solomon Tr. at 91-92.

Thus, "interest" accrued on the advances from S&S Finance is properly deducted in computing the Appreciation Cash Payment, whether those amounts are viewed as an element of "Developers Operating Equity" ("interest and principal on Mortgages and operating expenses" §3.6(b) ), "Permitted Debt" (debt incurred to fund the Property, e.g., development costs, operating deficits, and interest no higher than the market rate (§2.3(b)), or "Expenses" (includes "interest and principle payable on Permitted

_____

[22] Mr. Solomon, who rendered the Reznick opinion in 2005, was also designated as an expert in this litigation by Montgomery Road.

23

Debt" (§2.3(a)). Viad argues however, that because MRLP did not "pay" the interest, it is inconsistent

with the "requirement of the CPA that accounting for expenses be on a cash basis." [23]  As set forth in the

Declarations of Messrs. Rose and Glassman, 90 K Street was not income producing, and there was no

operating cash flow available to pay for the costs of maintaining the property (e.g., real estate taxes,

assessments, bid pursuit costs, and insurance).  These items were funded by advances from S&S Finance.

Rose Decl. at ¶18.  The fact that the interest on those advances has not been "paid" is not determinative

of the propriety of deducting that interest when computing the Appreciation Cash Payment.  As Mr.

Solomon explained, where there is an early stage development and no cash flow, such that a lender is not

being paid, interest accrues, and is "booked for cash basis financial statements" – otherwise, the liability

would be misstated.  Solomon Tr. at 94.  As further explained by Mr. Solomon in his deposition:

> Cash basis accounting is applied from a revenue and expense perspective.  When cash
> comes in, cash goes out, for expenses.
>
> With respect to capital items, if you will, like fixed assets, loans, equity, it is not on a pure
> cash basis.
>
> So if there were interest[], for example, accrued on a loan, on a cash basis financial
> statement, that would still show up as a liability, regardless of when it was paid.
>
> If there was depreciation on a fixed asset which is a noncash transaction, that still shows
> up on a financial statement, on a cash basis financial statement.
>
> The cash basis is intended to focus on items of operating revenue and expenses.

Solomon Tr. at 129.  Mr. Solomon further testified that interest on principal payments on Permitted Debt

referred to in Section 2.3(a)(9) of the Cash Participation Agreement would be an expense category that

does not require an actual cash payment for the expense to be included as a liability on a cash basis

---

[23] "Cash basis accounting" is not defined in the Agreement.

accounting financial statement. Solomon Tr. at 134. Another example would include amounts paid to Equity Holders in payment of Developer's Operating Equity and Developer's Equity Return. Solomon Tr. at 134 (citing CPA §2.3(a)(15)). Viad has provided no testimony on this issue to refute Mr. Solomon's expert opinion.

Viad also argues that the Settlement Sheet (Viad Exhibit 52) from the January 2007 closing "indicates that no loan from S&S Finance ... was repaid." In fact, funds advanced from S&S Finance have been repaid either to S&S Finance or its principals, Mr. Rose and Mr. Greenebaum. In anticipation of the closing of the transaction with TC MidAtlantic in January 2007, Mr. Glassman prepared numerous draft spread sheets to show various allocations of the sale proceeds. One of those spreadsheets is attached as Exhibit 51 to Viad's Motion for Summary Judgment. Although the spreadsheet reflects that $4,870,000 would be "repaid" to S&S Finance from the proceeds of the closing on 90 K Street, an additional approximately $35 million was distributed directly to Mr. Rose and Mr. Greenebaum, or to related entities. At year-end 2006 (ten days prior to closing), in addition to the First Mortgage Note Payable to S&S Finance of $10,297,139, the loan payable due to S&S Finance was approximately $19.9 million, and the interest thereon was approximately $18.7 million. See Glassman Decl. at ¶17.

## IV.    THE TDRs SHOULD NOT BE INCLUDED IN THE CASH APPRECIATION CALCULATIONS

The Cash Participation Agreement sets forth terms and conditions under which Transportation Leasing will participate in cash flow generated from "the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing thereof." CPA Recital at B. When TC Midatlantic purchased the land located at 90 K Street in January 2007 for approximately $46 million, it

also purchased from Montgomery Road (for approximately $8 million) by way of separate contract (Braesch Decl. at ¶20) the transferable development rights ("TDRs") which had been transferred to 90 K Street.[24] Viad argues that, as a component of any Cash Appreciation Payment, Viad is also entitled to 15% of the value of the TDRs sold by Montgomery Road to TC Midatlantic. Viad argues that TDRs are "interests" and "improvements" on the Property. There is no *admissible* evidence supporting Viad's arguments, however. The arguments are based on the hearsay reports of Viad's experts, as well as on extrinsic evidence that is not admissible under the circumstances of this case.

## A.    The TDRs are not Real Property

Under Paragraph 3.2(a) of the Cash Participation Agreement, an Appreciation Cash Payment is due if there is a "sale . . . of all or any part of or interest in the Property by the Developer . . .." Viad therefore argues that the TDRs are an "interest" in the Property. "Interest," however, is not defined in the Cash Participation Agreement. As discussed below, however, "Property" is a defined term. There being no definition of "interest" in the Agreement on which Viad can rely, Viad turns to the hearsay reports of its experts, Cynthia Giordano ("Giordano Report") and Steven Halbert ("Halbert Report"). Neither Ms. Giordano nor Mr. Halbert, however, has testified (or even opined in their reports) that TDRs constitute an "interest in Property" within the terms of the Cash Participation Agreement. Rather, Ms. Giordano merely described TDRs as zoning density and described the manner in which they can be acquired and Mr. Halbert reached a fair market value of 90 K based on developmental potential which took into account the

_____

[24] TDRs which Montgomery Road is obligated to acquire in the future and transfer to TC Midatlantic will be sold to TC Midatlantic for $13 million. Braesch Decl. at ¶20.

additional zoning density provided by the TDRs.[25]  Viad's approach is problematic because it ignores the definition of "Property" in the Cash Participation Agreement. Paragraph 1.32 defines "Property" as "the Improvements and the Real Property." Paragraph 1.35 defines "Real Property" as "that certain *land*, more fully described in Exhibit 'A' made a part of this Agreement by reference hereto." Thus, the phrase "interest in the Property" could be re-written as "interest in the land." Neither Ms. Giordano nor Mr. Halbert testified that a TDR is an interest in the *land*. At best, Ms. Giordano and Mr. Halbert have described TDRs as a right to density or development; they have not demonstrated that they are an interest in land.[26]  In fact, the only testimony on whether the TDRs are "interests" comes from Mr. Rose, who testified as follows: "Q: TDR's are an interest in the land, are they not? A: No." Rose Tr. at 221.

## B.     The TDRs are not Improvements

Viad's second approach is to characterize the TDRs as "Improvements." Unlike "interest," "Improvements" is a defined term. Section 1.21 defines "Improvements" as "all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the Real Property." ***Without any support or citation whatsoever***, Viad states as follows after reciting the Cash Participation Agreement's definition of Improvement: "Since TDRs add density to the property, they are essentially

---

[25] Describing TDRs in reference to "zoning" is a misnomer. The zoning at a receiving site remains unchanged. Braesch Decl. at ¶24. The zoning at 90 K remained unchanged at C-3-C. Id. The District of Columbia designates certain areas (the receiving sites) as eligible to receive TDRs. Id. There is no other or different zoning that applies. Id. There is no act by the District of Columbia that changes what can be built on the property. Id. The effect of a parcel being placed in a "receiving zone" for TDRs is not "upzoning." Id.

[26] In fact, there is no District of Columbia statute or regulation of which Montgomery Road is aware that subjects TDRs to any transfer or recordation tax.

"placed upon the Real Property" and, therefore, an Improvement under the plain language of the CPA."
The reason Viad has no testimony or expert report to support this statement is that both its experts
discussed "improvements" in a way that would **not** support Viad's statement.  Mr. Halbert's June 24, 2006
Appraisal identifies the "improvements" at 90 K Street as the "sidewalks, curbs and drainage."  Exhibit
43 (pertinent portions of 6/24/06 Appraisal) at 24 (Bates Numbered VD-001470).  Noticeably absent are
TDRs.  When asked  at her deposition what an improvement on real estate is, Ms. Giordano testified that
"in a general – you know, sense, an improvement is usually a building or a structure."  Giordano Tr. at 31.
When Mr. Halbert was asked whether the 90 K Street site was improved, Mr. Halbert answered: "If you
mean by improved is there a proposed office building on it yet, no.  There are parking spaces.  So it's
improved with sidewalks and asphalt parking."  Halbert Tr. at 21.  When asked whether there were any
other improvements, Mr. Halbert responded that he did not recall any others.  Halbert Tr. at 22.[27]  Mr.
Halbert then described "improvements" in the context of something that would be "demolished" in the event
of redevelopment.  Halbert Tr. at 22-23.  It is not surprising that there is no testimony or expert opinion
from either Mr. Halbert or Ms. Giordano that would support Viad's notion that TDRs are "placed upon
the property" and are therefore "improvements."  Viad's theory that TDRs are "placed upon" land is
stretching the defined terms of the Agreement beyond all reason, especially considering the remaining
language - and therefore context - of the definition: buildings and structures (connoting improvements with
physical presence) that are constructed or installed (connoting physical attachment to the land).  TDRs are
intangible rights that have no characteristics that are physical like buildings and structures  and  their

---

[27]  After Mr. Halbert's recollection was later refreshed, he recalled that the site was also
improved with drainage.  Halbert Tr. at 27.

association with property is not by construction, installation or placement. Braesch Decl. at ¶6.   Ms. Giordano acknowledged in her report that "the DD regulations permit the re-transfer from the original receiving lot to another eligible receiving lot" and that they also permit "'banking' (i.e., holding) of TDRs, either on a receiving site or independent of any receiving site.  A purchaser can acquire TDRs from a sending site, and then hold them for retransfer to an eligible receiving site.  This gives purchasers some maneuvering room in the event that TDRs are acquired for a development which does not proceed." Giordano Report at 4 (Viad Exh. 37). Ms. Giordano testified that TDRs are commodities. Exhibit 8 (Transcript of Deposition of Cynthia Giordano ("Giordano Tr.")) at 24.  See also Exhibit 6 (Transcript of Deposition of Steven Braesch ("Braesch Tr.")) at 18, 63, 68 (describing TDRs as commodities that are fungible and able to be moved to different properties); Exhibit 1 (Declaration of Steven Braesch ("Braesch Decl.")) at ¶6; Exhibit 12 (Transcript of Deposition of Reid Liffmann ("Liffmann Tr.")) at 31 (describing TDRs as a "commodity that is freely traded back and forth between developers and users").  TDRs simply are not "Improvements" under the Cash Participation Agreement.  See Braesch Decl. at ¶6.

## C.    Extrinsic Evidence is Not Necessary to Interpret the CPA

Finally, Viad argues that extrinsic evidence demonstrates that the parties intended to treat the TDRs as either an "interest in the Property" or as an "Improvement."  This argument should be rejected for the simple reason that there is no place for extrinsic evidence where an agreement has been reduced to writing and where a contract's terms are not ambiguous.[28]   Viad's argument at pages 11-16 of its Memorandum is internally inconsistent.  Viad asserts repeatedly that the Agreement's language is "plain" and "clear," yet

---

[28] Viad does not cite even one case that would support the introduction of extrinsic evidence in this case.

29

seeks to introduce extrinsic evidence of the parties' intent.  Because a written contract speaks for itself, the language of a written contract is not ambiguous and binds the parties without the need for extrinsic evidence.  Paul v. Howard University, 754 A.2d 297, 302 n.5 (D.C. 2000).  That the two parties disagree over the proper interpretation of the terms of a contract does not render the contract ambiguous.  Holland v. Hannan, 456 A.2d 807, 815 (D.C. 1983).  Viad offers no authority for the proposition that extrinsic evidence can be considered here.

The extrinsic evidence discussed by Viad, even if the Court were to consider it, would not support Viad's conclusion.  As its first piece of extrinsic evidence, Viad offers the fact that for five years, Montgomery Road included its expenses in purchasing the TDRs as deductible expenses on the Special Purpose Financial Statements.  These expenses were later removed because they should not have been included in the first place; the costs of these TDRs were not part of the 90 K Street property.  Braesch Decl. at ¶21.  Montgomery Road determined that charging the expense of the purchased TDRs to Montgomery Road was not proper absent a development of the Property.  Braesch Decl. at ¶21.  Just because the expenses were originally included does not mean that they should have been and their inclusion does nothing to alter the Cash Participation Agreement's definitions or to bring TDRs within those definitions.  As another piece of extrinsic evidence, Viad offers the fact that Montgomery Road recorded its TDR purchases in the land records.  The recordation does not convert the TDRs into real property any more than the statutorily required recording of a notice of intent to enforce a mechanic's lien (D.C. Code §40.301.02) converts the mechanic's lien into real property.

Lastly, Viad offers the purchase agreement entered into between Montgomery Road and Level 3 Communications in 2000.  Viad states (Memo. at page 13): "When it signed an agreement with Level 3

Communications in 2000 for the sale of 90 K Street, there were TDRs recorded on the Property at that time. (SOF¶106). In that agreement, the definition of property included 'development rights.' (SOR ¶106)." Although Viad would be hard-pressed to demonstrate the relevance of the Level 3 agreement (Ex. 38 to Viad's Motion) to this lawsuit,[29] Viad's description of the terms of that agreement (describing the agreement as defining property to include development rights) is misleading and, in fact, the definitions in the Level 3 agreement *are consistent* with Montgomery Road's position in this litigation. Section 2.1 of the Level 3 Agreement conveys "Property" to the seller and defines "Property" as including both "Real Property" and "Intangible Personal Property." The term "Real Property" includes the "land" and "all and singular the rights, benefits and appurtenances thereon or in anywise appertaining thereto." Level 3 Agreement at ¶2.1.1. In the next section, the Agreement identifies "Intangible Personal Property" as including "all intangible personal property related to the Real Property, including . . . contract rights related to the construction, operation, ownership or management of the Real Property, *including all development rights* owned by Seller in respect of the Property . . . ." Level 3 Agreement at ¶2.1.2. Thus, the Level 3 Agreement defines the development rights *as personal property*, not real property.

As Viad observes, there is no District of Columbia case law which characterizes TDRs. Viad relies on a California case, Mitsui Fudosan, Inc. v. County of Los Angeles, 268 Cal. Rptr. 356, 358 (Cal. Ct. App. 1990), in which the court concluded that the value of TDRs should be assessed on a tax basis upon transfer and that TDRs "'bear all the hallmarks of a transfer in real property.'" Viad Memo. at 14 (quoting Mitsui, 268 Cal. Rptr. at 358). Montgomery Road's counsel's research uncovered only one other

---

[29] Neither Viad nor TLC was a party to the Level 3 agreement; the agreement was entered into thirteen years after the CPA; and the Level 3 agreement never closed.

case on this issue and that case reached the opposite result of the <u>Mitsui</u> Court.  In <u>Wilkinson v. St. Jude</u>

<u>Harbors, Inc.</u>, 570 So.2d 1332 (Fla. Dist. Ct. App. 1990), the Florida court held that TDRs "are not real

property subject to assessment for ad valorem taxation." 570 So. 2d at 1333.  The court quoted from a

law review article explaining the difference in rights included within the bundle of rights associated with land:

> Land may be viewed as an assemblage or bundle of rights.  According to TDR theory, the
> right to develop one's property may be severed from the land and sold, much in the same
> way as mineral rights are severed and sold.  ***But while mineral rights do not "leave"
> the land, TDRs are separated from their land source and re-established on a
> designated recipient site.*** "

<u>Wilkinson</u>, 570 So.2d at 1333 (quoting Note, "Transferable Development Rights: An Innovative Concept

Faces an Uncertain Future in South Florida," 8 Nova L.J. 201, 202 (1983)).[30]  As the court  noted, in

<u>Mitsui</u>, "it d[id] not appear to have been necessary to the holding in that case, as to the assessed value of

the property to which the TDRs were transferred, that the court determine whether or not the TDRs were

in themselves property.  <u>Wilkinson</u>, 570 So.2d at 1334.

       Viad next looks to sources other than the Cash Participation Agreement for definitions of

"improvement." The definition in Black's Law Dictionary defines an improvement as "valuable addition"

that is "made to property."  <u>See</u> Viad Memo. at 15.  The TDRs, however, are not "made to property."

They are created by instruments of transfer and allow increased development of the receiving lot.  Braesch

Decl. at 11.  TDRs also do not fit within the definitions of "improvement" in the Maryland and Arizona

---

[30]    The "air rights" and "water rights" which Viad discusses at page 15 of its Memorandum
and which are included within the definition of "real property" in Section 6-103 of the D.C. Code, are
more in the nature of the mineral rights mentioned in the example in the Nova Law Journal article.  Air
rights and water rights, like mineral rights but unlike TDRs, cannot be transferred away from the
originating real property.  As discussed above, once transferred to a recipient site, the TDRs can be
transferred again.   TDRs are more like a mobile home - they can be parked at one site, but they can
just as easily be moved to a different site.

cases[31] cited by Viad. Both cases define "improvement" as requiring permanence. TDRs are not permanent. Braesch Decl. at ¶12.

TDRs simply do not fit within the Cash Participation Agreement's definitions of Property, Improvements and Real Property. Even if Viad could (it has not) demonstrate that TDRs fit within the definition of property or improvement found in a court decision or a statute or another agreement is wholly irrelevant to this litigation.

### D.    The Separation of TDRs in the Purchase Price was not a Sham

At pages 16-19, Viad argues that the segregation of the consideration in the Montgomery Road-TC Midatlantic between land and TDRs was a sham because it results in a TDR sales price of $70.00 per square foot, outside what Viad argues was the $3.00 to $25.00 range for which TDRs usually sell. Viad's accusations, however, ignore the fact that the appraisal prepared by Viad's expert, Mr. Halbert specifically depends on inclusion of the TDRs in reaching his fair market value of $64,800,000. Halbert Tr. at 39-43. Without the TDRs, the value is approximately $44 million (Halbert Tr. at 43), which approximates the land sale contract with TC MidAtlantic. See, e.g., Braesch Decl. at ¶20. The structuring of the sale to deal with the TDRs separate from the land is a recognition that the TDRs are not property. Id. Montgomery Road has not sought to exclude Viad from participating in the appreciation of the Property as that term is defined by the Cash Participation Agreement. Id. at ¶23. The term simply does not include TDRs.

Viad seeks to garner support from Stuart Smith's testimony that TDRs have sold for $3.50. See Smith Tr. at 93. As Mr. Smith testified, however, he was not retained as an expert in the valuation of

---

[31] Rose v. Fox Pool Corp., 643 A.2d 906 (Md. 1994) and Arizona Dep't of Revenue v. Arizona Outdoor Advertisers, Inc., 41 P.3d 631 (Ariz. Ct. App. 2002).

TDRs. Smith Tr. at 43. He was retained to conduct a review of Mr. Halbert's appraisal report. Smith

Tr. at 43-44. Mr. Smith also testified that there is a difference between price and value. Smith Tr. at 93.

"Price is simply a transaction amount and value has certain definitions associated with it, willing buyer,

willing seller." Smith Tr. at 93. Mr. Smith also explained that TDRs are separate commodities (Smith Tr.

at 48, 50, 87) and, as such , "are not part of the definition of an as is value" of property and under an "as

is value" the land cannot be merged with the TDRs. Smith Tr. at 50. Fair market value is the amount that

a ready and willing buyer will pay to a ready and willing seller. TC Midatlantic was ready and willing to

pay $70.00 per square foot for the TDRs. Viad has failed to demonstrate that he deal was a sham.

Moreover, as Montgomery Road argued in its Memorandum (at 39-45) in support of its Motion for

Summary Judgment, Viad and Montgomery Road are creditor and debtor and as such Montgomery Road

had no obligation to structure its deal with TC Midatlantic in a way that would benefit Viad.

## V.    VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF CONTRACT

In Count III of its First Amended and Supplemental Counterclaim[32], Viad alleges that Montgomery

Road has breached the Cash Participation Agreement "during the course of this litigation" by: 1) failing to

make the Appreciation Cash Payment; 2) by failing to provide a statement pursuant to § 3.9 of the Cash

Participation Agreement; 3) by failing to name an appraiser to "contest" the fair market value of the

Property; and 4) by failing to provide financial statements for 2005 and 2006. Viad seeks summary

judgment on each of these alleged "defaults" under the Cash Participation Agreement.

---

[32] Count II "Breach of Contract" is a new claim in the First Amended and Supplemental Counterclaim, which was filed at the same time as Viad's Motion for Summary Judgment.

**A.    Viad is Not Entitled to Summary Judgment on its Breach of Contract Claim for an Alleged Default Relating to 2005 and 2006 Financial Statements**

Section 2.6 of the Cash Participation Agreement requires financial statements and schedules to be submitted within 120 days of the end of each Fiscal Year (defined as December 31 in §1.19). Thus, the 2006 financial statements are not due until April 30, 2007. They are being worked on at the present time. Glassman Decl. at ¶18. Financial statements and schedules for Fiscal Year 2005 were provided on November 21, 2006. Exhibit 45. As set forth in the Declarations of Messrs. Rose and Glassman, these financial statements contained a restatement of the financials for the period December 1987- December 2005 (the "2005 Revised Statements"). Glassman Decl. at ¶¶12-16; Rose Decl. at ¶¶ 16-18. Viad makes the statement that the 2005 Revised Statements contain a different treatment of Montgomery Road's expenses than the tax returns filed by Montgomery Road for 2005, yet fails to identify – other than a cursory reference to the tax returns – the specific items about which it complains. See Viad SOF ¶127. In any event however, there is nothing in the Cash Participation Agreement that prohibits such treatment. Moreover, as described in detail above, the Special Purpose Financial Statements tendered prior to the 2005 Revised Statements erroneously treated legitimate expenses as equity, and the interest thereon was erroneously labeled as "Developers' Equity Return." Glassman Decl. at ¶¶10-16; Rose Decl. at ¶¶15-18. The purpose and intent of the 2005 Revised Statements was to reflect the economic reality of advances from S&S Finance –over a period of twenty years -- to Montgomery Road to maintain the Property. Glassman Decl. at ¶¶10-16; Rose Decl. at ¶¶15-18.

Viad also argues that Montgomery Road is in default because the 2005 Revised Statements do not carry a certification from a certified public accountant. For most of the twenty year history of this

35

relationship, TLC/Viad has concluded that sufficient information was being provided by Montgomery Road,

despite the fact that the Special Purpose Financial Statements did not include such a certification.  As stated

by John Zatarski, a TLC internal accountant, after reviewing annual statements at Mr. Goldman's request:

> It is my opinion that **our Developers [Montgomery Road and Sacramento] are in substantial compliance with our Agreement**.  My only concern is the Montgomery Road 90 K St. Property is a "compilation" and not an audited statement.  Due to the fact that this Partnership has net losses and owns more than one property, we may not consider this a serious exception to the Agreement.  **Overall, these both provide us the information we require.**

See Exhibit 18 (J. Zatarski handwritten notes, 6-7-91) (emphasis added); see also K. Goldman Tr. at 46

(given that there was very little going on with the property, Mr. Goldman agreed with Mr. Zatarski's

statement). Similarly in 1994, another internal accountant, Joyce Lum, reviewed  Montgomery Road's

Financials and advised Mr. Goldman "everything looks ok."  Exhibit19 (K. Goldman handwritten note and

J. Lum handwritten note in response, 5/31/94); see also K. Goldman Tr. at 46-53.  Until this litigation,

TLC/Viad never "declared a default" based on the failure to have the Special Purpose Financial Statements

certified with an unqualified opinion by an independent accountant (the terminology in §2.6).  Indeed, the

position paper submitted by Viad to the Reznick Group (Exhibit 37) makes no complaint about the fact that

the financials had historically not been accompanied by such an unqualified opinion.   Indeed, Ms. Fiorucci

testified that (since her involvement in 2000) TLC/Viad had never requested an audited statement in writing.

Fiorucci Tr. at 12-13, 94-95. As Mr. Rose testified with regard to the current insistence on an audited

statement : "You seem to be so concerned with getting audited statements. ... what meaning would the

statement have?  We got the same ... the same parking lot, the same charges.  And the taxes have gotten

to be a little higher.  What ... could you be looking for?  Why would you care?  But there's nothing being

hidden."  Rose Tr. at 209. Viad has never contended (nor does it in its pleadings or in its Summary

Judgment Motion) that any expenses or income are being hidden, omitted, or inflated. The dispute here is focused on two discreet issues: whether the calculation of the Appreciation Cash Payment should deduct the interest accrued on the advances to maintain the Property, and whether the calculation should include the purchase price of the TDR's. This dispute must be determined by the terms of the Cash Participation Agreement. Whether the Special Purpose Financial Statements contain the unqualified opinion of an independent accountant simply has no bearing on the dispute which is central to this litigation. That is because the complaint about the failure to provide audited statements is raised for purposes of this litigation only– to support the claim in Count IV of the First Amended and Supplemental Counterclaim for an award of attorneys fees.

Furthermore, the failure to provide the 2005 Revised Statements accompanied by the unqualified opinion of an independent accountant is simply not a material breach of the contract. See America v. Preston, 468 F.Supp.2d 118, 125 (D.D.C.,2006) (whether a breach is material turns on the extent to which plaintiff will be deprived of the benefit reasonably expected under the contract). As set forth above, the issue here is the amount, if any, of the Appreciation Cash Payment, and thus, Montgomery Road contends that the failure to provide the certification is not material. If the Court determines that it may be material, the question of whether the failure to provide the certification is a material breach is an issue for the trier of fact. Id. at 125; see also Camalier & Buckley, Inc. v. Sandoz & Lamberton, Inc., 667 A.2d 822, 829 (D.C. 1995) (whether a delay in payments constitutes a material breach of a contract is a question for the trier of fact). Rather, it is Montgomery Road's position that Viad has breached the CPA by refusing to release its lien without payment of a substantial Appreciation Cash Payment, thus forcing Montgomery Road to escrow $4.5 million dollars pending resolution of this dispute.

37

**B.    Viad is Not Entitled to Summary Judgment on its Breach of Contract Claim for an Alleged Default Relating to Providing a Statement or Payment to Viad**

Viad argues that Montgomery Road has breached the Cash Participation Agreement by failing to make the Appreciation Cash Payment within three days of closing on the transaction, and further by failing to provide a "statement" (pursuant to §3.9) from which the Appreciation Cash Payment can be calculated. The binding nature of the Reznick Opinion, and how to calculate the amount, if any, of the Appreciation Cash Payment have been the subject of this litigation since the original Complaint was filed by Montgomery Road in January 2006. Whether the TDRs are appropriately considered in the calculation of the Appreciation Cash Payment is the subject of Montgomery Road's First Amended Complaint, filed on December 8, 2006, and Viad's Counterclaim filed on January 3, 2007. Thus, there was no basis upon which to "make" the Appreciation Cash Payment within three days of closing on the TC MidAtlantic transaction. Nevertheless, Viad's rights are protected, because on the date of closing of the transaction with TC MidAtlantic, $4.5 million (an amount agreed to by Viad) was wired into an account jointly controlled by counsel for Montgomery Road and Viad, to secure any potential Appreciation Cash Payment, pending the resolution of this dispute. See Rose Decl. at ¶34.

Moreover, with regard to the "statement" required by §3.9, literally tens of thousands of documents have been produced by Montgomery Road in this case, including all relevant accounting documents. At the time of the closing of the TC MidAtlantic transaction, however, both Montgomery Road and Viad had petitioned this Court for a declaration of their rights under the CPA, including what elements are included and excluded in calculating the Appreciation Cash Payment, and thus, the calculation of the "statement" contemplated by § 3.9 of the CPA would have been an exercise in futility.

38

C.    **Viad is Not Entitled to Summary Judgment on its Breach of Contract Claim for an Alleged Default Relating to the Appraisal Process**

At pages 21-23 of its Motion, Viad argues that Montgomery Road has defaulted under the Cash Participation Agreement by failing to identify an appraiser. Viad relies on §3.8 and §3.11 of the Agreement. Viad contends that when it tendered its "expert report" of Stephen Halbert on January 31, 2007, it was invoking the "appraisal" process set forth in the Agreement for disputes as to the "fair market value" of the Property. Viad's contention is unfounded. First, Montgomery Road submits that if Viad intended to invoke the appraisal process, it would have to have done so within 45 days of "receiving notice of an[] event requiring the determination of fair market value." CPA §3.8. That date was December 17, 2006, which was 45 days following Viad's receipt of the amended contracts for the sale of 90 K Street and the TDR's on November 2, 2006. See Rose Decl. at ¶31. Without regard to the timeliness of Viad's purported invocation of the "appraisal process," the appraisal, however, upon which Viad relies was tendered in accordance with the January 31st deadline contained in the Scheduling Order for expert reports. Indeed, the appraisal was an attachment to a pleading entitled "Designation of Expert Witnesses by Viad Corp." [Docket #19], and made absolutely no reference to invoking the appraisal process under the Cash Participation Agreement. By the time the expert report was tendered, Viad had already filed its Counterclaim [Docket # 16], which sought a declaration that the value of the TDRs being sold to TC MidAtlantic were to be considered in valuing the Property for purposes of the Appreciation Cash Payment. Counterclaim ¶7.

Viad argues that Montgomery Road failed to "select its own appraiser" within 15 days of the tender of the Halbert expert report, so Viad sent a "default" notice on February 21, 2007. This asserted "default"

39

is a Viad creation. Given that Halbert's expert report was tendered in the context of this litigation (as an

"Expert Designation"), Montgomery Road designated Stuart Smith [Docket #21 2/23/07] as its rebuttal

expert witness (pursuant to Fed. R. Civ. P. 26(2)(c)) on the issue of fair market value of the property. Mr.

Smith provided a review report of the Halbert appraisal. See, e.g., Smith Tr. at 65-67, 82-86.

The appraisal prepared by Viad's expert, Mr. Halbert, specifically depends on inclusion of the

TDRs in reaching his fair market value of $64,800,000. Halbert Tr. at 39-43. Without the TDRs, the

Property fair market value is approximately $44 million (Halbert Tr. at 43), which approximates the land

sale contract with TC MidAtlantic. See, e.g., Braesch Decl. at ¶20. In an exceedingly cursory argument

on page 23, Viad argues that this Court should find that the "Agreed Value" of 90 K Street is

$67,424,457, which is the combined value of the land purchase ($46,036,528), the TDR purchase

($8,387,929), and the purchase of Future TDRs ($13,000,000). Braesch Decl. at ¶20. As set forth in

the Declaration of Stuart Smith (Montgomery Road's expert), although Mr. Halbert's unit value of $65 per

FAR was appropriate, Mr. Halbert applied the unit value to an incorrectly developed FAR-density of

997,229 FAR feet, which was dependent on the TDRs. If the $65 per FAR is applied to the permitted

density of 675,207 FAR feet, the results are $43,888,455. Stuart Smith Decl. at ¶6; see also Millenium

Report, attached as Exhibit A to Millenium Report.

### D.    An Audit of MRLP's Records is Not Required

Viad ignores the fact that in 2005, the Reznick Group provided its binding conclusion that the

interest expense attributable to the advances from S&S Finance were to be deducted in computing the

Appreciation Cash Payment. Viad now wants a "do-over," and seeks an audit of Montgomery Road's

books and records. As set forth above, the issue here is straightforward: whether the interest expense

attributable to advances funded by S&S Finance are proper deductions, and whether the purchase price of the TDRs is included in determining the value of the Property. An audit of Montgomery Road's records will not provide any assistance to the determination of those issues. Once the Court makes these determinations, a proper "statement" of the calculation can be made. As set forth above, Special Purpose Financial Statements have been provided for twenty years, and tens of thousands of pages of documentation have been provided in this litigation, and other than the *classification* of the interest expense, Viad has not challenged *any* expense items related to the maintenance of the Property, either in this litigation, or in the Reznick arbitration. Indeed, Ms. Fiorucci testified that she has no evidence that as of September 1999, MRLP did not have $25 million invested in the Property, which Mr. Rose told her was the investment at that time. Fiorucci Tr. at 58; see Exhibit 24 (E. Fiorucci e-mail to K. Goldman, 9-8-99). Nor did she have any basis to dispute that Montgomery Road had in fact, been accumulating significant interest expense. Fiorucci Tr. at 53-54.

## VI. VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM OF BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In Count III of its First Amended and Supplemental Counterclaim, Viad asserts that Montgomery Road violated the covenant of good faith and fair dealing which is implied in contracts. Viad alleges that over the years, Montgomery Road has misrepresented the value of 90 K Street, thereby seeking to convince Viad to relinquish its participation rights; that through the years, Montgomery Road has changed its position on accounting matters intending to decrease the appreciation cash flow and the appreciation cash payment to Viad; and that in its most recent financial statement (November 2006), Montgomery Road

41

attempted to decrease Viad's appreciation cash payment and took positions and classified items in ways that conflict with the Reznick Opinion.

Viad has no evidence to support these allegations of bad faith. Viad's allegation that Montgomery Road has ever misrepresented the value of 90 K Street is completely unsupported by the record.   Indeed, as Mr. Goldman testified, each time Mr. Rose proposed buying TLC/Viad out of the Cash Participation position, the company conducted due diligence (with the assistance of local District of Columbia real estate brokers)[33] and decided not to sell.  Goldman Tr. at 99-102; see also Exhibit 41 (E. Fiorucci Record of Telephone Conversation with K. Goldman, 5-23-05: "it's hard to identify what the interest is worth, because you don't know what Sam will do – sell or develop); see also Exhibit 20 (Draft letter from K. Goldman to R. Liffman, 7-2-99)(rejecting Liffmann proposal to relinquish cash participation interest). In addition, none of the accounting revisions were intended to deprive Viad of any rights it had under the Cash Participation Agreement.   Rose Decl. at ¶35.  The reasons for the accounting revisions are fully explained in the Declarations and deposition testimony of both Samuel Rose and Ronald Glassman, as discussed supra.

---

[33] Pat Marr (of CB Richard Ellis) was a real estate broker consulted by TLC/Viad on several occasions.  See Exhibit 25 (Letter from Pat Marr to E. Fiourucci, 9-15-99)("[i]f Greenebaum & Rose were to sell [the Property] today, [the value] would be approximately $30.00 per developable foot. With the ability to construct 650,000 square feet, that would equate to a value of $19,500,000. With your participating interest not valid until it exceeds what the owner has in the property (approximately $25 million), your interest would be worth nothing").  See also Exhibit 26 (E. Fiorucci Memorandum to K. Goldman, 9-15-99); Exhibit 34 (E. Fiorucci e-mail to K. Goldman, 11-26-02)(reflecting conversation with Pat Marr:  if property "sold as land, value is approximately $30/developable sq. ft. or $20,250,000")

### A.    Montgomery Road Did Not Owe A Duty Of Good Faith And Fair Dealing To Viad

There is implied in many contracts a duty of good faith and fair dealing.  <u>Allworth v. Howard University</u>, 890 A.2d 194 (D.C. 2006).  Here, however, there is no question that the relationship between Viad and Montgomery Road is that of creditor-debtor.  The Cash Participation Agreement expressly provides that the relationship between Viad and Montgomery Road is "solely that of creditor and debtor" and that "[n]othing in [the Cash Participation Agreement] or in any other document or instrument made in connection with the [Cash Participation Agreement] ... shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between [Viad] and [Montgomery Road]."  CPA at §6.1.  Many jurisdictions have recognized that the nature of the debtor-creditor relationship ought not trigger an implied duty of good faith and fair dealing.  <u>See</u> <u>e.g.</u>, <u>Allied Capital Corp. v. GC-Sun Holdings, L.P.</u>, 910 A.2d 1020, 1034  (Del. Ch. 2006) ("the restrictive covenants between debtors and creditors define, by omission, the freedom of action that the debtor retains"); <u>Home Hearth Plano Parkway, L.P. v. LaSalle Bank, N.A.</u>, 320 B.R. 596, 610 n.9 (N.D. Texas 2004) (Texas law does not recognized an implied covenant of good faith and fair dealing in the lender-borrower relationship); <u>Hais v. Smith</u>, 547 A.2d 986, 988 (D.C. 1988) (implied covenant of good faith and fair dealing does not require creditor to ensure fair dealings between co-debtors).

### B.    Even If Montgomery Road Owed A Duty Of Good Faith And Fair Dealing, It Did Not Breach The Duty

No provision of the Cash Participation Agreement obligates Montgomery Road to structure any sales transaction so as to maximize *Viad's* cash participation.  Because Montgomery Road is not a fiduciary to Viad, no such provision can be implied.  <u>See, e.g.</u>, <u>Suthers v. Amgen Inc.</u>, 441 F.Supp.2d 478,

43

485 (S.D.N.Y. 2006)(courts have refused attempts to impose liability on a party that engaged in conduct

permitted by a contract, even when such conduct is allegedly unreasonable). Even in cases in which the

implied covenant applies, it implies good faith and fair dealing in abiding by the contract's terms. It is not

to be used as a tool to modify or override the express terms of the contract. <u>Washington Metropolitan</u>

<u>Area Transit Authority v. Quik Serve Foods, Inc.</u>, 2006 WL 1147933, *4, *5 (D.D.C. 2006). The

implied covenant of good faith and fair dealing is not to be used to prevent a party from acting in its own

self-interest. <u>See</u> <u>Thyroff v. Nationwide Mut. Ins. Co.</u>, 460 F.3d 400, 408 (2d Cir. 2006) (the implied

covenant "'does not extend so far as to undermine a party's general right to act on its own interests in a

way that may incidentally lessen the other party's anticipated fruits from the contract'"); <u>In re IT Group</u>,

448 F.3d 661, 671 (3d Cir. 2006) ("the implied duty of good faith is merely an "interpretive tool to

determine the parties' justifiable expectations"; it may not be used to add new terms to an agreement, or

to override express contractual terms). In this case, Viad seeks to impose duties not present in the Cash

Participation Agreement. Transportation Leasing expressly excised any fiduciary duties from the Cash

Participation Agreement. Viad cannot now require further duties of Montgomery Road, nor impose

additional terms, by claiming a breach of a duty of good faith.

**VII**. **VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS**
         **CLAIM FOR ATTORNEYS FEES**

        As set forth above, Montgomery Road disputes that it has breached the Cash Participation

Agreement, or the implied covenant of good faith and fair dealing (if it even applies). Viad did not file its

Counterclaim ("bring suit", <u>see</u> CPA §7.4) until after the agreement was reached to put the $4.5 million in

an account pending the resolution of this dispute. Exhibit 47 (Deposit Agreement, 12-21-06). It was

44

Montgomery Road which had to bring this litigation when Viad refused to be bound by the Reznick Opinion.   Accordingly, there is no basis upon which to award Viad its attorneys fees, and certainly not in the context of a summary judgment motion.

## CONCLUSION

For all the foregoing reasons, Montgomery Road and Montgomery Road TDR respectfully request the Court to deny Viad's Motion for Summary Judgment.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.

_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com

*Attorneys for Plaintiff/Counterdefendant Montgomery Road I Limited Partnership and Third-Party Defendant Montgomery Road TDR, LLC*

45