**EXHIBIT 7**

ENTERED DEC 5 2006

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


MONTGOMERY ROAD I LIMITED )
PARTNERSHIP, )
                 )
         Plaintiff, )
                 )
     vs. )   CIVIL ACTION NO. 06-00344
                 )   (HHK)
VIAD CORP., )
                 )
         Defendant. )
_____)


30(b)(6) DEPOSITION OF EVE FIORUCCI
VOLUME I
PAGES 1 THROUGH 99


Phoenix, Arizona
November 7, 2006
9:30 a.m.


PREPARED FOR:
MR. DALE A. COOTER

REPORTED BY:
DAVID R. MINDER, RPR
ARIZONA CR NO. 50636

(COPY)

*Ottmar Holiday & Associates*
2800 N. Central, Ste. 150
Phoenix, Arizona 85004
(602) 485-1488
1-866-485-1444

```
 1              30(b)(6) DEPOSITION OF EVE FIORUCCI, taken on

 2   November 7, 2006, commencing at 10:05 a.m., at the law

 3   offices of BRYAN CAVE, LLP, One Renaissance Square,

 4   Two North Central Avenue, Suite 2200, Phoenix, Arizona,

 5   before DAVID R. MINDER, a Certified Reporter in the

 6   State of Arizona.

 7

 8

 9

10   COUNSEL APPEARING:

11           COOTER, MANGOLD, TOMPERT & WAYSON, L.L.P.
             BY:  Mr. Dale A. Cooter
12                Ms. Donna S. Mangold
             5301 Wisconsin Avenue, N.W.
13           Suite 500
             Washington, D.C.  20015
14           Attorneys for Plaintiff
             (202) 537-0700
15           dcooter@cootermangold.com

16

             BRYAN CAVE, L.L.P.
17           BY:  Mr. Rodney F. Page
             700 Thirteenth Street NW
18           Washington, D.C.   20005
             Attorneys for Defendant
19           (202) 508-6002
             rfpage@bryancave.com

20

21

22

23

24

25
```

EVE FIORUCCI 11/7/2006

```
1                    EVE FIORUCCI,
2     a witness herein, having been first duly sworn by the
3     Certified Reporter to speak the truth and nothing but
4     the truth, was examined and testified as follows:
5
6                    EXAMINATION
7
8     BY MR. COOTER:
9         Q.    Good morning.
10        A.    Good morning.
11        Q.    State your name and address for the record, if
12    you would.
13        A.    Eve Fiorucci, 6745 East Windstone Trail, Cave
14    Creek, Arizona, 85331.
15        Q.    Are you employed?
16        A.    I am.
17        Q.    How are you employed?
18        A.    I am employed by Viad Corp.
19        Q.    What do you do there?  What's your job?
20        A.    My title is Assistant Director of Real Estate.
21        Q.    What does that mean functionally?  Nice title,
22    but I want to know what you do.
23        A.    My job responsibilities include handling the
24    real estate needs of the company.
25        Q.    Do you have real estate undermanagement
```

12

EVE FIORUCCI 11/7/2006

1      Q.   Okay.  Then what happened?

2      A.   Then Viad hired me back as a full-time

3  employee.

4      Q.   Where are we in time?  What year are we

5  talking about?

6      A.   Probably 1999, 2000.

7      Q.   Have you been with Viad as a full-time

8  employee ever since?

9      A.   Yes, with this title.

10      Q.   That was my next question.  Since you came

11  back in 1999 or 2000, your function has remained the

12  same; is that right?

13      A.   Yes.

14      Q.   What do you recall as your first involvement

15  with the property known as 90 K Street in Washington?

16  It's 90 K Northeast, actually.

17      A.   My first involvement was probably several

18  years after I got to Viad.  I may have had to call Sam

19  Rose to request a financial statement.

20      Q.   I'm curious, because several years after you

21  got to Viad -- you got to Viad twice, it sounds like.

22  Where are we in time?

23      A.   Several years after 1997.

24      Q.   That would take us into the 2000 range?

25      A.   Probably.

13

EVE FIORUCCI 11/7/2006

1       Q.    Now --

2       A.    I can't be sure.

3       Q.    Okay.  The Cash Participation Agreement that

4    brings us here is dated November 30th of 1987.

5    Obviously, you didn't have anything to do with the

6    promulgation of this document, the negotiation or

7    anything else, because you weren't here.  Can we just

8    confirm that?

9       A.    That is correct.

10      Q.    Is there anyone at Viad who was here in that

11   time frame that had anything to do with the promulgation

12   of this document?

13      A.    Not to my knowledge.

14      Q.    How did you first become aware of the

15   document?

16      A.    I'm not sure, but I think that I would have

17   probably taken it out to review it when I received the

18   Level 3 letter from Sam Rose indicating that he planned

19   to sell 90 K Street to Level 3.

20      Q.    We'll come back to that.  So you think that

21   your first involvement is that you reviewed it in

22   connection with a potential sale transaction to Level 3;

23   is that accurate?

24      A.    I think so.

25      Q.    Now at that time, to whom were you reporting?

Ottmar Holiday & Associates
602-485-1488

37

EVE FIORUCCI 11/7/2006

1      A.    I believe he accounted for it in that way.

2      Q.    To save time, do you agree or disagree with

3 his conclusion based on the facts that he states in this

4 letter in the section called "Conclusion"?

5                    (Witness examines document.)

6      A.    I believe that his conclusion represents his

7 opinion on whether or not he made a good return.    That's

8 his opinion.

9      Q.    Now you and I can agree, can't we, that no

10 matter how you count, if this 8,775,000 was not listed

11 as equity, Developer's Equity Return, but it simply had

12 been an accrued interest payment made to a third-party

13 lender, that would be deducted from the sales price

14 before the 15 percent cash participation kicked in?    We

15 can agree to that; can't we?

16     A.    Yes.

17     Q.    So that if the 8,775,000 and change number was

18 accrued interest to a third-party lender, it would be an

19 appropriate deduct from the sales price before your

20 15 percent kicks in; is that right?

21     A.    It would need to be actually paid to a

22 third-party lender.

23     Q.    Let's take that step.    So if the accrued

24 8,775,000, as of 2000, were actually paid to a

25 third-party lender, it would be an appropriate deduct

EVE FIORUCCI 11/7/2006

1      Q.   Sure.  I'm just using the number that was on

2   the table in 2000.  If the $8,775,000 was actually

3   accrued interest owing to a third-party lender, you

4   would agree, would you not, that that would be a proper

5   deduction from the sales price of a sale before Viad's

6   15 percent kicks in?

7      A.   Okay.

8      Q.   That's my problem.

9      A.   My answer is, the appreciation cash flow --

10     Q.   Are you referring to the document?

11     A.   Yes.

12     Q.   Where?

13     A.   Section 3.1.

14     Q.   Okay.

15     A.   It means the agreed value of the property, so

16   the amount that the property is being sold for, less the

17   approved deductions, and my understanding of that

18   definition is that the approved deductions are the

19   permitted debt less Developer's Invested Equity and

20   Developer's Operating Equity.  Interest isn't

21   specifically called out.

22     Q.   That's fine.  Would you agree that if that

23   8,775,000, the number that was on the table in 2000, was

24   a permitted debt, that it would be a proper deduction

25   before the 15 percent kicks in?  That's all I'm asking.

EVE FIORUCCI 11/7/2006

1          A.    If it's a permitted debt, yes, I believe that
2     it would be an allowable deduction.
3          Q.    Now permitted debt is defined, is it not, in
4     Section 2.3, 2.3 (b) on page seven?
5                (Witness examines document.)
6                Now you've taken a moment to read that.
7     If the number, 8.775 million, that was on the table in
8     2000 was debt applied to fund all or part of the
9     purchase price pre-development, development construction
10    costs, for deficits included in the operation of the
11    property, it would be a permitted debt and therefore
12    deductible from the purchase price before the Viad
13    15 percent applies?  Would you agree with that?
14                And I think that's what you said.  I'm
15    just trying to clarify that we're using the same
16    definitions here.
17                (Witness examines document.)
18         A.    The approved deduction is the principal
19    balance of the permitted debt.  It says nothing about
20    interest.
21         Q.    Where did the money come from?  I'm trying to
22    follow up on something that you just said.  If the money
23    had come from a lender, and the interest is accruing,
24    just in normal parlance, would you agree with me that
25    every month, the principal balance gets bigger and

41

EVE FIORUCCI 11/7/2006

1    bigger if the interest isn't paid on a note?

2        A.    In general terms?

3        Q.    Yes.

4        A.    If you don't pay your interest and you accrue

5    it, then your principal balance gets larger.

6        Q.    What was the source, if you know, of the

7    $8.775 million?  Apparently that's interest on

8    something.  What was the source of the something that

9    generated the $8.7 million in interest?

10       A.    I don't know.

11       Q.    Did you ever inquire?

12       A.    I don't know.

13       Q.    I'm trying to understand this analytically.

14   If they had gone to a lender, and the lender had lent

15   money, and the interest hadn't been paid, and that

16   principal balance gets bigger and bigger, at the end of

17   the day, you and I can certainly agree that in

18   connection with the sale, that would be a deduction from

19   the purchase price before 15 percent kicks in?

20            MR. PAGE:  I object to the hypothetical.

21   You can go ahead and answer.

22            MR. COOTER:  Go ahead.

23            THE WITNESS:  That didn't happen.

24   BY MR. COOTER:

25       Q.    Just answer it my way.  If it had happened

42

EVE FIORUCCI 11/7/2006

1   that way, you and I agree that it's an allowable

2   deduction as I just described it?

3       A.   If they went to a third-party lender, and they

4   took a loan on which they never had to make a payment in

5   the life of the loan --

6       Q.   And the balance gets bigger and bigger, just

7   confirm for me that that would be an allowable deduction

8   in the event of a sale under this Agreement.

9       A.   I think it would be.

10      Q.   All right.  Now let's go back to

11  Mr. Liffmann's letter for just a moment, September

12  of 2000.

13      A.   Uh-huh.

14      Q.   Mr. Liffmann, on the second page of his letter

15  in this Transaction History, makes reference to a

16  company known as S&S Finance.  Do you see that?

17      A.   Yes, but may I go back?

18      Q.   Not just yet.  I just want to know if you see

19  "S&S Finance."

20      A.   Okay, I do.

21      Q.   What is S&S Finance, if you know?

22      A.   I don't know -- oh, what he says, it's a

23  wholly owned by the principals of Greenebaum And Rose.

24      Q.   Have you ever made inquiry about the

25  involvement of S&S Finance in this transaction?

44

EVE FIORUCCI 11/7/2006

1      Q.   Now this dispute about how to deal with, for

2  lack of a better word, interest on the Developer's

3  Equity contribution, if that's what it was, never did

4  get resolved, and at some point the issue was presented

5  to Reznick Fedder to analyze.  Do you agree with that?

6      A.   Yes.

7      Q.   First of all, how did it come to be that this

8  issue, this disagreement, was given to Reznick Fedder to

9  analyze?  I want to know how that happened.

10      A.   I called CB Richard Ellis, Pat Marr, and asked

11  Pat Marr for a couple of referrals for some real estate

12  accounting firms.

13      Q.   CB Richard Ellis, that person that you just

14  described, is that local or is that back east?

15      A.   Back east.

16      Q.   When did you make that call to that person?

17      A.   I don't remember.

18      Q.   What did Pat Marr -- is that a he or a she?

19      A.   That's a he.

20      Q.   What did Mr. Marr do in response to your call?

21      A.   Pat Marr provided me with a couple of

22  references -- referrals, rather.

23      Q.   One of which was the Reznick accounting firm?

24      A.   That is correct.

25      Q.   Do you recall who the others were?

EVE FIORUCCI 11/7/2006

1       A.    I do not.

2       Q.    This disagreement about how to treat this

3  interest on Developer's Equity, was that given to

4  Reznick to analyze?

5       A.    Yes, it was.

6       Q.    Confirm for me, did you select Reznick or did

7  the Montgomery Road people?

8       A.    We proposed the use of Reznick and Montgomery

9  Road agreed with them.

10                MR. COOTER:  I'm going to show you what

11  we'll mark as Exhibit No. 7.

12                (Exhibit No. 7 marked.)

13  BY MR. COOTER:

14       Q.    Exhibit No. 7 would appear to be notes of a

15  telephone conversation between Mr. Rose and you dated

16  December 16th of '04.  And again, it's a Viad document.

17  It's got a VD Bates number.  Can you confirm for me that

18  that's what it is?

19       A.    Can you repeat that?

20       Q.    These appear to be notes of a phone

21  conversation that happened 7/16 of '04.  Can you just

22  confirm that's what it is?

23       A.    Yes.

24       Q.    These are your notes?

25       A.    Yes.

46

EVE FIORUCCI 11/7/2006

1        Q.    And did you make these notes of a conversation
2    that took place on the 16th of December?
3        A.    Yes.
4        Q.    What it says is, "Discussed hiring Reznick
5    Fedder to help sort out our dispute.  We called Reznick
6    together and left a message.  Sam will call him on his
7    own to review the situation to see if he can analyze
8    them to help us determine what the documents are
9    saying."  Did I read that right?
10       A.    I believe that says, "see if he can engage
11   them to help us."
12       Q.    I'm sorry.  Now I just want to make sure I
13   understand.  The dispute we're making reference to is
14   the dispute that's evidenced by this exchange of
15   correspondence back in 2000, what's a proper deduct for
16   the Owner's Equity Return in the event of a sale.
17   That's the dispute we're talking about, right, the one
18   with Reznick?
19       A.    That is one of the disputes that we are
20   talking about.
21               MR. COOTER:  I want you to turn to -- you
22   can't turn to anything, because you don't have it.
23               (Exhibit No. 8 marked.)
24   BY MR. COOTER:
25       Q.    Exhibit No. 8 would appear to be a letter from

EVE FIORUCCI 11/7/2006

1   15 percent.  Then you write, "However, Montgomery Road

2   has been accumulating significant interest expense from

3   carrying the property over the past 17 years and has

4   been unable to develop it."  Do you believe that

5   statement to be true?

6       A.   At the time I wrote it, Sam told me it was

7   true.

8       Q.   Do you believe it to be true today?

9       A.   Now I don't know what to believe.

10      Q.   Okay.  "Additionally, we do not expect the

11  investment climate in Washington, D.C., to support the

12  development of this project in the near future."  Did

13  you believe that to be true in '99?

14      A.   At that time.

15      Q.   By the way, you don't dispute, do you, that

16  Montgomery Road has been accumulating significant

17  interest expense from carrying the property for the last

18  17 years as of 1999?  You don't dispute that?

19      A.   I may.

20      Q.   You may or you may not, but do you today is

21  the question.

22      A.   I don't know.  I'd have to take a look at

23  Sam's books and records.

24      Q.   As of the information that you have today, do

25  you have any basis to dispute your statement on your

54

EVE FIORUCCI 11/7/2006

1    memo that Montgomery Road has been accumulating

2    significant interest expense from carrying the property

3    over the years?

4         A.    I don't know.

5         Q.    Either way; is that right?

6         A.    That is correct.

7         Q.    You write, "Given the accumulated interest and

8    the investment climate in Washington, it seems unlikely

9    the Agreement will ever generate any cash income for

10   Viad."

11              MR. PAGE:  Objection.  You're not reading

12   it word for word.

13              MR. COOTER:  What did I say?  Did I

14   misread it?

15              MR. PAGE:  Yes.

16              MR. COOTER:  My apologies.

17        Q.    "Given the accumulated interest and the

18   investment climate in Washington, it seems unlikely that

19   the Agreement will ever generate any income from Viad."

20   Did I read that right?

21        A.    You read that correctly.

22        Q.    And was that your position at the time,

23   September of '99?

24        A.    This memo was reflecting a conversation that I

25   had with Sam.  These are items that Sam told me.  I

EVE FIORUCCI 11/7/2006

1    e-mail, was 25,760,000 and change?

2        A.    I don't know.

3        Q.    You don't know either way?

4        A.    I don't know, because I don't think I have

5    enough information to know.

6        Q.    Based on the information that you have today,

7    you have no evidence to support the notion that that

8    number is wrong?

9        A.    I have comments that Sam has made to me.

10       Q.    What are those that you think would call into

11   question the accuracy of that number?  I want to focus

12   on that number.

13       A.    Based on my experience with Sam, in the

14   future, whatever comments he makes to me about his

15   interest expense or invested equity, I would now want to

16   see evidence from Sam supporting that.

17       Q.    Whatever you're going to do in the future is

18   not what I asked you.  My question is, if he said

19   something that leads you to conclude that he said that

20   number is wrong, what did he say that leads that number

21   to be wrong?  That's the question, 25 million invested

22   equity.

23                MR. PAGE:  I object.  It's asked and

24   answered.

25                MR. COOTER:  No, it isn't.  It's been

64

EVE FIORUCCI 11/7/2006

1    Can you confirm that you drafted and sent this e-mail to

2    Mr. Goldman at or about that time?

3         A.    I can.

4         Q.    You did do that?

5         A.    I did do that.

6              MR. COOTER:   That's all I have on that.

7    I'm going to show you a document that we'll mark as

8    Exhibit 17.

9              (Exhibit No. 17 marked.)

10   BY MR. COOTER:

11        Q.    Exhibit No. 17 is a piece of paper that came

12   out of your files, has a VD Bates number on it.

13        A.    Correct.

14        Q.    Who prepared this document?  Have you ever

15   seen it before?

16        A.    I have.

17        Q.    Who prepared it?

18        A.    I think I did.

19        Q.    Now the document is dated January 9th of '03.

20   Can you tell me when it was you prepared this thing?

21        A.    On or about that time.

22        Q.    Why were you preparing this at that point?

23   Why were you doing this?

24        A.    I prepared this note to myself to help me

25   simplify the Cash Participation Agreement.  Why I did

65

EVE FIORUCCI 11/7/2006

1    that at that exact time I'm not sure.

2         Q.    Who directed the Cash Participation Agreement?

3         A.    I believe that was Jeff Buchanan and David

4    Lindner.

5         Q.    That was somebody at Transportation Leasing or

6    Greyhound?

7         A.    They were outside counsel, I believe.

8         Q.    Our understanding is, in reading the document,

9    that it was sort of an off-the-shelf agreement that had

10   been used somewhere else for something else; is that

11   right?

12        A.    I don't know.

13        Q.    They're outside counsel for Viad, the drafters

14   of it?

15        A.    Yes.

16        Q.    Now making reference to your notes of

17   January 9th, No. 17, just read those and tell me if

18   there's anything in your notes on Exhibit 17 with which

19   you disagree.

20        A.    Would you like me to read all these out loud?

21        Q.    No.   Read them to yourself.   If you change

22   your mind about something, let me know; will you?   If

23   you disagree with your notes, tell me.   If you agree

24   with them, tell me that.

25              (Witness examines document.)

66

EVE FIORUCCI 11/7/2006

1       A.    Well, I may.

2             (Witness examines document.)

3       Q.    First of all, if you disagree with something

4   in your notes, show me what part of your notes you

5   disagree with.  What are we talking about?

6             (Witness examines document.)

7       A.    No, I think I misread that.

8       Q.    That's going to be terribly unclear on this

9   record.  So far, you haven't disagreed with anything in

10  your notes?

11      A.    Correct.

12      Q.    Keep working.

13            (Witness examines document.)

14      A.    So far, I disagree with nothing in my notes.

15      Q.    All I'm trying to do is confirm.  Exhibit

16  No. 17 are your notes, and you don't disagree with

17  anything on the page; is that right?

18      A.    Correct.

19      Q.    Did you have any experience in the use of a

20  similar Cash Participation Agreement in any real estate

21  in Sacramento?

22      A.    Did I personally?

23      Q.    Did the company you're here as a

24  representative of?

25      A.    I believe there may have been a Cash

67

EVE FIORUCCI 11/7/2006

1    Participation Agreement drafted and used for a property

2    in Sacramento.

3        Q.   Was the property sold?  Do you still have the

4    Cash Participation Agreement?

5        A.   I don't believe we still have it, although I

6    don't know.  My experience with that property is limited

7    to my review of the archive box.  And I may have seen a

8    Cash Participation Agreement for a property in

9    Sacramento, but I couldn't tell you which one, and I

10   couldn't tell you if we still retain that.

11       Q.   Well, this is not a trick question.  It looks

12   from our review of material that this Cash Participation

13   Agreement was essentially off-the-shelf and also used in

14   Sacramento and Chicago.  Is that consistent with your

15   understanding?

16       A.   I just don't know.

17       Q.   Can you identify for me the property in

18   Sacramento which may have been subject to a Cash

19   Participation Agreement with Viad or a predecessor to

20   Viad?

21       A.   I can't remember.

22       Q.   Would your files reflect that?

23       A.   Yes.

24            MR. PAGE:  Well, if you want to treat that

25   as an interrogatory, I'll give you a letter on behalf of

Ottmar Holiday & Associates
602-485-1488

68

EVE FIORUCCI 11/7/2006

1    the company that gives you the history.

2                    MR. COOTER:  That will be fine.

3        Q.    Are you familiar with whether or not Viad had

4    a Cash Participation Agreement in connection with

5    property in Chicago?

6        A.    I believe they did.

7        Q.    Does Viad still have that Cash Participation

8    Agreement?

9        A.    I don't know.

10       Q.    Can you identify the property in Chicago that

11   was involved?

12       A.    I cannot.

13                   MR. COOTER:  Okay.  Mr. Page, will you

14   give me the answer to that?

15                   MR. PAGE:  Yes, I'll give you the same

16   outline for that.

17                   MR. COOTER:  That will be fine.

18                   MR. PAGE:  On that question, I don't think

19   it's covered by your designation in the 30(b)(6), but I

20   don't mind giving you --

21                   MR. COOTER:  It probably is, but I'm not

22   going to argue with you about it.  I don't think it's

23   necessary for our today's purposes, anyway.

24                   MR. PAGE:  Excuse me.  Can we go off the

25   record a minute?

69

EVE FIORUCCI 11/7/2006

1          MR. COOTER:  Yes.

2          (Discussion off the record.)

3          MR. COOTER:  I'm going the show you what

4     we'll mark as deposition Exhibit No. 18.  It's dated

5     June 13th of '05.

6               (Exhibit No. 18 marked.)

7     BY MR. COOTER:

8          Q.   Exhibit No. 18 would appear to be notes of a

9     telephone conversation between yourself and Pat Marr

10    having to do with 90 K Street in Washington.  Whose

11    notes are these?

12         A.   I believe these are my notes.

13         Q.   What were you talking to Pat Marr about in

14    June of '05 having to do with K Street?  What was the

15    assignment to Marr at this point?

16         A.   Occasionally I checked in with Pat Marr to

17    talk about the value of that property.

18         Q.   Your notes reflect a number of bullet points.

19    The fourth one down one is that Pat was to provide a

20    current estimated value of the land only.  Did he do

21    that in '05?

22         A.   I believe that what he stated is that land is

23    selling for $80 a square foot per buildable foot.

24         Q.   I see.  Did Viad ever have an appraisal done

25    of this property, a real appraisal?

94

EVE FIORUCCI 11/7/2006

1    A.    It could have paving.

2    Q.    All right.  Other than paving?

3    A.    I don't know.  I've never seen it.

4    Q.    Paragraph 2.6 says -- it says whatever it

5    says.  My question to you is simple.  Over the years,

6    when you got whatever information you were getting from

7    Mr. Rose and his colleagues at Montgomery Road, did you

8    ever say, "Sam, where's my audit"?

9    A.    Yes.

10    Q.    Okay.  In writing, "I demand an audited

11    statement"?

12    A.    I personally did not.

13    Q.    Did anybody at the company say, "I demand my

14    audited statement"?

15    A.    Yes.

16    Q.    When, in writing?

17    A.    I can't remember --

18    Q.    What was the --

19    A.    -- the exact date.

20    Q.    What was the response?  I haven't seen such a

21    paper.  Have you seen such a paper?

22    A.    I did.

23    Q.    When was it?  Before you got involved?

24    A.    Yes.

25    Q.    From the time you got involved forward, has

95

EVE FIORUCCI 11/7/2006

1   the company in writing said, "I want an audited

2   statement"?

3       A.   Not to my knowledge.

4           MR. COOTER:  Mark this.

5           (Exhibit No. 27 marked.)

6   BY MR. COOTER:

7       Q.   What is Exhibit No. 27?

8           (Witness examines document.)

9           Is this the statement that you were making

10  reference to earlier, saying, "Where's my audited

11  statement"?

12      A.   I believe so.

13      Q.   All right.  Now Exhibit No. 27 is a letter

14  from Mr. Ervanian to Sam Rose dated August 25th of 1989.

15  Other than this letter, has there ever been a written

16  demand for an audited statement from 1989 up until

17  today, that's about 17 years, other than this letter?

18      A.   I think there may have been another or two

19  others.

20      Q.   When?  Do you know?

21      A.   I can't remember the exact date.

22      Q.   Now who is John Zatarski?  Who is he?

23      A.   He used to work at Viad.

24      Q.   What did he do?

25      A.   I believe he was in the Accounting Department.