**EXHIBIT 10**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
------------------------------x
MONTGOMERY ROAD I, L.P.,        :

                                :

         Plaintiff,             :

                                : No. 06-00344 (HHK)

         v.                     :

                                :

VIAD CORP.,                     :

                                :

         Defendant.             :

------------------------------x
```

**ORIGINAL**

Washington, D.C.

Thursday, December 11, 2006

Deposition of

KENNETH PAUL GOLDMAN

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 11:05 a.m.,

at the law offices of Cooter Mangold Tompert &

Karas, L.L.P., 5301 Wisconsin Avenue, NW.,

Washington, D.C., before Lohna Esteb of Beta

Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:

2

```
1    APPEARANCES:
2       On behalf of Plaintiff:
3          DALE A. COOTER, ESQUIRE
           Cooter Mangold Tompert & Karas, L.L.P.
4          5301 Wisconsin Avenue, NW., Suite 500
           Washington, DC 20015
5          (202) 537-0700
6

        On behalf of Defendant:
7          RODNEY F. PAGE, ESQUIRE
           ALICIA HOGGES-THOMAS, ESQUIRE
8          Bryan Cave, L.L. P.
           700 Thirteenth Street NW
9          Washington, DC  2005
           (202) 508-6002
10
11                    *    *    *    *    *
12
13
14
15
16
17
18
19
20
21
22
```

5

1    A    Fair enough.

2    Q    Are you employed, sir?

3    A    I am.

4    Q    How are you employed?

5    A    I am employed currently by Viad

6  Corp.

7    Q    What do you do for them?

8    A    My title is director of real

9  estate.  And that entails the handling of

10  real estate matters for Viad Corp. and its

11  various subsidiaries.

12    Q    How long have you been in that job?

13    A    I've been in that job for over 19

14  years.  Well, actually, different titles, but

15  I've been with the company for 19 years.

16    Q    That takes us back to what?  What

17  year did you start?

18    A    Started in 1987.

19    Q    Just confirm for me that you have

20  no personal knowledge of the circumstances

21  surrounding the execution of the cash

22  participation agreement that's the subject of

10

1       A    After that, I took approximately a

2    year off and did some traveling.

3       Q    Okay.  And after that?

4       A    That's when I started my tenure

5    with Viad, which at the time was Greyhound

6    Corporation.

7       Q    Now, when you first got there,

8    you've told me that you are the director of

9    real estate or words to that effect today.

10   How long have you had that function?

11      A    I've had the title of director of

12   real estate since approximately 1996.

13      Q    Okay.  For the first, sounds like,

14   about nine years, what was your job out there

15   at Viad?

16      A    I was -- I started out as a senior

17   real estate representative.

18      Q    Okay.  So you've been in the real

19   estate function your whole time at Viad?

20      A    I have, yes.

21      Q    My understanding is that you are

22   the supervisor of Ms. Fiorucci, is that

11

1    right?

2        A    That is correct.

3        Q    And how long has she been, what's

4    the word, your subordinate?

5        A    I believe since approximately 1997

6    or '8.  Actually, 1998 is my recollection.

7        Q    Now, first of all, can you tell me

8    whether or not you have ever spoken with

9    anyone who you believe to be a representative

10   of Montgomery Road I, Limited Partnership?

11       A    I don't recall specifically, but

12   any conversations that I would have had would

13   have been in the early to -- up to, say,

14   mid-1990s.

15       Q    Do you recall --

16       A    And I don't recall.

17       Q    Well, okay.

18       A    Pardon me.

19       Q    Do you recall the substance of any

20   such conversation?

21       A    I do not recall any conversation.

22   I know there was some correspondence but I do

25

1   of the statement, yes.

2        Q    Now, in any event, whatever the

3   discussions were about this disagreement that

4   took place in connection with the possible

5   Level 3 transaction, other than being

6   Fiorucci's supervisor, can you just confirm

7   for me that you didn't talk to anybody about

8   it outside the company?

9        A    That is confirmed.

10       Q    All right.  Now, did there come a

11  time when you learned that this disagreement

12  would be submitted to somebody at the Resnick

13  accounting firm?

14       A    I believe that Ms. Fiorucci briefed

15  me on the steps that were being taken, one of

16  which was to submit the disputed matters to

17  the Resnick firm.

18       Q    Well, describe for me, if you

19  would, what she told you about the steps that

20  were being taken in connection with this

21  dispute that had arisen in connection with

22  the Level 3 transaction.

27

1       Q       Well, I know what the documents

2    say.  My question is did you ever talk to

3    anybody on that issue about whether or not

4    the Resnick opinion would be binding or

5    non-binding?

6       A       Not to my recollection, Dale.

7       Q       Who made a determination at the

8    company on that issue, whether the opinion

9    would be either binding or non-binding?

10      A       That would have been either Ms.

11   Fiorucci, probably with assistance of Ms.

12   Mann.

13      Q       Now, how did it come to be that

14   Resnick was selected as the accountant to

15   look at this dispute?

16      A       My knowledge of that is a little

17   sketchy, and really only updated by the fact

18   that I reviewed these documents in

19   preparation for today.

20      Q       Can you confirm for me that Resnick

21   was selected by Viad originally?

22      A       Only from what I've read in these

46

1    an expert on the cash participation

2    agreement.  He confirms it was a compilation

3    and not an audited financial statement.  And

4    that, you know, under the circumstances, it

5    was an appropriate review and response from

6    Mr. Zatarski.

7         Q    The next exhibit in my book is

8    Goldman Exhibit No. 32.

9                   (Deposition Exhibit No. 32 was

10                  marked for identification.)

11              BY MR. COOTER:

12        Q    Would you turn to that Bates

13   numbered 689.  Do you see that?

14        A    Yes.

15        Q    Okay.  This would appear to be a

16   handwritten note from you -- I assume Armen

17   is Mr. Ervanian, is that right?

18        A    Yes.

19        Q    And it's dated in 1994.  Can you

20   just confirm for me that you wrote this

21   handwritten memo to Mr. Ervanian on or about

22   May 20th of '94?

47

1       A    I wrote everything except for the

2   writing in the lower left-hand corner.

3       Q    Okay.  It says:  "Do you wish to

4   look over the Sacramento and Washington D.C.

5   cash participation agreement for 1993.  We

6   have not yet received Elcor's statement.

7   What is Elcor?

8       A    My recollection is that Elcor was

9   -- was the owner of a property in Chicago

10  where we also had a cash participation

11  interest. And we had not, apparently from

12  this note, we had not yet received their

13  annual statement.

14      Q    Is it accurate that your company

15  had a cash participation agreement on some

16  property in Sacramento at some point?

17      A    Yes.

18      Q    What was the property?

19      A    I do not recall the address, if

20  that's what you asking.

21      Q    No, just give my generically what

22  was it?  Was it an office building, race

48

1   track, brothel, what was it?

2        A    I -- I don't recall. These

3   properties in general were either vacant land

4   or former Greyhound bus terminals.

5        Q    Okay.  Tell me what happened to the

6   Sacramento property.

7        A    I don't recall, but I -- I don't --

8   we do not have a cash participation interest

9   in that property at this time.  I believe it

10  was disposed of in some manner.

11       Q    Well, that's my question, I

12  suppose.  Was the property disposed of, or

13  the cash participation agreement disposed of,

14  what are you talking about?

15            MS. HOGGES-THOMAS:  Objection.

16  Relevance.

17            BY MR. COOTER:

18       Q    Go ahead.

19            MS. HOGGES-THOMAS:  You can answer.

20            MR. COOTER:  She said I'm

21  irrelevant.  Don't pay attention to that.  Go

22  ahead.

49

1              THE WITNESS:  I believe -- I don't

2    know if the court reporter got that but I

3    stated I don't recall.

4              BY MR. COOTER:

5        Q    All right.  What about the property

6    in Chicago, what was that?

7        A    Again, that was a property that was

8    retained, and it was either a vacant property

9    or a former Greyhound bus terminal.

10       Q    What happened to your interest by

11   way of cash participation on the property in

12   Chicago?

13             MS. HOGGES-THOMAS:  Objection.

14   Relevance.  You can answer.

15             THE WITNESS:  Thank you, Alicia.  I

16   don't recall whether, you know, the property

17   sold or whether the interest in the cash

18   participation agreement was sold.

19             BY MR. COOTER:

20       Q    Do you recall when your interest in

21   the Sacramento property was, I don't know,

22   either sold or went away somehow?  Just give

50

1   me a date.

2       A    I would -- I don't recall unless

3   you are looking for a really broad period of

4   time.

5       Q    Well, do the best you can.  About

6   when did you lose your interest in this

7   Sacramento property?

8       A    If I had to venture a guess, I

9   would say sometime in the mid-1990s.

10      Q    Okay.  Was there a developer in

11  Sacramento who was involved in this?

12      A    Well, there was certainly an owner

13  of the property.

14      Q    Who was it?

15      A    I do not recall.

16      Q    Okay.  Was there a developer

17  involved in the Chicago property?

18      A    Yes.

19      Q    Who was it?

20      A    This memorandum jogged my memory,

21  Exhibit 32.  It was Elcor, which I believe

22  was a development firm out of Boston.

51

1       Q     When was your interest in the

2   Chicago property disposed of?

3       A     Again, I do not recall.  I'm sure

4   that if we, you know, reviewed our records on

5   those files, both Sacramento and Chicago, we

6   would have a better answer on that.  And I

7   believe -- okay.  That's it.

8       Q     Now, looking at your memo to Mr.

9   Ervanian, you say:

10           "The statements will be reviewed

11   by" -- and then it says, "John Zatarski as

12   usual."  That was crossed out, and then it

13   says -- is that Joyce?

14      A     That's correct.

15      Q     Who is Joyce?

16      A     Joyce L-U-M.

17      Q     What job did she have at the time?

18      A     At the time, Joyce Lum was an

19   accountant.

20      Q     Internal?

21      A     Internal to Viad Corporation.

22      Q     Is she still with you?

52

1       A     No, sir.

2       Q     Where is she, do you know?

3       A     I have no idea.

4       Q     Her last name is L-U-M?

5       A     At the time it was, yes.

6       Q     You believe her to be in the

7   Phoenix area?

8       A     I honestly don't know.

9       Q     Okay.  Now, at the bottom left of

10   the document, it says:

11          "Ken, everything looks okay."  What

12   is that?  "We are expecting something" --

13   what -- can you read that?  Tell me what that

14   refers to.

15      A     My reading of that is about as good

16   as yours.  I -- I think we -- I think it

17   says, "Were we expecting," and then I don't

18   know what -- something lot.

19      Q     Okay.  At the time that you

20   received this note, did you get this note

21   back from Joyce on or about the 31st of May

22   of '94?

53

1      A     Based on the date herein, I would

2    assume that to be true.

3      Q     It says:  "Ken everything looks

4    okay."  Did you agree with her opinion in

5    that regard at the time?

6      A     At the time, I did, qualified by

7    the fact that Joyce was not an expert on the

8    cash participation agreement, and that there

9    was very little going on on the property at

10   the time.

11            MR. COOTER:  Okay.  Anybody know

12   what time it is?

13            MR. PAGE:  It's noon according to

14   the bells that are ringing in the background.

15            MR. COOTER:  I'd like to take a

16   short recess, five minutes.

17            MS. HOGGES-THOMAS:  Sure.  Thank

18   you.

19                  (Recess)

20            BY MR. COOTER:

21      Q     The next exhibit should be Fiorucci

22   Exhibit No. 10, VD, a bunch of zeros, 20.

99

1        A    The CC Ken Goldman part is not my

2    handwriting.

3        Q    All right.  That's what I thought.

4    Now, attached to the document is a two-page

5    letter from Mr. Rose to Ms. Fiorucci dated

6    May the 2nd of '05.

7             Do you see that?

8        A    I'm with you.

9        Q    Did you read this document, the

10   letter from Rose to Fiorucci, dated May the

11   2nd of '05?

12       A    You asking me if I read it at the

13   time it was received?

14       Q    Yes.

15       A    I don't recall whether I did or did

16   not.

17       Q    Take a moment and read it now and

18   tell me if there's anything in it which you

19   contend to be inaccurate in the Rose letter

20   to Fiorucci.

21            MS. HOGGES-THOMAS:  Objection.

22   Argumentative.

100

1          MR. COOTER:  Asking him whether

2    it's accurate isn't an argument.  It's simply

3    a question.

4          I'm going to walk across the room

5    for a minute, but I'm not leaving you.  Hang

6    on just a minute.

7               (Recess)

8          THE WITNESS:  Well, my general

9    comment in reading this letter at this time

10   is that this is a position letter, you know,

11   from Mr. Rose indicating that -- you know,

12   he's presenting that the participation

13   interest has a nominal value, and we disagree

14   with that entire premise.

15               BY MR. COOTER:

16      Q    Is there any factual assertion?  I

17   understand he takes positions here and there.

18   Is there any factual assertion in his letter

19   with which you disagree?

20      A    Okay.  I'm back to reviewing it

21   again.

22      Q    What I mean by disagree, is there

101

1    any factual assertion that he makes that you

2    consider to be inaccurate?

3              MS. HOGGES-THOMAS:  Objection.  Can

4    you go over each factual assertion?

5              MR. COOTER:  Nope.

6              MR. PAGE:  For example, you're

7    asking the witness whether it's accurate that

8    you can't get blood out of a turnip, is that

9    one of the factual assertions?  If so, I'm

10   going to object.

11             MR. COOTER:  He need not respond to

12   that one.  I'll stipulate you can't get blood

13   out of a turnip.  Would you do that?

14             MR. PAGE:  No, because I don't know

15   if it's true personally.

16             My point is this, and it's for the

17   record:  The witness can answer it, but your

18   idea of what is a factual characterization

19   and the witness' may be totally different.

20             So you're question, "Tell me which

21   factual assertions you disagree with," when

22   the witness has already said this is a

102

1    position statement and he disagrees with the

2    whole thing, is an ambiguous, misleading

3    question.  And we object to it as being a

4    seriously vague question.

5            MR. COOTER:  All right.  You

6    object.

7            BY MR. COOTER:

8        Q    Answer the question.

9            MR. PAGE:  Answer the question if

10    you can do so, Mr. Goldman.

11            THE WITNESS:  Well, I don't believe

12    I can.  I mean, there's -- I don't -- you

13    know, I mean, we have taken statements by Mr.

14    Rose, you know, at this time and in the past

15    where he has made, you know, offers to -- to

16    sell the -- to have Viad relinquish the cash

17    participation interest.

18            And every time that he's done so,

19    we've done our due diligence, as we should,

20    and have come to the conclusion that, you

21    know, his offers are, you know, not -- not

22    appropriate.