**EXHIBIT 11**

ENTERED MAR 15 2007

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------x
MONTGOMERY ROAD I             :
LIMITED PARTNERSHIP,          :         **ORIGINAL**
                              :
     Plaintiff/               :
     CounterDefendant,        :
                              :
     v.                       :
                              :
VIAD CORP.,                   :
                              : No. 1:06CV00344(HHK)
     Defendant/               :
     CounterPlaintiff,        :
                              :
     v.                       :
                              :
MONTGOMERY ROAD I             :
LIMITED PARTNERSHIP,          :
                              :
     Defendant/               :
     CounterPlaintiff.        :
------------------------------x

                              Washington, D.C.
                    Tuesday, February 20, 2007

Deposition of

STEVE HALBERT

a witness, called for examination by counsel for Plaintiff/CounterDefendant pursuant to notice and agreement of counsel, beginning at approximately 2:24 p.m. at the law offices of Cooter Mangold Tompert & Karas, 5301 Wisconsin Avenue, NW,

2

1  Washington, D.C., before Chris A. Mazzochi of Beta

2  Court Reporting, notary public in and for the

3  District of Columbia, when were present on behalf of

4  the respective parties:

5  APPEARANCES:

6     On behalf of Defendant/CounterPlaintiff:

7        RODNEY F. PAGE, ESQUIRE

         Bryan Cave, LLP

8        700 Thirteenth Street, NW

         Washington, D.C.   20005-3960

9        (202) 508-6002

10    On behalf of Plaintiff/CounterDefendant:

11       DALE A. COOTER, ESQUIRE

         Cooter Mangold Tompert & Karas

12       5301 Wisconsin Avenue, NW, Suite 500

         Washington, D.C.   20015

13       (202) 537-0700

14

15

16

17

18

19

20

21

22

```
1      Q    Have you told me essentially all
2   you can recall about the first conversation?
3      A    Yes.
4      Q    After this first
5   conversation -- and I did see an engagement
6   letter.  But I don't need that for right now.
7      A    Okay.
8      Q    You undertook to do an appraisal.
9      A    Correct.
10     Q    Is that right?
11          You can look at your appraisal if
12  you want, or anything else that you want.
13  How did you go about doing it, as you
14  undertook the work?  Just tell me what you
15  did to go about this job.
16     A    Researched land sales in the locale
17  near 90 K Street.  Analyzed them, along with
18  all the other appraisal kinds of things that
19  lead up to it.  And --
20     Q    Know that nifty stuff about -- this
21  is a great market.
22     A    Yeah.
```

1     A    No.

2     Q    But you did go to the site?

3     A    Yes.  Uh-huh.

4     Q    Describe the site for me.

5     A    It is a rectangular site at the

6  northwest corner of K Street and First

7  Street, NE.

8     Q    Is the site improved?

9     A    If you mean by improved is there a

10 proposed office building on it yet, no.

11 There are parking spaces.  So it's improved

12 with sidewalks and asphalt parking.  It's

13 across the street from the D.C. adjudication

14 traffic court, and I have been there.  I have

15 appraised other properties within 100 yards

16 of this property in the last two years.

17 So I'm aware of that property.  Yeah.

18    Q    The property is paved.  It is an

19 asphalt parking lot; right?

20    A    Yeah.

21    Q    They're curved, I guess, to the

22 street?

1      A     Yeah.

2      Q     The sidewalk, I presume?

3      A     Yes, that's my recollection.

4      Q     Other than those things, are there

5   any improvements on the property?

6            Help yourself.

7      A     I don't recall right now.

8      Q     Either way?

9      A     I do not recall either way.

10  Improvements were not -- my assignment was

11  the land, not the improvements.

12           Moreover, they would not have

13  contributed to the overall value anyway.

14  They'd be demolished because it was time to

15  re-develop the site, so even if there were

16  some smaller -- something, it was not met.

17  Not --

18     Q     Let me follow up on that one.

19  You're saying it wouldn't have contributed to

20  value anyway, because it would have been

21  demolished.  I think what you're saying is

22  that if there was a building on it, it would

23

1  have been knocked down to make way for

2  re-development.

3       A    Basically.

4       Q    Is that what you are trying to say?

5       A    Basically.

6       Q    You just don't remember whether

7  there are any other improvement -- buildings

8  or anything on that property other than what

9  you've told me; is that right?

10      A    Certainly nothing noteworthy.

11      Q    In the first portion of your

12 report, you opined "subject to limiting

13 conditions, extraordinary assumptions and

14 hypothetical conditions," that you believe

15 this property as of June 24, '06 is worth

16 $64,800,000.  Is that right?

17      A    That's correct.

18      Q    Your report says -- and I just want

19 you to confirm -- that there were no

20 extraordinary assumptions or hypothetical

21 conditions that had anything to do with this

22 appraisal.

1   tell me.

2       A    I'm unaware of any inaccuracies.

3       Q    Do you perceive this to be
4   complete?

5       A    Yes.

6       Q    As to improvements, it says the
7   site improvements include sidewalk, curbs,
8   and drainage.  Earlier, you told me you
9   couldn't remember if there was any other
10  improvement on this property.  Does this
11  refresh your recollection?

12      A    Yes.

13      Q    Okay.

14      A    That's all I recall.

15      Q    That's fine.  So you and I can
16  confirm that the only improvements that you
17  were involved with here is sidewalks, curbs,
18  and drainage.  Is that accurate?

19      A    Yes.

20      Q    Turning to page 26, you talk about
21  the assessment -- and all that page 26 is
22  whatever is -- whatever the information is at

1   $64 million and change -- 64,800,000 price

2   includes development that would be available

3   only through the use of TDRs?

4       A   That's my recollection, that my

5   unit value of -- whatever it is.

6       Q   Turn to whatever page you want.

7   Tell me where you're going.

8       A   Page 37.  My $65 per FAR.  And the

9   allowable development, I used 987,000,

10  997,000 square feet, which I think might have

11  been the 10 FAR or the 9.6 -- don't recall.

12  You could calculate it, obviously -- and that

13  then became the total.  So TDRs were

14  involved.

15      Q   So your 64,800,000, that number is

16  necessarily dependent on the use of TDRs to

17  develop the site; is that right?

18      A   Yes.

19      Q   Looking at page 37, you have

20  indicated that it's your opinion as of June

21  24th, '06 that the FAR value as of that date

22  in this locale was $65 a foot; is that right?

1   A   That's right.

2   Q   You then multiply that 65, and you

3   stand by that, don't you, the $65?

4   A   Yes.

5   Q   You then multiply this number times

6   997,229.  How did you arrive at the 997,000

7   number?

8   A   I would have either used -- and I

9   don't see immediately which way I

10  did -- 10 times the site value because of the

11  maximum allowable, including TDR development

12  potential of 10, or I might have used the 9.6

13  because that's what the developer was

14  planning to do.  So the answer is partially

15  either 10 or 9.6 FAR.

16  Q   Now, you're an expert.  I want to

17  you to assume a hypothetical for me, if you

18  would.  If you need a calculator, we'll get

19  you one.  I'll proffer to you that the

20  as-right FAR here is 6.5.  I don't think

21  there is a dispute about that in this

22  case -- I want you to take the 6.5, apply a

41

1    6.5 factor to the site times $65 of TDR -- or

2    not a TDR -- $65 in FAR -- and tell me what

3    that number would be?

4             MR. COOTER:  You need a calculator?

5             THE WITNESS:  Have you got one

6    handy?

7             MR. COOTER:  I believe so.

8             (Discussion off the record)

9             MR. COOTER:  Let's go back on the

10   record.

11            BY MR. COOTER:

12   Q    I think what I asked you to do was

13   to calculate -- using what you believed to be

14   the proper FAR value of $65, and a 6.5 FAR as

15   of right, what's -- and however many feet are

16   on this piece -- what would that indicate to

17   you is the value of the ground -- on those

18   assumptions -- the value of 90 K -- not just

19   the ground; the value of the property.

20   A    Mathematically, it comes out to

21   43,888,000 and some change.

22   Q    Now, looking at the methodology of

42

1   your report versus the calculation that you

2   just did, what you did was you assumed $65 a

3   foot, per FAR foot, and then multiplied it

4   times 9.6; right?

5       A    Right.

6       Q    To get to 64,800,000.

7       A    Right.

8       Q    There's nothing the matter, as you

9   see it, with doing an arithmetical exercise.

10  I take it -- by taking the FAR foot price,

11  multiplying it times the allowed density and

12  reaching a value conclusion -- I mean,

13  there's nothing the matter with that; right?

14  Because that's what you did.

15      A    As long as it's a

16  mathematical -- something we're playing as

17  opposed to appraising.

18      Q    Well, I don't understand that.

19      A    Then let me clarify if I may.

20      Q    Go ahead.

21      A    It would not be proper appraisal

22  technique to only use 6.5.

43

1     Q    Why?

2     A    Because an appraiser takes into

3  account what is readily achievable through a

4  zoning office.

5     Q    Will you confirm for me that

6  essentially what you did is you used 9.6

7  because you assumed that that which was

8  readily achievable were some TDRs?

9     A    Yes.

10    Q    And that if you take the

11 equation -- if you take TDRs out of the

12 equation, that which is achievable is not

13 9.6, but rather, 6.5; right?

14    A    Yes.

15    Q    And then if you do that

16 mathematical exercise, the indicated value

17 is -- what you did you say?

18    A    Call it $44 million -- but that's

19 not good appraisal.  And any appraiser who

20 does that would not be doing what he's

21 supposed to be doing.

22    Q    And the reason that you say, I take