**EXHIBIT 13**

**Capital Reporting Company**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3   ------------------------------:
                                   :
 4   MONTGOMERY ROAD I LIMITED     :
                                   :
 5   PARTNERSHIP,                  :
                                   :
 6              Plaintiff,         : Case No.
                                   :
 7        v.                       : 1:06CV00344 (HHK)
                                   :
 8   VIAD CORP.,                   :
                                   :
 9              Defendant.         :
                                   :
10   ------------------------------: Pages 1 - 229

11                              Washington, D.C.
                                Tuesday, November 14, 2006
12   Videotape 30(b)(6) Deposition,

13       MONTGOMERY ROAD I LIMITED PARTNERSHIP

14   Individual deposition, SAMUEL G. ROSE,

15   called for oral examination by counsel for the

16   Defendant, pursuant to notice, at the law offices of

17   BRYAN CAVE, LLP, 700 Thirteenth Street, Northwest,

18   Twelfth Floor, Washington, D.C., before Marijane

19   Simon, RDR, CLR, of Capital Reporting Company, a

20   Notary Public in and for the District of Columbia,

21   beginning at 9:40 a.m. when were present on behalf

22   of the respective parties:
```

Capital Reporting Company

Page 2

```
 1   On behalf of the Plaintiff:
         DALE A. COOTER, ESQUIRE
 2       COOTER, MANGOLD, TOMPERT & WATSON, LLP
         5301 Wisconsin Avenue, NW
 3       Suite 500
         Washington, DC  20015
 4       (202) 537-0700
         (202) 364-3664 (Fax)
 5       dcooter@cootermangold.com

 6   On behalf of Defendant:
         RODNEY F. PAGE, ESQUIRE, and
 7       ALICIA I. HOGGES-THOMAS, ESQUIRE
         BRYAN CAVE, LLP
 8       700 Thirteenth Street, Northwest
         Twelfth Floor
 9       Washington, DC  20005-3960
         (202) 508-6002
10       (202) 508-6200
         rfpage@bryancave.com
11

12

13

14

15
                        *  *  *  *  *
16

17

18

19

20

21

22   . . .
```

**Capital Reporting Company**

Page 74

1  seeks a declaratory judgment that the finding --
2  says "above findings" of the independent accountants
3  as to 90 K Street are valid, binding, and
4  enforceable as to Defendant VIAD.
5           Do you see that?
6      A.   Yes.
7      Q.   And the independent accountants referred
8  to there is the Reznick firm; is that correct?
9      A.   Well, it doesn't mention their name here,
10 but I --
11     Q.   No, but you would agree with me it's the
12 Reznick opinion here?
13     A.   I assume it is.
14     Q.   It's referred to elsewhere and I -- we can
15 go back to the complaint.
16          My question to you, Mr. Rose, is this.
17 What is the basis for contending that the
18 "findings," as they're referred to here, of Reznick
19 are binding on VIAD?
20     A.   Well, the basis is, Eve Fiorucci and I
21 talked for, probably, three years about our problems
22 in -- in -- in regard to the accounting and --

**Capital Reporting Company**

Page 75

1  because we had gotten a letter from them sometime
2  during one of our other potential sales saying that
3  there was a disagreement with our accounting -- that
4  they did not think we should be able to get interest
5  on our equity.
6          And I said, Well, why don't we have -- I
7  disagree with you.  I think you can interpret the
8  agreement this way or that way and whether it's --
9  whether it's interest on equity or interest on
10 loans -- I think this -- we ought to get this
11 discrepancy out of the way because this was hurting
12 our ability to sell.  Every time we'd try to sell
13 it, we'd get into a discussion about this.
14          And she agreed and said, I can't do
15 anything.  I don't have the authority to hire some
16 accountants.  Because under the Cash Participation
17 Agreement, there was a paragraph where we could
18 settle differences by picking an accountant.  And,
19 finally, she said her general counsel said yes, she
20 could go ahead.  And that's when she sent me the
21 names of the accountant.  And that's when they were
22 hired.

Capital Reporting Company

Page 76

1       So I assume this comes about as us saying
2  that we don't understand why, since the accountant
3  you picked held against you, that you now want to
4  say that's not binding.
5       So isn't that where this comes about?  I
6  think I'm trying to follow it.
7       Q.   Okay.  Now, you referred to Eve Fiorucci;
8  correct?
9       A.   Yes.
10      Q.   And have you ever met her, by the way?
11      A.   I never have.
12      Q.   And what did you understand her role or
13 activity to be in connection with this?
14      A.   Well, anytime I called with questions over
15 the years, you know -- because, you know, we almost
16 sold this property three times -- she was the person
17 I was directed to discuss this issue for
18 Greyhound -- she was always the point person.
19      Q.   All right.
20      A.   And whether we had questions about
21 accounting or questions about settlement, she was
22 the one that seemed to be -- to represent Greyhound

Capital Reporting Company

Page 77

1  or VIAD.

2  Q. Do you know what her title or position is?

3  A. I have no idea. Probably on some of the

4  letters she sent me, but I really -- I don't know.

5  Q. What was it that triggered the

6  conversation, if you recall, that -- that led to

7  bringing in an accountant?

8  A. There were 330 conversations by my

9  recollection and she continued to -- She would say

10 she would look into the matter and call me back and

11 nothing would happen. I'd call her back after two

12 months and say, Let's do something before a sale

13 arises again, because I don't want to have this

14 issue staring us in the face. It had already

15 interfered with some other sales.

16     And she said she would. She didn't live

17 up to that promise, and I kept bugging her and we

18 talked. And years went by.

19     And, finally, she said she had -- someone

20 had told her, someone in a -- in -- in more -- in a

21 higher position, position of authority, that she

22 could get an accountant. And she was talking to the

1   general counsel. I know she said she was talking to
2   a female attorney who was their in-house counsel --
3   and they were ready to go so maybe we could get this
4   behind us, this difference about accounting.
5       Q.   All right. Now, in those conversations,
6   is it your testimony that Ms. Fiorucci stated that
7   the work or opinion of an accountant would be
8   binding on the parties?
9       A.   We were talking about -- We didn't discuss
10  that issue. It was -- We were talking about --
11  as -- as it's provided in the agreement so that
12  it -- it --
13      Q.   Where -- I'm sorry. Go ahead.
14      A.   There was always something you could get
15  if -- if the two of us picked one. The only thing I
16  did say to her that seemed to trigger some action is
17  that I would be willing to pay for it just so this
18  issue wasn't hanging there but we both were talking
19  about it as provided in the agreement, whatever that
20  says.
21      Q.   Now, you've referred now to "the
22  agreement" maybe two or three times.

Page 86

1  the subject of your conversation with Miss Fiorucci?

2      A.   Have not the foggiest idea.  I -- I just
3  told you that we didn't have this agreement in front
4  of us talking about it.  We were talking about a
5  general dispute about these statements.  I didn't
6  pull this thing out.  I can't understand this thing
7  even now so I don't think anybody else can either.

8      Q.   Is it -- Is it your contention that there
9  was an arbitration conducted by Reznick?

10     A.   I don't know that it was arbitration.  It
11 seemed to me -- I don't recollect describing it that
12 way.

13     Q.   All right.  What -- What happened here is
14 that each of you, meaning you, Greenebaum and Rose,
15 and -- and, on the other hand, VIAD -- submitted
16 letters to Reznick.  Is that correct?

17     A.   Eve picked an accountant.  We said we
18 would pay the fee just to get this done.  And the
19 accountant -- And then she wrote a letter in which
20 she, you know, made a comment that she felt it was
21 not binding but it seemed to me we had already
22 agreed that it was.

1  Q. How -- When and how did you agree that it
2  was binding?
3  A. That we spent three years picking them,
4  getting to this point. What's the point of doing it
5  if it's not binding? It was almost assumed. Why
6  would you take years to talk to your accountant, to
7  talk to all the bosses, to pick an accountant, and
8  then say it's not binding? I mean: Why bother?
9  Q. Can you point to any statement or writing
10 by VIAD in which it agreed that the Reznick opinion
11 would be binding?
12 A. Yes. The fact that this called for it to
13 be binding, that their own -- the agreement that
14 they drew called a Cash Participation Agreement
15 said, if we -- if they picked an accountant, it
16 would be binding.
17 Q. It's -- You're relying, then, on the
18 wording of Section 2.7; correct?
19 A. Well, I'm -- I'm relying on the fact --
20 Yes, I guess I'm relying on 2.7.
21 Q. Is there anything else you're relying on
22 when you say that it's binding?

Page 209

1   are now.  Maybe they'll -- There's certainly no --
2   nothing in there that's important to you because
3   there's nothing important in these statements.  In
4   fact, you make a point about auditing.  There's
5   parking income and there's some taxes and a few
6   expenses.  There is nothing going on with the
7   property.
8           What really is a focus is if we make some
9   value out of selling it or developing it but the
10  existing property -- there's no -- nothing going on
11  there.  You seem to be so concerned with getting
12  audited statements.  And even any statements -- what
13  meaning would the statement have?  We got the
14  same -- If you drive by it, the same parking lot,
15  the same charges.  And the taxes have gotten to be a
16  little higher.  What -- What could you be looking
17  for?  Why would you care?  But there's nothing being
18  hidden.  You're going to get these statements.
19          But right now, yes, we think the fact that
20  you're contesting the accountant you picked to -- to
21  resolve this confuses us.  And we're operating under
22  confusion.

Capital Reporting Company

Page 221

1  Why don't -- Maybe I should throw in all the other
2  land I bought --
3      Q.   You agree, do you not --
4      A.   -- under your agreement.  TDRs have
5  nothing to do with you.
6      Q.   TDRs are an interest in the land, are they
7  not?
8      A.   No.
9      Q.   And --
10     A.   TDRs are a right to add to the thing
11 that -- add to the development by going out and
12 paying for them.
13     Q.   There were --
14     A.   There's nothing in here that says you get
15 TDRs.
16     Q.   There is something in here, though, is
17 there not, that says that any interest in the
18 property that is sold -- any interest in the
19 property --
20     A.   Any interest in the property that's sold?
21     Q.   Yes.
22     A.   Uh-huh.  What was sold?