**EXHIBIT 14**

# TRANSCRIPT OF PROCEEDINGS

1

2          In the U.S. District Court

3          For the District of Columbia

4   ----------------------------x

5   Montgomery Road I Limited     :
    Partnership                   :
6                                 : NO. 1:06CV00344

7              v.                 :

8                                 :

9   Viad Corp., et al             :

10  ----------------------------x

11              March 7, 2007

12  DEPOSITION OF:

13              Stuart I. Smith,

14  a witness, called by counsel pursuant to notice,

15  commencing at 2:00 p.m., which was taken at Bryan,

16  Cave, 700 13th Street, NW, Washington, DC 20005

17

19  This transcript has been completely indexed for your convenience. It will help you locate the testimony you want FAST. The index is located in the back pages of this volume.

20

21  **Overnite**
    Court Reporting Service
    Serving Washington, D.C. metro area                    (301) 593-0671

Page 38

1 no question it happened but if you look at the fax
2 low go on top, that's telling me that this is
3 probably a printout of some e-mail that was on my
4 hard drive.
5    MR. PAGE: I think you're right, but
6 let me just say to you that the production of
7 Mr. Smith's file was done by a fax transmission to
8 us from Ms. Mangold. It wasn't received in a hard
9 copy.
10    I mean not in a mailed or delivered
11 copy. I think she assembled it all and faxed us the
12 whole set.
13    MR. COOTER: I accept that. I just
14 tell you as part of the process we would normally,
15 in the interest of full disclosure, search our own
16 files to see if we had anything, and I'm sure that's
17 what she did.
18    MR. PAGE: I'll accept that.
19 Whichever file it came from, the point is it was
20 produced in connection with his report.
21    MR. COOTER: It is what it is.

Page 39

1 BY MR. PAGE:
2    Q. Exhibit number eight which I'm going to
3 hand you now is also apparently a draft report and I
4 want to call your attention in the cover e-mail on
5 exhibit eight to the subject line of your e-mail,
6 Mr. Smith.
7    (Whereupon the proffered item was
8    marked as exhibit number 8.)
9 BY MR. PAGE:
10    Q. In the first e-mail your subject was
11 90 K Street. In the second one, exhibit eight, it
12 says "draft report to."
13    Do you see that?
14    A. Yes.
15    Q. That's why we're assuming --
16    A. That's probably consistent with the tag
17 line.
18    Q. There is a number three as well.
19    A. Yes.
20    Q. Again for efficiency, let's just get them
21 out on the table.

Page 40

1    MR. COOTER: I'm obviously right, by
2 the way.
3    If you look at the cover e-mails, it's
4 printed out with the name Donna Mangold. That means
5 these came out of our system, not his.
6    MR. PAGE: All I was saying is they
7 were produced in response to our request for his
8 file.
9    MR. COOTER: I have no question about
10 that.
11 BY MR. PAGE:
12    Q. Now you have exhibits 7, 8 and 9. They
13 appear to be three drafts, each of which, Mr. Smith,
14 was provided to Mr. Cooter or his colleague on
15 February 16, if I'm reading the e-mail time stamps
16 correctly.
17    A. That appears to be the case.
18    (Whereupon the proffered item was
19    marked as exhibit number 9.)
20 BY MR. PAGE:
21    Q. There were two revisions then it appears

Page 41

1 based on -- well, let me ask. You tell me. Was
2 there conversation going on with either Ms. Mangold
3 or Mr. Cooter at this time?
4    A. From my perspective there's only one final
5 report.
6    Even the tag line indicates these are
7 basically editorial changes.
8    As I indicated, we were trying to do this
9 thing quickly. There were some requirements to get
10 a report out to you, I believe.
11    So Mr. Cooter was kind enough to give me
12 some editorial advice, typos, word things, things
13 like that.
14    Q. Let's explore that a little bit. Look at
15 exhibit seven, if you would, the first of the three.
16    A. Yes.
17    Q. I'm going to call your attention initially
18 to page four of your letter.
19    A. Okay.
20    Q. About a third of the way down the page to
21 paragraph number two, do you see that?

Page 42

1  A. Yes.
2  Q. The sentence in that paragraph number two
3  reads as follows: "At present, TDR's are being
4  traded in the $3.50 per square foot range for
5  downtown Washington locations."
6      Do you see that?
7  A. Yes.
8  Q. That is, in fact, consistent with what you
9  just told me about the state of your knowledge in
10 your memory banks at the time you took this
11 assignment, correct?
12 A. Correct.
13 Q. Is it fair to say that this number in the
14 draft is derived from the experience you just
15 described to me a minute ago?
16 A. Correct.
17 Q. In the next exhibit, number eight, if we
18 turn to the same page four and look at the same
19 paragraph number two, that sentence has been
20 deleted.
21     Do you see that?

Page 43

1  A. I do.
2  Q. That holds through the next exhibit which
3  is number nine and also in your final report.
4  A. Yes, sir.
5  Q. Can you tell me how it is that it came to
6  be that the sentence describing your experience as
7  to the dollar value of TDR's was deleted from the
8  letter?
9  A. Well, when I went back and reviewed this,
10 while that might be an interesting number, I didn't
11 think it was germane to the scope of the assignment.
12     I wasn't really there to value TDR's. I was
13 there to review the report. I did an appraisal
14 review of the report, a desktop review, if you will,
15 and this was something that I felt wasn't germane to
16 the final report.
17 Q. Was it your suggestion or initiation that
18 that sentence be deleted?
19 A. I don't remember whether it was my
20 suggestion or not. I remember talking with
21 Mr. Cooter about it and decided to -- it's always my

Page 44

1  decision whether to leave it in or take it out. I'm
2  the author.
3      I take responsibility for it. I did discuss
4  it with Mr. Cooter.
5  Q. Is it your testimony today that you don't
6  remember whether he told you to take it out or not?
7  A. No one tells me to do anything.
8  Q. Did he recommend that you take it out?
9  A. No. We discussed it. I know that we
10 discussed it.
11 Q. You took it out because you concluded that
12 the value of TDR's was not germane to your report?
13 Is that your testimony?
14 A. The value of the TDR as an individual
15 price was not germane, correct. Remember my report
16 is a review report. I'm reviewing what Cushman and
17 Wakefield did.
18     That was the scope of my assignment. I was
19 not doing a de novo appraisal. That's why I felt it
20 was appropriate to take it out.
21 Q. Let me look at a couple of things that are

Page 45

1  in your first draft. Turn to page three, the first
2  version, exhibit seven.
3  A. Sure.
4  Q. At the top it says "February 15, page
5  three."
6  A. Yes.
7  Q. About two thirds of the way down the page
8  there is a paragraph that begins: "As of the date
9  of value."
10     Do you see that?
11 A. Yes, sir.
12 Q. The sentence that I'm kind of focusing on
13 here is that sentence that I just started to read.
14     It continues as follows: "It is our
15 understanding that the Montgomery Road Limited
16 Partnership did not own in that partnership any
17 additional TDR's. Therefore ..." and then it goes
18 on.
19     Do you see that?
20 A. Yes.
21 Q. That sentence, that statement that as to

Page 46

1  your understanding does not appear in the next draft
2  or in the subsequent drafts or the final report,
3  correct?
4     A. Correct.
5     Q. Can you tell me why it is that that was
6  changed from the first draft?
7     A. Because I was unable to confirm it. It
8  was my understanding -- this was my understanding
9  but I was unable to confirm it one way or the other.
10    Q. What efforts did you make to confirm it?
11    A. It was one of the questions I was going to
12 ask Mr. Liffman. That's when we sort of stopped in
13 our discussion midstream.
14       I actually asked Mr. Cooter if he knew and
15 he didn't respond.
16    Q. The first draft which is exhibit seven was
17 sent to Mr. Cooter at 10:12 a.m. on February 16 and
18 the second draft was sent to him just an hour and
19 twelve minutes later at 11:24 a.m.
20       I assume some time between roughly 10:15 and
21 11:15 you were on the phone with Mr. Cooter to

Page 47

1  discuss the first draft.
2     A. Yes, sir.
3     Q. In that telephone conversation your
4  testimony is you asked him to confirm that
5  Montgomery Road Limited Partnership did not own any
6  additional TDR's?
7     A. Correct.
8     Q. And he refused to answer you, is that what
9  you're saying?
10    A. He didn't feel that -- I just didn't get
11 the information. You'll have to ask him why it was,
12 but I didn't get the information.
13    Q. In your first draft you stated that it was
14 your understanding. Did you have any basis for
15 making that initial assumption when you prepared
16 your letter?
17    A. It was based on my initial conversation
18 with Reid Liffman where I asked him, started to ask
19 him about any TDR's and the issue would have gone in
20 a technical direction and he said he didn't think it
21 was appropriate to pursue.

Page 48

1       I asked Mr. Cooter if there was anything
2  else he could shed information on and I think he
3  felt it wasn't germane to my assignment or didn't
4  share it with me.
5     Q. Why did you think it was relevant to the
6  first draft that you know whether or not Montgomery
7  Road owned TDR's?
8     A. I thought it was a useful bit of
9  information.
10    Q. In the first draft, again looking at that
11 same paragraph --
12    A. Let me explain to you. TDR's are a
13 commodity and it's useful in an appraisal to know
14 who owns that commodity.
15       What I was trying to establish there was
16 what did Montgomery Road Limited Partnership itself
17 own in terms of TDR's.
18    Q. In the paragraph that precedes, in the
19 first draft --
20    A. Number seven?
21    Q. Yes. The paragraph that precedes the

Page 49

1  sentence we've been focusing on you
2  write: "However, in reading the report there is no
3  indication that the potential additional FAR of
4  322,022 feet had been acquired."
5       Do you see that?
6     A. Correct.
7     Q. I am taking from these two perhaps that
8  your statement that the as is value had to be based
9  or would be based appropriately on the 675,000 FAR
10 in your first draft was based on the assumption that
11 the owner of the property did not at that time have
12 any additional FAR for TDR's?
13    A. That is correct.
14    Q. What you were simply stating here was your
15 understanding that that was the case?
16    A. Correct.
17    Q. Would it have changed your view to know at
18 that time that in fact Montgomery Road Limited
19 Partnership did own TDR's?
20    A. No.
21    Q. It would not have changed your view as to

Page 50

1  whether those were available and should have been
2  included in the valuation?
3      A.  We're sort of getting out of focus. What
4  we need to focus on is my review of the Cushman and
5  Wakefield report.
6         In that regard what my review suggested was
7  that the definition that was provided in the Cushman
8  and Wakefield report reporting an as is value was
9  incorrect in that it was based on TDR's that were
10 not part of the definition of an as is value because
11 TDR's are a separate commodity.
12        If a developer has two pots, in one pot he
13 owns the land and in one pot he may or may not own
14 additional development rights, and perhaps awkwardly
15 what I was trying to assert here in the final
16 version at least was that fact, that they are two
17 separate things and under the definition of an as is
18 value you can't merge them.
19        There are some other values that you can
20 define, hypothetical values, assuming things that
21 are not making other assumptions but in the

Page 51

1  definition of an as is value you can't make those
2  assumptions.
3      Q.  We'll go back to the final report in a few
4  minutes.
5         I want to turn your attention to, and maybe
6  this is simply consistent with what you said, the
7  next page of exhibit seven.
8      A.  Yes.
9      Q.  This is page four again. After paragraph
10 two which we talked about a minute ago you will see
11 the paragraph that begins: "Thus, it is our
12 opinion."
13        Do you see that?
14     A.  Yes, sir.
15     Q.  There is a phrase there: "Should be
16 limited to the property rights actually owned."
17        Do you see that?
18     A.  Correct.
19     Q.  I think if we turn to your last report,
20 that phrase is missing, is that not correct?
21     A.  That I don't know.

Page 52

1      Q.  Let's turn to exhibit nine then.
2      A.  Exhibit nine?
3      Q.  Yes. It's the third version. Look at the
4  same paragraph on page four.
5      A.  Okay.
6      Q.  The phrase has been changed to read as
7  follows: "The as is value ... "
8         MR. COOTER:  What page are you on?
9         THE WITNESS:  Page four.
10     Q.  "As is value should be limited to the
11 property rights approved by the District as a matter
12 of right."
13        Do you see that?
14        THE WITNESS:  Yes.
15 BY MR. PAGE:
16     Q.  That change was made between the second
17 and the third drafts on the morning of February 16?
18     A.  Yes.
19     Q.  Recall for me, if you will, why it is and
20 how it came to be that that change was made.
21     A.  I think it was unclear. I think I do

Page 53

1  remember that one. I think Mr. Cooter pointed out
2  it was an unclear sentence and asked me if I could
3  clarify it.
4      Q.  Did he tell you what he thought was
5  unclear about it?
6      A.  My recollection was the issue of what an
7  as is value constitutes. He thought that the
8  sentence itself was unclear, asked me if I could
9  rewrite it.
10     Q.  Did he suggest the words you should use?
11     A.  No, sir.
12     Q.  If you look -- again, I'm looking at the
13 original draft, exhibit seven, page five.
14     A.  Yes?
15     Q.  The paragraph at the top of the page, do
16 you have that?
17     A.  Yes.
18     Q.  It begins with the words "in essence." Do
19 you see that?
20     A.  Yes.
21     Q.  In the first draft, the second sentence of

Page 62

1  additional consideration certain TDR's from the
2  seller (the TDR agreement)."
3      Do you see that?
4     A.  Yes.
5     Q.  Did you have any discussion with
6  Mr. Cooter or Mr. Liffman about this particular
7  paragraph?
8     A.  I did not.
9     Q.  Did you ask any questions about this other
10 agreement that is referred to here?
11    A.  I did not.
12    Q.  Do you know what the consideration that is
13 referred to in this agreement is or was?
14    A.  I do not.
15    Q.  Do you know who the parties were to the
16 TDR agreement?
17    A.  Not with certainty.
18    Q.  Were you ever shown a document called the
19 umbrella agreement?
20    A.  No.
21    Q.  Were you ever told that the sale of this

Page 63

1  property was contingent and conditioned upon the
2  purchase of the TDR's in the other agreement?
3     A.  No, but is that something that's in this
4  document?
5      It's been a while since I've read this
6  document.  But I was not told.
7     Q.  I'm going to hand you a document we've
8  marked as exhibit twelve.
9         (Whereupon the proffered item was
10        marked as exhibit number 12.)
11 BY MR. PAGE:
12    Q.  My question to you is have you seen this
13 document?
14    A.  I have not seen this document.
15    Q.  I'm not asking you to read it but I want
16 to ask you just a couple of quick things.
17    A.  Sure.
18    Q.  Look at the very first paragraph at the
19 top.
20    A.  The umbrella agreement?
21    Q.  Yes.  There's a reference there to

Page 64

1  45 L Street Venture.  Do you see that?
2     A.  I do.
3     Q.  Was there ever any discussion with you
4  about a property at 45 L Street in any way in
5  connection with your work looking at the document
6  that you looked at?
7     A.  No, sir.
8     Q.  Are you aware of a sale of the property at
9  45 L Street at about the same time the property at
10 90 K Street was sold?
11    A.  No, sir.
12    Q.  What I'd like to do now is go back to your
13 final report and, as I said, I think it's attached
14 to exhibit two.
15      Are you looking at a copy other than our
16 exhibit?
17    A.  Correct.
18    Q.  I prefer you look at the exhibit.  For
19 everybody's clarity, my view is you should not have
20 other documents in front of you except the exhibits.
21 Do you agree with that, Mr. Cooter?

Page 65

1         MR. COOTER:  I don't quarrel with the
2  notion that he shouldn't look at your documents.
3         MR. PAGE:  I don't want there to be
4  any dispute about which version of the final report
5  we're looking at, so use the exhibit which is
6  exhibit two.
7         That way we will always know we're
8  looking at the same document when it is attached to
9  the report.
10 BY MR. PAGE:
11    Q.  There are a few things I want to ask you
12 about here.  Some of these may have already been
13 alluded to.
14      I'm not trying to be redundant but I want to
15 make sure I've got the whole picture here.
16      The assignment that you had in preparing
17 this letter was not to do your own opinion of value.
18 That is correct, is it not?
19    A.  Correct.
20    Q.  What you did, as I understand it, is
21 something that in the jargon of appraisers is called

Page 66

1 an appraisal review.
2   A. Correct.
3   Q. An appraisal review is actually a term of
4 art in the appraisal business, is it not?
5   **A. I don't know what you mean by a term of**
6 **art.**
7   Q. There are published standards by the
8 Appraisal Institute as to how to conduct an
9 appraisal review, are there not?
10   A. Correct.
11   Q. There are basically two kinds of appraisal
12 reviews, if I'm correct.
13      There's one in which an appraiser sets forth
14 his own alternate opinion of value and one in which
15 the appraiser does not.
16   A. That's correct.
17   Q. You did the latter in this case, am I
18 correct?
19   **A. The one where the appraiser does not,**
20 **correct.**
21   Q. So that neither as an original proposition

Page 67

1 nor as a reviewer did you come to an opinion of
2 value yourself?
3   A. Correct.
4   Q. I think in the fourth paragraph on the
5 first page you state specifically you are not
6 performing your own opinion of value, producing your
7 own opinion of value, is that correct?
8   A. Yes.
9   Q. In the fifth paragraph on this first page
10 right after what I just asked you about you
11 state: "We have introduced some additional market
12 information that should have been considered as of
13 the date of value and some additional information
14 regarding the pending/actual sale of the property
15 which may not have been known to Mr. Halbert at the
16 time of his report."
17      Do you see that?
18   A. I do.
19   Q. Let me deal with the second piece of that
20 first.
21   A. All right.

Page 68

1   Q. Your first in the second half of that
2 sentence is to the actual sale pursuant to the
3 document we looked at a minute ago, correct?
4   A. Correct.
5   Q. In sequence that occurred after the
6 report, the appraisal report that Mr. Halbert
7 prepared, right?
8   A. Correct.
9   Q. So the contract itself had not even been
10 entered into at the time you did this report?
11   **A. Probably not.**
12   Q. We have the date of the contract.
13   A. Yes.
14   Q. Sequentially it just happened, right?
15   A. Yes.
16   Q. You took into account the fact that there
17 was a later sale is what you're saying, right?
18   **A. Yes. I didn't take into account. I just**
19 **simply reported there was a later sale which I**
20 **thought was useful to my client in this document but**
21 **I wanted to make sure that the reader understood**

Page 69

1 **that I was not judging Mr. Halbert on the basis of**
2 **information he may or may not have known.**
3   Q. Because he couldn't have had that
4 information?
5   A. Yes.
6   Q. Let's focus on the first part of the
7 sentence. You say: "We have introduced some
8 additional market information that should have been
9 considered as of the date of value."
10      What information is that?
11   **A. I don't remember. May have been -- I'm**
12 **trying to think of what that was.**
13   Q. Did you look at any information relating
14 to comparable sales?
15   **A. I did not, other than what was missing in**
16 **Mr. Halbert's report.**
17   Q. You don't recall today then what that
18 additional information was?
19   **A. No, sir, I don't.**
20   Q. If as we go through the rest of your
21 report it occurs to you as you look at something

Page 82

1  You were telling me what you thought an as
2  is value meant, what it was, and I'm only asking you
3  whether in developing an as is value standards rule
4  1-3 applies to the development of an as is value?
5     A. Yes. These all apply to Mr. Halbert's
6  development of his report.
7     Q. Standards rule 1-3A states "an appraiser
8  must identify and analyze the effect on use and
9  value of existing land use regulations reasonably
10 probably modifications of such land use regulations,
11 economic supply and demand, physical adaptability of
12 the real estate and market trends."
13    Do you see that?
14    A. Yes.
15    Q. Is it your contention that what
16 Mr. Halbert did went beyond looking at existing land
17 use regulations, reasonably probable modifications,
18 et cetera?
19    A. I don't think the right word is "going
20 beyond."
21    I think the definition he proposed in his

Page 83

1  report in his appraisal was incorrect. It made some
2  assumptions about the density of development on the
3  site which were not necessarily with the definition
4  of as is value.
5     He could have come to those conclusions that
6  he made by offering or providing a different value
7  other than an as is value or he could have provided
8  a value where he would have qualified that by
9  specifically providing or identifying whether there
10 was a hypothetical or extraordinary assumption, but
11 he didn't.
12    Q. In fact, it should have been, in your
13 view, an extraordinary assumption?
14    A. Correct.
15    Q. Extraordinary because of what?
16    A. Of the definition of --
17    Q. Look on the same page that we have in
18 front of us from the standards.
19    A. Okay.
20    Q. Under standards rule 1-2 there's a
21 requirement that an appraiser identify any

Page 84

1  extraordinary assumptions.
2     Do you see that?
3     A. 1-2? What are you looking at?
4     Q. Exhibit 14, start on the second page which
5  has standards rule 1-2.
6     Do you see that?
7     A. Correct.
8     Q. This standard states: "In developing a
9  real property appraisal an appraiser must," and then
10 if we skip down to item F which is on the third page
11 which is where we were, "identify any extraordinary
12 assumptions."
13    Do you see that?
14    A. Yes.
15    Q. Then it provides what appears to be some
16 qualifications or definitions, if you will, of the
17 extraordinary assumption.
18    Do you see that?
19    A. Yes.
20    Q. Your testimony was that had Mr. Halbert
21 said there's an extraordinary assumption his values

Page 85

1  would have been okay, is that right?
2     A. If he had conditioned this assumption that
3  this was an extraordinary assumption then yes, he
4  could have stated that.
5     Q. What would have been the extraordinary
6  assumption that he should have revealed?
7     A. The fact that the FAR that he was basing
8  it on, I think what he called potential density, he
9  didn't indicate in his report that they had these
10 additional FAR in their pocket. He simply called
11 them potential development density. That's just
12 incorrect.
13    Q. Incorrect because?
14    A. Because he called it potential
15 development.
16    He described it as potential development
17 density, not something that's in their pocket that
18 would be reflected in an as is value.
19    Q. You are not saying that any potential
20 change in the property has to be excluded or
21 categorized as extraordinary, are you?

Page 86

1  A. I'm simply talking, my report simply talks
2  about one factor, the fact that he describes this as
3  potential development density. That's what he says.
4  He calls it potential development density. That is
5  not a direct as is value, represents an
6  extraordinary assumption.
7  Q. Is your opinion based on your
8  understanding and analysis of TDR's or his choice of
9  words?
10  A. Both.
11  Q. What about the TDR's in your opinion makes
12  them merely potential?
13      MR. COOTER: Makes them what?
14      MR. PAGE: Potential.
15      THE WITNESS: The fact that he calls
16  them -- I'm reviewing his report. I'm reviewing his
17  report.
18      I've said to you that I took on face
19  value that what he tells me is correct. He tells me
20  that these are potential development rights. That's
21  what he's telling me.

Page 87

1  BY MR. PAGE:
2  Q. It's his choice of words that --
3  A. I don't know whether it's his words or
4  whether it's accurate or not accurate but he
5  simply -- he talks -- the developer reportedly has
6  plans for a 9.6 FAR development.
7      If he had those -- TDR's are a commodity.
8  They are separate from the real estate. You can own
9  real estate without TDR's. You can own real estate
10  with TDR's.
11      This seems to say that the developer
12  reportedly has plans for another building and has
13  potential additional density.
14      When I read the report, it didn't seem as
15  though that was in their pocket, the density to
16  enable them to go up to 997,222 square feet.
17  Q. You made no inquiry to find out whether
18  that was the case?
19  A. That was not part of the scope.
20  Q. It's merely his choice of the words that
21  raises a red flag with you because he didn't

Page 88

1  demonstrate the ownership, is that correct?
2  A. He did not demonstrate the ownership and
3  described it as being potential.
4  Q. When you point out in your letter that
5  Mr. Halbert says the developer reportedly has plans
6  for a 9.6 FAR multi-building development, you are
7  quarreling with that statement by Mr. Halbert, are
8  you not?
9  A. And the fact that in his discussion of
10  density he doesn't indicate that the 300 some odd
11  thousand additional FAR are part of the real estate.
12  Q. Let's do it one at a time. Before you
13  change the subject, let's go back in the sentence.
14  A. Sure.
15  Q. You underlined the word "reportedly," did
16  you not?
17  A. Yes.
18  Q. That's not underlined in his report?
19  A. No.
20  Q. You underlined it because that to you is
21  part of the problem with his analysis, right?

Page 89

1  A. It's one of the things that flagged this
2  as an issue.
3  Q. Because he used the word "reportedly,"
4  correct?
5  A. Correct.
6  Q. You don't know yourself whether in fact
7  the developer had plans for a 9.6 FAR multi-building
8  development.
9  A. All I know --
10  Q. You can answer what I just said yes or no.
11      MR. COOTER: Wait a minute.
12      THE WITNESS: That's not a yes or no.
13  All I know is what's in Mr. Halbert's report.
14  BY MR. PAGE:
15  Q. I didn't ask you that. Just listen to my
16  question.
17  A. Sure.
18  Q. In fact, you don't know whether or not the
19  developer has plans or did at the time for a 9.6 FAR
20  building?
21  A. It was not part of my scope and as a

Page 90

1  consequence I do not know, correct.
2      Q.  Would it make a difference to your view if
3  in fact the developer had such plans?
4      A.  It would have made a difference -- no.  We
5  are appraising the as is value.
6         We are reviewing a report which puts forth
7  the as is value.
8      Q.  You are doing a --
9         MR. COOTER:  Just a minute.  Let him
10 finish.
11        MR. PAGE:  I'm sorry.
12        THE WITNESS:  There are certain
13 criteria that apply to that definition of as is
14 value.
15        As I said before, it could be called
16 with certain conditions, it could be -- you could
17 call that value something else.
18        In my review of his report based on my
19 understanding that the value that was provided based
20 on the 997,229 FAR feet was not an as is value.
21 That's all I'm saying.

Page 91

1  BY MR. PAGE:
2      Q.  Is it your belief and opinion that a
3  property in a receiving zone does not have the
4  ability to assign TDR's to that property as a matter
5  of right?
6      A.  I'm sorry, I didn't understand.
7      Q.  Is it your opinion or belief that a
8  property in a receiving zone can assign to that
9  property TDR's as a matter of right?
10     A.  I'm a little confused.  I don't understand
11 the question.
12     Q.  Let's do it this way.
13     A.  Okay.
14     Q.  Let me draw your attention to one of the
15 sentences in your letter on page four.  About a
16 third of the way down the page you have this
17 paragraph that begins: "Thus, it is our opinion."
18        Do you see that?
19     A.  Yes.
20     Q.  In that paragraph you say: "The as is
21 value should be limited to the property rights

Page 92

1  approved by the District as a matter of right."
2         Do you see that?
3      A.  Correct.
4      Q.  Do you have an opinion as to whether or
5  not being in a receiving zone provides for the
6  ability to have the TDR's as a matter of right or
7  not?
8      A.  A property in a receiving zone is eligible
9  to acquire TDR's.
10        Those TDR's, depending on the market, as you
11 know, may or may not exist at the time the receiving
12 property wants those.
13     Q.  Are you under the impression that it's
14 difficult to acquire the TDR's on the market because
15 they don't exist?
16     A.  Right now, not, but years ago, yes.  It
17 depends.  It's a commodity.
18     Q.  What about June 24, 2006?
19     A.  I would estimate that they could go
20 out -- I have not done a study of the sending zones
21 as to what was available but I presume there was

Page 93

1  enough -- I'll make the presumption that there was
2  enough TDR's in the sending zone that they could
3  have been purchased by a site in the receiving zone.
4      Q.  They could have been purchased for about
5  $3.50, in your opinion, right?
6      A.  All I can tell you is that there are TDR's
7  that have been purchased in the range of $3.50.
8      Q.  Do you know of any TDR's in 2006 in any
9  transaction that were purchased and sold at a price
10 of let's say $50 a square foot?
11     A.  No.
12     Q.  Would that be a market value, in your
13 opinion?
14     A.  What would be a market value?
15     Q.  A sales price of $50 per TDR.
16     A.  There's a difference between price and
17 value.
18        Price is simply a transaction amount and
19 value has certain definitions associated with it,
20 willing buyer, willing seller.
21     Q.  Would it be a fair market value for TDR's