**EXHIBIT 45**

# GREENEBAUM AND ROSE ASSOCIATES

5301 WISCONSIN AVENUE, N.W.
SUITE 510
WASHINGTON, D.C. 20015

TEL (202) 686-3000
FAX (202) 686-3617

November 2, 2006

Viad Corporation
1850 North Central Avenue
Suite 800
Phoenix, Arizona  85004-4545

Re:  90 K Street, N.E.
Right of first refusal

Dear Gentlemen:

Enclosed is a notice that the contract of sale before us has been modified.

Two problems have arisen generating the contract modifications.  These changes reduce the purchase price of the 90 K property by approximately five million dollars. Approximately one million dollars of the reduction is due to a substantial amount of contaminated soil found on the subject property.  The second reduction (four and a half million dollars) is due to a pending comprehensive plan change, which if finalized by the D.C. Government will cause the purchaser to lose an entire floor on any new construction.

We have agreed in writing to accept these two changes to the subject contract. Since these changes reduce the purchase price of the subject property we're attaching a formal notice for you to exercise or not exercise your option to purchase the subject property.

Sincerely yours,

Samuel G. Rose

SGR/jls

Enclosures

November 2, 2006


<u>VIA FEDERAL EXPRESS</u>

Viad Corporation

1850 North Central Avenue

Suite 800

Phoenix, Arizona 85004-4545


Re:  Notice of Proposed Sale pursuant to Article 4 of that certain Cash Participation Agreement
     dated November 30, 1987 (the "Agreement"), by and between Transportation Leasing Co.
     <u>("TLC") and Montgomery Road I Limited Partnership ("Developer").</u>


Gentlemen:


Pursuant to Section 4.1(a) of the Agreement, this letter shall constitute written notice from
Developer to Viad, TLC's successor in interest under the Agreement, that Developer has
received a bona fide amendment to the written offer from an unrelated third party, TC
MidAtlantic Development, Inc. ("TCMD") to purchase from Developer, 90 K Street, N.E.,
Washington, D.C. ( the "Property"), along with certain transferable development rights ("90 K
TDRs") that have been acquired by or will be acquired by Developer that adds density to the
Property.  As part of, and contingent upon TCMD's offer to purchase the Property and the 90 K
TDRs from Developer, TCMD has also offered to purchase from 45 L Street Venture, LLC, an
affiliate of Developer (the "Affiliate") an adjacent property known as 45 L Street, N.E., ("45 L"),
as well as certain transferable development rights that the Affiliate has acquired that adds density
to 45 L (the "45 L TDRs").

In accordance with Section 4.1(a) of the Agreement, Developer has attached to this letter fully executed copies of (i) Second Amendment to the Land Purchase and Sale Agreement for the Property (the "90 K Land Contract") and (ii) First Amendment to the Purchase and Sale Agreement for the 90 K TDRs (the "90 K TDR Contract"), (iii) Second Amendment to the Land Purchase and Sale Agreement for 45 L (the "45 L Land Contract), (iv) First Amendment to the Purchase and Sale Agreement for the 45 L TDRs (the "45 L TDR Contract"), and (v) an umbrella agreement (the "Umbrella") by and among Developer, TCMD and the Affiliate, which conditions the purchase and sale of (i), (ii), (iii) and (iv) above, as an interdependent, all or nothing requirement (hereinafter, all of the documents listed in (i) – (v), above, collectively the "Sale Contracts").

Pursuant to Section 4.1(c) of the Agreement, TLC has fourteen (14) days from the date of receipt of this letter to notify Developer in writing of its election to exercise its right of first refusal provided in the Agreement (the "ROFR"). Section 4.1(b) of the Agreement also provides that TLC's failure to timely notify Developer in writing of TLC's election to exercise its right of first refusal shall constitute TLC's election not to exercise this right. In the event TLC fails to timely exercise its ROFR, Developer and Affiliate intend to proceed to close the transaction with TCMD pursuant to the Sale Contracts. We hereby request that you promptly notify Developer in writing of your exercise or waiver of your ROFR.

Sincerely,

Montgomery Road I Limited Partnership

By: Montgomery Road, Inc., its general partner

By: _____

Samuel G. Rose, Vice President

F:\Clients\421\14\TLC ROFR NOTICE LETTER.doc

## UMBRELLA AGREEMENT

THIS UMBRELLA AGREEMENT (this "Agreement") is made and entered into as of the 10th day of August, 2006, by and between (i) MONTGOMERY ROAD I LIMITED PARTNERSHIP, a Maryland limited partnership ("MRLP"), (ii) 45 L STREET VENTURE, LLC, a District of Columbia limited liability company ("45 L"), and (iii) TC MIDATLANTIC DEVELOPMENT, INC., a Delaware Corporation ("Purchaser"). MRLP and 45 L are sometimes collectively referred to as "Seller".

## RECITALS

A.     45 L and Purchaser are parties (i) to that certain Land Purchase and Sale Agreement of even date herewith ("45 L Land PSA") for the acquisition and sale of certain land, together with any improvements, fixtures, structures, and personal property situated thereon and intangible property associated therewith, located in the District of Columbia and known as Square 674, Lot 433 and having an address of 45 L Street, NE, Washington, D.C. ("45 L Property"), and (ii) to that certain 45 L TDR  Purchase and Sale Agreement of even date herewith ("45 L TDR PSA") for the acquisition and sale of transferable development rights which are recorded on the 45 L Property ("45 L TDRs").

B.     MRLP and Purchaser are parties (i) to that certain Land Purchase and Sale Agreement of even date herewith ("90 K Land PSA") for the acquisition and sale of certain land, together with any improvements, fixtures, structures, and personal property situated thereon and intangible property associated therewith, located in the District of Columbia adjacent to the 45 L Property and known as Square 674, Lot 432 and having an address of 90 K Street, NE, Washington, D.C. ("90 K Property"), and (ii) to that certain 90 K TDR Purchase and Sale Agreement of even date herewith ("90 K TDR PSA") for the acquisition and sale of transferable development rights (a) recorded on, and (b) to be contracted for and/or to be acquired and recorded on the 90 K Property (collectively, "90 K TDRs"). The 45 L Land PSA, the 45 L TDR PSA, the 90 K Land PSA, and 90 K TDR PSA are hereinafter individually referred to as a "Sale Agreement", and together referred to collectively as the "Sale Agreements". The 45 L Property, 45 L TDRs, the 90 K Property and 90 K TDRs are hereinafter collectively referred to as the "Sale  Property".

C.     MRLP, 45 L and Purchaser desire to set forth herein certain additional agreements with respect to the Sale Agreements.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby covenant and agree as follows:

1.   **RECITALS.**  The foregoing Recitals are hereby incorporated by this reference and made a substantive part hereof.  Any capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Sale Agreements.

2.   **CLOSING.**  Closing on the transactions contemplated by each of the Sale Agreements shall occur simultaneously on the Closing Date (except that the Secondary Closing under the 90K TDR PSA for the assignment of the To Be Acquired TDRs contract or the To Be Acquired TDRs themselves, shall close subsequent to the Closing Date for the rest of the Sale Property, and as provided in the 90 K TDR PSA), and any extension of the Closing Date under any Sale Agreement shall automatically effect an extension of the Closing Date under the other Sale Agreements, except for an extension that may effect the closing related to the To Be Acquired TDRs.  For example, if the Closing under the 90 K Land PSA is extended pursuant to Paragraph 1.1(a), Section 5.1, or any other provision of the 90 K Land PSA, the Closing Date under the other Sale Agreements shall be automatically extended to the same date even though there is not a corresponding provision in the other Sale Agreements.

3.   **MUTUAL INTERDEPENDENCE.**  It is the express intention of the parties that all of the Sale Agreements are mutually interdependent on each other and that no Closing for the transactions contemplated in one Sale Agreement shall occur without the Closing of the others (except as provided for the 90 K To Be Acquired TDRs).  A default or breach under one Sale Agreement shall be deemed a default or breach under the other Sale Agreements, any exercise of remedies under one Sale Agreement shall be deemed an exercise of remedies under the other Sale Agreements, and any failure to satisfy a condition under one Sale Agreement shall be deemed a failure to satisfy a condition under the other Sale Agreements.  A termination under one Sale Agreement shall be deemed to be a termination under the other Sale Agreements.  In the event of a default or breach, failure of a closing condition, or an exercise of an express termination right under one Sale Agreement, the same shall be deemed to be a default or breach, failure of a closing condition, or an exercise of an express termination right under all Sale Agreements, and consequently the Earnest Money under all Sale Agreements shall be released to Purchaser or Seller, as applicable, in the manner provided under such Sale Agreement.  For example, if Purchaser sends a Due Diligence Termination Notice or elects to terminate the 90 K Land PSA due to a failure of a condition to Purchaser's obligation to consummate the Closing under the 90 K Land PSA, the other Sale Agreements shall terminate and the Earnest Money under all of the Sale Agreements shall be returned to Purchaser.  Similarly, if Purchaser defaults under the 45 L Land PSA, all Sale Agreements shall terminate and the Earnest Money under all of the Sale Agreements shall be delivered to the Seller, as applicable.

4.   **SEVERABILITY.**  If any provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

5.   **BINDING EFFECT.**  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

2

6.    **AUTHORITY.**  Each party represents and warrants to each of the other parties that (i) it has the full right and authority to enter into this Agreement, (ii) the execution and performance of this Agreement will not conflict with any agreement which it is a party, or to its knowledge, binding upon it, and (iii) the person signing this Agreement on behalf of it is authorized to do so.

7.    **CONFLICTS.**  In the event any provision of this Agreement conflicts with any provision of the Sale Agreements, such provision of this Agreement shall govern and control for all purposes and in all respects.

8.    **COUNTERPARTS.**  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

9.    **ENTIRE AGREEMENT.**  This Agreement contains the entire agreement between the parties with respect to the relationship among the Sale Agreements.  No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto.  No waiver of any of the provisions of this Agreement shall be valid unless the same is in writing and is signed by the party against which it is sought to be enforced.

IN WITNESS WHEREOF, the parties hereto have executed this Umbrella Agreement as of the day and year first set forth above:

**PURCHASER:**

TC MIDATLANTIC DEVELOPMENT, INC.
a Delaware corporation

By: _____
Name:  DANIEL S. HUDSON
Title:   PRESIDENT

**45 L:**

45 L STREET VENTURE, LLC, a District of
Columbia limited liability company

By: _____
Samuel G. Rose, Managing Member

3

6.     **AUTHORITY.**  Each party represents and warrants to each of the other parties that (i) it has the full right and authority to enter into this Agreement, (ii) the execution and performance of this Agreement will not conflict with any agreement which it is a party, or to its knowledge, binding upon it, and (iii) the person signing this Agreement on behalf of it is authorized to do so.

7.     **CONFLICTS.**  In the event any provision of this Agreement conflicts with any provision of the Sale Agreements, such provision of this Agreement shall govern and control for all purposes and in all respects.

8.     **COUNTERPARTS.**  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

9.     **ENTIRE AGREEMENT.**  This Agreement contains the entire agreement between the parties with respect to the relationship among the Sale Agreements.  No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto.  No waiver of any of the provisions of this Agreement shall be valid unless the same is in writing and is signed by the party against which it is sought to be enforced.

IN WITNESS WHEREOF, the parties hereto have executed this Umbrella Agreement as of the day and year first set forth above:

**PURCHASER:**

TC MIDATLANTIC DEVELOPMENT, INC.
a Delaware corporation

By:     _____
Name:   _____
Title:  _____

**45 L:**

45 L STREET VENTURE, LLC, a District of
Columbia limited liability company

By:     _____
        Samuel G. Rose, Managing Member

3

**MRLP:**

MONTGOMERY ROAD I LIMITED
PARTNERSHIP, a Maryland limited
partnership

By:  Montgomery Road, Inc., a Maryland
corporation, its general partner

By: _____

Name: _____Samuel G. Rose_____

Title: _____Vice President_____

F:\Clients\421\14\umbrella agreement 8-10-06.DOC

4

## SECOND AMENDMENT TO
## LAND PURCHASE AND SALE AGREEMENT

THIS SECOND AMENDMENT TO LAND PURCHASE AND SALE AGREEMENT (the "Amendment"), dated effective as of October 31, 2006, is entered into by and between **MONTGOMERY ROAD I LIMITED PARTNERSHIP**, a Maryland limited partnership (hereinafter collectively referred to as "**Seller**") and **TC MIDATLANTIC DEVELOPMENT, INC.**, a Delaware corporation, or its assignee and/or designee (hereinafter referred to as "**Purchaser**").

## R E C I T A L S

A.    Seller and Purchaser are parties to that certain Land Purchase and Sale Agreement dated as of August 10, 2006, as amended by First Amendment dated October 11, 2006 (the "Agreement").

B.    Seller and Purchaser desire to amend the Agreement as set forth below.

## A G R E E M E N T

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    <u>Definitions</u>.  All capitalized terms not otherwise defined herein shall have the meanings given them in the Agreement.

2.    <u>Purchase Price</u>.  Paragraph 1.1(f) of the Agreement is hereby deleted in its entirety and is replaced with the following:

> Purchase Price:  Forty-Six Million Thirty-Six Thousand Five Hundred Twenty-Eight Dollars ($46,036,528.00), subject to adjustment as provided herein, and subject to possible rebate as provided in <u>Paragraph 2.3</u> hereof.

3.    <u>Closing Date</u>.  Paragraph 1.1(i) of the Agreement is hereby deleted in its entirety and is replaced with the following:

> Closing Date:  As designated by Purchaser, upon ten (10) days prior notice to Seller, but no earlier than January 2, 2007 and no later than January 10, 2007.

4.    <u>Additional Earnest Money</u>.  The fifth and sixth sentences of <u>Paragraph 1.3</u> of the Agreement are hereby deleted in their entirety and are replaced with the following:

> On November 1, 2006, Purchaser shall deposit additional Earnest Money (the "Additional Earnest Money") with the Escrow Agent in the amount of One Million Three Hundred Ninety-Nine Thousand Eight Hundred Seventy-Nine

Dollars ($1,399,879.00), so that the total Earnest Money shall then be One Million Four Hundred Forty-Eight Thousand Three Hundred Seventy-Nine Dollars ($1,448,379.00). Purchaser acknowledges that the Due Diligence Period has expired, and that the Earnest Money is non-refundable, subject, however, to the other provisions of this Agreement.

     5.    <u>Retail Overlay</u>.  The following provision is added to the Agreement as new Paragraph 2.3:

    2.3    <u>Retail Overlay</u>.

    (a)    Purchaser intends to construct a Proposed Project on the Property, including twelve (12) above-grade floors consisting of a first-floor with a slab to slab dimension of approximately fourteen (14) feet and a Clear Distance of 13'3" – 13'4 ½" as shown on the drawing attached hereto as <u>Exhibit F</u> (the "**Current Plan**") and containing lobby, retail/office and loading, and floors 2-12 containing office or residential uses.  For purposes of this <u>Paragraph 2.3</u> and <u>Exhibit F</u>, "**Clear Distance**" means the distance from the top of the ground floor slab to the bottom of the second floor slab, as illustrated on <u>Exhibit F</u>.

    (b)    Seller and Purchaser are aware that preliminary proposals have been made for the District of Columbia to enact legislation establishing a retail overlay district encompassing the Property, that might require all or a portion of the ground floor of the Proposed Project on the Property to be used for retail purposes and to have a minimum Clear Distance greater than shown on the Current Plan.  Seller and Purchaser agree that if a "Retail Overlay Requirement" (as hereinafter defined) is enacted prior to or within twenty four (24) months following the Closing Date and thereafter becomes effective prior to the issuance of a building permit for any improvements on the Property, Purchaser may be entitled to a rebate of a portion of the Purchase Price in accordance with this <u>Paragraph 2.3</u>.

    (c)    As used in this Paragraph 2.3, "**Building Permit**" means a building permit for the construction of improvements on any portion of the Property; and "**Retail Overlay Requirement**" means any law that (i) affects the Property or the Proposed Project, and (ii) requires all or a portion of the ground floor of the Proposed Project to be retail <u>and</u> to have a Clear Distance greater than shown on the Current Plan, and (iii) is enacted and becomes effective prior to the second anniversary of the Closing Date, and (iv) is enacted and becomes effective prior to the date a Building Permit is issued.  Any law that (A) does not mandate ground-floor retail in the Proposed Project the design of which requires a Clear Distance greater than shown on the Current Plan, or (B) is enacted and becomes effective after the second anniversary of the Closing Date, or (C) is enacted and becomes effective after the date a Building Permit is issued, shall be deemed <u>not</u> to be a Retail Overlay Requirement for purposes of this Agreement, and Purchaser shall not be entitled to a Rebate for Retail (as defined below).

2

(d)    Intentionally Deleted.

(e)    Purchaser agrees to promptly apply for and diligently pursue a Building Permit for the construction of twelve (12) above-grade floors, using all good-faith, commercially reasonable efforts to obtain it as soon as practicable after the Closing Date. The parties acknowledge that unavoidable delays may occur due to necessary modifications to the plans for the Proposed Project (for example, if the City requires a change in design), but Purchaser shall continue to diligently pursue the issuance of the Building Permit at the earliest practicable date, notwithstanding such unavoidable delays.

(f)    In the event a Retail Overlay Requirement is imposed, then subject to the conditions set forth in this Paragraph 2.3, Purchaser may be entitled to a "Rebate for Retail" (as hereinafter defined). As used in this Paragraph 2.3, "Rebate for Retail" is a dollar amount of Four Million Five Hundred Thousand Dollars ($4,500,000.00). In no event shall Seller be liable for any amounts in excess of $4,500,000.00 under this Paragraph 2.3

(g)    Any Rebate for Retail shall be reduced on a dollar-for-dollar basis by the value of any economic or other incentives, benefits, or concessions to which Purchaser shall be entitled in connection with the enactment, effect and implementation of the Retail Overlay Requirement in general or with respect to the Proposed Project, including but not limited to tax incentives (but only to the extent that such incentives, benefits or concessions benefit the owner of the Property, as opposed to a tenant, and would not have otherwise been available but for the imposition of the Retail Overlay Requirement).

(h)    The Rebate for Retail (if any) shall be paid by Seller (or Seller Successor, as hereinafter defined) to Purchaser on the "Secondary Closing Date," (and simultaneously with such Secondary Closing) as such term is defined in the TDR Agreement.

(i)    If Purchaser obtains a Building Permit for the construction of twelve (12) above-grade floors prior to the imposition of a Retail Overlay Requirement, then Purchaser shall not be entitled to the Rebate for Retail. If a Retail Overlay Requirement is enacted prior to the date Purchaser obtains a Building Permit, Purchaser shall nevertheless continue to diligently pursue, using all good-faith, commercially reasonable efforts, obtaining a Building Permit for the construction of twelve (12) above-grade floors as soon as practicable, and if Purchaser obtains such a Building Permit by the second anniversary of the Closing Date, then notwithstanding any provision hereof to the contrary, Purchaser shall not be entitled to the Rebate for Retail. Seller may, in its sole discretion, extend the date for payment of the Rebate for Retail for an additional six (6) months beyond the twenty-four (24) month period to allow additional time for Purchaser to pursue a Building Permit to contruct a building with twelve (12)

3

above-grade floors, and the seller under the TDR Agreement shall extend the Secondary Closing Date for the same additional six (6) month period. If Purchaser obtains a Building Permit for the construction of twelve (12) above-grade floors prior to the expiration of such six (6) month period, Purchaser shall not be entitled to the Rebate for Retail.

(j)     At or after Closing, Seller may establish a trust or other entity for the benefit of the partners of Seller (the "Seller Successor"). Purchaser agrees that at or after Closing, Seller shall have the right to assign (by written assignment and assumption a fully executed copy of which shall be delivered to Purchaser) its rights and delegate its obligations under this Paragraph 2.3 to the Seller Successor or directly to the partners of Seller.

(k)     Purchaser shall use all commercially reasonable efforts to minimize or avoid the impact of any Retail Overlay Requirement, including but not limited to the following: (i) work with city officials to reduce retail space, or reduce the Clear Distance of any required retail space such that the Proposed Project does not require a Clear Distance in excess of that shown on the Current Plan, (ii) design the building to encompass limited retail space on the first floor and still allow for twelve (12) above-grade floors, and/or (iii) taking advantage of the topography of the site, with additional grading to the extent practicable, to allow for the development of ground-floor retail space along the lowest points of the site so that twelve (12) above-grade floors may be constructed within the applicable height restrictions. It is understood that Purchaser shall not be required to take any action which materially reduces the utility of the space or is not typical for a first-class office building in Washington, DC, which materially increases the cost of development and/or construction of the Proposed Project, or which otherwise materially and adversely affects the Proposed Project (and specifically, by way of illustration and not in limitation, Purchaser shall not be obligated to design separated slab, undergo material additional excavation or other similar measures not currently reflected on the Current Plan in an effort to preserve a building with twelve (12) above-grade floors). The actions and methods used by landowners or developers of similarly affected properties shall be taken into account in determining what actions and methods could be used by Purchaser to minimize or avoid the impact of any Retail Overlay Requirement, and whether such actions are reasonable and prudent with respect to the Proposed Project.

(l)     If a Retail Overlay Requirement is enacted and becomes effective prior to the second anniversary of the Closing Date, but a building with twelve (12) floors above-grade floors may nevertheless be constructed upon a payment-in-lieu or the performance of off-site mitigation, then Seller shall have the option (but not the obligation) to elect to undertake such payment-in-lieu or off-site mitigation, in which case Purchaser agrees to cooperate with Seller's efforts provided If Seller elects to undertake such payment-in-lieu or off-site mitigation, Seller shall be responsible for the first Two Million Dollars ($2,000,000.00) of

4

such cost, the parties shall thereafter divide the cost equally between them until Seller has paid a total of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000.00) for such payment-in-lieu or mitigation. Under no circumstances shall Purchaser be obligated for an amount in excess of $1,250,000 pursuant hereto (but Purchaser may pay additional amounts in its sole discretion). In the event of the foregoing, provided Purchaser is able to construct a building with (12) floors above-grade floors, Purchaser shall not be entitled to the Rebate for Retail. As an example, if Three Million Dollars ($3,000,000.00) is the total payment-in-lieu, Seller's total obligation with respect thereto shall be Two Million Five Hundred Thousand Dollars ($2,500,000.00) (the first $2,000,000.00 plus one-half of the remaining $1,000,000.00), and Purchaser shall not be entitled to a Rebate for Retail, provided Purchaser is able to construct a building with (12) floors above-grade floors.

(m)    In the event of a dispute arising under this Paragraph 2.3, either party may elect to submit the dispute to binding arbitration by sending written notice to the other party. If the parties are unable to agree upon a neutral arbitrator to resolve such dispute within fifteen (15) days after the receipt of such written notice, either party may refer the dispute to the American Arbitration Association ("AAA"), which shall supply the parties with a list of three (3) persons consisting of active or retired accountants, architects, consultants or business executives who are experienced in real estate development, each of whom is independent of the parties. If the parties are unable to agree promptly upon one person on the list to serve as the arbitrator, each party shall promptly strike, in turn (with the first to strike chosen by chance), one name from the list, and the last remaining name shall be the arbitrator. The arbitrator selected will establish the rules for proceeding with the arbitration of the dispute. The arbitrator may use the rules of the AAA for commercial arbitration but may adopt such rules as the arbitrator deems appropriate to accomplish the arbitration in the most efficient and least expensive manner possible. Accordingly, the arbitrator shall require the parties to cooperate fully with each other in exchanging information relevant to the dispute and may order limited discovery if requested by either party. In addition, the arbitrator may (i) dispense with any formal rules of evidence and allow hearsay testimony so as to limit the number of witnesses required, (ii) accept evidence upon such information provided by the parties or other persons and otherwise minimize discovery procedures as the arbitrator deems appropriate, (iii) limit the time for presentation of any party's case as well as the amount of information or number of witnesses to be presented in connection with any hearing and (iv) impose any other rules which the arbitrator believes appropriate to effect a resolution of the dispute as quickly and inexpensively as possible. The arbitrator will have the exclusive authority to determine and award costs of arbitration and the costs incurred by any party for attorneys, advisors and consultants. The arbitrator shall rule on the dispute by issuing a written opinion within thirty (30) days after the close of the related hearings. Any award made by the arbitrator shall be binding on all parties to the arbitration, and judgment on the award may be entered by any court of competent

5

jurisdiction. The provisions of this <u>subparagraph 2.3(m)</u> shall apply only to a dispute under this <u>Paragraph 2.3</u>, and shall not apply to any other dispute or action arising under the Agreement.

(n)     From the date hereof through the second anniversary of the Closing Date [and for six (6) months thereafter, if Seller elects to extend the date for the payment of the Rebate for Retail as provided in <u>subparagraph 2.3(i)</u>], Purchaser shall keep Seller informed of Purchaser's efforts to obtain a Building Permit and to minimize or avoid the impact of the Retail Overlay Requirement. Purchaser shall promptly deliver to Seller copies of all correspondence to governmental authorities regarding the Building Permit, any proposed retail uses on the Property and any proposed Retail Overlay Requirement, and all responses to such correspondence received by Purchaser, including any and all correspondence related to concessions, benefits or other mitigating circumstances that may be provided to Purchaser. At Seller's request, Purchaser will meet periodically (but not more than once per calendar quarter) and provide Seller with an update and explanation of the status of the Purchaser's efforts to obtain a Building Permit and to minimize or avoid the impact of the Retail Overlay Requirement.

(o)     The provisions of this <u>Paragraph 2.3</u> shall survive the Closing.

6.     <u>GSA</u>. The following provision is added to the Agreement as new <u>Paragraph 2.4</u>:

(a)     In the event Purchaser or Seller identifies a procurement request from General Services Administration or other government entity ("GSA") that either party believes to be an appropriate opportunity for the Property, Purchaser and Seller agree to cooperate in pursuing the procurement process and the delivery of space to GSA as set forth in this Paragraph 2.4.

(b)     From October 31, 2006 through the Closing Date, Purchaser will have the primary responsibility to pursue space procurements with GSA. During this period, Seller agrees to provide Purchaser with the necessary written authorization to pursue the space procurement as a contract purchaser, and to cooperate fully with Purchaser in pursuing the procurement(s).

(c)     In the event any procurement commences prior to the Closing Date, Purchaser and Seller will cooperate to ensure that Seller or an affiliate of Seller, at Seller's election, shall be included as part of the "Offeror" in the procurement process, it being the intention of Seller and Purchaser that Seller shall be able to continue in the procurement in the event of Purchaser's failure to close under this Agreement. The foregoing arrangement shall be disclosed to GSA during the procurement process, in an appropriate manner mutually approved by Purchaser and Seller.

6

(d)     In the event that (i) there are active procurements initiated prior to the Closing Date, (ii) Purchaser fails to close on the purchase of the Property for any reason, and (iii) Seller elects in its sole discretion to continue to pursue the GSA space procurement, then Purchaser shall assign and deliver to Seller all non-proprietary third party work product, applications, and supporting documentation relating to the procurement(s) developed or submitted by or on behalf of Seller, and shall cooperate fully to allow Seller to continue to compete for the procurement.

7.     Counterparts.  This Amendment may be executed in any number of counterparts, all of which together shall have the effect of a single instrument. This Amendment may be delivered via facsimile transmission.

8.     Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the District of Columbia.

9.     No Further Modification.  Except as otherwise specifically amended and modified hereby, the Agreement remains unmodified and in full force and effect.

7

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed, effective as of the date first set forth above.

SELLER:

MONTGOMERY ROAD I LIMITED PARTNERSHIP, a Maryland limited partnership

By:  Montgomery Road, Inc., a Maryland corporation, its general partner

By: _____
Name:
Title:

PURCHASER:

TC MIDATLANTIC DEVELOPMENT, INC., a Delaware corporation

By: _____
Name:
Title:        **Daniel S. Hudson**
              **President**

F:\Clients\421\14\90 K Second Amendment 11-01-06 v2.doc

8

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed, effective as of the date first set forth above.

SELLER:

MONTGOMERY ROAD I LIMITED PARTNERSHIP, a Maryland limited partnership

By: Montgomery Road, Inc., a Maryland corporation, its general partner

By: _____
Name: Samuel G. Rose
Title: Vice President

PURCHASER:

TC MIDATLANTIC DEVELOPMENT, INC., a Delaware corporation

By: _____
Name:
Title:

F:\Clients\421\14\90 K Second Amendment 11-01-06 v2.doc

8

Exhibit F

TYPICAL BUILDING SECTION AT K STREET
20 K STREET, N.W.



## Notes to Typical Building Section:

1. The Current Plan as shown here provides a height of 14' measured from the top of the ground floor slab to the top of the second floor slab.

2. The assumed thickness of the second floor concrete slab is 7 1/2" to 9" inches yielding a Clear Distance (as such distance is defined herein) between the ground floor and second floor slabs of 13'3" to 13'4-1/2".

3. The Current Plan is for the top of the ground floor slab to be approximately 3'9" below the measuring point (for zoning purposes) allowing an overall building height of approximately 133'9" from the top of the ground floor slab to the top of the building.

### FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE
### OF TRANSFERABLE DEVELOPMENT RIGHTS

THIS FIRST AGREEMENT OF PURCHASE AND SALE OF TRANSFERABLE DEVELOPMENT RIGHTS ("Agreement") is made and entered into this 31st day of October, 2006, by and between MONTGOMERY ROAD I LIMITED PARTNERSHIP, a Maryland limited partnership and its permitted assigns ("Seller"), and TC MIDATLANTIC DEVELOPMENT, INC., a Delaware corporation, and its permitted assigns ("Purchaser")

#### RECITALS:

A.    Seller and Purchaser are parties to that certain Agreement of Purchase and Sale of Transferable Development Rights with an Effective Date of August 10, 2006 (the "Agreement").

B.    Seller and Purchaser desire to amend and modify certain terms and provisions of the Agreement as is set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Definitions. All capitalized terms not otherwise defined herein shall have the meanings given them in the Agreement.

2.    To-Be-Acquired TDRs. Recital E of the Agreement is hereby deleted in its entirety and is replaced with the following:

In addition to the Existing TDRs, Seller (or an affiliate of Seller) intends to enter into one or more contracts to acquire a minimum of one hundred twenty-four thousand two hundred ninety-four (124,294) square feet of additional transferable development rights (the "To Be Acquired TDRs")

3.    Purchase Price. Section 1.2(a) of the Agreement is hereby deleted in its entirety and is replaced with the following:

In consideration of the transfer of the TDRs, Purchaser shall pay to Seller the sum of Twenty-One Million Three Hundred Eighty-Seven Thousand Nine Hundred Twenty-Nine and 00/100 Dollars ($21,387,929.00) ("Purchase Price").

4.    Payment. The first sentence of Section 1.2(b) of the Agreement is hereby deleted in its entirety and is replaced with the following:

The Purchase Price shall be paid by Purchaser to Seller at the Closing and on the Closing Date (as such terms are defined in the Land Purchase Agreement), as follows: (i) Eight Million Three Hundred Eighty-Seven Thousand Nine Hundred

- 1 -

Twenty-Nine Dollars ($8,387,929.00) in cash or other immediately available federal funds (the "**Cash Portion of the Purchase Price**"), and (ii) the balance of the Purchase Price of up to Thirteen Million Dollars ($13,000,000.00) shall be deferred (the "**Deferred Portion of the Purchase Price**") and shall become due and payable in cash or other immediately available federal funds when Seller delivers the To Be Acquired TDRs, or assigns the TDR Contract to Purchaser (which assignment will be simultaneously with the closing under the TDR Contract).

5.    Potential Adjustment of Deferred Portion of the Purchase Price. Section 1.3(c) of the Agreement is hereby deleted in its entirety and is replaced with the following:

To the extent Seller conveys less than 124,294 square feet of To Be Acquired TDRs, the Deferred Portion of the Purchase Price shall be adjusted at the rate of $104.59 per square foot of To Be Acquired TDRs that are conveyed or assigned. Seller's failure to deliver all ~~118,000~~ square feet of To Be Acquired TDRs shall not constitute a default by Seller or excuse the performance by Purchaser hereunder (with respect to those To Be Acquired TDRs which Seller does in fact deliver in accordance herewith). *124,294  DSH*

6.    Deposit.    Section 1.3 of the Agreement is hereby deleted in its entirety and is replaced with the following:

By 1:00 p.m. on November 1, 2006, Purchaser shall increase the Initial Earnest Money deposited with the Escrow Agent by the amount of Six Hundred Fifty Thousand Four Hundred Ninety-Seven and 00/100 Dollars ($650,497.00), so that the total Earnest Money shall then be Six Hundred Seventy-Two Thousand Eight Hundred Ninety-Seven and 00/100 Dollars ($672,897.00) in the aggregate.

7.    Secondary Closing.    Section 2.1(b) of the Agreement is hereby deleted in its entirety and is replaced with the following:

Payment of the Deferred Portion of the Purchase Price ("**Secondary Closing**") shall take place at the offices of the Escrow Agent on a date and time ("**Secondary Closing Date**") as designated by the Seller, upon ten (10) days prior written notice to Purchaser; provided that the Secondary Closing Date shall be no earlier than twenty-four (24) months after the Closing Date, and no later than thirty (30) months after the Closing Date. If Purchaser is entitled to receive a Rebate for Retail (as defined in the Second Amendment to the Land Purchase Agreement), then the Secondary Closing Date shall be the date the Rebate for Retail is due and payable.

8.    Counterparts.    This Amendment may be executed in any number of counterparts, all of which together shall have the effect of a single instrument. This Amendment may be delivered via facsimile transmission.

- 2 -

Twenty-Nine Dollars ($8,387,929.00) in cash or other immediately available federal funds (the "**Cash Portion of the Purchase Price**"), and (ii) the balance of the Purchase Price of up to Thirteen Million Dollars ($13,000,000.00) shall be deferred (the "**Deferred Portion of the Purchase Price**") and shall become due and payable in cash or other immediately available federal funds when Seller delivers the To Be Acquired TDRs, or assigns the TDR Contract to Purchaser (which assignment will be simultaneously with the closing under the TDR Contract).

5.    <u>Potential Adjustment of Deferred Portion of the Purchase Price</u>. Section 1.3(c) of the Agreement is hereby deleted in its entirety and is replaced with the following:

To the extent Seller conveys less than 124,294 square feet of To Be Acquired TDRs, the Deferred Portion of the Purchase Price shall be adjusted at the rate of $104.59 per square foot of To Be Acquired TDRs that are conveyed or assigned. Seller's failure to deliver all ~~118,000~~ square feet of To Be Acquired TDRs shall not constitute a default by Seller or excuse the performance by Purchaser hereunder (with respect to those To Be Acquired TDRs which Seller does in fact deliver in accordance herewith).

6.    <u>Deposit</u>.  Section 1.3 of the Agreement is hereby deleted in its entirety and is replaced with the following:

By 1:00 p.m. on November 1, 2006, Purchaser shall increase the Initial Earnest Money deposited with the Escrow Agent by the amount of Six Hundred Fifty Thousand Four Hundred Ninety-Seven and 00/100 Dollars ($650,497.00), so that the total Earnest Money shall then be Six Hundred Seventy-Two Thousand Eight Hundred Ninety-Seven and 00/100 Dollars ($672,897.00) in the aggregate.

7.    <u>Secondary Closing</u>.  Section 2.1(b) of the Agreement is hereby deleted in its entirety and is replaced with the following:

Payment of the Deferred Portion of the Purchase Price ("**Secondary Closing**") shall take place at the offices of the Escrow Agent on a date and time ("**Secondary Closing Date**") as designated by the Seller, upon ten (10) days prior written notice to Purchaser; provided that the Secondary Closing Date shall be no earlier than twenty-four (24) months after the Closing Date, and no later than thirty (30) months after the Closing Date. If Purchaser is entitled to receive a Rebate for Retail (as defined in the Second Amendment to the Land Purchase Agreement), then the Secondary Closing Date shall be the date the Rebate for Retail is due and payable.

8.    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, all of which together shall have the effect of a single instrument. This Amendment may be delivered via facsimile transmission.

- 2 -

9.    Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the District of Columbia.

10.    No Further Modification.  Except as otherwise specifically amended and modified hereby, the Agreement remains in full force and effect as originally written.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed on their respective behalves as of the date set forth below.

**SELLER:**

**Montgomery Road I Limited Partnership,**
a Maryland limited partnership

By: Montgomery Road, Inc., its general partner

By: _____
     Samuel G. Rose, Vice President

**PURCHASER:**

**TC MidAtlantic Development, Inc.,**
a Delaware corporation

By: _____
     Daniel S. Hudson, President

F:\Clients\421\14\First Amendment to 90 K TDR 11-01-06 v1.DOC

- 3 -

9.    Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the District of Columbia.

10.    No Further Modification.  Except as otherwise specifically amended and modified hereby, the Agreement remains in full force and effect as originally written.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed on their respective behalves as of the date set forth below.

SELLER:

**Montgomery Road I Limited Partnership,**
a Maryland limited partnership

By: Montgomery Road, Inc., its general partner

By: _____
    Samuel G. Rose, Vice President

PURCHASER:

**TC MidAtlantic Development, Inc.,**
a Delaware corporation

By: _____
    Daniel S. Hudson, President

F:\Clients\421\14\First Amendment to 90 K TDR 11-01-06 v1.DOC

- 3 -

## SECOND AMENDMENT TO
## LAND PURCHASE AND SALE AGREEMENT

THIS SECOND AMENDMENT TO LAND PURCHASE AND SALE AGREEMENT (the "**Amendment**"), dated effective as of October 31, 2006, is entered into by and between **45 L STREET VENTURE, LLC**, a District of Columbia limited liability company (hereinafter collectively referred to as "**Seller**") and **TC MIDATLANTIC DEVELOPMENT, INC.**, a Delaware corporation, or its assignee and/or designee (hereinafter referred to as "**Purchaser**").

### R E C I T A L S

A.      Seller and Purchaser are parties to that certain Land Purchase and Sale Agreement dated as of August 10, 2006, as amended by First Amendment dated October 11, 2006 (the "**Agreement**").

B.      Seller and Purchaser desire to amend and modify certain terms and provisions of the Agreement as is set forth below.

### A G R E E M E N T

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      <u>Definitions</u>.  All capitalized terms not otherwise defined herein shall have the meanings given them in the Agreement.

2.      <u>Purchase Price</u>.  Paragraph 1.1(f) of the Agreement is hereby deleted in its entirety and is replaced with the following:

> <u>Purchase Price</u>:  Fifteen Million Seven Hundred Eight Thousand Five Hundred Seven Dollars ($15,708,507.00), subject to adjustment as provided herein.

3.      <u>Closing Date</u>.  Paragraph 1.1(i) of the Agreement is hereby deleted in its entirety and is replaced with the following:

> <u>Closing Date</u>:  As designated by Seller, upon ten (10) days prior notice to Purchaser, but no earlier than January 2, 2007 and no later than January 10, 2007.

4.      <u>Additional Earnest Money</u>.  The fifth and sixth sentences of Paragraph 1.3 of the Agreement are hereby deleted in their entirety and are replaced with the following:

> By 1:00 p.m. on November 1, 2006, Purchaser shall deposit additional Earnest Money (the "**Additional Earnest Money**") with the Escrow Agent in the amount of Four Hundred Seventy-Seven Thousand Seven Hundred Fourteen Dollars ($477,714.00), so that the total Earnest Money shall then be Four Hundred

Ninety-Four Thousand Two Hundred Fourteen Dollars ($494,214.00). Purchaser acknowledges that the Due Diligence Period has expired, and that the Earnest Money is non-refundable, subject, however, to the other provisions of this Agreement

5.    GSA. The following provision is added to the Agreement as new Paragraph 2.3:

(a)    In the event Purchaser or Seller identifies a procurement request from General Services Administration or other government entity ("GSA") that either party believes to be an appropriate opportunity for the Property, Purchaser and Seller agree to cooperate in pursuing the procurement process and the delivery of space to GSA as set forth in this Paragraph 2.3.

(b)    From October 31, 2006 through the Closing Date, Purchaser will have the primary responsibility to pursue space procurements with GSA. During this period, Seller agrees to provide Purchaser with the necessary written authorization to pursue the space procurement as a contract purchaser, and to cooperate fully with Purchaser in pursuing the procurement(s).

(c)    In the event any procurement commences prior to the Closing Date, Purchaser and Seller will cooperate to ensure that Seller or an affiliate of Seller, at Seller's election, shall be included as part of the "Offeror" in the procurement process, it being the intention of Seller and Purchaser that Seller shall be able to continue in the procurement in the event of Purchaser's failure to close under this Agreement. The foregoing arrangement shall be disclosed to GSA during the procurement process, in an appropriate manner mutually approved by Purchaser and Seller.

(d)    In the event that (i) there are active procurements initiated prior to the Closing Date, (ii) Purchaser fails to close on the purchase of the Property for any reason, and (iii) Seller elects in its sole discretion to continue to pursue the GSA space procurement, then Purchaser shall assign and deliver to Seller all non-proprietary third party work product, applications, and supporting documentation relating to the procurement(s) developed or submitted by or on behalf of Seller, and shall cooperate fully to allow Seller to continue to compete for the procurement.

6.    Counterparts. This Amendment may be executed in any number of counterparts, all of which together shall have the effect of a single instrument. This Amendment may be delivered via facsimile transmission.

7.    Governing Law. This Amendment shall be governed by and construed in accordance with the laws of the District of Columbia.

8.    No Further Modification. Except as otherwise specifically amended and modified hereby, the Agreement remains in full force and effect as originally written.

2

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed on their respective behalves as of the date set forth below.

SELLER:

45 L STREET VENTURE, LLC, a District of Columbia limited liability company

By: _____
Name:
Title:

PURCHASER:

TC MIDATLANTIC DEVELOPMENT, INC., a Delaware corporation

By: _____
Name:
Title:          **Daniel S. Hudson**
                **President**

F:\Clients\421\34\Second Amendment to 45 L Land 11-01-06 v1.DOC

3

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed on their respective behalves as of the date set forth below.

SELLER:

45 L STREET VENTURE, LLC, a District of Columbia limited liability company

By: _____

Name: *Samuel G. Rose*

Title: *Manager*

PURCHASER:

TC MIDATLANTIC DEVELOPMENT, INC., a Delaware corporation

By: _____

Name:

Title:

F:\Clients\421\34\Second Amendment to 45 L Land 11-01-06 v1.DOC

3

## FIRST AMENDMENT TO AGREEMENT OF PURCHASE AND SALE
## OF TRANSFERABLE DEVELOPMENT RIGHTS

**THIS FIRST AGREEMENT OF PURCHASE AND SALE OF TRANSFERABLE DEVELOPMENT RIGHTS ("Agreement")** is made and entered into this 31st day of October, 2006, by and between **45 L Street Venture, LLC**, a District of Columbia limited liability company **("Seller")**, and **TC MIDATLANTIC DEVELOPMENT, INC.**, a Delaware corporation, and its permitted assigns ("Purchaser")

### RECITALS:

A.    Seller and Purchaser are parties to that certain Agreement of Purchase and Sale of Transferable Development Rights with an Effective Date of August 10, 2006 (the "Agreement").

B.    Seller and Purchaser desire to amend and modify certain terms and provisions of the Agreement as is set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Definitions.  All capitalized terms not otherwise defined herein shall have the meanings given them in the Agreement.

2.    Purchase Price.  The first sentence of Section 1.2 of the Agreement is hereby deleted in its entirety and is replaced with the following:

In consideration of the transfer of the TDRs, Purchaser shall pay to Seller the sum of Twelve Million Two Hundred Twenty-One Thousand Six Hundred and 00/100 Dollars ($12,221,600.00) ("Purchase Price").

3.    Deposit.  The second and third sentences of Section 1.3 of the Agreement are hereby deleted in their entirety and are replaced with the following:

By 1:00 p.m. on November 1, 2006, Purchaser shall increase the Initial Earnest Money deposited with the Escrow Agent by the amount of Three Hundred Seventy-One Thousand Nine Hundred Ten and 00/100 Dollars ($371,910.00), so that the total Earnest Money shall then be Three Hundred Eighty-Four Thousand Five Hundred Ten and 00/100 Dollars ($384,510.00) in the aggregate.

4.    Counterparts.  This Amendment may be executed in any number of counterparts, all of which together shall have the effect of a single instrument. This Amendment may be delivered via facsimile transmission.

5.    Governing Law.  This Amendment shall be governed by and construed in accordance with the laws of the District of Columbia.

- 1 -

6.    <u>No Further Modification</u>.  Except as otherwise specifically amended and modified hereby, the Agreement remains in full force and effect as originally written.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed on their respective behalves as of the date set forth below.

**SELLER:**

**45 L Street Venture, LLC**
a District of Columbia limited liability company

By: _____
    Samuel G. Rose, Manager

**PURCHASER:**

**TC MidAtlantic Development, Inc.,**
a Delaware corporation

By: _____
    Daniel S. Hudson, President

F:\Clients\421\34\First Amendment to 45 L TDR 11-01-06 v1.DOC

- 2 -

6.  <u>No Further Modification</u>.  Except as otherwise specifically amended and modified hereby, the Agreement remains in full force and effect as originally written.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed on their respective behalves as of the date set forth below.

SELLER:

45 L Street Venture, LLC
a District of Columbia limited liability company

By: _____
Samuel G. Rose, Manager

PURCHASER:

TC MidAtlantic Development, Inc.,
a Delaware corporation

By: _____
Daniel S. Hudson, President

P:\Clients\421\34\First Amendment to 45 L TDR 11-01-06 v1.DOC

- 2 -

FedEx | Ship Manager | Label 7980 3474 3730                                  Page 1 of 1

From:   Origin ID:  (202)686-3000
Jennifer Scott
GREENEBAUM & ROSE ASSOCIATES
5301 WISCONSIN AVENUE, N.W
SUITE 510
WASHINGTON, DC 20015


FedEx
Express

Ship Date: 02NOV06
ActWgt: 1 LB
System#: 5454409/INET2500
Account#: S *********

REF:

Delivery Address Bar Code

SHIP TO:    (602)207-4000          BILL SENDER
**Real Estate Dept.**
**Viad Corporation**
**1850 North Central Avenue**
**Suite 800**
**Phoenix, AZ 850044545**



**PRIORITY OVERNIGHT**                          **FRI**
                                                Deliver By:
TRK#   **7980  3474  3730**    FORM      03NOV06
                               0201      **PHX**      A1

**85004**    -AZ-US

**NH DGLA**

---

Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.

2. Fold the printed page along the horizontal line.

3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.