## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **MONTGOMERY ROAD I LIMITED PARTNERSHIP,** | ) ) ) | |
| **Plaintiff and** | ) | |
| **Counterclaim-Defendant,** | ) | |
| **v.** | ) ) | |
| **VIAD CORP,** | ) ) | |
| **Defendant and** | ) | **Case No.  1:06CV00344 (HHK)** |
| **Counterclaim-Plaintiff,** | ) ) | |
| **v.** | ) ) | |
| **MONTGOMERY ROAD TDR, LLC,** | ) | |
| **Counterclaim-Defendant.** | ) | |

_____)

### VIAD CORP'S MEMORANDUM OF POINTS
### AND AUTHORITIES OPPOSING MOTION OF
### MONTGOMERY ROAD I LIMITED PARTNERSHIP AND
### MONTGOMERY ROAD TDR, LLC FOR SUMMARY JUDGMENT

Rodney F. Page (DC Bar No. 37994)
Alicia I. Hogges-Thomas (DC Bar No. 480548)
Bryan Cave LLP
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005-3960
P:  (202) 508-6000
F:  (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff Viad Corp*

Dated:  April 19, 2007

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

STATEMENT OF MATERIAL FACTS ........................................................................... 5

ARGUMENT ........................................................................................................... 5

I.     THE REZNICK ANALYSIS IS NOT BINDING ON THE PARTIES ............................ 5

II.    THE CPA DOES NOT SUPPORT THE TREATMENT OF S&S FINANCE
       CONTRIBUTIONS AS DEBT; FURTHERMORE, THERE IS NO EVIDENCE
       THAT THE AMOUNTS FROM S&S FINANCE WERE IN FACT DEBT .................... 9

III.   BASED ON THE ARGUMENTS ABOVE, COUNT I FAILS.  BUT, TO THE
       EXTENT THAT MRLP SEEKS TO HAVE THE COURT INTERPRET THE
       SPECIFICS OF REZNICK'S ANALYSIS AND THE CPA, THE COURT
       SHOULD FIND THAT REZNICK WAS WRONG ON THE KEY POINTS
       INVOLVING THE ACCOUNTING UNDER THE CPA .............................................. 12

       A.     Developer's Equity Return Cannot be Deducted When Calculating
              Appreciation Cash Flow ...................................................................... 13

       B.     MRLP Cannot Deduct Accrued Interest as Developer's Operating Equity
              or Developer's Equity Return ............................................................... 13

       C.     The First Mortgage was Equity and Its Acquisition by S&S Finance was a
              Refinancing ....................................................................................... 13

IV.    MRLP HAS MISSTATED THE ISSUE SURROUNDING THE TDRS ...................... 15

       A.     MRLP's Argument that TDRs are Commodities Supports Viad's Analysis
              Under the CPA ................................................................................... 15

       B.     Under the CPA, Viad is Owed 15% of the Appreciation of the 90 K Street
              Property, Based Upon its Agreed Value Under The CPA .......................... 17

       C.     MRLP Fails to Offer any Justification for the Sale Price of Approximately
              $70 for the TDRs ................................................................................ 19

              1.     Current Market Price of TDRs ..................................................... 19

              2.     MRLP's Purported Price for the TDRs ........................................... 20

              3.     Effect on Appreciation Cash Payment ........................................... 20

       D.     MRLP Failed to Offer any Evidence of the Fair Market Value of the
              Property ............................................................................................ 21

V.     MRLP HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH
       AND FAIR DEALING ................................................................................. 23

       A.     MRLP, Like All Parties to a Contract, Owed a Duty of Good Faith and
              Fair Dealing to Viad .................................................................... 23

              1.     Every Contract Contains the Implied Covenant of Good Faith and
                     Fair Dealing ............................................................................. 24

              2.     Contracts Between Creditors and Debtors Clearly Contain the
                     Implied Covenant of Good Faith and Fair Dealing ................... 24

       B.     The Language of the CPA Does Not Waive the Implied Covenant and
              Does Not Excuse Fraudulent Behavior ................................................. 26

       C.     Viad has Demonstrated Ample Evidence of MRLP's Bad Faith and Fair
              Dealing ...................................................................................... 27

VI.    CONCLUSION ........................................................................................ 30

# TABLE OF AUTHORITIES

## CASES

*In re A.W. Logging, Inc.*,
  2006 Bankr. LEXIS 3605 (Bankr. D. Idaho Oct. 4, 2006) .........................................24

*Allworth v. Howard University*,
  890 A.2d 194 (D.C. 2006) .............................................................................23, 24, 28

*Andrews v. Blue*,
  489 F.2d 367 (10th Cir. 1973) ...................................................................................26

*Arizona Department of Revenue v. Arizona Outdoor Advertisers, Inc.*,
  41 P.3d 631 (Ariz. Ct. App. 2002) .............................................................................18

*B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp.*,
  785 F. Supp. 222 (D. Mass. 1991) .............................................................................25

*Bristol Savings Bank v. Chic Miller's Chevrolet-Isuzu, Inc.*,
  1993 Conn. Super. LEXIS 996 (Conn. Super. Ct. Apr. 27, 1993).............................24

*Friedman v. Decatur Corp.*,
  135 F.2d 812 (D.C. Cir. 1943) ...................................................................................16

*In re Haar*,
  667 A.2d 1350 (D.C. 1995) .........................................................................................7

*Hais v. Smith*,
  547 A.2d 986 (D.C. 1988) ...................................................................................23, 25

*Home & Hearth Plano Parkway, L.P. v. LaSalle Bank, N.A (In re Home &*
  *Hearth Plano Parkway, L.P.)*,
  320 B.R. 596 (Bankr. N.D. Tex. 2004).......................................................................25

*In re IT Group, Inc.*,
  448 F.3d 661 (3d Cir. 2006) .......................................................................................29

*London v. Guberman*,
  29 Cal. Rptr. 279 (Cal. Ct. App. 1963) ................................................................26-27

*Mitsui Fudosan (U.S.A.), Inc. v. County of Los Angeles*,
  268 Cal. Rptr. 356 (Cal. Ct. App. 1990)....................................................................16

*Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241 (10th
  Cir. 2005) ...................................................................................................................28

*Sea Crest Construction Corp. v. United States*,
    59 Fed. Cl. 615 (2004) ................................................................7

*Steele v. Isikoff*,
    130 F. Supp. 2d 23 (D.D.C. 2000) ..........................................24

*Thyroff v. Nationwide Mutual Insurance Co.*,
    460 F.3d 400 (2d Cir. 2006)....................................................29

*Underwater Exotics, Ltd. v. Secretary of the Interior*,
    1994 WL 80878 (D.D.C. Feb. 28, 1994) ...................................7

*United Technologies. Corp. v. American Home Assurance Co.*,
    118 F. Supp. 2d 181 (D. Conn. 2000) ......................................25

*Wilbar Realty, Inc. v. Pennsylvania. Infrastructure Investment Authority (In re
    Wilber Realty, Inc.)*,
    325 B.R. 354 (Bankr. M.D. Pa. 2005) ......................................25

*William F. Klingensmith, Inc. v. District of Columbia*,
    370 A.2d 1341 (D.C. 1977) .......................................................8

## INTRODUCTION AND SUMMARY OF ARGUMENT

Montgomery Road I Limited Partnership ("MRLP") seeks summary judgment on its First Amended Complaint, the object of which is to defeat the possibility of any payment to Defendant Viad Corp ("Viad") under the Cash Participation Agreement ("CPA"), which MRLP executed twenty years ago. The CPA, which was heavily negotiated by sophisticated parties, provides that Viad is to receive 15% of the appreciation in the property at 90 K Street, N.E. at the point it is sold. (Defendant Viad Corp's Statement of Undisputed Material Facts submitted on March 29, 2007, (hereinafter "SOF") ¶ 12). MRLP purchased 90 K Street for $11 million in 1987, and it sold the property in January of 2007 for more than $67 million. (SOF ¶¶ 8, 133; *see also* Defendant Viad Corp's Statement of Disputed Material Facts (hereinafter "SODF") ¶ 34). According to MRLP, however, through various accounting treatments used solely for purposes of altering the payment to Viad and because of adjustments it unilaterally made in setting the contract price for the land (which bears no relationship to the fair market value), no money is owed to Viad. (*See generally* First Amended Complaint).

The logic of MRLP's position is built on open and irreconcilable contradictions and willful disregard of the facts. Four core examples demonstrate these convolutions:

First, MRLP repeatedly argues that its Special Purpose Financial Statements (which are in fact not financial statements but malleable internal compilations by MRLP's resident bookkeeper Ron Glassman and its litigation counsel) set forth the "economic reality" of MRLP's ownership. Nothing could be further from the truth. These various accounting treatments include:

- alternately seeking to classify cash advances and purchases as debt and equity (First Amended Complaint ¶ 37),

- accruing hypothetical but unpaid expenses for "equity return" and interest, despite requirements that calculations be on a cash basis (SOF ¶¶ 56-59),

- deducting costs of TDR purchases when calculating yearly operations cash payments but deleting them as a "mistake" when the property is sold and MRLP seeks to sell such TDRs for approximately eleven times their market value (SOF ¶ 107, 113),

The reality is that MRLP classified the purchase of and cash advances to the property as equity on its tax returns; has never documented any loans or advances to the property; made no payments to themselves for interest, even at closing on the sale; and structured the transaction for sale in a way that is anything but "economic reality." (SOF ¶¶ 57-59, 67, 127, 129; SODF ¶¶ 19, 50).

Count I of the First Amended Complaint itself reflects this schizophrenia, asking the court to ratify the Reznick Analysis as to its accounting but asking, in the alternative, to accept a complete reversal of those key accounting treatments as reflected in new financial statements provided during the course of, and in response to, litigation over the issues. (First Amended Complaint ¶¶ 35-37). The only "reality" of MRLP's position is that it adopts any accounting treatment convenient to avoiding payment, whether or not it comports with the CPA or "economic reality."

Second, MRLP claims that interest expense should be deductible as Developer's Equity Return when calculating Viad's participation, even though the plain language of the CPA demonstrates that Developer's Equity Return is not a proper deduction. (SOF ¶¶ 60-62). To get around this obstacle, MRLP now seeks to classify the interest expense as debt since "Permitted Debt" can be deducted. (SOF ¶¶ 60, 62). However, MRLP seeks to deduct interest that has been

accrued, and never paid, as Permitted Debt even though the CPA requires that interest be paid in order to be eligible for deduction as Permitted Debt. (SOF ¶¶ 56-59).

Third, contrary to MRLP's claims, the initial dispute between the parties was never about the financial statements that MRLP provided to Viad.  Rather, the dispute was over the proper calculation of the Appreciation Cash Payment.  (SOF ¶¶ 31-37).  In or around December 2004, Viad and MRLP decided to seek the advice of Reznick Group, P.C. ("Reznick"), an accounting firm, in an effort to informally resolve the disagreement.  (SOF ¶ 37).  Prior to and during the informal review by Reznick, MRLP never suggested to Viad that the analysis would be binding. (SOF ¶¶ 41-44).  However, MRLP is claiming that the analysis was binding under the CPA, even though there is no evidence of an agreement to invoke the arbitration provisions of the CPA or any intent expressed by either of the parties at the initiation of or during the review that it would be binding.  (SOF ¶¶ 41-45).

Fourth, MRLP falsely describes the issue relating to TDRs, stating that Viad is improperly attempting to share 15% of the "value of the TDRs."   In fact, Viad is claiming 15% of the appreciation attributed to the 90 K Street property.  The value of the land reflects its placement in a "receiving zone" eligible to use TDRs, which themselves are readily available, as a commodity, for purchase.  (SOF ¶¶ 95, 100-101).  TDRs themselves, by common agreement, have a value of only $5 or $6 per FAR[1/] square foot, which is the price paid by MRLP for most of the TDRs acquired for 90 K Street.  (SOF ¶¶ 98, 102).  That cost, as an expense of the developer, is a deductible cost when calculating the appreciation, and MRLP knows that.  But,

---

[1/]    FAR is a general measure of building density.  FAR, or floor-to-area ratio, is the result of adding together the square footage of all of the floors in the building and dividing that total by the land area of the lot.  Thus, a one-story building covering 100% of the lot equals a 1.0 FAR.  At the other end of the range, a ten-story building covering 100% of the lot is a 10.0 FAR.  (SOF ¶ 74).

instead of deducting the cost, MRLP is claiming that the value of each FAR rendered by a TDR when applied to 90 K Street for development is a value excluded from the CPA calculation. Not once in its analysis does MRLP seek to justify this exclusion of nearly $70 per square foot from the total consideration paid to it, a price nearly eleven times the undisputed market value of TDRs, or address the artificial structure of the transaction which separates the sale into two components that are contingent on each other in accordance with the Umbrella Agreement between the parties to the sale. (SOF ¶ 98, 102, 114; SODF ¶ 48).

Moreover, MRLP misstates the requirements of the CPA by focusing exclusively on the contract price for the sale of the land. Count II of the First Amended Complaint asks only that the court declare the artificially low "land" contract price to be the operative factor, and the Motion for Summary Judgment follows that request. In fact, the CPA clearly states that Viad is to be paid based on the Agreed Value for the property, which is the greater of the contract price or the fair market value at the time of sale. (SOF ¶¶ 141-142). And, consistent with this myopic view of the CPA, MRLP has failed to produce any evidence of the fair market value of the land and defaulted when given the opportunity under the contract to do so. (SOF ¶¶ 141-150). The fair market value properly takes into account the availability and commodity pricing of the TDRs (and the resulting increase in FAR) as they contribute to the full development of the property, as demonstrated in the MAI appraisal provided by Viad. (SOF ¶¶ 145-146). The purpose of including fair market value as an alternative Agreed Value was to protect Viad in the event that MRLP attempted to sell the property for a fraudulently low price.

In any event, the "land" price established by MRLP does not reflect the fair market value of the property and is obviously not the result of an "arms-length" negotiation with the buyer. Rather, the price for the "land" and the separate price for the TDRs were separated at the

insistence of MRLP, the total of the two being consistent with the buyer's view of the value of the package, and the "land" and TDR components being determined by MRLP with an eye toward the CPA. (SOF ¶¶ 118-122).

In sum, the Motion for Summary Judgment by MRLP must fail because its reading of the CPA is wrong, because its own conduct is inconsistent and contrary to both common sense and "economic reality" and because the undisputed facts favor the analysis of Viad.

Many of the issues that are discussed in this opposition memorandum have already been addressed in the memorandum submitted by Viad in support of its motion for summary judgment. Viad incorporates the previous arguments into this opposition memorandum.

## STATEMENT OF MATERIAL FACTS

The facts pertinent to this Motion are set forth in Defendant Viad Corp's Statement of Undisputed Material Facts, which was included with Viad's Summary Judgment Motion, filed on March 29, 2007. Viad's response to the Statement of Undisputed Material Facts Filed in Support of MRLP and MRTDR's Motion for Summary Judgment is included in Defendant Viad Corp's Statement of Disputed Material Facts, filed herewith.

## ARGUMENT

## I.    THE REZNICK ANALYSIS IS NOT BINDING ON THE PARTIES

In Count I of its First Amended Complaint, MRLP seeks a declaration that the review performed by Reznick Group (hereinafter the "Reznick Analysis") was a contractually binding dispute resolution. (First Amended Complaint ¶ 35). However, the undisputed evidence demonstrates that the Reznick Analysis is not binding on the parties and was never intended to be.

In the records of phone conversations leading up to the decision to seek advice from Reznick Group, there is no indication that Viad or MRLP intended Reznick's advice to be

binding or that the parties even mentioned Section 2.7 of the CPA.  (SOF ¶ 44).  Moreover, Viad explicitly conditioned its participation in seeking the advice of Reznick.  Viad's statement of position to Reznick, dated March 2005, was enclosed with a cover letter from Eve Fiorucci, the Assistant Director of Real Estate.  In that cover letter, Ms. Fiorucci wrote:  "Finally, while we appreciate your review of the documents and your opinion as to our interpretation of same, we wish to make clear that your opinion is not binding on TLC/Viad Corp."  (SOF ¶ 38).  Sam Rose of MRLP was copied on this letter, and he testified that he did in fact receive it.  (SOF ¶ 42).  Mr. Rose also testified that at the time he received the letter, he made no effort to contact Viad to discuss whether the Reznick Analysis would be binding.  (SOF ¶ 42).  In fact, in a letter to Reznick during the review process, Reid Liffmann, a limited partner of MRLP, indicated that the process was advisory only, stating: "[h]opefully, with guidance from you, the parties can get a process moving that will lead to a resolution, without wasting a lot of legal dollars and time." (SOF ¶ 43).  The Reznick partner who wrote the analysis testified that no one ever said to him that his opinion was binding.  (SODF ¶ 27).  After completing his analysis, Brent Solomon of Reznick Group suggested to MRLP that his review might be considered as having been pursuant to Section 2.7.  (SODF ¶ 27).  On April 10, 2005, Reznick provided its interpretation of certain terms in the CPA, an analysis of the classification of costs and charges, and a pro-forma calculation for a hypothetical sale of the property ("the Reznick Analysis").  (SOF ¶ 40).  Subsequently, on May 2, 2005, almost a month after the Reznick Analysis was completed, MRLP suggested to Viad that Reznick's review was binding on the parties.  (SOF ¶ 41).  It is clear from the evidence that Section 2.7 was never discussed by the parties until after the Reznick Analysis was received.

MRLP argues that Viad's position that the Reznick Analysis is not binding "simply is not reasonable," citing testimony from Sam Rose describing how the parties took three years to pick an accountant. (MRLP and MRTDR Brief at 12). However, Mr. Rose cannot point to a single conversation or document during that three year period in which Viad agreed that the Reznick Analysis would be binding (SOF ¶ 44). As a result, Mr. Rose's speculation that the review would be binding adds nothing to his argument.

Furthermore, MRLP argues that "[a]t best, the insertion by Ms. Fiorucci of the 'non-binding' language could be viewed as a counter-offer to amend the Cash Participation Agreement's provisions." (MRLP and MRTDR Brief at 12). MRLP adds that there was no acceptance on its part since "[g]enerally, silence does not constitute acceptance" and "[c]ourts consistently refuse to treat unilateral statements in cover and transmittal letters as effective modifications to agreements." *Id.* at 13. However, these arguments, and the cases cited by MRLP, do not apply to the facts of this case. [2] There is no evidence of an agreement between

---

[2]    The cases cited by MRLP do not apply to the facts of this case. There was never an agreement between MRLP and Viad to submit the dispute to Reznick under Section 2.7 of the CPA. As such, Ms. Fiorucci's letter was neither a counter-offer nor a unilateral attempt to alter the terms of the CPA. In contrast, the cases cited by MRLP deal with situations where a party who is clearly operating under an agreement uses correspondence in an attempt to alter the terms of the agreement. *See Sea Crest Construction Corp. v. United States*, 59 Fed. Cl. 615, 616-17 (2004) (finding on government's motion for summary judgment against a building contractor, that the Army Corps' rejection of a drawing that differed significantly from the site plan contained in the contractor's BAFO was not improper, even though in its cover letter the contractor reserved the right to revise the BAFO site plan, because the contractor did not have a unilateral right to alter the site plan, since any revisions to the BAFO site required approval of the Army Corps of Engineers and the contracting officer and needed to be consistent with the RFP, according to the BAFO cover letter and the contract between the parties; *see also Underwater Exotics, Ltd. v. Secretary of the Interior*, 1994 WL 80878, at *9 (D.D.C. Feb. 28, 1994) (finding that a plaintiff who submitted a settlement payment to the government, pursuant to the settlement agreement between himself and the government, accompanied by a cover letter in which the plaintiff stated that the government "would not imply any admission of liability from a settlement regarding [the] violations" could not demonstrate breach of contract because the condition was unilateral, and the plaintiff attempted to impose it after the settlement

*Continued on Next Page*

MRLP and Viad to submit their dispute to Reznick under Section 2.7 of the CPA. (SOF ¶ 44). Rather, the evidence shows that MRLP hoped that Reznick would "get a process moving that [would] lead to a resolution," and that Mr. Solomon was never informed that his opinion would be binding. (SOF ¶ 43; SODF ¶ 27). Furthermore, Section 2.7 was not mentioned until after Reznick completed its analysis. (SOF ¶ 41; SODF ¶ 27). As a result, Ms. Fiorucci's letter was neither a counter-offer to amend nor a unilateral attempt to modify the terms of the CPA.

Despite this evidence, MRLP argues that the parties had a dispute regarding the Special Purpose Financial Statements (hereinafter the "financial statements") and that the parties agreed to settle the dispute under Section 2.7. However, Section 2.7 of the CPA does not relate to the subject matter of the Reznick Analysis. Section 2.7 states in relevant part that, if the parties are unable to resolve a dispute concerning the fiscal year statements within a certain period of time, "the items shall be submitted to arbitration which arbitration shall be performed by an independent certified public accountant." (SOF ¶ 46). Reznick's analysis, on the other hand, dealt with the calculation of the Appreciation Cash Payment under Article 3 in the event of a hypothetical sale, whereas Section 2.7, which appears in the section of the CPA that deals with

---

agreement was signed); *William F. Klingensmith, Inc. v. District of Columbia*, 370 A.2d 1341, 1344 (D.C. 1977) (finding that a subcontractor's silence in response to a letter from a general contractor attempting to settle the claims between the parties did not create an agreement since in general, the subcontractor's silence could not create an agreement to settle all claims under the subcontract and because the contractor did not rely to its detriment on the subcontractor's silence); *In re Haar*, 667 A.2d 1350, 1352 & 1354 (D.C. 1995) (finding that a client's silence in response to a letter from her attorney in which he stated that he would withdraw money from a trust account containing settlement funds to pay his legal fees did not constitute an agreement, where the parties had a dispute over the legal fees and the client stated in an earlier letter that upon receipt of an amended fee statement, she would pay the fee if the proposal was agreeable to her).

Operations Cash Flow in Article 2 as opposed to Appreciation Cash Flow, concerns disputes about yearly Operations Cash Flow payments.[3]  (SOF ¶¶ 40, 47-51).

Furthermore, Section 2.7 of the CPA requires an arbitration.  (SOF ¶ 46).  However, it is undisputed that the Reznick Analysis was not an arbitration.  Sam Rose, testifying as the 30(b)(6) witness for MRLP, has admitted that the analysis was not an arbitration.  (SOF ¶ 54).  Thus, procedurally, the work of Reznick did not comply with Section 2.7.

MRLP accuses Viad of unilaterally trying to amend the CPA, but in reality, it is MRLP that is attempting unilaterally to make the Reznick Analysis binding in the absence of evidence that the parties agreed to a binding analysis.  Viad clearly notified MRLP prior to Reznick's review that the analysis would not be binding.  (SOF ¶ 38).  The subject matter of Reznick's review is not related to Section 2.7, and it is undisputed that the review was not an arbitration, which is required under Section 2.7 of the CPA.  (SOF ¶¶ 40, 46-51, 54).  Thus, to the extent that Count I of the First Amended Complaint seeks judgment based on the binding effect of the Reznick Analysis or the conclusion that Section 2.7 was invoked and is being enforced, summary judgment must be granted for Viad.

## II.    THE CPA DOES NOT SUPPORT THE TREATMENT OF S&S FINANCE CONTRIBUTIONS AS DEBT; FURTHERMORE, THERE IS NO EVIDENCE THAT THE AMOUNTS FROM S&S FINANCE WERE IN FACT DEBT

Count I of the First Amended Complaint also seeks a declaration in the alternative that all advances and/or investments in the Property were really debt owed to S&S Finance and, thus, a

---

[3]    Although MRLP submitted financial statements in an effort to comply with Section 2.6 of the CPA, these statements are not related to the calculation of the Appreciation Cash Payment because Section 2.6 is part of Article 2 of the CPA, which addresses Operations Cash Flow only. (SOF ¶¶ 11, 47-49).  Appreciation Cash Flow is addressed in Article 3 of the CPA.  (SOF ¶ 12). For the same reason, the dispute resolution provision in Section 2.7 is not related to the Appreciation Cash Payment.  (SOF ¶ 50).

loan that is "Permitted Debt" under the CPA. (First Amended Complaint ¶ 37). The court must enter summary judgment for Viad as to that alternative theory for the following reasons.

First, MRLP cannot prove that such a debt ever existed since there is no evidence of a loan. No loan documents were produced by MRLP. (SOF ¶ 67). Furthermore, MRLP has not paid any interest on this alleged loan to fund operations at 90 K Street. Rather, MRLP seeks to deduct hypothetically accrued interest on this alleged debt. (SOF ¶¶ 57-59).

Furthermore, MRLP's argument that the contributions are debt is contradicted by years of financial statements submitted by MRLP. For nearly 20 years, MRLP classified S&S Finance contributions as equity. (SOF ¶ 66). The new analysis has been orchestrated by litigation counsel in the middle of litigation for the sole purpose of avoiding payment to Viad, as is evidenced by the cover letter that accompanied the Revised Special Purpose Financial Statement for 2005 ("Revised 2005 Statement"). (SOF ¶¶ 67, 125; SODF ¶ 17). The Revised 2005 Statement, which was received by Viad on November 21, 2006, was not "prepared in accordance with generally accepted accounting principles," as required by Section 2.6. (SOF ¶ 125). Furthermore, it is not "consistent with past practices," and does not bear "the unqualified opinion of a firm of independent certified public accountants," all of which is required by the CPA. (SOF ¶¶ 70, 125-26). Unlike the other financial statements, which were prepared between 1987 and 2004, there is no signed statement indicating that the Revised 2005 Statement was compiled by a firm of independent certified public accountants, as required by Section 2.6 of the CPA.[4] (SOF ¶ 70).

---

[4]    A fair implication is that the reversals of previous treatments would not be accepted by the accountants; thus, they were done by Mr. Glassman, of MRLP, and vouched for by counsel as a substitute.

According to the Revised 2005 Statement that was received from litigation counsel's office, MRLP owes S&S Finance over $35 million dollars. (SODF ¶ 18). However, this amount is not consistent with MRLP's tax returns, which reflect total liabilities of under $5 million. (SOF ¶ 129; SODF ¶ 18). Furthermore, at the closing of the TCMD-MRLP transaction on January 11, 2007, the amount repaid to S&S Finance was also under $5 million. (SOF ¶ 129; SODF ¶ 53). MRLP claims that the "economic reality" of the situation is that the first mortgage and the other funds from S&S Finance, including the interest charged, are Permitted Debt. (MRLP and MRTDR Brief at 24 & 29). But the "economic reality" is what is reflected on MRLP's tax return and the settlement statement.

Reclassifying the advances and investments from MRLP's partners Greenebaum and Rose, through S&S Finance, as debt would also directly contradict the Reznick Analysis, which MRLP seeks to enforce as binding in this case. (SOF ¶ 72). According to the Reznick Analysis "any amount advanced by S&S or its partners to pay interest or any other reasonable expense should be treated as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b)." (SOF ¶ 72).

Finally, even if all the cash infusion to the Property was debt, which Viad disputes, MRLP cannot claim millions of dollars of accrued interest as a deduction because the CPA only recognizes cash basis accounting and requires that interest be paid before it can be deducted. (SOF ¶¶ 56; SODF ¶ 13). According to the CPA, if Permitted Debt is held by an Affiliate of Developer, "interest paid thereon shall be included as an expense." (SODF ¶ 13). MRLP has not paid the interest on the first mortgage or on the contributions from S&S Finance for operations at 90 K Street. (SOF ¶¶ 57-59; SODF ¶ 19). Nevertheless it seeks to deduct the accrued interest in its calculation of the Appreciation Cash Payment. (SOF ¶ 59). This is prohibited by the CPA.

Appreciation Cash Flow is calculated by finding the Agreed Value, deducting the Approved Deductions and Closing Costs, and then subtracting Developer's Invested Equity and Developer's Operating Equity.  (SOF ¶ 60; SODF ¶ 15).  In the event of the sale of the property, the Approved Deductions include Permitted Debt, Junior Financing, and the sum of previously calculated Appreciation Cash Flows."  (SOF ¶ 62).  The plain language of the CPA demonstrates that Developer's Equity Return is not an Approved Deduction from Appreciation Cash Flow. (SOF ¶ ¶ 60-62).  Rather, Developer's Equity Return is deducted under Article 2 when computing Operations Cash Flow.  (CPA, Section 2.3(a)(15)).  (SODF ¶ 20).

Citing Section 7.11 of the CPA, MRLP argues that the defined terms in the CPA apply throughout the agreement and are not confined to the sections where they appear.  (MRLP and MRTDR Brief at 24).  But, the formula for the calculation is clear and the Developer's Equity Return is not included in the calculation of Appreciation Cash Flow.  (SOF ¶¶ 60-62).  To get around this obstacle, MRLP now seeks to classify the alleged interest expense as Permitted Debt and, therefore, an Approved Deduction.  MRLP is merely manipulating the financial information to avoid payment to Viad.  As a result, this court should find for Viad on the alternative request for relief in Count I of the Amended Complaint.

III.    **BASED ON THE ARGUMENTS ABOVE, COUNT I FAILS.  BUT, TO THE EXTENT THAT MRLP SEEKS TO HAVE THE COURT INTERPRET THE SPECIFICS OF REZNICK'S ANALYSIS AND THE CPA, THE COURT SHOULD FIND THAT REZNICK WAS WRONG ON THE KEY POINTS INVOLVING THE ACCOUNTING UNDER THE CPA**

The court can dispose of Count I of the First Amended Complaint based on the arguments in Sections I and II above.  Regardless, a closer examination of the Reznick Analysis and the CPA will demonstrate that the positions of Reznick with regard to the key accounting issues are incorrect.

A.    **Developer's Equity Return Cannot be Deducted When Calculating Appreciation Cash Flow**

As was discussed previously, there is no recognition of or deduction for "Developer's Equity Return" in calculating the Appreciation Cash Flow. (SOF ¶¶ 60-62). The plain reading of the CPA indicates that it is not a deduction for this purpose, even if actual cash payments of equity return might be properly deducted under Article 2 in calculating the annual operational payment. (SODF ¶ 20). The failure to recognize the difference in wording between these two sections of the CPA is a key error made by Reznick. This result is logical because Viad's 15% participation on sale of the Property is a participation in the return of the developer, which is the appreciation of the property.

B.    **MRLP Cannot Deduct Accrued Interest as Developer's Operating Equity or Developer's Equity Return**

Under the CPA, MRLP must use "cash basis accounting" applied on a consistent basis in its calculations. (SOF ¶ 56). Nevertheless, MRLP has repeatedly calculated its costs by claiming accrued payments of interest and equity return. (SOF ¶¶ 57-59). None of these payments were made, and the payee of such hypothetical obligations is itself or its affiliate, S&S Finance. *Id*. Again, Reznick was wrong in asserting that accruals could be recognized since the plain language of the CPA says otherwise. Unpaid interest to Equity Holders is not cash basis accounting. Cash basis means cash basis.

C.    **The First Mortgage was Equity and Its Acquisition by S&S Finance was a Refinancing**

MRLP has taken inconsistent positions on the role of S&S Finance and the effect of its role on the calculations. (*See* First Amended Complaint ¶ 10; SOF ¶ 5, 64-67; SODF ¶ 52). The facts are that S&S Finance was owned by Rose and Greenebaum ("S"am and "S"tewart) who were the only partners of MRLP until Reid Liffmann and Steven Braesch were added in 2001

and 2003 respectively.  (SODF ¶ 54).  Under the CPA, S&S Finance would be defined as an

"Affiliate."  *Id*.  The individuals who are partners in MRLP, and specifically Rose and

Greenebaum, are also 'Equity Holders" under the CPA.  *Id*.  When S&S Finance acquired the

first mortgage in 1996, that debt was owned by MRLP.  Approximately a year after its

acquisition, $7.27 million of the mortgage was reclassified as equity in the financial statements

provided to Viad and in MRLP's tax returns.  *Id*.  Although MRLP changed the classification

back to debt in the financial statements provided to Viad in or around 1999, it has continued to

treat the first mortgage as equity for tax purposes.  (SOF ¶ 127; SODF ¶ 54).  Since the

repayment of the loan was at a discount of approximately $1 million, it was technically a

refinancing for which MRLP received value which they should have shared with Viad to the

extent of its 15% cash participation.  (SODF ¶ 54).[5/]

MRLP argues that "there is no reason why the discount which S&S Finance was able to

obtain should be treated any differently vis-à-vis its borrower than would any other loan

purchase discount would be treated for a borrower."  (MRLP and MRTDR Brief at 18).

However, given the aforementioned facts the response to this argument is obvious.  Since S&S

Finance is owned by Rose and Greenebaum, who are Equity Holders of MRLP, the acquisition

of the mortgage at a discount was essentially a repayment of the loan by MRLP.  For this same

reason, contrary to MRLP's assertions,[6/] interest on the first mortgage should only be charged on

the amount actually paid by S&S Finance to acquire the loan.

---

[5/]      Arguably, Viad should have been paid 15% of the amount of the refinancing at that time.
At this point, MRLP has recognized the cash value of the discount on sale of the property, and a
correct application of the calculated appreciation will include this amount as part of the
Appreciation Cash Payment due on sale.

[6/]      *See* MRLP and MRTDR Brief at 21.

IV.     **MRLP HAS MISSTATED THE ISSUE SURROUNDING THE TDRS**

In its pleadings and motion, MRLP has misstated the issues before the court relating to the TDRs.  First, MRLP focuses its argument on defining TDRs as commodities, a characterization which Viad accepts and which has no significant impact on the issue before this court.  Second, MRLP falsely describes the issue by asserting that Viad is attempting to share 15% of the "value of the TDRs."  This is not and has not been Viad's argument.  Instead, Viad claims that it is owed 15% of the appreciation attributed to the 90 K Street property, which appreciation reflects the additional development density as a result of being in a TDR "receiving zone."  Third, MRLP has failed to justify or discuss the exclusion of nearly $70 per square foot from the total consideration paid to it, a price nearly eleven times the undisputed market value of TDRs.  Lastly, MRLP fails to adequately discuss the requirements as set forth under the CPA by focusing exclusively on the contract price of the land and not the fair market value of the property.

A.     **MRLP's Argument that TDRs are Commodities Supports Viad's Analysis Under the CPA**

Ignoring that they are an "interest in the Property," MRLP only focuses on TDRs as a commodity which is tradable and saleable.  The law review article cited by MRLP discusses  the term "commodities" in the context of describing TDRs as one of the "sticks" in the "bundle of sticks" that constitute the rights associated with property.  This concept, more commonly known as the "the bundle of rights", is a common analysis which explains how various facets of property can simultaneously be "owned" by multiple parties.  Here, the fact that a "stick" of TDR rights exists supports Viad's analysis of the CPA.

Whether a TDR is a commodity – meaning that it can be easily bought or sold – does not change the fact that TDRs are both an interest in the property and an improvement made upon the property and, thus, included in the calculation of the value of the property at issue.

The "Agreed Value" of the property is defined as the greater of the gross proceeds actually received in a sale of the property or the fair market value of the property. (*See* Section 3.3 of the CPA). Under either measure, all "interests in the property" would naturally be included in the calculation of the Agreed Value. In fact, the CPA states as much when it sets forth that one of the events that triggers the payment of an Appreciation Cash Payment to Viad is "the sale, assignment, condemnation, conveyance or other disposition **of all or any part of or interest in the Property**." (SOF ¶ 12) (emphasis added).

TDRs are certainly an "interest in the property." First, "interest" is defined by Black's law dictionary as a "legal share in something" akin to a "right." BLACK'S LAW DICTIONARY, 328 (1996). TDRs by their name, are a right in property. "In the construction of a contract the intention of the parties is to prevail, and in ascertaining this intention the language is to be given its plain and ordinary meaning." *Friedman v. Decatur Corp.*, 135 F.2d 812, 815 (D.C. Cir. 1943). Given the plain and ordinary meaning of "interest" in property, TDRs would clearly be included as an interest.

Second, TDRs have value, are used for the benefit of the property, and their sale or transfer is recorded via covenants and certificates in the land records of the District of Columbia. (*See* 11 DCMR 1709.11) (TDRs "shall be recorded in the Office of the Recorder of Deeds"). These characteristics bear all the hallmarks of a traditional understanding of an "interest in property." As even stronger evidence, other courts have stated definitively that TDRs "constitute

a taxable property interest." *Mitsui Fudosan (U.S.A.), Inc. v. County of Los Angeles*, 268 Cal. Rptr. 356, 358 (Cal. Ct. App. 1990).

Third, analysis of the facts surrounding the instant dispute reveals that TDRs were considered by both parties to be an "interest in the property." It is undisputed that MRLP in 2000 tendered to Viad a proposed contract for sale of 90 K Street which clearly bundled all TDR development rights with land. (See SOF ¶¶ 75, 86, 87, 95, 96, 100). That contract did not close for unrelated reasons. Up until late 2006, in the middle of this litigation, MRLP listed its costs for purchase of TDRs as a deductible expense in the annual financial statements forwarded to Viad. (SOF ¶ 107). After concocting its scheme to separate $21 million of the purchase price allegedly attributable to TDRs from the sale, MRLP declared all of its prior conduct to have been an "administrative mistake." (SOF ¶ 113).

The availability of TDRs is inherently included in the value of land by purchasers and appraisers. The valuation of 90 K Street was based in part on its total development potential, which was increased by its placement in a receiving zone and the availability of TDRs. (*See* SOF ¶ 146). Evidence produced in this litigation also demonstrates that TCMD only paid the purchase price, more than $67 million, because the Property was eligible for TDRs to be applied to the determination of the FAR. (*See* SOF ¶¶ 118, 119). Viad believes that it is clear that TDRs are property or an interest in property, but does not believe the characterization is essential to its position that the TDRs can only be valued at their cost and not inflated to avoid MRLP's contractual obligation.

### B. Under the CPA, Viad is Owed 15% of the Appreciation of the 90 K Street Property, Based Upon its Agreed Value Under The CPA

MRLP has argued in its pleadings that Viad is seeking to share 15% of the "value of the TDRs." This misstates Viad's argument. Viad contends that it is owed 15% of the appreciation

of the entire property at 90 K Street.  The value of this land is increased by its placement within a "receiving zone."  When land is placed in a receiving zone, it is eligible under D.C. regulations to utilize TDRs. (*See* SOF ¶¶ 86, 96, 100). Thus, the value added to the land that results from its location and designation is part and parcel of the overall value of the land.  In accordance with the CPA, the value added to 90 K Street as a result of the property being designated a receiving zone should be included in the calculation of the Agreed Value and the attendant Appreciation Cash Payment reduced only by the actual cost of the TDRs.

As discussed in Viad's Memorandum in Support of its Summary Judgment Motion, TDRs would be considered Improvements under the CPA and therefore, they would be defined as Property.  The CPA defines "Property" to include "Improvements" and "Real Property" and defines "Improvements" to include "other improvements that are . . . placed upon the Real Property."  (SOF ¶ 12).  TDRs add density to the property and are therefore essentially "placed upon the Real Property."  Moreover, as previously documented, several jurisdictions have looked to Black's Law Dictionary for guidance in defining the term "improvements."  Utilizing this common sense approach has led courts to conclude that the term includes "everything that permanently enhances the value of the premises for general use." *Arizona Dep't of Revenue v. Arizona Outdoor Advertisers, Inc.*, 41 P.3d 631, 634 (Ariz. Ct. App. 2002).  It has been shown repeatedly through the evidence and pleadings that the 90 K Street property's value was enhanced by being designated a "receiving zone" with the attendant TDRs. (See SOF ¶¶ 75, 86, 87, 95, 96, 100).  As a result, TDRs are included in the definition of "Improvements" and "Property" under the CPA.

C.    **MRLP Fails to Offer any Justification for the Sale Price of Approximately $70 for the TDRs**

MRLP structured its sale to TCMD in two contracts, one for land and one for TDRs. MRLP's sale of TDRs valued them at approximately $70 per square foot. (SOF ¶¶ 114, 118). This price is both ridiculous and entirely unsupported by the pleadings and arguments set forth. To date, MRLP has not provided any reason as to why the TDRs were sold for $70 per square foot as opposed to the current market price. The buyer of the property could have purchased TDRs at their fair market value of less than $6 per square foot. It paid the inflated value of $70 per square foot because MRLP structured the overall transaction to deprive Viad of a participation.

On January 11, 2007, MRLP sold 90 K Street N.E. for more than $67,000,000 to TC MidAtlantic Development, Inc. (SOF ¶¶ 133, 134). Included within this amount was $46,036,528 that MRLP attributed to the property and approximately $21 million that MRLP attributed to the TDRs. (SOF ¶ 110). The agreement with TCMD included a so-called Umbrella Agreement (SOF ¶ 114). Under that document, sale of the land at 90 K Street was conditioned on the purchase of 45 L Street, the adjoining lot, and on the purchase of TDRs at a price sufficient to provide compensation for MRLP at an FAR value of approximately $70 per square foot, which represents the same price per square foot as attributed to the land. (SOF ¶ 114).

1.    **Current Market Price of TDRs**

Currently, TDRs are selling at $5.25 to $5.50 per square foot. (SOF ¶ 98). Since 1998, they have ranged in price from $25.00 to $3.00 with an overall downward trend to the present. (SOF ¶ 94). This is an indication that the supply of TDRs exceeds demand and that TDRs are readily available. MRLP's own expert, Stuart Smith, testified that on one recent occasion, he determined the value of the TDRs in the North Capitol receiving zone, where 90 K Street is

located, to be $3.50 per FAR. (SOF ¶ 103). Evidence demonstrates that MRLP paid $6.00 per

square foot for the TDRs that were subsequently sold to TCMD. (SOF ¶ 102).

### 2. MRLP's Purported Price for the TDRs

TCMD has admitted in deposition testimony that the price paid to MRLP for TDRs was

well-above the market price and was agreed to only because purchasing the TDRs at an inflated

value was a requirement imposed by MRLP as a condition for purchasing the land at 90 K Street,

even though they could be purchased for $5.25 to $5.50. (SOF ¶¶ 98, 122).

Further, this litigation has produced evidence that TCMD had been informed by its

broker that a large property was for sale in the range of $100 million dollars (for both 90 K Street

and the adjoining 45 L Street). (SOF ¶ 115). This led to a discussion between TCMD

representatives and MRLP representatives where the expectation of the price was known to be

approximately $100 million. (SOF ¶ 116). These discussions did not include any conversation

regarding a separation or differentiation between the property and the TDRs. (*See* SOF ¶ 117).

### 3. Effect on Appreciation Cash Payment

The cost of acquisition of the TDRs by MRLP is clearly a deductible cost under the CPA

in calculating the payment due to Viad. Thus, Viad would not be entitled to any share of the $6

per square foot price <u>paid</u> by MRLP to maximize the value it received in sale of the property. It

is, however, clearly entitled to the share in the amount artificially assigned to the TDRs by

MRLP to the extent they exceed the cost of acquisition.

The purpose of separating the TDRs and the land into two contracts was designed solely

as a means to deprive Viad of the Appreciation Cash Payment that it was owed under the CPA.

In any event, the land price is obviously not the result of an arms-length negotiation with the

buyer. The price paid for the "land" and the separate price paid for the TDRs were separated at

the insistence of MRLP, the total of the two being consistent with the buyer's view of the value

of the package, and the price allocations being determined by MRLP with an eye towards the CPA. According to Daniel Hudson, President of TC MidAtlantic, the buyer analyzed the sale in terms of the total FAR. (SOF ¶ 118). In the buyer's experience, the District of Columbia government would allow a maximum of 10.0 FAR on 90 K Street, and it calculated its expected yield on that basis. (SOF ¶ 119). 10.0 FAR is only achievable when the TDRs are included. (D.C. Mun. Regs. tit. 11, § 1707.5 (d); SOF ¶ 96). Mr. Hudson added that the "bargain" between the parties was that MRLP would be paid for the achievable FAR regardless of how the price was allocated between TDRs and land. (SOF ¶ 122).

In summary, the inflated dollar value assigned by MRLP to the TDRs it sold to TCMD is unjustified and is evidence of the fraud it seeks to perpetrate on Viad. The court must reject MRLP's contention that the $21 million price attributed to the TDR sale is not covered by the CPA and should not be included in the fair market valuation of the property.

### D.    MRLP Failed to Offer any Evidence of the Fair Market Value of the Property

In any event, the analysis of the contract price for sale of the property is not dispositive under the CPA. Instead the contract price must be compared to the fair market value to determine the "Agreed Value." The only evidence of the fair market value is that the property has a value of $64,800,000. MRLP's failure to abide by the CPA and provide a fair market value of the property through an appraiser requires the court to utilize the value calculated by Viad's expert appraiser.

The Agreed Value is defined in Section 3.3 of the CPA as the greater of the gross proceeds actually received in a sale of the property or the fair market value of the property. (SOF ¶ 14). Thus, to determine the Agreed Value, both figures must be calculated. MRLP claims that the gross proceeds of the property amounted to $46,036,528, arriving at this figure by

artificially separating the price paid for the TDRs. If the court found that this figure was the accurate gross proceeds amount, it would then need to compare it to the fair market value of the property.

The CPA provides a mechanism for calculating the fair market value of the property when there is a dispute regarding the Appreciation Cash Payment. Once Viad has received notice of an occurrence of an event that requires the determination of the fair market value, it has two choices. The parties may come to an agreement as to the fair market value or if they are unable to, the parties may follow procedures whereby qualified appraisers are utilized to determine the value. (SOF ¶¶ 145-147). On January 11, 2007, Viad was put on notice that a determination of fair market value would be required. On that date, MRLP sold 90 K Street N.E. for more than $67,000,000. (SOF ¶¶ 133-134).

Following this notification, the parties had thirty days to come to an agreement as to the fair market value of the property. This time period lapsed on February 11, 2007. If the parties are unwilling to come to an agreement, they have 15 days to select an appraiser. On January 31, 2007, Viad provided to MRLP a report and an opinion, prepared by an M.A.I. appraiser, as to the fair market value of the Property. (SOF ¶ 145). By doing so, Viad complied with the CPA and specifically with Section 3.8. The appraiser, Steven Halbert, of Cushman and Wakefield, provided his written opinion that the fair market value of the Property on June 24, 2006, and within a 6 month period thereafter, which period included the date of the contract between MRLP-TCMD, was $64,800,000. (SOF ¶ 146). The time period for identifying the appraiser lapsed on February 15, 2007.[7/] (SOF ¶ 148). Viad's letter of February 21, 2007 provided notice

---

[7/]    February 15, 2007 is the correct date because on January 31, 2007, Viad sent its appraisal report indicating that it did not feel an agreement between the parties could be reached regarding the fair market value. MRLP never responded to this appraisal nor did they respond to Viad's

*Continued on Next Page*

to MRLP that it was in default for failure to contest the fair market value component of the Agreed Value under the CPA. (SOF ¶ 150). Therefore, as required by the CPA, MRLP did not, and still has not, provided any evidence of the fair market price of the property.

This failure by MRLP necessitates a finding that Viad's expert opinion as to the fair market value is the only opinion for the parties to utilize in comparing to the amount generated by the gross proceeds. The appraised value (nearly $65 million), calculated by Viad's expert was considerably greater than the gross proceeds calculated by MRLP (close to $46 million). Thus, under Section 3.3, the Appreciation Cash Payment would be based on the higher amount, $64,800,000. (SOF ¶ 142).

Thus, even if the court were not to include the price paid for the TDRs in its calculation of the Appreciation Cash Payment, it would still be required to abide by the CPA and find that the appraised value was greater than the amount set forth by MRLP and use that as a basis for the Appreciation Cash Payment.

## V.  MRLP HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### A.  MRLP, Like All Parties to a Contract, Owed a Duty of Good Faith and Fair Dealing to Viad

In its summary judgment motion, MRLP argued that although "[t]here is implied in **many** contracts a duty of good faith and fair dealing . . . there is no question that the relationship between Viad and MRLP is that of creditor-debtor" and that such a relationship "ought not trigger an implied duty of good faith and fair dealing." (Pl.'s Br. Summ. J. 40) (emphasis

---

letter of February 21, 2007. In any event, MRLP has failed to name an appraiser in accordance with Section 3.8, thereby effectively waiving any arguments as to the calculation of timing under the CPA.

added).  MRLP has misstated the law in the District of Columbia and has misconstrued this

court's analysis of the covenant of good faith and fair dealing to creditor-debtor relationships.

### 1.    Every Contract Contains the Implied Covenant of Good Faith and Fair Dealing

As this court has recognized, "[u]nder District of Columbia law, '**every** contract

[contains] an implied covenant that neither party shall do anything which will have the effect of

destroying or injuring the right of the other party to receive the fruits of the contract, which

means that in **every** contract there exists an implied covenant of good faith and fair dealing.'"

*Steele v. Isikoff*, 130 F. Supp. 2d 23, 32 (D.D.C. 2000) (quoting *Hais v. Smith*, 547 A.2d 986, 987

(D.C. 1988) (emphasis added); *see also* MRLP's cited case *Allworth v. Howard Univ.*, 890 A.2d

194, 201 (D.C. 2006) (stating that "**all** contracts contain an implied duty of good faith and fair

dealing") (emphasis added).  MRLP's insinuation that some contracts do not contain the implied

covenant is both misleading and incorrect.  The Cash Participation Agreement at issue states that

the "agreement shall be governed and construed in accordance with the laws of the District of

Columbia . . . ."  (*See* CPA 7.10).  Accordingly, the Cash Participation Agreement contains an

implied covenant of good faith and fair dealing.

### 2.    Contracts Between Creditors and Debtors Clearly Contain the Implied Covenant of Good Faith and Fair Dealing

The majority of case law from all jurisdictions, including the District of Columbia,

provides that creditor-debtor relationships hold no special exemption from the traditional rule

imposing the implied covenant of good faith and fair dealing in all contracts.

D.C. Courts have not directly stated whether the implied covenant of good faith and fair

dealing applies to situations involving a creditor-debtor relationship.  This is perhaps, because

D.C. Courts have routinely found that the covenant applies to "all contracts", choosing not to

make distinctions involving specific relationships.  *See Allworth*, 890 A.2d at 201.

Although there is a lack of significant case law regarding the issue, other courts have found an implied covenant of good faith and fair dealing in a creditor-debtor relationship. *See In re A.W. Logging, Inc.*, 2006 Bankr. LEXIS 3605, at *16 (Bankr. D. Idaho Oct. 4, 2006) (finding the "creditor did not breach" its "covenant of good faith and fair dealing"); *Wilbar Realty, Inc. v. Pa. Infrastructure Inv. Auth. (In re Wilber Realty, Inc.)*, 325 B.R. 354, 360 (Bankr. M.D. Pa. 2005) (finding that a "lending institution does not violate" its "duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor"); *Bristol Sav. Bank v. Chic Miller's Chevrolet-Isuzu, Inc.*, 1993 Conn. Super. LEXIS 996 (Conn. Super. Ct. Apr. 27, 1993) (where debtor asserted that the creditor violated the implied covenant of good faith and fair dealing by not changing the terms of the loan and the court found that the creditor did not act in bad faith and did not mislead the debtor in any way).

Moreover, an implied covenant of good faith and fair dealing has been applied in a variety of contractual relationships, suggesting that no distinction needs to be made for creditor-debtor relationships. *United Techs. Corp. v. American Home Assur. Co.*, 118 F. Supp. 2d 181, 186 (D. Conn. 2000); *see also B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp.*, 785 F. Supp. 222, 228 (D. Mass. 1991) (finding that "'the implied covenant of good faith and fair dealing has been applied by this court in a variety of contractual relationships'" and applying it in a lender-borrower relationship) (citations omitted).

MRLP weakly cites three cases for the proposition that a "creditor-debtor relationship ought not trigger an implied duty of good faith and fair dealing." (Pl.'s Br. Summ. J. 40). MRLP can only cite one case, a decision in North Texas, that stands for the proposition it urges this court to adopt. (Pl.'s Br. Summ. J. 40) (citing *Home & Hearth Plano Parkway, L.P. v.*

25

*LaSalle Bank, N.A (In re Home & Hearth Plano Parkway, L.P.)*, 320 B.R. 596 (Bankr. N.D. Tex. 2004).

MRLP cites one District of Columbia case as evidence for its assertion. Even a cursory analysis reveals that this cited case is not relevant to this court's inquiry. In *Hais v. Smith*, the court found that there was no duty by one party to a contract to ensure fair dealings between two individuals who comprised the *other* party to a contract. 547 A.2d 986, 988 (D.C. 1988). The court reiterated that "'in every contract there exists an implied covenant of good faith and fair dealing.'" *Id.* at 987 (citations omitted). The court did not state that the covenant did not extend to creditor-debtor relationships as MRLP suggests. Instead, the court chose not to extend the duty past the bilateral parties to a contract.

Given the history in which the implied covenant has been applied, and because there is nothing to suggest it would not be applied in this instance, the court should follow its own long-standing precedent in enforcing the covenant of good faith and fair dealing and apply the covenant in the contract between the parties in the instant case.

### B.    The Language of the CPA Does Not Waive the Implied Covenant and Does Not Excuse Fraudulent Behavior

MRLP alternatively argues that Section 6.1 of the Cash Participation Agreement, which states that "Montgomery Road, at all times consistent with the terms and provisions of this Agreement . . . shall be free to determine and follow its own policies and practices in the management and conduct of its business on the Property," "insulates Montgomery Road from the kind of duty of good faith and fair dealing Viad seeks to impose on it." (Pl. Br. Summ. J. 40-41). This argument fails not only because MRLP fails to provide any support for its argument, but also because such an argument implies that Section 6.1 provides MRLP with a free pass to

behave fraudulently and with bad faith in violation of D.C. law. This language does not sanction fraudulent accounting.

To be clear, the phrase relied upon by MRLP does not expressly waive the implied covenant of good faith and fair dealing. Its wording is ambiguous at best. Without an express waiver the implied covenant of good faith and fair dealing is present in all contracts under D.C. law.

As well, if this court were to follow its own precedent and conclude that the implied covenant of good faith and fair dealing is present in the CPA, then the cited phrase would have to be read in conjunction with that implied covenant. The implied covenant would be one of the "terms or provisions of Agreement" and thus MRLP could not act contrary to its duties under the covenant.

In addition, contract language cannot be used as a shield to protect fraudulent behavior, as exhibited by MRLP. *See Andrews v. Blue*, 489 F.2d 367, 375 (10th Cir. 1973) (finding that a "contract cannot be used as a shield for wrongdoing amounting to statutory fraud"); *London v. Guberman*, 29 Cal. Rptr. 279, 282 (Cal. Ct. App. 1963) (finding that the provisions of the contract could not shield the defendant from liability for fraud).

As the Plaintiffs have not provided any support for their contention that Section 6.1 of the CPA would waive the covenant of good faith and fair dealing, the court should deny summary judgment for MRLP on this argument.

### C.    Viad has Demonstrated Ample Evidence of MRLP's Bad Faith and Fair Dealing

Contrary to MRLP's assertion, Viad has demonstrated ample evidence of MRLP's bad faith. This bad faith clearly breached the implied covenant of good faith and fair dealing. Although these instances were detailed in Viad's complaint and motion for summary judgment, a

short recount of the most glaring facts clarify the extent of the breach of the implied covenant by MRLP.

From 1987 until the present, MRLP has continually misrepresented the value of the land in an effort to convince Viad to relinquish its cash participation interest for a nominal price. (SOF ¶¶ 29, 30). Furthermore, MRLP has taken multiple and contradictory positions on the classification of items in the financial statements provided to Viad. (SOF ¶ 73). Under the direction of its litigation counsel, in a Revised 2005 Statement, MRLP reclassified amounts advanced by S&S Finance from equity to debt and reversed previous accounting treatments for TDRs as an "administrative error," during the pendency of litigation over that accounting. (SOF ¶¶ 67, 113). The Revised 2005 Statement reflects a debt of over $35 million to S&S Finance. (SODF ¶ 53). However, this Revised 2005 Statement, which MRLP claims reflects the "economic reality" of the situation, conflicts with MRLP's 2005 tax return, which shows liabilities of $4,209,927, and the settlement sheets for the TCMD-MRLP transaction, which shows a disbursement to S&S Finance of only $2,870,000. (SOF ¶ 129; SODF ¶ 53). Finally, MRLP defaulted under the contract by not designating an appraiser in accordance with sections 3.8 and 3.11 of the CPA, and by not providing a calculation of the Appreciation Cash Payment within three days of the closing in accordance with Sections 3.2 and 3.9 of the CPA. (SOF ¶¶ 133-138, 143-44, 147-48). MRLP failed to respond to Viad's letter providing notice of default, which consequently interfered with Viad's ability to enforce the CPA. (SOF ¶ 139-40).

MRLP has argued in its motion that it simply acted in its own self-interest and that such actions cannot be construed to be in violation of the implied covenant of good faith and fair dealing. (Pl.'s Br. Summ. J. 41). "Good faith and fair dealing" has been defined in D.C. Courts by stating that "'neither party shall do anything which will have the effect of destroying or

injuring the right of the other party to receive the fruits of the contract.  If the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing.'"  *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (citations omitted).  MRLP sets up a straw-man by characterizing Viad's position as asking this court to find that MRLP had to structure its sale transaction to maximize Viad's cash participation. This misstates Viad's argument.  However, it must be noted that the fair market value was included in the CPA as an alternative Agreed Value in order to protect Viad in the event that MRLP attempts to sell the property for a fraudulently low price.

Viad's complaints and motions have argued that MRLP, like all parties to a contract, simply owed the basic duty of good faith and fair dealing.  The numerous facts of improper behavior by MRLP, as discussed above, show that Viad's claims of improper behavior rise well above merely acting in MRLP's own self-interest.  Given this distinction, MRLP's cited cases[8/] are inapplicable as they all relate to a contracting party acting only in its own self-interest, rather than acting with a fraudulent intent.

Viad is not seeking to impose fiduciary duties upon MRLP, instead it expects MRLP to act in good faith, as required by all contracts in the District of Columbia.  Accordingly, Summary

---

[8/]    In all of these cases, none of which are from this court and are therefore not binding, fraud was not an allegation or claim made by the parties. In *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400 (2d Cir. 2006), there were no allegations of fraudulent behavior.  Instead, the court dealt with a non-compete agreement and information that might be used to more effectively compete.  *Id.*  The court did state that the covenant would be violated when a party's actions "directly violate 'an obligation that may be presumed to have been intended by the parties.'"  *Id.* at 407-08 (citation omitted).  Such is the case in the instant litigation. Similarly, in *In re IT Group, Inc.*, 448 F. 3d 661, 666 (3d Cir. 2006), the bankruptcy court was faced with the priority of creditors, rather than improper or fraudulent actions.. In *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepcsiCo, Inc.*, 431 F.3d 1241 (10th Cir. 2005), there were again no allegations of fraudulent behavior by the parties.  .

Judgment should be denied as to Section VII of MRLP's Memorandum of Points and Authorities in support of its Motion for Summary Judgment.

## VI.    CONCLUSION

For the foregoing reasons, Viad requests that this Court deny MRLP and MRTDR's motion for summary judgment.  Based on Viad's own motion for summary judgment, summary judgment should be entered for Viad on Counts I and II of the First Amended Complaint and Counts I, II, III and IV of the Amended and Supplemental Counterclaim.

Respectfully Submitted,

BRYAN CAVE LLP


By:  _/s/ Rodney F. Page_____
     Rodney F. Page (DC Bar No. 37994)
     Alicia I. Hogges-Thomas (DC Bar No. 480548)
     700 Thirteenth Street, N.W., Suite 700
     Washington, D.C. 20005-3960
     P:  (202) 508-6000
     F:  (202) 508-6200

     *Counsel for Defendant/Counterclaim-Plaintiff
     Viad Corp*

Dated:  April 19, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**MONTGOMERY ROAD I LIMITED**           )
**PARTNERSHIP,**                        )
                                        )
      **Plaintiff and**             )
      **Counterclaim-Defendant,**   )
                                        )
**v.**                                  )
                                        )
**VIAD CORP,**                          )    **Case No.  1:06CV00344 (HHK)**
                                        )
      **Defendant and**             )
      **Counterclaim-Plaintiff,**   )
                                        )
**v.**                                  )
                                        )
**MONTGOMERY ROAD TDR, LLC,**           )
                                        )
      **Counterclaim-Defendant.**   )
_____)


## DEFENDANT VIAD CORP'S
## STATEMENT OF DISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 7(h), Defendant/Counterclaim-Plaintiff Viad Corp ("Viad"), hereby submits this Statement of Disputed Material Facts in support of its Opposition to the Motion of Montgomery Road I Limited Partnership ("MRLP") and Montgomery Road TDR, LLC ("MRTDR") for Summary Judgment.  Viad avers that there are genuine issues with respect to the disputed facts identified below.  The citations referenced are to those portions of the record filed herewith (Exhibits 56-67) and to those portions that were previously filed with Viad's Motion for Summary Judgment (Exhibits 1-55) on March 29, 2007.

**VIAD CORP'S RESPONSE TO**
**THE STATEMENT OF UNDISPUTED MATERIAL FACTS FILED IN**
**SUPPORT OF MRLP AND MRTDR'S MOTION FOR SUMMARY JUDGMENT**

Viad responds to the individually numbered paragraphs of MRLP and MRTDR's

Statement of Undisputed Facts as follows.  To the extent the organizational headings and titles in

MRLP and MRTDR's Statement attempt to characterize the facts, such characterizations are

disputed.

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Undisputed.

5.    Undisputed.

6.    Undisputed.

7.    Disputed to the extent that MRLP and MRTDR are suggesting that MRLP paid

interest on the $10.3 million loan after its acquisition by S&S Finance Limited Partnership

("S&S Finance") in 1996.  The evidence demonstrates that MRLP has accrued interest, but never

paid it, on the first mortgage since its acquisition by S&S Finance in or about 1996.  (*See*

Deposition of Samuel Rose ("Rose Dep.") at 189:14-190:2 (Ex. 59); Deposition of Reid

Liffmann ("Liffmann Dep.") at 45:10-46:17 (Ex. 2);  Statement of Greenebaum and Rose

Associates, at Section I, VD-000458 (Ex. 13); Letter dated 11/21/06 from D. Cooter to R. Page,

enclosing Revised 2005 Statement at 2) (Ex. 36).

8.    Undisputed.

9.    Undisputed.

10.    Undisputed.

11.    Undisputed.

12.    Undisputed.

13.    Disputed to the extent that MRLP and MRTDR are suggesting that the interest charged by S&S Finance would be Permitted Debt under Section 2.3(b) of the Cash Participation Agreement ("CPA").  According to Section 2.3(b), "If Permitted Debt is held by any Affiliate of Developer, <u>interest paid thereon</u> shall be included as an expense only to the extent that it does not exceed the amount of interest that would have been payable on an equivalent loan from an unrelated bank, savings and loan association, insurance company or other financial institution." (CPA, § 2.3(b) (Ex. 9) (emphasis added).  The interest charged by S&S Finance was accrued, but never paid.  (Rose Dep. at 189:22-190:2 (Ex. 59); Liffmann Dep. at 45:10-46:17 (Ex. 2); Statement of Greenebaum and Rose Associates, at Section I, VD-000458 (Ex. 13); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36)).  As such, these accrued amounts are not Permitted Debt under Section 2.3(b).  (CPA, § 2.3(b) (Ex. 9).

14.    Undisputed.

15.    Disputed in that the Special Purpose Financial Statements (hereinafter "financial statements")were not provided <u>annually</u>.  There were also years when the financial statements were late. (Letter dated 5/12/93 from K. Goldman to R. Glassman, VD-000694 (Ex. 61); Letter dated 9/7/89 from K. Goldman to S. Rose, VD-000740 (Ex. 62); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Special Purpose Financial Statement ("Revised 2005 Statement") (Ex. 36)).  Furthermore, MRLP has not provided a financial statement for 2005. (Letter dated 9/21/06 from A. Pignatelli to R. Page, enclosing Draft 2005 Special Purpose Financial Statement ("Draft 2005 Statement") (Ex. 14); Rose Dep. at 212:6-213:7 (Ex. 1)).  In September and November 2006, counsel for Viad received draft and Revised 2005 financial

statements from Dale Cooter, litigation counsel for MRLP.  (Letter dated 9/21/06 from A.

Pignatelli to R. Page, enclosing Draft 2005 Statement (Ex. 14); Letter dated 11/21/06 from D.

Cooter to R. Page, enclosing Revised 2005 Statement (Ex. 36)).  The Revised 2005 Statement

was accompanied by a letter from Mr. Cooter with his opinion that the financial data is a correct

statement of expenses and other deductions under the CPA.  (Letter dated 11/21/06 from D.

Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36).  The Draft and Revised 2005

Statements (hereinafter "the Cooter Financials") do not comply with the requirements of the

CPA.  Unlike the other financial statements, which were prepared between 1987 and 2004, there

is no signed statement indicating that the Cooter Financials were certified by a firm of

independent certified public accountants, as required by Section 2.6 of the CPA.  (Liffmann Dep.

at 14:9-16:22; 35:15-37:12 (Ex. 2); CPA § 2.6 (Ex. 9); Letter dated 11/21/06 from D. Cooter to

R. Page, enclosing Revised 2005 Statement (Ex. 36); Letter dated 9/21/00 from A. Pignatelli to

R. Page, enclosing Draft 2005 Statement (Ex. 14); *see also* Special Purpose Financial Statement

for December 31, 2004 and 2003 (hereinafter "Representative Statement") MR-00953 at 00955)

(Ex. 35).  The CPA requires the certification of an independent certified public accountant

applying generally accepted accounting principles on a consistent basis to the books and records

of MRLP.  (CPA § 2.6) (Ex. 9).  Also disputed to the extent that MRLP seeks to characterize the

intent of the parties with respect to the provision of funds from S&S Finance.  Other than the

first mortgage note acquired by S&S Finance, no loan documents have been provided to

demonstrate that the amounts contributed by S&S Finance were in fact loans.  Further disputed

to the extent that MRLP's characterization of the amount previously classified as Developer's

Equity Return as "interest expense" suggests that it is properly deducted when calculating

Appreciation Cash Flow.  According to the CPA, only interest that is paid can be included as

Permitted Debt, and then subtracted as an Approved Deduction when computing Appreciation Cash Flow.  (CPA § 2.3(b), 3.1 and 3.4(a)) (Ex. 9).

16.    Undisputed.

17.    Disputed to the extent that MRLP suggests that Mr. Glassman prepared MRLP's Revised 2005 Statement for 2005 without direction from MRLP's litigation attorney.  The evidence demonstrates that the Revised 2005 Statement was prepared under the direction of attorney Dale Cooter.  (*See* Liffmann Dep. at 24:9-16; Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement; (Exs. 2 & 36).  In the cover letter accompanying the Revised 2005 Statement, Mr. Cooter stated: "As you know, I established that all money contributed to Montgomery Road I Limited Partnership was actually in the form of loans originating with S&S Finance.  There was never any intention to contribute non-interest bearing equity to the project."  (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36).  Furthermore, Reid Liffmann, testifying as a 30(b)(6) witness for MRLP, stated that the decision to revise the financial statements was made by counsel, himself, Mr. Rose and Mr. Glassman.  (Liffmann Dep. at 24:9-16) (Ex. 2)

18.    Disputed in that the intent of Mr. Greenebaum and Mr. Rose with respect to the funds from S&S Finance is irrelevant and inadmissible in interpreting the CPA.  Further disputed in that, other than the first mortgage, there is no evidence that the funds from S&S Finance are in fact loans.  MRLP has not produced loan documents to substantiate this claim.  Furthermore, according to MRLP's most recent tax return, MRLP owes S&S Finance less than $5 million. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50 & 52).  Nonetheless, MRLP claims in its Revised 2005 Statement that it owes S&S Finance over $35 million, excluding the principal on the first

mortgage.  (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36).  Finally, disputed to the extent that MRLP suggests that S&S Finance is not an Affiliate of MRLP.  According to the CPA, an Affiliate shall mean "any Person directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under Control with the Person in question, which, in the case of a Person which is a partnership shall include each of the constituent partners thereof."  (CPA § 1.2) (Ex. 9).  Furthermore, for entities that are not corporations, Control is "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person."  (CPA § 1.9).  Samuel Rose and Stewart Greenebaum are the limited partners of S&S Finance.  (Rose Dep. at 190:6-15) (Ex. 59).  They are also limited partners in MRLP, along with Reid Liffmann and Steve Braesch, who were added to the partnership in 2001 and 2003 respectively**.**  (Eighth Amendment to MRLP Partnership Agreement, MR-16825 (Ex. 7);  MRLP 2001 U.S. Return of Partnership Income at 10-23, MR-26497) (Ex. 63); MRLP 2003 U.S. Return of Partnership Income at 9-25, MR-26446 (Ex. 64); MRLP 1996 U.S. Partnership Return of Income, MR-26609, at Schedule K-1 (MR26620-26631) (Ex. 65)).

19.    Disputed because there is no basis in the record to support these argumentative conclusions, which are irrelevant to interpreting the CPA.  Also disputed in that MRLP has accrued, but never paid, interest on the S&S contributions to 90 K Street, including the first mortgage.  (Rose Dep. at 189:22-190:2 (Ex. 59); Liffmann Dep. at 45:10-46:17 (Ex. 2); Statement of Greenebaum and Rose Associates, at Section I, VD-000458 (Ex. 13); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36)).  As such, these accrued amounts are not Permitted Debt under Section 2.3(b)).  (CPA § 2.3(b) (Ex. 9).

20.    Disputed to the extent that MRLP suggests that its calculation of costs was correct. Developer's Equity Return is not an Approved Deduction under the CPA. Rather, Developer's Equity Return is deducted when computing Operations Cash Flow. (CPA §§ 2.3(a)(15), 3.1, 3.4(a)) (Ex. 9).

21.    Disputed in that the labeling of the alleged interest expense as Developer's Equity Return is not the only reason that Viad posits that the interest on the funds from S&S Finance are not a proper deduction when calculating Appreciation Cash Flow. Rather, Viad also contends that the interest on the first mortgage, which was acquired by S&S Finance is not properly deducted because it has been accrued not paid. (Rose Dep. at 189:22-190:2 (Ex. 59); Liffmann Dep. at 45:10-46:17 (Ex. 2); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36)); Statement of Greenebaum and Rose Associates, at Section I, VD-000458 (Ex. 13)). As such, these accrued amounts are not Permitted Debt under Section 2.3(b)). (CPA § 2.3(b) (Ex. 9). According to the CPA's definition of Permitted Debt, "[i]f Permitted Debt is held by an Affiliate of Developer, interest paid thereon shall be included as an expense." (CPA § 2.3(b) (emphasis supplied) (Ex. 9).

22.    Undisputed.

23.    Undisputed.

24.    Undisputed.

25.    Disputed. Although the parties had a dispute concerning the meaning and application of certain terms of the Cash Participation Agreement, there was never a dispute concerning the Special Purpose Financial Statements. The purpose of seeking advice from an accounting firm was to begin to resolve informally the dispute between the parties regarding the calculation of the Appreciation Cash Payment in the event of a sale of the Property, since MRLP

was eager to buy out Viad's interest. (Deposition of Eve Fiorucci ("Fiorucci Dep.") at 46:1-20; Record of Telephone Conversation on 6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664; (Exs. 6, 19, 27). In or about 2005, the parties agreed to seek the informal advice of Reznick Group ("Reznick"). (Fiorucci Dep. at 46:1-20; Record of Phone Conversation on 12/16/04, VD-000960; Letter dated 3/24/05 from R. Liffmann to B. Solomon, MR-01685) (Exs. 6, 30, 34). Although Reznick was selected by Viad, there is no evidence that this selection was done pursuant to Section 2.7 of the CPA. The dispute between the parties was related to the Appreciation Cash Payment, under Article 3 of the CPA. (*See* CPA § 3.1; Deposition of Eve Fiorucci ("Fiorucci Dep.") at 46:1-20; Record of Telephone Conversation on 6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664; (Exs. 6, 9, 19, 27). Such disputes are not governed by the dispute resolution provision in Section 2.7 (Compare CPA § 2.7 with CPA § 3.11). Furthermore, Section 2.7 requires an arbitration. (CPA, Section 2.7). Sam Rose, MRLP's 30(b)(6) witness, has testified that the Reznick review was not an arbitration. (Rose Dep. at 86:8-12) (Ex. 1).

26.     Undisputed that on April 10, 2005, the Reznick Group provided its analysis (hereinafter the "Reznick Analysis") and that a true and correct copy of the Reznick Analysis has been provided to the court. However, the characterization put on Reznick's analysis by MRLP is disputed. The Reznick Analysis speaks for itself.

27.     Disputed in that the CPA speaks for itself. According to the CPA, "the items shall be submitted to <u>arbitration</u>, which <u>arbitration</u> shall be performed by an independent certified public accountant selected by TLC and reasonably satisfactory to Developer, whose determination shall be final." (CPA § 2.7) (emphasis supplied) (Ex. 9). Further disputed in that Viad was not bound by the Reznick Group's conclusions because there was no arbitration under

Section 2.7 by Reznick Group. (Sam Rose Dep. at 86:8-12) (Ex. 1). The dispute between the parties related to the calculation of the Article 3 Appreciation Cash Payment, not the financial statements required under Article 2. (*See* CPA § 3.1; Deposition of Eve Fiorucci ("Fiorucci Dep.") at 46:1-20; Record of Telephone Conversation on 6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664; (Exs. 6, 9, 19, 27). Section 2.7, which appears in Article 2, the section of the CPA that deals with Operations Cash Flow, has nothing to do with the Appreciation Cash Payment. (*See generally* CPA, Article 2) (Ex. 9). Section 2.7 of the CPA does not relate to the subject matter of the Reznick letter; the letter deals with a hypothetical sale, whereas section 2.7 concerns disputes about yearly Operations Cash Payments (CPA § 2.7 (Ex. 9); Letter dated 4/10/05 from B. Solomon to R. Rose ("Reznick Analysis") ¶ 2, VD-000466 (Ex. 32)). Section 2.7 was not even mentioned until Reznick had completed its analysis. (*See* Email dated April 11, 2005 from B. Solomon to S. Rose, MR01939, attached as Ex. 66; Letter dated 5/2/05 from S. Rose to E. Fiorucci, VD-000453, attached as Ex. 33). Furthermore, Brent Solomon, the accountant who completed the analysis on behalf of Reznick, stated in his deposition: "I don't think anyone ever came to us and said your opinion is binding." (Deposition of Brent Solomon ("Solomon Dep.") at 108:8, attached as Ex. 60).

      28.    Undisputed.

      29.    Undisputed.

      30.    Undisputed.

      31.    Undisputed.

      32.    Undisputed.

      33.    Undisputed.

34.    Disputed.  Viad does not claim that it is entitled to 15% of the <u>value</u> of the TDRs. According to Viad's expert, the current market price of TDRs is $5.25 to $5.50.  (Expert Report of Cynthia Giordano ("Giordano Report") at 5 (Ex. 37).  Rather, Viad is claiming that it is entitled to 15% of the purchase price for the land as enhanced by the availability of TDRs because of the location and zoning of the Property.  (Amended and Supplemental Counterclaim, ¶¶ 7-9).  The price paid, more than $67 million, was for the total achievable FAR.  (Hudson Dep. at 33:5-10; 33:18-34:4) (Ex. 5).  Under the D.C. Regulations, the total achievable FAR, 10.0, is only achievable when the TDRs are included.  (D.C. Mun Regs. tit. 11, Section 1707.5(d)).

35.    Undisputed.

36.    Undisputed.

37.    Undisputed.

38.    Undisputed.

39.    Disputed in that the creation of the receiving zone, not the transfer of TDRs, is what increases the development rights of the receiving site.  According to Viad's expert Cynthia Giordano, the establishment of a receiving zone is effectively an up-zoning of the properties located within the zone to a higher matter of right density.  (Giordano Dep. at 5) (Ex. 37).

40.    Undisputed.

41.    Undisputed.

42.    Undisputed.

43.    Disputed to the extent that Montgomery Road already has the Future TDRs under contract.  (Agreement of Purchase and Sale of Transferable Development Rights dated September 29, 2006, between Montgomery Road TDR, LLC and Freedom Forum, Inc., MR-24115-24134, attached as Ex. 67).

44.    Undisputed.

45.    Undisputed.

46.    Disputed in that the TDRs do in fact inure as a natural benefit to and reflect value of 90 K Street.  The Property is in a receiving zone and may by right acquire TDRs to increase density from 6.5 FAR to 10.0 FAR.  (D.C. Mun. Regs. tit. 11, § 1707.5(d); *see also* Giordano Report at 5, attached as Ex. 37).  Furthermore, MAI Appraiser Steven Halbert considered the TDRs in his appraisal of 90 K Street.  Mr. Halbert based his valuation on the total development potential of 10.0 FAR.  (Expert Report of Steven Halbert ("Halbert Report") at 27 & 37, attached as Ex. 54).  Also, according to Daniel Hudson, President of TCMD, the buyer analyzed the sale of 90 K Street in terms of the total FAR of 10.0.  (Hudson Dep. at 33:5-10; 33:18-34:4) (Ex. 5).  Under the D.C. Regulations, 10.0 FAR is only achievable when TDRs are included.  (D.C. Mun. Regs. tit. 11, 1707.5(d)).

47.    Undisputed.

48.    Disputed in that, although TDRs are commodities that may or may not be sold concurrently with a land sale, TDRs are not sold separately for a price per square foot that is the same as the price of the land to which they will be attached.  (Deposition of Stuart Smith ("Smith Dep.") at 94:13-95:4) (Ex. 4).  According to Viad's expert Cynthia Giordano, the current market price for TDRs is between $5.25 to $5.50 per square foot.  (Giordano Report at 5) (Ex. 37).  Furthermore, MRLP's rebuttal expert, Stuart Smith, testified that on one recent occasion, he determined the value of TDRs in the North Capitol Receiving Zone, where 90 K Street is located.  The value he concluded for that transaction was that TDRs had value of $3.50 per FAR.  Furthermore, Mr. Smith testified that TDRs do not sell for a price that is equal to or similar to the price per square foot of the land to which they will be attached.  (Smith Dep. at 34:1-3; 94:13-

11

95:4) (Ex. 4).  Finally, MRLP contracted to buy TDRs for use at 90 K Street for $6 per square foot.  (Braesch Dep. at 24:19-29:17) (Ex. 3).  However, TCMD paid approximately $70 per square foot for the TDRs because the TDRs were sold with the land as part of a total square foot package.  (Hudson Dep. at 33:5-10; 33:18-34:4) (Ex. 5).  Not once in its analysis does MRLP seek to justify its exclusion of nearly $70 per square foot from the total consideration paid to it, a price nearly eleven times the undisputed market value of TDRs, or address the structure of the transaction which separates the sale into two components that are contingent on each other in accordance with the Umbrella Agreement between the parties.  TCMD has admitted in Deposition testimony that the price paid to MRLP for TDRs was well above the market price and was agreed to only because purchasing the TDRs at the higher value was a requirement imposed by MRLP as a condition for purchasing the land at 90 K Street.  (Hudson Dep. 45:4-46:17) (Ex. 5).

49.     Disputed in that Viad's experts did not opine on whether the TDRs would be considered Improvements or Property under the CPA.  Ms. Giordano was not asked to interpret the terms of the CPA, nor was Mr. Halbert.  (Deposition of Cynthia Giordano ("Giordano Dep." at 6:21-7:10, attached as Ex. 56; Halbert Dep. at 15:9-22; 17:5-18:1, attached as Ex. 58).

50.     Disputed to the extent that MRLP suggests that Mr. Glassman was the only person involved in preparing the 2005 Revised Statement.  In fact, the decision to revise the 2005 Statement was made by MRLP's litigation counsel, Sam Rose, Reid Liffmann and Mr. Glassman.  ((*See* Liffmann Dep. at 24:9-16; Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement; (Exs. 2 & 36).  It is clear that Mr. Cooter orchestrated the revision of the 2005 Statement.  *Id.*  Further disputed in that there is no evidence that the alleged corrections in the Revised 2005 Statement reflect the "economic reality" of what had occurred

since MRLP's purchase of the property.  No loan documents have been submitted by MRLP to substantiate their claim that the contributions from S&S Finance are debt.  Furthermore, Ron Glassman, testifying as a 30(b)(6) witness for MRLP, stated that MRLP has continued to treat the first mortgage, which was acquired by S&S Finance in 1996, as partners capital on its tax forms.  (Deposition of Ronald Glassman ("Glassman Dep." at 33:3-17; 37:14-39:22 (Ex. 57); Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-001015) (Ex. 24).  The treatment of the S&S Finance contributions in the Revised 2005 Statement conflicts with the treatment of these amounts in MRLP's most recent tax return and in the settlement statement for the closing on the TCMD-MRLP transaction.  In the tax return and the settlement statement, the amounts owed to S&S Finance are under $5 million.  (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50 & 52).  However, in the Revised 2005 Statement, MRLP is claiming that it owes S&S Finance over $35 million.  (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36).  The treatment of the contributions from S&S Finance as debt also conflicts with the Reznick Analysis.  According to the Reznick Analysis "any amount advanced by S&S or its partners to pay interest or any other reasonable expense should be treated as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b)."  (Reznick Analysis, VD-000466, at ISSUE 3, Interpretation) (Ex. 32).  It is clear from the foregoing that MRLP made the alleged corrections to the Revised 2005 Statement as part of its effort to deprive Viad of its rights under the CPA.  Also disputed in that S&S Finance's expectations with regard to the funds it allegedly contributed are irrelevant and inadmissible in interpreting the CPA.

51.    Disputed to the extent that MRLP implies that the classifications in the Revised 2005 Statement are correct.  Also disputed in that although S&S Finance is not a partner of

MRLP, S&S Finance's partners, Sam Rose and Stewart Greenebaum, are also partners of MRLP. (Rose Dep. at 190:6-15) (Ex. 59); Eighth Amendment to MRLP Partnership Agreement, MR-16825 (Ex. 7). In fact, they were the only partners of MRLP until Reid Liffmann and Steve Braesch were added in 2001 and 2003 respectively. (MRLP 2001 U.S. Return of Partnership Income at 10-23, MR-26497) (Ex. 63); MRLP 2003 U.S. Return of Partnership Income at 9-25 (Ex. 64); MRLP 1996 U.S. Partnership Return of Income, MR-26609, at Schedule K-1 (MR26620-26631) (Ex. 65)). As a result, S&S Finance can advance equity to MRLP. (*See* CPA §§ 1.17, 3.6(a) & 3.6(b)) (Ex. 9).

52. Disputed in that there is no evidence that the alleged corrections in the Revised 2005 Statement reflect the "economic reality" of what had occurred since MRLP's purchase of the property. First, S&S Finance repaid the first mortgage on the property in 1996 at a discount of approximately $1 million. (Declaration of Ronald Glassman at ¶ 8, attached as Exhibit 2 to MRLP and MRTDR's Motion for Summary Judgment). S&S Finance is owned by Rose and Greenebaum. (Rose Dep. at 190:6-15) (Ex. 59). They were the only partners of MRLP until Reid Liffmann and Steve Braesch were added in 2001 and 2003 respectively. (MRLP 2001 U.S. Return of Partnership Income at 10-23, MR-26497) (Ex. 63); MRLP 2003 U.S. Return of Partnership Income at 9-25 (Ex. 64); MRLP 1996 U.S. Partnership Return of Income, MR-26609, at Schedule K-1 (MR26620-26631) (Ex. 65)). Under the CPA, S&S Finance would be defined as an "Affiliate." (CPA §1.2) (Ex. 9). The individuals who are partners in MRLP, and specifically Rose and Greenebaum, are also 'Equity Holders" under the CPA. (CPA § 1.17) (Ex. 9). When S&S Finance acquired the first mortgage in 1996, that debt was owned by MRLP. Approximately a year after its acquisition, $7.27 million of the mortgage was reclassified as equity in the financial statements provided to Viad and in MRLP's tax returns. (*See* Glassman

Dep. at 33:3-17; 37:14-39:22) (Ex. 57).  Although MRLP changed the classification back to debt in the financial statements provided to Viad in or around 1999, it has continued to treat the first mortgage as equity for tax purposes.  *Id*.  Furthermore, the decision to remove the cost of the TDRs was made by litigation counsel for MRLP in November 2006, after depositions in this case were underway.  (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36).  Also disputed to the extent that MRLP implies that its alleged corrections are valid.

53.    Disputed to the extent that MRLP suggests that its list of Liabilities in the Revised 2005 Statement is an accurate reflection of the liabilities for 90 K Street.  No loan documents have been submitted by MRLP to substantiate their claim that the contributions from S&S Finance are debt.  Furthermore, Ron Glassman, testifying as a 30(b)(6) witness for MRLP, stated that MRLP has continued to treat the first mortgage from S&S Finance as partners capital on its tax forms.  (*See* Glassman Dep. at 33:3-17; 37:14-39:22) (Ex. 57)).  The treatment of the S&S Finance contributions in the Revised 2005 Statement conflicts with the treatment of these amounts in MRLP's most recent tax return and in the settlement statement for the closing on the TCMD-MRLP transaction.  In the tax return and the settlement statement, the amounts owed to S&S Finance are under $5 million.  (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50 & 52).  However, in the Revised 2005 Statement, MRLP is claiming that it owes S&S Finance over $35 million.  (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36)  The treatment of the contributions from S&S Finance as debt also conflicts with the Reznick Analysis.  (Reznick Analysis, VD-000466, at ISSUE 3, Interpretation) (Ex. 32)).  Additionally, the CPA requires that items be computed "on the basis of sound cash basis

accounting practices."  (CPA §§ 2.3(a) and (b).  Although the CPA requires that interest on

Permitted Debt be paid in order to be deducted, MRLP seeks to deduct accrued interest,

classifying these amounts as Liabilities in the Revised 2005 Statement  (CPA § 2.3(b); Rose

Dep. at 189:22-190:2 (Ex. 59); Liffmann Dep. at 45:10-46:17 (Ex. 2); Statement of Greenebaum

and Rose Associates, at Section I, VD-000458 (Ex. 13); Letter dated 11/21/06 from D. Cooter to

R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36)).

     54.     Disputed.  S&S Finance repaid the first mortgage on the property in 1996 at a

discount of more than $1 million.  (Declaration of Ronald Glassman at ¶ 8, attached as Exhibit 2

to MRLP and MRTDR's Motion for Summary Judgment).  S&S Finance is owned by Rose and

Greenebaum.  (Rose Dep. at 190:6-15) (Ex. 59).  They were the only partners of MRLP until

Reid Liffmann and Steve Braesch were added in 2001 and 2003 respectively.  (MRLP 2001 U.S.

Return of Partnership Income at 10-23, MR-26497 (Ex. 63); MRLP 2003 U.S. Return of

Partnership Income at 9-25 (Ex. 64); MRLP 1996 U.S. Partnership Return of Income, MR-

26609, at Schedule K-1 (MR26620-26631) (Ex. 65)).  Under the CPA, S&S Finance would be

defined as an "Affiliate."  (CPA § 1.2).  The individuals who are partners in MRLP, and

specifically Rose and Greenebaum, are also 'Equity Holders" under the CPA.  (CPA § 1.17).  As

such, the acquisition of the loan at a discount resulted in a reduction of the principal balance

from MRLP's perspective and MRLP now owes less on the first mortgage.  When S&S Finance

acquired the first mortgage, that debt was owned by MRLP.  About a year after its acquisition,

$7.27 million of the mortgage was reclassified as equity in the financial statements provided to

Viad and in MRLP's tax returns.  (*See* Glassman Dep. at 33:3-17; 37:14-39:22) (Ex. 57).

Although MRLP changed the classification back to debt in the financial statements provided to

Viad in or around 1999, it has continued to treat the first mortgage as equity for tax purposes.  *Id.*

Because S&S Finance repaid the loan at a discount, it was technically a refinancing for which they received value which they should at the time have shared with Viad to the extent of 15%. (CPA § 3.2(b)).

     55.    Disputed in that the decision to remove the cost of the TDRs was made by litigation counsel for MRLP in November 2006, after depositions in this case were underway, in an effort to bolster MRLP's argument that TDRs are not part of the 90 K Street Property.  (*See* Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement (Ex. 36)). Furthermore, disputed in that the statements "this was an error," "Viad is not entitled to the value of the TDRs," "it was not a correct cost deduction on the Special Purpose Financial Statements," and "[t]herefore, one of the revisions which is reflected in the 2005 Revised Special Purpose Financial Statements provided to Viad in November 2006 is the removal of these costs" are argumentative.