# EXHIBIT 58

```
                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

-------------------------------x
MONTGOMERY ROAD I              :
LIMITED PARTNERSHIP,           :
                               :
          Plaintiff/           :
          CounterDefendant,    :
                               :
     v.                        :
                               :
VIAD CORP.,                    :
                               : No. 1:06CV00344(HHK)
          Defendant/           :
          CounterPlaintiff,    :
                               :
     v.                        :
                               :
MONTGOMERY ROAD I              :
LIMITED PARTNERSHIP,           :
                               :
          Defendant/           :
          CounterPlaintiff.    :
-------------------------------x
```

Washington, D.C.

Tuesday, February 20, 2007

Deposition of

STEVE HALBERT

a witness, called for examination by counsel for

Plaintiff/CounterDefendant pursuant to notice and

agreement of counsel, beginning at approximately

2:24 p.m. at the law offices of Cooter Mangold

Tompert & Karas, 5301 Wisconsin Avenue, NW,

Page 14

1  with that.
2  A  Okay.
3  Q  When you first talked to Mr. Page
4  and his colleague, first of all, who was
5  there?  Who was involved in that
6  conversation?
7  A  My recollection is that Rodney, and
8  then the gentleman, Scott Sayer, and someone
9  else from Viad.  Goldman, I think.
10     Ken Goldman?
11  Q  Okay.  I know who it is.  And what
12  was discussed during the course of that
13  conversation?
14  A  That they had a -- an interest in
15  the value of this property from when they had
16  been a prior owner and there was some legal
17  issue associated with a residual interest of
18  some sort.
19  Q  Did they describe to you the nature
20  of the interest?
21  A  Some participation -- in general,
22  yes.

Page 15

1  Q  I noticed from some of the
2  documents I saw this morning that at some
3  point, somebody furnished you with a copy of
4  what is called a cash participation
5  agreement.  Have you read that document?
6  A  I doubt that I read it.  I have no
7  recollection of doing so.  It's not pertinent
8  to an appraisal.  So --
9  Q  In any event, what were you asked
10  to do during this first conversation?  It was
11  a phone call, I presume?
12  A  Yes.
13  Q  What were you asked to do?
14  A  I don't recall specifically.  But
15  the normal kind of thing would have been, can
16  I complete an appraisal on this property;
17  what would the fee be; what would be my
18  timing?  And we discussed then those issues.
19  Subsequently, I would have prepared -- or
20  they would have -- someone would have
21  prepared an engagement letter and I would be
22  formally engaged.

Page 16

1  Q  When you say whether you would
2  perform or -- I'm trying to recall your exact
3  words -- perform an appraisal on the
4  property, what did you understand the
5  property to be?
6  A  Well, whatever I ended up
7  appraising.
8  Q  Let's take a look.
9  A  Tax parcels, squares -- I didn't
10  bring my reading glasses -- 674, Lot 432?
11  Q  Where are you reading from?
12  A  I'm on actually page 26.  But it
13  would show up in a number of different
14  places.
15  Q  That's all right.  I'll go wherever
16  you are.
17  A  Second line of type --
18  Q  Is it your understanding that the
19  street address is 90 K?
20  A  It's my understanding that the
21  handle for it is 90 K Street.  Often the tax
22  assessor has some screwy address.  So yes,

Page 17

1  that --
2  Q  Square 674, Lot 432, and 90 K,
3  we're talking about the same property.
4  A  Yes.  Yes to that question.
5  Q  How long was this first
6  conversation that you had with Mr. Page and
7  his colleague?
8  A  Probably 15 minutes max.
9  Q  Were you told anything at all at
10  that point about the nature of the cash
11  participation agreement, what this residual
12  interest was?
13  A  Yes.
14  Q  What were you told?
15  A  I don't recall.  Again, because it
16  is not relevant to an appraisal, I sort of
17  allow lawyers to do what they do and
18  simply --
19  Q  I mean relevant things.
20  A  Yes.
21  Q  Yes.
22  A  I focus on what's relevant to my

**Page 18**

1  task.
2  Q  You don't mean to suggest that the
3  lawyers are irrelevant, do you?
4     You don't have to answer that.
5  A  No.
6  Q  Do you recall what they told you
7  about the nature of what this interest was,
8  this residual interest?
9  A  I did not recall what they told me.
10 If you rephrase the question as what is my
11 understanding --
12 Q  What is your understanding?
13 A  Then.
14 Q  What was your understanding then?
15 A  My understanding now is about as
16 clear as it was then, that Viad somehow had
17 been an owner -- they were partners or
18 something -- that as part of their sale
19 agreement, there was a participation in a
20 future disposition.  And the accounting for
21 it, those issues, I don't recall anything
22 about.

**Page 19**

1  Q  Have you told me essentially all
2  you can recall about the first conversation?
3  A  Yes.
4  Q  After this first
5  conversation -- and I did see an engagement
6  letter.  But I don't need that for right now.
7  A  Okay.
8  Q  You undertook to do an appraisal.
9  A  Correct.
10 Q  Is that right?
11    You can look at your appraisal if
12 you want, or anything else that you want.
13 How did you go about doing it, as you
14 undertook the work?  Just tell me what you
15 did to go about this job.
16 A  Researched land sales in the locale
17 near 90 K Street.  Analyzed them, along with
18 all the other appraisal kinds of things that
19 lead up to it.  And --
20 Q  Know that nifty stuff about -- this
21 is a great market.
22 A  Yeah.

**Page 20**

1  Q  Big office buildings and that kind
2  of stuff.
3  A  Yes, those kinds of things.  Both
4  the hyperbole and hopefully some salt on that
5  hyperbole to make it an appropriately
6  defensible appraisal on the marketplace.
7  Analyzed the sales comps, drew conclusions,
8  and reported them in the report.
9  Q  As part of your work, did you go to
10 the site?
11 A  Yes.
12 Q  And -- refreshing my recollection
13 that there are a bunch of pictures of the
14 site in here, aren't there?
15 A  There should be in the front part,
16 beginning sort of before page 1.  It includes
17 some aerial photos.  But --
18 Q  I see the aerials that you got off
19 the Internet, I presume.  Right?
20 A  Yeah.
21 Q  Are there any actual photographs of
22 the site itself?

**Page 21**

1  A  No.
2  Q  But you did go to the site?
3  A  Yes.  Uh-huh.
4  Q  Describe the site for me.
5  A  It is a rectangular site at the
6  northwest corner of K Street and First
7  Street, NE.
8  Q  Is the site improved?
9  A  If you mean by improved is there a
10 proposed office building on it yet, no.
11 There are parking spaces.  So it's improved
12 with sidewalks and asphalt parking.  It's
13 across the street from the D.C. adjudication
14 traffic court, and I have been there.  I have
15 appraised other properties within 100 yards
16 of this property in the last two years.
17 So I'm aware of that property.  Yeah.
18 Q  The property is paved.  It is an
19 asphalt parking lot; right?
20 A  Yeah.
21 Q  They're curved, I guess, to the
22 street?