# EXHIBIT 60

**Capital Reporting Company**

Page 1

```
1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                      DISTRICT OF COLUMBIA

3   ----------------------------------:

4   MONTGOMERY ROAD I, LIMITED        :

5   PARTNERSHIP                       :

6                 Plaintiff           : Civil Action

7         v.                          : No. 06-00344

8   VIAD CORPORATION                  : (HHK)

9                 Defendant           :

10  ----------------------------------:
```

11                Washington, D.C.

12              Thursday, November 30, 2006

13  Deposition of:

14                  BRENT SOLOMON,

15  called for oral examination by counsel for

16  Defendant, pursuant to notice, at the law office

17  of Bryan Cave, LLP, 700 13th Street, N.W.,

18  Washington, D.C. 20005, before Sheri C. Stewart,

19  Registered Professional Reporter and Notary

20  Public in and for the District of Columbia,

21  beginning at 9:56 a.m., when were present on

22  behalf of the respective parties:

Page 106

1 taxable income, taxable ordinary income?
2  A   Well, what I would say is the tax
3 results would be different.
4  Q   Right.
5  A   They would be different.
6  Q   It would be substantially different,
7 wouldn't they?
8  A   Well, you're going to have -- you would
9 have interest expense within the entity, and you'd
10 have interest income at the entity that is picking
11 it up.
12  Q   Would it be a reasonable way of
13 handling this from S & S's standpoint, treat it as
14 interest as opposed to an equity return?
15  A   You know, I think either one is
16 reasonable.
17     What happens in these complex real
18 estate deals, as they often need additional
19 funding, I think everyone contemplated that this
20 project would need it.
21     The capital's going to come in one of
22 two forms, it's either going to be equity or debt.

Page 107

1 There is always a return that's provided to the
2 holders, okay?
3     And a treatment as debtor equity in
4 some cases there is -- the agreements have leeway
5 as to how it's handled. In other cases, they
6 require it to be one form or another.
7  Q   In your view, this agreement does not
8 contain any restrictions of how it's done,
9 correct?
10  A   I'm not sure I could give you my view
11 as to -- I'd have to determine that.
12     I think it allowed for -- it
13 contemplates both equity, and it contemplates debt
14 because it talked about debt from related parties.
15     As long as the interest rates were
16 customary and reasonable, what I would say is that
17 the cash participation agreement itself should not
18 really have any concern as to whether it goes in
19 as equity or interest. Okay?
20     Because it is -- the cash participation
21 agreement really isn't among equity partners, it's
22 a residuary type of interest and really should not

Page 108

1 have -- it should not care whether the return is a
2 return on equity computed based on an equity
3 return or a return on debt which would be
4 interest.
5  Q   Now, in your review of this agreement
6 originally, was it your understanding that your
7 opinion would be binding on the parties?
8  A   I don't think anyone ever came to us
9 and said your opinion is binding. I was aware
10 that there was a clause in the cash participation
11 agreement that provided for an independent
12 opinion.
13  Q   In the cover letter from VIAD,
14 Ms. Fiorucci wrote to you saying that, in the view
15 of VIAD, this was not a binding opinion.
16     Do you recall that?
17  A   I do recall seeing that.
18  Q   The exhibit happens to be right there
19 in front of you.
20  A   Yes.
21  Q   When you received that, did you discuss
22 that specific point with anyone?

Page 109

1  A   I don't believe there was any
2 discussion about that, I was just reviewing to see
3 in the letter.
4  Q   And to be more particular, what I want
5 to make sure that I understand is, you did not
6 dispute that statement with Ms. Fiorucci when you
7 received the letter, did you?
8  A   No, I didn't. To me, that's a legal
9 matter.
10  Q   You didn't discuss it with Mr. Rose or
11 Mr. Liffmann or anyone else connected with
12 Montgomery Road, did you?
13  A   I don't remember having any specific
14 discussions about that.
15  Q   Okay.
16  A   It appeared to me that both parties
17 were asking us to proceed, and we proceeded.
18  Q   Now, going back a minute ago to what
19 you were suggesting about the way in which a
20 developer might handle things one way or another.
21     Section 2 of the agreement contemplated
22 a yearly review with the yearly statements, did it