## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MONTGOMERY ROAD I** )<br>**LIMITED PARTNERSHIP,** )<br> )<br>   **Plaintiff/** )<br>   **Counter-Defendant,** )<br> )<br> )<br>**v.** )<br> )<br>**VIAD CORP,** )<br> )<br>   **Defendant/** )<br>   **Counter-Plaintiff/** )<br>   **Third-Party Plaintiff** )<br> )<br>**v.** )<br> )<br>**MONTGOMERY ROAD TDR, LLC,** )<br> )<br>   **Third-Party Defendant** )<br> ) | **Case No. 1:06CV00344 (HHK)**<br><br>**Next event:  Status Conference**<br>             **May 11, 2007** |

### REPLY MEMORANDUM TO VIAD'S OPPOSITION
### TO MONTGOMERY ROAD I LIMITED PARTNERSHIP AND
### MONTGOMERY ROAD TDR, LLC'S MOTION FOR SUMMARY JUDGMENT

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      THE REZNICK OPINION IS BINDING ON THE PARTIES . . . . . . . . . . . . . . . . . . . . 2

II.     THE REZNICK OPINION IS SUPPORTED BY THE TERMS
        OF THE CASH PARTICIPATION AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      "Developer's Equity Return" is a Proper Deduction in the
                Appreciation Cash Flow Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.      Accrued Interest May Properly be Deducted as Developer's
                Operating Equity or Developer's Equity Return . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.      The First Mortgage is Not Equity, and Its Acquisition
                by S& S Finance  is Not a "Refinancing" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.    THE S&S ADVANCES ARE PERMITTED DEBT UNDER THE
        CASH PARTICIPATION AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.     THE TDRs SHOULD NOT BE INCLUDED IN THE CASH
         APPRECIATION  CALCULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.      The TDRs are not Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.      The TDRs are not Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        C.      Separation of TDRs in the Purchase Contracts was not Improper . . . . . . . . . . . 19

        D.      The Halbert Appraisal Does Not Determine the Agreed
                Value of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.      SUMMARY JUDGMENT IS APPROPRIATE ON THE CLAIM OF
        BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
        AND FAIR DEALING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES - FEDERAL

Sea Crest Construction Corp. v. United States,
    59 Fed. Cl. 615 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Underwater Exotics, Ltd. v. Secretary of the Interior,
    1994 WL 80878 (D.D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Washington Metropolitan Area Transit Authority v.Quik Serve Foods, Inc.,
    2006 WL 1147933 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24


## CASES - STATE

In Re Haar, 667 A.2d 1350 (D.C. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Mitsui Fudosan, Inc. v. County of Los Angeles, 268 Cal. Rptr. 356 (Cal. Ct. App. 1990) . . 16, 17

Wilkinson v. St. Jude Harbors, Inc., 570 So.2d 1332 (Fla. Dist. Ct. App. 1990) . . . . . . . . 16, 17

William F. Klingensmith, Inc. v. District of Columbia, 370 A.2d 1341 (D.C. 1977) . . . . . . . . . . 5


## STATUTES AND RULES

Fed. R. Civ. P. 26(2)© . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

9 U.S.C. § 1 et seq. (Federal Arbitration Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code Ann., § 16-4301 (District of Columbia Arbitration Act) . . . . . . . . . . . . . . . . . . . . . 3

## INTRODUCTION

_____In its attempt to create factual disputes to defeat Plaintiff/Counterdefendant Montgomery

Road I Limited Partnership ("Montgomery Road") and Third-Party Defendant Montgomery Road

TDR, LLC's ("Montgomery Road TDR") Motion for Summary Judgment, Viad Corp ("Viad")

relies on sweeping assertions that are not supported by the actual evidence in this case.  Some of the

assertions are simply inaccurate paraphrases, some are distortions, and some are pure fiction.

Untangling the real from the imaginary is complicated because of Viad's reliance on references to

its "SOF" and "SODF"[1] to provide evidentiary support, rather than citations to the evidence itself.

In turn, the SOF and SODF typically do not contain actual quotations from an item of evidence, but

rather, conclusory assertions about the evidence.  Although the SOF and SODF include citations to

the evidence, the *actual evidence*, in many instances, fails to actually support either the SOF/SODF

or the argument.  By way of example only, in its opening remarks (presumably to set the tone for the

Opposition), Viad states:

> The CPA [Cash Participation Agreement], *which was heavily negotiated* by sophisticated
> parties*,* provides that Viad is to receive 15% of the appreciation in the property at 90 K
> Street, N.E. at the point it is sold.

Oppos. at 1 (citing Viad's SOF at ¶12)(emphasis added).  In turn, SOF ¶12 – the purported support

for the assertion – provides:

> Second, in Article 3 of the CPA, the Developer is required to pay to Viad 15% of the
> appreciation realized by the Developer in "the sale, assignment, condemnation, conveyance
> or other disposition of the Property," or in the refinancing of the Property or of an interest
> in the Property.  The CPA defines the terms and conditions for calculating this payment,
> referred to as the "Appreciation Cash Payment." (Id. §§ 1.6, 1.28, 3.1, 3.2). Furthermore, the
> CPA defines "Property" as "the Improvements and the Real Property." (Id. § 1.32).

---

[1] "SOF" refers to Viad's Statement of Undisputed Material Facts filed in support of its
Motion for Summary Judgment.  "SODF" refers to Viad's Statement of Disputed Material Facts
filed with its Opposition.

"Improvements" are defined as "all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the Real Property." (Id. § 1.21).

SOF ¶12.  There is simply no reference in SOF ¶12 – or anywhere in the record – for Viad's assertion that the CPA *"was heavily negotiated."*  The only evidence on this point is from Samuel Rose, who testified in response to counsel for Viad's questions about the negotiation of the CPA:

> ... At the time, we were – we had never seen such an agreement before.  This is the [] first and only such agreement that we've ever been involved in in the history of our company.  It ... was brought into the deal sort of an after the fact, after we had a deal to buy the land for a certain price.  And I ... think we didn't pay enough attention  to it because it's one of the most obnoxious agreements I've ever read in my life and I don't — you know, we must have been stupid to sign it without even any — fighting any of these clauses which are so one-sided but I do not recall — recollect really getting into this.

Rose Tr. at 52 (Exhibit 35).[2]  As Eve Fiorucci (Viad's Assistant Director of Real Estate) testified, the CPA was drafted by outside counsel for Transportation Leasing.  Fiorucci Tr. at 65 (Exhibit 33).  Thus, there is simply no evidence that the CPA was "heavily negotiated."[3]

## ARGUMENT

### I.    THE REZNICK OPINION IS BINDING ON THE PARTIES

The basis of Viad's argument that the Reznick process is not binding is because "there is no indication that Viad or MRLP intended Reznick's advice to be binding or that the parties even mentioned Section 2.7 of the CPA."  Oppos. at 5-6.  The problem with this argument however, is that the Cash Participation Agreement itself makes the process binding.  Section 2.7 of the Cash Participation Agreement provides that if Transportation Leasing/Viad  "disputes any computation

---

[2]  Exhibits 1-28 are those that were submitted with Montgomery Road and Montgomery Road TDR's Motion for Summary Judgment [Dckt. # 23].  Exhibits 29-42 are submitted herewith.

[3]  Whether the CPA was "heavily negotiated" is not material to resolution of Montgomery Road's Summary Judgment Motion, but the foregoing demonstrates that Viad's assertions must be tested against the evidence, not just Viad's paraphrasing of the evidence.

or item contained in any portion" of a year end special purpose financial statement, such disputed items were to be "submitted to arbitration" for resolution by an independent certified public accountant selected by Transportation Leasing "***whose determination shall be final***." CPA at §2.7. Viad argues that the Reznick determination is not binding because the issue Mr. Solomon dealt with was the Appreciation Cash Payment "in the event of a hypothetical sale." Oppos. at 8. What Viad ignores however, is that the determination of the Appreciation Cash Payment depends on the calculation of deductions and expenses defined in other sections of the Cash Participation Agreement, and as set forth in the Special Purpose Financial Statements.[4] The calculation of the Appreciation Cash Payment is not done in a vacuum: income and expenses (and accounting treatment of those items) which are offsets from the gross proceeds of a sale (in calculating the Appreciation Cash Flow) are identified in the Special Purpose Financial Statements. Disputes regarding those items have previously been submitted to Mr. Solomon, "whose determination shall be final," via the arbitration process provided for under Section 2.7 of the Cash Participation Agreement. Viad argues, citing to its SOF ¶54, that "Sam Rose ... has admitted that the analysis was not an arbitration." Mr. Rose has *admitted* no such thing, all he stated was that "I don't know that it was arbitration. It seemed to me – I don't recollect describing it that way." (Rose Dep. at 86) (Ex. 35). Of course, under both federal and District of Columbia law, decisions rendered pursuant to an arbitration clause are binding on the parties. See e.g., 9 U.S.C. § 1 et seq. (Federal Arbitration Act); D.C. Code Ann., § 16-4301 (D.C. Arbitration Act).

---

[4] Indeed, after the Reznick Opinion was tendered, Ms. Fiorucci referred to the process as follows: "our submission ... was done as part of an attempt to settle the dispute ... regarding the characterization of certain transactions and accruals *reflected in the Special Purpose Statements* generated by your company." E. Fiorucci Letter to S. Rose, 8/26/2005 (Exhibit 42)(emphasis added).

3

Viad further argues that it "explicitly conditioned its participation in seeking the advice of Reznick" in its cover letter enclosing its position paper. See, e.g., Opp. at 6. Mr. Rose testified as follows with regard to the "non-binding" language in Ms. Fiorucci's cover letter:

> A. ... she unilaterally, after years of negotiating [on how to resolve the dispute], at the last – must have decided that she didn't want it to be binding but I didn't agree to that.
>
> ***
>
> A. I can point to numerous conversations with Miss Fiorucci where we were trying to settle a disagreement and there's no way you can settle a disagreement if it's not binding. Why would you bother [or] ... pay for something that wouldn't change anything if I was right?

Rose Tr. at 91, 94 (Exhibit 35).[5] Despite Viad's unsupported assertions to the contrary, the conversations which Mr. Rose and Ms. Fiorucci had regarding having an independent accountant resolve the dispute were had in the context of the Cash Participation Agreement and provisions contained in §2.7 of the Cash Participation Agreement. Rose Tr. at 78 ("we didn't discuss [whether it was binding] ... as it's provided in the agreement"), 83 (Rose was referring to the provision dealing with "disputes concerning the fiscal year statements"), 84-85 ("it was obvious that it was a dispute of the statements" ... "that [§2.7] was the paragraph we were talking about").

Moreover, it is undisputed that Ms. Firoucci knew that Montgomery Road was seeking a *resolution* of the accounting issue.[6] See Exhibit 41 (12/16/04 Telecon. between Ms. Fiorucci and Mr. Rose: "Discussed hiring ... Reznick to help sort out our dispute"); Exhibit 23 (6/10/02 Telecon.

---

[5] The cover letter was the first indication that Viad gave that it did not agree that the process was binding. Rose Tr. at 87; see also Goldman Tr. at 27 (the decision to contend that the Reznick Opinion would be non-binding was made by Ms. Fiorucci, or by Viad's counsel).

[6] Ms. Fiorucci expressed concern about the process: "Sam wants to buy Viad out ... . Believes his accounting methods were correct, would pay for Viad to have an outside firm look at accounting **(I don't recommend this)**[.] ... Sam wants to resolve the accounting issue right now." Exhibit 23 (6-10-02 Telecon.).

4

between Ms. Fiorucci and Mr. Rose: "Sam wants to resolve the accounting issue right now"). Indeed, Viad's submission to Reznick demonstrates that it was submitting the dispute for "resolution." See Exhibit 24 at VD 906 ("History of the Dispute;" and submission "to resolve the issues"); at VD 908 ("dispute resolution process"). Viad's submission belies its unilateral attempt to make the process non-binding: "We suggest that [Montgomery Road] submit drafts of such documents to TLC [Viad] and **to the arbitrator of these disputes for use as part of the dispute resolution process.**" Exhibit 24 at VD 908 (emphasis added).

In response to Montgomery Road's argument that Viad's insertion of the unilateral "non-binding" language was at most a counter-offer to amend the Cash Participation Agreement's provisions (Montgomery Road Mem. at 12), Viad simply repeats its argument that "there is no evidence of an agreement between MRLP and Viad to submit their dispute to Reznick under Section 2.7 of the CPA." Oppos. at 7-8. There was no need for further "agreement" because the Cash Participation Agreement itself is the "agreement." Remarkably, Viad attempts to distinguish the cases cited by Montgomery Road (cited for the proposition that an agreement cannot be unilaterally modified)[7] by arguing that the cases are distinguishable because they deal with "situations where a party who is clearly operating under an agreement uses correspondence to alter the terms of the agreement." It appears that Viad considers the Cash Participation Agreement to be something other than an agreement under which it was "operating."

## II.    THE REZNICK OPINION IS SUPPORTED BY THE TERMS OF THE CASH PARTICIPATION AGREEMENT

---

[7]  William F. Klingensmith, Inc. v. District of Columbia, 370 A.2d 1341, 1343 (D.C. 1977);In Re Haar, 667 A.2d 1350, 1353-54 (D.C. App. 1995); Sea Crest Construction Corp. v. United States, 59 Fed. Cl. 615 (2004); Underwater Exotics, Ltd. v. Secretary of the Interior, 1994 WL 80878 (D.D.C. 1994).

### A.    "Developer's Equity Return" is a Proper Deduction in the Appreciation Cash Flow Calculation

Viad argues (Oppos. at 13) that the Reznick Group's determination that it is proper to deduct Developer's Equity Return (the return on the funds advanced by S&S Finance) in computing Appreciation Cash Flow, is "a key error."  (Reznick Issue No. 1). Viad's argument is simply based on the fact that the because the Special Purpose Financial Statements (beginning in 1997)[8] labeled the interest on funds advanced by S&S Finance as "Developer's Equity Return," Montgomery Road is not allowed to deduct those amounts in calculating the Appreciation Cash Payment.   Viad has simply ignored the argument (Montgomery Road Memo. at 15-16) that the annual Developer's Equity Return is an allowable incurred Expense under Section 2.3 in computing Operations Cash Flow that is effectively paid from and increases Developer's Operating Equity.   Developer's Operating Equity is a specifically mentioned as an allowable deduction in computing Appreciation Cash Flow under § 3.1.   As Mr. Solomon testified, under § 2.3, "Developers Equity Return" is an "Expense"[9] which becomes part of  Developer's Operating Equity, which is a permitted deduction under Section 3.  Solomon Tr. at 90-91 (Exhibit 37)(as an allowable incurred expense, the interest amounts build up, and become part of Developer's Operating Equity which is one of the permitted deductions under the Cash Participation Agreement calculations).  Thus, although "Developer's Equity Return" is not specifically identified as an Allowable Deduction under § 3.1 of the Cash Participation Agreement, because the Developer's Equity Return accumulates annually, it becomes

---

[8]  In November 2006, the Special Purpose Financial Statements were revised to properly classify the amounts as "interest" and to remove the label of "Developers Equity Return."  See Declaration of Ronald Glassman ("Glassman Decl.") at ¶15.

[9]  Section 2.3(a)(15) defines "Expenses" as including "amounts paid to Equity Holders in payment of (i) Developer's Operating Equity and (ii) Developer's Equity Return."

6

part of the Developer's Operating Equity, and therefore becomes an allowable deduction. Id. at 91-92.   As Mr. Solomon explained, where there is an early stage development and no cash flow, such that a lender is not being paid, interest accrues.  Solomon Tr. at 94.  Viad has ignored this argument, simply standing on its assertion that "Developer's Equity Return" is not an identified deduction under § 3.1.

### B. Accrued Interest May Properly be Deducted as Developer's Operating Equity or Developer's Equity Return

The Reznick Opinion (Issue No. 4) found that accruals of unpaid interest may not be deducted in calculating the Appreciation Cash Payment, and that determination is binding on the parties.  Viad nevertheless argues that such a deduction is improper, because "cash basis means cash basis." Oppos. at 14. Viad's argument however, conflicts with the testimony of Ms. Fiorucci (Viad's corporate representative), that if the "Developers Equity Return" had represented accrued interest, it would have been properly deducted in computing the Appreciation Cash Payment.  See Fiorucci Tr. at 37 (if amount had not been listed as Developer's Equity Return, but had been an accrued interest payment made to a third-party lender, it would be deducted from sales price in calculating cash participation).  Ms. Fiorucci further testified: "If you don't pay your interest and you accrue it, then your principal balance gets larger." Id. at 41.  Ms. Fiourucci also admitted that if no payment was made, and the balance increases, it would be an allowable deduction under the Cash Participation Agreement.  Id. at 42.

The "interest" accrued on the advances from S&S Finance is properly deducted in computing the Appreciation Cash Payment, whether those amounts are viewed as an element of "Developers Operating Equity" ("interest and principal on Mortgages and operating expenses" §3.6(b)), "Permitted Debt" (debt incurred to fund the Property, e.g., development costs, operating deficits, and

7

interest no higher than the market rate (§2.3(b)), or "Expenses" (includes "interest and principle payable on Permitted Debt" (§2.3(a)). Viad argues however, that because MRLP did not "pay" the interest, "Reznick was wrong in asserting that accruals could be recognized since the plain language of the CPA says otherwise." Oppos. at 13 (arguing that accruals are not "cash basis accounting"). "Cash basis accounting" is not defined in the Agreement. As set forth in the Declarations of Messrs. Rose and Glassman, 90 K Street was not income producing, and there was no operating cash flow available to pay for the costs of maintaining the property (e.g., real estate taxes, assessments, bid pursuit costs, and insurance). These items were funded by advances from S&S Finance. Rose Decl. at ¶18. The fact that the interest on those advances has not been "paid" is not determinative of the propriety of deducting that interest when computing the Appreciation Cash Payment. As Mr. Solomon explained, where there is an early stage development and no cash flow, such that a lender is not being paid, interest accrues, and is "booked for cash basis financial statements" – otherwise, the liability would be misstated. Solomon Tr. at 94; see also Id. at 129 ("if there were interest[], for example, accrued on a loan, on a cash basis financial statement, that would still show up as a liability, regardless of when it was paid"). Viad provides no counter to Mr. Solomon's testimony that, even under a cash basis system, the interest accrual is a proper deduction when computing the Appreciation Cash Payment. Mr. Solomon further testified that interest on principal payments on Permitted Debt referred to in Section 2.3(a)(9) of the Cash Participation Agreement would be an expense category that does not require an actual cash payment for the expense to be included as a liability on a cash basis accounting financial statement. Id. at 134. Another example would include amounts paid to Equity Holders in payment of Developer's Operating Equity and Developer's Equity Return. Solomon Tr. at 134 (citing CPA §2.3(a)(15)). Other than to simply argue "cash basis

means cash basis" Viad has provided no testimony on any of these issues (discussed at Montgomery Road's Mem. at 19-20) to refute Mr. Solomon's expert opinion.

      **C.    The First Mortgage is Not Equity, and Its Acquisition by S& S Finance  is Not a "Refinancing"**

Viad argues (Oppos. at 13-14) that the S&S Finance's 1996 acquisition of the Sun Chase first mortgage was a  was a "refinancing" that should have triggered a Cash Appreciation Payment under Section 3.3©.   The Reznick Opinion correctly concluded that it was not, and that determination is binding.   Reznick Opinion at 2, Issue 2 (A "refinancing"  "typically contemplates obtaining a new loan and a partial or total repayment of an existing loan").  Further, in his deposition, Mr. Solomon explained that such a transaction should not be considered a refinancing: "a refinancing is an event, it's a debt event that provides new capital.  And with respect to the entity, there was no capital. There was no refinancing event. ... [T]he holder of the note [Sun Chase], which sits outside the entity, sold their note and it happened to be to a related party [S&S Finance]."  Solomon Tr. at 119. Further, Mr. Solomon testified that the purchase of the Sun Chase note did not trigger an Appreciation Cash Payment, even considering the $1 million discount,[10] "because no proceeds were received."  Id. at 126-27.  Other than to argue that the discount is a "refinance" which triggered an Appreciation Cash Payment, Viad has offered no evidence to contradict either the Reznick Opinion, or Mr. Solomon's testimony, that the purchase of the Sun Chase note was not a refinancing.

Viad also "argues" that the "First Mortgage was Equity" (Heading "C", Oppos. at 13), relying on the fact that Mr. Rose and Mr. Greenebaum have ownership interests (via entities) in both

---

[10]  In 1996, S&S Finance purchased the Sun Chase note for approximately $9.3 million. At the time of S&S Finance's purchase of the note, the real estate business suffered from a massive liquidity crisis, which enabled S&S Finance to purchase the loan at a discount (in the amount of $1,027,139).  Rose Decl. at ¶12 (Exhibit 31).

Montgomery Road and S&S Finance.  Viad argues that because of the common ownership, the $1 million discount constitutes "proceeds" making the loan purchase a "refinance," and also, "[s]ince S&S Finance is owned by Rose and Greenebaum, who are Equity Holders of MRLP, the acquisition of the mortgage at a discount was essentially a *repayment of the loan by MRLP*."  Oppos. at 14 (emphasis added).  Viad's argument ignores that Montgomery Road and S&S Finance are separate entities, and further, that the ownership is not the same, even with regard to Mr. Rose and Mr. Greenebaum: the limited partners of Montgomery Road include SJG Holdings, LLC (owned by Greenebaum and/or his family members) and the Samuel G. Rose Revocable Trust[11]; the limited partners of S&S Finance are the Stewart J. Greenebaum Revocable Trust and the Samuel G Rose Revocable Trust.  <u>Compare</u> Rose Decl. at ¶3 and ¶11 (Exhibit 31).  Viad's argument that the purchase of the Sun Chase note by S&S Finance constitutes a "repayment of the loan by MRLP" also ignores §2.3(b) of the Cash Participation Agreement, which provides that "Permitted Debt" may be held by an affiliate.  Thus, there is absolutely no basis, under the Cash Participation Agreement or under the evidence, to argue that S&S Finance's purchase of the Sun Chase note was a "repayment" of the loan by Montgomery Road.

Viad also argues that "interest on the first mortgage should only be charged on the amount actually paid by S&S Finance to acquire the loan."  Oppos. at 14.  As Mr. Solomon testified however, loans are sold and purchased every day in the mortgage market "at premiums and discounts" and the benefit of such discounts are not usually passed on to the debtor.  Solomon Tr.

---

[11]   Reid Liffmann ("Liffmann") and Steven Braesch ("Braesch") are limited partners in Montgomery Road , but have no interest in S&S Finance.

10

at 125-27.[12]    Viad has offered no contrary testimony on this point, and simply relies on the "relatedness" of Messrs. Rose and Greenebaum to both of the entities.  There is however, nothing in the express terms of either § 2.3(b) ("Permitted Debt") or §3.7 ("Definition of Ineligible Deductions") which would preclude interest on the full first mortgage amount (not reduced by the purchase discount) from being included as an allowable "Expense" (§2.3(a),(b),©), and therefore a proper deduction in calculation the Appreciation Cash Payment.

## III.    THE S&S ADVANCES ARE PERMITTED DEBT UNDER THE CASH PARTICIPATION AGREEMENT

Even if the Reznick Opinion is not binding, Montgomery Road is entitled to summary judgment on the alternative grounds that because the advances by S&S Finance are "Permitted Debt," the interest thereon is included in calculating the Appreciation Cash Payment.  Viad argues that because no loan documents exist, "MRLP cannot prove that such a debt ever existed."  Oppos. at 10.  Further Viad argues that "MRLP has not paid any interest on this alleged loan to fund operations at 90 K Street."  Viad has not challenged that significant funds (over and above the first mortgage)[13] have been advanced via infusions from S&S Finance to maintain the Property over the past twenty years.  Instead, Viad simply argues that it is entitled to a "free ride."  Viad has failed to rebut the evidence proffered in support of Montgomery Road's Motion for Summary Judgment that

---

[12]    Contrary to Mr. Solomon's testimony about the usual treatment in the mortgage market, the Reznick Opinion concluded that interest on the first mortgage should only be charged on the amount actually paid by S&S Finance to acquire the first mortgage (treating the discount as an unreasonable related party fee).  Reznick Opinion at 4, Issue No. 6.  Montgomery Road submits that on this one issue, the Reznick Opinion was in error.  It is Montgomery Road's position however, that the Reznick Opinion is binding, and if the Court agrees, Montgomery Road submits that it is bound by the Reznick determination on this issue.  If the Court declines to find the Reznick Opinion binding, than Montgomery Road submits that S&S Finance is entitled to recoup interest on the full amount of the first mortgage, without offset for the discount.

[13]    As of December 31, 2005, the advances exceeded $18 million.  Glassman Decl. at ¶14.

11

the funds were provided by S&S Finance with the intention of earning a return on those funds. Rose Decl. at ¶15; Glassman Decl. at ¶14.

Viad argues that the advances cannot be treated as debt because the Special Purpose Financial Statements previously treated them as equity, and that the 2005 Revised Special Purpose Financials have been "orchestrated by litigation counsel." Oppos. at 10. 90 K Street has not been income producing, and there has been no operating cash flow available to pay for the costs of maintaining the Property. Montgomery Road has managed and marketed the Property at a substantial loss (prior to the sale in January 2007). Rose Decl. at ¶18. Montgomery Road has funded the costs and operating deficits (via cash infusions from S&S Finance) with no contribution from Defendant Viad or Transportation Leasing. Rose Decl. at ¶18. Other than the fact that Montgomery Road previously (on the Special Purpose Financial Statements) labeled the advances as "equity," Viad has provided no evidence to support its contention that the funds provided by S&S Finance are not "Permitted Debt," and were not provided by S&S Finance with the intention of earning a return on those funds. Rose Decl. at ¶15; Glassman Decl. at ¶14. This treatment was confirmed by Mr. Solomon, who testified that the contributions by S&S Finance could properly be considered "Permitted Debt." Solomon Tr. at 96, 104 . Then the amounts would simply be interest. Id. at 96. As long as the rates were the same, the end number would also be the same. Id. 96, 104, 106. "[T]he effect on any appreciation cash flow payment would be no other affect on the appreciation cash flow payment. Debt would be deducted, and it's principal, just like equity would be, equity contributed would be." Id. at 104.

Viad further argues that the Settlement Sheet (Viad Exhibit 52) from the January 2007 closing indicates that the amount "repaid to S&S Finance was also under $5 million." In fact, funds

advanced from S&S Finance have been repaid either to S&S Finance or its principals, Mr. Rose and Mr. Greenebaum.  In anticipation of the closing of the transaction with TCMidAtlantic in January 2007, Mr. Glassman prepared draft spread sheets to show various allocations of the sale proceeds. One of those spreadsheets is attached as Exhibit 51 to Viad's Motion for Summary Judgment. Although the spreadsheet reflects that $4,870,000 would be "repaid" to S&S Finance from the proceeds of the closing on 90 K Street, an additional approximately $35 million was distributed directly to Mr. Rose and Mr. Greenebaum, or to related entities.  Glassman Decl. at ¶17.  At year-end 2006 (ten days prior to closing), in addition to the  First Mortgage Note Payable to S&S Finance of $10,297,139, the loan payable due to S&S Finance was approximately $19.9 million, and the interest thereon was approximately $18.7 million.  See Glassman Decl. at ¶17.  Viad also complains that the treatment as Permitted Debt is inconsistent with Montgomery Road's tax returns.  There is nothing in the Cash Participation Agreement that requires the Special Purpose Financial Statements to be the same as the tax returns for MRLP.  Moreover, as described in detail above, the Special Purpose Financial Statements tendered prior to the 2005 Revised Statements erroneously treated legitimate expenses as equity, and the interest thereon was erroneously labeled as "Developers' Equity Return." Glassman Decl. at ¶¶10-16; Rose Decl. at ¶¶15-18.  The purpose and intent of the 2005 Revised Statements was to reflect the substance of advances from S&S Finance to Montgomery Road to maintain the Property for over 20 years.  Id.

At pages 24-29 of its Summary Judgment Memorandum, Montgomery Road provides a detailed analysis of the Cash Participation Agreement, and how, under the defined terms of the agreement, the advances from S&S Finance are Permitted Debt, and the interest thereon is an allowable deduction.  Viad wholly fails to address this analysis, depending instead on the fact that

the words "Developer's Equity Return" do not appear in §3.1.  Viad thus argues that "the formula for the calculation is clear and the Developer's Equity Return is not included in the calculation of the Appreciation Cash Flow."  Oppos. at 12.  Viad only looks at the label, an erroneous one at that, and refuses to acknowledge the substance of the transaction as it relates to the other terms of the Cash Participation Agreement.  (See detailed analysis, Montgomery Road Memorandum at 24-29).  Mr. Solomon considered the fact that the Cash Participation Agreement treats both outstanding principal and interest on debt, and equity contributed and return on equity.  Reznick Opinion at 4, Issue No. 5.     Both are "considered in computations of Operations Cash Flow (as allowable expenses under Section 2.3) and Appreciation Cash Flow (as part of Developer's Operating Equity). . . The 'carve out' in Section 3.6(a) and Section 3.6(b) appears to be intended to ensure that amounts are treated as debt or equity but not double counted." Reznick Opinion at 4, Issue No. 5.   This is consistent with §3.12 of the Cash Participation Agreement, which provides that items shall not be duplicated in various computations (Gross Revenue, Appreciation Cash Flow, Expenses, Approved Deductions, Closing Costs).

## IV.    THE TDRs SHOULD NOT BE INCLUDED IN THE CASH APPRECIATION  CALCULATIONS

The Cash Participation Agreement sets forth terms and conditions under which Transportation Leasing will participate in "cash flow hereinafter generated from the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing thereof."  CPA Recital at B. When TC Midatlantic purchased the land located at 90 K Street in January 2007 for approximately $46 million, it also purchased from Montgomery Road (for approximately $8 million) by way of separate contract (Braesch Decl. at ¶20) the transferable

development rights ("TDRs") which had been transferred to 90 K Street.[14]  Viad argues that, as a

component of any Cash Appreciation Payment, Viad is also entitled to 15% of the value of the TDRs

sold by Montgomery Road to TC Midatlantic.    Viad argues that TDRs are "interests" and

"improvements" on the Property.

### A.    The TDRs are not Real Property

Under Paragraph 3.2(a) of the Cash Participation Agreement, an Appreciation Cash Payment

is due if there is a "sale . . . of all or any part of or interest in the Property by the Developer . . .."

Viad therefore argues that the TDRs are an "interest" in the Property.   "Interest in the Property," is

not defined in the Cash Participation Agreement.   There is however, a definition of "Sale of an

Interest" which refers to the transfer of "20% or more of the Equity Holders' interest in Developer...

."[15]  There has been no "Sale of an Interest" as that term is defined in the agreement; rather, the

Property itself has been sold.  See, e.g., Rose Decl. at ¶¶28-34.

Neither of Viad's experts, Cynthia Giordano nor Steven Halbert, however, has testified (or

even opined in their reports) that TDRs constitute an "interest in Property" within the terms of the

Cash Participation Agreement.  Rather, Ms. Giordano merely described TDRs as zoning density and

described the manner in which they can be acquired and Mr. Halbert reached a fair market value of

90 K based on developmental potential which took into account the additional  zoning density

provided by the TDRs.[16]  Viad's reliance on the term "interest" is problematic because it ignores the

_____

[14]  TDRs which Montgomery Road is obligated to acquire in the future and transfer to TC
Midatlantic will be sold to TC Midatlantic for $13 million.  Braesch Decl. at ¶20.

[15]  The "Equity Holders" are the partners of Montgomery Road, which is the "Developer."
CPA §§ 1.11, 1.17.

[16]  Describing TDRs in reference to "zoning" is a misnomer. The zoning at a receiving
site remains unchanged.  Braesch Decl. at ¶24.  The zoning at 90 K remained unchanged at C-3-

definition of "Property" in the Cash Participation Agreement.  Section 1.32 defines "Property" as "the Improvements and the Real Property."  Section 1.35 defines "Real Property" as "that certain *land*, more fully described in Exhibit 'A' made a part of this Agreement by reference hereto."  Thus, the phrase "interest in the Property" could be re-written as "interest in the land."  Neither Ms. Giordano nor Mr. Halbert testified that a TDR is an interest in the *land*.  In fact, the only testimony on whether the TDRs are "interests" comes from Mr. Rose, who testified as follows: "Q: TDR's are an interest in the land, are they not?  A: No."  Rose Tr. at 221.

In more of its circular analysis, and without support in the Cash Participation Agreement, Viad relies on Black's Law Dictionary (1996) for the definition of "interest" - "a legal share in something" akin to a "right." Opp. at 16.  Viad then asserts that "TDR's by their name, are a right in property."  Id. The problem however, is that "Property" is defined as the particular "Real Property" identified in the legal description attached to the Cash Participation Agreement.  There is no District of Columbia case law which characterizes TDRs.   Viad states that "other courts have stated definitively that TDR's constitute a taxable property interest."  Oppos. at 16-17 (citing Mitsui Fudosan, Inc. v. County of Los Angeles, 268 Cal. Rptr. 356, 358 (Cal. Ct. App. 1990)).  Viad's statement "other courts have stated" is an exaggeration: one other court - the Mitsui Court - has stated that the value of TDRs should be assessed on a tax basis upon transfer.  Undersigned counsel's research uncovered only one other case on this issue and that case reached the opposite result.  In Wilkinson v. St. Jude Harbors, Inc., 570 So.2d 1332 (Fla. Dist. Ct. App. 1990), the Florida court held that TDRs "are not real property subject to assessment for ad valorem taxation."  570 So. 2d at

---

C.  Id. The District of Columbia designates certain areas (the receiving sites) as eligible to receive TDRs.  Id. There is no other or different zoning that applies.  Id.   There is no act by the District of Columbia that changes what can be built on the property.  Id.   The effect of a parcel being placed in a "receiving zone" for TDRs is not "upzoning."  Id.

16

1333.[17]    The court quoted from a law review article explaining the difference in rights included

within the bundle of rights associated with land:

> Land may be viewed as an assemblage or bundle of rights.  According to TDR
> theory, the right to develop one's property may be severed from the land and sold,
> much in the same way as mineral rights are severed and sold.  ***But while mineral
> rights do not "leave" the land, TDRs are separated from their land source and re-
> established on a designated recipient site.***"

Wilkinson, 570 So.2d at 1333 (quoting Note, "Transferable Development Rights: An Innovative

Concept Faces an Uncertain Future in South Florida," 8 Nova L.J. 201, 202 (1983)).    As the

Wilkinson Court  noted, in Mitsui, "it d[id] not appear to have been necessary to the holding in that

case, as to the assessed value of the property to which the TDRs were transferred, that the court

determine whether or not the TDRs were in themselves property."  570 So.2d at 1334.

In further support of its "interest" argument, Viad relies on the purchase agreement entered

into between Montgomery Road and Level 3 Communications in 2000.    Viad states that this

contract "clearly bundled all TDR development rights with land." Oppos. at 17.  Although Viad

would be hard-pressed to demonstrate the relevance of the Level 3 agreement (Viad Exhibit 38) to

this lawsuit,[18]  the definitions in the Level 3 agreement ***are consistent*** with Montgomery Road's

position in this litigation.  Section 2.1 of the Level 3 Agreement conveys "Property" to the seller,

and defines "Property" as including both  "Real Property" and "Intangible Personal Property."  The

term "Real Property" includes the "land" and "all and singular the rights, benefits and appurtenances

thereon or in anywise  appertaining thereto."  Level 3 Agreement at ¶2.1.1.  In the next section, the

---

[17]  There is no District of Columbia statute or regulation of which Montgomery Road is
aware that subjects TDRs to any  transfer or recordation tax.

[18]  Neither Viad nor TLC was a party to the Level 3 agreement; the agreement was entered
into thirteen years after the CPA; and the Level 3 agreement never closed.

Agreement identifies "Intangible Personal Property" as including "all intangible personal property related to the Real Property, including ...  contract rights related to the construction, operation, ownership or management of the Real Property, ***including all development rights*** owned by Seller in respect of the Property... ."  Level 3 Agreement at ¶2.1.2.  Thus, the Level 3 Agreement defines the development rights ***as personal property***, not real property.

### B.    The TDRs are not Improvements

Viad's second approach is to characterize the TDRs as "Improvements."  Oppos. at 18. Section 1.21 defines "Improvements" as "all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the Real Property." ***Without any support or citation whatsoever***, Viad states as follows: "TDRs add density to the property, they are essentially 'placed upon the Real Property' and, therefore, an Improvement under the plain language of the CPA."  The reason Viad has no evidence to support this statement is that both its experts discussed "improvements" in a way that would ***not*** support Viad's statement.  Mr. Halbert's June 24, 2006 Appraisal identifies the "improvements" at 90 K Street  as the "sidewalks, curbs and drainage." Exhibit 27 (pertinent portions of 6/24/06 Appraisal) at 24 (Bates Numbered VD-001470). Noticeably absent are TDRs.  When asked  at her deposition what an improvement on real estate is, Ms. Giordano testified that "an improvement is usually a building or a structure."  Giordano Tr. at 31.  The "improvements" testified to by Mr. Halbert were "sidewalks and asphalt parking" (Halbert Tr. at 21) and "drainage" (id. at 27). When asked whether there were any other improvements at the Property, Mr. Halbert responded that he did not recall any others.  Halbert Tr. at 22.  Mr. Halbert then described "improvements" in the context of something that would be "demolished" in the event of redevelopment.  Halbert Tr. at 22-23.  It is not surprising that there is no testimony or expert

opinion from either Mr. Halbert or Ms. Giordano that would support Viad's notion that TDRs are "placed upon the property" and are therefore "improvements." Viad's theory that TDRs are "placed upon" land is stretching the defined terms of the Agreement beyond all reason, especially considering the remaining language - and therefore context - of the definition: buildings and structures (connoting improvements with physical presence) that are constructed or installed (connoting physical attachment to the land). TDRs are intangible rights that have no characteristics that are physical like buildings and structures and their association with property is not by construction, installation or placement. Braesch Decl. at ¶6. TDRs simply are not "Improvements" under the Cash Participation Agreement. See Braesch Decl. at ¶6.

Viad states that it is a "common sense approach" to rely on Black's Law Dictionary, but does not cite to any particular definition of "improvement." See Viad Opp. at 18. Viad argues that the term improvements "includes 'everything that permanently enhances the value of the premises for general use.'" Oppos. at 18. Clearly, there is nothing "permanent" about TDR's, as they are commodities that can be transferred from site to site. Braesch Decl. at ¶12.[19]

## C.    Separation of TDRs in the Purchase Contracts was not Improper

Viad argues (Opp. at 19-21) that the separation of the consideration in the TC Midatlantic contracts between land and TDRs was not justified, because it results in a TDR sales price of $70.00 per square foot, outside what Viad argues was the $3.00 to $25.00 range for which TDRs usually sell. Viad's accusations, however, ignore the fact that the appraisal prepared by Viad's expert, Mr. Halbert, specifically depends on inclusion of the TDRs in reaching his fair market value of

---

[19] Ms. Giordano acknowledged that TDR's can be transferred from the original receiving lot to another receiving lot and that they can also be "banked," either on a receiving site or independent of any receiving site. Giordano Report at 4 (Viad Exh. 37). Ms. Giordano testified that TDRs are commodities. Giordano Tr. at 24 (Exhibit 7).

$64,800,000. Halbert Tr. at 39-43. Mr. Halbert testified that, without the TDRs, the value is approximately $44 million (Halbert Tr. at 43), which approximates the land sale contract with TC MidAtlantic. Braesch Decl. at ¶20. The structuring of the sale to deal with the TDRs separate from the land is a recognition that the TDRs are not Property. Id. Montgomery Road has not sought to exclude Viad from participating in the appreciation of the Property as that term is defined by the Cash Participation Agreement. Id. at ¶23. The term simply does not include TDRs.

Viad seeks to garner support from Stuart Smith's testimony that TDRs have sold for $3.50. Oppos. at 19-20 (citing Smith Tr. at 93). As Mr. Smith testified, however, he was not retained as an expert in the valuation of TDRs. Smith Tr. at 43. He was retained to conduct a review of Mr. Halbert's appraisal report. Id. at 43-44. Mr. Smith also testified that there is a difference between price and value. Id. at 93. "Price is simply a transaction amount and value has certain definitions associated with it, willing buyer, willing seller." Id. at 93. Mr. Smith also explained that TDRs are separate commodities (Id at 48, 50, 87) and, as such , "are not part of the definition of an [']as is['] value" of property, and under an "as is" value the land cannot be merged with the TDRs. Id at 50. The value of a TDR to a developer is different than its acquisition cost; for example, Montgomery Road purchased the ManLife TDRs for $30.00 per square foot. Braesch Decl. at ¶¶14, 22.

Without any citation to actual evidence, Viad argues that Montgomery Road has sought "deprive Viad of the Appreciation Cash Payment" by creating a separate contract for the sale of the TDRs. As set forth above, TDRs are not part of the Cash Participation Agreement's definition of "Property" and therefore, separating the two elements cannot be evidence of attempting to deprive Viad of anything. Braesch Decl. at ¶¶6, 23. Moreover, Viad's expert testimony (Mr. Halbert) establishes that there is no fraud or sham in separating the TDR and land sale portions of the

20

transaction: without the TDRs, the value is approximately $44 million (Halbert Tr. at 43), which

approximates the land sale contract with TC MidAtlantic.  See, e.g., Braesch Decl. at ¶20.

### D.  The Halbert Appraisal Does Not Determine the Agreed Value of the Property

Montgomery Road seeks summary judgment on its claim for a declaration that the TDRs are

not included in the price of the Property for purposes of calculating the Appreciation Cash Payment.

Other than the question of whether the TDR's are included, there really can be no dispute as to

Agreed Value (the greater of the gross proceeds or the fair market value, CPA §3.1), and

accordingly, the appraisal process under the Cash Participation Agreement is not applicable.  Viad's

contention that there is a dispute as to the "fair market value" is a manufactured "dispute."  The only

issue is whether the TDRs are included.  As Mr. Halbert testified, his value of  $64,800,000

specifically depends on inclusion of the TDRs.  Halbert Tr. at 39-43.

Viad argues that Montgomery Road has failed to offer evidence of the fair market value of

the Property.  Oppos. at 21-22.  Other than its contention that the TDR's should be included, Viad

has offered no evidence that the fair market value of the Property, *i.e., the Real Property,* is anything

other than the gross proceeds received from TCMidAtlantic for the land portion of the transaction.

Indeed, Mr. Halbert testified that, without the TDRs, the value was approximately $44 million.

Halbert Tr. at 43.  The actual gross proceeds received from TC Mid-Atlantic for the land sale was

$46,036,528.  Braesch Decl. at ¶20.  Thus, the "appraisal process" invoked by Viad is simply a red

herring.  Viad contends that when it tendered Mr. Halbert's "expert report" on January 31, 2007, it

was invoking the "appraisal" process for disputes as to the "fair market value" of the Property.  Mr.

Halbert's appraisal was tendered in accordance with the January 31st deadline contained in the

Scheduling Order for expert reports, as an attachment to a pleading entitled "Designation of Expert

Witnesses by Viad Corp." [Dckt. #19].  It made absolutely no reference to invoking the appraisal process under the Cash Participation Agreement.[20]  By the time the expert report was tendered, Viad had already filed its Counterclaim [Dckt. # 16], seeking a declaration that the value of the transferred TDRs were to be considered in valuing the Property for purposes of the Appreciation Cash Payment.  Counterclaim ¶7.

Viad asserts that Montgomery Road failed to "select its own appraiser," and therefore "defaulted" by failing to contest fair market value.  This is a figment of Viad's creative imagination.  Given that Halbert's appraisal was tendered as an "Expert Designation," Montgomery Road designated Stuart Smith as its rebuttal expert witness (pursuant to Fed. R. Civ. P. 26(2)(c)) on the issue of fair market value of the property.  Dckt. #21, 2/23/07. Mr. Smith provided a review report of the Halbert appraisal.  See, e.g., Smith Tr. at 65-67, 82-86.   In an exceedingly cursory argument on page 23, Viad argues that this Court should find that the "Agreed Value" of 90 K Street is $64,800,000 (Mr. Halbert's total value, including TDRs).  As set forth in Mr. Smith's Declaration (Exhibit 32), however, although Mr. Halbert's unit value of $65 per FAR was appropriate, Mr. Halbert applied the unit value to an incorrectly developed FAR-density of 997,229 FAR feet, which was dependent on the TDRs.  If the TDRs are not included, and $65 per FAR is applied to the permitted density of 675,207 FAR feet, the results are $43,888,455.  Stuart Smith Decl. at ¶6; see also Millenium Report, attached as Exhibit A to Smith Declaration.  This is even lower than the gross proceeds received:  $46,036,528.  Braesch Decl. at ¶20.  The issue on which Montgomery Road seeks summary judgment however is a simple one: that the TDRs are not included in the

---

[20]  If Viad intended to invoke the appraisal process, it should have done so by December 17, 2006, which was 45 days after its receipt of the amended contracts on November 2, 2006. See Rose Decl. at ¶31; see CPA §3.8.

"Agreed Value" of the Property. Viad's arguments about the appraisal process have nothing to do with this issue, because Viad's own expert testified that without the TDRs, the value of the Property was approximately $44 million. Halbert Tr. at 43.

## V.    SUMMARY JUDGMENT IS APPROPRIATE ON THE CLAIM OF BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In Count III of its First Amended and Supplemental Counterclaim (previously alleged in Count II of Viad's original Counterclaim), Viad alleges that Montgomery Road violated the covenant of good faith and fair dealing by misrepresenting the value of 90 K Street, by changing its position on accounting matters (and in its most recent financial statement), and by defaulting under the Cash Participation Agreement, including by failing to appoint an appraiser. Viad has no evidence to support these allegations of bad faith. Viad's allegation of misrepresentation of the value of the Property is completely unsupported: Viad has produced no evidence of any specific indications of value from Montgomery Road or any contrary contemporaneous valuations. Indeed, as Kenneth Goldman (Viad's Director of Real Estate) testified, each time Mr. Rose proposed buying TLC/Viad out of the Cash Participation position, the company conducted due diligence[21] and decided not to sell. Goldman Tr. at 99-102. None of the accounting revisions were intended to deprive Viad of any rights it had under the Cash Participation Agreement, Rose Decl. at ¶35, and Viad has proffered *no evidence* of any such intent. The reasons for the accounting revisions (including the revisions to the

---

[21] Even Pat Marr, a real estate broker consulted by TLC/Viad, concluded that because of the funds invested by Montgomery Road, the Viad interest was worthless. See Exhibit 38 (Letter from Pat Marr to E. Fiourucci, 9-15-99)("[the value of the Property] would be approximately $30.00 per developable foot ... .[T]hat would equate to a value of $19,500,000. With your participating interest not valid until it exceeds what the owner has in the property (approximately $25 million), your interest would be worth nothing"). See also Exhibit 39 (E. Fiorucci Memorandum to K. Goldman, 9-15-99); Exhibit 40 (E. Fiorucci e-mail to K. Goldman, 11-26-02) (reflecting conversation with Pat Marr: if property "sold as land, value is approximately $30/developable sq. ft. or $20,250,000").

23

TDR treatment) are fully explained in the declarations and deposition testimony of Messrs. Rose, Glassman, and Braesch, as discussed *supra*. The alleged defaults under the Cash Participation Agreement are at most contractual breaches, and not evidence of bad faith. An independent claim for breach of the covenant cannot co-exist with "identical claims for relief under established cause[s] of action." Washington Metropolitan Area Transit Authority v. Quik Serve Foods, Inc., 2006 WL 1147933, *5 (D.D.C. 2006). Count III (covenant of good faith/fair dealing) seeks relief based on the same claims as are set forth in Count I (declaratory judgment regarding the TDR's) and Count II (breach of contract) of the Amended and Supplemental Counterclaim. Viad identifies conduct which it argues supports its claim for a violation of the covenant of good faith. Opp. at 28. The conduct identified however (other than "misrepresenting the value of the Property"), is substantially the same conduct identified in Count I (declaratory judgment - TDR), and Count II (breach of contract). This "identical claim" argument was not raised in Montgomery Road's Summary Judgment Motion, because Viad had not yet filed its Amended and Supplemental Counterclaim alleging breach of contract. It was filed simultaneously with Viad's Summary Judgment Motion, on the same day that Montgomery Road filed its Summary Judgment Motion.

Viad ignores Montgomery Road's argument that if the covenant even applies to this debtor-creditor relationship (CPA § 6.1), the covenant only requires good faith and fair dealing in abiding by the contract's terms. It is not to be used as a tool to modify or override the express terms of the contract. WMATA v. Quik Serve, 2006 WL 1147933, at *4, *5. As set forth above, and consistent with WMATA v. Quik Serve, none of the conduct complained of rises to the level of "bad faith," 2006 WL 1147933 at *3-5, and no damages have resulted from any of the conduct alleged. Indeed, the joint custody account holding $4.5 million of the sale proceeds (Montgomery Road Undisputed

24

Fact #33) conclusively establishes that the claim of bad faith/unfair dealing cannot be sustained.

## CONCLUSION

For all the foregoing reasons, Montgomery Road and Montgomery Road TDR respectfully request the Court to grant their Motion for Summary Judgment.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.

_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 3rd day of May, 2007,  the foregoing REPLY MEMORANDUM OF MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT was served by electronic transmission through the ECF system upon:

> Rodney F. Page, Esq.
> Alicia Hogges-Thomas, Esq.
> Bryan Cave LLP
> 700 Thirteenth Street, N.W.
> Suite 700
> Washington, D.C. 20005

_____/s/_____
Donna S. Mangold
