**EXHIBIT 29**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MONTGOMERY ROAD I**<br>**LIMITED PARTNERSHIP,**<br><br>    **Plaintiff/**<br>    **Counter-Defendant,**<br><br>    and<br><br>**MONTGOMERY ROAD TDR, LLC,**<br><br>    **Third-Party Defendant,**<br><br>    v.<br><br>**VIAD CORP,**<br><br>    **Defendant/**<br>    **Counter-Plaintiff/**<br>    **Third-Party Plaintiff.** | **Case No. 1:06CV00344 (HHK)** |

**DECLARATION OF STEVEN BRAESCH**
**IN SUPPORT OF OPPOSITION OF MONTGOMERY ROAD I**
**LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC**
**TO DEFENDANT VIAD'S MOTION FOR SUMMARY JUDGMENT**

I, Steven Braesch, declare and state under the laws of perjury of the District of Columbia as follows:

1. I am over the age of 18 and am competent to testify to the matters contained herein, which are made from my personal knowledge.

2. I am have been employed by Greenebaum & Rose Associates ("G&R") since April 1987. I have operational responsibility for the management of G&R's commercial and office properties.

1

3.      Montgomery Road I Limited Partnership ("Montgomery Road") purchased the property at 90 K Street in Washington, D.C. ("90 K Street") in November or December 1987 from Transportation Leasing Company ("TLC"). Near the time of the purchase, TLC and Montgomery Road entered into a Cash Participation Agreement.

4.      In 1987, when Montgomery Road purchased 90 K Street from Viad's predecessor and the parties entered into the Cash Participation Agreement, transferable development rights ("TDRs") did not exist in the District of Columbia. The District of Columbia had not yet passed the regulations creating the TDRs. It was not until approximately 1991 that the D.C. Council passed regulations creating TDRs. The regulations were passed under the authority of the D.C. Zoning Act.

5.      I am the person within Montgomery Road and within G&R who is primarily responsible for locating available TDRs and for documenting their sale and purchase. Since 2000, G&R has completed five TDR acquisitions and has one pending transaction at this time. In each case, my role was to be the point person for G&R to locate, contract and close on the TDR purchase.

6.      TDRs are a tradeable commodity that can be bought and sold. TDRs are in the nature of intangible rights that have no characteristics that are physical like buildings and structures and their association with property is not by construction, installation or placement. TDRS are not improvements because they can be moved to another site.

7.      In general, under the regulatory scheme approving TDRs, a developer who engages in a qualifying development activity (*e.g.*, historic preservation or residential rehabilitation)) can generate additional development rights and, once certified by the District of Columbia, can apply to move development rights from that area and project - the "sending site" -

and transfer them to a different area and project – the "receiving site." Once TDRs are transferred to a qualified site in a receiving zone, or to a "receiving entity" that does not own land (TDRs may be purchased by an entity or individual that intends to hold the TDRs for resale at a future date), the receiving site benefits in that the development rights of the receiving site will be increased to an amount greater than would otherwise be available in the receiving site without TDRs.

8. In the District of Columbia, development rights can be transferred from a project within the Downtown Development Overlay District ("DD Overlay District") to: (1) a receiving lot or lots located elsewhere in the DD Overlay District; (2) to other designated receiving zones or sites; or (3) to a non-land owning entity.

9. In the District of Columbia, the creation and transfer of TDRs is accomplished in a three-step process. First, the District of Columbia and the owner of the sending site enter into a "Transfer of Development Rights Covenant" (the "TDR Covenant"). Pursuant to the TDR Covenant, the owner of the sending site agrees that development of the sending site will be undertaken in a way that furthers the purposes of the of the Downtown Development District. In exchange, the District of Columbia agrees to grant the owner of the sending site TDRs pursuant to which the sending site can transfer its bonus gross floor area to a receiving site or to an entity. The TDR Covenant is recorded in the District of Columbia land records. The content and form of TDR Covenant is approved by the District of Columbia.

10. The second step in the process occurs when the owner of the sending site enters into an agreement with the owner of a receiving site to transfer the TDRs from the sending site to the receiving site or to an entity. This agreement of transfer is entered into between the owners of the sending and receiving sites and sets forth the consideration being paid and the

number of square feet of development rights being transferred. This purchase agreement is typically negotiated between the purchaser (owner of receiving lot or non-land owning entity) and the seller (owner of sending lot) and need not be approved as to form or content by the District of Columbia. Currently, the availability of TDRs is somewhat diminished from recent years and therefore I dispute the statement in Paragraph 101 of Viad's Statement of Material Facts that there is a "glut" of TDRs available in the market place. Because of the diminished supply, the acquisition cost is now in a range of $5.00 to $8.00 per square foot.

11. The third step in the process occurs when the owner of the sending lot and the owner of the receiving lot or purchasing entity and the District of Columbia enter into a Certificate of Transfer of Development Rights ("TDR Certificate"). The TDR Certificate is an instrument of transfer of the TDRs from the sending lot to the receiving lot or non-land owning entity. Like the TDR Covenant, the form and content of the TDR Certificate is subject to approval by the District of Columbia and is recorded in the District of Columbia land records.

12. Once TDRs have been transferred to a receiving site or non-land owning entity, they may later be re-transferred to a receiving site or if already on a receiving site, may be re-transferred to another receiving site. Thus, until they have been utilized, TDRs are not permanent.

13. There are three sets of TDRs which are at issue in this litigation. The first set of TDRs were purchased by Montgomery Road from Manufacturers Life Insurance Company ("ManLife TDRs"). The second set of TDRs (the "E Street TDRs") was transferred by a Carr America entity as part of a transaction whereby a G&R entity (other than Montgomery Road) sold property bordered by 6th, 7th, E and F Streets, Northwest in Washington, D.C.(the "E Street Property") to Carr America in 2002 but retained the right to any TDRs that might subsequently

4

be generated on the E Street Property (which was a qualified "sending site").  Carr America did subsequently generate TDRs and transferred them in late 2003 to Montgomery Road at G&R's direction.  The third set of TDRs has not yet been acquired by Montgomery Road ("Future TDRs").

14.  The ManLife TDRs consisted of 7,500 square feet of gross floor area (as that term is defined in the zoning regulations) and were sold by Manufacturers Life Insurance Company ("Manufacturers Life") as the owner of the sending lot to Montgomery Road as the owner of the receiving lot (90 K Street).  The sale was made pursuant to an Agreement Concerning Transferable Development Rights made as of October 1, 1999 (*twelve years **after** the Cash Participation Agreement was entered into by Montgomery Road and TLC*).  See Exhibit 21.  As part of the same transaction, an additional 2,500 square feet of TDRs (which are not at issue in this litigation) were sold by Manufacturers Life to Swanee Limited Partnership (1,250 square feet) as the owner of a receiving lot and to Sliver Building Limited Partnership (1,250 square feet) as the owner of another receiving lot.  Manufacturers Life sold the 10,000 square feet of TDRs for $300,000.  Manufacturers Life originally acquired the 10,000 square feet of TDRs in 1994 pursuant to the Transfer of Development Rights Covenant entered into between Manufacturers Life and the District of Columbia.

15.  In addition to the ManLife TDRs purchase agreement, the parties (Manufacturers Life and Montgomery Road) and the District of Columbia executed a "Certificate of Transfer of Development Rights" ("Certificate of Transfer") ( Exhibit 22).  The Certificate of Transfer provides (at ¶8 on page 3) that the TDRs which are the subject of the Certificate of Transfer may be "further transferred from the Receiving Lot and vested in one or more 'receiving lots' or

"receiving zone lots." Thus, Montgomery Road was not required to use the TDRs at 90 K Street because it could have transferred the ManLife TDRs from 90 K Street to another receiving site.

16.     90 K Street became the receiving site of the E Street TDRs in October 2003. Prior to October of 2003, a G&R entity had owned and subsequently sold the E Street Property. However, G&R retained the right to all TDR's generated by the E Street Property wheter before or after the sale. The E Street Property became a sending site for TDRs based on completion of a qualified residential development. G&R decided to transfer 112,606 square fee of TDRs from the E Street Property sending lot to Montgomery Road (90 K Street) as the receiving lot in October 2003. Montgomery Road paid no additional consideration at the time these TDRs were transferred other than the legal and transactions costs.

17.     90 K Street is the receiving lot for both the ManLife TDRs and the E Street TDRs. The TDRs do not inure as a natural benefit to or reflect value of 90 K Street. Just as Manufacturers Life in 1999 divided its 10,000 square feet of TDRs among three receiving sites, Montgomery Road could have transferred one or both sets of TDRs from 90 K Street to another receiving site, just as TC Midatlantic could do now.

18.     Montgomery Road never used either the ManLife TDRs or the E Street TDRs for development at 90 K Street. These TDRs always remained available for further transfer to other receiving lots.

19.     Concurrently with its sale to TC MidAtlantic of the land at 90 K Street, Montgomery Road also sold both the ManLife TDRs and the E Street TDRs to TC Midatlantic. Under its sales agreement, Montgomery Road is obligated to cause Montgomery Road TDR to acquire 124,000 square feet of additional TDRs (the Future TDRs) which will then be transferred to TC Midatlantic as part of TC Midatlantic's purchase of 90 K Street. Montgomery Road TDR

is a non-land owning entity (a limited liability company) created by Montgomery Road in 2006 to acquire and hold the Future TDRs. I am one of the members of MRTDR, along with Reid Liffmann, SJ Holdings, Inc., and the Samuel G. Rose Revocable Trust. Pursuant to the agreement with TC Midatlantic, Montgomery Road TDR has until June 2009 within which to acquire and transfer the Future TDRs to TC Midatlantic.

20. Montgomery Road sold the 90 K Street TDRs (comprised of the ManLife TDRs and the E Street TDRs) to TC Midatlantic for $8,387,929 by way of purchase agreement that was separate from the purchase agreement for the land at 90 K Street. When the Future TDRs are delivered to TC Midatlantic (sometime between January 11, 2009 and June 11, 2009), Montgomery Road will be paid an additional $13 million. The land itself was sold to TC Midatlantic for $46,036,528. The structuring of the sale to deal with the TDRs separate from the land is a recognition that the TDRs are not property. The sale of TDRs may or may not be done concurrently with a land sale. TDRs are freely saleable commodities without regard to the sale of the land itself. Here, Montgomery Road did not buy land from Manufacturers Life, for instance, but it did buy TDRs from Manufacturers Life. Similarly, G&R sold the E Street land to Carr America, but it did not sell the rights to the E Street TDRs to Carr America as part of that transaction.

21. Neither Viad nor Transportation Leasing contributed any monies or other consideration toward the purchase of the ManLife TDRs, the E Street TDRs or the Future TDRs. The cost ($938,341) of the ManLife TDRs and the E Street TDRs was originally reflected as an expense on the Special Purpose Financial Statements provided to Viad. However, this was an error because the costs of these TDRs were not part of the 90 K Street property. Rather, TDRs are a commodity that is freely traded back and forth between developers and users.

Montgomery Road determined that charging the expense of the purchased TDRs to Montgomery Road was not proper absent a development of the Property. The Property was not developed. Rather it has been sold, and the Property and the TDRs have been sold pursuant to separate contracts. Because Viad is not entitled the value of the TDRs, it was not a correct cost deduction on the Special Purpose Financial Statements. Therefore, one of the revisions which is reflected in the 2005 Revised Special Purpose Financial Statements provided to Viad in November 2006 is the removal of these costs.

22. TDRs sell for whatever price is reached between the seller and the buyer. The value of a TDR to a developer is different than the acquisition cost of the TDR.

23. Montgomery Road has not sought to exclude Viad from participating in the appreciation of the Property as that term is defined by the Cash Participation Agreement.

24. The zoning at a receiving site remains unchanged. The zoning at 90 K remained unchanged at C-3-C. The District of Columbia designates certain areas (the receiving sites) as eligible to receive TDRs. There is no other or different zoning that applies. There is no act by the District of Columbia that changes what can be built on the property. The effect of a parcel being placed in a "receiving zone" for TDRs is not "upzoning."

I swear under the penalties of perjury of the District of Columbia that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in the District of Columbia, on the 19 day of April, 2007.

_____
Steven Braesch