**EXHIBIT 30**

Case 1:06-cv-00344-HHK    Document 33-3    Filed 05/03/2007    Page 1 of 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONTGOMERY ROAD I <br> LIMITED PARTNERSHIP, <br><br>     Plaintiff/ <br>     Counter-Defendant, <br><br> v. <br><br> VIAD CORP, <br><br>     Defendant/ <br>     Counter-Plaintiff/ <br>     Third-Party Plaintiff <br><br> v. <br><br> MONTGOMERY ROAD TDR, LLC, <br><br>     Third-Party Defendant | Case No. 1:06CV00344 (HHK) |

**DECLARATION OF RONALD GLASSMAN IN SUPPORT OF
MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR'S
<u>OPPOSITION TO VIAD'S MOTION FOR SUMMARY JUDGMENT</u>**

I, Ronald Glassman, declare and state under the laws of perjury of the State of Maryland as follows:

    1.   I am over the age of 18 and am competent to testify to the matters contained herein, which are made from my personal knowledge.

    2.   I am the Financial Vice President of Greenebaum & Rose Associates ("G&R"). I have been employed by G&R since June 1987. I was responsible for the tax and accounting work for G&R from

1

1987 through 2002. I now work on special projects for G&R and its affiliated entities.

3. In the course of my work for G&R during the period 1987-2002, I was also responsible for the tax and accounting work for various affiliated entities, including Montgomery Road I Limited Partnership ("Montgomery Road") and S&S Finance Limited Partnership ("S&S Finance"). I continued to be responsible for the tax and accounting work for Montgomery Road from 2003 to the present.

4. I am familiar with the Cash Participation Agreement which was entered into between Montgomery Road and Transportation Leasing Co. ("Transportation Leasing") at the time of the purchase of 90 K Street in 1987.

5. At the time Montgomery Road acquired 90 K Street, a $10.3 million mortgage was placed on 90 K Street with Yorkridge-Calvert Savings and Loan ("Yorkridge-Calvert"). On March 1, 1989, a second mortgage in the amount of $1.5 million was placed on 90 K Street with Yorkridge-Calvert to fund operating deficits, including interest paid on the mortgage.

6. In 1990, Yorkridge-Calvert came under the control of the Resolution Trust Company (the "RTC"). Thereafter, Montgomery Road was required to and did pay off the $1.5 million second

trust in 1992, as a condition of obtaining a two-year extension on the loan.

7. The RTC sold the first mortgage to Sun Chase Bank of Phoenix. Montgomery Road continued to pay interest on that loan to Sun Chase until 1996.

8. In 1996, S&S Finance purchased the Sun Chase note, for approximately $9.3 million, which reflected a discount of approximately $1 million.

9. In 1997, we (Montgomery Road's accountants) reclassified approximately $7.3 million of the first mortgage debt to equity. The reason for this reclassification was for internal tax reasons, relating to the fact that the interest income in S&S Finance could not be offset by the interest expense in Montgomery Road for Maryland state tax purposes. It had nothing to do with the Cash Participation Agreement.

10. In accordance with the provisions of the Cash Participation Agreement, I have prepared Special Purpose Financial Statements ("Special Purpose Statements") which were provided to Transportation Leasing annually. Although the reclassification referred to in the foregoing paragraph was for internal tax reasons, and had nothing to do with the Cash Participation Agreement, I carried the reclassification through to the Special Purpose Statements prepared for the years 1997

through 1999. With regard to the reclassification, I reduced the first mortgage debt (reflected on the Special Purpose Statements) by $7.3 million, which had the effect of increasing the amounts under the label "Developer's Invested Equity" (a term defined in the Cash Participation Agreement). I then included the annual interest expense on that increase in Developer's Invested Equity under the label "Developer's Equity Return" (another term used in the Cash Participation Agreement). (See, e.g., Exhibit 27 (Special Purpose Statements as of December 31, 1999 at page 8 of the Financial Statements)).

11. Beginning in 2000, I eliminated the re-classification, and treated the entire $9.3 million first mortgage as debt, and it continued to carry a rate of interest of 1.5% over prime.

12. Section 2.3 (b) of the Cash Participation Agreement, entitled "Permitted Debt," provides that debt can be acquired by a related company so long as it charges interest at or below the rates charged by other financial institutions on similar real estate loans. From 1996 to date, S&S Finance charged the Property 1.5% over prime on the first mortgage, which is the same rate which had been charged by Yorkridge-Calvert and Sun Chase, and thus, I believe to be not greater than the market rate of interest.

13. As of December 31, 2005, S&S Finance had made significant advances to the Property. Prior to my 2005 Revised Special Purpose Statements, those advances were in excess of $18 million, and carried a rate of return at the prime rate.

14. Notwithstanding the label I used when describing the interest expense (i.e., by captioning the page "Schedule of Developer's Equity Return,") it was always my understanding that the funds provided by S&S Finance (the first mortgage and advances for operating expenses) were intended to be "Permitted Debt" under the Cash Participation Agreement, and were provided by S&S Finance with the intention of earning a return on those funds. Therefore, the amounts categorized as "Developer's Equity Return" on the Special Purpose Statements (prior to the 2005 Revision described below) are in fact, and always were, intended to be an interest expense for purposes of the Cash Participation Agreement.

15. Accordingly, in November 2006, I prepared Montgomery Road's revised Special Purpose Financial Statement for the period from 1987 through December 31, 2005 (see Exhibit 46 ("2005 Revised Special Purpose Statement")). That revision reflects the amounts advanced by S&S Finance as debt and the interest thereon as interest expense, not as "Developer's Equity Return." The revision maintains the interest rate on the first mortgage

5

(principal amount of approximately $10.3 million) at 1.5% over prime. As to the advances by S&S Finance for other expenses, I calculated the interest rate for those amounts at 2% over prime, which I believe to be not greater than the market rate.

16.  The 2005 Revised Special Purpose Statements also contain corrections in three other areas to accurately reflect the economic reality of what had occurred since Montgomery Road's purchase of 90 K Street in 1987. Those corrections addressed the treatment of the loan discount which S&S Finance obtained when it purchased the Sun Chase note in 1996, the accounting for the cost of the TDR's, and the rate of interest on advances from S&S Finance. The TDR issue is addressed in the Declaration of Steven Braesch. With regard to the loan discount, S&S Finance purchased the Sun Chase note at a discount (in the amount of $1,027,139) in 1996. That discount should not result in a reduction of the principal balance on the mortgage owed by Montgomery Road: Montgomery Road should owe the same principal amount to S&S Finance as it owed to Sun Chase. To the extent that the earlier Special Purpose Statements reflected such a discount benefitting Montgomery Road, it was erroneous. The 2005 Revision corrected this error to eliminate the discount. The change in the interest rate is discussed above.

17. In anticipation of the closing of the transaction with TC MidAtlantic in January 2007, I prepared numerous draft spread sheets to show various allocations of the sale proceeds. One of those spreadsheets is attached as Exhibit 51 to Viad's Motion for Summary Judgment. Exhibit 51 shows an e-mail transmittal from Mr. Liffmann dated January 9, 2007, but I prepared the first three schedules on the spreadsheet (at pages MR 19672-76) referenced by Viad. Although the spreadsheet reflects that $4,870,000 would be "repaid" to S&S Finance from the proceeds of the closing on 90 K Street, an additional approximately $35 million was distributed directly to Mr. Rose and Mr. Greenebaum, or to related entities. At year-end 2006 (ten days prior to closing), in addition to the First Mortgage Note Payable to S&S Finance of $10,297,139, the loan payable due to S&S Finance was approximately $19.9 million, and the interest thereon was approximately $18.7 million.

18. Pursuant to §2.6 of the Cash Participation Agreement, financial statements and schedules are to be furnished to Viad within 120 days of the end of the Fiscal Year (December 31st pursuant to CPA §1.19). I am currently in the process of preparing the 2006 statements, which are not due until April 30, 2007.

19. In specific response to Viad's SOF 65: From 1997 to 1999 (not 2004), the accrued interest on only $7.3 million of the first mortgage was included in Developer's Equity Return. This was restated on the 1999 and 2000 statements to reclassify all of the first mortgage interest under the classification "Developer's Operating Equity." Only the interest on this "first mortgage interest" was included in Developer's Equity Return. Effective with the 2005 Revision (done in November 2006), all of the first mortgage interest is included in the loan payable to S&S Finance, and interest on these loan advances is included in interest payable to S&S Finance. On the 2005 Revision (and for all prior periods back to the acquisition of the first mortgage by S&S Finance), MRLP has used the following procedure: the monthly interest on the first mortgage is treated as an advance from S&S Finance on the last day of each month and is therefore added to the loan balance on that day.

I swear under the penalties of perjury of the State of Maryland that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in Baltimore County, Maryland on the 18th day of April, 2007.

_____
Ronald Glassman