**EXHIBIT 31**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONTGOMERY ROAD I LIMITED PARTNERSHIP,<br><br>    Plaintiff/<br>    Counter-Defendant,<br><br>    v.<br><br>VIAD CORP,<br><br>    Defendant/<br>    Counter-Plaintiff/<br>    Third-Party Plaintiff<br><br>    v.<br><br>MONTGOMERY ROAD TDR, LLC,<br><br>    Third-Party Defendant | Case No. 1:06CV00344 (HHK) |

### DECLARATION OF SAMUEL G. ROSE IN SUPPORT OF MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR'S OPPOSITION TO VIAD'S MOTION FOR SUMMARY JUDGMENT

I, Samuel G. Rose, declare and state under the laws of perjury of the District of Columbia as follows:

1.  I am over the age of 18 and am competent to testify to the matters contained herein, which are made from my personal knowledge.

2.  Greenebaum & Rose Associates ("G&R") is a real estate development firm with offices in Washington, D.C. and Baltimore Maryland.  I am one of the principals of G&R, along with Stewart J. Greenebaum ("Greenebaum").  I have been in the business of

1

real estate development for over 40 years.

3.  G&R typically sets up separate entities to own the
properties in which it invests.  The Plaintiff in this case,
Montgomery Road I Limited Partnership ("Montgomery Road") is one
of those entities.  Montgomery Road is a Maryland limited
partnership formed for the purpose of owning real property.  The
limited partners of Montgomery Road are Reid Liffmann
("Liffmann"), Steven Braesch ("Braesch"), SJG Holdings, LLC
(owned by Greenebaum and/or his family members) and the Samuel G.
Rose Revocable Trust.  Greenebaum, Liffmann, Braesch and I are
all employees of G&R.

4.  In late 1987, Montgomery Road purchased the property
located at First and K Streets, N.E. ("90 K Street" or "the
Property") for approximately $11 million from Transportation
Leasing Company ("Transportation Leasing"), which is the
predecessor in interest to Viad Corp. ("Viad"), the Defendant in
this case.  Montgomery Road owned and maintained 90 K Street for
twenty years, until January 2007.

5.  At the time of the purchase of the Property,
Transportation Leasing and Montgomery Road entered into a Cash
Participation Agreement.  Exhibit 16.  The Cash Participation
Agreement was drafted by counsel for Transportation Leasing.
Pursuant to the Cash Participation Agreement, under certain
circumstances, Transportation Leasing would receive 15% of any

2

cash flow generated by the operation of the property ("Operations Cash Flow") and 15% of the net proceeds generated by the sale, disposition, or refinancing of the property ("Appreciation Cash Flow"). See Cash Participation Agreement at §§ 1.27, 1.28, 2.1, and 3.1.

6.  At the time Montgomery Road acquired 90 K Street in 1987, a $10.3 million  mortgage was placed on 90 K Street with Yorkridge-Calvert Savings and Loan ("Yorkridge-Calvert"). On March 1, 1989, a second mortgage in the amount of $1.5 million was placed on 90 K Street with Yorkridge-Calvert to fund operating deficits, including interest paid on the mortgage. The interest paid on the mortgage was 1.5% over the prime rate.

7.  Montgomery Road paid interest on both loans on an ongoing basis, and Stewart Greenebaum and I personally guaranteed the loans.

8.  Montgomery Road and Transportation Leasing amended the Cash Participation Agreement in 1989, effective retroactively as of December 9, 1987, to revise the definition of "Senior Mortgage" in Section 1.39 to clarify that mortgages and deeds of trust executed after the initial loan closing for specified purposes would be superior to Transportation Leasing's interest. Specifically, the amendment was executed to make clear that debts incurred to fund carrying costs (such as the $1.5 million second mortgage) would be senior to Transportation Leasing's interest.

9.  In 1990, Yorkridge-Calvert encountered financial difficulties and came under the control of the Resolution Trust Company (the "RTC").  Thereafter, Montgomery Road was required to and did pay off the $1.5 million second trust in 1992, as a condition of obtaining a two-year extension on the loan.

10.  The RTC sold the first mortgage to Sun Chase Bank of Phoenix.  Montgomery Road continued to pay interest on that loan (at 1.5% over prime rate) to Sun Chase until 1996.

11.  S&S Finance Limited Partnership ("S&S Finance") is an "in house" bank for all G&R projects; the limited partners of S&S Finance are the Stewart J. Greenebaum Revocable Trust and the Samuel G Rose Revocable Trust.

12.  In 1996, S&S Finance purchased the Sun Chase note for approximately $9.3 million.  At the time of S&S Finance's purchase of the note, the real estate business suffered from a massive liquidity crisis.  This enabled S&S Finance to purchase the loan at a discount (in the amount of $1,027,139).

13.  S&S Finance held the first mortgage on 90 K Street until the sale of the property in January 2007, and a Deed of Trust securing its position was recorded in the land records of the District of Columbia.  From 1996 to date, S&S Finance charged the Property 1.5% over prime on the first mortgage, which was consistent with the rate charged by Yorkridge-Calvert and Sun Chase, and in my experience was at or below the market rate.

4

This was consistent with Section 2.3 (b) of the Cash
Participation Agreement ("Permitted Debt") which provides that
debt can be held by a related company so long as it charges
interest at or below the rates charged by other financial
institutions on similar real estate loans.

14.  In 1997, Montgomery Road's accountants reclassified
approximately $7.3 million of the first mortgage debt to equity.
The reason for this reclassification was for internal tax
reasons, relating to the fact that the interest income in S&S
Finance could not be offset by the interest expense in Montgomery
Road for Maryland state tax purposes.

15.  Pursuant to the Cash Participation Agreement,
Montgomery Road prepared Special Purpose Financial Statements
("Special Purpose Statements") which were provided to
Transportation Leasing annually.  Although the reclassification
referred to in the foregoing paragraph was for internal tax
reasons, and had nothing to do with the Cash Participation
Agreement, Ronald Glassman, G&R's in-house accountant, carried
the reclassification through to the Special Purpose Statements
prepared for the years 1997 and 1999.  Mr. Glassman reduced the
first mortgage debt by $7.3 million, which had the effect of
increasing the amounts under the label "Developer's Invested
Equity" (a term used in the Cash Participation Agreement).  He
then included the annual interest expense on that increase in

5

Developer's Invested Equity under the label "Developer's Equity Return" (another term used in the Cash Participation Agreement). (See, e.g., Exhibit 27 at page 8(Special Purpose Financial Statements as of December 31, 1999)). Without regard to the label however, the economic reality of the situation is that the funds provided by S&S Finance were provided by S&S Finance with the absolute intention of earning a return on those funds. Therefore, the amounts categorized as "Developer's Equity Return" on the Special Purpose Statements (prior to the 2005 Revision described below) are in fact interest expense.

16.   As described in the Declaration of Ronald Glassman, in November 2006, Mr. Glassman prepared Montgomery Road's revised Special Purpose Financial Statement for the period from 1987 through December 31, 2005 (see Exhibit 46 ("2005 Revised Special Purpose Statement")), which reflect the amounts as interest expense, not as "Developer's Equity Return."

17.   Although Stewart Greenebaum and I have limited partnership interests in both Montgomery Road and S&S Finance (through trusts and a family partnership), we always intended that the funds invested into Montgomery Road, including the reclassified $7.3 million portion of the first mortgage which S&S Finance held, were to have earned interest.  S&S Finance is not a partner in Montgomery Road, and it never has been; it is a separate legal entity and its ownership is different than the

6

ownership of Montgomery Road, in which Reid Liffmann and Steven Braesch are also limited partners.

18.    S&S Finance funds projects under the G&R umbrella. Certain real estate, like 90 K Street, is not income producing. With such non-income producing properties, there are no monies available to pay for the costs of maintaining the property. These costs (which for 90 K Street were in the millions of dollars) include expenses such as real estate taxes, assessments, bid pursuit costs, and insurance.  Montgomery Road has paid all of the real estate taxes, interest and other payments on the property, and has managed and marketed the 90 K Street property at a substantial loss (prior to the sale in January 2007). Montgomery Road has funded these costs and operating deficits (via cash infusions from S&S Finance) with no contribution from Defendant Viad or its predecessor Transportation Leasing.

19.    On or about June 26, 2000, Montgomery Road notified Transportation Leasing of a pending sale of the Property pursuant to Section 4.1 of the Cash Participation Agreement.  As stated in the notice, the sale price of the Property was $24,975,000 with expected net proceeds of approximately $23 million.  Montgomery Road calculated its cost basis on the property, including the interest and other charges which had been reflected on the Special Purpose Financial Statements as Developer's Invested Equity, Developer's Operating Equity, Developer's Equity Return,

and the balance of the first mortgage. Those costs were estimated to be in excess of $29,000,000. As a result, there would be no positive cash flow (and thus, no Cash Appreciation Payment) from the sale transaction. As part of this pending transaction, however, Montgomery Road sought to resolve any outstanding title issues created by the Cash Participation Agreement including obtaining from Transportation Leasing a waiver of its right of first refusal and the release of any lien on the Property.

20. In response, in August 2000, Transportation Leasing contended that the interest expense, categorized on the Special Purpose Financial Statements as "Developers Equity Return," could not be subtracted in calculating the Appreciation Cash Flow. Exhibit 27. It was Transportation Leasing's position that if the pending sale took place, Transportation Leasing would be entitled to a substantial six-figure Cash Appreciation Payment. Specifically, Transportation Leasing claimed that under the definition of "Appreciation Cash Flow" in Section 3.1 of the Cash Participation Agreement, the category "Developer's Equity Return" was not a permitted subtraction. Thus, it was Transportation Leasing's position (and it is now Viad's position) that the interest on the funds provided by S&S Finance are not a proper deduction when calculating the Appreciation Cash Flow, simply because the interest expense was labeled as "Developer's Equity

8

Return" in Montgomery Road's Special Purpose Statements.

21.  Transportation Leasing also questioned whether the acquisition of the first mortgage by Montgomery Road's affiliate, S&S Finance, was a "Refinancing" under Section 3.2(b) of the Cash Participation Agreement, which would have triggered a disclosure by Montgomery Road and an analysis of whether a Cash Appreciation Payment was due to Transportation Leasing.

22.  For reasons unrelated to this lawsuit, the proposed 2000 sale of the 90 K Street property did not take place.

23.  In November 2000, Transportation Leasing assigned its interest in the Cash Participation Agreement to Viad.

24.  The dispute between the parties remained concerning the meaning and application of certain terms of the Cash Participation Agreement, and the Special Purpose Statements.  In 2005, Montgomery Road and Viad agreed to seek a resolution of the dispute by submitting the matter to the Reznick Group, an independent accounting firm.  Consistent with §2.7 of the Cash Participation Agreement, the Reznick Group was selected by Viad. Montgomery Road, however, paid the cost of the review.

25.  Exhibit 39 to the Opposition to Viad's Motion for Summary Judgment is a true and correct copy of the report provided by Brent Solomon of the Reznick Group, dated April 10, 2005.

26.  Pursuant to §2.7 of the Cash Participation Agreement,

"the determination [of the accountant] shall be final." Viad however, refused to be bound by the Reznick Group's conclusions.

27.   Thereafter, this litigation was instituted by Montgomery Road in January 2006, to seek a declaration of the parties' rights under the Cash Participation Agreement.  Viad has taken the position in this litigation (as it did in August 2000, and during the Reznick review in 2005) that it was entitled to an Appreciation Cash Payment (provided for under §3.1 of the Cash Participation Agreement) which is calculated without any offset for interest owed to S&S Finance for either the first mortgage it held or the funds it advanced to maintain the property.

28.   While this litigation has been pending, in August 2006, Montgomery Road received an offer to purchase 90 K Street from an unrelated third party, TC MidAtlantic Development, Inc. ("TC MidAtlantic").  In addition, TC MidAtlantic also offered to purchase the adjacent property located at 45 L Street, N.E., from an affiliate of Montgomery Road, 45 L Street Venture, LLC. ("45 L Venture").

29.   The various agreements with TC MidAtlantic also included the purchase of certain transferable development rights ("TDRs") that had been, or will be acquired in the future. Neither Viad nor Transportation Leasing contributed any monies or other consideration toward the purchase of any of the TDRs. The TDRs are valuable rights, in that they add density to the

10

properties to which they are transferred.  The Declaration of Steven Braesch provides additional information about the TDRs.

30.  On August 15, 2006, Montgomery Road notified Viad of the offer to purchase, pursuant to the right of first refusal provisions set forth in Section 4.1(a) of the Cash Participation Agreement.  Viad did not exercise its right of first refusal.

31.  On November 2, 2006, Montgomery Road notified Viad that the agreements with TC MidAtlantic had been modified (to adjust the purchase price and address a future potential contingent liability), and on that same date, Montgomery Road provided Viad with the modified contracts, so as to comply with the right of first refusal provisions set forth in Section 4.1(c) of the Cash Participation Agreement.  Viad did not exercise its right of first refusal.

32.  Viad, through the deposition of its corporate representative on November 7, 2006, has taken the position that, as a component of any Appreciation Cash Payment, Viad is also entitled to 15% of the value of the TDRs included in the purchase by TC MidAtlantic.  Viad has also taken this position in its Answer and Counterclaim.

33.  Pursuant to the First Amendment of Purchase and Sale of Transferable Development Rights between Montgomery Road and TC MidAtlantic, dated October 31, 2006, the purchase price of the TDRs to be purchased from Montgomery Road is $21,387,929.00.

11

34.  The land sale portion of the TC MidAtlantic transaction closed in January 2007; and the first portion of the TDR sale also closed.  Prior to closing, and to secure the release of Viad's lien on the property (securing Montgomery Road's obligations under the Cash Participation Agreement) Montgomery Road and Viad entered into an agreement whereby $4.5 million of the sale proceeds was put into a jointly-controlled account pending the resolution of this dispute.

35.  In November 2006, Ronald Glassman prepared the 2005 Revised Special Purpose Statements for the period from 1987 through December 31, 2005 (see Exhibit 46).  The 2005 Revised Special Purpose Statements identify the amounts owing to S&S Finance as debt and the interest thereon as an expense, and contain other corrections to accurately reflect the economic reality of what had occurred since Montgomery Road's purchase of the 90 K Street in 1987.  Those revisions are discussed in the Declarations of Steven Braesch and Ronald Glassman.  None of these corrections were made to deprive Viad of rights under the Cash Participation Agreement; rather they were made to accurately reflect the economic reality of the advances made by S&S Finance throughout the period of Montgomery Road's twenty year ownership of the Property.  In addition, the revision also includes a rate of interest on the funds advanced by S&S Finance (other than the first mortgage) at the rate of 2% over prime.  In my experience,

that is a rate of interest that is at, or below, the market rate of interest.

36.  Over the years, I have approached Transportation Leasing/Viad to offer to buy them out of their cash participation interest.  Those offers were not intended to mislead or misrepresent the value of the property, but rather, were based on my assessment that the value of any Appreciation Cash Payment was zero, based on the amount of funds that had been expended by Montgomery Road to maintain the Property.  My assessment was validated in the Reznick Opinion, which concluded that the sale price of the Property would have to exceed $37 million (as of April 2005) for there to be any Appreciation Cash Flow.  See Exhibit 39 (Reznick Opinion) at VD000326.

I swear under the penalties of perjury of the District of Columbia that the facts set forth above are true and correct and made from my personal knowledge.

Executed under the penalties of perjury in the District of Columbia, on the ____19th____ day of April 2007.

Samuel G. Rose

14