**EXHIBIT 35**

**Capital Reporting Company**

```
                                                          Page 1
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3   -------------------------------:
                                    :
 4   MONTGOMERY ROAD I LIMITED      :
                                    :
 5   PARTNERSHIP,                   :
                                    :
 6             Plaintiff,           : Case No.
                                    :
 7        v.                        : 1:06CV00344 (HHK)
                                    :
 8   VIAD CORP.,                    :
                                    :
 9             Defendant.           :
                                    :
10   -------------------------------: Pages 1 - 229

11                         Washington, D.C.
                           Tuesday, November 14, 2006
12   Videotape 30(b)(6) Deposition,

13        MONTGOMERY ROAD I LIMITED PARTNERSHIP

14   Individual deposition, SAMUEL G. ROSE,

15   called for oral examination by counsel for the

16   Defendant, pursuant to notice, at the law offices of

17   BRYAN CAVE, LLP, 700 Thirteenth Street, Northwest,

18   Twelfth Floor, Washington, D.C., before Marijane

19   Simon, RDR, CLR, of Capital Reporting Company, a

20   Notary Public in and for the District of Columbia,

21   beginning at 9:40 a.m. when were present on behalf

22   of the respective parties:
```

```
 1   On behalf of the Plaintiff:
         DALE A. COOTER, ESQUIRE
 2       COOTER, MANGOLD, TOMPERT & WATSON, LLP
         5301 Wisconsin Avenue, NW
 3       Suite 500
         Washington, DC  20015
 4       (202) 537-0700
         (202) 364-3664 (Fax)
 5       dcooter@cootermangold.com

 6   On behalf of Defendant:
         RODNEY F. PAGE, ESQUIRE, and
 7       ALICIA I. HOGGES-THOMAS, ESQUIRE
         BRYAN CAVE, LLP
 8       700 Thirteenth Street, Northwest
         Twelfth Floor
 9       Washington, DC  20005-3960
         (202) 508-6002
10       (202) 508-6200
         rfpage@bryancave.com
11

12

13

14

15

16                  *   *   *   *   *

17

18

19

20

21

22   . . .
```

**Capital Reporting Company**

Page 52

1   Mr. Rose?

2       A.   I -- I have no rec -- recollection of
3   reading it.

4       Q.   Do you know if your counsel, Mr. David,
5   read it?

6       A.   I don't know.

7            MR. COOTER:  Wait just a moment.  I have
8   to instruct him not to answer.

9            Do not answer that.

10           THE WITNESS:  Okay.

11           MR. PAGE:  On -- On the grounds?

12           MR. COOTER:  Privilege.  I mean --

13           MR. PAGE:  It's privileged.

14           MR. COOTER:  My -- My problem is, once you
15   waive it, it gets pretty slippery, Rodney.

16           MR. PAGE:  Okay.

17           THE WITNESS:  Teacher, can I take a break?

18           MR. PAGE:  Yeah.  Sure.  I'm sorry.

19           THE WITNESS:  Would you mind?

20           MR. PAGE:  Please.  Let's go off the
21   record.

22           (Discussion off the record.)

Capital Reporting Company

Page 78

1  general counsel.  I know she said she was talking to
2  a female attorney who was their in-house counsel --
3  and they were ready to go so maybe we could get this
4  behind us, this difference about accounting.
5       Q.   All right.  Now, in those conversations,
6  is it your testimony that Ms. Fiorucci stated that
7  the work or opinion of an accountant would be
8  binding on the parties?
9       A.   We were talking about -- We didn't discuss
10 that issue.  It was -- We were talking about --
11 as -- as it's provided in the agreement so that
12 it -- it --
13      Q.   Where -- I'm sorry.  Go ahead.
14      A.   There was always something you could get
15 if -- if the two of us picked one.  The only thing I
16 did say to her that seemed to trigger some action is
17 that I would be willing to pay for it just so this
18 issue wasn't hanging there but we both were talking
19 about it as provided in the agreement, whatever that
20 says.
21      Q.   Now, you've referred now to "the
22 agreement" maybe two or three times.

**Capital Reporting Company**

Page 87

1  Q.  How -- When and how did you agree that it
2  was binding?
3  A.  That we spent three years picking them,
4  getting to this point.  What's the point of doing it
5  if it's not binding?  It was almost assumed.  Why
6  would you take years to talk to your accountant, to
7  talk to all the bosses, to pick an accountant, and
8  then say it's not binding?  I mean:  Why bother?
9  Q.  Can you point to any statement or writing
10  by VIAD in which it agreed that the Reznick opinion
11  would be binding?
12  A.  Yes.  The fact that this called for it to
13  be binding, that their own -- the agreement that
14  they drew called a Cash Participation Agreement
15  said, if we -- if they picked an accountant, it
16  would be binding.
17  Q.  It's -- You're relying, then, on the
18  wording of Section 2.7; correct?
19  A.  Well, I'm -- I'm relying on the fact --
20  Yes, I guess I'm relying on 2.7.
21  Q.  Is there anything else you're relying on
22  when you say that it's binding?

Page 91

1   anything.  I'm -- You're --
2      A.   I know.
3      Q.   Let me take it a step at a time and it
4   might be clearer.
5      A.   Yeah.  Yeah, but I -- It seems to me that
6   she unilaterally, after years of negotiating, at the
7   last -- must have decided she didn't want it to be
8   binding but I didn't agree to that.
9      Q.   Well, you did receive this letter in March
10  of Two Thousand --
11     A.   I -- I did receive it.
12     Q.   All right.  And in the para -- In the
13  cover letter, Miss Fiorucci writes -- and I'm
14  referring to the bullet paragraphs.  She says:  The
15  purpose of our sending this information is to obtain
16  an estimate of the cost involved for your firm to
17  review the information and render an opinion as to
18  the accuracy of our position.
19          Do you see that?
20     A.   Yes.
21     Q.   That was correct at the time, was that not
22  right?

Page 94

1  prior conversations --

2      A.   Yes.

3      Q.   -- with Miss Fiorucci?

4           Can you point to a specific, earlier

5  conversation where Miss Fiorucci said it would be

6  binding?

7      A.   I can point to numerous conversations with

8  Miss Fiorucci where we were trying to settle a

9  disagreement and there's no way you can settle a

10 disagreement if it's not binding.  Why would you

11 bother?  Why would I pay for something that wouldn't

12 change anything if I was right?  Am I stupid?  If

13 I'm stupid, I would have.

14           Now, it seems to me that we, all the way

15 along, and all this time it took her to check -- And

16 you ought to check with -- with VIAD.  How many

17 people had input before she got approval to do this?

18 Why would you do it on a nonbinding basis?  It seems

19 silly.  So it seemed to me it was an afterthought of

20 hers or somebody there:  We don't want this to be

21 binding in case we're wrong.  That doesn't make

22 sense.

Capital Reporting Company

Page 221

```
1    Why don't -- Maybe I should throw in all the other
2    land I bought --
3         Q.    You agree, do you not --
4         A.    -- under your agreement.  TDRs have
5    nothing to do with you.
6         Q.    TDRs are an interest in the land, are they
7    not?
8         A.    No.
9         Q.    And --
10        A.    TDRs are a right to add to the thing
11   that -- add to the development by going out and
12   paying for them.
13        Q.    There were --
14        A.    There's nothing in here that says you get
15   TDRs.
16        Q.    There is something in here, though, is
17   there not, that says that any interest in the
18   property that is sold -- any interest in the
19   property --
20        A.    Any interest in the property that's sold?
21        Q.    Yes.
22        A.    Uh-huh.  What was sold?
```