## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————— )
)
**MONTGOMERY ROAD I LIMITED** )
**PARTNERSHIP,** )
   **Plaintiff and** )
   **Counterclaim-Defendant,** )
 **v.** )
)
**VIAD CORP,** )
   **Defendant and** )  **Case No.  1:06CV00344 (HHK)**
   **Counterclaim-Plaintiff,** )
)
 **v.** )
)
**MONTGOMERY ROAD TDR, LLC,** )
   **Counterclaim-Defendant.** )
—————————————————————— )

### VIAD CORP'S MEMORANDUM IN REPLY TO THE OPPOSITION OF MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC TO VIAD CORP'S MOTION FOR SUMMARY JUDGMENT

Rodney F. Page (DC Bar No. 37994)
Alicia I. Hogges-Thomas (DC Bar No. 480548)
Bryan Cave LLP
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005-3960
P:  (202) 508-6000
F:  (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff*
*Viad Corp*

Dated:  May 3, 2007

## TABLE OF CONTENTS

ARGUMENT ............................................................................................................. 1

I.  VIAD HAS ESTABLISHED THAT THE REZNICK ANALYSIS IS NOT
    BINDING ON THE PARTIES .............................................................................. 1

    A.  The Dispute Between the Parties did not Arise From the Financial
        Statements but from a Disagreement over the Calculation of the
        Appreciation Cash Payment During Negotiations to Buy Out Viad's
        Participation Interest .................................................................................... 1

    B.  Reznick's Review was not an Arbitration and There was no
        Agreement to Arbitrate the Dispute Between the Parties ........................... 3

    C.  There was no Counter-Offer to Amend the CPA ....................................... 7

II. THE DEDUCTION OF INTEREST PREVIOUSLY LABELED AS
    DEVELOPER'S EQUITY RETURN IS NOT SUPPORTED BY THE
    TERMS OF THE CPA NOR THE EVIDENCE IN THIS CASE ......................... 8

    A.  The Reclassification of Interest from Equity to Debt was Directed by
        Litigation Counsel for MRLP .................................................................... 8

    B.  There is no Evidence that the Contributions from S&S Finance are
        Permitted Debt ........................................................................................... 9

    C.  Under the CPA, Interest on Permitted Debt can only be Deducted if
        Paid ............................................................................................................ 9

    D.  Not all Expenses are Approved Deductions for Purposes of
        Calculating the Appreciation Cash Payment ............................................ 10

    E.  MRLP Cannot Deduct Accrued Interest as Developer's Operating
        Equity or Developer's Equity Return ....................................................... 11

III. THE TOTAL CONTRACT PRICE FOR 90 K STREET, INCLUDING THE
     PRICE ASSIGNED TO THE TDRS BY THE PARTIES, SHOULD BE THE
     BASIS FOR THE CALCULATION OF THE APPRECIATION CASH
     PAYMENT ........................................................................................................ 12

    A.  The Separation of the TDRs was Clearly a Sham .................................... 12

    B.  MRLP's Arguments Regarding Definitions in the Contract Lack
        Support and Logic .................................................................................... 14

        1.  TDRs are "An Interest in the Property" ......................................... 14

        2.  TDRs are "Improvements" ............................................................ 16

i

C.      The Extrinsic Evidence, Which Strongly Supports Viad's Arguments, can be Utilized if the Court Finds the Contract to be Ambiguous............ 16

D.      The Instant Litigation is More Akin to the *Mitsui* Case Than That Cited by MRLP ...................................................................................... 17

IV.     VIAD CORP IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF CONTRACT .......................................................................... 19

A.      MRLP has Failed to Provide Financial Statements for 2005 and 2006 That Comply With the Requirements of the CPA ..................................... 19

B.      MRLP Defaulted by Failing to Provide the Appreciation Cash Payment and a Statement of its Calculation .............................................. 20

C.      MRLP has Defaulted Under the CPA by Failing to Designate an Appraiser...................................................................................................... 21

D.      An Audit of MRLP's Records is Necessary to Calculate the Appreciation Cash Payment.................................................................... 23

V.      MRLP HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, WHICH IS INHERENT IN THE CPA ........................ 24

CONCLUSION.................................................................................................................... 25

## **TABLE OF AUTHORITIES**

### **CASES**

*In re A.W. Logging, Inc.*,
No. 05-500, 2006 Bankr. LEXIS 3605 (Bankr. D. Idaho Oct. 4, 2006) ......................24

*Amtrak v. ERC Frankona Ruckversicherungs-Ag*,
No. 03-2420 (JGP), 2005 U.S. Dist. LEXIS 43490 (D.D.C. June 24, 2005) .............21

*AT&T Technologies, Inc. v. Communications Workers of America*,
475 U.S. 643 (1986) ...........................................................................................................6

*Baily v. Federal National Mortgage Ass'n*,
209 F.3d 740 (D.C. Cir. 2000), .........................................................................................6

*Bristol Savings  Bank v. Chic Miller's Chevrolet-Isuzu, Inc.*,
No. CV-92-07035245, 1993 Conn. Super. LEXIS 996 (Conn. Super. Ct.
Apr. 27, 1993) ..................................................................................................................24

*In re Calomiris*,
894 A.2d 408 (D.C. 2006) .................................................................................................6

*Dowley v. Dewey Ballentine, LLP*,
No. 05-622 (EGS), 2006 WL. 1102768 (D.D.C. 2006) .................................................6

*Friedman v. Decatur Corp.*,
135 F.2d 812 (D.C. Cir. 1943) .......................................................................................15

*In re Haar*,
667 A.2d 1350 (D.C. 1995) .............................................................................................7

*Hobbs v. Head & Dowst Co.*,
231 U.S. 692 (1914) ........................................................................................................21

*Louisiana Public Service Commission v. Texas & N.O.R. Co.*,
284 U.S. 125 (1931) ........................................................................................................16

*Mitsui Fudosan, (U.S.A) Inc. v. County of Los Angeles*,
268 Cal. Rptr. 356 (Ct. App. 1990) .........................................................................15, 17

*National Railroad Passenger Corp. v. Boston & Maine Corp.*,
850 F.2d 756 (D.C. Cir. 1988) ......................................................................................6, 7

*Pearce v. E.F. Hutton Group, Inc.,*
    828 F.2d 826 (D.C. Cir. 1987) ...................................................................................5

*Sea Crest Construction Corp. v. United States,*
    59 Fed. Cl. 615 (2004) ...........................................................................................7

*Shore v. Groom Law Group,*
    877 A.2d 86 (D.C. 2005) .........................................................................................5

*Underwater Exotics, Ltd. v. Secretary of the Interior,*
    No. Civ. A. 93-1586 (CRR),1994 WL. 80878 (D.D.C. Feb. 28, 1994) .........................7

*United States ex rel. DOL v. Insurance Co. of North America,*
    131 F.3d 1037 (D.C. Cir. 1997) .............................................................................16

*Wilbar Realty, Inc. v. Pa. Infrastructure Investment Authority (In re Wilbar*
    *Realty Inc.),* 325 B.R. 354 (Bankr. M.D. Pa. 2005).................................................24

*Wilkinson v. St. Jude Harbors, Inc.,*
    570 So. 2d 1332 (Fla. Dist. Ct. App. 1990) .............................................................18

*William F. Klingensmith, Inc. v. District of Columbia,*
    370 A.2d 1341 (D.C. 1977) ....................................................................................7

## STATUTES

D.C. Code § 16-4301 ...................................................................................................6

## MISCELLANEOUS

*Michael B. Hitchcock, Note, Suitum v. Tahoe Regional Planning Agency:*
    *Applying the Takings Ripeness Rule to Land Use Regulations and*
    *Transferable Development Rights,* 28 Golden Gate U. L. Rev. 87 (1998).................19

iv

## ARGUMENT

I.    **VIAD HAS ESTABLISHED THAT THE REZNICK ANALYSIS IS NOT BINDING ON THE PARTIES**

In its Opposition to Viad Corp's ("Viad's") motion for summary judgment, Montgomery Road I Limited Partnership ("MRLP") claims that the analysis performed by Reznick Group (the "Reznick Analysis") [1/] was a binding process under Section 2.7 of the Cash Participation Agreement ("CPA") and, also, for the first time that Reznick's review was an arbitration. Despite MRLP's best efforts to transform the Reznick Analysis *ex post facto* into a Section 2.7 arbitration, the undisputed facts demonstrate that Reznick's review was not an arbitration and, furthermore, that there was no agreement between the parties to arbitrate. The evidence clearly shows that the dispute between the parties did not arise from the annual financial statements but from a disagreement over the calculation of the Appreciation Cash Payment and arose during negotiations to buy out Viad's interest. As a result, summary judgment should be entered for Viad on this issue.

A.    **The Dispute Between the Parties did not Arise From the Financial Statements but from a Disagreement over the Calculation of the Appreciation Cash Payment During Negotiations to Buy Out Viad's Participation Interest**

Section 2.7 states in relevant part that, if the parties are unable to resolve a dispute concerning any computation or item in a financial statement within 60 days, "the items shall be submitted to arbitration which arbitration shall be performed by an independent certified public accountant." (Defendant Viad Corp's Statement of Undisputed Material Facts, (hereinafter "SOF") ¶ 46). Contrary to MRLP's assertions, the subject matter of Section 2.7, relating to the yearly financial statements, has no relation to the Reznick Analysis.

---

[1/]    Although MRLP refers to the product of Reznick's review as the "Reznick Opinion," in fact, Reznick's conclusions were presented in the form of a letter that summarized its analysis.

On August 14, 2000, MRLP informed Viad of a proposed sale to Level 3 Communications, LLC ("Level 3"). (SOF ¶ 31). At that time, MRLP asserted that the proposed sale price would result in no Appreciation Cash Payment to Viad. (SOF ¶ 32). Viad disputed MRLP's calculation of the Appreciation Cash Payment, asserting specifically that Developer's Equity Return was improperly deducted as a cost from the sale price. (SOF ¶ 33). For the next five years, the parties debated the proper calculation of the Appreciation Cash Payment while negotiating a buy out of Viad's participation interest. (SOF ¶¶ 34-36). The purpose of the Reznick Analysis was to assist the parties with their buy out negotiations by calculating the Appreciation Cash Payment for a hypothetical sale of the property. For example, on June 10, 2002, Ms. Fiorucci wrote: "Sam wants to buy Viad out of Cash Participation Agreement. Offered $50,000. Believes his accounting methods were correct, would pay for Viad to have an outside firm look at accounting." (SOF ¶ 51). On June 15, 2004, Mr. Rose "again offered $50,000 to buy out Viad's interest" and the parties "[a]greed to get some referrals for accounting firms in the DC area." (SOF ¶ 55). On December 16, 2004, Mr. Rose and Ms. Fiorucci "[d]iscussed hiring Reznick Fedder – Dave Renzick to help sort out our dispute." (SOF ¶ 55). And on April 10, 2005, Reznick provided the Reznick Analysis – an interpretation of certain terms in the CPA, an analysis of the classification of costs and charges, and a pro-forma calculation for a hypothetical sale of the property. (SOF ¶ 40).

The calculation of the Appreciation Cash Payment is addressed in Article 3, which deals with Appreciation Cash Flow, and disputes over the Appreciation Cash Payment are resolved under Section 3.11. (SOF ¶¶ 12, 52). According to Section 3.11, disputes regarding the calculation of the Appreciation Cash Payment are submitted to arbitration by an MAI appraiser after the Appreciation Cash Payment and the accompanying statement have been received by Viad. (SOF ¶ 52). Since there was no payment of the Appreciation Cash Payment and the

review was conducted by an accountant instead of an appraiser, it is clear that the Reznick Analysis was not conducted under Section 3.11. In contrast, Section 2.7, which appears in Article 2, concerns disputes about yearly Operations Cash Flow payments. (SOF ¶¶ 49-50). As a result, the dispute resolution provision in Section 2.7 was not involved with or implicated by the Reznick Analysis. (SOF ¶ 50).

MRLP argues that the determination of the Appreciation Cash Payment depends on the calculation of deductions and expenses identified in other sections of the CPA and set forth in the Special Purpose Financial Statements. According to MRLP, the income and expenses that are deducted from the proceeds of a sale are identified in the financial statements and these deductions were submitted to arbitration under Section 2.7. (MRLP Brief at 5). However, it is clear from the CPA that the Appreciation Cash Payment is calculated by multiplying the participating percentage by the Appreciation Cash Flow, which is calculated under Section 3.1. (SOF ¶ 12, 60). The calculation of the Appreciation Cash Payment is not contingent on the identification of deductions and expenses in the financial statements. As a result, whether the expenses appeared on the financial statements is irrelevant.

**B.      Reznick's Review was not an Arbitration and There was no Agreement to Arbitrate the Dispute Between the Parties**

The undisputed evidence demonstrates that the Reznick Analysis was not an arbitration and that the parties never agreed to submit their dispute to Reznick under Section 2.7. Samuel Rose, MRLP's 30(b)(6) witness, has testified that he has no recollection of describing the Reznick Analysis as an "arbitration." (SOF ¶ 54). Furthermore, Mr. Rose could not point to a specific conversation where MRLP or Viad stated that the Reznick Analysis was intended to be or would be binding. (SOF ¶ 44). Brent Solomon, the Reznick partner who wrote the analysis, testified that no one ever said to him that his opinion was binding. (Defendant Viad Corp's

Statement of Disputed Material Facts (hereinafter "SODF") ¶ 27).  Also, in the cover letter accompanying Viad's Statement of Position to Reznick, Ms. Fiorucci explicitly conditioned the participation of Viad, stating: "Finally, while we appreciate your review of the documents and your opinion as to our interpretation of same, we wish to make clear that your opinion is not binding on TLC/Viad Corp."  (SOF ¶ 38).  Moreover, in a letter to Reznick during the review process, Reid Liffmann (of MRLP) indicated that the process was advisory only, stating: "[h]opefully, with guidance from you, the parties can get a process moving that will lead to a resolution, without wasting a lot of legal dollars and time." (SOF ¶ 43).

In the records of phone conversations leading up to the decision to seek advice from Reznick Group, there is no indication that Viad or MRLP intended Reznick's advice to be binding or that the parties even mentioned Section 2.7 of the CPA.  (SOF ¶ 44).  In some of those conversations, Sam Rose offered to pay for Reznick's review.  For example, according to Ms. Fiorucci's notes of a phone conversation with Mr. Rose on June 10, 2002, Sam Rose "would pay for Viad to have an outside firm look at the accounting."  (Viad Corp's Response to MRLP and MRTDR's Statement of Genuine Issues (hereinafter "RSGI") ¶ 37).  In her notes of a phone conversation on June 15, 2004, Ms. Fiorucci wrote: "Sam to pick up cost of accountant to look over financial statements and agreement."  (RSGI ¶ 37).  However, Section 2.7 requires that "the fees of such accountant, as well as any arbitration fees incurred in connection with the dispute, shall be paid by … [Viad] unless such review shall indicate that the computation resulted in an error, in favor of … [MRLP], in the Operations Cash Payment of an amount more than three percent (3%) of the amount actually owing to .. [Viad] for such Fiscal Year, in which case … [MRLP] shall pay all such fees."  (RSGI ¶ 37).  Sam Rose's offers to pay for the Reznick Analysis are further evidence that Reznick's letter was not written pursuant to Section 2.7.  The

failure to abide by the fee splitting arrangements in Section 2.7 demonstrates that neither Viad nor MRLP thought Section 2.7 was applicable.

MRLP argues that "[i]t is clear under both Federal and District of Columbia law that decisions rendered pursuant to an arbitration clause are binding on the parties." (MRLP Opp. Brf. at 5). However, as was discussed above, the undisputed evidence demonstrates that Reznick's review was not conducted under the arbitration provisions of Section 2.7. MRLP adds that "the federal policy favoring arbitration counsels that doubts about the intended scope of an agreement to arbitrate be resolved in favor of the arbitral process." *Pearce v. E.F. Hutton Group, Inc.* 828 F.2d 826, 829 (D.C. Cir. 1987). The first case cited by MRLP for this position, *Pearce v. E.F. Hutton Group, Inc.*, contains arbitration language that is much broader than that of Section 2.7 of the CPA.[2/] The arbitration provision in Section 2.7 only applies to disputes concerning fiscal year statements. (SOF ¶ 46). It does not apply to every controversy between the parties arising from the CPA. The second case cited by MRLP, *Shore v. Groom Law Group*, involved a situation where the plaintiff voluntarily submitted her claims against her former employer to arbitration. 877 A.2d 86, 89 (D.C. 2005). The plaintiff's intention to submit to arbitration was declared in writing by her counsel. *Shore*, 877 A.2d at 89. The facts in *Shore* are easily distinguished from the facts in this case. Here, there is no evidence that Viad or MRLP intended to arbitrate their dispute through Reznick, and Viad conditioned its participation in Reznick's review before it began.

---

[2/]     In *Pearce*, an employee filed a defamation suit against his employer. However, the employee's contract stated that "[a]ny controversy between me and any member or member organization or *affiliate* or subsidiary thereof arising out of my employment or the termination of my employment shall be settled by arbitration . . . in accordance with the arbitration procedure prescribed in the Constitution and Rules then obtaining of the New York Stock Exchange." *Pearce*, 828 F.2d at 828. The Constitution of the NYSE provided that "any controversy between a member . . . and any other person arising out of the business of such member . . . shall at the instance of any such party be submitted to arbitration." *Id*. at 828.

According to the Uniform Arbitration Act, which has been adopted by the District of Columbia, "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable." (D.C. Code § 16-4301); *In re Calomiris*, 894 A.2d 408 (D.C. 2006). When faced with an action to compel arbitration, the court must "determine, according to traditional principles of contract law, whether the parties have an enforceable agreement to arbitrate and, if so, whether the underlying dispute between the parties falls within the scope of the agreement [to arbitrate]. *Id.* at 409; *see also Dowley v. Dewey Ballantine, LLP*, Civ. A. No. 05-622 (EGS), 2006 WL 1102768, at *3 (D.D.C., Apr. 26, 2006).

According to the Supreme Court, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643 (1986), *cited in In re Calomiris*, 894 A.2d at 409 n.3; *see also Dowley*, 2006 WL 1102768, at *2. Under District of Columbia law, "arbitration is predicated upon the consent of the parties to a dispute, and the determination of whether the parties have consented to arbitrate is a matter to be determined by the courts on the basis of the contracts between the parties." *Bailey v. Federal Nat'l Mortgage Ass'n*, 209 F.3d 740, 746 (D.C. Cir. 2000) (internal citation omitted). Whether Viad and MRLP have contractually bound themselves to arbitrate a dispute is a legal conclusion that is based on the court's factual findings. *Id.* at 744.

Although there is a presumption of arbitrability when a contract contains an arbitration clause, an order to arbitrate should not be granted where it can be said "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 760 (D.C. Cir. 1988). Even though federal policy favors arbitration, the D.C. Circuit has cautioned that courts must

"nonetheless … determine what appears to be most consistent with the intent of the parties."
*National R.R.*, 850 F.2d at 760-61; *Dowley*, 2006 WL 1102768, at *2.

It is clear from the language of Section 2.7 that the dispute between MRLP and Viad over the proper calculation of the Appreciation Cash Payment, which arose during buy out negotiations, does not fall within the scope of that arbitration provision.  As noted above, the facts in this case do not show that the parties intended or acted to invoke the arbitration clause.

### C.    There was no Counter-Offer to Amend the CPA

MRLP argues that "[a]t best, the insertion by Ms. Fiorucci of the unilateral 'non-binding' language [in the cover letter to Reznick] could be viewed as a counter-offer to amend the Cash Participation Agreement's provisions" and that this "counter-offer" was not accepted by MRLP. (MRLP and MRTDR Opp. Brief at 10-11).  However, these arguments, and the cases cited by MRLP, do not apply to the facts of this case. [3/]  There is no evidence of an agreement between MRLP and Viad to submit their dispute to Reznick under Section 2.7 of the CPA.  (SOF ¶ 44). Rather, the evidence shows that MRLP hoped that Reznick would "get a process moving that [would] lead to a resolution," and that Mr. Solomon was never informed that his opinion would be binding.  (SOF ¶ 43; SODF ¶ 27).  Furthermore, Section 2.7 was not mentioned until after Reznick completed its analysis.  (SOF ¶ 41; SODF ¶ 27).  As a result, Ms. Fiorucci's letter was neither a counter-offer to amend nor a unilateral attempt to modify the terms of the CPA.

---

[3/]    Ms. Fiorucci's letter was neither a counter-offer nor a unilateral attempt to alter the terms of the CPA.  In contrast, the cases cited by MRLP deal with situations where a party who is clearly operating under an agreement uses correspondence in an attempt to alter the terms of the agreement.  *See Sea Crest Const. Corp. v. United States*, 59 Fed. Cl. 615, 616-17 (2004); *see also Underwater Exotics, Ltd. v. Secretary of the Interior*, No. Civ. A. 93-1586 (CRR), 1994 WL 80878, at *9 (D.D.C. Feb. 28, 1994); *William F. Klingensmith, Inc. v. District of Columbia*, 370 A.2d 1341, 1344 (D.C. 1977); *In re Haar*, 667 A.2d 1350, 1352 & 1354 (D.C. 1995).

Rather, it was made for the express purpose of avoiding any future interest that the process was anything other than a non-binding effort to resolve a non-binding dispute.

## II.    THE DEDUCTION OF INTEREST PREVIOUSLY LABELED AS DEVELOPER'S EQUITY RETURN IS NOT SUPPORTED BY THE TERMS OF THE CPA NOR THE EVIDENCE IN THIS CASE

### A.    The Reclassification of Interest from Equity to Debt was Directed by Litigation Counsel for MRLP

The plain language of the CPA demonstrates that Developer's Equity Return is not an Approved Deduction from Appreciation Cash Flow. Appreciation Cash Flow is calculated by finding the Agreed Value, deducting the Approved Deductions and Closing Costs, and then subtracting Developer's Invested Equity and Developer's Operating Equity. (SOF ¶ 60; SODF ¶ 15). In the event of the sale of the property, the Approved Deductions include Permitted Debt, Junior Financing, and the sum of previously calculated Appreciation Cash Flows." (SOF ¶ 62).

Until November 2006, MRLP treated the amounts contributed by S&S Finance for operations at 90 K Street as equity and the alleged interest on the contributions as Developer's Equity Return. (SOF ¶ 60). Because it now realizes that Developer's Equity Return is not a proper deduction when calculating the Appreciation Cash Payment, MRLP has reclassified the alleged interest expense on the alleged loan, along with the accrued interest on the first mortgage held by S&S Finance, as Permitted Debt, which is an Approved Deduction when calculating Appreciation Cash Flow. This flip-flop was orchestrated by litigation counsel for MRLP in the middle of litigation for the sole purpose of avoiding payment to Viad, as is evidenced by the cover letter that accompanied the Revised Special Purpose Financial Statement for 2005 ("Revised 2005 Statement" or "Cooter Financials"). (SOF ¶¶ 67, 125; SODF ¶ 17).

B.    **There is no Evidence that the Contributions from S&S Finance are Permitted Debt**

MRLP cannot prove that the contributions from S&S Finance were a loan since there is no evidence of a loan.  No loan documents were produced by MRLP.  (SOF ¶ 67).  MRLP has not paid any interest on this alleged loan to fund operations at 90 K Street.  Rather, MRLP seeks to deduct hypothetically accrued interest on this alleged debt.  (SOF ¶¶ 57-59).

According to the Revised 2005 Statement received from litigation counsel, MRLP owes S&S Finance over $35 million dollars.  (SODF ¶ 18).  However, this amount is not consistent with MRLP's tax returns, which reflect total liabilities of under $5 million. (SOF ¶ 129; SODF ¶ 18).  Furthermore, at the closing of the TCMD-MRLP transaction on January 11, 2007, the amount repaid to S&S Finance was also under $5 million.  (SOF ¶ 129; SODF ¶ 53).  MRLP claims that it reclassified the first mortgage and the other funds from S&S Finance, including the interest charged, as Permitted Debt to reflect the "economic reality."  (MRLP and MRTDR Opp. Brief at 16).  But the "economic reality" is what is reflected on MRLP's tax return and the settlement statement.  Mere use of the term "Permitted Debt" does not make it so.

C.    **Under the CPA, Interest on Permitted Debt can only be Deducted if Paid**

Even if all the cash infusion to the Property was debt, which Viad disputes, MRLP cannot claim millions of dollars of accrued interest as a deduction because the CPA only recognizes cash basis accounting and requires that interest be paid before it can be deducted.  (SOF ¶¶ 56; SODF ¶ 13).  According to the CPA, if Permitted Debt is held by an Affiliate of Developer, "interest paid thereon shall be included as an expense."  (SODF ¶ 13).  MRLP has not paid the interest on the first mortgage or on the contributions from S&S Finance for operations at 90 K Street.  (SOF ¶¶ 57-59; SODF ¶ 19).  Nevertheless it seeks to deduct the accrued interest in its calculation of the Appreciation Cash Payment.  (SOF ¶ 59).  MRLP argues that under Section

2.6(b) of the CPA, if the interest on amounts contributed by S&S Finance were calculated according to a bank's rate of interest, the amounts constitute Permitted Debt.  MRLP conveniently ignores the requirement, also under Section 2.6(b), that the interest must be paid.  (SODF ¶ 13).

MRLP cites to Ms. Fiorucci's deposition in support of its position that the Developer's Equity Return would have been properly deducted when calculating the Appreciation Cash Payment if it was in fact accrued interest.  (MRLP Opp. Brief at 22).  However, MRLP mischaracterizes Ms. Fiorucci's testimony.  In fact, she testified that accrued interest owed to a third party lender would only be deducted if paid.[4/]  (RSGI ¶ 57).

### D. Not all Expenses are Approved Deductions for Purposes of Calculating the Appreciation Cash Payment

Developer's Equity Return is not an Approved Deduction from Appreciation Cash Flow.  (SOF ¶¶ 60-62).  Rather, Developer's Equity Return is deducted as an Expense under Article 2 when computing Operations Cash Flow.  (SODF ¶ 20).  MRLP argues that the alleged interest is also an allowable Expense and therefore an Approved Deduction.  However, in the event of the sale of the property, the Approved Deductions include Permitted Debt, Junior Financing, and the sum of previously calculated Appreciation Cash Flows."  (SOF ¶ 62).  Although Permitted Debt is deducted when calculating Appreciation Cash Flow, other Expenses are clearly not deducted.

---

[4/]    Q:  Now you and I can agree, can't we, that no matter how you count, if this 8,775,000 was not listed as equity, Developer's Equity Return, but it simply had been accrued interest payment made to a third party lender, that would be deducted from the sales price before the 15 percent cash participation kicked in?  We can agree to that; can't we?  A: Yes.  Q: So that if the 8,775,000 and change number was accrued interest to a third-party lender, it would be an appropriate deduct from the sales price before your 15 percent kicks in; is that right?  A: It would need to be actually paid to a third party lender.  (RSGI ¶ 57).

### E.    MRLP Cannot Deduct Accrued Interest as Developer's Operating Equity or Developer's Equity Return

Under the CPA, MRLP must use "cash basis accounting" applied on a consistent basis in its calculations.  (SOF ¶ 56).  Nevertheless, MRLP seeks to deduct accrued payments of interest and equity return.  (SOF ¶¶ 57-59).  Brent Solomon opined that the amounts accrued as Developer's Equity Return become part of Developer's Operating Equity, which is an Approved Deduction.  (SOF ¶ 72).  However, Reznick was wrong in asserting that accruals could be recognized since the plain language of the CPA says otherwise.  (SOF ¶¶ 57-59).  According to Viad's accounting expert Kirk Rogers, "[c]ash basis accounting is the basis of accounting in which accounting transactions are recorded when the cash transaction occurs, rather than when the obligation is incurred (as is predicated under the accrual basis of accounting).  Under the cash basis of accounting, revenue is recorded upon the receipt of the cash, and costs are recorded when the entity disburses the cash." (RSGI ¶ 57).  Mr. Rogers testified that he defined what cash basis of accounting means in preparing cash basis financial statements and that his definition was a "widely held description."  (RSGI ¶ 57).  Given the foregoing, it is clear that unpaid interest to Equity Holders is not cash basis accounting.  Although MRLP cites to the testimony of Brent Solomon in support of its position that accrued interest can be deducted, Mr. Solomon was never asked if accrued interest can be deducted if it is never paid.  Mr. Solomon testified that: "if there were interest[], for example, accrued on a loan, on a cash basis financial statement, that would still show up as a liability, regardless of when it was paid." (RSGI ¶ 57).  It is clear from Mr. Solomon's testimony that he was assuming that the interest would be paid at some point.

III.    **THE TOTAL CONTRACT PRICE FOR 90 K STREET, INCLUDING THE PRICE ASSIGNED TO THE TDRS BY THE PARTIES, SHOULD BE THE BASIS FOR THE CALCULATION OF THE APPRECIATION CASH PAYMENT**

The CPA provides in Section 3.1 that the Appreciation Cash Payment shall be based on the Agreed Value of the Property, less certain specified deductions as defined in the CPA. (SOF ¶ 141). The Agreed Value is defined in Section 3.3 of the CPA as the greater of the gross proceeds actually received in a sale of the property or the fair market value of the property. (SOF ¶ 142). The purpose of including fair market value as an alternative Agreed Value was to protect Viad in the event that MRLP attempted to sell the property for a fraudulently low price. MRLP does not contest, or even address, the requirement of Section 3.1 that bases the calculation on Agreed Value. Viad's MAI appraiser, Steven Halbert, found the fair market value to be $64,800,000. (SOF ¶ 146). Because the Agreed Value of the Property is the greater of the contract price or the fair market value, this court should find that the total contract price including the TDRs, $67,424,457, is the Agreed Value. (SOF ¶151).

A.    **The Separation of the TDRs was Clearly a Sham**

The Umbrella Agreement between MRLP and TCMD conditioned the sale of 90 K Street on the further purchase of 45 L Street, the adjoining property, and on the purchase of TDRs at a price of $70 per square foot, which was the same price per square foot of the land. (SOF ¶ 114). At the time, the market price for TDRs was between $5.25 and $5.50. (SOF ¶¶ 98, 122). The Umbrella Agreement is unmistakable evidence that the sale price of the property was manipulated to avoid paying Viad its share of the Appreciation Cash Payment. Both TCMD's 30(b)(6) witness and MRLP's own expert testified to facts supporting such a conclusion.

Daniel Hudson, President of TCMD, admitted in deposition testimony that the price paid to MRLP for TDRs was well-above the market price and was agreed to only because purchasing the TDRs at the higher value was a requirement imposed by MRLP as a condition for purchasing

the land at 90 K Street.  (SOF ¶ 122).  Further, MRLP's own expert, Stuart Smith stated that the market price for TDRs was not $70 per square foot, but rather had a market value price "in the range of $3.50" per square foot.  (RSGI ¶ 104).  Mr. Smith was not aware of any sales of TDRs that came even close to a value of over $50, let alone the $70 designated by MRLP.  (RSGI ¶ 104).  Furthermore, Mr. Smith testified that TDRs do not ever sell for a price that is equal to or similar to the price per square foot of the land to which they will be attached.  (SOF ¶¶ 103-104).

MRLP argues that the fair market value of the land (almost $65 million) as stated by Viad's expert was incorrectly calculated because it "specifically depends on [the] inclusion of TDRs."  (MRLP Opp. Brief at 33).  MRLP is correct that the total value of the land, based on the density resulting from TDRs, was included in the appraisal of the land.  MRLP mischaracterizes Mr. Halbert's testimony when it cites to his deposition for the proposition that "[w]ithout TDRs, the value is approximately $44 million."  In fact, Mr. Halbert testified that the value of 90 K Street would be $43,888,000 in response to a hypothetical in which the FAR was only 6.5. (RSGI ¶ 152).  Mr. Halbert also testified that "[i]t would not be proper appraisal technique to only use 6.5" because "an appraiser takes into account what is readily achievable through the zoning office."  (RSGI ¶ 152).  Furthermore, he stated that taking TDRs out of the equation to reach a value of $44 million is "not good appraisal" and "any appraiser who does that would not be doing what he's supposed to be doing."  (RSGI ¶ 152).  In his expert report, Mr. Halbert did not provide an alternate value that excluded the TDRs.  (SOF ¶ 146; RSGI ¶ 152).

Although MRLP's rebuttal expert, Stuart Smith, testified that Viad's expert incorrectly relied upon TDR density when calculating the "as is" value of 90 K Street, he also testified that the final value of opinion would have been correct if Viad's expert had simply described the availability of TDRs as an "extraordinary assumption."  (SOF ¶ 149).  Thus, his objection to the result is procedural not substantive.

Furthermore, the inclusion of the TDR-created value in the appraisal is consistent with the reasoning utilized by MRLP and TCMD in their negotiations for the sale of the property. In mid-2006, TCMD learned that a property that was valued at "roughly $100 million" was for sale. (SOF ¶ 115). Later, in a meeting between TCMD and MRLP, the price discussed for the property remained at approximately $100 million. (SOF ¶ 116). The parties never made a distinction between the price for the land and the portion of the density resulting from the TDRs. The only discussions regarding the TDRs related to the total FAR available because 90 K Street is in a "receiving zone." (SOF ¶ 117).

Then in 2006, TCMD determined that it did not need as many TDRs for density as the contracts had provided. (SOF ¶ 120). The contracts were amended but the total purchase price for the TDRs did not change. (SOF ¶ 120). Instead, the parties simply inflated, once again, the price for each square foot of TDR density, in order to maintain the overall sale price of the property. TCMD's president, Daniel Hudson, went even further in explaining the synthetic nature of the agreement. MRLP would be paid for the total achievable FAR regardless of how the price was allocated between the TDRs and land. (SOF ¶ 122). There is no legitimate reason for the distinction between the two contracts. MRLP can provide no reason why a seller would pay $70 for a TDR when they could easily be bought at that time for a price of $3.50. MRLP has only made such an arbitrary arrangement in order to claim a lower contract price for the property and deny Viad of its proportionate share of the Appreciation Cash Payment.

### B.    MRLP's Arguments Regarding Definitions in the Contract Lack Support and Logic

#### 1.    TDRs are "An Interest in the Property"

Under the CPA, the events that trigger the payment of an Appreciation Cash Payment to Viad are "the sale, assignment, condemnation, conveyance or other disposition of all or any part

14

of or **interest in the Property**." (emphasis added).  (SOF ¶ 12).  In responding to Viad's

argument that TDRs are an "interest in the property", MRLP admits that the phrase "interest in

the property" and the term "interest" are not defined in the CPA.

Viad argues that an analysis of the nature of TDRs was the most appropriate method of

determining whether they should be defined as such under the CPA.  As well, D.C. law dictates

that "[i]n the construction of a contract, the intention of the parties is to prevail, and in

ascertaining this intention, the language is to be given its plain and ordinary meaning."

*Friedman v. Decatur Corp*., 135 F.2d 812, 815 (D.C. Cir. 1943).  Experts responded that TDRs

constituted "zoning density" that enable properties in receiving zones to be developed to their

maximum potential.  (SOF ¶¶ 78, 96).  This interest, when acquired by a property in a receiving

zone, constitutes an "upzoning" of a property.  (SOF ¶ 95).  Moreover, those who appraised the

property and those who purchased the property also considered the TDRs to be interest in the

property.  (SOF ¶¶ 118, 146).

Instead of responding directly to the analysis of the nature of TDRs or to the plain

language,  MRLP instead parses the language of the CPA to arbitrarily suggest that the phrase

"interest in the property" is equal to the phrase "interest in land."  This analysis ignores the plain

language of the CPA by failing to address the term "Improvements" and strains credibility in

logic.  The term "Property" is more encompassing than the term "land."  In fact, the CPA defines

Property as the Improvements and the Real Property." (SOF ¶ 12).  Moreover, other courts have

specifically found that TDRs do represent interests in "real property" finding that the term

includes other unsufrucuary interests.  *Mitsui Fudosan (U.S.A.) Inc. v. County of Los Angeles*,

268 Cal. Rptr. 356, 358 (Ct. App. 1990).

### 2.    TDRs are "Improvements"

In the CPA, the term "Improvements" is defined to include the circular and ambiguous phrase "other improvements."  (SOF ¶ 12).  TDRs add density to property and because of this addition, they are effectively "placed upon the property."  None of the experts deposed were questioned as to whether TDRs constituted "other improvements."

MRLP suggests that TDRs are better defined as "commodities" and one of the "sticks" in the "bundle of rights" and as such they cannot be deemed "improvements."  These definitions support Viad's analysis, rather than defeating it.  The intangible nature of TDRs, which is key to MRLP's likening of the TDRs to commodities, does not eliminate their ability to be defined as improvements.  Other rights, such as air rights or easements would naturally be considered improvements and, therefore, TDRs would as well.  There is nothing to suggest that commodities cannot be improvements.  *See Louisiana Public Serv. Comm'n. v. Texas & N.O.R. Co.*, 284 U.S. 125, 132 (1931) (finding that "the commodities in question are used chiefly for the construction, [and] improvement" of structures).

### C.    The Extrinsic Evidence, Which Strongly Supports Viad's Arguments, can be Utilized if the Court Finds the Contract to be Ambiguous

In its Memorandum in Support of its Motion for Summary Judgment, Viad argued that the plain language of the CPA supports a finding that TDRs are both an "interest in the property" and an "Improvement" to the property.  Viad also pointed out that the extrinsic evidence overwhelmingly supports Viad's arguments regarding the language of the CPA.  In response, MRLP has suggested that "there is no place for extrinsic evidence" in regards to interpreting a contract.

If the court determines that the plain language of the contract is clear and definite, then it does not need to consider the extrinsic evidence that amply supports Viad's position.  If,

however, the court determines that certain terms of the contract are ambiguous, it may turn to extrinsic evidence for assistance in determining the intent of the parties. *United States ex rel. DOL v. Insurance Co. of N. Am.*, 131 F.3d 1037, 1042 (D.C. Cir. 1997).

Here, the extrinsic evidence is useful in interpreting the contract. MRLP listed the costs of TDRs as deductible property expenses for over **five years** in its Special Purpose Financial Statements. (SOF ¶ 107). The accounting for the TDRs was revised only in November 2006, during this litigation, but MRLP's prior conduct is consistent with Viad's view.

MRLP argues that although the TDRs related to the property were recorded in the land records of the city, this is of no relevance to the court in interpreting the nature of the TDRs or the intention of the parties in relation to the TDRs. This argument ignores the fact that MRLP points out that the phrase "interest in the property" and "interest" are not defined in the Cash Participation Agreement. All agree that TDRs are required to be recorded in the land records of the city. This valuable context for the unique characteristics of TDRs should be relied on by the court in determining the nature of TDRs.

Lastly, MRLP argues its purchase contract with Level 3, which contained a definition of "property" that included "development rights," was a different contract. Viad concedes that the purchase agreement was a separate contract not directly involved in the instant dispute, but the specific definition of property including "development rights" is significant evidence of the understanding and knowledge of MRLP in regards to TDRs prior to 2006.

### D.  The Instant Litigation is More Akin to the *Mitsui* Case Than That Cited by MRLP

Both parties agree that that there is no District of Columbia case law that specifically discusses or characterizes TDRs. The case cited by Viad, *Mitsui Fudosan, (U.S.A) Inc. v. County of Los Angeles*, 268 Cal. Rptr. 356 (Ct. App. 1990), is far more similar to the instant litigation

than the case relied upon by MRLP, *Wilkinson v. St. Jude Harbors, Inc.*, 570 So. 2d 1332 (Fla. Dist. Ct. App. 1990). The *Mitsui* case, combined with D.C. law that supports the Mitsui interpretation, suggests that the court should conclude that TDRs are "an interest in the property."

In *Mitsui*, as in this case, the court was asked to consider Mitsui Fudosan's purchase of three parcels of land and TDRs from adjacent landowners. 268 Cal. Rptr. at 357. Mitsui sought to purchase the TDRs so that it could construct an additional 490,000 square feet of building area, more than doubling the density which otherwise would have been permitted. *Id.* Similarly, TCMD sought to purchase TDRs in an effort to develop 90 K Street to its maximum development potential. (SOF ¶ 117). In *Mitsui*, the court found that the word "land" was not specifically defined by California regulations. *Id.* The *Mitsui* court found that the transactions at issue bore "all of the hallmarks of a transfer in "real property" because the owners of the donor parcels received valuable consideration in return for "divesting themselves of a portion of their own property interests." *Id.* at 358.

By contrast, in *Wilkinson*, the court specifically stated that its conclusion was, in part, based on a strict construction of the tax statutes, as required under settled Florida law. 570 So. 2d. at 1333. No such definitive case law requires strict construction of the tax statutes in D.C. The *Wilkinson* decision suggests that because TDRs are transferable, they must be considered separate from a particular piece of property. But, as other commentators have noted, the position that TDRs have nothing to do with the use of the land and are merely chits redeemable on the market for compensation, fails to take into account the real-property characteristics of TDRs. TDRs often bear "all the hallmarks of real property transfers; such as escrow accounts, escrow instructions, purchase and sale agreements, title reports and title insurance, and restrictive covenants." Michael B. Hitchcock, *Note, Suitum v. Tahoe Regional Planning Agency: Applying*

*the Takings Ripeness Rule to Land Use Regulations and Transferable Development Rights*, 28 Golden Gate U.L. Rev. 87 (1998). TDRs are much more than chits and can directly affect the development patterns and densities of receiving properties.

**IV.    VIAD CORP IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF CONTRACT**

**A.    MRLP has Failed to Provide Financial Statements for 2005 and 2006 That Comply With the Requirements of the CPA**

The Revised 2005 Statement (hereinafter the "Cooter Financials"), which was received by Viad on November 21, 2006 with a cover letter from Dale Cooter, MRLP's litigation counsel, was not "prepared in accordance with generally accepted accounting principles," as required by Section 2.6. (SOF ¶¶ 48, 125). Furthermore, it is not "consistent with past practices," and does not bear "the unqualified opinion of a firm of independent certified public accountants," all of which is required by the CPA. (SOF ¶¶ 48, 70, 125-26). According to Viad's accounting expert Kirk Rogers, to provide an "unqualified opinion," an accountant must perform an audit. (RSGI ¶ 123). There is a qualitative difference between the Cooter Financials and the previous financial statements. Unlike the previous financial statements, which were prepared between 1987 and 2004, the Cooter Financials do not contain a signed cover letter certifying that they were compiled by a firm of independent certified public accountants, as required by Section 2.6 of the CPA.[5/] (SOF ¶ 48, 70). Although Viad has accepted unaudited financial statements with a cover letter certifying their compilation by a certified public accountant, it has not waived its right to audited financial statements, and it certainly has not waived its right to certified financial statements. (RSGI ¶ 123).

---

[5/]    A fair implication is that the reversals of previous treatments would not be accepted by the accountants; thus, they were done by Mr. Glassman, of MRLP, and vouched for by counsel as a substitute.

Contrary to MRLP's assertions, Viad does not assert that MRLP is in default for failure to provide audited financial statements up to the point of the sale transaction. (MRLP Opp. Brief at 35-36). However, Viad's decision not to require at the time unaudited financial statements does not excuse MRLP's failure to provide a financial statement for 2005 that is, at a minimum, certified, and even then less than required by the CPA. (SOF ¶ 48). As a result, the Cooter Financials do not comply with the requirements of the CPA.

Incredibly, MRLP states in its Opposition that it has not defaulted with regard to the 2006 financial statement. Although the CPA required that such statement be provided by April 30, 2007 while this motion is pending, the statement was not provided by this date, and the default is now clear: MRLP will not comply with the accounting provisions of the contract.

**B.      MRLP Defaulted by Failing to Provide the Appreciation Cash Payment and a Statement of its Calculation**

Under Section 3.2 of the CPA, MRLP was required to deliver the Appreciation Cash Payment within three (3) days of closing on its transaction with TCMD. (SOF ¶ 135). However, no payment was made by MRLP at any time nor was any payment received by Viad as a result of the sale of the property on January 11, 2007. (SOF ¶ 136).

Furthermore, under Section 3.9 of the CPA, MRLP was required to deliver to Viad "a statement reflecting the Agreed Value, the Approved Deductions, the Closing Costs and the Appreciation Cash Flow used in calculating the Appreciation Cash Payment and a detailed breakdown of all items necessary for the calculation of each such item." (SOF ¶ 137). However, no "statement" as required by Section 3.9 has been delivered by MRLP to Viad. (SOF ¶ 138).

MRLP argues that there was no basis upon which to make the Appreciation Cash Payment because the calculation is the subject of this litigation. (MRLP Opp. Brief at 38). Furthermore, with regard to the statement required under Section 3.9, MRLP argues that all

relevant accounting documents have been provided during discovery and that compiling the statement would have been an "exercise in futility" since the issue of what items can be deducted when calculating the Appreciation Cash Payment is currently before this court. However, a party is not excused from performance of contractual obligations merely by contesting its obligation to perform. *See Hobbs v. Head & Dowst Co.*, 231 U.S. 692 (1914) (stating that a breach by one party does not excuse failure to perform); *Amtrak v. ERC Frankona Ruckversicherungs-Ag*, No. 03-2420 (JGP), 2005 U.S. Dist. LEXIS 43490 (D.D.C. June 24, 2005) (concluding that the parties remain bound by the duties imposed by their Agreement while a claim is pending). Furthermore, although a large volume of documents has been produced during this litigation, MRLP has modified its calculations on numerous occasions and, most recently, on November 21, 2006. (SOF ¶ 113, 125, 127; SODF ¶ 54). Due to these flip-flops, Viad is unable to calculate the Appreciation Cash Payment from the documents produced and, as a result, the statement of calculation is essential.

### C.    MRLP has Defaulted Under the CPA by Failing to Designate an Appraiser

Once Viad has received notice of an occurrence of an event that requires the determination of the fair market value, the parties may agree on the fair market value or, if they are unable to do so, the parties may select appraisers to determine the value. (SOF ¶¶ 145-147). On January 11, 2007, Viad received notice when MRLP sold 90 K Street for more than $67,000,000. (SOF ¶¶ 133-134).

Following this notification, the parties had thirty days to agree on the fair market value of the property. If the parties are unwilling to agree, they have 15 days to select an appraiser. (SOF ¶¶ 147-148). On January 31, 2007, Viad provided to MRLP a report and an opinion, prepared by an MAI appraiser, as to the fair market value of the Property in accordance with Section 3.8 of the CPA. (SOF ¶ 145). The appraiser, Steven Halbert, of Cushman and Wakefield, opined that

the fair market value of the Property on June 24, 2006, and within a 6 month period thereafter, which period included the date of the contract between MRLP-TCMD, was $64,800,000. (SOF ¶ 146). Because Viad sent its appraisal report, indicating its belief that an agreement on fair market value could not be reached, on January 31, 2007, the time period for identifying the appraiser lapsed 15 days later on February 15, 2007. (SOF ¶ 148).

MRLP now argues that the time period lapsed on December 17, 2006, 45 days after Viad received the amended contracts for sale of 90 K Street. However, given the possibility that the transaction may not have closed (and an actual history of an announced transaction that failed to close), MRLP's argument that the formation of the contract provided notice to Viad is unreasonable. Moreover, MRLP failed to respond to Viad's letter of February 21, 2007 notifying MRLP that it was in default, and has failed to designate an appraiser, thereby waiving its arguments regarding the calculation of the relevant time period under the CPA. (SOF ¶¶ 139-140, 148). The fact that the appraisal tendered by Viad on January 31, 2007 was in response to this court's deadline for expert designations and made no reference to the appraisal process in Section 3.11 does not alter the procedure required under the CPA. Furthermore, any doubts that MRLP may have had with respect to the purpose of Viad's designation of Steve Halbert were dispelled by Viad's default letter of February 21, 2007, in which Viad asserted that the deadline to identify an appraiser in accordance with Section 3.8 expired on February 15, 2007. Under the CPA, MRLP had 30 days to cure this default, but it chose not to do so. (SOF ¶¶ 139-140).

MRLP did tender a rebuttal report that was prepared by MAI appraiser Stuart Smith. Mr. Smith testified that he has no opinion of the fair market value of the property. Rather, the thrust of his "rebuttal" is that Mr. Halbert should have described the availability of TDRs as an "extraordinary assumption." (SOF ¶ 149). As a result, MRLP has completely disregarded the

fair market value component of the Agreed Value by failing to provide evidence of fair market value.

Even if MRLP were persuasive in arguing that Viad should have invoked the appraisal procedure earlier, the requirement of Section 3.1 that Agreed Value is the greater of the contract price or the fair market value of 90 K Street remains.  MRLP has no evidence of fair market value and offers only its artificial contract price.  Absent any proffer of evidence of fair market value, it cannot dispute the evidence presented by Viad and its MAI appraiser.

Viad has not waived the requirement of the contract that Agreed Value be based on a comparison of fair market value or the contract price.  The litigation was started by MRLP to construe the contract for sale and to confirm its understanding of the appropriate deductions, and Viad counterclaimed on both.  But, the action of the parties does not change either the fact that fair market value must be determined or the process for doing so.

Because the Agreed Value of the Property is the greater of the contract price or the fair market value, this court should find that the total contract price including the TDRs, $67,424,457, is the Agreed Value.  (SOF ¶ 151).  Alternatively, in no event is the fair market value less than $64,800,000, the fair market value provided by Steve Halbert.  (SOF ¶ 152).

> **D.     An Audit of MRLP's Records is Necessary to Calculate the Appreciation Cash Payment**

The undisputed evidence demonstrates that MRLP has failed to provide financial statements on a cash basis, has taken inconsistent approaches in its accounting by removing the costs for TDRs and converting equity to debt, and has failed to provide the required statement of its costs and calculation after closing on the TCMD-MRLP transaction.  (SOF ¶¶ 57-59, 113, 133-38).  Due to MRLP's conduct and defaults under the CPA, Viad requests that the Court

order an audit of MRLP's records, at its expense, to determine which costs should be included in the calculation of the Appreciation Cash Payment.[6/]

## V.    MRLP HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, WHICH IS INHERENT IN THE CPA

MRLP asserts that the relationship between Viad and MRLP is that of creditor-debtor, and as such, it is exempt from the almost universal rule that its agreement contains the implied covenant of good faith and fair dealing.

MRLP cites again the same three cases in support of its argument.  As Viad has previously discussed in its Opposition Memorandum, two of these cases are inapplicable as they do not actually address the question regarding the applicability of the implied covenant to agreements between creditors and debtors.  Viad has pointed out that the majority of cases that have considered the question have found that the implied covenant does exist in agreements between creditors and debtors.  *See In re A.W. Logging, Inc.*, No. 05-500, 2006 Bankr. LEXIS 3605, at *16 (Bankr. D. Idaho Oct. 4, 2006); *Wilbar Realty, Inc. v. Pa. Infrastructure Inv. Auth. (In re Wilbar Realty Inc.)*, 325 B.R. 354, 360 (Bankr. M.D. Pa. 2005); *Bristol Sav. Bank v. Chic Miller's Chevrolet-Isuzu, Inc.*, No. CV-92-07035245, 1993 Conn. Super. LEXIS 996 (Conn. Super. Ct. Apr. 27, 1993).  MRLP's arguments fail because they lack supportive case law or logic.

MRLP argues that it "is not required to maximize Viad's cash participation."  Viad has never suggested that MRLP was required to maximize Viad's cash participation.  Viad has asked only that MRLP abstain from fraudulent accounting and manipulation in calculating Viad's share of the appreciation for 90 K Street.

---

[6/]    Furthermore, because Viad has not waived its right to audited financial statements, it is entitled to an audit under the terms of the CPA.  (SOF ¶ 48; RSGI ¶ 25).

MRLP then suggests that the implied covenant cannot be used to "modify or override the express terms of the contract."  MRLP fails to address what portions of the CPA it is alleging that the implied covenant is attempting to override.  It does cite case law for the notion that a party may act in its own self-interest even if those actions "may incidentally lessen the other parties anticipated fruits from the contract."  This attempted analogy grossly misstates MRLP's actions in regards to the CPA.  MRLP has intentionally sought to evade the spirit of the CPA and has undertaken actions that were deliberately designed to defraud Viad of its rightful share of the Appreciation Cash Payment.

<u>**CONCLUSION**</u>

For the foregoing reasons, Viad requests that this Court enter Summary Judgment for Viad on Counts I and II of the First Amended Complaint and Counts I, II, III, and IV of the Amended and Supplemental Counterclaim.

Respectfully Submitted,

BRYAN CAVE LLP

By:  /s/ Rodney F. Page
Rodney F. Page (DC Bar No. 37994)
Alicia I. Hogges-Thomas (DC Bar No. 480548)
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005-3960
P:  (202) 508-6000
F:  (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff
Viad Corp*

Dated: May 3, 2007

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

MONTGOMERY ROAD I LIMITED
PARTNERSHIP,

       Plaintiff and
       Counterclaim-Defendant,

   v.

VIAD CORP,                        Case No.  1:06CV00344 (HHK)

       Defendant and
       Counterclaim-Plaintiff,

   v.

MONTGOMERY ROAD TDR, LLC,

       Counterclaim-Defendant.
_____

## DEFENDANT VIAD CORP'S RESPONSE
## TO MONTGOMERY ROAD I LIMITED PARTNERSHIP AND
## MONTGOMERY ROAD TDR, LLC'S STATEMENT OF GENUINE ISSUES

Defendant/Counterclaim-Plaintiff Viad Corp ("Viad") submits this Response to

Montgomery Road I Limited Partnership ("MRLP") and Montgomery Road TDR, LLC's

("MRTDR's") Statement of Genuine Issues in support of its Reply to the Opposition of MRLP

and MRTDR to Viad's Motion for Summary Judgment.  Based on MRLP and MRTDR's

Statement of Genuine Issues, it is clear that there is no dispute with regard to the material facts

contained in paragraphs 1-24, 26-27, 31-35, 39, 46, 48, 52, 54, 56, 58, 61-64, 68-71, 74-96, 105-

106, 108-109, 111, 113-119, 133, 139, 141-144, 149, and 153.  Furthermore, Viad avers that

upon closer examination of the purported genuine issues that are raised in the remaining

paragraphs, it becomes clear that MRLP and MRTDR's assertions that disputes exist are not supported by the evidence.

The citations referenced are to those portions of the record filed on March 29, 2007 and April 19, 2007 (Exhibits 1-67) and to those portions of the record filed herewith (Exhibits 68-73).

Viad responds to the individually numbered paragraphs of MRLP and MRTDR's Statement of Genuine Issues as follows:

1.    Undisputed.

2.    Undisputed that SJG Holdings, LLC, which is owned by Stewart Greenebaum and/or his family members, is a limited partner of Montgomery Road I Limited Partnership, in addition to The Samuel G. Rose Revocable Trust, Reid Liffmann and Steven Braesch.

3.    Undisputed.

4.    Undisputed.

5.    Undisputed that the ownership of MRLP and S&S Finance are different. However, the ownership of the two entities was the same until approximately 2001, when Reid Liffmann was added as a limited partner.  (MRLP 2001 U.S. Return of Limited Partnership Income at 10-23, MR-26497) (Ex. 63); (MRLP 1996 U.S. Partnership Return of Income, MR-26609, at Schedule K-1, MR-26620-26631) (Ex. 65).

6.    Undisputed.

7.    Undisputed.

8.    Undisputed.

9.    Undisputed.

10.    Undisputed.

11.    Undisputed.

12.    Undisputed.

13.    Undisputed.

14.    Undisputed.

15.    Undisputed.

16.    Undisputed.

17.    Undisputed.

18.    Undisputed.

19.    Undisputed.

20.    Undisputed, and Viad contends this fact is material.

21.    Undisputed, and Viad contends this fact is material.

22.    Undisputed, and Viad contends this fact is material.

23.    Undisputed, and Viad contends this fact is material.

24.    Undisputed.

25.    Undisputed that a Revised 2005 Statement was tendered on November 21, 2006.

However, disputed to the extent that MRLP suggests that the Revised 2005 Statement complies

with the requirements of the CPA.  Unlike previous financial statements, the Revised 2005

Statement did not contain a signed letter certifying its compilation by a certified public

accountant.  (Deposition of Reid Liffmann ("Liffmann Dep.") at 14:9-16:22; 35:15-37:12 (Ex.

2); Cash Participation Agreement ("CPA") § 2.6 (Ex. 9); Letter dated 11/21/06 from D. Cooter to

R. Page, enclosing Revised 2005 Statement (Ex. 36); Letter dated 9/21/00 from A. Pignatelli to

R. Page, enclosing Draft 2005 Statement (Ex. 14); *see also* Special Purpose Financial Statement

for December 31, 2004 and 2003 (hereinafter "Representative Statement") MR-00953 at 00955)

(Ex. 35).  Under Section 2.6 of the CPA, Viad is entitled to financial statements that bear the unqualified opinion of a firm of independent certified public accountants.  (CPA § 2.6) (Ex. 9).  According to Viad's accounting expert Kirk Rogers, to provide an "unqualified opinion," an accountant must perform an audit.  (Deposition of Kirk Rogers ("Rogers Dep.") at 40:8-14 (Ex. 68)).  Although Viad has accepted unaudited financial statements with a cover letter certifying their compilation by a certified public accountant, it has not waived its right to audited financial statements, and it certainly has not waived its right to certified financial statements.  (CPA § 7.6) (Ex. 9).

26.    Undisputed.

27.    Undisputed.

28.    MRLP and MRTDR state that the CPA speaks for itself.  According to the CPA, "the term 'Expenses' shall mean all reasonable expenses actually incurred by Developer with respect to the ownership, operation, leasing and occupancy of the Property, determined on the basis of sound cash basis accounting practices applied on a consistent basis."  (CPA § 2.3(a) (Ex. 9).  Given the language of the CPA, there is no dispute with respect to the facts in Paragraph 28.

29.    MRLP and MRTDR do not dispute the material fact that MRLP has sought to convince Viad to relinquish its cash participation interest for a nominal sum since the late 1980's.  MRLP's statement that Mr. Rose's offers "were not intended to mislead or represent the value of the property but rather, were based on Mr. Rose's assessment that the value of any Appreciation Cash Payment was zero" does not change the underlying material fact that MRLP has sought since the late 1980's to buy out Viad's participation rights for a nominal sum.  (Letter dated 10/25/89 from A. Ervanian to S. Rose, VD-001027; Letter dated 4/6/95 from S. Rose to A. Ervanian, MR-05987; Letter dated 7/14/99 from R. Liffmann to K. Goldman, VD-001098; Letter

dated 7/12/00 from E. Fiorucci to S. Rose, VD-000658; Memorandum dated 12/18/02, MR-00664, attached as Exs. 15-19). Furthermore, MRLP's assertion that the offers to Viad "were based on Mr. Rose's assessment that the value of any Appreciation Cash Payment was zero" is mere speculation and not supported by any citations to the record.

30. MRLP and MRTDR do not dispute the material fact that MRLP, in its correspondence with Viad employees, provided values for the 90 K Street Property that were lower than values provided to other parties, in an effort to convince Viad to relinquish its participation interest. (*Compare* Letter dated June 17, 1992 from S. Rose to C. Helwig, MR-07004 (Ex. 20) with Letter dated 4/6/95 from S. Rose to A. Ervanian, MR-05987 (Ex. 16); *see also* Letter dated 5/21/02 from S. Rose to E. Fiorucci, VD-000537-38, attached as Ex. 21). MRLP's statement that there is no evidence that anyone from TLC/Viad was misled because Viad conducted due diligence each time Sam Rose offered to buy out their interest does not change the underlying material fact.

31. Undisputed.

32. Undisputed.

33. Undisputed.

34. Undisputed.

35. Undisputed.

36. See Viad's Response to MRLP and MRTDR's Response to Paragraph 29. Furthermore, MRLP and MRTDR do not dispute the material fact that MRLP has sought to convince Viad to relinquish its cash participation interest on more than a few occasions for a lesser sum. (Letter dated 5/21/02 from S. Rose to E. Fiorucci, VD-000537; Record of Telephone Conversation on 6/10/02, VD-00966; Record of Telephone Conversation on 6/15/04, VD-

000965; Record of Telephone Conversation on 7/25/04, VD-000964) (Exs. 21, 27-29). MRLP's disagreement with the use of "continuously" does not change the underlying material fact. Furthermore, although MRLP and MRTDR dispute the reference to a "nominal sum" this assertion is not supported by citation to the record.

     37.    Although MRLP and MRTDR claim that this material fact is disputed, they have not demonstrated that the dispute between the parties was submitted to Reznick under the arbitration provision in Section 2.7. On the other hand, Viad has presented ample evidence that the dispute was not submitted to Reznick for arbitration but for advice only. The dispute between the parties related to the calculation of the Article 3 Appreciation Cash Payment, not the financial statements required under Article 2. (*See* CPA § 3.1; Deposition of Eve Fiorucci ("Fiorucci Dep.") at 46:1-20; Record of Telephone Conversation on 6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664; (Exs. 6, 9, 19, 27). Section 2.7, which appears in Article 2, the section of the CPA that deals with Operations Cash Flow, has nothing to do with the Appreciation Cash Payment. (*See generally* CPA, Article 2) (Ex. 9). As a result, Section 2.7 of the CPA does not relate to the subject matter of the Reznick letter; the letter deals with a hypothetical sale, whereas section 2.7 concerns disputes about yearly Operations Cash Payments (CPA § 2.7 (Ex. 9); Letter dated 4/10/05 from B. Solomon to R. Rose ("Reznick Analysis") ¶ 2, VD-000466 (Ex. 32)). Samuel Rose, MRLP's 30(b)(6) witness, has testified that he has no recollection of describing the Reznick Analysis as an "arbitration." (Deposition of Samuel Rose ("Rose Dep.") at 86:8-12) (Ex. 1). Brent Solomon, the accountant who completed the analysis on behalf of Reznick, stated in his deposition: "I don't think anyone ever came to us and said your opinion is binding." (Deposition of Brent Solomon ("Solomon Dep.") at 108:5-12, attached as Ex. 60). In its letter dated March 2, 2005, Viad conditioned its submission of papers to

Reznick on the understanding that Reznick's analysis would not be binding. (*See* Letter dated 3/2/05 from E. Fiorucci to B. Solomon, VD-000904 (Ex. 31). In a letter to Reznick during the review process, Reid Liffmann, a limited partner of MRLP, indicated that the process was advisory only, stating: "[h]opefully, with guidance from you, the parties can get a process moving that will lead to a resolution, without wasting a lot of legal dollars and time." (Letter dated 3/24/05 from R. Liffmann to B. Solomon, MR-01685, attached as Ex. 34). MRLP cannot point to a specific conversation where MRLP or Viad stated that the Reznick Analysis would be binding. (Rose Dep. at 86:13-87:8; 93:15-94:13) (Ex. 1). In the records of phone conversations leading up to the decision to seek advice from an accountant, there is no indication that Viad or MRLP intended Reznick's advice to be binding. (Record of Telephone Conversation on 6/15/04, VD-000965; Record of Telephone Conversation on 7/25/04, VD-000964; Record of Telephone Conversation dated 12/16/04, VD-000960) (Exs. 28-30). In some of those conversations, Sam Rose offered to pay for Reznick's review. For example, according to Ms. Fiorucci's notes of a phone conversation with Mr. Rose on June 10, 2002, Sam Rose "would pay for Viad to have an outside firm look at the accounting." (Record of Telephone Conversation on 6/10/02, VD-00966 (Ex. 27). In her notes of a phone conversation on June 15, 2004, Ms. Fiorucci wrote: "Sam to pick up cost of accountant to look over financial statements and agreement." (Record of Telephone Conversation on 6/15/04, VD-000965 (Ex. 28). However, Section 2.7 requires that "the fees of such accountant, as well as any arbitration fees incurred in connection with the dispute, shall be paid by … [Viad] unless such review shall indicate that the computation resulted in an error, in favor of … [MRLP], in the Operations Cash Payment of an amount more than three percent (3%) of the amount actually owing to .. [Viad] for such Fiscal Year, in which case … [MRLP] shall pay all such fees." (CPA § 2.7) (Ex. 9).

38.    Undisputed.  Viad does not dispute that Ms. Fiorucci's letter did not have the effect of unilaterally turning a binding dispute resolution into a non-binding review.  The evidence clearly demonstrates that the parties never agreed to submit their dispute to Reznick under Section 2.7.  (*See* Viad's Response to MRLP and MRTDR's Response to Paragraph 37).  As a result, Ms. Fiorucci's letter was not a unilateral attempt to amend Section 2.7.

39.    Undisputed.

40.    Although MRLP and MRTDR claim that this material fact is disputed, they have not demonstrated that Reznick's analysis was a final determination under Section 2.7 of the CPA.  On the other hand, Viad has presented ample evidence that the dispute was not submitted to Reznick for arbitration but for advice only.  (*See* Viad's Response to MRLP and MRTDR's Response to Paragraph 37).

41.    Viad does not dispute the recitation of the words from Mr. Rose's letter.

42.    Viad does not dispute that Ms. Fiorucci's letter did not have the effect of unilaterally turning a binding dispute resolution into a non-binding review.  Furthermore, Viad does not dispute that MRLP had no obligation to contact Viad with regard to an alleged unilateral attempt to change the terms of CPA.

43.    Viad does not dispute that Mr. Liffmann's letter did not modify the terms of the CPA.  Furthermore, MRLP and MRTDR do not cite any evidence for their position that Mr. Liffmann's letter does not indicate that the process was advisory only.

44.    MRLP and MRTDR do not dispute the material fact that MRLP cannot point to a specific conversation where Viad stated that the Reznick Analysis would be binding and that the records of phone conversations do not indicate that Viad or MRLP intended Reznick's advice to be binding.  (Rose Dep. at 86:13-87:8; 93:15-94:13) (Ex. 1); Record of Telephone Conversation

on 6/15/04, VD-000965; Record of Telephone Conversation on 7/25/04, VD-000964; Record of

Telephone Conversation dated 12/16/04, VD-000960) (Exs. 28-30). Sam Rose's testimony that

the parties' intent to be bound is evident in the length of time it took to get approval and pick an

accountant does not change the underlying material fact. Furthermore, MRLP and MRTDR cite

to Ms. Fiorucci's phone records to the effect that "Sam Rose wants to buy Viad out" and that he

"would pay for Viad to have an outside firm look at accounting." Disputes over a buy out price

are not covered by Section 2.7 of the CPA. (CPA § 2.7) (Ex. 9). Furthermore, MRLP's offer to

pay for the accounting does not comply with the fee sharing arrangement in Section 2.7. *Id*. As

a result, the very evidence cited by MRLP supports Viad's position that the decision to submit

the dispute to Reznick was an attempt to reach an informal compromise solution, instead of an

attempt to arbitrate under Section 2.7.

45.    Undisputed that SOF ¶ 45 and MRLP's response describe MRLP's position with

respect to the nature of the Reznick Analysis. Disputed to the extent that MRLP suggests that

Viad supports this position.

46.    Undisputed.

47.    Undisputed; MRLP's additional response is argumentative and should be

disregarded.

48.    Undisputed.

49.    MRLP and MRTDR provide no evidentiary support for their position that "[t]he

financial statements necessary to compute the elements of Appreciation Cash Flow are the same

Financial Statements required by Section 2.6." The calculation of Appreciation Cash Flow in

Section 3.1 makes no reference to the financial statements that are submitted in response to

Section 2.6. (CPA §§ 2.6, 3.1) (Ex. 9).

50.    The dispute resolution provision in Section 2.7 concerns fiscal year statements only.  (CPA § 2.7) (Ex. 9).  Disputes regarding the Appreciation Cash Payment are covered by Section 3.11, after the payment has been received.  (CPA § 3.11) (Ex. 9).

51.    Although MRLP and MRTDR claim that this material fact is disputed, they have not demonstrated that the dispute between the parties was submitted to Reznick under the arbitration provision in Section 2.7.  On the other hand, Viad has presented ample evidence that the dispute was not submitted to Reznick for arbitration but for advice only.  (*See* Viad's Response to MRLP and MRTDR's Response to Paragraph 37).

52.    Undisputed.

53.    Although MRLP and MRTDR claim that the Reznick Analysis was the product of an arbitration under Section 2.7, they have not demonstrated that the dispute between the parties was submitted to Reznick under the arbitration provision in Section 2.7.  On the other hand, Viad has presented ample evidence that the dispute was not submitted to Reznick for arbitration but for advice only.  (*See* Viad's Response to MRLP and MRTDR's Response to Paragraph 37).

54.    Undisputed.

55.    Although MRLP and MRTDR claim that the Reznick Analysis was the product of an arbitration under Section 2.7, they have not demonstrated that the dispute between the parties was submitted to Reznick under the arbitration provision in Section 2.7.  On the other hand, Viad has presented ample evidence that the dispute was not submitted to Reznick for arbitration but for advice only.  (*See* Viad's Response to MRLP and MRTDR's Response to Paragraph 37).

56.    Undisputed.

57.    MRLP and MRTDR mischaracterize Ms. Fiorucci's deposition testimony.  Ms. Fiorucci testified that accrued interest owed to a <u>third party lender</u> would only be deducted if

paid.  (Fiorucci Dep. at 37:9-22).  Later, in response to a hypothetical, she testified that if MRLP

went to a third party lender and took a loan on which they never had to make a payment in the

life of the loan, and the interest was not paid and the balance increases, then the balance would

be an allowable deduction.  (Fiorucci Dep at 41:13-42:9, attached as Ex. 69).  Moreover, Ms.

Fiorucci's initial response to the hypothetical was "[t]hat didn't happen." *Id*.  According to

Viad's accounting expert Kirk Rogers, "[c]ash basis accounting is the basis of accounting in

which accounting transactions are recorded when the cash transaction occurs, rather than when

the obligation is incurred (as is predicated under the accrual basis of accounting).  Under the cash

basis of accounting, revenue is recorded upon the receipt of the cash, and costs are recorded

when the entity disburses the cash." (Expert Report of Kirk Rogers, attached as Exhibit 70).  Mr.

Rogers testified that he defined what cash basis of accounting means in preparing cash basis

financial statements and that his definition was a "widely held description."  (Rogers Dep. at

23:15-24:22) (Ex. 68).  Thus, unpaid interest is not cash basis accounting, and MRLP's reflection

of accrued interest payments on its financial statements is not consistent with the CPA.  Finally,

although MRLP cites to the testimony of Brent Solomon in support of its position that accrued

interest can be deducted, Mr. Solomon was never asked if accrued interest can be deducted if it is

never paid.  It is clear from Mr. Solomon's testimony that he was assuming that the accrued

interest would be paid at some point: "[s]o, if there were interest[], for example, accrued on a

loan, on a cash basis financial statement, that would still show up as a liability, regardless of

when it was paid." (Solomon Dep. at 128:20-129:9, attached as Ex. 71) (emphasis added).  To

date, MRLP has not paid the interest on the first mortgage and the contributions from S&S

Finance.

       58.    Undisputed.

59.    MRLP's assertion that this is disputed is contrary to its own admissions.  No interest was ever paid, and MRLP's characterizations are misleading.  (Liffmann Dep. at 45:10-46:17) (Ex. 2).

60.    Although MRLP and MRTDR dispute that the calculation is as simplistic as inferred in the SOF, this does not change the underlying material fact.  Furthermore, MRLP and MRTDR's assertion that the calculation of Appreciation Cash Flow is not as simplistic as inferred in this SOF is not supported by any citation to the record.

61.    Undisputed.

62.    Undisputed.

63.    Undisputed.

64.    Undisputed.

65.    Undisputed.

66.    The facts described by Viad are undisputed, and MRLP's response is argument based on its alleged unilateral intent.

67.    MRLP and MRTDR's statements that the Financial Statements were revised in 2006 "to reflect the proper treatment of the advances from S&S Finance" and that "the funds were advanced by S&S with the intention of earning a return on those funds" are virtually unsupported.  MRLP and MRTDR merely cite to the Declarations of Sam Rose and Ron Glassman.  Furthermore, these statements do not change the underlying material facts in Paragraph 67.

68.    Undisputed.

69.    Undisputed.

70.    Undisputed.

71.    Undisputed.

72.    Although MRLP states that the decision to treat amounts advanced by S&S Finance and the accrued interest on those amounts as debt instead of equity is not inconsistent with the Reznick Analysis, but rather an alternative treatment, this is mere argument. There is no cite to the record to support this position. As a result, the material facts in Paragraph 72 are undisputed.

73.    Although MRLP claims that the changes to the financial statements were made to accurately reflect the economic situation, MRLP has not produced documents that show that the advances from S&S Finance are in fact debt.- Furthermore, the amount allegedly owed to S&S Finance under the 2005 Revised Statement conflicts with the liabilities recorded in MRLP's 2005 tax return and the amount disbursed to S&S Finance upon sale of 90 K Street. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50 & 52); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36).

74.    Undisputed.

75.    Undisputed.

76.    Undisputed.

77.    Undisputed.

78.    Undisputed.

79.    Undisputed.

80.    Undisputed.

81.    Undisputed.

82.    Undisputed.

83.    Undisputed.

84.    Undisputed.

85.    Undisputed.

86.    Undisputed.

87.    Undisputed.

88.    Undisputed.

89.    Undisputed.

90.    Undisputed.

91.    Undisputed.

92.    Undisputed.

93.    Undisputed.

94.    Undisputed.

95.    Undisputed.

96.    Undisputed.

97.    Undisputed in that MRLP's additional assertions contradict its own admissions and the evidence or are immaterial.

98.    Undisputed in that MRLP's additional assertions contradict its own admissions and the evidence or are immaterial.

99.    Undisputed in that MRLP's additional assertions contradict its own admissions and the evidence or are immaterial.

100.    Undisputed in that MRLP's response is mere argument.

101.    Undisputed in that MRLP's additional assertions contradict its own admissions and the evidence or are immaterial.

102.    MRLP and MRTDR's response does not change the fact that MRLP has contracted to buy TDRs for use at the 90 K Street Property, in connection with the sale to TCMD in January 2007, for $6 per square foot.  (Deposition of Steven Braesch ("Braesch Dep.") at 24:19-29:17), attached as Ex. 3).  Therefore, Paragraph 102 is undisputed.

103.    The testimony cited by MRLP in its response to Paragraph 103 does not change the fact that Stuart Smith also testified that on one occasion, he determined the value of TDRs in the North Capitol receiving zone to be $3.50 per FAR.  (Deposition of Stuart Smith ("Smith Dep.") at 33:6-34:3, attached as Ex. 72).  As a result, Paragraph 103 is undisputed.

104.    MRLP's own expert testified that TDRs do not sell for a price that is equal to or similar to the price per square foot of land to which they will be attached.  (Smith Dep. at 94:13-95:4) (Ex. 72).  Stuart Smith stated that the market price for TDRs was not $70 per square foot, but rather had a market value price "in the range of $3.50" per square foot. (Smith Dep. at 93:4-7, attached as Ex. 72).  Mr. Smith was not aware of any sales of TDRs that came even close to a value of over $50, let alone the $70 designated by MRLP. (Smith Dep. at 93:8-11, attached as Ex. 72).  MRLP's statement that "TDRs sell for whatever price is reached between the seller and the buyer" is merely supported by the declaration of one of its limited partners, Steven Braesch.

105.    Undisputed.

106.    Undisputed.

107.    MRLP's statement that it disputes that the TDR expenses were appropriate deductions does not change the fact that these expenses were previously listed as appropriate deductions on the financial statements for 2000 to 2004 and the Draft Financial Statement for 2005.  (Financial Statement for December 31, 2000 and 1999 at 7, VD 000180; Letter dated

11/21/06 from D. Cooter to R. Page ¶ 1) (Exs. 36, 40).  As a result, Paragraph 107 is not disputed.

108.    Undisputed.

109.    Undisputed.

110.    The evidence provided by MRLP does not support its position that TDRs are not Property under the CPA.  In contrast, Viad has provided ample evidence that TDRs are an interest in the property or an improvement to the property and, therefore, should be included in the calculation of the Appreciation Cash Payment.  Furthermore, Viad has demonstrated that the buyer of 90 K Street only paid the inflated price for the TDRs because it was a condition imposed by MRLP for purchasing the land at 90 K Street.  (Deposition of Daniel Hudson ("Hudson Dep.") at 45:4-46:17) (Ex. 5).  The buyer was aware that the TDRs were being sold significantly above market price.  *Id*.  Also, under the bargain that was reached between MRLP and the buyer, TCMD would pay for the achievable FAR regardless of how the price was allocated between the land and the TDRs.  (Hudson Dep. at 46:8-17) (Ex. 5).  The foregoing is ample evidence of MRLP's intent to exclude Viad from participating in the appreciation of the property by creating a separate contract for the sale of he TDRs.

111.    Undisputed.

112.    This paragraph is essentially undisputed.  MRLP's statement that TDRs are intangibles and that references to the TDRs as "property" were properly deleted from the TCMD-MRLP contract does not change the underlying material fact that efforts were made to delete any reference to TDRs as "property."  (Draft Purchase and Sale Agreement at 6, MR-10942, attached as Ex. 44).  Furthermore, MRLP's position that the TDRs were properly deleted because they were intangibles is weakly supported by the Declaration of Steven Braesch and

contradicted by the treatment of TDRs in the Level 3 contract, which included intangible personal property in the definition of "property." ("MRLP-Level 3 Agreement" at 1.1.3 and Article 2, VD-000593) (Ex. 38); Rose Dep. at 193:21-195:17 (Ex. 1)).

113.    Undisputed.

114.    Undisputed.

115.    Undisputed.

116.    Undisputed.

117.    Undisputed.

118.    Undisputed.

119.    Undisputed.

120.    The evidence cited by Viad in Paragraph 120 supports Viad's position that the TCMD deal was a sham transaction. Furthermore, MRLP fails to cite evidence that supports its position that the deal was not a sham transaction. As a result, Paragraph 120 is undisputed.

121.    The evidence cited by Viad in Paragraph 121 supports Viad's position that the TCMD deal was a sham transaction. Furthermore, MRLP fails to cite evidence that supports its position that the deal was not a sham transaction. As a result, Paragraph 121 is undisputed.

122.    The evidence cited by Viad in Paragraph 122 supports Viad's position that the TCMD deal was a sham transaction. Furthermore, MRLP fails to cite evidence that supports its position that the deal was not a sham transaction. As a result, Paragraph 122 is undisputed.

123.    Although MRLP provided a Revised Financial Statement for 2005, this statement did not contain a signed cover letter certifying that the statement was compiled by a firm of independent certified public accountants, in accordance with Section 2.6 of the CPA. (Liffmann Dep. at 14:9-16:22; 35:15-37:12 (Ex. 2); CPA Section 2.6 (Ex. 9); Letter dated 11/21/06 from D.

Cooter to R. Page, enclosing Revised 2005 Statement (Ex. 36); Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement (Ex. 14); *see also* Representative Statement, MR-00953 at 00955) (Ex. 35). MRLP admitted this fact in its Response to Paragraph 70. Under Section 2.6 of the CPA, Viad is entitled to financial statements that bear the unqualified opinion of a firm of independent certified public accountants. (CPA § 2.6) (Ex. 9). According to Viad's accounting expert, Kirk Rogers, to provide an "unqualified opinion," an accountant must perform an audit. (Rogers Dep. at 40:8-14) (Ex. 68). Although Viad has accepted unaudited financial statements with a cover letter certifying their compilation by a certified public accountant, it has not waived its right to audited financial statements, and it certainly has not waived its right to certified financial statements. (CPA § 7.6) (Ex. 9). As a result, contrary to MRLP's assertion in its Response to Paragraph 123, it is undisputed that MRLP has not provided a financial statement pursuant to the CPA for fiscal year 2005. It is also undisputed that the 2006 Financial Statement was due on April 30, 2007, and was not provided.

124.    In its Response to Paragraph 70, MRLP admitted that the Revised Financial Statement for 2005, which was provided to Viad, did not contain a signed cover letter certifying that the statement was compiled by a firm of independent certified public accountants, in accordance with Section 2.6 of the CPA. Under Section 2.6 of the CPA, Viad is entitled to financial statements that bear the unqualified opinion of a firm of independent certified public accountants. (CPA § 2.6) (Ex. 9). According to Viad's accounting expert, Kirk Rogers, to provide an "unqualified opinion," an accountant must perform an audit. (Rogers Dep. at 40:8-14) (Ex. 68). Although Viad has accepted unaudited financial statements with a cover letter certifying their compilation by a certified public accountant, it has not waived its right to audited financial statements, and it certainly has not waived its right to certified financial statements.

18

(CPA § 7.6) (Ex. 9).  As a result, contrary to MRLP's assertion in its Response to Paragraph 124, it is undisputed that MRLP has not provided a financial statement pursuant to the CPA for fiscal year 2005 and, hence, that MRLP's failure to provide a proper 2005 financial statement under Section 2.6 of the CPA is a default under the contract.  It is also undisputed that the 2006 financial statement was due on April 30, 2007, and was not provided.

125.    Although MRLP asserts that Viad's summary of CPA Section 2.6 is not accurate, it is clear from the language of Section 2.6 that the CPA requires the certification of an independent certified public accountant applying generally accepted accounting principles on a consistent basis.  (CPA § 2.6) (Ex. 9).  MRLP's word for word recitation of Section 2.6 does not change this underlying material fact.  Thus, despite MRLP's assertion to the contrary, Paragraph 125 is not disputed.

126.    Undisputed.  Viad has accepted unaudited financial statements from MRLP.  However, the financial statements for 1987 through 2004 all contained a signed statement certifying that the financial statement was compiled by a firm of independent certified public accountants.  Unlike the previous statements, the Revised 2005 Statement does not contain this certification.  (Liffmann Dep. at 14:9-16:22; 35:15-37:12 (Ex. 2); CPA Section 2.6 (Ex. 9); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement (Ex. 36); Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement (Ex. 14); *see also* Representative Statement, MR-00953 at 00955) (Ex. 35).  MRLP admitted these facts in its Response to Paragraph 70.  Under Section 2.6 of the CPA, Viad is entitled to financial statements that bear the unqualified opinion of a firm of independent certified public accountants.  (CPA § 2.6) (Ex. 9).  According to Viad's accounting expert, Kirk Rogers, to provide an "unqualified opinion," an accountant must perform an audit.  (Rogers Dep. at 40:8-

14) (Ex. 68). Although Viad has accepted unaudited financial statements with a cover letter certifying their compilation by a certified public accountant, it has not waived its right to audited financial statements, and it certainly has not waived its right to certified financial statements. (CPA § 7.6) (Ex. 9). As a result, it is undisputed that the Cooter Financials do not comply with the requirements of the CPA.

127.    MRLP's response to Paragraph 127 does not change the fact that the Cooter Financials are inconsistent with the tax returns for MRLP. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406 (Ex. 50); Revised 2005 Statement at 2 & 5 (Ex. 36). In fact, MRLP does not affirmatively dispute this fact in its response. As a result, Paragraph 127 is undisputed. With regard to MRLP's statement that Viad fails to identify the specific items about which it complains, the specific pages cited demonstrate, under the heading "Liabilities and Capital" that MRLP's "other current liabilities" are $2,209,927 and MRLP's "mortgages, notes and bonds payable" are $2,000,000. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406 (Ex. 50). This information is easily identifiable on the pages cited by Viad. MRLP provides no support for its statement that prior to the Revised 2005 Statement, legitimate expenses were erroneously labeled as equity and the interest was erroneously labeled as equity return. MRLP claims that the changes in the Revised 2005 Statement were made to reflect the "economic reality" of advances from S&S Finance to Montgomery Road over the last 20 years. However, rather than providing a note or other proof that these advances were debt, MRLP merely cites to the declarations of Sam Rose and Ron Glassman. This is insufficient to prove that the advances from S&S Finance were loans. Moreover, MRLP states that the Special Purpose Financial Statements do not need to be the same as the tax returns for MRLP. However, by asserting that the Revised 2005 Statement reflects "economic reality" and that this statement

20

does not contain the same information as MRLP's 2005 tax return, MRLP is suggesting that the information in its 2005 tax return is incorrect.

128.    MRLP's Response to Paragraph 128 does not change the underlying material fact that a spreadsheet with a summary of the MRLP-TCMD transaction was prepared internally by MRLP. MRLP also does not dispute that the spreadsheet identifies the various closing costs and the reimbursement of previously incurred expenses in buying and holding 90 K Street, and that the calculation showed that a total of $50,172,452 would be available for distribution to the partners of MRLP, excluding the $4,500,000 that was set aside for possible payment to Viad. (Email dated 1/9/07 from R. Liffmann to R. Glassman attaching spreadsheet, MR-19671, attached as Ex. 51). As a result, Paragraph 128 is undisputed. With regard to MRLPs' statement that at year-end 2006, the loan payable due to S&S Finance was approximately $19.9 million and the interest thereon was approximately $18.7 million, no record evidence is cited to support these assertions.

129.    MRLP's statement in its Response to Paragraph 128 that "[a]lthough the spreadsheet reflects that $4,870,000 was to be 'repaid' to S&S Finance from the proceeds of the closing on 90 K Street, an additional approximately $35 million was distributed directly to Mr. Rose and Mr. Greenebaum, or to related entities" does not change the material fact that, consistent with MRLP's tax returns and the distribution of funds reflected in the settlement statement, the spreadsheet indicated total loans payable to S&S Finance of less than $5 million. (Email dated 1/9/07 from R. Liffmann to R. Glassman attaching spreadsheet, MR-19671 at 19676; MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50-52). As a result, Paragraph 129 is undisputed.

130.    Because MRLP has failed to provide loan documents to substantiate their claim that advances from S&S Finance are debt, there is no evidence that the changes in the Revised 2005 statement reflect "the economic reality."  This omission, in addition to the fact that the amount owed to S&S Finance under the Revised 2005 Statement conflicts with the liabilities reflected in MRLP's 2005 tax return and the disbursement to S&S Finance recorded in the MRLP-TCMD settlement statement, is ample evidence that the purpose and intent of the Cooter Financials was to retroactively change the accounting for MRLP's ownership of the property to increase the deductions from Agreed Value upon sale of the Property and, thus, defeat the possibility of a payment to Viad.  Given the lack of evidence to the contrary, this Court should find that Paragraph 130 is not disputed.  (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36); MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50 & 52).

131.    See Viad's Response to MRLP and MRTDR's Response to Paragraph 130.

132.    See Viad's Response to MRLP and MRTDR's Response to Paragraph 130.

133.    Undisputed.

134.    MRLP's separation of the sale price into land purchase, TDR purchase and Future TDR purchase does not change the material fact that the total consideration paid to MRLP for the sale of 90 K Street was $67,424,457.  (Settlement Statement for 90 K Street Land Sale, MR-26158, Settlement Statement for 90 K Street TDR Sale, MR-26163) (Ex. 43 & 52).  As a result, Paragraph 134 is not disputed.

135.    MRLP's statement that there was no basis on which to make an Appreciation Cash Payment because at the time the TCMD-MRLP transaction closed the matter was already

being litigated in this case, does not change the underlying material fact that under Section 3.2 of the CPA, MRLP was required to make the Appreciation Cash Payment within three (3) days of closing.  (CPA § 3.2) (Ex. 9).  Moreover, a party is not excused from performance of a contractual obligation merely by contesting its obligation to perform.  Parties remain bound by the duties imposed in their contract while a claim is pending.  Although MRLP states that Viad's rights are protected by the $4.5 million placed in escrow, this amount is not sufficient to cover all of Viad's potential cash participation payment.  Furthermore, Viad was under no obligation to release its lien on the Property.  Under Section 5.1 of the CPA, in the event of a dispute concerning the amount of the Appreciation Cash Payment, Viad is entitled to retain its lien until such dispute has been resolved.  (CPA § 5.1) (Ex. 9).

136.    See Viad's Response to MRLP and MRTDR's Response to Paragraph 135. Also, MRLP's Response to Paragraph 136 does not change the material fact that no payment was made to Viad as a result of the sale of the Property on January 11, 2007.  As a result, Paragraph 136 is undisputed.

137.    MRLPs' statements that "literally tens of thousands of documents have been produced by Montgomery Road in this case including the closing sheets … and all documents from which to calculate all elements of Appreciation Cash Flow" does not change the underlying material fact that under section 3.9 of the CPA, MRLP was required to deliver to Viad "a statement reflecting the Agreed Value, Approved Deductions, the Closing Costs and the Appreciation Cash Flow used in calculating the Appreciation Cash Payment and a detailed breakdown of all items necessary for the calculation of each such item."  (CPA § 3.9) (Ex. 9).  Although MRLP suggests that Viad has all the information necessary to calculate Appreciation Cash Flow, the frequent changes in MRLP's accounting have made it impossible for Viad to

calculate Appreciation Cash Flow with any accuracy.  (*See* Glassman Dep. at 33:3-17; 37:14-39:22) (Ex. 57).  MRLP's most recent accounting changes occurred in November 2006.  (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36).  Moreover, a party is not excused from performance of a contractual obligation merely by contesting its obligation to perform.  Parties remain bound by the duties imposed in their contract while a claim is pending.

138.    See Viad's Response to MRLP and MRTDR's Response to Paragraph 137.  MRLPs' statements that "literally tens of thousands of documents have been produced by Montgomery Road in this case including the closing sheets … and all documents from which to calculate all elements of Appreciation Cash Flow" does not change the underlying material fact that no statement, as required by Section 3.9 was delivered by MRLP to Viad.  (CPA § 3.9).  As a result, Paragraph 138 is undisputed.

139.    Undisputed.

140.    It is undisputed that the 2006 Financials were due on April 30, 2007, and were not provided.  With respect to the Revised 2005 Statement, MRLP is in default for failure to include a signed statement certifying that the statement was compiled by a firm of certified public accountants.  (Liffmann Dep. at 14:9-16:22; 35:15-37:12 (Ex. 2); CPA Section 2.6 (Ex. 9); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement (Ex. 36); Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement (Ex. 14); *see also* Representative Statement, MR-00953 at 00955) (Ex. 35).  Under Section 2.6 of the CPA, Viad is entitled to financial statements that bear the unqualified opinion of a firm of independent certified public accountants.  (CPA § 2.6) (Ex. 9).  According to Viad's accounting expert, Kirk Rogers, to provide an "unqualified opinion," an accountant must perform an audit.  (Rogers Dep.

at 40:8-14) (Ex. 68). Although Viad has accepted unaudited financial statements with a cover letter certifying their compilation by a certified public accountant, it has not waived its right to audited financial statements, and it certainly has not waived its right to certified financial statements. (CPA § 7.6) (Ex. 9). Even though the subjects of other defaults are presently being litigated before this court, MRLP is not excused from performance of its contractual obligation merely by contesting its obligation to perform. Parties remain bound by the duties imposed in their contract while a claim is pending. Finally, MRLP's response to Paragraph 140 does not change the underlying material fact that MRLP has made no effort to cure the defaults and that under Section 7.4 of the CPA, the prevailing party in a suit for breach or failure to perform any of the covenants or obligations under the CPA is entitled to attorneys fees. (CPA § 7.4) (Ex. 9). As a result, Paragraph 140 is undisputed.

141.  Undisputed.

142.  Undisputed.

143.  Undisputed. See also Viad's Response to MRLP and MRTDR's Response to Paragraph 137.

144.  Undisputed.

145.  MRLP argues that the time period to invoke the appraisal process lapsed on December 17, 2006, 45 days after Viad received the amended contracts for sale of 90 K Street. However, MRLP has failed to respond to Viad's letter of February 21, 2007 notifying MRLP that it was in default, and has failed to designate an appraiser, thereby waiving its arguments regarding the calculation of the relevant time period under the CPA. MRLP also argues that the appraisal tendered by Viad on January 31, 2007 was in response to this court's deadline for expert designations and made no reference to the appraisal process in the CPA. Nevertheless,

any doubts that MRLP may have had with respect to the purpose of Viad's designation of Steve Halbert were dispelled by Viad's default letter of February 21, 2007, in which Viad asserted that the deadline to identify an appraiser in accordance with Section 3.8 expired on February 15, 2007.  (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).  Under the CPA, MRLP had 30 days to cure this default, but it chose not to do so.  (CPA § 7.3) (Ex. 9).  MRLP asserts that Viad waived the appraisal process by actively participating in this litigation.  However, parties remain bound by the duties imposed in their contract while a claim is pending.  Thus, both MRLP and Viad were required to comply with the appraisal process in the CPA.  MRLP's response is argument.  There was no waiver by Viad because the litigation is about the contract price and accounting, not about the fair market value, which is the subject of the appraisal process.

146.    Undisputed.  The "hearsay" objection does not lie to this unrebutted expert testimony.

147.    MRLP's assertion that Viad has not invoked the appraisal process under the CPA does not change the material fact that under Section 3.8 of the CPA, MRLP must select its own appraiser and MRLP's appraiser and Viad's appraiser shall together select a third appraiser.  (CPA § 3.8) (Ex. 9).  As a result, Paragraph 147 is undisputed.  Any doubts that MRLP may have had with respect to the purpose of Viad's designation of Steve Halbert were dispelled by Viad's default letter of February 21, 2007, in which Viad asserted that the deadline to identify an appraiser in accordance with Section 3.8 expired on February 15, 2007.  (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).  Under the CPA, MRLP had 30 days to cure this default, but it chose not to do so.  (CPA § 7.3) (Ex. 9).

148.    Any doubts that MRLP may have had with respect to the purpose of Viad's designation of Steve Halbert were dispelled by Viad's default letter of February 21, 2007, in which Viad asserted that the deadline to identify an appraiser in accordance with Section 3.8 expired on February 15, 2007.  (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53). Under the CPA, MRLP had 30 days to cure this default, but it chose not to do so.  (CPA § 7.3) (Ex. 9).  By failing to respond to Viad's letter of February 21, 2007 notifying MRLP that it was in default, MRLP has waived its argument that it was not required to name an appraiser. Furthermore, parties remain bound by the duties imposed in their contract while a claim is pending.  Thus, both MRLP and Viad were required to comply with the appraisal process in the CPA.

149.    Undisputed.

150.    Any doubts that MRLP may have had with respect to the purpose of Viad's designation of Steve Halbert were dispelled by Viad's default letter of February 21, 2007, in which Viad asserted that the deadline to identify an appraiser in accordance with Section 3.8 expired on February 15, 2007.  (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53). Under the CPA, MRLP had 30 days to cure this default, but it chose not to do so.  (CPA § 7.3) (Ex. 9).  MRLP asserts that Viad waived the appraisal process by actively participating in this litigation.  However, parties remain bound by the duties imposed in their contract while a claim is pending.  Thus, both MRLP and Viad were required to comply with the appraisal process in the CPA.  MRLP's failure to do so was a default.  This litigation was filed in connection with the contract price and appropriate deductions, not the fair market value of the property, which is the subject of the appraisal process.

151.    The evidence provided by MRLP does not support its position that TDRs are not Property under the CPA.  In contrast, Viad has provided ample evidence that TDRs are an interest in the property or an improvement to the property and, therefore, should be included in the calculation of the Appreciation Cash Payment.  Furthermore, Viad has demonstrated that the buyer of 90 K Street only paid the inflated price for the TDRs because it was a condition imposed by MRLP for purchasing the land at 90 K Street.  (Hudson Dep. 45:4-46:17) (Ex. 5). The buyer was aware that the TDRs were being sold significantly above market price.  *Id*.  Also, under the bargain that was reached between MRLP and the buyer, TCMD would pay for the achievable FAR regardless of how the price was allocated between the land and the TDRs. (Hudson Dep. at 46:8-17) (Ex. 5).  The foregoing is ample evidence that MRLP's efforts to exclude the TDR portion of the contract from the total sales price when calculating the Agreed Value is improper.

152.    It is undisputed that Halbert considered the property's location in the receiving zone and the availability of TDRs when determining the fair market value of 90 K Street. However, MRLP mischaracterizes Mr. Halbert's testimony when it cites to his deposition for the proposition that "[w]ithout TDRs, the value is approximately $44 million."  In fact, Mr. Halbert testified that the value of 90 K Street would be $43,888,000 in response to a hypothetical in which the FAR was only 6.5."  (Halbert Dep. at 40:16-41:21, attached as Ex. 73).  Mr. Halbert also testified that "[i]t would not be proper appraisal technique to only use 6.5" because "an appraiser takes into account what is readily achievable through a zoning office."  (Halbert Dep. at 41:22-43:4) (Ex. 73).  Furthermore, he stated that taking TDRs out of the equation to reach a value of $44 million is "not good appraisal" and "any appraiser who does that would not be doing what he's supposed to be doing."  (Halbert Dep. at 43:5-21) (Ex. 73).  In his expert report,

Mr. Halbert did not provide an alternate value that excluded the TDRs. (Halbert Report at 27 & 37) (Ex. 54). Even if the court determines that TDRs are not properly included in the calculation, which Viad disputes, the CPA clearly dictates that the Agreed Value is the greater of the fair market value or the gross proceeds. Since Halbert's appraised fair market value is greater than the purchase price in the land contract, it would be the Agreed Value. That Halbert considered TDRs in his appraisal is of no consequence.

153.    Undisputed.

154.    The undisputed evidence demonstrates that MRLP has failed to provide financial statements on a cash basis, has reversed course in the calculation of its costs by removing the costs for TDRs and converting equity to debt, and has failed to provide the required statement of its costs and calculation after closing on the TCMD-MRLP transaction. (Statement of Greenebaum and Rose Associates, at Section I, VD-000458) (Ex. 13); Liffmann Dep. at 45:10-46:17) (Ex. 2); Letter dated 11/21/06 from D. Cooter to R. Page, at cover page and p.2) (Ex. 36); Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53). Given the foregoing the Appreciation Cash Payment can only be calculated after a certified public accountant audits MRLP's records. MRLP argues that an audit is not necessary because the relevant issues have been addressed by Reznick. However, the undisputed evidence demonstrates that the Reznick Analysis was not a binding arbitration. (*See* Viad's Response to MRLP and MRTDR's Response to Paragraph 137). Because of the inconsistent approaches taken by MRLP in its accounting, an audit is necessary to assist the court in its determination of which costs should be included in the calculation and whether TDRs should be included in determining the value of the property. (*See* Glassman Dep. at 33:3-17; 37:14-39:22) (Ex. 57); Letter dated 11/21/06 from D. Cooter to R. Page, at cover page and p.2) (Ex. 36)).