# EXHIBIT 69

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

MONTGOMERY ROAD I LIMITED    )
PARTNERSHIP,                 )
                             )
            Plaintiff,       )
                             )
     vs.                     )   CIVIL ACTION NO. 06-00344
                             )   (HHK)
VIAD CORP.,                  )
                             )
            Defendant.       )
_____)

30(b)(6) DEPOSITION OF EVE FIORUCCI
VOLUME I
PAGES 1 THROUGH 99

Phoenix, Arizona
November 7, 2006
9:30 a.m.

*Ottmar Holiday & Associates*
2800 N. Central, Ste. 150
Phoenix, Arizona 85004
(602) 485-1488
1-866-485-1444

PREPARED FOR:
MR. RODNEY F. PAGE

REPORTED BY:
DAVID R. MINDER, RPR
ARIZONA CR NO. 50636

(COPY)

**34**

1  Q. Whether you believe that's true or not, we'll
2  come to that, but I want you to take a look at this
3  letter, and if there are things in this letter with
4  which you disagree, I want you to point me to them.
5      (Witness examines document.)
6  A. Okay. I don't believe that it is the clear
7  intention of the Cash Participation Agreement that you
8  would subtract Developer's Equity Return from an
9  appreciation cash flow. In fact, I believe it is
10 clearly not --
11 Q. Point me to the language of the letter that
12 you're talking about. Where is it?
13 A. First paragraph, second sentence.
14 Q. Okay, so you disagree with that. What else in
15 this letter do you disagree with?
16     (Witness examines document.)
17 A. I disagree with paragraph two, "If we
18 eliminate the category of Developer's Equity Return,
19 there is still no participation due." In fact, we
20 believe there is.
21 Q. Okay. Keep going.
22     (Witness examines document.)
23 A. Paragraphs three and four, I am simply
24 accepting their summary of what happened. I have not
25 verified that, so I'm not disagreeing with it, but I

**35**

1  don't know.
2  Q. That's fine. So there's a section called
3  "Transaction History," and you have no present basis to
4  disagree with the facts set out in the first two
5  paragraphs of that section?
6  A. Correct.
7  Q. Okay. Keep going.
8      (Witness examines document.)
9      Maybe I can get this a little clearer. In
10 the section of the letter, Mr. Liffmann's letter of
11 September 12th, you don't have any reason to disagree
12 with that whole section of what he says in the
13 Transaction History; is that accurate?
14 A. Which section? I'm sorry.
15 Q. Transaction History.
16     (Witness examines document.)
17 A. Correct. I just don't -- I have not verified
18 it, so I'm accepting him at face value.
19 Q. That's fine. Let's go to the section called
20 "Accounting Treatment."
21     (Witness examines document.)
22 A. Well, are you asking me if I disagree with
23 their Accounting Treatment?
24 Q. Let me state it to you differently. There are
25 certain statements in the section of the letter saying

**36**

1  "Accounting Treatment." Are there any facts in that
2  section of this letter with which you disagree? Forget
3  the conclusions under the Cash Participation Agreement.
4  Are there any facts in that section with which you
5  disagree?
6  A. I don't know what the January 1997 statement
7  looks like, because I don't have it in front of me.
8  Q. Okay.
9  A. So I won't disagree with it.
10 Q. Okay, that's fine. Keep going. I just want
11 to know if there are any facts in that section that he
12 states with which you disagree, facts.
13     (Witness examines document.)
14 A. I don't disagree with his summary of how they
15 accounted for the transaction. I don't disagree with
16 the way he is stating he did it. I may disagree, and in
17 fact do disagree, with some of their calculations.
18 Q. What calculations?
19 A. Those aren't stated in this letter.
20 Q. Let's just stick with this letter for the
21 moment. I'm trying to stick with the letter. He's
22 telling you folks how they treated this accounting and
23 why they did it in this section of this letter. All I
24 want to know is, do you disagree with him factually as
25 to what actually happened? That's all I care about.

**37**

1  A. I believe he accounted for it in that way.
2  Q. To save time, do you agree or disagree with
3  his conclusion based on the facts that he states in this
4  letter in the section called "Conclusion"?
5      (Witness examines document.)
6  A. I believe that his conclusion represents his
7  opinion on whether or not he made a good return. That's
8  his opinion.
9  Q. Now you and I can agree, can't we, that no
10 matter how you count, if this 8,775,000 was not listed
11 as equity, Developer's Equity Return, but it simply had
12 been an accrued interest payment made to a third-party
13 lender, that would be deducted from the sales price
14 before the 15 percent cash participation kicked in? We
15 can agree to that; can't we?
16 A. Yes.
17 Q. So that if the 8,775,000 and change number was
18 accrued interest to a third-party lender, it would be an
19 appropriate deduct from the sales price before your
20 15 percent kicks in; is that right?
21 A. It would need to be actually paid to a
22 third-party lender.
23 Q. Let's take that step. So if the accrued
24 8,775,000, as of 2000, were actually paid to a
25 third-party lender, it would be an appropriate deduct

**Page 38**

1  before you get 15 percent of the net cash appreciation?
2  Would you agree to that? That's all I'm trying to get
3  to.
4      A.  I believe so. May I see a copy of your Cash
5  Participation Agreement?
6          MR. COOTER: You sure can.
7          (Exhibit No. 5 marked.)
8  BY MR. COOTER:
9      Q.  Exhibit No. 5 is actually a copy of the Cash
10 Participation Agreement that brings us here. You asked
11 for it, and now you have it. All I'm trying to
12 ascertain is that if the disputed amount had been
13 actually interest accrued and paid, to use that phrase,
14 to a third-party lender, and not Equity Return, that
15 would be a proper deduction from the sales price before
16 Viad gets 15 percent? That's all I'm trying to get at
17 here. Just confirm that for me.
18         (Witness examines document.)
19         If you want to point me to the provision
20 of the document, I'd be happy to do it with you.
21         (Witness examines document.)
22         Actually, I'd like you to do that for me.
23 Point to me wherever it is you think it is.
24         (Witness examines document.)
25     A.  Can you restate your question?

**Page 39**

1      Q.  Sure. I'm just using the number that was on
2  the table in 2000. If the $8,775,000 was actually
3  accrued interest owing to a third-party lender, you
4  would agree, would you not, that that would be a proper
5  deduction from the sales price of a sale before Viad's
6  15 percent kicks in?
7      A.  Okay.
8      Q.  That's my problem.
9      A.  My answer is, the appreciation cash flow --
10     Q.  Are you referring to the document?
11     A.  Yes.
12     Q.  Where?
13     A.  Section 3.1.
14     Q.  Okay.
15     A.  It means the agreed value of the property, so
16 the amount that the property is being sold for, less the
17 approved deductions, and my understanding of that
18 definition is that the approved deductions are the
19 permitted debt less Developer's Invested Equity and
20 Developer's Operating Equity. Interest isn't
21 specifically called out.
22     Q.  That's fine. Would you agree that if that
23 8,775,000, the number that was on the table in 2000, was
24 a permitted debt, that it would be a proper deduction
25 before the 15 percent kicks in? That's all I'm asking.

**Page 40**

1      A.  If it's a permitted debt, yes, I believe that
2  it would be an allowable deduction.
3      Q.  Now permitted debt is defined, is it not, in
4  Section 2.3, 2.3 (b) on page seven?
5          (Witness examines document.)
6          Now you've taken a moment to read that.
7  If the number, 8.775 million, that was on the table in
8  2000 was debt applied to fund all or part of the
9  purchase price pre-development, development construction
10 costs, for deficits included in the operation of the
11 property, it would be a permitted debt and therefore
12 deductible from the purchase price before the Viad
13 15 percent applies? Would you agree with that?
14         And I think that's what you said. I'm
15 just trying to clarify that we're using the same
16 definitions here.
17         (Witness examines document.)
18     A.  The approved deduction is the principal
19 balance of the permitted debt. It says nothing about
20 interest.
21     Q.  Where did the money come from? I'm trying to
22 follow up on something that you just said. If the money
23 had come from a lender, and the interest is accruing,
24 just in normal parlance, would you agree with me that
25 every month, the principal balance gets bigger and

**Page 41**

1  bigger if the interest isn't paid on a note?
2      A.  In general terms?
3      Q.  Yes.
4      A.  If you don't pay your interest and you accrue
5  it, then your principal balance gets larger.
6      Q.  What was the source, if you know, of the
7  $8.775 million? Apparently that's interest on
8  something. What was the source of the something that
9  generated the $8.7 million in interest?
10     A.  I don't know.
11     Q.  Did you ever inquire?
12     A.  I don't know.
13     Q.  I'm trying to understand this analytically.
14 If they had gone to a lender, and the lender had lent
15 money, and the interest hadn't been paid, and that
16 principal balance gets bigger and bigger, at the end of
17 the day, you and I can certainly agree that in
18 connection with the sale, that would be a deduction from
19 the purchase price before 15 percent kicks in?
20         MR. PAGE: I object to the hypothetical.
21 You can go ahead and answer.
22         MR. COOTER: Go ahead.
23         THE WITNESS: That didn't happen.
24 BY MR. COOTER:
25     Q.  Just answer it my way. If it had happened

EVE FIORUCCI 11/7/2006

42

1  that way, you and I agree that it's an allowable
2  deduction as I just described it?
3      A.  If they went to a third-party lender, and they
4  took a loan on which they never had to make a payment in
5  the life of the loan --
6      Q.  And the balance gets bigger and bigger, just
7  confirm for me that that would be an allowable deduction
8  in the event of a sale under this Agreement.
9      A.  I think it would be.
10     Q.  All right.  Now let's go back to
11 Mr. Liffmann's letter for just a moment, September
12 of 2000.
13     A.  Uh-huh.
14     Q.  Mr. Liffmann, on the second page of his letter
15 in this Transaction History, makes reference to a
16 company known as S&S Finance.  Do you see that?
17     A.  Yes, but may I go back?
18     Q.  Not just yet.  I just want to know if you see
19 "S&S Finance."
20     A.  Okay, I do.
21     Q.  What is S&S Finance, if you know?
22     A.  I don't know -- oh, what he says, it's a
23 wholly owned by the principals of Greenebaum And Rose.
24     Q.  Have you ever made inquiry about the
25 involvement of S&S Finance in this transaction?

43

1      A.  We may have.  I don't remember.
2      Q.  Can you and I agree that S&S Finance is not an
3  equity holder in Montgomery Road under the partnership?
4      A.  I don't know.
5          MR. COOTER:  You don't know either way?
6  Okay.  Now this disagreement that is referenced by these
7  documents we've just gone through, Mr. Goldman's letter
8  of August 23rd of 2000, Mr. Liffmann's response of
9  September 12th, was further discussed on October 2nd of
10 2000.  I want to show you what we'll mark as the next
11 exhibit.
12         (Exhibit No. 6 marked.)
13 BY MR. COOTER:
14     Q.  Exhibit No. 6, again it's a Viad document, if
15 you look at the Bates number, is a letter to
16 Mr. Liffmann from Mr. Goldman dated October 2nd of 2000,
17 which would appear to be a response to Mr. Liffmann's
18 letter of September 12th.  Have you seen the document
19 before?
20         (Witness examines document.)
21     A.  Yes, I have seen this document before.
22     Q.  It indicates it's copied to you.  Can you just
23 confirm for me that Mr. Goldman sent this letter to
24 Mr. Liffmann on or about October 2nd of 2000?
25     A.  Yes.

44

1      Q.  Now this dispute about how to deal with, for
2  lack of a better word, interest on the Developer's
3  Equity contribution, if that's what it was, never did
4  get resolved, and at some point the issue was presented
5  to Reznick Fedder to analyze.  Do you agree with that?
6      A.  Yes.
7      Q.  First of all, how did it come to be that this
8  issue, this disagreement, was given to Reznick Fedder to
9  analyze?  I want to know how that happened.
10     A.  I called CB Richard Ellis, Pat Marr, and asked
11 Pat Marr for a couple of referrals for some real estate
12 accounting firms.
13     Q.  CB Richard Ellis, that person that you just
14 described, is that local or is that back east?
15     A.  Back east.
16     Q.  When did you make that call to that person?
17     A.  I don't remember.
18     Q.  What did Pat Marr -- is that a he or a she?
19     A.  That's a he.
20     Q.  What did Mr. Marr do in response to your call?
21     A.  Pat Marr provided me with a couple of
22 references -- referrals, rather.
23     Q.  One of which was the Reznick accounting firm?
24     A.  That is correct.
25     Q.  Do you recall who the others were?

45

1      A.  I do not.
2      Q.  This disagreement about how to treat this
3  interest on Developer's Equity, was that given to
4  Reznick to analyze?
5      A.  Yes, it was.
6      Q.  Confirm for me, did you select Reznick or did
7  the Montgomery Road people?
8      A.  We proposed the use of Reznick and Montgomery
9  Road agreed with them.
10         MR. COOTER:  I'm going to show you what
11 we'll mark as Exhibit No. 7.
12         (Exhibit No. 7 marked.)
13 BY MR. COOTER:
14     Q.  Exhibit No. 7 would appear to be notes of a
15 telephone conversation between Mr. Rose and you dated
16 December 16th of '04.  And again, it's a Viad document.
17 It's got a VD Bates number.  Can you confirm for me that
18 that's what it is?
19     A.  Can you repeat that?
20     Q.  These appear to be notes of a phone
21 conversation that happened 7/16 of '04.  Can you just
22 confirm that's what it is?
23     A.  Yes.
24     Q.  These are your notes?
25     A.  Yes.