# EXHIBIT 72

In the U.S. District Court

For the District of Columbia

---------------------------x

Montgomery Road I Limited    :
Partnership                  :
                             : NO. 1:06CV00344

        v.            :

                              :

Viad Corp., et al            :

---------------------------x

        March 7, 2007

DEPOSITION OF:

        Stuart I. Smith,

a witness, called by counsel pursuant to notice,

commencing at 2:00 p.m., which was taken at Bryan,

Cave, 700 13th Street, NW, Washington, DC 20005

Page 30

1  factor or a part of your appraisal considerations in
2  any of those?
3      A.  No.
4      Q.  What experience is it that you are
5  referring to then when you say I have experience
6  with TDR's?
7      A.  Well, we've noted several transfers of
8  TDR's, familiar with the prices that they've
9  transferred and we've talked with parties that have
10 been involved in those transfers.
11     Q.  Why would you have had the occasion to do
12 that?
13     A.  I've worked on other assignments in the
14 city that involve TDR's and the analysis of TDR's.
15     Q.  By analysis do you mean that you have
16 appraised and assigned an appraisal to TDR's?
17     A.  I have assigned an appraisal and appraised
18 value.
19         I have assigned values to TDR's, yes.  I
20 have assigned values to TDR's.
21     Q.  How many times do you think you've done

Page 31

1  that?
2      A.  Very recently, probably twice within the
3  last 18 months.
4      Q.  Other than the two times in 18 months, how
5  many times total?
6      A.  I don't know.
7      Q.  Let's talk about the twice in 18 months.
8  I take it these were assignments not on the list of
9  litigation assignments.
10     A.  Correct.
11     Q.  They were for some other purpose?
12     A.  Correct.
13     Q.  Can you tell me generally what those
14 purposes were?
15     A.  Could you be more specific?
16     Q.  I'm trying to get to the purpose of the
17 appraisal.
18         Was it for a lender to establish value for
19 property, for example?  I don't want to put words in
20 your mouth.  What's the purpose of doing an
21 appraisal?

Page 32

1      A.  The purpose of these appraisals was to
2  establish a market value.
3      Q.  Were you employed by an owner in these
4  cases of property?
5      A.  Yes.
6      Q.  In both cases?
7      A.  One was a specific appraisal and the other
8  one was involved -- was part of the research that I
9  did for another case.
10     Q.  In those cases, and again I'm trying to be
11 quick so we can get out of here but I don't want to
12 put words in your mouth.
13     A.  That's all right.
14     Q.  Part of your work was to come up with an
15 opinion of value for the TDR's, right?
16     A.  For whose assignment?
17     Q.  These two that you referred to.
18     A.  One involved an explicit valuation of the
19 TDR's.  The other involved researching TDR's as
20 input to another assignment.
21     Q.  As I understand TDR's, they involved

Page 33

1  transfer of FAR essentially from one part of the
2  city to another.
3      A.  From a sending zone to a receiving zone.
4      Q.  The receiving zone concept was what I was
5  getting to.
6          In the cases that you were employed, you
7  just mentioned these two cases, the properties
8  involved were in receiving zones, am I correct about
9  that?
10     A.  Yes.
11     Q.  What receiving zones, if you have zones,
12 if you recall, were involved?
13     A.  I can give you a general geographic area.
14 One was along North Capitol Street and the other was
15 in southeast Washington.
16     Q.  Which of the two assignments is the one
17 where you actually came up with a value for TDR's?
18     A.  The one on North Capitol Street.
19     Q.  Do you recall what dollar value you ended
20 up concluding was an appropriate value?
21     A.  Yes.

Page 34

1    Q. What was it?
2    A. The value that we concluded for that
3  property was I believe $3.50 per FAR.
4    Q. In the other matter, the one in southeast,
5  if I understand you correctly, Mr. Smith, you
6  weren't coming up with a specific dollar value, am I
7  correct?
8    A. I was researching a transaction that
9  occurred in southeast Washington, the value of which
10 was a function in seller's and purchaser's mind that
11 would be affected by TDR's and so that began the
12 discussion about TDR's and what anticipated values
13 were for TDR's.
14   Q. How did you research the value of TDR's?
15   A. We research the value of TDR's by going to
16 purchasers of TDR's and asking them how much they
17 paid for them.
18   Q. If I can go back for a minute to the
19 process for doing your letter of February 16. You
20 have mentioned at least a couple of conversations
21 with Mr. Cooter.

Page 35

1    A. Yes.
2    Q. You had a conversation with Mr. Liffman
3  that I take it from what you said did not result in
4  a substantive conversation.
5    A. Correct.
6    Q. Were there any other individuals or any
7  other conversations in addition to the ones we just
8  mentioned?
9    A. No, sir.
10   Q. Did you have anyone within your company
11 work with you on this assignment?
12   A. No, sir.
13   Q. This was all then your own work product?
14   A. Correct.
15   Q. Did there come a time when you had a draft
16 prepared of your letter?
17   A. I typically go through several drafts of
18 the letter trying to winnow out things that are
19 either confusing or irrelevant.
20       MR. PAGE: Let's mark this as exhibit
21 seven.

Page 36

1        (Whereupon the proffered item was
2        marked as exhibit number 7.)
3  BY MR. PAGE:
4    Q. I'm going to hand you what was just marked
5  as exhibit number seven.
6        This comes, again, from your file that was
7  produced to us.
8    A. So much for confidential draft reports.
9    Q. The rules are the rules.
10   A. I understand.
11   Q. The first page is a copy of your cover
12 e-mail.
13   A. Yes.
14   Q. It appears that the draft was sent to
15 Mr. Cooter on the morning of February 16, correct?
16   A. It does appear that way.
17   Q. That's the same day as the final letter is
18 dated, correct?
19   A. That's true, although this one letter was
20 dated on the 15th. Sometimes I'm a little sloppy
21 with redated transmittal letters. I apologize.

Page 37

1    Q. No problem. Attached then is your letter
2  dated the 15th and I take it this is your first
3  draft?
4    A. Let me explain to you.
5        I don't retain drafts. I go through, do a
6  draft. In this particular case Mr. Cooter probably
7  retained them.
8        MR. COOTER: Probably came out of my
9  pile.
10       MR. PAGE: It appears there are two
11 or three drafts, all of which were in the papers
12 produced to us from your file.
13       It might be quicker actually if we put
14 all of them in front of you. I don't plan to go
15 through a lot of detail so we're not confusing one
16 version with another.
17       THE WITNESS: Sure.
18       MR. COOTER: I believe, just given
19 the fax logo on top, I think we simply replicated
20 our e-mails with him as part of his production. I
21 don't know that this came from his files. There's

Page 90

1  consequence I do not know, correct.
2     Q.  Would it make a difference to your view if
3  in fact the developer had such plans?
4     A.  It would have made a difference -- no. We
5  are appraising the as is value.
6         We are reviewing a report which puts forth
7  the as is value.
8     Q.  You are doing a --
9            MR. COOTER:  Just a minute.  Let him
10 finish.
11           MR. PAGE:  I'm sorry.
12           THE WITNESS:  There are certain
13 criteria that apply to that definition of as is
14 value.
15           As I said before, it could be called
16 with certain conditions, it could be -- you could
17 call that value something else.
18           In my review of his report based on my
19 understanding that the value that was provided based
20 on the 997,229 FAR feet was not an as is value.
21 That's all I'm saying.

Page 91

1  BY MR. PAGE:
2     Q.  Is it your belief and opinion that a
3  property in a receiving zone does not have the
4  ability to assign TDR's to that property as a matter
5  of right?
6     A.  I'm sorry, I didn't understand.
7     Q.  Is it your opinion or belief that a
8  property in a receiving zone can assign to that
9  property TDR's as a matter of right?
10    A.  I'm a little confused.  I don't understand
11 the question.
12    Q.  Let's do it this way.
13    A.  Okay.
14    Q.  Let me draw your attention to one of the
15 sentences in your letter on page four.  About a
16 third of the way down the page you have this
17 paragraph that begins: "Thus, it is our opinion."
18           Do you see that?
19    A.  Yes.
20    Q.  In that paragraph you say: "The as is
21 value should be limited to the property rights

Page 92

1  approved by the District as a matter of right."
2         Do you see that?
3     A.  Correct.
4     Q.  Do you have an opinion as to whether or
5  not being in a receiving zone provides for the
6  ability to have the TDR's as a matter of right or
7  not?
8     A.  A property in a receiving zone is eligible
9  to acquire TDR's.
10          Those TDR's, depending on the market, as you
11 know, may or may not exist at the time the receiving
12 property wants those.
13    Q.  Are you under the impression that it's
14 difficult to acquire the TDR's on the market because
15 they don't exist?
16    A.  Right now, not, but years ago, yes. It
17 depends.  It's a commodity.
18    Q.  What about June 24, 2006?
19    A.  I would estimate that they could go
20 out -- I have not done a study of the sending zones
21 as to what was available but I presume there was

Page 93

1  enough -- I'll make the presumption that there was
2  enough TDR's in the sending zone that they could
3  have been purchased by a site in the receiving zone.
4     Q.  They could have been purchased for about
5  $3.50, in your opinion, right?
6     A.  All I can tell you is that there are TDR's
7  that have been purchased in the range of $3.50.
8     Q.  Do you know of any TDR's in 2006 in any
9  transaction that were purchased and sold at a price
10 of let's say $50 a square foot?
11    A.  No.
12    Q.  Would that be a market value, in your
13 opinion?
14    A.  What would be a market value?
15    Q.  A sales price of $50 per TDR.
16    A.  There's a difference between price and
17 value.
18          Price is simply a transaction amount and
19 value has certain definitions associated with it,
20 willing buyer, willing seller.
21    Q.  Would it be a fair market value for TDR's

Page 94

1  to sell at $50 a square foot?
2      A.  I would not expect TDR's at the current
3  time to sell at $50 a square foot.
4      Q.  I was really asking about 2006.
5      A.  In 2006 I would not have expected TDR's,
6  I'm not aware of evidence that would indicate that
7  TDR's would sell for $50 a foot.
8      Q.  Or higher?
9      A.  Or higher.
10     Q.  Like $65 a foot?  Do you understand what
11 I'm saying?
12     A.  I thought I answered.  I said yes.
13     Q.  In your experience, do TDR's typically
14 trade at any price that is near the actual FAR for
15 the land itself?
16     A.  It's all a function of supply and demand.
17     Q.  I know that.  Is it your experience,
18 because you said you had researched this, that the
19 TDR's ever sell at a price that is equal to the FAR
20 price for the land itself?
21     A.  In what time period?

Page 95

1      Q.  2006.
2      A.  I'm not aware of TDR's that are selling
3  near the price of the otherwise market value of
4  land.
5      Q.  In the sentence we were looking
6  at: "Thus, it is our opinion, which follows local
7  precedent" what did you have in mind about local
8  precedent?
9      A.  That TDR's are a commodity, that TDR's are
10 traded independent of the real estate.
11     Q.  Anything else that you meant by that?
12     A.  I think that's adequate.
13     Q.  Do you know what the TDR's subject of the
14 second contract that is referred to in the land
15 sales contract were being sold for?
16     A.  No, sir.
17     Q.  You've made no inquiry in that regard, is
18 that correct?
19     A.  No, sir.
20     Q.  Now, in this dispute the parties are each
21 party to something called a cash appreciation

Page 96

1  agreement.  Excuse me.  Cash participation
2  agreement.
3      Have you heard of such an agreement?
4      A.  No, sir.
5      Q.  Have you seen it?
6      A.  No, sir.
7      Q.  Were you told anything about it?
8      A.  No, sir.
9      Q.  Are you expressing any views or opinions
10 about it in this matter?
11     A.  No, sir.
12         MR. PAGE:  Let's take a break again.
13 Let me go over my notes.
14         (Recess from 3:34 p.m. - 3:44 p.m.)
15         MR. PAGE:  I have no further
16 questions.
17         MR. COOTER:  I have no questions.
18         (Deposition adjourned at 3:45 p.m.)

Page 97

1         Reporter's Certificate

3      I, the undersigned, Certified Court Reporter,
4  do hereby certify that the foregoing transcript of
5  testimony was taken by me in stenotype and
6  thereafter reduced to print under my direction,
7  that said transcript is a full, true and
8  substantially accurate record of the proceedings,
9  to the best of my ability.

11     I do further certify that I am neither counsel
12 for, related to, nor employed by any of the parties
13 to the action in which this deposition was taken;
14 and, further, that I am not a relative or employee
15 of any attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.

19     _____
20     Certified Realtime Reporter