```
          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
```

|  |  |
|---|---|
| **MONTGOMERY ROAD I,** <br> **LIMITED PARTNERSHIP,** <br><br>         Plaintiff, <br><br>   v. <br><br> **VIAD CORP.,** <br><br>         Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action 06-00344 <br> ) (HHK) <br> ) <br> ) <br> ) <br> ) |

**SECOND AMENDED COMPLAINT**

Plaintiff Montgomery Road I Limited Partnership ("MRLP"), by and through its undersigned counsel, Cooter, Mangold, Tompert, and Karas, L.L.P., hereby files this Second Amended Complaint against Defendant Viad Corp., and as grounds therefor states as follows:

**JURISDICTION AND VENUE**

1. This case has been removed to this Court pursuant to 28 U.S.C. § 1441. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties.

2. Venue properly rests in this Court pursuant to 28 U.S.C. § 1391, in that the real property that is the underlying subject matter of the contract at issue lies in the District of Columbia.

**PARTIES**

3. Non-party Greenebaum & Rose Associates ("G&R") is a real estate development firm with offices in Washington, D.C. and Baltimore Maryland. Non-party S&S Finance Limited Partnership ("S&S Finance") is an "in house" bank for all G&R projects; the limited partners of S&S Finance are the Stewart J. Greenebaum Revocable Trust and the Samuel G Rose Revocable Trust. G&R typically sets up separate entities to own the properties in which it invests. The Plaintiff in this case, Montgomery Road I Limited Partnership ("MRLP" or the "Developer") is one of those entities. MRLP is a Maryland limited partnership formed for the purpose of owning real property. The limited partners of Montgomery Road are Reid Liffmann ("Liffmann"), Steven Braesch ("Braesch"), SJG Holdings, LLC (owned by Greenebaum and/or his family members) and the Samuel G. Rose Revocable Trust. Greenebaum, Rose, Liffmann, and Braesch are all employees of G&R.

4. Defendant Viad Corporation is a Delaware corporation and the parent company and successor in interest to Transportation Leasing Company ("TLC"), a California corporation whose assets are now liquidated, and the former owner of the 90 K Street property.

**STATEMENT OF FACTS**

5. On or about December 9, 1987, MRLP purchased the property located at First and K Streets, N.E. ("90 K Street" or "the Property") from TLC for approximately $11 million dollars. In connection with this sale, MRLP and TLC also executed a "Cash Participation Agreement" (the "CPA"), which contemplated that under certain circumstances TLC would receive 15% of any cash flow generated by the operation of the property ("Operations Cash Flow") or 15% of the net proceeds generated by the sale, disposition, or refinancing of the property ("Appreciation Cash Flow").

6. The intent of the CPA, which was drafted by attorneys for TLC, was to provide the Developer with a complete return of, and return on, its investment – including a return on its equity, and a payoff of all debt, including interest – before TLC was permitted any participation in Appreciation Cash Flow. The CPA also gave TLC the right of first refusal to purchase the Property. TLC's interest in the property was secured by a Deed of Trust recorded on December 10, 1987 in the land records of the District of Columbia.

7. At the time of the acquisition of the 90 K Street

property by MRLP in 1987, a mortgage for $10.3 million was placed on the property with Yorkridge-Calvert Savings and Loan, a local S&L.  In March 1989, a second mortgage in the amount of approximately $1.5 million was placed on the Property with the same S&L to fund operating deficits.  MRLP paid interest on both loans on an ongoing basis and the limited partners, Greenebaum and Rose, also personally guaranteed the loans.

8. In 1990, Yorkridge-Calvert encountered financial difficulties and came under the control of the Resolution Trust Company (the "RTC").  As a result, MRLP was required to and did pay off the $1.5 million second trust. The RTC then sold the first mortgage to Sun Chase Bank of Phoenix. MRLP continued to pay interest on that loan (at 1.5% over the prime rate) to Sun Chase until 1996.

9. MRLP and TLC amended the CPA in 1989, effective retroactively as of December 9, 1987, to revise the definition of "Senior Mortgage" in Section 1.39 to clarify that mortgages and deeds of trust executed after the initial loan closing for specified purposes would be superior to TLC's interest.  Specifically, the amendment was executed to make clear that debts incurred to fund

  carrying costs (such as the $1.5 million second mortgage) would be senior to TLC's interest.

10. In April 1996, S&S Finance purchased the Sun Chase Note for approximately $9.3 million. Section 2.3 (b) of the CPA, entitled "Permitted Debt," provides that debt can be acquired by a related company so long as it charges interest at or below the rates charged by other financial institutions in similar real estate loans. From 1996 to date, S&S Finance has charged the Property a below market rate of interest, namely 1.5% over prime. S&S Finance continues to hold the first mortgage on the Property, and a Deed of Trust securing its position is recorded in the land records of the District of Columbia.

11. In 1997, MRLP's accountants reclassified approximately $7.3 million of the first mortgage debt to equity, for tax reasons. Although the reclassification was for internal tax purposes, and had nothing to do with the CPA, the reclassification was carried through to the Special Purpose Financial Statements required by the CPA. Accordingly, $7.3 million of the loan held by S&S Finance was classified as Developer's Invested Equity in the 1997-1999 Special Purpose Financial Statements, and the interest thereon was indicated under the heading

"Developer's Equity Return." Without regard to the classification however, the interest expense, for purposes of the CPA, clearly constitutes interest, not an equity return. Beginning in 2000, the re-classification was eliminated, and the entire $9.3 million first mortgage was reflected as debt, and it continued to carry a rate of interest of 1.5% over prime. As of December 31, 2005, S&S Finance had made significant advances to the Property, which were in excess of $18 million. In November 2006, MRLP's accountant prepared Montgomery Road's revised Special Purpose Financial Statement for the period from 1987 through December 31, 2005("2005 Revised Special Purpose Statement"). That revision reflects the amounts advanced by S&S Finance as debt and the interest thereon as interest expense, not as "Developer's Equity Return." The revision maintains the interest rate on the first mortgage (principal amount of approximately $10.3 million) at 1.5% over prime. The 2005 Revised Special Purpose Statements also contain corrections in three other areas to accurately reflect the economic reality of what had occurred since Montgomery Road's purchase of 90 K Street in 1987. Those corrections addressed the treatment of the loan discount

which S&S Finance obtained when it purchased the Sun Chase note in 1996, the accounting for the cost of the TDR's, and the rate of interest (2%) on advances from S&S Finance for other expenses.

12. At the time it was acquired, the 90 K Street property was, and remains, a vacant lot.  Apparently believing its interest in the Property to have little if any value, in 1999, after receipt and review of more than twelve years of financial statements, TLC offered to relinquish all of its rights in the Property under the CPA, including its right of first refusal, for $25,000.  The parties were unable to reach an agreement on the value of TLC's interest, and no settlement of the matter was ever executed.

13. On or about June 26, 2000, MRLP notified TLC of a pending sale of the Property pursuant to Section 4.1 of the CPA.  As stated in the notice, the sale price of the Property was $24,975,000 with expected net proceeds of approximately $23 million.  MRLP calculated its cost basis on the property, including the Developer's Invested Equity, Developer's Operating Equity, and Developer's Equity Return to be in excess of $27,000,000.  As a result, there would be no positive cash flow from the

sales transaction. As part of this pending transaction, however, MRLP sought to resolve any outstanding title issues created by the CPA including obtaining from TLC a waiver of its right of first refusal and the release of any lien on the property, for which MRLP offered to compensate TLC in the amount of $10,000.00.

14. In response, in August 2000, TLC claimed for the first time that MRLP had overstated the amount of Developer's equity that could be subtracted in calculating the Appreciation Cash Flow and that, if the pending sale took place, TLC would be entitled to a substantial six-figure Cash Appreciation Payment. Specifically, TLC claimed that under the definition of "Appreciation Cash Flow" in Section 3.1 of the CPA, the category "Developer's Equity Return" was not a permitted subtraction.

15. TLC also questioned whether the acquisition of the first mortgage by MRLP's affiliate, S&S Finance, was a "Refinancing" under Section 3.2(b) of the CPA, which would have triggered a disclosure by MRLP and an analysis of whether a Cash Appreciation Payment was due to TLC. TLC also raised concerns regarding MRLP's classifications of debt and equity.

16. On or about November 30, 2000, TLC was liquidated and the

    Cash Participation Agreement and accompanying deed of trust relating to the 90 K Street property were assigned to Defendant Viad Corporation, TLC's parent corporation.

17. For reasons unrelated to this lawsuit, the proposed 2000 sale of the 90 K Street property did not take place. Nevertheless, the dispute between the parties remained concerning the meaning and application of certain terms of the CPA. In 2005, MRLP and Viad agreed to seek a resolution of the dispute by submitting the matter to an independent accounting firm for review. Specifically, the parties sought the interpretation, analysis, and application of certain terms of the CPA. In addition, the parties asked the independent accountants to analyze the classification of certain costs and charges, and prepare a pro-forma calculation under the CPA for the hypothetical sale of the Property.

18. Pursuant to Section 2.7 of the CPA, Defendant Viad was permitted to select the independent accountants, and it chose the Reznick Group of Bethesda, Maryland ("Reznick Group"). MRLP paid the full costs of the independent review.

19. Both parties were permitted to, and did, submit position papers and any relevant materials. On March 2, 2005,

Defendant Viad submitted its position paper plus nine related exhibits. In an accompanying cover letter Viad noted, contrary to the prior understanding between the parties, that neither Viad nor TLC would be bound by the opinion rendered. MRLP submitted its position paper on March 30, 2005.

20. In addition to the parties' position papers, the Reznick Group reviewed and analyzed the CPA, the 1989 First Amendment thereto, and the Special Purpose Financial Statements for the years 2002 and 2003.  On April 10, 2005 the Reznick Group rendered its opinion, which found in favor of MRLP on five of the six issues submitted to them. The Reznick Group also determined that as of 12/31/2003, the 90 K Street property would have to command a selling price in excess of $37.8 million for Viad to be entitled to any Cash Appreciation Payment under the terms of the CPA.

21. Defendant Viad has rejected the Reznick Group opinion, including the finding in its favor, and maintains that the Reznick Group opinion is not binding.

22. In August 2006, MRLP received an offer to purchase 90K from an unrelated third party, TC MidAtlantic Development, Inc. ("TCMD").  In addition, TCMD also

offered to purchase the adjacent property located at 45 L Street, N.E., from an affiliate of MRLP, 45 L Street Venture, LLC. ("45 L Venture").

23. The various agreements with TCMD also included the purchase of certain transferable development rights ("TDRs") that had been, or will be acquired in the future by MRLP ("Future TDR's"). The TDRs are valuable rights, in that they add density to the properties to which they are transferred.

24. On August 15, 2006, MRLP notified Viad of the offer to purchase, pursuant to the right of first refusal provisions set forth in Section 4.1(a) of the CPA. Viad did not exercise its right of first refusal.

25. On November 2, 2006, MRLP notified Viad that the agreements with TCMD had been modified, resulting in an approximately five million dollars reduction to the purchase price. In addition, on that same date, MRLP provided Viad with the modified contracts, so as to comply with the right of first refusal provisions set forth in Section 4.1(c) of the CPA. Viad did not exercise its right of first refusal.

26. Viad, through the deposition of its corporate representative on November 7, 2006, has taken the

position that, as a component of any Cash Participation Payment, Viad is also entitled to 15% of the value of the TDRs included in the purchase by TCMD.

27. Pursuant to the First Amendment of Purchase and Sale of Transferable Development Rights between MRLP and TCMD, dated October 31, 2007, the purchase price of the TDRs to be purchased from MRLP is $21,387,929.00.

28. Pursuant to the First Amendment of Purchase and Sale of Transferable Development Rights between 45 L Venture and TCMD, dated October 31, 2007, the purchase price of the TDRs to be purchased from 45 L Venture is $12,221,600.00. It does not appear that Viad seeks any Cash Appreciation Payment related to the sale of TDRs from 45 L Venture.

29. The dispute over the Appreciation Cash Payment and whether the TDRs were a component of the calculation resulted in Viad demanding a $4.5 million escrow before it would release the Deed of Trust on 90 K Street so that the transaction with TCMD could close.

30. The land sale portion of the TCMD transaction closed in January 2007; and the first portion of the TDR sale also closed. MRLP sold the first portion of the TDRs (which it had purchased from third-parties) to TCMD for approximately $8 million by way of purchase agreement

that was separate from the purchase agreement for the land at 90 K Street. When the Future TDRs are delivered to TCMD (sometime between January 11, 2009 and June 11, 2009), MRLP will be paid an additional $13 million. The land itself was sold to TCMD for approximately $46 million. Prior to closing, and to secure the release of Viad's lien on the property (securing MRLP's obligations under the Cash Participation Agreement) MRLP and Viad entered into an agreement whereby $4.5 million of the sale proceeds was put into a jointly-controlled account pending the resolution of this dispute.

**COUNT I**

**Declaratory Judgment - Appreciation Cash Flow**

31. MRLP realleges and incorporates by reference the facts and allegations set forth in Paragraphs 1 - 30 above.

32. For nearly 20 years, MRLP paid all of the real estate taxes, interest and other payments on the property, and has managed and marketed the 90 K Street property at a substantial loss. MRLP has funded these costs and operating deficits via advances from S&S Finance, with no contribution from Defendant Viad or its predecessor TLC.

33. In addition, over the years MRLP has provided TLC and Viad with detailed annual Special Purpose Financial

Statements for the Property, and these Special Purpose Financial Statements have documented the operational losses incurred by MRLP and the increase in MRLP's equity position in the Property. Until the potential sale of the Property in 2000, neither TLC nor Viad ever questioned the Special Purpose Financial Statements or the accounting methods used by MRLP.

34. When Defendant Viad did raise certain questions concerning the accounting methods used, MRLP submitted the dispute concerning the terms of the CPA (an agreement drafted by attorneys for TLC) to the accounting firm selected by Defendant, and paid the cost of that dispute resolution. Nevertheless, Defendant Viad refuses to be bound by the results.

35. This disagreement between the parties has dragged on for more than five years, and it must be resolved so that the $4.5 million held in the joint account can be disbursed. Accordingly, MRLP seeks a Declaratory Judgment that the findings of the independent accountants are valid, binding, and enforceable as to Defendant Viad and its predecessor, TLC:

    a)    It is proper to deduct Developer's Equity Return in computing Appreciation Cash Flow by including the annual Developer's Equity Return as an allowable incurred Expense under Section 2.3 in

        computing Operations Cash Flow that is effectively paid from and increases Developer's Operating Equity.  Developer's Operating Equity is then treated as a deduction in computing Appreciation Cash Flow under Section 3.1. (Issue 1);

b)    The 1996 acquisition of the first mortgage debt by S&S Finance, which is owned by MRLP's Limited Partners, Greenebaum and Rose, was not a "refinancing" that should have triggered a Cash Appreciation Payment under Section 3.3(c).  (Issue 2);

c)    Any amount advanced by S&S Finance or its partners to pay interest or any other reasonable expense should be treated as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b).  (Issue 3);

d)    There is no substance or effect on the computations for Operations Cash Flow, or Developer's Operating Equity, between a cash payment for interest on the first mortgage and a non-cash charge for interest that satisfies MRLP's obligation for interest due.  (Issue 4);

e)    For financial purposes and computations under the Cash Participation Agreement, the first mortgage (held by S&S Finance) was reclassified as equity.  The first mortgage should be classified as debt, and this debt would qualify as Permitted Debt under the CPA.  (Issue 5);

f)    The 1996 acquisition of the first mortgage by S&S Finance occurred at a $1,024,571 discount to the outstanding loan balance.  For the purpose of determining what type of accounting, if any, this transaction should receive for the purpose of computations under the CPA, interest on the first mortgage should only be charged on the amount actually paid by S&S Finance to acquire the first mortgage.  The discount on the mortgage would be considered an unreasonable

     related party fee if not passed on to the Partnership (Section 2.3(b) and Section 3.7). (Issue 6).

36. In the event however, that this Court should decline to find the Reznick Group opinion binding, then MRLP submits that Viad should not receive the benefit of the discount referred to in the foregoing Issue 6 in the calculation of any Cash Appreciation Payment.

37. Further, MRLP seeks a Declaratory Judgment that under the terms of the CPA:

  a) It is proper to deduct any interest pursuant to loans related to the Property, whether those loans were for the purpose of acquisition of the Property, or to fund operational needs, regardless of whether the interest is reflected as Developer's Equity Return on the Special Purpose Financial Statements;

  b) It is proper in computing Appreciation Cash Flow to deduct the annual Developer's Equity Return (because it is, in fact, interest) as an Approved Deduction pursuant to Section 3.4 of the CPA.

 **WHEREFORE,** Plaintiff Montgomery Road I Limited Partnership seeks a Declaratory Judgment as set forth above,

and for such other and further relief as this Court shall deem just and proper.

## COUNT II

### Declaratory Judgment - Sale of TDRs

38. MRLP realleges and incorporates by reference the facts and allegations set forth in Paragraphs 1 - 37 above.

39. As set forth above, Viad has taken the position that, as a component of any Appreciation Cash Payment, Viad is also entitled to 15% of the value of the TDRs sold (and to be sold) to TCMD. There is however, no basis for such an entitlement under the terms of the CPA. Moreover, TDRs are tradeable commodities that are a creation of the District of Columbia City Council to encourage development in various parts of the city. TDRs were not even in existence at the time the parties entered into the CPA.

40. The land sale and the first portion of the TDR sale of the TCMD transaction closed in January 2007.

41. This issue must be resolved so that the $4.5 million held in the joint account can be disbursed, and to avoid any future claim with regard to the Future TDRs.

42. Accordingly, MRLP seeks a Declaratory Judgment that the

value of the purchase price attributed to the TDRs cannot be considered in determining the Cash Appreciation Payment, if any, due to Viad.

**WHEREFORE,** Plaintiff Montgomery Road I Limited Partnership seeks a Declaratory Judgment as set forth above, and for such other and further relief as this Court shall deem just and proper.

COUNT III

**Attorneys Fees Under The Cash Participation Agreement**

43. MRLP realleges and incorporates by reference the facts and allegations set forth in Paragraphs 1 – 42 above.

44. As set forth above, Viad has taken the position that advances made by S&S Finance (and the interest thereon) are not to be considered in the calculation of the Appreciation Cash Payment. In addition, Viad has taken the position that, as a component of any Appreciation Cash Payment, it is also entitled to 15% of the value of the TDRs sold (and to be sold) to TCMD. There is however, no basis for such an entitlement under the terms of the CPA.

45. The dispute over the Appreciation Cash Payment and whether the TDRs were a component of the calculation resulted in Viad demanding a $4.5 million escrow before

it would release the Deed of Trust on 90 K Street so that the transaction with TCMD could close.

46. Viad's refusal to execute a release of its lien, and its insistence on the $4.5 million escrow (to release its lien so the TCMD transaction could close), constitutes a failure by Viad to perform its obligations under the CPA. Accordingly, and pursuant to §7.4 of the CPA, MRLP is entitled to its attorneys fees and costs in bringing this action, and defending against Viad's Counterclaim and Third-Party claim.

**WHEREFORE,** Plaintiff Montgomery Road I Limited Partnership seeks an award of its attorneys fees and costs, and for such other and further relief as this Court shall deem just and proper.

>                       COOTER, MANGOLD, TOMPERT
>                        & KARAS, L.L.P.
>
>
>                             /s/
>                       Dale A. Cooter, Bar #227454
>                       Donna S. Mangold, Bar #358851
>                       5301 Wisconsin Avenue, N.W.
>                       Suite 500
>                       Washington, D.C.  20015
>                       (202)537-0700
>                       efiling@cootermangold.com
>                       *Attorneys for Plaintiff*
>                       *Montgomery Road I Limited*
>                       *Partnership*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the \_\_\_\_\_ day of April 2007, a copy of the foregoing **SECOND AMENDED COMPLAINT** was served via the Court's ECF system to:

> Rodney F. Page, Esq.
> Alicia Hogges-Thomas, Esq.
> Bryan Cave LLP
> 700 Thirteenth Street, N.W.
> Suite 700
> Washington, D.C. 20005

 

                                              /s/

                                    Donna S. Mangold