## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| MONTGOMERY ROAD I LIMITED PARTNERSHIP, | ) ) ) | |
| Plaintiff and Counter Defendant | ) ) | |
| v. | ) ) | |
| VIAD CORP, | ) ) | |
| Defendant and Counterclaimant and Plaintiff on the Counterclaim | ) ) ) ) | Case No. 1:06CV00344 (HHK) |
| v. | ) ) | |
| MONTGOMERY ROAD TDR, LLC A DISTRICT OF COLUMBIA LLC 5301 WISCONSIN AVENUE WASHINGTON, D.C. 20015 | ) ) ) ) | |
| Additional Defendant on the Counterclaim | ) ) ) | |

_____)

## MOTION FOR SUMMARY JUDGMENT BY DEFENDANT VIAD CORP

Defendant Viad Corp ("Viad") moves pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing the Second Amended Complaint and entering judgment in its favor on its counterclaims in the action. The attention of the Court is respectfully directed to the Memorandum of Points and Authorities and to the Statement of Undisputed Material Facts filed herewith.

The Court has previously denied, without prejudice to renewal, Motions of both parties for Summary Judgment and encouraged the parties to rely upon and consolidate arguments raised in previously filed briefs.

In this motion, Viad seeks summary judgment dismissing all three counts of the Second Amended Complaint. The first count asks that the Court declare that an advisory opinion obtained by the parties from an accounting firm as to the interpretation of some terms of their Cash Participation Agreement ("CPA") is binding. As demonstrated hereafter, the advice was advisory only and does not have a binding effect. The same count seeks, "in the alternative", a declaration from the Court that Montgomery Road I Limited Partnership's ("MRLP") proposed accounting for the sale of the property by which all equity investment would be retroactively treated as debt and accrued, unpaid interest on that debt would be a permitted deduction from any amount owed to Viad is proper under the CPA. Viad demonstrates in its Memorandum that the proposed treatment is contrary to the plain language of the CPA.

The second count of MRLP's Second Amended Complaint seeks a declaration that Viad is not entitled to any payment arising from the portion of the sales price for the real estate which MRLP has assigned to an allegedly separate contract for the sale of Transferable Development Rights ("TDRs"). Viad demonstrates in this Motion that the contract is not separate, that TDRs are tied to the property subject to the CPA and otherwise, and that the relief sought by MRLP must be denied.

The third count of MRLP's Second Amended Complaint seeks attorneys fees and costs for bringing this action and in defending against Viad's counterclaim. Under the CPA, if either party brings suit against the other as a result of an alleged breach or failure of the other party to fulfill or perform any covenants or obligations under this Agreement, the prevailing party is entitled to attorneys fees and costs. MRLP cannot demonstrate that Viad has defaulted under the CPA or failed to perform its obligations and should therefore deny the relief sought.

Viad also seeks summary judgment on its Counterclaims. Specifically, in Counts I and II of the Amended and Supplemental Counterclaim, Viad seeks a declaration that: it is owed a payment under the CPA based on the full value of the property, including the value assigned by MRLP to the TDRs; that segmenting the price paid to MRLP for the property was a sham transaction; and that MRLP is in default for failure to pay Viad or even to report on the transaction as required by the CPA. Further, under Count II, MRLP is in default for failure to comply with the accounting reporting requirements of the CPA.

Summary judgment is also sought on Count III of the Counterclaim asserting that the failures and defaults by MRLP are breach of an implied duty and covenant of good faith and fair dealing. Finally, because the CPA provides for the payment of attorneys fees in the event of default and litigation, Viad seeks an award of fees for this litigation.

WHEREFORE, Viad moves for summary judgment on the First Amended Complaint and on the Amended and Supplemental Counterclaim.

Respectfully Submitted,

BRYAN CAVE LLP

By: /s/ Rodney F. Page
Rodney F. Page (DC Bar No. 37994)
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005-3960
P: (202) 508-6000
F: (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff Viad Corp*

Dated: September 6, 2007

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **MONTGOMERY ROAD I LIMITED** | ) | |
| **PARTNERSHIP,** | ) | |
|        **Plaintiff and** | ) | |
|        **Counterclaim-Defendant** | ) | |
|     **v.** | ) | |
|  | ) | |
| **VIAD CORP,** | ) | |
|        **Defendant and** | ) | **Case No.  1:06CV00344 (HHK)** |
|        **Counterclaim-Plaintiff** | ) | |
|  | ) | |
|     **v.** | ) | |
|  | ) | |
| **MONTGOMERY ROAD TDR, LLC** | ) | |
|        **Counterclaim-Defendant** | ) | |

_____)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT VIAD CORP'S
## RENEWED MOTION FOR SUMMARY JUDGMENT

Rodney F. Page (DC Bar No. 37994)
Bryan Cave LLP
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005-3960
P:  (202) 508-6000
F:  (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff Viad Corp*

Dated:  September 6, 2007

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................................. 1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................. 2

III. SUMMARY JUDGMENT STANDARD .......................................................................... 2

IV.  ARGUMENT ..................................................................................................................... 3

    A.   SUMMARY JUDGMENT SHOULD BE ENTERED FOR VIAD
        BECAUSE THE ANALYSIS OF THE REZNICK GROUP IS NOT
        BINDING ................................................................................................................. 3

        1.   The Undisputed Facts Do Not Support a Finding that the Reznick
            Analysis is Binding ................................................................................... 4

        2.   Proper Application of the CPA Shows that the Reznick Analysis is
            not Binding ................................................................................................ 6

            i.   The Dispute Did Not Arise Over the Issuance of the Financial
               Statements ...................................................................................... 7

            ii.  The Parties did not Believe that the Work of the Reznick Group was an
               Arbitration ..................................................................................... 8

    B.   MRLP HAS REQUESTED THAT THE COURT MAKE ACCOUNTING
        FINDINGS THAT ARE IN VIOLATION OF THE CPA ................................... 10

        1.   Under the CPA, Developer's Equity Return Is Not an Approved
            Deduction ................................................................................................ 11

            i.   The CPA is Clear Regarding the Definition of the Appreciation Cash
               Flow ............................................................................................. 11

            ii.  The Undisputed Facts Reveal That MRLP Realized that Developer's
               Equity Return was not an Approved Deduction ................................... 12

        2.   The CPA Requires MRLP to Account for Expenses on a Cash Basis –
            MRLP's Requested Relief Depends on Accrual Accounting .................. 15

    C.   THE VALUE ASSIGNED BY MRLP TO THE TDRs SHOULD BE
        INCLUDED IN THE CASH APPRECIATION CALCULATIONS ................... 16

        1.   MRLP's Removal of the TDRs from the Purchase Price of the
            Property Is a Sham .................................................................................. 17

            i.   Under the CPA, Viad is Owed 15% of the Total Appreciation of the 90
               K Street Property, Based Upon Its Agreed Value ................................ 17

i

        ii.      Viad Has Created an Artificial Value for the TDRs and Then Removed them From the Overall Purchase Property and the Cash Appreciation Payment ........................................................................... 18

        iii.     Removal and Separation of the TDRs from the Purchase Price is a Sham .................................................................................................. 19

    2.      Under the Plain Language of the CPA, TDRs Should be Included in the Cash Participation Calculations .......................................................... 22

        i.       TDRs Are an "Interest in the Property" ................................. 22

        ii.      TDRs Are "Improvements" and Therefore Property ........................... 25

    3.      The Extrinsic Evidence Supports The Argument that TDRs Should be Included in the Cash Participation Calculations ....................................... 27

D.     MRLP HAS DEFAULTED UNDER THE CPA ..................................................... 29

    1.      MRLP Has Failed to Identify an Appraiser to Contest Fair Market Value .................................................................................................. 29

    2.      MRLP Defaulted by Failing to Provide Timely Financial Statements as Required under the CPA ........................................................................ 31

        i.       The 2005 Financial Statements ............................................. 31

        ii.      The 2006 Financial Statements ............................................. 32

    3.      MRLP Has Failed to Fulfill Its Post-Closing Obligations Under The CPA .................................................................................................. 33

    4.      The Court Should Order an Audit of MRLP's Records to Determine The Calculation of The Cash Appreciation Payment ............................... 34

E.     VIAD HAS NOT DEFAULTED UNDER THE CPA ........................................... 35

F.     MRLP HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ....................................................................................... 36

    1.      Every Contract Contains the Implied Covenant of Good Faith and Fair Dealing ........................................................................................ 37

    2.      MRLP Has Breached the Implied Covenant of Good Faith and Fair Dealing .................................................................................................. 38

G.     Due to MRLP's Default and Breach of the Implied Covenant of Good Faith and Fair Dealing, Viad is Entitled to Attorneys Fees ............................................. 42

CONCLUSION ..................................................................................................... 43

# TABLE OF AUTHORITIES

## CASES

*Alberts v. Tuft (In re Greater Southeast Community Hospital Corp.)*, 353 B.R.
324, 352 (Bankr. D.D.C. 2006) ..................................................................26

*Allworth v. Howard University*,
890 A.2d 194 (D.C. 2006) ...........................................................37, 38, 41

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................................2

*Arizona Department of Revenue v. Arizona Outdoor Advertisers, Inc.*,
41 P.3d 631 (Ariz. Ct. App. 2002)............................................................27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................................2

*Friedman v. Decatur Corp.*, 135 F. 2d 812, 815 (D.C. Cir. 1943) ...................22

*Mitsui Fudosan, Inc. v. County of Los Angeles*,
268 Cal. Rptr. 356 (Cal. Ct. App. 1990)..............................................24, 29

*Rose v. Fox Pool Corp.*,
335 Md. 351 (Md. 1994)............................................................................27

*Steele v. Isikoff*, 130 F. Supp. 2d 23, 32 (D.D.C. 2000) ...................................37

*United States ex rel. DOL v. Insurance Co. of North America*, 135 F. 3d 1037,
1042 (D.C. Cir. 1997) ..............................................................................27

*United States Plywood Corp. v. Continental Casualty Co.*,
157 A.2d 286 (D.C. 1960) .........................................................................16

*Washington Post Co. v. United States Department of Health & Human Services*,
865 F.2d 320 (D.C. Cir. 1989)....................................................................2

*West v. United States*, 866 A.2d 74, 79 (D.C. 2005) ........................................26

## MISCELLANEOUS AUTHORITIES

D.C. Mun. Regs. tit. 11, § 1707.5 (d) .........................................................23, 24

D.C. Code § 6-1003 (2001)..............................................................................28

Fed. R. Civ. P. 56(c) ...........................................................................................2

Fed. R. Civ. P. 56(e) ...........................................................................................2

Blacks Law Dictionary 773, 828 (8th ed. 2004)..........................................22, 26

## I.    INTRODUCTION

In 1987, Plaintiff Montgomery Road I Limited Partnership ("MRLP") purchased a parcel of land at 90 K Street N.E. from Transportation Leasing Company, a predecessor in interest to Viad Corp. ("Viad"). (Defendant Viad Corp's Statement of Undisputed Material Facts, (hereinafter "SOF") ¶¶ 6-8). The purchase price was approximately $11,000,000. (SOF ¶¶ 6-8). As part of the transaction, MRLP contractually agreed that, if the property were thereafter sold, it would pay, as additional consideration to Viad, 15% of the appreciation in the property. (SOF ¶ 12). On January 11, 2007, MRLP sold 90 K Street N.E. for more than $67,000,000. (SOF ¶¶ 143-44). In anticipation of selling the property, MRLP filed this suit a year before the closing seeking a declaratory judgment that it owes nothing under the contract to Viad. (*See generally* MRLP's Second Amended Complaint).

MRLP recognizes that the contract is a valid obligation. But, as its principal Sam Rose has made very clear, it does not want to honor the agreement. (SOF ¶ 25). To avoid the contractual obligation, MRLP has devised a variety of tactics, including shifting and alternative accounting practices, to claim that its costs for the property exceed any appreciation. (SOF ¶¶ 135-37; 140-41). Moreover, in violation of its duty of good faith and fair dealing, MRLP has structured the sale of the property in a way that assigns approximately a third of the purchase price, $21,387,929, to a separate contract for density rights on the property – valuing them at $70.00 per square foot, which is more than eleven times the $6.00 per square foot it paid to acquire them, and approximately thirteen times the current market range for Transferable Development Rights ("TDRs") of $5.25 to $5.50 per square foot – so that it could claim that portion of the price is not covered by the contract commitment to Viad. (SOF ¶¶ 105, 109, 117).

The terms of the contract between the parties are clear, however, and MRLP has defaulted under the agreement in numerous instances. (SOF ¶¶ 133-34; 145-50, 158). Viad has counterclaimed against MRLP seeking appropriate relief under the contract. As shown herein, summary judgment based on undisputed facts is appropriate.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

The facts pertinent to this Motion are set forth in the accompanying Statement of Undisputed Material Facts, which is incorporated herein by reference.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To succeed in its motion for summary judgment, Viad must demonstrate initially the absence of any genuine issue of material fact and its entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once Viad meets its initial burden, MRLP and Montgomery Road TDR, LLC ("MRTDR") "may not rest upon the mere allegations or denials of [their] pleading[s], but the[ir] response[s] . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 322. In considering a summary judgment motion, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson*, 477 U.S. at 255; *see Washington Post Co. v. United States Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

## IV.    ARGUMENT

### A.    SUMMARY JUDGMENT SHOULD BE ENTERED FOR VIAD BECAUSE THE ANALYSIS OF THE REZNICK GROUP IS NOT BINDING

In Count I of the Second Amended Complaint, MRLP seeks a declaratory judgment "that the findings of the independent accountants are valid, binding, and enforceable as to Defendant VIAD [*sic*] and its predecessor, TLC." (Second Amended Complaint, ¶ 35). Such a request is in direct contradiction with the facts of the case and the contract between the parties. The actions and communications by Viad and MRLP show that the letter and analysis of the Reznick Group ("Reznick Analysis") was never intended to be binding on the parties.[1] MRLP has claimed that the Reznick Analysis is binding because of Section 2.7 of the Cash Participation Agreement ("CPA") which deals with disputes regarding financial statements. (SOF ¶ 51). The dispute between the parties, however, has centered on the calculation of the Appreciation Cash Payment, and not a dispute over the financial statements. The Court should find that the analysis of the Reznick Group is not binding and its findings are not valid or enforceable.

Since the late 1980's, MRLP has sought to persuade Viad to relinquish its rights under the CPA for a nominal sum. (SOF ¶ 31). In furtherance of this goal, MRLP employees have misrepresented the value of the 90 K Street Property to Viad employees. (SOF ¶ 32). On August 14, 2000, MRLP informed Viad of a proposed sale to Level 3 Communications, LLC ("Level 3"). (SOF ¶ 33). At that time, MRLP also asserted that the sale price would result in no

---

[1] Although MRLP refers to the product of the Reznick Group as an "Opinion," in fact, the Reznick Group's conclusions were presented in the form of a letter that summarized its analysis, that clearly stated that the "services [were] intended to assist in resolving a dispute between the Partnership and Viad Corp related to a Cash Participation Agreement dated November 30, 1987 (the "Agreement")" and could only be used for this "aforementioned purpose." Further, the letter, addressed only to Sam Rose, said that its conclusions were not "a legal opinion, audit opinion, or any other form of assurance." (SOF ¶ 50)

3

Appreciation Cash Payment[2] to Viad.  (SOF ¶ 34).  Viad disputed MRLP's calculation, asserting that a particular item, specifically, the Developer's Equity Return, was improperly deducted as a cost from the sale price.  (SOF ¶ 35).

Although the Level 3 transaction did not close, the parties continued to debate the proper calculation of the Appreciation Cash Payment for four years, since MRLP was anxious to sell the Property as soon as possible.  (SOF ¶¶ 36-38).  In or around December 2004, Viad and MRLP decided to seek the advice of Reznick Group, P.C. ("Reznick Group"), an accounting firm, in an effort to informally resolve the disagreement.  (SOF ¶ 39).

### 1.    The Undisputed Facts Do Not Support a Finding that the Reznick Analysis is Binding

The undisputed facts show that neither party to the CPA nor the Reznick Group itself ever believed that the analysis of the Reznick Group would be binding.  Viad employees stated so explicitly, while MRLP officials, at best, "assumed" that the analysis would be binding.  Even the letter containing the Reznick Group's analysis stated the limited nature of the Group's engagement and the analysis that it had performed.

In records of phone conversations leading up to the decision to consult with the Reznick Group, there is no indication that Viad or MRLP intended Reznick's advice to be binding.  (SOF ¶ 46).  Furthermore, MRLP cannot point to a specific conversation where Viad stated that the Reznick Analysis was intended to be or would be binding.  (SOF ¶ 46).  In fact, Viad employees explicitly stated the opposite – that the analysis would not be binding and MRLP officials did not disagree.

---

[2]  This term, like others hereafter which are capitalized, are defined terms in the CPA.

When Viad submitted its statement of position to the Reznick Group in March 2005, Eve Fiorucci, the Assistant Director of Real Estate, wrote in the third bulleted paragraph: "Finally, while we appreciate your review of the documents and your opinion as to our interpretation of same, we wish to make it clear that your opinion is not binding on TLC/Viad Corp." (SOF ¶ 40). Sam Rose of MRLP was copied on this letter, and he testified that he did in fact receive it. (SOF ¶ 44). Mr. Rose also testified that at the time he received the letter, he made no efforts to contact Viad to discuss whether the Reznick Analysis would be binding. (SOF ¶ 44).

Not only was MRLP silent when confronted with Viad's belief that the analysis would only be advisory, they indicated their agreement with Viad's position. In a letter to the Reznick Group during the review process, Reid Liffmann, a limited partner of MRLP, signaled that the process was advisory only, stating: "[h]opefully, with guidance from you, the parties can get a process moving that will lead to a resolution, without wasting a lot of legal dollars and time." (SOF ¶ 45). Liffmann had necessarily considered that the Reznick Analysis would be used in negotiations and contemplated potential legal actions that could ensue after the Reznick Analysis was released.

Although MRLP had suggested that it believed that the parties understood the process of using the Reznick Group to be binding, they can point to no single document or conversation where such an understanding was realized. (SOF ¶ 46). In fact, Mr. Rose has suggested his belief that the agreement was binding was based on nothing more than an assumption – if that.

Q.    How – When and how did you agree that it was binding?

A.    That we spent three years picking them, getting to this point. What's the point of doing it if not's binding? **It was almost assumed**. Why would you take years to talk to your accountant, to talk to all the bosses, to pick an accountant, and then say it's not binding? I mean: Why bother?

5

(SOF ¶ 49) (emphasis added).  This exchange highlights how the dispute over the nature of the analysis of the Reznick Group originated.  There was clearly no mutual agreement or understanding that the Reznick Analysis would be binding.

On April 10, 2005, Reznick provided its interpretation of certain terms in the CPA, an analysis of the classification of costs and charges, and a pro-forma calculation for a hypothetical sale of the property.  (SOF ¶ 42).  In a letter containing its analysis, the Reznick Group stated ""[w]e understand that our services are intended to **assist** in resolving a  dispute between the Partnership and Viad Corp relating to the Cash Participation Agreement dated November 30, 1987 (the "Agreement").  This report **may only be used for the aforementioned purpose**, and may not be distributed or used for other purposes without the express written consent of Reznick Group, P.C."  And, the letter stated, its "conclusions … do not constitute a legal opinion, audit opinion, or any other form of assurance."  The letter was addressed only to Sam Rose, and a copy provided to Viad.  (SOF ¶ 50). (emphasis added).

It was not until May 2, 2005, three weeks after the Reznick Analysis had been submitted, that MRLP suggested to Viad that Reznick's review was binding on the parties.  (SOF ¶ 43).  From the timing of this assertion, one could infer that MRLP decided that the Reznick Analysis should be binding only after receiving notice that the review was in its favor.  More importantly, the facts simply do not indicate that parties intended for the analysis of the Reznick Group to be binding.

## 2.    Proper Application of the CPA Shows that the Reznick Analysis is not Binding

MRLP has argued that the Reznick Analysis is binding under Section 2.7 of the CPA. (SOF ¶ 48).  However, the Reznick advice was not provided under Section 2.7, which applies to disputes over financial statements that were submitted in accordance with Sections 2.4, 2.5 or 2.6

6

of the CPA. (SOF ¶ 51).[3] The subject matter of Section 2.7 has no relation to the work performed by the Reznick Group. Moreover, disputes under Section 2.7 require that the parties engage in an arbitration process to resolve their disagreement. The evidence shows that the parties did not believe that the work being performed by the Reznick Group to be an arbitration.

### i. The Dispute Did Not Arise Over the Issuance of the Financial Statements

The purpose of seeking advice from Reznick was to begin to informally resolve the five year dispute between MRLP and Viad regarding the calculation of the Appreciation Cash Payment. (SOF ¶ 56). As evidence thereof, on June 10, 2002, Ms. Fiorucci wrote: "Sam wants to buy Viad out of Cash Participation Agreement. Offered $50,000. Believes his accounting methods were correct, would pay for Viad to have an outside firm look at accounting." (SOF ¶ 61). On June 15, 2004, Mr. Rose "again offered $50,000 to buy out Viad's interest" and the parties "[a]greed to get some referrals for accounting firms in the DC area." (SOF ¶ 60). In the Reznick Group's own words, the purpose of its analysis was to interpret certain terms of the CPA, analyze the classification of costs and charges, and create a pro-forma calculation for a hypothetical sale of the property. (SOF ¶ 42).

MRLP has argued that the determination of the Appreciation Cash Payment depends on the calculation of deductions and expenses identified in other sections of the CPA and set forth in the Special Purpose Financial Statements – which they believe ties the dispute into Section 2.7 of the CPA. The calculation of the Appreciation Cash Payment, however, is not contingent on the identification of deductions and expenses in the financial statements. Instead, the Appreciation

---

[3] Section 2.7 states in relevant part that, if the parties are unable to resolve a dispute concerning the fiscal year statements within a certain period of time, "the items shall be submitted to arbitration which arbitration shall be performed by an independent certified public accountant." (SOF ¶ 51).

Cash Payment is calculated by multiplying the participating percentage by the Appreciation Cash Flow, which is calculated under Section 3.1  (SOF ¶¶ 12, 67).  As a result, whether the expenses appeared on the financial statements is irrelevant.

In addition, although MRLP submitted Special Purpose Financial Statements in an effort to comply with Section 2.6 of the CPA, these statements are not related to the calculation of the Appreciation Cash Payment because Section 2.6 is part of Article 2 of the CPA, which addresses **Operations** Cash Flow only.  (SOF ¶¶ 11, 52-54).  **Appreciation** Cash Flow is addressed in Article 3 of the CPA.  (SOF ¶ 12).  For the same reason, the dispute resolution provision in Section 2.7 is not related to the Appreciation Cash Payment.  (SOF ¶ 55).

Although MRLP has attempted to force application of Section 2.7 on these facts, the CPA already contains an entirely different provision, in Article 3, which addresses this exact dispute – disagreements regarding the calculation of the Appreciation Cash Payment.  According to Section 3.11, disputes regarding the calculation of the Appreciation Cash Payment must be submitted to resolution by an MAI appraiser after receipt of the Appreciation Cash Payment and of the statement accompanying the payment.  (SOF ¶ 57).  This procedure should have been used to resolve the dispute, rather than that prescribed in Article 2.

### ii. The Parties did not Believe that the Work of the Reznick Group was an Arbitration

Section 2.7 of the CPA requires the use of an arbitration to resolve disputes concerning the financial statements in Sections 2.4, 2.5, and 2.6.  (SOF ¶ 51).  That section further requires that Viad, or its predecessor, to pay for any arbitrations fees.  (SOF ¶ 51).  Neither of the parties believed that the Reznick Analysis would be given pursuant to a binding arbitration.  As such, the parties were not contemplating that their dispute fell under Section 2.7 or that it would be binding.

In his deposition, Sam Rose was asked directly whether he considered the work done by the Reznick Group to be an arbitration. He replied that he did not "know that it was an arbitration" and that he did not "recollect describing it that way." (SOF ¶ 59).

Viad also did not consider the work of the Reznick Group to be a binding arbitration. Ms. Fiorucci stated so in her letter to the Reznick Group prior to the commencement of their work where she wrote: "Finally, while we appreciate your review of the documents and your opinion as to your interpretation of the same, we wish to make it clear that your opinion is not binding on TLC/Viad Corp." (SOF ¶ 40). If Ms. Fiorucci had believed that the Reznick Analysis were to be an arbitration, she would not have included such language, as it would have been superfluous. Brent Solomon, the Reznick partner who wrote the analysis, testified that neither side ever suggested to him that the process would be binding. (SOF ¶ 47). In addition, the Reznick Analysis stated that its "services [were] intended to assist in resolving a dispute between the Partnership and Viad Corp related to a Cash Participation Agreement dated November 30, 1987 (the "Agreement")" and could only be used for this "aforementioned purpose." (SOF ¶ 50).

In addition to the direct statements of the parties, the actions by the two sides suggest that the parties did not consider the work performed by the Reznick Group to be an arbitration. Section 2 .7 requires that "the fees of such accountant [selected to be the arbitrator], as well as any arbitration fees incurred in connection with the dispute, shall be paid by . . . [Viad] . . . ." (SOF ¶ 51). Yet, MRLP offered to pay for the costs associated with the Reznick Group. (SOF ¶ 61). Mr. Rose ultimately agreed to pay the costs billed by the Reznick Group. (SOF ¶ 62). Had MRLP believed that the dispute arose under Section 2.7 of the CPA, Viad would have been

required to pay for the dispute.  The parties apparently never considered Section 2.7 as MRLP always assumed it would pay the costs associated with the use of the Reznick Group.

In sum, there is no evidence that the parties agreed to a binding analysis by the Reznick Group.  Viad notified MRLP prior to Reznick's review that the analysis would not be binding, and the arbitration provisions in the CPA do not apply to the Reznick Analysis.  For the foregoing reasons, the Court should declare that the Reznick Analysis is **not** binding and enter judgment against MRLP.

**B.     MRLP HAS REQUESTED THAT THE COURT MAKE ACCOUNTING FINDINGS THAT ARE IN VIOLATION OF THE CPA**

In Count I of its Second Amended Complaint, MRLP argues that if the Court were to find that the Reznick Analysis were not binding, it should then issue a declaratory judgment for MRLP on two important accounting disputes between the parties.

First, MRLP asks for a declaratory judgment that under the terms of the CPA "[i]t is proper to deduct any interest pursuant to loans related to the Property, whether those loans were for the purpose of acquisition of the Property, or to fund operational needs, regardless of whether the interest is reflected as Developer's Equity Return on the Special Purpose Financial Statements."  (Second Amended Complaint, ¶ 37(a)).  Second, MRLP asks the Court to declare that "[i]t is proper in computing Appreciation Cash Flow to deduct the annual Developer's Equity Return . . . as an Approved Deduction pursuant to Section 3.4 of the CPA."  (Second Amended Complaint, ¶ 37(b)).

In effect, MRLP is asking the Court to declare that all advances and/or investments in the Property, which had been treated as equity in the property, were actually loans made by S&S Finance Limited Partnership ("S&S Finance"), a wholly owned affiliate of Greenebaum and

Rose, who also own and control MRLP.  As a result, MRLP hopes to convince the court to follow it in re-labeling these investments as "Permitted Debt."  MRLP's strategy has only one purpose – to reduce the overall Appreciation Cash Payment to avoid paying Viad its rightful share.

This alternative theory, proposed by MRLP, relies on two gross distortions of the CPA. The first is to suggest that Article 3 of the CPA somehow allows Developer's Equity Return to be an approved deduction.  The second distortion in MRLP's argument is that it ignores the requirement of the CPA that accounting for expenses be done on a cash basis, i.e. actual payments.  For MRLP's argument to prevail, the Court would have to allow for accounting on an accrual basis, in violation of the CPA.

> **1.** **Under the CPA, Developer's Equity Return Is Not an Approved Deduction**

Advances made by S&S Finance were used to fund the operating activities of the property at 90 K Street.  S&S Finance's contributions were being added to its equity stake in the investment.  In the financial statements, these contributions were reflected as "Developer's Invested Equity."

If MRLP's efforts to re-label Developer's Invested Equity as Developer's Equity return and then to further re-label that as Permitted Debt were to succeed, then MRLP could effectively reduce the Appreciation Cash Flow and the Viad's corresponding share of the Appreciation Cash Payment so that Viad's ultimate payout from the sale of the property is eliminated.

> **i.  *The CPA is Clear Regarding the Definition of the Appreciation Cash Flow***

The plain language of the CPA demonstrates that Developer's Equity Return is not an Approved Deduction from the Appreciation Cash Flow.  Appreciation Cash Flow is calculated by finding the Agreed Value, deducting the Approved Deductions and Closing Costs, and then

subtracting Developer's Operating Equity.  (SOF ¶¶ 67, 68).  In the event of the sale of the property, the Approved Deductions include Permitted Debt, Junior Financing, and the sum of previously calculated Approved Cash Flows.  (SOF ¶ 69).  The calculation of the Appreciation Cash Flow is of paramount importance to this litigation, as the

```
  Agreed Value
-  Approved Deductions
-  Closing Costs
-  Developer's Operating Equity
=  Appreciation Cash Flow
```

Appreciation Cash Payment (Viad's share of the sale of the property) is simply a percentage of the Appreciation Cash Flow.  If MRLP had followed this simple formula, using the accounting it had employed for over twenty years and which was provided for in the CPA, the Appreciation Cash Payment owed to Viad would have been approximately $8,200,868.[4]

Instead, MRLP, in its bad-faith effort to deprive Viad of its rightful share has sought other ways of influencing this equation so that the Appreciation Cash Flow would be so small so as to eliminate any payment to Viad.  One such method was to insert Developer's Equity Return as an additional item to be subtracted from the Agreed Value.  Yet, as a term, Developer's Equity Return is not included in this calculation.  (SOF ¶ 68).  Nor is it even mentioned in this section of the CPA.

### ii. The Undisputed Facts Reveal That MRLP Realized that Developer's Equity Return was not an Approved Deduction

In MRLP's request for Declaratory Judgment, it asks the Court to declare that contributions and/or investments made by S&S Finance were actually loans. Such a finding would be in direct contradiction with twenty years of classification by MRLP and its independent auditor.

---

[4] *See* page 33 for a further explanation of this calculation.

From approximately 1987 to 2004, the Special Purpose Financial Statements were compiled by a firm of independent certified public accountants. (SOF ¶ 77). During that time period, MRLP classified amounts advanced by S&S Finance, to fund operational needs as equity. (SOF ¶ 70, 73). Furthermore, after S&S Finance acquired the first mortgage on the 90 K Street Property in 1996, MRLP started to classify the accrued interest on the mortgage as Developer's Equity Return. (SOF ¶¶ 71-72). These classifications have consistently been reflected in the Financial Statements of MRLP, which were compiled by outside accountants until 2004, and were also reflected in the Draft Special Purpose Financial Statement for 2005, which was submitted to Viad by MRLP's litigation counsel Dale Cooter on September 21, 2006. (SOF ¶¶ 76-77). Thus, for nearly twenty years, MRLP and its auditors classified S&S Finance Contributions as equity. (SOF ¶ 73). This treatment was proper, as Developers Equity Return is not a proper deduction under the CPA.

Then, under the direction of its litigation counsel, MRLP sought to reclassify the amounts forwarded by S&S Finance, the accrued interest on those amounts, and the accrued interest on the first mortgage as debt. (SOF ¶ 74). In a letter sent to Viad's counsel on November 21, 2006, attorney Cooter wrote: "[a]s you know, I established that all money contributed to Montgomery Road I Limited Partnership was actually in the form of loans originating with S&S Finance. There was never any intention to contribute non-interest bearing equity to the project." (SOF ¶ 74). Attached to Mr. Cooter's letter was a revised Special Purpose Financial Statement for 2005. (SOF ¶ 75). In this revised statement, the accrued interest on the first mortgage was reclassified as "Interest Expense – S&S Loan." (SOF ¶ 78). Furthermore, the amounts contributed by S&S Finance and the accrued interest on those amounts were reclassified as "S&S Finance Loan Payable." (SOF ¶ 78). These classifications, which do not appear in previous financial

13

statements, were then included under the Liabilities section of the financial statement.[5]  (SOF ¶ 78).   Yet, MRLP has never produced any notes, loan Documents, or other contemporary documentary evidence to support their claim.   The result is another fraudulent attempt to decrease Viad's cash participation to zero.

Neither the draft nor the revised statements (hereinafter the "Cooter Financials") were "prepared in accordance with generally accepted accounting principles," as required by Section 2.6.  Furthermore, the Cooter Financials are not "consistent with past practices," and they do not bear "the unqualified opinion of a firm of independent certified public accountants," all of which is required by the CPA.  (SOF ¶¶ 77, 135-36).  The Cooter Financials are also inconsistent with the Reznick Analysis, which MRLP seeks to enforce as binding in this case.  (SOF ¶ 79).

Moreover, the Cooter Financials conflict with the information provided in MRLP's 2005 tax return.  (SOF ¶ 137).  Finally, the settlement sheet from the closing on January 11, 2007, indicates that no loan from S&S Finance, as hypothesized by Mr. Cooter, was repaid.  (SOF ¶ 137).

Recognizing the lack of legitimacy that accompanied the Cooter Financials, MRLP attempted to cover its tracks by submitting an unauthorized Supplemental Filing to the Court that contained a new set of financial statements, this time approved by their accountants.  In late June 2007, nearly two months after the initial round of briefing (Summary Judgment Motions, Opposition Motions, & Reply Motions) had been completed by the parties and more than six months after discovery had closed in the case, MRLP submitted new financials statements that purported to be "special purpose financial statements for the period 2004-2007."  (*See* Docket #

---

[5]  When the sale of 90 K Street took place on January 11, 2006, the distribution of the proceeds from the sale did not reflect the existence of such loans.  Less than $5 million was paid to S&S Finance for outstanding loans.  (SOF ¶ 139).

42).  This filing was not authorized as MRLP failed to seek leave of the Court or consent of

Viad.  MRLP did not seek to justify the need for this filing because of new law or new facts.

Rather, MRLP argued that it was filed in response to arguments made by Viad during this

litigation.   In other words, MRLP is attempting to once again change its accounting for the

disputed property to suit its current litigation posture.

As the Court had ordered another round of briefing in the case, MRLP will no doubt act

as if the Supplemental Filing is simply part of the record.  But, the Supplemental Filing is not

evidence in this matter, was not produced during discovery, or subject to discovery, and is not

admissible at trial.  The Court should disregard the Supplemental Filing.

For over twenty years, MRLP and its auditors were in agreement that contributions

and/or investments made by S&S Finance would be classified as equity.  Once the instant dispute

arose with a payment to Viad looming, MRLP sought refuge in the advice of its counsel, who

overruled both history and the advice of professionals and, for the first time re-labeled the S&S

Finance contributions/investments as "Permitted Debt."  The CPA requires that the accounting of

MRLP be on a "consistent" basis (SOF ¶63), and the alternative accounting is not that.  The

Court should see through this fraudulent behavior and declare that Developer's Equity Return is

not an Approved Deduction.

> **2.    The CPA Requires MRLP to Account for Expenses on a
> Cash Basis – MRLP's Requested Relief Depends on
> Accrual Accounting**

The second fatal defect for MRLP's proposed accounting is that the CPA requires that

MRLP account for its expenses on a cash basis of accounting.  (SOF ¶ 63).  Thus, even if all the

cash infusion to the Property was debt, which Viad vigorously disputes, MRLP cannot claim

millions of dollars of accrued interest as a deduction because the CPA only recognizes cash basis

accounting applied on a consistent basis and requires that the interest be paid before it can be deducted. (SOF ¶ 63).

According to the CPA, if Permitted Debt is held by an Affiliate of Developer, "interest paid thereon shall be included as an expense." (SOF ¶ 20). MRLP has not paid the interest on the first mortgage or on the contributions from S&S Finance for operations at 90 K Street. (SOF ¶¶ 64-66). Nevertheless, it seeks to deduct the accrued interest in its calculation of the Appreciation Cash Payment. (SOF ¶ 66).

The plain language of the CPA demonstrates that Developer's Equity Return is not considered when computing Appreciation Cash Flow. (SOF ¶¶ 67-68). Nor is there any reference to Developer's Equity Return in the definition of "Approved Deductions." Courts are not at liberty to ignore the plain language and intent of the contracting parties. *United States Plywood Corp. v. Continental Cas. Co.*, 157 A.2d 286, 289 (D.C. 1960). This court should not reward MRLP's repeated and self-serving flip-flopping. Given the foregoing, this court should declare that it is **not** proper to deduct Developer's Equity Return when computing Appreciation Cash Flow.

## C. THE VALUE ASSIGNED BY MRLP TO THE TDRs SHOULD BE INCLUDED IN THE CASH APPRECIATION CALCULATIONS

The 90 K Street Property, which is the heart of this dispute, contained "Transferable Development Rights ("TDRs") that were attached to the Property. TDRs are development rights that can be transferred from one property to another property. They allow the receiving party the ability to add density to the structure on their property. As such, TDRs can have a "dramatic impact on the value of downtown properties." (SOF ¶ 89). They also provide the sending party the ability to reap significant profits if the TDRs are sold. (SOF ¶ 90). 90 K Street contained a

considerable amount of TDRs and so TDRs are a significant part of the value of 90 K Street. (SOF ¶ 104).

In Count II of its Second Amended Complaint, MRLP seeks a declaratory judgment that "the value of the purchase price attributed to the TDRs cannot be considered in determining the Cash Appreciation Payment" to Viad. (Second Amended Complaint, ¶ 42). In Count I of its Amended and Supplemental Counterclaim, Viad counters that the value assigned to the purchase of the TDRs is properly included in the calculation of the Cash Appreciation Payment, and requests a declaratory judgment to that effect. (Counterclaim, ¶ 7).

### 1.      MRLP's Removal of the TDRs from the Purchase Price of the Property Is a Sham

When the parties initially contracted in the 1980s, TDRs had not been created. In the CPA, however, Viad was guaranteed 15% of the total appreciation of the 90 K Street Property based upon its Agreed Value. Over time, TDRs became available for the 90 K Street Property and significantly added to its overall value. In an effort to avoid having to make a payment, reflecting the increased vale of the property as a result of the addition of the TDRs, MRLP fraudulently designed a scheme to remove the TDRs from the purchase price of the property, inflate the value of the TDRs, and then sell the TDRs at this bloated price in a separate contract. Such actions would remove a considerable portion of the value from the overall worth of 90 K Street. MRLP's motive was clear – to avoid having to pay Viad its fair share of the appreciation of the property. MRLP's actions are a sham and as such, the Court should find that the value assigned by MRLP to the TDRs should be included in the Cash Appreciation calculations.

### i.      *Under the CPA, Viad is Owed 15% of the Total Appreciation of the 90 K Street Property, Based Upon Its Agreed Value*

In Article 3 of the CPA, the Developer is required to pay to Viad 15% of the appreciation realized by the Developer in the "sale, assignment, condemnation, conveyance,\ or other

disposition of all or any part of or interest in the Property." (SOF ¶ 12). MRLP has argued that it can sell the TDRs associated with 90 K Street separately from the land because they are not covered by this language. The amount that will be owed to Viad is known as the Appreciation Cash Payment. The CPA further provides that the Appreciation Cash Payment owed to Viad shall be based on the Agreed Value, less certain deductions as defined in the CPA. (SOF ¶ 151).

The Agreed Value is defined in Section 3.2 of the CPA as *the **greater** of the gross proceeds actually received in the sale of the property **or** the fair market value of the property*. (SOF ¶ 152). The requirement that the Agreed Value be alternatively based on a fair market value calculation serves as a safety check in the event that MRLP attempts to sell the property for a fraudulently low price.

### ii. Viad Has Created an Artificial Value for the TDRs and Then Removed them From the Overall Purchase Property and the Cash Appreciation Payment

In or about August 2006, MRLP signed an agreement with T.C. MidAtlantic Development, Inc. ("TCMD") for the sale of the 90 K Street Property. (SOF ¶ 117). This sale closed on January 11, 2007. (SOF ¶ 143). As part of this sale, MRLP sought to exclude Viad from participating in the appreciation of the property by creating a separate contract for the sale of the TDRs – the Agreement of Purchase and Sale of Transferable Development Rights – and allocating approximately a third of the purchase price, $21,387,929, to this separate contract. (SOF ¶ 117).

The contract provides for the sale of such rights to the buyer at eleven times the acquisition price paid by MRLP (*i.e.*, $6 per square foot) and approximately thirteen times the current market price of the TDRs (*i.e.*, $5.25 to $5.50 per square foot). (SOF ¶¶ 105, 109). MRLP created a new entity in the summer of 2006, Counterclaim Defendant Montgomery Road

TDR, LLC ("MRTDR"), to be a party to the separate contract selling TDRs.  (SOF ¶¶ 115-16).  This entity has the identical ownership as MRLP and is its alter ego.  (SOF ¶¶ 115-16).

### iii.  Removal and Separation of the TDRs from the Purchase Price is a Sham

The undisputed evidence demonstrates that the structure of the MRLP-TCMD sale documents, which segregate consideration for the purchase of the property into land value and value for the attributes of the TDR zoning, is a sham.  Currently, TDRs are selling at $5.25 to $5.50 per square foot.  (SOF ¶ 105).  Since 1998, they have ranged in price from $25.00 to $3.00 with an overall downward trend to the present.  (SOF ¶ 101).  MRLP's own expert, Stuart Smith, testified that on one recent occasion, he determined the value of the TDRs in the North Capitol receiving zone, where 90 K Street is located, to be $3.50 per FAR.[6]  (SOF ¶ 110).  The evidence demonstrates that MRLP paid $6.00 per square foot for the TDRs that were subsequently sold to TCMD for $70 per square foot as part of the 90 K Street transaction – over thirteen times the current market price of $5.25 to $5.50 per square foot.  (SOF ¶¶ 105, 109).

The agreements with TCMD included a so-called Umbrella Agreement.   Under that document, sale of the land at 90 K Street was conditioned on the purchase of 45 L Street, the adjoining lot, and on the purchase of TDRs at a price sufficient to provide compensation for MRLP at an FAR value of $70 per square foot.  (SOF ¶ 121).  The Umbrella Agreement is a critical link establishing the relationship between the property and the TDR's;  one could not be purchased without the other, and the prices of the two were linked.

Thus, MRLP acquired TDRs for $6 per square foot or less for use at 90 K Street and is claiming a sale price of $70 per square foot in re-selling them to TCMD.  (SOF ¶¶ 109, 121).

---

[6] FAR represents Floor Area Ratio, which is a measure that describes the ratio of the total floor area of buildings on a certain location to the size of the land of that location, or the limit imposed on such a ratio.

The artificial nature of this price is readily apparent. TCMD has admitted in deposition testimony that the price paid to MRLP for TDRs was well-above the market price and was agreed to only because purchasing the TDRs at an inflated value was a requirement imposed by MRLP as a condition for purchasing the land at 90 K Street, even though they could be purchased for $5.25 to $5.50. (SOF ¶¶ 105, 129).

The cost of acquisition of the TDRs by MRLP is clearly a deductible cost under the CPA in calculating the payment due to Viad. Thus, Viad would not be entitled to any share of the market value per square foot price received by MRLP to reimburse it for utilizing the property to its full extent. It is, however, entitled to the share in the amount artificially assigned to the TDRs by MRLP to the extent they exceed the cost of acquisition. By fixing an arbitrary inflated price for selling the TDRs at 90 K Street (a price equal to price per FAR for the land), MRLP has unabashedly tried to deprive Viad of its share of that portion of the value of the property.

In fact, if this arbitrary pricing were permitted, MRLP would always be able to adjust the calculation for the land in order to deny Viad any participation. In fact, as set forth below, the history of the sale transaction demonstrates MRLP's willingness to make adjustments for that very purpose.

In the summer of 2006, TCMD had learned through its broker that a large property in the NoMa area was available for "roughly $100 million."[7] (SOF ¶ 122). There was a subsequent face to face meeting between representatives of TCMD, Sam Rose and Reid Liffmann, and the price discussed, or at least the expectation of the parties regarding price, was known to be, approximately $100 million. (SOF ¶ 123). In discussions between TCMD and MRLP, there was

---

[7] NoMa is short for "North of Massachusetts Avenue" and is a neighborhood in the Northwest and Northeast quadrants of Washington, D.C.

never any differentiation made in the discussions of price between the two parcels (90 K Street and the adjoining 45 L Street) or between TDRs and land.  The only discussion "was relating to [the] total FAR."  (SOF ¶ 124).  The buyer analyzed the sale in terms of the total FAR, which it priced at approximately $70 per square foot. (SOF ¶ 125).  In fact, the "experience" of TCMD was that the District government would allow a FAR of up to 10 in this area, and it calculated its expected yield on that basis.  (SOF ¶ 126).

But, In or about October 2006, TCMD determined that it did not need to purchase as many TDRs as the contracts provided because they could not be used in the development plans under consideration.  (SOF ¶ 127).  Although the contracts were amended, the total dollar amount for the purchase of TDRs by TCMD from MRLP was not changed.  (SOF ¶ 127).  Instead, the price per TDR was increased by an amount necessary to insure that MRLP was paid the same amount (roughly $100 million) even if the total number of TDRs it sold was reduced. (SOF ¶ 127).  Under MRLP's theory, the "profit piece" was guaranteed to MRLP, regardless of the actual number of TDRs sold.  This merely confirmed the "bargain," according to Daniel Hudson, President of TCMD, that MRLP would be paid for the achievable FAR regardless of how the price was allocated between TDRs and land.  (SOF ¶ 129).  In sum, the undisputed evidence demonstrates that the purchase price for the 90 K TDRs was only achieved by affixing the TDRs to the 90 K Street Property.

Furthermore, the draft agreements demonstrate that efforts were made to delete any reference to the TDRs as "property."  For example, in one draft agreement, Section 3.5(a) states that upon closing, the Seller shall deliver a deed, which shall include the TDRs.  (SOF ¶ 119). Inserted next to this section is the following comment:  ("Why are the TDR's [*sic*] here –

because they run with the land – would prefer not to have this clause here – thinking about Cooter/Viad?")  (SOF ¶ 119).

The evidence demonstrates that the decision to separate the TDRs and the land into separate contracts was merely a fraudulent, bad faith attempt to deprive Viad of its Appreciation Cash Payment.  As shown above, the CPA does not support such a distinction.  As a result, this court should find that MRLP's interpretation is incorrect and that the purchase price paid by TCMD for the TDRs is properly included in the calculation of the Appreciation Cash Payment.

### 2. Under the Plain Language of the CPA, TDRs Should be Included in the Cash Participation Calculations

Despite MRLP's fraudulent behavior, the Court can look to the CPA directly to help its determine that the assigned value of the TDRs should be included in Cash Participation calculations.  Several terms, as defined in the CPA and by their plain meaning, incorporate TDRs into the CPA.  As a result, the Court should find that the MRLP-assigned value of the TDRs should be included in the total calculation of the Agreed Value and the Appreciation Cash Payment.

#### i. TDRs Are an "Interest in the Property"

Under the CPA, one of the events that triggers the payment of an Appreciation Cash Payment to Viad is "the sale, assignment, condemnation, conveyance or other disposition of all or any part of or **interest in the Property**."  (SOF ¶ 12) (emphasis added).  Thus, if an "interest in the property" is sold, assigned, condemned, conveyed, or otherwise disposed of, MRLP is responsible for paying Viad for its share of the appreciation of that interest.

Neither the phrase "interest in the property" or the term "interest" is defined in the CPA.  As well, the experts in the case were not asked what "interest in the property" means.  Thus, the Court is left with the choice of examining the plain language of the phrase itself, analyzing the

nature of the TDRs for a greater understanding of whether it fits under the definition, and examining relevant case law to aid in determining whether TDRs are an "interest in the property." Under any of the three methods, the Court should find that TDRs are an "interest in the property."

Under a plain language analysis, TDRs are clearly an "interest in the property."[8] "Interest" is defined by Black's Law Dictionary as a "legal share in something; all or part of a legal or equitable claim to or right in property." Blacks Law Dictionary 828 (8th ed. 2004). A TDR, or without the acronym, a Transferable Development Right, naturally fits under this definition. A TDR is, by its own name, a "right." This right is associated with the property for which it is designated (whether real property or improvements) and therefore a TDR, under the plain language of the CPA, should be viewed as an "interest in the property."

If the Court were to examine the nature of TDRs in order to better understand whether they fit under the definition, it would also find that the TDRs are an "interest in the property." TDRs have value, are used for the benefit of the property, and their sale or transfer is recorded via covenants and certificates in the land records of the District of Columbia, (*See* 11 DCMR 1709.11). These characteristics bear all the hallmarks of a traditional understanding of an "interest in property."

As even further evidence, the experts employed in the case examined TDRs as an essential element of or interest in the 90 K Street property. The property at 90 K Street is in a "receiving zone" and may by right acquire TDRs to increase density from 6.5 FAR to as much as 10.0 FAR. (D.C. Mun. Regs. tit. 11, § 1707.5 (d); SOF ¶ 103). In Ms. Giordano's expert

---

[8] "In the construction of a contract the intention of the parties is to prevail, and in ascertaining this intention the language is to be given its plain and ordinary meaning." *Friedman v. Decatur Corp.*, 135 F. 2d 812, 815 (D.C. Cir. 1943).

opinion, the establishment of a receiving zone is effectively an up-zoning of the properties located within the zone to a higher matter-of-right density. (Giordano Report at 5; SOF ¶ 102). Consistent with this principle, MAI appraiser Steven Halbert based his valuation of 90 K Street on its total development potential of 10.0 FAR. (Expert Report of Steven Halbert ("Halbert Report") at 27 & 37; SOF ¶ 156). This is the common approach to finding fair market value of a property. Because TDRs are readily available for a reasonable – even nominal – price, it follows logically that the value of a property in a receiving zone will reflect the full potential – and the full set of interests in that property – for development.

Moreover, the evidence demonstrates that TCMD only paid the purchase price, more than $67 million for 90 K Street, because the up-zoning permitted the TDRs to be applied to the determination of the total FAR. In fact, Daniel Hudson, President of TCMD, testified that TCMD analyzed the sale in terms of the total FAR. (SOF ¶ 125). In TCMD's experience, the District of Columbia government would allow a maximum of 10.0 FAR on 90 K Street, and it calculated its expected yield on that basis. (SOF ¶ 126). Under the D.C. regulations, 10.0 FAR is only achievable when the TDRs are included. (D.C. Mun. Regs. tit. 11, § 1707.5 (d); SOF ¶ 103).

As an inherent part of the value of the land, the TDRs are clearly an "interest in the Property" under the plain language of the CPA. The nature of the TDRs and the previous actions taken by the parties support a finding that TDRs are an "interest in the property."

Relevant case law also suggest that TDRs are an "interest in the Property." One court explicitly stated that TDRs "constitute a taxable property interest" and found that the term includes other unsufrucuary interests. *Mitsui Fudosan (U.S.A.), Inc. v. County of Los Angeles*, 268 Cal. Rptr. 356, 358 (Cal. Ct. App. 1990). In *Mitsui*, the Court considered whether TDRs

which had been purchased by the respondent could be taxed upon transfer.  To reach its decision, the court analyzed whether TDRs constituted real property interests.  Although the court found that the word "land" was "not specifically defined by the revenue and taxation code or related property tax regulations", it did find that "the sort of property in land which is taxable . . . is not limited to the title in fee, but is sufficiently comprehensive to include any unsufrucuary interest."[9] *Id*.

By specifically extending the definition of "property" in land to include TDRs, the court concluded that the value of the TDRs should be assessed on a tax basis upon transfer.  Further, the court found that transactions involving TDRs "bear all the hallmarks of a transfer in real property."  *Id*.  The court noted that valuable consideration had been rendered in return for a divesting of a portion of property interest.  *Id*.

### ii.  TDRs Are "Improvements" and Therefore Property

It is also reasonable for the Court to find, from the plain language of the CPA, that TDRs are Improvements and, therefore, "Property" as used in the CPA language "interest in the Property."  Once the Court concludes that TDRs are Property, then the trigger contained in Article 3 of the CPA would be activated, requiring MRLP to pay Viad its share of the appreciation of the Property.

According to Section 1.32 of the CPA, "Property" includes "the Improvements and the Real Property."  (SOF ¶ 12).  The term "Improvements" is defined as "all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the Real Property."  (SOF ¶ 12).  While the term "other improvements" is circular and vague, it was

---

[9] Unsufruct is defined as the legal right to use and derive profit from property belonging to someone else provided that the property itself is not injured in any way.

clearly added so that the definition of "Improvements" reached items beyond just building and structures.

By inserting the "other improvements" language, it is reasonable to conclude that the parties contracted to include this phrase so that additional improvements, perhaps not easily defined or yet known, would be covered by the definition. None of the experts deposed in this litigation were asked to define "other improvements" or whether TDRs fell under that definition. When asked to list improvements, the experts immediately suggested that buildings and structures would qualify but did not limit the definition to those items and were not asked whether items like TDRs would be excluded from their own definition. (SOF ¶¶ 130-32).

At the same time, the same reasoning that allows buildings and structures to be defined as "improvements" should be applied to determining whether a given item falls under the "other improvements" aspect of the definition in the CPA. Once a building or structure (such as a sidewalk or drainage system) is constructed on a given piece of property, it is deemed an improvement because its addition has added utility and value to the piece of property. In fact, this is precisely how Black's Dictionary defines "improvement" – as "an addition to real property, whether permanent or not; esp., one that increases its value or utility or that enhances its appearance." Blacks Law Dictionary 773 (8th ed. 2004). Thus, "other improvements" should be construed similarly.

Other courts have taken this suggested approach by examining the plain meaning of the term improvements. Courts, in a number of jurisdictions, including Maryland,[10] have examined

---

[10] As courts in this jurisdiction have stated, the District shares its common law with Maryland, making its case more persuasive than other jurisdictions. *See West v. United States*, 866 A.2d 74, 79 (D.C. 2005) (stating that the District of Columbia derives its common law from Maryland); *Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp.)*, 353 B.R. 324, 352

*Continued on Next Page*

the definition of improvement in an effort to align their reasoning with a "common-sense, ordinary meaning." *Rose v. Fox Pool Corp.*, 643 A.2d 906, 918 (Md. 1994). The *Rose* Court further stated that considerations that a court should consider in making its case by case determination include "the nature of the addition or betterment, its permanence and relationship to the land and its occupants, and its effect on the *value* and use of the property. . . ." (emphasis added).

Similarly, in Arizona, the court found that "an improvement . . . encompasses everything that permanently enhances the *value* of the premises for general use." *Arizona Dep't of Revenue v. Arizona Outdoor Advertisers, Inc.*, 41 P.3d 631, 634 (Ariz. Ct. App. 2002) (emphasis added).

TDRs are intangible, unlike a building or sidewalk, but their addition to a piece of property undoubtedly adds value to that property. (SOF ¶ 89). TDRs effectively allow the land to have greater permitted density, which almost always adds value to that piece of property. (SOF ¶ 91). By adding value, TDRs can reasonably be construed to fit under the definition of "other improvements."

      **3.**      **The Extrinsic Evidence Supports The Argument that TDRs Should be Included in the Cash Participation Calculations**

Although Viad believes that Court can adjudicate this disagreement between the parties by simply looking at the plain language of the CPA, the Court may choose, if it finds the contract language to be ambiguous, to look at extrinsic evidence to assist in deciphering how best to treat the TDRs. *United States ex rel. DOL v. Insurance Co. of N. Am.*, 135 F. 3d 1037, 1042 (D.C. Cir. 1997) (noting that when contract provision is ambiguous, extrinsic evidence may be necessary to ascertain the mutual intent of the parties and thus resolve the ambiguity, and its admission is

_____

(Bankr. D.D.C. 2006) (noting that Maryland shares its common law with the District of Columbia).

within the province of the district court). The extrinsic evidence amply demonstrates that the parties intended to treat TDRs as an "interest in the Property" or an "Improvement" to the property.

Beginning in its Special Purpose Financial Statement for 2000, MRLP listed the cost of acquiring TDRs and the legal fees associated with the acquisition as expenses that were deductible against Viad's payment from yearly operations. (SOF ¶ 114). MRLP continued to list TDR expenses as a deduction in its statements for 2000, 2001, 2002, 2003, 2004 and the draft statement for 2005. (SOF ¶ 114). MRLP only removed the TDR expenses in the revised statement for 2005, which was submitted by MRLP's counsel in November 2006 after depositions in this case. (SOF ¶ 120). According to MRLP's 30(b)(6) witness Reid Liffmann, based on the advice of litigation counsel, it was determined that the previous deductions taken for TDR expenses were "an administrative mistake." (SOF ¶ 120).

Furthermore, MRLP has recorded its prior purchases of TDRs in the Land Records for the District of Columbia for 90 K Street. (SOF ¶¶ 112-13). The fact that the District of Columbia requires TDRs purchases to be recorded in the District's Land Records indicates the inherent nature of TDRs, at least in the view of the city officials who created the rights, is one that can be associated with real property.

When MRLP signed the agreement with Level 3 Communications in 2000 for the sale of 90 K Street, there were TDRs recorded on the Property at that time. (SOF ¶ 113). In that agreement, the definition of property included "development rights." (SOF ¶ 113). Although this agreement is not at issue in this case, it is evidence of MRLP's beliefs and treatment regarding the nature of the TDRs.

In sum, MRLP's conduct demonstrates that it has for many years treated TDRs as part of the 90 K Street Property. It was not until ten months after this litigation began that MRLP, for the first time, asserted that the purchase price paid by TCMD for the TDRs is not properly included in the calculation of the Appreciation Cash Payment. (SOF ¶ 120).

The D.C. Code also supports a conclusion that TDRs should properly be construed as "Property" or as "Improvements" to the property. Although "land" is not explicitly defined, as in the *Mitsui* case, and TDRs are not discussed in the D.C. Code, the Code does include in its definition of "real property", interests that would be deemed "unsufrucuary" by the *Mitsui* court. For example, Section 6-1003 of the D.C. Code defines "real property" to include "air rights, water rights, and other interests therein." D.C. Code § 6-1003 (2001).

Even thought the contract language fully supports Viad's argument that the value assigned to the TDRs should be included in the Cash Appreciation calculations, the Court, if it finds the contract language to be ambiguous, can also rely on the extrinsic evidence, which further supports the inclusion of the value assigned to the TDRs.

## D. MRLP HAS DEFAULTED UNDER THE CPA

During the course of this litigation, MRLP has failed to comply with the requirements of the CPA with regard to its accounting practices and reports to Viad. As a result, summary judgment should be granted for Viad on Count II of the Amended and Supplemental Counterclaim for Breach of Contract.

### 1. MRLP Has Failed to Identify an Appraiser to Contest Fair Market Value

Under the CPA, once Viad has received notice of an occurrence of an event that requires the determination of the fair market value, the parties may agree on the fair market value or, if they are unable to do so, the parties may select appraisers to determine the value. (SOF ¶¶ 155-

57). On January 11, 2007, Viad received notice that MRLP had sold 90 K Street for more than $67,000,000. (SOF ¶¶ 143-44). This date was crucial, as it represented a conclusive notice that the sale had closed and was complete.[11]

Following this notification, the parties had thirty days to agree on the fair market value of the property, If the parties were unable to agree, they would then have 15 days to select an appraiser. (SOF ¶¶ 157-58). On January 31, 2007, Viad provided to MRLP a report and an opinion, prepared by an MAI appraiser, as to the fair market value of the Property in accordance with Section 3.8 of the CPA. (SOF ¶ 155). The appraiser, Steven Halbert, opined that the fair market value of the Property was $64,800,000 (SOF ¶ 156). Because Viad sent its appraisal report, indicating its belief that an agreement on fair market value could not be reached, on January 31, 2007, the time period for identifying the appraiser lapsed 15 days later on February 15, 2007. (SOF ¶ 158). MRLP had not selected an appraiser and still has not. On February 21, 2007, Viad sent MRLP a letter notifying MRLP that it had failed to select an appraiser as required under the CPA. MRLP did not respond to this letter, despite having thirty days under the CPA to cure its default. (SOF ¶¶ 149-150). MRLP is in default under the CPA for failing to designate an appraiser, as required under the CPA.

As a result of this default, MRLP has submitted no admissible evidence of an appraisal or consequently, the fair market value of the property. Thus, the appraisal submitted by Viad's appraiser is the only evidence of the fair market value that has been put before the Court.

---

[11]   Viad's reliance on this date was reasonable. Earlier dates, such as when Viad received amended contracts for the sale of 90 K Street mid-December were inappropriate dates to utilize because the transaction regarding the property had not yet closed at that time.

## 2. MRLP Defaulted by Failing to Provide Timely Financial Statements as Required under the CPA

The undisputed evidence demonstrates that MRLP failed to provide timely financial statements for fiscal years 2005 and 2006. This failure to timely provide financial statements under Section 2.6 of the CPA is a default under the contract. (SOF ¶¶ 133-34).

Section 2.6 of the CPA requires financial statements and schedules to be submitted within 120 days of the end of the Fiscal Year (defined as December 31 in § 1.19). The CPA requires the certification of an independent certified public accountant applying generally accepted accounting principles on a consistent basis to the books and records of MRLP. (SOF ¶ 135).

### i. The 2005 Financial Statements

Under the terms of the CPA, the 2005 Financial Statements and Schedules were due to Viad from MRLP in the spring of 2006. They were not provided until November 21, 2006 – a full seven months late. The documents that were delivered to Viad at that time were a compilation of financial data, under cover of a letter from attorney Dale Cooter, its litigation counsel, with his opinion that the financial data was a correct statement of expenses and other deductions under the CPA. (SOF ¶ 135). These "Cooter Financials" do not remotely comply with the requirements of the CPA. (SOF ¶ 136). Here again, MRLP defaulted under the CPA.

Furthermore, the Cooter Financials are inconsistent with tax returns filed by MRLP. (SOF ¶ 137). Specifically, the Cooter Financials classify all out of pocket expenses by MRLP in maintaining the land as loans rather than as equity investments in the Property, whereas the actual accounting and tax treatment of these items for all other purposes, and in prior financial statements submitted by MRLP to Viad, classified these expenses as equity. (SOF ¶ 137).

The purpose and intent of the Cooter Financials is to change retroactively the accounting for MRLP's ownership of the Property for the purpose of increasing artificially those items that

31

might be deducted as an expense from the Agreed Value of the Property upon sale and, thus, defeat the possibility of a payment to Viad.  (SOF ¶¶ 138-41).  Like the structure of the MRLP-TCMD sale documents, which purport to segregate consideration for the purchase of the Property by TCMD into land value and value for attributes of the zoning, thus lowering the Agreed Value under the CPA, the failure to provide financial statements for 2005 and to substitute during this litigation the Cooter Financials is a sham which fraudulently seeks to increase the possible deductions or adjustments to the payment due to Viad. (SOF ¶¶ 138-41).

### ii.  The 2006 Financial Statements

Under the terms of the CPA, the 2006 Financials Statements were due to Viad on April 30, 2007.  Viad did not receive these statements, despite being in the midst of this litigation. Under the plain language of the CPA, MRLP once again defaulted under the CPA.

As a result, Viad had to rely on 2004 statements and the un-audited and vastly altered 2005 statements in assessing the true value of its share of the Appreciation Cash Payment.  After both sides had filed their initial rounds of Motions for Summary Judgment,  Oppositions to each other's Motions for Summary Judgment, and Replies to those Oppositions, MRLP decided to submit a Supplemental Filing on June 27, 2007, that contained allegedly audited statements for 2005 and 2006.   These new "financial statements" have not been subject to discovery so that they may be tested for their own validity or for the legitimacy of the independent auditor utilized by MRLP.  MRLP filed these documents without seeking the consent of the Court or of Viad.

These newly filed financial statements were almost two months late.  Once gain MRLP defaulted under the CPA.   These statements were also largely identical to the "Cooter Financials."    MRLP's efforts to cleanse the Cooter Financials with the now "unqualified opinion" of an outside auditor should be viewed with a  keen eye by the Court.  In fact, because

the Supplemental Filing was procedurally improper and MRLP made no effort to seek the Court's permission, Viad urges the Court to not consider the contents of the Supplemental Filing at all.

### 3. MRLP Has Failed to Fulfill Its Post-Closing Obligations Under The CPA

On January 11, 2007, MRLP proceeded to close on the MRLP-TCMD transaction. (SOF ¶ 143). The total consideration paid to MRLP for the sale of 90 K Street N.E. on January 11, 2007, including deferred compensation, was $67,424,457. (SOF ¶ 144). Under Section 3.2 of the CPA, MRLP was required to make the Appreciation Cash Payment within three (3) days of that closing. (SOF ¶ 145). However, no payment was made by MRLP at any time nor was any payment received by Viad as a result of the sale of the property on January 11, 2007. (SOF ¶ 146).

Furthermore, under Section 3.9 of the CPA, MRLP was required to deliver to Viad "a statement reflecting the Agreed Value, the Approved Deductions, the Closing Costs and the Appreciation Cash Flow used in calculating the Appreciation Cash Payment and a detailed breakdown of all items necessary for the calculation of each such item." (SOF ¶ 147). However, no "statement" as required by Section 3.9 has been delivered by MRLP to Viad. (SOF ¶ 148).

On February 21, 2007, Viad gave written notice to MRLP under Section 7.3 that it was in default under the CPA for failure to provide either a payment or a statement of the calculation of the payment. (SOF ¶ 149). The CPA provides that MRLP had a ten (10) day period to cure monetary defaults and a thirty (30) day period to cure non-monetary defaults after notice from Viad. (SOF ¶ 149). However, MRLP has made no effort to cure these defaults, and it remains in default. (SOF ¶ 150).

**4.    The Court Should Order an Audit of MRLP's Records to Determine The Calculation of The Cash Appreciation Payment**

Had MRLP made a good faith effort to disclose its costs and to provide reports in accordance with the CPA, a calculation of the 15% payment due to Viad could be readily accomplished upon resolution of the issues relating to the Agreed Value of the property.  But MRLP has not done that.  It has not provided financial statements on a cash basis, claiming deductions for interest payments to an affiliate which were never paid.  (SOF ¶¶ 64-66).  It has reversed course in calculating costs for acquiring TDRs removing them from its financial statements after filing this suit and after structuring the contract to separate the TDRs from the land.  (SOF ¶ 120).  It failed to provide the required statement of its costs and deductions after closing.  (SOF ¶¶ 143-48).

In these circumstances, the most reliable evidence of the proper calculation is the spreadsheet prepared by MRLP partner Reid Liffmann on January 9, 2007, intended for internal distribution only.  (SOF ¶ 138).  In that spreadsheet, Liffmann deducted the actual costs to determine the "Gain Allocated" to the partners.  (SOF ¶ 138).  The deductions listed are similar to those described in the CPA, including "project costs," broker's commissions, and closing costs.  (SOF ¶ 138).  Liffmann's calculations show a gain of $54,672,452.[12]  (SOF ¶ 138).  A payment to Viad of 15% of this gain would equal $8,200,868.  This calculation is surely a close approximation of the payment due to Viad.

Because of the defaults by MRLP in complying with the CPA, Viad requests that the Court order an audit of MRLP's records, at its expense, to determine whether or not other costs

---

[12]  The spreadsheet, like all internal and external correspondence and documentation on the subject combines the economics of the two sales contracts relating to 90 K Street, making no distinction between MRLP and MRTDR.

are to be recognized in the calculation.  The audit should be conducted by an auditor appointed by the Court with instructions to report within 30 days on the final calculation of the Appreciation Cash Payment.

## E.    VIAD HAS NOT DEFAULTED UNDER THE CPA

In its Second Amended Complaint, MRLP added a claim for attorneys fees not present in its original or First Amended Complaint.  (*See* Docket # 78).  To assert this claim, which mirrors one previously made by Viad, MRLP argues that Viad has breached the requirements of the CPA by "demanding" that an escrow account be created.  Viad has not breached the CPA and has instead followed its edicts precisely and fully.  Moreover, the creation of the escrow account was done by mutual consent of the parties and any claims by MRLP that it was coerced into the creation of the escrow defy reason and logic.

The creation of the escrow account was the result of a voluntary act by MRLP and its counsel, and of a voluntary relinquishment of a contractual right on the part of Viad, to facilitate the sale of 90 K Street while the dispute over payment is resolved.  (SOF ¶ 174).  The escrow account was formally created under a contract between the parties termed a "Deposit Agreement."  (SOF ¶ 174).  The Deposit Agreement states that "MRLP and Viad have agreed that, to facilitate the Sale, and in exchange for Viad's execution and delivery of certain Release Documents described below, MRLP will cause a deposit to be made in the amount of Four Million, Five Hundred Thousand Dollars . . . .  Both parties signed this agreement.  (SOF ¶ 174).  At the time of its creation, MRLP did not claim that it was coerced.  As well, any alleged coercion would fly in the face of rights Viad could rightfully rely on under the CPA.

Viad had no obligation under the CPA to release its lien on the property so that the TCMD-MRLP transaction could close.  In fact, under the CPA, Viad is entitled to retain its lien

after the closing and for the pendency of any dispute over payments owed to it.  Under Section

5.1 of the CPA:

> [a]ll sums to be paid to TLC[/Viad] hereunder and all covenants and obligations to be performed by Developer[/MRLP] pursuant to this Agreement shall be secured by the TLC Mortgage … it being the intention of TLC and Developer that this Agreement shall remain in effect and continue to be secured until all covenants and obligations of Developer to TLC hereunder have been fully satisfied, which shall be no earlier than ninety (90) days after all Operations Cash Payments and Appreciation Cash Payments have been made, or, in the event of a dispute concerning the amount of those Operations Cash Payments or Appreciation Cash Payments payable, until such dispute has been resolved. Notwithstanding any other provision of this Agreement, this Agreement shall continue in full force and effect until all covenants and obligations of Developer under this Agreement and the TLC Mortgage have been paid and/or performed in full at which time TLC shall execute and cause to be recorded a release of the TLC Mortgage and all other security instruments securing TLC.

(SOF ¶ 167).  Thus, Viad clearly had no obligation or duty to release its lien prior to or

simultaneous with the closing which is the premise of the new claim.  Furthermore, if there is a

dispute over the computation of the Appreciation Cash Payment, the lien is to remain in place

until the dispute has been resolved.   (SOF ¶ 168).   Currently, MRLP has not paid the

Appreciation Cash Payment and there is a dispute over the amount that should be paid.  As a

result, contrary to MRLP's assertion, Viad was under no obligation to release its lien.  (SOF ¶

169).  MRLP does not cite to any section of the CPA in support of its claim that "Viad's refusal

to execute a release of its lien, and its insistence of the $4.5 million escrow … constitutes a

failure by Viad to perform its obligations under the CPA."  This is because there is no section of

the CPA that supports MRLP's claim. (*See* Second Amended Complaint ¶ 46).


## F.    MRLP HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In its Amended and Supplemental Counterclaim, Viad has claimed that MRLP has

breached the implied covenant of good faith and fair dealing.  Since 1987 and extending through

this litigation, MRLP has endeavored to prevent Viad from receiving the benefits of the CPA. The undisputed evidence demonstrates that MRLP has not acted in good faith in its dealings with Viad.   MRLP owes Viad a duty of good faith and fair dealing and has violated that duty.  This continued abdication of its required duty is evidenced by numerous examples.

### 1.    Every Contract Contains the Implied Covenant of Good Faith and Fair Dealing

According to the D.C. Court of Appeals, "'all contracts contain an implied duty of good faith and fair dealing, which means that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Allworth v. Howard University*, 890 A.2d 194, 201 (D.C. 2006) (quoting *Paul v. Howard Univ.,* 754 A.2d 297, 310 (D.C. 2000)).   "'If the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, he or she may be liable for breach of the implied covenant of good faith and fair dealing.'"  *Id*.  The *Allworth* case is not alone in being so explicit.  "Under District of Columbia law, '**every** contract [contains] an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in **every** contract there exists an implied covenant of good faith and fair dealing.'" *Steele v. Isikoff*, 130 F. Supp. 2d 23, 32 (D.D.C. 2000) (quoting *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988) (emphasis added).[13]

---

[13]  MRLP has previously argued that the implied covenant of good faith and fair dealing does not apply to creditor-debtor relationships, which it likens to its relationship with Viad.  The majority of jurisdictions disagree with MRLP and hold that creditor-debtor relationships hold no special exemption from the traditional rule.  D.C. Courts have granted no such exemption.  This court should summarily dismiss such an argument as both bad policy and unaligned with the majority of courts.

In *Allworth v. Howard University*, the D.C. Court of Appeals looked to the Restatement for clarification of the meaning of "good faith":

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate standards of decency, fairness or reasonableness.

*Allworth v. Howard University*, 890 A.2d at 201-02 (quoting Restatement (Second) of Contracts, § 205 cmt. a.). The court also noted that "[b]ad faith involves evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. Bad faith means more than mere negligence." *Id.* at 202 (internal quotations and citations omitted). Finally, the court also found that "'fair dealing' involves reasonable rather than arbitrary or capricious action." *Id.* (citing *Adler v. Abramson*, 728 A.2d 86, 90 (D.C. 1999)).

## 2. MRLP Has Breached the Implied Covenant of Good Faith and Fair Dealing

With the full benefit of hindsight, the actions and omissions that MRLP has engaged in over the last twenty years amount to considerable evidence of its bad faith and unfair dealing towards Viad. MRLP has routinely sought to avoid its obligations under the CPA and has interfered with Viad's ability to perform under the contract. The CPA required that the accounting for the property by MRLP be on a cash basis and be "consistent." (SOF ¶63.) MRLP's conduct is far from consistent. Examples of this bad faith and unfair dealing include:

- For 20 years, MRLP has misrepresented the value of the property during conversations with Viad employees in an effort to deceive Viad into giving up its participation interest for a small price. For example, in 1995, Sam Rose wrote to Viad and claimed that 90 K Street

was worth only $5,000,000 and that MRLP's costs exceeded this amount. (SOF ¶ 32).  Yet only three years earlier, Sam Rose wrote to a potential buyer claiming that the property was valued at $26,000,000.  (SOF ¶ 32).

- MRLP has taken multiple and contradictory positions on the manner in which items should be classified in its financial statements with the intent to decrease the Appreciation Cash Payment to Viad.  (SOF ¶ 80).  During the first half of this year, MRLP, through the Cooter Financials, removed expenses associated with acquiring TDRs and has reclassified the amounts advanced by equity holders from equity to debt.  (SOF ¶¶ 74, 120).  The Cooter Financials conflict with the Reznick Analysis, which MRLP seeks to enforce as binding in this litigation. (SOF ¶ 79).  The Cooter Financials also conflict with MRLP's 2005 tax returns.  (SOF ¶ 137).

- After the closing on January 11, 2007, MRLP failed to provide a calculation of the Appreciation Cash Payment to Viad, as required under the CPA.  (SOF ¶ 143-48).  This calculation should have been provided to Viad three (3) days after the closing. (SOF ¶ 143-48).  Although Viad requested a statement of the calculation on February 21, 2007, no response was received until June, 27, 2007, a full six and a half months after the closing. (SOF ¶ 149-50).  MRLP's failure to ever provide this calculation is yet further evidence of MRLP's efforts to prevent Viad from receiving its benefits under the CPA.

- MRLP defaulted under the contract by not designating an appraiser in accordance with section 3.8 and 3.11 of the CPA.  (SOF ¶¶ 157-158).

- MRLP filed an un-consented to and unauthorized Supplemental Filing on June 27, 2007 before this court, nearly two months after the initial round of briefing had closed, and six months after discovery closed.  (*See* Docket # 42)  The Supplemental Filing sought to alter

and expand arguments made by MRLP and offered the untested "opinion" of the independent auditor long after discovery had closed. (SOF ¶ 162). This is another example of MRLP's belief that there is no need to act in good faith with either Viad or the Court.

- In the Supplemental Filing, MRLP has for the first time increased the value of "Land" from approximately $7.3 million to over $11 million. (SOF ¶ 164). When 90 K Street was purchased in 1987, it was acquired in exchange for land located in Howard County, Maryland that was owned by the partnership. (SOF ¶ 164). In every special purpose financial statement previously prepared by MRLP, the "Land" asset of 90 K Street was carried on the balance sheet at its purchase price ($10.3 million), plus settlement costs ($766,000) and reduced by the excess value received over the basis of the property of the exchanged property ($3.7 million). (SOF ¶ 164). This resulted in the "net cost of the land on the partnership's books" of just over $7.3 million. (SOF ¶ 164). This treatment was logical and in accordance with general accounting, and MRLP has reported this value for the land for nearly 20 years, through annual submissions to Viad. (SOF ¶ 164). Now, however, MRLP has, without explanation or justification, chosen to ignore the exchange value of the Howard County property in its calculation. and provides no reason for the change. (SOF ¶ 165). MRLP's accounting firm, KAWG&F, now has deleted an entire paragraph explaining the exchange that had been present in the notes to all other financial statements. Of course, by increasing the land value MRLP has increased a deductible cost, thus reducing by $3.7 million any appreciation under the CPA. (SOF ¶ 165).

- In the Supplemental Filing, MRLP eliminated or renamed several line items previously found on the partnerships' balance sheets. (SOF ¶ 166). In the previous KAWG&F compilation, the partnership's cost of purchasing TDRs for 90 K Street were listed under

"Project Costs" on the Balance Sheet. (SOF ¶ 166). This line item was listed under the assets of the partnership. (SOF ¶ 166). In the newly filed Special Purpose Financial Statements, MRLP has removed the category entitled "Project Costs." (SOF ¶ 166). A new category, entitled "Land Improvements" has been added. (SOF ¶ 166). MRLP has not explained the difference between the two categories. It appears that $140,000 of "Project Costs" have been reclassified as "Land Improvements" but the costs of the TDRs appear to be deleted. (SOF ¶ 166). MRLP's financials now state, in the notes to its newly filed financial statements, that "TDRs are a separate asset of the partnership and are not covered by the CPA." (SOF ¶ 166). This parsing of partnership assets purchased for use at 90 K Street from the accounting for the land itself is a reversal of prior accounting not justified by any explanation other than MRLP's own self-serving interpretation of the CPA.

The evidence demonstrates that MRLP has intentionally evaded the spirit of the CPA, willfully rendered imperfect performance, and failed to cooperate with Viad's performance under the CPA. *See Allworth,* 890 A.2d at 202. MRLP is likely to argue it has simply acted in its own self-interest, rather than in bad-faith, and that it has no duty to maximize Viad's Appreciation Cash Payment. But, there is a clear difference between acting properly in one's own self interest and crossing the line to act purposefully in bad faith. MRLP has acted willfully and with an intent to harm Viad. MRLP has evaded the requirements of the contract and sought to alter its own actions so as to deny Viad its rightful share of the Appreciation Cash Payment. MRLP owes Viad a duty of good faith. The numerous examples listed above show that MRLP's improper behavior rise above merely acting in one's own self-interest.

As a result, summary judgment should be entered for Viad on Count III of the Amended and Supplemental Counterclaim for breach of the implied covenant of good faith and fair dealing.

**G.    DUE TO MRLP'S DEFAULT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, VIAD IS ENTITLED TO ATTORNEYS FEES**

According to Section 7.4 of the CPA:

> If either party hereto shall bring suit against the other as a result of any alleged breach or failure of the other party to fulfill or perform any covenants or obligations under this Agreement, then in such event, the prevailing party in such action shall, in addition to any other relief granted or awarded by the court, be entitled to judgment for reasonable attorney's fees incurred by reason of such action and all costs of suit and those incurred in preparation thereof at both trial and appellate levels.

(SOF § 150). The evidence demonstrates that MRLP has defaulted under the CPA and breached the implied covenant of good faith and fair dealing. As a result, Viad requests that this Court award attorneys fees in addition to such other relief as this Court may deem proper.

## CONCLUSION

For the foregoing reasons, Viad requests that this Court enter Summary Judgment for Viad on Counts I, II, and III of the Second Amended Complaint and Counts I, II, III, and IV of the Amended and Supplemental Counterclaim.

Respectfully Submitted,

BRYAN CAVE LLP

By:   /s/ Rodney F. Page
    Rodney F. Page (DC Bar No. 37994)
    700 Thirteenth Street, N.W., Suite 700
    Washington, D.C. 20005-3960
    P:  (202) 508-6000
    F:  (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff Viad Corp*

Dated:  September 6, 2007