# EXHIBIT 4

Page 1

In the U.S. District Court

For the District of Columbia

---------------------------x

Montgomery Road I Limited    :
Partnership                  :
                             : NO. 1:06CV00344

        v.           :

                     :

Viad Corp., et al            :

---------------------------x

        March 7, 2007

DEPOSITION OF:

        Stuart I. Smith,

a witness, called by counsel pursuant to notice,

commencing at 2:00 p.m., which was taken at Bryan,

Cave, 700 13th Street, NW, Washington, DC 20005

Page 34

1  Q. What was it?
2  A. The value that we concluded for that
3  property was I believe $3.50 per FAR.
4  Q. In the other matter, the one in southeast,
5  if I understand you correctly, Mr. Smith, you
6  weren't coming up with a specific dollar value, am I
7  correct?
8  A. I was researching a transaction that
9  occurred in southeast Washington, the value of which
10 was a function in seller's and purchaser's mind that
11 would be affected by TDR's and so that began the
12 discussion about TDR's and what anticipated values
13 were for TDR's.
14 Q. How did you research the value of TDR's?
15 A. We research the value of TDR's by going to
16 purchasers of TDR's and asking them how much they
17 paid for them.
18 Q. If I can go back for a minute to the
19 process for doing your letter of February 16. You
20 have mentioned at least a couple of conversations
21 with Mr. Cooter.

Page 35

1  A. Yes.
2  Q. You had a conversation with Mr. Liffman
3  that I take it from what you said did not result in
4  a substantive conversation.
5  A. Correct.
6  Q. Were there any other individuals or any
7  other conversations in addition to the ones we just
8  mentioned?
9  A. No, sir.
10 Q. Did you have anyone within your company
11 work with you on this assignment?
12 A. No, sir.
13 Q. This was all then your own work product?
14 A. Correct.
15 Q. Did there come a time when you had a draft
16 prepared of your letter?
17 A. I typically go through several drafts of
18 the letter trying to winnow out things that are
19 either confusing or irrelevant.
20         MR. PAGE: Let's mark this as exhibit
21 seven.

Page 36

1       (Whereupon the proffered item was
2  marked as exhibit number 7.)
3  BY MR. PAGE:
4  Q. I'm going to hand you what was just marked
5  as exhibit number seven.
6     This comes, again, from your file that was
7  produced to us.
8  A. So much for confidential draft reports.
9  Q. The rules are the rules.
10 A. I understand.
11 Q. The first page is a copy of your cover
12 e-mail.
13 A. Yes.
14 Q. It appears that the draft was sent to
15 Mr. Cooter on the morning of February 16, correct?
16 A. It does appear that way.
17 Q. That's the same day as the final letter is
18 dated, correct?
19 A. That's true, although this one letter was
20 dated on the 15th. Sometimes I'm a little sloppy
21 with redated transmittal letters. I apologize.

Page 37

1  Q. No problem. Attached then is your letter
2  dated the 15th and I take it this is your first
3  draft?
4  A. Let me explain to you.
5     I don't retain drafts. I go through, do a
6  draft. In this particular case Mr. Cooter probably
7  retained them.
8         MR. COOTER: Probably came out of my
9  pile.
10        MR. PAGE: It appears there are two
11 or three drafts, all of which were in the papers
12 produced to us from your file.
13        It might be quicker actually if we put
14 all of them in front of you. I don't plan to go
15 through a lot of detail so we're not confusing one
16 version with another.
17        THE WITNESS: Sure.
18        MR. COOTER: I believe, just given
19 the fax logo on top, I think we simply replicated
20 our e-mails with him as part of his production. I
21 don't know that this came from his files. There's

Page 62

1  additional consideration certain TDR's from the
2  seller (the TDR agreement)."
3      Do you see that?
4   A. Yes.
5   Q. Did you have any discussion with
6  Mr. Cooter or Mr. Liffman about this particular
7  paragraph?
8   A. I did not.
9   Q. Did you ask any questions about this other
10 agreement that is referred to here?
11  A. I did not.
12  Q. Do you know what the consideration that is
13 referred to in this agreement is or was?
14  A. I do not.
15  Q. Do you know who the parties were to the
16 TDR agreement?
17  A. Not with certainty.
18  Q. Were you ever shown a document called the
19 umbrella agreement?
20  A. No.
21  Q. Were you ever told that the sale of this

Page 63

1  property was contingent and conditioned upon the
2  purchase of the TDR's in the other agreement?
3   A. No, but is that something that's in this
4  document?
5      It's been a while since I've read this
6  document. But I was not told.
7   Q. I'm going to hand you a document we've
8  marked as exhibit twelve.
9      (Whereupon the proffered item was
10     marked as exhibit number 12.)
11 BY MR. PAGE:
12  Q. My question to you is have you seen this
13 document?
14  A. I have not seen this document.
15  Q. I'm not asking you to read it but I want
16 to ask you just a couple of quick things.
17  A. Sure.
18  Q. Look at the very first paragraph at the
19 top.
20  A. The umbrella agreement?
21  Q. Yes. There's a reference there to

Page 64

1  45 L Street Venture. Do you see that?
2   A. I do.
3   Q. Was there ever any discussion with you
4  about a property at 45 L Street in any way in
5  connection with your work looking at the document
6  that you looked at?
7   A. No, sir.
8   Q. Are you aware of a sale of the property at
9  45 L Street at about the same time the property at
10 90 K Street was sold?
11  A. No, sir.
12  Q. What I'd like to do now is go back to your
13 final report and, as I said, I think it's attached
14 to exhibit two.
15     Are you looking at a copy other than our
16 exhibit?
17  A. Correct.
18  Q. I prefer you look at the exhibit. For
19 everybody's clarity, my view is you should not have
20 other documents in front of you except the exhibits.
21 Do you agree with that, Mr. Cooter?

Page 65

1      MR. COOTER: I don't quarrel with the
2  notion that he shouldn't look at your documents.
3      MR. PAGE: I don't want there to be
4  any dispute about which version of the final report
5  we're looking at, so use the exhibit which is
6  exhibit two.
7      That way we will always know we're
8  looking at the same document when it is attached to
9  the report.
10 BY MR. PAGE:
11  Q. There are a few things I want to ask you
12 about here. Some of these may have already been
13 alluded to.
14     I'm not trying to be redundant but I want to
15 make sure I've got the whole picture here.
16     The assignment that you had in preparing
17 this letter was not to do your own opinion of value.
18 That is correct, is it not?
19  A. Correct.
20  Q. What you did, as I understand it, is
21 something that in the jargon of appraisers is called

Page 66

1  an appraisal review.
2     A. Correct.
3     Q. An appraisal review is actually a term of
4  art in the appraisal business, is it not?
5     A. I don't know what you mean by a term of
6  art.
7     Q. There are published standards by the
8  Appraisal Institute as to how to conduct an
9  appraisal review, are there not?
10    A. Correct.
11    Q. There are basically two kinds of appraisal
12 reviews, if I'm correct.
13       There's one in which an appraiser sets forth
14 his own alternate opinion of value and one in which
15 the appraiser does not.
16    A. That's correct.
17    Q. You did the latter in this case, am I
18 correct?
19    A. The one where the appraiser does not,
20 correct.
21    Q. So that neither as an original proposition

Page 67

1  nor as a reviewer did you come to an opinion of
2  value yourself?
3     A. Correct.
4     Q. I think in the fourth paragraph on the
5  first page you state specifically you are not
6  performing your own opinion of value, producing your
7  own opinion of value, is that correct?
8     A. Yes.
9     Q. In the fifth paragraph on this first page
10 right after what I just asked you about you
11 state: "We have introduced some additional market
12 information that should have been considered as of
13 the date of value and some additional information
14 regarding the pending/actual sale of the property
15 which may not have been known to Mr. Halbert at the
16 time of his report."
17      Do you see that?
18    A. I do.
19    Q. Let me deal with the second piece of that
20 first.
21    A. All right.

Page 68

1     Q. Your first in the second half of that
2  sentence is to the actual sale pursuant to the
3  document we looked at a minute ago, correct?
4     A. Correct.
5     Q. In sequence that occurred after the
6  report, the appraisal report that Mr. Halbert
7  prepared, right?
8     A. Correct.
9     Q. So the contract itself had not even been
10 entered into at the time you did this report?
11    A. Probably not.
12    Q. We have the date of the contract.
13    A. Yes.
14    Q. Sequentially it just happened, right?
15    A. Yes.
16    Q. You took into account the fact that there
17 was a later sale is what you're saying, right?
18    A. Yes. I didn't take into account. I just
19 simply reported there was a later sale which I
20 thought was useful to my client in this document but
21 I wanted to make sure that the reader understood

Page 69

1  that I was not judging Mr. Halbert on the basis of
2  information he may or may not have known.
3     Q. Because he couldn't have had that
4  information?
5     A. Yes.
6     Q. Let's focus on the first part of the
7  sentence. You say: "We have introduced some
8  additional market information that should have been
9  considered as of the date of value."
10      What information is that?
11    A. I don't remember. May have been -- I'm
12 trying to think of what that was.
13    Q. Did you look at any information relating
14 to comparable sales?
15    A. I did not, other than what was missing in
16 Mr. Halbert's report.
17    Q. You don't recall today then what that
18 additional information was?
19    A. No, sir, I don't.
20    Q. If as we go through the rest of your
21 report it occurs to you as you look at something

Page 82

1    You were telling me what you thought an as
2 is value meant, what it was, and I'm only asking you
3 whether in developing an as is value standards rule
4 1-3 applies to the development of an as is value?
5    A.  Yes.  These all apply to Mr. Halbert's
6 development of his report.
7    Q.  Standards rule 1-3A states "an appraiser
8 must identify and analyze the effect on use and
9 value of existing land use regulations reasonably
10 probably modifications of such land use regulations,
11 economic supply and demand, physical adaptability of
12 the real estate and market trends."
13    Do you see that?
14    A.  Yes.
15    Q.  Is it your contention that what
16 Mr. Halbert did went beyond looking at existing land
17 use regulations, reasonably probable modifications,
18 et cetera?
19    A.  I don't think the right word is "going
20 beyond."
21    I think the definition he proposed in his

Page 83

1 report in his appraisal was incorrect.  It made some
2 assumptions about the density of development on the
3 site which were not necessarily with the definition
4 of as is value.
5    He could have come to those conclusions that
6 he made by offering or providing a different value
7 other than an as is value or he could have provided
8 a value where he would have qualified that by
9 specifically providing or identifying whether there
10 was a hypothetical or extraordinary assumption, but
11 he didn't.
12    Q.  In fact, it should have been, in your
13 view, an extraordinary assumption?
14    A.  Correct.
15    Q.  Extraordinary because of what?
16    A.  Of the definition of --
17    Q.  Look on the same page that we have in
18 front of us from the standards.
19    A.  Okay.
20    Q.  Under standards rule 1-2 there's a
21 requirement that an appraiser identify any

Page 84

1 extraordinary assumptions.
2    Do you see that?
3    A.  1-2?  What are you looking at?
4    Q.  Exhibit 14, start on the second page which
5 has standards rule 1-2.
6    Do you see that?
7    A.  Correct.
8    Q.  This standard states:  "In developing a
9 real property appraisal an appraiser must," and then
10 if we skip down to item F which is on the third page
11 which is where we were, "identify any extraordinary
12 assumptions."
13    Do you see that?
14    A.  Yes.
15    Q.  Then it provides what appears to be some
16 qualifications or definitions, if you will, of the
17 extraordinary assumption.
18    Do you see that?
19    A.  Yes.
20    Q.  Your testimony was that had Mr. Halbert
21 said there's an extraordinary assumption his values

Page 85

1 would have been okay, is that right?
2    A.  If he had conditioned this assumption that
3 this was an extraordinary assumption then yes, he
4 could have stated that.
5    Q.  What would have been the extraordinary
6 assumption that he should have revealed?
7    A.  The fact that the FAR that he was basing
8 it on, I think what he called potential density, he
9 didn't indicate in his report that they had these
10 additional FAR in their pocket.  He simply called
11 them potential development density.  That's just
12 incorrect.
13    Q.  Incorrect because?
14    A.  Because he called it potential
15 development.
16    He described it as potential development
17 density, not something that's in their pocket that
18 would be reflected in an as is value.
19    Q.  You are not saying that any potential
20 change in the property has to be excluded or
21 categorized as extraordinary, are you?

Page 86

1    A. I'm simply talking, my report simply talks
2  about one factor, the fact that he describes this as
3  potential development density. That's what he says.
4  He calls it potential development density. That is
5  not a direct as is value, represents an
6  extraordinary assumption.
7    Q. Is your opinion based on your
8  understanding and analysis of TDR's or his choice of
9  words?
10    A. Both.
11    Q. What about the TDR's in your opinion makes
12  them merely potential?
13      MR. COOTER: Makes them what?
14      MR. PAGE: Potential.
15      THE WITNESS: The fact that he calls
16  them -- I'm reviewing his report. I'm reviewing his
17  report.
18      I've said to you that I took on face
19  value that what he tells me is correct. He tells me
20  that these are potential development rights. That's
21  what he's telling me.

Page 87

1  BY MR. PAGE:
2    Q. It's his choice of words that --
3    A. I don't know whether it's his words or
4  whether it's accurate or not accurate but he
5  simply -- he talks -- the developer reportedly has
6  plans for a 9.6 FAR development.
7      If he had those -- TDR's are a commodity.
8  They are separate from the real estate. You can own
9  real estate without TDR's. You can own real estate
10  with TDR's.
11      This seems to say that the developer
12  reportedly has plans for another building and has
13  potential additional density.
14      When I read the report, it didn't seem as
15  though that was in their pocket, the density to
16  enable them to go up to 997,222 square feet.
17    Q. You made no inquiry to find out whether
18  that was the case?
19    A. That was not part of the scope.
20    Q. It's merely his choice of the words that
21  raises a red flag with you because he didn't

Page 88

1  demonstrate the ownership, is that correct?
2    A. He did not demonstrate the ownership and
3  described it as being potential.
4    Q. When you point out in your letter that
5  Mr. Halbert says the developer reportedly has plans
6  for a 9.6 FAR multi-building development, you are
7  quarreling with that statement by Mr. Halbert, are
8  you not?
9    A. And the fact that in his discussion of
10  density he doesn't indicate that the 300 some odd
11  thousand additional FAR are part of the real estate.
12    Q. Let's do it one at a time. Before you
13  change the subject, let's go back in the sentence.
14    A. Sure.
15    Q. You underlined the word "reportedly," did
16  you not?
17    A. Yes.
18    Q. That's not underlined in his report?
19    A. No.
20    Q. You underlined it because that to you is
21  part of the problem with his analysis, right?

Page 89

1    A. It's one of the things that flagged this
2  as an issue.
3    Q. Because he used the word "reportedly,"
4  correct?
5    A. Correct.
6    Q. You don't know yourself whether in fact
7  the developer had plans for a 9.6 FAR multi-building
8  development.
9    A. All I know --
10    Q. You can answer what I just said yes or no.
11      MR. COOTER: Wait a minute.
12      THE WITNESS: That's not a yes or no.
13  All I know is what's in Mr. Halbert's report.
14  BY MR. PAGE:
15    Q. I didn't ask you that. Just listen to my
16  question.
17    A. Sure.
18    Q. In fact, you don't know whether or not the
19  developer has plans or did at the time for a 9.6 FAR
20  building?
21    A. It was not part of my scope and as a

Page 94

1  to sell at $50 a square foot?
2     A.  I would not expect TDR's at the current
3  time to sell at $50 a square foot.
4     Q.  I was really asking about 2006.
5     A.  In 2006 I would not have expected TDR's,
6  I'm not aware of evidence that would indicate that
7  TDR's would sell for $50 a foot.
8     Q.  Or higher?
9     A.  Or higher.
10    Q.  Like $65 a foot?  Do you understand what
11 I'm saying?
12    A.  I thought I answered.  I said yes.
13    Q.  In your experience, do TDR's typically
14 trade at any price that is near the actual FAR for
15 the land itself?
16    A.  It's all a function of supply and demand.
17    Q.  I know that.  Is it your experience,
18 because you said you had researched this, that the
19 TDR's ever sell at a price that is equal to the FAR
20 price for the land itself?
21    A.  In what time period?

Page 95

1     Q.  2006.
2     A.  I'm not aware of TDR's that are selling
3  near the price of the otherwise market value of
4  land.
5     Q.  In the sentence we were looking
6  at: "Thus, it is our opinion, which follows local
7  precedent" what did you have in mind about local
8  precedent?
9     A.  That TDR's are a commodity, that TDR's are
10 traded independent of the real estate.
11    Q.  Anything else that you meant by that?
12    A.  I think that's adequate.
13    Q.  Do you know what the TDR's subject of the
14 second contract that is referred to in the land
15 sales contract were being sold for?
16    A.  No, sir.
17    Q.  You've made no inquiry in that regard, is
18 that correct?
19    A.  No, sir.
20    Q.  Now, in this dispute the parties are each
21 party to something called a cash appreciation

Page 96

1  agreement.  Excuse me.  Cash participation
2  agreement.
3        Have you heard of such an agreement?
4     A.  No, sir.
5     Q.  Have you seen it?
6     A.  No, sir.
7     Q.  Were you told anything about it?
8     A.  No, sir.
9     Q.  Are you expressing any views or opinions
10 about it in this matter?
11    A.  No, sir.
12       MR. PAGE:  Let's take a break again.
13 Let me go over my notes.
14       (Recess from 3:34 p.m. - 3:44 p.m.)
15       MR. PAGE:  I have no further
16 questions.
17       MR. COOTER:  I have no questions.
18       (Deposition adjourned at 3:45 p.m.)

Page 97

1           Reporter's Certificate

3     I, the undersigned, Certified Court Reporter,
4  do hereby certify that the foregoing transcript of
5  testimony was taken by me in stenotype and
6  thereafter reduced to print under my direction,
7  that said transcript is a full, true and
8  substantially accurate record of the proceedings,
9  to the best of my ability.

11    I do further certify that I am neither counsel
12 for, related to, nor employed by any of the parties
13 to the action in which this deposition was taken;
14 and, further, that I am not a relative or employee
15 of any attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.

20           Certified Realtime Reporter