# EXHIBIT 41

## LAND PURCHASE AND SALE AGREEMENT

Square 674, Lot 432, 90 K Street, NE, Washington, DC

### ARTICLE 1: PROPERTY VALUE

1.1     Certain Basic Terms.

(a) Purchaser and Notice Address:
TC MidAtlantic Development, Inc.
1055 Thomas Jefferson Street, NW
6th floor
Washington, DC 20007
Attn: Mr. Daniel S. Hudson
Telephone (202) 295-3392
Facsimile (202) 298-8123
E-mail: Dhudson@trammellcrow.com

With a copy to:
J. Richard Saas, Esq.
Tenenbaum and Saas, PC
4504 Walsh Street, Suite 200
Chevy Chase, MD 20815
Telephone (301) 961-5300
Facsimile: (301) 961-5305
E-mail: rsaas@tspclaw.com

(b) Seller and Notice Address:
MONTGOMERY ROAD I LIMITED PARTNERSHIP,
a Maryland limited partnership
Attn: Sam Rose
c/o Greenebaum and Rose Associates, Inc.
5301 Wisconsin Avenue, N.W., Suite 510
Washington, D.C. 20015
Telephone: 202/686-3000
Facsimile: 202/686-3617
E-mail: jscott@greenebaum-rose.com

With a copy to:
Shapiro, Lifschitz and Schram, PC
Attn: Ronald Shapiro
1742 N Street, NW,
Washington, DC 20036
Telephone: 202/689-1900
Facsimile: 202/689-1901
E-mail: shapiro@slslaw.com

(c) Title Company:
Commonwealth Land Title Insurance Company
c/o LandAmerica Commercial Services
1015 15th Street NW
Suite 300
Washington, DC 20005
Attn: Ms. Sarah (Sally) Eckert Webb
Telephone: (202) 737-4747
Facsimile: (202) 737-4108
E-mail Swebb@landam.com

(d) Escrow Agent:
Commonwealth Land Title Insurance Company
c/o LandAmerica Commercial Services
1015 15th Street NW
Suite 300
Washington, DC 20005
Attn: Ms. Sarah (Sally) Eckert Webb
Telephone: (202) 737-4747
Facsimile: (202) 737-4108
E-mail Swebb@landam.com

| | | |
|---|---|---|
| (e) | Date of this Agreement: | The latest date of execution by the Seller or the Purchaser, as indicated on the signature page. |
| (f) | Purchase Price: | Forty-Seven Million One Hundred Fifty Four Thousand Nine Hundred Fourteen Dollars ($47,154,914.00), subject to adjustment as provided herein.. |
| (g) | Initial Earnest Money: | Forty Eight Thousand Five Hundred Dollars ($48,500.00). The Initial Earnest Money and the Additional Earnest Money (hereafter defined), |

together with any interest earned on the foregoing, are sometimes referred to collectively as the "Earnest Money", which amount may be increased pursuant to Section 1.3 below.

(h)  Due Diligence Period:  The period ending on October 10, 2006.

(i)  Closing Date:  As designated by the Purchaser, upon ten (10) days prior notice to Seller, but no later than November 10, 2006 (subject to extension as set forth in Section 5.1 hereof); provided however, Purchaser shall have the one (1) time right to extend the Closing Date for up to 30 days, but in no event later than December 10, 2006, by providing Seller written notice of its election to extend the closing Date on or before October 30, 2006, and by posting an increase to the Additional Earnest Money set forth in paragraph 1.3, below.

(j)  Broker:  Trammell Crow Real Estate Services, Inc. ("TCR").

(k)  Proposed Project:  Commercial development in accordance with the requirements of the District of Columbia C-3-C zoning district.

1.2    Property.  Subject to the terms and conditions of this Agreement, Seller agrees to sell to Purchaser, and Purchaser agrees to acquire from Seller, the 103,878 square feet of land located at 90 K Street, NE, Washington, DC, as described in Exhibit A attached hereto, together with all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereunto belonging or appertaining thereto, and Seller's rights, easements or other interests, if any, in and to adjacent streets, alleys and rights-of-way, or other property abutting such real property, and together with any and all minerals and mineral rights, water and water rights, wells, well rights and well permits, water and sewer taps, sanitary or storm sewer capacity or reservations and rights under utility agreements with any applicable governmental or quasi-governmental entities or agencies with respect to the providing of utility services to such real property (all of the foregoing being collectively hereinafter referred to as the "Property").

1.3    Earnest Money.  Within five (5) business days after receipt of a fully executed copy of this Agreement, Purchaser shall deposit the Initial Earnest Money with the Escrow Agent. The Earnest Money shall be applied to the Purchase Price at Closing. If this Agreement terminates pursuant to any express right of Purchaser to terminate this Agreement, the Earnest Money shall be refunded to Purchaser immediately upon request, and all further rights and obligations of the parties under this Agreement shall terminate, except those which by their terms survive any termination of this Agreement. The Earnest Money shall be held and disbursed by the Escrow Agent pursuant to Article 9 of this Agreement. If Purchaser does not terminate this Agreement pursuant to Paragraph 2.2 of this Agreement, Purchaser shall deposit additional Earnest Money (the "Additional Earnest Money") with the Escrow Agent in the amount of One Million Sixty Six Thousand One Hundred Dollars ($1,066,100.00) no later than the expiration of the Due Diligence Period, so that the total Earnest Money deposited by Purchaser shall be One Million One Hundred Fourteen Thousand Six Hundred Dollars ($1,114,600.00) in the aggregate. Further, if Purchaser elects to extend the Closing Date per Paragraph 1.1(i), Purchaser shall increase the Additional Earnest Money by Three Hundred Thirty Nine Thousand Two Hundred Dollars ($339,200.00) so that the total Earnest Money shall then be One Million Four Hundred Fifty Three Thousand Eight Hundred Dollars ($1,453,800.00) .

1.4    Payment of Purchase Price:  Purchaser shall pay Seller the total Purchase Price in immediately available funds at Closing.

1.5    Transferable Development Rights.

The Property is currently zoned C-3-C, and is in a receiving zone for purposes of accepting transferable development rights ("TDRs") as defined in the District of Columbia zoning regulations (the "Zoning Regulations"). Reference is made to a certain purchase contract between Purchaser and Seller dated even date

herewith whereby Purchaser has agreed and is obligated to acquire, for additional consideration, certain TDRs from Seller (the "TDR Agreement"). The provisions of this Paragraph 1.5 shall survive the Closing.

ARTICLE 2:  INSPECTION AND DEVELOPMENT RIGHTS

2.1    Seller's Delivery of Specified Documents.  Within five (5) business days after the Date of this Agreement, Seller shall provide to Purchaser the following (the "Property Information") to the extent in Seller's possession or control:  (i) the latest property tax bills from all taxing authorities; (ii) any environmental reports and a schedule listing any such reports; (iii) existing plans, specifications, permits, and surveys; (iv) any existing title report, commitment or policy; (v) any soils and engineering reports, and (vi) any of the other information in Seller's possession or control as identified on Exhibit E attached hereto. Purchaser acknowledges that it has received the Property Information from Seller. Seller shall promptly provide to Purchaser any documents described above and coming into Seller's possession or produced by Seller after the initial delivery above and shall continue to promptly provide same during the pendency of this Agreement.

2.2    Due Diligence. Purchaser shall have through the last day of the Due Diligence Period in which to examine, inspect, and investigate the Property and, in Purchaser's sole and absolute judgment and discretion, to determine whether the Property is acceptable to Purchaser and to obtain all necessary internal approvals. Notwithstanding anything to the contrary in this Agreement, Purchaser may terminate this Agreement by giving notice of termination (a "Due Diligence Termination Notice") to Seller on or before the last day of the Due Diligence Period, and in which event the Escrow Agent shall refund the Earnest Money and the parties shall have no further obligations under this Agreement, except for any obligations which by their terms survive any termination of this Agreement. If Purchaser does not timely deliver the Due Diligence Termination Notice, this Agreement shall continue in full force and effect. If this Agreement is terminated or the Closing is not consummated hereunder for any reason other than a Seller default hereunder, Purchaser shall promptly deliver copies of all reports, surveys and studies furnished to Purchaser by third parties in connection with Purchaser's physical inspection of the Property (e.g., title, survey, soils and environmental) to Seller, but in no event shall Purchaser be obligated to deliver internal studies or drawings, plans and specifications or other documentation with respect to the Proposed Project; provided, however, that delivery of such copies and information shall be without warranty or representation whatsoever, express or implied, including, without limitation, any warranty or representation as to ownership, accuracy, adequacy or completeness thereof or otherwise.

Purchaser and its agents, employees, and representatives shall have a continuing right of reasonable access to the Property during the pendency of this Agreement for the purpose of conducting surveys, engineering, geotechnical, and environmental inspections and tests (including intrusive inspection and sampling), and any other inspections, studies, or tests reasonably required by Purchaser. Purchaser shall notify Seller at least twenty-four (24) hours prior to any entry on the Property, which notice may be by telephone. Seller shall be allowed to have its representative present; provided that the proposed inspections shall not be delayed in the event Seller or its representatives are not available. Prior to Purchaser's first entry on the Property, Purchaser shall deliver to Seller a certificate of insurance naming Seller as an additional insured and showing that Purchaser is carrying commercial general liability insurance with limits for bodily injury and property damage of not less than Two Million Dollars ($2,000,000). In the course of its investigations Purchaser may make inquiries to  municipal, local, and other government officials and representatives, and Seller consents to such inquiries; provided, Purchaser notifies Seller of any meetings with such parties two (2) business days in advance of such meetings (or if such meetings are scheduled on less than 2 business days notice, as soon as practicable following the scheduling thereof), and Seller shall have the right to have a representative(s) present at any such meeting. Purchaser shall keep the Property free and clear of any liens and will indemnify, defend, and hold Seller harmless from all claims and liabilities asserted against Seller as a result of any such entry by Purchaser, its agents, employees, or representatives; provided such indemnification shall not apply to the discovery by Purchaser or its representatives of any pre-existing conditions located on or under the Property. If any inspection or test disturbs the Property, Purchaser will restore the Property to substantially the same condition as existed prior to any such inspection or test. Purchaser's obligations under this Paragraph 2.2 shall survive the Closing and any termination of this Agreement.

3

## ARTICLE 3: TITLE AND SURVEY REVIEW

3.1     Delivery of Title Commitment and Survey. Purchaser shall cause to be prepared: (i) a current, effective commitment for title insurance (the "Title Commitment") issued by the Title Company, in the amount of the Purchase Price with Purchaser as the proposed insured, and accompanied by true, complete, and legible copies of all documents referred to in the Title Commitment; and (ii) at Purchaser's election, a current ALTA/ACSM Urban survey of the Property (the "Survey").

3.2     Title Review and Cure. During the Due Diligence Period, Purchaser shall review title to the Property as disclosed by the Title Commitment and the Survey. Seller will cooperate with Purchaser, without material expense to Seller, in curing any objections Purchaser may have to title to the Property, but Seller shall have no obligation to cure title objections except (a) liens of an ascertainable amount created by, through or under Seller, including any deeds of trust affecting the Property that secure any performance or payment obligations of Seller, all of which shall be released at the Closing, (b) the TLC Mortgage (subject to the terms of Paragraph 3.3 below), and (c) any exceptions or encumbrances to title which are created after the Date of this Agreement without the written consent of Purchaser, all of which shall be removed by the Closing Date. Purchaser may terminate this Agreement and receive a refund of the Earnest Money if the Title Company revises the Title Commitment after the expiration of the Due Diligence Period to add or modify exceptions in a material and adverse manner if such additions, modifications or deletions are caused by Seller after the date of this Agreement, or if not caused by Seller, are recorded after the expiration of the Due Diligence Period, and in either case are not removed from the Title Commitment by the Closing Date. The term "Permitted Exceptions" shall mean (i) the specific exceptions (exceptions that are not customarily deleted by a title company upon receipt of a standard and customary owner's affidavit and gap indemnity from the property owner) in Schedule B, Section 2 of the Title Commitment (or properly recorded of public record against the Property as of the date of the Title Commitment, irrespective of whether shown on the Title Commitment) that the Title Company has not agreed to insure over or remove from the Title Commitment as of the expiration of the Due Diligence Period and all other matters of record that Seller is not required to remove as provided above, and (ii) real estate taxes and water and sewer charges not yet due and payable and that are pro rated in accordance with the terms of this Agreement.

3.3     TLC Agreement.

(a)     Seller and Viad Corp. (successor in interest to Transportation Leasing Co. ("TLC") are parties to that certain Cash Participation Agreement dated November 30, 1987 (the "TLC Agreement"). Seller's obligations under the TLC Agreement are secured by that certain Deed of Trust dated December 9, 1987, and recorded among the land records of the District of Columbia on December 10, 1987 as Instrument No. 69951 (the "TLC Mortgage").

(b)     Pursuant to Section 4.1 of the TLC Agreement (a true, correct and complete copy of which has been delivered to Purchaser prior to the date hereof), TLC has a right of first refusal to purchase the Property (the "Right of First Refusal"), on the terms and conditions set forth therein. Within two (2) business days following the date of this Agreement, Seller shall submit this Agreement to TLC to comply with the requirements of Section 4.1(a) of the TLC Agreement. If TLC exercises its right of first refusal pursuant to Section 4.1(b) of the TLC Agreement, then, Seller shall promptly notify Purchaser thereof, and notwithstanding anything contained herein to the contrary, but subject to the reinstatement provisions set forth below, this Agreement shall automatically terminate, Purchaser shall receive a refund of the Initial Earnest Money, Seller shall reimburse Purchaser for its reasonable documented third party costs incurred in connection with the negotiation of this Agreement and the due diligence investigation of the Property undertaken hereunder in an amount not to exceed $100,000 in the aggregate (the "Expense Reimbursement"), and thereafter the parties shall have no further rights or obligations hereunder (except for rights and obligations that expressly survive termination hereof). Notwithstanding the foregoing if TLC waives the Right of First Refusal prior to the expiration of the Due Diligence Period, this Agreement shall continue in full force and effect in accordance with the terms hereof. In the event TLC exercises the Right of First Refusal but thereafter waives the Right of First Refusal or otherwise fails to timely consummate closing thereunder, Purchaser and Seller shall reinstate this Agreement, provided that the Due Diligence Period shall be deemed to commence on the date of such reinstatement (and simultaneously therewith Purchaser shall return to Seller the Expense Reimbursement).

(c)      Pursuant to the TLC Agreement, under certain circumstances TLC is entitled to a payment from Seller upon a sale of the Property (the "TLC Payment"). In no event, shall Purchaser be responsible for the TLC Payment. Seller shall use commercially reasonable efforts to cause the TLC Mortgage to be released of record at or prior to the Closing Date (provided that in the event the TLC Litigation, as hereafter defined, remains outstanding as of Closing, such release shall include an acknowledgement that the TLC Litigation does not affect or bind the Property or any successor in title to Seller). If Seller is unable to cause the TLC Mortgage to be released despite such reasonable efforts, then Purchaser may terminate this Agreement and receive a refund of the Earnest Money, Seller shall reimburse Purchaser for its reasonable documented third party costs incurred in connection with the negotiation of this Agreement, the due diligence investigation of the Property undertaken hereunder and Purchaser's preparations for Closing hereunder and thereafter the parties shall have no further rights or obligations hereunder (except for rights and obligations that expressly survive termination hereof).

3.4      Condition of Title at Closing. As a condition to Purchaser's obligation to close, on the Closing Date Seller shall be the sole owner of good, marketable and indefeasible fee simple title to the Property, subject only to the Permitted Exceptions. Seller shall execute at Closing an affidavit in favor of the Title Company that is reasonably acceptable to Seller and the Title Company so that the Title Company can delete or modify the standard printed exceptions as to parties in possession, unrecorded liens, and similar matters and, if required to issue the Title Policy at Closing, the customary gap indemnity.

3.5      Title and Survey Costs. Purchaser shall pay for the cost of the Survey and the premium for its owner and lender's policy of title insurance (the "Title Policy"), including any search and exam fees, settlement and escrow fees, and the premium for any title endorsements requested by Purchaser.

## ARTICLE 4: OPERATIONS AND RISK OF LOSS

4.1      Performance under Contracts. During the pendency of this Agreement, Seller will perform its obligations under agreements that affect the Property.

4.2      New Contracts; New Leases. During the pendency of this Agreement, Seller will not enter into any contract without Purchaser's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed). During the pendency of this Agreement, Seller shall not enter into any new lease or occupancy agreement affecting the Property after Closing without Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

4.3      Listings and Other Offers. Upon the execution and delivery hereof, Seller will remove the Property from the market (as for sale) and cease all discussions with other brokers and prospective purchasers pertaining to the sale of the Property, and will not otherwise solicit or make or accept any offers, whether or not binding, with respect to the sale or other disposition of Seller's ownership interest in the Property, except for providing the notice for the Right of First Refusal as set forth in Paragraph 3.3 above.

4.4      Seller's Obligations. Other than the obligations of Seller expressly assumed by Purchaser, Seller, subject to the terms and conditions of this Agreement, covenants that it shall pay and discharge any and all liabilities of each and every kind arising out of or by virtue of the conduct of its business before and as of the Closing Date on or related to the Property.

4.5      Condemnation. By notice to Seller given within 10 days after Purchaser receives written notice of proceedings in eminent domain that are contemplated, threatened or instituted by any body having the power of eminent domain, and if necessary the Closing Date shall be extended to give Purchaser the full 10-day period to make such election, Purchaser may: (i) terminate this Agreement and the Earnest Money shall be immediately returned to Purchaser; or (ii) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Purchaser its entire right, title and interest in and to any condemnation award. In the event Purchaser does not elect to terminate this Agreement, Seller agrees that (a) it shall not settle or compromise any claim on account of the proceeding without Purchaser's written consent, which consent shall not be unreasonably withheld, conditioned or delayed, and (b) Purchaser shall have the right to participate with Seller in connection with the resolution thereof.

5

4.6     Insurance. Seller shall maintain the insurance on the Property as currently maintained by Seller in the current amounts through the date of the consummation of the Closing.

4.7     Creation of Encumbrances. Seller shall not hereafter create or consent to the imposition of any lien, easement, restriction, covenant, condition or other encumbrance upon the Property which would be binding upon Purchaser or the Property following the Closing without, in each instance, the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed,.

4.8     Representations. Seller shall not take any action, or omit to take any action, which action or omission would have the effect of materially violating any of the representations or warranties of the Seller contained in this Agreement.

4.9     Alterations. Seller shall not make or permit to be made any alterations, improvements or additions to the Property without the prior written consent of Purchaser, except those made by Seller pursuant to the express requirements of this Agreement or required by applicable law or ordinance.

4.10    Notice to Purchaser. Seller shall notify Purchaser promptly of the occurrence of (i) receipt of notice of eminent domain proceedings or condemnation of or affecting the Property, or any portion thereof; or (ii) receipt of notice from any governmental or quasi-governmental agency relating to the condition, use or occupancy of the Property, or any portion thereof.

4.11    Applicable Laws. Seller shall comply with all applicable material laws, codes, regulations and ordinances relating to the Property or Seller's ownership of the Property.

4.12    Material Adverse Change. Seller will not cause any material adverse change which would affect the value of the Property or prohibit the Purchaser from developing the Property as contemplated.

4.13    Litigation. Seller shall promptly notify Purchaser of the commencement of any litigation, condemnation or other judicial or administrative proceeding relating to the Property of which Seller becomes aware, and Seller's receipt of any written notice of any material claim with respect to the Property. Seller has advised Purchaser that Seller has commenced litigation against TLC under the TLC Agreement, which litigation is currently pending in the Superior Court for the District of Columbia, Civil Action 06-0000542 (the "TLC Litigation").

### ARTICLE 5: CLOSING

5.1     Closing. The consummation of the transaction contemplated herein ("Closing") shall occur on the Closing Date at the offices of the Escrow Agent. Closing shall occur through an escrow with the Escrow Agent. Funds shall be deposited into and held by Escrow Agent in a closing escrow account with a bank satisfactory to Purchaser and Seller. Upon satisfaction or completion of all closing conditions and deliveries, the parties shall direct the Escrow Agent to immediately record and deliver the closing documents to the appropriate parties and make disbursements according to the closing statements executed by Seller and Purchaser. Notwithstanding the Closing Date as defined in Section 1.1(i) hereof, in the event the TLC Mortgage or the TLC Litigation affects the Property as of the Closing Date (i.e., Seller has not been successful in obtaining the release thereof as contemplated in Section 3.3[c]), then in such event Purchaser shall have the right to extend the Closing Date by written notice to Seller, without the payment of any increase to the Earnest Money as contemplated in Section 1.3 hereof, to that date which is thirty (30) days after the release of the TLC Mortgage (but not later than June 10, 2007) (the "Extended Outside Closing Date"); provided that if, as of the Extended Outside Closing Date, Seller has not secured the release of the TLC Mortgage as contemplated in Section 3.3(c) above, or, notwithstanding anything in this Agreement, if Closing has not occurred by June 10, 2007, then in either of such events, this Agreement shall terminate, Purchaser shall receive a refund of the Earnest Money, Seller shall reimburse Purchaser for its reasonable documented third party costs incurred in connection with the negotiation of this Agreement, the due diligence investigation of the Property undertaken hereunder and Purchaser's preparations for Closing hereunder and thereafter the parties shall have no further rights or obligations hereunder (except for rights and obligations that expressly survive termination hereof).

6

      5.2     <u>Conditions to the Parties' Obligations to Close</u>. In addition to all other conditions set forth herein, the obligation of Seller, on the one hand, and Purchaser, on the other hand, to consummate the transactions contemplated hereunder shall be contingent solely upon the following:

      (a)     <u>Accuracy of Representations and Warranties</u>. The other party's representations and warranties contained herein shall be true and correct in all material respects as of the Date of this Agreement and the Closing Date. For purposes of this clause (a), if a representation is made to knowledge, but the factual matter that is the subject of the representation is false notwithstanding any lack of knowledge or notice to the party making the representation, such event shall constitute a failure of this condition only, and not a default by Seller;

      (b)     <u>Performance of Obligations</u>. As of the Closing Date, the other party shall have performed its obligations hereunder in all material respects and all deliveries to be made at Closing have been tendered;

      (c)     <u>No Proceedings, Litigation</u>. As a condition of Purchaser's obligation to close, with the exception of the TLC Litigation (which as of Closing Date shall not affect the Property), there shall exist no actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, pending or to Seller's knowledge threatened against Seller or the Property that would materially and adversely affect the operation or value of the Property or Seller's ability to perform Seller's obligations under this Agreement, unless the Seller bonds off the liability to the reasonable satisfaction of Purchaser and the Title Company;

      (d)     <u>Vacant Land; Termination of Contracts and Leases</u>. As a condition of Purchaser's obligation to close, the Property shall be free of leases, agreements, or contracts which will be binding on Purchaser or the Property subsequent to Closing or which permit any person or entity to use or occupy all or any portion of the Property. Seller shall terminate, at its sole cost and expense, all leases, agreements and contracts affecting the Property on or before the Closing Date and shall deliver evidence of such termination to Purchaser at Closing. At Closing, Purchaser and Seller shall enter into a short-term license agreement with Seller or an affiliate of Seller to permit Seller or an affiliate to operate a parking lot on the Property for a period of sixty (60) days following the Closing Date. The license agreement shall provide that Seller shall be solely responsible for any loss, cost, damage or expense resulting from the operation of such parking lot, and shall be obligated to provide insurance against all such loss in amounts and otherwise reasonably acceptable to Purchaser. Subsequent to the initial sixty (60) day term, either party shall have the right to terminate the license agreement at will upon thirty (30) days prior written notice to the other party. Seller shall pay Purchaser monthly rent in an amount equal to ninety percent (90%) of the net revenue (i.e., gross revenue less the direct costs of operating the parking lot, including insurance) collected by Seller or its affiliate under the lease agreement in connection with the operation of the parking lot. Seller shall be entitled to retain the remaining ten percent (10%) of the net revenue collected by Seller in connection with the operation of the parking lot;

      (e)     <u>Title</u>. Title to the Property shall be consistent with the requirements of Article 3 of this Agreement and showing no exceptions other than the Permitted Exceptions;

      (f)     <u>Hazardous Materials</u>. As of the Closing Date, there shall be no Hazardous Materials at, on or under the Property which did not exist as of the expiration of the Due Diligence Period.

      So long as a party is not in default hereunder, if any condition to such party's obligation to proceed with the Closing hereunder has not been satisfied as of the Closing Date, such party may, in its sole discretion, (i) terminate this Agreement by delivering written notice to the other party on or before the Closing Date upon which the Earnest Money shall be returned to Purchaser and neither party shall have any further right or liability hereunder except for those obligations which by their terms survive such termination, (ii) elect to extend the Closing until such condition is satisfied, which extension shall not exceed thirty (30) days from the Closing Date, or (iii) elect to consummate this transaction notwithstanding the non-satisfaction of such condition, in which event such party shall be deemed to have waived any such condition. In the event such party elects to close, notwithstanding the nonsatisfaction of such condition, there shall be no liability on the part of any other party hereto for breaches of representations and warranties of which the party electing to close had actual knowledge at the Closing. In the event the failed condition

is the result of either party's default hereunder, the non-defaulting party shall have those rights as are set forth in Article 8 hereof.

    5.3    <u>Seller's Deliveries in Escrow</u>. On or prior to the Closing Date, Seller shall deliver in escrow to the Escrow Agent the following:

    (a)    <u>Deed</u>. A special warranty deed in form attached hereto as <u>Exhibit B</u> (the "<u>Deed</u>").

    (b)    <u>Form FP-7</u>. District of Columbia Form FP-7 executed by Seller.

    (c)    <u>Assignment of Intangible Property</u>. An Assignment of Intangible Property in the form attached hereto as <u>Exhibit C</u>.

    (d)    <u>State Law Disclosures</u>. Such disclosures and reports, required by applicable state and local law in connection with the conveyance of real property.

    (e)    <u>FIRPTA</u>. A Foreign Investment in Real Property Tax Act affidavit executed by Seller. If Seller fails to provide the necessary affidavit and/or documentation of exemption on the Closing Date, Purchaser may proceed with withholding provisions as provided by law.

    (f)    <u>Authority</u>. Evidence of existence, organization, and authority of Seller and the authority of the person executing documents on behalf of Seller reasonably satisfactory to Title Company.

    (g)    <u>Partnership Authority</u>. A certified copy of all appropriate limited partnership action authorizing the execution, delivery and performance by Seller of this Agreement and the other Closing Document.

    (h)    <u>Additional Documents</u>. Any additional documents that Purchaser, the Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

    (i)    <u>TDR Agreement</u>. All documents and other delivery items required of Seller under the TDR Agreement.

    (j)    <u>Reaffirmation</u>. A Reaffirmation of Representations and Warranties reaffirming, as of the Closing Date, the representations and warranties of Seller hereunder.

    (k)    <u>Books and Records</u>. All original books, records, files, plans and specifications and other materials in Seller's possession necessary to the continuity of operation of the Property.

    (l)    <u>Plans and Specifications</u>. All plans and specifications relating to the Property to the extent in Seller's possession.

    (m)    <u>Owners' Affidavit</u>. An Owner's Affidavit and Gap Indemnity in a form reasonably acceptable to the Title Company.

    (n)    <u>Documents</u>. The originals of all Property Information and other documents, instruments and materials in Seller's possession or control related to the Property other than Seller's proprietary information.

    5.4    <u>Purchaser's Deliveries in Escrow</u>. On or prior to the Closing Date, Purchaser shall deliver in escrow to the Escrow Agent the following:

    (a)    <u>Purchase Price</u>. The Purchase Price (plus or minus applicable prorations), shall be deposited by Purchaser one (1) business day prior to the Closing Date in immediate, same-day federal funds wired into the Escrow Agent's escrow account.

(b)    Form FP-7. District of Columbia Form FP-7 executed by Purchaser.

(c)    State Law Disclosures. Such disclosures and reports required by applicable state and local law in connection with the conveyance of real property.

(d)    Authority of Purchaser. A certified copy of all appropriate entity action authorizing the execution, delivery and performance by Purchaser of this Agreement and the other Closing Documents.

(e)    Additional Documents. Any additional documents that Seller, the Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

(f)    TDR Agreement. All documents, proceeds and other delivery items required of Purchaser under the TDR Agreement.

5.5    Closing Statements. At Closing, Seller and Purchaser shall deposit with the Escrow Agent executed closing statements consistent with this Agreement in form required by the Escrow Agent. If Seller and Purchaser cannot agree on the closing statement to be deposited as aforesaid because of a dispute over the prorations and adjustments set forth therein, the Closing nevertheless shall occur, and the amount in dispute shall be withheld from the Purchase Price and placed in an escrow with the Title Company (in the form of cash), to be paid out upon the joint direction of the parties or pursuant to court order upon resolution or other final determination of the dispute.

5.6    Possession. Seller shall deliver possession of the Property to Purchaser at the Closing subject only to the Permitted Exceptions.

ARTICLE 6: PRORATIONS

6.1    Proration of Taxes and Assessments. All taxes and tax assessments applicable to the Property, including, without limitation, the Special Metro assessment (collectively, "Taxes"), which accrue for the time period before Closing will be Seller's responsibility, and all Taxes which accrue for the time period from and after Closing will be Purchaser's responsibility. Such amounts shall be prorated at Closing.

6.2    Transfer and Recordation Taxes. Purchaser shall pay all transfer and recordation taxes imposed by the District of Columbia in connection with the recordation of the Deed. Purchaser shall also pay all transfer and recordation taxes imposed by the District of Columbia in connection with the recordation of any documents in connection with any financing that it places on the Property.

6.3    Commissions. Seller and Purchaser represent and warrant each to the other that they have not dealt with any real estate broker, sales person or finder in connection with this transaction other than Broker. If, and only if this transaction is closed, Seller shall pay the commission due to TCR in accordance with a separate agreement between Seller and TCR; and Seller shall indemnify and hold Purchaser harmless from and against any claim by TCR for a commission or other fee with respect to this transaction (including, without limitation, attorney's fees and costs) with respect to the commission agreed to be paid by Seller pursuant to their separate agreements. Broker is an independent contractor and is not authorized to make any agreement or representation on behalf of either party. Except as expressly set forth above, in the event of any claim for broker's commissions, finder's fees or similar compensation in connection with the negotiation, execution or consummation of this Agreement or the transactions contemplated hereby, each party shall indemnify and hold harmless the other party from and against any such claim (including, without limitation, attorney's fees and costs) based upon any statement, representation or agreement of such party. The payment and indemnification obligations under this Paragraph 6.3 shall survive Closing.

6.4    Other Expenses. Purchaser shall pay all fees and expenses charged by the Title Company in connection with Purchaser's title policy or otherwise.

ARTICLE 7:  REPRESENTATIONS AND WARRANTIES

7.1    Seller's Representations and Warranties. As a material inducement to Purchaser to execute this Agreement and consummate this transaction, Seller represents and warrants to Purchaser that:

(a)    Authority. Seller is the sole owner of fee simple title to the Property. Seller has been duly organized and is validly existing as a Maryland limited partnership, qualified to transact business in the District of Columbia, and is in good standing in Maryland and in the District of Columbia. Seller has the full right and authority and has obtained any and all consents required therefor to enter into this Agreement, consummate or cause to be consummated the sale of the Property as contemplated hereby and make or cause to be made transfers and assignments contemplated herein. The execution and delivery of this Agreement and all documents required under this Agreement by Seller, and the consummation of the transaction described herein, are and will be binding on Seller and do not and will not cause Seller to be in violation of any law, ordinance, order or requirement or of any agreement or contract to which Seller is a party. The persons signing this Agreement on behalf of Seller are authorized to do so. This Agreement has been, and the documents to be executed by Seller pursuant to this Agreement will be, authorized and properly executed and does and will constitute the valid and binding obligations of Seller, enforceable against Seller in accordance with their terms, subject to the TLC Litigation.

(b)    Conflicts and Pending Actions or Proceedings. There is no agreement to which Seller is a party or, to Seller's knowledge, binding on Seller which is in conflict with this Agreement. There is no action or proceeding pending or, to Seller's knowledge, threatened against or relating to the Property, which challenges or impairs Seller's ability to execute or perform its obligations under this Agreement, all however, subject to the Right of First Refusal set forth in Paragraph 3.3. To the best of Seller's knowledge, there are no judgments, orders, or decrees of any kind against Seller unpaid or unsatisfied of record, nor any legal action, suit or other legal or administrative proceeding pending before any court or administrative agency relating to the Property which enjoin or threaten to enjoin Seller from consummating the transaction contemplated in this Agreement or would adversely affect the Property for the Proposed Project, nor is Seller aware of any threatened legal action, suit or other legal or administrative proceeding relating to Seller or the Property.

(c)    Agreements with Governmental Authorities/Restrictions. Except as included in the Property Information delivered to Purchaser, Seller has not entered into, and has no knowledge of, any agreement with or application to any governmental authority with respect to any zoning modification, variance, exception, platting or other matter. To Seller's knowledge, neither Seller nor the Property is in violation or non-compliance with any restriction or covenant affecting the Property.

(d)    Condemnation and Property Rights. To Seller's knowledge, no condemnation, eminent domain or similar proceedings are pending or threatened with regard to the Property. Except as included in the Property Information, Seller has received no payment from any party for any easements or any other rights to use the Property. Seller has not made any commitment to any board, bureau, commission, department or body of any municipal, county, DC or other federal governmental unit or any subdivision thereof, having jurisdiction over the Property or the use or improvement thereof or to any homeowner or homeowners' association, or to any third party to dedicate or grant any portion of the Property for roads, easements, rights-of-way, park lands or for any other public purposes, to construct any recreational facilities, to impose any restrictions or incur any other expense or obligation relating to the Property.

(e)    Notice of Special Assessments. Other than a potential BID, Seller has not received any notice and has no knowledge of any pending or threatened liens, special assessments (other than the special Metro assessment), condemnations, impositions or increases in assessed valuations to be made against the Property by any governmental authority, other than increases in assessed valuations in the ordinary course.

(f)    Environmental. Other than as set forth in the list of Environmental Reports attached hereto as Exhibit D, Seller has no knowledge of any violation of Environmental Laws related to the Property or the presence or release of Hazardous Materials on or from the Property except as disclosed in the Property Information. Seller has not manufactured, introduced, released or discharged from or onto the Property any Hazardous Materials or any toxic wastes, substances or materials (including, without limitation, asbestos), and Seller has not used the Property or any part thereof for the generation, treatment, storage, handling or disposal of any Hazardous Materials,

10

in violation of any Environmental Laws. The term "Environmental Laws" includes without limitation the Resource Conservation and Recovery Act and the Comprehensive Environmental Response Compensation and Liability Act and other federal laws governing the environment as in effect on the Date of this Agreement together with their implementing regulations and guidelines as of the Date of this Agreement, and all state, regional, county, municipal and other local laws, regulations and ordinances that are equivalent or similar to the federal laws recited above or that purport to regulate Hazardous Materials. The term "Hazardous Materials" includes, without limitation: (i) those substances included within the definitions of any one or more of the terms "hazardous substances," "hazardous materials," and "toxic substances," in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. Sec. 9061 et seq., the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. Sec. 6901 et seq., and the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §§ 1801 et seq., and in the regulations promulgated pursuant to said laws; (ii) those substances listed in the United States Department of Transportation Table (49 CFR 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 CFR Part 302 and amendments thereto); (iii) such other substances, materials and wastes as are or become regulated under applicable local or federal laws, or which are classified as hazardous or toxic under federal or local laws or regulations; and (iv) any materials, wastes or substances that are (a) petroleum; (b) friable asbestos; (c) polychlorinated biphenyls; (d) designated as a "Hazardous Substance" pursuant to Section 311 of the Clean Water Act, 13 U.S.C. §§ 1321 et seq. (33 U.S.C. § 1321) or designated as "toxic pollutants" subject to Chapter 26 of the Clean Water Act pursuant to §307 of the Clean Water Act (33 U.S.C. § 1317); (e) flammable explosives; or (f) radioactive materials, and all regulations promulgated thereunder which even if not so regulated, may or could pose a hazard to the health and safety of the occupants of the Property or the owners of the premises adjacent to the Property. . Seller has disclosed to Purchaser that a gasoline tank was removed from the Property in 1987, in compliance with applicable Environmental Laws.

(g)  Withholding Obligation.  Seller is not a foreign person (as defined in Section 1445(f)(3) of the Code (defined below)).  The consummation of the transactions contemplated by this Agreement by Seller is not subject to any federal, state or local withholding obligation of Purchaser under the tax laws applicable to Seller or the Property.

(h)  Bankruptcy or Debt of Seller.  Seller is not in the hands of a receiver and has not committed an act of bankruptcy.

(i)  Compliance with Existing Law.  Seller has not received written notice of the existence of any violations of any current law, municipal or other governmental ordinances, orders, rules, regulations or requirements, or of any restrictive covenants against or affecting the Property, or any part thereof not generally known to the public at large.  To the best of Seller's knowledge, the execution of this Agreement by Seller, and the consummation of the transaction described herein, does not and will not cause Seller to be in violation of any such law, ordinance, order, or requirement or of any agreement or contract to which Seller is a party.

(j)  Leases.  With the exception of Seller's current arrangement with respect to parking on the Property, which arrangement shall be memorialized at Closing consistent with Section 5.2(d) above, there are no leases, licenses or occupancy agreements affecting the Property,

(k)  Contracts.  There are no Contracts affecting the Property which will be binding upon the Property or Purchaser after Closing.

(l)  Prohibited Persons and Transactions.  To the best of Seller's knowledge, Seller is in compliance with, the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

(m)  Property Information.  To the best of Seller's knowledge, the Property Information as delivered to Purchaser are true, complete and correct copies of such documents as are kept in Seller's files in the ordinary course of business.

11

(n)    Options and Other Property Rights.  Other than the TLC Agreement and the TLC Mortgage, Seller has entered into no agreements, contracts, leases, licenses or other occupancy agreements affecting or relating to the right of any party with respect to the sale, possession or occupancy of the Property, or any portion thereof, which are obligations which will affect Purchaser, the Property or any portion thereof subsequent to the recordation of the Deed. No rights of first refusal, options or similar rights regarding the Property exist.

(o)    Seller's Knowledge.  The knowledge of Seller is limited to the actual knowledge of Mssrs. Sam Rose and Steve Braesch, which persons Seller represents are the persons associated with Seller or its affiliates with the most substantive knowledge regarding the Property and Seller.

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND/OR IN ANY OF THE CLOSING DOCUMENTS, IT IS UNDERSTOOD AND AGREED THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE (OTHER THAN SELLER'S LIMITED WARRANTY OF TITLE TO BE SET FORTH IN THE DEED), ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE PROPERTY WITH GOVERNMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF THE PROPERTY DOCUMENTS OR ANY OTHER INFORMATION PROVIDED BY OR ON BEHALF OF SELLER TO PURCHASER, OR ANY OTHER MATTER OR THING REGARDING THE PROPERTY.  PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL TRANSFER AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS, WITH ALL FAULTS", EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THIS AGREEMENT, PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR RELATING THERETO (INCLUDING SPECIFICALLY, WITHOUT LIMITATION, PROPERTY INFORMATION PACKAGES DISTRIBUTED WITH RESPECT TO THE PROPERTY) MADE OR FURNISHED BY SELLER, THE MANAGER OF THE PROPERTY, OR ANY REAL ESTATE BROKER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, UNLESS SPECIFICALLY SET FORTH IN THIS AGREEMENT. PURCHASER HAS CONDUCTED, OR WILL CONDUCT PRIOR TO CLOSING, SUCH INVESTIGATIONS OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE PROPERTY AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE PROPERTY, AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED BY OR ON BEHALF OF SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT. UPON CLOSING, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INVESTIGATIONS, AND PURCHASER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER (AND SELLER'S PARTNERS, EMPLOYEES AND AGENTS) FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH PURCHASER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER (AND SELLER'S PARTNERS, EMPLOYEES AND AGENTS) AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE PROPERTY; PROVIDED, HOWEVER, THIS RELEASE EXCLUDES (A) CLAIMS FOR BREACH OF ANY REPRESENTATION, WARRANTY, COVENANT OR AGREEMENT BY SELLER; (B)

POST-CLOSING COVENANTS AND AGREEMENTS OF SELLER; (C) CONTRIBUTION OR INDEMNITY CLAIMS, INCLUDING THOSE UNDER ENVIRONMENTAL LAW; AND (D) CLAIMS FOR FRAUD.

    7.2    <u>Purchaser's Representations and Warranties</u>.  As a material inducement to Seller to execute this Agreement and consummate this transaction, Purchaser represents and warrants to Seller that:

    (a)    <u>Organization and Authority</u>.  Purchaser has been duly organized and is validly existing as a corporation in good standing in the State of Delaware and qualified to do business in the District of Columbia. Subject only to obtaining certain internal approvals on or before the expiration of the Due Diligence Period, Purchaser has the full right and authority and has obtained any and all consents required therefor to enter into this Agreement, consummate and cause to be consummated the transaction.  This Agreement and all of the documents to be delivered by Purchaser at the Closing have been and will be authorized and properly executed and will constitute the valid and binding obligations of Purchaser, enforceable in accordance with their terms.

    (b)    <u>Conflicts and Pending Action</u>.  There is no agreement to which Purchaser is a party, including its organizational documents, or to Purchaser's knowledge binding on Purchaser which is in conflict with this Agreement or the performance of Purchaser's duties and obligations hereunder or under any of the closing documents to be delivered to Seller.  There is no action, suit or proceeding pending or to Purchaser's knowledge, threatened, against Purchaser which challenges or impairs Purchaser's ability to execute or perform its obligations under this Agreement, in any court or before any governmental authority, domestic or foreign.

    7.3    <u>Survival of Representations and Warranties</u>.  The representations and warranties set forth in this <u>Article 7</u> are made as of the Date of this Agreement and are remade as of the Closing Date and shall not be deemed to be merged into or waived by the instruments of Closing, but shall survive the Closing for a period of  nine (9) months after the Closing Date.  Seller and Purchaser shall have the right to bring an action thereon only if Seller or Purchaser, as the case may be, has given the other party written notice of the circumstances giving rise to the alleged breach within such nine (9) month period.  Each party agrees to defend and indemnify the other against any claim, liability, damage or expense asserted against or suffered by such other party arising out of the breach or inaccuracy of any such representation or warranty, subject to the provisions of <u>Paragraph 10.14</u> below.

ARTICLE 8:  DEFAULT AND REMEDIES

    8.1    <u>Seller's Default</u>.  If this transaction fails to close or the TDR Agreement fails to close, as a result of Seller's default, then Purchaser's sole remedies in such event shall be to either (i) terminate this Agreement, in which event the Earnest Money shall be returned to Purchaser, and thereafter neither party shall thereafter have any further right or obligation hereunder, or (ii) pursue the remedy of specific performance.  Notwithstanding the foregoing, if specific performance is not a remedy available to Purchaser due to fraud or the willful act of Seller (such as the prior conveyance of the Property in violation of this Agreement), then Purchaser shall be entitled to such remedies for breach of contract as may be available at law or in equity, which remedies shall  not be limited by the Cap (as such term is defined in Section 10.14 below).

    8.2    <u>Purchaser's Default</u>.  If this transaction fails to close or the TDR Agreement fails to close, due to the default of Purchaser, then Seller's sole remedy in such event shall be to terminate this Agreement and to retain the Earnest Money as liquidated damages, Seller hereby waiving all other rights or remedies in the event of such default by Purchaser.  The parties acknowledge that Seller's actual damages in the event of a default by Purchaser under this Agreement will be difficult to ascertain, and that such liquidated damages represent the parties' best estimate of such damages.

    8.3    <u>Notice of Default</u>.  Except for a party's failure to close on the Closing Date, neither party shall have the right to declare a default by the other party and terminate this Agreement because of a failure by such other party to perform under the terms of this Agreement unless the other party shall fail to cure such failure to perform within three business days after its receipt of written notice of such failure to perform.

ARTICLE 9: EARNEST MONEY PROVISIONS

9.1    Investment and Use of Funds.  The Escrow Agent shall invest the Earnest Money in a government insured interest-bearing account satisfactory to Purchaser and Seller at an institution having assets of not less than $125,000,000, shall not commingle the Earnest Money with any funds of the Escrow Agent or others, and shall promptly provide Purchaser and Seller with confirmation of the investments made.  If the Closing under this Agreement occurs, the Escrow Agent shall deliver the Earnest Money to Seller.  Provided such supplemental escrow instructions are not in conflict with this Agreement as it may be amended in writing from time to time, Seller and Purchaser agree to execute such supplemental escrow instructions as may be appropriate to enable Escrow Agent to comply with the terms of this Agreement.

9.2    Termination Pursuant to Paragraph 2.2.  Purchaser shall notify the Escrow Agent of the date that the Due Diligence Period ends promptly after such date is established under this Agreement, and Escrow Agent may rely upon such notice.  If Purchaser elects to terminate this Agreement pursuant to Paragraph 2.2, Escrow Agent shall pay the entire Earnest Money to Purchaser one business day following receipt of the Due Diligence Termination Notice from Purchaser (as long as the current investment can be liquidated in one day) and this Agreement shall thereupon terminate.  No notice to Escrow Agent from Seller shall be required for the release of the Earnest Money to Purchaser by Escrow Agent.  The Earnest Money shall be released and delivered to Purchaser from Escrow Agent upon Escrow Agent's receipt of the Due Diligence Termination Notice, despite any objection or potential objection by Seller.  Seller agrees it shall have no right to bring any action against Escrow Agent which would have the effect of delaying, preventing, or in any way interrupting Escrow Agent's delivery of the Earnest Money to Purchaser pursuant to this paragraph, any remedy of Seller being against Purchaser, not Escrow Agent.

9.3    Other Terminations.  Upon a termination of this Agreement other than as described in Paragraph 9.2, either party to this Agreement (the "Terminating Party") may give written notice to the Escrow Agent and the other party (the "Non-Terminating Party") of such termination and the reason for such termination.  Such request shall also constitute a request for the release of the Earnest Money to the Terminating Party.  The Non-Terminating Party shall then have five business days in which to object in writing to the release of the Earnest Money to the Terminating Party.  If the Non-Terminating Party provides such an objection, then the Escrow Agent shall retain the Earnest Money until it receives written instructions executed by both Seller and Purchaser as to the disposition and disbursement of the Earnest Money, or until ordered by final court order, decree or judgment, which is not subject to appeal, to deliver the Earnest Money to a particular party, in which event the Earnest Money shall be delivered in accordance with such notice, instruction, order, decree or judgment.

9.4    Interpleader.  Except as provided in Paragraph 9.2 above, Seller and Purchaser mutually agree that in the event of any controversy regarding the Earnest Money, unless mutual written instructions are received by the Escrow Agent directing the Earnest Money's disposition, the Escrow Agent shall not take any action, but instead shall await the disposition of any proceeding relating to the Earnest Money or, at the Escrow Agent's option, the Escrow Agent may interplead all parties and deposit the Earnest Money with a court of competent jurisdiction in which event the Escrow Agent may recover all of its court costs and reasonable attorneys' fees.  Seller or Purchaser, whichever loses in any such interpleader action, shall be solely obligated to pay such costs and fees of the Escrow Agent, as well as the reasonable attorneys' fees of the prevailing party in accordance with the other provisions of this Agreement.

9.5    Liability of Escrow Agent.  The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Seller or Purchaser resulting from the Escrow Agent's mistake of law respecting the Escrow Agent's scope or nature of its duties.  Seller and Purchaser shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence on the part of the Escrow Agent.

### ARTICLE 10: MISCELLANEOUS

10.1    Parties Bound. Neither party may assign this Agreement without the prior written consent of the other, and any such prohibited assignment shall be void; provided that Purchaser may assign this Agreement upon written notice to Seller, but without Seller's consent to an Affiliate. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective representatives, successors, assigns, heirs, and devisees of the parties. For the purposes of this paragraph, the term "Affiliate" means an entity (i) which is controlled by or is in common control with or affiliated with Purchaser, (ii) in which Purchaser is a partner, shareholder or member, or (iii) with which Purchaser has a contractual relationship as a fee developer or manager. Any such transfer shall not release Purchaser from all obligations set forth in this Agreement.

10.2    Headings. The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

10.3    Invalidity and Waiver. If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against the other any term or provision of this Agreement shall be deemed not to be a waiver of such party's right to enforce against the other party the same or any other such term or provision.

10.4    Governing Law. This Agreement and said other instruments shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the District of Columbia without giving effect to the principles of conflicts of law thereof.

10.5    Survival. The provisions of this Agreement that contemplate performance after the Closing and the obligations of the parties not fully performed at the Closing shall survive the Closing and shall not be deemed to be merged into or waived by the instruments of Closing, except as otherwise provided herein.

10.6    No Third Party Beneficiary. This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions or remedies to any person or entity as a third party beneficiary, decree, or otherwise.

10.7    Entirety and Amendments. This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property. This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

10.8    Time. Time is of the essence in the performance of this Agreement.

10.9    Agreement Not to Market.  Seller agrees that after the execution of this Agreement and prior to termination or Closing hereunder, with the exception of Seller's obligations under the TLC Agreement to provide notice of the Right of First refusal, Seller shall take the Property off the market and not solicit or accept any offers nor engage in any discussions concerning the sale of the Property other than the transaction contemplated herein.

10.10    Attorneys' Fees. Should either party employ attorneys to enforce any of the provisions hereof, the party losing in any final judgment agrees to pay the prevailing party all reasonable costs, charges and expenses, including attorneys' fees, expended or incurred in connection therewith.

10.11    Notices. All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Paragraph 1.1. Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier, (b) sent by facsimile, in which case notice shall be deemed delivered upon transmission of such notice, or (c) sent by personal delivery, in which case notice shall be deemed delivered upon receipt. A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.

Notices given by counsel to the Purchaser shall be deemed given by Purchaser and notices given by counsel to the Seller shall be deemed given by Seller.

10.12    Construction. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

10.13    Calculation of Time Periods. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday. The last day of any period of time described herein shall be deemed to end at 6:00 p.m. Washington, D.C. time.

10.14    Procedure for Indemnity. The following provisions govern actions for indemnity under this Agreement. Promptly after receipt by an indemnitee of notice of any claim, such indemnitee will, if a claim in respect thereof is to be made against the indemnitor, deliver to the indemnitor written notice thereof and the indemnitor shall have the right to participate in, and, if the indemnitor agrees in writing that it will be responsible for any costs, expenses, judgments, damages and losses incurred by the indemnitee with respect to such claim, to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnitee shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnitor, if the indemnitee reasonably believes that representation of such indemnitee by the counsel retained by the indemnitor would be inappropriate due to actual or potential differing interests between such indemnitee and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnitor within a reasonable time of notice of any such claim shall relieve such indemnitor of any liability to the indemnitee under this indemnity only if and to the extent that such failure is prejudicial to its ability to defend such action, and the omission so to deliver written notice to the indemnitor will not relieve it of any liability that it may have to any indemnitee other than under this indemnity. If an indemnitee settles a claim without the prior written consent of the indemnitor, then the indemnitor shall be released from liability with respect to such claim unless the indemnitor has unreasonably withheld such consent. Seller shall have no liability for claims, demands, liabilities, costs, expenses, penalties, damages and losses except to the extent that the amount of such items exceeds Twenty-five Thousand and No/100 Dollars ($25,000.00), in which event the full amount shall be payable, provided that the total liability of Seller shall not exceed Two Million Dollars ($2,000,000) in the aggregate (the "Cap").

10.15    Further Assurances. In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by Seller to Purchaser at Closing, Seller agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Purchaser.

10.16    Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the parties may execute and exchange by telephone facsimile counterparts of the signature pages.

10.17    Section 1031 Exchange. Seller may consummate the sale of the Property as part of a so-called like kind exchange (an "Exchange") pursuant to § 1031 of the Internal Revenue Code of 1986, as amended (the "Code"), provided that: (a) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of an Exchange be a condition precedent or condition subsequent to the Seller's obligations under this Agreement; (b) Seller shall effect its Exchange through an assignment of this Agreement, or its rights under this Agreement, to a qualified intermediary (c) Purchaser shall not be required to take an assignment of the purchase agreement for relinquished or replacement property or be required to acquire or hold title to any real property for purposes of consummating an Exchange desired by Seller and (d) Seller shall pay any additional costs that would not otherwise have been incurred by Purchaser had Seller not consummated the transaction through an Exchange.

10.18    Waiver of Trial by Jury. The respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Agreement, or for the enforcement of any remedy under any statute, emergency or otherwise .

10.19    Confidentiality. Purchaser and Seller shall each maintain as confidential any and all information and material obtained about the other, or which is furnished to it by the other in connection with this Agreement, and such obligation shall survive any termination of this Agreement and shall survive Closing. Purchaser and Seller shall each maintain as confidential the terms of this transaction and will not disclose to anyone other than legal counsel, financial and other consultants, prospective investors and lenders and agents who need to know such information in connection with this transaction (collectively the "Exempt Parties"). Subject to the requirements of applicable law, neither Purchaser nor Seller, their respective agents or representatives, shall make any news releases or other public disclosure with respect to the transaction without prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Confidential information shall not include information and material which (i) becomes generally available to the public other than as a result of a disclosure prohibited by this Section 10.19, (ii) is known by Purchaser or Seller, as the case may be, on a non-confidential basis, prior to its receipt of such information and material from the other party, or (iii) becomes available to Purchaser or Seller, as the case may be, on a non-confidential basis from a source other than the other party which source is not prohibited from disclosing the same. Neither Seller nor Purchaser shall publicize the transaction contemplated hereby or publicize any references to the other party or the Purchase Price.

10.20    District of Columbia Soils Disclosure. The characteristic of the soil on the subject property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia published in 1976 and as shown on the Soil Maps of the District of Columbia is: Urban Land – Not Rated. For further information, the Purchaser can contact a soil testing laboratory, the District of Columbia Department of Environmental Services, or the Soil Conservation Service of the Department of Agriculture.

10.21    Underground Storage Tanks. Purchaser acknowledges that, pursuant to the District of Columbia Underground Storage Tank Management Act of 1990 and Amendment of 1992 (the "UST Act"), prior to the Date of this Agreement, Seller has informed Purchaser in writing that Seller has no knowledge of the existence or removal of underground storage tanks, except for a gasoline tank that was removed from the Property in 1987, in compliance with applicable Environmental Laws. The disclosure of Seller's lack of knowledge was made solely for the purpose of complying with the disclosure requirements of the UST Act and no representation or warranty of any nature whatever is made with respect to the possibility of the existence or removal of any other underground storage tank(s) that may have existed or been removed prior to Seller's ownership of the Property.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year set forth below.

MONTGOMERY ROAD I LIMITED
PARTNERSHIP, a Maryland limited partnership

By: Montgomery Road, Inc.,
     a Maryland corporation,
     its general partner

By: _____
Name:    Samuel G. Rose
Title:    Vice President
                              "Seller"

Date: August 11, 2006

TC MIDATLANTIC DEVELOPMENT, INC.
a Delaware corporation

17

By: _____
Name: __DANIEL S. HUDSON___
Title: ____PRESIDENT_____

Date: August_10_, 2006

"Purchaser"

Escrow Agent has executed this Agreement in order to confirm that the Escrow Agent has received and shall hold the Earnest Money and the interest earned thereon, in escrow, and shall disburse the Earnest Money, and the interest earned thereon, pursuant to the provisions of Article 9.

LANDAMERICA          FINANCIAL
SERVICES/COMMONWEALTH    LAND
TITLE INSURANCE COMPANY

By:_____
Name:_____
Title:_____

Date: August__, 2006

"Escrow Agent"

PURCHASE AND SALE AGREEMENT

Square 674, Lot 432, 90 K Street, NE, Washington, DC

EXHIBITS

A –     Legal Description of Real Property

B –     Form of Special Warranty Deed

C –     Form of Assignment of Intangible Property

D –     List of Environmental Reports

E -     List of Property Information

18

**EXHIBIT A**

LEGAL DESCRIPTION OF REAL PROPERTY

Lot Numbered 432 in Square Numbered 674 in a subdivision made by the District of Columbia Land Agency, as per plat recorded in as per plat recorded in Liber 146 at folio 82 in the Office of the Surveyor for the District of Columbia

**EXHIBIT B**

### FORM OF SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED is made as of this _____ ___, 200___, by and between _____, a _____ (the "Grantor"), having an address of _____, and, _____, a _____, having an address of _____ (the "Grantee").

#### WITNESSETH:

THAT, for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor does hereby grant, bargain, sell and convey, with Special Warranty of Title, unto Grantee, its successors and assigns, fee simple title to that certain parcel of land situate in the District of Columbia (the "Real Estate"), and being more particularly described in Schedule A attached hereto and made a part hereof.

This Special Warranty Deed and the conveyance hereinabove set forth is executed by Grantor and accepted by Grantee subject to such matters of record as are validly existing and applicable to the Property (hereinafter referred to collectively as the "Permitted Encumbrances").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereunto otherwise belonging, unto Grantee, its successors and assigns forever, and Grantor does hereby bind itself, its successors and assigns, to specially WARRANT AND FOREVER DEFEND all and singular the title to the Property unto the said Grantee, its successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, by through or under Grantor but not otherwise, subject only to the Permitted Encumbrances. WITNESS their hand and seals the day and year above written.

**GRANTOR:**

Witness

_____, a _____

_____        By_____ (SEAL)
                                   Name:_____
                                   Title:_____

DISTRICT OF COLUMBIA         )         SS:

     The foregoing Special Warranty Deed was acknowledged before me on this _____ day of _____, 200_, by _____, as the _____ of _____, for the purpose therein contained.

     WITNESS my hand and seal this _____ day of _____, 200_.


                                         _____
                                         Notary Public


My Commission expires: _____

2

EXHIBIT C

FORM OF ASSIGNMENT OF INTANGIBLE PROPERTY

THIS ASSIGNMENT OF INTANGIBLE PROPERTY (this "Assignment"), is executed by
_____, a _____ ("Seller"), for the benefit of
_____, a
_____ ("Purchaser"), as of the ___ day of _____, 200__ under
the following circumstances:

1.      Contemporaneously herewith, Purchaser is acquiring from Seller certain real property located in
the District of Columbia, and described in Exhibit A hereto (the "Property").

2.      In connection with the foregoing acquisition, Seller desires to transfer and assign to Purchaser all
of Seller' right, title and interest in and to the certain property and rights herein described.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, Seller hereby agrees as follows:

(a)     Assignment.  Seller hereby transfers and assigns to Purchaser, to the extent assignable, all of
Seller's right, title and interest in and to the following (the "Assigned Properties"), to the extent the same exist
and have been disclosed to Purchaser prior to the date hereof:

(i)     all plans and specifications, architectural and engineering drawings, surveys, plats, studies and/or
        reports prepared or obtained in connection with Seller's ownership, use or contemplated
        development of the Property;

(ii)    all permits, licenses, certificates, development rights, governmental approvals, entitlements,
        development agreements, utility agreements with any governmental or quasi-governmental entities
        or agencies with respect to the providing of utility services to the Property and sanitary or storm
        sewer capacity or reservations relating to the Property, or the right to develop the Property;

(iii)   all agreements with or applications to any governmental authority with respect to any zoning
        modification, variance, exception, platting or other matter relating to the zoning, use,
        development, subdivision or platting of the Property;

(iv)    all agreements, studies, reports, correspondence and other documents relating to the presence or
        absence of any endangered species or environmentally sensitive areas on the Property;

(v)     all claims, demands or causes of action Seller has or may have arising out of or relating to or
        caused by any defects in any of the studies or reports prepared for Seller and hereby assigned to
        Purchaser;

(vi)    All of Seller's right, title and interest in the transferable development rights described in those
        certain recorded TDR Certificates prior to execution; and

(vii)   all other rights, privileges and appurtenances owned by Seller and in any way related to the
        Property.

(b)     Seller' Representation.  Seller represents and warrants to Purchaser that Seller has not assigned,
transferred, or hypothecated its interest in the above described property to any other person or entity other than as
disclosed in the Purchase and Sale Agreement with respect to the TLC Agreement and the TLC Mortgage.
Except as set forth in the immediately preceding sentence, Seller makes no representation or warranty with
respect to the Assigned Properties and the parties agree that the Assigned Properties are being assigned on an AS
IS, WHERE IS basis, and accepted by Purchaser on that basis.

IN WITNESS WHEREOF, Seller and Purchaser have executed this Assignment as of the date first set forth above.

SELLER:

_____, a _____

By: _____
Name: _____
Title: _____

PURCHASER:

_____, a _____

By: _____
Name: _____
Title: _____

**EXHIBIT D**

LIST OF ENVIRONMENTAL REPORTS

## 90 K Street Environmental Reports

- Environmental Assessment
  By: CC Johnson & Malhotra
  Dated: December 8, 1987
  For Irfan Ali

- Environmental Assessment
  By: CC Johnson & Malhotra
  Dated: October 15, 1999
  For Greenebaum & Rose Associates

- FOIA Responses
  By: CC Johnson & Malhotra
  Dated: December 17, 1999
  For Greenebaum & Rose Associates

EXHIBIT E

Property Information

(All limited to the extent in Seller's possession or control)

<u>Operating Information</u>

1.    Copies of all service, maintenance, leasing, management or other contracts.

2.    Copies of real estate tax bills (including special assessments) for prior five (5) years.

<u>Building Information</u>

1.    All reports relating to the physical condition of the Property, in Seller's possession or control, including engineering,, environmental and seismographic.

2.    Information regarding any insurance claim(s) concerning the Property which are outstanding.

<u>Other</u>

1.    Seller's most current title policy, reports or commitments, including exceptions thereto.

2.    All licenses, permits and approvals.

3.    All surveys.

4.    TLC Agreement and TLC Mortgage