# EXHIBIT 42

## AGREEMENT OF PURCHASE AND SALE
## OF TRANSFERABLE DEVELOPMENT RIGHTS

THIS AGREEMENT OF PURCHASE AND SALE OF TRANSFERABLE DEVELOPMENT RIGHTS ("**Agreement**") is made and entered into this 10th day of August, 2006 ("**Effective Date**") by and between **MONTGOMERY ROAD I LIMITED PARTNERSHIP**, a Maryland limited partnership ("**Seller**"), and TC MIDATLANTIC DEVELOPMENT, INC., a Delaware corporation, and its permitted assigns ("**Purchaser**")

### RECITALS:

A.  Seller holds all rights, title and interest to Lot 432 in Square 674 in the District of Columbia (as more particularly described on the attached Exhibit A, the "**Land**").

B.  Seller desires to sell and Purchaser desires to purchase the Land on the terms and conditions set forth in a certain Land Purchase and Sale Agreement by and between Seller and Purchaser of even date herewith (the "**Land Purchase Agreement**"). Any capitalized terms used but not defined herein shall have the meanings set forth in the Land Purchase Agreement.

C.  The District of Columbia (the "**District**") Zoning Commission has adopted certain rules and regulations which permit the transfer of certain transferable development rights.

D.  Seller holds all right, title and interest in and to one hundred twenty thousand one hundred six (120,106) square feet of transferable development rights which has been recorded for use on the Land ("**Existing TDRs**").

E.  In addition to the Existing TDRs, Seller (or an affiliate of Seller) intends to enter into one or more contracts to acquire up to one hundred ninety-two thousand five hundred twenty-four (192,524) square feet of additional transferable development rights (the "**To Be Acquired TDRs**"). At the option of Seller, the To Be Acquired TDRs may be in the form of (i) one or more binding contracts to acquire transferable development rights (a "**TDR Contract**"), or (ii) direct ownership of transferable development rights evidenced by a certificate that may be recorded in the District land records. The Existing TDRs and the To Be Acquired TDRs are sometimes referred to collectively as the "**TDRs**."

F.  Seller desires to sell and Purchaser desires to purchase the TDRs on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing Recitals, which are a material part of this Agreement and not mere precatory language, the mutual terms, conditions and covenants set forth in this Agreement, and other good and valuable

-1-

**MR 19926**

consideration, the receipt and sufficiency of which hereby are acknowledged, Seller and Purchaser hereby agree as follows:

1. **Purchase and Sale of TDRs; Deposit.**

    1.1 **Commitment to Sell and Purchase.** Upon the terms and subject to the conditions set forth in this Agreement, Seller shall sell, convey, transfer, assign and deliver the TDRs, and Purchaser hereby agrees to purchase and accept transfer of the TDRs, on the terms set forth below.

    1.2 **Purchase Price and Payment.**

    (a) In consideration of the transfer of the TDRs from the Seller to Purchaser, Purchaser shall pay to Seller Sixty-Nine and 84/100 Dollars ($69.84) for each square foot of TDRs transferred or assigned pursuant hereto for a total of up to Twenty-One Million Eight Hundred Thirty-Three Thousand Three Hundred Sixty-Five Dollars ($21,833,365.00) (the **"Purchase Price"**).

    (b) The Purchase Price shall be paid by Purchaser to Seller at the Closing and on the Closing Date (as such terms are defined in the Land Purchase Agreement), as follows: (i) Eight Million Three Hundred Eighty-Seven Thousand Nine Hundred Twenty-Nine Dollars ($8,387,929.00) in cash or other immediately available federal funds (the **"Cash Portion of the Purchase Price"**), and (ii) the balance of the Purchase Price of up to Thirteen Million Four Hundred Forty-Five Thousand Four Hundred Thirty-Six Dollars ($13,445,436.00) shall be deferred (the **"Deferred Portion of the Purchase Price"**) and shall become due and payable in cash or other immediately available federal funds when Seller delivers the To Be Acquired TDRs, or assigns the TDR Contract to Purchaser (which will be simultaneously with the closing under the TDR Contract). If the To Be Acquired TDRs are in the form of an assignment of a TDR Contract, then, at Seller's option (A) Seller shall pay the transferor under the TDR Contract the consideration due thereunder (and Seller shall also pay all costs required of the purchaser thereunder), and Purchaser shall pay Seller the Deferred Portion of the Purchase Price as required herein, or (B) Purchaser shall pay the transferor under the TDR Contract the consideration due thereunder (and Purchaser shall also pay all costs required of the purchaser thereunder), and Purchaser shall simultaneously pay Seller (y) the Deferred Portion of the Purchase Price, less (z) the consideration due under the TDR Contract and all costs required of the purchaser incurred by Purchaser thereunder.

    (c) To the extent Seller conveys less than 192,524 square feet of To Be Acquired TDRs, the Deferred Portion of the Purchase Price shall be adjusted at the rate of $69.84 per square foot of To Be Acquired TDRs that are conveyed or assigned. Seller's failure to deliver all 192,524 square feet of To Be Acquired TDRs shall not constitute a default by Seller or excuse the performance by Purchaser hereunder (with respect to those To Be Acquired TDRs which Seller does in fact deliver in accordance herewith).

MR 19927

1.3 **Deposit.**

(a) Within five (5) business days after the Effective Date, Purchaser shall deposit the sum of Twenty-Two Thousand Four Hundred ($22,400.00) Dollars ("**Initial Earnest Money**") with Commonwealth Land Title Insurance Company ("**Escrow Agent**"). The Initial Earnest Money, together with additions thereto as provided herein, and all interest accrued thereon, is herein referred to as the "**Earnest Money.**" The Earnest Money shall be held and disbursed by the Escrow Agent pursuant to Article 7 of this Agreement.

(b) If Purchaser does not terminate this Agreement prior to the expiration of the Due Diligence Period (which has the same meaning as set forth in the Land Purchase Agreement), Purchaser shall increase the Initial Earnest Money deposited with the Escrow Agent by the amount of Four Hundred Ninety Three Thousand Eight Hundred and 00/100 Dollars ($493,800.00) on or before the expiration of the Due Diligence Period, so that the total Earnest Money deposited with Escrow Agent shall be Five Hundred Sixteen Thousand Two Hundred and 00/100 Dollars ($516,200.00) in the aggregate. If Purchaser elects to extend the Closing Date per Paragraph 1.1(i) of the Land Purchase Agreement, Purchaser shall further increase the Earnest Money deposited with the Escrow Agent by the amount of One Hundred Fifty Seven Thousand and 00/100 Dollars ($157,000.00), so that the total Earnest Money shall then be Six Hundred Seventy-Three Thousand Two Hundred and 00/100 Dollars ($673,200.00) in the aggregate.

(c) Unless otherwise returned to Purchaser or released to Seller in accordance with any other provision of this Agreement, the Earnest Money shall be applied to the Cash Portion of the Purchase Price at the Closing.

2. **Closing.**

2.1 **Time and Place.**

(a) Full and final consummation of the sale of the TDRs shall take place simultaneously with the full and final consummation of the sale of the Land in accordance with the Land Purchase Agreement.

(b) Payment of the Deferred Portion of the Purchase Price ("**Secondary Closing**") shall take place at the offices of the Escrow Agent on a date and time ("**Secondary Closing Date**") as designated by the Seller, upon ten (10) days prior written notice to Purchaser; provided that the Secondary Closing Date shall be no later than twenty-four (24) months after the Closing Date.

2.2 **Closing Costs.** Purchaser shall pay for the costs of any title examination ordered by Purchaser, customary title company closing and settlement charges and notary fees, all District of Columbia recordation and transfer taxes, all

- 3 -

**MR 19928**

title insurance premiums, and all other closing costs incurred by Purchaser (including, without limitation, any attorneys' fees incurred by Purchaser) in connection with the transactions contemplated hereby.

    2.3    **Conditions to Closing with respect to Existing TDRs.**

    (A)    **Seller.** The obligation of Seller to proceed to Closing is subject to the satisfaction, at or prior to Closing, of each of the following conditions, any of which may be waived, in whole or in part, in writing by Seller in its sole discretion at or prior to Closing:

    (i)    The representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects as if made on and as of the Closing Date; and

    (ii)    Purchaser shall have performed and complied in all material respects with all of the covenants and deliveries required by this Agreement, and by the Land Purchase Agreement to be performed or complied with by Purchaser at or prior to Closing.

    (B)    **Purchaser.** The obligation of Purchaser to proceed to Closing is subject to the satisfaction, at or prior to Closing, of each of the following conditions, any of which may be waived, in whole or in part, in writing by Purchaser in its sole discretion at or prior to Closing:

    (i)    All of the representations and warranties of Seller set forth in this Agreement relevant to the Existing TDRs shall be true and correct in all material respects as if made on and as of the Closing Date.

    (ii)    Seller shall have performed and complied in all material respects with all of the covenants and deliveries required by this Agreement, and by the Land Purchase Agreement to be performed or complied with by Seller at or prior to Closing.

    (iii)    Title to the Existing TDRs shall be good, marketable and insurable as such by the Escrow Agent through a TDR endorsement, and shall not be subject to any recorded lien, mortgage, deed of trust, or security interest, but shall be subject to the provisions of applicable law, and to the provisions of the Land Purchase Agreement.

    (C)    **Failure of a Condition to Closing with respect to Existing TDRs.** If any condition precedent to a party's obligation to close hereunder is not satisfied on or before the Closing Date, such party shall by written notice to the other party specifying such failure of condition either (x) extend the Closing Date for up to thirty (30) days to allow the other party to satisfy such condition, a failure to satisfy such condition at the end of the 30-day extension shall entitle either party to terminate

**MR 19929**

this Agreement, subject however, to the last clause of 2.3B(iii), or (y) waive such failed condition and proceed to Closing.

    2.4    **Closing Deliveries with respect to Existing TDRs.**

        (A)    At Closing, Seller shall:

            (i)    Deliver to Purchaser a special warranty deed or other acceptable recordable instrument that transfers the Existing TDRs;

            (ii)    Execute, acknowledge and deliver a certificate stating that the representations and warranties of Seller set forth in this Agreement are true and correct in all material respects as of Closing as if made on and as of the Closing Date;

            (iii)    Execute, acknowledge and deliver to the Escrow Agent a title affidavit (in customary form);

            (iv)    Execute, acknowledge and deliver all items required to be delivered by Seller pursuant to the Land Purchase Agreement; and

            (v)    Execute, acknowledge (as appropriate) and deliver such additional documents as may be reasonably required to consummate the transactions contemplated herein.

        (B)    At Closing, Purchaser shall:

            (i)    Pay the Cash Portion of the Purchase Price to Seller;

            (ii)    Execute, acknowledge and deliver a certificate stating that the representations and warranties of Purchaser set forth in this Agreement are true and correct in all material respects as of Closing as if made on and as of the Closing Date;

            (iii)    Execute, acknowledge and deliver all other items required to be delivered by Purchaser pursuant to the Land Purchase Agreement;

            (iv)    Deliver to Seller (at Purchaser's option) either (a) an unconditional, irrevocable, sight draft letter of credit from a nationally recognized financial institution, the form and substance of which to be reasonably approved by Seller, in an amount equal to Thirteen Million Four Hundred Forty Five Thousand Four Hundred Thirty Six and 00/100 Dollars ($13,445,436.00) with an expiration date of no less than twenty-five (25) months after the Closing Date ("**Letter of Credit**") as security for Purchaser's obligations to pay the Deferred Portion of the Purchase Price or (b) a guaranty of payment of the Deferred Portion of the Purchase Price from Trammell Crow Company, a Delaware corporation, or a substitute guarantor with

**MR 19930**

creditworthiness acceptable to Seller. If applicable, the direct charge for issuing the Letter of Credit by the issuing bank shall be shared 50% each by Purchaser and Seller, and all other costs, if any, associated with the Letter of Credit shall be borne by Purchaser; and

(v) Execute, acknowledge (as appropriate) and deliver such additional documents as may be reasonably necessary or customary to consummate the transactions contemplated herein.

2.5 **Conditions to Secondary Closing.**

(A) **Seller.** The obligation of Seller to proceed to Secondary Closing is subject to the satisfaction, at or prior to Secondary Closing, of each of the following conditions, any of which may be waived, in whole or in part, in writing by Seller in its sole discretion at or prior to Secondary Closing:

(i) The Closing shall have taken place with respect to the Land and the Cash Portion of the Purchase Price shall have been paid to Seller; and

(ii) Purchaser shall have performed and complied in all material respects with all of the covenants required by this Agreement to be performed or complied with by Purchaser at or prior to the Secondary Closing, including tendering the full Deferred Portion of the Purchase Price to Seller.

(B) **Purchaser.** The obligation of Purchaser to proceed to the Secondary Closing is subject to the satisfaction, at or prior to Secondary Closing, of each of the following conditions, any of which may be waived, in whole or in part, in writing by Purchaser in its sole discretion at or prior to the Secondary Closing:

(i) The Closing shall have taken place with respect to the Land and the TDRs;

(ii) If the To Be Acquired TDRs are in the form of a TDR Contract, there shall be no material default by either party under the TDR Contract and closing shall be simultaneously occurring thereunder; and

(iii) The To Be Acquired TDRs shall be in compliance with District of Columbia law and regulations. Since Purchaser will own legal title to the Land at that time, such compliance shall be evidenced by the delivery of a recordable certificate to Purchaser acknowledging that all steps have been taken to convey the To Be Acquired TDRs, except for Purchaser's execution of the documentation and recordation of the To Be Acquired TDRs on the Land. Purchaser agrees to fully cooperate with Seller (and the transferor under the TDR Contract, if applicable) and to take all commercially reasonable action requested by Seller (but at no out of pocket,

MR 19931

third party cost to Purchaser) required for Seller to assign or cause to be assigned the To Be Acquired TDRs to Purchaser, or otherwise perfect the To Be Acquired TDRs.

(iv) Title to the To Be Acquired TDRs shall be good, marketable and insurable by the Escrow Agent by TDR endorsement, and shall not be subject to any recorded lien, mortgage, deed of trust, or security interest, but shall be subject to provisions of applicable law.

(C) **Failure of a Condition to Closing with respect to the To Be Acquired TDRs.** If any material condition precedent to a party's obligation to close on the Secondary Closing hereunder is not satisfied on or before the Secondary Closing Date, such party shall by written notice to the other party specifying such failure of condition, either (x) extend the Secondary Closing Date for up to thirty (30) days to allow the other party to satisfy such condition, or (y) waive such failed condition and proceed to Closing. If, after the thirty (30) day extension, the condition is still not materially met, the complying party shall have all rights set forth herein to terminate this Agreement and/or seek the default remedies set forth in Section 5, below, as applicable.

2.6 **Secondary Closing Deliveries**

(A) By Seller:

(i) Execute, acknowledge and deliver to Purchaser either (i) an assignment of the TDR Contract (if applicable), which assignment shall include an acknowledgement by the transferor thereunder of the assignment to Purchaser, if transferor's consent is required under the TDR Contract, or (ii) a conveyance of the fully vested To Be Acquired TDRs in a form to be recorded by Purchaser;

(ii) Execute, acknowledge (as appropriate) and deliver such additional reasonable documents as may be reasonably necessary or customary to consummate the transactions contemplated herein.

(B) By Purchaser:

(i) Pay the Deferred Portion of the Purchase Price to Seller, whereupon Seller shall return the original Letter of Credit or, as applicable, the guaranty;

(ii) Execute, acknowledge (as appropriate) and deliver such additional reasonable documents as may be reasonably necessary or customary to consummate the transactions contemplated herein, including accepting an assignment of and assuming the TDR Contract, in accordance with terms of this Agreement.

3. **Representations and Warranties.**

-7-

MR 19932

3.1 **Purchaser's Representations and Warranties.** Purchaser represents and warrants to Seller that the following are true and correct as of the Effective Date, the Closing Date and the Secondary Closing Date, as applicable:

Purchaser (i) is a corporation duly formed and validly existing under the laws of State of Delaware, (ii) is qualified to do business in the District of Columbia, (iii) has full power and authority to enter into and consummate this Agreement without the consent of any person or entity and (iv) has authorized the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement. The person signing this Agreement on behalf of Purchaser is authorized and has the power to execute this Agreement on Purchaser's behalf.

3.2 **Seller's Representations and Warranties.** Seller represents and warrants that the following are true and correct as of the Effective Date, the Closing Date and the Secondary Closing Date, as applicable:

(A) Seller (i) is a limited partnership validly existing under the laws of the State of Maryland, (ii) is qualified to do business in the District of Columbia, (iii) has full power and authority to enter into and consummate this Agreement without the consent of any person or entity, and (iv) has authorized the execution, delivery and performance of this Agreement. The person signing on behalf of Seller is authorized and has the power to execute this Agreement on Seller's behalf.

(B) Seller is not a "foreign person," "foreign trust," or "foreign corporation" within the meaning of the United States Foreign Investment in Real Property Tax Act of 1980 and the Internal Revenue Code of 1986, as amended.

Except as set forth in this Section 3.2, Seller makes no representations or warranties to Purchaser, and Purchaser shall acquire the Existing TDRs and accept an assignment of or conveyance of the To Be Acquired TDRs "as is", "where is" without further warranty or representation, but subject however, to the conditions and covenants set forth herein.

4. **Pre-Closing Covenants.**

4.1 Prior to Closing or the Secondary Closing, as applicable, Seller shall provide Purchaser with copies of any written notices that Seller receives with respect to (i) any special assessments pertaining to the TDRs, (ii) any condemnation or eminent domain proceedings affecting the TDRs, (iii) any violation of any zoning, or other law, regulation or code applicable to the TDRs, and (iv) any notices of any kind received under or related to the To Be Acquired TDRs.

4.2 Seller shall use its commercially reasonable efforts to expeditiously enter into a TDR Contract or acquire the To Be Acquired TDRs in compliance with the District of Columbia law and regulations, so that Seller can assign or convey the To Be

MR 19933

Acquired TDRs to Purchaser as contemplated by this Agreement. Purchaser acknowledges that it has received from Seller a letter of intent with CarrAmerica to acquire 192,524 square feet of the To Be Acquired TDRs and a draft TDR Contract to convey same. Notwithstanding anything else contained herein to the contrary, a failure by Seller to enter into a TDR Contract or acquire the To Be Acquired TDRs shall not be a condition precedent to, or delay, Closing hereunder, or Closing on the Land Purchase Agreement.

5. **Events of Default and Remedies.**

    5.1     **Events of Default.**

        (A)     **Purchaser.** Each of the following shall constitute an event of default ("**Event of Default**") by Purchaser hereunder:

            (i)     if Purchaser fails to pay the Cash Portion of the Purchase Price at Closing or the Earnest Money as required by this Agreement;

            (ii)     if Purchaser fails to pay the Deferred Portion of the Purchase Price as required herein;

            (iii)     if Purchaser fails to deliver the Letter of Credit or the guaranty of Trammell Crow Company, a Delaware corporation (or acceptable substitute) at Closing; or

            (iv)     if Purchaser fails to comply in any material respect with any of the terms, conditions, or covenants applicable to Purchaser set forth in this Agreement or the Land Purchase Agreement.

        (B)     **Seller.** Each of the following shall constitute an Event of Default by Seller hereunder:

            (i)     if Seller fails to convey the TDRs in accordance with the terms of this Agreement, or fails to close in accordance with the terms and conditions of the Land Purchase Agreement; or

            (ii)     if any representation or warranty of Seller under this Agreement is not true or correct in any material respect.

        (C)     **Remedies Upon an Event of Default.**

            (i)     **Seller's Remedies.** Upon the occurrence of an Event of Default by Purchaser with respect to the Existing TDRs, Seller shall have as its exclusive remedy hereunder, the absolute right to terminate this Agreement by written notice to Purchaser, whereupon the Escrow Agent shall promptly deliver the Earnest Money to Seller, as agreed upon liquidated damages and not as a penalty. Upon the occurrence of an Event of Default by Purchaser with respect to the

MR 19934

Secondary Closing, Seller shall have as its exclusive remedy hereunder the right to immediately negotiate and retain the proceeds of the Letter of Credit or call on the guaranty, and use the proceeds thereof to consummate the Secondary Closing as set forth herein, whereupon, upon the consummation of the Secondary Closing this Agreement shall be deemed to be terminated and the parties shall have no further liability or obligations under this Agreement. The parties hereby agree that actual damages would be difficult to ascertain and therefore, they have knowingly and willingly agreed to the liquidated damage sum.

(ii) **Purchaser's Remedies.** Upon the happening of an Event of Default by Seller, Purchaser shall have the absolute right, as its sole remedy in lieu of any other remedy, to either terminate this Agreement by written notice to Seller, whereupon the Escrow Agent shall promptly return the Earnest Money to Purchaser, or to obtain specific performance of Seller's obligation to consummate Closing; however, with respect to the Secondary Closing, Purchaser's sole remedy shall be limited to return of the Letter of Credit or guaranty, whereupon Purchaser's obligation to pay the Deferred Portion of the Purchase Price shall be null and void, this Agreement shall be deemed to be terminated and the parties shall have no further liability or obligations under this Agreement.

The above remedies and rights of Purchaser and Seller shall be exclusive and not cumulative. Notwithstanding anything set forth herein to the contrary, prior to declaring an Event of Default, Purchaser and Seller shall each provide written notice thereof to the other and shall provide ten (10) business days to cure any such default.

6. **General Provisions.**

    6.1 **Notices.** All notices, payments and other required communications ("Notices") to the parties shall be in writing, and shall be addressed respectively as follows:

    If to Seller:   Montgomery Road I Limited Partnership
                    Attn: Sam Rose
                    c/o Greenebaum and Rose Associates, Inc.
                    5301 Wisconsin Avenue, N.W., Suite 510
                    Washington, D.C. 20015
                    Telephone: 202/686-3000
                    Facsimile: 202/686-3617

    With a copy to: Shapiro, Lifschitz and Schram, PC
                    Attn: Ronald Shapiro
                    1742 N Street, NW,
                    Washington, DC 20036
                    Telephone: 202/689-1900
                    Facsimile: 202/689-1901

MR 19935

|  |  |
|---|---|
| If to Purchaser: | TC MidAtlantic Development, Inc.<br>1055 Thomas Jefferson Street, NW<br>6th floor<br>Washington, DC 20007<br>Attn: Mr. Daniel S. Hudson<br>Telephone (202) 295-3392<br>Facsimile (202) 298-8123<br>E-mail: Dhudson@trammellcrow.com |
| With a copy to: | J. Richard Saas, Esq.<br>Tenenbaum and Saas, PC<br>4504 Walsh Street, Suite 200<br>Chevy Chase, MD 20815<br>Telephone (301) 961-5300<br>Facsimile: (301) 961-5305<br>E-mail: rsaas@tspclaw.com |
| Escrow Agent: | Commonwealth Land Title Insurance Company<br>c/o LandAmerica Commercial Services<br>1015 15th Street NW<br>Suite 300<br>Washington, DC 20005<br>Attn: Ms. Sarah (Sally) Eckert Webb<br>Telephone: (202) 737-4747 |

All Notices shall be given (i) by personal delivery to the applicable party; or (ii) by facsimile, in which case notice shall be deemed delivered upon transmission of such notice; or (iii) by Federal Express, or other recognized courier. All Notices shall be effective and shall be deemed delivered upon actual receipt (or refusal of receipt). A party hereto may change its address by written notice to the other party.

6.2    **Waiver.** The failure of Seller or Purchaser to insist on the strict performance of any provision of this Agreement or to exercise any right, power or remedy upon a breach hereof shall not constitute a wavier of any provision of this Agreement or limit Seller's or Purchaser's right thereafter to enforce any provision or exercise any right.

6.3    **Modification.** No modification of this Agreement shall be valid unless made in writing and duly executed by authorized representatives of Purchaser and Seller.

6.4    **Governing Law.** This Agreement shall be governed by and interpreted in accordance with the laws of the District of Columbia (without regard to conflicts of laws principles).

MR 19936

6.5 **Further Assurances.** Each of the parties hereto agrees to take such actions and execute such additional instruments from time to time as may be reasonably necessary or convenient to implement and carry out the intent and purpose of this Agreement.

6.6 **Entire Agreement; Successors and Assigns.** This Agreement contains the entire understanding of the parties which supersedes all prior agreements and understandings between the parties relating to the subject matter hereof. This Agreement shall be binding upon and inure to the benefit of the respective successors, affiliates and assigns of Seller and Purchaser. Neither this Agreement, nor the performance of any of the provisions contained herein, shall be assigned, subcontracted or delegated by Seller or Purchaser, without the express prior written consent of the other party which may be withheld, conditioned or delayed in the other party's sole discretion; provided that the Purchaser shall have the right to assign this Agreement to any entity to which Purchaser has (or obtains) the right to assign its rights under the Land Purchase Agreement; provided the guaranty obligations set forth herein shall remain, and Purchaser shall not be released from its obligations hereunder. Further, and notwithstanding the foregoing, Seller may assign its rights and delegate its obligations under this Agreement, without the consent of Purchaser, to any entity which is an affiliate of Seller, and controlled by the existing partners/members of Seller.

6.7 **Disputes.** If any dispute arises under, or relates to, this Agreement, including the guaranty, the losing party hereby agrees to promptly reimburse the prevailing party for all fees, costs and expenses incurred by the prevailing party, including without limitation reasonable attorneys' fees, expert fees and collection costs, whether or not formal proceedings are instituted.

6.8 **Exhibits.** The following exhibits are attached hereto and made a part of this Agreement:

<u>Exhibit A:</u>   Property Legal Description

6.9 **Severability.** In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

6.10 **Counterparts.** This Agreement may be executed in any number of counterparts all of which taken together shall constitute one and the same instrument and any of the parties or signatories hereto may execute this Agreement by signing any such counterpart.

6.11 **Interpretation.** Wherever the singular number is used herein, the same shall include the plural; the use of any gender shall include all genders. The

MR 19937

headings set forth herein are provided solely for convenience and shall not be considered when interpreting the intention of the parties hereto.

6.12 **Non-Merger.** The provisions hereof, including those relating to the Deferred Portion of the Purchase Price, shall not be merged into any assignment document or other instrument delivered at Closing, but shall specifically survive the Closing hereunder.

7. **Deposit and Escrow.**

(a) Escrow Agent shall hold the Earnest Money in escrow in an interest-bearing account at a federally-insured financial institution in the Washington metropolitan area. All interest earned on the Earnest Money shall be and become part of the Earnest Money. Escrow Agent shall release the Earnest Money as follows:

(1) If Escrow Agent receives written notice from Purchaser (**"Purchaser Notice"**) stating that Purchaser is entitled to the return of the Earnest Money in accordance with this Agreement, then Escrow Agent shall immediately deliver a copy of the Purchaser Notice to Seller. If on or before the date that is five (5) business days following Seller's receipt of the Purchaser Notice, Seller objects in writing (**"Seller Objection Notice"**) to the return of the Earnest Money to Purchaser, then Escrow Agent shall not return the Earnest Money to Purchaser. If Seller does not deliver a Seller Objection Notice to Escrow Agent on or before the date that is five (5) business days following Seller's receipt of the Purchaser Notice, then Escrow agent shall promptly return the Earnest Money to Purchaser.

(2) If Escrow Agent receives written notice from Seller (**"Seller Notice"**) stating that Seller is entitled to the Earnest Money in accordance with this Agreement, then Escrow Agent shall immediately deliver a copy of the Seller Notice to Purchaser. If on or before the date that is five (5) business days following Purchaser's receipt of the Seller Notice, Purchaser objects in writing (**"Purchaser Objection Notice"**) to the release of the Earnest Money to Seller, then Escrow Agent shall not release the Earnest Money to Seller. If Purchaser shall not deliver a Purchaser Objection Notice to Escrow Agent on or before the date that is five (5) business days following Purchaser's receipt of the Seller Notice, then Escrow Agent shall promptly release the Earnest Money to Seller.

(b) In the event of any dispute between Seller and Purchaser regarding the disbursement of the Earnest Money, or if Escrow Agent receives conflicting demands or instructions with respect to the disbursement of the Earnest Money, then Escrow Agent shall withhold disbursement of the Earnest Money until it receives either (i) joint written instructions from Seller and Purchaser with respect to the disbursement of the Earnest Money or (ii) an order binding upon it from a court of competent jurisdiction with respect to the disbursement of the Earnest Money. Notwithstanding the foregoing, in the event of any such dispute or conflicting demands

MR 19938

or instructions, Escrow Agent shall have the right to deliver the Earnest Money into the registry of any court of competent jurisdiction, and Escrow Agent thereupon shall be released from any further liabilities or obligations with respect to the Earnest Money.

(c)     Escrow Agent shall receive no compensation for its services performed pursuant to this Agreement except for reasonable attorneys' fees and costs incurred as a result of any dispute between Seller and Purchaser. Such fees and costs shall be borne by the parties in proportion to the degree of fault of each as adjudged by a court of competent jurisdiction.

(d)     Escrow Agent may act upon any instrument or writing believed by it in good faith to be genuine and executed by the proper person, and shall not be liable in connection with the performance of its duties except in the event of the willful misconduct or gross negligence of Escrow Agent or its agents or employees.

(e)     In the event there exists a dispute between Seller and Purchaser as to the disbursement of the Earnest Money in accordance with this Section 7, and a court of competent jurisdiction determines that the Earnest Money should have been released to Seller or returned to Purchaser, then in addition to all other amounts payable under this Agreement, and notwithstanding any limitation set forth in this Agreement on the liability of any party, the non-prevailing party in such litigation or proceeding shall pay all fees and expenses (including court costs and reasonable attorneys' fees) incurred by the other party in obtaining the release of the Earnest Money.

8.    **Due Diligence Period.**

Seller has delivered to Purchaser the relevant documents in connection with the Existing TDRs, and, as soon as one is executed, a copy of the fully executed TDR Contract. Purchaser shall satisfy itself during the Due Diligence Period as to all aspects of the Existing TDRs and, if available during the Due Diligence Period, the TDR Contract. During the Due Diligence Period (as defined in the Land Purchase Agreement), Purchaser shall undertake, at its own cost and expense, a review and examination of the documents provided by Seller and of all matters relating to the TDRs (including, without limitation, the current zoning category of the Land and the transfer and utilization of the TDRs as Purchaser deems appropriate, and the compliance with District of Columbia law and regulations related to the TDRs). At any time during the Due Diligence Period, Purchaser shall have the right to terminate this Agreement by written notice to Seller, in which event Seller and Purchaser shall have no further liability to each other under or in respect of this Agreement. Any such termination of this Agreement during the Due Diligence Period shall also require Purchaser to terminate the Land Purchase Agreement simultaneously.

In addition, with respect to the To Be Acquired TDRs, Seller shall provide Purchaser access to all agreements to acquire same prior to execution, during which time Purchaser shall undertake, at its own cost and expense, a review and

**MR 19939**

examination of the documents provided by Seller. Seller shall have no further requirements in this regard with respect to the To Be Acquired TDRs. As long as such documents are standard documents to acquire transferable development rights in the District of Columbia, and/or are similar to the Existing TDRs documentation, Purchaser's consent shall not be required. If, notwithstanding the foregoing, Purchaser's consent is required, it shall not unreasonably withhold, condition or delay such approval. In this regard, should Purchaser fail to respond within five (5) business days, its approval shall be deemed given.

9.  **1031 Exchange.**

Seller may consummate the sale of the TDRs as part of a so-called like kind exchange (an "Exchange") pursuant to § 1031 of the Internal Revenue Code of 1986, as amended (the "Code"), provided that: (a) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of an Exchange be a condition precedent or condition subsequent to the Seller's obligations under this Agreement; (b) Seller shall effect its Exchange through an assignment of this Agreement, or its rights under this Agreement, to a qualified intermediary (c) Purchaser shall not be required to take an assignment of the purchase agreement for relinquished or replacement property or be required to acquire or hold title to any real property for purposes of consummating an Exchange desired by Seller and (d) Seller shall pay any additional costs that would not otherwise have been incurred by Purchaser had Seller not consummated the transaction through an Exchange.

[signatures on following page]

MR 19940

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed under seal as of the date first above written.

|  |  |
|---|---|
|  | **SELLER:** |
|  |  |
|  | **Montgomery Road I Limited Partnership,** a Maryland limited partnership |
| WITNESS: | By: Montgomery Road, Inc., its general partner |
|  |  |
| _____ | By: _____ [SEAL] |
|  | Name: Samuel G. Rose |
|  | Title: Vice President |
|  |  |
|  | **PURCHASER:** |
|  |  |
|  | TC MidAtlantic Development, Inc. |
| WITNESS: |  |
| /s/ D. _____ | By: /s/ Daniel S. Hudson [SEAL] |
|  | Name: Daniel S. Hudson |
|  | Title: President |

MR 19941

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed under seal as of the date first above written.

**SELLER:**

**Montgomery Road I Limited Partnership,**
a Maryland limited partnership

WITNESS:

By: Montgomery Road, Inc.,
    its general partner

___/s/ Maria B. Varona___
MARIA B. VARONA

By: ___/s/ Samuel G. Rose___ [SEAL]
Name: Samuel G. Rose
Title: Vice President

**PURCHASER:**

TC MidAtlantic Development, Inc.

WITNESS:

_____

By: _____ [SEAL]
Name: Daniel S. Hudson
Title: President

**MR 19942**

## EXHIBIT A

## PROPERTY LEGAL DESCRIPTION

Lot 674, Square 432, 90 K Street, N.E., District of Columbia

F:\Clients\421\14\90 K TDR 8-10-06.DOC

**MR 19943**