# Exhibit 59

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------x
MONTGOMERY ROAD I            :
LIMITED PARTNERSHIP,         :
                             :
    Plaintiff/               :
    CounterDefendant,        :
                             :
    v.                       :
                             :
VIAD CORP.,                  :
                             : No. 1:06CV00344(HHK)
    Defendant/               :
    CounterPlaintiff,        :
                             :
    v.                       :
                             :
MONTGOMERY ROAD I            :
LIMITED PARTNERSHIP,         :
                             :
    Defendant/               :
    CounterPlaintiff.        :
------------------------------x

Washington, D.C.

Tuesday, February 20, 2007

Deposition of

STEVE HALBERT

a witness, called for examination by counsel for

Plaintiff/CounterDefendant pursuant to notice and

agreement of counsel, beginning at approximately

2:24 p.m. at the law offices of Cooter Mangold

Tompert & Karas, 5301 Wisconsin Avenue, NW,

**Page 18**

1 task.
2 Q You don't mean to suggest that the
3 lawyers are irrelevant, do you?
4   You don't have to answer that.
5 A No.
6 Q Do you recall what they told you
7 about the nature of what this interest was,
8 this residual interest?
9 A I did not recall what they told me.
10 If you rephrase the question as what is my
11 understanding --
12 Q What is your understanding?
13 A Then.
14 Q What was your understanding then?
15 A My understanding now is about as
16 clear as it was then, that Viad somehow had
17 been an owner -- they were partners or
18 something -- that as part of their sale
19 agreement, there was a participation in a
20 future disposition. And the accounting for
21 it, those issues, I don't recall anything
22 about.

**Page 19**

1 Q Have you told me essentially all
2 you can recall about the first conversation?
3 A Yes.
4 Q After this first
5 conversation -- and I did see an engagement
6 letter. But I don't need that for right now.
7 A Okay.
8 Q You undertook to do an appraisal.
9 A Correct.
10 Q Is that right?
11   You can look at your appraisal if
12 you want, or anything else that you want.
13 How did you go about doing it, as you
14 undertook the work? Just tell me what you
15 did to go about this job.
16 A Researched land sales in the locale
17 near 90 K Street. Analyzed them, along with
18 all the other appraisal kinds of things that
19 lead up to it. And --
20 Q Know that nifty stuff about -- this
21 is a great market.
22 A Yeah.

**Page 20**

1 Q Big office buildings and that kind
2 of stuff.
3 A Yes, those kinds of things. Both
4 the hyperbole and hopefully some salt on that
5 hyperbole to make it an appropriately
6 defensible appraisal on the marketplace.
7 Analyzed the sales comps, drew conclusions,
8 and reported them in the report.
9 Q As part of your work, did you go to
10 the site?
11 A Yes.
12 Q And -- refreshing my recollection
13 that there are a bunch of pictures of the
14 site in here, aren't there?
15 A There should be in the front part,
16 beginning sort of before page 1. It includes
17 some aerial photos. But --
18 Q I see the aerials that you got off
19 the Internet, I presume. Right?
20 A Yeah.
21 Q Are there any actual photographs of
22 the site itself?

**Page 21**

1 A No.
2 Q But you did go to the site?
3 A Yes. Uh-huh.
4 Q Describe the site for me.
5 A It is a rectangular site at the
6 northwest corner of K Street and First
7 Street, NE.
8 Q Is the site improved?
9 A If you mean by improved is there a
10 proposed office building on it yet, no.
11 There are parking spaces. So it's improved
12 with sidewalks and asphalt parking. It's
13 across the street from the D.C. adjudication
14 traffic court, and I have been there. I have
15 appraised other properties within 100 yards
16 of this property in the last two years.
17 So I'm aware of that property. Yeah.
18 Q The property is paved. It is an
19 asphalt parking lot; right?
20 A Yeah.
21 Q They're curved, I guess, to the
22 street?

6 (Pages 18 to 21)

**Page 22**

1  A   Yeah.
2  Q   The sidewalk, I presume?
3  A   Yes, that's my recollection.
4  Q   Other than those things, are there
5  any improvements on the property?
6      Help yourself.
7  A   I don't recall right now.
8  Q   Either way?
9  A   I do not recall either way.
10 Improvements were not -- my assignment was
11 the land, not the improvements.
12     Moreover, they would not have
13 contributed to the overall value anyway.
14 They'd be demolished because it was time to
15 re-develop the site, so even if there were
16 some smaller -- something, it was not met.
17 Not --
18 Q   Let me follow up on that one.
19 You're saying it wouldn't have contributed to
20 value anyway, because it would have been
21 demolished. I think what you're saying is
22 that if there was a building on it, it would

**Page 23**

1  have been knocked down to make way for
2  re-development.
3  A   Basically.
4  Q   Is that what you are trying to say?
5  A   Basically.
6  Q   You just don't remember whether
7  there are any other improvement -- buildings
8  or anything on that property other than what
9  you've told me; is that right?
10 A   Certainly nothing noteworthy.
11 Q   In the first portion of your
12 report, you opined "subject to limiting
13 conditions, extraordinary assumptions and
14 hypothetical conditions," that you believe
15 this property as of June 24, '06 is worth
16 $64,800,000. Is that right?
17 A   That's correct.
18 Q   Your report says -- and I just want
19 you to confirm -- that there were no
20 extraordinary assumptions or hypothetical
21 conditions that had anything to do with this
22 appraisal.

**Page 24**

1  A   That's correct.
2  Q   I want to go through the report.
3  We can sort of go through it together. The
4  only appraisal technique that you used -- I'm
5  not being critical -- was a sales comparison
6  approach. Is that correct?
7  A   That's correct.
8  Q   Why did you use that approach and
9  no other?
10 A   That's the appropriate one for
11 doing land.
12 Q   On improved land, essentially?
13 A   On improved land.
14 Q   One thing. Turn to the executive
15 summary.
16 A   Okay.
17 Q   Turn to the actual appraisal itself
18 as opposed to the executive summary. Page
19 number 1, introduction.
20 A   Uh-huh.
21 Q   You indicate that the current
22 disposition is that as of the time you did

**Page 25**

1  your work, it was your understanding that the
2  subject property was not being marketed for
3  sale. When did you first learn that the
4  property was for sale?
5  A   I'm not sure. Didn't have any
6  knowledge June, July; clearly had knowledge
7  November, December. There had been rumors on
8  the street. So somewhere between June and
9  December.
10 Q   You write on that current
11 disposition it is your understating that "the
12 subject property is not being marketed for
13 sale although development offers are being
14 accepted." What development offers are you
15 talking about?
16 A   It was my understanding from
17 talking to brokers in the marketplace that
18 Greenbaum & Rowe were open to tenants coming
19 forward who wanted to have a couple of
20 hundred thousand feet which would then set up
21 the development financing.
22 Q   You're not aware of any specific

7 (Pages 22 to 25)