# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MONTGOMERY ROAD I LIMITED PARTNERSHIP, <br>      Plaintiff and <br>      Counterclaim-Defendant, <br><br>   v. <br><br> VIAD CORP, <br>      Defendant and <br>      Counterclaim-Plaintiff, <br><br>   v. <br><br> MONTGOMERY ROAD TDR, LLC, <br>      Counterclaim-Defendant. | Case No. 1:06CV00344 (HHK) |

## VIAD CORP'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC RENEWED MOTION FOR SUMMARY JUDGMENT

Rodney F. Page (DC Bar No. 37994)
Bryan Cave LLP
700 Thirteenth Street, N.W., Suite 700
Washington, D.C. 20005-3960
P: (202) 508-6000
F: (202) 508-6200

*Counsel for Defendant/Counterclaim-Plaintiff Viad Corp*

Dated: September 27, 2007

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

STATEMENT OF MATERIAL FACTS ........................................................................ 6

ARGUMENT ................................................................................................. 6

I.    THE REZNICK ANALYSIS IS NOT BINDING ON THE PARTIES ............................ 6

    A.    Ms. Fiorucci's Letter Was Not a Counter-Offer ...................................... 7

    B.    MRLP's Cited Authority is Inapplicable .............................................. 9

II.   THE CPA DOES NOT SUPPORT THE TREATMENT OF S&S FINANCE
    CONTRIBUTIONS AS DEBT; FURTHERMORE, THERE IS NO EVIDENCE
    THAT THE AMOUNTS FROM S&S FINANCE WERE IN FACT DEBT ................. 11

III.  IF THE COURT FINDS THAT THE REZNICK ANALYSIS WAS NOT
    BINDING, IT SHOULD THEN FIND THAT REZNICK WAS WRONG ON
    KEY POINTS ......................................................................................... 13

    A.    The First Mortgage was Equity and Its Acquisition by S&S Finance was a
        Refinancing ......................................................................................... 14

    B.    Developer's Equity Return Cannot be Deducted When Calculating
        Appreciation Cash Flow ....................................................................... 15

    C.    MRLP Cannot Deduct Accrued Interest as Developer's Operating Equity
        or Developer's Equity Return ................................................................ 15

IV.   LAND APPRECIATION ATTRIBUTABLE TO TDRS SHOULD BE
    INCLUDED IN THE CASH APPRECIATION CALCULATIONS ............................ 16

    A.    Under the CPA, Viad is Owed 15% of the Appreciation of the 90 K Street
        Property, Based Upon its Agreed Value Under The CPA .................................... 16

    B.    MRLP Fails to Offer any Justification for the Sale Price of Approximately
        $70 for the TDRs ................................................................................. 16

        1.    Current Market Price of TDRs ............................................................. 17

        2.    MRLP's Purported Price for the TDRs .................................................. 17

        3.    Effect on Appreciation Cash Payment .................................................. 18

V.    MRLP HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH
    AND FAIR DEALING ............................................................................... 19

A.    MRLP, Like All Parties to a Contract, Owed a Duty of Good Faith and Fair Dealing to Viad....................................................................... 19

    1.    Every Contract Contains the Implied Covenant of Good Faith and Fair Dealing ............................................................................ 19

    2.    Contracts Between Creditors and Debtors Clearly Contain the Implied Covenant of Good Faith and Fair Dealing ................................. 20

B.    The Language of the CPA Does Not Waive the Implied Covenant and Does Not Excuse Fraudulent Behavior................................................ 22

VI.    MRLP HAS DEFAULTED UNDER THE CPA.......................................... 23

A.    MRLP Defaulted by Failing to Provide Financial Statements for 2005 and 2006.................................................................................................... 23

    1.    The Failure to Provide Timely Financial Statements Was a Material Breach...................................................................... 24

    2.    The Supplemental Filing Did Not Comply with the CPA ........................ 25

B.    MRLP Defaulted by Failing to Make the Appreciation Cash Payment and for Failing to Provide a Statement for Calculating the Payment .......................... 26

C.    MRLP Defaulted by Failing to Name an Appraiser ............................................ 27

D.    An Audit of MRLP's Records is Required ........................................................ 29

VII.    CONCLUSION...................................................................................................... 30

## TABLE OF AUTHORITIES

### CASES

*In re A.W. Logging, Inc.,*
  2006 Bankr. LEXIS 3605 (Bankr. D. Idaho Oct. 4, 2006) .........................................20

*Allworth v. Howard University,*
  890 A.2d 194 (D.C. 2006) ..................................................................................20

*Amtrak v. ERC Frankona Ruckversicherungs-Ag,*
  2005 U.S. Dist. LEXIS 43490 (D.D.C. June 24, 2005) ...............................26

*Andrews v. Blue,*
  489 F.2d 367 (10th Cir. 1973) ..................................................................23

*B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp.,*
  785 F. Supp. 222 (D. Mass. 1991) ............................................................21

*Bristol Savings Bank v. Chic Miller's Chevrolet-Isuzu, Inc.,*
  1993 Conn. Super. LEXIS 996 (Conn. Super. Ct. Apr. 27, 1993)..............................21

*In re Haar,*
  667 A.2d 1350 (D.C. 1995) ............................................................... 9-10

*Hais v. Smith,*
  547 A.2d 986 (D.C. 1988) ......................................................... 20, 21-22

*Hobbs v. Head & Dowst Co.,*
  231 U.S. 692 (1914) ..................................................................................26

*Home & Hearth Plano Parkway, L.P. v. LaSalle Bank, N.A (In re Home &*
  *Hearth Plano Parkway, L.P.),*
  320 B.R. 596 (Bankr. N.D. Tex. 2004).......................................................21

*London v. Guberman,*
  29 Cal. Rptr. 279 (Cal. Ct. App. 1963)......................................................23

*Sea Crest Construction Corp. v. United States,*
  59 Fed. Cl. 615 (2004) ..............................................................................9

*Steele v. Isikoff,*
  130 F. Supp. 2d 23 (D.D.C. 2000)..............................................................20

*Underwater Exotics, Ltd. v. Secretary of the Interior,*
  1994 WL 80878 (D.D.C. Feb. 28, 1994) ....................................................9

*United. Corp. v. American Home Assur. Co.,*
    118 F. Supp. 2d 181, 186 (D. Conn. 2000) ................................................................21

*Wilbar Realty, Inc. v. Pennsylvania. Infrastructure Investment Authority (In re*
    *Wilber Realty, Inc.),*
    325 B.R. 354 (Bankr. M.D. Pa. 2005) ................................................................ 20-21

*William F. Klingensmith, Inc. v. District of Columbia,*
    370 A.2d 1341 (D.C. 1977) ........................................................................................9

## INTRODUCTION AND SUMMARY OF ARGUMENT

Montgomery Road I Limited Partnership ("MRLP") seeks summary judgment on its Second Amended Complaint, the object of which is to defeat the possibility of any payment to Defendant Viad Corp ("Viad") under the Cash Participation Agreement ("CPA"), which MRLP executed twenty years ago.

The CPA, which was heavily negotiated by sophisticated parties, provides that Viad is to receive 15% of the appreciation in the property at 90 K Street, N.E. at the point it is sold. (Defendant Viad Corp's Statement of Undisputed Material Facts submitted on September 11, 2007, (hereinafter "SOF") ¶¶ 12, 21). MRLP purchased 90 K Street for $11 million in 1987, and it sold the property in January of 2007 for more than $67 million. (SOF ¶¶ 8, 144; *see also* Defendant Viad Corp's Statement of Disputed Material Facts (hereinafter "SODF") ¶ 34). According to MRLP, no money is owed to Viad. (*See generally* Second Amended Complaint). This result, however, reflects various and shifting accounting treatments used solely for purposes of altering the payment to Viad, and because of artificial adjustments it made in setting the contract price for the land (which bears no relationship to the fair market value).

The logic of MRLP's position is built on open and irreconcilable contradictions and willful disregard of the facts. Four core examples demonstrate these convolutions:

**First**, MRLP repeatedly argues that its Special Purpose Financial Statements (which are in fact not financial statements but malleable internal compilations by MRLP's resident bookkeeper Ron Glassman and its litigation counsel) set forth the "economic reality" of MRLP's ownership. Nothing could be further from the truth. These various accounting treatments include:

- alternately seeking to classify cash advances and purchases as debt and equity (Second Amended Complaint ¶ 37);

- accruing hypothetical but unpaid expenses for "equity return" and interest, despite requirements that calculations be on a cash basis (SOF ¶¶ 63-66);

- deducting costs of TDR purchases when calculating yearly operations cash payments but deleting them as a "mistake" when the property was sold (SOF ¶ 120);

- and seeking to sell such TDRs for approximately eleven times their market value and treating that inflated value as an exclusion from the purchase price of the land. (SOF ¶ 117).

The reality is that MRLP classified the purchase of and cash advances to the property as equity on its tax returns; has never documented any loans or advances to the property; made no payments to themselves for interest, even at closing on the sale; and structured the transaction for sale in a way that is anything but "economic reality." (SOF ¶¶ 63-66, 74, 137, 139).

Count I of the Second Amended Complaint itself reflects this schizophrenia, asking the court to ratify the Reznick letter as to its accounting but asking, in the alternative, to accept a complete reversal of those key accounting treatments as reflected in new financial statements provided during the course of, and in response to, litigation over the issues. (Second Amended Complaint ¶¶ 35-37). The only "reality" of MRLP's position is that it adopted any accounting treatment convenient to avoiding payment, whether or not it comports with the CPA or "economic reality."

**Second**, MRLP claims that interest expense should be deductible as Developer's Equity Return when calculating Viad's participation, even though the plain language of the CPA demonstrates that Developer's Equity Return is not a proper deduction. (SOF ¶¶ 60-62). To get around this obstacle, MRLP now seeks to classify the interest expense as debt since "Permitted Debt" can be deducted. (SOF ¶ 69). However, MRLP seeks to deduct interest that has been

accrued, and never paid, as Permitted Debt even though the CPA requires that interest be paid in order to be eligible for deduction as Permitted Debt. (SOF ¶¶ 56-59).

To bolster its position on these various accounting points, MRLP submitted to the Court in late June 2007 yet another version of the Special Purpose Financial Statements. (*See* ECF Document # 42). This Supplemental Filing purported to contain an outside auditor's certification of the propriety of MRLP's accounting positions. In fact, the Supplemental Filing was little more than a reiteration of the "Cooter Financials."[1] The new arguments were slightly altered to address specific arguments made in the concluded briefing for summary judgment. This filing came months after the close of discovery and long after the contractual deadlines set forth in the CPA.

The Supplemental Filing is further proof of the inconsistency of MRLP's position, of its disregard for contractual obligations and of its unseemly willingness to make any argument to deny Viad its rightful share of its share of the Appreciation Cash Payment. The Court should disregard this late attempt of MRLP to introduce new evidence.

**Third**, contrary to MRLP's claims, the initial dispute between the parties was never about the annual financial statements that MRLP provided to Viad. Rather, the dispute was over the proper calculation of the Appreciation Cash Payment. (SOF ¶¶ 33-39). In or around December 2004, Viad and MRLP decided to seek the advice of Reznick Group, P.C. ("Reznick"), an accounting firm, in an effort to informally resolve the disagreement. (SOF ¶ 39). Prior to and during the informal review by Reznick, MRLP never suggested to Viad that the analysis would be binding. (SOF ¶¶ 42-45). However, MRLP is claiming that the analysis was

---

[1]     During the course of litigation, on November 21, 2006, MRLP tendered a compilation of financial data, accompanied by a letter from its litigation counsel, Dale Cooter, with his opinion that the financial data is a correct statement of expenses and other deductions under the CPA.

binding under the CPA, even though there is no evidence of an agreement to invoke the arbitration provisions of the CPA or any intent expressed by either of the parties at the initiation of or during the review that it would be binding and a disclaimer from Reznick itself that the binding arbitration procedure applied. (SOF ¶¶ 42-46).

**Fourth**, MRLP falsely describes the issue relating to TDRs, stating that Viad is improperly attempting to share 15% of the "value of the TDRs." In fact, Viad is claiming 15% of the appreciation attributed to the 90 K Street property. The value of the land reflects its placement in a "receiving zone" eligible to use TDRs, which themselves are readily available, as a commodity, for purchase. (SOF ¶¶ 102, 107-08). TDRs themselves, by common agreement, have a value of only $5 or $6 per FAR[2] square foot, which is the price paid by MRLP for most of the TDRs acquired for 90 K Street. (SOF ¶¶ 105, 109). That cost, as an expense of the developer, is a deductible or excluded cost when calculating the appreciation, and MRLP knows that. But, instead of deducting the true cost, MRLP is claiming that the value of each FAR rendered by a TDR when applied to 90 K Street for development is a value excluded from the CPA calculation. Not once in its analysis does MRLP seek to justify this exclusion of nearly $70 per square foot from the total consideration paid to it, a price nearly eleven times the undisputed market value of TDRs, or address the artificial structure of the transaction which separates the sale into two components that are contingent on each other in accordance with the Umbrella Agreement between the parties to the sale. (SOF ¶ 105, 109, 121).

---

[2] FAR is a general measure of building density. FAR, or floor-to-area ratio, is the result of adding together the square footage of all of the floors in the building and dividing that total by the land area of the lot. Thus, a one-story building covering 100% of the lot equals a 1.0 FAR. At the other end of the range, a ten-story building covering 100% of the lot is a 10.0 FAR. (SOF ¶¶ 83-84).

Moreover, MRLP misstates the requirements of the CPA by focusing exclusively on the contract price for the sale of the land. Count II of the Second Amended Complaint asks only that the court declare the artificially low "land" contract price to be the operative factor, and the Motion for Summary Judgment follows that request. In fact, the CPA clearly states that Viad is to be paid based on the Agreed Value for the property, which is the greater of the contract price or the fair market value at the time of sale. (SOF ¶¶ 151-52). And, consistent with their myopic view of the CPA, MRLP has failed to produce any evidence of the fair market value of the land and defaulted when given the opportunity under the contract to do so. (SOF ¶¶ 151-60). The fair market value properly takes into account the availability and commodity pricing of the TDRs (and the resulting increase in FAR) as they contribute to the full development of the property, as demonstrated in the MAI appraisal provided by Viad. (SOF ¶¶ 155-56). The purpose of including fair market value as an alternative Agreed Value was to protect Viad in the event that MRLP attempted to sell the property for a fraudulently low price.

In any event, the "land" price established by MRLP does not reflect the fair market value of the property and is obviously not the result of an "arms-length" negotiation with the buyer. Rather, the price for the "land" and the separate price for the TDRs were separated at the insistence of MRLP, the total of the two being consistent with the buyer's view of the value of the package, and the "land" and TDR components being determined by MRLP with an eye toward the CPA. (SOF ¶¶ 118-22).

Finally, MRLP has consistently ignored the requirements of the CPA. By failing to provide accounting when due, by failing to even to report to Viad the specifics of the sale in January, 2007 until its late Supplemental Filing, MRLP defaulted under the provisions of the CPA.

In sum, the Motion for Summary Judgment by MRLP must fail because its reading of the CPA is wrong, because its own conduct is inconsistent and contrary to both common sense and "economic reality" and because the undisputed facts supports the analysis of Viad.

Many of the issues that are discussed in this Opposition memorandum have already been addressed in the Memorandum submitted by Viad in support of its Motion for Summary Judgment. Viad incorporates the previous arguments into this Opposition Memorandum.

## STATEMENT OF MATERIAL FACTS

The facts pertinent to this Motion are set forth in Defendant Viad Corp's Statement of Undisputed Material Facts, which was included with Viad's Summary Judgment Motion, filed on September 6, 2007. Viad's response to the Statement of Undisputed Material Facts Filed in Support of MRLP and MRTDR's Motion for Summary Judgment is included in Defendant Viad Corp's Statement of Disputed Material Facts, filed herewith.

## ARGUMENT

### I.     THE REZNICK ANALYSIS IS NOT BINDING ON THE PARTIES

In its Memorandum in Support of its Motion for Summary Judgment, MRLP argues that that the Reznick Analysis was a contractually binding dispute resolution agreed to by the parties. As Viad explained in detail in its Memorandum in Support of its Motion for Summary Judgment, this argument fails for several reasons. (*See* Memorandum of Points and Authorities in Support of Defendant Viad Corp's Motion for Summary Judgment, "Viad's Renewed Motion", at 3-10). While there is no need to fully reiterate all of these arguments again in this Opposition,  MRLP's filing necessitates a response to specific arguments.

When Viad submitted its statement of position to the Reznick Group in March 2005, the cover letter written by Eve Fiorucci, the Assistant Director of Real Estate, stated "Finally, while we appreciate your review of the documents and your opinion as to our interpretation of same, we wish to make clear that your opinion is not binding on TLC/Viad Corp." MRLP has claimed that the "non-binding" language used by Ms. Fiorucci was, at best, a counter-offer to amend the CPA's provisions. (MRLP's Initial Memorandum in Support of it Motion for Summary Judgment, ECF Document # 23 (hereinafter "MRLP Initial Motion") at 12).[3] MRLP then also suggests that Ms. Fiorucci's statements represent a unilateral attempt to modify the terms of the CPA. (MRLP Initial Motion at 14).

### A.    Ms. Fiorucci's Letter Was Not a Counter-Offer

MRLP's arguments lack basic logic. As MRLP readily admits, describing Ms. Fiorucci's letter as a counter-offer is an improbable "characterization" as Ms. Fiorucci "addressed her letter to the Reznick Group, not to Montgomery Road." (MRLP Initial Motion at note 16).

Moreover, there is no evidence of an agreement between MRLP and Viad to submit their dispute to Reznick under Section 2.7 of the CPA. (SOF ¶¶ 44-49). Without such an agreement, Ms. Fiorucci had nothing to counter-offer against. The evidence shows that MRLP hoped that Reznick would "get a process moving that [would] lead to a resolution," and that Mr. Solomon, the accountant who completed the analysis on behalf of Reznick, was never informed that his opinion would be binding. (SOF ¶ 45, 47). In records of phone conversations leading up to the decision to consult with the Reznick Group, there is no indication that Viad or MRLP intended Reznick's advice to be binding. (SOF ¶ 46). In a letter to the Reznick Group during the review process, Reid Liffmann, a limited partner of MRLP, signaled that the process was advisory only,

---

[3]    In accordance with the Court's suggestion, MRLP filed a Renewed Motion for Summary Judgment which largely incorporates by reference previous arguments made.

stating: "[h]opefully, with guidance from you, the parties can get a process moving that will lead to a resolution, without wasting a lot of legal dollars and time." (SOF ¶ 45). In a letter containing its analysis, the Reznick Group stated ""[w]e understand that our services are intended to **assist** in resolving a dispute between the Partnership and Viad Corp relating to the Cash Participation Agreement dated November 30, 1987 (the "Agreement"). This report **may only be used for the aforementioned purpose**, and may not be distributed or used for other purposes without the express written consent of Reznick Group, P.C." And, the letter stated, its "conclusions ... do not constitute a legal opinion, audit opinion, or any other form of assurance." The letter was addressed only to Sam Rose, and a copy provided to Viad. (SOF ¶ 50). (emphasis added). As a result, Ms. Fiorucci's letter was neither a counter-offer to amend nor a unilateral attempt to modify the terms of the CPA.

Despite this evidence, MRLP argues that the parties had a dispute regarding the Special Purpose Financial Statements (hereinafter the "financial statements") and that the parties agreed to settle the dispute under Section 2.7. However, Section 2.7 of the CPA does not relate to the subject matter of the Reznick Analysis. Section 2.7 states in relevant part that, if the parties are unable to resolve a dispute concerning the fiscal year statements within a certain period of time, "the items shall be submitted to arbitration which arbitration shall be performed by an independent certified public accountant." (SOF ¶ 51). Reznick's analysis, on the other hand, dealt with the calculation of the Appreciation Cash Payment under Article 3 in the event of a hypothetical sale. Section 2.7, which appears in the section of the CPA that deals with

Operations Cash Flow in Article 2 as opposed to Appreciation Cash Flow, concerns disputes about yearly Operations Cash Flow payments.[4]  (SOF ¶¶ 42, 51-55).

### B.    MRLP's Cited Authority is Inapplicable

Moreover, MRLP's reliance on case law for its argument that Ms. Fiorucci's letter was a counter-offer is misguided.    The cases cited by MRLP all differ from the instant case in a significant respect.    The cited authority deal with situations where a party who is clearly operating under an agreement uses correspondence addressed to the other party in an attempt to alter the terms of the agreement. *See Sea Crest Construction Corp. v. United States*, 59 Fed. Cl. 615, 616-17 (2004) (finding that the second site plan submitted by a home builder to the opposing party differed significantly with its original plan and was therefore a unilateral attempt to modify the agreement between the parties); *Underwater Exotics, Ltd. v. Secretary of the Interior*, 1994 WL 80878, at *9 (D.D.C. Feb. 28, 1994) (finding that a cover letter addressed to the opposing party that expressly limited liability was a unilateral attempt to limit the contract between the parties); *William F. Klingensmith, Inc. v. District of Columbia*, 370 A.2d 1341, 1344 (D.C. 1977) (finding that a subcontractor's silence in response to a letter from a general contractor attempting to settle the claims between the parties did not create an agreement since in general, the subcontractor's silence could not create an agreement to settle all claims under the subcontract); *In re Haar*, 667 A.2d 1350, 1352, 1354 (D.C. 1995) (finding that a client's silence in response to a letter from her attorney in which he stated that he would withdraw money from a

---

[4]    Although MRLP submitted financial statements in an effort to comply with Section 2.6 of the CPA, these statements are not related to the calculation of the Appreciation Cash Payment because Section 2.6 is part of Article 2 of the CPA, which addresses Operations Cash Flow only. (SOF ¶¶ 11, 47-49).  Appreciation Cash Flow is addressed in Article 3 of the CPA.  (SOF ¶ 12). For the same reason, the dispute resolution provision in Section 2.7 is not related to the Appreciation Cash Payment.  (SOF ¶ 55).

trust account containing settlement funds to pay his legal fees did not constitute an agreement, where the parties had a dispute over the legal fees and the client stated in an earlier letter that upon receipt of an amended fee statement, she would pay the fee if the proposal was agreeable to her).

Each of these cases involve the correspondence between the two opposing parties and one party's attempts to alter the agreement through that correspondence. In the instant case, Ms. Fiorucci's letter, addressed to the Reznick Group, simply stated her understanding of the engagement that the Reznick Group was undertaking. It was not a counter-offer or a unilateral attempt to alter an agreement with MRLP. Ms. Fiorucci's intention to clearly lay out the parameters of the Reznick Group's analysis was reasonable as the parties had failed to discuss it explicitly. MRLP cannot point to a specific conversation where Viad stated that the Reznick Group was intended to be or would be binding. (SOF ¶ 46). Mr. Rose has admitted that there was no explicit discussion of the scope of the Reznick Group's work and that he simply assumed that the analysis would be binding. (SOF ¶ 49). Mr. Rose received the letter and made no efforts to contact Viad to discuss whether the Reznick Analysis would be binding. (SOF ¶ 44).

MRLP accuses Viad of unilaterally trying to amend the CPA, but in reality, it is MRLP that is attempting unilaterally to make the Reznick Analysis binding in the absence of evidence that the parties agreed to a binding analysis. Thus, to the extent that Count I of the Second Amended Complaint seeks judgment based on the binding effect of the Reznick Analysis or the conclusion that Section 2.7 was invoked and is being enforced, summary judgment must be granted for Viad.

II.   **THE CPA DOES NOT SUPPORT THE TREATMENT OF S&S FINANCE CONTRIBUTIONS AS DEBT; FURTHERMORE, THERE IS NO EVIDENCE THAT THE AMOUNTS FROM S&S FINANCE WERE IN FACT DEBT**

Count I of the Second Amended Complaint also seeks a declaration in the alternative that all advances and/or investments in the Property were really debt owed to S&S Finance and, thus, a loan that is "Permitted Debt" under the CPA. (Second Amended Complaint ¶ 37). The court must enter summary judgment for Viad as to that alternative theory for the following reasons.

First, MRLP cannot prove that such a debt ever existed since there is no evidence of a loan. No loan documents were produced by MRLP. (SOF ¶ 74). Furthermore, MRLP has not paid any interest on this alleged loan to fund operations at 90 K Street. Rather, MRLP seeks to deduct hypothetically accrued interest on this alleged debt. (SOF ¶¶ 64-66).

MRLP's argument that the contributions are debt is contradicted by years of financial statements submitted by MRLP. For nearly 20 years, MRLP classified S&S Finance contributions as equity. (SOF ¶ 73). The new analysis has been orchestrated by litigation counsel in the middle of litigation for the sole purpose of avoiding payment to Viad, as is evidenced by the cover letter that accompanied the Revised Special Purpose Financial Statement for 2005 ("Revised 2005 Statement"). (SOF ¶¶ 74, 135).

According to the Revised 2005 Statement that was received from litigation counsel's office, MRLP owes S&S Finance over $35 million dollars. (SODF ¶ 18). However, this amount is not consistent with MRLP's tax returns, which reflect total liabilities of under $5 million. (SOF ¶ 139; SODF ¶ 18). Furthermore, at the closing of the TCMD-MRLP transaction on January 11, 2007, the amount repaid to S&S Finance was also under $5 million. (SOF ¶ 139; SODF ¶ 53). MRLP claims that the "economic reality" of the situation is that the first mortgage and the other funds from S&S Finance, including the interest charged, are Permitted Debt.

11

(MRLP Initial Motion 24, 29). But the "economic reality" is what is reflected on MRLP's tax return and the settlement statement.

Reclassifying the advances and investments from MRLP's partners Greenebaum and Rose, through S&S Finance, as debt would also directly contradict the Reznick Analysis, which MRLP seeks to enforce as binding in this case. (SOF ¶ 79). According to the Reznick Analysis, "any amount advanced by S&S or its partners to pay interest or any other reasonable expense should be treated as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b)." (SOF ¶ 79).

Finally, even if all the cash infusion to the Property was debt, which Viad disputes, MRLP cannot claim millions of dollars of accrued interest as a deduction because the CPA only recognizes cash basis accounting and requires that interest be paid before it can be deducted. (SOF ¶ 63; SODF ¶ 13). According to the CPA, if Permitted Debt is held by an Affiliate of Developer, "interest paid thereon shall be included as an expense." (SODF ¶ 13). MRLP has not paid the interest on the first mortgage or on the contributions from S&S Finance for operations at 90 K Street. (SOF ¶¶ 63-66; SODF ¶ 19). Nevertheless it seeks to deduct the accrued interest in its calculation of the Appreciation Cash Payment. (SOF ¶ 66). This is prohibited by the CPA.

Appreciation Cash Flow is calculated by finding the Agreed Value, deducting the Approved Deductions and Closing Costs, and then subtracting Developer's Invested Equity and Developer's Operating Equity. (SOF ¶ 67). In the event of the sale of the property, the Approved Deductions include Permitted Debt, Junior Financing, and the sum of previously calculated Appreciation Cash Flows. (SOF ¶ 69). The plain language of the CPA demonstrates that Developer's Equity Return is not an Approved Deduction from Appreciation Cash Flow.

(SOF ¶¶ 68-69). Rather, Developer's Equity Return is deducted under Article 2 when computing Operations Cash Flow. (CPA, Section 2.3(a)(15)). (SODF ¶ 20).

Citing Section 7.11 of the CPA, MRLP argues that the defined terms in the CPA apply throughout the agreement and are not confined to the sections where they appear. (MRLP Initial Motion at 24). But, the formula for the calculation is clear and the Developer's Equity Return is not included in the calculation of Appreciation Cash Flow. (SOF ¶¶ 68-69). To get around this obstacle, MRLP now seeks to classify the alleged interest expense as Permitted Debt and, therefore, an Approved Deduction. MRLP is merely manipulating the financial information to avoid payment to Viad. As a result, this court should find for Viad on the alternative request for relief in Count I of the Second Amended Complaint.

## III.    IF THE COURT FINDS THAT THE REZNICK ANALYSIS WAS NOT BINDING, IT SHOULD THEN FIND THAT REZNICK WAS WRONG ON KEY POINTS

In its Memorandum in Support of its Motion for Summary Judgment, MRLP argues that if the Court were to find that the Reznick Analysis was not binding, then it should examine the Reznick Analysis and agree with its findings. MRLP then discusses each of the first five issues analyzed by the Reznick Group and attempts to show how its inconsistent and bad faith accounting should be accepted by the Court.

Viad has, in its Memorandum in Support of its Renewed Motion for Summary Judgment, largely discussed these issues and shown how MRLP's efforts have been designed with only one purpose in mind – to reduce the overall Cash Payment to avoid paying Viad its rightful share. (*See* Viad Renewed Motion at 10-16). Three areas, however deserve further discussion.

A.    **The First Mortgage was Equity and Its Acquisition by S&S Finance**
      **was a Refinancing**

MRLP has taken inconsistent positions on the role of S&S Finance and the effect of its

role on the calculations. (*See* Second Amended Complaint ¶ 10; SOF ¶ 5, 70-73). The facts are

that S&S Finance was owned by Rose and Greenebaum ("S"am and "S"tewart) who were the

only partners of MRLP until Reid Liffmann and Steven Braesch were added in 2001 and 2003

respectively. (SODF ¶ 54). Under the CPA, S&S Finance would be defined as an "Affiliate."

*Id.* The individuals who are partners in MRLP, and specifically Rose and Greenebaum, are also

'Equity Holders" under the CPA. *Id.* When S&S Finance acquired the first mortgage in 1996,

that debt was owned by MRLP. Approximately a year after its acquisition, $7.27 million of the

mortgage was reclassified as equity in the financial statements provided to Viad and in MRLP's

tax returns. *Id.* Although MRLP changed the classification back to debt in the financial

statements provided to Viad in or around 1999, it has continued to treat the first mortgage as

equity for tax purposes. (SOF ¶ 137). Since the repayment of the loan was at a discount of

approximately $1 million, it was technically a refinancing for which MRLP received value which

they should have shared with Viad to the extent of its 15% cash participation. (SODF ¶ 54).[5]

MRLP argues that "there is no reason why the discount which S&S Finance was able to

obtain should be treated any differently vis-à-vis its borrower than would any other loan

purchase discount would be treated for a borrower." (MRLP Initial Motion at 18). However,

given the aforementioned facts the response to this argument is obvious. Since S&S Finance is

owned by Rose and Greenebaum, who are Equity Holders of MRLP, the acquisition of the

---

[5]    Arguably, Viad should have been paid 15% of the amount of the refinancing at that time.
At this point, MRLP has recognized the cash value of the discount on sale of the property, and a
correct application of the calculated appreciation will include this amount as part of the
Appreciation Cash Payment due on sale.

mortgage at a discount was essentially a repayment of the loan by MRLP. For this same reason, contrary to MRLP's assertions,[6] interest on the first mortgage should only be charged on the amount actually paid by S&S Finance to acquire the loan.

**B.    Developer's Equity Return Cannot be Deducted When Calculating Appreciation Cash Flow**

As was discussed previously, there is no recognition of or deduction for "Developer's Equity Return" in calculating the Appreciation Cash Flow. (SOF ¶¶ 68-69). The plain reading of the CPA indicates that it is not a deduction for this purpose, even if actual cash payments of equity return might be properly deducted under Article 2 in calculating the annual operational payment. (SODF ¶ 20). The failure to recognize the difference in wording between these two sections of the CPA is a key error made by Reznick. This result is logical because Viad's 15% participation on sale of the Property is a participation in the return of the developer, which is the appreciation of the property.

**C.    MRLP Cannot Deduct Accrued Interest as Developer's Operating Equity or Developer's Equity Return**

Under the CPA, MRLP must use "cash basis accounting" applied on a consistent basis in its calculations. (SOF ¶ 63). Nevertheless, MRLP has repeatedly calculated its costs by claiming accrued payments of interest and equity return. (SOF ¶¶ 64-66). None of these payments were made, and the payee of such hypothetical obligations is itself or its affiliate, S&S Finance. *Id.* Again, Reznick was wrong in asserting that accruals could be recognized since the plain language of the CPA says otherwise. Unpaid interest to Equity Holders is not cash basis accounting. Cash basis means cash basis.

---

[6]    *See* MRLP Initial Motion at 21.

## IV.    LAND APPRECIATION ATTRIBUTABLE TO TDRS SHOULD BE INCLUDED IN THE CASH APPRECIATION CALCULATIONS

In its Memorandum in Support of its Motion for Summary Judgment, MRLP has argued that the TDRs that were attached to the 90 K Street property can be sold in a separate contract and the proceeds from such a sale should not be included in the calculation of the Appreciation Cash Payment to Viad. In Viad's Renewed Motion, it has pointed out that any such removal of the TDRs from the purchase prices of the property is nothing short of a sham and that under the plain language of the CPA, TDRs should be included in Cash Appreciation calculations. Without restating all of the points previously made by Viad, certain arguments must be revisited, given MRLP's misstatement of the issues.

### A.    Under the CPA, Viad is Owed 15% of the Appreciation of the 90 K Street Property, Based Upon its Agreed Value Under The CPA

MRLP has argued in its pleadings that Viad is seeking to share 15% of the "value of the TDRs." This misstates Viad's argument. Viad contends that it is owed 15% of the appreciation of the entire property at 90 K Street. The value of this land is increased by its placement within a "receiving zone." When land is placed in a receiving zone, it is eligible under D.C. regulations to utilize TDRs. (*See* SOF ¶¶ 91, 93, 97, 107). Thus, the value added to the land that results from its location and designation is part and parcel of the overall value of the land. In accordance with the CPA, the value added to 90 K Street as a result of the property being designated a receiving zone should be included in the calculation of the Agreed Value and the attendant Appreciation Cash Payment reduced only by the actual cost of the TDRs.

### B.    MRLP Fails to Offer any Justification for the Sale Price of Approximately $70 for the TDRs

MRLP structured its sale to TCMD in two contracts, one for land and one for TDRs. MRLP's sale of TDRs valued the TDRs at approximately $70 per square foot. (SOF ¶¶ 121,

16

125).  This price is both ridiculous and entirely unsupported by the pleadings and arguments set forth.  To date, MRLP has not provided any reason as to why the TDRs were sold for $70 per square foot as opposed to the current market price.  The buyer of the property could have purchased TDRs at their fair market value of less than $6 per square foot.  It paid the inflated value of $70 per square foot because MRLP structured the overall transaction to deprive Viad of a participation in the appreciation.

On January 11, 2007, MRLP sold 90 K Street N.E. for more than $67,000,000 to TC MidAtlantic Development, Inc.  (SOF ¶¶ 117, 143).  Included within this amount was $46,036,528 that MRLP attributed to the property and approximately $21 million that MRLP attributed to the TDRs. (SOF ¶ 117).  The agreement with TCMD included a so-called Umbrella Agreement (SOF ¶ 121).  Under that document, sale of the land at 90 K Street was conditioned on the purchase of 45 L Street, the adjoining lot, and on the purchase of TDRs at a price sufficient to provide compensation for MRLP at a FAR value of approximately $70 per square foot, which represents the same price per square foot as attributed to the land.  (SOF ¶ 121).

### 1.    Current Market Price of TDRs

Currently, TDRs are selling at $5.25 to $5.50 per square foot.  (SOF ¶ 105).  Since 1998, they have ranged in price from $25.00 to $3.00 with an overall downward trend to the present. (SOF ¶¶ 101, 104, 108).  This is an indication that the supply of TDRs exceeds demand and that TDRs are readily available.  MRLP's own expert, Stuart Smith, testified that on one recent occasion, he determined the value of the TDRs in the North Capitol receiving zone, where 90 K Street is located, to be $3.50 per FAR. (SOF ¶ 110).  Evidence demonstrates that MRLP paid $6.00 per square foot for the TDRs that were subsequently sold to TCMD for $70.00 per square foot. (SOF ¶ 109).

### 2.    MRLP's Purported Price for the TDRs

TCMD has admitted in deposition testimony that the price paid to MRLP for TDRs was well-above the market price and was agreed to only because purchasing the TDRs at an inflated value was a requirement imposed by MRLP as a condition for purchasing the land at 90 K Street, even though they could be purchased for $5.25 to $5.50. (SOF ¶ 129).

Further, this litigation has produced evidence that TCMD had been informed by its broker that a large property was for sale in the range of $100 million dollars (for both 90 K Street and the adjoining 45 L Street). (SOF ¶ 122). This led to a discussion between TCMD representatives and MRLP representatives where the expectation of the price was known to be approximately $100 million. (SOF ¶ 123). These discussions did not include any conversation regarding a separation or differentiation between the property and the TDRs. (SOF ¶ 124).

### 3.    Effect on Appreciation Cash Payment

The cost of acquisition of the TDRs by MRLP is clearly a deductible cost under the CPA in calculating the payment due to Viad. Thus, Viad would not be entitled to any share of the $6 per square foot price paid by MRLP to maximize the value it received in sale of the property. It is, however, clearly entitled to the share in the amount artificially assigned to the TDRs by MRLP to the extent they exceed the cost of acquisition.

The purpose of separating the TDRs and the land into two contracts was designed solely as a means to deprive Viad of the Appreciation Cash Payment that it was owed under the CPA. In any event, the land price is obviously not the result of an arms-length negotiation with the buyer. The price paid for the "land" and the separate price paid for the TDRs were separated at the insistence of MRLP, the total of the two being consistent with the buyer's view of the value of the package, and the price allocations being determined by MRLP with an eye towards the CPA. According to Daniel Hudson, President of TC MidAtlantic, the buyer analyzed the sale in terms of the total FAR. (SOF ¶ 125). In the buyer's experience, the District of Columbia

government would allow a maximum of 10.0 FAR on 90 K Street, and it calculated its expected yield on that basis. (SOF ¶ 126). 10.0 FAR is only achievable when the TDRs are included. (D.C. Mun. Regs. tit. 11, § 1707.5 (d); SOF ¶ 103). Mr. Hudson added that the "bargain" between the parties was that MRLP would be paid for the achievable FAR regardless of how the price was allocated between TDRs and land. (SOF ¶ 129).

In summary, the inflated dollar value assigned by MRLP to the TDRs it sold to TCMD is unjustified and is evidence of the fraud it seeks to perpetrate on Viad. The court must reject MRLP's contention that the $21 million price attributed to the TDR sale is not covered by the CPA and should not be included in the fair market valuation of the property.

## V.  MRLP HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### A.  MRLP, Like All Parties to a Contract, Owed a Duty of Good Faith and Fair Dealing to Viad

In its summary judgment motion, MRLP argued that although "[t]here is implied in **many** contracts a duty of good faith and fair dealing . . . there is no question that the relationship between Viad and MRLP is that of creditor-debtor" and that such a relationship "ought not trigger an implied duty of good faith and fair dealing." (MRLP Initial Motion at 40) (emphasis added). MRLP has misstated the law in the District of Columbia and has misconstrued this court's analysis of the covenant of good faith and fair dealing to creditor-debtor relationships.

#### 1.  Every Contract Contains the Implied Covenant of Good Faith and Fair Dealing

As this court has recognized, "[u]nder District of Columbia law, '**every** contract [contains] an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which

means that in **every** contract there exists an implied covenant of good faith and fair dealing.'" *Steele v. Isikoff*, 130 F. Supp. 2d 23, 32 (D.D.C. 2000) (quoting *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988) (emphasis added); *see also* MRLP's cited case *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006) (stating that "**all** contracts contain an implied duty of good faith and fair dealing") (citations omitted) (emphasis added). MRLP's insinuation that some contracts do not contain the implied covenant is both misleading and incorrect. The Cash Participation Agreement at issue states that the "agreement shall be governed and construed in accordance with the laws of the District of Columbia . . . ." (CPA 7.10). Accordingly, the Cash Participation Agreement contains an implied covenant of good faith and fair dealing.

### 2. Contracts Between Creditors and Debtors Clearly Contain the Implied Covenant of Good Faith and Fair Dealing

The majority of case law from all jurisdictions, including the District of Columbia, provides that creditor-debtor relationships hold no special exemption from the traditional rule imposing the implied covenant of good faith and fair dealing in all contracts.

D.C. Courts have not directly stated whether the implied covenant of good faith and fair dealing applies to situations involving a creditor-debtor relationship. This is perhaps, because D.C. Courts have routinely found that the covenant applies to "all contracts", choosing not to make distinctions involving specific relationships. *See Allworth*, 890 A.2d at 201.

Although there is a lack of significant case law regarding the issue, other courts have found an implied covenant of good faith and fair dealing in a creditor-debtor relationship. *See In re A.W. Logging, Inc.*, 2006 Bankr. LEXIS 3605, at *16 (Bankr. D. Idaho Oct. 4, 2006) (finding the "creditor did not breach" its "covenant of good faith and fair dealing"); *Wilbar Realty, Inc. v. Pa. Infrastructure Inv. Auth. (In re Wilber Realty, Inc.)*, 325 B.R. 354, 360 (Bankr. M.D. Pa. 2005) (finding that a "lending institution does not violate" its "duty of good faith by adhering to

its agreement with the borrower or by enforcing its legal and contractual rights as a creditor");

*Bristol Sav. Bank v. Chic Miller's Chevrolet-Isuzu, Inc.*, 1993 Conn. Super. LEXIS 996 (Conn.

Super. Ct. Apr. 27, 1993) (where debtor asserted that the creditor violated the implied covenant

of good faith and fair dealing by not changing the terms of the loan and the court found that the

creditor did not act in bad faith and did not mislead the debtor in any way).

Moreover, an implied covenant of good faith and fair dealing has been applied in a

variety of contractual relationships, suggesting that no distinction needs to be made for creditor-

debtor relationships. *United Techs. Corp. v. American Home Assur. Co.*, 118 F. Supp. 2d 181,

186 (D. Conn. 2000); *see also B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp.*, 785 F.

Supp. 222, 228 (D. Mass. 1991) (finding that "'[t]he implied covenant of good faith and fair

dealing has been applied by this court in a variety of contractual relationships'" and applying it

in a lender-borrower relationship) (citations omitted).

MRLP weakly cites three cases for the proposition that a "creditor-debtor relationship

ought not trigger an implied duty of good faith and fair dealing." (MRLP Initial Motion at 40).

MRLP can only cite one case, a decision in North Texas, that stands for the proposition it urges

this court to adopt. (MRLP Initial Motion at 40) (citing *Home & Hearth Plano Parkway, L.P. v.*

*LaSalle Bank, N.A (In re Home & Hearth Plano Parkway, L.P.)*, 320 B.R. 596 (Bankr. N.D. Tex.

2004).

MRLP cannot find a District of Columbia case that stands directly for its suggested

proposition. It weakly cites another case, with very dissimilar facts, as evidence for its assertion.

Even a cursory analysis reveals that this cited case is not relevant to this court's inquiry. In *Hais*

*v. Smith*, the court found that there was no duty by one party to a contract to ensure fair dealings

between two individuals who comprised the *other* party to a contract. 547 A.2d 986, 988 (D.C.

1988). The court reiterated that "'in every contract there exists an implied covenant of good faith and fair dealing.'" *Id.* at 987 (citations omitted). The court did not state that the covenant did not extend to creditor-debtor relationships as MRLP suggests. Instead, the court chose not to extend the duty past the bilateral parties to a contract.

Given the history in which the implied covenant has been applied, and because there is nothing to suggest it would not be applied in this instance, the court should follow its own long-standing precedent in enforcing the covenant of good faith and fair dealing and apply the covenant in the contract between the parties in the instant case.

**B.    The Language of the CPA Does Not Waive the Implied Covenant and Does Not Excuse Fraudulent Behavior**

MRLP alternatively argues that Section 6.1 of the Cash Participation Agreement, which states that "Montgomery Road, at all times consistent with the terms and provisions of this Agreement . . . shall be free to determine and follow its own policies and practices in the management and conduct of its business on the Property." This language, MRLP suggests, "insulates Montgomery Road from the kind of duty of good faith and fair dealing Viad seeks to impose on it." (MRLP Initial Motion at 40-41). This argument fails not only because MRLP fails to provide any support for its argument, but also because such an argument implies that Section 6.1 provides MRLP with a free pass to behave fraudulently and with bad faith in violation of D.C. law. This language does not sanction fraudulent accounting.

To be clear, the phrase relied upon by MRLP does not expressly waive the implied covenant of good faith and fair dealing. Its wording is ambiguous at best. Without an express waiver the implied covenant of good faith and fair dealing is present in all contracts under D.C. law.

22

As well, if this court were to follow its own precedent and conclude that the implied covenant of good faith and fair dealing is present in the CPA, then the cited phrase would have to be read in conjunction with that implied covenant. The implied covenant would be one of the "terms or provisions of Agreement" and thus MRLP could not act contrary to its duties under the covenant.

In addition, contract language cannot be used as a shield to protect fraudulent behavior. *See Andrews v. Blue*, 489 F.2d 367, 375 (10th Cir. 1973) (finding that a "contract cannot be used as a shield for wrongdoing amounting to statutory fraud"); *London v. Guberman*, 29 Cal. Rptr. 279, 282 (Cal. Ct. App. 1963) (finding that the provisions of the contract could not shield the defendant from liability for fraud).

As the Plaintiffs have not provided any support for their contention that Section 6.1 of the CPA would waive the covenant of good faith and fair dealing, the court should deny summary judgment for MRLP on this argument.

## VI.    MRLP HAS DEFAULTED UNDER THE CPA

In MRLP's Renewed Motion for Summary Judgment, it largely cited verbatim its previously dismissed Motion. MRLP did, however, raise several new arguments in Section VIII. These arguments fail in basic logic and in persuasiveness.

### A.    MRLP Defaulted by Failing to Provide Financial Statements for 2005 and 2006

The undisputed evidence demonstrates that MRLP failed to provide timely financial statements for fiscal years 2005 and 2006. This failure is a default under the contract. (SOF ¶¶ 133-34). Section 2.6 of the CPA requires financial statements and schedules to be submitted within 120 days of the end of the Fiscal Year (defined as December 31 in § 1.19). The CPA

23

requires the certification of an independent certified public accountant applying generally accepted accounting principles on a consistent basis to the books and records of MRLP.  (SOF ¶ 135).

### 1.    The Failure to Provide Timely Financial Statements Was a Material Breach

While not challenging the fact that it defaulted under the CPA, MRLP instead argues that such a breach would be immaterial under the CPA.  (MRLP Renewed Memorandum in Support of its Motion for Summary Judgment, ECF Document # 46 (hereinafter "MRLP Renewed Motion") at 7).  This bold and cavalier statement completely neglects the entire purpose of the CPA.    The CPA was designed to provide detailed procedures and protocol for determining payments owed to Viad under the Agreement entered into by the parties.

Under Section 2.6, MRLP must furnish "financial statements and schedules, including a balance sheet and statement of operations for the Property for such Fiscal Year, prepared in accordance with generally accepted accounting principles applied on a basis consistent with past practices and bearing the unqualified opinion of a firm of independent certified public accountants . . . ." (SOF ¶ 53).

The CPA sets "forth the terms and conditions under which [Viad] will participate in the cash flow hereafter generated from the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing" of the Property.  (SOF ¶ 9).  MRLP is required to make two payments under the CPA, which rely specifically on the financial statements that accompany the property.  First, in Article 2 of the CPA, the Developer is required to pay to Viad 15% of the cash flow from operations on the Property.  (SOF ¶ 11).  Second, in Article 3 of the CPA, the Developer is required to pay to Viad 15% of the appreciation realized by the Developer in "the sale, assignment, condemnation, conveyance or other disposition of all

24

or any part of or interest in the Property," or in the refinancing of the Property or of an interest in the Property. (SOF ¶12).

As such, procedures for accounting for the property were designed as a safeguard and a tool for the parties to assess the proper payment owed to Viad. Without the financial statements, which only MRLP can provide, Viad has no ability to gauge whether MRLP's payments are properly calculated and made. The failure to provide timely financial statement is clearly material.

For example, under the terms of the CPA, the 2006 Financials Statements were due to Viad on April 30, 2007. Viad did not receive these statements, despite being in the midst of this litigation. As a result, Viad had to rely on 2004 statements and the un-audited and vastly altered 2005 statements in assessing the true value of its share of the Appreciation Cash Payment.

### 2.    The Supplemental Filing Did Not Comply with the CPA

MRLP also argues that it could not be in default of the CPA, as it has filed the required financials statements in its Supplemental Filing. (MRLP Renewed Motion at 7). MRLP did file financial statements in its Supplemental Filing but these statements were delivered well past the timelines espoused in the CPA and were unauthorized.

After both sides had filed their initial rounds of Motions for Summary Judgment, Oppositions to each other's Motions for Summary Judgment, and Replies to those Oppositions, MRLP decided to submit a Supplemental Filing on June 27, 2007, that contained allegedly audited statements for 2005 and 2006. The statements relating to 2006 were almost two months late, while the statements relating to 2005 were over fourteen months late. These are clear breaches of the CPA. Filing the statements over a year past the deadline does not cure the breach or allow Viad to fully exercise its rights under the CPA.

Moreover, these new "financial statements" have not been subject to discovery so that they may be tested for their own validity or for the legitimacy of the independent auditor utilized by MRLP. MRLP filed these documents without seeking the consent of the Court or of Viad.

### B.    MRLP Defaulted by Failing to Make the Appreciation Cash Payment and for Failing to Provide a Statement for Calculating the Payment

Under Section 3.2 of the CPA, MRLP was required to deliver the Appreciation Cash Payment within three (3) days of closing on its transaction with TCMD. (SOF ¶ 145). However, no payment was made by MRLP at any time nor was any payment received by Viad as a result of the sale of the property on January 11, 2007. (SOF ¶ 146).

Furthermore, under Section 3.9 of the CPA, MRLP was required to deliver to Viad "a statement reflecting the Agreed Value, the Approved Deductions, the Closing Costs and the Appreciation Cash Flow used in calculating the Appreciation Cash Payment and a detailed breakdown of all items necessary for the calculation of each such item." (SOF ¶ 147). However, no "statement", as required by Section 3.9, has been delivered by MRLP to Viad. (SOF ¶ 148).

MRLP argues that there was no basis upon which to make the Appreciation Cash Payment because the calculation is the subject of this litigation. (MRLP Renewed Motion at 7). This argument is in direct contradiction with established case law. *Amtrak v. ERC Frankona Ruckversicherungs-Ag*, 2005 U.S. Dist. LEXIS 43490 (D.D.C. June 24, 2005) (concluding that the parties remain bound by the duties imposed by their Agreement while a claim is pending). Further, a party is not excused from performance of contractual obligations merely by contesting its obligation to perform. *See Hobbs v. Head & Dowst Co.*, 231 U.S. 692 (1914) (stating that a breach by one party does not excuse failure to perform); Furthermore, although a large volume of documents has been produced during this litigation, MRLP has modified its calculations on numerous occasions. (SOF ¶ 120, 135, 137; SODF ¶ 54). Due to these flip-flops, Viad is unable

to calculate the Appreciation Cash Payment from the documents produced and, as a result, the statement of calculation is essential.

**C.    MRLP Defaulted by Failing to Name an Appraiser**

Once Viad has received notice of an occurrence of an event that requires the determination of the fair market value, the parties may agree on the fair market value or, if they are unable to do so, the parties may select appraisers to determine the value. (SOF ¶¶ 155-157). On January 11, 2007, Viad received notice when MRLP sold 90 K Street for more than $67,000,000. (SOF ¶¶ 143-144).

Following this notification, the parties had thirty days to agree on the fair market value of the property. If the parties are unwilling to agree, they have 15 days to select an appraiser. (SOF ¶¶ 157-58). On January 31, 2007, Viad provided to MRLP a report and an opinion, prepared by an MAI appraiser, as to the fair market value of the Property in accordance with Section 3.8 of the CPA. (SOF ¶ 155). The appraiser, Steven Halbert, of Cushman and Wakefield, opined that the fair market value of the Property on June 24, 2006, and within a 6 month period thereafter, which period included the date of the contract between MRLP-TCMD, was $64,800,000. (SOF ¶ 156). Because Viad sent its appraisal report, indicating its belief that an agreement on fair market value could not be reached, on January 31, 2007, the time period for identifying the appraiser lapsed 15 days later on February 15, 2007. (SOF ¶ 158).

MRLP now argues that the time period lapsed on December 17, 2006, 45 days after Viad received the amended contracts for sale of 90 K Street. However, given the possibility that the transaction may not have closed (and an actual history of an announced transaction that failed to close), MRLP's argument that the formation of the contract provided notice to Viad is unreasonable. Moreover, MRLP failed to respond to Viad's letter of February 21, 2007 notifying MRLP that it was in default, and has failed to designate an appraiser, thereby waiving

27

its arguments regarding the calculation of the relevant time period under the CPA. (SOF ¶¶ 149-50, 158). The fact that the appraisal tendered by Viad on January 31, 2007 was in response to this court's deadline for expert designations and made no reference to the appraisal process in Section 3.11 does not alter the procedure required under the CPA. Furthermore, any doubts that MRLP may have had with respect to the purpose of Viad's designation of Steve Halbert were dispelled by Viad's default letter of February 21, 2007, in which Viad asserted that the deadline to identify an appraiser in accordance with Section 3.8 expired on February 15, 2007. Under the CPA, MRLP had 30 days to cure this default, but it chose not to do so. (SOF ¶¶ 149-50).

MRLP did tender a rebuttal report that was prepared by MAI appraiser Stuart Smith. Mr. Smith testified that he has <u>no</u> opinion of the fair market value of the property. Rather, the thrust of his "rebuttal" is that Mr. Halbert should have described the availability of TDRs as an "extraordinary assumption." (SOF ¶ 159). As a result, MRLP has completely disregarded the fair market value component of the Agreed Value by failing to provide evidence of fair market value.

Even if MRLP were persuasive in arguing that Viad should have invoked the appraisal procedure earlier, the requirement of Section 3.1 that Agreed Value is the greater of the contract price or the fair market value of 90 K Street remains. MRLP has no evidence of fair market value and offers only its artificial contract price. Absent any proffer of evidence of fair market value, it cannot dispute the evidence presented by Viad and its MAI appraiser.

Viad has not waived the requirement of the contract that Agreed Value be based on a comparison of fair market value or the contract price. The litigation was started by MRLP to construe the contract for sale and to confirm its understanding of the appropriate deductions, and

Viad counterclaimed on both. But, the action of the parties does not change either the fact that fair market value must be determined or the process for doing so.

Because the Agreed Value of the Property is the greater of the contract price or the fair market value, this court should find that the total contract price including the TDRs, $67,424,457, is the Agreed Value. (SOF ¶ 151). Alternatively, in no event is the fair market value less than $64,800,000, the fair market value provided by Steve Halbert. (SOF ¶ 156).

### D.    An Audit of MRLP's Records is Required

The undisputed evidence demonstrates that MRLP has failed to provide financial statements on a cash basis, has taken inconsistent approaches in its accounting by removing the costs for TDRs and converting equity to debt, and has failed to provide the required statement of its costs and calculation after closing on the TCMD-MRLP transaction. (SOF ¶¶ 57-59, 113, 133-38). Due to MRLP's conduct and defaults under the CPA, Viad requests that the Court order an audit of MRLP's records, at its expense, to determine which costs should be included in the calculation of the Appreciation Cash Payment.[7]  Such an order would be consistent with Federal Rule of Civil Procedure 53(a)(1)(B)(ii) which provides that a court may appoint a master to "make or recommend findings of fact on issues to be decided by the court without a jury if appoint is warranted by . . . the need to perform an accounting or resolve a difficult computation of damages . . . ."  MRLP can simply not be trusted to provide proper financial statements and accounting.

---

[7]    Furthermore, because Viad has not waived its right to audited financial statements, it is entitled to an audit under the terms of the CPA.

**VII.    CONCLUSION**

For the foregoing reasons, Viad requests that this Court deny MRLP motion for summary judgment.  Based on Viad's own motion for summary judgment, summary judgment should be entered for Viad on Counts I and II, and III of the Second Amended Complaint and Counts I, II, III and IV of the Amended and Supplemental Counterclaim.

Respectfully Submitted,

BRYAN CAVE LLP

By:   /s/ Rodney F. Page
     Rodney F. Page (DC Bar No. 37994)
     700 Thirteenth Street, N.W., Suite 700
     Washington, D.C. 20005-3960
     P:  (202) 508-6000
     F:  (202) 508-6200

     *Counsel for Defendant/Counterclaim-Plaintiff*
     *Viad Corp*

Dated:  September 27, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MONTGOMERY ROAD I LIMITED PARTNERSHIP,**

        **Plaintiff and Counterclaim-Defendant,**

    **v.**

**VIAD CORP,**

        **Defendant and Counterclaim-Plaintiff,**

    **v.**

**MONTGOMERY ROAD TDR, LLC,**

        **Counterclaim-Defendant.**

Case No.  1:06CV00344 (HHK)

## DEFENDANT VIAD CORP'S
## <u>STATEMENT OF DISPUTED MATERIAL FACTS</u>

Pursuant to Local Civil Rule 7(h), Defendant/Counterclaim-Plaintiff Viad Corp ("Viad"), hereby submits this Statement of Disputed Material Facts in support of its Opposition to the Renewed Motion of Montgomery Road I Limited Partnership ("MRLP") and Montgomery Road TDR, LLC ("MRTDR") for Summary Judgment.  Viad avers that there are genuine issues with respect to the disputed facts identified below.  The citations referenced are to those portions of the record filed herewith (Exhibits 62-71) and to those portions that were previously filed with Viad's Renewed Motion for Summary Judgment (Exhibits 1-61) on September 6, 2007.

**VIAD CORP'S RESPONSE TO
THE STATEMENT OF UNDISPUTED MATERIAL FACTS FILED IN
SUPPORT OF MRLP AND MRTDR'S MOTION FOR SUMMARY JUDGMENT**

Viad responds to the individually numbered paragraphs of MRLP and MRTDR's Statement of Undisputed Facts as follows. To the extent the organizational headings and titles in MRLP and MRTDR's Statement attempt to characterize the facts, such characterizations are disputed.

1.    Undisputed.

2.    Undisputed.

3.    Undisputed.

4.    Undisputed.

5.    Undisputed.

6.    Undisputed.

7.    Disputed to the extent that MRLP and MRTDR are suggesting that MRLP paid interest on the $10.3 million loan after its acquisition by S&S Finance Limited Partnership ("S&S Finance") in 1996. The evidence demonstrates that MRLP has <u>accrued</u> interest, but never paid it, on the first mortgage since its acquisition by S&S Finance in or about 1996. (*See* Deposition of Samuel Rose ("Rose Dep.") at 190:03-190:2 (Ex. 62); Deposition of Reid Liffmann ("Liffmann Dep.") at 45:10-46:17 (Ex. 2); Statement of Greenebaum and Rose Associates, at Section I, VD-000458 (Ex. 13); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36).

8.    Undisputed.

9.    Undisputed.

10.    Undisputed.

11.    Undisputed.

12.    Undisputed.

13.    Disputed to the extent that MRLP and MRTDR are suggesting that the interest charged by S&S Finance would be Permitted Debt under Section 2.3(b) of the Cash Participation Agreement ("CPA"). According to Section 2.3(b), "If Permitted Debt is held by any Affiliate of Developer, interest paid thereon shall be included as an expense only to the extent that it does not exceed the amount of interest that would have been payable on an equivalent loan from an unrelated bank, savings and loan association, insurance company or other financial institution." (CPA, § 2.3(b) (Ex. 9) (emphasis added). The interest charged by S&S Finance was accrued, but never paid. (Rose Dep. at 189:22-190:2 (Ex. 62); Liffmann Dep. at 45:10-46:17 (Ex. 2); Statement of Greenebaum and Rose Associates, at Section I, VD-000458 (Ex. 13); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36)). As such, these accrued amounts are not Permitted Debt under Section 2.3(b). (CPA, § 2.3(b) (Ex. 9).

14.    Undisputed.

15.    Disputed in that the Special Purpose Financial Statements (hereinafter "financial statements") were not provided annually. There were also years when the financial statements were late. (Letter dated 5/12/93 from K. Goldman to R. Glassman, VD-000694 (Ex. 69); Letter dated 9/7/89 from K. Goldman to S. Rose, VD-000740 (Ex. 70); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Special Purpose Financial Statement ("Revised 2005 Statement") (Ex. 36)). Furthermore, MRLP failed to provide timely financial statements for 2005. In September and November 2006, counsel for Viad received draft and Revised 2005 financial statements from Dale Cooter, litigation counsel for MRLP. (Letter dated 9/21/06 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement (Ex. 14); Letter dated 11/21/06 from D.

3

Cooter to R. Page, enclosing Revised 2005 Statement (Ex. 36)).  The Revised 2005 Statement was accompanied by a letter from Mr. Cooter with his opinion that the financial data is a correct statement of expenses and other deductions under the CPA.  (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36).  The Draft and Revised 2005 Statements (hereinafter "the Cooter Financials") do not comply with the requirements of the CPA.  Unlike the other financial statements, which were prepared between 1987 and 2004, there is no signed statement indicating that the Cooter Financials were certified by a firm of independent certified public accountants, as required by Section 2.6 of the CPA.  (Liffmann Dep. at 14:9-16:22; 35:15-37:12 (Ex. 2); CPA § 2.6 (Ex. 9); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement (Ex. 36); Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement (Ex. 14); *see also* Special Purpose Financial Statement for December 31, 2004 and 2003 (hereinafter "Representative Statement") MR-00953 at 00955) (Ex. 35).  The CPA requires the certification of an independent certified public accountant applying generally accepted accounting principles on a consistent basis to the books and records of MRLP.  (CPA § 2.6) (Ex. 9).  On June 27, 2007, MRLP submitted an unauthorized Supplemental Filing to the Court, that contained the allegedly audited financial statements from 2005 and 2006.  (*See* Docket # 42).  The Supplemental Filing was submitted almost two months after the initial round of motions had been completed and six months after discovery had closed in the case.  The Supplemental Filing proffered new evidence, seeks to add additional witness testimony, including presumably expert testimony, long after the deadline for disclosing the identity of such witnesses and providing their reports.  Also disputed to the extent that MRLP seeks to characterize the intent of the parties with respect to the provision of funds from S&S Finance.  Other than the first mortgage note acquired by S&S Finance, no loan documents have

been provided to demonstrate that the amounts contributed by S&S Finance were in fact loans. Further disputed to the extent that MRLP's characterization of the amount previously classified as Developer's Equity Return as "interest expense" suggests that it is properly deducted when calculating Appreciation Cash Flow. According to the CPA, only interest that is paid can be included as Permitted Debt, and then subtracted as an Approved Deduction when computing Appreciation Cash Flow. (CPA § 2.3(b), 3.1 and 3.4(a)) (Ex. 9).

16.    Undisputed.

17.    Disputed to the extent that MRLP suggests that Mr. Glassman prepared MRLP's Revised 2005 Statement for 2005 without direction from MRLP's litigation attorney. The evidence demonstrates that the Revised 2005 Statement was prepared under the direction of attorney Dale Cooter. (*See* Liffmann Dep. at 24:9-16; Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement; (Exs. 2 & 36). In the cover letter accompanying the Revised 2005 Statement, Mr. Cooter stated: "As you know, I established that all money contributed to Montgomery Road I Limited Partnership was actually in the form of loans originating with S&S Finance. There was never any intention to contribute non-interest bearing equity to the project." (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36). Furthermore, Reid Liffmann, testifying as a 30(b)(6) witness for MRLP, stated that the decision to revise the financial statements was made by counsel, himself, Mr. Rose and Mr. Glassman. (Liffmann Dep. at 24:9-16) (Ex. 2)

18.    Disputed in that the intent of Mr. Greenebaum and Mr. Rose with respect to the funds from S&S Finance is irrelevant and inadmissible in interpreting the CPA. Further disputed in that, other than the first mortgage, there is no evidence that the funds from S&S Finance are in fact loans. MRLP has not produced loan documents to substantiate this claim. Furthermore,

according to MRLP's most recent tax return, MRLP owes S&S Finance less than $5 million. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50 & 52).   Nonetheless, MRLP claims in its Revised 2005 Statement that it owes S&S Finance over $35 million, excluding the principal on the first mortgage.   (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36).   Finally, disputed to the extent that MRLP suggests that S&S Finance is not an Affiliate of MRLP.   According to the CPA, an Affiliate shall mean "any Person directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under Control with the Person in question, which, in the case of a Person which is a partnership shall include each of the constituent partners thereof."   (CPA § 1.2) (Ex. 9).   Furthermore, for entities that are not corporations, Control is "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person."   (CPA § 1.9).   Samuel Rose and Stewart Greenebaum are the limited partners of S&S Finance.   (Rose Dep. at 190:6-15) (Ex. 1). They are also limited partners in MRLP, along with Reid Liffmann and Steve Braesch, who were added to the partnership in 2001 and 2003 respectively.   (Eighth Amendment to MRLP Partnership Agreement, MR-16825) (Ex. 7);   (MRLP 2001 U.S. Return of Partnership Income at 10-23, MR-26497) (Ex. 63); (MRLP 2003 U.S. Return of Partnership Income at 9-25, MR-26446) (Ex. 64); (MRLP 1996 U.S. Partnership Return of Income, MR-26609, at Schedule K-1 (MR26620-26631)) (Ex. 65)).

19.    Disputed because there is no basis in the record to support these argumentative conclusions, which are irrelevant to interpreting the CPA.   Also disputed in that MRLP has accrued, but never paid, interest on the S&S contributions to 90 K Street, including the first mortgage.   (Rose Dep. at 189:22-190:2 (Ex. 62); Liffmann Dep. at 45:10-46:17 (Ex. 2);

Statement of Greenebaum and Rose Associates, at Section I, VD-000458 (Ex. 13); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36)). As such, these accrued amounts are not Permitted Debt under Section 2.3(b)). (CPA § 2.3(b) (Ex. 9).

20.    Disputed to the extent that MRLP suggests that its calculation of costs was correct. Developer's Equity Return is not an Approved Deduction under the CPA. Rather, Developer's Equity Return is deducted when computing Operations Cash Flow. (CPA §§ 2.3(a)(15), 3.1, 3.4(a)) (Ex. 9).

21.    Disputed in that the labeling of the alleged interest expense as Developer's Equity Return is not the only reason that Viad posits that the interest on the funds from S&S Finance are not a proper deduction when calculating Appreciation Cash Flow. Rather, Viad also contends that the interest on the first mortgage, which was acquired by S&S Finance is not properly deducted because it has been accrued not paid. (Rose Dep. at 189:22-190:2 (Ex. 62); Liffmann Dep. at 45:10-46:17 (Ex. 2); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36)); Statement of Greenebaum and Rose Associates, at Section I, VD-000458 (Ex. 13)). As such, these accrued amounts are not Permitted Debt under Section 2.3(b)). (CPA § 2.3(b) (Ex. 9). According to the CPA's definition of Permitted Debt, "[i]f Permitted Debt is held by an Affiliate of Developer, interest paid thereon shall be included as an expense." (CPA § 2.3(b) (emphasis supplied) (Ex. 9).

22.    Undisputed.

23.    Undisputed.

24.    Undisputed.

25.    Disputed. Although the parties had a dispute concerning the meaning and application of certain terms of the Cash Participation Agreement, there was never a dispute

concerning the Special Purpose Financial Statements. The purpose of seeking advice from an accounting firm was to begin to resolve informally the dispute between the parties regarding the calculation of the Appreciation Cash Payment in the event of a sale of the Property, since MRLP was eager to buy out Viad's interest. (Deposition of Eve Fiorucci ("Fiorucci Dep.") at 46:1-20; Record of Telephone Conversation on 6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664; (Exs. 6, 19, 27). In or about 2005, the parties agreed to seek the informal advice of Reznick Group ("Reznick"). (Fiorucci Dep. at 46:1-20; Record of Phone Conversation on 12/16/04, VD-000960; Letter dated 3/24/05 from R. Liffmann to B. Solomon, MR-01685) (Exs. 6, 30, 34). Although Reznick was selected by Viad, there is no evidence that this selection was done pursuant to Section 2.7 of the CPA. The dispute between the parties was related to the Appreciation Cash Payment, under Article 3 of the CPA. (*See* CPA § 3.1; Deposition of Eve Fiorucci ("Fiorucci Dep.") at 46:1-20; Record of Telephone Conversation on 6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664; (Exs. 6, 9, 19, 27). Such disputes are not governed by the dispute resolution provision in Section 2.7 (Compare CPA § 2.7 with CPA § 3.11). Furthermore, Section 2.7 requires an arbitration. (CPA, Section 2.7) (Ex. 9). Sam Rose, MRLP's 30(b)(6) witness, has testified that the Reznick review was not an arbitration. (Rose Dep. at 86:8-12) (Ex. 1).

26.     Undisputed that on April 10, 2005, the Reznick Group provided its analysis (hereinafter the "Reznick Analysis") and that a true and correct copy of the Reznick Analysis has been provided to the court. However, the characterization put on Reznick's analysis by MRLP is disputed. The Reznick Analysis speaks for itself.

27.     Disputed in that the CPA speaks for itself. According to the CPA, "the items shall be submitted to <u>arbitration</u>, which <u>arbitration</u> shall be performed by an independent certified

public accountant selected by TLC and reasonably satisfactory to Developer, whose determination shall be final." (CPA § 2.7) (emphasis supplied) (Ex. 9). Further disputed in that Viad was not bound by the Reznick Group's conclusions because there was no arbitration under Section 2.7 by Reznick Group. (Sam Rose Dep. at 86:8-12) (Ex. 1). The dispute between the parties related to the calculation of the Article 3 Appreciation Cash Payment, not the financial statements required under Article 2. (*See* CPA § 3.1; Deposition of Eve Fiorucci ("Fiorucci Dep.") at 46:1-20; Record of Telephone Conversation on 6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664; (Exs. 6, 9, 19, 27). Section 2.7, which appears in Article 2, the section of the CPA that deals with Operations Cash Flow, has nothing to do with the Appreciation Cash Payment. (*See generally* CPA, Article 2) (Ex. 9). Section 2.7 of the CPA does not relate to the subject matter of the Reznick letter; the letter deals with a hypothetical sale, whereas section 2.7 concerns disputes about yearly Operations Cash Payments (CPA § 2.7) (Ex. 9); (Letter dated 4/10/05 from B. Solomon to R. Rose ("Reznick Analysis") ¶ 2, VD-000466) (Ex. 32). Section 2.7 was not even mentioned until Reznick had completed its analysis. (*See* Email dated April 11, 2005 from B. Solomon to S. Rose, MR01939, attached as Ex. 71; Letter dated 5/2/05 from S. Rose to E. Fiorucci, VD-000453, attached as Ex. 33). Furthermore, Brent Solomon, the accountant who completed the analysis on behalf of Reznick, stated in his deposition: "I don't think anyone ever came to us and said your opinion is binding." (Deposition of Brent Solomon ("Solomon Dep.") at 108:8, attached as Ex. 57).

28.    Undisputed.

29.    Undisputed.

30.    Undisputed.

31.    Undisputed.

32.    Undisputed.

33.    Undisputed.

34.    Disputed.  Viad does not claim that it is entitled to 15% of the <u>value</u> of the TDRs.
According to Viad's expert, the current market price of TDRs is $5.25 to $5.50.  (Expert Report
of Cynthia Giordano ("Giordano Report") at 5 (Ex. 37).  Rather, Viad is claiming that it is
entitled to 15% of the purchase price for the land as enhanced by the availability of TDRs
because of the location and zoning of the Property.  (Amended and Supplemental Counterclaim,
¶¶ 7-9).  The price paid, more than $67 million, was for the total achievable FAR.  (Hudson Dep.
at 33:5-10; 33:18-34:4) (Ex. 5).  Under the D.C. Regulations, the total achievable FAR, 10.0, is
only achievable when the TDRs are included.  (D.C. Mun Regs. tit. 11, Section 1707.5(d)).

35.    Undisputed.

36.    Undisputed.

37.    Undisputed.

38.    Undisputed.

39.    Disputed in that the creation of the receiving zone, not the transfer of TDRs, is
what increases the development rights of the receiving site.  According to Viad's expert Cynthia
Giordano, the establishment of a receiving zone is effectively an up-zoning of the properties
located within the zone to a higher matter of right density.  (Giordano Report at 5) (Ex. 37).

40.    Undisputed.

41.    Undisputed.

42.    Undisputed.

43.    Disputed to the extent that Montgomery Road already has the Future TDRs under
contract.   (Agreement  of  Purchase  and  Sale  of  Transferable  Development  Rights  dated

September 29, 2006, between Montgomery Road TDR, LLC and Freedom Forum, Inc., MR-24115-24134, attached as Ex. 66).

44.    Undisputed.

45.    Undisputed.

46.    Disputed in that the TDRs do in fact inure as a natural benefit to and reflect value of 90 K Street. The Property is in a receiving zone and may by right acquire TDRs to increase density from 6.5 FAR to 10.0 FAR. (D.C. Mun. Regs. tit. 11, § 1707.5(d); *see also* Giordano Report at 5, attached as Ex. 37). Furthermore, MAI Appraiser Steven Halbert considered the TDRs in his appraisal of 90 K Street. Mr. Halbert based his valuation on the total development potential of 10.0 FAR. (Expert Report of Steven Halbert ("Halbert Report") at 27 & 37, attached as Ex. 54). Also, according to Daniel Hudson, President of TCMD, the buyer analyzed the sale of 90 K Street in terms of the total FAR of 10.0. (Hudson Dep. at 33:5-10; 33:18-34:4) (Ex. 5). Under the D.C. Regulations, 10.0 FAR is only achievable when TDRs are included. (D.C. Mun. Regs. tit. 11, 1707.5(d)).

47.    Undisputed.

48.    Disputed in that, although TDRs are commodities that may or may not be sold concurrently with a land sale, TDRs are not sold separately for a price per square foot that is the same as the price of the land to which they will be attached. (Deposition of Stuart Smith ("Smith Dep.") at 94:13-95:4) (Ex. 4). According to Viad's expert Cynthia Giordano, the current market price for TDRs is between $5.25 to $5.50 per square foot. (Giordano Report at 5) (Ex. 37). Furthermore, MRLP's rebuttal expert, Stuart Smith, testified that on one recent occasion, he determined the value of TDRs in the North Capitol Receiving Zone, where 90 K Street is located. The value he concluded for that transaction was that TDRs had value of $3.50 per FAR.

Furthermore, Mr. Smith testified that TDRs do not sell for a price that is equal to or similar to the price per square foot of the land to which they will be attached. (Smith Dep. at 34:1-3; 94:13-95:4) (Ex. 4). Finally, MRLP contracted to buy TDRs for use at 90 K Street for $6 per square foot. (Braesch Dep. at 24:19-29:17) (Ex. 3). However, TCMD paid approximately $70 per square foot for the TDRs because the TDRs were sold with the land as part of a total square foot package. (Hudson Dep. at 33:5-10; 33:18-34:4) (Ex. 5). Not once in its analysis does MRLP seek to justify its exclusion of nearly $70 per square foot from the total consideration paid to it, a price nearly eleven times the undisputed market value of TDRs, or address the structure of the transaction which separates the sale into two components that are contingent on each other in accordance with the Umbrella Agreement between the parties. TCMD has admitted in Deposition testimony that the price paid to MRLP for TDRs was well above the market price and was agreed to only because purchasing the TDRs at the higher value was a requirement imposed by MRLP as a condition for purchasing the land at 90 K Street. (Hudson Dep. 45:4-46:17) (Ex. 5).

49.     Disputed in that Viad's experts did not opine on whether the TDRs would be considered Improvements or Property under the CPA. Ms. Giordano was not asked to interpret the terms of the CPA, nor was Mr. Halbert. (Deposition of Cynthia Giordano ("Giordano Dep.") at 6:21-7:10, attached as Ex. 56; Halbert Dep. at 15:9-22; 17:5-18:1, attached as Ex. 68).

50.     Disputed to the extent that MRLP suggests that Mr. Glassman was the only person involved in preparing the 2005 Revised Statement. In fact, the decision to revise the 2005 Statement was made by MRLP's litigation counsel, Sam Rose, Reid Liffmann and Mr. Glassman. (*See* Liffmann Dep. at 24:9-16; Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Exs. 2 & 36). It is clear that Mr. Cooter orchestrated the

revision of the 2005 Statement. *Id.* Further disputed in that there is no evidence that the alleged corrections in the Revised 2005 Statement reflect the "economic reality" of what had occurred since MRLP's purchase of the property. No loan documents have been submitted by MRLP to substantiate their claim that the contributions from S&S Finance are debt. Furthermore, Ron Glassman, testifying as a 30(b)(6) witness for MRLP, stated that MRLP has continued to treat the first mortgage, which was acquired by S&S Finance in 1996, as partners capital on its tax forms. (Deposition of Ronald Glassman ("Glassman Dep.") at 33:3-17; 37:14-39:22) (Ex. 67); Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-001015) (Ex. 24). The treatment of the S&S Finance contributions in the Revised 2005 Statement conflicts with the treatment of these amounts in MRLP's most recent tax return and in the settlement statement for the closing on the TCMD-MRLP transaction. In the tax return and the settlement statement, the amounts owed to S&S Finance are under $5 million. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50 & 52). However, in the Revised 2005 Statement, MRLP is claiming that it owes S&S Finance over $35 million. (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36). The treatment of the contributions from S&S Finance as debt also conflicts with the Reznick Analysis. According to the Reznick Analysis "any amount advanced by S&S or its partners to pay interest or any other reasonable expense should be treated as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b)." (Reznick Analysis, VD-000466, at ISSUE 3, Interpretation) (Ex. 32). It is clear from the foregoing that MRLP made the alleged corrections to the Revised 2005 Statement as part of its effort to deprive Viad of its rights under the CPA. Also disputed in that S&S Finance's expectations with regard to the funds it allegedly contributed are irrelevant and inadmissible in interpreting the CPA.

13

51.     Disputed to the extent that MRLP implies that the classifications in the Revised 2005 Statement are correct. Also disputed in that although S&S Finance is not a partner of MRLP, S&S Finance's partners, Sam Rose and Stewart Greenebaum, are also partners of MRLP. (Rose Dep. at 190:6-15) (Ex. 62); Eighth Amendment to MRLP Partnership Agreement, MR-16825 (Ex. 7). In fact, they were the only partners of MRLP until Reid Liffmann and Steve Braesch were added in 2001 and 2003 respectively. (MRLP 2001 U.S. Return of Partnership Income at 10-23, MR-26497) (Ex. 63); (MRLP 2003 U.S. Return of Partnership Income at 9-25) (Ex. 64); (MRLP 1996 U.S. Partnership Return of Income, MR-26609, at Schedule K-1 (MR26620-26631)) (Ex. 65). As a result, S&S Finance can advance equity to MRLP. (*See* CPA §§ 1.17, 3.6(a) & 3.6(b)) (Ex. 9).

52.     Disputed in that there is no evidence that the alleged corrections in the Revised 2005 Statement reflect the "economic reality" of what had occurred since MRLP's purchase of the property. First, S&S Finance repaid the first mortgage on the property in 1996 at a discount of approximately $1 million. (Declaration of Ronald Glassman at ¶ 8, attached as Exhibit 2 to MRLP and MRTDR's Motion for Summary Judgment). S&S Finance is owned by Rose and Greenebaum. (Rose Dep. at 190:6-15) (Ex. 62). They were the only partners of MRLP until Reid Liffmann and Steve Braesch were added in 2001 and 2003 respectively. (MRLP 2001 U.S. Return of Partnership Income at 10-23, MR-26497) (Ex. 63); (MRLP 2003 U.S. Return of Partnership Income at 9-25) (Ex. 64); (MRLP 1996 U.S. Partnership Return of Income, MR-26609, at Schedule K-1 (MR26620-26631)) (Ex. 65). Under the CPA, S&S Finance would be defined as an "Affiliate." (CPA §1.2) (Ex. 9). The individuals who are partners in MRLP, and specifically Rose and Greenebaum, are also 'Equity Holders" under the CPA. (CPA § 1.17) (Ex. 9). When S&S Finance acquired the first mortgage in 1996, that debt was owned by MRLP.

Approximately a year after its acquisition, $7.27 million of the mortgage was reclassified as equity in the financial statements provided to Viad and in MRLP's tax returns. (*See* Glassman Dep. at 33:3-17; 37:14-39:22) (Ex. 67). Although MRLP changed the classification back to debt in the financial statements provided to Viad in or around 1999, it has continued to treat the first mortgage as equity for tax purposes. *Id.* Furthermore, the decision to remove the cost of the TDRs was made by litigation counsel for MRLP in November 2006, after depositions in this case were underway. (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36). Also disputed to the extent that MRLP implies that its alleged corrections are valid.

53.     Disputed to the extent that MRLP suggests that its list of Liabilities in the Revised 2005 Statement is an accurate reflection of the liabilities for 90 K Street. No loan documents have been submitted by MRLP to substantiate their claim that the contributions from S&S Finance are debt. Furthermore, Ron Glassman, testifying as a 30(b)(6) witness for MRLP, stated that MRLP has continued to treat the first mortgage from S&S Finance as partners capital on its tax forms. (*See* Glassman Dep. at 33:3-17; 37:14-39:22) (Ex. 67)). The treatment of the S&S Finance contributions in the Revised 2005 Statement conflicts with the treatment of these amounts in MRLP's most recent tax return and in the settlement statement for the closing on the TCMD-MRLP transaction. In the tax return and the settlement statement, the amounts owed to S&S Finance are under $5 million. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for Land Sale, at L.1304, MR-26158) (Exs. 50 & 52). However, in the Revised 2005 Statement, MRLP is claiming that it owes S&S Finance over $35 million. (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36) The treatment of the contributions from S&S Finance as debt also conflicts with the

Reznick Analysis. (Reznick Analysis, VD-000466, at ISSUE 3, Interpretation) (Ex. 32). Additionally, the CPA requires that items be computed "on the basis of sound cash basis accounting practices." (CPA §§ 2.3(a) and (b)) (Ex. 9). Although the CPA requires that interest on Permitted Debt be paid in order to be deducted, MRLP seeks to deduct accrued interest, classifying these amounts as Liabilities in the Revised 2005 Statement (CPA § 2.3(b) (Ex. 9); (Rose Dep. at 189:22-190:2) (Ex. 62); (Liffmann Dep. at 45:10-46:17) (Ex. 2); (Statement of Greenebaum and Rose Associates, at Section I, VD-000458) (Ex. 13); (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement at 2) (Ex. 36).

54.     Disputed. S&S Finance repaid the first mortgage on the property in 1996 at a discount of more than $1 million. (Declaration of Ronald Glassman at ¶ 8, attached as Exhibit 2 to MRLP and MRTDR's Motion for Summary Judgment). S&S Finance is owned by Rose and Greenebaum. (Rose Dep. at 190:6-15) (Ex. 62). They were the only partners of MRLP until Reid Liffmann and Steve Braesch were added in 2001 and 2003 respectively. (MRLP 2001 U.S. Return of Partnership Income at 10-23, MR-26497) (Ex. 63); (MRLP 2003 U.S. Return of Partnership Income at 9-25) (Ex. 64); (MRLP 1996 U.S. Partnership Return of Income, MR-26609, at Schedule K-1 (MR26620-26631)) (Ex. 65). Under the CPA, S&S Finance would be defined as an "Affiliate." (CPA § 1.2) (Ex. 9). The individuals who are partners in MRLP, and specifically Rose and Greenebaum, are also 'Equity Holders" under the CPA. (CPA § 1.17). As such, the acquisition of the loan at a discount resulted in a reduction of the principal balance from MRLP's perspective and MRLP now owes less on the first mortgage. When S&S Finance acquired the first mortgage, that debt was owned by MRLP. About a year after its acquisition, $7.27 million of the mortgage was reclassified as equity in the financial statements provided to Viad and in MRLP's tax returns. (*See* Glassman Dep. at 33:3-17; 37:14-39:22) (Ex. 67).

Although MRLP changed the classification back to debt in the financial statements provided to Viad in or around 1999, it has continued to treat the first mortgage as equity for tax purposes. *Id.* Because S&S Finance repaid the loan at a discount, it was technically a refinancing for which they received value which they should at the time have shared with Viad to the extent of 15%. (CPA § 3.2(b)) (Ex. 9).

55.    Disputed in that the decision to remove the cost of the TDRs was made by litigation counsel for MRLP in November 2006, after depositions in this case were underway, in an effort to bolster MRLP's argument that TDRs are not part of the 90 K Street Property. (*See* Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement (Ex. 36)). Furthermore, disputed in that the statements "this was an error," "Viad is not entitled to the value of the TDRs," "it was not a correct cost deduction on the Special Purpose Financial Statements," and "[t]herefore, one of the revisions which is reflected in the 2005 Revised Special Purpose Financial Statements provided to Viad in November 2006 is the removal of these costs" are argumentative.

56.    Disputed to the extent that MRLP represents that this audit was performed in compliance with the CPA.

57.    Disputed to the extent that MRLP is alleging that the KAWG&F audit was in accordance with GAAP, that it was an independent audit, or that the 2005 and 2006 Financial Statements submitted by MRLP should be considered by the Court. On June 27, 2007, MRLP submitted an unauthorized Supplemental Filing to the Court, that contained the allegedly audited financial statements from 2005 and 2006. (*See* Docket # 42). The Supplemental Filing was submitted almost two months after the initial round of motions had been completed and six months after discovery had closed in the case. The Supplemental Filing proffered new evidence,

seeks to add additional witness testimony, including presumably expert testimony, long after the deadline for disclosing the identity of such witnesses and providing their reports. The bookkeeper for MRLP, Ron Glassman, provided an affidavit for the Supplemental Filing explaining how he commissioned the KAWG&F firm to prepare the new financial statements. Glassman's earlier testimony in this case as a Rule 30(b)(6)witness for MRLP provides some insight on the working relationship between MRLP and KAWG&F. Glassman testified that he prepared all of the financials statements. Furthermore, he provided a "blank page" for the cover letter which suggested "contents" for KAWG&F to "copy" onto their letterhead, although, he said, "the wording is under their control." (Glassman Dep. at 23:01-25:30) (Ex. 60).

58.     Disputed to the extent that MRLP is alleging that the KAWG&F audit was in accordance with GAAP, that it was an independent audit, or that the 2005 and 2006 Financial Statements submitted by MRLP should be considered by the Court. On June 27, 2007, MRLP submitted an unauthorized Supplemental Filing to the Court, that contained the allegedly audited financial statements form 2005 and 2006. (*See* Docket # 42). The Supplemental Filing was submitted almost two months after the initial round of motions had been completed and six months after discovery had closed in the case. The Supplemental Filing proffered new evidence, seeks to add additional witness testimony, including presumably expert testimony, long after the deadline for disclosing the identity of such witnesses and providing their reports. The bookkeeper for MRLP, Ron Glassman, provided an affidavit for the Supplemental Filing explaining how he commissioned the KAWG&F firm to prepare the new financial statements. Glassman's earlier testimony in this case as a Rule 30(b)(6)witness for MRLP provides some insight on the working relationship between MRLP and KAWG&F. Glassman testified that he prepared all of the financials statements. Furthermore, he provided a "blank page" for the cover

letter which suggested "contents" for KAWG&F to "copy" onto their letterhead, although, he said, "the wording is under their control." (Glassman Dep. at 23:01-25:30) (Ex. 60).

59.    Disputed to the extent that the Special Purpose Financial Statement should be considered by the Court as evidence. On June 27, 2007, MRLP submitted an unauthorized Supplemental Filing to the Court, that contained the allegedly audited financial statements from 2005 and 2006. (*See* Docket # 42). The Supplemental Filing was submitted almost two months after the initial round of motions had been completed and six months after discovery had closed in the case. The Supplemental Filing proffered new evidence, seeks to add additional witness testimony, including presumably expert testimony, long after the deadline for disclosing the identity of such witnesses and providing their reports.

60.    Disputed to the extent that the Special Purpose Financial Statement should be considered by the Court as evidence. On June 27, 2007, MRLP submitted an unauthorized Supplemental Filing to the Court, that contained the allegedly audited financial statements from 2005 and 2006. (*See* Docket # 42). The Supplemental Filing was submitted almost two months after the initial round of motions had been completed and six months after discovery had closed in the case. The Supplemental Filing proffered new evidence, seeks to add additional witness testimony, including presumably expert testimony, long after the deadline for disclosing the identity of such witnesses and providing their reports.

61.    Disputed in that the December 17, 2006 is not the correct measurement date for invoking the fair market value appraisal process. Because there was a significant possibility that the transaction may not have closed (evidenced by the actual history of an announced transaction that failed to close), MRLP's argument that the formation of the contract provided notice to Viad is unreasonable. Moreover, MRLP failed to respond to Viad's letter of February 21, 2007

notifying MRLP that it was in default, and has failed to designate an appraiser, thereby waiving its arguments regarding the calculation of the relevant time period under the CPA.

62.    Disputed in that Viad provided to MRLP a report and an opinion, prepared by an MAI appraiser, as to the fair market value of the Property in accordance with Section 3.8 of the CPA on January 31, 2007. The appraiser, Steven Halbert, of Cushman and Wakefield, opined that the fair market value of the Property on June 24, 2006, and within a 6 month period thereafter, which period included the date of the contract between MRLP-TCMD, was $64,800,000. Because Viad sent its appraisal report, indicating its belief that an agreement on fair market value could not be reached, on January 31, 2007, the time period for identifying the appraiser lapsed 15 days later on February 15, 2007.