## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MONTGOMERY ROAD I LIMITED PARTNERSHIP,** ) | |
| ) | |
| **Plaintiff/** ) | |
| **Counter-Defendant,** ) | |
| ) | **Case No. 1:06CV00344 (HHK)** |
| ) | |
| **v.** ) | **Next event:  Status Conference** |
| ) | **December 14, 2007** |
| **VIAD CORP,** ) | |
| ) | |
| **Defendant/** ) | |
| **Counter-Plaintiff/** ) | |
| **Third-Party Plaintiff** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **MONTGOMERY ROAD TDR, LLC,** ) | |
| ) | |
| **Third-Party Defendant** ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MONTGOMERY ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC'S OPPOSITION TO DEFENDANT VIAD'S RENEWED MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
Phone:(202)537-0700
Fax:    (202)364-3664
efiling@cootermangold.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

FACTS AND CHRONOLOGY OF KEY EVENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I        THE SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.      VIAD HAS NOT ESTABLISHED AS A MATTER OF LAW THAT THE
         REZNICK OPINION IS NOT BINDING ON THE PARTIES . . . . . . . . . . . . . . . . . . . 4

         A.      Submission of the Dispute to the Reznick Group is Binding . . . . . . . . . . . . . . . 5

         B.      The Items Contained in the Special Purpose Financial Statements
                 Which Were Addressed in the Reznick "Dispute Resolution Process"
                 Determine the Calculation of the Appreciation Cash Payment . . . . . . . . . . . . . . 9

III.     THE DEDUCTION OF INTEREST PREVIOUSLY LABELED AS
         DEVELOPER'S EQUITY RETURN IS SUPPORTED BY THE
         TERMS OF THE CPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.      THE TDRs SHOULD NOT BE INCLUDED IN THE CASH
         APPRECIATION  CALCULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

         A.      The Separation of TDRs in the Purchase Price was not a Sham . . . . . . . . . . . 22

         B.      The TDRs are not "Interests" or "Improvements" . . . . . . . . . . . . . . . . . . . . . . . 24

         C.      Extrinsic Evidence is Not Necessary to Interpret the CPA . . . . . . . . . . . . . . . . 28

V.       VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT
         ON  ITS CLAIM FOR BREACH OF CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

         A.      Viad is Not Entitled to Summary Judgment on its Breach of
                 Contract Claim for an Alleged Default Relating to
                  the Appraisal Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

         B.      Viad is Not Entitled to Summary Judgment on its Breach of
                 Contract Claim for an Alleged Default Relating to the
                 Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

i

C.  Viad is Not Entitled to Summary Judgment on its Breach of Contract
Claim for an Alleged Default Relating to Providing a
Statement or Payment to Viad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

D.  An Audit of MRLP's Records is Not Required . . . . . . . . . . . . . . . . . . . . . . . . . 37

VI.  VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON
MONTGOMERY ROAD'S CLAIM FOR REACH OF CONTRACT . . . . . . . . . . . . . 38

VII.  VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS
CLAIM OF BREACH OF THE IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.  Montgomery Road Did Not Owe A Duty Of Good Faith
And Fair Dealing To Viad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

B.  Even If Montgomery Road Owed A Duty Of Good Faith
And Fair Dealing, It Did Not Breach The Duty . . . . . . . . . . . . . . . . . . . . . . . . . 41

VII.  VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS
CLAIM FOR ATTORNEYS FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

## FEDERAL CASES

America v. Preston,  468 F.Supp.2d 118 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CEI Washington Bureau, Inc. v. Department of Justice, 469 F.3d 126 (C.A.D.C. 2006) . . . . . . . 4

Fortune, Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355 (9th Cir.1983) . . . . . . . . . . . . . . . 5

Home Hearth Plano Parkway, L.P. v. LaSalle Bank, N.A., 320 B.R. 596 (N.D. Texas 2004) . . 41

In re IT Group, 448 F.3d 661 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

Moses H. Cone Hospital v. Mercury Construction Corp., 460 U.S. 1 (1983) . . . . . . . . . . . . . . 5

Nuzzo v. FBI, 1996 WL 741587, (D.D.C.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pearce v. E.F. Hutton Group, Inc., 828 F. 2d 826 (C.A.D.C. 1987) . . . . . . . . . . . . . . . . . . . . . . 5

Rains v. Cascade Indus., Inc., 402 F.2d 241 (3d Cir.1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Sea Crest Construction Corp. v. United States, 59 Fed. Cl. 615 (2004) . . . . . . . . . . . . . . . . . . . 9

Suthers v. Amgen Inc., 441 F.Supp.2d 478 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 41

Underwater Exotics, Ltd. v. Secretary of the Interior, 1994 WL 80878 (D.D.C. 1994) . . . . . . . . 9

United States v. INA,131 F.3d at 1042 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States ex rel. DOL v. Insurance Company of North America,
    131 F.3d 1037 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Washington Metropolitan Area Transit Authority v. Quik Serve Foods, Inc.,
    2006 WL 1147933,  (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## STATE CASES

Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020 (Del. Ch. 2006) . . . . . . . . 40, 41

Allworth v. Howard University, 890 A.2d 194 (D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Arizona Dep't of Revenue v. Arizona Outdoor Advertisers, Inc.,
   41 P.3d 631 (Ariz. Ct. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Camalier & Buckley, Inc. v. Sandoz & Lamberton, Inc., 667 A.2d 822 (D.C. 1995) . . . . . . . 35

Hais v. Smith, 547 A.2d 986 (D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Holland v. Hannan, 456 A.2d 807 (D.C. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

In Re Haar, 667 A.2d 1350 (D.C. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Mitsui Fudosan, Inc. v. County of Los Angeles, 268 Cal. Rptr. 356 (Cal. Ct. App. 1990) . 27, 28

Paul v. Howard University, 754 A.2d 297 (D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Rose v. Fox Pool Corp., 643 A.2d 906 (Md. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Shore v. Groom Law Group, 877 A.2d 86 (D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Wilkinson v. St. Jude Harbors, Inc., 570 So.2d 1332 (Fla. Dist. Ct. App. 1990) . . . . . . . . 27, 28

William F. Klingensmith, Inc. v. District of Columbia, 370 A.2d 1341 (D.C. 1977) . . . . . . . . . 8

## FEDERAL RULES

Fed. R. Civ. P. 26(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Fed. R. Civ. P. 56 (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## LOCAL RULES

Local Court Rule 56.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## FEDERAL STATUTES

The Federal Arbitration Act (9 U.S.C. § 2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## DISTRICT OF COLUMBIA STATUTES

iv

District of Columbia Arbitration Act (D.C. Code Ann., § 16-4301) . . . . . . . . . . . . . . . . . . . . . . . . 5

District of Columbia Mechanic's Lien Act (D.C. Code. Ann. § 40.301.02)  . . . . . . . . . . . . . . 29

## TREATISES & OTHER

Restatement (Second) of Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Black's Law Dictionary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Plaintiff/Counterdefendant Montgomery Road I Limited Partnership ("Montgomery Road")

and Third-Party Defendant Montgomery Road TDR, LLC ("Montgomery Road TDR")(collectively,

"the Montgomery Road Parties"), by and through their undersigned counsel, hereby submit this

Memorandum of Points and Authorities in support of their Opposition to Defendant Viad's

(Renewed) Motion for Summary Judgment.[1]  Defendant Viad Corp. ("Viad") seeks summary

judgment in its favor on its First Amended and Supplemental Counterclaim (ECF Document #41)[2]

and on Montgomery Road's Second Amended Complaint (ECF Document #39 ).

## **FACTS AND CHRONOLOGY OF KEY EVENTS**[3]

---

[1]  Pursuant to this Court's July 16, 2007 Order, the parties were directed to incorporate by reference their prior summary judgment filings. Although Viad's (Renewed) Motion for Summary Judgment essentially restates the same arguments verbatim, they are organized in a way that is a little different than the original summary judgment motion (ECF #25), and a few new arguments have been added. Moreover, Viad has included 20 new "Statements of Undisputed Facts" and its Statement of Undisputed Facts ("SOF") has been renumbered.  Thus, it would have been exceedingly cumbersome for the Montgomery Road Parties to "incorporate by reference" their original Summary Judgment Opposition (ECF # 30) ("Original Opposition"). As a result, this current Opposition repeats verbatim most of the Original Opposition, but has been modified to refer to the re-numbered SOFs and to address Viad's re-organized and new arguments.  Exhibits 1-47 referred to herein were filed with the Original Opposition, and have not been re-filed. (A hard copy of all of the original summary judgment pleadings and exhibits were transmitted to Chambers on May 9, 2007).  Three additional exhibits have been filed in support of this Opposition to Viad's Renewed Motion:  the Declaration of Clemens Mueller, dated September 6, 2007 (Exhibit 48), the Declaration of Ronald Glassman, dated September 26, 2007 (Exhibit 49), and Declaration of Ronald Glassman, dated June 26, 2007 (Exhibit 50)  Mr. Mueller's Declaration was previously filed with the Montgomery Road Parties' Renewed Summary Judgment Motion (ECF #46), and Mr. Glassman's June 26, 2007 Declaration was previously filed with the Montgomery Road Parties' Supplemental Filing (ECF #42).

[2]  ECF Documents #27 and #41contain the same Amended and Supplemental Counterclaim of Viad; they also include the Answer to the First Amended Complaint (#27) and the Second Amended Complaint (#41).

[3]  Record citations to the factual statements in this section are set forth in the accompanying Response to Viad's Statement of Material Facts Not in Dispute.

Pursuant to Local Rule 56.1, the Montgomery Road Parties are filing concurrently herewith their separate Response to Viad's Statement of Undisputed Material Facts.  The Montgomery Road Parties' Response to Viad's Statement of Material Facts contains detailed facts as well as their evidentiary support.  The following is a chronology of the key events described by the Response to Viad's Statement of Material Facts:

• November 1987 - Montgomery Road[4] purchased the property located at First and K Streets, N.E. ("90 K Street" or "the Property") for approximately $11 million from Transportation Leasing Company ("Transportation Leasing"), which is the predecessor in interest to Viad Corp. ("Viad"), the Defendant in this case.   At the same time, Transportation Leasing and Montgomery Road entered into a Cash Participation Agreement ("CPA").  Pursuant to the CPA, under certain circumstances, Transportation Leasing would receive 15% of any cash flow generated by the operation of the property ("Operations Cash Payment") and 15% of the net proceeds generated by the sale, disposition, or refinancing of the property ("Appreciation Cash Payment").  At the time the Property was acquired 90 K Street in 1987, a $10.3 million  mortgage was placed on it.

• 1996 -  S&S Finance Limited Partnership ("S&S Finance") (an "in house" bank for all G&R projects) purchased the mortgage note for approximately $9.3 million (at a discount of approximately $1 million).  S&S Finance held the first mortgage on the Property until its sale in January 2007.

• 1997 - Montgomery Road's accountants reclassified approximately $7.3 million of the first mortgage debt to equity.  Although the reclassification was for internal tax reasons, and had nothing to do with the CPA, Ronald Glassman, G&R's in-house accountant, carried the reclassification

---

[4]  Montgomery Road is an affiliate of Greenebaum & Rose ("G&R"), which is a real estate developer with offices in the District of Columbia and Baltimore, Maryland

through to the 1997-1999 Special Purpose Financial Statements (which were provided to Transportation Leasing annually).

• 2000-2005 - Montgomery Road and Transportation Leasing disagree regarding the calculation of the Appreciation Cash Payment in the event of a sale of 90 K Street. The focus of the dispute is the effect of the classification as equity of the amounts advanced by S&S Finance.

• 2005 - Montgomery Road and Viad agreed to seek an arbitration of the dispute by submitting the matter to the Reznick Group, an independent accounting firm. On April 10, 2005 the Reznick Group rendered its opinion, which found in favor of Montgomery Road on five of the six issues submitted to them. Viad refused to be bound by the Reznick Group's conclusions, despite language in the CPA that the determination "shall be final."

• January 2006 - Montgomery Road institutes this litigation to seek a declaration of the parties' rights under the CPA.

• November 2006 - Revised Special Purpose Financial Statements for the period from 1987 through December 31, 2005 (Exhibit 46) are prepared by Montgomery Road to identify the amounts owing to S&S Finance as debt and the interest thereon as an expense.

• January 2007 - 90 K Street is sold to a third party.

• June 2007 - Montgomery Road tendered audited Special Purpose Financial Statements (December 31, 2005 and 2004; December 31, 2006 and 2005; January 11, 2007 and December 31, 2006), to Viad via a Supplemental filing in this action. (ECF #42).

## ARGUMENT

### I.     THE SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard. See Nuzzo v. FBI, 1996 WL 741587, *1 (D.D.C.1996) ("When both parties in a cause of action move for summary judgment, each party must carry its own burden"); CEI Washington Bureau, Inc. v. Department of Justice 469 F.3d 126, 129 (C.A.D.C.2006) ("cross-motion for summary judgment does not concede the factual assertions of the opposing motion"); Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.1968) ("cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified").  Viad is not entitled to summary judgment because it cannot establish that it is entitled to judgment as a matter of law on the claims set forth in Montgomery Road's Second Amended Complaint or Viad's First Amended and Supplemental Counterclaim.

### II.    VIAD HAS NOT ESTABLISHED AS A MATTER OF LAW THAT THE REZNICK OPINION IS NOT BINDING ON THE PARTIES

Viad seeks summary judgment on the grounds that the "the actions and communications by Viad and MRLP show that the letter and analysis of the Reznick Group [] was never intended to be binding on the parties." Mem. at 3.  Montgomery Road of course contends that the undisputed facts demonstrate that the Reznick Opinion, resulting from an arbitration process provided for in the CPA,

is binding.  In any event however, Viad has failed to establish as a matter of law that it is entitled to summary judgment on this issue.

### A.     Submission of the Dispute to the Reznick Group is Binding

Section 2.7 of the CPA provides that if Transportation Leasing (now Viad)  "disputes any computation or item contained in any portion" of a year end special purpose financial statement, such disputed items were to be "submitted to arbitration" for resolution by an independent certified public accountant selected by Transportation Leasing "*whose determination shall be final*."  CPA at §2.7.  It is clear under both Federal and District of Columbia law that decisions rendered pursuant to an arbitration clause are binding on the parties.  The Federal Arbitration Act makes written agreements to arbitrate "valid, irrevocable, and enforceable" on the same terms as other contracts. 9 U.S.C. § 2.  "Whereas doubts about the meaning of a contract are generally to be resolved by reference to the intention of the parties, the federal policy favoring arbitration counsels that doubts about the intended scope of an agreement to arbitrate be resolved in favor of the arbitral process." Pearce v. E.F. Hutton Group, Inc.  828 F.2d 826, 829, 264 U.S.App.D.C. 246, 249 (C.A.D.C.1987) (citing Moses H. Cone Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)); Shore v. Groom Law Group,  877 A.2d 86, 91 (D.C.2005) ("a party may not submit a claim to arbitration and then challenge the authority of the [arbitration panel] to act after receiving an unfavorable result")(quoting Fortune, Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355, 1357 (9th Cir.1983)); see also District of Columbia Arbitration Act, D.C. Code Ann., § 16-4301 ("... a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable ... .").

Viad argues that it can unilaterally convert the resolution of the dispute by Reznick into a non-binding exercise.  See, e.g., Mem. at 5.  As Mr. Rose testified in his deposition, he and Eve Fiorucci (Viad's Assistant Director of Real Estate)[5] had discussions over a period of about three years regarding the accounting issues.  Rose Tr. at 74-77 (Exhibit 13).  In 2005, Montgomery Road and Viad finally submitted the dispute to the Reznick Group for resolution.  Declaration of Samuel G. Rose ("Rose Decl.") (Exhibit 4) at ¶24; see also Fiorucci Tr. at 44-46; Transcript of Deposition of Kenneth Goldman ("Goldman Tr.") at 25 ( Exhibit 10).[6]  Consistent with §2.7 of the CPA, the Reznick Group was selected by Viad.  Montgomery Road paid the cost.  Rose Decl. (Exhibit 4)at ¶24; See also Rose Tr. at 75,77, 78, 86; Fiorucci Tr. at 45; Viad's Answer to ¶18 of the Amended Complaint.

Specifically, the parties sought the interpretation, analysis, and application of certain terms of the CPA.  Both parties were permitted to, and did, submit position papers and any relevant materials.   On March 2, 2005, Defendant Viad submitted its position paper plus nine related exhibits.  Exhibit 37  (Letter from E. Fiorucci to Brent Solomon[7], 3-2-05).  Montgomery Road submitted its position paper on March 30, 2005.  Exhibit 38 (Letter from Gerald Katz to B. Solomon, 3/30/05 ).   The parties also asked the independent accountants to analyze the classification of certain costs and charges in the Special Purpose Financial Statements, and prepare a pro-forma calculation under the CPA for the hypothetical sale of the Property. See Exhibit 37 (Fiorucci Letter) at VD 908; Exhibit 39 (B. Solomon letter to S. Rose, 4/10/05  (the "Reznick Opinion")) at 1).   On

---

[5]  Transcript of Deposition of Eve Fiorucci ("Fiorucci Tr.") at 6 ( Exhibit 7).

[6]  Kenneth Goldman is Viad's Director of Real Estate.  He is Ms. Fiorucci's supervisor.  Goldman Tr. at 5, 10-11 (Exhibit 10).

[7]  Mr. Solomon was the Reznick partner who rendered the Opinion.

April 10, 2005 the Reznick Group rendered its determination, which found in favor of Montgomery

Road on five of the six issues submitted for resolution.  Exhibit 39 (Reznick Opinion) at 2-4)[8].  The

Reznick Group also determined that as of December 31, 2003, 90 K Street would have to command

a selling price in excess of $37.8 million for Viad to be entitled to any Cash Appreciation Payment

under the terms of the CPA.  Exhibit 39 (Reznick Opinion at Exhibit A).

The conversations which Mr. Rose and Ms. Fiorucci had regarding the process of having an

independent accountant look at their dispute were all had in the context of the CPA and the dispute

resolution provisions contained in §2.7 of the CPA.  Rose Tr. at 78.  It was Viad (by Ms. Fiorucci)

that selected the Reznick Group to resolve the dispute.  Rose Tr. at 86; Fiorucci Tr. at 45.[9]

However, when Viad submitted its materials to Mr. Solomon, it accompanied its materials with a

cover letter addressed to the Reznick Group stating: "Finally, while we will appreciate your review

of the documents and your opinion as to our interpretation of same, we wish to make it clear that

your opinion is not binding on TLC/Viad Corp."  See Exhibit 37 (3/2/05 letter from E. Fiorucci to

Solomon).[10]  Viad now  relies on this unilateral statement as the basis for its argument that the

Reznick Opinion is not binding, despite Ms. Firoucci's knowledge that Montgomery Road was

---

[8]  In footnote 1, Viad asserts that the letter was "addressed only to Sam Rose." Ms. Fiorucci, however, was "copied" on the letter.

[9]  Ms. Fiorucci expressed concern about submitting the dispute to an accountant for resolution, evidencing Viad's recognition that the process would be binding: "Sam wants to buy Viad out ... . Believes his accounting methods were correct, would pay for Viad to have an outside firm look at accounting (**I don't recommend this**)[.] ... Sam wants to resolve the accounting issue right now."  Exhibit 33 (Record of Tele. Conversation, 6-10-02).

[10]  This is the first indication of Viad's position that the process was not binding.  See e.g. Rose Tr. at 87.  Mr. Goldman testified that the "non-binding" position was taken by Ms. Fiorucci, or by Viad's counsel, Susan Mann.  Mr. Goldman did not speak to anyone about it. Goldman Tr. at 27.

seeking a *resolution* of the accounting issue at that time.  See Exhibit 36 (Record of 12/16/04

Telephone Conversation between Ms. Fiorucci and Mr. Rose: "Discussed hiring ... Reznick to help

sort out our dispute"); Exhibit 33 (Record of 6/10/02 Telephone Conversation between Ms. Fiorucci

and Mr. Rose: "Sam wants to resolve the accounting issue right now").  Indeed, Viad's own

language in its "Statement of Position" submitted to Mr. Solomon belies its unilateral attempt to

make the process non-binding: "... TLC would like to accomplish the following goals **during the**

**dispute resolution process**: *** We suggest that [Montgomery Road] submit drafts of such

documents to TLC [Viad] and **to the arbitrator of these disputes for use as part of the dispute**

**resolution process**." Exhibit 37  at VD 908 (emphasis added); see also Id. at VD 906 (referring to

the "History of the Dispute;" and submission "to resolve the issues").  At best, the insertion by Ms.

Firorucci of the unilateral "non-binding" language in the cover letter could be viewed as a counter-

offer to amend the CPA's provisions (although the letter was addressed to the Reznick Group,  not

to Montgomery Road), but as is clear from Mr. Rose's testimony (Tr. at 87), it was never accepted:

A.    That we spent three years picking them, getting to this point.  What's the point of
      doing it if it's not binding?  It was almost assumed.  Why would you take years to
      talk to  your accountant, to talk to all the bosses, to pick an accountant, and then say
      it's not binding?  I mean:  Why bother?

The District of Columbia follows the Restatement (Second) of Contracts with regard to

whether an offeree's silence can constitute acceptance.  William F. Klingensmith, Inc. v. District

of Columbia, 370 A.2d 1341, 1343 (D.C. 1977)(discussing tentative draft of Restatement (Second)

of Contracts §72 which became the final draft of §69).  Generally, silence does *not* constitute

acceptance.  Id.; In Re Haar, 667 A.2d 1350, 1353-54 (D.C. App. 1995) (respondent was not entitled

to take client's silence as an agreement to respondent's statement in his letter that he would

withdraw money from the client trust account).    Although there are limited exceptions to this general rule, none apply here.[11]  Courts consistently refuse to treat unilateral statements in cover and transmittal letters as effective modifications to agreements.    See, e.g Sea Crest Construction Corp. v. United States, 59 Fed. Cl. 615 (2004)(granting summary judgment, because the builder "did not have a unilateral right to alter its [best and final offer] site plan," despite its attempt to reserve such a right to itself in letter transmitting offer); Underwater Exotics, Ltd. v. Sec. of Interior, 1994 WL 80878 (D.D.C. 1994)(rejecting the argument based on cover letter: "not only is this condition unilateral, but the plaintiff also attempted to impose it after the settlement agreement had been concluded").

Here, the parties agreed to submit their dispute to the Reznick Group for resolution and such a process is explicitly provided for in Section 2.7 of the CPA, which refers to it as "arbitration." Viad's unilateral statement in its cover letter is ineffective to convert the Reznick Opinion into a non-binding determination, and thus, Viad is not entitled to summary judgment on this issue.

**B.    The Items Contained in the Special Purpose Financial Statements Which Were Addressed in the Reznick "Dispute Resolution Process" Determine the Calculation of the Appreciation Cash Payment**

Viad argues that the Reznick Opinion is not binding because the issue now confronting the parties is the Appreciation Cash Payment, not the "financial statements."  Mem. at 7.  Viad argues

---

[11]   The three exceptions are where: (a) an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation; (b)the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer; and (c) because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept.  Restatement (Second) of Contracts, §69(1)(a), (b) and (c) (1981).

that disputes regarding the Appreciation Cash Payment are resolved by an appraisal process under CPA §3.11. What Viad ignores however, is that the determination of the Appreciation Cash Payment depends on the calculation of deductions and expenses defined in other sections of the CPA, and as set forth in the Special Purpose Financial Statements. The calculation of the Appreciation Cash Payment is not done in a vacuum: income and expenses (and accounting treatment of those items) which are offsets from the gross proceeds of a sale (in calculating Appreciation Cash Flow) are identified in the Special Purpose Financial Statements. The propriety of those deductions has been submitted to Reznick for binding arbitration under CPA § 2.7.

The dispute over the propriety of the expenses and deductions (which are ultimately offsets to any Appreciation Cash Payment) began nearly seven years ago. As explained Mr. Rose's Declaration (Exhibit 4), in the summer of 2000, Montgomery Road entered into a contract to sell 90 K Street. Rose Decl. at ¶19. The contract price of Property was $24,975,000 with expected net proceeds of approximately $23 million. Viad's Answer to ¶13 of the Second Amended Complaint.[12] After Transportation Leasing/Viad received a copy of the contract pursuant to the right of first refusal provisions of the CPA § 4.1, it began to challenge Montgomery Road's calculation of certain expenses that would ultimately be deducted from any future Appreciation Cash Payment. Rose Decl. at ¶¶21-22. Montgomery Road calculated its cost basis on the property, including the interest and other charges which had been reflected on the Special Purpose Financial Statements as Developer's Invested Equity, Developer's Operating Equity, Developer's Equity Return, and the balance of the first mortgage. Viad's Answer to ¶13 of the First Amended Complaint. Those costs

---

[12] The proposed 2000 sale of the 90 K Street property did not take place for reasons unrelated to this lawsuit. Rose Decl. (Exhibit 4) at ¶22; Viad's Answer to ¶17 of the Second Amended Complaint.

were estimated to be in excess of $29,000,000.  Rose Decl. at ¶19.  As a result, there would be no

positive cash flow (and thus, no Cash Appreciation Payment) from the proposed sale transaction.

In response, in August 2000, Transportation Leasing contended that the interest expense,

categorized on the Special Purpose Financial Statements as "Developers Equity Return," could not

be subtracted in calculating the Appreciation Cash Flow.  It was Transportation Leasing's position

that if the pending sale took place, Transportation Leasing would be entitled to a substantial six-

figure Cash Appreciation Payment.  See Exhibit 28 (Letter from K. Goldman to S. Rose, 8-23-00).

Specifically, Transportation Leasing claimed that under the definition of "Appreciation Cash Flow"

in CPA §3.1, the category "Developer's Equity Return" was not a permitted subtraction.  Id.; Rose

Decl. (Exhibit 4) at ¶20.    Thus, it was Transportation Leasing's position (and it is now Viad's

position) that the interest on the funds provided by S&S Finance (an internal bank for G&R

development projects) were not a proper deduction when calculating the Appreciation Cash Flow,

simply because the interest expense was labeled as "Developer's Equity Return" in Montgomery

Road's Special Purpose Statements.  Rose Decl. at ¶20.

A series of correspondence was exchanged between the parties regarding their differences

concerning the Special Purpose Financial Statements, including a September 12, 2000 letter from

Reid Liffmann (on behalf of Montgomery Road) to Kenneth Goldman (on behalf of Transportation

Leasing/Viad) (Exhibit 29).  Mr. Liffmann's letter enclosed Special Purpose Financial Statements

for 1998 and 1999, revised as of September 11, 2000 (pursuant to CPA § 2.6 ).  On October 2, 2000

Mr. Goldman responded to Mr. Liffmann (Exhibit 30), describing the special purpose financial

statements as having "creat[ed] a host of issues."  Thus, the parties had a dispute regarding the

computations and the items contained in the financial statements being provided by Montgomery

Road to Transportation Leasing/Viad pursuant to § 2.6 of the CPA.  Accordingly, the dispute was

properly subject to resolution pursuant to § 2.7 of the CPA, which result is binding on the parties.

## III.    THE DEDUCTION OF INTEREST PREVIOUSLY LABELED AS DEVELOPER'S EQUITY RETURN IS SUPPORTED BY THE TERMS OF THE CPA

Viad argues that it is entitled to Summary Judgment on the issue of whether, in calculating

the Cash Appreciation Payment, it is proper to deduct interest expense related to the Property,

regardless of whether the interest is reflected as "Developer's Equity Return" or "interest" on the

Special Purpose Financial Statements.  Quite simply, the Viad argument is that because the Special

Purpose Financial Statements (beginning in 1997)[13] labeled interest as "Developer's Equity Return,"

Montgomery Road is not allowed to deduct those amounts in calculating the Appreciation Cash

Payment.  The CPA is laden with defined terms, and resolution of this issue depends on tracing the

components of the Appreciation Cash Payment through the various definitions set forth in the

agreement.    Simply because Montgomery Road used a particular label  ("Developer's Equity

Return") does not mean that Montgomery Road is bound by the consequences of using such a label

(*i.e.,* that referring to the interest as "Developers' Equity Return" mandates that it may not be

included in the offsets when calculating the Appreciation Cash Flow).  Use of a term does not make

it so.  Where an event or a calculation does not meet the criteria of a  particular definition of a

defined term, then the CPA must be searched for the correct term.  Here, the CPA defined terms

which most accurately defines and captures the economic realities of the interest charged by S&S

Finance is either "Expense" or "Permitted Debt."    As such, the total interest amount – whether on

---

[13]  In November 2006, the Special Purpose Financial Statements were revised to properly classify the amounts as "interest" and to remove the label of "Developers Equity Return."  <u>See</u> April 19, 2007 Declaration of Ronald Glassman ("Glassman Decl.") (Exhibit 2) at ¶15.

the mortgage or on the cash infusions to operate the Property – is properly deducted in calculating Appreciation Cash Flow. See Rose Decl. (Exhibit 4)at ¶13; Glassman Decl. at ¶12.

The genesis of this issue is S&S Finance's purchase of the mortgage on the property (then held by Sun Chase) in 1996, for approximately $9.3 million. Rose Decl. (Exhibit 4)at ¶12. S&S Finance held the first mortgage on 90 K Street until the sale of the property in January 2007. Rose Decl. (Exhibit 4)at ¶13. From 1996 to date, S&S Finance charged the Property 1.5% over prime on the first mortgage, which was at or below the market rate. See, e.g., Glassman Decl. (Exhibit 2) at ¶¶11, 12; Rose Decl. (Exhibit 4)at ¶13; Exhibit 27 (see attachment, Special Purpose Financial Statements as of December 31, 1999 at 9 (note 3)); This was consistent with CPA § 2.3 (b) ("Permitted Debt") which provides that debt can be held by a related company if charges interest at or below the rates charged by other financial institutions on similar real loans. Rose Decl. at ¶13.

Montgomery Road's accountants reclassified approximately $7.3 million of the first mortgage debt to equity in 1997 (because the interest income in S&S Finance could not be offset by the interest expense in Montgomery Road for Maryland state tax purposes). Rose Decl. at ¶14; Glassman Decl. (Exhibit 2) at ¶9. Although this reclassification was for internal tax reasons, and had nothing to do with the CPA, Mr. Glassman carried the reclassification through to the Special Purpose Statements prepared for the years 1997 through 1999. Rose Decl. at ¶15; Glassman Decl. (Exhibit 2) at ¶10. When he prepared those statements, Mr. Glassman reduced the first mortgage debt by $7.3 million, which had the offsetting effect of increasing the amounts under the label "Developer's Invested Equity" (a term used in the CPA). See Exhibit 27 (see attachment, Special Purpose Financial Statements as of December 31, 1999 at 8, 9 (note 3), and 10-11 (note 6)); See also Rose at ¶15; Glassman Decl. (Exhibit 2) at ¶10. Mr. Glassman then included the annual

interest expense on that increase in Developer's Invested Equity under the label "Developer's Equity

Return." Rose Decl. (Exhibit 4) at ¶15; Glassman Decl. (Exhibit 2) at ¶10.

Beginning in 2000, Mr. Glassman eliminated the re-classification, and treated the entire $9.3

million first mortgage as debt, and it continued to carry a rate of interest of 1.5% over prime.

Glassman Decl. (Exhibit 2) at ¶11.  Until November 2006 however, Mr. Glassman continued to

label the interest on the other funds advanced by S&S Finance (advances as of December 2005

which were in excess of $18 million) as "Developers Equity Return."  See e.g., Exhibit 44 (9/21/06

Letter of transmittal and draft 2004/2005 Special Purpose Financial Statements).

In November 2006, Mr. Glassman prepared Montgomery Road's revised Special Purpose

Financial Statements for the period from 1987 through December 31, 2005 (see Exhibit 46 ("2005

Revised Statements")).[14]  The Revised Special Purpose Statements reflect the amounts as interest

expense, not as "Developer's Equity Return." Glassman Decl. (Exhibit 2) at ¶15. Viad contends that

the 2005 Revised Statements demonstrate a "flip flop" – a contrivance for purposes of this litigation.

In fact however, they reflect the economic reality of the transaction, not tainted by an erroneous

label.  Although Stewart Greenebaum and Samuel Rose have limited partnership interests in both

Montgomery Road and S&S Finance (through trusts and a family partnership), they always intended

that the funds invested into Montgomery Road, including the $7.3 million portion of the first

mortgage which S&S Finance held, were to have earned interest.  Rose Decl. (Exhibit 4) at ¶17.

S&S Finance is not a partner in Montgomery Road, and it never has been; it is a separate legal entity

---

[14]  Viad's repeated reference to the Revised Special Purpose Financial Statements as the
"Cooter Financials" is a transparent attempt to paint the financials as a litigation artifice, rather
than what they are: a legitimate  portrayal of the economic reality of the situation.

and its ownership is different than the ownership of Montgomery Road, in which Reid Liffmann and Steven Braesch are also limited partners.    Rose Decl. (Exhibit 4) at ¶17.

S&S Finance funds projects under the G&R umbrella.  Rose at ¶18.  Certain real estate, like 90 K Street, is not income producing.  With such non-income producing properties, there is no operating cash flow available to pay for the costs of maintaining the property.  These costs include real estate taxes, assessments, bid pursuit costs, and insurance.  Montgomery Road has paid all of these expenses on the property, and has managed and marketed the 90 K Street property at a substantial loss (prior to the sale in January 2007).  Rose Decl. (Exhibit 4) at ¶18.  Montgomery Road has funded these costs and operating deficits (via cash infusions from S&S Finance) with no contribution from Defendant Viad (or Transportation Leasing).  Rose Decl. (Exhibit 4)at ¶18.  By the end of 2005, S&S Finance had advanced in excess of $18 million to Montgomery Road to maintain the Property in addition to the first mortgage, See Exhibit 46 (2005 Revised Statements) at page 2; Glassman Decl. (Exhibit 2) at ¶13.  Without regard to the label, the economic reality of the situation is that the funds provided by S&S Finance are "Permitted Debt" and were provided by S&S Finance with the absolute intention of earning a return on those funds.  Rose Decl. (Exhibit 4)at ¶15; Glassman Decl. (Exhibit 2) at ¶14.  Therefore, the amounts categorized as "Developer's Equity Return" on the Special Purpose Statements (prior to the 2005 Revision described below) are in fact interest expense.  Rose Decl. (Exhibit 4)at ¶15; Glassman Decl. (Exhibit 2) at ¶14.

The determination that the S&S Finance advances are Permitted Debt (and therefore a deduction in calculating the Appreciation Cash Payment) is consistent with the applicable provisions in the CPA.  The agreement has numerous defined terms and those definitions apply throughout the agreement, not just to limited sections.  See CPA §1.1 ("*As used in this Agreement*, certain terms

shall have the meanings described in this Article 1") (emphasis added).  Most of the definitions are

not actually set forth in Article 1 – Article 1 merely contains a cross-reference to other sections of

the Agreement in which the substance of the definition can be found.  See CPA at 1-5.  The

definitions apply throughout the agreement.   For example, §1.18 defines the term "Expenses" as

having "the meaning as set forth in Section 2.3 hereof."  Although Article 2 is captioned "Operations

Cash Flow," §2.3 states: "*[f]or purposes of this Agreement*, the term "Expenses" shall mean ...

."(Emphasis added).   Working through the various definitions throughout the CPA demonstrates

that as long as the interest on the amounts infused by S&S Finance were calculated according to a

bank's rate of interest, they constitute "Permitted Debt," which is an "Expense" and is therefore an

"Approved Deduction" for "Appreciation Cash Flow" (all defined terms).  As set forth in the

Declarations of Messrs.  Rose and Glassman, the interest rate does not exceed the market rate of

interest.  Rose Decl. (Exhibit 4)at ¶35; Glassman Decl. (Exhibit 2) at ¶¶12, 15.

CPA §2.3 defines "Expenses" as "all reasonable expenses actually incurred by Developer

with respect to ownership, operation, leasing and occupancy of the Property ... ."  "Expenses"

specifically include the following two items: "... (9) interest and principle payable on **Permitted**

**Debt**, as well as any fees and charges related thereto; ... (15) amounts paid to **Equity Holders** in

payment of *(i)Developer's Operating Equity* and *(ii)Developer's Equity Return*."[15]

_____

[15]  Pursuant to the definition set forth in §1.17, "Equity Holders" are the partners of
Montgomery Road.   "Developer's Operating Equity" and "Developer's Equity Return," are
defined in Sections  3.6(b) and (c), respectively: "3.6 (b) Developer's Operating Equity shall
mean ... amounts actually advanced to the Developer by the Equity Holders (other than amounts
treated as Permitted Debt) which are used by the Developer for operation of the Property,
including without limitation *interest and principal on Mortgages and operating **expenses*** that
are not financed by borrowings secured by a Mortgage on the Property, but excluding any
Inegligible Deductions with respect thereto, and any costs included as Approved Deductions in
any calculation of Appreciation Cash Flow.  (c) 'Developer's Equity Return" shall mean the
unpaid sum total of each and every "Daily Equity Return." For purposes [of this section], a

"Permitted Debt" is defined in Section 2.3(b) of the CPA as:

> (i) any debt secured by a Senior Mortgage and  (ii) that portion of any debt incurred by Equity Holders, whether secured or unsecured, the proceeds of which are incurred solely to fund all or part of:  (1) the purchase price of the Real Property,  (2)  predevelopment, development, construction costs (but excluding any costs representing *Approved Deductions* or Ineligible Deductions) with respect to the Property, or  (3) deficits incurred in the operation of the Property.

> If *Permitted Debt* is held by any Affiliate of Developer, interest paid thereon shall be included as an *expense* only to the extent that it does not exceed the amount of interest that would have been payable on an equivalent loan from an unrelated bank ... if such loan had been made on terms generally available in the District of Columbia area at the time such debt was incurred."

CPA §2.3(b)(emphasis added; initial capitals on defined terms in original).[16]   Based on the foregoing definitions, the interest on the funds advanced by S&S Finance charged is an allowable "Expense" or "Permitted Debt," and therefore an Approved Deduction for purposes of the Appreciation Cash Payment.  See Rose Decl. (Exhibit 4)at ¶13; Glassman Decl. (Exhibit 2) at ¶12.  Here, it is which is at issue.  The  components of the Appreciation Cash Payment and the Appreciation Cash Flow calculations are identified  in Article 3, but, as noted *supra*, other sections must be consulted for the definitions of the components, including the defined terms in Article 2. See also § 7.11 ("The titles of Articles and Sections contained in this Agreement are inserted for convenience of reference only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation thereof").  "*Appreciation Cash Flow*" is defined as:

---

"Daily Equity Return" shall be computed for each day and shall be equal to the product of the (i) the annual Prime Rate on such day divided by 365 and (ii) the sum of Developers Invested Equity and Developer's Operating Equity on such day."

[16] Permitted Debt  excludes certain costs included in "Approved Deductions" because those costs are already subtracted as an "Approved Deductions" pursuant to § 3.1(ii))(see chart *infra).*

(i) the *Agreed Value* of the Property or applicable portion thereof; (ii) reduced by the sum of the *Approved Deductions* [3.4] related to the Property or applicable portion thereof and the Closing costs and (iii) reduced by the amount, if any, of the then remaining [3.6d] *Developer's Invested Equity* [3.6a] and *Developers Operating Equity* [3.6b]; each determined as of the date(s) on which the Appreciation Cash Payment shall be payable, provided that in no event shall the Appreciated Cash Payment be less than zero.

CPA §3.1 (emphasis added; initial capitals on defined terms in original).

## CALCULATION OF APPRECIATION CASH FLOW

Column 1 defines terms used in Column 2; Column 2 defines terms used in Column 3; Column 3 sets out the calculation for Appreciation Cash Flow.

| COLUMN 1 | COLUMN 2 | COLUMN 3 (§3.1) | |
|---|---|---|---|
| | **AGREED VALUE OF PROPERTY**= Greater of gross proceeds of sale or fair market value of property (3.3(a)) | **AGREED VALUE OF PROPERTY** (3.1 (i)) | |
| **Permitted Debt** = (i) debt secured by senior mortgage and (ii) portion of any debt incurred by **Equity Holders**, the proceeds of which are used to fund all or part of purchase price of **Real Property**, (2) predevelopment, development, construction costs (but excluding costs representing **Approved Deductions**) with respect to the property or (3) operations deficits. *If Permitted Debt is held by Affiliate, interest is included as an expense to the extent it does not exceed amount of interest that would have been payable on loan from unrelated bank* (2.3(b)). | **APPROVED DEDUCTIONS  =**     Aggregate outstanding principal balances of all **Permitted Debt** & **Junior Financing** (3.4(a)(i)) *Plus:*    **Appreciation Cash Flows** from previous occurring **Sales of  Interest** (3.4(a)(ii)) [NO PREVIOUS SALES] | *Minus:* **APPROVED DEDUCTIONS & CLOSING COSTS** (3.1(ii)) | |
| | | *Minus:* | Amount of then remaining **DEVELOPER'S INVESTED EQUITY** (3.1(iii)) |
| **Permitted Debt** = (See above) **Expenses** = (9) interest and principle payable on Permitted Debt, as well as any fees and charges related thereto; (15) amounts paid to Equity Holders in payment of (i)Developer's Operating Equity and (ii)Developer's Equity Return." | **DEVELOPER'S OPERATING EQUITY =** Amounts actually advanced to the **Developer** by the **Equity Holders** (other than amounts treated as **Permitted Debt**) which **Developer** uses for operation of **Property** including interest and principal on Mortgages and **operating expenses** that are not financed by borrowings secured by a Mortgage on the Property, but excluding any **Ineligible Deductions** with respect thereto and any costs included as **Approved Deductions** in any calculation of **Appreciation Cash Flow** (3.6(b)). | *Minus:* | Amount of then remaining **DEVELOPER'S OPERATING EQUITY** (3.1(iii)) |
| | | *EQUALS:* **APPRECIATION CASH FLOW** | |

Thus, simply because "Developer's Equity Return" is not specifically referred to in §3.1 does not mean that the interest due on the funds advanced by S&S Finance are not appropriate deductions when computing Appreciation Cash Flow.  Indeed, Ms. Fiorucci (Viad's corporate representative, testified that if the "Developers Equity Return" had represented accrued interest, it would have been properly deducted in computing the Appreciation Cash Payment:

> Q: ... [I]f this 8,775,000 was not listed as equity, Developer's Equity Return, but it simply had been an accrued interest payment made to a third-party lender, that it would be deducted from sales price before 15% cash participation kicked in?  We can agree to that; can't we?
>
> A: Yes.

Fiorucci Tr.) at 37.[17]

> Q: ... Would you agree that if that 8,775,000 ... was a permitted debt, that it would be a proper deduction before the 15 % kicks in? That's all I'm asking.
>
> A:  If it's a permitted debt, yes, I believe that it would be an allowable deduction.
>
> ***
>
> A: If they went to a third-party lender, and they took a loan on which they never had to make a payment in the life of the loan –
>
> Q: And the balance gets bigger and bigger, just confirm for me that that would be an allowable deduction in the event of a sale under this Agreement.
>
> A: I think it would be.

Fiorucci Tr. at 39-42.  Similarly, Mr. Solomon[18] testified that as an allowable incurred expense, the interest amounts build up, and become part of Developer's Operating Equity which is one of the permitted deductions under the CPA calculations.  Solomon Tr. (Exhibit 15) at 91.  When the

---

[17] $8,775,927 was the amount erroneously identified as "Developer's Equity Return" at the time of the proposed 2000 sale of the Property.  See Exhibit 27 (Letter from R. Liffman to K. Goldman, 6/27/00)

[18] Mr. Solomon, who rendered the Reznick Opinion in 2005, was also designated as an expert in this litigation by Montgomery Road.

19

interest is added in a given year, it becomes a part of the carried forward operating equity of the developer. Solomon Tr. at 91. Then, at the time the property is sold, the Developer's Operating Equity is an appropriate deduction. Solomon Tr. at 91. Although Developer's Equity Return is not specifically listed in CPA § 3.1, because the Developer's Equity Return accumulates annually, when it is not paid, it becomes part of the Developer's Operating Equity and therefore becomes an allowable deduction. Solomon Tr. at 91-92.

Thus, "interest" accrued on the advances from S&S Finance is properly deducted in computing the Appreciation Cash Payment, whether those amounts are viewed as an element of "Developers Operating Equity" ("interest and principal on Mortgages and operating expenses" §3.6(b) ), "Permitted Debt" (debt incurred to fund the Property, e.g., development costs, operating deficits, and interest no higher than the market rate (§2.3(b)), or "Expenses" (includes "interest and principle payable on Permitted Debt" (§2.3(a)). Viad argues however, that because MRLP did not "pay" the interest, it is inconsistent with the "requirement of the CPA that accounting for expenses be on a cash basis." "Cash basis" is not defined in the CPA. As set forth in the Declarations of Messrs. Rose and Glassman, 90 K Street was not income producing, and there was no operating cash flow available to pay for the costs of maintaining the property (e.g., real estate taxes, assessments, bid pursuit costs, and insurance). These items were funded by advances from S&S Finance. Rose Decl. (Exhibit 4)at ¶18. The fact that the interest on those advances has not been "paid" is not determinative of the propriety of deducting that interest when computing the Appreciation Cash Payment. As Mr. Solomon explained, where there is an early stage development and no cash flow, such that a lender is not being paid, interest accrues, and is "booked for cash basis financial statements" – otherwise, the liability would be misstated. Solomon Tr. at 94. See also Solomon

Tr. at 129 (cash basis accounting is applied from a revenue and expense perspective, "interest ... accrued on a loan, on a cash basis financial statement, that would still show up as a liability, regardless of when it was paid," as would depreciation "which is a noncash transaction, that still shows up ... on a cash basis financial statement"). Mr. Solomon further testified that interest on principal payments on Permitted Debt referred to in § 2.3(a)(9) would be an expense category that does not require an actual cash payment for the expense to be included as a liability on a cash basis accounting financial statement. Solomon Tr. at 134. Another example would include amounts paid to Equity Holders in payment of Developer's Operating Equity and Developer's Equity Return. Solomon Tr. at 134 (citing CPA §2.3(a)(15)).    Viad has provided no testimony to refute Mr. Solomon's expert testimony.

Viad also argues that the Settlement Sheet (Viad Exhibit 52) from the January 2007 closing "indicates that no loan from S&S Finance ... was repaid."  In fact, funds advanced from S&S Finance have been repaid either to S&S Finance or its principals, Mr. Rose and Mr. Greenebaum. In anticipation of the closing of the transaction with TC MidAtlantic in January 2007, Mr. Glassman prepared numerous draft spread sheets to show various allocations of the sale proceeds.  One of those spreadsheets is attached as Exhibit 51 to Viad's Motion for Summary Judgment.  Although the spreadsheet reflects that $4,870,000 would be "repaid" to S&S Finance from the proceeds of the closing on 90 K Street, an additional approximately $35 million was distributed directly to Mr. Rose and Mr. Greenebaum, or to related entities.  At year-end 2006 (ten days prior to closing), in addition to the First Mortgage Note Payable to S&S Finance of $10,297,139, the loan payable due to S&S Finance was approximately $19.9 million, and the interest thereon was approximately $18.7 million. See Glassman Decl. (Exhibit 2) at ¶17.

## IV.    THE TDRs SHOULD NOT BE INCLUDED IN THE CASH APPRECIATION CALCULATIONS

The CPA sets forth terms and conditions under which Transportation Leasing will participate in cash flow generated from "the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing thereof."  CPA Recital at B. When TC Midatlantic purchased the land located at 90 K Street in January 2007 for approximately $46 million, it also purchased from Montgomery Road (for approximately $8 million) by way of separate contract the transferable development rights ("TDRs") which had been transferred to 90 K Street. Exhibit 1 (Declaration of Steven Braesch ("Braesch Decl.")) at ¶20) .[19]  Viad argues that, as a component of any Cash Appreciation Payment, Viad is also entitled to 15% of the value of the TDRs sold by Montgomery Road to TC Midatlantic.  Viad argues that TDRs are "interests" and "improvements" on the Property.   There is no *admissible* evidence supporting Viad's arguments, however.  The arguments are based on the hearsay reports of Viad's experts, as well as on inadmissible extrinsic evidence.

### A.    The Separation of TDRs in the Purchase Price was not a Sham

Viad argues that the segregation of the consideration in the Montgomery Road-TC Midatlantic between land and TDRs was a sham because it results in a TDR sales price of $70.00 per square foot, outside what Viad argues was the $3.00 to $25.00 range for which TDRs usually sell.  The appraisal prepared by Viad's expert, Stephen. Halbert specifically depends on inclusion of the TDRs in reaching his fair market value of $64,800,000, calculating at $65 per foot, and including the TDR's in the density of 987,000 square feet.  Halbert Tr. at 39-43.  Without the TDRs,

---

[19]  TDRs which Montgomery Road is obligated to acquire in the future and transfer to TC Midatlantic will be sold to TC Midatlantic for $13 million.  Braesch Decl. (Exhibit 1) at ¶20.

(a lower density), Mr. Halbert testified that the value is approximately $44 million, using the same $65 per FAR foot (Halbert Tr. at 43). <u>See also</u> Declaration of Stuart Smith (Montgomery Road's expert) (Exhibit 5)(if the $65 per FAR is applied to the permitted density of 675,207 FAR feet, the results are $43,888,455). Smith Decl. (Exhibit 5) at ¶6. The "land value" calculated by both experts thus approximates the land sale contract with TC MidAtlantic. <u>See, also.,</u> Braesch Decl. (Exhibit 1) at ¶20. Montgomery Road has not sought to exclude Viad from participating in the appreciation of the Property as that term is defined by the CPA-- structuring the sale to separate the TDRs separate from the land is simply a recognition that the TDRs are not Property as defined in the CPA. <u>Id</u>. at ¶23.

Viad seeks to garner support from Stuart Smith's testimony that TDRs have sold for $3.50. <u>See</u> Smith Tr. at 93. As Mr. Smith testified, however, he was not retained as an expert in the valuation of TDRs. Smith Tr. at 43. He was retained to conduct a review of Mr. Halbert's appraisal report. Smith Tr. at 43-44. Mr. Smith also testified that there is a difference between price and value. Smith Tr. at 93. "Price is simply a transaction amount and value has certain definitions associated with it, willing buyer, willing seller." Smith Tr. at 93. Mr. Smith also explained that TDRs are separate commodities (Smith Tr. at 48, 50, 87) and, as such , "are not part of the definition of an as is value" of property and under an "as is value" the land cannot be merged with the TDRs. Smith Tr. at 50. Fair market value is the amount that a ready and willing buyer will pay to a ready and willing seller. TC Midatlantic was ready and willing to pay $70.00 per square foot for the TDRs. Viad has failed to demonstrate that he deal was a sham, especially given their own expert's testimony about the value of the land. Moreover, Viad and Montgomery Road are creditor and

debtor and as such Montgomery Road had no obligation to structure its deal with TC Midatlantic in a way that would benefit Viad.

**B.**    **The TDRs are Not "Interests" or "Improvements"**

Under CPA §3.2(a), an Appreciation Cash Payment is due if there is a "sale . . . of all or any part of or interest in the Property by the Developer . . .." Viad therefore argues that the TDRs are an "interest" in the Property. "Interest," however, is not defined in the CPA. As discussed below, however, "Property" is a defined term. There being no definition of "interest" in the Agreement on which Viad can rely, Viad turns to the hearsay reports of its experts, Cynthia Giordano ("Giordano Report") and Steven Halbert ("Halbert Report"). Neither Ms. Giordano nor Mr. Halbert, however, has testified (or even opined in their reports) that TDRs constitute an "interest in Property" within the terms of the CPA. Rather, Ms. Giordano merely described TDRs as zoning density and described the manner in which they can be acquired and Mr. Halbert reached a fair market value of 90 K based on developmental potential which took into account the additional zoning density provided by the TDRs.[20] Viad's approach is problematic because it ignores the definition of "Property" in the CPA. Section 1.32 defines "Property" as "the Improvements and the Real Property." Section 1.35 defines "Real Property" as "that certain ***land***, more fully described in Exhibit 'A' made a part of this Agreement by reference hereto." Thus, the phrase "interest in the Property" could be re-written as "interest in the land." Neither Ms. Giordano nor Mr. Halbert testified that a TDR is an interest in the ***land***. Ms. Giordano and Mr. Halbert have described TDRs

---

[20] Describing TDRs in reference to "zoning" is a misnomer. The zoning at a receiving site remains unchanged. Braesch Decl. (Exhibit 1) at ¶24. The zoning at 90 K remained unchanged at C-3-C. Id. The District of Columbia designates certain areas (the receiving sites) as eligible to receive TDRs. Id. There is no other or different zoning that applies. Id. There is no act by the District of Columbia that changes what can be built on the property. Id. The effect of a parcel being placed in a "receiving zone" for TDRs is not "upzoning." Id.

as a right to density or development; they have not established that they are an interest in land.[21]  In

fact, the only testimony on whether the TDRs are "interests" comes from Mr. Rose, who testified

as follows: "Q: TDR's are an interest in the land, are they not?  A: No."  Rose Tr. at 221.

Viad's second approach is to characterize the TDRs as "Improvements."  Unlike "interest,"

"Improvements" is a defined term.  Section 1.21 defines "Improvements" as "all buildings,

structures and other improvements that are hereafter constructed, installed or placed upon the Real

Property."  ***Without any support or citation whatsoever***, Viad states as follows after reciting the

CPA's definition of Improvement: "Since TDRs add density to the property, they are essentially

"placed upon the Real Property" and, therefore, an Improvement under the plain language of the

CPA."  The reason Viad has no testimony or expert report to support this statement is that both its

experts discussed "improvements" in a way that would ***not*** support Viad's statement.  Mr. Halbert's

June 24, 2006 Appraisal identifies the "improvements" at 90 K Street as the "sidewalks, curbs and

drainage."  Exhibit 43 (pertinent portions of 6/24/06 Appraisal) at 24 VD 1470).  Noticeably absent

are TDRs.  When asked  at her deposition what an improvement on real estate is, Ms. Giordano

testified that "in a general – you know, sense, an improvement is usually a building or a structure."

Giordano Tr. at 31.  When Mr. Halbert was asked whether the 90 K Street site was improved, Mr.

Halbert answered: "If you mean by improved is there a proposed office building on it yet, no.  There

are parking spaces.  So it's improved with sidewalks and asphalt parking."  Halbert Tr. at 21.  When

asked whether there were any other improvements, Mr. Halbert responded that he did not recall any

---

[21]  In fact, there is no District of Columbia statute or regulation of which Montgomery
Road is aware that subjects TDRs to any  transfer or recordation tax.

others. Halbert Tr. at 22.[22]  Mr. Halbert then described "improvements" in the context of something

that would be "demolished" in the event of redevelopment. Halbert Tr. at 22-23. It is not surprising

that there is no testimony or expert opinion from either Mr. Halbert or Ms. Giordano that would

support Viad's notion that TDRs are "placed upon the property" and are therefore "improvements."

Viad's theory that TDRs are "placed upon" land is stretching the defined terms of the CPA beyond

all reason, especially considering the remaining language - and therefore context - of the definition:

buildings and structures (connoting improvements with physical presence) that are constructed or

installed (connoting physical attachment to the land).    TDRs are intangible rights that have no

characteristics that are physical like buildings and structures and their association with property is

not by construction, installation or placement. Braesch Decl. (Exhibit 1) at ¶6.    Ms. Giordano

acknowledged in her report that "the DD regulations permit the re-transfer from the original

receiving lot to another eligible receiving lot" and that they also permit "'banking' (i.e., holding)

of TDRs, either on a receiving site or independent of any receiving site. A purchaser can acquire

TDRs from a sending site, and then hold them for retransfer to an eligible receiving site. This gives

purchasers some maneuvering room in the event that TDRs are acquired for a development which

does not proceed." Giordano Report at 4 (Viad Exh. 37). Ms. Giordano testified that TDRs are

commodities. Giordano Tr. (Exhibit 8) at 24. See also Steven Braesch Tr. (Exhibit 6) at 18, 63, 68

(describing TDRs as commodities that are fungible and able to be moved to different properties);

Braesch Decl. (Exhibit 1) at ¶6; Reid Liffman Tr. (Exhibit 12) at 31 (describing TDRs as a

"commodity that is freely traded back and forth between developers and users"). TDRs simply are

not "Improvements" under the CPA.  See Braesch Decl. (Exhibit 1) at ¶6.

---

[22]    After Mr. Halbert's recollection was later refreshed, he recalled that the site was also
improved with drainage. Halbert Tr. at 27.

26

There is no District of Columbia case law which characterizes TDRs.    Viad relies on a California case, Mitsui Fudosan, Inc. v. County of Los Angeles, 268 Cal. Rptr. 356, 358 (Cal. Ct. App. 1990), in which the court concluded that the value of TDRs should be assessed on a tax basis upon transfer and that TDRs "'bear all the hallmarks of a transfer in real property.'" Viad Memo. at 25 (quoting Mitsui, 268 Cal. Rptr. at 358).    Montgomery Road's counsel's research uncovered only one other case on this issue and that case reached the opposite result of the Mitsui Court.    In Wilkinson v. St. Jude Harbors, Inc., 570 So.2d 1332 (Fla. Dist. Ct. App. 1990), the Florida court held that TDRs "are not real property subject to assessment for ad valorem taxation."  570 So. 2d at 1333.  The court quoted from a law review article explaining the difference in rights included within the bundle of rights associated with land:

> Land may be viewed as an assemblage or bundle of rights.  According to TDR theory, the right to develop one's property may be severed from the land and sold, much in the same way as mineral rights are severed and sold.  ***But while mineral rights do not "leave" the land, TDRs are separated from their land source and re-established on a designated recipient site.***"

Wilkinson, 570 So.2d at 1333 (quoting Note, "Transferable Development Rights: An Innovative Concept Faces an Uncertain Future in South Florida," 8 Nova L.J. 201, 202 (1983)).[23]  As the court noted, in Mitsui, "it d[id] not appear to have been necessary to the holding in that case, as to the assessed value of the property to which the TDRs were transferred, that the court determine whether or not the TDRs were in themselves property.  Wilkinson, 570 So.2d at 1334.

---

[23]    The "air rights" and "water rights" which Viad discusses at page 29 of its Memorandum and which are included within the definition of "real property" in Section 6-1003 of the D.C. Code, are more in the nature of the mineral rights mentioned in the example in the Nova Law Journal article.  Air rights and water rights, like mineral rights but unlike TDRs, cannot be transferred away from the originating real property.  As discussed above, once transferred to a recipient site, the TDRs can be transferred again.    TDRs are more like a mobile home - they can be parked at one site, but they can just as easily be moved to a different site.

27

Viad also relies on Black's Law Dictionary, which defines an improvement as "an addition" that is "made to real property," especially one that increases its value. <u>See</u> Viad Memo. at 26. The TDRs, however, are not "made to real property." They are created by instruments of transfer and allow increased development of the receiving lot. Braesch Decl. (Exhibit 1) at ¶11. TDRs also do not fit within the definitions of "improvement" in <u>Rose v. Fox Pool Corp.</u>, 643 A.2d 906 (Md. 1994) and <u>Arizona Dep't of Revenue v. Arizona Outdoor Advertisers, Inc.</u>, 41 P.3d 631 (Ariz. Ct. App. 2002), the cases cited by Viad. Both cases define "improvement" as requiring permanence. TDRs are not permanent. Braesch Decl. (Exhibit 1) at ¶12.

### C.     <u>Extrinsic Evidence is Not Necessary to Interpret the CPA</u>

Although at pages 23 and 26 Viad refers to the "plain" meaning of the terms "interest" and "improvements", Viad also argues that extrinsic evidence demonstrates that the parties intended to treat the TDRs as either an "interest in the Property" or as an "improvement." This argument should be rejected for the simple reason that there is no place for extrinsic evidence where an agreement has been reduced to writing and its terms are not ambiguous. Because a written contract speaks for itself, the language of a written contract is not ambiguous and binds the parties without the need for extrinsic evidence. <u>Paul v. Howard University</u>, 754 A.2d 297, 302 n.5 (D.C. 2000). That the two parties disagree over the proper interpretation of the terms of a contract does not render the contract ambiguous. <u>United States ex rel. DOL v. Insurance Company of North America</u>, 131 F.3d 1037, 1042 (D.D.C. 1997); <u>Holland v. Hannan</u>, 456 A.2d 807, 815 (D.C. 1983). Other than to cite <u>United States v. INA,</u> 131 F.3d at 1042, for the general proposition that extrinsic evidence may be considered in the context of an ambiguous contract, Viad offers no authority for the proposition that extrinsic evidence can be considered here.

The extrinsic evidence discussed by Viad, even if the Court were to consider it, would not support Viad's conclusion. As its first piece of extrinsic evidence, Viad offers the fact that for five years, Montgomery Road included its expenses in purchasing the TDRs as deductible expenses on the Special Purpose Financial Statements. These expenses were later removed because they should not have been included in the first place; the costs of these TDRs were not part of the 90 K Street property. Braesch Decl. (Exhibit 1) at ¶21. Montgomery Road determined that charging the expense of the purchased TDRs to Montgomery Road was not proper absent a development of the Property. Braesch Decl. (Exhibit 1) at ¶21. Just because the expenses were originally included does not mean that they should have been and their inclusion does nothing to alter the CPA's definitions or to bring TDRs within those definitions. As another piece of extrinsic evidence, Viad offers the fact that Montgomery Road recorded its TDR purchases in the land records. The recordation does not convert the TDRs into real property any more than the statutorily required recording of a notice of intent to enforce a mechanic's lien (D.C. Code §40.301.02) converts the mechanic's lien into real property.

Viad also relies on a contract entered into between Montgomery Road and Level 3 Communications[24] (Exhibit 38 to Viad's Memorandum) in 2000: "When it signed an agreement with Level 3 Communications in 2000 for the sale of 90 K Street, there were TDRs recorded on the Property at that time. (SOF¶113). Memo. at page 28. In the Level 3 agreement, the definition of property included 'development rights.' (SOR ¶113)." Although the Level 3 contract is simply not relevant to this lawsuit, Viad's description of the terms of that agreement (describing the agreement as defining property to include development rights) is misleading and, in fact, the definitions in the

---

[24] Neither Viad nor TLC was a party to the Level 3 agreement; the agreement was entered into thirteen years after the CPA; and the Level 3 agreement never closed.

Level 3 agreement *are consistent* with Montgomery Road's position in this litigation. Section 2.1 of the Level 3 Agreement conveys "Property" to the seller and defines "Property" as including both "Real Property" and "Intangible Personal Property." The term "Real Property" includes the "land" and "all and singular the rights, benefits and appurtenances thereon or in anywise appertaining thereto." Level 3 Agreement at ¶2.1.1. In the next section, the Agreement identifies "Intangible Personal Property" as including "all intangible personal property related to the Real Property, including . . . contract rights related to the construction, operation, ownership or management of the Real Property, *including all development rights* owned by Seller in respect of the Property . . . ." Level 3 Agreement at ¶2.1.2. Thus, the Level 3 Agreement explicitly defines the development rights *as personal property*, not real property.

## V.    VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR BREACH OF CONTRACT

In Count II of its First Amended and Supplemental Counterclaim, Viad alleges that Montgomery Road has breached the CPA "during the course of this litigation" by: 1) failing to make the Appreciation Cash Payment; 2) by failing to provide a statement pursuant to § 3.9 of the CPA; 3) by failing to name an appraiser to "contest" the fair market value of the Property; and 4) by failing to provide financial statements for 2005 and 2006. Viad seeks summary judgment on each of these alleged "defaults" under the CPA.

### A.    Viad is Not Entitled to Summary Judgment on its Breach of Contract Claim for an Alleged Default Relating to the Appraisal Process

Viad argues that Montgomery Road has defaulted under the CPA by failing to identify an appraiser. Relying on CPA §3.8, Viad contends that when it tendered its "expert report" of Stephen Halbert on January 31, 2007, it was invoking the "appraisal" process for disputes as to the "fair

market value" of the Property. Viad's contention is unfounded. First, Montgomery Road submits that if Viad intended to invoke the appraisal process, it would have to have done so within 45 days of "receiving notice of an[] event requiring the determination of fair market value." CPA §3.8. That date was December 17, 2006, which was 45 days following Viad's receipt of the amended contracts for the sale of 90 K Street and the TDR's on November 2, 2006. See Rose Decl. (Exhibit 4) at ¶31. Without regard to the timeliness of Viad's purported invocation of the "appraisal process,"[25] it is clear that no "appraisal process" was actually invoked. The "appraisal" upon which Viad relies was tendered in accordance with the January 31st deadline contained in the Scheduling Order for expert reports in this case. Indeed, the appraisal was an attachment to a pleading entitled "Designation of Expert Witnesses by Viad Corp." [Docket #19], and made absolutely no reference to invoking the appraisal process under the CPA. By the time the expert report was tendered, Viad had already filed its Counterclaim [Docket # 16], which sought a declaration that the value of the TDRs being sold to TC MidAtlantic were to be considered in valuing the Property for purposes of the Appreciation Cash Payment. Counterclaim ¶7.

Viad argues that Montgomery Road failed to "select its own appraiser" within 15 days of the tender of the Halbert expert report, so Viad sent a "default" notice on February 21, 2007. This asserted "default" is a Viad creation. Given that Halbert's expert report was tendered in the context of this litigation (as an "Expert Designation"), Montgomery Road timely designated Stuart Smith as its rebuttal expert witness (pursuant to Fed. R. Civ. P. 26(2)(c)) on the issue of fair market value

---

[25] Viad contends that the trigger date was the date of closing of the transaction, January 11, 2007, which it contends was "reasonable." Nevertheless, it was not in compliance with the contract, which requires the notice to be sent within 45 days of "receiving notice of an[] event requiring the determination of fair market value." CPA §3.8.

of the property. [ECF #21 2/23/07]. Mr. Smith's expert report provided a review report of the Halbert appraisal. See, e.g., Smith Tr. at 65-67, 82-86.

As set forth in the discussion above with regard to Viad's assertion that the separation of the TDR and land portions of the sale was a sham, the appraisal prepared by Viad's expert, Mr. Halbert, specifically depends on inclusion of the TDRs in reaching his fair market value of $64,800,000. Halbert Tr. at 39-43. Without the TDRs, the **Property fair market value** is approximately $44 million (Halbert Tr. at 43), which approximates the land sale contract with TC MidAtlantic for $46,036,528. See, e.g., Braesch Decl. (Exhibit 1) at ¶20. Nevertheless, Viad argues that this Court should find that the "fair market value" of 90 K Street is $64,800,000 (the value set forth in the Halbert expert report, including the TDRs) because Montgomery Road did not submit evidence of an "appraisal." Because this dispute is in litigation, Montgomery Road responded to Halbert's report, tendered as an "expert" report, and provided its own expert report from Stuart Smith. As set forth in the Smith Declaration (April 18-07) (Montgomery Road's expert) (Exhibit 5), although Mr. Halbert's unit value of $65 per FAR was appropriate, Mr. Halbert applied the unit value to an incorrectly developed FAR-density of 997,229 FAR feet, which was dependent on the TDRs. If the $65 per FAR is applied to the permitted density of 675,207 FAR feet, the results are $43,888,455. Smith Decl. (Exhibit 5) at ¶6; see also Millenium Report (Exhibit A to Stuart Smith Declaration). Thus, the appropriate fair market of the Property is $43,888,455, which approximates the land sale portion of the contract.

**B.     Viad is Not Entitled to Summary Judgment on its Breach of Contract Claim for an Alleged Default Relating to the Financial Statements**

Section 2.6 of the CPA requires financial statements and schedules to be submitted within 120 days of the end of each Fiscal Year (defined as December 31 in §1.19). Thus, the 2006 financial

statements were not due until April 30, 2007.  On June 20, 2007, KAWG&F, P.A. completed its

audits of the financial statements and its examination of the financial records related to the 90 K

Street Property, and issued its Special Purpose Financial Statements (December 31, 2005 and 2004;

December 31, 2006 and 2005;  January 11, 2007 and December 31, 2006), accompanied by the

unqualified opinion of KAWG&F. P.A.  <u>See</u> Clemens Mueller Declaration at ¶10(attached as

Exhibit 1 to Montgomery Road Parties Renewed Motion for Summary Judgment [ECF #46].  These

Special Purpose Statements were tendered to Viad on June 27, 2007 (via the SUPPLEMENTAL

FILING,  (ECF Documents # 42-3, 42-4, 42-5)).   Previously, financial statements and schedules

for Fiscal Year 2005 (but without an unqualified opinion) were provided on November 21, 2006.

Exhibit 45.   As set forth in the Declarations of Messrs. Rose and Glassman, these financial

statements contained a restatement of the financials for the period December 1987- December 2005

(the "2005 Revised Statements").  Glassman Decl. (Exhibit 2) at ¶¶12-16; Rose Decl. (Exhibit 4)at

¶¶ 16-18.  Viad makes the statement that the 2005 Revised Statements contain a different treatment

of Montgomery Road's expenses than the tax returns filed by Montgomery Road for 2005, yet fails

to identify – other than a cursory reference to the tax returns – the specific items about which it

complains.  <u>See</u> Viad SOF ¶137.  In any event however, there is nothing in the CPA that prohibits

such treatment.  Moreover, as described in detail above, the Special Purpose Financial Statements

tendered prior to the 2005 Revised Statements erroneously treated legitimate expenses as equity, and

the interest thereon was erroneously labeled as "Developers' Equity Return."  Glassman Decl.

(Exhibit 2) at ¶¶10-16; Rose Decl. (Exhibit 4)at ¶¶15-18.  The purpose and intent of the 2005

Revised Statements was to reflect the economic reality of advances from S&S Finance –over a

period of twenty years -- to Montgomery Road to maintain the Property.   Glassman Decl. (Exhibit 2) at ¶¶10-16; Rose Decl. (Exhibit 4)at ¶¶15-18.

To cure Viad's contention that Montgomery Road was in default because the Financial Statement were not accompanied by an unqualified opinion of its auditor, as set forth above, on June 27, 2007, Montgomery Road tendered its statements with an unqualified opinion.  Viad complains that these statements were "two months late."  Mem. at 32.  For most of the twenty year history of this relationship, however, TLC/Viad has concluded that sufficient information was being provided by Montgomery Road, despite the fact that the Special Purpose Financial Statements did not include such a certification.  As stated by John Zatarski, a TLC internal accountant, after reviewing annual statements at Mr. Goldman's request:

> It is my opinion that **our Developers [Montgomery Road and Sacramento] are in substantial compliance with our Agreement**.  My only concern is the Montgomery Road 90 K St. Property is a "compilation" and not an audited statement.  Due to the fact that this Partnership has net losses and owns more than one property, we may not consider this a serious exception to the Agreement.  **Overall, these both provide us the information we require.**

See Exhibit 18 (J. Zatarski handwritten notes, 6-7-91) (emphasis added); see also K. Goldman Tr. at 46 (given that there was very little going on with the property, Mr. Goldman agreed with Mr. Zatarski's statement); see also Exhibit19 (K. Goldman handwritten note and J. Lum handwritten note in response, 5/31/94 "everything looks ok." ).  Until this litigation, TLC/Viad never "declared a default" based on the failure to have the Special Purpose Financial Statements certified with an unqualified opinion by an independent accountant (the terminology in §2.6).  Indeed, the position paper submitted by Viad to the Reznick Group (Exhibit 37) makes no complaint about the fact that the financials had historically not been accompanied by such an unqualified opinion.  Indeed, Ms. Fiorucci testified that (since her involvement in 2000) TLC/Viad had never requested an audited

34

statement in writing.  Fiorucci Tr. at 12-13, 94-95.  Viad has never contended (nor does it in its

pleadings or in its Summary Judgment Motion) that any expenses or income are being hidden,

omitted, or inflated.  The dispute here is focused on two discrete issues:  whether the calculation of

the Appreciation Cash Payment should deduct the interest accrued on the advances to maintain the

Property, and whether the calculation should include the purchase price of the TDR's.  This dispute

must be determined by the terms of the CPA.  Whether the Special Purpose Financial Statements

contain the unqualified opinion of an independent accountant simply has no bearing on the dispute

which is central to this litigation.  That is because the complaint about the failure to provide audited

statements is raised for purposes of this litigation only– to support the claim in Count IV of the First

Amended and Supplemental Counterclaim for an award of attorneys fees.[26]

Viad also complains that the audited statements were submitted "after the close of

discovery."  Viad ignores that its breach of contract claim (alleging, *inter alia,* for the first time, a

default for a failure to have an unqualified opinion) was not even brought until April 2, 2007, after

the close of discovery, and after the deadline for filing summary judgment motions.  Given that

Viad was satisfied with the unaudited statements prior to this litigation, Viad should thus not be

heard to complain about the timing of the audited statements.

### C.    Viad is Not Entitled to Summary Judgment on its Breach of Contract Claim

---

[26]  Moreover, the lateness of the 2006 statements, or the failure to provide earlier statements accompanied by the unqualified opinion of an independent accountant is simply not a material breach of the contract.  See America v. Preston,  468 F.Supp.2d 118, 125 (D.D.C.,2006) (whether a breach is material turns on the extent to which plaintiff will be deprived of the benefit reasonably expected under the contract).  As set forth above, the issue here is the amount, if any, of the Appreciation Cash Payment, and thus, Montgomery Road contends that the failure to provide the certification is not material.  The question of whether the failure to provide the certification is a material breach is an issue for the trier of fact.  Id. at 125; see also  Camalier & Buckley, Inc. v. Sandoz & Lamberton, Inc., 667 A.2d 822, 829 (D.C. 1995) (whether a delay in payments constitutes a material breach of a contract is a question for the trier of fact).

**for an Alleged Default Relating to Providing a Statement or Payment to Viad**

Viad argues that Montgomery Road has breached the CPA by failing to make the Appreciation Cash Payment within three days of closing on the transaction, and further by failing to provide a "statement" (pursuant to §3.9) from which the Appreciation Cash Payment can be calculated. The binding nature of the Reznick Opinion, and how to calculate the amount, if any, of the Appreciation Cash Payment have been the subject of this litigation since the original Complaint was filed by Montgomery Road in January 2006. Whether the TDRs are appropriately considered in the calculation of the Appreciation Cash Payment is the subject of Montgomery Road's First Amended Complaint, filed on December 8, 2006, and Viad's Counterclaim filed on January 3, 2007. Thus, there was no basis upon which to "make" the Appreciation Cash Payment within three days of closing on the TC MidAtlantic transaction. Nevertheless, Viad's rights are protected, because on the date of closing of the transaction with TC MidAtlantic, $4.5 million (an amount agreed to by Viad) was wired into an account jointly controlled by counsel for Montgomery Road and Viad, to secure any potential Appreciation Cash Payment, pending the resolution of this dispute. See Rose Decl. (Exhibit 4) at ¶34.

Moreover, with regard to the "statement" required by §3.9, literally tens of thousands of documents have been produced by Montgomery Road in this case, including all relevant accounting documents. At the time of the closing of the TC MidAtlantic transaction, however, both Montgomery Road and Viad had petitioned this Court for a declaration of their rights under the CPA, including what elements are included and excluded in calculating the Appreciation Cash Payment, and thus, the calculation of the "statement" contemplated by § 3.9 of the CPA would have been an exercise in futility. In any event however, when the audited financial statements were

36

tendered on June 27, 2007, the statement was provided.  <u>See</u> Declaration of Ronald Glassman, June 26, 2007 (Exhibit 50) at ¶8; <u>see also</u>  SUPPLEMENTAL FILING, page 2 (ECF # 42, page 2) (Exhibit D to the filing contains a Schedule of Appreciation Cash Flow as of the date of the sale of 90K Street).

###    D.    <u>An Audit of MRLP's Records is Not Required</u>

Viad  ignores the fact that in 2005, the Reznick Group provided its binding conclusion that the interest expense attributable to the advances from S&S Finance were to be deducted in computing the Appreciation Cash Payment.  Viad now wants a "do-over," and seeks an audit of Montgomery Road's books and records.  As set forth above, the issue here is straightforward: whether the interest expense attributable to advances funded by S&S Finance are proper deductions, and whether the purchase price of the TDRs is included in determining the value of the Property. An audit of Montgomery Road's records will not provide any assistance to the determination of those issues.   Once the Court makes these determinations, a proper "statement" of the calculation can be made.  As set forth above, Special Purpose Financial Statements have been provided for twenty years, and tens of thousands of pages of documentation have been provided in this litigation, and other than the c*lassification* of the interest expense, Viad has not challenged *any* expense items related to the maintenance of the Property, either in this litigation, or in the Reznick arbitration. Indeed, Ms. Fiorucci testified that she has no evidence that as of September 1999, MRLP did not have $25 million invested in the Property, which Mr. Rose told her was the investment at that time. Fiorucci Tr. at 58; see Exhibit 24 (E. Fiorucci e-mail to K. Goldman, 9-8-99).  Nor did she have any basis to dispute that Montgomery Road had in fact, been accumulating significant interest expense.

Fiorucci Tr. at 53-54.  In any event however, as set forth above, an audit has now been performed.

The cost of the audit by KAWG&F, P.A. was $34,500.00.  See Glassman Decl. (Exhibit 49) at ¶8.

## VI.    VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON MONTGOMERY ROAD'S CLAIM FOR BREACH OF CONTRACT

As set forth in all of Montgomery Road's Original Summary Judgment Filings, Viad has taken the position that advances made by S&S Finance (and the interest thereon) are not to be considered in the calculation of the Appreciation Cash Payment.  In addition, Viad has taken the position that, as a component of any Appreciation Cash Payment, it is also entitled to 15% of the value of the TDRs sold (and to be sold) to TC MidAltantic.  There is however, as set forth above, and in the Original SJ Filings, no basis for such an entitlement under the terms of the CPA.   The dispute over the Appreciation Cash Payment and whether the TDRs were a component of the calculation resulted in Viad demanding a $4.5 million escrow before it would release the Deed of Trust on 90 K Street so that the transaction with TCMD could close.  See Rose Decl. (Exhibit 4) at ¶34;  Deposit Agreement, 12-21-06 (Exhibit 47).   Viad argues that the creation of the escrow account was "voluntary."  Mem. at 35.  It is true that no one held a gun to Mr. Rose's head, but it was "involuntary" in that the lien would not otherwise be released.  See Rose Decl. at ¶34.  Viad's refusal to execute a release of its lien, and its insistence on the $4.5 million escrow (to release its lien so the transaction could close), constitutes a failure by Viad to perform its obligations under the CPA.  Although §5.1 provides for a lien, it is a violation of the CPA for Viad to refuse to release the lien when the dispute had already been resolved by binding arbitration under CPA §2.7.  Accordingly, and pursuant to §7.4 of the CPA, MRLP is entitled to its attorneys fees and costs in bringing this action, and defending against Viad's Counterclaim and Third-Party claim.

**VII.  VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON
        ITS CLAIM OF BREACH OF THE IMPLIED COVENANT
        OF GOOD FAITH AND FAIR DEALING**

In Count III of its First Amended and Supplemental Counterclaim, Viad asserts that
Montgomery Road violated the implied covenant of good faith and fair dealing.  At pages 38-40 of
its Memorandum, Viad sets forth a litany of alleged offenses:  that Montgomery Road has
misrepresented the value of 90 K Street, thereby seeking to convince Viad to relinquish its
participation rights; that Montgomery Road has changed its position on accounting matters; that in
the 2005 Revised Statements Montgomery Road took positions and classified items in ways that
conflicted with the Reznick Opinion and tax returns; that Montgomery Road failed to appoint an
appraiser and deliver the Statement of Appreciation Cash Flow; that Montgomery Road filed the
"Supplemental Filing" which contained the audited statements, and those statements take positions
which are inconsistent with prior financial statements.

Viad has no evidence to support these allegations of bad faith.  Viad's allegation that
Montgomery Road has ever misrepresented the value of 90 K Street is completely unsupported by
the record.   Indeed, as Mr. Goldman testified, each time Mr. Rose proposed buying TLC/Viad out
of the Cash Participation position, the company conducted due diligence (with the assistance of local
District of Columbia real estate brokers)[27] and decided not to sell.  Goldman Tr. at 99-102; see also

---

[27]  Pat Marr (of CB Richard Ellis) was a real estate broker consulted by TLC/Viad on
several occasions.  See Exhibit 25 (Letter from Pat Marr to E. Fiourucci, 9-15-99)("[i]f
Greenebaum & Rose were to sell [the Property] today, [the value] would be approximately
$30.00 per developable foot.  With the ability to construct 650,000 square feet, that would equate
to a value of  $19,500,000.  With your participating interest not valid until it exceeds what the
owner has in the property (approximately $25 million), your interest would be worth nothing").
See also Exhibit 26 (E. Fiorucci Memorandum to K. Goldman, 9-15-99); Exhibit 34 (E. Fiorucci
e-mail to K. Goldman, 11-26-02)(reflecting conversation with Pat Marr:  if property "sold as
land, value is approximately $30/developable sq. ft. or $20,250,000")

Exhibit 41 (E. Fiorucci Record of Telephone Conversation with K. Goldman, 5-23-05: "it's hard to identify what the interest is worth, because you don't know what Sam will do – sell or develop); <u>see also</u> Exhibit 20 (Draft letter from K. Goldman to R. Liffman, 7-2-99)(rejecting Liffmann proposal to relinquish cash participation interest).  In addition, none of the accounting revisions were intended to deprive Viad of any rights it had under the CPA.  Rose Decl. (Exhibit 4)at ¶35.  The reasons for the prior accounting revisions are fully explained in the Declarations and deposition testimony of both Samuel Rose and Ronald Glassman, as discussed *supra*.  (<u>See</u> Exhibits 2, 4, 9 and 13 to the Montgomery Road  Parties' Opposition to Viad's Original Motion for Summary Judgment, ECF #30).  In addition, attached hereto as Exhibit 49 is the Declaration of Ronald Glassman, dated September 26, 2007, which explains the changes in the audited statements, which were required to comply with GAAP.  To the extent that Viad also complains about the lack of appraiser or failure to provide the Statement of Appreciation Cash Flow, those issues have been addressed above.

      **A.**    **Montgomery Road Did Not Owe A Duty Of Good Faith<br>And Fair Dealing To Viad**

There is implied in many contracts a duty of good faith and fair dealing.  <u>Allworth v. Howard University</u>, 890 A.2d 194 (D.C. 2006).   Here, however, there is no question that the relationship between Viad and Montgomery Road is that of creditor-debtor.  The CPA expressly provides that the relationship between Viad and Montgomery Road is "solely that of creditor and debtor" and that "[n]othing in [the CPA] or in any other document or instrument made in connection with the [CPA] ... shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between [Viad] and [Montgomery Road]."  CPA at §6.1.  Many jurisdictions have recognized that the nature of the debtor-creditor relationship ought not trigger an implied duty of good faith and fair dealing.  <u>See</u> <u>e.g.</u>, <u>Allied Capital Corp. v. GC-Sun Holdings, L.P.</u>,

910 A.2d 1020, 1034  (Del. Ch. 2006) ("the restrictive covenants between debtors and creditors

define, by omission, the freedom of action that the debtor retains"); Home Hearth Plano Parkway,

L.P. v. LaSalle Bank, N.A., 320 B.R. 596, 610 n.9 (N.D. Texas 2004) (Texas law does not

recognized an implied covenant of good faith and fair dealing in the lender-borrower relationship);

Hais v. Smith, 547 A.2d 986, 988 (D.C. 1988) (implied covenant of good faith and fair dealing does

not require creditor to ensure fair dealings between co-debtors).  In footnote 13, Viad argues that the

"majority of jurisdictions disagree with MRLP" on the issue of debtor-creditor relationships.  Viad,

however, has failed to cite even one case from this "majority."

B.    **Even If Montgomery Road Owed A Duty Of Good Faith
      And Fair Dealing, It Did Not Breach The Duty**

No provision of the CPA obligates Montgomery Road to structure any sales transaction so

as to maximize *Viad's* cash participation.  Because Montgomery Road is not a fiduciary to Viad, no

such provision can be implied.  See, e.g., Suthers v. Amgen Inc., 441 F.Supp.2d 478, 485 (S.D.N.Y.

2006)(courts have refused attempts to impose liability on a party that engaged in conduct permitted

by a contract, even when such conduct is allegedly unreasonable).  Even in cases in which the

implied covenant applies, it implies good faith and fair dealing in abiding by the contract's terms.

It is not to be used as a tool to modify or override the express terms of the contract.  Washington

Metropolitan Area Transit Authority v. Quik Serve Foods, Inc., 2006 WL 1147933, *4, *5 (D.D.C.

2006).  The implied covenant of good faith and fair dealing is not to be used to prevent a party from

acting in its own self-interest.  See Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 408 (2d Cir.

2006) (the implied covenant "'does not extend so far as to undermine a party's general right to act

on its own interests in a way that may incidentally lessen the other party's anticipated fruits from

the contract'"); In re IT Group, 448 F.3d 661, 671 (3d Cir. 2006) ("the implied duty of good faith

41

is merely an "interpretive tool to determine the parties' justifiable expectations"; it may not be used to add new terms to an agreement, or to override express contractual terms).   In this case, Viad seeks to impose duties not present in the CPA. Transportation Leasing expressly excised any fiduciary duties from the CPA.  Viad cannot now require further duties of Montgomery Road, nor impose additional terms, by claiming a breach of a duty of good faith.

## VII.   VIAD IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIM FOR ATTORNEYS FEES

As set forth above, Montgomery Road disputes that it has breached the CPA, or the implied covenant of good faith and fair dealing (if it even applies).  Viad did not file its Counterclaim ("bring suit", see CPA §7.4) until after the agreement was reached to put the $4.5 million in an account pending the resolution of this dispute.   Exhibit 47 (Deposit Agreement, 12-21-06).   It was Montgomery Road which had to bring this litigation when Viad refused to be bound by the Reznick Opinion.   Accordingly, there is no basis upon which to award Viad its attorneys fees, and certainly not in the context of a summary judgment motion.

## CONCLUSION

For all the foregoing reasons, Montgomery Road and Montgomery Road TDR respectfully

request the Court to deny Viad's (Renewed) Motion for Summary Judgment.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.

_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com

*Attorneys  for  Plaintiff/Counterdefendant*
*Montgomery Road I Limited  Partnership and Third-*
*Party  Defendant Montgomery Road TDR, LLC*

43

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 27th day of September, 2007, a copy of the

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MONTGOMERY**

**ROAD I LIMITED PARTNERSHIP AND MONTGOMERY ROAD TDR, LLC'S**

**OPPOSITION TO DEFENDANT VIAD'S RENEWED MOTION FOR SUMMARY**

**JUDGMENT, STATEMENT OF MATERIAL FACTS NOT IN DISPUTE** and **EXHIBITS** in

support thereof,  was served  upon the following counsel, by electronic transmission through the

ECF  system:

       Rodney F. Page, Esq.
       Bryan Cave LLP
       700 Thirteenth Street, N.W.
       Suite 700
       Washington, D.C. 20005


                  _____/s/_____
                  Donna S. Mangold

## TABLE OF EXHIBITS

** Exhibits 1 - 47 were previously filed on April 19, 2007, as Exhibits to Opposition to Defendant's Motion for Summary Judgment (ECF Document 30).  Exhibits 48, 49 and 50 are new Exhibits to this Opposition, and are attached hereto.

| Exhibit No. | Date | Description |
|:---:|:---:|:---|
| 1 | 4-19-07 | Declaration of Steven Braesch |
| 2 | 4-18-07 | Declaration of Ronald Glassman |
| 3 | 4-19-07 | Declaration of Donna S. Mangold |
| 4 | 4-19-07 | Declaration of Samuel G. Rose |
| 5 | 4-18-07 | Declaration of Stuart I. Smith |
| 6 | 11-28-06 | Excerpts of Deposition of Steven Braesch |
| 7 | 11-7-06 | Excerpts of Deposition of Eve Fiorucci |
| 8 | 2-15-07 | Excerpts of Deposition of Cynthia Giordano |
| 9 | 11-28-06 | Excerpts of Deposition of Ronald Glassman |
| 10 | 12-11-06 | Excerpts of Deposition of Kenneth Goldman |
| 11 | 2-20-07 | Excerpts of Deposition of Steve Halbert |
| 12 | 11-28-06 | Excerpts of Deposition of Reid Liffmann |
| 13 | 11-14-06 | Excerpts of Deposition of Samuel G. Rose |
| 14 | 3-7-07 | Excerpts of Deposition of Stuart I. Smith |
| 15 | 11-30-06 | Excerpts of Deposition of Brent Solomon |
| 16 | 11-30-87 | Cash Participation Agreement |
| 17 | 3-2-89 | First Amendment to Cash Participation Agreement |
| 18 | 6-7-91 | J. Zatarski handwritten notes |
| 19 | 5-31-94 | "Joyce Lum" handwritten notes |
| 20 | 7-02-99 | Draft Letter from Kenneth Goldman to Reid Liffmann |
| 21 | 10-01-99 | Agreement Concerning Transferrable Development Rights |
| 22 | 10-01-99 | Certificate of Transfer of Development Rights |

| 23 | 9-8-99 | Eve Fiorucci e-mail to Kenneth Goldman |
|----|--------|----------------------------------------|
| 24 | 9-8-99 | Eve Fiorucci e-mail to Kenneth Goldman |
| 25 | 9-15-99 | P. Marr Letter to Eve Fiorucci |
| 26 | 9-15-99 | Eve Fiorucci Memorandum to Kenneth Goldman |
| 27 | 6-27-00 | Letter from Reid Liffmann to Kenneth Goldman |
| 28 | 8-23-00 | Letter from Kenneth Goldman to Samuel Rose |
| 29 | 9-12-00 | Letter from Reid Liffmann to Kenneth Goldman |
| 30 | 10-2-00 | Letter from Kenneth Goldman to Reid Liffmann |
| 31 | 11-30-00 | Assignment from TLC to Viad |
| 32 | 5-21-02 | Letter from Samuel Rose to Eve Fiorucci |
| 33 | 6-10-02 | Eve Fiorucci Record of Telephone Conversation with Samuel Rose |
| 34 | 11-26-02 | Eve Fiorucci e-mail to Kenneth Goldman |
| 35 | 1-9-03 | Eve Fiorucci Notes |
| 36 | 12-16-04 | Eve Fiorucci Record of Telephone Conversation with Samuel Rose |
| 37 | 3-2-05 | Eve Fiorucci letter to Brent Solomon |
| 38 | 3-30-05 | Letter from Gerald Katz to Brent Solomon |
| 39 | 4-10-05 | Letter from Brent Solomon to Samuel Rose (Reznick Report) |
| 40 | 5-2-05 | Fax Cover and Letter from Samuel Rose to Eve Fiorucci |
| 41 | 5-23-05 | Eve Fiorucci Record of Telephone Conversation with Kenneth Goldman |
| 42 | 8-26-05 | Letter from Eve Fiorucci to Samuel Rose |
| 43 | 6-24-06 | Cushman and Wakefield Appraisal of 90 K Street (Viad's Expert Report) |
| 44 | 9-21-06 | Letter of transmittal and 2004/2005 Special Purpose Financial Statements |
| 45 | 11-2-06 | Letter from Samuel Rose and transmittal of Revised Contracts |

| 46 | 11-21-06 | Letter of transmittal and 2005 Revised Special Purpose Financial Statements |
| 47 | 12-20-06 | Deposit Agreement between MRLP and VIAD |
| 48 | 9-6-07 | Declaration of Clemens Mueller |
| 49 | 9-26-07 | Declaration of Ronald Glassman |
| 50 | 6-26-07 | Declaration of Ronald Glassman |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **MONTGOMERY ROAD I** | ) | |
| **LIMITED PARTNERSHIP,** | ) | |
| | ) | |
| **Plaintiff/** | ) | |
| **Counter-Defendant,** | ) | |
| | ) | **Case No. 1:06CV00344 (HHK)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VIAD CORP,** | ) | |
| | ) | |
| **Defendant/** | ) | |
| **Counter-Plaintiff/** | ) | |
| **Third-Party Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MONTGOMERY ROAD TDR, LLC,** | ) | |
| | ) | |
| **Third-Party Defendant** | ) | |

_____)

**MONTGOMERY ROAD AND MONTGOMERY ROAD TDR'S STATEMENT OF
GENUINE ISSUES AND RESPONSE TO DEFENDANT VIAD CORP'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**[1]

**Parties and Affiliated Entities**

1. Viad Corp ("Viad") is a Delaware corporation, with its principal place of business in Phoenix, Arizona. (Amended and Supplemental Counterclaim ¶ 1).

**Response:**   This is not disputed.

2. Montgomery Road I Limited Partnership ("MRLP") is a Maryland Limited Partnership that was formed for the purpose of owning real property. (Second Amended Complaint ¶ 3). The limited partners of MRLP include The Samuel G. Rose Revocable Trust, Reid Liffmann and Steven Braesch. (Eighth Amendment to MRLP Partnership Agreement, MR-l6825) (Ex. 7).

---

[1] For the convenience of the Court, each of Viad's "Undisputed" Facts is set forth, and is responded to immediately below.

**Response:** This is not disputed, except that the limited partners of MRLP also include

SJG Holdings, LLC, which is owned by Stewart Greenebaum and/or his family members.

3. Montgomery Road TDR, LLC ("MRTDR") is a limited liability company under the same ownership as MRLP. (Limited Liability Company Operating Agreement of MRTDR, MR-07636) (Ex. 8). MRTDR was formed in July 2006 to "acquire, hold and ultimately sell transfer development rights in the District of Columbia." (Id.).

**Response:** This is not disputed.

4. Greenebaum and Rose Associates ("Greenebaum and Rose") is a partnership that was created by Samuel Rose and Stewart Greenebaum. (Deposition of Samuel Rose ("Rose Dep.") at 18:6-20:3) (Ex. 1). Greenebaum and Rose formed MRLP to purchase real property. (Id. at 33:5-12; 35:20-36:10).

**Response:** This is not disputed.

5. S&S Finance Limited Partnership ("S&S Finance") is an internal finance company that funds Greenebaum and Rose projects and is an affiliate of MRLP. (Deposition of Reid Liffmann ("Liffmann Dep.") at 33:14-20) (Ex. 2).

**Response:** This is not disputed, although the ownership of MRLP and S&S Finance are

different.  Decl. of Samuel Rose at ¶11.

**The Cash Participation Agreement**

6. A Cash Participation Agreement ("CPA') was executed an November 30, 1987, by Transportation Leasing Company ("TLC"), and on December 9, 1987 by Montgomery Road I Limited Partnership ("MRLP") as "Developer." (Cash Participation Agreement ("CPA"), VD000484) (Ex. 9).

**Response:** This is not disputed.

7. Thereafter, on or about November 30, 2000, Viad succeeded to the interests of TLC. (Assignment and Assumption Agreement, VD-000954) (Ex. 10).

**Response:** This is not disputed.

8. The CPA was negotiated and signed as partial consideration for a sale by Viads predecessor in interest of a parcel of land located at 90 K Street NE in the District of Columbia to MRLP for $11,000,000, "further described as Lot 432 in Square 674" ("the Property"). (CPA at Recital A) (Ex. 9).

**Response:**   This is not disputed.

9. The CPA sets "forth the terms and conditions under which [Viad] will participate in the cash flow hereafter generated from the ownership, operation and rental of the Property or the sale, exchange or other disposition or the refinancing" of the Property. (16 at Recital B).

**Response:**   This is not disputed.

10. To secure the obligations of MRLP under the CPA, the agreement created a lien on the Property, referred to as a "mortgage," which was recorded in the land records and remained in effect during the life of any obligations of MRLP. (Id. § 5.1).

**Response:**   This is not disputed.

11. The CPA sets forth three broad obligations on the part of the Developer, MRLP. First, in Article 2 of the CPA, the Developer is required to pay to Viad 15% of the cash flow from operations on the Property. The CPA defines the terms and conditions for calculating this payment, referred to as the "Operations Cash Payment." (Id. § 1.26-1.28, 2.1).

**Response:**   This is not disputed.

12. Second, in Article 3 of the CPA, the Developer is required to pay to Viad 15% of the appreciation realized by the Developer in "the sale, assignment, condemnation, conveyance or other disposition of all or any part of or interest in the Property," or in the refinancing of the Property or of an interest in the- Property. The CPA defines the terms and conditions for calculating this payment, referred to as the "Appreciation Cash Payment." (Id. § § 1.6, 1.28, 3.1, 3.2). Furthermore, the CPA defines "Property" as "the Improvements and the Real Property." (Id. § 1.32). "Improvements" are defined as "all buildings, structures and other improvements that are hereafter constructed, installed or placed upon the Real Property." (Id. § 1.21).

**Response:**   This is not disputed.

13. Third, in Article 4 of the CPA, the Developer is required to afford Viad a right of first refusal in the event it makes or receives a bona tide written offer for sale of the Property. (id. § 4.1).

**Response:**   This is not disputed.

14. There is no dispute between the parties concerning the Article 4 rights of the parties. MRLP has notified Viad of offers to purchase the property, and Viad has declined to exercise its right of first refusal. (Letter dated 8/31/06 from E. Fiorucci to MRLP) (Ex. 11).

**Response:**   This is not disputed.

3

15. By agreement of the parties while this litigation was pending, the "mortgage" created by the CPA in favor of Viad was released to facilitate a sale of the Property by MRLP. This action was taken in conjunction with the creation of a fund reserved from proceeds of the sale to provide alternate security for Viad. (Deposit Agreement) (Ex. 12).

**Response:**    This is not disputed.

16. During the life of the CPA, the Property has been used as a parking lot, but there has been no commercial development thereon. (Statement of Greenebaum and Rose Associates at 7) (Ex. 13).

**Response:**    This is not disputed.

17. During the life of the CPA, MRLP has made no payments under the CPA. (Letter dated 2/21/07 from E. Fiorucci to S. Rose; letter dated 8/14/00 from S. Rose to E. Fiorucci, VD000364) (Exs. 22 & 53).

**Response:**    This is not disputed, to the extent that it refers to payments to TLC/Viad.

18. Viad is not claiming in this litigation that any Operations Cash Payment, that is a payment based on operations on the Property under Article 2, is owed to it. (See generally, Amended and Supplemental Counterclaim).

**Response:**    This is not disputed.

19. Section 2.7 requires that "the fees of such accountant, as well as any arbitration fees incurred in connection with the dispute, shall be paid by ... [Viad] unless such review shall indicate that the computation resulted in an error, in favor of... [MRLP], in the Operations Cash Payment of an amount more than three percent (3%) of the amount actually owing to .. [Viad] for such Fiscal Year, in which case ... [MRLP] shall pay all such fees." (CPA § 2.7) (Ex. 9).

**Response:** This recitation of language from CPA §2.7 is not disputed

20. According to Section 2.3(b) of the CPA, "If Permitted Debt is held by any Affiliate of Developer, interest paid thereon shall be included as an expense only to the extent that it does not exceed the amount of interest that would have been payable on an equivalent loan from an unrelated bank, savings and loan association, insurance company or other financial institution." (CPA, § 2.3(b) (Ex. 9).

**Response:**  This recitation of language from CPA §2.3(b) is not disputed

**MRLP's Interpretation of the CPA**

21. According to Samuel G. Rose, a principal owner of MRLP, testif'ing as a Rule 30

4

(b)(6) witness on its behalf, "we (MRLP) are sophisticated developers." (Rose Dep. at 108:13-109:l)(Ex. 1).

**Response:** This is not disputed.

22. At the same time, he is candid in stating that "there is some resentment on our pan" about the CPA. (Id.). He has indicated various reasons or motives for this resentment. For example, Rose has testified that "we were sloppy in not being careful about reading it. We would never sign such an agreement if we were careful, but we weren't but that's — We still take responsibility for signing it." (Id.).

**Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

Rose's deposition, but SOF 22 is not a material fact.

23. Rose, who obtained a law degree before becoming a real estate developer, finds the CPA a "mysterious, obnoxious" agreement. (Id. at 13:7-11, 15:1-14, & 45:4-6).

**Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

Rose's deposition, but SOF 23 is not a material fact.

24. Rose testifies that the CPA was "the first and only such agreement that we've ever been involved in in the history of our company." (Id. at 50:3-16).

**Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

Rose's deposition, but SOF 24 is not a material fact.

25. Rose states that, in retrospect, " I think we didn't pay enough attention to it because it's one of the most obnoxious agreements i've ever read in my life and I don't — you know, we must have been stupid to sign it without even any — fighting any of these clauses which are so one-sided but I do not recall—recollect really getting into this." (Id.).

**Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

Rose's deposition, but SOF 25 is not a material fact..

26. MRLP, in filing suit to have this Court declare that it owes no money under the CPA to Viad, has not made any claim that the contract is fraudulent, was induced by fraud, contains mistakes, should be rescinded, or needs reformation. Instead, it seeks to assert its own interpretation of the CPA. (See generally Second Amended Complaint).

**Response:** This is not disputed.

27. Although the CPA requires that an annual audited financial statement be submitted by MRLP to Viad by a date certain, MRLP failed to submit timely financial statements in 2005. Instead, with a cover letter from its litigation counsel, a compilation of financial data for that year was submitted to Viad on September 21, 2006, with the word "Draft" written across the top of the first page. (Letter dated 9/21/06 from A. Pignatelli to R. Page, enclosing Draft 2005 Special Purpose Financial Statement ("Draft 2005 Statement")) (Ex. 14).

**Response:**  This is disputed.  Revised 2005 Statements were tendered on November 21, 2006.  Viad Exhibit 36.  On June 20, 2007, KAWG&F, P.A. completed its audits of the financial statements and its examination of the financial records related to the 90 K Street Property, as well as the following Special Purpose Financial Statements, accompanied by the unqualified opinion of KAWG&F, P.A.:  December 31, 2005 and 2004; December 31, 2006 and 2005; and January 11, 2007 and December 31, 2006.  The January 11, 2007/December 31, 2006 Statements also contained a Schedule of Appreciation Cash Flow as of the date of the sale of the 90 K Street Property.  Supplemental Filing (ECF 42) and Exhibits A-D.  Exhibit A to the Supplemental Filing is the Declaration of Ronald Glassman, dated June 26, 2007 (Exhibit 50); see also Declaration of Clemens Mueller, September 6, 2007 (Exhibit 48).  These audited statements were tendered to Viad on June 27, 2007, via the Supplemental Filing (ECF 42).

28. Rose had an explanation for why MRLP had not submitted a timely financial statement for 2005. He testified as the Rule 30(b)(6) witness that MRLP "missed it" (referring to the requirement of such submissions) because, "[w]ell, we got more important things . . . to do, like our taxes." (Rose Dep. at 212:6-213:7) (Ex. 1).

**Response:**  MRLP and MRLP TDR do not dispute the recitation of the words from Mr. Rose's deposition.

29. Rose and MRLP contend that the CPA should be interpreted to provide that the expenses of MRLP which are recognized in calculation of the annual Operations Cash Payment are the same expenses that should be recognized for calculation of the Appreciation Cash Payment on sale of the property. (M at 2t5:3-9). But, Rose admits that the CPA is not written so as to make the calculations the same. (Id. at 215:10-13).

**Response:** This is not disputed, except that Mr. Rose's analysis of the calculations required under the CPA do not control this Court's analysis of those required calculations.

30. Rose acknowledges on behalf of MRLP that the CPA requires that all expenses shall be "determined on the basis of sound cash basis accounting practices applied on a consistent basis," but he finds those requirements "tricky and devious." (Id. at 2 19:2-15).

**Response:** The terms of the CPA speak for themselves, and are for this Court to determine. MRLP and MRLP TDR do not dispute the recitation of the words "tricky and devious" from Mr. Rose's deposition.

**The Analysis Performed by Reznick Group**

31. Since the late 1980's, MRLP has sought to convince Viad to relinquish its cash participation interest for a nominal sum. (Letter dated 10/25/89 from A. Ervanian to S. Rose, VD-001027; Letter dated 4/6/95 from S. Rose to A. Ervanian, MR-05987; Letter dated 7/14/99 from R. Liffbrnnn to K. Goldman, VD-O0 1098; Letter dated 7/12/00 from E. Fiorucci to S. Rose, VD-000658; Memorandum dated 12/18/02, MR-00664) (Exs. 15-19).

**Response:** This inference from this statement is disputed. Over the years, Mr. Rose has approached Transportation Leasing/Viad to offer to buy it out of its cash participation interest. Those offers were not intended to mislead or represent the value of the property, but rather, were based on Mr. Rose's assessment that the value of any Appreciation Cash Payment was zero, based on the amount of funds that had been expended by Montgomery Road to maintain the Property. His assessment was validated in the Reznick Opinion, which concluded that the sale price of the Property would have to exceed $37 million (as of April 2005) for there to be any Appreciation Cash Flow. Rose Decl. at ¶36; Exhibit 39 (Reznick Opinion) at VD000326.

32. In its efforts to convince Viad to relinquish its participation interest, MRLP has frequently misrepresented the value of the property to Viad employees. For example, in April 1995, Sam Rose wrote to Viad that the 90 K Street Property was worth $5,000,000 and that MRLP's costs exceeded this amount. However, three years earlier, in June 1992, Sam Rose wrote to a potential buyer that the property was valued at $26,000,000 and that this amount exceeded MRLP's costs. (Compare Letter dated June 17, 1992 from S. Rose to C. flelwig,

7

MR07004 (Ex. 20) with Letter dated 4/6/95 from S. Rose to A. Ervanian, MR-05987 (Ex. 16); see also Letter dated 5/21/02 from S. Rose to E. Fiorucci, VD-000537-38) (Ex. 21).

**Response:** See Response to SOF 31.  Moreover, Viad has no evidence that the value of the property at any given point in time was not what Mr. Rose stated it was, or that anyone from TLC/Viad was misled.   As Mr. Goldman testified, each time Mr. Rose proposed buying TLC/Viad out of the Cash Participation position, the company conducted due diligence (with the assistance of local District of Columbia real estate brokers) and decided not to sell.  Goldman Tr. at 99-102.  Pat Marr (of CB Richard Ellis) was a real estate broker consulted by TLC/Viad on several occasions.  See Exhibit 25 (Letter from Pat Marr to E. Fiourucci, 9-15-99)("[i]f Greenebaum & Rose were to sell [the Property] today, [the value] would be approximately $30.00 per developable foot.  With the ability to construct 650,000 square feet, that would equate to a value of  $19,500,000.  With your participating interest not valid until it exceeds what the owner has in the property (approximately $25 million), your interest would be worth nothing"). See also Exhibit 26 (E.  Fiorucci Memorandum to K. Goldman, 9-15-99); Exhibit 34 (E. Fiorucci e-mail to K. Goldman, 11-26-02)(reflecting conversation with Pat Marr:  if property "sold as land, value is approximately $30/developable sq. ft. or $20,250,000"); see also Exhibit 41 (E. Fiorucci Record of Telephone Conversation with K. Goldman, 5-23-05: "it's hard to identify what the interest is worth, because you don't know what Sam will do – sell or develop); see also Exhibit 20 (Draft letter from K. Goldman to R. Liffman, 7-2-99) (rejecting Liffmann proposal to relinquish cash participation interest).

33. On or about August 14, 2000, MRLP advised Viad of its intent to sell the 90 K Street property to Level 3 Communications, LLC ("Level 3"). (Letter dated 8/14/00 from S. Rose to E. Fiorucci, VD-000364) (Ex. 22).

**Response:**  This is not disputed.

8

34. In a letter to Viad dated August 14, 2000, Greenebaum and Rose Associates, an affiliate of MRLP, stated that the proposed sale price would result in na cash participation payment to Viad. Id.

**Response:**  This is not disputed.

35. In a letter dated August 23, 2000, Viad responded that MRLP had overstated the costs that could be deducted from the purchase price when calculating Viad's participation payment. Specifically, Viad asserted that the Developer's Equity Return was not a proper deduction when calculating the Appreciation Cash Payment, and that Viad would be entitled to their portion of the Appreciation Cash Flow of $4.9 million after the sale of 90 K Street to Level 3. (Letter dated 8/23/00 from K. Goldman to S. Rose, VD-000533) (Ex. 23).

**Response:**  MRLP and MRLP TDR do not dispute the summary of the words of (or

message conveyed in) Mr. Goldman's letter.

36. The parties continued to correspond in September and October of 2000, debating the proper calculation of the Appreciation Cash Payment. (Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-001015; Letter dated 10/2/00 from K. Goldman to R. Liffmann, VD-000944) (Exs. 24-25).

**Response:**  This is not disputed.

37. For reasons unrelated to Viad, the transaction between MRLP and Level 3 did not close. (Letter from R. Liffmann to E. Fiorucci dated 4/10/01, VD-000544-46) (Ex. 26).

**Response:**  This is not disputed.

38. For the next four years, MRLP sought continuously to convince Viad to relinquish its participation interest for a nominal sum. MRLP was anxious to sell 90 K Street as soon as possible. (Letter dated 5/21/02 from S. Rose to B. Fiorucci, VD-000537; Record of Telephone Conversation on 6/10/02, VD-00966; Record of Telephone Conversation on 6/15/04, VD-000965; Record of Telephone Conversation on 7/25/04, VD-000964) (Exs. 21, 27-29).

**Response:**  The use of the term "continuously" is disputed, because four

communications in four years is not "continuously."  In addition, MRLP and MRLP TDR dispute

the reference to a "nominal sum."  See Response to SOF 31.

39. In or about December 2004 Viad and MRLP agreed to seek the advice of Reznick Group, P.C. ("Reznick"), an accounting firm, with respect to the interpretation of terms in the

9

CPA and the proper classification of costs and charges for purposes of calculating the Appreciation Cash Payment. (See Record of Telephone Conversation dated 12/16/04, VD000960) (Ex. 30).

      **Response:**    This is disputed.  The dispute was submitted to Reznick consistent with the

binding arbitration provision in §2.7 of the CPA, it was not merely to "seek advice."  CPA §2.7;

Rose Tr. at 87; Rose Decl. at ¶¶ 24-26.

      40. On March 2, 2005, Viad submitted the statement of its position and related exhibits to Reznick. In her March 2, 2005 letter to Reznick, Eve Fiorucci, Assistant Director of Real Estate for Viad, stated in the third bulleted paragraph: "Finally, while we will appreciate your review of the documents and your opinion as to our interpretation of same, we wish to make it clear that your opinion is not binding on TLC/Viad Corp." (See Letter dated March 2, 2005 from E. Fiorucci to B. Solomon enclosing Statement of TLC's Position ("Statement of TLC's Position") (Ex. 31).

      **Response:**    MRLP and MRLP TDR do not dispute that TLC/Viad submitted its

Statement of Position on March 2, 2005, nor to they dispute the recitation of the words from Ms.

Fiorucci's letter.  They do however dispute that those words are effective to unilaterally turn a

binding dispute resolution process into a non-binding  "request for advice" or merely a "review."

      41. In or about April 2005, Greenebaum and Rose submitted its statement of position to Reznick. (See Fax dated 4/27/05 from Robin-Eve Jasper to E. Fiorucci enclosing Statement of Greenebaum and Rose Associates, Inc. ("Statement of Greenebaum and Rose" VD-000458) (Ex. 13).

      **Response:**    This is not disputed.

      42. On April 10, 2005, Reznick provided its interpretation of certain terms in the CPA, an analysis of the classification of costs and charges, and a pro-forma calculation for a hypothetical sale of the property. (See Letter dated 4/10/05 from B. Solomon to S. Rose (hereinafter "Reznick Analysis") ¶ 2, VD-000466) (Ex. 32).

      **Response:**    This is not disputed, except to the extent that Viad attempts to infer that

"Reznick provided its interpretation" is something other than a final determination as provided

for in CPA §2.7.

      43. On May 2, 2005, after the Reznick Analysis was completed, Greenebaum and Rose

10

suggested to Viad that Reznick's review should be binding on the parties. (See letter dated 5/2/05 from S. Rose to E. Fiorucci, VD-000453) (Ex. 33).

**Response:** This is disputed as a distortion of Mr. Rose's letter. Mr. Rose did not

"suggest[] to Viad that Reznick's review should be binding on the parties." Rather Mr. Rose

stated:

> The Participation Agreement which was "drawn by TLA" states that if we mutually select an accountant, their opinion should be binding. Although you made a statement in your signed authorization letter to Reznick that you would not be blind [sic] to their opinion, you failed to get us to agree to that. Your Participation Agreement clearly requires two signatures to make changes to the agreement. So the Reznick opinion, whether we like it or not, is binding.

44. However, Greenebaum and Rose knew that Viad, in its letter dated March 2, 2005, conditioned its submission of papers to Reznick on the understanding that Reznick's analysis would not be binding. Sam Rose was copied on this letter and he testified that he received the letter. However, prior to the issuance of the Reznick Analysis, no efforts were made to contact Viad regarding its statement that the Reznick opinion wcmld not be binding. (See Letter dated 3/2/05 from E. Fiorucci to B. Solomon, VD-000904 (Ex. 31); Rose Dep. at 88:13-91:11; 95:1-96:1 (Ex. 1).

**Response:** See Response to SOF 43. For the reasons stated in Mr. Rose's letter, MRLP

had no obligation to "contact" Viad with regard to its unilateral attempt to change the terms of

the CPA.

45. In fact, in a letter to Reznick during the review process, Reid Liffmann, a limited partner of MRLP, indicated that the process was advisory only, stating: "[h]opefully, with guidance from you, the parties can get a process moving that will lead to a resolution, without wasting a lot of legal dollars and time." (Letter dated 3/24/05 from R. Liffmann to B. Solomon, MR-0 1685) (Ex. 34).

**Response:** MRLP and MRLP TDR dispute that Mr. Liffmann's letter indicates that the

process was "advisory only" or that his letter effectively modified the terms of the CPA.

46. Furthermore, MRLP cannot point to a specific conversation where Viad stated that the Reznick Analysis would be binding. (Rose Dep. at 86:13-87:8; 93:15-94:13) (Ex. I). In the records of phone conversations leading up to the decision to seek advice from an accountant, there is no indication that Viad or MRLP intended Reznick's advice to be binding (Record of Telephone Conversation on 6/15/04, VD-000965; Record of Telephone Conversation on

7/25/04, VD-000964; Record of Telephone Conversation dated 12/16/04, VD-000960) (Exs. 29-30).

    **Response:**  This is disputed.  First, the CPA provides that the arbitration proceeding would be final, it is not MRLP's burden to "point to a specific conversation" where Viad affirmatively acquiesced in something to which it was already bound.  Mr. Rose testified however:

> Q.    How – When and how did you agree that it was binding?
>
> A.    That we spent three years picking them, getting to this point.  What's the point of doing it if it's not binding?  It was almost assumed.  Why would you take years to talk to  your accountant, to talk to all the bosses, to pick an accountant, and then say it's not binding?  I mean: Why bother?

Rose Tr. at 87.  Indeed, Viad's own language in its "Statement of Position" submitted to Reznick belies its unilateral attempt to make the process non-binding: "We suggest that [Montgomery Road] submit drafts of such documents to TLC [Viad] and **to the arbitrator of these disputes for use as part of the dispute resolution process**." Exhibit 37  at VD 908 (emphasis added).  Moreover,  Ms. Fiorucci expressed concern about submitting the dispute to an accountant for resolution, evidencing Viad's recognition that the process constituted binding arbitration: "Sam wants to buy Viad out ... . Believes his accounting methods were correct, would pay for Viad to have an outside firm look at accounting **(I don't recommend this)**[.] ... Sam wants to resolve the accounting issue right now."  Exhibit 33 (Record of Tele. Conversation, 6-10-02).

    47.  Brent Solomon, the accountant who completed the analysis on behalf of Reznick, stated in his deposition: "I don't think anyone ever came to us and said your opinion is binding." (Deposition of Brent Solomon ("Solomon Dep.") at 108:5-18)(Ex. 57).

    **Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr. Solomon's deposition. However, the testimony continued: "I was aware that there was a clause

in the cash participation agreement that provided for an independent opinion." Solomon Dep. at

108:9-12.

48. MRLP claims that the Reznick Analysis is binding under Section 2.7 of the CPA. (Rose Dep. at 87:9-20) (Ex. I).

**Response:**   This is not disputed, because the Reznick Opinion, resulting from the

arbitration process described in §2.7,  is binding.

49. Mr. Rose suggested his belief that the agreement was binding was based on nothing more than an assumption — if that.

Q. How — When and how did you agree that it was binding?

A. That we spent three years picking them, getting to this point. What's the point of doing it if not's binding? It was almost assumed. Why would you take years to talk to your accountant, to talk to all the bosses, to pick an accountant, and then say it's not binding? I mean: Why bother?

(Rose Dep. at 87:1-8) (Ex. I).

**Response:** MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

Rose's deposition. However, MRLP and MRLP TDR dispute Viad's contention that the quoted

language indicates that Mr. Rose's belief was based on "nothing more than an assumption."

CPA §2.7 explicitly provides that the dispute resolution procedure was binding.

50. In a letter containing its analysis, the Reznick Group stated "[w]e understand that our services are intended to assist in resolving a dispute between the Partnership and Viad Corp related to a Cash Participation Agreement dated November 30, 1987 (the "Agreement"). This report may only be used for the aforementioned purpose, and may not be distributed or used for other purposes without the express written consent of Reznick Group, P.C." And, the letter went on to say that its "conclusions .. .do not constitute a legal opinion, audit opinion, or any other form of assurance." The letter was addressed only to Sam Rose, and a copy provided to Viad. (Reznick Analysis) (Ex. 32).

**Response:**  MRLP and MRLP TDR do not dispute the recitation of the words from Mr.

13

Solomon's letter. However the quoted language, which is typical of language in accountant's letters, cannot convert the process under CPA §2.7, which explicitly provides that the dispute resolution procedure was binding.

51. Under Section 2.7, if the parties are unable to resolve a dispute concerning the fiscal year statements in Sections 2.4, 2.5 and 2.6 within a certain period of time, "the items shall be submitted to arbitration which arbitration shall be performed by an independent certified public accountant selected by TLC [Viad's predecessor] and reasonably satisfactory to Developer, whose determination shall be final." (CPA § 2.7) (Ex. 9). Section 2 .7 also requires that "[t]he fees of such accountant [selected to be the arbitrator], as well as any arbitration fees incurred in connection with the dispute, shall be paid by. . . [Viad] (Id.)

**Response:**   MRLP and MRLP TDR do not dispute the recitation of the words from CPA § 2.7.

52. From approximately 1987 to 2005, MRLP has submitted Special Purpose Financial Statements to Viad in an effort to comply with Section 2.6 of the CPA. (See Special Purpose Financial Statement for December 31, 2004 and 2003 (hereinafter "Representative Statement") (Ex. 35).

**Response:**   This is not disputed, except to the extent that Viad infers that the Statements did not substantially comply with §2.6.   Mr. Zatarkski, an internal accountant advised Mr. Goldman "**Overall, these both provide us the information we require.**"  See Exhibit 18 (J. Zatarkski handwritten notes, 6-7-91) (emphasis added); see also K. Goldman Tr. at 46 (given that there was very little going on with the property, Mr. Goldman agreed with Mr. Zatarkski's statement).  Similarly in 1994, another internal accountant, Joyce Lum, reviewed  Montgomery Road's Financials and advised Mr. Goldman "everything looks ok."  Exhibit 19 (K. Goldman handwritten note and J. Lum handwritten note in response, 5/31/94); see also K. Goldman Tr. at 46-53.

53.  Under Section 2.6, MRLP must furnish "financial statements and schedules,

including a balance sheet and statement of operations for the Property for such Fiscal Year, prepared in accordance with generally accepted accounting principles applied on a basis consistent with past practices and bearing the unqualified opinion of a firm of independent certified public accountants . . . ." (CPA § 2.6) (Ex. 9).

**Response:**  This recitation of language from CPA §2.6 is not disputed.

54. The Special Purpose Financial Statements, which were submitted in response to Section 2.6, are not related to the calculation of the Appreciation Cash Payment. Section 2.6 appears in Article 2, which deals with "Operations Cash Flow," not "Appreciation Cash Flow." (See generally CPA, Article 2) (Ex. 9).

**Response:**   This is disputed.  The Financial Statements necessary to compute the elements of the Appreciation Cash Flow, including expenses related to the operation of the Property, are the same Financial Statements required by § 2.6.  Moreover, The agreement has numerous defined terms and those definitions apply throughout the agreement, not just to limited sections.   See CPA §1.1 ("***As used in this Agreement***, certain terms shall have the meanings described in this Article 1") (emphasis added).  Most of the definitions are not actually set forth in Article 1 – Article 1 merely contains a cross-reference to other sections of the Agreement in which the substance of the definition can be found.  See CPA at 1-5.  Just because the definition is set out in a particular section, however, does not limit the applicability of that definition to that particular section.  The definition applies throughout the agreement.   For example, Section 1.18 defines the term "Expenses" as having "the meaning as set forth in Section 2.3 hereof." Although Article 2 is captioned "Operations Cash Flow", Section 2.3 states: "*[f]or purposes of this Agreement*, the term "Expenses" shall mean ... ."(Emphasis added).  Thus, "expenses" which are an element of the Appreciation Cash Payment (see §3.6(b)), are identified on the Special Purpose Financial Statement, as are items of Developers Equity, which are also part of the Appreciation Cash Payment calculation.  CPA §3.6.  In addition, § 7.11 provides: "The titles of

Articles and Sections contained in this Agreement are inserted for convenience of reference only,

and they neither form a part of this Agreement nor are they to be used in the construction or

interpretation thereof."

55. Furthermore, the dispute resolution provision in Section 2.7 also is not related to the Appreciation Cash Payment. Article 2.7 appears in Article 2, which deals with "Operations Cash Flow," not "Appreciation Cash Flow." (See generally CPA, Article 2) (Ex. 9).

**Response:**    This is disputed.  See Response to SOF 54.

56. The purpose of seeking advice from an accounting firm was to begin to resolve informally the potential dispute between MRLP and Viad regarding the calculation of the Appreciation Cash Payment, since MRLP was eager to buy out Viad's interest. (Record of Telephone Conversation on 6/10/02, VD-000966; Memorandum dated 12/18/02, MR-000664) (Exs. 19, 27).

**Response:**    This is disputed.  See Response to SOF 38 through SOF 52.

57. According to CPA Section 3.11, disputes regarding the calculation of the Appreciation Cash Payment shall be submitted to arbitration by an MAI appraiser after receipt of the Appreciation Cash Payment and the statement accompanying the payment. (CPA § 3.11) (Ex. 9).

**Response:**    This summary of the terms of §3.11 is not disputed.

58. The Reznick Analysis was not conducted under Section 3.11 because no Appreciation Cash Payment had been paid at the time of the analysis, the analysis was conducted by an accountant, not an appraiser, and the analysis was not an arbitration. (CPA § 3.11; Rose Dep. at 86:8-12) (Exs. 1 & 9).

**Response:**    MRLP and MRTDR do not dispute the fact that Solomon is an accountant,

and not an appraiser, and that no Appreciation Cash Payment had been paid at the time.

Nevertheless, the Reznick Opinion resulted from an arbitration under §2.7, and its determination

is binding on the parties.

59. Samuel Rose, MRLP's 30(b)(6) witness, has testified that he has no recollection of describing the Reznick Analysis as an "arbitration." (Rose Dep. at 86:8-12) (Ex. 1). In his deposition, Sam Rose was asked directly whether he considered the work done by the Reznick Group to be an arbitration. He replied that he did not "know that it was an arbitration" and that

he did not "recollect describing it that way." (Rose Dep. at 86:8-12) (Ex. 1)

    **Response:**  MRLP and MRTDR do not dispute the summary of Mr. Rose's testimony.

    60. At most the evidence demonstrates that MRLP and Viad agreed to seek the advice of an accounting firm regarding the proper classification of costs and charges for purposes of calculating the Appreciation Cash Payment in the event of a sale. On June 15, 2004, Mr. Rose "again offered $50,000 to buy out Viad's interest" and the parties "[a]greed to get some referrals for accounting firms in the DC area." (Deposition of Eve Fiorucci, hereinafter "Fiorucci Dep." at 46:1-20 (Ex. 6); see Letter dated 4/10105 from B. Solomon to S. Rose ¶2, VD-000466 (Ex. 32); see also Record of Phone Conversation on 12/16/04, VD-000960; Record of Phone Conversation on 6/I 5104,VD-000965; Letter from R. Liffmann to B. Solomon dated 3/24/05, MR-01685) (Exs. 28, 30, 34).

    **Response:**   This is disputed. <u>See</u> Response to SOF 38 through SOF 52; SOF 54 through

SOF 56.

    61. In the records of phone conversations leading up to the decision to seek advice from an accountant, Sam Rose offered to pay for Reznick's review. For example, according to Ms. Fiorucci's notes of a phone conversation with Mr. Rose on June 10, 2002, Sam Rose "would pay for Viad to have an outside firm look at [the] accounting." (Record of Telephone Conversation on 6/10/02, VD-00966 (Ex. 27). In her notes of a phone conversation on June 15, 2004, Ms. Fiorucci wrote: "Sam to pick up cost of accountant to look over financial statements and agreement." (Record of Telephone Conversation on 6/15/04, VD-000965) (Ex. 28).

    **Response:**  MRLP and MRTDR do not dispute that the exhibits referred to include the

words set forth above.

    62. Mr. Rose ultimately agreed to pay the costs billed by the Reznick Group. In his deposition, Mr. Rose was asked whether he agreed to pay the costs associated with the review performed by the Reznick Group. He replied the did agree to pay the costs. (Rose Dep.) at 91:12-93:9. (Ex. 1).

    **Response:** MRLP and MRTDR do not dispute the summary of Mr. Rose's testimony.

**Cash Basis Accounting**

    63. The CPA requires that accounting for both revenue and expenses related to the Property be "on the basis of sound cash basis accounting practices applied on a consistent basis." (CPA § 2.2, 2.3, 2.6) (Ex. 9).

**Response:**   It is not disputed that the provisions cited include the quoted language.

64. The various financial statements tendered from time to time by MRLP and by its counsel have, despite the requirement for cash basis accounting, reflected accrued interest payments on debt allegedly incurred by MRLP. (Statement of Greenebaum and Rose Associates, at Section I, VD-000458) (Ex. 13).

**Response:**   MRLP and MRTDR dispute that the accrued interest payments are

inconsistent with the CPA.  See Fiorucci Tr. at 39-42 (if loan balance increases because of

failure to pay interest, accrued interest "would be an allowable deduction in the event of a sale

under [the CPA]";  Solomon Tr. at 91 (as an allowable incurred expense, the interest amounts

build up, and become part of Developer's Operating Equity); .  Solomon Tr. at 94 (where there is

an early stage development and no cash flow, such that a lender is not being paid, interest

accrues and must be booked for cash basis financial statements;  otherwise, the liability would be

misstated).  The term "Cash basis accounting" is not defined in the Agreement.    As further

explained by Mr. Solomon in his deposition:

> Cash basis accounting is applied from a revenue and expense perspective.  When cash comes in, cash goes out, for expenses.

> With respect to capital items, if you will, like fixed assets, loans, equity, it is not on a pure cash basis.

> So if there were interest[], for example, accrued on a loan, on a cash basis financial statement, that would still show up as a liability, regardless of when it was paid.

> If there was depreciation on a fixed asset which is a noncash transaction, that still shows up on a financial statement, on a cash basis financial statement.

> The cash basis is intended to focus on items of operating revenue and expenses.

Solomon Tr. at 129; see also  Solomon Tr. at 134 (interest on principal payments on Permitted

Debt referred to in Section 2.3(a)(9) of the Cash Participation Agreement would be an expense

category that does not require an actual cash payment for the expense to be included as a liability

on a cash basis accounting financial statement).

65. The debt claimed by MRLP, and on which it has accrued interest, is based on its own, or its principals' and affiliates' investment in the property. (Id.)

**Response:**   This is not disputed, except to the extent that the Mortgage was originally

held by Yorkridge-Calvert Savings and Loan, and later by Sun Chase Bank of Phoenix.

Thereafter the mortgage note was acquired by S&S Finance.

66. MRLP has never made interest payments, in fact, but it seeks to deduct such payments as if they had been made in any calculation of amounts due to Viad under the CPA. (Deposition of Reid Liffmann ("Liffmann Dep.") at 45:10-46:17) (Ex. 2).

**Response:**   This is disputed.  MRLP paid interest on the Mortgage until it was acquired

by S&S Finance in 1996.  Rose Decl. at 6-10.

## Developer's Equity Return

67. According to the CPA, the Appreciation Cash Flow is calculated by taking the Agreed Value of the Property, deducting the Approved Deductions and the Closing Costs, and then deducting the Developer's Invested Equity and Developer's Operating Equity. The Appreciation Cash Payment is 15% of the Appreciation Cash Flow. (CPA § 3.1) (Ex. 9).

**Response:**   MRLP and MRLPTDR do not dispute this "summary" of the terms of CPA §

3.1, but dispute that the calculation is as simplistic as inferred by this SOF.

68. In Section 3.1 of the CPA, "Developer's Equity Return" is not included in the definition of Appreciation Cash Flow. (Id. § 3-. I)-.

**Response:**   It is not disputed that the words "Developer's Equity Return" are not

included in §3.1.

69. Under Section 3.4(a) of the CPA, "Permitted Debt" and "Junior Financing" are Approved Deductions from Appreciation Cash Flow in the event of (he sale of the Property. (Id. § 3.4(a)).

**Response:**  This is not disputed.

19

70. S&S Finance is a 100% owned affiliate of Greenebaum and Rose. (Second Amended Complaint ¶ 3).

**Response:**   More precisely, the limited partners of S&S Finance are the Stewart J. Greenebaum Revocable Trust and the Samuel G. Rose Revocable Trust.

71. In 1996, S&S Finance acquired the first mortgage on the 90 K Street Property. (Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-001015) (Ex. 24).

**Response:**   This is not disputed.

72. In its Special Purpose Financial Statements for 1997 through 2004, MRLP classified the accrued interest on the first mortgage as Developer's Equity Return. (Letter dated 9/12/00 from R. Liffmann to K. Goldman, VD-00l015, at 001016 (Ex. 24)).

**Response:**   This is disputed.  From 1997 to 1999 (not 2004), the accrued interest on only $7.3 million of the first mortgage was included in Developer's Equity Return. This was restated on the 1999 and 2000 statements to reclassify all of the first mortgage interest under the classification "Developer's Operating Equity." Only the interest on this "first mortgage interest" was included in Developer's Equity Return. Effective with the 2005 Revision (done in November 2006), all of the first mortgage interest is included in the loan payable to S&S Finance, and interest on these loan advances is included in interest payable to S&S Finance. On the 2005 Revision (and for all prior periods back to the acquisition of the first mortgage by S&S Finance), MRLP has used the following procedure: the monthly interest on the first mortgage is treated as an advance from S&S Finance on the last day of each month and is therefore added to the loan balance on that day. Glassman Decl. (Exhibit 2) at ¶ 19.

73. From approximately 1987 to November 2006, MRLP has treated amounts contributed by S&S Finance to 90 K Street as equity. (See Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised Special Purpose Financial Statement for 2005 ("Revised 2005 Statement") (Ex. 36).

**Response:**   This is disputed. _See_ Response to SOF 72.  The amounts advanced from

20

S&S Finance were always intended to earn interest. They were however, for internal tax

purposes, reflected as equity during the period 1997-2000. As described above, a reclassification

took place as to $7.3 million of the first mortgage in 2000. <u>See</u> Rose Decl. at ¶¶ 14-18 ;

Glassman Decl. (Exhibit 2) at ¶¶ 9-15, 19.

74. Now, under the direction of its litigation attorney Dale Cooter, MRLP seeks
retroactively to convert the amounts contributed by S&S Finance, the accrued interest on those
amounts, and the accrued interest on the first mortgage from equity to debt. In a letter to Viad's
counsel, Mr. Cooter stated: "As you know, I established that all money contributed to
Montgomery Road I Limited Partnership was actually in the form of loans originating with S&S
Finance. There was never any intention to contribute non-interest bearing equity to the project."
(Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement) (Ex. 36).
However, no loan documents have been provided to Viad to substantiate Mr. Cooter's claim that
the money contributed to MRLP by S&S Finance was in the form of a loan. (Id.).

**Response:** This is disputed; the Special Purpose Financial Statements were revised in

2006 to reflect the proper treatment of the advances from S&S Finance. As set forth in Mr.

Rose's Declaration, the funds were advanced by S&S with the intention of earning a return on

those funds. <u>See</u> Rose Decl. at ¶¶ 14-18 ; Glassman Decl. (Exhibit 2) at ¶¶ 9-15.

75. Attorney Cooter also attached a revised Special Purpose Financial Statement for
2005 ("Revised 2005 Statement") to his November 21, 2006 letter. (Id.).

**Response:** This is not disputed.

76. Prior to their receipt of the Revised 2005 Statement, counsel for Viad received a
Draft 2005 Statement from Mr. Cooter's office on September 21, 2006 (Letter dated 9/21/06
from A. Pignatelli to R. Page, enclosing Draft 2005 Statement) (Ex. 14).

**Response:** This is not disputed.

77. Unlike the other Special Purpose Financial Statements, which were prepared between
1987 and 2004, there is no signed statement indicating that the Revised or Draft 2005
Statements were compiled by a firm of independent certified public accountants, as required by
Section 2.6 of the CPA. (Liffmann Dep. at 14:9-16:22; 35:15-37:12 (Ex. 2); CPA Section 2.6
(Ex. 9); Letter dated 11/21/06 from D. Cooter to R. Page, enclosing revised 2005 Statement (Ex.
36); Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement (Ex. 14);
see also Special Purpose Financial Statement for December 31, 2004 and 2003 (hereinafter

"Representative Statement") MR-00953 at 00955) (Ex. 35).

**Response:**    This is not disputed.

78. In the Revised 2005 Statement, MRLP reclassified the amount that was previously classified as Developer's Equity Return as "Interest Expense — S&S Loan." MRLP also reclassified other amounts as "S&S Finance Loan Payable." These items were then added under "Liabilities" in the Revised 2005 Statement. These new classifications do not appear in previous Special Purpose Financial Statements. (See Letter dated 11/21/06 from D. Cooter to R. Page, Revised 2005 Statement at 2 & 5 (Ex. 36); see also Representative Statement, VD-00953 at 00956) (Ex. 35).

**Response:**    This is not disputed.

79. The decision to treat amounts advanced by S&S Finance and the accrued interest on those amounts as debt instead of equity is inconsistent with the Reznick Analysis, which MRLP seeks to enforce as binding in this case. According to the Reznick Analysis "any amount advanced by S&S or its partners to pay interest or any other reasonable expense should be treated as if it were made from an Equity Holder and included in Developer's Operating Equity under Section 3.6(b)." (Reznick Analysis, VD-000466, at ISSUE 3, Interpretation) (Ex. 32).

**Response:**    This is disputed. These treatments are not inconsistent; they are alternative

treatments.

80. Through its attorney, MRLP has taken multiple and contradictory positions on the manner in which items should be classified on its financial statements, with the intent to decrease Viad's Appreciation Cash Payment. (Compare Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement, with Letter dated 9/21/00 from A. Pignatelli to R. Page, enclosing Draft 2005 Statement) (Exs. 14 & 36).

**Response:**    This is disputed. As set forth in the Declaration of Mr. Rose, the revisions

were made to accurately reflect the economic situation resulting from S&S Finance's substantial

advances to fund the Property over the past twenty years ($18 million in addition to the first

mortgage).  Rose Decl. at ¶ 35; see also Glassman Decl. (Exhibit 2) at ¶¶ 13-16.

**Transferable Development Rights**

81. The 90 K Street Property is zoned C-3-C which permits a maximum height of 90 feet and a maximum FAR of 6.5. (See Expert Report of Cynthia Giordano ("Giordano Report") at 1) (Ex. 37).

**Response:**   This is not disputed.

82. It is also located in the North Capitol TDR Receiving Zone under the D.C. Zoning Regulations (D.C. Mun. Regs. tit. 11, § 1709.17) which permits increased density up to the maximum height permitted by the 1910 Building Height Act and an FAR of 10.0 with TDRs. (46 D.C. Reg. 1054, 1059 (Oct. 19, 1998)).

**Response:**   This is not disputed.

83. "FAR is a general measure of building density. FAR, or floor-to-area ratio, is the result of adding together the square footage of all of the floors in a building and dividing that total by the land area of the lot. Thus, a one-story building covering 100% of the lot equals a 1.0 FAR. At the other end of the range, a ten-story building covering 100% of the lot is a 10.0 FAR." (Giordano Report at 1 n.l)(Ex. 37).

**Response:**   This is not disputed.

84. "Permitted FAR under District of Columbia zoning ranges from the lowest density of 0.9 FAR to the highest density of 10.0 FAR." (Id. at 1, n. I; see generally, D.C. Mun. Regs. tit. 11, § 1709).

**Response:**   This is not disputed.

85. "Transferable Development Rights or TDRs are what the name implies: zoning density which may be transferred from a site on which the density is not used to another site on which the density may be developed." (Giordano Report at 2) (Ex. 37).

**Response:**   This is not disputed.

86. "TDRs were created in the District of Columbia in 1991 when the D.C. Zoning Commission enacted the "Downtown Development District" regulations ("DD regulations")." (Id. at 2; 49 D.C. Reg. 6444, 6448 (Jul. 5, 2002)).

**Response:**    This is not disputed.

87. "These regulations imposed significant requirements on new development projects in downtown Washington, ranging from minimum retail space requirements and historic preservation to design standards and mandated housing." (Giordano Report at 2 (Ex. 37); see generally, D.C. Mun. Regs. tit. 11, § 1709).

**Response:**    This is not disputed.

88. "To compensate owners subject to the new restrictions, the DD Regulations also

created TDRs. Under the new regulations, when an owner develops a project which meets or exceeds certain requirements of the DD Regulations, TDRs are generated. These TDRs can then be sold at a profit for use on other development sites in designated "receiving" districts." (Giordano Report at 2 (Ex. 37); D.C. Mun. Regs. tit. 11, § 1709.1).

**Response:**    This is not disputed.

89. "TDRs can have a dramatic impact on the value of downtown properties." (Giordano Report at 2) (Ex. 37).

**Response:**    This is not disputed.

90. "For sending sites, generating and transferring TDRs can yield profits which mitigate the costs of historic preservation and providing preferred uses and provide an incentive for providing such uses." (Id. at 2).

**Response:**    This is not disputed.

91. "For receiving sites, TDRs can create additional density in a way that was formerly available only through expensive and lengthy discretionary zoning processes." (Id. at 2).

**Response:**    This is not disputed.

92. "The mechanics of a TDR transfer begins with a sending site and a receiving site. A sending site which is eligible to generate and transfer TDRs meets one of two profiles. It may be a designated historic property or a development project which provides certain preferred uses identified in the DD regulations." (Id. at 2; D.C. Mun. Regs. tit. II, § 1709).

**Response:**    This is not disputed.

93. "TDRs generated under the DD Regulations may be transferred to any other lot located within the DD District or to lots located within receiving zones which have been designated by the City as appropriate for high density commercial development." (Giordano Report at 3) (Ex. 37); (D.C. Mun. Regs. tit. 11, § 1709.)).

**Response:**    This is not dispute.  In addition, MRLP and MRLP TDR state that the TDRs can also be transferred to a non-landowning entity.  Braesch Decl. at ¶¶11.  Either the receiving lot or the non-landowning entity can then re-transfer the TDRs. ¶¶12, 17, 18.

94. "The "North Capitol" receiving zone, in which the [90 K Street Property] is located, is one such zone. It was established in October of 1998." (Giordano Report at 3 (Ex. 37); 46 D.C. Reg. 1054, 1058 (Oct. 19, 1998)).

24

**Response:**    This is not disputed.

95. "The TDR transfer process involves both a real estate transaction and a ministerial government process." (Giordano Report at 3) (Ex. 37).

**Response:**    This is not disputed.

96. "The transfer must be certified by the District government." (Id. at 4; D.C. Mun. Regs. tit. 11, § 1707 (i) (4)).

**Response:**    This is not disputed.

97. "The owner of the sending site will process with the District of Columbia zoning, planning and legal agencies a 'TDR Covenant.' The TDR Covenant restricts the sending site in perpetuity to provide the preferred use giving rise to TDRs, or to maintain the historic project undertaken. Once approved and executed by the District, the TDR Covenant is recorded in the land records and runs with the chain of title to the sending site." (Giordano Report at 4 (Ex. 37); D.C. Mun. Regs. tit. 11, § 1709.14).

**Response:**    This is not disputed.

98. The parties also process with the same District agencies a "TDR Certificate." This document is akin to a deed, and legally transfers the specified TDRs from the sending site to the receiving site. (Id. at 4; D.C. Mun. Regs. tit. 11, § 1709.10-1709.11). "Standard forms for the TDR Covenant and the TDR Certificate have been developed by the City and the process for City review and execution is ministerial in nature." (Giordano Report at 4) (Ex. 37).

**Response:**    This is not disputed.

99. "The TDR Certificate is recorded at closing on the transfer of TDRs, and completes the transaction between sending lot and receiving lot." (Id. at 4; D.C. Mun. Regs. tit. 11, 1709.14).

**Response:**    This is not disputed except to state that there is usually another document

involved and that is the purchase agreement between the owner of the sending lot and the owner

of the receiving lot or the non-landowning entity that is purchasing the TDRs.  Braesch Decl. at

¶10.

100. [T]he DD regulations permit the re-transfer from the original receiving lot to another eligible receiving lot. (Id. at 4; D.C. Mun. Regs. tit. II, § 1709.8).

**Response:**   This is not disputed.

101. "TDRs have generally been readily available for purchase and the going rate for TDRs has generally ranged since 1998 from a high of approximately $25.00 per square foot of transferred density to a low of $3.00 per square foot with an overall downward trend in prices to the present." (Giordano Report at 4) (Ex. 37).

**Response:**   This is not disputed.

102. "The establishment of a receiving zone is effectively an up-zoning of the properties located within the zone to a higher matter-of-right density." (Id. at 5).

**Response:**   This is not disputed.

103. "In the North Capitol receiving zone, [where the 90 K Street Property is locatedj, TDRs may be used to increase matter-of-right FAR from a maximum of 6.5 FAR to as much as 10.0 FAR with TDRs." (Id.; D.C. Mun. Regs. tit. 11, § 1707.5 (d)).

**Response:**   This is not disputed.

104. "Utilizing approximately 360,513 square feet of TDRs, the density of [the 90 K Street Property] can potentially be increased from 6.5 to 10.0 FAR. . . . This approximate quantity of TDRs has been available in the market since the inclusion of [90 K Street] in a receiving zone at prices which have generally ranged from approximately $25.00 to $3.00 per square foot with an overall downward trend in prices Ia the present." (Giordano Report at 5) (Ex. 37).

**Response:**   MRLP and MRLP TDR dispute that $25.00 is the high end of the range of prices for TDRs.    MRLP purchased the TDRs from Manufacturers Life Insurance Company ("ManLife TDRs")  for $30.00 per square foot.  Braesch Decl. at ¶14.   Currently, the availability of TDRs is somewhat diminished from recent years and therefore the cost to purchase TDRs is now in a range of $5.00 to $8.00 per square foot. Braesch Decl. at ¶10.

105. "TDRs are currently selling at $5.50 to $5.25 per square foot." (Id. at 5).

**Response:**   MRLP and MRLP TDR dispute that the current selling price is as stated; the current selling price ranges from $5.00 to $8.00 per square foot.  Braesch Decl. at ¶10.  This dispute is not material, however,  because it is the value of the TDRs  that is material.

**Transferable Development Rights are an "Interest in the Property" or an "Improvement"
to the Property for Purposes of Calculating the Appreciation Cash Payment**

106.  TDRs are an aspect of the zoning for the property. (Giordano Report at 2) (Ex. 37).

**Response:**   MRLP and MRLP TDR are uncertain of the meaning of the term "aspect of"
zoning and therefore they dispute this statement.  The zoning at a receiving site remains
unchanged.  Braesch Decl. at ¶24.  The zoning at 90 K remained unchanged at C-3-C.  Braesch
Decl. at ¶24. The District of Columbia designates certain areas (the receiving sites) as eligible to
receive TDRs.  Braesch Decl. at ¶24.  There is no other or different zoning that applies.  Braesch
Decl. at ¶24.  There is no act by the District of Columbia that changes what can be built on the
property.  Braesch Decl. at ¶24.

107. The effect of a parcel being placed in a "receiving zone" for TDRs is an "upzoning"
of the property. (Id. at 5).

**Response:**   MRLP and MRLP TDR dispute this statement.  The effect of a parcel being
placed in a "receiving zone" for TDRs is not "upzoning."  Braesch Decl. at ¶24.  See also
Response to SOF 106.

108. There is a glut of TDRs available in the market place. The fair market value of
TDRs has ranged from $3.00 to $25.00. (Id. at 4-5).

**Response:**    MRLP and MRLP TDR dispute that there is currently a "glut" of TDRs in
the market place.  Braesch Decl. at ¶10.   They also dispute that the "fair market value" of TDRs
has ranged from $3.00 to $25.00.  The value of a TDR to a developer is different than the
acquisition cost of the TDR.   Braesch Decl. at ¶22.

109. MRLP contracted to buy TDRs for use at the 90 K Street Property for $6 per square
foot. (Deposition of Steven Braesch ("Braesch Dep.") at 24:19-29:17) (Ex. 3).

**Response:**   MRLP and MRLP TDR dispute that  MRLP  purchased the ManLife TDRs

27

for $6 per square foot; it purchased them for $30.00 per square foot. Braesch Decl. at ¶14.

MRLP and MRLP TDR do not dispute that the ManLife TDRs were sent to 90 K Street as the

receiving site. MRLP was not required to use the TDRs at 90 K Street because it could have

transferred the ManLife TDRs from 90 K Street to another receiving site. Braesch Decl. at ¶16.

MRLP did not contract to buy the E Street TDRs, as explained by Steve Braesch in his

Declaration at Paragraph 16.

110. The "rebuttal appraisal" expert retained in this litigation by MRLP, Stuart I. Smith, has on one occasion determined the value of TDRs in the "North Capitol" receiving zone. The value he concluded for that transaction was that TDRs had value of $3.50 per FAR. (Deposition of Stuart I. Smith ("Smith Dep.") at 34:1-3) (Ex. 4).

**Response:**   MRLP and MRLP TDR dispute that in the referenced testimony Stuart

Smith testified that the "value" of the TDRs was $3.50 per FAR. Mr. Smith testified that there is

a difference between price and value. Smith Tr. at 93. "Price is simply a transaction amount

and value has certain definitions associated with it, willing buyer, willing seller." Smith Tr. at

93.

111. TDRs do not sell for a price that is equal to or similar to the price per square foot of land to which they will be attached. (Id. at 94:13-95:4).

**Response:**   MRLP and MRLP TDR dispute this statement. TDRs sell for whatever price

is reached between the seller and the buyer. Braesch Decl. at ¶22.

112. TDRs are recorded in the land records of the District of Columbia for both the sending and receiving lots. (D.C. Mun. Regs. tit. II, § 1709.10-1709.11, 1709.14).

**Response:**   This is not disputed.

113.  In 2000, when MRLP complied with the requirement of the CPA and provided to Viad the details of its proposal to sell the Property to Level 3, there were TDRs recorded on the property at that time. (Letter dated 7/21/00 from S. Rose to TLC, attaching agreement between MRLP and Level 3 Communications, LLC ("MRLP—Level 3 Agreement"), VD-000593;

Certificate of TDR Transfer dated 8/16/00, MR-07470-07487, attached as Exs. 38 & 39). The contract of sale to Level 3 was for a single price that included the TDRs already assigned, since "development rights" were included in the definition of "Property." (Rose Dep. at 193:21-195:17) (Ex. 1); "MRLP-Level 3 Agreement" at 1.1.3 and Article 2, VD-000593) (Ex. 38). MRLP provided that contract to Viad so that it could consider whether to exercise its right of first refusal; Viad chose not to do so. (MRLP-Level 3 Agreement at cover letter, VD-000593) (Ex. 38).

**Response:**   MRLP and MRLP TDR do not dispute that in 2000, pursuant to the first right of refusal provisions of the Cash Participation Agreement, MRLP provided to Viad the details of its proposed transaction with Level 3 and that Viad chose not to exercise those rights. While the Level 3 Agreement did include "development rights" within the definition of Property, they were included within the "Intangible Personal Property" subsection of that definition.  Level 3 Agreement at Paragraph 2.1.2.

114. Beginning in 2000, MRLP listed as expenses for the property deductible under the CPA against any payment owed to Viad for yearly operations the cost of acquiring TDRs and the legal fees associated with doing so. The total cost over a period of time was approximately $350,000. The annual financial statements of MRLP submitted to Viad under the CPA for the years 2000, 2001, 2002, 2003, 2004 and the 'Draft' statement for 2005 listed these TDR expenses as an appropriate deduction. (Financial Statement for December 31, 2000 and 1999 at 7, VD 000180, attached as Ex. 40; Letter dated 11/21/06 from D. Cooter to R. Page ¶ 1) (Ex. 36).

**Response:**   MRLP and MRLP TDR  do not dispute that MRLP included the TDR expenses as recited in Paragraph 107.  MRLP and MRLP TDR do dispute that they were appropriate deductions.  Braesch Decl. at ¶21.

115. In July 2006, the partners of MRLP formed a separate entity, Montgomery Road TDR, LLC ("MRTDR"), which is identical in ownership to MRLP. This new entity was created to be a party to which TDRs would be transferred and then sold as part of a transaction with TC MidAtlantic Development, Inc. (Limited Liability Operating Agreement of Montgomery Road TDR, LLC; Eighth Amendment to Certificate of Agreement of Limited Partnership of MRLP at 4) (Exs. 7 & 8).

**Response:**   This is not disputed.

29

116. MRTDR is an "Affiliate" of MRLP within the meaning of the CPA. (CPA § 1.2) (Ex. 9).

**Response:**   This is not disputed.

117. in or about August 2006, MRLP signed an agreement with TC MidAtlantic Development, Inc. ("TCMD") for the sale of the 90 K Street Property. (Land Purchase and Sale Agreement dated August 10, 2006; Agreement of Purchase and Sale of Transferable Development Rights dated August 10, 2006, MR-19926, attached as Exs. 41 & 42). As part of this sale, MRLP has sought to exclude Viad from participating in the appreciation of the property by creating a separate contract for the sale of the TDRs —. the Agreement of Purchase and Sale of Transferable Development Rights — and allocating approximately a third of the purchase price, $21,387,929, to this separate contract. (Agreement of Purchase and Sale of Transferable Development Rights dated August 10, 2006, MR-19926 (Ex. 42); First Amendment to Agreement of Purchase and Sale of Transferable Development Rights dated October 31, 2006; Settlement Statement for 90 K Street TDR Sale, MR-26163, attached as Exs. 43 & 55). In this separate TDR agreement, the TDRs are valued at more than eleven times the price that MRLP paid to acquire them and approximately thirteen times the market price for TDRs. (Id; see also Giordano Report at 5) (Ex. 37).

**Response:**   MRLP and MRLP TDR do not dispute the first sentence of Paragraph 110.

MRLP and MRLP TDR do, however,  dispute that as part the sale MRLP sought to exclude Viad

from participating in the appreciation of the property by creating a separate contract for the sale

of the TDRs.   TDRs are not part of the Cash Participation Agreement's definition of "Property"

as explained in Montgomery Road's Memorandum in opposition to Viad's summary judgment

motion.  Montgomery Road has not sought to exclude Viad from participating in the appreciation

of the Property as that term is defined by the Cash Participation Agreement.  Braesch Decl. at

¶23.

118. TCMD is an affiliate of The Trammel Crow Company. (Hudson Dep. at 11:19-12:3) (Ex. 5).

**Response:**   This is not disputed.

119. The draft agreements demonstrate that efforts were made to delete any reference to the TDRs as "property." For example, in one draft, Section 5.3(a) states that the deed shall include the TDRs. Inserted next to this section is the following comment: ("Why are the TDR's

[sic] here — because they run with the land — would prefer not to have this clause here — thinking about Cooter/Viad?" (Draft Purchase and Sale Agreement at 6, MR-10942) (Ex. 44).

    **Response:**   The documents speak for themselves and the statement is not disputed.

Because TDRs are intangibles,  not real property or improvements, the deletions were

appropriate.  Braesch Decl. at ¶6.

    120. In November 2006, 10 months after this litigation was filed, and after the contract of sale between MRLP and TCMD had been entered into, MRLP reversed its accounting treatment of the TDRs. The unaudited, unsigned financial statement submitted to Viad by counsel for MRLP eliminated these TDR expenses. (Letter dated 11/21/06 from D. Cooter to R. Page, at cover page and p.2) (Ex. 36). In the Rule 30(b)(6) deposition of MRLP on this matter, Reid Liffmann testified that, based on advice of litigation counsel, it was determined that the previous deductions taken for TDR expenses were "an administrative mistake." (Liffmann Dep. at 28:2-29:14)(Ex. 2).

    **Response:**   This is not in dispute.

    121. The agreements with TCMD included a so-called Umbrella Agreement. Under that document, sale of the land at 90K Street was conditioned on the purchase of45 L Street, the adjoining lot, and on the purchase of TDRs at a price sufficient to provide compensation for MRLP at an FAR value of $70 per square foot. (Umbrella Agreement dated August 11, 2006 between MRLP, 45 L Street Venture, EEC and TCMD) (Ex. 45).

    **Response:**   This is not disputed.

    122. In the summer of 2006, TCMD had learned through its broker that a large property in the NoMa area was available for "roughly $100 million." (Hudson Dep. at 21:2-13) (Ex. 5).

    **Response:**   This is not disputed.

    123. There was a subsequent face to face meeting between representatives of TCMD and Rose and Liffmann, and the price discussed, or at least the expectation of the parties regarding price was known to be, approximately $100 million. (Id. at 24:14-21).

    **Response:**   This is not in dispute.

    124. In discussions between TCMD and the seller MRLP, there was never any differentiation made in the discussions of price between the two parcels, one at 45 L Street and one at 90K Street. The only discussion "was relating to [thej total FAR." (Id. at 30:3-14).

    **Response:**   This is not in dispute.

125. The buyer analyzed the sale in terms of the total FAR, which it priced at approximately $70 per square foot. (Id. at 33:5-10).

**Response:**   This is not in dispute.

126. The "experience" of TCMD was that the District of Columbia government would allow up an FAR of up to 10 in this area, and it calculated its expected yield on that basis. (id. at 33:18-34:4).

**Response:**   This is not in dispute.

127. The TDR price in the contracts was changed after the agreement was made. In or about October 2006, TCMD determined that it did not need to purchase as many TDRs as the contracts provided for because they could not be used in the plans under consideration. However, in the amendments to the contracts, the total contract price for the purchase of TDRs by TCMD from MRLP was not changed. Instead, the price per TDR was increased by an amount necessary to insure that MRLP was paid the same amount even if the total number of TDRs it sold was reduced. (Hudson Dep. at 42:9-45:6) (Ex. 5); Email dated 10/31/06, 6:27 p.m., from R. Saas to D. Hudson, MR-22461 at 22462; Email, dated 11/1/06, 8:02 a.m., from S. Braesch to R. Shapiro, R. Saas, D. Hudson, R. Liffmann, and R. Foster, MR-l9563; Email dated 11/1/06, 11:40 a.m., from S. Braesch to R. Saas, R. Shapiro, R. Liffmann, D. Hudson and R. Foster, MR-20535) (Exs. 46-48); (First Amendment to Agreement of Sale of Transferable Development Rights dated October 31, 2006) (Ex. 55).

**Response:**   This is not in dispute.  MRLP and MRLP TDR do, however, dispute the

inference which Viad seeks to glean from this - that the TC Midatlantic deal was a sham

transaction.  It was not.  Braesch Decl. at ¶20.

128. The reason for making the change in this manner was explained by counsel for TCMD. The only reduction in the price if the TDRs were not to be included in the sale was the small cost of acquisition of the TDRs, and the "profit piece" would be guaranteed to TCMD. (Email from 10/31/06, 6:27 p.m., from R. Saas to D. Hudson, MR-22461 at 22462) (Ex. 46).

**Response:**   This is not in dispute.  MRLP and MRLP TDR do, however, dispute the

inference which Viad seeks to glean from this - that the TC Midatlantic deal was a sham

transaction; it was not.  Braesch Decl. at ¶20.

129. TCMD has admitted in deposition testimony that the price paid to MRLP for TDRs was well-above the market price and was agreed to only because purchasing the TDRs at the higher value was a requirement imposed by MRLP as a condition for purchasing the land at 90 K

Street. (Hudson Dep. 45:4-46: 17) (Ex. 5). The "bargain" according to Daniel Hudson, President of TCMD, was that MRLP would be paid for the achievable FAR regardless of how the price was allocated between TDRs and land. (Id. at 46:8-17).

**Response:**   This is not in dispute.  MRLP and MRLP TDR do, however, dispute the

inference which Viad seeks to glean from this - that the TC Midatlantic deal was a sham

transaction; it was not.  Braesch Decl. at ¶20.

130. Mr. Halbert's appraisal of June 24, 2006 of 90 K Street lists several improvements present at 90 K Street. Among these are the "sidewalks, curbs, and drainage." (pertinent portions of 6/24/06 Appraisal) (Ex. 58).

**Response:**   MRLP and MRTDR do not dispute that Mr. Halbert's report refers to

"sidewalks, curbs and drainage" as "site improvements."  Despite the SOF 130's contention that

the report "lists several improvements," it actually only states: "[t]he site improvements include

sidewalks, curbs, and drainage."  No other "improvements" are mentioned.


131. When asked about at her deposition to list examples of "improvements" on real estate, Ms. Giordano stated that "in general — you know, sense, an improvement is usually a building or a structure." Ms. Giordano did not describe this as an exclusive or exhaustive list. She was also not asked whether TDRs could be considered improvements. (Deposition of Cynthia Giordano ("Giordano Dep.") at 31) (Ex. 56).

**Response:**   MRLP and MRTDR do not dispute that Ms. Giordano testified as indicated

by the quoted language.  MRLP and MRTDR do dispute however that the lack of a question

about "an exhaustive list" or whether TDRs are improvements in any way supports Viad's

contention that TDRs are improvements.


132. When asked whether 90 K Street was improved, Mr. Halbert replied that "If you mean by improved is there a proposed office building on it yet, no. there are parking spaces. So it's improved with sidewalks and asphalt parking." Mr. Halbert was not asked whether TDRs were improvements. (Deposition of Steven Halbert ("Halbert Dep.") at 21) (Ex. 59)

**Response:**   MRLP and MRTDR do not dispute that Mr.  Halbert testified as indicated by

the quoted language.  MRLP and MRTDR do dispute however that the lack of a question about

whether TDRs are improvements in any way supports Viad's contention that TDRs are

improvements.

**MRLP's Default Under the CPA**

133. MRLP has not provided financial statements pursuant to the CPA for fiscal years
2005 and 2006. (See Letter from R. Page to D. Cooter dated 9/13/06 requesting Special Purpose
Financial Statement for 2005) (Ex. 48).

**Response:**    Section 2.6 of the Cash Participation Agreement requires financial

statements and schedules to be submitted within 120 days of the end of each Fiscal Year (defined

as December 31 in §1.19).  Financial statements and schedules for Fiscal Year 2005 were

provided on November 21, 2006.  Exhibit 46.  As set forth in the Declarations of Messrs. Rose

and Glassman, these financial statements contained a restatement of the financials for the period

December 1987- December 2005 (the "2005 Revised Statements").  Glassman Decl. (Exhibit 2)

at ¶¶12-16; Rose Decl. at ¶¶ 16-18. On June 20, 2007, KAWG&F, P.A. completed its audits of

the financial statements and its examination of the financial records related to the 90 K Street

Property, as well as the following Special Purpose Financial Statements, accompanied by the

unqualified opinion of KAWG&F, P.A.:      December 31, 2005 and 2004; December 31, 2006

and 2005; and January 11, 2007 and December 31, 2006.  The January 11, 2007/December 31,

2006 Statements also contained a Schedule of Appreciation Cash Flow as of the date of the sale

of the 90 K Street Property.  Supplemental Filing (ECF 42) and Exhibits A-D.  Exhibit A to the

Supplemental Filing is the Declaration of Ronald Glassman, dated June 26, 2007(Exhibit 50);

see also Declaration of Clemens Mueller, September 6, 2007 (Exhibit 48).  These audited

statements were tendered to Viad on June 27, 2007, via the Supplemental Filing (ECF 42).

134. The failure to provide financial statements under Section 2.6 of the CPA is a default under the contract. (CPA § 2.6) (Ex. 9).

**Response:**   This is disputed. As set forth in the Response to SOF 123, 2005 Statements

were provided on November 21, 2006.  See Glassman Decl. (Exhibit 2) at ¶¶15, 18; On June 20,

2007, KAWG&F, P.A. completed its audits of the financial statements and its examination of the

financial records related to the 90 K Street Property, as well as the following Special Purpose

Financial Statements, accompanied by the unqualified opinion of KAWG&F, P.A.:

December 31, 2005 and 2004; December 31, 2006 and 2005; and January 11, 2007 and

December 31, 2006.  The January 11, 2007/December 31, 2006 Statements also contained a

Schedule of Appreciation Cash Flow as of the date of the sale of the 90 K Street Property.

Supplemental Filing (ECF 42) and Exhibits A-D.  Exhibit A to the Supplemental Filing is the

Declaration of Ronald Glassman, dated June 26, 2007 (Exhibit 50); see also Declaration of

Clemens Mueller, September 6, 2007 (Exhibit 48).  These audited statements were tendered to

Viad on June 27, 2007, via the Supplemental Filing (ECF 42).

135. As was discussed previously, during the course of litigation, on November 21, 2006, MRLP has tendered a compilation of financial data, accompanied by a letter from its litigation counsel with his opinion that the financial data is a correct statement of expenses and other deductions under the CPA. (this compilation is hereinafter referred to as the "Cooler Financials"). By contrast, the CPA requires the certification of an independent certified public accountant applying generally accepted accounting principles on a consistent basis to the books and records of MRLP. (Letter dated 11/21/06 from D. Cooter to R. Page, enclosing Revised 2005 Statement; CPA § 2.6) (Exs. 9 & 36). Neither the draft nor the revised statements were "prepared in accordance with generally accepted accounting principles," as required by Section 2.6. Section 2.6 of the CPA requires financial statements and schedules to be submitted within 120 days of the end of the Fiscal Year (defined as December 31 in § 1.19).

**Response:**   The summary of the language of CPA §2.6 is not accurate.  Specifically,

CPA §2.6 states: "Developer shall furnish to TLC ... financial statements and schedules,

35

including a balance sheet and statement of operations for the Property for such Fiscal Year, prepared in accordance with generally accepted accounting principles applied on a basis consistent with past practices and bearing the unqualified opinion of a firm of independent certified public accountants ... ."  On June 20, 2007, KAWG&F, P.A. completed its audits of the financial statements and its examination of the financial records related to the 90 K Street Property, as well as the following Special Purpose Financial Statements, accompanied by the unqualified opinion of KAWG&F, P.A.:      December 31, 2005 and 2004; December 31, 2006 and 2005; and January 11, 2007 and December 31, 2006.  The January 11, 2007/December 31, 2006 Statements also contained a Schedule of Appreciation Cash Flow as of the date of the sale of the 90 K Street Property.  Supplemental Filing (ECF 42) and Exhibits A-D.  Exhibit A to the Supplemental Filing is the Declaration of Ronald Glassman, dated June 26, 2007 (Exhibit 50); see also Declaration of Clemens Mueller, September 6, 2007 (Exhibit 48).  These audited statements were tendered to Viad on June 27, 2007, via the Supplemental Filing (ECF 42).

136. The Cooter Financials do not comply with the requirements of the CPA. Id.

**Response:**  It is not disputed that the 2005 Revised Statements do not contain the unqualified opinion of an independent accountant.  Until this litigation however, TLC/Viad has been satisfied with the information provided.  See, e.g.  Response to SOF 52.  In addition, the position paper submitted by Viad to the Reznick Group (Exhibit 37) makes no complaint about the fact that the financials had historically not been accompanied by such an unqualified opinion.  Moreover, Ms. Fiorucci testified that (since her involvement) TLC/Viad has never requested an audited statement in writing.  Fiorucci Tr. at 94-95.

137. The Cooter Financials are inconsistent with tax returns filed by MRLP and, on

36

information and belief, with the tax returns filed by the principals of MRLP. Specifically, whereas the Cooter Financials classify all out of pocket expenses by MRLP in maintaining the land as loans rather than as equity investments in the Property, the actual accounting and tax treatment of these items for all other purposes and in prior financial statements submitted by MRLP to Viad classified these expenses as equity. (MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406 (Ex. 50); Revised 2005 Statement at 2 & 5 (Ex. 36); Representative Financial Statement at 2 & 5, MR-00953) (Ex. 35).

      **Response:** Viad makes the statement that the 2005 Revised Statements contain a

different treatment of Montgomery Road's expenses than the tax returns filed by Montgomery

Road for 2005, yet fails to identify – other than a cursory reference to the tax returns – the

specific items about which it complains. There is nothing in the Cash Participation Agreement

that requires the tax and Special Purpose Financial Statements to be the same as the tax returns

for MRLP. Moreover, as described in detail above, the Special Purpose Financial Statements

tendered prior to the 2005 Revised Statements erroneously treated legitimate expenses as equity,

and the interest thereon was erroneously labeled as "Developers' Equity Return." Glassman

Decl. (Exhibit 2) at ¶¶10-16; Rose Decl. at ¶¶15-18. The purpose and intent of the 2005 Revised

Statements was to reflect the economic reality of advances from S&S Finance to Montgomery

Road to maintain the Property for over 20 years. Glassman Decl. (Exhibit 2) at ¶¶10-16; Rose

Decl. at ¶¶15-18.

      138. On January 9, 2007, MRLP partner Reid Liffmann prepared a spreadsheet with a summary of the MRLP-TCMD transaction, including a "Net Gain Calculation" and a "Gain on Sale" calculation. In that spreadsheet, he identified the various closing costs and the reimbursement or recognition of previously incurred expenses in buying and holding the Property. The deductions listed are similar to those described in the CPA, including "project costs," broker's commissions, and closing costs. His calculation showed that a total of $50,172,452 would be available for distribution to the partners of MRLP, not including the $4,500,000 it set aside for possible payment to Viad. Thus a net gain of $54,672,452 was anticipated. (Email dated 1/9/07 from R. Liffmann to R. Glassman attaching spreadsheet, MR19671) (Ex.51).

      **Response:** This is disputed. In anticipation of the closing of the transaction with TC

MidAtlantic in January 2007, Mr. Glassman prepared numerous draft spread sheets to show

various allocations of the sale proceeds, including the one that is included in Exhibit 51 to Viad's

Motion for Summary Judgment.  Exhibit 51 shows an e-mail transmittal from Mr. Liffmann

dated January 9, 2007, but Mr. Glassman prepared the first three schedules on the spreadsheet (at

pages MR 19672-76) referenced by Viad.  Although the spreadsheet reflects that $4,870,000

would be "repaid" to S&S Finance from the proceeds of the closing on 90 K Street, an additional

approximately $35 million was distributed directly to Mr. Rose and Mr. Greenebaum, or to

related entities.  At year-end 2006 (ten days prior to closing), in addition to the First Mortgage

payable to S&S Finance of $10,297,139, the loan payable due to S&S Finance was

approximately $19.9 million and the interest thereon was approximately $18.7 million.

139. Consistent with the tax returns of MRLP prior to the closing, and consistent with the
distribution of funds shown on the settlement statement after the sale, the Liffmann spreadsheet
indicated total loans payable to S&S (including the mortgage) of less than $5 million. (Email
dated 1/9/07 from R. Liffmann to R. Glassman attaching spreadsheet, MR-19671 at 19676;
MRLP 2005 U.S. Return of Partnership Income at 4 & 8, MR-26406; Settlement Statement for
Land Sale, at L.1304, MR-26158) (Exs. 50-52).

**Response:**  See Response to SOF 138.

140.  The purpose and intent of the Cooter Financials was to retroactively change the
accounting for MRLP's ownership of the Property for the purpose of increasing those items that
might be deducted as an expense from the Agreed Value of the Property upon sale and, thus,
defeat the possibility of a payment to Viad. (Liffmann Dep. at 19:20-21:2; 24:9-16; 25:21-26:13;
27:9-28:1) (Ex. 2).

**Response:**   This is disputed.  The purpose and intent of the 2005 Revised Statements

was to reflect the economic reality of advances from S&S Finance to Montgomery Road to

maintain the Property for over 20 years.  Glassman Decl. (Exhibit 2) at ¶¶10-16; Rose Decl. at

¶¶15-18.

141. Like the structure of the MRLP-TCMD sale documents, which purport to segregate

consideration for the purchase of the Property by TCMD into land value and value for attributes of the zoning, thus lowering the Agreed Value under the CPA, the failure to provide financial statements for 2005 and 2006 and to substitute during this litigation the Cooter Financials is a sham for which MRLP fraudulently seeks to increase the possible deductions or adjustments to the payment due to Viad. (Id.).

**Response:**   This is disputed. See Response to SOF 140.

142. During the course of this litigation, MRLP has engaged in actions to avoid and defeat its contractual obligations to Viad under the CPA. (Letter from E. Fiorucci to Sam Rose dated2/21/07) (Ex. 53).

**Response:**   This is disputed. See Response to SOF 140.

143. On January 11, 2007, MRLP proceeded to close on the transaction to sell 90 K Street, N.E. to TCMD or one of its affiliates. (Settlement Statement for 90 K Street Land Sale, MR-26158, Settlement Statement for 90 K Street TDR Sale, MR-26163) (Ex. 43 & 52).

**Response:**   This is not disputed.

144. The total consideration paid to MRLP for the sale of 90 K Street N.E. on January 11, 2007, including deferred compensation, was $67,424,457. (Id.).

**Response:**   More precisely, the consideration was as follows:  the land purchase

($46,036,528), the TDR purchase ($8,387,929), and the purchase of Future TDRs ($13,000,000).

Braesch Decl. at ¶20.

145. Under Section 3.2 of the CPA, MRLP was required to make the Appreciation Cash Payment within three (3) days of that closing. (CPA § 3.2)(Ex. 9).

**Response:**   It is not disputed that Section 3.2 of the CPA requires the Appreciation Cash

Payment to be made within 3 days of a sale (or other triggering event).  At the time of the closing

however, this matter was already being litigated in this case.  The binding nature of the Reznick

Opinion, and how to calculate the amount, if any, of the Appreciation Cash Payment have been

the subject of this litigation since the original Complaint was filed by Montgomery Road in

January 2006.  Whether the TDRs are appropriately considered in the calculation of the

39

Appreciation Cash Payment is the subject of Montgomery Road's First Amended Complaint, filed on December 8, 2006, and Viad's Counterclaim filed on January 3, 2007.  Thus, there was no basis upon which to "make" the Appreciation Cash Payment within 3 days of closing on the TC MidAtlantic transaction.  Nevertheless, Viad's rights are protected, because on the date of closing of the transaction with TC MidAtlantic, $4.5 million (an amount agreed to by Viad) was wired into an account jointly controlled by counsel for Montgomery Road and Viad, to secure any potential Appreciation Cash Payment, pending the resolution of this dispute.  <u>See</u> Rose Decl. at ¶34.

146. No payment was made by MRLP at any time nor was any payment received by Viad as a result of the sale of the property on January 11, 2007. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

**<u>Response:</u>**  <u>See</u> Response to SOF 145.

147. Under Section 3.9 of the CPA, MRLP was required to deliver to Viad "a statement reflecting the Agreed Value, the Approved Deductions, the Closing Costs and the Appreciation Cash Flow used in calculating the Appreciation Cash Payment and a detailed breakdown of all items necessary for the calculation of each such item." (CPA § 3.9) (Ex. 9).

**<u>Response:</u>**  With regard to the "statement" required by §3.9, literally tens of thousands of documents have been produced by Montgomery Road in this case, including the closing settlement sheets from the TC MidAtlantic transaction, and all documents from which to calculate all elements of the Appreciation Cash Flow, and all costs and deductions therefrom (which will result in the conclusion that no Appreciation Cash Payment is owed).  At the time of the closing of the TC MidAtlantic transaction, both Montgomery Road and Viad had petitioned this Court for a declaration of their rights under the CPA, and thus, the calculation of the "statement" contemplated by § 3.9 of the CPA would have been an exercise in futility, given the disparate views of the parties on the inclusion of interest due to S&S Finance, and the exclusion

40

of the TDRs from the sale proceeds in calculating the Appreciation Cash Payment.

148. No "statement" as required by Section 3.9 has been delivered by MRLP to Viad. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

**Response:**  See Response to SOF 147.

149. On February 21, 2007, Viad gave written notice to MRLP under Section 7.3 that it was in default under the CPA for failure to provide either a payment or a statement of the calculation of the payment. (Id.). The CPA provides that MRLP had a ten (10) day period to cure monetary defaults and a thirty (30) day period to cure non-monetary defaults after notice from Viad. (CPA § 7.3) (Ex. 9).

**Response:**  It is not disputed that Viad sent such a letter, declaring a default, and that the

CPA §7.3 contains a cure provision.

150. MRLP made no effort to cure these defaults, and it remains in default. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53). According to Section 7.4 of the CPA: "[i]f either party hereto shall bring suit against the other as a result of any alleged breach or failure of the other party to fulfill or perform any covenants or obligations under this Agreement, then in such event, the prevailing party in such action shall, in addition to any other relief granted or awarded by the court, be entitled to judgment for reasonable attorney's fees incurred by reason of such action and all costs of suit and those incurred in preparation thereof at both trial and appellate levels." (CPA § 7.4) (Ex. 9).

**Response:** As set forth above, audited statements, as well as a statement of the

Appreciation Cash Payment were tendered on June 27, 2007.  All of the other alleged "defaults"

are subject to resolution in this litigation.  Viad's declaration of a "default" is nothing more than

an artifice upon which to base its claim for attorneys fees. See Response to SOF 155 regarding

the alleged "appraisal" default.

151. The CPA provides in Section 3.1 that the Appreciation Cash Payment shall be based on the Agreed Value of the Property, less certain specified deductions as defined in the CPA. (CPA § 3.1)(Ex. 9).

**Response:**  It is admitted that the basic components of the Appreciation Cash Payment are set forth in CPA § 3.1.

152. The Agreed Value is defined in Section 3.3 of the CPA as the greater of the gross

41

proceeds actually received in a sale of the property or the fair market value of the property. (Id. § 3.3).

     **Response:**   This "summary" of Agreed Value is not disputed.

     153. After the sale of the Property on January 11, 2007, MRLP failed to provide a statement of the Agreed Value based on the sale or otherwise to provide its calculation of the Cash Appreciation Payment. (Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Ex. 53).

     **Response:**   This is not disputed, however, <u>see</u> Response to SOF 147.

     154. The CPA provides in Section 3.11 that, if the parties disagree about the Agreed Value, Viad may notify MRLP within ninety days of the receipt of the payment of that disagreement. Because MRLP had filed this suit to declare that the TDR portion of the sale was not covered by the CPA, and because it failed and refused to provide any payment or even a statement of how it calculated the lack of a payment and its deductions from the Agreed Value upon which it is relying, Viad gave notice on February 21, 2007, in writing, that a disagreement existed. (CPA § 3.11; Letter dated 2/21/07 from E. Fiorucci to S. Rose) (Exs. 9 & &3).

     **Response:**   Viad sent a letter to Mr. Rose on February 21, 2007, alleging various

"defaults," and indicating that "agreement" as to fair market value was not likely.

     155. Viad also, on January 31, 2007, provided to MRLP in accordance with the CPA a report prepared by an M.A.I. appraiser, as provided for in Sections 3.8 and 3.11 of the CPA, with an opinion as to the fair market value of the Property. (Expert Report of Steven Halbert ("Halbert Report") (Ex. 54); (CPA § 3.8, 3.11) (Ex. 9).

     **Response:**   Viad contends that when it tendered its "expert report" of Stephen Halbert

on January 31, 2007, it was invoking the "appraisal" process set forth in the Agreement for

disputes as to the "fair market value" of the Property.   Viad's contention is unfounded.  First,

Montgomery Road submits that if Viad intended to invoke the appraisal process, it would have

to have done so within 45 days of "receiving notice of an[] event requiring the determination of

fair market value." CPA §3.8.  That date was December 17, 2006, which was 45 days following

Viad's receipt of the Amended Contracts for the sale of 90 K Street and the TDR's on November

2, 2006.  <u>See</u> Rose Decl. at ¶31.  Without regard to the timeliness of Viad's purported invocation

of the "appraisal process," the appraisal upon which Viad relies was tendered in accordance with the January 31st deadline contained in the Scheduling Order for expert reports. Indeed, the appraisal was an attachment to a pleading entitled "Designation of Expert Witnesses by Viad Corp." [Docket #19], and made absolutely no reference to invoking the appraisal process under the Agreement. By the time the expert report was tendered, Viad had already filed its Counterclaim [Docket # 16], which sought a declaration that the value of the TDRs being sold to TC MidAtlantic were to be considered in valuing the Property for purposes of the Appreciation Cash Payment. Counterclaim ¶7. Thus, Viad had, by actively participating in this litigation, waived the appraisal process.

156. The appraiser, Steven Halbert, of Cushman and Wakefield, provided his written opinion that the fair market value of the Property on June 24, 2006, and within a 6 month period thereafter, which period included the date of the contract between MRLP-TCMD, was $64,800,000. (Halbert Report, at Executive Summary). Mr. Halbert based his valuation on the total development potential of 90 K Street. (Halbert Report at 27 & 37) (Ex. 54).

**Response:** It is not disputed that Mr. Halbert valued the Property at $64,800,000. For purposes of this Summary Judgment Motion however, his report is hearsay.

157. Section 3.8 of the CPA provides that MRLP must select its own appraiser and MRLP's appraiser and Viad's appraiser shall together select a third appraiser. (CPA § 3.8) (Ex. 9).

**Response:** It is not disputed that §3.8 provides for the designation of an appraiser by MRLP in the context of an appraisal process. As set forth above however, Viad has not invoked the appraisal process under the CPA, but rather, has simply tendered the report of an expert witness pursuant to the Scheduling Order in this case.

158. MRLP failed to name an appraiser to determine fair market value. Under Section 3.8 of the CPA, this designation should have been made by February 15, 2007 (CPA § 3.8.) (Exs. 9 & 53).

**Response:** It is disputed that MRLP was required to "name an appraiser" pursuant to

43

§3.8 of the CPA. See Response to SOF 157 and SOF 158. Given that Halbert's expert report

was tendered in the context of this litigation, on February 23, 2007, Montgomery Road

designated Stuart Smith [Docket #21] as its rebuttal expert witness (pursuant to Fed. R. Civ. P.

26(2)(C)) on the issue of fair market value of the property. Mr. Smith provided a review report

of the Halbert appraisal. Smith Tr. at 82-86.

159. MRLP did designate as a rebuttal expert in this litigation Stuart I. Smith. He has
testified that he has no opinion of the fair market value of the property. (Deposition of Stuart I.
Smith, ("Smith Dep.") at 65:16-67:8). Rather, the thrust of his "rebuttal" is that Mr. Halbert
should have described the availability of TDRs as an "extraordinary assumption." (Smith Dep. at
84:20-86:6) (Ex. 4).

**Response:**    It is not disputed that Mr. Smith did an "appraisal review" of Mr. Halbert's

appraisal, rather than performing his own appraisal of the Property. Smith Tr. at 65-67. One of

the criticisms of Mr. Halbert's appraisal was that he failed to identify the availability of TDRs as

an extraordinary assumption. Smith Tr. at 82-86.

160. Viad's notice of February 21, 2007, gave notice to MRLP that it was in default for
failure to name an appraiser for purposes of determining the fair market value calculation and
component of the Agreed Value under the CPA (Letter dated 2/21/07 from E. Fiorucci to S.
Rose) (Ex. 53).

**Response:**    Viad's letter of February 21, 2007 purported to give notice to MRLP that it

was in default for failing to "select an appraiser." MRLP denies that it was in default. The

parties have actively participated in this litigation, for months prior to Viad's designation of its

expert witnesses (pursuant to this Court's Scheduling Order), and then three-weeks later (by its

February 21, 2007 letter) attempting to portray that expert witness designation as an invocation

of the "appraisal" process.

**Supplemental Filing**

161. On June 27, 2007, MRLP submitted an unauthorized Supplemental Filing to the

44

Court. (See Docket # 42). The Supplemental Filing was submitted almost two months after the initial round of motions had been completed and six months after discovery had closed in the case. MRLP did not seek the consent of Viad in submitting this filing.

**Response:**  MRLP and MRTDR do not dispute that the audited statements were

submitted with a Supplemental Filing on June 27, 2007.  MRLP and MRTDR dispute however,

that the filing was "unauthorized."  The filing was made to supplement the record with the

audited statements which did not exist when MRLP filed its Original Motion for Summary

Judgment (ECF #23) on March 29, 2007; they did not exist because at  that time, Viad had not

yet brought its claim alleging a breach of contract (or any other claim) based on the failure to

provide audited statements.  That claim was not brought until April 2, 2007, after the close of

discovery,  and after the deadline for filing summary judgment motions.


162. The Supplemental Filing proffered new evidence, seeks to add additional witness testimony, including presumably expert testimony, long after the deadline for disclosing the identity of such witnesses and providing their reports. The Supplemental Filing allegedly offers to provide the "unqualified opinion" of the KAWG&F accounting firm for a set of new Special Purpose Financial Statements. (Supplemental Filing) (See Docket # 42).

**Response:**  See Response to SOF 162. The opinion is "unqualified."  See Declaration of

Clemens Mueller (Exhibit 48) at ¶10.


163. The bookkeeper for MRLP, Ron Glassman, provided an affidavit for the Supplemental Filing explaining how he commissioned the KAWG&F firm to prepare the new financial statements. Glassman's earlier testimony in this case as a Rule 30(b)(6)witness for MRLP provides some insight on the working relationship between MRLP and KAWG&F. Glassman testified that he prepared all of the financials statements. Furthermore, he provided a "blank page" for the cover letter which suggested "contents" for KAWG&F to "copy" onto their letterhead, although, he said, "the wording is under their control." (Glassman Dep. at 23:01-25:30) (Ex. 60)

**Response:**  First, Mr. Glassman is a CPA, he is not a "bookkeeper." Glassman Decl.

(Exhibit 49) at ¶1.  Further, MRLP and MRTDR dispute the inference that the statements are not

45

"audited."   As a result of the audit, KAWG&F, P.A. directed Mr. Glassman to make various

changes in the statements to bring them into compliance with GAAP. The language of the

unqualified opinion accompanying the statements was drafted by KAWG&F, P.A.  Mr.

Glassman did not draft the language, nor was it drafted at his direction.  Glassman Decl. (Exhibit

49) at ¶9. The fee for the audit was $34,500. Glassman Decl. (Exhibit 49) at ¶8.

164. In the Supplemental Filing, MRLP has for the first time increased the value of
"Land" from approximately $7.3 million to over $11 million. When 90 K Street was purchased
in 1987, it was acquired in exchange for land located in Howard County, Maryland that was
owned by the partnership. In every special purpose financial statement previously prepared by
MRLP, the "Land" asset of 90 K Street was carried on the balance sheet at its purchase price
($10.3 million), plus settlement costs ($766,000) and reduced by the excess value received over
the basis of the property of the exchanged property ($3.7 million). This resulted in the "net cost
of the land on the partnership's books" of just over $7.3 million. This treatment was logical and
in accordance with general accounting, and MRLP has reported this value for the land for nearly
20 years, through annual submissions to Viad. (Ex. 35)

**Response:**   Although Viad may have found the prior treatment "logical and in

accordance with general accounting," the change on the Balance Sheet from $7.3 million to $11

million was made to bring the statements into compliance with GAAP.  The $7.3 million value,

which resulted from the tax treatment for purposes of the exchange could not be reflected on the

Balance Sheet of the audited statements and be in compliance with GAAP.  In any event

however, the "Schedule of Investment in the Property" always carried the "Total Cost of

Property" at $11 million, not $7.3 million.  See, e.g., Special Purpose Financial Statements,

December 31, 2000 and 1999 (Exhibit 40 to Viad Memo.) compare page 2 (Special Purpose

Statement of Assets and Liabilities) with page 5 (Schedule of Investment in the Property).

Therefore, the revision in the Balance Sheet has no effect on the calculation of Developer's

Equity and Appreciation Cash Flow. Glassman Decl. (Exhibit 49) at ¶11.

46

165. Now, however, MRLP has, without explanation or justification, chosen to ignore the exchange value of the Howard County property in its calculation, and provides no reason for the change. KAWG&F now has deleted an entire paragraph explaining the exchange that had been present in the notes to all other financial statements. Of course, by increasing the land value MRLP has increased a deductible cost, thus reducing by $3.7 million any appreciation under the CPA. (Supplemental Filing) (See Docket # 42).

**Response:**   See Response to SOF 164.

166. MRLP has eliminated or renamed several line items previously found on the partnerships' balance sheets. In the previous KAWG&F compilation, the partnership's cost of purchasing TDRs for 90 K Street were listed under "Project Costs" on the Balance Sheet. This line item was listed under the assets of the partnership. In the newly filed Special Purpose Financial Statements, MRLP has removed the category entitled "Project Costs." A new category, entitled "Land Improvements" has been added. MRLP has not explained the difference between the two categories. It appears that $140,000 of "Project Costs" have been reclassified as "Land Improvements", but the costs of the TDR's appear to be deleted. MRLP's financials now state, in notes its newly filed financial statements, that "TDRs are a separate asset of the partnership and are not covered by the CPA." This parsing of partnership assets purchased for use at 90 K Street from the accounting for the land itself is a reversal of prior accounting not justified by any explanation other than MRLP's own self-serving interpretation of the CPA. (Supplemental Filing) (See Docket # 42).

**Response:**   MRLP has renamed the category entitled "Project Costs" to the new name of "Land Improvements."  The name change was at the direction of KAWG&F, PA.  The reduction in the amount previously listed in this category resulted from the fact that, to comply with GAAP, approximately $800,000 of Project Costs had to be expensed, as well as the removal of TDR costs as explained below.  This left approximately $140,000 of Land Improvements on the Balance Sheet under the new category "Land Improvements." Regardless of the changes however, the same total amounts are still reflected in the calculation of Developers Operating Equity and developers invested equity, except for the TDR costs of approximately $300,000. The TDR costs have been removed from the Balance Sheet and the Schedule of Investment in Property because the TDR's are not considered Property under the CPA, as set forth in ¶21 of the

47

Declaration of Steven Braesch.  Glassman Decl. (Exhibit 49) at ¶12.

**Escrow**

167. Section 5.1 of the CPA states that:

[a]ll sums to be paid to TLC[/Viad] hereunder and all covenants and obligations to be performed by Developer[/MRLP] pursuant to this Agreement shall be secured by the TLC Mortgage ... it being the intention of TLC and Developer that this Agreement shall remain in effect and continue to be secured until all covenants and obligations of Developer to TLC hereunder have been fully satisfied, which shall be no earlier than ninety (90) days after all Operations Cash Payments and Appreciation Cash Payments have been made, or, in the event of a dispute concerning the amount of those Operations Cash Payments or Appreciation Cash Payments payable, until such dispute has been resolved. Notwithstanding any other provision of this Agreement, this Agreement shall continue in full force and effect until all covenants and obligations of Developer under this Agreement and the TLC Mortgage have been paid and/or performed in full at which time TLC shall execute and cause to be recorded a release of the TLC Mortgage and all other security instruments securing TLC.

(CPA § 5.1) (Ex. 9).

**Response:**   The recitation of the language of CPA §5.1 is not disputed.

168. The CPA allows Viad to retain its lien after the closing and for the pendency of any dispute over the payments owed to it.

**Response:**   CPA §5.1 speaks for itself, and its legal effect is to be determined by the

Court.  It is disputed that Viad can maintain its lien even after the dispute was submitted to

binding arbitration pursuant to CPA §2.7.

169. As of today, MRLP has not paid the Appreciation Cash Payment and there is a dispute over the amount that should be paid.

**Response:** MRLP does not dispute that the Appreciation Cash Payment has not been

paid.  The "dispute" has been manufactured by Viad, which refused to be bound by the Reznick

Opinon.

**The Agreed Value and Approved Deductions for Purposes of Calculating the Appreciation Cash Payment**

170. The Agreed Value for the Property under Section 3 of the CPA is the higher of the sales price or the fair market value of the Property. The sales price, based on inclusion of the TDR portion of the contract that MRLP has sought improperly to exclude, is $67,424,457. (CPA § 3.3; Settlement Statement for 90 K Street Land Sale; Settlement Statement for 90 K Street TDR Sale) (Exs. 9, 43 & 52).

**Response:**    This is disputed. The TDR Contract is not included in the fair market value

of the Property.  "Property" is defined under the CPA as the real property and the improvements

thereon. CPA §§ 1.21 ("Improvements"), 1.32 ("Property"), 1.35 ("Real Property").

171. In the alternative, in no event is the Agreed Value less than the fair market value for the Property, appraised in accordance with the CPA as $64,800,000. (Halbert Report, at Executive Summary); (CPA § 3.3) (Ex. 9 & 54).

**Response:**    The appraisal prepared by Viad's expert, Mr. Halbert specifically depends

on inclusion of the TDRs in reaching his fair market value of $64,800,000.  Halbert Tr. at 39-43.

Without the TDRs, the value is approximately $44 million (Halbert Tr. at 43), which

approximates the land sale contract with TC MidAtlantic.  See, e.g., Braesch Decl. at ¶20.

172. Calculation of the Approved Deductions and other components of the Appreciation Cash Payment is based on the legitimate expenses incurred by MRLP in the sale of the property and upon the proper calculation of the Agreed Deductions. (CPA § 3.1, 3.4(a)) (Ex. 9).

**Response:**    This is not disputed.

173. Calculation of the Appreciation Cash Payment will require an audit of the records of MRLP and must be conducted, as contemplated in the CPA, by a qualified accountant. (Id. § 3.9).

**Response:**    This is disputed. In 2005, the Reznick Group provided its binding conclusion

that the interest expense attributable to the advances from S&S Finance were to be deducted in

computing the Appreciation Cash Payment.  Viad now wants a "do-over," and seeks an audit of

Montgomery Road's books and records "for review by a qualified accountant."  Whether the

interest expense attributable to advances funded by S&S Finance are proper deductions, and

whether the purchase price of the TDRs is included in determining the value of the Property.  An

audit of Montgomery Road's records will not provide any assistance to the determination of

those issues.   As set forth above, Special Purpose Financial Statements have been provided for

twenty years, and tens of thousands of pages of documentation have been provided in this

litigation, and other than the classification of the interest expense, Viad has not challenged *any*

expense items related to the maintenance of the Property, either in this litigation, or in the

Reznick arbitration proceeding.  Ms. Fiorucci testified that she has no evidence that as of

September 1999, MRLP did not have $25 million invested in the Property, which Mr. Rose told

her was the investment at that time. Fiorucci Tr. at 58; see Exhibit 23 (E. Fiorucci e-mail to K.

Goldman, 9-8-99).  Nor did she have any basis to dispute that Montgomery Road had been

accumulating significant interest expense.  Fiorucci Tr. at 53-54.  In any event however, audited

statements have now been tendered.  The cost of the audit to MRLP was $34,500.  Glassman

Decl. (Exhibit 49) at ¶¶ 5-9.

174.   The creation of the escrow was the result of a voluntary act by MRLP and its
counsel, and of a voluntary relinquishment of a contractual right on the part of Viad, to facilitate
the sale of 90 K Street while the dispute over payment is resolved. (Deposit Agreement) (Ex.
61). The escrow account was formally created under a contract between the parties termed a
"Deposit Agreement." (Deposit Agreement) (Ex. 61). The Deposit Agreement states that "MRLP
and Viad have agreed that, to facilitate the Sale, and in exchange for Viad's execution and
delivery of certain Release Documents described below, MRLP will cause a deposit to be made
in the amount of Four Million, Five Hundred Thousand Dollars . . . . (Deposit Agreement) (Ex.
61). Both parties signed this agreement. (Deposit Agreement) (Ex. 61).

**Response:** MRLP and MRTDR dispute that the creation of the escrow account was

"voluntary."  It was "involuntary" in that the lien would not otherwise be released.  See Rose

50

Decl. at ¶34.  Viad's refusal to execute a release of its lien, and its insistence on the $4.5 million

escrow (to release its lien so the transaction could close), constitutes a failure by Viad to perform

its obligations under the CPA.  Although §5.1 provides for a lien, it is a violation of the CPA for

Viad to refuse to release the lien when the dispute had already been resolved by binding

arbitration under CPA §2.7.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.

_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202)537-0700
efiling@cootermangold.com

*Attorneys for Plaintiff/Counterdefendant
Montgomery Road I Limited  Partnership and
Third-Party  Defendant Montgomery Road TDR,
LLC*